**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No. 07-12056 PBS |
| Petitioner, | ) | |
| v. | ) | |
| JEFFREY SHIELDS, | ) | |
| Respondent. | ) | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT**
**OF ADMISSION OF EVIDENCE**

The United States respectfully submits this memorandum in support of a pre-trial ruling that the government's proffered evidence regarding Mr. Shields' sexual dangerousness is admissible at trial. In particular the government submits that the opinion of its expert Dr. Niklos Tomich, both as to Mr. Shields' mental abnormality, as well as his sexual dangerousness to others, is relevant, and reliable under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Indeed, Dr. Tomich's methodology has been tested, subject to peer review and publication, has a known rate of error, and is generally accepted by the scientific community. This methodology has been widely litigated in the state courts, and every state appellate court to have examined the issue has concluded that expert psychiatric or psychological testimony regarding an individual's sexual dangerousness is scientifically reliable and may be admitted at trial. Moreover, Dr. Plaud, an expert designated by the court at the request of the Respondent, was able to offer an expert opinion in this case based on criteria which Mr. Shields now claims is unreliable, and Dr. Kriegman, Mr. Shields' Daubert expert, himself has utilized actuarial instruments and the adjusted actuarial approach in rendering expert testimony regarding sexual

dangerousness in state court. Accordingly, the Court should rule that the government's proffered expert testimony is admissible at trial.

### A.     Standards

In Daubert, the Supreme Court held that the district court must function as a "gatekeeper" to ensure that the offered expert testimony is both relevant and reliable. See 509 U.S. at 589. Specifically, the Court held that when expert testimony is challenged, a judge must determine under the Federal Rules of Evidence whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue, which requires a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue. Id. at 592-93; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). The Court further enumerated a list of additional factors bearing on reliability that district courts may consider, including: (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. See Daubert, 509 U.S. at 593-94.

In 2000, Congress codified the Daubert standard and its progeny by amending Rule 702 of the Federal Rules of Evidence. The Amended Rule 702 of the Federal Rules of Evidence provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. Although the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, see Daubert, 509 U.S. at 593 n. 10, the district court is the ultimate "gatekeeper." See Fed. R. Evid. 104(a). The First Circuit has confirmed that "[t]he Rule 702 inquiry is a 'flexible one,' and there is no particular procedure that the trial court is required to follow in executing its gatekeeping function under Daubert." United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002) (quoting Daubert, 509 U.S. at 594).

### B. Procedural Background

In his motion to dismiss, Mr. Shields asserted that the psychiatric and psychological evidence required for commitment under 18 U.S.C. § 4248 is deficient under the Daubert evidentiary standard. See Respondents' Memorandum in Support of Defendants' Motion to Dismiss at p. 61-62. In support of this argument, Mr. Shields submitted an affidavit from Dr. Kriegman. This Court rejected that argument in the context of the motion to dismiss, and stated that a determination on this issue must await a Daubert hearing. United States v. Shields, – F. Supp.2d –, 2007 WL 3326803, * 20 (D. Mass. Nov. 7, 2007).

On November 5, and 23, 2007, Mr. Shields moved for a Daubert hearing. That hearing was held on November 26 and 27, 2007, at which the government presented testimony from its expert, Dr. Niklos Tomich. November 26 -27, 2007 Transcript at p. 30-

197. Mr. Shields presented testimony from his <u>Daubert</u> expert, Dr. Kriegman. November 27, 2007, Transcript at p. 198-275.

### C. The General Acceptance of Actuarial Risk Assessment Has Been Widely Litigated and Established in the State Courts

In determining whether Dr. Tomich's proposed testimony meets the <u>Daubert</u> standard, this Court will not be writing on a <u>tabula rasa</u>. As the government noted in its opposition to Mr. Shields' motion to dismiss, the reliability of the very type of methodology at issue here has been widely litigated in state courts, and those courts have uniformly held that expert testimony regarding future sexual dangerousness is admissible, whether under <u>Daubert</u> or <u>Frye</u> v. <u>United States</u>, 293 F. 1013 (D.C. Cir. 1923).[1] <u>See, e.g.</u>, <u>In re Detention of Thorell</u>, 149 Wash.2d 724, 755, 72 P.3d 708, 725 (2003) ("[W]e have accepted evidence of predictions of future dangerous in [Sexually Violent Predator] commitment hearings as based on established scientific methodology. * * * Based on our established precedent, we reiterate that the <u>Frye</u> standard has been satisfied by both clinical and actuarial determinations of future dangerousness."); <u>In re Commitment of Simons</u>, 213 Ill.2d 523, 535-36, 821 N.E.2d 1184, 1192 (2004) ("After careful consideration, we emphatically agree * * * that, whether or not actuarial risk assessment is subject to <u>Frye</u>, there is no question that it is generally accepted by professionals who assess sexually violent offenders and therefore is perfectly

---

[1] Notably, in his two previous submissions on <u>Daubert</u>, Mr. Shields failed to cite any case finding the use of actuarial instruments to be inadmissable. <u>See</u> Memorandum in Support of Defendant's Motion to Dismiss at 62-73 and Response to Opposition of the United States To Respondent's Motion to Dismiss at 19-21.

admissible in a court of law. As of this writing, experts in at least 19 other states rely upon actuarial risk assessments in forming their opinions on sex offenders' risks of recidivism."); In re Commitment of R.S., 173 N.J. 134, 137, 801 A.2d 219, 221 (2002) ("We conclude, as did the courts below, that actuarial risk assessment instruments may be admissible in evidence in a civil commitment proceeding under the [Sexually Violent Predator Act] when such tools are used in the formation of the basis for a testifying expert's opinion concerning the future dangerousness of a sex offender."); Commonwealth v. Gomes, 355 Mass. 479, 483, 245 N.E.2d 429, 431-32 (1969) ("The defendant urges also that the concept 'sexually dangerous person' is inexact and without medical significance for psychiatrists. It is our view that the conclusions of expert physicians who have observed the conduct of emotionally afflicted persons having a history of aggressive, sexual misconduct can be of help to the [fact finder] * * *..") (citation omitted); In re Detention of Holtz, 653 N.W.2d 613, 619 (Iowa App. 2002) (en banc) ("Following a careful review of the record, we conclude the district court ably summed up the issues and was correct in determining the evidence concerning actuarial risk assessment instruments went to the weight the evidence should receive as opposed to the issue of admissibility."). Indeed, as one state appeals court has noted, "[o]ur research has revealed no state appellate court decision which has found actuarial instruments inadmissible at [Sexually Violent Predator] proceedings." In re Commitment of R.S., 339 N.J. Super. 507, 547, 773 A.2d 72, 96 (N.J. Super. A.D. 2001), aff'd, 173 N.J. 134, 801 A.2d 219 (2002).

Thus, for example, in In re Commitment of Simons, the Illinois Supreme Court engaged in an exhaustive examination of state court decisions, the relevant statutory scheme, and the academic literature regarding actuarial risk assessments regarding sexual dangerousness. The court first "recognize[d], of course, that relying exclusively upon prior judicial decisions to establish general scientific acceptance can be a hollow ritual if the underlying issue of scientific acceptance has not been adequately litigated," but found that "[t]his is not a concern here, however, as the general acceptance of actuarial risk assessment has been thoroughly litigated in several states, as several of the above citations illustrate." 213 Ill.2d at 537, 821 N.E.2d at 1193 (internal quotation and citation omitted). After canvassing this extensive body of authority, the court concluded that "we were unable to identify any state outside of Illinois in which expert testimony based upon actuarial risk assessment was deemed inadmissible on the question of sex offender recidivism." Id. at 539, 821 N.E.2d at 1194. The court also noted that many state schemes mandated the use of actuarial instruments by statute. Id. at 539-40, 821 N.E.2d at 1194-95. Finally, the court examined the academic literature and found that it, too, "contains many articles confirming the general acceptance of actuarial risk assessment by professionals who assess sexually violent offenders for risk of recidivism." Id. at 541, 821 N.E.2d at 1195. The court concluded that: "Taking all of this together-the case law, the statutory law, and the academic literature-we are more than convinced that actuarial risk assessment has gained general acceptance in the psychological and psychiatric communities. We therefore hold that the trial

court properly admitted the expert testimony . . . which relied in part upon actuarial risk assessment." Id. at 543, N.E.2d at 1196.

This Court should reach a similar conclusion in this case. As the Illinois Supreme Court noted, "the general acceptance of actuarial risk assessment has been thoroughly litigated in several states," and the uniform authority holding that form of expert testimony admissible itself is sufficient to defeat Mr. Shield's Daubert challenge.

### D. Actuarial Risk Assessment Satisfies the Daubert Test

Even were this Court to consider this issue as a matter of first impression, the result would be the same. Congress presumed that such expert testimony would be admissible in a commitment hearing, providing that "[p]rior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c)." 18 U.S.C. § 4248(b).

Moreover, both Drs. Tomich and Plaud have been able to render expert opinions regarding whether Mr. Shields is a "sexually dangerous person" based on the use of actuarial instruments and the adjusted actuarial approach, and the RRASOR and STATIC-99 have been accepted in peer review journals. November 26, 2007, Transcript at p. 56 (testimony of Dr. Tomich).[2] See also Dr. Plaud's November 13, 2007, Report at p. 7 ("Over the past

---

[2] See also Exhibit A, a document that was admitted into evidence at the Daubert hearing as Exhibit 4-A, that contains a list of references from Hanson, R.K., The Accuracy of Recidivism Risk Assessments for Sexual Offenders: A Meta-Analysis 2007-01 (Dr. Tomich testified that those studies preceded by an asterix are the ones which tested the reliability of STATIC-99. November 26, 2007, Transcript at p. 69.) See also "Cross Validations Studies Of The STATIC-

five to ten years there has been a growing body of research supporting the predictive validity of actuarial assessments of risk for recidivism among sex offenders released from secure facilities."). The actuarial instruments are accepted currently in the field of psychiatry and psychology as the best available tool for assessing risk. November 26, 2007, Transcript at p. 58. These instruments have inter-rater reliability, meaning that two different evaluators should arrive at similar scores. Id. at 63. The STATIC-99 is the standard in the field. Id. at 64.

In the face of the overwhelming evidence that actuarial risk assessment satisfies the Daubert or Frye standards, as corroborated by tests and court opinions, Mr. Shields has proffered an affidavit from Dr. Kriegman in which he concludes that "it has become clear that we simply have no ability to accurately predict[3] sex offense recidivism for individuals," Affidavit of Daniel Kriegman ¶ 14, at 13. For several reasons, this opinion is entitled to little, if any, weight.

To begin with, Dr. Kriegman testified in this proceeding and in a Middlesex Superior Court proceeding that this statement is inaccurate. See November 27, 2007 Transcript at p. 274. Indeed, Dr. Kriegman testified that the actuarial approach is "the most validated and empirically demonstrated - the most highly validated, reliable and valid instrument in

---

99" a list from www.amyphenix.com. Amy Phenix is listed as one of the authors of the STATIC-99 Coding Manual. A copy of that list is attached hereto as Exhibit B.

[3] Sections 4247 and 4248 do not require a prediction. Rather, the law requires a risk assessment showing that a person "would have a serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

making risk predictions." Id. at p. 206. He also acknowledged that with respect to the STATIC-99 that it was the best tool that exists, it had been published in peer review journals, and was used by people in the field. Id. at 216. He further acknowledged that he "would use [the STATIC-99] today," and stated "If you are going to make these decisions, you should use your best predictive method." Id. at 217.[4]

Moreover, contrary to the views which he now espouses, Dr. Kriegman has regularly used the very same methods which he now critiques in providing expert testimony in state court. See Commonwealth v. Gross, 64 Mass.App.Ct. 829, 833 n.6, 835 N.E.2d 1147, 1152 n.6 (2005) ("[T]he defendant filed with the court reports from Drs. Daniel Kriegman and Joseph J. Plaud, which set forth their expert opinions that the defendant did not meet the statutory definition of a sexually dangerous person."); Commonwealth v. Pike, 2005 WL 704952, *1 (Mass. Super. Feb. 17, 2005) ("The expert who testified on behalf of the respondent, Dr. Daniel Kriegman, used an actuarial instrument, the Sex Offender Recidivism Actuarial Guide ('SORAG'), in addition to his clinical judgment."); accord November 27, 2007 Transcript at p. 271. Indeed, Dr. Kriegman has testified in state court that he "does not approve of the clinical method but the adjusted actuarial method instead." Commonwealth v. Parks, 2005 WL 1367112, * 2 (Mass. Super. March 9, 2005); accord November 27, 2007, Transcript at p. 272. Given his own use of actuarial instruments and the adjusted actuarial

---

[4] Dr. Kriegman went on to say that the fact-finder could never find someone to be sexually dangerous except in very rare cases. He then said the court should use "common sense" which essentially contradicted his prior testimony about the utility of the STATIC-99. See November 27, 2007 at p. 218, 220 (Dr. Kriegman testimony).

approach in rendering expert testimony in state court regarding whether an individual is sexually dangerous, Dr. Kriegman effectively impeaches himself.

For these reasons, the use of actuarial instruments and the adjusted actuarial easily pass the Daubert test, and this Court should allow presentation of such testimony and evidence at trial.

**D.  Dr. Tomich's Diagnosis of Hebephilia Should Be Admitted**.

Dr. Tomich found that Mr. Shields presents with a diagnosis of, inter alia, hebephilia. November 27, 2007 Transcript at p. 88.  This Court expressed some concern about the validity of that diagnosis given that the exact term "hebephilia" does not appear in the DSM-IV.[5]  In addition, Dr. Kriegman led the Court to believe that there were no peer-reviewed journals that accepted hebephilia as a legitimate diagnosis.  November 27, 2007, Transcript at p. 253.

Although the DSM-IV is the generally accepted diagnostic manual of psychiatric disorders, the absence of the term hebephilia from that manual does not render such a diagnosis improper. [6] The DSM-IV is recognized as having limits with respect to the

---

[5] The Court: "And of course hebephilia, . . . Essentially I have nothing in the DSM-IV, and I see no peer-reviewed literature discussing it, which is the two big things that you look at, but if some psychiatrist testified that "In the field, we consider it paraphilia NOS," and there's a disagreement as to whether it's included or not, is that just a disagreement among psychiatrist as opposed to – because that is a standard diagnosis. Obviously, Dr. Kriegman says "no," but it's got to be rare as punch, and another doctor disagreed with that. . . .Let's assume for a minute you don't find anything on hebophilia, isn't the other diagnosis, paraphilia NOS?"  November 27, 2007, Transcript at p. 278-279.

[6] Even if the diagnoses of hebephilia were deemed not to be a recognized mental disorder, the statute does not limit its scope to DSM-IV recognized "mental disorders."  Instead,

diagnosis of sex offenders. Dennis Doren, Evaluating Sex Offenders, 2002 at p. 54. (" [T]he unfortunate reality is that the DSM-IV often leaves the clinician without sufficient guidance for diagnostic situations common to incarcerated sex offenders.  As a group, these offenders bring their own unique characteristics and circumstances to diagnostic scrutiny, characteristics that the DSM-IV often delineates too ambiguously or not at all.").

The clinical term hebephilia dates back to a 1955 study by Glueck.  See Glueck, B.C., Jr. (1955), *Final Report: Research Project for the study and treatment of persons convicted of crimes involving sexual aberrations. June 1952 to June 1955.*  New York:  New York State Department of Mental Hygiene.  The term hebephilia, or ephebophilia, is an old and well-accepted concept, and is in current peer-reviewed literature as the subject of study. See, e.g., Cantor, J.M., et al (2007), *Physical Height in Pedophilic and Hebephilic Sexual Offenders*, Sex Abuse (factor influencing the development of hebephilia) (a copy of this article is attached as Exhibit C); Blanchard, R., et al., (July 17, 2007) *IQ, Handedness, and Pedophilia in Adult Male Patients Stratified by Referral Source*, Sex Abuse p. 286 ("the term hebephilia (Glueck, 1955) refers to persons who are most attracted to pubescent children") (a copy of the article is attached as Exhibit D); Cantor, J.M., et al. (December 2006) *Grade Failure and Special Education Placement in Sexual Offenders' Educational Histories*,

---

it speaks more broadly, providing that an individual may be subject to commitment where the individual suffers from a "a serious mental illness, abnormality, or disorder." 18 U.S.C. 4247(a)(6). Contrast United States v. Roberson, 459 F.3d 39, 55 (1st Cir. 2006)("All words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous.").

Archives of Sexual Behavior, Vol. 35, No. 6, December 2006, pp. 743-751 (a copy of this article is attached as Exhibit E); Cantor, J. M. et al., (August, 2005) *Handedness in Pedophilia and Hebephilia*, Archives of Sexual Behavior, Vol. 34, No. 4 pp. 447-459 (hebephiles found to be different than those attracted to adults) (a copy of this article is attached as Exhibit F). Accordingly, this concept is "currently" accepted in peer-reviewed journals.

Indeed, Dr. Doren identifies hebephilia, otherwise known as paraphilia NOS, sexually attracted to adolescents, as one of the most common types of paraphilia NOS relevant to sex offender civil commitment assessments. Doren, <u>Evaluating Sex Offenders</u>, at p. 80. Dr. Doren discusses whether it is "normal," and not pathological, for adult males to be sexually aroused by adolescents. He concludes that the answer lies "in the degree to which someone is repetitively or chronically impaired by that attraction, not the attraction per se." <u>Id</u>. Dr. Doren continues that "[a]lthough a significant portion of adult men show sexual arousal to adolescents, there does not appear to be many who, as adults, selectively pursue sexual contact with adolescents." <u>Id</u>. He specifically identified when such attraction, and even acting on it to a limited extent, would not be a paraphilia: "For those who do, getting legally prosecuted or otherwise punished . . . can serve as the one-time event from which the person learns never to venture into sexual activity with adolescents again. Up to this point, there would be insufficient evidence of a paraphilia." <u>Id</u>. at 80-81.

Dr. Doren then gives an example of when such an attraction could be diagnosed as hebephilia:

> Some people do not stop acting in ways that cause repetitive negative effects of their attraction to adolescents at this point, however. Despite serious consequences to them (i.e. impairment) due to their earlier behavior, these people continue to seek sexual contact with adolescents. . . . Sexual contact with adolescents repeatedly occurs despite the ongoing risk of legal consequences and inability to maintain such relationships on a long-term basis due to the adolescents' growing beyond the age range of interest.   These people show the characteristics of hebephilia, more formally called paraphilia NOS, sexually attracted to adolescents.

Id. at 81.   Accordingly, notwithstanding Dr. Kriegman's testimony to the contrary, hebephilia is a well-established clinical diagnosis that has been accepted as such in peer-reviewed journals and in the field.  Therefore, this Court should allow Dr. Tomich to provide testimony regarding this diagnosis.

### F.   The Complete STATIC-99 Results Should Be Admitted Into Evidence.

This Court expressed some concern as to whether the nomenclature associated with the STATIC-99 score (i.e. "moderate" "low" "high") should be admitted into evidence, as the Court suggested that the term  "high" category may be unduly prejudicial given the statistical correlations associated with the STATIC-99.[7]

Fed. R. Evid. 403 provides in pertinent part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  The inclusionary nature of the rule, with its use of the word "may," has led courts to hold that Rule 403 "is a liberal rule under which relevant evidence generally is

---

[7] The Court: "There are subpieces of it that I've got some issues with: A, high risk seems not to really capture what the 6 gives you.  It gives you that 52 percent.  In other words, I'm not sure I'm going to allow that term." November 27, 2007, Transcript at p. 278.

admitted." Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 516 (1st Cir.1996) (emphasis added) (quoting United States v. McMahon, 938 F.2d 1501, 1508 (1st Cir.1991)); see also Dente v. Riddell, Inc., 664 F.2d 1, 6 (1st Cir.1981) ("It has been said with respect to Rule 403, 'the general rule is that the balance should be struck in favor of admission.'") (quoting United States v. Dennis, 625 F.2d 782, 797 (8th Cir.1980)).

Rule 403 is not intended to exclude evidence merely because it might be prejudicial. Id. at 9. Because all evidence used against a party could be considered prejudicial, Rule 403 instead "makes explicit [that] the law shields a defendant 'against *unfair* prejudice, not against *all* prejudice.'" United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2002) (quoting United States v. Candelaria-Silva, 162 F.3d 698, 705 (1st Cir.1998)). Unfairly prejudicial evidence "is evidence that triggers the mainsprings of human action in such a way as to cause the jury to base its decision on something other than the established proposition in the case." United States v. Currier, 836 F.2d at 18 (internal quotation marks and brackets omitted). The Rule was not designed to keep out evidence merely because it is damaging to the other party. See United States v. Benedetti, 433 F.3d 111, 118 (1st Cir. 2005) ("Although [] evidence likely worked to the appellant's detriment, Rule 403 is concerned not with prejudicial evidence."). The court must balance the risk of harmful consequences against the need for, and probative value of, the evidence, see United States v. Brown, --- F.3d ----, 2007 WL 4278009 *7-8 (1st Cir. Dec. 7, 2007), but the "Rule 403 analysis is confined to 'unfair' prejudice, and the scales do not tip in favor of exclusion unless the probative value is 'substantially outweighed'." United States v. Jimenez, 507 F.3d 13, 18 (1st Cir. 2007). See

United States v. Li, 206 F.3d 78, 85 (1st Cir. 2000) ("The legal standard is also somewhat weighted in favor of admissibility. In order to be excluded, the evidence must be not only be prejudicial, but *unfairly* prejudicial, and must not only outweigh probative value, but *substantially* outweigh probative value.") (citing United States v. Rivera, 83 F.3d 542, 545 (1st Cir.1996)).

In effect, then, Rule 403 is to be construed as permitting courts to usher in evidence unless its effect is so obviously and detrimentally prejudicial that it cannot be cured by a jury instruction, rigorous cross-examination, or some other form of mitigation. See Baker v. Dalkon Shield Claimants Trust, 156 F.3d 248, 254 (1st Cir. 1998) (holding that cross-examination of an expert witness could easily mitigate any unfair prejudice that may occur from the testimony.). A court may "mitigate[] the impact of the unfair prejudice . . . by giving the jury clear and emphatic cautionary instructions immediately after the . . . introduction [of] evidence . . . . Currier, 836 F.2d. at. 19 (internal citation omitted).

Here, as amply demonstrated during the Daubert hearing, the expert's testimony will be subject to rigorous cross-examination. Moreover, as discussed above, the STATIC-99 test, and similar actuarial instruments, clearly pass the Daubert test for admissibility, and the nomenclature is part and parcel of that test. The complete STATIC-99 test includes 10 individual item scores that must be added together for a total risk score. 2003 STATIC-99 Coding Manual at p. 57 (a copy of this document was admitted into evidence as Government Exhibit 3). This total score can range from "0" to "12." Scores of "6" and greater are all considered high risk and treated alike. Once an evaluator has computed the total risk score,

then he or she is able to use a table entitled <u>STATIC-99 Recidivism Percentages by Risk Level</u> ("the Recidivism Percentage Table"). 2003 Coding Manual at Appendix 6. That table provides recidivism risk estimates over 5, 10, and 15 year projections. The evaluator can find the percentage chance of reconviction by matching the left-most column (the offender's total risk score) and reading across the table. These statistics, while useful, have limits.

For example, the projections are based on reconviction rates – a far higher standard than imposed by the subject statutes – 18 U.S.C. §§ 4247, 4248 – which require only a showing of "serious difficulty from refraining" not reconviction. Indeed, studies have shown that the Hanson tables underestimate reoffense rates. For example, as stated in <u>Evaluating Sex Offenders</u> at p. 147:

> Doren (1998), for instance, found that rearrest rates seemed to coincide with about a 27% to 47% increase over reconviction rates for the same samples and time frames. Since that review, Doren (2001a) documented that the Song and Lieb (1995) study showed a 50% increase of the same type, a finding interpreted as in keeping with the earlier results. Offender self-reports are known to differ greatly depending on the context in which those reports are made. Polygraph-solicited self-reports are quite regularly much higher in their acknowledgment of occurrence (and frequency) of recidivism than under other circumstances (e.g. Ahlmeyer, English, & Simmons, 1998). Under nonpolygraph circumstances, offender self-reports are often lower even than their reconviction rates. Under the polygraph, however, their reported crimes are far greater than their history of having been rearrested, no less reconvicted.

Second, the Recidivism Percentage Table measures reconviction over a 5, 10, and 15 year period. Yet, 18 U.S.C. §§ 4247 and 4248 place no such time frame on the Court's determination of whether a person is sexually dangerous.

Accordingly, it is not surprising, that the 2003 Coding Manual itself states that the STATIC-99 test itself may be communicated "as nominal risk categories using the following guidelines. Raw STATIC-99 scores of "0" and "1" should be reported as "Low Risk," scores of "2" and "3" reported as "Moderate-Low" risk, scores of "4" and "5" reported as "Moderate-High" risk, and scores of "6" and above as "High Risk." 2003 STATIC-99 Coding Manual at p. 57.[8]  Indeed, Appendix Seven to the 2003 Coding Manual, which is "a suggested template for communicating STATIC-99 risk information" recommends using the "low" or "high" nomenclature. 2003 STATIC-99 Coding Manual at p. 57, and Appendix 7 (p. 71).

Indeed, to disallow the nomenclature could cause confusion to the trier of fact. The leading treatise on the subject recommends otherwise. Dr. Dennis Doren, Evaluating Sex Offenders, 2002 at p. 182 ("Simply listing scores without any interpretation is not recommended. If an evaluator wishes not to go into the explanation of what each score means, then it is suggested that a simple overall description of the results is more useful than an unexplained enumeration of scale scores. In other words, writing that "Mr. X's scores were all in the low range for recidivism risk" is probably better than an unexplained, "Mr. X scored a . . . 2 on the STATIC-99.").

---

[8] The recommendations essentially contradict Dr. Kriegman's testimony that "Carl Hanson did not create those labels with an eye towards sexual dangerousness." November 27, 2007, Transcript at p. 222 (Dr. Kriegman Testimony).

Finally, the government is not aware of any court opinion that has precluded testimony regarding the labels associated with the STATIC-99 results. Given that there is no such precedent, and, indeed, as argued above, because such an opinion is not warranted, this Court should allow the experts to testify regarding the labels of the STATIC-99 results.

### G.   The Court Should Allow Testimony Regarding The Use Of Factors Other Than Those Delineated in the STATIC-99

This Court expressed some concern about using factors in assessing risk of sexual recidivism that are not part of the STATIC-99 and have not been validated.[9] Nevertheless, the authors of the STATIC-99 themselves recognize the utility of consideration of factors not included in the STATIC-99. For example, the 2003 STATIC-99 Coding Manual explicitly states: "The STATIC-99 does not address all relevant risk factors for sexual offenders. Consequently, a prudent evaluator will always consider other external factors that may influence risk in either direction." 2003 STATIC-99 Coding Manual at p. 3. In addition, that manual in its suggested reporting format for communicating STATIC-99 risk information also endorses reliance on factors other than those used in the STATIC-99. For example, it suggests that an evaluator report the following:

> The offender's risk may be higher or lower than the probabilities estimated in the STATIC-99 depending on other risk factors not measured by this instrument . . . . Based on a review of other risk factors in this case I believe

---

[9] The Court: "The second thing is, when you adjust . . . when you're adjusting, the adjusted actuarial method, the question, is, does the science support adjusting if the specific factor hasn't been validated; for example, declining treatment or alcohol dependence? So those are things I want to think about, sort of a dynamic process." November 27, 2007, Transcript at p. 278.

> that this STATIC-99 score (Over/Under/Fairly) represents Mr. X's risk at this time. The other risk factors considered that lead me to this conclusion were the following: {Stable Variables: Intimacy Deficits, Social Influences, Attitudes Supportive of Sexual Assault, Sexual Self-Regulation, and General Self-Regulation; Acute Variables: Substance Abuse, Negative Mood, Anger/Hostility, Opportunities for Victim Access - Taken from SONAR*} (Hanson & Harris, 2001) * Note: This list is not intended to be definitive. Evaluators may want to include other static or dynamic variables in their evaluations.

2003 Coding Manual at Appendix Seven (p. 71). Indeed, the developers of the STATIC-99 acknowledge that there are relative considerations to sexual recidivism risk assessment outside of the elements measured by the STATIC-99.  <u>See</u> Hanson, R.K., (2006) *Does STATIC-99 Predict Recidivism Among Older Sexual Offenders?* Sex Abuse ("The authors of STATIC-99, however, have never claimed that it provides a complete comprehensive assessment of recidivism risk. Because it addresses only static, historical factors, STATIC-99 does not directly measure the enduring psychological traits that are presumed to motivate sexual offending (e.g. deviant sexual interests, lifestyle instability, intimacy deficits; Beech Fisher & Thornton, 2003; Beech & Ward, 2004). As well, other ways of defining static factors could add information not captured in STATIC-99 (Hanson & Thornton, 2003)").

For these reasons, this Court should not categorically exclude factors not listed in the STATIC-99, and, if it is to consider exclusion of any individual factor, it should be done individually after the party seeking its exclusion files a motion <u>in</u> <u>limine</u>.

## CONCLUSION

For the foregoing reasons, this Court should reject the Respondent's Daubert challenge to any of Dr. Tomich's proffered testimony.

        Respectfully submitted,

        MICHAEL J. SULLIVAN
        United States Attorney

    By:  /s/ Jennifer C. Boal
        JENNIFER C. BOAL
        TIMOTHY Q. FEELEY
        MARK J. GRADY
        Assistant U.S. Attorneys
        John Joseph Moakley U.S. Courthouse
        One Courthouse Way, Suite 9200
        Boston, MA 02210
        (617) 748-3310

Dated: January 9, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 9, 2008

        /s/    Jennifer C. Boal
        Jennifer C. Boal
        Assistant U.S. Attorney