UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CIVIL NO. 07-CV-12056-PBS |
| | ) | |
| | ) | |
| JEFFREY SHIELDS | ) | |
| | ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S MEMORANDUM IN SUPPORT OF ADMISSION OF EVIDENCE**

The Government suggests that this Court should accept the testimony of Dr. Tomich as relevant and reliable under Fed. R. Evid. 702 and Daubert v. Merrell Down Pharmaceuticals, Inc. 509 U.S. 579 (1993). See Government's Memorandum In Support of Admission of Evidence (hereinafter "Government's Mem. at __"). Mr. Shields maintains that it should not.

I.   The Materials Submitted By the Government Do Not Validate "Hebephilia" as an Accepted Mental Illness, Abnormality, or Disorder as Required by 18 U.S.C. § 4247.

The Government requests that this Court admit Dr. Tomich's diagnosis of "hebephilia"[1] and asserts that hebephilia is a term that "dates back to 1955,"[2] has been "well-accepted," and "is in current peer-reviewed literature as the subject of study." Government's Mem. at 11. To

---

[1] Defendant argues, not that Dr. Tomich's diagnosis of hebephilia should not be admitted by the Court were he to testify, but more broadly that Dr. Tomich's willingness to use a diagnosis that has been rejected by the American Psychiatric Association is symptomatic of his fundamentally unsound methodology and provides grounds for the exclusion of his testimony as a whole under Daubert. (Defendant's Post-Daubert Hearing Brief, at 21-23.)

[2] For the proposition that the term "dates back to 1955" the Government cited Glueck, B.C., Jr. (1955), *Final Report: Research Project for the study and treatment of persons convicted of crimes involving sexual aberrations. June 1952 to June 1955.* New York: New York State Department of Mental Hygiene. Gleuck was quoted in Government Exhibits C through F solely for the statement that "hebephilia is the erotic interest in pubescent children." Since the Government did not attach the Gleuck report, it is difficult to say whether Gleuck did little more than coin a term.

substantiate this contention, it has provided four studies which use the terms "pedophile," "hebephile," and "teleiophile" to categorize and identify different groups of research subjects. See Government's Exhibits C through F.[3]  The fact that the authors of these four studies - a group of researchers associated with the University of Toronto and the Center for Addiction and Mental Health in Toronto, Canada - chose the word "hebephile" to identify and categorize a particular group of study participants does not elevate that term to a validated mental disorder.

---

[3]These four studies, conducted by the same group of researchers, did not address recidivism, diagnosis, treatment, or sex offender commitment in any way.  Rather, they studied whether there was a relationship between an erotic interest in pre-pubescent children and neuro-developmental problems, as evidenced by left-handedness, grade failure, low IQ, or short statute.  The study participants were grouped into three categories, pedophile, hebephile, and teleiophile based on their responses to phallometric testing.  The "hebephilic group" was defined as the men who had a greater penile response to laboratory stimuli depicting pubescent males or females than to other stimuli, the "pedophilic group" was defined as the men who had a greater penile response to laboratory stimuli depicting prepubescent males or females, and the "teleiophilic group" was defined as men who had a greater penile response to laboratory stimuli depicting post-pubescent males or females.  At the outset it is worth noting that phallometric testing has been held inadmissible under the Daubert standard.  See United States v. Powers, 59 F.3d 1460 (4th Cir. 1995); Doe v. Glanzer, 232 F.3d 1258, 1266 (9th Cir. 2000) ("Courts are uniform in their assertion that results of penile plethysmographs are inadmissible as evidence because there are no accepted standards for this test in the scientific community."). Thus, the identification of the "hebephilic" group in these four studies using a method that does not meet the Daubert criteria does little to advance the argument that hebephilia is an accepted mental illness, abnormality, or disorder

Secondly, the Government acknowledges that a "significant portion of adult men show sexual arousal to adolescents" but attempts to argue that, at a certain point, this otherwise normal sexual arousal becomes deviant. Government Mem. at 12.  The Government proposes that evidence of this deviance can be shown in the fact that the individual acted on the attraction despite the ongoing risk of serious consequences, such as prosecution. Id. at 13.  These four studies do nothing to address this contention. Study participants were all patients at a clinic which "provides evaluation services to male patients referred as a result of illegal or clinically significant behaviors or interests." Indeed, in the most recent study men who had no contact with the criminal justice system comprised just 9% of the study participants. Government's Exh. D. at 8.  Thus, the studies did not attempt to compare so-called normal hebephilic men and so-called deviant hebephilic men.  These studies simply bear no relationship to the Government's contention that hebephilia is an accepted and validated mental illness, abnormality, or disorder.

Researchers and scientists use various terms to identify groups for comparison in scientific studies. That they do so does not transform the words used as the group identifier into a diagnostic category. For example, Karl Hanson's 1998 meta-analysis *Predicting Relapse* assigned descriptive terms to certain groups of offenders such as "rapist" or "low social skills" for the purpose of classification and comparison. See R. Karl Hanson & Monique Bussiere, *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies*, 66 J. Consulting & Clin. Psy. 348 (1998), introduced as Defendant's Exhibit 8. This identification or description does not transform "rapist" or "low social skills" into a diagnosis. Similarly, the fact that term hebephile was used to classify a group in a research study does not demonstrate the existence of peer-reviewed literature supporting use of the term hebephilia as a clinical diagnosis for the purpose of sexually dangerous person commitment. In fact, the Government has not provided any peer-reviewed study to support a clinical diagnosis of hebephilia even outside the realm of sex offender commitment.

The Government cites a book authored by Dr. Dennis Doren to support its contention that hebephilia is a valid diagnosis. Dr. Doren opines that the categories of the DSM-IV "leaves the clinician without sufficient guidance for diagnostic situations common to incarcerated sex offenders" and suggests a new diagnostic category of "Paraphilia NOS - Sexually Attracted to Adolescents." Government's Mem. at 11. Dr. Doren advocates the liberal use of the Paraphilia-NOS category and has coined at least two new "not otherwise specified" categories to apply to situations where an individual has sexually offended against adolescents (Paraphilia-NOS-Sexually Attracted to Adolescents) and adults (Paraphilia-NOS-Nonconsent). See Brown v. Watters, 2007 WL 2127606 at *1 (E.D. Wis. 2007) ("Doren acknowledged that the psychiatric

community did not recognize the former disorder [Paraphilia - NOS - Nonconsent] and that he had *created it himself* because he perceived a gap in the American Psychiatric Association's Diagnostic and Statistical Manual.") (emphasis added). Dr. Doren has "diagnosed" numerous individuals with the paraphilia categories he created, leading to their commitment as sexually dangerous persons.[4]

In contrast, the Court has been presented with information both from Dr. Plaud and Dr. Kriegman that the American Psychiatric Association considered and rejected hebephilia as a diagnostic category; Plaud Rep. at 13; Tr. at 252. The APA's considered rejection should be entitled to substantial weight. As described in the introduction to the DSM-IV-TR, the diagnostic categories of the DSM-IV are the products of a lengthy and inclusive process of peer-review, comment, and critique involving thirteen work groups, whose reviews were critiqued by between 50 and 100 advisers, and a task force of experts who represented a wide range of perspectives and experiences. These work groups conducted a three stage-empirical process that included comprehensive and systemic literature reviews, reanalysis of data sets, and issue-focused field trials. The DSM-IV drafters solicited input from more than sixty organizations

---

[4] A Westlaw search reveals that Dr. Doren testified in thirty-four published sexually dangerous person cases in various states as a government witness. Counsel for Mr. Shields was unable to find any published decision in which Dr. Doren testified for the defense or in which he opined that the individual in question was not sexually dangerous. In many of the cases he diagnosed the individuals with either "paraphilia-NOS-nonconsent" or "paraphilia-NOS-sexually attracted to adolescents".

In addition to discussing the rejection of hebephilia as a diagnosis, Dr. Plaud's report also discusses the fact that "[r]ecently a pseudo-diagnosis under the rubric of paraphilia-NOS has been appearing in psychological evaluations of sex offenders who have histories of raping adults and has been labeled 'paraphilia-NOS-nonconsent'. This is not a formal diagnosis, it is not recognized in the DSM-IV-TR, and further this pseudo-diagnosis has not achieved acceptance in the professional community of psychologists and psychiatrists." Plaud Rep. at 12.

over a multi-year period. Thus, the DSM-IV-TR confidently states "it is our belief that the major innovation of DSM-IV lies not in any of its specific content changes but rather in the systematic and explicit process by which it was constructed and documented. *More than any other nomenclature of mental disorders, DSM-IV is grounded in empirical evidence*." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision, at xxiii to xxxi (emphasis added).

The DSM-IV-TR describes eight specific paraphilias and delineates the diagnostic criteria for each. As in every category, the DSM provides a "not otherwise specified" or "NOS" category which is included for coding paraphilias that do not meet the criteria of any of the specific paraphilias. The text of "Paraphilia-NOS" lists seven examples of paraphilias that do not meet the criteria for any of main categories and thus which would be appropriate for coding under Paraphilia -NOS. Although the NOS category is, by nature, not exclusive, it is clear from these examples that it is reserved for rarely encountered paraphilias.[5] Even these examples that the DSM gives for "not otherwise specified" categories have been extensively empirically studied. For example, the DSM-IV Sourcebook Volume 2 contains a discussion by the paraphilia work group addressing whether Telephone Scatologia, one of the rare disorders mentioned as an example of the "not otherwise specified" category should be given its own separate coding diagnosis. See American Psychiatric Association, *DSM-IV Sourcebook*, v.2. Given the scrutiny received by even the rarest of paraphilias, it is inconceivable that the DSM committees simply

---

[5] See DSM-IV-TR at 576 ("302.9 Paraphilia Not Otherwise Specified. This category is included for coding Paraphilias that do not meet the criteria for any of the specific categories. Examples include, but are not limited to, telephone scatologia (obscene phone calls), necrophilia (corpses), partialism (exclusive focus on part of the body), zoophilia (animals), coprophilia (feces), klismaphilia (enemas), and urophilia (urine).").

forgot to consider the relatively common concept of attraction to adolescents.  In addition, Appendix B of the DSM-IV-TR lists criteria sets and axis provided for further study.  This appendix sets proposals for new categories and axes that were suggested for possible inclusion in the DSM-IV and in which the Task Force determined that there was insufficient information to warrant inclusion.  Hebephilia is not listed, indicating that the DSM-IV task force was not provided with enough empirical information to even elevate it to the level of a potential category or axis warranting further study.

      The Government correctly points out that the statutory language of 18 U.S.C. § 4247(a)(6) does not limit its scope to DSM-IV-recognized mental illnesses and disorders.  However, because a "serious mental illness, abnormality, or disorder" is a constitutional prerequisite to what may be a lifetime commitment, the legitimacy of the proceeding hinges on the scientific integrity of the diagnostic decision. See Kansas v. Hendricks, 521 U.S. 346, 373 (1997) (Kennedy, J. concurring) ("[I]f it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it."). Placing defendants into newly created diagnostic categories that have no known empirical support for the purpose of sexually dangerous person commitment appears to run afoul of the purpose of the statute, to differentiate the "dangerous sexual offender whose serious mental illness, abnormality or disorder subjects him to civil commitment from the dangerous but typical recidivist". Kansas v. Crane, 534 U.S. 407, 413 (2002). This court should view with skepticism the testimony of any individual clinician who, against the great weight of the deliberative processes of his professional organization, opines regarding diagnostic categories with no known empirical support.

> II. Actuarial Risk Assessments Do Not Have Sufficient Predictive Accuracy To Satisfy the Daubert Criteria.

The Government continues to assert that "the RRASOR and the Static-99 have *been accepted* in peer-reviewed journals."Government's Mem. at 7. (emphasis added). The purpose of publication and peer-review is to examine complex scientific issues with an eye toward exploring and discussing any weaknesses in methodology or potential rates of error. In this case, publication and peer-review has consistently revealed that the actuarial instruments in question have an extremely high rate of error. Thus, of all the individuals who scored a 6 or above on the Static-99 placing them in a category of "high" risk, 48% *did not reoffend* within the 15 year time frame. See 2003 Static-99 coding rules, at 69. An error rate of almost 50% appears prima facie proof of unreliability. Indeed, the Government has so argued in other contexts.[6]

Of course, the issues surrounding the Static-99 and other actuarial instruments to predict recidivism are *not* that simple. If they were, judges and juries could score the instrument themselves and explanation of the underlying statistical science would be unnecessary. Similarly, actuarial instruments would not be the subject of so much study if the science regarding their use were not both exceedingly complex and continually evolving. The Government glosses over all of this complexity and simplistically suggests that the mere fact that research regarding the Static-99 and other like instruments is published in peer-reviewed journals

---

[6] For example, in United States v. Scheffer, 523 U.S. 303, 310 (1998), the Government argued for a per se rule against the admissibility of polygraph evidence in court martial proceedings noting that "overall, the cumulative research evidence suggests that when used in criminal investigations, the polygraph tests detects deception better than chance, but with error rates that could be considered significant." Studies cited in Scheffer regarding polygraph accuracy ranged from 50% to 87% accurate. Id. at 310

is enough to provide an imprimatur of validity, while ignoring what the research actually documents - that it is an extremely imperfect tool. This appears to be part of a pattern of simplification by the Government. For example, they claim that states have "upheld" the use of actuarials under <u>Daubert</u>, when there is little or no evidence that a full blown <u>Daubert</u> hearing has been conducted on the science underlying actuarials in any of the state court cases accepting testimony regarding the actuarial instruments. <u>See</u> Defendant's Post-Hearing Daubert Brief, at 12-15; Janus & Prentky, *Forensic Use of Actuarial Risk Assessment With Sex Offenders: Accuracy, Admissibility and Accountability*, attached thereto as Exhibit A. In addition, the Government's most recent cited case was decided approximately four years ago and prior to the publication of several important analyses of the accuracy of the Static-99. <u>See</u> <u>e.g</u>. Richard Wollert, *Low Base Rates Limit Expert Certainty When Current Actuarials Are Used To Identify Sexually Violent Predators*, 12 Psy. Pub. Pol. & Law 56 (2006); R. Hanson, *Does Static-99 Predict Recidivism Among Older Sexual Offenders?* 18 Sex Abuse: A Journal of Research & Treatment, 343 (2006).[7]

     The Government continues this pattern of simplification in its suggestion that Drs. Tomich, Plaud, and Kriegman have used essentially the same methodology. Government's Mem. at 1-2. Drs. Tomich and Plaud may be opining within the realm of the same subject matter, but they do not use the same methodology. As detailed at length in Defendant's Post-Hearing Daubert Brief, Dr. Tomich labels his method the "adjusted actuarial approach," but he declines to use potential protective factors that have the most empirical validity (such as age),

---

     [7]These studies were previously submitted to the Court as Exhibits C and G to Defendant's Post-Daubert Hearing Brief.

liberally uses factors with no or low validity, and defines factors inconsistent with the literature. In contrast, at every junction, Dr. Plaud is careful to explain the underlying limitations of his method and to cite to additional articles where warranted to provide the reader with further information.  For example, when discussing the results of the RRASOR, Dr. Plaud described it as having "moderate predictive accuracy" and was careful to note the fact that the instrument was normed on "a reference group whose average age was over 10 years younger than Mr. Shields at present," which is information the factfinder may consider important in judging the instrument's predictive accuracy relative to Mr. Shields.

Similarly, the Government has stated that Dr. Kriegman, the defendant's Daubert expert "effectively impeaches himself" because he "has utilized actuarial instruments and the adjusted actuarial approach in rendering expert testimony regarding sexual dangerousness in state court." Government's Mem. at 1-2,10.  The purpose of Dr. Kriegman's testimony in this case is *not* to render an opinion on whether Mr. Shields is sexually dangerous, but to educate counsel and the Court about the complex statistical science underlying actuarial risk instruments, and to examine the methodology of the State's expert – who *is* rendering an opinion regarding Mr. Shields' dangerousness.  In that vein, Dr. Kriegman has authored an eighty page affidavit explaining the findings of the available science behind risk prediction and explaining the limits of actuarial instruments. Dr. Kriegman's submissions to the Court have consistently explained that the available science *does* indicate that actuarial instruments are currently the most reliable tools for predicting future sexual dangerousness.  However, contrary to the Government's suggestion, this is not the end of the inquiry, but rather the beginning.  Acknowledging something as the best available tool – and using the best available tool when called upon to do so – is not the

equivalent of stating that the tool will provide an accurate result.

In fact, the only time that the Government even attempts to address the science underlying actuarial risk assessment is in its suggestion that the Static-99 actually underestimates recidivism risk because the data was based on reconviction rather than reoffense. Government's Mem. at 16. Once again, this complex area of statistical analysis is glossed over by the Government. In his 2006 peer-reviewed article, Richard Wollert examines the five major arguments for the proposition that actuarials underestimate sex offender recidivism. Wollert, *supra*, at 76-79. He concludes that:

> Furthermore, the size of the effect of almost all of these variables has never been quantified. As a result, it is virtually impossible to derive a defensible formula for adjusting actuarials for the effect of undetected recidivism or any other factor associated with the underestimated hypothesis. In the absence of such a formula, which is the cornerstone of the actuarial method . . . the most accurate and unbiased approach for experts, attorneys, and fact finders is to resist the temptation to speculate and to rely instead on actuarial formulas that are informed by solid empirical research.

Id. at 78-79.

### III. The "High Risk" Label Should Be Excluded.

Finally, the Government cites Dr. Doren's book, <u>Evaluating Sex Offenders</u> in support of its argument that this Court allow the use of labels such as "high risk" to describe Mr. Shields' score on the Static-99. Dr. Doren opines that "simply listing scores without any interpretation is not recommended" and suggests that "*if an evaluator wishes not to go into the explanation of what each score means*, then it is suggested that a simple overall description of the results is more useful than an unexplained enumeration of scale scores." Government's Mem. at 17 (emphasis added). It is extremely troubling that any expert opining in the area of civil commitment would suggest that testifying witnesses should have the option of reporting the Static-99 results as

10

"high," "moderate" or "low" without providing an explanation of the recidivism rates behind the instrument, effectively obfuscating the fact that the highest recidivism rate on the Static-99 is only 52% over 15 years. This suggestion speaks volumes about Dr. Doren's bias in this area.

These risk labels were not designed in the context of civil commitment statutes[8], but by a Canadian researcher for an entirely different purpose - to organize recidivism risk data in a way that would be useful for treatment assessment. Hanson divided the subjects of his study into groups according to their score on the Static-99, and then chose labels to assist in easily tracking the conduct of each group. The labels are arbitrary in the sense that their only "real" referent is a subject's membership in a group having a particular score on the Static-99; they do *not* denote any inherent psychological or character trait of any specific subject. To use them as though they do describe the character or condition of a specific individual, as the government proposes to do, is an abuse of Hanson's terminology and is prejudicial to Mr. Shields.

                                               JEFFREY SHIELDS
                                               By his attorney,
                                               /s/ Page Kelley
                                               Page Kelley
                                                 B.B.O. #548237
                                               Federal Defender Office
                                               408 Atlantic Avenue, 3rd Floor
                                               Boston, MA  02110
                                               Tel: 617-223-8061

February 1, 2008

---

[8] The Government misquotes Dr. Kriegman as stating that Dr. Hanson did not create the labels with "an eye toward sexual dangerousness" Government's Mem. at 17 n.8. In fact Dr. Kriegman testified that Hanson did not create the labels with an eye toward sexual dangerousness *statutes*. Tr. at 222 (emphasis added).

CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 1, 2008.

                /s/ Page Kelley
                Page Kelley