```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                              )
                 Petitioner   )
                              )
           -VS-               ) CA No. 07-12056-PBS
                              ) Pages 1 - 39
JEFFREY SHIELDS,              )
                              )
                 Respondent   )




                  FINAL PRETRIAL CONFERENCE

            BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE




                     United States District Court
                     1 Courthouse Way, Courtroom 19
                     Boston, Massachusetts
                     May 13, 2008, 4:15 p.m.
```

```
                    LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
                United States District Court
                1 Courthouse Way, Room 3205
                    Boston, MA  02210
                     (617)345-6787
```

c54f8bf1-818f-4641-970a-3c7a9b86cf63

1    A P P E A R A N C E S :

2         MARK J. GRADY, ESQ., JENNIFER C. BOAL, ESQ., and
     JENNIFER A. SERAFYN, ESQ., Assistant United States Attorneys,
3    Office of the United States Attorney, 1 Courthouse Way,
     Boston, Massachusetts, 02210, for the Petitioner.
4
          PAGE KELLEY, ESQ, Federal Defenders Office,
5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
     for the Respondent.
6
          JOHN G. SWOMLEY, ESQ. and ERIC TENNEN, ESQ.,
7    Swomley & Associates, 227 Lewis Wharf, Boston,
     Massachusetts, 02110-3927, for the Respondent.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

c54f8bf1-818f-4641-970a-3c7a9b86cf63

1                    P R O C E E D I N G S

2           THE CLERK:  The case of the United States V.

3    Jeffrey Shields, Civil Action No. 07-12056, will now be heard

4    before this Court.  Will counsel please identify themselves

5    for the record.

6           MS. BOAL:  Good afternoon, your Honor.  Jennifer

7    Boal, Assistant United States Attorney, on behalf of the

8    petitioner, United States, and with me at counsel table are

9    AUSAs Jennifer Serafyn and Mark Grady.

10          MS. KELLEY:  Good afternoon, your Honor.  Page

11   Kelley.  I represent Mr. Shields, and with me are John

12   Swomley and Eric Tennen.

13          THE COURT:  Good.  And Mr. Shields is here?

14          MS. KELLEY:  Yes, he is.

15          THE COURT:  Well, the first issue is timing of the

16   trial.  I understand that you're starting a trial on the 2nd,

17   is that right?

18          MR. SWOMLEY:  I've actually started a trial.  We

19   just got a jury after five days of selection.  We're viewing

20   tomorrow and have openings on Thursday.  It's expected to go

21   through the second week of June.  It's gotten pushed and

22   pushed.  But what I'm understanding is, that might actually

23   be where the Court is.

24          THE COURT:  I could do it earlier, but I've got two

25   graduations in my family.  And rather than having it, you

1   know, suspend a day and back a day and all that -- I think

2   Mr. Alba reported what you had said -- just to give you

3   smooth trial dates, we could start it on that Monday.  What

4   is it, June --

5          THE CLERK:  16th would be the Monday.  That's the

6   day of Peavey's trial.

7          THE COURT:  We'll bump Peavey, and we'll just do

8   Shields.

9          MR. SWOMLEY:  That works great.

10          THE COURT:  Does that work for all of you?

11          MS. BOAL:  Your Honor, I would just say, we had

12   asked Dr. Tomich about his availability, and I think also

13   Dr. Plaud was contacted in the uniform manner that we've been

14   dealing with him.  I think they were both only asked for the

15   weeks through the week of the 9th, so we'll have to go back

16   and ask for the weeks of the 16th and 23rd.

17          THE COURT:  We'll try and work around their

18   schedules.  I mean, I suppose, if we got desperate, we could

19   start that earlier week.  I'd prefer not to.

20          Your big forte would be doing what,

21   cross-examination of Tomich?

22          MR. SWOMLEY:  Any and everyone that has anything to

23   do with the science, yes, that's what I'd like to be doing.

24          THE COURT:  In other words, we don't need you for

25   every -- ideally we'd have you every single day.

1      MR. SWOMLEY:  Ideally I would like to be sitting at

2  counsel table.  I think that the continuity is an important

3  component of a trial; I mean, obviously, if we're doing jury.

4      THE COURT:  We'll try and see if we can get those

5  experts in.  That really is the key question that's left at

6  this point, right?  Have I ruled on all motions in limine?

7      MS. BOAL:  You have not, your Honor.  The

8  respondents have filed two motions in limine and the

9  government has filed four.  Some of them have been ruled on

10  but not all of them.

11      THE COURT:  So what's left?

12      MS. BOAL:  The respondent has two, a motion to

13  prohibit prejudicial terms being used and a motion to exclude

14  police reports.  The government's --

15      THE COURT:  Okay, okay, all right, you're reminding

16  me.  And yours is?

17      MS. BOAL:  The government's four are, one, we move

18  to preclude two lines of questioning of Dr. Tomich.  One was

19  the historical rate of sexual dangerousness findings by the

20  CAB, of which he'd only been a member for a month at the time

21  of the Daubert hearing; and then also there was cross at the

22  Daubert hearing pertaining to Dr. Tomich's bias because he

23  was a QE, and that same company also provided the treatment

24  in the state system.  That's not applicable here because the

25  BOP would be providing treatment if Mr. Shields was

1  committed.

2          The other motions --

3          THE COURT:  All right, so let's just take these one

4  at a time.

5          MS. BOAL:  Okay.

6          THE COURT:  So your first motion is what?

7          MS. BOAL:  Our first motion was to preclude the two

8  lines of cross-examination of Dr. Tomich.  One line was,

9  there was cross at the Daubert hearing on the historical rate

10  of sexual dangerousness findings by the CAB.

11          THE COURT:  What's the CAB?

12          MS. BOAL:  The Community Access Board.  That is the

13  board that reviews individuals after they have already been

14  committed in the state system.

15          THE COURT:  And how long is he the head of it?

16          MS. BOAL:  He's not the head of it.  He was a

17  member for a month at the time of the November Daubert

18  hearing.

19          THE COURT:  So that's all, so --

20          MR. SWOMLEY:  I don't know exactly how this is

21  coming in at trial.  I'm just trying to visualize that issue,

22  other than as a credential or as some historical reference

23  for people that were committed at the treatment center.  I

24  can tell you I know that Dr. Tomich is quite familiar with

25  the CAB Board and the CAB Board's rate of opining dangerous

1    because he has been doing a qualified examiner's position and

2    running the Qualified Examiners Board for a number of years,

3    and part of the testimony that one offers as a qualified

4    examiner involves knowing everything about the individual's

5    six-part folder, which is the Department of Corrections'

6    history of the prisoner.

7            THE COURT:  Well, so I think it's a fair point that

8    it's not fair game to cross what they did before he got

9    there, so I think I will allow it to that extent.  Since he's

10   been there and he's been the head of this, then I think it's

11   fair game.  So --

12           MS. BOAL:  He's just a member of the board, your

13   Honor.  He's not the head.  I think there are five members on

14   the board.

15           THE COURT:  All right, so --

16           MR. SWOMLEY:  Just so you know the CAB Board and

17   the Qualified Examiner Board are populated by people that are

18   subcontracted through Forensic Health Services.  They're the

19   entity, and they supply experts to both boards.  So it's not

20   like you leave one board and you go to another board and you

21   don't know what happened between them.  It's basically the

22   same umbrella or entity, Forensic Health Services.

23   Dr. Tomich ran the qualified examiner contract for years.

24           THE COURT:  Well, based on what I know now, he

25   can't be impeached on something he didn't do.  On the other

1   hand, if you try and build up those credentials, like, "Oh,

2   he's this fancy-shmancy examiner certified by the CAB," he

3   can knock down the CAB.

4           So what's --

5           MS. BOAL:  The other line of cross-examination that

6   the government sought to preclude, your Honor, was, at the

7   Daubert hearing, there was cross-examination to show bias on

8   behalf of Dr. Tomich because he was employed by the entity

9   that employs the QEs.  It's the same entity --

10          THE COURT:  You know what, I know you're living

11  this case.  You're probably dreaming it.  The QE is the

12  qualified examiners?

13          MS. BOALS:  The Qualified examiners.

14          THE COURT:  It just makes -- you know, let's just

15  talk it out and --

16          MS. BOAL:  I'm sorry, your Honor.  That Dr. Tomich

17  is a qualified examiner in the Massachusetts state system.

18  There was a line of cross-examination that the same entity

19  that employs the qualified examiners also provides treatment

20  in the Massachusetts system, so therefore there is bias by

21  the qualified examiners to find someone is sexually dangerous

22  because their employer will then get the benefit of getting

23  to provide the treatment.  That is not the case here because

24  the Bureau of Prisons --

25          THE COURT:  All right, so do you want to -- is that

1    a relevant line for you?

2           MR. SWOMLEY:  I don't know that it is relevant

3    unless they're beefing up his state credentials.  You know,

4    he's only ever been certified by a Department of Corrections

5    head.  He's never been certified as an expert.

6           THE COURT:  All right, I allow it unless you come

7    up to me and you tell me there's a special reason to go

8    there.

9           MR. SWOMLEY:  I wouldn't go there unless I thought

10   it would matter to somebody.

11          THE COURT:  Fine, but just come up to side bar

12   before it mattered.  All right, what's the next one?

13          MS. BOAL:  The next motion, the government filed a

14   motion in limine to limit the time for the questioning of

15   experts under local Rule 43.1 that gives the Court discretion

16   to set --

17          THE COURT:  I know, but I don't want to.  I mean,

18   you're trying to send him away essentially for life.  I

19   learned a huge amount in that Daubert hearing.  And while I

20   found it was reliable because it's been accepted in peer

21   review literature and generally acceptable, that goes to

22   whether it's admissible, not to the weight of the thing.  And

23   so if they want to punch holes in it, that's their right.

24          MS. BOAL:  Okay.  So just as a technical matter,

25   you had denied that motion.

1          THE COURT:  I denied it already.

2          MS. BOAL:  Yes, and then we moved to reconsider

3  because there were 87 articles that we had been given.

4          THE COURT:  I guarantee you, I will not allow him

5  to go through 87 articles.

6          MS. BOAL:  Your Honor, the next motion was to

7  preclude evidence about post-release plans, and Ms. Serafyn

8  is going to speak to that.

9          MS. SERAFYN:  Good afternoon, your Honor.  There is

10  one question in this case, and that is, is Mr. Shields

11  sexually dangerous now?  Any testimony, any evidence about

12  what happens after he is released, if he were to be released,

13  is not relevant to the issue of whether he is sexually

14  dangerous now.  Perhaps such testimony and evidence would be

15  relevant if Mr. Shields is civilly committed, and then there

16  is a hearing under Section 4248, Subsection (e).  But right

17  now any evidence of post-release intention --

18          THE COURT:  Well, I was just curious about how

19  then -- suppose they find that based on all these earlier

20  convictions and the doctors' opinions that he is sexually

21  dangerous now, at what point does someone decide whether

22  there's a condition or a combination of conditions of release

23  which will assure the safety of the community?

24          MS. SERAFYN:  Your Honor, that inquiry comes

25  after --

1       THE COURT:  Well, who does it?

2       MS. SERAFYN:  I mean, according to Subsection (e),

3   it's the Bureau of Prisons.  Once he is committed, the Bureau

4   of Prisons then makes the determination that he is no longer

5   sexually dangerous.  Or Mr. Shields could petition to be

6   released, and I think the statute provides for a six-month

7   period.  So if he were to be civilly committed, he could

8   petition after six months; or at some point during his

9   commitment, the Bureau of Prisons could determine that he is

10   no longer sexually dangerous.  But that determination about

11   what would happen after he is released comes after the

12   initial commitment, and what we're here to do is to determine

13   whether Mr. Shields should --

14       THE COURT:  So all those things, like it comes up

15   in another case -- it comes up with castration, and it comes

16   up in whether or not I can have such stringent conditions of

17   release -- you would say it comes up after the commitment

18   order?

19       MS. SERAFYN:  That's correct, your Honor.  The only

20   issue is whether he is sexually dangerous now.

21       THE COURT:  All right, so --

22       MS. KELLEY:  No, let me answer it.  Your Honor, we

23   responded in writing to this.

24       THE COURT:  Yes, you did.

25       MS. KELLEY:  And the government's position is just

1   patently absurd.  If the only question is whether Mr. Shields

2   is now presently dangerous in prison, he isn't because there

3   are no children there.  The question is, when he is released

4   into the community, is he sexually dangerous under the

5   statute?  And for any expert to opine about that -- and the

6   government knows good and well, we've been sitting through

7   these depositions, they all considered this.  Dr. Plaud

8   testified this was a major consideration of his.  Dr. Tomich

9   on the witness stand before your Honor said that he considers

10  people's release plans.  Dr. Kriegman testified that the

11  conditions under which someone is placed and the restrictions

12  that are on them are highly relevant to determining --

13          THE COURT:  What happens in the state on this?  I

14  imagine this comes up, right?

15          MR. SWOMLEY:  Yes.  In fact, I'm actually impressed

16  that she's got the argument down very well.

17          MS. KELLEY:  Thanks a lot, John.

18          THE COURT:  I knew she would.

19          MR. SWOMLEY:  Judge, it's a three-prong test now in

20  the state court.  And it was a one-prong.  It was "likely."

21  And it's basically:  You open the door, what's going to

22  happen?  Is he likely to reoffend or not?  And it's been

23  broken down into, now on the state level, you evaluate the

24  seriousness of the threatened harm, the likelihood of that

25  harm occurring, and the ability of there being successful

1    intervention to prevent that harm.  It's a three-prong test

2    basically.  And what happens on the outside, whether already

3    there are probation conditions in place, that's relevant to

4    the consideration; whether there can be additional things

5    done, whether it be Sex Offender Registry Board designation,

6    you know, essentially monitoring on the outside, whatever

7    that is, and that is part of the consideration because,

8    really, the truth is, you're not dangerous on the inside.

9    It's the moment of release, what happens then?  Is that

10   person at risk to reoffend?  If so, how much risk?  What kind

11   of offense did they commit or what offenses did they commit?

12        THE COURT:  What's the statutory standard here?

13   It's --

14        MS. SERAFYN:  Your Honor, the statutory standard

15   here at the federal level is much different than at the state

16   level.

17        THE COURT:  So just remind me.  You've molested or

18   you've hurt someone once, you have a mental disease or

19   disorder, and then what's the third part?

20        MS. SERAFYN:  Well, it's that "The person suffers

21   from a serious mental illness, abnormality, or disorder, as a

22   result of which he would have serious difficulty in

23   refraining from sexually violent conduct or child molestation

24   if released."  So it's tied to whether there is a mental

25   abnormality now, where if this person was released, he would

1  have serious difficulty because of the mental abnormality

2  that he has now.  So it is a present-looking inquiry.  So the

3  federal statute, Section 4248 --

4         THE COURT:  Well, what does the state say?  Do you

5  know?  I'd have to look it up.

6         MS. SERAFYN:  Your Honor, the point I would mention

7  about the state statutes is, when Congress was enacting

8  Section 4248, there were approximately nineteen state civil

9  commitments statutes on the books.  So Congress obviously

10 looked for those different state statutes and did not adopt

11 language --

12        THE COURT:  Yes, but I'm asking you something

13 simpler:  What does the state statute say?

14        MR. SWOMLEY:  The statute statute says a mental

15 abnormality or personalty disorder that is likely to affect

16 involitional impairment basically.

17        THE COURT:  So you'd say it's not that different.

18        MR. SWOMLEY:  No, it's not that different.  In

19 fact, there are only really three different variants of the

20 nineteen states -- actually, there are twenty-one states now

21 that do it -- and there are only three rough variants:  The

22 one that's out of Washington State, that model; Massachusetts

23 is another model; and then Minnesota is the third basic

24 model.  And they're not dramatically different.  Kansas V.

25 Hendricks found that the Kansas statute, which was modeled on

1    the Washington one, passed constitutional muster; and that's

2    been basically what I think has been the argument federally.

3              THE COURT:  All right, well, I'll think about that

4    one.  That's hard.

5              MS. KELLEY:  Well, if I could just add, your Honor,

6    this is not just a matter of, are you going to admit a

7    certain piece of evidence or not?  This is part of

8    Mr. Shields's constitutional due process rights to present

9    evidence that's relevant here in his defense.  If you --

10             THE COURT:  So how will this play out as a

11   practical matter?  What kinds of questions are we thinking

12   about?

13             MS. KELLEY:  Well, if you were deciding --

14             THE COURT:  No, no, no, no.  Just what kinds of

15   evidence because I have a jury here?  So how does this play

16   out?  I may instruct them that it's got to be the way the

17   government just said, maybe, but you want to be able to ask

18   questions of --

19             MS. KELLEY:  Well, what we seek to do is to put on

20   someone from Probation who is -- Probation is very

21   sophisticated now about monitoring sex offenders.  It's a

22   completely different world than it was even twelve months

23   ago.  And they would describe, number one, the conditions

24   that the judge imposed on Mr. Shields, which include mandated

25   sex offender treatment, polygraphs, and so on.  And then they

c54f8bf1-818f-4641-970a-3c7a9b86cf63

1    would also explain to you and the jury what other tools

2    Probation has now to monitor and supervise sex offenders.

3    And it's a really impressive array of ways and means they

4    have to try to prevent people from reoffending.

5              And anyone deciding whether Mr. Shields is going to

6    be dangerous or not, just in a very common sense way, would

7    want to know, is he going to walk out of the door of the

8    prison and that's the last we see of him?

9              THE COURT:  So what you're trying to do is

10   effectively preclude Probation from saying what the

11   conditions of release would look like?

12             MS. SERAFYN:  That's right, your Honor, because --

13             THE COURT:  But, you know, isn't there a line of

14   cases -- it's different, but remember that line of cases

15   where you're supposed to tell a jury that if they find

16   someone not guilty by reason of insanity, that they're not

17   going to just walk out the door, so that they understand what

18   happens?  Do you know what I'm talking about?

19             MS. SERAFYN:  I'm not personally familiar with

20   that, your Honor.

21             THE COURT:  That you actually can tell the jury

22   that, "Well, no, even though the guy murdered someone, he's

23   not going to walk out the door, he goes to a state

24   institution," so they understand what happens.

25             MS. KELLEY:  Well, there's also the question, your

1    Honor, of what in the world the experts are going to say,

2    because they've all testified, either before you or in their

3    depositions, that this is a factor they routinely consider

4    when assessing someone's risk of recidivism.  The experts

5    have to know these things.  They've all reviewed his

6    conditions of release, and they will take this into

7    consideration when forming their own opinion.  So it's not

8    only just the sheer evidence that we seek to present to the

9    jury about-- and you, I guess --

10          THE COURT:  Well, as I understand it, your expert

11   is going to -- I mean, I read it quickly, so excuse me if I

12   butcher this, but your expert is going to say, "Yes, he's

13   dangerous, but he can control himself because he'll have all

14   these assists when he gets out," that, "Yes, he's sort of got

15   this problem, but --"

16          MS. KELLEY:  Right.  Well, yes, that's an important

17   part of his opinion, and we can't be precluded from putting

18   that on.

19          THE COURT:  Excuse me.  So your expert is going to

20   say, "Yes, he hurt a child," or whatever he's going to say,

21   "Yes, he's got a mental disease and disorder, but he can

22   control himself because we're going to give him the support

23   system once he gets out"?  Isn't that the gist of what he

24   says?

25          MS. KELLEY:  In part.  That's not the only reason

1    he finds Mr. Shields not dangerous, but it's certainly a very

2    important reason.  And --

3               THE COURT:  So you say their expert can't say

4    that?

5               MS. SERAFYN:  That's right, your Honor.  What we're

6    looking to exclude is the speculation.  So, practically

7    speaking, I think the testimony is going to be something like

8    this:  "Mr. Shields represented that once he gets out, he

9    wants to have sex offender treatment, and he's looked into

10   it, and he, you know, intends to go to this place to get sex

11   offender treatment."  But that's only his stated intent.

12   It's purely speculative.  There is nothing requiring him to

13   do that.  And, your Honor, the statute --

14              THE COURT:  Wait, wait.  There is something

15   requiring him to do it.  I forget whoever the judge is but --

16   who's the judge?

17              MS. KELLEY:  That's totally wrong.  There is a sex

18   offender treatment provider in Maine that is mandated by

19   Probation.  Mr. Shields would have to go there as a condition

20   of his probation.

21              THE COURT:  Let me say this:  I am likely to

22   instruct the jury something along the lines of, "It's got to

23   be what he's like now," but I'm not going to cut them off

24   from finding out what happens when he gets out.  So I'm not

25   going to stop the probation officer from testifying or their

1  expert from testifying.  And it's like not -- maybe I'm

2  thinking of a bad metaphor -- it's like not telling someone,

3  a jury, that they can consider the person not guilty by

4  reason of insanity and not let some lunatic on the street.  I

5  mean, what some jury is going to be worried about, since he

6  has molested so many children -- we've now got the record --

7  since he has molested so many children, they're going to be

8  worried that the minute they let him out, he's going to go

9  back to the woods of Maine to get another nine-year-old,

10  right?  Right?  That's what they're going to be worried

11  about, that we're going to just sort of open the door and

12  there he goes.  So don't you think that they'll need to know

13  that?

14       MS. SERAFYN:  Your Honor, it's reasonable that the

15  jury might be thinking that or might be wondering that, but

16  based on an interpretation of Section 4248, there is no

17  provision in Subsection (d), which is what we're dealing with

18  here, for that sort of future-looking inquiry.  That inquiry

19  does come, but it comes under Subsection (e) after --

20       THE COURT:  It's whether he can -- well, let me

21  just put the hypothetical to you.  It's whether he can

22  control himself.  Isn't that the whole thing?  Like, is he

23  going to be able to control himself, or is he going to go out

24  and hurt someone?  That's really what the gist of this is.

25  And doesn't whether he can control himself depend on whether

1    or not he's got a support system?

2           MS. SERAFYN:  No, your Honor.  Respectfully, that

3    element of control in the statute is tied to his mental

4    abnormality or illness.  So that's the link there.  It's not

5    tied to what treatment he may undergo or what restrictions

6    may be in place after he's released.

7           THE COURT:  Okay, I understand the argument.

8           Okay, so what's the next issue?

9           MR. SWOMLEY:  Can I just tell you that all experts,

10   both sides, everywhere in the country, take into account the

11   release plan as part of the model for assessing risk.  They

12   can't even assess risk without talking about the back end of

13   it.

14          MS. BOAL:  The last motion by the government was a

15   motion to exclude the testimony of Dr. Kriegman, and the

16   Court has ruled on that.  And my only purpose of raising it

17   is just to clarify.  The Court denied the motion, but I just

18   want to clarify that that means that Dr. Kriegman can

19   testify.  But we don't have an expert report from

20   Dr. Kriegman.  We don't have anything that talks --

21          THE COURT:  Is that right?  That's a fair point.

22          MS. KELLEY:  Well, he wrote approximately a

23   100-page affidavit stating --

24          THE COURT:  So you're going to use that report.

25   Well, that's okay.

1          MS. KELLEY:  That's correct, plus he testified, and

2   we have that transcript.

3          MS. BOAL:  The affidavit was submitted for the

4   purposes of the motion to dismiss, and it said there was no

5   scientific basis on which this Court could rule that someone

6   was sexually dangerous.

7          THE COURT:  Well, let me ask you this.  He can't --

8   we've now got a little bit more time.  That was submitted in

9   connection with the Daubert hearing.  So you can either be

10  limited to what he said there, or he needs -- I won't let you

11  go beyond it because he needs a report otherwise.  They can't

12  be surprised.  That's the basic touchstone.  You can't jump

13  something on them.

14         MS. KELLEY:  If I may, and I've explained this to

15  the government, the purpose for our using Dr. Kriegman -- and

16  we would call him last, if at all -- is if we feel that we

17  have not adequately explained the science through the

18  witnesses who are being called.  I mean, you wrote in your

19  order when we moved to exclude Dr. Tomich that he can't

20  testify about statistical matters, and we don't know how much

21  we'll be able to get into that with Dr. Plaud and Dr. Rypma.

22  So if we need to call Dr. Kriegman, it's only to clear up

23  questions we would feel are still there about the science.

24         THE COURT:  But if they're not there in that

25  affidavit, I won't let you do it.  So you need -- I mean,

1   fair is fair.

2           MS. KELLEY:  Right.  They're in the affidavit,

3   though.  But we'll look back through the affidavit.  If

4   there's something in there we want, we would want him to

5   testify to, we'll produce it.

6           THE COURT:  All right, so you just tell them what

7   you think you're going to want in an expert report, so --

8           MS. BOAL:  The affidavit doesn't mention anything

9   in particular about Mr. Shields.

10          MS. KELLEY:  No, we don't intend to use

11  Dr. Kriegman for that purpose.

12          MS. BOAL:  Okay.  So we also don't have

13  Dr. Kriegman's compensation or his list of testimony for the

14  prior four years.

15          THE COURT:  That's fair enough.  Okay.

16          MS. BOAL:  Then it's the respondent's motions, so

17  we've now talked about the government's motions.

18          THE COURT:  Okay.

19          MS. KELLEY:  We have outstanding a motion to

20  prevent the government from using prejudicial terms, and I

21  don't believe the Court has ruled on that.

22          THE COURT:  Yes, but how can they not say he's a

23  sex offender?  I mean, how can they not use words like that?

24          MR. SWOMLEY:  They can't call him a pedophile.

25  They can't call him --

1      THE COURT:  Well, pedophile is the mental illness

2  diagnosis.

3      MR. SWOMLEY:  No.

4      THE COURT:  Well, what is it?

5      MR. SWOMLEY:  You diagnose someone with having

6  pedophilia.  Calling somebody a pedophile or a pervert, or

7  whatever it is you want to call --

8      THE COURT:  Well, "pervert" may be off the bounds,

9  but "pedophile" is what the diagnosis is.

10      MR. SWOMLEY:  You can be diagnosed with having

11  pedophilia at some point in time, having it currently, having

12  it in remission, having whatever; but when you call somebody

13  a "pedophile," it is not giving them the diagnosis.  That is,

14  I would submit, calling them a name, and it's derogatory.  I

15  mean, you can call him "the respondent, the petitioner,

16  Mr. Shields."  You don't need to call him "the sex offender,"

17  the anything.  I mean, you don't.  Everybody else, you know,

18  refers to each other by their politest --

19      THE COURT:  What are you planning on referring to

20  him as?

21      MS. BOAL:  Well, your Honor, I certainly think that

22  the government should be allowed to use the terms "sex

23  offender, sexual predator, pedophile."  These are all terms

24  that have independent legal and clinical significance.  We

25  have to call this case what it is.  You know, Mr. Shields has

1    four convictions in Maine involving a six-, twelve-,

2    thirteen-, and fourteen-year-old.  The testimony is going to

3    be that it was predatory behavior.  These are all fair game

4    for discussion in this trial.

5           MR. SWOMLEY:  You don't need to call anybody a

6    predator.  That is, I would submit, grossly valuating, and it

7    is a label which he doesn't get yet.

8           MS. BOAL:  It's in Dr. Rypma's report, the term

9    "predator" and "predatory behavior."

10          MR. SWOMLEY:  It doesn't mean he is a predator.

11          THE COURT:  Stay away from inflammatory opening

12   statements.  What individual witnesses say is going to be up

13   to them.  And, of course, you're not going to call them

14   perverts.  I'm missing the distinction between having

15   pedophilia and being a pedophile.  I'm missing that

16   distinction.  However, what I don't want is this to be just,

17   you know, a scare-the-jury kind of thing:  He's a sexual

18   predator, and, you know, just lock the door, don't listen

19   further.  But if the witnesses want to use those terms, I'll

20   let the witnesses uses those terms.

21          MS. KELLEY:  The last thing I'll bring up, there

22   are some ongoing discussions.  For example, the government

23   has said that they may want to try to put in pictures from

24   the child pornography case, and I don't think they've finally

25   decided that they want to do that or not.  So I don't think

1  we'll bring that up here.  We'll just try to work it out.

2  And if we can't, perhaps at the final pretrial we can do

3  that.

4        THE COURT:  Although I've been thinking, too, the

5  details of the individual offenses might be relevant.

6        MS. KELLEY:  Well, this is a huge issue, as it

7  turns out, because the government has flagged as exhibits

8  reams of police reports that have totem pole hearsay, that --

9        THE COURT:  Right, and that was the biggest,

10 frankly, in all your motions in limine, the ones I was the

11 most worried about because this is a civil case, not a

12 criminal case, but, still, you can't do totem pole hearsay

13 through the police reports.  So that's the issue I wanted to

14 air today, which is how the government -- are you planning on

15 putting in details of the underlying offenses, and if so, who

16 would put it in?

17       MR. GRADY:  I would speak to -- if we were going to

18 go and parse out the reports, I can talk about specifically

19 what we would be looking to go into, but AUSA Serafyn can

20 talk about -- she did the legal motion on this.

21       THE COURT:  I mean, you can't usually put in the

22 hearsay through a police report, so --

23       MS. SERAFYN:  Your Honor, in a civil case, under

24 Federal Rule of Evidence 8038, public records can come in,

25 and there are cases, including --

1          THE COURT:  Sometimes.  If the police officer goes

2     to a traffic accident, right? -- we've been all been there,

3     right? -- and he measures out the distance and reports on his

4     report, yes, in a civil case, that can come in.  But if he's

5     reporting on what a child said to him or what a mother of a

6     child said that the child said, I start having a lot bigger

7     problems with it.  So, in other words, when there's hearsay

8     within the police report, not what the police officer himself

9     observed or any particular finding, because the touchstone,

10    as I keep using that word, is reliability, is it reliable?

11    So I don't know until I see the police reports.

12          MS. KELLEY:  Well, if I may --

13          THE COURT:  If a police officer sees a battered

14    child and reports on it, it may come in.  If it's someone

15    saying to someone who says to someone, I have a bigger

16    problem with it.

17          MS. KELLEY:  There's nothing like that.  And,

18    furthermore, the reports which the government seeks to admit

19    don't even always talk about the offense in question.  They

20    talk about a policeman calling another policeman who says,

21    "Oh, we heard he roamed the halls of some school, and

22    there's some other car that kind of looks like his, and we

23    want to match him up with these offenses in our

24    jurisdiction," and so on.

25          THE COURT:  Well, that's exactly right, I don't

1    know until I read the reports whether it qualifies.

2         MS. KELLEY:  Well, can I just raise one sort of

3    overarching question here, which is, why does the government

4    need to do this at all, where we have convictions and we have

5    Mr. Shields talking about the details of the offenses to both

6    of the experts in this case?  So they're getting in the

7    underlying facts.  And we have Dr. --

8         THE COURT:  Excuse me.  I don't know all these

9    things, right?  I'm learning as I'm going.  I don't know

10   that, if you've already got all the details and they're

11   consistent with the reports.  Now, if they're not consistent

12   and he's minimizing, that may be relevant to what you want

13   too.  But then you're going to have to get someone in with

14   admissible evidence.

15        MR. GRADY:  Certainly, your Honor.  And in fact, to

16   the extent the Court's ruling becomes that what the Court

17   wants to see are officers' direct observations, we can taylor

18   what we're seeking to put in.

19        THE COURT:  But it can't be hearsay.

20        MR. GRADY:  Certainly.  It would be --

21        THE COURT:  So give me an example of what you think

22   would come in.

23        MR. GRADY:  The victim's age.  The officer goes,

24   sees the victim, observes the age, details the age.  The

25   officer observed the victim at a lineup, goes to a lineup,

1  picks out Mr. Shields and identifies Mr. Shields.

2      THE COURT:  But why?  If he's pled guilty or been

3  convicted, why do you even need that?  I mean, he's either

4  pled guilty or been found guilty, right, of four offenses

5  with little children?

6      MR. GRADY:  Your Honor, with respect, they would

7  not allow the government's expert to go in and examine him,

8  first of all, so we're not in a position where our expert is

9  operating on the same basis --

10      THE COURT:  Can I say this?  I'm not ruling.  If

11  you want me to admit in police reports, give them to me.

12  First of all, I don't even know what you're talking about.  I

13  don't need a fancy-shmancy memo.  Just yellow highlight what

14  it is you want in.

15      MR. GRADY:  Sure.

16      THE COURT:  And you will tell me if you've got a

17  problem with them.  It is a civil case.  It's different rules

18  than in the criminal case, but I do agree that hearsay within

19  hearsay shouldn't come in.  I'm assuming you have plea

20  colloquies, right?

21      MR. GRADY:  For most of the cases, when you start

22  talking about a 1989 offense, the tapes don't even exist to

23  be transcribed as a plea colloquy.

24      MS. KELLEY:  But if I may, your Honor, your comment

25  about whether the police reports differ from what Mr. Shields

1   said to the experts, it doesn't even matter in predicting

2   recidivism whether someone has minimized something.  That has

3   to do with the efficacy of treatment.  But this whole thing

4   is just a total red herring where the government is seeking

5   to admit very inflammatory information just --

6          THE COURT:  Excuse me.

7          MS. KELLEY:  -- just for the emotional impact.

8          THE COURT:  Excuse me.  It depends.  I want to see

9   what the report says.  I want to see if it's reliable; I want

10  to see if it's relevant.  But I'm not going to rule in the

11  abstract.  I just don't know what we're talking about.

12         MS. KELLEY:  Well, if I can just say one other

13  thing.  The civil cases that the government cites are exactly

14  what your Honor has flagged.  You know, the case they really

15  rely on is the Schwartz case which was before

16  Judge Collings.  It's a mail truck striking a car.  It's a

17  magistrate judge, jury-waived trial, and they let in a police

18  report from a policeman who testified and did some

19  observations at the scene.  That's the kind of stuff that

20  comes in at civil trials.

21         THE COURT:  Sure, I get this stuff all the time in

22  civil reports.

23         MS. KELLEY:  Well, he has constitutional rights

24  here that those people don't have.

25         THE COURT:  Excuse me.  This is a civil case, let's

1    start from basics, so the rules are a little different.  But

2    the basic rule, which is, I've got to be sure it's reliable

3    and relevant, I can't rule on.  Not cumulative, not overly

4    prejudicial, all that stuff I've got to still address, and I

5    can't do it in the abstract.  When can you get me your

6    reports?

7               MR. GRADY:  Today actually, but I think --

8               THE COURT:  Today I don't really need it.  I'm not

9    going to rule between now and 5:00 o'clock.

10              MS. BOAL:  We'll do it next week, your Honor.

11              THE COURT:  Next week.  All right, you've got a

12   little time now.  You'll give me the reports.  You'll tell me

13   what you object to about them.  And how long will this trial

14   take on a 9:00-to-1:00 basis?  Well, let me be --

15              MS. KELLEY:  We believe two weeks, your Honor.

16              MS. BOAL:  Your Honor, the government believes it

17   should only take a week, but --

18              THE COURT:  Well, I tell you, it's going to be done

19   before New Year's or we'll lose every juror who walks in

20   here.  So we know it's not going to be -- so if it starts the

21   16th and then the 23rd, we'll be done, and we'll scale it

22   that way.  How long do you think your case is?  Have you

23   figured it out?

24              MS. BOAL:  I haven't figured it out, your Honor.

25   I'm sorry.  I don't have a time frame for that.  I think it

1   should take --

2           THE COURT:  Well, who are your witnesses?

3           MS. BOAL:  Well, that actually raises another issue

4   that I wanted to raise with the Court.  Dr. Plaud is the

5   Court's examiner.  I didn't know how the Court wanted to deal

6   with that, if you wanted to deal with hearing from him first

7   or allow the parties to decide when he was called.

8           THE COURT:  I hadn't thought about this.  That's

9   why I'm having this pretrial.

10          MS. BOAL:  Okay.  Well, if Dr. Plaud was called by

11  the government, it would also be Dr. --

12          THE COURT:  But let me -- I'm glad you raised this

13  because I'm thinking out loud.  I've never done this before.

14  He's my examiner only in the sense that -- is this the one

15  that both sides agreed to, and he changed his mind when he

16  got additional?  I'm not sure I want to give the extra

17  blessing that comes with saying, well, the Court picked him.

18  Well, I only picked him in the sense that you both agreed on

19  him, I mean, and it's like, if you agree, I agree, so I

20  designated him.  So it shouldn't have some special blessing

21  that I -- so you can call him.

22          MS. BOAL:  All right, then I believe the government

23  would call him.

24          THE COURT:  What you guys can't do is attack him as

25  a hired gun, you know, because he really was someone you both

1   agreed on.  So you'll put him on.

2           MS. BOAL:  Yes, and Dr. Tomich.

3           THE COURT:  Yes.

4           MS. BOAL:  We had said we might call Dr. Renaud,

5   who's the BOP psychiatrist, not to give her opinion but to

6   talk about statements that Mr. Shields made to her during the

7   interview.  I don't know if we'll call her, but if we did

8   call her, her testimony would be probably a half hour or

9   less.  I mean, the real time-consuming thing here is going to

10  be the three experts.  We had also listed the Maine -- is now

11  a DA who was an ADA who prosecuted three of the Maine cases,

12  and there seemed to be some confusion about what Mr. Shields

13  had actually pled guilty to.  And some of the challenges to

14  the records were on that basis, so we have listed him as a

15  witness to testify.

16          THE COURT:  You mean, in case you can't work it

17  out?

18          MS. BOAL:  Exactly, exactly.  We had also --

19          THE COURT:  Have we given you a pretrial order

20  yet?

21          MS. BOAL:  We gave you a pretrial memorandum, your

22  Honor.

23          THE COURT:  With the list of witnesses and the voir

24  dire questions and all that sort of stuff?

25          MS. BOAL:  Both sides have filed voir dire, and

1  both sides have filed jury instructions.  And we provided a

2  pretrial memorandum list of the witnesses.  And we had listed

3  a forensic examiner regarding the child pornography images.

4  I don't know, again, if we're going to call that person.

5          THE COURT:  Now, who do you have?

6          MS. KELLEY:  Well, I would just like to say, we're

7  objecting to the forensic examiner or anything about the

8  child pornography coming into evidence.  If Dr. Renaud is

9  going to testify, we deposed her yesterday.  And the waiver,

10 what she said to Mr. Shields about his waiver when she spoke

11 to him we contend is inadequate.  And if the government does

12 intend to call her, we'd be asking the Court not to allow her

13 to testify on that basis.

14         THE COURT:  Well, you'd better brief that because

15 that's a brand-new issue.  And I know you're busy, but --

16         MS. KELLEY:  Right.  Well, we didn't know about it

17 till yesterday when we deposed her.

18         THE COURT:  Well, I don't know, it's sort of

19 hovered along the surface here for a while now, this waiver

20 issue.  But let me just -- is your client going to testify,

21 do you know?

22         MS. KELLEY:  No.

23         THE COURT:  All right, so the big issue is, since

24 this is a civil case, I still think it's playing with fire.

25 You're all civil attorneys.  I'd at least want to think about

c54f8bf1-818f-4641-970a-3c7a9b86cf63

1     it if you're going to make any argument about that.

2          MS. BOAL:  About Mr. Shields not testifying?  I'm

3     not sure we had contemplated that.  But the other thing that

4     I did want to raise with your Honor -- and I know that my

5     brethren are criminal attorneys -- that it's customary in

6     civil closings to say "evidence is undisputed."  So I just

7     wanted to raise that issue so we didn't get an objection

8     automatically because that is fair game in a civil case to

9     say.

10          THE COURT:  Right, and we're all thinking this

11    through through a different kind of prism.

12          MS. BOAL:  Yes.

13          THE COURT:  But I think what I don't want you to do

14    is say, "And he must be guilty or he would have testified."

15          MS. BOAL:  That's fair enough, your Honor.

16          MS. KELLEY:  I'm also just being reminded by my

17    cocounsel that we should wait to finally make that decision,

18    so I don't want to just lock us into his not testifying.

19          THE COURT:  I guarantee you, you can even change

20    your mind.  If he wants to testify -- it's his life -- he'll

21    be able to.  But I'm just worried in this

22    quasi-civil/criminal context what to do if he doesn't

23    testify, just thinking out loud.  What do they do in the

24    state courts?

25          MR. SWOMLEY:  I don't think they read your charge

1   that they have a right not to testify.  I know no --

2          THE COURT:  But no one comments on it?

3          MR. SWOMLEY:  No, they don't comment on, "He didn't

4   testify, therefore there's an inference," no.  That is not --

5          MR. GRADY:  Your Honor, they're compelled to

6   cooperate with the qualified examiners under the state

7   statute, so there never is an issue of him not being

8   presented to an expert because he's compelled to do so; and

9   if he doesn't, he's in contempt.  Here he has refused to meet

10  with the government's expert, and we believe because he

11  wishes to hide information from the government's expert.  I

12  think that is fair game.

13         THE COURT:  That's why I want to talk about it,

14  so --

15         MR. SWOMLEY:  His characterization of the state

16  system is entirely inaccurate.

17         THE COURT:  But apart from the state system, the

18  issue is, if you cross-examine his expert on the grounds that

19  you've never met with him, is it fair game to say that "He

20  refused to meet with me"?  I think it is.

21         MR. SWOMLEY:  I think that is, yes.  I'd agree with

22  that.

23         THE COURT:  Okay, so --

24         MR. GRADY:  And I take it, your Honor, I mean,

25  along the lines of discussing this issue, were we to subpoena

1   Mr. Shields to testify in the government's case in chief, you

2   would find that he has a right not to do so.

3              THE COURT:  Excuse me?

4              MR. GRADY:  Were we to subpoena him to testify in

5   the government's case in chief, you would find he has a right

6   not to testify.  I mean, you've asked us to discuss the

7   issue.  I mean, this is one permutation of the issue.  If we

8   were to subpoena Mr. Shields --

9              THE COURT:  I don't think I've ruled on that.

10             MR. GRADY:  That's an open issue then.

11             THE COURT:  I don't think I've ever ruled on that

12   or been asked to rule on that.  Are you planning on doing

13   that?

14             MS. BOAL:  No, your Honor.  What I would just ask

15   is, obviously Mr. Shields can testify or he cannot not

16   testify.  It is a civil proceeding.  We have not noticed his

17   deposition because, you know, we assumed he was not going to

18   testify.  I would just ask, if he is going to testify, that

19   we receive some notice of that so that we could take his

20   deposition prior to testimony.

21             THE COURT:  Right now, is it your intent not to

22   have him testify?  Or you don't know?

23             MS. KELLEY:  No, but -- no.  I'll just say "no."

24             THE COURT:  I can guarantee you, if he wants to

25   testify, I'm going to let him testify.  I mean, I don't know

c54f8bf1-818f-4641-970a-3c7a9b86cf63

1    how this is going to work out in the system, but is this

2    still true that the state has never recommended that someone

3    be released?

4         MR. SWOMLEY:  The state has never from the

5    treatment center done that, no.  The government agents, the

6    lawyers have not opposed when -- for example, all the

7    examiners clear somebody, they've gone into -- basically come

8    in and said, you know, "We're not opposing a release."  But

9    that's different than the Community Access Board, which is

10   the arm of the treatment center.  They don't say "Go."  No,

11   that doesn't happen.  Does that answer your question?

12        THE COURT:  Mostly.  Good-bye.  So we're right now

13   planning on June 16.  If your case gets bucked over, let me

14   know because there's a chance I could start the week earlier,

15   and I just would miss -- you know, let's just stay with the

16   16th.  I think it's just our safest bet.  Even if your case

17   goes away, we know about it, everyone can plan around it.  I

18   think that's the better course, even if your case gets

19   continued.

20        MR. SWOMLEY:  It's not going to get continued.  We

21   got a jury.

22        THE COURT:  What case is this?

23        MR. SWOMLEY:  Commonwealth V. Taylor.  It's the

24   murder case where the body was burned in Franklin Park two

25   years ago.

c54f8bf1-818f-4641-970a-3c7a9b86cf63

1              THE COURT:  It's a definite?  It's already been

2      impaneled?

3              MR. SWOMLEY:  Yes, it's already been impaneled.

4              THE COURT:  A three-week trial.  All right, so --

5              MS. BOAL:  Your Honor, if we're moving to the 16th,

6      there is a pretrial order in Peavey where dates have already

7      started to kick in.  We made our pretrial disclosures

8      yesterday.  So I guess I would suggest -- Mr. Fick is not

9      here from the Federal Public Defender's office -- that we

10     confer with him.  I don't know what the Court's schedule is.

11             THE COURT:  Maybe we'll do it in July, do Peavey in

12     July?

13             MS. BOAL:  So we'll talk to Mr. Fick about that.

14             THE COURT:  But, you know, just scheduling is so

15     fickle.  What would happen if his case went an extra week and

16     I couldn't try it before July 4, would you want to do Peavey

17     on the 16th?

18             MR. SWOMLEY:  I thought I was doing Peavey too,

19     so --

20             THE COURT:  You're doing Peavey too?

21             MR. SWOMLEY:  Yes, I'm on both of them.  I really

22     do think that we've given my murder case enough time here to

23     finish, so I don't think that that's going to be a problem.

24     I don't think it's going to be another week.

25             THE COURT:  Well, work it out with Mr. Fick because

1    hopefully we'll fall right on the heels in July and --

2         MR. SWOMLEY:  What I'd love is for them to keep the

3    discovery obligations flowing so that we're not --

4         THE COURT:  I want Peavey to be ready to go.  And

5    Wetmore is a whole other issue.  And, you know, it's

6    5:00 o'clock, and I've been on the bench since quarter of

7    9:00 this morning, so I am ready to go.

8         We don't need another pretrial.  I'm going to

9    impanel -- how many jurors should I impanel?

10        MR. SWOMLEY:  Thirty.

11        MS. BOAL:  Your Honor, just a couple quick

12   questions, whether you're going to allow jury binders?

13        THE COURT:  Yes.

14        MS. BOAL:  So we'd be ready to go with that.  And I

15   just wanted to quickly get some clarification on the Daubert

16   memo.  You had said that Dr. Tomich would not be able to,

17   quote, "testify about statistical matters."  I assume that

18   means he can say --

19        THE COURT:  He can say what the chart shows.  He

20   just can't render a -- I think he said he wasn't qualified to

21   discuss this.

22        MS. BOAL:  But he can talk about the rates of

23   recidivism on that enhancement chart, that 50 percent --

24        THE COURT:  Yes.  All right, good-bye.

25             (Adjourned, 5:00 p.m.)

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7

8           I, Lee A. Marzilli, Official Court Reporter, do

9   hereby certify that the foregoing transcript, Pages 1 through

10  39 inclusive, was recorded by me stenographically at the time

11  and place aforesaid in Civil Action No. 07-12056-PBS, United

12  States of America V. Jeffrey Shields, and thereafter by me

13  reduced to typewriting and is a true and accurate record of

14  the proceedings.

15          In witness whereof I have hereunto set my hand this

16  1st day of June, 2008.

17

18

19

20

21

            /s/ Lee A. Marzilli
22          _____

            LEE A. MARZILLI, RPR, CRR
23          OFFICIAL COURT REPORTER

24

25