```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
                Petitioner     )
                               )
           -VS-                ) CA No. 07-12056-PBS
                               ) CA No. 07-12059-PBS
JEFFREY SHIELDS and            ) Pages 1 - 40
CHARLES PEAVEY,                )
                               )
                Respondents    )




                       MOTION HEARING

             BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE
```

```
                       United States District Court
                       1 Courthouse Way, Courtroom 19
                       Boston, Massachusetts
                       November 16, 2007, 3:45 p.m.
```

```
                       LEE A. MARZILLI
                    OFFICIAL COURT REPORTER
                  United States District Court
                  1 Courthouse Way, Room 3205
                      Boston, MA  02210
                       (617)345-6787
```

1    A P P E A R A N C E S:

2        MARK J. GRADY, ESQ. and MARK QUINLIVAN, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the United States of America.

4
         PAGE KELLEY, ESQ, Federal Defenders,
5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
     for Jeffrey Shields.

6
         WILLIAM FICK, ESQ., Federal Defenders, 408 Atlantic
7    Avenue, Boston, Massachusetts, 02210, for Charles Peavey.

8        ERIC TENNEN, ESQ., Swomley & Associates,
     227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
9    for Jeffrey Shields and Charles Peavey.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2            THE CLERK:  The case of the United States V.

3    Jeffrey Shields, Civil Action No. 07-10256, and United States

4    V. Charles Peavey, Civil Action No. 07-12059, will now be

5    heard before this Court.  Will counsel please identify

6    themselves for the record.

7            MR. QUINLIVAN:  Good afternoon, your Honor.  Mark

8    Quinlivan for the United States.

9            MS. KELLEY:  Good afternoon.  Page Kelley.  I

10   represent Mr. Shields.

11           MR. TENNEN:  Eric Tennen sitting in on behalf of

12   Attorney Swomley for Mr. Shields and Mr. Peavey.

13           MR. FICK:  William Fick for Mr. Peavey.

14           MR. GRADY:  Mark Grady for the United States.

15           THE COURT:  All right, let me turn to the

16   government first.  Do you want the trial?

17           MR. QUINLIVAN:  Your Honor, we would like the

18   opportunity to inform this Court on Monday whether we're

19   going forward.  I can tell you this is what we anticipate

20   doing, your Honor:  We are likely going to request that one

21   of two individuals who have been qualified in the

22   Massachusetts system be appointed as an additional expert in

23   this case, both of whom have told us that they will render an

24   opinion within 21 days, and we will live with whatever

25   judgment they come up --

1          THE COURT:  Why can't you just have them as your

2    expert?

3          MR. QUINLIVAN:  Well, because they haven't examined

4    Mr. Shields.

5          THE COURT:  But what if he refuses to be examined?

6    I'm right back into this mess.

7          MR. QUINLIVAN:  And this is what we learned with

8    Dr. Channell, and I apologize for not making this clear, but

9    we had anticipated that even if Dr. Channell could not, like,

10   personally interview the respondent --

11         THE COURT:  Who's Channell?  Just start me from

12   base one.  He's your guy?

13         MR. QUINLIVAN:  He was our guy, that's right.

14         THE COURT:  I don't remember.  Just I appointed

15   one.  He's the independent person and --

16         MR. QUINLIVAN:  Well, and if your Honor recalls --

17         THE COURT:  You agreed to him, so --

18         MR. QUINLIVAN:  Well, if I could just back up very

19   quickly on that.  I believe, and I've looked back on this,

20   the request came in on October 1, and we had the hearing on

21   October 2.  At that time we had not taken a look and had no

22   opportunity to look at the background of this individual.  We

23   do have some concerns.  It turns out that Dr. Plaud, it's

24   come to our attention, has only testified as a defense

25   witness, and his testimony has only come to the conclusion

1   that individuals don't meet the standard in Massachusetts.

2   So --

3           THE COURT:  Well, is he here right now?  Has he

4   ever come out the other way?

5           MR. TENNEN:  If I can just explain that, your

6   Honor, no expert who testifies for a defense will ever be on

7   record as testifying that someone is dangerous because if --

8           THE COURT:  No, I've had psychiatrists in state

9   court and Federal Court, and sometimes they come out the

10  prosecution way, and sometimes they come out the defense way,

11  and that's who they are.

12          MR. TENNEN:  The way it's structured in

13  Massachusetts is that you have these two qualified examiners,

14  is what they're called, and those are the court-appointed

15  ones, if you will, and then the petitioners are entitled to

16  their own.  If we as petitioners have a doctor do an

17  evaluation and he comes out, "You know what, I evaluated this

18  guy.  I actually think he's dangerous," we're not going to

19  call them to testify.  That's why the persons who normally do

20  petitioner work or defense side work, if you will, they're

21  never going to be on record as saying that because they just

22  won't be called in that case.  So it's really a matter of

23  what side your testifying --

24          THE COURT:  It just gives me less comfort that it's

25  an independent, but you didn't object.  You didn't object.

1   And maybe you're new to the game, but you didn't object.  So

2   here's the problem:  These people -- I've got a doctor who's

3   independent who's now -- I don't want to put the trial off.

4   Now, I'm not saying that you can't -- no, I'm not putting

5   this trial off.  This guy has been held for six or seven

6   months.  If you want to put on your expert, put on your

7   expert.  If you want to evaluate him and he declines, then

8   you can just say he declined.  It's not the Fifth Amendment.

9   Just say he declined.

10         But I'm back at base one, which is that this guy's

11   probably being held -- you can't say 21 days in December.

12   That puts me on Christmas Eve.  That's just not going to

13   happen.  You want me to do it December 23?  So, you know,

14   he's probably being held, and he might be found not

15   sexually -- I'm searching for the words, I'm so new to

16   this -- not sexually dangerous.  So, I mean, realistically I

17   can't put it off 21 days.

18         MR. QUINLIVAN:  And, your Honor, all we're

19   requesting --

20         THE COURT:  So you use your psychiatrist.  If you

21   want to try and have access to him, do it.  I don't think the

22   Fifth Amendment -- if he declines, he declines, and then you

23   can say that to the jury.

24         MR. QUINLIVAN:  And if I could further explain,

25   your Honor, the problem with our expert as an forensic

4846d85c-0056-4b49-85aa-1294947786a7

1    examiner, in the absence of either the consent of one of the

2    respondents or a court order, he can't even, based on the

3    ethical guidelines, he can't even look at the records to

4    render an opinion.

5         THE COURT:  You want access to the records?  I'll

6    give you access to the records.  You want to go try and talk

7    to him and he says "no," it's not going to be any different

8    if I appoint.  What am I going to do, tie him up?  I mean, if

9    he says "no," he says "no."

10        MR. QUINLIVAN:  No, I -- well, and, your Honor, I

11   understand the situation.  What we would like to do is this:

12   We would like the opportunity -- we will file on Monday a

13   request to have one of these other two.  If your Honor denies

14   it, we understand, but we want also till Monday to advise the

15   Court whether we can go forward on the 26th in the absence

16   because right now we have no expert.

17        THE COURT:  You want to go forward?

18        MS. KELLEY:  We want to go forward on the 26th, but

19   I would ask your Honor not to give the government any more

20   time to dig up an expert.  They've had a year, not six or

21   seven months.

22        THE COURT:  Denied.  They've already come up

23   with -- this is the Channell guy, right, whatever name you

24   came up with before?  You know who they want.  I am not going

25   to say they can't put on their case.

1          So let me put it this way:  They want this guy,

2     assuming -- I don't know anything about the man.  Is he a

3     psychiatrist?  Who is he?  I didn't even read the stuff

4     because I wasn't about to employ a second independent person.

5          MR. QUINLIVAN:  Your Honor, he is a certified

6     psychologist with the Bureau of Prisons.  And I know that the

7     concern has been raised that he works for the Bureau of

8     Prisons.  I would point out, your Honor, that --

9          THE COURT:  So what?  He's your expert.

10         MR. QUINLIVAN:  And, indeed, in cases in North

11    Carolina in which the person from the Bureau of Prisons has

12    determined that the individual is not sexually dangerous to

13    others, then the case has been dismissed.

14         THE COURT:  Listen, I'm just not going to make him

15    my independent expert, that's what I'm not going to do,

16    because he's an in-house person.  That would be not an

17    independent observer.  But if you want to put on an expert --

18    just like a police officer is not independent, you know, not

19    neutral.  So if you want him, assuming for a moment he's

20    qualified, I will give him to you, but I'm not going to --

21    and if he wants access to the records, he gets access to the

22    records.

23         So, now, here's the issue:  If I allow that, do you

24    want to go forward on the Monday?

25         MS. KELLEY:  Yes, we'd still want to go forward on

1    the 26th, but if I may, your Honor --

2            THE COURT:  Do you want additional time to get his

3    report?  I mean, this is --

4            MS. KELLEY:  Well, we obviously need his report

5    before trial, but if I may, we have filed a motion to exclude

6    Dr. Channell's testimony because the statute does not

7    envision that the court will take expert testimony from

8    someone who is not a court-appointed independent expert.  And

9    he isn't qualified anyway.  He isn't --

10           THE COURT:  The statute doesn't say one way or

11   another what that hearing looks like.  It's not -- you can't

12   just simply -- essentially the way you would have it is that

13   one neutral person makes the decision, not me, because

14   otherwise there's insufficient evidence.  I won't know

15   whether he -- I mean, I've never done one of these cases.  So

16   putting aside the advisory jury for a second, I need to be

17   able to hear the basis for the government's position; and I'm

18   not going to so hamstring them that they can't put on their

19   own position unless the statute says otherwise, which it

20   doesn't, right?

21           MR. TENNEN:  It does, your Honor.

22           THE COURT:  What does it say?

23           MR. TENNEN:  It says that each examiner shall be

24   designated by the court, except essentially, dot-dot-dot,

25   upon the request of the defendant.  I mean, essentially what

1   the statute is doing is envisioning, look, we get one neutral

2   person.  They make an evaluation.  If they find that your guy

3   is dangerous, we're going to give you, defendants, an

4   opportunity to have your own.  And that's it.

5          THE COURT:  Well, do you want your own?

6          MS. KELLEY:  No, because he's not dangerous, and

7   they've had their --

8          THE COURT:  Please, please, please.  If they want

9   their own expert, I will let them have their expert.  It will

10  not have the blessing of a neutral court-appointed examiner.

11  If you want access to the records, I'll give you access to

12  the records.  When can you -- I'm assuming -- I may be wrong

13  about this -- that -- I don't know whether he'll -- well, I

14  won't assume anything about whether he'll want to talk with

15  your person.  I've got to --

16         MR. QUINLIVAN:  He has to at least make a

17  good-faith effort to do so, and unfortunately, your Honor,

18  the --

19         MS. KELLEY:  He will not talk to the expert.

20         THE COURT:  Okay, so we're over that.

21         THE COURT:  So, now, how many records are there?

22         MR. QUINLIVAN:  Well, your Honor brings me

23  to, we've spoken to Dr. -- he has not looked at any records

24  because of this, so if that were the case --

25         THE COURT:  Well, who made the certification from

1    the prisons?

2            MR. QUINLIVAN:  It's made by a board in Washington,

3    D.C.

4            THE COURT:  Don't they see the records?

5            MR. QUINLIVAN:  Well, they do, but they are not --

6    it's a different standard than the ultimate determination on

7    whether somebody's sexually dangerous to others, and --

8            THE COURT:  Well, who made the decision he was?

9            MR. QUINLIVAN:  It was a determination that was

10   made by -- actually, I don't know the doctor's name off the

11   top of my head, but it was included with our certification.

12           THE COURT:  Well, why don't you just have that guy,

13   or woman?

14           MR. QUINLIVAN:  Well, I appreciate that, your

15   Honor, but --

16           THE COURT:  He's looked at the records or she's

17   looked at the records.

18           MR. QUINLIVAN:  But it's -- well, your Honor,

19   that's a different -- there are two issues.  First off, they

20   have looked at the issues, and I understand the time has gone

21   by, but that was largely at the respondent's request.  But

22   that was a determination a year ago that the person would be

23   happy to make a present determination.

24           THE COURT:  Well, how thick are these records?  Is

25   it like a little thing or --

1          MR. QUINLIVAN:  No.  They're -- I mean, I -- well,

2     I --

3          THE COURT:  Well, sure, can he read them this

4     weekend?

5          MR. QUINLIVAN:  He has told us that he would not be

6     able to render an opinion by the 26th, so that's why I've

7     told you in the alternative that we would have to advise the

8     Court whether we can go forward in these circumstances.

9          THE COURT:  Your problem is that this guy has been

10    held now for how many months?

11         MS. KELLEY:  A year.

12         THE COURT:  A year.  Part of this was agreed to

13    because of the briefing schedule, and it was very long and

14    complex and important constitutional issues, and we all

15    agreed to that, and the probable cause hearing was waived

16    just with respect to him because he wanted to move right on

17    to the main thing.  However, I've now got a situation where,

18    as far as I'm concerned, that he could easily based on that

19    report be found not sexually dangerous, and I don't want to

20    hold him any longer than I have to.

21         MR. QUINLIVAN:  I understand, your Honor.

22         THE COURT:  Can this man look at these records over

23    the weekend and then tell you whether -- not a report --

24    whether you even want to go forward?

25         MR. QUINLIVAN:  He has told us that he cannot.

1          THE COURT:  Well, when can he look at them,

2     Monday?

3          MR. QUINLIVAN:  Well, he has -- your Honor, we

4     spoke with him, and, you know, they take this very seriously,

5     obviously, because, you know, to make a determination or a

6     recommendation that somebody be held, he said that he would

7     need a significant period of time.  And that's why we went to

8     the Massachusetts list of qualified examiners to see if

9     somebody could do it in a shorter period of time, and we have

10    two people who said they could do it within --

11         THE COURT:  Well, why haven't you filed an

12    opposition yet to her thing?  In other words, I've got a

13    problem, a big problem.

14         What's your position on this?

15         MS. KELLEY:  I think the case should be dismissed

16    and --

17         THE COURT:  Overruled.

18         MS. KELLEY:  -- Mr. Shields should be freed.

19         THE COURT:  Overruled.  Okay, so now we're there.

20    We're going to have a trial, all right?  And I'm going to let

21    them have their own expert, but I am incredibly worried about

22    the amount of time that's gone by.  And I don't understand

23    why you haven't asked before this.  You asked to have him

24    appointed as a neutral, but that's different from your own

25    expert.

1          MR. QUINLIVAN:  Well, and when we didn't object to

2     their expert, we understood and we were under the assumption

3     that our expert would be able to meet and do an evaluation,

4     and that motion was denied.  And Dr. Channell now tells us

5     that he can't even make an evaluation based on the records,

6     absent either the court order or the consent of the

7     individual.

8          THE COURT:  I'll give you the court order for

9     access, but you could have asked for this weeks ago.

10         MR. QUINLIVAN:  Well, and, your Honor, you know, we

11    did not -- we were operating under the --

12         THE COURT:  You thought you'd get a "He's sexually

13    dangerous" out of this.

14         MR. QUINLIVAN:  No, no.  We were under the

15    impression that he and we thought that he would be able to

16    render an opinion, even without a personal interview.  We've

17    learned this week --

18         THE COURT:  You're not getting a personal

19    interview.  So now what is he going to do?

20         MR. QUINLIVAN:  He needs a court order even to

21    issue a recommendation or an opinion based on the record.

22         THE COURT:  Well, can he render -- I don't want to

23    wait three weeks for him to say, "I can't do it just based on

24    the records."

25         MR. QUINLIVAN:  Well, that's why we contacted two

1   people who have been qualified by the Massachusetts

2   Department of Correction with respect to state court

3   certifications.  Both have assured us they can do it within

4   three weeks.

5            THE COURT:  Just on the records?  But I don't want

6   to wait three weeks if you're just going to dismiss the

7   case.  I need some threshold assurance from you that you

8   still plan on going ahead, and I don't want to wait three

9   weeks to do that.  You're telling me now you don't have a

10  psychiatrist who's willing to look at it to say whether

11  there's even a probable cause?

12           MR. QUINLIVAN:  No, I -- well --

13           THE COURT:  I mean, this is pretty bleak.  This guy

14  has been held for a year.  I need some psychiatrist to come

15  in here and say that there's probable cause to believe he'd

16  do it again.

17           MR. QUINLIVAN:  Well, the probable cause, I mean --

18  well, your Honor, first off, my understanding is, again, I

19  mean, I guess you could --

20           THE COURT:  Why don't I even have a probable cause

21  hearing on Monday.  I need someone to say that now that I've

22  got this report, right?  What basis do I have for holding him

23  even?  Why don't I release him on supervised release, I mean,

24  pending the hearing.  I don't know what to do.  I'm not

25  convinced I have probable cause anymore.

1          MR. QUINLIVAN:  Well, your Honor, if we could be

2     just afforded the opportunity on Monday to file something on

3     that point, and we will advise the Court whether, if your

4     Honor decides to go forward on the 26th, whether we can

5     proceed.

6          THE COURT:  I'm right now planning on going forward

7     on the 26th.  I would give you the right to your expert, and

8     I orally give you the right to access to the records.

9     They've said orally on the record he won't be talking to you,

10    so that is the situation you need to present to your

11    psychiatrist, okay?

12         Now, if at some point he says he can render an

13    opinion just based on the records, and this is what the

14    preliminary threshold is, then they've got a legitimate issue

15    here because they may want to see a report first so that they

16    can cross-examine him.  And they need to discuss with their

17    client about whether or not it's worth it to them for another

18    week or two to see whatever the report is so they can prepare

19    and cross and maybe challenge it under Daubert or whatever

20    comes up.

21         I'm not, by the way, even sure I even understand

22    your psychiatrist's report.  I don't understand this test,

23    and he sure wasn't explaining it well with the 0, 1, 2, 3, 4,

24    5, 6, and how it gets to -- I don't even understand it.  So

25    at some point I'm going to need to understand that.  At this

1    point, I notice you're not challenging the methodology

2    anymore because you got the answer that's favorable to your

3    client, but you may well want to challenge this guy's

4    methodology.  And maybe there's good reason why the state has

5    two examining people instead of one.  You can't all hang on

6    what one person says, right?

7            MS. KELLEY:  Well, if they come out for the

8    defendant, it seems to me that everyone is suddenly saying,

9    "Oh, we need a second opinion," but the statute does not

10   provide for that, your Honor.

11           THE COURT:  I'm overruling that.  Okay, so the

12   issue really is, right now there's a trial on the 26th.  Now,

13   am I willing to put it off if you want it?

14           MS. KELLEY:  We want the trial on the 26th.

15           THE COURT:  Now, you need to come up -- that's

16   where we're at right now.  Now, point two is -- if you want a

17   little written order -- I don't know, it's now Friday at

18   4:00 -- to give him access to the records, can he read them

19   this weekend?

20           MR. QUINLIVAN:  We will contact him.

21           THE COURT:  Point two is, for the next person up, I

22   don't want to have this happen again.  We haven't even signed

23   an order yet, so how are we going to come up with an

24   independent examiner?

25           MR. FICK:  We actually have an appointed

1    independent examiner for Mr. Peavey.  It's a different

2    person, Dr. Prentky.  The government may want to have a

3    conversation about whether they still think that's okay.

4         THE COURT:  Yes, I don't want to be here again.

5    When can you tell me me about Prentky?

6         MR. QUINLIVAN:  A week from today.

7         MR. GRADY:  Is a week from today okay with your

8    Honor?

9         THE COURT:  I'm not going to be here a week from

10   today.  Maybe you all are.

11        MR. GRADY:  Well, the Tuesday after -- why don't we

12   say a week from Tuesday.

13        MR. FICK:  Your Honor, I hope we can confer next

14   week and figure out if we agree or not.

15        THE COURT:  Can't you decide next week so I can get

16   this ruling to you?

17        MR. GRADY:  Yes, yes, we'll do it next week.

18        THE COURT:  Tell me about your person because, I

19   mean, essentially I knew nothing about -- I guess you'd call

20   him the petitioner -- the petitioner until I saw this

21   report.  I mean, do you have multiple --

22        MR. GRADY:  This is a third offense.  There were

23   two offenses of assault on males under the age of fourteen,

24   convictions in state court, and then there was a 57-month

25   sentence in the Federal Court for possession of

1    postpubescent/prepubescent child pornography on the

2    respondent's computer.

3              THE COURT:  For two nonconsensual touches.

4              MS. KELLEY:  Are we speaking about Mr. Shields at

5    this point?

6              THE COURT:  No, no.

7              MR. FICK:  Mr. Grady was actually talking about

8    Mr. Shields.

9              MR. GRADY:  I was talking about Mr. Shields.

10             THE COURT:  No, but one was consensual with

11   Shields.  I want to know about Mr. Peavey.

12             MR. FICK:  Mr. Peavey has a long history of sort of

13   serious health problems, including mental health problems,

14   and has been institutionalized much of his life.  There are a

15   couple of serious sexual assaults from decades ago.  He was

16   in federal custody for a simple assault on a nurse in a VA

17   hospital for which he got a six-month sentence.

18             THE COURT:  What are his prior sexual assaults?

19             MR. FICK:  There are a couple of rapes from back

20   decades ago.  Since then, he's had a stroke.  He's got all

21   kinds of incapacitating health issues.

22             THE COURT:  So you're saying he may have once been,

23   but now, given where he's at in terms of his age and status,

24   that he no longer is.  So it's a different kind of case, is

25   that it?

1       MR. FICK:  The gist of it is, yes, it's a different

2   kind of case.  It's going to involve sort of issues of just

3   plain old physical health in addition to everything else.

4       THE COURT:  Okay, that's useful.  I mean, I don't

5   even know these basic things.  So when do we have his trial

6   coming up?  It's soon.

7       MR. FICK:  Well, a date was actually never

8   scheduled, and that was one of the things I was going to ask

9   about today, if we could get one in like January or

10  something --

11      THE COURT:  We need an independent examiner.  Do

12  you know anything about this guy?  Are you prepared today to

13  agree to him?

14      MR. QUINLIVAN:  We're not prepared to agree to him

15  today, but we will look, and I would say by Tuesday we would

16  let the Court know whether we'd want --

17      THE COURT:  This Tuesday, not a week from Tuesday.

18      MR. QUINLIVAN:  No, I understand.  This coming

19  Tuesday we would let the Court know whether that's

20  agreeable.  What we would do in the alternative to avoid the

21  situation going forward, again, we have these two individuals

22  who have been qualified for Massachusetts who have told us

23  they could do it within three weeks.  We would request, if

24  it's not agreeable, that the Court appoint this other person

25  as well.

1          THE COURT:  Let me ask you.  So you're going to

2      come up with another person, and maybe you can negotiate a

3      person by Tuesday.  Mr. Alba thinks we have a court date for

4      Mr. Peavey.

5          THE CLERK:  December 3, isn't it?

6          MR. FICK:  Well, there was discussion of it, but I

7      think actually another criminal trial in our office got

8      scheduled for that day.

9          THE COURT:  Right, Trevor Charlton.  So I'm

10     consuming the Federal Defender's office, so we'll do the 10th

11     or something like that.

12         MR. FICK:  Well, we also had an issue with the

13     availability of Dr. Prentky to get into Devens.  I think

14     we're only going to be able to get him in, like, after

15     Thanksgiving.

16         THE COURT:  All right, so when do you want?

17         MR. FICK:  Early January I think would make --

18         THE COURT:  So what date should we put it on?  And

19     I want a date for Wetmore too.

20         MR. TENNEN:  I would say mid to late January for

21     Peavey in order to have the time for the evaluation of the

22     report.

23         THE COURT:  Sure, it's your right at this point.

24     And the alternative is, you don't have to waive probable

25     cause forever if you want a probable cause hearing.  So you

1    have for the time being, and I've put that in my back burner,

2    but at least right now -- so, Mr. Alba, when in January?

3              THE CLERK:  Late January, January 22?

4              THE COURT:  January 22?

5              MR. FICK:  That's fine.

6              THE COURT:  Sound good to you?  Okay, I want to do

7    Wetmore right now too.

8              MS. KELLEY:  If I can address Joel Wetmore's

9    situation.

10             THE COURT:  Okay.

11             MS. KELLEY:  I represent him.  He is being

12   evaluated by a defense-hired expert today.  That's the reason

13   why I didn't want him brought in today.  And we, I believe,

14   will be asking the Court in the very near future to help us

15   arrange with the Bureau of Prisons to medicate Mr. Wetmore.

16             THE COURT:  Like, he's depressed?  That kind of --

17             MS. KELLEY:  No.  Do you want to address it?  Well,

18   the medication has to do with treatment, but we need to speak

19   further with --

20             THE COURT:  I know, but I want to set up a

21   timetable with him.  You know, I'm always here if you need to

22   continue it.  I mean, I think we should come up with a

23   jointly agreed-upon expert by a certain date.  Just pick a

24   date.  I just don't want him to fall off my chart, so --

25             MS. KELLEY:  Well, I think we could agree on an

1   expert or try to agree on an expert with the government

2   tomorrow.  I mean --

3         THE COURT:  Fine.

4         MS. KELLEY:  -- just reaching an agreement about

5   who should be the court-appointed expert --

6         THE COURT:  Just say by the -- by Tuesday of next

7   week, maybe you could agree to the same person.  Or maybe if

8   you have a disagreement, one would be for one and one for

9   another.  Let's set up a trial when, in February, March?  I

10  don't want it to go off forever.

11        MS. KELLEY:  Yes, I don't think this is going to go

12  on forever, but I'm very reluctant to set a trial date

13  without conferring further with our expert.  I don't know

14  what the timetable is.

15        THE COURT:  Just I want something.  You can always

16  move to continue it.

17        MS. KELLEY:  Okay, can we have a March date?

18        THE COURT:  Yes.

19        THE CLERK:  March 17.

20        THE COURT:  Okay?  I'm actually not sure myself.

21  I'm going on vacation somewhere in there.  It may be in

22  March.

23        MR. GRADY:  You can ask for a continuance.

24        MS. KELLEY:  Can I say one thing, because I think

25  it's important, about these qualified experts on the

Page 24

1    stateside?

2           THE COURT:  Yes.

3           MS. KELLEY:  There is a list of experts that are

4    referred to as qualified experts in state court.  There's no

5    special training or qualifications that people need to get on

6    that list, and in fact many people on that list are much less

7    qualified than people who are not on the list.  There are

8    people who are not on the list who used to be on the list.

9           THE COURT:  Sure.

10          MS. KELLEY:  And so on.  There's nothing specially

11   qualified or certified or anything about the people on that

12   list versus people --

13          THE COURT:  So, okay.

14          MS. KELLEY:  Well, the government just keeps

15   saying, "This is the person who is qualified by the state."

16   It really has no meaning.

17          THE COURT:  Okay.

18          MR. QUINLIVAN:  Your Honor, if I could just address

19   very briefly on that, the only point we're trying to make on

20   this is that in the Shields case, the motion to appoint

21   Dr. Plaud was filed on October 1.  The next day we had the

22   status conference where this issue was raised.  We had not

23   had the opportunity to look at his background or anything.

24          THE COURT:  But you agreed.  I mean, if you hadn't

25   agreed, I would have said -- you know, I would have heard

1    some argument.  I mean, I think it was just submitted to me

2    as an agreed-upon name?

3              MR. QUINLIVAN:  No, when -- if your Honor

4    recalls --

5              THE COURT:  You never objected.  You never

6    objected.  Did you?

7              MR. QUINLIVAN:  What I said was that your Honor

8    needs to appoint somebody independent, but the statute allows

9    the respondent in any sense to ask for somebody, so --

10             THE COURT:  You know what?  I understand.  You

11   know, I'm not faulting you.  This is new for all of us --

12   maybe you -- it's brand-new for all of us.  I don't know if

13   the other district -- actually, they found it unconstitutional,

14   so maybe they're not.

15             MR. QUINLIVAN:  They're not proceeding, that's

16   right.

17             THE COURT:  Maybe I'm the only one struggling with

18   these issues.  I don't know the answers.  But I do know, if

19   you don't object, because the government's really good at

20   objecting when they don't agree, I'm assuming there's no

21   problem.  So I appointed him.  I got no objection.  He may be

22   right; he may be wrong.  I don't know.  I'm going to let you

23   have your own expert.  There's nothing in the statute that

24   precludes that.

25             That having been said, you know, I'm holding these

1    people.  You've got to be ready.  The government's got to be

2    ready to go.  And if you're not prepared to use the guy in

3    Washington who made the initial determination and you need a

4    new person, it can't -- you shouldn't have waited this long.

5          MR. QUINLIVAN:  I understand, your Honor.

6          THE COURT:  And I'm not faulting you.  We're all

7    learning as we're going.  It's just the reality is, I'm

8    holding him.

9          Now, let's get to Part B.  Is it like a detention?

10   I used to be an magistrate judge, as you know.  Are there

11   conditions or a combination of conditions of release -- I've

12   never done one of these things -- that take a guy who maybe

13   there could be two reasonable points of view on, where

14   release subject to heightened conditions is a possibility?

15   I'm not the sentencing judge, so I don't know that that's my

16   job.

17         MS. KELLEY:  Well, if I may, one of the things we

18   were going to present at Mr. Shields's trial was the kind of

19   unbelievably restrictive conditions that sex offenders are

20   placed under on supervised release these days.  For three

21   years, Mr. Shields here before you is going to be very

22   closely supervised by a probation officer.

23         THE COURT:  Where?  What district?

24         MS. KELLEY:  In Maine, who will know where he lives

25   and see that he's registered with the police locally.  And

1    the Sex Offender Registry law in Maine is very stringent.

2    They keep very close tabs on these people.  They notify the

3    neighbors, and they can't live around schools and places

4    where children congregate, et cetera.  He'll be subject to

5    polygraphs.  He'll be subject to -- he'll have to go to sex

6    offender treatment.  They will be reporting to his probation

7    officer how he's doing and so on.

8            So for the next three years, he's going to be under

9    very, very strict supervision.  He was in a halfway house.

10   He was one day from being released.  And one of the witnesses

11   we will call if we ever get to his trial is a woman named

12   Rene' Moore who was his case worker there, who was totally

13   stunned when he was whisked away because he was doing

14   everything right at that halfway house.  He had found

15   employment.

16           THE COURT:  Sure, so that's what I'm sort of

17   asking, which is I don't know because I've never done one of

18   these before.  I'm categorically precluded in a criminal case

19   from being involved in plea negotiations, but this isn't a

20   criminal case.  It's a civil case.  And the question is on

21   some of these cases, which maybe reasonable people can

22   disagree or agree on, whether there are alternative

23   resolutions.

24           I don't know if you've looked at this.  You're

25   civil lawyers for the most part.  She's for the most part a

1    criminal lawyer.  And if she's looked at the conditions of

2    supervised release, it may be different for him, for example,

3    than someone who's in on a drug charge who may not have this

4    level of supervision coming out.  I just would urge you to

5    try and look at that in making a determination for the

6    government.  You know, it may very well be that somebody

7    who's in on child pornography with very restrictive

8    conditions may, from the government's point of view, be in a

9    different position than someone who's in on a drug charge,

10   where you happen to know that, you know, there were a bunch

11   of previous convictions or evidence or whatever, and he's

12   only out on drug testing.  You know, that's just a different

13   kind of case.

14        So I'm simply saying the following:  It's a really

15   serious situation for me now to continue to hold him.  He's

16   entitled to a hearing, and at this point I want to have that

17   trial on the 26th.  If you need a quick sign on the order to

18   give him access to the records or if you can just simply -- I

19   don't know.  I mean, you can just --

20        MR. QUINLIVAN:  We would submit something really

21   quickly, your Honor.

22        THE COURT:  Okay, and I'll sign it, and it will be

23   subject -- I don't know if you have an objection or not.

24        MS. KELLEY:  Well, I object to this whole process.

25   I think it is not envisioned by the statute.  I don't think

1    it's --

2           THE COURT:  So that's preserved, and I will allow

3    him access to the records.  But here's the issue:  I'm having

4    that hearing.  As long as they still want it, I'm having it.

5    And then I've got Peavey in January and Wetmore in March.

6           And the other thing I would like you all to sit and

7    think about is, as I understand it, prospectively the

8    Department of Justice is not issuing regulations on timing of

9    probable cause hearings.  Am I right?

10          MR. GRADY:  There is nothing in the rules right

11   now.

12          THE COURT:  How should I be handling these in the

13   future?  I mean, in other words, I don't ever want this to

14   happen again where somebody the night before they're about to

15   be released --

16          MR. QUINLIVAN:  Well, I mean --

17          THE COURT:  Somebody's got to look at this.

18          MR. QUINLIVAN:  I took it from your Honor's ruling

19   that at least in any case that your Honor has in the future,

20   there's going to be a probable cause hearing within -- at

21   least absent --

22          THE COURT:  Yes, but the way it's working now --

23   and I should mention this to you, we talked about it at the

24   Judges' meeting -- it's going to be a random draw.  There's

25   got to be a way that that's just not going to sit there.  I

1    could do it at a Judges' meeting, which I prefer not to do,

2    or we could come up with some sort of game plan.  It's mostly

3    Federal Defenders, right?  It's mostly you people, right?

4    What's going to happen?  Should it immediately be referred to

5    a magistrate judge for a discussion by counsel about whether

6    they want some sort of a hearing before the two or three

7    months moves along?  How do you want it?  I don't want to put

8    you on the spot, but it came up with me, for example, I was

9    the one who got the boot camp issue, as you all well

10   remember.  And so the way we had it is -- who was it?  Was it

11   you?

12          MR. GRADY:  Bunker, George Henderson for the United

13   States in the boot camp --

14          THE COURT:  You would instantly go up to the Clerk

15   and say, "This is a boot camp issue," and you would make a

16   decision about whether you wanted to fight it or just redo it

17   under the old CCC guideline so it didn't run its course.

18          MR. QUINLIVAN:  Perhaps we can -- we'll speak with

19   the Federal Defenders, and we'll also consult with BOP in

20   Washington about that, your Honor.

21          THE COURT:  Okay.  Now, if the case goes forward,

22   I've got this other problem, which is, they need to be able

23   to get an expert report, and then they have the right if they

24   think they can't handle it.  Now, you're telling me it's

25   impossible, so you may decide not to go forward.  I don't

1    know.

2          MR. QUINLIVAN:  We'll be advising you about that on

3    Monday, yes.

4          THE COURT:  But if in fact you decide to go

5    forward, and if in fact you ask for an expert, he's got to be

6    able to turn around a report in a way that they can respond

7    to Thanksgiving week.  So I need some sort of timetable.  And

8    then it's in your ballpark as to whether you want it bumped

9    by a couple of weeks, your decision, your call.  I could do

10   it after Trevor Charlton, which I think -- you can talk to

11   both your respective sides, but I think it's only about a

12   week-long trial.  But it sounds like you're telling me that

13   there's no way you can do it.

14         MR. QUINLIVAN:  Well, I think, your Honor, from my

15   understanding, and we will consult, but my understanding, in

16   all likelihood, what we'll be advising your Honor on Monday

17   is whether we can proceed in the case at all, given the

18   circumstances.  But that's obviously a decision that I can't

19   make on the spot, and we'll have to consult, but we will so

20   inform the Court on Monday.

21         THE COURT:  All right, now, if it doesn't happen,

22   then what happens?

23         MR. QUINLIVAN:  Well, if it doesn't happen, then I

24   think that, you know, we will -- well, I assume, if the case

25   doesn't go forward, then, you know, the certification would

Page 32

1  be withdrawn and the case dismissed.

2        THE COURT:  And then what happens?

3        MS. KELLEY:  He goes to Maine and reports to his

4  probation officer.

5        THE COURT:  How does that happen?  Just physically

6  what happens?  He's here.  I do what?

7        MS. KELLEY:  I think you let him go, and you

8  discharge him.  And he walks out the door, and he gets on a

9  bus and goes to Maine.

10        THE COURT:  Is that what -- I actually am pretty

11  ignorant about this in terms of what usually happens when you

12  leave a halfway house.  Where is he right now?

13        MR. QUINLIVAN:  He's at FMC Devens right now.

14        MS. KELLEY:  He had extensive plans set up for his

15  release, including living at another halfway house called the

16  Oxford House.  He had a deposit there.  They have a curfew.

17  They have random drug screens there.

18        THE COURT:  Those are exactly the questions I'm

19  asking.  Is a bed still available?  I don't know.

20        MS. KELLEY:  Yes, well, we're looking into that.

21  They're actually checking now to see where is his deposit

22  there?  But he would work out with his probation officer

23  where he's going to live and so on in the community there.

24        THE COURT:  This is what I sort of want to happen,

25  which is that if you decide not to proceed -- maybe you'll

1    decide to proceed and just cross-examine the expert.

2         MR. QUINLIVAN:  Well, and one of the questions

3    we're looking at is whether we can, you know, both as a

4    matter of ethics and professionally, whether, you know, we

5    can go forward in a case of this magnitude in the absence --

6    if the government were not to put on an expert.  So that's

7    one of the issues we have to look at.

8         MR. TENNEN:  That's certainly one of the issues

9    that we raised in our motion to dismiss and I guess is

10   attached to the Daubert hearing, that they can't put on a

11   case without an expert.  In other words, there can be no

12   finding from a jury or judge that someone is sexually

13   dangerous without some psychologist or psychiatrist getting

14   up there and giving that opinion because it is beyond the

15   scope of what lay people know, and no one can go up there and

16   testify, so --

17        THE COURT:  You've actually said two different

18   things.  One is that no one can do it at all.

19        MR. TENNEN:  Well, if we're forced to do it, then

20   at the very least, it has to be someone who has knowledge in

21   the field and can at least explain the science.

22        THE COURT:  At the very least, what I have to have

23   is some tender from a psychiatrist who's looked at the

24   records to say there's a plausible case for holding him the

25   man.  I don't have that.  I have some nameless, faceless

1    person who filed a certificate on the eve of release.  I have

2    nothing right now that I could even say probable cause on,

3    and that's what's giving me extreme problems

4    constitutionally.  You need a psychiatrist to look at this

5    and at least look at the records and say, on a good-faith

6    basis, do I even have a basis for a motion for a continuance?

7              MR. QUINLIVAN:  Very good.

8              THE COURT:  Okay?

9              MR. QUINLIVAN:  Your Honor, one -- I just felt

10   obligated.  We had filed -- in the Shields case, there had

11   been a motion to dismiss that he had been held for two days

12   long.  We had opposed it as a matter of law, but I did want

13   to inform the Court that we had asked Bureau of Prisons to

14   check whether or not their calculations were correct, and

15   indeed they were.  So we don't think that that provides a

16   basis --

17             THE COURT:  I just haven't had a chance to rule.

18             MR. QUINLIVAN:  Very good.  I just wanted to bring

19   it to your attention.

20             THE COURT:  It was joined as of this afternoon,

21   right?

22             MR. QUINLIVAN:  It's not a dispute as to the

23   facts.  It's only a question of the statute in that

24   circumstance.  I just wanted to bring it to your --

25             THE COURT:  I understand she's raised it.  She's

1   preserved it.  You've opposed it.  I'll just have to look at

2   it.

3            MR. QUINLIVAN:  Very good.

4            MS. KELLEY:  But what he's saying is, we're right

5   about the calculation.  He should have been released.

6            THE COURT:  Right.  So the question is whether or

7   not, if no one's raised it till now, whether it's lawful

8   custody or just custody, and that's a legal question.  I

9   understand that it's a legal battle.  But a far bigger

10  problem is, given the fact that I have one psychiatrist who

11  was not objected to saying he's not sexually dangerous, what

12  do I have to hold him?  I don't even have the grounds for a

13  continuance because you don't even have anyone who's going to

14  come in here and say, based on today's records, he's sexually

15  dangerous.

16            I am urging you, since this is civil, to try and

17  resolve it in a way that protects the safety of the community

18  as well as all the civil and constitutional rights involved.

19  If you can't, we'll have a trial.  And you're just going to

20  have to make some tough judgments.  And it's Thanksgiving

21  week coming up, so as a practical matter, Wednesday is tough

22  for people.  I mean, just it's tough for people.  On a human

23  level, it's tough for people.  So we're going to have to try

24  and resolve this Monday or Tuesday.

25            MR. QUINLIVAN:  Very good, your Honor.

1          THE COURT:  Okay?

2          MR. FICK:  Your Honor, I apologize, but in

3     conferring with Mr. Peavey, he would like to invoke his right

4     to a probable cause hearing, if we could set a date in

5     December at the Court's convenience, understanding that at

6     about a month later the real trial would happen, but I think

7     under the circumstances, he would like --

8          THE COURT:  I understand that.  I've been throwing

9     it out there.

10         MR. FICK:  So if there's a date when the Court

11    would be available in December, we would like to do that.

12    And it's the kind of thing that could conceivably take a day,

13    I think.

14         THE COURT:  I may even refer it to a United States

15    magistrate judge.  I mean, it's basically like a detention

16    hearing:  Is there a basis for holding the person?  I'm not

17    even sure if we have a paired magistrate judge.

18         THE CLERK:  It should be, since it was drawn as a

19    civil case.

20         THE COURT:  Maybe it has.  I don't know.  We'll

21    find out.

22         MS. KELLEY:  So we're coming back on Monday?

23         THE COURT:  I'm getting a filing from them on

24    Monday.  What I'm saying is I --

25         THE CLERK:  It's Judge Bowler.

1        THE COURT:  Judge Bowler?

2        MR. FICK:  So should we talk to her session about a

3   date?

4        THE COURT:  Would you do something for me?  Just

5   file a motion for a probable cause hearing, and I'll shoot it

6   to her, and --

7        MR. GRADY:  No objection, your Honor.

8        MR. FICK:  The other question I had is whether

9   there was still the Daubert hearing next Wednesday that had

10  been scheduled?

11       THE COURT:  No.

12       MR. FICK:  And the final issue that Mr. Peavey

13  wanted me to raise, which I know I'll have to exhaust with

14  the government and the Bureau of Prisons, he has a concern

15  about being housed in a special housing unit.  He would

16  rather be in the medical unit, given his stroke and his

17  difficulties getting around.  I'll try and sort that out with

18  the government, but --

19       THE COURT:  Where is he now?

20       MR. FICK:  He's at Devens.

21       THE COURT:  He's still at Devens, right?

22       MR. FICK:  They're all at Devens, but the

23  particular housing unit --

24       THE COURT:  That's supposed to be great for medical

25  problems.

1        MR. FICK:  Well, I mean, there are different units

2   and different issues with different units.  I just wanted to

3   alert the Court that I'll take it up with the government and

4   the Bureau of Prisons, but we may be back just to deal with

5   where within Devens he is and how he's able to get around and

6   that sort of thing.

7        THE COURT:  So you don't oppose a probable cause

8   hearing.  When you file it, I'll refer it to a United States

9   magistrate judge.  We've got a hearing in January.  What

10  about -- have you discussed with Mr. Wetmore what he wants to

11  do with that?

12       MS. KELLEY:  He does not want a probable cause

13  hearing.

14       MR. TENNEN:  At least not for now.

15       MS. KELLEY:  Not at this time.

16       THE COURT:  Can I ask you this?  I'm new at all

17  this.  In general, I'm wondering whether he should be here

18  the way he is himself or whether --

19       MS. KELLEY:  He waived it in open court at the last

20  hearing.

21       THE COURT:  He did, but the thing that's worrying

22  me is your representation that he needs certain drugs.  Was

23  he competent?

24       MS. KELLEY:  Yes.  The drugs have nothing to do

25  with competency.

1    May I just ask that Mr. Shields be brought in on

2    Monday?

3    THE COURT:  No, because I don't have a hearing

4    yet.  Let me just see what their response is on Monday.  We

5    may have to stick this on Tuesday or possibly Wednesday

6    morning.  Under no circumstances am I going past noon or

7    1:00 o'clock on Wednesday, so -- let me ask you, what does

8    Wednesday look like?  Are you around here?  You're not

9    traveling?

10    MR. TENNEN:  We had the Daubert hearing set up that

11    day.  Maybe we could substitute a status just as to

12    Mr. Shields.

13    MS. KELLEY:  But if the government announces on

14    Monday or informs the Court that they are not going forward,

15    when will Mr. Shields be released?

16    THE COURT:  We'll bring him in the next day.  But

17    if they say they are going forward, I mean, I --

18    MS. KELLEY:  Well, we will check with his probation

19    officer meanwhile, optimistically, in Maine to see, if he is

20    released next Tuesday, can they be expecting him, and where

21    he will stay, et cetera?

22    THE COURT:  And how does he get there?

23    MS. KELLEY:  I think people take a bus generally.

24    THE COURT:  I don't know.  When somebody is on this

25    kind of supervision, I don't know.  I'm never at this end of

1    it.

2              MR. TENNEN:  He's saying that what happens is, the

3    Bureau of Prisons sets it up, and they'll put him on a bus,

4    and they'll take care of buying the ticket and send him to

5    where he needs to go.  And if that's Maine, that's Maine.

6              FROM THE FLOOR:  There is a distinction, though.

7    If he's released from the courtroom, the Bureau of Prisons

8    will not provide that.  If he's sent back to Devens, they'll

9    process his release, give him a gratuity, put him on a bus

10   and send him home.

11             THE COURT:  That's very useful.

12             (Adjourned, 4:30 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7

8          I, Lee A. Marzilli, Official Court Reporter, do

9  hereby certify that the foregoing transcript, Pages 1 through

10 40 inclusive, was recorded by me stenographically at the time

11 and place aforesaid in Civil Action No. 07-12056-PBS, United

12 States of America V. Jeffrey Shields, and Civil Action

13 No. 07-12059, United States V. Charles Peavey, and thereafter

14 by me reduced to typewriting and is a true and accurate

15 record of the proceedings.

16         In witness whereof I have hereunto set my hand this

17 5th day of August, 2008.

18

19

20

21

22

            /s/ Lee A. Marzilli
23         _____

           LEE A. MARZILLI, RPR, CRR
24         OFFICIAL COURT REPORTER

25