IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
              Petitioner       )
                               )
         -VS-                  ) CA No. 07-12056-PBS
                               ) Pages 1 - 57
JEFFREY SHIELDS,               )
                               )
              Respondent       )




                      JURY TRIAL - DAY ONE

                 BEFORE THE HONORABLE PATTI B. SARIS
                   UNITED STATES DISTRICT JUDGE




                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         September 2, 2008, 9:07 a.m.




                         LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 3205
                      Boston, MA  02210
                        (617)345-6787

1    A P P E A R A N C E S:

2        MARK J. GRADY, ESQ. and EVE A. PIEMONTE-STACEY, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the Petitioner.
4
         PAGE KELLEY, ESQ, Federal Defenders,
5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
     for the Respondent.
6
         JOHN G. SWOMLEY, ESQ. Swomley & Associates,
7    227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
     for the Respondent.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

                                                        PAGE

3

    PRELIMINARY JURY INSTRUCTIONS:                       39

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1b059d11-a661-46d8-afa5-0e1d06da8d1f

1              P R O C E E D I N G S

2           THE CLERK:  The case of the United States V.

3    Jeffrey Shields, Civil Action No. 07-12056, will now be

4    heard before this Court.  Will counsel please identify

5    themselves for the record.

6           MR. GRADY:  Good morning, your Honor.  Mark Grady

7    along with Eve Stacey for the United States.

8           MS. KELLEY:  Good morning, your Honor.  Page

9    Kelley for Jeff Shields.

10          MR. SWOMLEY:  John Swomley for Jeff Shields.

11          THE COURT:  And Mr. Shields is here in street

12   clothes?  All right.  So let me first begin by asking what

13   the status is of the government's witnesses?  I know that

14   Mr. Tomich's wife has lung cancer, so there's a problem in

15   terms of timing.

16          MR. GRADY:  With respect to that first, the most

17   recent news was simply that she had been scheduled for an

18   MRI this week, which would guide a biopsy as to the

19   particular masses at issue, and there's presently no issue

20   with respect to his testifying on the 9th, or the 8th,

21   either the 8th or the 9th.  I think the 9th was the schedule

22   we came up with, but he'd be available starting next Monday.

23          THE COURT:  So all I would ask you to do is to

24   make sure you give the other side heads-up if we have to do

25   any rescheduling to accommodate his wife's surgery schedule.

1          MR. GRADY:  I would absolutely.

2          THE COURT:  So I don't want to prejudge this, but

3    doesn't it make sense -- when's the MRI?

4          MR. GRADY:  That I don't know.  I've just been

5    getting e-mail communications.

6          THE COURT:  I understand how distraught he is, but

7    wouldn't it make some sense to get him in early and get it

8    over with, so to speak, and then he --

9          MR. GRADY:  As I explained last time, what he

10   felt, given the recentness of the news, he wasn't ready this

11   week emotionally to prepare for his testimony.

12         THE COURT:  So give me the lineup now of who's

13   going to be in what order.

14         MR. GRADY:  Tomorrow the witnesses will be

15   District Attorney Rushlau, who prosecuted three offenses in

16   1989 against Jeffrey Shields.

17         THE COURT:  What's he going to do?

18         MR. GRADY:  He's going to testify -- I expect he

19   would testify first with respect to, based solely -- well,

20   there are two avenues of possible examination.  The first

21   is, he would testify that he doesn't have a memory of

22   specific facts to which Jeffrey Shields pleaded guilty; but

23   he has and is required by Maine law with respect to two of

24   the felony offenses, that in January of 1989 and September

25   of 1989, to provide a specific description of the facts to

1   the Court to be admitted in the course of the guilty plea.

2   And that would, with respect to the offense against the

3   6-year-old, he will testify that based on his review of the

4   original records he has, he would have included the

5   statement of facts from the police report, inconsistent with

6   what the respondent has told the experts, that that offense

7   involved his inserting a finger into the anus of the

8   6-year-old child --

9            THE COURT:  Wait, wait, wait.  Let me just back up

10  for a minute.

11           MR. GRADY:  Sure.

12           THE COURT:  You only gave me certain sanitized

13  copies of police reports.

14           MR. GRADY:  Yes.

15           THE COURT:  Don't forget, I didn't read

16  everything.  So is there a police report that says this?

17           MR. GRADY:  Yes, there is.  There is a police

18  report and an affidavit in support of a warrant for arrest.

19           THE COURT:  So what you gave me to read --

20           MR. GRADY:  You haven't seen this, no.

21           THE COURT:  I haven't seen it.  So why haven't I

22  seen it?

23           MR. GRADY:  Because you asked not to originally

24  and --

25           THE COURT:  Wait, wait.  Let me back up.  I

1    understand that.  So you're not seeking to admit the police

2    report that says this?

3              MR. GRADY:  No.

4              THE COURT:  All right.  See, I just don't -- I'm

5    not at the baby steps that you're at.

6              MR. GRADY:  I apologize, your Honor.

7              THE COURT:  There's a police report that says he

8    raped a 6-year-old, but I don't have it because it's pure

9    hearsay, and it's excluded under the hearsay rule.  So now

10   you're trying to get in this evidence through the prosecutor

11   as to what the statements were that he -- just do the baby

12   steps -- as to what he -- statement of facts he read in

13   court that Mr. Shields admitted to.

14             MR. GRADY:  That's correct.

15             THE COURT:  Okay, all right.  So this is going to

16   be on what his refreshed recollection is from the record?

17   Is that how you're getting in prior recollection -- was it

18   refreshed, or is he just --

19             MR. GRADY:  He's testifying --

20             THE COURT:  I want to understand it.

21             MR. GRADY:  He would be testifying based on his

22   practices and based upon the requirements of Maine law with

23   respect to what facts need to be put on the record with

24   respect to a felony; that based on his practice and based on

25   his practice for twenty years, that what he would have done

1  is reviewed the police report and the affidavit in support

2  of the arrest, and he would have determined, you know,

3  detailed facts that would have been important to inform the

4  court of; that under Maine law, a rule called Rule 11,

5  they're required to put out specific facts of the plea, not

6  simply have an admission to the elements of the offense.

7  And he will testify that having reviewed the original police

8  reports from his own original records, that based on his

9  practice and based on his own knowledge of what he would

10  have done, he would have included the facts with respect to

11  the nature of the contact with the victim, the age of the

12  victim.

13          THE COURT:  That it was a rape of a 6-year-old.

14          MR. GRADY:  That what he would have read in court

15  would have been --

16          THE COURT:  I know I'm feeling frustrated because

17  I don't really know the facts as well as you do.  What is he

18  actually going to say up there?  He's going to say, "I would

19  have read --"

20          MR. GRADY:  "I would have read that on the date of

21  the offense, that Mr. Shields penetrated the victim's anus

22  with his finger and fondled the genitals of the 6-year-old

23  boy."  That's the crux of it.

24          THE COURT:  So that's it?

25          MR. GRADY:  By and large, he may give some

1    explanation of guilty pleas and how it happens so that the

2    contextual --

3              THE COURT:  All right, so that's the one fact

4    you're trying to really get in, which is that he was 6 and

5    there was penetration of the anus?

6              MR. GRADY:  Yes.

7              THE COURT:  And it's not going to be elaborated on

8    more than that?

9              MR. GRADY:  No.

10             THE COURT:  Okay, so that will take five minutes.

11             MR. GRADY:  You may be optimistic, but, yes, I

12    expect under a half an hour.

13             THE COURT:  So what else?  I'm trying to figure

14    out if I have a day tomorrow.

15             MR. GRADY:  Well, and the only other witness would

16    be Detective Marsh, who would --

17             THE COURT:  All right, so that's all he's going to

18    do?

19             MR. GRADY:  That's all the District Attorney we're

20    seeking to do.

21             THE COURT:  So who else is coming tomorrow?

22             MR. GRADY:  Detective Donald Marsh who

23    investigated the incident involving the 6-year-old.  He will

24    authenticate the copies of his police reports, and we're

25    going to seek to admit them as authenticated and nonhearsay,

1    as found by Judge Collings.

2            THE COURT:  So this is still the 6-year-old?

3            MR. GRADY:  Yes, it is.

4            THE COURT:  And which exhibit is that?

5            MR. GRADY:  On what you have --

6            THE COURT:  Wait a minute, I've got to --

7            MR. GRADY:  -- it would be, I believe, Exhibit 5.

8    Yes, Exhibit 5.  And the police reports and warrant

9    affidavit by Detective Marsh following that --

10           MS. KELLEY:  Our Exhibit 5 is something about the

11   Coding Manual.

12           MR. GRADY:  You are looking not at the letter I

13   gave to Judge Saris but at the exhibits -- I also attempted

14   to meet with the defense with respect to trial exhibits.

15           THE COURT:  So I've got --

16           MR. GRADY:  It's Exhibit 5 of what you have, and

17   the defense has it as well.

18           THE COURT:  So the indictment -- there have been

19   objections to various things.  So they've in general not

20   opposed the charging document and the conviction, I think.

21           MS. KELLEY:  That's correct.

22           THE COURT:  All right, so the indictment comes in.

23   I don't see, once you have the indictment, why do you need

24   the docket sheet; I mean, once you have the conviction?  You

25   have a certified conviction, right?  The judgment and

1  conviction comes in, but what does the docket sheet do for

2  you?

3      MR. GRADY:  The docket sheet gives us a number of

4  issues with respect to the conditions of probation, his

5  violations of the conditions of probation.

6      THE COURT:  So where?

7      MR. GRADY:  With respect to this particular docket

8  sheet, it reflects the guilty.

9      THE COURT:  Yes, but we've got that through the

10  judgment and commitment order, and I think that gives the

11  probation, right?  No?

12      MR. GRADY:  It also gives us a motion to correct

13  and reduce sentence.  The government has a copy of that

14  motion that's attached.

15      THE COURT:  I just think I'm not going to allow

16  that in.

17      MR. GRADY:  Well, your Honor, if I can explain why

18  that would be relevant.

19      THE COURT:  No, no, wait a minute.  The docket

20  sheet, I think that's repetitive, just redundant, unless you

21  can come up with an independent reason.  We don't have to

22  deal with it right now.  So then you have the judgment and

23  commitment order which I will allow in.  You have the

24  special conditions of probation which I will allow in.  And

25  then details of complaint or incidence, that he's

1    6-year-old, you want to put that in?  Is that what the

2    police officer is going to put in, that he's 6?

3              MR. GRADY:  The police officer will put in the

4    victim is 6, yes.

5              THE COURT:  So is there anything else?

6              MR. GRADY:  There are statements of Jeffrey

7    Shields with respect to Exhibit 5.

8              THE COURT:  This is his statements within the --

9              MR. GRADY:  Within the police reports, yes.

10             THE COURT:  This is that "I'm sick, I want to go

11   to a hospital," right?

12             MR. GRADY:  Yes, that "I can't control this, it's

13   not me."

14             THE COURT:  So he's essentially just going to

15   authenticate that?

16             MR. GRADY:  Yes.  He can't testify to any --

17             THE COURT:  I'm just trying to figure out.  So

18   those are the two witnesses tomorrow?

19             MR. GRADY:  It's an hour of testimony tops.

20             THE COURT:  How long do you think it would be?

21             MS. KELLEY:  Well, at the outset, if I can just

22   put on the record our objection to the District Attorney and

23   our reasons why.  First of all, this District Attorney is

24   not going to testify that he remembers anything.  The police

25   reports are voluminous, and I believe it's a little bit

glossed over in what Mr. Grady just said, but I think he must have fashioned some statement of facts that he stated at the guilty plea hearing which he doesn't have anymore. So he's going to testify in this highly speculative manner to something he doesn't remember but he thinks he must have done based on his practice.

THE COURT: Well, one is allowed to testify of one's habit, so I'd have to hear the testimony to hear whether I think it's admissible or not.

MS. KELLEY: Well, I would ask that we have a voir dire before the jury hears him, but to say he had a habit of doing something is completely different from saying, "Here is precisely what I read to the jury on this date I don't remember, and I can't find the document I read."

THE COURT: Well, it depends how he states it. But let me just say this: I think we only have two hours of testimony tomorrow, at most. Are you both prepared -- I'm just trying to get through this piece of it, all right? And then you have Plaud on Thursday?

MR. GRADY: Yes. That's the present schedule, yes.

THE COURT: And can Plaud get in earlier? Have you talked to him?

MR. GRADY: He could not get in earlier. I asked after the pretrial conference if he could get in on the 3rd,

1    and he remains committed to a trial on the 3rd in New York.

2              THE COURT:  All right, things go off.  Could you

3    call him again today because we certainly could use some

4    time tomorrow.  We could get going on him.

5              MS. KELLEY:  But if I could just finish.

6              THE COURT:  Yes, sure.

7              MS. KELLEY:  Just for the record, I also think the

8    District Attorney's testimony is irrelevant.  We have

9    conceded that we have these convictions.  We are conceding

10   the victim was 6 years old.  The specific facts that he may

11   want to assert here happened back then.  I would argue to

12   your Honor, number one, they're irrelevant to anyone's

13   consideration of the issue here, which is, is Mr. Shields at

14   risk to reoffend?  They're just very inflammatory and

15   prejudicial.  That's why the government wants them in.

16             THE COURT:  So what we can't do is all the

17   extraneous facts.  That's why I asked you specifically that

18   because it is more prejudicial than probative.  So I'm

19   assuming all you're going to say is that he pled guilty to

20   raping a 6-year-old.

21             MR. GRADY:  What I would anticipate the testimony

22   to be not that the District Attorney --

23             THE COURT:  I tell you what, why don't you make a

24   little proffer tomorrow morning, you know, exactly what it

25   is you want to say because I do have to do the 403 weighing.

1          MS. KELLEY:  If I may also just say, we did file

2     something on Friday objecting to the police reports coming

3     in.

4          THE COURT:  Sure, and that's overruled because

5     this is a civil case, but let me just say this:  I have read

6     them, and I have the same overall piecemeal approach that we

7     just did to this exhibit.  I don't see how a warrant comes

8     in.  In other words, I'm going to have to do this document

9     by document.

10          MR. GRADY:  Certainly.

11          THE COURT:  It may well be that something can be

12     "scored," but that doesn't mean it makes it admissible as an

13     evidentiary matter.  So the warrant doesn't come in.  The

14     warrant is just a warrant.  There's no doubt that there was

15     a warrant, but you're trying to get it in for the value of

16     what's inside the warrant.  It may be that he admitted to it

17     to a psychiatrist?  Is that what happened?

18          MR. GRADY:  The expert testimony we'll hear will

19     be that he admitted to the conduct charged.

20          THE COURT:  All right, so that can come in but not

21     the warrant.  In other words, I have to assess each thing.

22     His statements are admissions of a party opponent.  They

23     come in.

24          MR. GRADY:  Yes.

25          THE COURT:  Okay.  Direct observations of a police

1   officer come in.  Statements by someone else to the police

2   officer may not sometimes come in unless they're separately

3   supported by another hearsay rule.  There could potentially

4   be an excited utterance or a fresh complaint, as they

5   sometimes say, possibly.  But I've got to scrub it line by

6   line, if you will, all right?  So the fact of somebody's age

7   would come in.  I think that's generally reliable, even

8   under the residual exception to the hearsay rule, but not

9   all of the details.  And it's hard for me to say line by

10  line, but sometimes it goes on for pages and pages and pages

11  of a docket sheet that just clutters the record.  If you've

12  got the conviction, you get the charging document, you get

13  the conviction, you get the admissions of the party

14  opponent; and then after that, we're just going to have to

15  talk because some of them, there may be hearsay exceptions

16  that would support their coming in.

17          MS. KELLEY:  But we do object to docket sheets

18  because they contain matters about bail and various motions

19  that could be very confusing.

20          THE COURT:  I agree with you.  I'm agreeing.  I'm

21  agreeing.  I agree.  It's confusing, it's redundant, it

22  clutters the record.  But the fact of the charge, the fact

23  of the indictment, certain facts in the police report can

24  come in.  I have to do the 403 weighing.  It's a little hard

25  right now.  But just right now the way I've got it, so Plaud

1  comes in on Thursday, right?  If we can get through opening

2  statements today, we will.  Otherwise we'll start it

3  tomorrow.

4       I've got the questionnaires which I changed to --

5  and we basically ballparked it at a day for you to put in

6  your expert report, no more than two days for cross, a day

7  for the expert report, no more than two days for cross.  I'd

8  like to try and get it to them on that Friday, although the

9  way we actually put it in, it may end up spanning over till

10 the Monday, I think is how the timing works, the 22nd.  I'd

11 love to get it to them on the 19th just simply because I

12 have another trial, but that's not as -- I'd love to.

13       MS. KELLEY:  There is one other evidentiary matter

14 I think that's going to come up with regard to the openings,

15 and that is, you know, we had several previous trial dates.

16 One of them was derailed because on the Friday before the

17 Monday, the government gave us additional discovery with

18 additional offenses in it that we had not previously known

19 about.  And if your Honor remembers, that was very

20 late-breaking, and some pretty serious police reports were

21 given to us basically right on the eve of trial.  This

22 necessitated Dr. Plaud's going back to reinterview

23 Mr. Shields and changing his opinion, and we feel that it's

24 extremely unfair now at this proceeding for the government

25 to be able to take advantage of essentially a situation they

1    created by their providing late discovery by arguing that

2    Mr. Shields was not candid with Dr. Plaud and was lying

3    about his history.  In Dr. Plaud's deposition, he said he

4    did ask Jeff some question like, "Is there any other thing

5    you want to tell me about?" but it's very vague.  And I

6    think for that to become a big issue at this trial now, that

7    when additional discovery was provided very late by the

8    government, right on the eve of trial, it kind of derailed

9    things, for that to sort of reflect badly on Mr. Shields is

10   really unfair.  It really amounts to his being set up.  So

11   what we'd like the Court to do to ameliorate that problem is

12   to have Dr. Plaud simply testify to his second report and

13   not to mention anything about --

14          THE COURT:  Well, it depends if that's part of the

15   reason he gave the opinion as to how candid he was.  I don't

16   know, but I'll have to think about that.  Don't mention it

17   in your opening, though.

18          MR. GRADY:  Certainly.

19          MS. KELLEY:  And I think Mr. Swomley would like to

20   address the Court.

21          THE COURT:  Let me just -- we're going to get this

22   jury in in about five minutes.  My view is, I'm going to go

23   through it all, just getting rid of people who just can't

24   sit because they have a conflict in their time, people who

25   might know some of the witnesses, and then I'm going to hand

1   out the questionnaire.  And let me -- I should have them

2   come in.  Sometimes jurors get frustrated, as you know.  So

3   how long is your opening?

4           MR. GRADY:  Less than twenty minutes, your Honor.

5           THE COURT:  How long is yours?

6           MR. SWOMLEY:  Twenty, twenty to thirty,

7   thereabouts.

8           THE COURT:  All right, so unless I have an hour

9   after the impanelment, I'll do the openings tomorrow, okay.

10  I'm not going to give preliminary jury instructions, mostly

11  because -- I mean, I do my normal standard ones, and I think

12  the standard is clear and convincing, right?

13          MR. GRADY:  Except as to the past offenses.

14          THE COURT:  Except as to the past offenses.

15  That's almost stipulated to.

16          MR. SWOMLEY:  We're stipulating.

17          MS. KELLEY:  We're stipulating.

18          MR. SWOMLEY:  In fact, that really was -- there

19  are two things that I wanted to mention to you.  One had to

20  do with the first question you were trying to resolve with

21  respect to what kind of underlying facts come in with

22  respect to the 6-year-old.  We're stipulating to all of the

23  offenses, and so in terms of the probative value of those

24  offenses, I would -- for the government to get to go into

25  the details, I would submit they have to show some relevance

1    to those details.  Yes, as a matter of law, they're

2    admissible; but in terms of what probative value they have

3    in this kind of a case -- it's not like they have to prove

4    that he did these offenses.  We're stipulating to them, and

5    there's not really a dispute about that.  In terms of what

6    value that information has, as far as the degree of force

7    used, the details for their predictive value, which is the

8    only reason one introduces them in these kinds of cases is

9    to show this person, Mr. Shields, possess these

10   distinguishing characteristics that's put him in a category

11   of people that offend at such and such a rate.

12           THE COURT:  Well, let me ask you this:  Most

13   people, if they hear rape of a 6-year-old --

14           MR. SWOMLEY:  Yes.  Well, that's not actually what

15   his charge is called.  I mean, if you want to -- what should

16   be done is to read what he's charged with, what he was

17   convicted of.  And, yeah, unlawful sexual conduct with a

18   minor also has its own -- you can conjure up --

19           THE COURT:  I was trying to think at home which

20   way it cut.  I mean digital penetration versus -- most

21   people would think penile.

22           MR. SWOMLEY:  Right, well, and I don't have a

23   problem with digital.  I mean, I don't really have a

24   problem, because the facts are what they are, with there

25   being some sort of a cursory explanation of that.  But to

1b059d11-a661-46d8-afa5-0e1d06da8d1f

1    have people testify about it as if they have some specific

2    import in this trial, they don't.  So beyond -- if we

3    stipulate to them or if -- I mean, if it's essentially a

4    thumbnail sketch of it --

5           THE COURT:  Maybe you can reach a stipulation.

6    That's another matter.  But at least at this point, other

7    than that there was a rape of a 6-year-old, or however you

8    want to say it --

9           MR. GRADY:  I would simply refer to it, without

10   the Court's ruling, as he was convicted molesting a

11   6-year-old at this point.  I'm not going to go into those

12   facts in an opening until the Court has definitively ruled.

13          THE COURT:  Fine, fine.

14          MR. GRADY:  Your Honor, just for the record --

15          THE COURT:  Is it molesting, or is it rape?  See,

16   I don't know the Maine statutes well enough myself.  Was he

17   convicted of a rape, or was he convicted of a touching?

18          MR. GRADY:  He was convicted of unlawful sexual

19   contact, and sexual contact --

20          THE COURT:  What are the elements?

21          MR. GRADY:  The elements are that the

22   individual -- essentially there be a sexual contact for the

23   purpose of sexual gratification of the toucher.  There are

24   two separate statutes that define it.  That's another thing

25   that the District Attorney would provide testimony on to

1    illustrate to the jury the crime involved.

2             THE COURT:  So it wasn't a rape?

3             MR. GRADY:  It's not charged as a rape.  The facts

4    may have involved -- your Honor, I do want to say, for

5    purposes of this issue, what the defendant is suggesting,

6    first, that because they've stipulated, they're entitled to

7    have the narrative of these events told as they would have

8    it told, not necessarily the facts that can be proved but

9    the facts that they want to be -- and essentially a

10   narrative told by the defendant himself to the experts in

11   this case about what happened.

12            Now, it isn't simply that the government has to

13   prove future acts.  The government is required to prove

14   beyond a reasonable doubt, as this Court has found, past

15   acts of child molestation.  And that's in the statute for a

16   reason, because Congress considers it important to these

17   cases.  And the way the government goes about proving its

18   own case, the fact that it chooses to use certified

19   convictions instead of oral testimony of experts and

20   admissions of the defendant, is the government's choice, and

21   it is not a situation where this is unduly prejudicial.

22   Essentially they're attempting to, and it's a wonderful

23   trial strategy --

24            THE COURT:  Excuse me.  I'm going to let you put

25   in the bare-bones facts.  I just don't want it embellished

1    beyond that because of the possible prejudicial impact.   In

2    other words, I was thinking, you know, the basic fact of the

3    penetration of the child may be relevant, but not maybe --

4    I'll have to think about it, I mean, it's so prejudicial --

5    didn't he just basically, you know, every mother's

6    nightmare, woo him off into the woods and take him into a

7    shack?

8              MR. GRADY:  Yes.

9              THE COURT:  Those kinds of things are just so

10   prejudicial that I don't want those coming in.

11             MR. GRADY:  Even if they were admissions?  I had

12   not intended --

13             THE COURT:  I don't know if they're admissions.

14   Admissions are different, but I'm talking about through what

15   this prosecutor is going to say.

16             MR. GRADY:  Yes, he's not going to talk about

17   that.

18             THE COURT:  I don't know.  I'm going to have to do

19   it line by line, and I'm not willing to script it.  But in

20   your opening, keep it to the basics.

21             MR. GRADY:  Absolutely.

22             THE COURT:  What there was.  And you tell your

23   story, they'll tell theirs, and we'll -- obviously I'm a

24   fact-finder too, so -- but we're making a good-faith effort

25   here, sort of an experiment almost, to have an advisory

1    jury.  It's what they do in our state court system, which I

2    respect enormously, which is why I'm trying to model after.

3    As we start, Judge Wolf is doing a different model.  As I

4    understand it, he's doing a bench trial.  I don't know what

5    I'm going to do for the next two.  I wanted to try this

6    because I think, you know, at least it's my dream that it's

7    better justice.  I mean, at the end of the day, however,

8    I'll have to make the decision.

9            MR. GRADY:  Yes, your Honor.  We had one issue

10   come up yesterday.  There were approximately twelve exhibits

11   agreed in the pretrial memorandum.  We were informed

12   yesterday that the defense would seek to withdraw from that

13   agreement as to those exhibits, and I think that we should

14   address that issue right up front so that the agreed

15   exhibits, at least, can be marked as Exhibits 1 through

16   numbers and --

17           MS. KELLEY:  Well, we agreed a very long time ago.

18   And Mr. Swomley, as you know, was out during August.  And

19   when I met with Mr. Swomley and Eric Tennen, his associate,

20   they basically said that Exhibits 4 through 10, especially

21   No. 10, which, frankly, I --

22           THE COURT:  I don't have that.

23           MR. GRADY:  Your Honor, let me give you a copy of

24   what we discussed this weekend.

25           THE COURT:  Let me start off.  At this point

1  you're bound by it in terms of authentication because I'm

2  not going to derail this trial to get some -- now, on

3  whether it's hearsay and all that kind of stuff --

4       MS. KELLEY:  It's nothing like that.  What they're

5  seeking to introduce, for example, are these charts from the

6  RRASOR and Static-99, which Mr. Swomley would argue are

7  misleading if they're not corrected, and they're going to

8  give the jury kind of a skewed idea of what those

9  actually --

10       THE COURT:  Are you going to do it in your

11  opening?

12       MR. GRADY:  Your Honor, Exhibits 1 to 12 were

13  agreed at the pretrial memorandum.

14       THE COURT:  Excuse me.  Are you doing it in your

15  opening, the chart?

16       MR. GRADY:  I would not refer to the chart

17  specifically in my opening, I do not believe, or I can do it

18  without it, if you wish.

19       THE COURT:  All right, so --

20       MS. KELLEY:  So, for example, one of these things

21  is the Coding Manual.  It's very long and complicated.  I

22  don't know why the jury needs it.

23       THE COURT:  You know what, this is something, I

24  can't do this right now.  So let me put it this way:  At

25  this point, you're estopped or barred from challenging

1  authenticity because I can't bring in custodians and all

2  that kind of stuff.  If there are specific objections, I'm

3  going to have to walk through them.  And I think we'll be

4  getting a jury any minute now, so --

5          MS. KELLEY:  There's nothing like that where they

6  would need a witness now.

7          THE COURT:  But you can't refer to anything in

8  your opening statement.  At this point it's too late.  Okay,

9  so you can refer to whatever is going to be in these

10  exhibits in your opening statement.  There was an agreement.

11  Now, whether I actually allow it in or not, as usual, you

12  know, I go line by line, paragraph by paragraph.  Some might

13  come in.  I don't know enough about it.

14          MR. GRADY:  As I say, your Honor, this was two

15  months ago, and Attorney Swomley wasn't absent two months

16  ago, and these were agreed --

17          THE COURT:  Excuse me, excuse me.  There's a thumb

18  on your side because it was agreed upon, but at the end of

19  the day, I have to look at them.  I can't rule across the

20  board.  It may be that they're stuck with their agreement.

21  In a close call, maybe the tie goes to you.  I'm just simply

22  saying, I don't want to rule across the board until I see

23  what's here.  For example, that whole docket of all those

24  things that come in, they may be technically --

25  Judge Collings may well be right that they're a public

1  record that's admissible for some purposes; but at this

2  point, he on ruled from a hearsay point of view.  There's no

3  need to put all that stuff in.  It's irrelevant, and also

4  under 403 it's confusing to throw it all in.  So I don't

5  know why we need the Coding Manual, the whole Coding Manual.

6  If they challenge some of the way, let's say, Dr. Tomich

7  does it, and you say it's consistent with the Coding Manual,

8  maybe I'll put it in, I mean, for example, I mean, you know.

9  Yes?

10         MR. SWOMLEY:  The only thing that I would say is

11  that these are akin to learned treatises; and if the learned

12  treatise on one side comes in, the learned treatise on the

13  other side ought to come in.  So what's fair for the goose

14  is fair for the gander.  If you let this stuff in, I would

15  submit that I should be able to go, "And here is the

16  counterpoint.  Here's where all of this stuff is wrong."

17         THE COURT:  That Dr. Kriegman viewed?

18         MR. GRADY:  If the government has agreed to any of

19  those exhibits, I'd agree they should come in, but the

20  government didn't.  And the exhibits the government is

21  putting in are --

22         THE COURT:  Excuse me.  If there was an agreement,

23  I understand it, but I also have an independent obligation.

24  In other words, if there's a whole Coding Manual that's

25  unbelievably confusing, I don't know that I'm going to put

1   the whole thing in.  I mean, if, though, he's challenged, as

2   I know he will be, on certain key points and there are

3   certain key pages that it's consistent with, maybe those

4   pages come in.  You've certainly given notice of a learned

5   treats, it's been accepted in the peer-reviewed literature,

6   but there are also challenges to it, so --

7          No one should mention my ruling, by the way, on

8   Daubert on whether it's reliable or not.

9          MR. GRADY:  There is -- I don't know if I would do

10   it, your Honor, but the Court also ruled in that Daubert

11   hearing that the government can refer to him being found to

12   be high risk if it mentions percentages that go along with

13   it.

14          THE COURT:  Yes.

15          MR. GRADY:  Okay.

16          THE COURT:  But you can't say, "Judge Saris said

17   that this is a reliable --" because what I allowed is, it

18   comes in under Daubert.  That doesn't go to the weight of

19   it, which is fairly challenged, so --

20          MR. SWOMLEY:  The one thing I wanted to ask you

21   about and the deals with jury selection, I noted that there

22   is a missing question that I typically do ask be asked of

23   the jury, either by you or in some fashion.  And I think

24   it's incredibly important, and I would ask that your Honor

25   consider it, even at this late juncture.

1        THE COURT:  Which is?

2        MR. SWOMLEY:  "Do you believe that someone in a

3   situation such as Mr. Shields --" and you can

4   nonpersonallyize it or personalize it as you see fit -- "can

5   be rehabilitated?"  And that's essentially at the crux

6   of and is one of the questions --

7        THE COURT:  They wouldn't know that.

8        MR. SWOMLEY:  Well, "Do you believe that a

9   person --"

10        THE COURT:  Can I say something?  I don't know the

11   answer to that question, so I don't know how a juror would

12   know the answer to that question.  You're putting in people

13   who talk about this, right?

14        MR. SWOMLEY:  Well, as a matter of law, I would

15   submit, the system presumes someone can be rehabilitated.

16        THE COURT:  Presumes it, but they don't know that.

17   They don't know that.

18        MR. SWOMLEY:  Typically this question is a

19   for-cause question asked in state court.  If the juror says

20   "no," then essentially the --

21        THE COURT:  Well, how about putting it in this

22   way?  How about something like, "If you hear evidence that

23   a -- are you open to evidence that somebody can be

24   rehabilitated?"

25        MR. SWOMLEY:  I would submit that the answer to

1    whether or not --

2              THE COURT:  Because you're talking about any

3    person, not just him, right?

4              MR. SWOMLEY:  Yes, we're talking about -- but I

5    would submit that if the conclusion is that "no," people

6    that are similarly situated cannot be, they should be

7    excluded for cause.

8              THE COURT:  Because it depends on what

9    "rehabilitated" means.  Let me just say, there's a huge

10   amount --

11             MR. SWOMLEY:  The civil commitment statute

12   presumes such, quite honestly.

13             THE COURT:  It presumes that you can teach someone

14   to control their impulses.  If that's what you mean, yes.

15   If it means, can you eliminate the attraction? -- that's

16   what the mental disorder is about -- I don't know.  In other

17   words, rehabilitated means you can control your actions,

18   right?  What do you mean by rehabilitated?

19             MR. SWOMLEY:  That once a sex offender, not always

20   a sex offender.

21             THE COURT:  Somebody who acts.

22             MR. SWOMLEY:  Yes.

23             THE COURT:  Fair enough, I would agree with that.

24             MR. SWOMLEY:  And that they have to be able to

25   believe that.

1          THE COURT:  So how would you word it?

2          MR. SWOMLEY:  The way I typically do ask that it

3     be worded is, "Do you believe someone who has committed past

4     sex offenses can be rehabilitated?"  Just that bluntly.

5          MR. GRADY:  Your Honor, clearly the Court has

6     trouble with that as being misleading to the question being

7     asked because the Court doesn't believe that that asks the

8     correct question.  And we've been through this.

9          THE COURT:  Well, let me ask you the question.

10    You've talk to all these psychiatrists, all right?  So

11    assume somebody has pedophilia.  You're not talking about

12    that being cured.  You're talking about the acting on it?

13         MR. SWOMLEY:  That's correct.  Right, that's all.

14         THE COURT:  So, I mean, but those nuances are

15    coming to me who's new to this field.  You know, I impose

16    treatment every single day on these child pornography cases,

17    and I'm assuming we're helping somebody control their

18    conduct, that as opposed to whether someone stops being

19    attracted, right?  I don't know the answer to that question,

20    but someone -- I don't know what you've heard.  I don't know

21    what the psychiatrists would say, right?

22         MR. GRADY:  Your Honor, we've been through a jury

23    charge conference.  We've been through a question

24    conference, and all of the issues raised my Attorney Swomley

25    that he suggests are being raised by this question are being

1   raised by the other questions the Court is asking.  And

2   we've been through this, and it seems as if every time the

3   defense doesn't get what they want, they come back and we

4   argue things two and three times, your Honor.

5            THE COURT:  Yes, but Mr. Swomley has something

6   that nobody in this room has, which is why I'm thinking

7   about it, which is a very sophisticated state court system

8   which has been functioning.  Are you telling me it is the

9   practice in the state courts in Massachusetts to always ask

10  a question that's something like that?

11           MR. SWOMLEY:  I can only tell you, in the cases

12  that I've participated in, that is a question that I

13  routinely am permitted to have asked, whether the court asks

14  it or whether it comes in the form of a follow-up, but

15  essentially, yes, that's a question that is routinely asked,

16  and it is a question which I won't say that every judge

17  excludes someone for cause for an answer that -- but that is

18  mostly the situation, yes.

19           MR. GRADY:  And his experience, your Honor, is

20  under a different statute with a different standard and a

21  different commitment procedure.

22           MR. SWOMLEY:  The bottom line in any commitment

23  scheme is that the whole predicate for the scheme itself is

24  that we as a society have figured out a way to help these

25  people get better.  If you view that is not possible and

1    that what we're doing --

2              THE COURT:  By "get better" it means control your

3    conduct, right, control your conduct?

4              MR. SWOMLEY:  We're not engaged in essentially the

5    Hotel California, where we create a location where we can

6    dump people and that's it, good-bye, they're done.  They can

7    get better.

8              THE COURT:  As opposed to, you know, like, for

9    example, take something totally out of -- a schizophrenic,

10   you can control their conduct by giving them drugs, but you

11   aren't necessarily going to fix the schizophrenia, right?

12             MR. SWOMLEY:  Correct.

13             THE COURT:  That's what you're talking about?

14   You're not going to fix the pedophilia.  The question is,

15   can you teach somebody to -- I don't know, I'm asking you --

16   you know, can you teach someone not to act on their

17   instincts?

18             MR. SWOMLEY:  And in fact what you are now hitting

19   on, and I don't mean to clutter or complicate this

20   conversation, but there is a fundamental misinterpretation

21   by the host of psychologists that now use the DSM-IV

22   "pedophilia" designation to talk about behaviors, past

23   behaviors being able to forever brand someone as a

24   "pedophile," quote/unquote, going forward in time.  There's

25   no diagnosis pedophilia --

1        THE COURT:  Well, but wait a minute.  Well, there

2    is a diagnosis.

3        MR. SWOMLEY:  There's no diagnosis pedophilia that

4    has an end date, end time, end whatever.  It's not like you

5    can be undiagnosed.

6        MR. GRADY:  We're getting into disputes

7    about whether --

8        THE COURT:  We're not.  I'm just trying to figure

9    out what to ask, if anything.  So this is a brand-new issue.

10       Is the jury ready?  Have we heard?  Oh, we can

11   call them now, so I hadn't quite realized that.

12       So I'll think about it.  But I can't say can

13   you -- I think you'd have to say something like --

14       MR. GRADY:  Your Honor, and in fact the Court, not

15   the jury, is assigned the question of whether he is going to

16   be released on conditions safely, whether he has been

17   sufficiently, using the term "rehabilitated" so that he can

18   be released from prison under conditions.  It's not the

19   jury's province to ask that.  They're here to simply

20   determine whether he has engaged in conduct in the past,

21   whether he presently has a mental disorder, and whether he

22   would have serious difficulty refraining --

23       THE COURT:  But the legal issue is whether right

24   now, whether he has the ability to control himself short of

25   incarceration.  But I think that assumes a certain level of

1  support, so that's what he's talking about, right?  Whether

2  or not --

3           MR. SWOMLEY:  When one is sentenced criminally,

4  one is sentenced both for punishment and for rehabilitative

5  reasons.  And the goal of the Department of Corrections is

6  to correct the behaviors that someone is engaged in.  If one

7  doesn't believe that the criminal justice system can correct

8  behaviors, even just before he gets to be committed or not

9  committed, the question is whether or not they believe

10  someone can learn from their mistakes, can appreciate

11  wrongfulness, can benefit from the therapies offered from

12  the therapies taken, can get to a point where they're not

13  the animal that they were portrayed as in 1989, for example.

14           THE COURT:  So would this do it:  "Could you

15  fairly and impartially evaluate testimony as to whether

16  defendant can be rehabilitated by treatment?"

17           MR. GRADY:  I would not use the term

18  "rehabilitation," your Honor.  I don't think it's the

19  province of the jury whether --

20           THE COURT:  What word would you use?

21           MR. GRADY:  I wouldn't use this word at all, and I

22  would object to it.

23           THE COURT:  "Can be treated effectively"?  That

24  presume the illness, which is their burden to prove.  This

25  is where I'm stumbling.

1          MR. SWOMLEY:  Well, what it does is, it seeks to,

2     if nothing else, allow me to understand if I have a group of

3     people or an individual who is going to say, "No matter

4     what, he did it, he goes away, period," and that's my

5     thought processes, "If he did it, he's gone.  He can't be

6     rehabilitated, there's nothing that we can do."

7          THE COURT:  How about this:  "Can you fairly and

8     impartially evaluate testimony as to the effectiveness of

9     sex offender treatment?"

10          MR. GRADY:  That's fine.

11          MR. SWOMLEY:  That doesn't get them talking.  It

12     doesn't get them to say anything other than -- I mean, it

13     begs the "yes" answer, is what it begs.

14          THE COURT:  Of coure.

15          MR. GRADY:  But that's what he said he was asking

16     you for.

17          MR. SWOMLEY:  No.  I'm asking it to try and learn

18     what the person is thinking.  That's the while point of what

19     voir dire is, to figure out --

20          THE COURT:  I'm going to do something along these

21     lines.  I can't -- it's a late-blooming issue.

22          MR. GRADY:  I object.

23          THE COURT:  I don't know.  As you can tell, I'm

24     new to it, looking forward to learning.

25          MR. SWOMLEY:  I just want to hear --

1        THE COURT:  You want to hear what they have to

2   say.

3        MR. SWOMLEY:  Really, I just want to know the

4   answer.  I mean, if you tell me, "I'm not excluding them for

5   cause," at least it's information that I can make use of.

6        THE COURT:  All right.  So, okay, we're going to

7   call the jury up right now.  By the way, we are the only

8   people impaneling today?

9        THE CLERK:  Yes.

10        THE COURT:  We have 80 people.  I'm going to

11  assume a three-week trial on the theory that we're going to

12  be done by the Jewish holiday, which I think is -- was it

13  the 29th something?  So I'm not going to ask the people

14  about -- because I'm hoping we're not going to lose people

15  over that.  When is that, the 20 something?  And I'm hoping

16  to start a trial the 22nd, but if I can't, then I only want

17  to bump it one week, so. . .

18        MR. SWOMLEY:  Can I ask your indulgence or help in

19  getting water brought in?  I like to have soda water, and

20  since I'm not a court employee, they will not let me in the

21  front door with it.  They let anybody with a little tag

22  around walk in with a Dunkin' Donuts cup but --

23        THE COURT:  I tell you what, you'll work that out

24  with Mr. Alba, all right?

25        (A recess was taken, 9:45 a.m.)

1          (Jury panel enters the courtroom, 10:05 a.m.)

2          (Resumed, 10:10 a.m.)

3          THE CLERK:  The case of the United States V.

4    Jeffrey Shields, Civil Action No. 07-10256 will now be heard

5    before this Court.

6          THE COURT:  Good morning.  My name is Judge Saris,

7    and this morning we will impanel a jury in a civil case.  In

8    order to do that, I will introduce you to the attorneys,

9    I'll introduce you to the parties, I'll read you a list of

10   witnesses, and I'll tell you enough about the case so that

11   you can decide whether or not you can serve fairly and

12   impartially.  I will be asking you a series of questions.

13   Some of them will be oral, and if you have an affirmative

14   response, like do you know any of the witnesses or do you

15   have any conflict during this period of time in terms of

16   scheduling, I will ask you to tell me about it at side bar.

17          Some of the questions are more confidential, and

18   they go to your deepest thoughts about whether you can be

19   fair and impartial.  I'll ask some of those orally, and I'll

20   ask some of them in writing for those of you who may be too

21   shy or embarrassed to raise your hand.  So before we get

22   going, what I am going to do is ask Mr. Alba to administer

23   the oath because all of your answers are under oath.

24          All right, Mr. Alba, thank you.

25          (Jury panel duly sworn.)

1          (Jury duly impaneled and sworn.)

2          THE CLERK:  All rise for the jury.

3          (Jury enters the courtroom.)

4          THE COURT:  Good morning again.  In case you've

5     forgotten, my name is Judge Saris, and we'll be together for

6     a few weeks.  I make it a practice to give you a set of

7     preliminary jury instructions.  They are no means a

8     substitute for the final instructions of law, but it's an

9     effort to give you a preview of what to expect.  So as you

10    know by now, this is a civil case, not a criminal case, and

11    I want to keep emphasizing that because you'll hear about

12    certain matters involving criminal convictions, but this is

13    a civil case.  You are the jury here, and you're the ones

14    who will resolve all disputed issues of fact.  You're the

15    ones who will assess the credibility of the witnesses, and

16    you are the ones who will ultimately render a unanimous

17    verdict.

18          Nothing I say or do over the course of the trial

19    is intended to indicate to you what my view is as to the

20    ultimate outcome of this case.  So the fact I may ask

21    questions of a witness or that you may think I have any

22    facial expressions, put it aside because you are going to be

23    asked to render the verdict here.

24          Now, how are you going to decide what the facts

25    are?  You're going to decide the facts based on evidence.

1   Evidence consists of the testimony of witnesses, and you'll

2   hear them on the stand under oath.  You'll hear some expert

3   testimony from psychiatrists, and you'll evaluate their

4   credibility as you would any other witness.  You're going to

5   have documents that will be received into evidence, and it

6   will get an exhibit number and come with you into the jury

7   room.  And sometimes the attorneys will stipulate to certain

8   facts.  That means they agree to those facts so you don't

9   need any more evidence on them.

10          But many things happen over the course of a trial

11   that you should not consider as evidence.  Tomorrow morning

12   you will hear maybe a half an hour apiece of opening

13   statements about the case.  The opening statements are not

14   evidence.  Rather, the attorneys will sum up the evidence

15   that they expect to be introduced, and if that evidence

16   isn't introduced, you should not consider anything in the

17   opening statements.  You will hear closing arguments at the

18   end.  You know what closing arguments are simply by being

19   citizens watching movies.  Closing arguments are not

20   evidence.  Questions by lawyers are not evidence.  This is

21   important because many attorneys, the attorneys will ask

22   many questions, and the witness may disagree with certain of

23   the factual premises in those statements.  So to take an

24   example which has nothing to do with this case, "It was

25   raining out that day, wasn't it?"  Well, you shouldn't

1   assume it must have been raining or they wouldn't have asked

2   the question.  If the witness says, "Well, no, actually, it

3   was just cloudy," it's the witness's answer, not the

4   attorney's question, which is the evidence in the case.

5   There could well be other evidence that is admitted as to

6   the weather that day, but the information in the question is

7   not the evidence.

8          Objections to questions aren't evidence.  You know

9   what objections are, you've seen them:  "Objection,

10  leading," putting words into a witness's mouth; "objection,

11  irrelevant," irrelevant to the matters here; "objection,

12  hearsay," an out-of-court statement which is not subject to

13  cross-examination.  There are certain exceptions to the

14  hearsay rule, but those are the kinds of things I will rule

15  on before you come in in the morning, at side bar, and after

16  you leave in the evening.  So if I sustain an objection, it

17  means I agree with the objection, and you cannot hear the

18  evidence.  "Overruled" means I disagree with the objection,

19  and the evidence should be treated like any other.

20         Sometimes I'll limit the use to which information

21  can be put.  So sometimes, for example, there might be

22  hearsay.  For example, sometimes an expert may look at

23  hearsay.  You may consider the expert opinion, but you

24  should not treat the hearsay for the truth of the matter

25  asserted, and I'll try and remember to give you those

1   limiting instructions as we go.  You'll be getting juror

2   notebooks, so please put a big L next to it if I've limited

3   the use to which information can be put.

4         Now, many times a lawyer asks a question; the

5   other side objects.  I'm sitting there trying to figure out

6   how to rule.  I always like to say I'm not an ATM machine,

7   you know, I'll sometimes spit it out.  The witness answers

8   anyway.  I may strike that answer if I find that it was

9   inadmissible.  Please just if you've written it down, strike

10  it right out of your notebook and do not consider it in any

11  way during the deliberations.

12        Anything you may have seen or heard outside the

13  courtroom is not evidence and should be disregarded.  I used

14  to take two seconds to give that instruction, and then we

15  hit -- it shows you how old I am -- the age of the Internet.

16  No one should be Googling anyone.  Nobody should be

17  Wikipedia'ing anybody.  No one should be in any way looking

18  up any of the issues in this case.  You're going to hear

19  certain psychiatric terms.  If you don't understand them,

20  I'll let you write down a question and ask the expert the

21  question.  Write it down, ask it.  But you cannot Google it.

22  You cannot look on the Internet or any other place to get

23  any information.  Needless to say, no one here should be a

24  private eye.  No one should be driving to any locations.

25  You must base your verdict only on what you hear in this

1  room.  So no one should be doing any other kind of outside

2  research.

3           There are two kinds of evidence that you can

4  consider:  There's direct and circumstantial.  Direct

5  evidence is direct proof of a fact, such as the testimony of

6  an eyewitness; and circumstantial evidence is proof of facts

7  from which you may reasonably infer or conclude that other

8  facts exist.  There's direct evidence and circumstantial.

9           Let me give you an example which makes this

10  distinction quite simple.  Once again, this example has

11  nothing to do with this case.  Suppose your daughter were to

12  see the letter carrier deliver the mail.  She saw it and she

13  reported it to you.  That's direct evidence.  She used one

14  of her percipient senses, her sight, to see something, and

15  she tells you.  You may decide you don't believe her.  You

16  may decide she wasn't wearing her glasses and saw it

17  incorrectly.  You may decide she had a tough day and isn't

18  remembering it correctly, she's thinking of another day, or

19  you may think that she has a motive to lie; the check's in

20  the mail, right?  But that's direct testimony.  Suppose no

21  one saw the letter carrier deliver the mail, no one saw him

22  show up that day, but you come home from work and you find

23  the mail is through the mail slot.  That's circumstantial

24  evidence that the letter carrier had been there; how else

25  would the mail get through the slot?

1          Now, it's your job as the jury not only to

2     determine what the facts are but what are the reasonable

3     inferences to be drawn from the facts?  So to go back to my

4     example, it may be reasonable to infer that a letter carrier

5     had been there, but perhaps it isn't reasonable to find that

6     it was your regular letter carrier.  Maybe he or she was

7     sick or on vacation.  So you decide not only what the facts

8     are, but based on all the evidence, what's reasonable to

9     infer from those facts.

10          It will be, as I mentioned to you before, up to

11    you to decide what witnesses to believe, which witnesses not

12    to believe, and how much of a witness's testimony to accept

13    or reject.

14          The burden of proof.  This is a civil case, and

15    you will hear about two kinds of burdens of proof:  proof by

16    a fair preponderance of the evidence, which means a fact is

17    more likely true than not true, and two of the key issues in

18    this case must be proven by clear and convincing evidence,

19    which is a higher burden of proof.  However, this is not a

20    criminal case so you do not have to, at least at this point,

21    the two issues that I was just referring to that are clear

22    and convincing evidence, that does not mean proof beyond a

23    reasonable doubt, and I will be going much deeper into the

24    jury instructions at that point.

25          Now, let me just say this:  The key issues in this

1    case are -- the government has the burden of proving certain

2    things with respect to three elements.  Now, some of this

3    may be stipulated to, so, as I said, the two key issues here

4    are -- so the three things the government must prove is

5    whether or not Mr. Shields has engaged in or attempted to

6    engage in sexually violent conduct or child molestation in

7    the past; whether or not he currently suffers from a serious

8    mental illness, abnormality, or disorder; and as a result of

9    which, whether the respondent would have a serious

10   difficulty in refraining from sexually violent conduct or

11   child molestation in the future.  So those are the three key

12   things the government must prove, and with respect to the

13   latter two, I will be talking to you at huge length about

14   the issue of what the standard of proof is.

15           Now, Mr. Shields has taken the position that the

16   government will not be able to sustain its burden to prove

17   by clear and convincing evidence that he currently suffers

18   from a serious mental illness or abnormality or disorder, as

19   a result of which he would have serious difficulty

20   refraining from sexually violent conduct if released.  So

21   that's the issue fairly joined, and that's what you're going

22   to be hearing about over the next few days.  So keep in mind

23   that high burden of clear and convincing evidence.  We're

24   going to be talking about that a lot.

25           What is the burden here?  The burden is on the

1  government.  The government will introduce its witnesses

2  first.

3            I sort of have referred to the fact that there's

4  some scheduling issues here.  We have a very busy

5  psychiatrist/psychologist here, and so we have been trying

6  to make sure that we can have all of their schedules lined

7  up.  Tomorrow we'll hear opening statements and I believe

8  two fact witnesses.  The first government psychiatrist will

9  not be available to be here until Thursday, so tomorrow

10  might be an early day.  I'm not sure exactly how long those

11  witnesses will take.  Then you'll hear the government's

12  case.  There will be direct, cross, redirect, recross, and

13  then we'll move on to the next witness.

14            So at the end of that, you'll hear the government

15  say the government rests, and then you'll hear from

16  defendant's witnesses.  Now, as I say, these are very busy

17  people and there may be certain scheduling problems.  I may

18  take certain people out of order.  If I do, I'll give you a

19  heads-up about that.

20            At the end of the case, you'll hear closing

21  arguments, you'll hear my instructions of law, and then I'll

22  send you out to deliberate.  As I said before, some

23  deliberations take a day, some take three days.  Once I send

24  you out, that's totally up to you as to how long that will

25  take.

1          Now, your conduct as a jury.  Let me talk to you

2    about a few things.  First of all, I have not seen any press

3    coverage about this case, but there are certain reporters

4    who cover the court, and I wouldn't be surprised if at some

5    point there might be an article about it.  I didn't see

6    anyone here this morning.  I don't know.  If you see

7    anything about this case in the newspaper, don't read it.

8    If there's something on the evening news, don't read it.

9    There's plenty going on, conventions, storms.  I'm not going

10   to stop you from reading or looking at the press, but you

11   cannot read anything about this case.

12          The second thing is, you cannot talk about the

13   case at home or with one another.  You saw the number of

14   people who came up here.  Most of those people are not

15   telling me about conflicts in their schedules.  They were

16   telling me about why they couldn't sit on this case.  You

17   cannot in any way talk to anyone else who might have a bias

18   or a prejudice who might influence your thinking about the

19   case.  So if anyone says to you, "Oh, you're on a jury,

20   what's it about?" you have to say, "I can't talk about it."

21   Blame it on me, I'm the grouch, but you can't talk about it,

22   because we don't want anyone else's feelings or thoughts or

23   prejudices to come in and influence you about the case.

24          The second thing is, you can't talk about it with

25   one another.  Why?  Because we have found with deliberating

1   juries is the best thing is for you to hear everything, both

2   sides of the case, all of the instructions, and for you to

3   sit down in your room and to really talk through the issues

4   and everybody talking at the same time, because otherwise

5   you've got three people deciding after the first witness,

6   and four people after the opening statement, and little

7   factions, and you become very embedded in your point of

8   view.  Keep an open mind.  Wait till you've heard about the

9   facts and the law.  Don't go in there in any kind of rigid

10  view:  "I know what I'm going to do, and no one is going to

11  change my mind."  Keep an open view.  So I'm instructing you

12  not to talking with one another.

13          As I mentioned before very strenuously, if anyone

14  were to do any research about any of this on the Internet

15  and brought that into the jury room, I'd have to start

16  again.  You saw the process we've gone through.  No one

17  should be looking at anything having to do with this case.

18  No one should form an opinion until all the evidence is in.

19          And last, but not least, I want to talk about

20  taking notes.  I believe very strongly in taking notes.  Let

21  me see if I can find my notebook.  I take them in a little

22  brown book.  We are giving you a reporter's notebook

23  essentially to take notes in.  Those are confidential notes.

24  I strongly encourage you to take notes because at the end of

25  this trial, you do not get a transcript of the testimony.

1   So at least write down the person's name who's testifying,

2   maybe some thoughts you have as he's going, a few dates, if

3   you think that that's useful; but you do not get a

4   transcript at the end.  Now, the question is -- we have a

5   fabulous court reporter -- is it possible to get a

6   transcript?  I'd have to say "yes," but it takes a while to

7   perfect it, and you don't want to be sitting back there for

8   three hours while we get a transcript.  It's very important

9   to take notes to remember the basic thrust of the various

10  witness's testimony.

11          So I encourage you to take notes.  However, a lot

12  of what goes on here is -- I think there will be certain

13  exhibits which will flash up on your screen.  I don't know

14  if they'll be circulating any exhibits, but if they do, you

15  can take notes on them and keep those as your own exhibits.

16  But at the end of the day, don't lose sight of the forest

17  for the trees.  You know, you've got to look at the witness,

18  you have to think about what makes sense, you have to think

19  about whether you agree with them, and you also have to

20  resolve disputed issues of any fact -- there are going to be

21  disputed expert opinions -- as to what makes more sense to

22  you.

23          I will also encourage you -- very few jurors take

24  me up on it.  Maybe you're shy, I don't know.  Sometimes I

25  ask questions because I don't understand a term.  Ask

1  questions.  We're going to give you a form.  If you don't

2  understand what a word means or you don't understand what a

3  certain fact is that you want to know, ask it, because you

4  won't be able to once you're in the jury room.

5          I will hand the questions to the lawyers.  There

6  may be a reason they're not asking the question.  Maybe it's

7  inadmissible, so maybe you're not going to get the answer,

8  all right?  So I'm not guaranteeing that it will be

9  answered.  Maybe there's some reason they don't know or it's

10 inadmissible or perhaps some other reason it's irrelevant.

11 So I'm not guaranteeing you can get the answer, but if you

12 have a question, write it down, and I will hand it to the

13 lawyers and talk to them about that question.  So understand

14 that that's an open invitation for you to do that.

15         And, last, as far as notes go, please, when you go

16 back into that jury room -- some people take great notes,

17 you know, the kind you wanted to borrow from at school and

18 at work, and there are other people, you say, even if

19 offered, "No thanks," you know, because people don't take as

20 accurate notes as other people.  So please go into that jury

21 room with your own memory and your own notes so that you can

22 deliberate based on the evidence as you remember it.

23         Now, let me finally talk to you about the

24 scheduling of this trial.  In general, you will sit from

25 9:00 until 1:00, except for the day or days you deliberate

1   and I hold you until 5:00.  Now, if there is a problem in

2   any given day -- you got at flat tire, your kid is sick, you

3   have the flu, unfortunately there may be somebody else in

4   your family who's sick -- you need to let us know, because

5   with everybody here in this room, if one person is late, we

6   all wait.  That's true for everybody, the witness, the

7   lawyers, you and me.  So we need to know what's going on.

8   If it's simply that you're on the Southeast Expressway and

9   there's a hideous tie-up, we'll wait another extra twenty

10  minutes.  But if it's something more profound, like you

11  can't be here that day, we have to make a decision as to

12  what to do, so please let Mr. Alba know.  I hope they don't

13  take cell phones out of cars because for me, even though

14  that may be unsafe, I get these calls:  "I'm sorry, I'm

15  stuck at the Braintree split, and I can't get here."  I

16  mean, that's useful to know what's going on.

17          So we generally begin as close to 9:00 as I can

18  get everyone in here.  We break around 11:00, and we give

19  you food so for the second half you can have energy.  And

20  then we break at 1:00.  It could be 1:10, it could be 1:15.

21  There may be certain days that I might have to leave a

22  little early.  For example, I have three or four immigration

23  proceedings this month where I'm going to have to swear in

24  new citizens.  I mean, there's things that happen.  There's

25  one day there that I already know I have a conflict.  I'll

1    let you know, Mr. Alba will let you know plenty in advance.

2         So we're going to go from 9:00 to 11:00, break

3    from 11:00 to 11:30, then go to 1:00-ish, except on the day

4    that you deliberate.  I'll give you lunch, good lunch, a

5    good caterer here, and then you'll stay till 5:00 o'clock,

6    and I'll give you plenty of advanced notice so you can

7    schedule your time that day.

8         So at this point I basically have covered

9    everything.  Let me just add, I have no expectation of snow,

10   so I don't have to give you the snow talk, what happens if

11   there's a snow day.  But I will say in general, since we're

12   roughly in hurricane season, although we're not expecting

13   any up here, the general rule is, if there's no school in

14   Boston, there's no court.  So if there's some weather

15   situation, that's it.  Otherwise, if there are any

16   questions, we'll give you a general phone number to reach.

17        All right, well, thank you very much.  Remember,

18   don't talk about the case, and I will see you tomorrow

19   morning at 9:00 o'clock.  Thank you.

20        THE CLERK:  All rise for the jury.

21        (Jury excused.)

22        THE COURT:  A few things.  Keep this on the

23   record.  I stumbled over it because I wasn't sure I had

24   enough at this point to have a stipulation.  Is there a

25   stipulation that the government's satisfied --

1        MR. SWOMLEY:  There will be a stipulation as to

2   prong one, yes.

3        THE COURT:  Prong one, so I tripped over it.  So

4   as a matter of practice, there may be some disputes about

5   whether certain factual things should be relied on, but the

6   overarching standard is clear and convincing evidence.  And

7   if you have a good way of defining that, that would be

8   useful.  I don't use it very often.

9        MR. SWOMLEY:  Do you mind if we talk about that in

10  our opening?  I mean, obviously you're going to instruct

11  them on the law, but --

12       THE COURT:  Yes, of course.  If you're going to

13  stipulate to it, stipulate to it.  That's fine.

14       MS. KELLEY:  We have a "clear and convincing" in

15  our proposed jury instructions, it's kind of buried in

16  there, but we are proposing language both for the elements

17  what the government has to prove, and also for the standard.

18       THE COURT:  Okay, so while I tripped over it, I

19  wish I'd actually talked to you about it beforehand.  So I

20  think it is correct that neither preponderance of the

21  evidence nor proof beyond a reasonable doubt are going to

22  play any role in this case whatsoever, and really the only

23  thing I need to -- so when you talk about it tomorrow, I

24  think, just so they're not getting confused with all these

25  standards, we'll just stick with clear and convincing?  Seem

1   fair enough?

2          MR. GRADY:  Your Honor, I don't have a problem

3   with stipulation to Count 1.  What I have a problem with is

4   attempts to say that the government can't prove up that

5   element of the case because they've stipulated.

6          THE COURT:  No no, no, no, that's fair enough,

7   because there are other things that go to it:  Are they

8   dangerous, can they control themselves?  But I --

9          MR. GRADY:  It is the government's case, and if --

10          THE COURT:  You can put in the convictions if you

11   want, but it does go to how -- I mean, I don't want to spend

12   a lot of time with it -- the issue, you know --

13          MS. KELLEY:  Well, I think what he's actually

14   getting at is, we are stipulating that Mr. Shields has four

15   convictions for unlawful contact with a minor.  I think the

16   government has unconvicted conduct that they're going to

17   argue meets that first prong.  I really think it's

18   confusing.  If it comes in in some other way, that's fine,

19   but --

20          THE COURT:  It's only relevant to the other two

21   prongs, but it may be, okay, so --

22          MS. KELLEY:  Okay.

23          THE COURT:  So tomorrow I'll give you the hook

24   after a half an hour.

25          MR. GRADY:  I'll be well under a half an hour.

1    THE COURT:  And then the witnesses.  I make it a

2    practice to be in here by quarter of whenever I'm on trial,

3    so it might be very useful to sit -- can you at this point

4    give them the exhibits you're planning on relying on?

5        MR. GRADY:  I have walked through the direct of

6    the DA, and the police officer literally is just going to

7    come down and authenticate the copies of --

8        THE COURT:  Just show them exhibits so tomorrow

9    morning, if there's a problem --

10       MR. SWOMLEY:  We have copies of what they want

11   to --

12       THE COURT:  -- I won't be scrambling as to what

13   the objections are, and what I'm likely to do is -- for

14   example, the problem I'm running into is this:  If you

15   wanted to shoot them up on the screen, if I didn't totally

16   agree, you should have some paralegal here who can shoot

17   upstairs and sanitize it so we don't hold up the -- I don't

18   know if you have an intern or someone who can do that for

19   you, you know, just sit here.  And then if I say "yes" to

20   this and "no" to this, if it's unresolved, you won't be able

21   to put it up on the screen, or you'll have to use the paper

22   over it and that sort of thing.

23       MS. KELLEY:  Also I just wanted to raise one

24   scheduling issue, which is, on Thursday morning, it's one of

25   my children's first day in school, and I can't drop him off

1    till 8:00, so I don't -- I'm hoping I can get here timely.

2    It shouldn't take me an hour to get here, but --

3              THE COURT:  You're lucky he still lets you go with

4    him on the first day of school.

5              MS. KELLEY:  I know, really.  It's the first day

6    of middle school, so --

7              THE COURT:  In any event, so you'll get here when

8    you get here.

9              MS. KELLEY:  Right, but hopefully I'll be here.

10             THE COURT:  Who's doing the cross on him?

11             MS. KELLEY:  On Thursday, that would be Plaud, and

12   Mr. Swomley is doing it.

13             THE COURT:  So, all right, you'll just slip in,

14   that's fine.  I'll explain it even.  Okay, so I'll see at

15   quarter to tomorrow morning?

16             MS. KELLEY:  Yes.

17             MR. SWOMLEY:  Just in terms of other nomenclature

18   that I think is unique to this stuff and I think does make a

19   difference, first of all, there are no psychiatrists, there

20   are only psychologists, and, in my view, there's a

21   difference, so, I mean, I think that's important.

22             THE COURT:  None of them are psychiatrists, none

23   of them, even yours?

24             MR. SWOMLEY:  No.  Everybody is a psychologist.

25   And the other thing is, he's not a defendant.  There's

1b059d11-a661-46d8-afa5-0e1d06da8d1f

1    nothing criminal, and referring to him as a defendant I

2    think is prejudicial.

3                THE COURT:  So how would you like, respondent?

4                MR. SWOMLEY:  Respondent.

5                THE COURT:  You know, it's funny, we played with

6    that, but then I figured people didn't know what a

7    respondent was.

8                MS. KELLEY:  I didn't know what a respondent was.

9                THE COURT:  All right, because no one's flagged

10   that for me, what do you want me to call him?  I'll just

11   call him Mr. Shields.

12               MS. KELLEY:  Mr. Shields is good.

13               THE COURT:  Shields is a good one.  All right, so

14   I don't know how you want to -- "respondent" just seems so

15   unfamiliar --

16               MR. GRADY:  Witnesses called by the response?  Can

17   I say witnesses called by the defense?

18               MR. SWOMLEY:  By the respondent is the way it

19   would be by Mr. Shields, what I would prefer, because

20   "defendant" puts it into a mindset.

21               THE COURT:  Yes, yes, I agree with you.  I agree

22   with you.  So we'll see you tomorrow morning at quarter to

23   9:00.

24               (Adjourned, 1:07 p.m.)

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Court Reporter, do

8  hereby certify that the foregoing transcript, Pages 1

9  through 57 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action

11 No. 07-12056-PBS, United States of America V. Jeffrey

12 Shields, and thereafter by me reduced to typewriting and is

13 a true and accurate record of the proceedings.

14          In witness whereof I have hereunto set my hand

15 this 18th day of October, 2008.

16

17

18

19

20
                /s/ Lee A. Marzilli
21          _____
                LEE A. MARZILLI, RPR, CRR
22              OFFICIAL COURT REPORTER

23

24

25