```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
               Petitioner      )
                               )
          -VS-                 ) CA No. 07-12056-PBS
                               ) Pages 1 - 145
JEFFREY SHIELDS,               )
                               )
               Respondent      )
```

JURY TRIAL - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
September 4, 2008, 8:55 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2        MARK J. GRADY, ESQ. and EVE A. PIEMONTE—STACEY, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the Petitioner.

4
         PAGE KELLEY, ESQ, Federal Defenders,
5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
     for the Respondent.

6
         JOHN G. SWOMLEY, ESQ. Swomley & Associates,
7    227 Lewis Wharf, Boston, Massachusetts, 02110—3927,
     for the Respondent.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

eed06d86-2ad0-4cf7-9303-0631408369df

1                          I N D E X

2

    OPENING STATEMENTS                      PAGE
3

4   By Mr. Grady:                           21

5   By Mr. Swomley:                         31

6

7   WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

8   Joseph J. Plaud          48     131

9

10  EXHIBITS                    RECEIVED IN EVIDENCE

11

    Petitioner
12
    1                              49
13

14  4                              76

15  5                              78

16  6                              81

17  7                              83

18  8                              91

19  9                              92

20  10                             93

21  11                             93

22  22                             100

23  26                             118

24

25

1            P R O C E E D I N G S

2           THE COURT:  Good morning

3            MR. SWOMLEY:  Good morning.

4            MR. GRADY:  Good morning, your Honor.

5           THE COURT:  So I'm hoping I'm right, we didn't

6   have court yesterday because of a stipulation reached by the

7   parties?  Is that what I heard --

8            MR. SWOMLEY:  Yes.

9           THE COURT:  -- through my very reliable grapevine?

10  All right, so who's going to read it?

11           MR. GRADY:  I think we could save it till the

12  final jury instructions.

13           THE COURT:  You're going to mark it?  Is it

14  written?

15           MR. GRADY:  It is written.  We have a written

16  agreement from last night.  I don't know if we've finalized

17  it.

18           THE COURT:  All right, so you'll mark it.  We'll

19  send it in.  You can refer to it.  Fine.

20           MS. KELLEY:  It's not controversial at all, so --

21           THE COURT:  Okay.  So today we have?

22           MR. GRADY:  Dr. Plaud, who has informed us last

23  night he will be here this morning at 9:00 or so.

24           THE COURT:  Who are you?

25           MS. KELLEY:  There is Dr. Rypma, your Honor, Craig

1   Rypma.

2            THE COURT:  All right, okay, so good morning.

3            DR. RYPMA:  Good morning.

4            THE COURT:  You're going to be sitting through

5   this?

6            DR. RYPMA:  Yes, ma'am.

7            THE COURT:  All right.  So it could go a couple of

8   days anyway, I mean, right?  So you're going to be here

9   today, and then you're going on the stand, I guess, Monday,

10  right?

11           MR. GRADY:  Dr. Tomich will be Monday.

12           THE COURT:  Monday, all right.  So you're going to

13  sit through both experts?

14           MS. KELLEY:  Yes, he is.

15           MR. GRADY:  Monday or Tuesday, depending on how

16  long the cross is.

17           MS. KELLEY:  Can we just talk about the schedule

18  briefly?  My understanding is, Dr. Plaud will testify today

19  and tomorrow.

20           THE COURT:  Yes.  Where is he, by the way?

21           MS. KELLEY:  He said he would be here.

22           THE COURT:  All right.

23           MS. KELLEY:  On Monday we have Dr. Tomich, and

24  we've told Mr. Swomley he has to finish and give the

25  government a chance to redirect on Tuesday.  So we're not

1    seeking two days for cross as we had originally asked.

2             THE COURT:  Okay.

3             MS. KELLEY:  If we could go a full day on

4    Wednesday, all the parties are available.  We have five

5    out-of-town witnesses whom I would really love to put on in

6    one day, but I just don't want people flying in and flying

7    back out again, since we're not having court on Thursday.

8             THE COURT:  What date is that, the 10th?

9             THE CLERK:  Yes, that's the 10th.

10            (Discussion off the record between the Court and

11   Clerk.)

12            THE COURT:  Here's the thing.  I have one thing.

13   I have a very serious pretrial for the case that's probably

14   going to start the following week.  It's right now scheduled

15   at 3:00.  We could probably move it to 4:00.  And I also

16   have a naturalization ceremony at 1:30, but it's here in the

17   building, right?  I think so.

18            MS. KELLEY:  If I could just say, the --

19            THE COURT:  So I could maybe get you an extra

20   couple of hours, but that's all it's going to get you, so --

21            MS. KELLEY:  If I could just say, the reason for

22   the slight time pressure is this:  We're off on Thursday.

23   We will put Dr. Rypma on on Friday.  He can presumably

24   continue his testimony on Monday, but on Tuesday afternoon

25   Dr. Rypma has to fly out of Boston.  He's unavailable.

1    THE COURT:  Let me ask you this:  You're talking

2  about September 10?

3    MS. KELLEY:  I'm talking about Wednesday,

4  September 10, for the long day.  And then that way --

5    THE COURT:  Excuse me.  We can check and see if

6  the jury can do it because, don't forget, I made the

7  commitment of 9:00 to 1:00.  There is a pretrial conference

8  that needs to happen for me, and I can't give it less than

9  an hour.  So I can see if they can make it at 4:00; we can

10  see if the jury can make it.  I believe, although I may be

11  wrong, that that immigration ceremony is one that was here

12  in the building.

13    THE CLERK:  It is.

14    THE COURT:  So I could conceivably give you an

15  extra two hours on that day.

16    MS. KELLEY:  Because that way, if Dr. Rypma begins

17  his testimony on Friday, the 19th, and then continues it to

18  the 22nd, he could then safely leave on the 23rd.

19    THE COURT:  I mean, your other option is to have

20  him start in that afternoon.  Anyway, I leave it up to you.

21  I don't know why --

22    MS. KELLEY:  Just I have a witness flying up from

23  North Carolina who cannot be available the week of the 22nd

24  and so on.

25    THE COURT:  All right, I'll try and work this out

1   for you.  But let me just say this:  I'm not sure why he's

2   sitting through this whole thing.  It's very expensive.  It

3   would be cheaper, actually, to have him read a transcript.

4               Where are you from, sir?

5               DR. RYPMA:  Des Moines, Iowa.

6               THE COURT:  I don't know why he's sitting here.

7   Am I paying for the hotels and the -- I mean, at some level,

8   let me just say this, a transcript would be easier.

9               MS. KELLEY:  Well, the government is paying for

10  the hotel and paying him an hourly rate.

11              THE COURT:  That's us.

12              MS. KELLEY:  But not a daily rate, which I think a

13  lot of experts charge per day when they're out of their home

14  area.  He's charging a flat rate of $200 an hour is my

15  understanding, which the government agrees is a very low

16  rate for this kind of work.  In fact --

17              THE COURT:  I'm not paying for afternoons, right?

18              MS. KELLEY:  The only time the government is

19  paying for is when he is actively working.  You're not

20  paying him for being in Boston, which a lot of experts would

21  charge the court for that.

22              THE COURT:  And I wouldn't have allowed, so --

23              MS. KELLEY:  Yes.

24              THE COURT:  But let me come back to that because I

25  really want -- the jury is probably all here now.  I hadn't

1    quite understood when I agreed to this sitting in that I was

2    being billed for it.  I thought -- I didn't realize he was

3    from out of town and the hotel rooms and the back-and-forth

4    in a plane.  We're going to try and work to make this

5    cheaper rather than -- I don't want him flying back and

6    forth, I mean, on the government dime.  I mean, I just think

7    it's -- we could just get a transcript.

8              MS. KELLEY:  I can speak to him about that.  I

9    don't know that he had anticipated flying back and forth

10   during the trial.

11             THE COURT:  Well, let's try and do this in an

12   economical way.  I have no problem with him reading it.

13   It's not a sequestration issue.  It's the expense issue.

14   But let me just -- what are the documents issues?  Anything

15   left?

16             MS. KELLEY:  Yes.

17             MR. GRADY:  We have narrowed it down to a narrow

18   set of disputes.

19             THE COURT:  All right, what's the issue?

20             MS. KELLEY:  Well, I don't know if you have a

21   binder of the proposed exhibits?

22             THE COURT:  Yes.  I'd like also -- do we know, are

23   they going to signal us when the jury is all here?

24             THE CLERK:  I'll find out.

25             THE COURT:  All right, he's going to check to see

1    if the jury is here.

2              MS. KELLEY:  Exhibit No. 5, we have no objection

3    to the indictment or the redacted docket sheet.  However,

4    the government seeks to --

5              THE COURT:  Excuse me.  I think I'm looking at the

6    wrong Exhibit 5.

7              MR. GRADY:  There should be one from this morning.

8              THE COURT:  Excuse me?

9              MR. GRADY:  There have been, unfortunately, many

10   iterations of the documents.  There should be one we just

11   handed up this morning.

12             THE COURT:  This is a new one?

13             MR. GRADY:  A brand-new one.  In fact, it should

14   be dated --

15             MS. KELLEY:  No. 5.

16             THE COURT:  All right, so what do you want?  I've

17   got it.

18             MS. KELLEY:  We have no objection to the

19   indictment or the redacted docket sheet, which your Honor

20   has said she will allow.  However, if you look at the third

21   page of No. 5 which is Bates 900, it says that the defendant

22   filed a motion to correct or reduce his sentence which was

23   denied by the judge.  And then if you continue going through

24   those documents --

25             THE COURT:  So you want that out?

1          MS. KELLEY:  Yes.

2          THE COURT:  Yes, allowed.  What's the next?

3          MR. GRADY:  Your Honor, if I may speak to that

4   briefly.

5          MS. KELLEY:  Then if you continue --

6          THE COURT:  Excuse me, excuses me.  Yes?

7          MR. GRADY:  If I could, the motion in question,

8   one of the arguments presented by the defense here, at least

9   it's anticipated based on the witnesses, is that he will be

10  on probation, that he's expressed an interest to go to sex

11  offender treatment, that this is something that goes to

12  reduce his risk.  What this particular motion contains are

13  similar statements from eighteen years ago, that he wants to

14  go to sex offender treatment --

15         THE COURT:  Well, I didn't say I was going to

16  eliminate the motion.  I said I was going to disallow the

17  judge's ruling.

18         MR. GRADY:  Oh, that's fine.

19         THE COURT:  I don't care that he moved to have it

20  reduced or the motion.  That's a statement of a party

21  opponent.  It's the judge's ruling which might be unduly

22  prejudicial.

23         MR. GRADY:  Okay.

24         MS. KELLEY:  Then if you go through about another

25  three pages of that Exhibit No. 5, Bates Nos. 905 through

1   908 is the actual motion to correct the reduced sentence

2   pursuant to Rule 35.  And the defendant makes some -- well,

3   there's a statement of the facts that is typed out, and says

4   that the sex offenders education group has been cut, he

5   wants to go to another group, and what his plans are when he

6   gets out.  And I just think this --

7             THE COURT:  The motion to eliminate, that's denied

8   because that's his statements.  And as I see this case

9   playing out, which is quite interesting, is, I know you're

10  still disputing whether he has pedophilia or not, but it's

11  the third prong which is really going to be the heartland,

12  which is --

13            MS. KELLEY:  That's true.

14            THE COURT:  And so what he's done in the past and

15  whether it's been successful and the chronology of that, and

16  whether he actually had sex offender treatment, I actually

17  think it's relevant that he says it was canceled and why he

18  thinks it didn't work for him.  And they can point out that

19  it didn't work.  I mean, I think that's really what this is

20  about:  Can he control himself?

21            MS. KELLEY:  Well, if I may, at the bottom of 905

22  again is the court's denial.

23            THE COURT:  Yes, they'll remove that.  That's fair

24  enough.

25            MS. KELLEY:  Well, just note our objection to that

1    coming in at all.

2         THE COURT:  Okay, fine.

3         Excuse me, are they all here?

4         THE CLERK:  No.

5         THE COURT:  We're still missing one juror, so we

6    can keep going.

7         MS. KELLEY:  In No. 8, if you look at Exhibit 8,

8    the government has included in about the middle of that

9    exhibit -- there's a lot of pages there -- beginning on

10   Bates 622 a portion of the sentencing transcript; and then

11   immediately afterwards, the judge's findings affecting

12   sentencing.  And, you know, we have agreed to the portion of

13   the presentence report coming in that states there are

14   prepubescent pictures in the pictures that the defendant was

15   convicted of.  I really think the judge's musings on his

16   sentence, on the guidelines, on the government's

17   recommendations --

18        THE COURT:  Yes, I don't have time to walk through

19   it, but I think it's very relevant how much he had involving

20   small children, but not the court's necessarily findings on

21   it, so --

22        MS. KELLEY:  Well, the presentence report, we have

23   agreed those facts are coming in, and it's in here as well.

24   It states that.

25        THE COURT:  So I don't know why -- if it's nothing

1   else other than cumulative, we don't need that addition.

2          MR. GRADY:  Very well, your Honor.

3          MS. KELLEY:  So we're taking out the sentencing

4   transcript and the findings affecting sentencing?  I mean, I

5   just think the whole guideline thing --

6          THE COURT:  Excuse me.  If it's already in the

7   presentence report, I don't have a problem with it coming

8   out because it's cumulative; but I think it is relevant that

9   he had pictures of small children because that's part of the

10  issue, as I remember it, is, as he's getting older, does he

11  still have the attraction?  And so that's relevant.  So I'm

12  allowing the fact that he had lots of pictures of small

13  children but not the court's findings, unless those are not

14  somewhere else.

15         MR. GRADY:  There were two findings.  There were

16  findings in the sentencing transcript and findings in the

17  sentencing proceedings that the offense involved

18  prepubescent children, the pictures.

19         THE COURT:  Yes, that's relevant.

20         MS. KELLEY:  That's in the presentence report

21  facts.

22         MR. GRADY:  It's not in the facts in that form,

23  your Honor, and the --

24         THE COURT:  So show me how it's in there.

25         MS. KELLEY:  That's Exhibit 9, Page 77.  And if

1   you look at Page 78, the next one, it says, "Analysis

2   revealed hundreds of images of adolescent and preadolescent

3   children, predominantly boys, engaged in sexually explicit

4   conduct."

5               MR. GRADY:  Your Honor, if it's in there --

6               THE COURT:  That's fine.

7               MS. KELLEY:  So I think that covers it without

8   glopping everything up with the guidelines.

9               THE COURT:  Fine, if you see something else --

10  excuse me -- if you see something else that you've missed

11  here because we're going through it quickly, you'll let me

12  know, but at least right now that seems reasonable.

13              So what's the next thing, anything?

14              MS. KELLEY:  So that's it.  The rest of this is

15  fine.

16              THE COURT:  Great.  As soon as that juror comes

17  in, we'll do openings.  Is Dr. Plaud here?

18              MS. KELLEY:  If you could also just ask the jurors

19  about Wednesday, if that's a possibility?

20              THE COURT:  I'll have Mr. Alba do it privately.  I

21  mean, already some of them have asked, "Well, what about

22  this date?  What about that date?"  You know, I mean, we

23  really have to keep to a tight tether because I did promise

24  them the afternoons, but I'll try.  Actually, I'll do

25  everything I can.  I don't want to make people from Maine

1   stay overnight either.

2           MS. KELLEY:  Right, or North Carolina.

3           THE COURT:  Let me ask you this, Dr. Rypma, while

4   I've got you:  Are you flying home for the weekend?

5           DR. RYPMA:  No.

6           THE COURT:  I'm just trying to figure out.  If you

7   could do the dollar sign, if we got you a transcript rather

8   than have you sit here every day.  When would you be coming

9   back here?  I just want to at this point now that you're

10  here, I'm just trying to do the dollars and cents thing of

11  this.

12          MS. KELLEY:  Your Honor, I think to fly him back

13  and then fly him back again for his testimony, and with all

14  the vagaries of, you know, when is he actually going to

15  begin his testimony, he has to come in the night before,

16  et cetera --

17          THE COURT:  Could you at least think about that,

18  because I hadn't realized that I was putting him up in a

19  hotel and it was going to --

20          MS. KELLEY:  Well, if I can just say, we really --

21  I at least really require his assistance during this trial.

22  He's our expert.  I'm going over the government's allegation

23  as things develop during the trial with him, and we really

24  need him here.  I think in many civil trials people have

25  their experts attend.  If Mr. Shields could pay for it, we

1   would certainly have him sitting here at Mr. Shields's

2   expense.

3            THE COURT:  Can I say, I've now been sitting on a

4   criminal trial for fourteen years, and so I've never had

5   someone sit, a defense expert, for five days, or whatever it

6   is, so I'm just a little wary about it.  He's here.  I

7   missed the fact that he's from Iowa.  I thought he was one

8   of our local people, so it's my miss, my -- I missed the

9   fact that we were putting him up in a hotel the whole time.

10  I mean, the government opposed it.  I thought it was a

11  sequestration opposition, not a monetary one, but I have to

12  worry about that.  I'm paying for, I don't know, six nights

13  in a hotel room?

14           MS. KELLEY:  Well, if I might, your Honor --

15           THE COURT:  How much is it?  Where is he staying?

16           MS. KELLEY:  At this point, I think he's staying

17  at the Intercontinental Hotel.

18           THE COURT:  How much is that a night?

19           MS. KELLEY:  I don't know.  I'm assuming it's the

20  government rate.  It's the government that arranges for all

21  this.

22           THE COURT:  How much is it a night?  Do you know?

23           MS. KELLEY:  But can I just say something?

24           THE COURT:  No, no.  I'm being real serious.  Why

25  are we at the Intercontinental?  I mean, are you getting

1   government rates?

2              DR. RYPMA:  Yes.

3              THE COURT:  How much is it a night?

4              DR. RYPMA:  I think it's $180.

5              THE COURT:  That's doable.  That's fine.

6              MS. KELLEY:  Also, if I can just say, $180 a night

7   even times six or seven --

8              THE COURT:  Right.  If it were $500 a night, I

9   would feel differently about it.

10             MS. KELLEY:  -- versus this man being incarcerated

11  for the next twenty years --

12             THE COURT:  Excuse me, excuse me.  Your office has

13  been in front of me so many times.  I've never had someone

14  be here for a week.  I've just never had it, and it's just

15  unusual, right?

16             MS. KELLEY:  Well, I don't think it's an

17  outrageous expense given the stakes of this trial.

18             THE COURT:  So is the jury here?

19             THE CLERK:  No.  We're still down one.

20             THE COURT:  I wish you had flagged for me that the

21  expense was the issue, not sequestration order, because who

22  cares if he sits in?  Experts sit in all the time.

23             MS. STACEY:  Well, we found out, and it was later,

24  that he was going to be here the whole time, and we had

25  intended to file a motion for clarification just asking that

eed06d86-2ad0-4cf7-9303-0631408369df

1   we not be required to pay for the afternoons that he's not

2   testifying.

3           THE COURT:  Well, I'm not paying for any of that

4   unless he's working directly on this case.  I'm not paying

5   for travel time.

6           MS. KELLEY:  Well, when the government contacted

7   us and said, "How much are we paying for here?" I called

8   Dr. Rypma and said, "What are you charging the government?"

9   It's not actually my problem.  The government is paying for

10  this.

11          THE COURT:  Excuse me.  I want to make it clear

12  that I'm only paying for in-court time and actual time spent

13  on this case.  I'm not paying for the travel time or the

14  afternoons or the evenings and all that stuff.  So, anyway,

15  we'll get to --

16          MS. KELLEY:  Well, anytime he is directly working

17  on the case because he is sometimes talking to us.  I mean,

18  that's the purpose of him being here, so --

19          THE COURT:  Fair enough.

20          MS. STACEY:  Would the Court like a written motion

21  filed?

22          THE COURT:  At this point I just want to get this

23  case started.  I just hadn't realized until I saw him

24  sitting here what we were talking about.  The government's

25  issue was flagged more in terms of a sequestration order,

1   and experts all the time sit in on other experts' testimony.

2   It doesn't have the same memory issues.  That isn't the

3   problem.  I just want to make sure that we are being

4   reasonable in our expenses.

5              So is the jury here?

6              THE CLERK:  No.  The CSO said he would come in and

7   tell us.

8              THE COURT:  So I think we can go off, stand in

9   recess.  I think we're still waiting for one juror.  He's

10  going to check on the person.  And, you know, while you're

11  in there, find out what date it was that she wanted and see

12  if they can do it before we start switching our schedule

13  around.

14             MS. KELLEY:  Wednesday, the 10th.

15             (A recess was taken.)

16             (Resumed, 9:20 a.m.)

17             THE COURT:  The last juror is here.

18             (Jury enters the courtroom.)

19             THE COURT:  Good morning to everybody.  Did anyone

20  speak about the case or see anything in the press?  I find

21  the jury has complied with my instructions.

22             What happened yesterday?  Yesterday the attorneys

23  were able to reach a stipulation.  Remember I told you a

24  stipulation is when the attorneys agree to certain facts,

25  and in that way, you don't need the witnesses.  So there was

1    two witnesses coming in from out of town.  The attorneys

2    agreed to what they would say and what the evidence would

3    be.  That way you get a day off, and you'll get a written

4    stipulation.  And so that's why we didn't sit in trial

5    yesterday, but today we're going for the full morning, and

6    we're going to start off with the opening statements.

7              I see that you all have your notebooks, right?

8    Okay, so if you want to take notes on the opening statement,

9    you're certainly welcome to, but, remember, the opening

10   statement is not evidence.  Each opening statement should

11   be, I'm told, twenty minutes to half an hour.  At half an

12   hour, you get the hook.

13             Okay, go ahead.

14   OPENING STATEMENT BY MR. GRADY:

15             MR. GRADY:  Good morning.

16             THE JURY:  Good morning.

17             MR. GRADY:  And thank you all for being here.

18   Since it's been a day or two, I'll remind you --

19             THE COURT:  Louder because I've got to hear too,

20   and so do they.

21             MR. GRADY:  Since it's been a day, I will remind

22   you all my name is Mark Grady, and I represent the United

23   States in this matter, and my cocounsel is Eve Stacey.  And

24   before I begin my opening statement, I want to remind you of

25   one thing, and the Judge has already instructed you about

1   this:  You are going to hear evidence of past crimes against

2   children, and you are going to have, more than likely than

3   not, an emotional reaction to that.  And the Judge has

4   instructed, and you have all taken an oath, that you will

5   not be swayed by your emotional reaction to these crimes,

6   and that you will judge the facts of this case based on the

7   evidence you hear today.  Please keep that in mind when you

8   hear the evidence in this case.

9        One cannot judge what will happen in the future

10  except by looking at the past.  That is to say, if one wants

11  to make a determination of what may happen or is likely to

12  happen in the future, there is no other basis on which to

13  make that judgment than to look at what has already happened

14  and what conditions are today.  And the evidence you are

15  going to hear in this trial is about Jeffrey Shields's past,

16  his prior offenses, his present condition.  You're going to

17  hear about his present mental diagnosis, and what the

18  evidence in this case will tell is what conclusions you can

19  draw clearly and convincingly about what will happen in the

20  future.

21       You are going to hear that the statute in this

22  case tracks exactly that.  It requires the government to

23  prove past acts of child molestation, the past; the

24  government prove that Mr. Shields presently suffers from a

25  serious mental illness, abnormality, or disorder,

1    Mr. Shields's present condition; and the statute requires,

2    and the Judge will tell you this, that the government prove

3    that as a result of these two things, Mr. Shields will have

4    serious difficulty in refraining from further acts of child

5    molestation.

6              You are going to hear evidence that the single

7    best predictor, the most important factor in assessing the

8    likelihood of future acts of sexual conduct against children

9    is whether or not the individual has engaged in past acts of

10   that kind.  And because of this, because not only does the

11   government have to prove it, but because it is relevant to

12   the question of future risk, you are going to hear about

13   Jeffrey Shields's prior crimes.  You are going to hear about

14   three offenses in Maine in 1989 for which Jeffrey Shields

15   was convicted.  You're going to hear that in January of

16   1989, Jeffrey Shields -- and before I get into this,

17   remember, it's not comfortable to hear, but please do not be

18   swayed by your emotional reaction to these crimes -- that in

19   January of 1989, he fondled the genitals of a 14-year-old

20   boy.  You're going to hear -- excuse me -- a 13-year-old

21   boy.  In July of 1989 in the bathroom of the Hyde School in

22   Maine at the gymnasium Jeffrey Shields grabbed a 14-year-old

23   boy, pulled him into a bathroom stall, began masturbating,

24   touched the boy's penis and forced the boy to touch his.

25   You're going to hear that less than a month later Jeffrey

Page 24

1   Shields returned to that same Hyde School and molested a

2   6-year-old boy, and you're going to hear about the facts of

3   that offense.

4           You're going to hear that Jeffrey Shields pled

5   guilty to those offenses, and you're going to see certified

6   court records of those offenses.

7           Now, you may hear in this case evidence about

8   Jeffrey Shields's plans; that he plans to go to sex offender

9   treatment, that he has remorse.  The evidence in this case

10  will show you with respect to those 1989 convictions, that

11  back in 1991, almost twenty years ago, Jeffrey Shields was

12  going to go to sex offender treatment.  Jeffrey Shields had

13  remorse.  What has happened in the past informs our judgment

14  about what will happen in the future.

15          You're going to hear that Jeffrey Shields was

16  sentenced to three and a half years in prison in 1990.

17  You're going to hear that he underwent sex offender

18  treatment as part of his probation for those offenses, and

19  you're going to hear that Jeffrey Shields reoffended.

20  You're going to hear that in 1998 Jeffrey Shields was

21  convicted of unlawful sexual contact with a 12-year-old boy.

22          When you hear Jeffrey Shields say or if you hear

23  evidence in this case about the future risk of Jeffrey

24  Shields has been reduced because he's going to go to sex

25  offender treatment, he's been to sex offender treatment as a

1    result of the 1990 conviction, and Jeffrey Shields

2    reoffended.  What happened in the past informs our judgment

3    about what will happen in the future.

4            As a result of the 1998 offense, Jeffrey Shields

5    was given a five-year sentence, but the Judge in that case

6    made him serve 112 days and gave him four years of probation

7    with strict conditions; that he go to sex offender

8    treatment, that he register as a sex offender, that he be

9    supervised by a probation officer.

10           Now, you are going to hear evidence that one month

11   after that sentence was imposed in November, 1998, the

12   Probation Department was back before the court seeking a

13   warrant because Mr. Shields wasn't complying with the

14   conditions of his probation; and you'll find out that four

15   months after the sentence was imposed Jeffrey Shields was

16   put back in jail for failing to comply with conditions of

17   his probation, and he served four months.

18           When you hear evidence in this case about

19   Mr. Shields being on probation in the future, remember this:

20   The evidence will show, within a month of being placed on

21   probation last time, he was being violated, and he was sent

22   back to jail.  Within two years of that date, while still on

23   probation, Jeffrey Shields was sent back to jail a second

24   time in February of 2001 for not complying with the

25   conditions of his probation, and he was sent to jail for

1   18 months that time.

2          And you're going to hear that while still on

3   probation, in September of 2002, just about a month after he

4   would have finished that 18-month sentence, Jeffrey Shields

5   reoffended by possessing child pornography.  You're going to

6   find that Jeffrey Shields was found with hundreds of images

7   of child pornography, including both teenagers and

8   prepubescent children engaged in sexual acts.  And you'll

9   hear that Jeffrey Shields in 2003 was convicted in Federal

10  Court and sentenced to 57 months in prison with probation.

11         You may hear evidence in this case about the

12  probation that Mr. Shields will be on as a result of his

13  federal conviction.  You may hear evidence about his plans

14  to go to sex offender treatment.  When you hear that

15  evidence, remember the evidence in this case will show that

16  Mr. Shields has had plans before, and he has reoffended and

17  reoffended.  Mr. Shields has been on probation before, and

18  he's failed to comply with the conditions of probation.  And

19  Mr. Shields has been on probation, and he has reoffended

20  while on probation.  What happens in the past informs our

21  judgment about what will happen in the future.  That is the

22  past.

23         You're also going to hear evidence in this case

24  about Mr. Shields's present mental condition, and you're

25  going to hear from three experts.  Two of them will be

eed06d86-2ad0-4cf7-9303-0631408369df

1  called by the government, and one will be called by the

2  defense.  And you are going to hear agreement from every one

3  of these experts that Mr. Shields presently suffers from

4  pedophilia.  You're going to hear that pedophilia is a

5  mental disorder recognized by the American Psychiatric

6  Association, and you're going to hear from all three experts

7  that this is a serious mental disorder.  There's going to be

8  no disagreement on that issue.

9          You're going to hear the experts talk about

10  pedophilia, and all of the experts will tell you that among

11  the diagnostic criteria for pedophilia is the requirement

12  that the individual have strong and recurrent sexual

13  fantasies and urges towards prepubescent children; and

14  you're going to hear that it is a chronic condition, that

15  these sexual urges don't go away.

16          And, finally, members of the jury, you're going to

17  hear evidence and testimony from two government experts that

18  Jeffrey Shields would have serious difficulty refraining

19  from further acts of child molestation.  You're going to

20  hear from an expert called by the respondent, Mr. Shields,

21  that he would not.

22          You're going to hear a great deal of testimony in

23  this case about what are called actuarial models.  They're

24  going to have fancy names like Static-99 and RRASOR.  But

25  what these are, the evidence will show basically, are

1   studies of past sex offenders, and the studies have looked

2   at which have reoffended and which have not.  And what these

3   studies attempt to tell us is what characteristics that were

4   shared by those sex offenders who have previously reoffended

5   are the same as the characteristics of Mr. Shields.  They

6   look at prior offenses, types of victims, how old people

7   are, and you come up with a score.

8          So these mathematical models come up with a score.

9   Now, they cannot predict the future.  I want you to be very

10  clear about this.  The government is not telling you that

11  any of these witnesses are going to come up and testify,

12  "Jeffrey Shields will reoffend.  We can prove that he'll do

13  it."  It can't be done.  No one can predict the future.

14         The evidence will show you that based upon studies

15  of other sex offenders, Jeffrey Shields shares the same

16  characteristics of groups of sex offenders under the RRASOR

17  who reoffend at 73 percent rate over a ten-year period.  And

18  you're going to hear that he scores in the RRASOR in the

19  highest possible risk group, and what that means is that he

20  is in that group that reoffends or is rearrested for a new

21  sex offense 73 percent of the time within ten years.

22         And you're going to hear under a second actuarial

23  model called the Static-99, which looks at reconviction

24  only, that Jeffrey Shields again falls into the highest risk

25  group, and that he falls into a class or he shares the same

eed06d86-2ad0-4cf7-9303-0631408369df

1  characteristics of a class of offenders that reoffend at a

2  rate of 52 times out of 100 over a 15-year period --

3  reconvicted -- excuse me -- under the Static-99, 52 out of

4  100, he shares the same characteristics of a group of sex

5  offenders that will be reconvicted of a new sex offense

6  52 percent of the time over 15 years.

7         You are going to hear a great deal about this

8  matter.  You are going to hear about error rates.  You're

9  going to hear about correlation coefficients and area under

10  the curve.  At the end of the day, you're going to hear that

11  in the scientific community, these are generally accepted

12  tools.  They are relied upon in the field of sex offense --

13         MR. SWOMLEY:  Objection.

14         THE COURT:  Overruled.

15         MR. GRADY:  You're going to hear that these are

16  generally relied upon in the field, and while -- and bear in

17  mind, none of the experts for the government, again, are

18  going to tell you they're going to predict Jeffrey Shields

19  will reoffend.  You're going to hear all of the experts say

20  that Jeffrey Shields will have serious difficulty in

21  refraining.

22         You're going to hear from all of these experts

23  that the be-all and end-all are not these actuarial models

24  because it only looks at group statistics; you have to look

25  at the individual.  And they adjust what they determine to

1   be the risk profile as a result of these actuarials by what

2   they refer to as dynamic factors, but what the evidence will

3   show you is basically individual characteristics of

4   Mr. Shields.  And you're going to hear primarily -- there

5   are a lot of dynamic factors that could alter risk, but the

6   biggest ones here, I think the evidence will show, are age,

7   the conditions of probation, and treatment.

8           I talked to you about probation, whether

9   Mr. Shields should have a reduction in risk for his

10  probation.  What happens in the past tells us about what

11  would happen in the future.  I told you about treatment.

12  What happens in the past informs our judgment.  Mr. Shields

13  has been on probation.  He has failed to comply.

14  Mr. Shields has been on probation, and he has reoffended

15  while on probation.  Mr. Shields has been to treatment, and

16  he has reoffended and reoffended.

17          You're going to hear evidence that as a general

18  matter, recidivism, the likelihood of reoffending, decreases

19  with age.  That is, as individuals get older, they're less

20  likely to commit new crimes.  But you're also going to hear

21  evidence in this case that when one looks at child molesters

22  who offended outside of their families, that those offenders

23  continue to offend well into their fifties.  And you're

24  going to hear from the experts called by the government that

25  Mr. Shields, even though, generally speaking, age reduces

1   risk, no reduction or no significant reduction is warranted

2   for Mr. Shields.

3           At the end of the evidence, I will come back and I

4   will ask you to find that the government has met its burden;

5   that it has proved that Mr. Shields has engaged in past acts

6   of child molestation; that it has proved that Mr. Shields

7   presently suffers from a serious mental disorder; and that

8   it has proved that Mr. Shields will have serious difficulty

9   in refraining.  When I come back, I will tell you the same

10  thing:  The past informs our judgment about the future.

11  Mr. Shields has offended against children.  Mr. Shields has

12  been on probation and reoffended.  Mr. Shields has been on

13  probation and failed to comply.  Mr. Shields has been to

14  treatment, and he has reoffended and reoffended.

15          Thank you.

16          THE COURT:  Mr. Swomley?

17  OPENING STATEMENT BY MR. SWOMLEY:

18          MR. SWOMLEY:  Good morning.  Mr. Shields is not

19  sexually dangerous.  He's not sexually dangerous, and when

20  you have listened to all the evidence in this case, I submit

21  that that's what you will conclude.

22          Now, what is sexual dangerousness?  You got a

23  little bit of that from the government here, but I don't

24  think they got it exactly right.  Sexual dangerousness,

25  first of all, is not a mental or medical or psychological

1  term.  It is a legal term.  It is a legal designation that

2  is basically created by you all, the court, and the law

3  here.  And when you listen to the evidence, you will

4  conclude that there really isn't a mental health or medical

5  basis for what the government is suggesting here.

6           What the government is suggesting and the

7  definitions that you will hear about have to do with the

8  legal process, and there are essentially three parts of what

9  you will be called upon to figure out.  The first one, not

10 even in dispute.  The first one is:  Did Jeffrey Shields

11 commit sexual acts in the past?  No dispute, he did, two

12 separate convictions.  The government talks about four

13 events.  Three of them are aggregated in 1989, one

14 conviction -- I mean, I'm sorry -- one sentence date for

15 those three events, and then eight, nine years later one

16 more conviction.

17          Now, the government's analysis basically consists

18 of:  Once a sick bastard, always a sick bastard.  That's

19 basically what he has been telling you in his opening.  And

20 essentially he's saying:  If you've done something in the

21 past, you are irredeemable basically.  You belong locked up.

22          Now, the --

23          MR. GRADY:  Your Honor?

24          THE COURT:  Well --

25          MR. SWOMLEY:  Mr. Shields was convicted of every

1   crime, and there is no dispute that he has served every day

2   that the judge asked of him, every day that society demanded

3   of him for the crimes he committed.  He has served his

4   criminal sentence.

5          You heard the prosecutor here explain to you that

6   you should not be considering the emotional effects of

7   hearing the evidence that you're going to hear; and the

8   reality is, when you hear that, there will be an emotional

9   effect.  And what you've done and what I'm going to ask of

10  you is a little more complicated.  I'm not going to ask you

11  to forget you have those emotional reactions.  You will have

12  emotional reactions.  What I'm going to ask you to do -- and

13  that's natural and that's normal.  What I'm going to ask you

14  to do is acknowledge that reaction and make clear in your

15  own mind you are not going to make a decision based upon

16  that emotional reaction.  You're going to make it based upon

17  the evidence of risk prediction, different than, did he do

18  it, does he deserve to be punished?  Okay?  He did it.  He

19  was punished.

20         Prongs two and three, the two important -- the

21  battleground basically in this case, is going to be, does he

22  currently today suffer from a mental abnormality, mental

23  illness, or personality disorder?  And I would submit, the

24  government says there's not really any dispute about that.

25  There is.  And the dispute really hinges on the third part

Page 34

1   of the definition of pedophilia which the government didn't

2   bother to mention, and that is behaviors.

3           There is what's known as the DSM, the Diagnostic

4   and Statistical Manual of Mental Disorders put out by the

5   American Psychiatric Association and used by psychologists

6   and psychiatrists around this country.  And in between

7   Versions III and IV, they added a definition to pedophilia

8   which added behaviors to that.

9           The government says that Mr. Shields suffers from

10  pedophilia and has current urges and fantasies.  Now, there

11  are three parts to pedophilia:  urges, fantasies, and

12  behaviors.  There has never been an analysis of Mr. Shields

13  with respect to urges and fantasies.  That has a method of

14  testing, which there hasn't been tests like that performed

15  on Mr. Shields.  They are in fact basing the diagnosis, and

16  the government's witnesses will say, "It's the behaviors

17  that has rendered it possible for us to make this diagnosis,

18  past behaviors."

19          Now, in terms of what happens, once you get

20  labeled a pedophile, that's it.  There really isn't any

21  putting that cat back in the bag.  There isn't any ten years

22  later saying, "Well, I'm not," because once you've been

23  defined as such, there's no way to undefine you.  The real

24  question becomes whether or not you have an ability to

25  control those behaviors.  And the DSM-IV makes very clear

1    that having a diagnosis has absolutely zero information to

2    the hearer of that diagnosis that allows you to conclude

3    there is an inability or a decrease in the ability to

4    control your conduct.  So while Mr. Grady would like to say

5    it's chronic and suggest to you by using that word, oh, my

6    God, that means he is and forever will be a pedophile and a

7    dangerous one, and that is absolutely categorically false,

8    and the evidence, I submit, will demonstrate that when you

9    hear it.

10             The real battleground is whether or not

11   Mr. Shields is able to control his behaviors.  Now, you have

12   heard the rough sketch of history.  1989 is when there were

13   three events.  1998, I would submit, when you hear the facts

14   of that -- and I am sorry, I'm sorry you all have been

15   selected and will have to for the next couple of weeks

16   pollute your brain with the details of someone else's sex

17   crimes, but, beyond that, have to absorb what they call

18   science.  And I would really, really urge you to be

19   skeptical of what "science" by definition is in this case.

20   We're talking about, starting off, psychology, one of the

21   softest sciences there is; but the suggestion that there is

22   general acceptance in the scientific community of what the

23   doctors you're going to hear from sitting here are

24   testifying about, what is generally accepted in their

25   profession, they are not.  And you will hear the American

1    Psychological Association, the American Psychiatric

2    Association, the National Academy of Sciences, all, all say

3    that these doctors cannot do what they're telling you

4    they're going to do.  And in fact the only people -- and

5    you'll hear this evidence -- the only people in which there

6    is general acceptance that you can do this is the community

7    of doctors that make money testifying about this.  Really,

8    the rest of the profession thinks this is quackery.

9                Now, the methods that are used to define

10   Mr. Shields as being someone who is dangerous, someone who

11   is likely to reoffend, someone who has a volitional control

12   problem, now, you've heard that this is a proceeding

13   designed to essentially, after someone has served their

14   criminal sentence, if the government is able to demonstrate

15   mental disorder and inability to control --

16                MR. GRADY:  Your Honor?

17                THE COURT:  Overruled.

18                MR. GRADY:  I think we're about to go into an area

19   where the Court had asked the parties not to.

20                THE COURT:  Why don't you start again.

21                MR. SWOMLEY:  The government is asking you to

22   conclude that Mr. Shields has an inability to control his

23   impulses, and the question really is whether or not that is

24   true.  Now, if you evaluate the evidence, what I would

25   submit you will hear is that the "science," quote/unquote,

1    does not get you there.  And you heard Mr. Grady kind of

2    allude to that, that you won't hear the doctors actually say

3    he's going to do something in the future.  That is

4    essentially where the science leaves off.  And I'll tell

5    you, the science as Mr. Grady has told you about it is

6    inaccurate, first of all.  And what you will hear with

7    respect to these, quote/unquote, "actuarial instruments" is,

8    you will hear that the field, the field of sex offender risk

9    prediction, as it were, has been evolving rather rapidly in

10   the last, say, ten plus years, from one where essentially,

11   if a doctor thought something about a sex offender and was

12   trying to figure out what their risk is, they would engage

13   in what's called clinical judgment.  They would say, "Hmm,

14   based upon his past, he's likely to do this again."

15           And there were some doctors, mostly out of the

16   Solicitor General's office in Canada, who began doing

17   research on assumptions that were made in risk prediction.

18   That is, somebody does something wrong; they don't appear to

19   show empathy or remorse; they don't appear to benefit from

20   therapy; they don't appear to do a number of things.  These

21   doctors did tests on these variables and reached some rather

22   dramatic and starkly unconsidered results, and that was,

23   victim empathy is not predictive whatsoever.  Degree of

24   force -- that is, whether or not there was penetration,

25   whether or not there was physical force used to overcome the

1    resistance of a victim -- none of that predicts.  Denial,

2    saying, "I didn't do it," doesn't predict.  And so these

3    doctors, these scientists, were able to throw out a whole

4    bunch of what was common wisdom in how to assess what

5    someone's likely to do in the future, and they decided that

6    they were going to try and use the variables that did have

7    some predictive accuracy.

8            And Mr. Grady talked about how these actuarial

9    instruments are really just studies.  No, they're not.

10   Actuarial instruments are instruments derived from studies

11   where they pull out some variables that have predictive

12   value, put them all together in a formula, and try to

13   enhance the predictive value.  And if you understand -- and

14   some of you, I think, if I'm remembering correctly from your

15   biographies, have economic backgrounds, maybe accountant

16   backgrounds, some statistics.  That's going to be helpful.

17   And what you will learn is, basically the social scientists

18   cribbed from the life insurance community and created

19   actuarials modeled on risk prediction engaged in by life

20   insurance.  Hey, if economists can make money off predicting

21   when somebody's going to die, heart disease, smoking,

22   whatever variables you plug in, they can make money off of

23   that.

24           The theory was, well, okay, then we can predict

25   when someone's likely to reoffend sexually if we plug in the

1   right variables.  The problem is, we're not there yet.  And

2   even if we were there yet, here's the main limitation:  It

3   cannot, none of these actuarial instruments can predict what

4   an individual is likely to do.  And here's a rough sketch:

5   It can predict to a certain extent, if you believe the

6   underlying data, and that's another caveat, but if you

7   believe the underlying data, what it can do is, it can get

8   you to the point where you go, "Hmm, this person fits in

9   this category.  If I believe the category is similar to this

10  person, the group reoffends at --" and he's given you some

11  numbers, 73 percent and 52 percent.  I would submit those

12  numbers are way off, and I'll get to why they're way off.

13  But even if you believe those, what you end up doing is, you

14  put Mr. Shields in a category of people that offend at that

15  rate, and that's it.  Science drops the floor out from under

16  you.  There is nothing more that science can do to tell you

17  whether Mr. Shields is of the -- let's say it's 50 percent,

18  52 percent that is going to reoffend or the 48 that isn't.

19  There will be no more science.  That will be on you to try

20  and get beyond that.

21          Some of you may conclude, "Hey, the government has

22  the burden here.  I can't get beyond that.  Done.  Done,

23  done," and a finding of not sexually dangerous should

24  follow.  Some of you may want to go beyond that and say,

25  "Okay, even though the science can't take me there, I'm

1   going to try and get there on my own."  And when you do

2   that, I would submit you will hear, and you should listen

3   to, the real story of Jeffrey Shields, starting with his own

4   childhood and history of victimization, because, see, when

5   you really think about this, what you're trying to do,

6   forgetting the science for a second, is figure out, based

7   upon everything you can learn about Jeffrey Shields, whether

8   he today gets it.  He didn't get it, didn't get it, didn't

9   get it, yes, that is definitely his past.  He has had fits

10  and starts.  He has engaged in therapy.  He has not

11  succeeded.  He has been on probation.  He has not succeeded.

12  The question really is today, now, has he learned something?

13  Is he a different person?  Is he redeemable?  And you need

14  to start with his own childhood, and I'm going to

15  fast-forward to seven years old.

16          Mr. Shields did not come from a very good

17  background.  When he was seven years old, his father left

18  the family, never to return.  He has seen his father here

19  and there sporadically, but his father has not been involved

20  in his life.  At seven, essentially the bottom drops out of

21  his family life.  There is no social control.  Mother cannot

22  handle him, cannot handle what's going on in life, and

23  ultimately, at seven years old, Mr. Shields is raped

24  repeatedly by two older boys from the neighborhood, anally

25  and orally sodomized over and over and over again from seven

1   years old until eleven years old.  During that time period,

2   it's physical abuse if he resists, and it's sexual abuse

3   whether or not he resists.  And after a while, those two

4   boys brought their friends, and their friends had sex anally

5   and orally with Mr. Shields over and over again.  That's his

6   upbringing.

7           At eleven years old his mother, figuring it out

8   maybe -- I don't know -- sends had him off to live with

9   grandma and grandpa.  He goes to live with grandma and

10  grandpa at eleven years old.  An older cousin begins

11  sexually assaulting him, and he is sexually assaulted pretty

12  much through thirteen.  At age thirteen, he comes through

13  his grandparents' front door to see his grandfather with a

14  shotgun at his head blow his head off, commit suicide in

15  front of thirteen-year-old Jeffrey.

16          Mr. Shields did not learn from his role models

17  proper respect for other individuals.  He at thirteen

18  basically didn't have much grounding and much ability to

19  understand how humans should treat each other.  He didn't

20  get that training.  And after seeing what he saw, he didn't

21  really care very much about himself or others or his

22  prospects in life.  He didn't graduate from high school.  By

23  senior year, he knew he wasn't going to graduate, dropped

24  out.  By that point he was basically living on the streets

25  anyway, living on the streets and supporting himself, or

1   surviving rather, by prostituting himself to other men.  And

2   when he ran away in his senior year of high school, he ran

3   to Florida, started to prostitute himself at gay bars down

4   in Florida.  Ultimately came back to Maine -- Maine is where

5   he's from -- and hid in a bottle, hid on drugs, lived a life

6   where he basically did not care about living or dying, and

7   that was his life pretty much up until his last

8   incarceration.  He did not care.

9           Now, there's a big difference between not caring

10  and being unable to control yourself.  He didn't try.  He

11  could care less.  And he did care less.  He did things he

12  probably doesn't even remember doing while completely fueled

13  by alcohol and drugs.  And in fact, if there's any solace

14  that you can hear in the facts, it is that all of his

15  offenses were committed while he was blotto.

16          Now, that may not sound like an encouraging thing,

17  but if you hear the evidence, what you will learn, and it is

18  true, alcohol is not a predictor of whether somebody will or

19  won't offend.  It is a disinhibitor, but in terms of

20  predicting whether somebody will or won't offended, it's

21  not.  There's no evidence of that.  Again, go back to the

22  doctors that were trying to figure out what was and wasn't

23  predictive, that's one that wasn't.

24          And the reality is, and I think this is the one

25  little silver lining, he doesn't offend when he's not under

1    the influence.  Now, if you're comparing him to offenders

2    that offend without alcohol, the saving grace is, as long as

3    you remove the alcohol and drugs from him, he has

4    inhibitions; he wouldn't do or didn't do any offending while

5    he was sober.

6           Now, again the question is, can he stay sober?

7    And you will hear -- you hear that he's not treated, and

8    that is absolutely false.  And during this last

9    incarceration -- and the real, real question when you talk

10   about treatment and whether it works or it doesn't work is,

11   does the person get it?  You're going to hear from his

12   therpaist when he was done at FCI Butner in North Carolina

13   that he in fact finally invested in therapy, and he got it.

14   Dr. Grainey will come up here and tell you he gets it.  And

15   that's it:  You have to get it.  Some people never do.  And

16   those people, like a hurt dog, the government might be right

17   in saying, "There's nothing we can do.  Lock him up."

18           I would submit that is not Jeffrey Shields.

19   Jeffrey Shields doesn't have organic brain damage.  He's

20   never been kicked in the head.  He doesn't have anything

21   other than the fact that he's been emotionally starved and

22   abused, physically abused much of his young life; and his

23   adult life, didn't care.

24           Now, the age stuff -- and you heard some of

25   that -- is really important.  The numbers you heard, and the

1   main big flaw in all of these actuarials is that they are so

2   imprecise, they cannot account for a single changeable

3   variable.  The Static-99 is by definition static, meaning

4   when you're 30, if you have an offense history, it's

5   whatever the number is.  When you're 40, the number stays

6   the same.  When you're 50, the number stays the same.

7          The recent research conducted by the same guy who

8   developed the Static-99, maybe as a mea culpa, was that

9   "Hold it, my instrument doesn't really account for age."

10  And since 1999, the Static-99 -- that's when that was

11  derived -- and the RRASOR, also derived by the same doctor,

12  less variables, the same essentially, the first precursor to

13  the Static-99, those actuarial instruments make no account

14  of age.  They're normed on a 34-year-old, meaning most of

15  the people in that population group that form the stats,

16  that form the basis for these tests, are 34.  47 years old

17  here.

18          Now, some of guys may not need a doctor to tell

19  you this:  Testosterone has been decreasing in your life,

20  and in his.  And the reality is, if you think about it,

21  knowing nothing more than that sexual urge decreases as a

22  function of age, Mr. Shields derives pretty significant

23  benefit.  And the stats -- and, again, they don't get you

24  anywhere, but if you're going to buy some of them, buy the

25  rest of them, please -- those stats tell you that

1   Mr. Shields, as he sits here today at 47 years old, is in a

2   risk category that reoffends at about an 18 percent rate.

3   And when you get to the age of 50 -- and it's not like,

4   ding, 50, it drops.  It goes down in a linear fashion.  By

5   the age of 50, we're around 8 percent; and by the age of 60,

6   we're down into the very low single digits, and by 70

7   there's essentially no reoffense.  But he's going to be on

8   probation, supervised release, for three years from whenever

9   he gets out.  That will put him at 50.  His sexual

10  recidivism rate, as measured by the doctor that created

11  these tests, is going to be in the single digits.

12          Mr. Shields is a person who gets it.  He didn't

13  get it for a long time, and you can blame him for that.

14  Listen to the evidence.  You'll hear from three experts, one

15  of them hired by the government, one the court-ish expert,

16  Dr. Plaud, and one hired by the defense of Mr. Shields, us.

17          And, by the way, I should introduce Page Kelley

18  who works for Federal Defenders.  She is going to be trying

19  this case with me.  We will be alternating witnesses.

20          You'll hear from these doctors, and one doctor

21  whose only real credential, the government's first -- well,

22  he's not the first witness, but the government's expert,

23  Dr. Tomich, his main credential is that he owns the contract

24  to do this stuff, predict risk prediction on the state

25  level; not particularly qualified and someone who really

1    doesn't know the statistics, and I think there are people

2    here on this jury that understand it better than he does.

3           Then you have Dr. Plaud.  Dr. Plaud, he looks like

4    Mr. Science, bow tie, and really does have a fair sense of

5    the science.  The problem is, science doesn't get you there.

6    Those first two doctors are not therapists.  What they are

7    is professional evaluators.  They are paid to score tests,

8    the Static-99, RRASOR, whatever.  Dr. Plaud does it in

9    assembly-line fashion.

10          The last doctor, the one you'll hear from from us,

11   is a doctor that is a therapist predominantly; that is,

12   someone who has both provided therapy to children and to sex

13   offenders.  He knows both sides of therapy and knows that

14   it's not:  You do them, or you do these.  You do everything.

15   And you understand and he understands that you can treat

16   someone, and they can get it.  And this doctor spent his

17   time interviewing Mr. Shields for over ten hours, much

18   longer than any of the other doctors.  In fact, the first

19   doctor didn't interview anybody.  And you will hear him

20   testify that, in his opinion, Mr. Shields gets it; he has

21   finally been reached, and he understands the pain he's

22   caused, and he understands his own pain.  And the thing that

23   was missing, the thing that was missing all along -- and,

24   yes, all of the failures, you got it, there were plenty of

25   them -- the thing that was missing is the getting it.  And

1    when you do finally get it -- and you'll hear alcoholics go

2    into AA or therapy multiple times.  They don't get it, they

3    don't get it, they don't get it.  Mr. Shields gets it.  He

4    gets it, and he understands how not to reoffend.  And it

5    probably was because the sex offender therapy wasn't what

6    was going to work for him.  He needed to work on his own

7    issues first; and he did, he worked on his own issues.  He

8    sorted out -- and you'll hear it's not a beginning and an

9    ending.  His therapy is forever basically.  And in the

10   continuum of getting it, does he have some way to go?  You

11   bet.  But there's nothing that prevents him from being able

12   to process his own pain, realize the hurt he has caused, and

13   learn from it.  Nothing organically prevents him from doing

14   that.

15            And when you listen to all of the evidence, ladies

16   and gentlemen -- and you'll hear that Mr. Shields, actually,

17   before they reeled him in for this proceeding, was already

18   in a halfway house, was doing well, had already gotten into

19   therapy, had already gotten a job, was doing the things that

20   he needed to do right, maybe for the first time in his life,

21   and then here he is -- when you hear all the evidence,

22   ladies and gentlemen, I think you'll arrive at the only

23   conclusion that is fair and just in this case, and that is

24   the conclusion that Mr. Shields is not a sexually dangerous

25   person today.  Thank you.

1          THE COURT:  First witness?

2          MR. GRADY:  Your Honor, we will call Dr. Joseph

3     Plaud.

4                    JOSEPH J. PLAUD

5     having been first duly sworn, was examined and testified as

6     follows:

7          MR. GRADY:  Your Honor, may I approach the

8     witness?

9          THE CLERK:  Would you please state your name and

10    spell it for the record, sir.

11         THE WITNESS:  Yes.

12         THE WITNESS:  My name is Joseph J. Plaud,

13    P-l-a-u-d.

14         THE COURT:  Are you going to be asking the jurors

15    to look at the document camera?

16         MR. GRADY:  To the extent that --

17         THE COURT:  You should notice that next to you

18    there's a screen in the front of the front row, but for the

19    folks in the back row, it looks like an airplane tray table

20    right next to you, there's a screen in case anybody -- I'm

21    not sure if the documents will be put on the document

22    camera, but you can pull them out now if you want.

23    DIRECT EXAMINATION BY MR. GRADY:

24    Q.   Doctor, you have in front of you an exhibit marked

25    Government No. 1 in that binder.  Take a look at that,

1   please.

2   A.   Yes.

3   Q.   What is that?

4   A.   That is a copy of my curriculum vitae, my resume'.

5   Q.   Is that a true and accurate copy of your resume' as it

6   exists today as of the date?

7   A.   Yes.

8        MR. GRADY:  Your Honor, by agreement of the

9   parties, the CVs of all the experts will be admitted.

10       THE COURT:  All right, Exhibit 1.

11       (Petitioner Exhibit 1 received in evidence.)

12   Q.   Can you briefly describe your educational background at

13   the college level and beyond.

14   A.   Yes.  I received a bachelor's degree in psychology from

15   Clark University in Worcester, Massachusetts, and a Ph.D. in

16   clinical psychology from the University of Maine in Orono,

17   Maine.  I completed my clinical internship at the University

18   of Mississippi and Jackson Department of Veteran Affairs and

19   Medical Centers in Jackson, Mississippi.

20   Q.   What is a clinical internship, and what types of duties

21   do you perform?

22   A.   A clinical internship is an applied experience that we

23   who are in clinical psychology programs accredited by the

24   American Psychological Association fulfill as a component of

25   receiving our doctoral degree in psychology.  It involves a

1   yearlong series of rotations in a clinic, a medical center,

2   a hospital, depending upon your areas of expertise that you

3   receive further training prior to getting your degree.

4   Q.   And you've listed on your resume' a number of

5   fellowships.  What are those and what does that mean,

6   "fellowship"?

7   A.   Well, a fellowship means different things, but a

8   fellowship is generally either a special position -- it can

9   be an elected or appointed position -- that means you've

10  attained a certain status in a particular area, clinical

11  area, an area of specialty, clinical specialty.

12  Q.   And what are your fellowships?

13  A.   Well, I am a fellow of the American Psychological

14  Association, specific to the Division 25, which is the

15  Division of the Experimental Analysis of Behavior.  I am

16  also a clinical fellow, was appointed a clinical fellow of

17  the Behavior Therapy and Research Society.

18  Q.   Do you currently hold any licenses in psychology?

19  A.   I do.

20  Q.   And what are those?

21  A.   I am licensed as a psychologist here in the

22  Commonwealth of Massachusetts.  Additionally, I am licensed

23  as a psychologist in the state of New York.

24  Q.   Have you held any other licenses in the past?

25  A.   Yes.

1   Q.    What besides?

2   A.    Well, my first position postmatriculation was on the

3   clinical psychology faculty at the University of North

4   Dakota, so I was licensed while I was there as a

5   psychologist in the state of North Dakota.

6   Q.    And when was that?

7   A.    That was between 1994 and 1997.

8   Q.    Was that license ever suspended or revoked?

9   A.    No.

10  Q.    And why did you allow it to lapse?

11  A.    Because it's a long way to North Dakota.

12  Q.    And how long have you been licensed in Massachusetts

13  and New York?

14  A.    I was first licensed -- I moved back to Massachusetts

15  in December of 1997.  I was licensed in early 1998 a few

16  months after moving back.  Excuse me, I'm just going to get

17  some water.

18  Q.    Sure.

19  A.    And I was licensed in the state of New York, I think

20  August 20 was the date, so I was recently licensed there.

21  Q.    Have either of those licenses ever been suspended or

22  revoked?

23  A.    No.

24  Q.    And can you tell us -- actually I'd like to talk

25  briefly about your work experience in the field of sex

1  offender treatment.  Can you start for us, when did you

2  first begin working in the field?

3  A.   I began working with sex offenders as a first-year

4  graduate student, so it would be the fall of 1987 is the

5  first time that I actually began clinically working with

6  offenders.  My first major professor at the university, his

7  area of clinical expertise was in evaluating and treating

8  sexual offenders, and I was introduced to this area by

9  virtue of the mentorship model that we had in place at the

10 University of Maine.

11          During that time, I was responsible for, since I

12 had some experience with computers, setting up what we call

13 the psychophysiological laboratory at the University of

14 Maine.  We initially contracted with the Maine Department of

15 Probation and Parole to conduct risk evaluations on sex

16 offenders; and that involved psychological tests,

17 personality tests, intellectual assessments, as well as

18 physiological tests, most notably the -- I'll call it the

19 PPG for obvious reasons, penile plethysmograph, which is a

20 physiological test of patterns of sexual arousal.

21          So I began conducting those evaluations on

22 referred sex offenders in context of their probation, the

23 terms of probation, risk assessments, and began also

24 participating as a psychologist in training as a therapist

25 working with sex offenders in group settings, including

1  adult male sex offenders, adolescent sex offenders, as well

2  as those who were in what we call deniers groups.

3          I continued that work throughout my graduate

4  training years in a variety of clinical contexts, so beyond

5  the university campus itself, I worked at various placements

6  during graduate school, inpatient, outpatient community

7  mental health centers, again, running individual and group

8  therapy with sex offenders, both adolescent and adult male

9  sex offenders.  So I've continued that work to one extent or

10 another for over twenty years now.

11 Q.   On your resume' you indicate that between 1995 and 1997

12 you were a clinical psychologist in North Dakota; is that

13 correct?

14 A.   Yes.

15 Q.   And what did that entail, or have you described it

16 already?

17 A.   Well, the reason I went to North Dakota was to accept a

18 faculty position on the clinical psychology faculty at the

19 University of North Dakota, which had its own doctoral

20 training program approved by the American Psychological

21 Association.  When I arrived on campus, I set up my own

22 clinic like I worked at the University of Maine, which was

23 devoted to conducting research in areas of human sexuality

24 as well as evaluating and treating sexual offenders;

25 training graduate students, I had now graduate students

1   working under me receiving their master's and Ph.D. in

2   clinical psychology in this clinical subspecialty.

3               During that period of time, I also coordinated

4   with local human service agencies in the state of North

5   Dakota, and I was approached by the state to assist or to

6   develop their statewide treatment program for sex offenders

7   who also had a history of developmental disabilities, a

8   program that I did design and implement at the North Dakota

9   Developmental Center called the STOP prgram, the Specialized

10  Treatment Offenders Program.  I put that program into place.

11  I supervised my students as well as the staff there at the

12  developmental center, and I served as a consultant for a

13  number of years, even after I left North Dakota, to that

14  program.

15  Q.   It sounds like you've had a lot of experience in the

16  treatment of sex offenders?

17  A.   I have.

18               MR. SWOMLEY:  Objection.

19               THE COURT:  Overruled.

20  Q.   What would you say to someone who said that you had

21  not?

22  A.   That I had not had experience treating sex offenders?

23  Q.   That you had no experience treating sex offenders.

24  A.   Well, I would say that's an inaccurate statement.

25  Q.   There's an indication that you served as the director

1    of the Relationship in Human Sexuality Clinic.  You served

2    as the director between 1996 and 1997?

3    A.    Yes.

4    Q.    What did that entail?

5    A.    Well, that was the title of the clinic at the

6    Psychological Services Center at the University of North

7    Dakota that I set up with my students to both do research in

8    this area as well as to provide assessment and treatment

9    services.

10   Q.    And you also indicate between 1998 and 2000 you were a

11   consulting clinical psychologist for the development center.

12   Did that change, or were those similar duties?

13   A.    That's what I described, yes.

14   Q.    And it indicates that in 2000 to 2001 you went to New

15   Hampshire?

16   A.    Yes.

17   Q.    Or you worked in New Hampshire?  What did that entail?

18   A.    I was contacted by the Department of Developmental

19   Disabilities after I returned back to Massachusetts, and I

20   was asked to serve as a consulting psychologist to their sex

21   offender treatment program in Laconia, New Hampshire, that

22   dealt with sex offenders who also had a history of

23   developmental disabilities.  In other words, they were

24   looking for the types of programs that I had put together

25   and supervised in North Dakota in this area for New

1   Hampshire.

2   Q.   And what is Applied Behavioral Consultants, Inc.?

3   A.   That's a very long title for my private practice.

4   Q.   And what does your private practice entail?

5   A.   My private practice is devoted to -- primarily to

6   evaluating or doing risk assessments on sex offenders.

7   However, to this day, I still do maintain a small treatment

8   service to the best of my ability to provide those services.

9   Q.   And approximately how many patients do you presently

10  treat?

11  A.   Very few.  Approximately three right now.  It's down.

12  Q.   How long have you been at ABC or how long have you had

13  this private practice?

14  A.   I began about five or six years ago, I think formally.

15  Q.   And the number of individuals you treat, has it gone up

16  over three, down?

17  A.   Down.

18  Q.   I'm sorry, my question was poorly phrased.  Has it

19  been -- is three the highest it's been or the lowest?

20  A.   No.  The lowest.

21  Q.   Okay.  And what's the highest number?

22  A.   Well, as part of Applied Behavioral Consultants, I was

23  doing a lot of consulting to programs and doing my work

24  there.  So if you added up all of those, it would probably

25  be over a hundred offenders at some point.

eed06d86-2ad0-4cf7-9303-0631408369df

1   Q.   You provided treatment to?

2   A.   Yes, or supervised treatment or supervised people

3   providing treatment in those contexts.

4   Q.   And then you also indicated that you provide risk

5   assessment evaluations?

6   A.   I do.

7   Q.   And approximately how many times have you conducted a

8   sex offender risk evaluation?

9   A.   Many times.  I would say, if I said over a thousand

10  times, I would not capture it all.

11  Q.   And approximately how many occasions have you

12  testified -- I guess we'll start in Massachusetts -- in a

13  proceeding involving the commitment of sexually dangerous

14  persons?

15  A.   I've testified well over a hundred times in that

16  particular area in Massachusetts.

17  Q.   And on each of those occasions, were you certified by

18  the court to be an expert witness in the field?

19  A.   I was.

20  Q.   And have you ever not been certified as an expert?

21  A.   No.

22  Q.   Have you testified in other states?

23  A.   I have.

24  Q.   What other states have you testified in?

25  A.   A number of other states.  I've testified in at least a

1    dozen other states.  If you want me to name them,

2    New Hampshire, New York, Maine, Connecticut, Florida, Texas,

3    California, Washington, North Dakota, Iowa.  I'm sure I'm

4    missing some.  Virginia.

5    Q.   And in each of those states that you were called to

6    testify, you were certified as an expert by a court?

7    A.   Yes.

8    Q.   And were you ever not certified?

9    A.   No.

10   Q.   Now, in working for ABC, Inc. -- I'll call it ABC just

11   for simplistic purposes -- by whom are you hired?

12   A.   Well, in the context of civil commitment now or

13   general?

14   Q.   Yes, in civil commitment.

15   A.   In the context of civil commitment, I am hired by

16   respondents, generally by the person whom the petition is

17   being filed against if it's an initial commitment; or if

18   it's a reevaluation, by the petitioner.

19   Q.   So exclusively on behalf of respondents?

20   A.   Yes.

21           THE COURT:  Well, explain what you mean by a

22   respondent.

23           THE WITNESS:  Yes, Judge.  A respondent, if a

24   petition is filed --

25           THE COURT:  It's a legal term, so why don't you --

1       THE WITNESS:  It is.  If a petition is filed

2  alleging that a person is a sexually dangerous person -- for

3  example, in the Commonwealth of Massachusetts, under state

4  law, General Laws 123A, a petition is filed by a District

5  Attorney's office alleging the person is sexually

6  dangerous -- the person whom the allegations are made

7  against is the respondent in that case.  So they are in the

8  civil sense the defendant, but it's not a criminal sense, so

9  they're the respondent.

10      If that person has already been adjudicated as

11  sexually dangerous and they are petitioning to be released

12  from that status, in Massachusetts where they reside --

13      MR. SWOMLEY:  I object to this as being

14  nonrelevant to this proceeding.

15      THE COURT:  Well, I'll allow him to explain what

16  he's done.

17      THE WITNESS:  Yes, Judge -- then that person then

18  is the petitioner.  That's just the difference.

19      MR. SWOMLEY:  Could we have a side bar?  This is,

20  I think --

21      THE COURT:  Well, we'll deal with it.  I think

22  we're done with this line of questioning.

23      MR. GRADY:  Yes.  Well, we're not done with this

24  line of questioning, your Honor.  If that's what

25  Attorney Swomley wishes to address, I'm happy to.

1    THE COURT:  What's your next question?

2  Q.   Have you ever testified on behalf of the government

3  ever?

4  A.   No.

5  Q.   This is the first time?

6  A.   It is.

7  Q.   Now, certainly this isn't the first time you've ever

8  found someone sexually dangerous?

9  A.   Correct.

10  Q.   What happens on those other occasions that you've

11  previously found someone to be sexually dangerous?

12  A.   When I complete my evaluation and I reach a

13  professional decision, I communicate that decision to the

14  attorney who initially contacted; and since it's a defense

15  attorney, if my ultimate decision in that particular case is

16  that the person --

17    THE COURT:  Well, why don't I see you.  You know,

18  when I come over here, it's a great time to stand and

19  stretch.  You notice I stand and stretch when I want to, so

20  if you feel like you want to, go ahead.

21  SIDE-BAR CONFERENCE:

22    THE COURT:  Look, I think it's fair game to say,

23  "How do you generally testify?"  But at this point we're

24  going on and on too much about it because it starts

25  making -- I don't know where you're going with this.

1          MR. GRADY:  Just that he's never testified

2    before --

3          THE COURT:  You've done that.

4          MR. GRADY:  -- I didn't want to leave that open to

5    say that --

6          THE COURT:  You've done that.  So now where are we

7    going?

8          MR. GRADY:  That he works for Attorney Swomley,

9    that he was appointed at the request of both parties in this

10   case.  Attorney Swomley opened by saying he was the

11   court-ish expert in his opening.

12         THE COURT:  Excuse me.  You're welcome to say he

13   was a court-appointed expert by the agreement of both

14   parties in this case, but then move on.

15         MR. SWOMLEY:  I want to register one objection.

16   The whole what has come out through this question is what

17   happens on the state level once one is committed.  I don't

18   think that's the same on the federal level, and I --

19         THE COURT:  I don't know whether it is or it

20   isn't, but he was explaining it in a totally different

21   context.

22         MR. SWOMLEY:  Yes, I know, and I think he

23   shouldn't have been entitled to do any of that.

24         THE COURT:  Overruled.

25         (End of side-bar conference.)

1   Q.   Now, Mr. Plaud, you were appointed by the Court in this

2   case to evaluate Jeffrey Shields, correct?

3   A.   That is my understanding, yes.

4   Q.   And, to your knowledge, you were appointed by agreement

5   of both parties?

6   A.   Yes.

7   Q.   Both the government and Mr. Shields?

8   A.   That's correct.

9   Q.   Have you ever been retained by Attorney Swomley or his

10  firm?

11  A.   I have.

12  Q.   In past cases?

13  A.   Yes.

14  Q.   Do you presently work with Attorney Swomley or his firm

15  on any cases?

16  A.   Presently. . .I don't believe we have any present

17  cases.  We may.

18  Q.   Within the last six months?

19  A.   Yes.

20  Q.   You have?

21  A.   I have.

22  Q.   I note from your resume' you serve as the editor or

23  reviewer of a number of journals.  Can you explain what

24  journals, what your role is.

25  A.   Yes.  I serve both on editorial boards as well as a

1    reviewer for several journals in psychology and psychiatry.

2    And what that means is, I review manuscripts submitted for

3    publication presenting research or review of certain areas,

4    and I make recommendations to the editor whether I think the

5    article merits publication in the journal.

6              I have an online journal that was started a couple

7    of years ago that is devoted to this particular area of

8    civil commitment, and I serve on the editorial board of the

9    Psychological Record as well as the Journal of Offender

10   Therapy and Comparative Criminology.  I've also reviewed

11   articles for a number of other psychology and psychiatry

12   journals.

13   Q.   And do you yourself have any publications in the field?

14   A.   I do.

15   Q.   Can you describe those for us.  Or, first of all, are

16   they listed in your resume'?

17   A.   Yes.

18   Q.   Can you describe briefly those for us.

19   A.   Yes.  Well, the focus of my research has been on human

20   sexual arousal, physiology in human sexual arousal, the

21   relationship of sexual arousal to sexual behavior, different

22   assessment and treatment methodologies with sex offenders,

23   as well as in other areas of psychology, but the focus has

24   been mostly on issues relating to sexual behavior and sexual

25   offending.

1   Q.   You've also indicated you've given thousands of

2   presentations?

3   A.   Well, I've given many presentations.  I don't know if

4   it's thousands of them but --

5   Q.   And what types of presentations and to whom?

6   A.   Well, I've given presentations to national and

7   international conferences in psychology, psychiatry.  I've

8   given presentations to universities, to professionals on

9   issues relating to the use of statistics and evaluative

10   methodologies in predicting risk.  I mean, I've given a lot

11   of presentations over the years.

12   Q.   Doctor, just speaking briefly as an introductory, with

13   respect to your general conclusions here, you've been asked

14   by the Court to conduct an evaluation of Jeffrey Shields

15   under the standards of 18 U.S.C. 4247 and 4248; is that

16   correct?

17   A.   Correct.

18   Q.   Generally speaking, what was your conclusion?

19   A.   My professional conclusion is that -- I want to word

20   this properly.  It's my professional judgment today that I

21   am unable to say that Mr. Shields is not sexually dangerous.

22   Q.   Okay, what does that mean without so many negatives?

23   A.   It means that I have personal and professional

24   difficulty sitting here and saying I think he is dangerous

25   because I don't feel that I would be able to do that, to say

1    it that way.  My opinion is, and that's why the negatives

2    are introduced for a very particular reason, and that is, I

3    can't say he's not dangerous.

4    Q.   Okay.  And with respect to whether he meets the

5    criteria of the statute, do you have an opinion?

6    A.   Well, I believe he is at risk to reoffend.  I believe

7    that I am unable in totality to say that he would not meet

8    those criteria.

9    Q.   Okay.  Can you tell us about the general process by

10   which you conduct the sex offender evaluation.

11   A.   Yes.  A risk assessment with regard to making

12   professional judgments about likelihood to reoffend, the

13   methodology, the procedure that I utilize generally begins

14   with an analysis of the person's records, their history,

15   their psychosocial history, legal history, criminal history,

16   certainly their sex offender history, what had happened to

17   them after their detection and incarceration; so, in other

18   words, their institutional history; whether or not they

19   participated in treatment, any other factors that I can find

20   from a review of the records pertaining to the individual

21   being evaluated.

22           I then generally subject that record review with

23   the computation as a baseline of an empirically validated

24   risk assessment tool or an actuarial tool as a place to

25   start the analysis.

1          I then, if I'm able to, make every effort to make

2     contact with the individual and perform a clinical

3     interview, to go over the records, to go over the

4     information, and to assist me in making sure that what I

5     have organized and understand is also represented from the

6     individual's perspective.  And it may also help me to make

7     certain conclusions diagnostically, if I'm making some

8     conclusions or statements, for example, about mental

9     disorders.

10    Q.   What would you say to someone that said you did these

11    on an assembly line?

12    A.   Well, I'd say it worked for Henry Ford.  I wouldn't

13    characterize my work in such a way as an assembly line,

14    although I do try to be as objective -- I'll try to take

15    some positives from that in the sense that I try to be

16    objective and consistent in the approach that I use.

17    However, some good old-fashioned human thought does go into

18    the process as well.

19    Q.   You make an individualized study of records?

20    A.   Yes.

21    Q.   And an individualized clinical assessment?

22    A.   I do.

23    Q.   You conduct an individualized clinical interview?

24    A.   Yes.

25    Q.   Can you briefly explain, is there a general terminology

1   for the methodology you use?

2   A.   Well, I would characterize the methodology that I use

3   as an adjusted actuarial approach, which means I begin the

4   analysis, as I said earlier, with the computation of an

5   actuarial or statistical risk tool; and then I look for

6   other factors that research has shown may or may not be --

7   well, in this particular case in evidence, that might be

8   predictive of risk.

9   Q.   And are there other methodologies, and could you

10  briefly describe those?

11  A.   Well, there are a number of methodologies that have

12  been described, defined, talked about in the professional

13  literature over the years.  The oldest and first is

14  generally referred to as a clinical methodology, and that

15  refers to a clinician making professional judgments based on

16  his or her training and experience in the field working with

17  sex offenders, based on what they have learned in their own

18  training, in their own work with offenders, and making

19  judgments about risk in that context.  That's a clinical

20  methodology on the one end.

21          The actuarial methodology on the other means that

22  your decision of risk is based on the information gathered

23  from the computation of an actuarial tool or tools,

24  depending upon whoever is doing the evaluation, that does

25  make some reference to statistical ranges of risk over

1    periods of time.  And in between there are two terms, one of

2    which is the "adjusted actuarial," which is as I described,

3    beginning the analysis with the computation of an actuarial

4    calculation, and then relying on research in context of that

5    baseline to make judgments about whether or not the risk is

6    in line with that actuarial score or classification.

7           And then there's the structured or empirically

8    guided approach, which means that your decision is guided --

9    it's a clinical -- it shares a lot with the clinical

10   methodology in the sense that you rely on your training and

11   experience, but you're also at least making some effort --

12   how good you are at that depends -- but at supplementing

13   your clinical judgments with an appeal to research.

14   Q.   And what, if any, studies exist with respect to the

15   accuracy of these various methods?

16   A.   Well, the outcome research that we have now suggests

17   that -- there's not really a lot on the adjusted actuarial

18   at this time, although there is on the actuarial approach.

19   The actuarial approach seems to be the best single type of

20   approach; whereas, the clinical approach seems to be the

21   least valid approach.  There's more error in that approach.

22           The caveat to that is that in all of these

23   approaches, even an actuarial approach, it's at best a

24   moderate predictor of risk.  It's not -- there's so much

25   that we don't know at this point that to base a judgment on

1    an actuarial tool alone, for example, you're going to be
2    right a certain percentage of the time, and that's going to
3    be statistically significant, but it's not going to be a
4    home run.  It's not going to be right even necessarily most
5    of the time.  It's greater than chance prediction, though.
6    Q.   What do you mean by that?  Can you explain what you
7    mean by the limitations on actuarials?
8    A.   Well, the limitations on actuarials are the limitations
9    in this whole enterprise, and that is predicting risk to
10   reoffend in the future.  What we don't know or do not
11   measure right now in the state of the science means that
12   there is error in judgment, error in prediction.  I consider
13   myself to be an expert.  I have fancy initials after my
14   name.  I'm well-read and well-published, and, yes, I do wear
15   bow ties; but I'm no better as a person or a professional at
16   being able to predict the future than anybody else in this
17   courtroom.  If I was better than anybody else here in
18   predicting the future in general, I wouldn't be here today.
19   I'd be in the lottery office.
20   Q.   And so it's not your testimony today that you can
21   predict whether Jeffrey Shields will or will not reoffend
22   based on any method?
23   A.   That's right.  That gets back to the "nots" that I had
24   when you asked me for any professional judgment.  The
25   ability to predict the future based on measurable events in

1   the present or past allows us to account for some of the

2   variability in being right in making these predictions, but

3   it doesn't account for all of it, or in some cases not even

4   a lot of it.  There's a lot of error in measurement, and

5   that is the issue that makes it difficult, number one.

6          Number two, and to still answer your question, is

7   the issue of base rates.  That's really the most important

8   single thing I could testify to in answering your question.

9   The base rate is the natural rate of occurrence of a

10  phenomenon in question.  So base rate in this context means

11  reoffending.  At what rate, if a person is convicted for,

12  for example, a sexual offense and is released back into the

13  community, at what rate do these individuals so adjudicated

14  over certain periods of time reoffend, recidivate?  And when

15  we study this phenomenon, what we find is that the base

16  rates tend to be low.

17  Q.   For all offenders?

18  A.   For all offenders.  And if you look at, comparatively

19  speaking, among different types of offense groups, sex

20  offenders tend to be the lower echelons of reoffending.  So

21  if the base rate itself is in an area that is low and you

22  make predictions that someone is going to reoffend, there's

23  a chance that you're going to overpredict dangerousness.  If

24  the base rate, for example, were 90 percent, say, over ten

25  years, over ten years 90 percent of offenders reoffend, and

eed06d86-2ad0-4cf7-9303-0631408369df

1    I got on here and every time I said, "Yes, they're going to

2    reoffend," I'd be pretty comfortable with that.  I'd be

3    right 90 percent of the time.  But it's not that.  That's

4    where the error comes in, and that's where we run into

5    problems.

6    Q.   Within that -- you've said there's a base rate for

7    general offenders.  Within that base rate, what's the role

8    of an actuarial?

9    A.   Okay, actuarial tools were advanced to try to go into

10   that group and try to see if we could cull out some factors,

11   some variables that could load on higher risk groups within

12   that general group of overall sex offenders who overall tend

13   to reoffend at a certain rate.  So it's trying to measure

14   this group on certain other factors to see if those rates

15   that I just said, if we can identify, I guess the bottom

16   line is, a group or groups of more likely or more highly

17   probable reoffenders.

18   Q.   So within that group that reoffends at a certain base

19   rate, it's an attempt to distinguish those who are more

20   likely to reoffend from those who are not?

21   A.   That's fair, yes.

22   Q.   And is it fair to say those actuarials are somewhat

23   successful at distinguishing between those group?

24   A.   Well, somewhat successful.  You used the word

25   "somewhat," I think you said.

1   Q.   Moderately?

2   A.   I would say somewhat.  As I said, I think I talked

3   about that a little bit earlier.  They're greater than

4   chance, but they're moderate predictors, but they're

5   certainly not everything we know.

6   Q.   What is the role of the actuarial in your assessment?

7   A.   It's a baseline.  I begin my analysis there.  In other

8   words, I compute an actuarial score.  I take an individual

9   whose records I reviewed, and I match them up on the

10  factors, the variables that the actuarial tool measures.

11  And I look at the risk percentages over periods of time

12  based on individuals who score in that range on that tool,

13  and it allows me to start the analysis.  In other words,

14  this person begins the analysis in this sort of range,

15  whether it's a higher risk or moderate risk or lower risk

16  range.  And then I assess other dimensions to see if there

17  are other factors that might tend to argue for either

18  increased or decreased recidivism based on that initial

19  actuarial calculation.

20  Q.   And that's the adjusted part of the actuarial?

21  A.   That's right.  I'm not actually changing the number

22  per se.  I'm just making some assumptions based on research.

23  Q.   Now, you get a number as a result of these actuarials?

24  A.   Yes.

25  Q.   Is that fixed, or is that simply part of the analysis?

1    I mean, it's been suggested perhaps that one gets an

2    actuarial, those numbers go in and the numbers can't be

3    adjusted.  Is that true, entirely true, or does that somehow

4    misstate your analysis?

5    A.   Well, it's not completely true, although there is an

6    element of truth to it.  It depends which actuarial tool

7    you're using, first of all.  There are several of them that

8    have been advanced for use in this area.  Some of them rely

9    more on some dynamic or changeable factors than others.  For

10   example, the Sex Offender Risk Appraisal Guide or the

11   Minnesota Sex Offender Screening Tool Revised measures some

12   dynamic factors.  The Static-99 other than age as a quasi --

13   it's dichotomously measured in there -- is basically

14   historical or unchangeable factors, as is the Rapid Risk

15   Assessment for Sexual Offense Recidivism, the RRASOR, which

16   I use, is largely static with that exception of age grossly

17   measured as such.

18          So it can change depending upon circumstances, but

19   to the large extent, for the more static factors, once you

20   get a score, that's your score till death, you know, until

21   you leave the earth.

22   Q.   I'm asking you, within the context of your analysis, is

23   that risk percentage something that you accept as being

24   entirely true, or is that something that, as you say,

25   establishes a baseline?

1    A.   I would say it establishes a baseline.  I wouldn't say

2    it's entirely true.  There are a number of issues because,

3    again, those ranges based on scores come from validation

4    studies on groups of offenders, of which generally the

5    person you're evaluating was not a part of.

6    Q.   What are dynamic factors, and how do they play into

7    your analysis?

8    A.   Well, dynamic factors are changeable or potentially

9    changeable factors.  They're present-day factors, or

10   factors, even if in the past, intervene between, for

11   example, their last sex offense and the time of the

12   evaluation.  So it doesn't have to be present or future, it

13   can be in the past as well, but it's something that has

14   intervened since the last commission of a sex offense.

15   Treatment, for example, is potentially a dynamic factor.

16   Sexual arousal or patterns of sexual arousal are potentially

17   a dynamic factor.  Aging in a nondichotomous sense,

18   measuring it at different cohorts through the life cycle, is

19   a dynamic factor.

20   Q.   With respect to this particular individual, Jeffrey

21   Shields, what information did you have with respect to

22   Mr. Shields, and what information did you go out and get in

23   order to form your opinion?

24   A.   Well, I received data, records from the government

25   concerning Mr. Shields's background, his other reports

1   written, his criminal history, sex offense history,

2   treatment notes, a variety of records pertaining to his

3   background.  I reviewed that material prior to interviewing

4   him for the first time.

5          After I interviewed him for the first time, I made

6   some initial decisions, and then I received other

7   documentation, again from the government.  I reviewed that

8   additional material, and I felt that given the nature of the

9   material, I needed to see Mr. Shields again.  So I traveled

10  and reinterviewed Mr. Shields and went over some of that

11  data that I'd received subsequent to the initial record

12  review, and based on both sets of records and the two

13  interviews, made my decision as I sit here today.

14  Q.   And you've interviewed him twice, in November of 2007

15  and March of 2008?

16  A.   That's right.

17  Q.   And you received information after November, 2007, that

18  prompted you to feel that you needed to do a reinvestigation

19  or reinterview in March of 2008?

20  A.   Correct.

21  Q.   From those records, were you able to -- well, let's

22  just say from the records that you have received in total

23  now, are you able to identify prior sexual offenses of

24  Mr. Shields?

25  A.   I am.

1   Q.   Can you take a look in the materials that you have at

2   Exhibits -- we'll start with Exhibit 4.

3            MR. SWOMLEY:  Could I object and ask that only if

4   the witness needs refreshing should he be looking at

5   documents?

6            THE COURT:  Sure.  Well, let me hear the question

7   first.

8            MR. GRADY:  Sure, your Honor.

9   Q.   Can you tell me what Exhibit 4 is, Mr. Plaud?

10           THE WITNESS:  Well, Judge, I need to look at the

11   record.

12           THE COURT:  Just ask him a question.

13   Q.   Did you see copies of certified convictions of Jeffrey

14   Shields?

15   A.   I did.

16   Q.   Okay.  Is Exhibit 4 one of them?

17   A.   Yes.

18           MR. GRADY:  I move to admit Exhibit 4 in the form

19   that the parties agreed to.

20           MR. SWOMLEY:  No objection.

21           MS. KELLEY:  No objection.

22           (Petitioner Exhibit 4 received in evidence.)

23   Q.   If you look at the first --

24           MR. GRADY:  No objection, your Honor?

25           THE COURT:  Right, Exhibit 4 is in.

1  Q.   If you look at the first page of Exhibit 4 --

2         THE COURT:  Do you all have your screens up?  Are

3  they all working?

4         THE JURY:  Yes.

5  Q.   Exhibit 4 reflects that Mr. Shields was indicted on

6  January 9 of 1989, committing an unlawful sexual contact

7  upon an individual who I will identify as WH?

8  A.   Yes.

9  Q.   Is that an offense that you discussed with Mr. Shields

10  at all?

11  A.   Yes.

12  Q.   And what, if anything, did Mr. Shields tell you about

13  that offense?

14  A.   Mr. Shields was forthcoming, in my judgment.  He did

15  not disagree with or deny committing the offense.

16  Q.   And that was in the second interview?

17  A.   Yes.

18  Q.   Okay.  You mentioned you had interviewed him in

19  November.  Was he forthcoming about this offense in

20  November?

21         MR. SWOMLEY:  Objection.  May we have a side bar?

22         THE COURT:  No.  Overruled.

23  A.   No.

24  Q.   You had in November asked Mr. Shields --

25         THE COURT:  This is all leading, so --

1      MR. GRADY:  Strike it.  That's fine.

2   Q.  Just coming back to the final interview, what, if

3   anything, did Mr. Shields tell you about that offense, the

4   facts underlying it?

5   A.  Well, when I went back and reinterviewed him and

6   discussed some of the additional information that I had had,

7   Mr. Shields looked me straight in the eye and said that,

8   without getting into any of the details of the allegations

9   or the information that I had, and just stated that if it's

10  there in the record, he did it, he doesn't deny it.  And

11  that's about the extent of the details during the interview.

12  Q.  Okay, with respect to this offense?

13  A.  Yes.

14  Q.  Can you take a look at Exhibit 5 and tell me if you

15  recognize what that is.  You may need to look at the third

16  or fourth page of the indictment.

17  A.  Yes.

18  Q.  What is Exhibit 5?

19  A.  Well, it is a several-count indictment for unlawful

20  sexual contact and assault.

21      MR. GRADY:  I move to admit Exhibit 5 into

22  evidence.

23      MR. SWOMLEY:  No objection.

24      (Petitioner Exhibit 5 received in evidence.)

25  Q.  Do you recall, Doctor, at your second interview or at

1    your first interview, whichever applies, what, if anything,

2    Jeffrey Shields told you about the offense underlying this

3    indictment and this conviction?

4    A.   If you can just give me a moment.

5    Q.   Sure, and actually. . .

6              THE COURT:  This is Exhibit 5?

7              MR. GRADY:  It is Exhibit 5 in evidence, your

8    Honor.

9    Q.   And, Doctor, if you wish, there were other police

10   reports and materials you reviewed with respect to these

11   offense; is that correct?

12   A.   That's right.

13   Q.   If you were to look to perhaps Exhibit 18 marked for

14   identification in the government's binder in front of you,

15   that might assist you in identifying a particular offense.

16             (Witness examining documents.)

17   A.   Okay.

18   Q.   What, if anything, do you remember Jeffrey Shields

19   telling you about this offense, and in the context of the

20   two interviews, when did that occur?

21   A.   I just want to make sure I've got this straight because

22   it is a little differently ordered than the way I have it,

23   but, yes, Mr. Shields admitted to this behavior.

24   Q.   Okay.  Well, how did he describe it to you?  What did

25   he say the facts were underlying this event?

1    A.   He stated that he was delivering a pizza to a school

2    and then had to use the bathroom.  He stated that the victim

3    was in the bathroom urinating when he entered, that he had

4    entered the stall next to him.  He had described it as a gym

5    or gymnasium bathroom.  After leaving, exiting the stall, he

6    proceeded to the sink area, washed his hands.  And the

7    victim was there, and he touched the victim over the clothes

8    in the genital area, then proceeded to walk into the

9    bathroom stall and masturbated.

10   Q.   Can you take a look at the indictment in Exhibit 5

11   that's now up on the screen.  What, if any, inconsistencies

12   would you observe between the conduct alleged in the

13   indictment, to which Mr. Shields testified guilty, and the

14   version of events he related to you?

15            (Witness examining document.)

16   A.   Well, it states in the actual indictment, No.1, it

17   talks about touching genitals, so there's a question of

18   whether it's over or under the clothing in No. 1; in No. 2,

19   whether Mr. Shields himself had the victim touch his

20   genitals.

21   Q.   There's nothing about that in his story to you?

22   A.   No.

23   Q.   What, if anything, did Jeffrey Shields tell you about

24   pulling the victim into a stall?

25   A.   He did not.

1   Q.   Can I ask you to take a look at Exhibit 6.  Can you

2   tell me what that is?

3   A.   Yes.  It's grand jury charges.

4   Q.   And, Doctor, before I move on, do you know what Jeffrey

5   Shields told you about the age of the victims involved in

6   the first two, Exhibit 4 and Exhibit 5?

7            (Witness examining document.)

8   A.   I believe they were -- stated they were 13 or 14 years

9   old.

10  Q.   If you can take a look at Exhibit 6.

11  A.   Yes.

12  Q.   Can you tell me what that is?

13  A.   Yes.  It's State of Maine versus Jeffrey Shields,

14  Indictment for Violation, Grand Jury Charges.

15            MR. GRADY:  I move to admit Exhibit 6 as agreed by

16  the parties.

17            MR. SWOMLEY:  No objection.

18            (Petitioner Exhibit 6 received in evidence.)

19  Q.   Can you tell me, Doctor, when vis-a-vis the November

20  and the March interview did you receive information

21  regarding this offense?

22            (Witness examining document.)

23  Q.   And if it would assist you in placing the --

24            MR. SWOMLEY:  May the record reflect I object to

25  this line of inquiry.

1          THE COURT:  Overruled.

2   Q.   And if it may help you place it, Exhibit 21 refers to

3   the victim AC, and there may be some records that you had

4   reviewed.

5   A.   Thank you.

6          (Witness examining document.)

7   A.   Yes, this is information that was received subsequent

8   to my initial interview and record review.

9   Q.   And what, if any, information about this offense did

10  Mr. Shields disclose to you in the November of 2007

11  interview?

12  A.   I would characterize my comments before as pertaining

13  to this as well.  In other words, he did not deny that he

14  did it.  There was no details, but he basically, again, when

15  I went over this material, that he did not deny any of it.

16  The general comment was, "Well, if they said I did it, I did

17  it."

18  Q.   Let me back you up.  That was the March, 2008

19  interview, correct?

20  A.   Right.

21  Q.   What, if any, information did Mr. Shields give you

22  about this offense in the November, 2007 interview?

23  A.   None.

24  Q.   How old is AC?

25  A.   Six.

1  Q.   And just to be clear, what did he say about that

2  particular offense in the March, 2008 interview?

3  A.   I would characterize it as he did not deny that he did

4  it.  He did not offer any details or any specifications

5  other than his general conclusion that because of, I

6  believe, substance abuse at the time, he did not have a

7  recollection of it.

8  Q.   Can you take a look at Exhibit 7.

9          MR. GRADY:  And if I have not, I move Exhibit 6 in

10 evidence, your Honor.

11          THE COURT:  All right.

12 Q.   Can you tell me what Exhibit 7 is?

13 A.   Again, State of Maine Indictment for Violation, Grand

14 Jury.

15          MR. GRADY:  I would move to admit grand jury

16 charges.  I would move to admit Exhibit 7, your Honor.

17          MR. SWOMLEY:  No objection.

18          (Petitioner Exhibit 7 received in evidence.)

19 Q.   Can you tell me, Doctor, at either interview, what, if

20 anything, Jeffrey Shields told you about the offense

21 underlying this conviction?

22 A.   I'm going to need to cross-reference it.  There's not

23 enough information.

24 Q.   With respect to your revised report, that would be the

25 1998 offense described at Pages 6 and 7.

Page 84

1   A.   Okay.   Yes.

2   Q.   Now, what did Mr. Shields tell you about this 1998

3   offense at the first interview?

4          THE COURT:  When you're done with this line of

5   questioning, we'll take our break, unless you want to do it

6   now.

7          MR. GRADY:  We'll just finish this one.

8   Q.   Specifically with respect to the first interview, and

9   if you need to refer to Exhibit 20 to help you, what did he

10  tell you about this 1998 offense at the first interview?

11  A.   He stated that approximately on six occasions in 1998,

12  which went over an approximate three-week period, he and --

13  he described it as a 13- or 14-year-old male engaged in

14  mutual masturbation, for which he paid the victim $20 on

15  each occasion.

16  Q.   Did you subsequently learn the age of the victim

17  involved in this case?

18  A.   Yes.   Yes, I did.

19  Q.   And the victim was aged --

20  A.   Twelve.

21          MR. GRADY:  Why don't we stop here, your Honor,

22  take a break.

23          THE COURT:  We'll take our morning break.

24          THE CLERK:  All rise for the jury.

25          (Jury excused.)

1          THE COURT:  I'll see counsel at side bar on

2     scheduling.

3     SIDE-BAR CONFERENCE:

4          THE COURT:  How much longer do you have?

5          MR. GRADY:  I would think I definitely am going to

6     take today.  I had said four hours.  I probably will be

7     under that, but I might go into tomorrow.  I would hope not.

8          THE COURT:  Yes, try and wrap it up today.

9          MR. GRADY:  He's got so much cross, your Honor,

10    I've got to prep the jury for it.

11         THE COURT:  So we'd sort of -- how much do you

12    think -- she had ballparked it at around six hours, but what

13    do you think you're going to need on it?

14         MR. SWOMLEY:  If he's going to do four, I'll try

15    and do it in only double or only one and a half, one and a

16    half times.

17         MR. GRADY:  I will do four.

18         THE COURT:  So I'm just trying to schedulingwise,

19    I'm just trying to figure out realistically what we're

20    talking about.

21         MR. SWOMLEY:  If we're doing 9:00 to 1:00, I'll

22    have him most of --

23         THE COURT:  Out of here.

24         MR. SWOMLEY:  Yes, tomorrow.  If I can finish it

25    by the end of the day tomorrow --

1          THE COURT:  We have so many people from out of

2     town.  So, anyway, if that's the case, then how's

3     Dr. Tomich's wife doing?

4          MR. GRADY:  There's been no new news that he won't

5     be available.

6          THE COURT:  So we'll still be planning on him for

7     Monday.

8          MR. SWOMLEY:  Can I make a quick record here

9     before you leave?

10          THE COURT:  Yes.

11          MR. SWOMLEY:  I know we objected, and we're trying

12     to keep out this first-second interview business with

13     Dr. Plaud, and it's come in.  And I know we objected to it,

14     and you I guess -- I mean, I didn't get a previous ruling,

15     but --

16          THE COURT:  She flagged it.  I thought about it.

17          MR. SWOMLEY:  All right, well, okay, basically

18     you've ruled.

19          THE COURT:  Right.

20          MR. SWOMLEY:  And I want to make sure that the

21     record is clear here.  We have objected.  I think that what

22     essentially now is begged for is a demonstration that the

23     government engaged in bad faith and sandbagged, and that's

24     where this is going.  And I want to make clear that I think

25     I should be entitled to demonstrate that there were court

1    orders demanding that they turn over everything they had,

2    and they didn't do it.  I want to go back now into the

3    record.  I want to actually consider in introducing --

4              THE COURT:  Try and reach a stipulation, the

5    timing of the production by the government.  I'm happy to do

6    that.

7              MR. SWOMLEY:  They were told, they were ordered to

8    produce.  They didn't.

9              THE COURT:  I'm happy to.  First of all, there's

10   no evidence that these guys -- he held back documents he

11   knew existed to get an adverse opinion of an expert.

12             MR. SWOMLEY:  Reasonable inferences, I would

13   submit.

14             THE COURT:  Excuse me.  There's no evidence in

15   this record of bad faith on the part of the Assistant U.S.

16   Attorneys here.  There is evidence, however -- I remember it

17   vividly -- that at the last minute they found documents

18   which radically transformed how he thought about this case.

19   And if you want to put in the fact that this was late

20   production, you know, late in the day after, I'm happy to

21   have you do that, okay?  All right, but, in any event, try

22   and work out a stipulation on the timing of the whole thing.

23   Perfect.  We'll see you.

24                  (End of side-bar conference.)

25                  (A recess was taken, 11:05 a.m.)

1          (Resumed, 12:37 p.m.)

2          THE COURT:  Call in the jury.

3          THE CLERK:  Yes.

4          MR. GRADY:  Your Honor, I do have jury binders

5   with all of these exhibits.  It may speed things up if I

6   just gave them all the binders with the agreed convictions

7   and the reports in it.

8          THE COURT:  My theory was if there was any one you

9   wanted them to mark up, but not every single exhibit.

10         MR. GRADY:  Oh, you don't want every exhibit to

11  the jury that comes in evidence?

12         THE COURT:  I'm sure someone just spent the

13  weekend doing it, but if there is a particular exhibit that

14  people are going to spend a lot of time on, then it makes

15  sense for both sides to spend time on it, but not every

16  single --

17         MR. GRADY:  But the exhibits do go to the jury?

18         THE COURT:  Eventually, yes, but usually --

19         MR. GRADY:  We've had binders made of the

20  convictions and the government's exhibits as for today.

21         THE COURT:  Well, we'll deal with it later.

22         (Jury enters the courtroom.)

23  BY MR. GRADY:

24  Q.   Dr. Plaud, just returning to the exhibit in front of

25  us, if you could look at Exhibit 7.  That's the indictment.

1   I want to just go to a separate page of that.  In Exhibit 7

2   beginning on Bates stamp Page 586, there is a multipage

3   record.  Do you recognize what that is, referring to the top

4   right-hand corner of Page 586?

5   A.   Yes.

6   Q.   What is it?

7   A.   It's a charge.  It begins, the cover sheet, of "Charge

8   of unlawful sexual contact."

9   Q.   Are you familiar with the term "docket sheet"?

10  A.   Yes.

11  Q.   What is it?

12  A.   It means -- well, essentially when I refer to a docket

13  sheet, it's something that's entered into the court.

14  Q.   And what is your understanding of what's recorded on

15  docket sheets?

16  A.   Well, in this case, for example, a charge of a criminal

17  offense.

18  Q.   And if we look at 587, we see a plea of guilty?

19  A.   Yes.

20  Q.   A sentence.  Skipping ahead to Page 588 -- or strike

21  that.  Let's go back for a moment.  On Page 587, what date,

22  if any, is reflected for the date that Mr. Shields was

23  sentenced in that case?

24  A.   The plea of guilty was accepted by the court, according

25  to the information here, on October 30, 1998.

1    Q.    Okay.  And what day was Mr. Shields sentenced?

2    A.    The ruling also says October 30, 1998.

3    Q.    I'm just going to show you the next page of the docket

4    sheet.  What, if anything, does the docket reflect occurred

5    on 12/9?

6    A.    There was a motion for a probation revocation that was

7    originally filed December 2, 1998.

8    Q.    And -- oops.  We hole punched out the date at the top.

9    Can you tell me, what does the docket reflect with respect

10   to any finding made on 3/19/99 with respect to that

11   probation violation?

12   A.    3/19/99, plea --

13          MR. SWOMLEY:  I will stipulate that the record

14   correctly reflects January 4, 1999, in the little hole-punch

15   thing, if that's helpful.

16          THE COURT:  All right.

17   Q.    Essentially, if I can speed it up, his probation was

18   revoked on March 19?

19   A.    Correct.

20   Q.    And if we look at Page 590, again on February 28, 2001?

21   A.    Yes.

22   Q.    And on September 24, 2002, a probation warrant was

23   sought?

24   A.    Yes.

25   Q.    And ultimately on 10/10 of 2003, the probation was

1    ultimately revoked, and he was ordered to serve the balance

2    of the sentence?

3    A.    Correct.

4    Q.    With respect to your discussion with Mr. Shields about

5    his offenses, what, if anything, happened in September of

6    2002 that might have led to that probation warrant?

7    A.    Okay, what happened was an issue involving the

8    discovery of what could be described as child pornography on

9    a computer.

10   Q.    Belonging to Mr. Shields?

11   A.    Yes.

12   Q.    Can you take a look at Exhibit 8.  Tell me if you

13   recognize that.

14   A.    Yes.

15   Q.    What is it?

16   A.    This, again, was pending counts of possession of child

17   pornography.

18   Q.    And what we have here --

19            MR. GRADY:  I actually move to admit Exhibit 8 in

20   evidence as provided this morning.

21            MR. SWOMLEY:  No objection.

22            (Petitioner Exhibit 8 received in evidence.)

23   Q.    And what we have here is a certified copy of the

24   docket, United States District Court of Maine, reflecting

25   Mr. Shields's conviction for possession of child

Page 92

1    pornography?

2    A.    Yes.

3    Q.    What, if any, sentence did he receive?

4          MR. SWOMLEY:  I stipulate he received 57 months,

5    if that's helpful.

6          THE WITNESS:  Thank you.

7    Q.    And then if you could just take a look at Exhibit 9.

8    A.    Yes.

9          MR. GRADY:  Well, if I could say, your Honor, it's

10   been stipulated and agreed between the parties that

11   Exhibit 9 represents the facts underlying the offense and

12   ask to move it into evidence.

13         MR. SWOMLEY:  No objection.

14         (Petitioner Exhibit 9 received in evidence.)

15   Q.    And just if I could ask you to look at Exhibit 10,

16   those are police reports that you reviewed in connection

17   with your evaluation in connection with the charges in Maine

18   Superior Court, 89297, the offense against the boy in the

19   bathroom; is that correct?

20   A.    Yes.

21         MR. GRADY:  I move to admit into evidence

22   Exhibit 10 pursuant to the discussion and the record made

23   this morning.

24         THE COURT:  Yes.

25         MR. SWOMLEY:  No objection.

Page 93

1                (Petitioner Exhibit 10 received in evidence.)

2  Q.   And the same, could you take a look at Exhibit 11.  Can

3  you tell me if you recognize those to be police reports with

4  respect to Maine Superior Court Docket 927 that you reviewed

5  in connection with your evaluation?

6  A.    That is correct.

7                MR. GRADY:  I move to introduce Exhibit 11.

8                MR. SWOMLEY:  No objection.

9                (Petitioner Exhibit 11 received in evidence.)

10                THE COURT:  Wait.  Just so the jury follows this,

11  this is going back.  That's one of the earlier convictions?

12                MR. GRADY:  These are 9027 and 89297, and the jury

13  should have the --

14                THE COURT:  No, but Exhibit 11 goes back to the

15  1989 --

16                MR. GRADY:  Yes, it does.

17                THE COURT:  So just so you follow, the most recent

18  one was the child -- just so you just follow the chronology

19  when you see them.

20                MR. GRADY:  The police reports contained in

21  Exhibit 10 go back to what will be marked and submitted to

22  you as Exhibit 5, and the police reports in Exhibit 11 go

23  back to the document, the certified record of conviction

24  that will be submitted to you as Exhibit 6.

25                Thank you, your Honor.

1    Q.   Dr. Plaud, were there other instances of sexually

2    inappropriate conduct with minors of which you became aware

3    during your clinical interviews that were not recorded in

4    the convictions?

5    A.   Yes.

6    Q.   I'm going to ask you to look, without disclosing the

7    content of any record, at Exhibit 14 marked for

8    identification in the binder in front of you.

9              (Witness examining document.)

10   A.   Yes.

11   Q.   Without disclosing the content of that record, can you

12   tell me what, if any, discussion did you have with

13   Mr. Shields, and what, if anything, did Mr. Shields tell you

14   about the events recorded in Exhibit 14?

15   A.   I would characterize, in response to that question, my

16   answer would be the same as I had previously stated

17   regarding Mr. Shields's report to me, self-report to me,

18   after going over additional materials that I had received in

19   that second interview.

20   Q.   Okay.  So essentially -- I want to clarify this -- you

21   would have relayed the facts of the information contained in

22   Exhibit 14; is that correct?

23   A.   Yes.

24   Q.   And Mr. Shields said, "I'm not --"

25              THE COURT:  Well, what did you say, and what did

1   he say?

2            MR. GRADY:  Okay, I was trying to lay a foundation

3   your Honor.  I apologize.

4   Q.   What did you say, and what did he say?

5   A.   Well, during the second interview, what happened was, I

6   had the additional information, and it was organized.  It

7   was in a table form reflecting different dates, different

8   events, and victim characteristics.  And I went over and let

9   Mr. Shields know that I had obtained this additional

10  information and I wanted to -- I went over it with him and

11  asked him to give me his impression, his self-report on that

12  information.  And as I testified to earlier, there was

13  really no details gone into other than Mr. Shields did not

14  deny any of this behavior.

15  Q.   Okay.  And with respect to Exhibit 16, is your

16  testimony similar?

17           THE COURT:  There's no Exhibit 16.

18           MR. GRADY:  What's been marked for identification

19  in front of him.  He already --

20           THE COURT:  Let me see you at side bar.

21  SIDE-BAR CONFERENCE:

22           THE COURT:  They don't know what you're talking

23  about.  There is no Exhibit 16.  So you need to do this a

24  different way, you know, what did you review, so you're not

25  leading, what did you show him, and what did he say?

1    MR. GRADY:  I was trying to do it without letting

2    him --

3    THE COURT:  I understand, but there is no

4    Exhibit 16.  This is unintelligible, and you can't imply

5    that there are exhibits that they're not seeing.  Just what

6    did you say, and what did he say, you know?

7    (End of side-bar conference.)

8    Q.   For the record, Dr. Plaud, what is Exhibit 14?

9    MR. SWOMLEY:  Objection, your Honor.

10   THE COURT:  Why don't you do this:  What did you

11   say about one of these instances, and then what did he say?

12   THE WITNESS:  Okay, what I said was --

13   THE COURT:  There are certain things that aren't

14   admissible because they're not -- because I've had a series

15   of rulings, they're not admissible.  But he's allowed to go

16   through what happened at the interview.  So present what you

17   said and what he responded.

18   THE WITNESS:  Okay.

19   THE COURT:  That's why you're not getting these

20   documents.  They're not admissible.

21   THE WITNESS:  I had a summary of the date, the

22   purported or alleged event, meaning what happened.  It also

23   had references to certain other documents, legal documents,

24   reports.  And what I did was, in the second interview, I

25   went over the information; in other words, "This date it was

Page 97

1    stated that you did this."

2              THE COURT:  All right, so what did you say?

3              THE WITNESS:  And I asked him if he did this.

4              THE COURT:  What's the "this"?

5              THE WITNESS:  Engage in the sexual abuse that was

6    alleged to have occurred in that information, did he

7    perpetrate the sexual abuse as alleged in that

8    documentation?

9    Q.   Did you go over the documentation at all with

10   Mr. Shields?

11   A.   I didn't go over the specific sources other than the

12   summary of the events and the way they were summarized.

13   Q.   Okay, what summary of the events did you give with

14   respect to the conduct described in what's been marked for

15   identification as Exhibit 16?

16   A.   I went over the material that actually appeared in this

17   table.

18   Q.   Okay.

19   A.   I read it.

20   Q.   When you say "this table," are you referring to what

21   was marked for identification as 13?

22   A.   That's correct.

23   Q.   Did you go over any additional offenses beyond what are

24   listed in this chart?

25   A.   No.

1   Q.    Doctor, what, if any, diagnosis have you reached with
2   respect to Mr. Shields?
3   A.    I would be prepared to give him a diagnosis of
4   pedophilia, nonexclusive type.
5   Q.    When you say you're prepared, is that your opinion?
6   A.    Yes.
7   Q.    Are you familiar with the Diagnostic and Statistical
8   Manual of Mental Disorders?
9   A.    Yes.
10  Q.    What is that?
11  A.    The Diagnostic and Statistical Manual of Mental
12  Disorders, currently in its fourth edition under text
13  revision, which is currently referred to as the DSM-IV-TR,
14  is the major text that we use, or professionals, meaning
15  psychologists and psychiatrists, use to diagnose mental
16  conditions, mental disorders.
17  Q.    And is it used by psychologists/psychiatrists?
18  A.    It is.
19  Q.    And it provides a common terminology?
20  A.    It does.
21  Q.    And this book, the Diagnostic and Statistical Manual,
22  that has what we all sort of as lay people view as mental
23  illnesses, schizophrenia, bipolar, they're all in there?
24  A.    They are.
25  Q.    I'm just going to show you what was marked for

1    identification as Government Exhibit 22.  Can you tell me if

2    you recognize what that is.

3    A.    Yes.  That's the introductory section in the DSM-IV-TR

4    for the diagnosis of the sexual disorder called pedophilia.

5    Q.    Okay.  And if one looks at the second page?

6    A.    The second page contains what we call the diagnostic

7    criteria for pedophilia.

8    Q.    Okay.  And are those the diagnostic criteria you relied

9    upon here?

10   A.    Yes.

11   Q.    Does the diagnosis of pedophilia have modifiers, and

12   what are they?

13   A.    Yes.  There are the main diagnostic criteria that

14   refers to the cardinal issues relating to the diagnosis

15   itself, but then there is other specifiers:  Whether or not

16   the person is attracted to males, females, to both; whether

17   the behavior is exclusive to prepubescent children or not;

18   whether or not it's limited to incest, meaning within the

19   family types of sexual abuse of prepubescents.

20   Q.    And what, if you can tell us, is the basis for your

21   diagnosis of Jeffrey Shields?

22   A.    It's based on his record of sexual abuse, and it does

23   involve sexual abuse of at least one victim who was clearly

24   prepubescent.

25              MR. SWOMLEY:  Can I object or at least ask for

1   clarification?  I know this is not an exhibit in evidence.

2   It's being put on the screen here.  I don't mind that as

3   long as I can put all the pages I want to put up on the

4   screen when the time comes.

5           THE COURT:  Do you want to introduce it?

6           MR. GRADY:  The diagnostic criteria.  I would not

7   this entire page.

8           THE COURT:  Well, do you want to introduce it?

9           MR. SWOMLEY:  No.  I just am saying if we're -- my

10  thought, the only thing that went up on the screen were

11  exhibits.  If this isn't an exhibit, I just want to make

12  sure that I get to put what I want to put up on the screen

13  when my time comes.

14          MR. GRADY:  If you're not going to introduce it,

15  you need to take it down, unless --

16          MR. GRADY:  I would move to introduce the

17  diagnostic criteria.

18          THE COURT:  Allowed.  What exhibit number is it?

19          MR. GRADY:  It would be 22.  I will get the

20  original to Mr. Alba.

21          (Witness examining exhibit.)

22          (Petitioner Exhibit 22 received in evidence.)

23  Q.   Coming back, Doctor, can you tell us, what is the

24  basis, what specific facts serve as the basis for your

25  diagnosis of pedophilia?

1  A.   The diagnosis of pedophilia, by Mr. Shields's record,

2  includes the fact that, in my judgment, that he would meet

3  the criteria, the three criteria that define the disorder,

4  referring to over a period of time of at least six months

5  recurrent, intense sexually arousing fantasies, urges, or

6  behaviors involving prepubescent children.

7  Q.   Okay, how is it or what facts in the record

8  substantiate a finding that he meets the first criteria?

9  A.   Well, over a period of time, there is evidence that

10  Mr. Shields did engage in sexual behavior with prepubescent

11  children, prepubescent male children, involving not only the

12  contact sexual behavior but also noncontact behavior that

13  involves the governing offense involving pornography.

14  Q.   So you rely both on the child pornography offense in

15  making this diagnosis and the offense against a 6-year-old?

16  A.   Yes.

17  Q.   What about the 1998 offense against the 12-year-old?

18  A.   Well, when we get into victim characteristics involving

19  12-year-olds, 13-year-olds, or even in some

20  cases 11-year-olds or 14-year-olds, that general age range,

21  it gets more difficult.  The DSM-IV in the diagnostic

22  criteria does state that the prepubescent children are

23  generally age 13 years and younger.  The whole issue depends

24  upon the attainment of pubescence by the victim, meaning the

25  development of secondary sexual characteristics; and that is

1   the dividing line essentially between pedophilia and

2   nonpedophilia.  And whenever you have victims who are

3   obviously still children, who are legally unable to give

4   consent, but yet who evidence the development of secondary

5   sexual characteristics, it really muddies the water up.  So

6   if I just had that information about a 12-year-old, in

7   context of the other information which indicates some older

8   victims, I would be less inclined to make the diagnosis.

9   But with the additional information of the 6-year-old plus

10  the evidence of child pornography, and the relationship as a

11  diagnostic indicator of child pornography to pedophilia, I

12  would be prepared to give the diagnosis.

13  Q.   What does the DSM generally say about that issue?

14  A.   About what issue?

15  Q.   The issue of age.

16  A.   Well, it says generally age 13 years or younger.  It's

17  a case-by-case basis.  Children mature sexually at different

18  rates.  And really the issue is, the very important issue --

19  it's not just reflects the person is age 12 or age 11 -- it

20  depends on whether the person's sexual arousal is to the

21  characteristics that are associated with pubescence or the

22  absence of pubescence, meaning the absence of secondary

23  sexual characteristics, and that you cannot judge totally by

24  age.

25           Now, if you have a 6-year-old victim or 9-year-old

1   victim, I don't think it's any stretch of the imagination to

2   conclude otherwise; but if your victims are all in that age

3   range, without having other information, it gets more

4   difficult.

5   Q.   If you could, could you go back and take a look at what

6   was marked for identification as Government's Exhibit 14.

7   A.   Yes.

8   Q.   Do you recall testifying at deposition in this matter?

9   A.   I do.

10  Q.   And do you recall what, if any, testimony you provided

11  as to whether the information contained in that document

12  served as a basis for your diagnosis?

13            MR. SWOMLEY:  Objection.  Leading.

14            THE COURT:  Overruled.

15  A.   Well, no, I don't recall specifically what I said in a

16  deposition about this particular information, no.

17            MR. GRADY:  May I approach the witness, your

18  Honor?

19            THE COURT:  Yes.

20            MS. KELLEY:  What page are you on?

21            MR. GRADY:  120 to 124.

22  Q.   I'm just going to show you what's been marked for

23  identification purposes as Government's Exhibit 23.  Can you

24  tell me what that is?

25  A.   Yes.  This is the transcript of my deposition.

1  Q.   Okay.  And if you could read through that through

2  Page 124 and see if that refreshes your recollection as to

3  whether or not --

4         MR. SWOMLEY:  Objection.  There hasn't been any

5  testimony that his recollection needs refreshing.

6         THE COURT:  Yes, you can impeach him with it.

7         MR. GRADY:  I just --

8         THE COURT:  Are you doing this to impeach or to

9  refresh?  Which one?

10        MR. GRADY:  Both.

11  Q.   Doctor -- very well.  Starting at --

12        MR. GRADY:  I'm sorry, your Honor.  I apologize.

13  I'm trying to find the question.

14  Q.   At your deposition, did you become aware of the

15  information that's contained in Exhibit 14?

16  A.   Yes.

17  Q.   Okay.  And what, if any, role would that play in your

18  diagnosis?

19  A.   The information contained there would also be

20  applicable or reinforce the diagnosis of pedophilia.

21  Q.   What is that information that's in that exhibit?

22  A.   It has to do with sexual contact with a prepubescent

23  male who was identified as 9 years old.

24  Q.   And when did that occur?

25        (Witness examining document.)

1   A.    It occurred in April of 1989.

2   Q.    Now, between April and September, that's only five

3   months between those two events; is that correct?

4   A.    That's correct.

5   Q.    Does that preclude you from making a diagnosis of

6   pedophilia?

7   A.    No.

8   Q.    Okay.  Can you explain why, why not?

9   A.    Well, the issue of six months duration, the question is

10  what the six months referred to:  Is there continuous

11  activity over a period of at least six months?  Is there

12  activity for a smaller period of time?  Time elapses and

13  then additional activity?

14          If you look at it in context, again, it was less

15  than six months.  So in and of itself, if there was no other

16  information, it would be questionable whether it was of

17  sufficient duration.  But then you have eight years later,

18  again, the child pornography offense, which serves as the

19  governing offense.

20          THE COURT:  Is this conduct with the 9-year-old

21  one of the convictions?

22          MR. GRADY:  No, it is not, your Honor.

23          THE COURT:  Actually I asked him.  Was it?

24          THE WITNESS:  No.

25  Q.    Doctor, is it typical to rely upon --

Page 106

1        THE COURT:  Can I see you at side bar.

2   SIDE-BAR CONFERENCE:

3        THE COURT:  Both for the jury and for me, this is

4   not coming in clearly.  Let me ask you this:  I ruled that

5   certain documents, documents, weren't admissible; but to the

6   extent he admitted to conduct, I permitted it.  So when you

7   keep saying, "In this exhibit, did --" is this something he

8   admitted to?

9        MR. GRADY:  Yes, but not to this doctor.

10  Apparently he admitted it to the expert to be called by the

11  defense.

12       THE COURT:  I see.  But I need them to have some

13  sense.  It's confusing.  They don't have a time line as to

14  what's subject to a conviction.  So, in other words, you're

15  allowed to say, "Did you ask him about," for example, "two

16  obscene phone calls?  Yes.  Did he say he did it?  Yes."

17       MS. KELLEY:  But I think it wasn't that clear in

18  the interview.  That's what's coming through.

19       THE COURT:  I don't know.  It's just, I'm a

20  fact-finder too, and I even have some familiarity with this

21  stuff, and I can't make it out.

22       MR. GRADY:  I'm trying to do it in the context of

23  your order.

24       THE COURT:  Excuse me.  It's got to be clear this

25  isn't a conviction and it's something that he admitted to,

1    if he did.

2              MR. GRADY:  Okay.

3              MR. SWOMELY:  Can I stipulate?  I'll just -- I

4    promise I'll make a stipulation that should obviate all of

5    the problem here, okay?

6              THE COURT:  I know, but they have to understand

7    it.

8              MR. SWOMLEY:  All right, okay, it should be clear.

9              (End of side-bar conference.)

10             MR. SWOMLEY:  Ladies and gentlemen, to avoid

11   confusion, I'm going to make a stipulation here which should

12   short-circuit a lot of this difficulty here.  Mr. Shields

13   admits to conduct involving a 9-year-old in 1989 in Port

14   Saint Joe, Florida, and does so unequivocally.  The

15   government has a document that has information about that.

16   It's not in dispute, not in dispute that he can use it, rely

17   on it.  It occurred, and --

18             THE COURT:  All right.  So what I was dealing with

19   here is, you don't have the time line.  That's why it's

20   important for you to take notes.  This was not one of the

21   convictions.  This is something that happened in Florida,

22   but it is not subject, as I understand it, to one of the

23   convictions that you will receive into evidence.  This is an

24   additional incident.

25             So now they understand what it is.  Now, you ask

1    your question.

2    Q.   Doctor, does that information that Mr. Shields admits

3    to, having engaged in the conduct described in Exhibit 14 --

4            THE COURT:  But they don't have Exhibit 14, so

5    just describe what -- just ask it.

6    Q.   Doctor, what is the --

7            MR. SWOMLEY:  Let me just read the conduct.  I'm

8    happy to do that.

9    Q.   Exhibit 14 is a warrant, Doctor, correct?

10           MR. SWOMLEY:  "Nine-year-old was asked to pull his

11   pants down and let me see your privates."  That was what was

12   said to the minor child.  That's what is the conduct alleged

13   that Mr. Shields did.  That's what Mr. Shields admits to.

14           THE COURT:  Well, so what's the question?

15   Q.   What, if any, role does that play in your diagnosis of

16   pedophilia?

17   A.   It is a piece of information involving sexual behavior

18   that would be consistent with the diagnosis of pedophilia.

19   Q.   What's the most important piece of information in your

20   diagnosis of pedophilia?

21   A.   Well, what you have here over a period of time is

22   demonstrable sexual behavior with prepubescent children, two

23   of them, and other behavior occurring around the same time

24   with older children.  For example, in 1998, the 12-year-old

25   male that he was convicted of, that is a borderline case.

1    I'm not sure because I don't know anything more about the

2    victim, but it could be another piece of information

3    consistent with that.  Then the lapsing of many years and

4    the confiscation of a large case of child pornography, which

5    is a significant diagnostic indicator of pedophilia.  So

6    putting all the pieces together, it would be consistent with

7    a diagnosis of pedophilia, sexually attracted to males, and

8    nonexclusive.

9    Q.   Doctor, there's been some discussion of whether one can

10   be cured of pedophilia.  What is the course of pedophilia?

11   Is it something that ebbs and flows, goes away?

12   A.   Well, pedophilia is described in the Diagnostic and

13   Statistical Manual using another generic term of "chronic."

14   It's oftentimes considered to be a chronic condition, which

15   would seem to indicate it has a longevity or it is fairly

16   resistant to change over time.  There is no one answer I can

17   give you about curing pedophilia.  It depends.  It's a

18   case-by-case basis.  Individuals who may have the diagnosis

19   have other factors, physiological, psychological, behavioral

20   factors that would make that, even though technically a

21   diagnosis, something that they could reorient to.  Others

22   it, would be more difficult to do that.  We used to use

23   older terms --

24               THE COURT:  What do you mean by "reorient"?

25               THE WITNESS:  It means not show any patterns of

1    sexual arousal any longer to prepubescent children, males or

2    females.

3              THE COURT:  So some people are cured?

4              THE WITNESS:  I'm sorry, Judge?

5              THE COURT:  Are some people cured?

6              THE WITNESS:  That's a term I don't really like to

7    use, Judge.  People can be more successfully treated, to the

8    extent that they truly do have a disorder pattern,

9    underlying pattern of sexual interests, and there are

10   techniques specifically designed to address and to reorient

11   that that have some success.

12             For others who have the diagnosis of pedophilia,

13   it's a more complex psychosocial phenomenon that involves

14   other factors that may lead to a complete abatement of

15   sexual behavior with prepubescent children.  It's not

16   simple, and that's the best way to answer it.

17   Q.   Okay.  Is pedophilia a serious mental disorder, in your

18   mind?

19   A.   Yes, it is serious.  It's a paraphilia.  It's a sexual

20   disorder.  And given that it involves sexual behavior -- it

21   doesn't have to be behavior but generally does involve

22   sexual behavior -- with prepubescent children, I would say

23   it's very serious.

24   Q.   Doctor, you've generally described your approach to

25   conducting risk assessments.  You said you use an actuarial

1    tool.  What actuarial tool did you use here?

2    A.   I used the Rapid Risk Assessment for Sexual Offense

3    Recidivism, the RRASOR, R-R-A-S-O-R.

4    Q.   So we'll call it RRASOR?

5    A.   Yes.

6    Q.   How was the RRASOR developed?

7    A.   Well, the RRASOR was one of the first actuarial or

8    statistical risk tools.  It was developed by a research

9    group, mostly associated with a researcher named Karl, with

10   a K, Hanson in Canada, who works for the present -- what's

11   called the Department of Public Safety, I believe then was

12   called the Solicitor General's Office of Canada.  And it

13   involved a number of groups that were studied, and factors

14   were identified, measurements along four dimensions; and

15   outcome data was gathered to generate recidivism statistics

16   based on an initial group estimate of recidivism of

17   13.2 percent five-year as the base rate.

18   Q.   Okay.  And how is the RRASOR useful in assessing risk

19   here?

20   A.   What the RRASOR does in this case is, as a baseline

21   tool, is it compares Mr. Shields on four factors, and then

22   compares that score with the reference groups for which the

23   instrument was initially validated; and you get essentially

24   five- and ten-year recidivism rates for that number, that

25   score that a person achieves on the tool.

1  Q.   How did they know the recidivism rates for the original

2  group?

3  A.   Well, the original groups, they were -- recidivism

4  statistics were collected that involved mostly reconviction

5  data, but there was some rearrest data in there as well,

6  recharge.

7  Q.   And what, if any, relationship is there between the

8  RRASOR and the Static-99?

9  A.   Well, subsequent to the publication of the RRASOR,

10 another group joined Dr. Hanson, principally associated with

11 Dr. David Thornton, and another tool called the SAC-J, items

12 from that were incorporated with these four RRASOR items to

13 come up with another actuarial tool that went from four

14 items to ten items, and it was relabeled the Static-99.

15 Q.   Can you explain what, if any, testing there's been done

16 or subsequent studies of the RRASOR and its validity?

17 A.   Well, over the past twelve years, there have been a

18 number of years that have looked at the RRASOR in different

19 populations of sex offenders to compare whether or not the

20 recidivism statistics hold water, whether they can be

21 cross-validated.  The bottom line is that over the --

22           MR. SWOMLEY:  Objection.

23           THE COURT:  Overruled.  It's preserved.

24           MR. SWOMLEY:  Can we be seen at side bar?

25           THE COURT:  No.

1  Q.   Go ahead.

2  A.   That the outcome data support the use of the RRASOR as

3  a, as I said earlier in my testimony, as a moderate

4  predictor of risk of sexual offense recidivism.

5  Q.   And do you agree generally with those studies?

6  A.   Well, I have issues with all studies, but, yes, I

7  believe the data are supportive of the use of the RRASOR as

8  an actuarial tool in risk assessments.

9  Q.   I'm going to show you what's been marked as

10  Government's Exhibit 26.  Can you tell me if you recognize

11  what that is.

12  A.   Yes.  That is the RRASOR instrument.

13  Q.   Can you walk us through how you scored Jeffrey Shields,

14  and you could get a pen, could you write it down on the copy

15  you have.

16  A.   Yes.  How do I do that?

17  Q.   You should have a copy of Exhibit 26 in your binder.

18         MR. GRADY:  May I approach the witness, your

19  Honor?

20         THE COURT:  Yes.

21  Q.   What is the first item?  How do you score Jeffrey

22  Shields?

23  A.   Well, the first item measures prior offenses to the

24  governing or index offense.  In this case, the index offense

25  is defined as generally the most recent offense, and that's

1   not counted.  So what you do is, you exclude that.  In this

2   case that would be the child pornography offense.  So

3   excluding that, you would look back at charges and

4   convictions for prior sexual offenses.  And you'll see that

5   there are a potential -- it goes from zero to three points

6   that can be scored on this item.  If you look at the

7   prior -- and it's based on a combination, and whichever is

8   higher, charges or convictions -- and if you look back at

9   Mr. Shields's sexual offense history regarding the charges

10   and convictions, he would score three points on that item.

11   Q.   What's the significance of asking about prior crimes?

12   What do the studies show about that?

13   A.   Well, the significance of that has to do with a number

14   of factors:  Number one, a person's involvement in being

15   detected by the legal system, by law enforcement for having

16   engaged in sexually abusive behavior.  That's one

17   consideration.  Number two, more generally is the fact that

18   prior sex offense history -- in other words, committing

19   prior sexual offenses -- is a predictor of committing future

20   sexual offenses.  More generally, you may hear it described

21   as, past behavior is a predictor of future behavior.

22   Q.   What about Question 2?

23   A.   Question 2 is that dichotomous variable I referred to

24   earlier on age, and that is, if the person is less than age

25   25 at the time of the evaluation, they are scored a one

1    point.  If they are over the age of 25, they are not scored

2    any points.

3    Q.   What did Jeffrey Shields receive?

4    A.   A zero.

5    Q.   Would you note that on the exhibit.

6    A.   Yes.

7    Q.   And the next question?

8    A.   Would be victim gender.  If the offender has any male

9    victims, he would score a point.  If he had only female

10   victims, he would not score a point.

11   Q.   And what score, if any, did Jeffrey Shields receive?

12   A.   He would receive a one point.  His victims are males.

13   Q.   What, if any, studies exist with respect to the

14   relationship between recidivism risk and male victims?

15   A.   Well, there is research supportive of the conclusion

16   that there is a statistical relationship between having male

17   victims and being at greater risk to reoffend.

18   Q.   And do you generally accept the findings of those

19   studies?

20   A.   Well, I do accept it, although it's not as clear as I

21   just stated it, but, yes.

22   Q.   And Item No. 4?

23   A.   Item No. 4 has to do with the relationship of the

24   perpetrator to the victim such that if the offender has any

25   victims that are nonrelated, they would score a point.  If

1    the victims were only within the context biologically or

2    functionally within the family, they would not score a

3    point.

4    Q.   How did Jeffrey Shields score on that item?

5    A.   He scored a point for having unrelated victims.

6    Q.   What do studies show about having unrelated victims

7    vis-a-vis risk to reoffend?

8    A.   Studies generally show that those who have victims

9    outside of the family are at greater risk when compared to

10   those whose victims are within the family, so-called incest

11   or intrafamilial offenders.

12   Q.   And do you generally agree with those findings?

13   A.   Yes.

14   Q.   What was the total score for Jeffrey Shields?

15   A.   Mr. Shields scored 5 points on the RRASOR.

16   Q.   Is it possible to get a 6?

17   A.   It is.

18   Q.   Are you aware of how frequently that would occur?

19         MR. SWOMLEY:  Objection.

20         THE COURT:  How frequently what?  Could you

21   rephrase that?

22         MR. GRADY:  Yes.

23   Q.   What, if any, is the frequency with which an individual

24   could score a 6?

25         MR. SWOMLEY:  I object.

1          THE COURT:  Overruled.

2    Q.   If you know?

3    A.   I don't know.  I don't know specific statistics on

4    that.

5    Q.   How many individuals in the original model scored a

6    six?

7    A.   In the original model, there were no individuals, I

8    believe, who scored a six.

9    Q.   Out of how many?

10   A.   Out of 2,592, I believe.

11   Q.   How many scored a 5?

12   A.   I have to look.

13          MR. SWOMLEY:  Objection.

14   Q.   52?

15          MR. SWOMLEY:  It's irrelevant, your Honor.

16          THE COURT:  Sustained.  Let's get to his statement

17   about what the significance of the score is.

18          MR. GRADY:  I move to admit Exhibit 26 as scored

19   by Dr. Plaud into evidence.

20          MR. SWOMLEY:  I don't object to --

21          THE COURT:  Well, he just testified about it.  If

22   you want to put the scoring system in, you can do that.  Do

23   you want to put that in?

24          MR. GRADY:  I was just going to move in the score

25   sheet he had.  The attorney, we had previously discussed

1   that --

2           THE COURT:  Any objection?

3           MR. SWOMLEY:  I don't have any objection to him

4   putting it in.

5           THE COURT:  He doesn't object, all right.

6           (Petitioner Exhibit 26 received in evidence.)

7   Q.   What is the significance of a finding of 5?

8           THE COURT:  So what number is that?

9           MR. GRADY:  It was premarked as Exhibit 26.

10  Q.   What do you do with a 5?  What happens?

11  A.   Well, each score on the RRASOR is associated with both

12  five- and ten-year risk percentages for sexual offense

13  recidivism.

14  Q.   I'm going to show you what's been previously marked

15  Exhibit 27.  Do you recognize this?

16          MR. SWOMLEY:  I'm going to object to this.  This

17  doesn't go on the screen until we talk about it, I would

18  submit.  Can we have a side bar, please?

19          THE COURT:  Excuse me?

20          MR. SWOMLEY:  Can we have a side bar?

21          MR. GRADY:  These were previously --

22          THE COURT:  Was this agreed upon?

23          MR. GRADY:  Yes.  It was agreed in a pretrial

24  conference, your Honor.

25

1  SIDE-BAR CONFERENCE:

2          THE COURT:  Excuse me.  First of all, you say it

3  was agreed upon?

4          MR. GRADY:  It's at the time of the pretrial

5  conference.  I can get the memo.

6          THE COURT:  Did you agree on it?

7          MS. KELLEY:  We agreed to a list of things having

8  to do with this RRASOR, et cetera.  And more recently we

9  informed the government we would not agree to these things

10  actually coming into evidence, although they're welcome to

11  use them, because they're inaccurate, according to us, and

12  they need to be revised.  And to have the jury actually

13  take --

14          THE COURT:  What's inaccurate?

15          MR. SWOMLEY:  They are predicated on an age that

16  doesn't apply to Mr. Shields, meaning they're on a different

17  age group.  They're then an extrapolation.  The five- and

18  ten-year time gates are essentially an extrapolation.  Nolw,

19  if you start with a base rate that's high and go --

20          THE COURT:  Excuse me.  This wasn't even subject

21  to the Daubert hearing.  Wasn't the Static-99 what we

22  concentrated on?  You didn't challenge it in the Daubert

23  hearing.

24          MR. SWOMLEY:  Judge, we had a Daubert hearing

25  before all of these shenanigans.

1          THE COURT:  I can't do this on the fly.

2          MS. KELLEY:  To have the jury staring at a chart

3     of statistics that we're going to claim is inaccurate I

4     think is very prejudicial to have them take it back into the

5     jury room with them.  He's welcome to use it in court,

6     obviously.

7          THE COURT:  At this point we'll premark it for

8     identification, and you can put it up on the screen, subject

9     to my hearing the cross.  But that's why I held a Daubert so

10    that we wouldn't be here.  I can't do it at side bar.  I

11    held an extensive Daubert hearing.  This case has now

12    spanned a year since we've seen --

13         MS. KELLY:  Well, we're not objecting --

14         THE COURT:  Excuse me.  It's going up there.  It's

15    premarked, and then if there's a motion to strike --

16         (End of side-bar conference.)

17         THE COURT:  As you can tell this, this at this

18    point is not being marked as an exhibit.  We're going to

19    hear the testimony, and there's some disagreement about its

20    applicability, and you'll hear that on cross.

21    Q.   Doctor, what is this?

22    A.   This is an estimate of recidivism rate table for each

23    of the scale scores on RRASOR.

24    Q.   This comes from the RRASOR itself?

25    A.   It comes from the actual publication of the document

1    with the RRASOR, yes.

2    Q.   Okay.  So when you take a 5, what does that mean in the

3    context of this document?

4    A.   Well, what you see in this document is that in the

5    original sample groupings -- as I said, 2,592 offenders --

6    they are subdivided from zero to 5 on the RRASOR, and you

7    see next to the sample size, so 52 out of that original

8    grouping scored a 5 on the RRASOR.  And that score was

9    associated with a five-year unadjusted 49.8 percent sexual

10   offense recidivism and 73.1 percent ten-year.

11   Q.   The adjusted rate?  You said unadjusted?

12   A.   Unadjusted, five to ten years.

13   Q.   As I look at this, I just look at the top of the second

14   column, it says "unadjusted" and lists a different number,

15   and then the 49 and 73 under "adjusted."  Can you explain

16   that?

17   A.   Yes.  That's not taking the five -- in other words it's

18   taking the five- and ten-year estimates and aggregating

19   them.

20   Q.   Okay.  So which are adjusted and which are unadjusted?

21   A.   No, none of them are adjusted.  I'm using unadjusted in

22   an entirely different context.  What I'm saying is, of that

23   group in the validation samples, 52 out of 2,592, the

24   recidivism statistics five-year, 49.8 percent, ten-year,

25   73.1 percent.

1  Q.   And that's the recidivism rate for that group?

2  A.   On the original samples, yes.

3            THE COURT:  What does the 53.8 percent mean?

4            THE WITNESS:  The way the RRASOR was developed --

5  talk about only five years -- overall, the recidivism rate

6  of sex offenders over five years was 13.2 percent.  That's

7  five years.  To extrapolate to ten years, they took

8  characteristics of the instrument -- this may get

9  complicated -- they took characteristics of the instrument

10 and figured out at each score what the sensitivity, meaning

11 the test's ability at that score to correctly identify

12 recidivists, who recidivists were, and its specificity, its

13 ability to correctly identify nonrecidivists at each score.

14 Taking that information and putting it into a formula that's

15 called Bays' theorem, they were able to take and get

16 ten-year recidivism statistics for each.  If you average --

17 if you go across those from five to ten years, you'll get

18 the entire unadjusted amount.

19            THE COURT:  Feel free to ask questions, remember I

20 gave you that, if you don't understand it, so --

21 Q.   I'll see if I can make that make some more sense.  So

22 the five-year figure, 49.8, that's from the underlying data?

23 A.   That's correct.

24 Q.   Okay.  But the ten-year rate is something they

25 generated by mathematical prediction?

1   A.   Correct.

2   Q.   Okay.  Do you take any issue with the mathematics

3   figures to generate those numbers?

4   A.   That is much too broad a question for me to answer.

5   Yes, it would be "yes," I do.

6   Q.   Do you believe that they applied --

7              THE COURT:  So can I ask, so there's actual data

8   that supports the five-year number?

9              THE WITNESS:  Yes.

10             THE COURT:  But it's a mathematical model for the

11   ten?

12             THE WITNESS:  Yes.

13             THE COURT:  And no one's looked at the data to see

14   if it matched up?

15             THE WITNESS:  Well, yes, Judge.  We're talking

16   about the original studies here.

17             THE COURT:  This is the original study?

18             THE WITNESS:  Yes.  This is the table produced in

19   the original publication of the RRASOR.

20             THE COURT:  And was it in a peer-reviewed --

21             THE WITNESS:  No.  It was published on the

22   Solicitor General's Web site with the instrument in, I

23   believe, 1996.

24   Q.   What, if any, peer-reviewed studies have there been

25   subsequently of the RRASOR's data --

1    THE COURT:  So why don't we take this down.

2    Q.   Okay, go ahead.  Doctor, what, if any, subsequent

3    validations have there been?

4    A.   Well, there have been multiple validations,

5    cross-validation studies of the RRASOR estimates at the

6    different risk scores in different clinical populations.

7    And I would say for the RRASOR, if we're speaking only about

8    the RRASOR, that they have been in a range that are

9    acceptable.  I mean, they comport themselves with the

10   original validation data.

11   Q.   So that --

12       THE COURT:  Have peer-reviewed studies validated

13   it?

14       THE WITNESS:  That's right, Judge, peer-reviewed

15   studies.

16   Q.   Now, how does this play into your risk assessment of

17   Jeffrey Shields?  Is this the end?  Do we simply take these

18   numbers and make a projection?

19   A.   Well, they are associated with numbers.  No, it's not

20   the end.  It's the beginning.  It's a baseline.  That's what

21   I referred to it as.  In other words, it's used to establish

22   a -- to compare the person, in this case, Mr. Shields's

23   score on the instrument, with the group data that generates

24   recidivism statistics over a specified period of time; in

25   this case, five to ten years.  It's a place to start the

1    analysis.

2    Q.   And what did you do next?

3    A.   What I did next was, I looked at, reviewed, and made

4    judgments about whether there are other data that would be

5    suggestive or support a conclusion that the risk estimates

6    that the baseline afforded might be overpredictions or may

7    not be truly suggestive of Mr. Shields's risk to reoffend in

8    a sexual manner at this time.

9    Q.   Let me back you up for a moment because I think I need

10   to ask sort of simple questions.  What does the score of 5

11   tell us about Mr. Shields's risk to reoffend?  Does it place

12   him in a lower end, a higher end?  What does it tell us?

13   A.   Well, I have to be very careful about this.  This data

14   was not based on Mr. Shields.  What this tells me is that if

15   I score Mr. Shields on the RRASOR as I have done, and I

16   compare his score with groups of known recidivists, that

17   that group that he is a part of has, by the data, reoffended

18   in a range that's reflected in that data, which in this

19   case -- I mean, I don't like to use -- it's, relatively

20   speaking, a higher-risk range.

21   Q.   Okay.

22   A.   That's -- but --

23   Q.   As best science can define it?

24        THE COURT:  Well, I strike that, I strike that.  I

25   strike it.  The jury is going to decide how reliable this

1   is.  So you, I think, were cut off there.  So you were about

2   to finish that sentence, I think.

3   A.   And even if you look at the ten-year number, there's

4   issues because it's not a hundred percent recidivism.  I

5   don't know if Mr. Shields is in the group that didn't

6   reoffend, even with a 5, or the group that did.  There's no

7   way for me to know because this was not validated on him.

8   All it's saying is, when you compute a score for Mr. Shields

9   and you compare that with known recidivists, these are the

10  ranges that this group tends to reoffend and over specific

11  periods of time.  That's all it's saying.

12  Q.   And besides the RRASOR, did you consider any other --

13  are there any other empirically proven factors that may

14  increase risk?

15  A.   Yes.

16  Q.   What are they?

17  A.   What I like to do in these cases, once I get the

18  baseline assessment, is to look at a number of factors that

19  have empirical validation in being predictive of future

20  risk.  I look at the person's current age.  I look at their

21  treatment history.  I try to look diagnostically, and if

22  possible even deeper, into whether or not in my judgment

23  they have ongoing sexual deviance.  Those are the big three

24  factors that I would look at as a more dynamic to make

25  adjustments in the sense of whether or not I believe that

1   the actuarial baseline may not be representative of the

2   person's risk.

3   Q.   And what, if any, of those are present here?

4   A.   Well, in this particular case, I talked about the

5   diagnosis I'm prepared to make.  The more recent

6   adjudication of a child pornography finding, I mean, which

7   is, as I said, a valid diagnostic indicator of pedophilia,

8   and in some studies is shown actually also to be related to

9   recidivism, would tend to support the fact that in the

10  recent history, Mr. Shields evidences ongoing sexual

11  deviance.  That's not a positive.

12          He's 46 years old.  He will be 47, I believe, very

13  shortly, within a couple of weeks.  He is starting to be in

14  that age range that statistics show is associated with less

15  sexual offense recidivism, but, in my judgment, he's not

16  quite there yet.  So that's not a plus.

17          And I did note his treatment participation, and he

18  has participated in treatment.  I don't look at it as, did

19  he complete or did he not complete?  For people who start

20  the risk analysis at a higher-risk baseline, participation

21  and compliance with treatment would serve as a protective

22  factor, a risk-reducing factor.  And he has participated in

23  treatment, but given the fact that he relapsed in the sense

24  of the governing offense, which is the child pornography

25  offense, it gives me questions as to how well he did in

1   treatment, whether he does in fact -- or whether he did

2   actually benefit from treatment.  And during the interview,

3   when I was more specifically asking Mr. Shields himself

4   about his participation in treatment, there was a reference

5   that I would characterize as he believes that he was sort of

6   self-motivated.  He read self-help books.  He himself was

7   trying to figure out treatmentwise what to do, which, given

8   the governing offense when he was obviously in what we would

9   call in-cycle, perhaps past the point of a self-intervention

10  that would be appropriate, given that he had the stimuli on

11  his computer, it leads me at least to question how treatment

12  is effective as a risk reducer, as a potential protective

13  factor in this case.

14          So when I look at those factors, there's nothing

15  there really that allows me to opine that Mr. Shields's risk

16  would be reduced, given the knowledge of these other

17  factors.

18  Q.   What, if any, consideration did you give to

19  Mr. Shields's terms of probation?

20  A.   Well, he does have, I believe, a three-year term of

21  probation/supervised release awaiting him.  It may serve as

22  a protective factor.  I understand that he has been violated

23  in the past for probation, so, I mean, it's equivocal.  He

24  has it, I'd rather see that he has it, but I can't make

25  sense of it statistically or empirically one way or the

1  other.

2  Q.   What, if any, significance did you attribute to the

3  length of the probation as regards research on age?   That

4  is -- I'll leave the question.

5  A.   Well, he's going to be forty-seven.   It's a three-year

6  term of probation, so do the math.   That would make him

7  around 50 years old when he would be terminated.   Fifty

8  years old is the beginning of an age cohort that is

9  associated with less reoffending.   So to that extent, the

10  argument could be made that that would be a protective

11  factor.   Again, I've considered it, and -- and that's what

12  it is.   I mean, it is as I described it, but I do not

13  believe it overrides the other factors.

14  Q.   Doctor, just to sum up, what, if any, conclusion have

15  you reached with respect to whether Mr. Shields has engaged

16  in past acts of child molestation?

17  A.   He has indeed.

18  Q.   And what, if any, conclusion have you reached with

19  respect to any diagnosis?

20  A.   I believe he does meet the diagnostic criteria for

21  pedophilia.

22  Q.   And do you state that to a reasonable degree of medical

23  certainty?

24  A.   I'm not a physician, so it would be --

25  Q.   A reasonable degree of certainty in your field?

1   A.   It is my professional judgment and I am so satisfied,

2   yes.

3   Q.   And, Doctor, just, again, what, if any, opinion did you

4   have with respect to Mr. Shields would have serious

5   difficulty refraining from future acts of child molestation?

6   A.   Well, I believe there is a risk there.  I am not

7   prepared and I will not say definitively that he will

8   reoffend, but -- and that's why I used negatives in my

9   initial -- I cannot say that he is not a risk to reoffend,

10  and that's about the best I can say it.

11  Q.   Doctor, do you recall testifying at a deposition in

12  this matter?

13  A.   Yes.

14  Q.   Do you have a copy of that with you up there?

15  A.   I do.

16  Q.   I'd ask you to just look at Page 60 and 61 and start

17  down at Line 16.

18  A.   I'm sorry, Pages 60 to 61?

19  Q.   Yes.

20  A.   All right, thank you.

21  Q.   And the question was, "In fact, given the way the Adam

22  Walsh Act, the federal statute, defines sexually dangerous

23  person, do I understand your testimony to be that in fact,

24  in your professional judgment, Mr. Shields is a sexually

25  dangerous person, as that term is defined under the Adam

1    Walsh Act?  Answer:  Yes."

2              Was that your testimony?

3    A.   Yes.

4    Q.   Are you changing that testimony today?

5    A.   Well, no, I'm not changing my testimony.  I believe

6    that if you want to use that definition, that's fine.  I'm

7    just saying that I -- I do not believe I have the ability to

8    say "yes" in the way that I believe you're asking me now,

9    that -- that he is likely or will reoffend in the future.

10   Q.   You were asked if he met the definition of the Adam

11   Walsh Act in your deposition, and you testified "yes," is

12   that correct?

13   A.   Yes.

14   Q.   Is that not your testimony today?

15             THE COURT:  No.  Ask it in a different way.

16             MR. GRADY:  Very well.

17   Q.   Given the way the Adam Walsh Act, the statute defines

18   sexually dangerous person, is it your testimony today that

19   Mr. Shields is a sexually dangerous person as that term is

20   defined under the Adam Walsh Act?

21   A.   It's a very uneasy "yes."

22             MR. GRADY:  Thank you, Doctor.  Nothing further.

23   CROSS-EXAMINATION BY MR. SWOMLEY:

24   Q.   Doctor, I believe you've said this is a difficult case

25   and a close call as well in your previous testimony; is that

Page 132

1    correct?

2    A.   Yes.

3    Q.   You and I have met on numerous prior occasions, right?

4    A.   We have.

5            MR. SWOMLEY:  I need more room to spread out.

6    Unless I need to put stuff on the screen, can I be

7    elsewhere?  I've got documents back there.

8            THE COURT:  Move.

9            MR. SWOMLEY:  Thank you, Judge.

10           THE COURT:  Roam.

11   Q.   Are you mad at me for some of the things I've said

12   about you, Doctor?

13   A.    I've heard worse.

14   Q.   You don't predominantly do therapy as your current

15   incarnation has you, right?

16   A.   Correct.

17   Q.   And, really, you testify in multiple states, and to

18   have much of a clinical practice, where you are out of state

19   on the road in different courts all the time, would be doing

20   a disservice to a clinical population, wouldn't it?

21   A.   Yes.

22   Q.   And how long has it been that your number of actual

23   therapies, individuals that you see, has dwindled to

24   something near three?

25   A.   Well, it's been reduced.  I would say for the last five

eed06d86-2ad0-4cf7-9303-0631408369df

1   years it's been a significantly less amount of clients for

2   therapy.

3   Q.   Okay.  And if you were to look at your trial schedule,

4   just go back two weeks, you've been to other states in the

5   last two weeks?

6   A.   I have.

7   Q.   How many different stops have you made to testify in

8   other proceedings, in other cases in the last two weeks,

9   just a short thumbnail sketch?

10  A.   Well, I spent about a week in the state of Washington a

11  couple weeks ago, and then I returned and I was to go to New

12  York, but the case was continued.  And then I've testified

13  in Massachusetts, I believe twice since that time.

14  Q.   Okay, so at least -- am I counting correctly -- four

15  cases you've done in the last four weeks?

16  A.   Correct.

17  Q.   And over the last five years, the thousand plus cases,

18  is that what we're talking about you've done in that period

19  of time?

20  A.   No, I wouldn't say in the last five years.  I'm talking

21  in total the last twenty years.

22  Q.   Oh, okay, all right.  Now, Doctor, you have a

23  statistical background, right?

24  A.   Yes.

25  Q.   You have training in probabilities, right?

Page 134

1    A.    I do.

2    Q.    And you actually do a fair amount of reading in this

3    field, right?

4    A.    Yes.

5    Q.    And in fact you would consider yourself, would you not,

6    pretty well versed in the literature on sex offender

7    recidivism, right?

8    A.    Yes, I would.

9    Q.    You also are well versed in where the limits are in

10   this field, right?

11   A.    That's correct.

12   Q.    And, for example, just talking about your definition of

13   what is a moderate predictor, your research instrument that

14   you've made use of, the RRASOR, you've characterized as a

15   moderate predictor, right?

16   A.    Right.

17   Q.    Now, that was developed in '96, right, a good twelve

18   years ago?

19   A.    It was first published then, yes.

20   Q.    Dr. Hanson is really considered by your field to be

21   among the two or three top researchers in that field, right?

22   A.    I would agree.

23   Q.    And he is predominantly a researcher, right?

24   A.    He is.

25   Q.    He is not a therapist?

1    A.    No.

2    Q.    He is not an expert witness in the sense that he

3    doesn't do risk evaluations himself?

4    A.    Correct.

5    Q.    Right?

6    A.    Correct.

7    Q.    So he doesn't come in here and do what you're doing

8    right now, right?

9    A.    Correct.

10   Q.    And subsequent to 1996, he developed what he considers

11   to be a slightly better tool than the RRASOR, and that would

12   be the Static-99, right?

13   A.    Yes.

14   Q.    And, really, the RRASOR is just the Static-99 pared

15   down, or the Static-99 is conversely the RRASOR beefed up,

16   right, with more variables?

17   A.    Well, I would say it has more variables, but I would

18   disagree with the "beefed up" part of it.

19   Q.    Okay.  And would you agree that according to

20   Dr. Hanson, at this point in time the Static-99 has had more

21   use than the RRASOR?

22   A.    I would agree that it is the most utilized actuarial

23   tool.

24   Q.    And, I mean, Dr. Hanson's own research would put his

25   own tools as the number one and the number two most used,

1    for example, correct?

2    A.   Well, I don't have any hard data to back the number one

3    and number two.

4    Q.   Well, what if Hanson says it in one of his articles,

5    would that be helpful?

6    A.   (No response.)

7    Q.   Regardless, they're two of the more used, right?

8    A.   Right.

9    Q.   And when Hanson tries to tell people and you through

10   reading his research try to tell people how much credit to

11   give such instruments, you put the phrase "moderate

12   predictor," right?

13   A.   That's the phrase I use, that's right.

14   Q.   Okay.  And in terms of analysis of what a predictor is

15   or isn't, much of the data that was derived by Hanson to put

16   into these instruments came from what he called a

17   meta-analysis, right?

18   A.   Correct.

19   Q.   And a meta-analysis is itself not a study, is it?

20   A.   It isn't.

21   Q.   It is essentially an analysis of other people's

22   studies?

23   A.   Correct.

24   Q.   And Dr. Hanson back in '96, '97, and '98 was working on

25   trying to figure out how to move risk prediction from the

1   dark ages into the modern ages, right?

2   A.   That's a colorful way to put it, but I wouldn't

3   disagree with that.

4   Q.   Okay.  And when we were in the dark ages, we were

5   basically relying on people that were clinicians and would

6   go to school and learn about all the weird things that

7   people can be diagnosed with.  And in their training, one of

8   the things, one of the early researchers in the limits of

9   risk prediction -- and that would be Mossman and Monahan --

10  are you familiar with those individuals?

11  A.   I am.

12  Q.   They did a fair amount of research on the people that

13  did predictions, right?

14  A.   Yes.

15  Q.   And they talked about the universe of possible

16  outcomes.  Are you familiar with that?

17  A.   Yes.

18  Q.   And in that universe of possible outcomes, you have

19  basically a pie, if you want to do it in a pie, or you could

20  do it in a square, but four squares or four slices of a pie,

21  right, like that?

22  A.   Yes.

23  Q.   You draw a circle with a cross in the middle of it.

24  And of the universe of possible outcomes in risk prediction,

25  you have the risk predictors saying, "I see this person, I

1    evaluate this person, this person is not dangerous," and

2    they're right.  That would be a true negative, right?

3    A.   Correct.

4    Q.   And that would comprise --

5              THE COURT:  No, put it on the document camera.

6              MR. SWOMLEY:  Okay.  I'm in the dark ages myself,

7    Judge.  Ah, it works.

8    Q.   True negative is one of those boxes, right?  And then

9    on top --

10             THE COURT:  Just so the jury can follow this, so

11   what's the true negative again?

12             MR. SWOMLEY:  The evaluator says --

13             THE COURT:  Why don't you say it.  Explain it to

14   the jury.

15             THE WITNESS:  Okay.  Well, you have two dimensions

16   because you have a circle or whatever, but look at it, on

17   one side you have a prediction.  In other words, someone

18   like me is saying, yes, a person will reoffend; no, they

19   will not reoffend, okay?  That's one side of the equation.

20             On the other side you have the true outcome, what

21   happens:  The person does offend in real life or the person

22   doesn't reoffend in real life.  So you have what the

23   evaluator is saying, and you have what really happens in the

24   world.

25             So if I as the evaluator say, "Well, based on

1    whatever, I say they're not going to reoffend," and then we

2    study them over time and we find out truly that they do not

3    reoffend, I will have made a correct prediction.  That

4    person would therefore be called a "true negative."  I said

5    they won't; they didn't.  True negative.

6    Q.   Okay.  The next category is, you say they won't, and

7    they do?

8    A.   Right.

9    Q.   And what is that called?

10   A.   Well, if I say they're not going to reoffend and they

11   do actually reoffend, that's called a false negative.  I

12   have made an error in judgment.

13   Q.   Okay.  Now, then there is the category where you say

14   they are going to reoffend, right?

15   A.   Yes.

16   Q.   And that would be either a true positive or a false

17   positive, right?

18   A.   If I say they will reoffend and they do reoffend, that

19   again is true.  That's a true positive.  If I say they will

20   reoffend and then they don't reoffend, that's another source

21   of error.  That's called a false positive.

22   Q.   Now, therapists say that in the research of Douglas

23   Mossman -- Douglas and Dennis -- I'm not sure if I'm

24   right -- Mossman and Monahan, the study of people making

25   those predictions found that the single largest category of

1    the universe of possible outcomes was the false positive,

2    right?

3    A.   Right, correct.

4    Q.   And early research didn't even have necessarily to do

5    with sex offender risk prediction.  It had to do with

6    clinicians engaging in predictive behavior; that is,

7    figuring out what somebody might do in the future?

8    A.   Right.

9    Q.   And would you also agree that as the risk predictions

10   went farther out into the future -- that is, went from

11   short-term predictions into long-term predictions -- the

12   predictive accuracy also decreased?

13   A.   Correct.

14   Q.   And is it fair to say that, according to your

15   understanding of what is a traditional role of a

16   psychologist or a psychiatrist, would you agree that

17   predicting future behavior on a short term fits squarely

18   within the job description of most psychologists and

19   psychiatrists?

20   A.   Well --

21   Q.   That is -- I'll pose it another way.  Let's say you are

22   a court psychologist and you're sent down to see if somebody

23   in the lockup is dangerous for some sort of danger to self

24   or others, immediate short-term kind of situation.  You go

25   down there, and you're standing next to the cell, and the

eed06d86-2ad0-4cf7-9303-0631408369df

1   guy is, like, trying to grab at your pen so that he can stab

2   you or himself and frothing at the mouth a little bit.  Fair

3   to say, it's pretty for a psychologist or a psychiatrist to

4   say, "Hhm, that guy is on the short term florid.  He needs

5   to be locked up for a few days"?  That kind of stuff happens

6   all the time, right?

7   A.   Short-term predictions, yes.

8   Q.   Okay.  When the profession is called upon to make

9   long-term predictions, fair to say there is not, even today,

10  consensus in the scientific community that that is possible?

11  A.   I would agree with that.

12  Q.   And when Mossman and Monahan in their early research

13  were trying to figure out why this false positive is the

14  most common outcome in risk prediction, one of the reasons

15  was because psychologists are trained to see pathology,

16  right?

17  A.   Correct.

18  Q.   And when they get out of psych school, they want to be

19  able to think they actually can look at people and figure

20  them out, right?

21  A.   Well, there are different theories, but that's

22  certainly one of them.

23  Q.   Well, would you agree that sometimes a little knowledge

24  is a dangerous thing?

25  A.   Yes.

1  Q.   And when you have psychologists trained to see

2  something, they want their training to have meant something,

3  and they use it to inform their decision-making?  Whether

4  it's consistent issues or subconscious, on some level, the

5  suggestion by these researchers is that it does intrude into

6  the decision-making process, right?

7  A.   It can, yes.

8          THE COURT:  Is this a good place to break?

9          MR. SWOMLEY:  Sure.

10         THE COURT:  All right.  See you tomorrow morning.

11 We'll go to 1:00 o'clock.  I know one person had trouble

12 getting in today, so make sure you leave in plenty of time.

13         THE CLERK:  All rise for the jury.

14         (Jury excused.)

15         THE COURT:  Thank you, Doctor.  I'll see you

16 tomorrow.

17         (Witness excused.)

18         THE COURT:  So why don't we come up just two

19 seconds on the --

20 SIDE-BAR CONFERENCE:

21         MS. KELLEY:  Do we know about the 10th?  I have

22 witnesses I need to fly in.

23         THE COURT:  Just ask him.  Hopefully he asked.

24         MR. SWOMLEY:  I really think I probably will have

25 the full day, and I don't want to tell you I'll be done, but

1   I'll try.  That's the best I can do.

2           THE COURT:  Here's the issue:  So if we finished

3   early, which sounds unlikely, I take it Tomich couldn't be

4   here, right?

5           MR. GRADY:  For Friday?  No.  He's set for Monday.

6           THE COURT:  So I don't think it's a serious issue,

7   but I think you could reasonably give him the prediction of

8   Monday.

9           MR. GRADY:  Yes.

10          THE COURT:  You still want him, right?

11          MR. GRADY:  Yes.  I think that at least I can

12  prepare my direct with that witness.  That was the first

13  time in a long time I haven't been able to contact a witness

14  ahead.  So I apologize if it was stunted or seemed uneasy

15  because I haven't been able to prepare the direct with the

16  witness.

17          THE COURT:  All right, so you'll try and -- just

18  so that we can have some predictability with respect to the

19  people coming in from out of time.  So theoretically anyway,

20  it will be Tomich on Monday and Tuesday, and Wednesday, if

21  we can, we can get your fact witnesses out of the way, and

22  then you finish up with Rypma, right?  Is that how you're

23  thinking?

24          MR. SWOMLEY:  Yes.

25          MS. KELLEY:  On Friday and Monday, yes.  But the

1   Wednesday I would say is really critical.  Otherwise --

2           THE COURT:  See if we can, you know -- if not,

3   first thing tomorrow morning.  I hope this worked well for

4   you.  I'll come in at quarter to 9:00, and you'll share

5   whatever exhibits that you're going to use with him, and if

6   there are any problems, we'll address them at quarter of

7   9:00.

8           MS. KELLEY:  We had filed these motions for two

9   witnesses' travel to be paid by the court, and we have to

10  arrange through the marshals for them to be flown in.

11          THE COURT:  I think I  approved --

12          MS. KELLEY:  You did, but I'm just saying the

13  witnesses would like some lead time on when they're

14  traveling, but the marshals also need time to acquire the

15  plane tickets and so on, so that's --

16          THE COURT:  I can't do anything.  Ask Robert.

17          MS. KELLEY:  I'm going to do it for Wednesday, and

18  if it doesn't work out, it doesn't work out.

19          THE COURT:  I'll try.  It's really up to the

20  jurors' schedule.  We'll readjust ours.

21          MS. KELLEY:  It would require us to shorten them

22  up to get through them all on Wednesday, but I think we'll

23  do it, if we can.

24          THE COURT:  Yes, yes.  One of them is very

25  important to you, right, the Bureau of Prisons lady?

Page 145

1          MS. KELLEY:  They're all very important.  There's

2     one you might not think is important, but I do.

3          THE COURT:  Who?

4          MS. KELLEY:  Yes, the one from North Carolina is

5     very important.

6          THE COURT:  Just make sure you have enough time

7     with her.  All right.

8          MR. GRADY:  Thank you.

9          (End of side-bar conference.)

10          (Adjourned, 1:05 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 146

1              C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7            I, Lee A. Marzilli, Official Court Reporter, do

8  hereby certify that the foregoing transcript, Pages 1

9  through 145 inclusive, was recorded by me stenographically

10 at the time and place aforesaid in Civil Action No.

11 07-12056-PBS, United States of America V. Jeffrey Shields,

12 and thereafter by me reduced to typewriting and is a true

13 and accurate record of the proceedings.

14           In witness whereof I have hereunto set my hand

15 this 30th day of September, 2008.

16

17

18

19

20
                /s/ Lee A. Marzilli
21             _____
               LEE A. MARZILLI, RPR, CRR
22             OFFICIAL COURT REPORTER

23

24

25