IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,    )
                             )
              Petitioner     )
                             )
        -VS-                 ) CA No. 07-12056-PBS
                             ) Pages 1 - 150
JEFFREY SHIELDS,             )
                             )
              Respondent     )




JURY TRIAL - DAY THREE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
September 5, 2008, 9:00 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2        MARK J. GRADY, ESQ. and EVE A. PIEMONTE-STACEY, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the Petitioner.
4
         PAGE KELLEY, ESQ, Federal Defenders,
5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
     for the Respondent.
6
         JOHN G. SWOMLEY, ESQ. Swomley & Associates,
7    227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
     for the Respondent.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

   WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS
3

4    Joseph J. Plaud                 17        138

5

     EXHIBITS                 RECEIVED IN EVIDENCE
6

7    Petitioner

8
     32                              105
9

10

11   Respondent

12
     22-A and 22-B                   120
13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.

3           MS. STACEY:  Good morning, your Honor.

4          THE COURT:  I understand Ms. Kelley is just

5     outside and will be in in a second.  We are still down two

6     jurors, but I thought we would use this time to address what

7     you want to do with the juror question.  Have you both seen

8     them?

9           MR. GRADY:  Yes.

10         THE COURT:  Some of this will come in later.  The

11    treatment piece they'll just have to wait and hear.

12          With respect to the 9-year-old boy, it did

13    highlight what I was trying to do at side bar.  It's

14    actually, not to tell either of you how to try a case, it's

15    hard unless you've kept a time line.  You don't necessarily

16    remember what was conviction and what was an uncharged

17    conduct that he admitted to.  And so I'm thinking, you

18    stipulated to this yesterday.

19          MR. SWOMLEY:  I don't have a problem asking the

20    questions myself, incorporating it into my cross, if that's

21    agreeable.  But I guess the only place I'm going, I may not

22    otherwise go into this subject matter area, and I don't want

23    that to be a door opener for another ten minutes or twenty

24    minutes on redirect about that.  So, I mean, I'm probably

25    not going to go there at all.

1          THE COURT:  Well, I don't want to prejudice your

2     case.  On the other hand, I've got a jury question, so

3     I would allow him to ask it -- let me put it this way:  I'll

4     allow him to ask on redirect to clean it up.  I could just

5     address it now.

6          MR. SWOMLEY:  That would be fine.

7          THE COURT:  But let me make sure --

8          MR. GRADY:  The other thing, your Honor --

9          THE COURT:  Hold on.  Let me make sure I

10    understand it because there are a lot of -- there are three

11    convictions in 1989, and they all stem from Maine.  As I

12    understand it, this is not one of them.

13         MS. KELLEY:  That's correct.

14         THE COURT:  This is uncharged conduct in Florida.

15         MR. SWOMLEY:  No.  It's charged conduct.  It's no

16    conviction.

17         THE COURT:  Charged conduct with no conviction,

18    but he admitted to it.

19         MR. GRADY:  To Dr. Rypma.

20         MR. SWOMLEY:  Well, he just admitted to it,

21    period.

22         THE COURT:  He has admitted it's true.  And what

23    year was it in, 1989 as well, right, April of 1989?

24         MR. SWOMLEY:  Right.

25         THE COURT:  Okay.  In Florida, right?

1          MR. GRADY:  Yes.  The 9-year-old boy was in

2     Port Saint Joe, Florida.

3          THE COURT:  Okay.

4          MR. GRADY:  And if it matters, there will be, when

5     Dr. Tomich testifies, additional evidence of an obscene

6     phone calls charge.

7          THE COURT:  I'm not going to touch that right now.

8          So, okay, we're still down two jurors, but I

9     thought I would come out anyway and --

10         MR. GRADY:  Your Honor, since you are here, there

11    are a few issues I would like to raise or flag.

12         THE COURT:  Let me just start with, any

13    evidentiary issues, I mean, in terms of documents?

14         MR. GRADY:  Yes.  That would be the first on the

15    list.

16         THE COURT:  Yes.

17         MR. GRADY:  The government would like to introduce

18    the recidivism rates for the RRASOR because we had agreed

19    exhibits until the day before trial.  We have had a Daubert

20    hearing.

21         THE COURT:  Let me just say, refresh my

22    recollection, the Daubert hearing focused on the Static-99,

23    is that right?

24         MR. GRADY:  That is only generally right.  There

25    was an across-the-board challenge to the use of actuarials

1    at all.

2              THE COURT:  That may have been.  I focused very

3    much on two issues:  Static-99 and whether a freestanding

4    hebephilia diagnosis was recognized as opposed to paraphilia

5    NOS, right?

6              MR. GRADY:  Yes.

7              THE COURT:  Those are my two areas.  I know the

8    RRASOR was mentioned, but what I heard testimony about -- I

9    just want to make sure I'm right.  I don't think I wrote

10   about it, did I, about the RRASOR?  No one really challenged

11   it.  Yesterday was my nightmare, which is, suddenly it came

12   up at side bar, a little mini Daubert challenge that I can't

13   do at side bar.

14             MR. GRADY:  And, your Honor, with respect to the

15   government's case, the government can't prepare a Daubert

16   evidentiary hearing where --

17             THE COURT:  I understand that, but I don't know

18   anything about it.  My problem is, I don't have a background

19   in it, so it's hard for me to rule.  So with that

20   knowledge -- I did about the Static-99, you know, that it

21   was peer reviewed and accepted by all these courts and

22   ya-da-da; but I don't know about the RRASOR, and that's why

23   I asked.  He said it was validated through peer-reviewed

24   literature, which at least from a gatekeeper point of view I

25   thought was enough for him to use it.  And he supported it,

1  and he's the neutral, you know, one everyone agreed to.  So

2  what do you want to put in?  He did put in --

3          MR. GRADY:  The score.

4          THE COURT:  -- the score and the percentages, so

5  what else do you want?

6          MR. GRADY:  The government would ask to put in the

7  actual percentages established by the RRASOR.

8          THE COURT:  It was up on the screen, right?

9          MR. GRADY:  It was.

10          THE COURT:  Okay.

11          MR. SWOMLEY:  And you directed the government to

12  take it down when you learned that the ten-year time gate

13  involved a lot of acrobatics to get to, as opposed to

14  something that was a raw score.

15          THE COURT:  Excuse me.  I think your timing was

16  wrong.  I had him take it down as soon as you made the

17  challenge because I didn't know anything about it.  We went

18  up to side bar, and I said I was not prepared to do a

19  Daubert hearing at side bar.  Subsequent to that, we learned

20  what you just described, which is one was validated

21  mathematically, the five-year.  And then I wasn't sure as we

22  stand here right now whether the ten-year prediction based

23  on a mathematical model has actually been validated by

24  statistics.  So I don't know the answer to that.  If you lay

25  that foundation, I am happy to consider it, but I don't know

1    that.  And maybe the doctor said it and I don't remember it,

2    but it was not a focus.

3          MR. SWOMLEY:  I don't object to it being used.  I

4    object to it being admitted as if it is agreed upon.  And I

5    do want to, I'm sorry, just briefly, the chronology of

6    acceptance of any of this and the acceptance of exhibits was

7    predating this new bunch of evidence that the government

8    suddenly gave over.  So all of that pretrial and all of that

9    agreement was when there was really no reason to be

10   vociferously challenging the methodology.  Now there is, and

11   after that -- and so what the government is relying upon is

12   agreements made before they went and did this document.

13         THE COURT:  Excuse me.  Maybe, but in a way, we

14   used -- in a way, you used the word "sandbagged" yesterday.

15   It's hard for either the government or me to do a reasoned

16   analysis when you don't find out about a challenge till the

17   morning of trial.  So it took me three days and a lot of

18   reading to get through Static-99.  So I'm not saying you're

19   right or you're wrong.  It's just, you know this stuff;

20   you've been litigating it in state court.  I actually didn't

21   know there was going to be a challenge to the RRASOR because

22   you've all been so aggressive in pursuing everything that I

23   just didn't know.  So you may be right or you may be wrong,

24   but let me ask you this:  It strikes me that they allowed in

25   the -- excuse me.  He said you can either lay more of a

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1   foundation for it, we could do a little mini voir dire at

2   some point, but I'm in a fix.

3          MR. GRADY:  First of all, your Honor, I'm happy to

4   do a mini voir dire right now before the jury comes back.

5          THE COURT:  Wait.  Is the jury here?

6          THE CLERK:  Yes.

7          THE COURT:  No.  We're not taking the jury's time.

8          MR. GRADY:  Okay.  Before we move on, your Honor,

9   what Attorney Swomley just told you is a lie.  The pretrial

10  conference memo was in May of 2008.  This agreement

11  postdates any claimed late disclosure of anything by more

12  than six months.  Attorney Swomley is misrepresenting facts

13  to this Court.

14         THE COURT:  I'm going to ask the doctors whether

15  it's been validated through peer-reviewed studies, that

16  mathematical model.  Do you know what the answer --

17         MR. GRADY:  I just suggested to --

18         THE COURT:  Excuse me.  Do you know what the

19  answer is?

20         MR. GRADY:  Yes.  It has been, and it has been

21  validated.

22         THE COURT:  Well, then this should be easy.

23         MS. KELLEY:  Well, can I just say one thing, which

24  is, aside from all the other arguments, I think the

25  fundamental point here is, for the jury to take something

1  like that that we contend is only part of the truth about

2  those numbers in the study, for them to take that partial

3  thing back into the jury room and have it with them and pore

4  over it and study it is really unnecessarily validating it

5  for the jury.  We have no problem with the doctor testifying

6  about it, but to actually put that document into evidence

7  all by itself and let the jury study it we think is very

8  prejudicial.

9             THE COURT:  I understand.  It's just a huge issue.

10  This case has been pending a year.  I've held the Daubert

11  hearing.  I've done everything you've wanted, the

12  constitutional hearing, the Daubert hearing.  I've done the

13  deliberative part.  I continued this hearing because of

14  scheduling conflicts.  It shouldn't be raised this way,

15  that's all.

16             MR. SWOMLEY:  It's already been admitted from my

17  perspective.  The government has already gotten what they

18  wanted, which is the testimony of --

19             THE COURT:  The jury is here.  I'll worry about it

20  later.

21             MR. SWOMLEY:  And to the extent that I misspoke, I

22  withdraw my misrepresentations.  I will say, I have not been

23  fundamentally involved in every aspect of this, and I am the

24  one with more knowledge about when you do stuff and when you

25  don't do stuff.  And I apologize if I did not flag for my

Page 12

1    cocounsel.  And to the extent that the record needs to be

2    clear, at this point I do think there is a problem with

3    admitting this stuff, and I'll register the objection.  You

4    do what you've got to do.

5              THE COURT:  I'll think about it.  I'll think about

6    it.  Let's bring this jury in.

7              MR. GRADY:  Your Honor, there were two evidentiary

8    issues with respect to --

9              THE COURT:  Well, they're here.  Is there anything

10   that's going to come up this second?

11             MR. GRADY:  It can come up in the course of cross,

12   if the Court wants to bring out the jury.  It was just with

13   respect to two lines of questioning, one based on Barefoot

14   V. Estelle, which is a 20-year-old -- counsel in the Daubert

15   hearing had attempted to cross Dr. Tomich based upon a

16   20-year-old amicus brief filed by the American Psychiatric

17   Association in Barefoot V. Estelle that predates by a good

18   fifteen years the development of actuarials in the field of

19   sex offender research.  It also, I believe, is a death

20   penalty case rather than a sex offender case.  There is a

21   second case from 2005 --

22             THE COURT:  Wait.  You want me to rule on this

23   now?

24             MR. GRADY:  I wanted to flag the issue, your

25   Honor.

1    THE COURT:  All right, you've flagged it.  What's

2    the second one?

3    MR. GRADY:  There was a second amicus brief in

4    2005 in a case U.S. V. Fields, which again has been provided

5    to the government as one upon which counsel will rely.  It

6    involved the American Psychological Association, and it

7    involves a death penalty case involving a prediction of

8    dangerousness in prison.  And the American Psychological

9    Association filed an amicus brief saying that psychologists

10   could not make reasoned predictions about future violence in

11   prisons because there hadn't been actuarial studies.

12   THE COURT:  Yes, but can't he answer it and say,

13   "We now have actuarial tables"?

14   MR. GRADY:  Well, I'm concerned that

15   Attorney Swomley will be using this for the purpose of

16   saying to the jury that what they said in this case applies

17   across the board.

18   THE COURT:  All right, thank you.  All right, so

19   let's bring the jury in.  By the way, you got the message

20   that we can --

21   MR. SWOMLEY:  If that's the testimony, that's the

22   testimony, but --

23   THE COURT:  Excuse me.  All I can say is, we will

24   organize our court schedule, and the jury can sit next

25   Wednesday afternoon.  The key is, because on September 11 is

1  the whole law clerk hiring feeding frenzy, that day is

2  pretty much out of bounds.  And so, ideally speaking, we'll

3  finish off anyone from out of town, but I've got to see

4  these people at 4:00 o'clock because that's really where

5  I'm -- I think that should give you enough leeway.  And I'm

6  happy to break into whoever's testimony it is and take a few

7  of these little fact witnesses, if we can do it.

8          MS. KELLEY:  And I'm getting people in, although I

9  do need the orders I filed signed for the marshals for them

10 to bring people in.

11         THE COURT:  I thought I signed a bunch.  You

12 haven't seen it?

13         MS. KELLEY:  I don't have them.  They were filed

14 under seal.

15         THE COURT:  You know, we don't need to file these

16 under seal.  A, they're not --

17         MS. KELLEY:  Well, somehow the rule says so,

18 but -- so that's why I did it that way.

19         THE COURT:  I think that's usually criminal, so I

20 don't think you need to, but, in any event, I will sign

21 them.  Or I did, I thought, but I will if I haven't.

22         MS. KELLEY:  And I guess the marshals need them

23 today in order to make arrangements for plane tickets and so

24 on.  There's an order especially for Dawn Graney and an

25 order just for Raenae Moore.  They were filed together with

Page 15

1  the motion for witness expenses for both --

2       THE COURT:  Maybe you can go up and have Nancy or

3  Christine try and find them.

4       THE LAW CLERK:  I think they got filed on Friday.

5       MS. KELLEY:  I'm hoping, and I'm working with the

6  government on this, that we can get through all those

7  witnesses on Wednesday and just do it quickly.  If we have

8  to, I'll schedule somebody first thing Friday before we put

9  Dr. Rypma on, so --

10       THE CLERK:  All rise for the jury.

11       (Jury enters the courtroom.)

12       THE COURT:  Good morning.

13       THE JURY:  Good morning.

14       THE COURT:  Did anyone see anything in the press

15  about this case -- how could you with all the political

16  stuff going on, right? -- or speak about this case?  All

17  right, I find the jury has complied.

18       I did receive a question from one juror.  It was

19  done in a completely correct manner.  One question was

20  asking about the incident -- I'll read it, so you'll know

21  what the question was, and then I will answer it.  I talked

22  to the attorneys about it a little before you came in.

23       "I would appreciate some clarification with the

24  incident of the 9-year-old boy.  Did Mr. Shields confess to

25  the acts by his own admission and was not charged, or was he

1  charged and convicted?"

2           It's actually something a little in between that.

3  This is an incident that took place in April of 1989, and

4  Mr. Shields was charged with the incident.  He was never

5  convicted.  This happened in Florida in Fort Saint Joe.  It

6  involved a 9-year-old boy, but he has subsequently admitted

7  that he did it.  So that is the clarification of the

8  Question No. 1.

9           Question 2, I'm not going to -- it goes on and on

10 about, appropriately, about issues having to do with

11 treatment, and I'm not going to read the whole thing to you,

12 but the bottom line is, you haven't heard the whole case

13 yet, and there will be evidence on some of the answers to

14 this, like what are the possible methods of treatment, and

15 how does that affect the RRASOR, and those kinds of things?

16 So if this question isn't answered in the course of the next

17 few days, somebody should rewrite it to me.  Okay?

18           MR. SWOMLEY:  May I inquire?

19           THE COURT:  Yes.  Come on up, sir.  You're still

20 under oath.

21                JOSEPH J. PLAUD

22 having been previously duly sworn, was examined and

23 testified further as follows:

24 CONTINUED CROSS-EXAMINATION BY MR. SWOMLEY:

25 Q.   Good morning, Mr. Plaud.

1    A.    Good morning.

2    Q.    Are you a member of the American Psychological

3    Association?

4    A.    Yes.

5    Q.    How many members, if you know, are there of that

6    organization?

7    A.    Well, I believe there are a couple hundred thousand

8    members.

9    Q.    Okay.  And there's a sister organization, if you were,

10   of psychiatrists; is that right?

11   A.    True.

12   Q.    And is that also an APA?

13   A.    Yes.  It's the American Psychiatric Association.

14   Q.    And do you have an understanding of the respective

15   positions of those membership organizations with respect to

16   their members engaging in risk prediction in a courtroom

17   setting?

18   A.    Yes.  I'm familiar with different policy or position

19   papers that have been put out, different arguments, which

20   actually are ongoing in that domain, yes.

21   Q.    Okay.  And is it fair to say that since the early '70s,

22   the American psychological and American Psychiatric

23   Association has been studying the issue of psychologists and

24   psychiatrists claiming expertise and the ability to predict

25   long-term events off into the future?

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1    A.    Well, yes.  Actually, some of that work predates the

2    1970s, but, yes.

3    Q.    Well we talked about that yesterday, if I'm not

4    mistaken, and some of the research of Mossman and Monahan,

5    right, and Coccoza and Steadman as well?

6    A.    Sure.

7    Q.    Now, that research was made use of in the '70s by the

8    American Psychological and American Psychiatric Association,

9    right?

10   A.    Yes.

11   Q.    And they convened a task force, the American

12   Psychiatric Association, in any event, right?

13   A.    Correct.

14   Q.    And the task force was set with the task of studying in

15   that case in the '70s death penalty risk prediction, right?

16   A.    Correct.

17   Q.    And the question really that was posed for its

18   membership in this task force was whether or not doctors in

19   death penalty cases could go in and say with any expertise

20   that the person is likely to commit a future act of violence

21   at some point in time off into the future, right?

22   A.    Right.

23              MR. GRADY:  Your Honor, I'm going to object.

24              THE COURT:  Overruled.  This is not about sex

25   offenders, right?

1        MR. SWOMLEY:  No.  This is the background.

2        THE COURT:  This is about violent people, right?

3   So why don't you give him the -- so they understand.

4        MR. SWOMLEY:  Okay.

5   Q.   You understand that the terms "violence," as it is used

6   by the psychological and the legal community, are not

7   exactly the same, right?

8   A.   True.

9   Q.   And you know that even in the sexually -- even in

10  commitment considerations involving sex offenders, the

11  definitions of what the sex offender has done in the past is

12  often classified as violent, right?

13  A.   It is.

14  Q.   So violence against a child doesn't mean you're

15  punching the child necessarily, but it means you're sexually

16  violating that child, which is a violent act?

17  A.   Right.

18  Q.   And that's what legislatures around the country have

19  termed that kind of conduct, right?

20       MR. GRADY:  Objection.

21       THE COURT:  Overruled.

22  A.   Yes.

23  Q.   Now, back in the '70s, the American Psychiatric

24  Association came out with its position essentially on

25  doctors opining in court about long-term predictions as if

1   they had some expertise, right?

2          MR. GRADY:  Objection.  I believe the testimony at

3   this point has been limited to violence.  The question was

4   not.

5          THE COURT:  Yes, ask that differently.

6          MR. SWOMLEY:  Okay.

7          THE COURT:  You need to speak up just because it's

8   a huge courtroom.

9          MR. GRADY:  I apologize, your Honor.

10          THE COURT:  I'm straining here, all right.

11   Q.   Just to be clear, the task force that was convened in

12   the '70s was convened on the subject of predicting future

13   violence for people that had been convicted of murder and

14   were being proposed for a death sentence?

15   A.   Correct.

16   Q.   And the conclusion in that circumstance was that

17   psychiatric expertise and the prediction of quote/unquote

18   "dangerousness" is not established, right?

19   A.   That's the conclusion.

20   Q.   And that "The ability of psychiatrists or any other

21   professionals to reliably predict future violence is

22   unproved," right?

23          MR. GRADY:  Again I object without clarifying that

24   that was in the 1970s, your Honor.

25   Q.   All of these questions concern the task force convened

1   by the American Psychiatric Association in the 1970s?

2   A.   Yes.

3   Q.   Okay.  Now, you're aware that they have opined in this

4   decade about the ability to predict violence -- again,

5   violence -- in the future?

6   A.   Yes.

7   Q.   Has the position from the '70s to this decade changed?

8   A.   Overall, I would say it is still -- well, it's an open

9   question, but I would say many of the same tenets that

10  applied in the '70s in general were reaffirmed more

11  recently, and I think I spoke to some of the reasons for

12  that earlier in my direct testimony about predicting the

13  future.

14  Q.   And is the position of the American Psychiatric

15  Association and/or the American Psychological Association

16  still that experts or that psychologists and psychiatrists

17  have no real expertise in long-term risk prediction?

18  A.   Well, there are significant difficulties in being able

19  to make such predictions long term with a degree of

20  accuracy.  It's not just a simple yes, no, or you can't do

21  it, but there are a lot of caveats, a lot of cautions, and

22  it's difficult to do.

23  Q.   And is the main caution against using it that -- and

24  this is again according to the American Psychiatric

25  Association -- that "Utilizing such testimony gives the

1   appearance of being based on expert medical judgment when in

2   fact no such expertise exists"?

3   A.   Well, yes, I mean, that's what it says.

4   Q.   Okay.  Are there any other professional organizations

5   that you're aware of that have reached similar conclusions

6   with respect to long-term future risk prediction?

7   A.   Well, there are numerous -- are you talking specific to

8   sex offenders?

9   Q.   Now I'm actually going to ask you about the National

10  Academy of Sciences.  Are you familiar with the National

11  Academy of Sciences?

12  A.   I am.

13  Q.   What is your understanding of that professional

14  organization?

15  A.   It is a large organization, one of two major

16  organizations that is multidisciplinary and speaks to issues

17  concerning the -- well, many issues, but not the least of

18  which is the dissemination of scientific information for

19  public consumption.

20  Q.   Okay.  I'm sorry, I wanted before I left off on the

21  APA, let me ask you, how many members of the American

22  Psychological Association or American Psychiatric

23  Association, to your knowledge -- strike that question.  How

24  many psychologists or psychiatrists, to your knowledge, are

25  engaged in the business or practice of risk prediction and

1   then testimony in courts?

2   A.   I don't know exact numbers.  I would say a small

3   percentage.

4   Q.   Okay.  Well, you gave me a 200,000 figure for

5   membership in the APA.  Are we in the thousands or even

6   hundreds of -- I mean, how many are we talking about?

7   A.   Well, you're mixing two APAs up.  If I can speak to the

8   American Psychological Association, I mean, there is a

9   subgroup, subdiscipline called Forensic Psychology, and that

10  has, you know, several thousand members.  I don't know the

11  exact number, but it has several thousand.  It's certainly a

12  subset of the full amount.  Now, how many of it within that

13  group focus on the actual court work in this domain, I don't

14  know exact numbers.  This is all --

15  Q.   Okay, I think I may have confused you by the question I

16  withdrew.  I am not asking how many APA members also do

17  this.  You don't have to be a member of the APA to be a

18  psychologist, right?

19  A.   No.

20  Q.   And you don't have to be a member of the APA to testify

21  in court, right?

22  A.   No.

23  Q.   You certainly don't have to be a member of the APA in

24  the subset field of forensic psychology to testify in court

25  even, right?

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1   A.   Correct.

2   Q.   You should be a forensic psychologist, though, if

3   you're going to testify in court, right?

4   A.   It's probably a good practice.

5   Q.   And the definition of a forensic psychologist is what,

6   if you will?

7   A.   A forensic psychologist is one whose professional work,

8   whether that is primarily involving evaluations, deals on

9   the interface between psychology and the law.

10  Q.   So you've got to know a little bit about the law and a

11  little bit about -- well, hopefully a lot about psychology,

12  right?

13  A.   Hopefully.

14  Q.   And knowing you don't have to be a member of any of

15  these organizations is really where I wanted to begin and

16  then ask you just raw numbers, how many actual people engage

17  in the business of sex offender risk prediction and testify?

18  We're in the hundreds, right, less than hundreds?

19  A.   Well, I don't know the exact number, but it's -- you're

20  probably not too far off.

21  Q.   Okay.  And that's the subset of psychologists that

22  claim that there is any consensus in the scientific

23  community about the ability to do that, right?

24  A.   I can't speak for that group.   I mean --

25  Q.   Okay.  You're not aware of any major trade organization

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1   of psychologists or psychiatrists that endorses the ability

2   of its membership to come in and make long-term risk

3   predictions, whether sexual or violent?

4   A.   No.

5   Q.   Now, going on to the National Academy of Sciences, and

6   I'm jumping from the '70s now to the '80s, all right, and in

7   the '80s there were what were known as sexual psychopath

8   laws, right?

9   A.   Yes.  They were generally known as MDSO laws, or

10  mentally disordered sex offender.

11  Q.   And those laws involved psychiatric or psychological

12  testimony of potential for sexual reoffense as a basis for

13  an enhanced sentence, right?

14  A.   Yes.

15  Q.   And so when the National Academy of Sciences studied

16  risk prediction, they included sex offender risk prediction

17  in their analysis, right?

18  A.   They did.

19  Q.   And in the '80s, the position of the National Academy

20  of Sciences, which please tell me if it's changed today, but

21  is that -- let me just ask you whether you agree.  And

22  again, now, this is mid-'80s, all right?  "It is important

23  to take stock of current predictive capacities.  With our

24  present knowledge, with the best possible long-term

25  predictions of violent behavior, we can expect to make one

1  true positive prediction of violence to the person for every

2  two false positive predictions."

3          Are you familiar with that opinion?

4  A.   I am.

5  Q.   And let me ask you whether you would have agreed with

6  it back then, and then I'm going to ask you the next

7  question.

8  A.   Well, if you're talking specific about sex offenders, I

9  mean, I am in agreement with the false positive problem.

10  Whether it's a two-to-one ratio is the question because it

11  didn't deal with individual cases, and it certainly took

12  place in a period of time before, for example, we have

13  actuarial tools, so -- but I'm going to tell you, I share

14  those concerns.

15  Q.   Okay.  And the concerns for the overprediction, the

16  false positive, is something that was even studied back in

17  the '70s in the original task force?

18  A.   Yes.

19  Q.   And their conclusion back then was "Psychiatrists, in

20  order to be safe, too often predict dangerousness and the

21  tendency towards false positive errors in prediction.  That

22  is, persons clinically predicted to be dangerous who are in

23  fact not dangerous has been attributed, at least in part, to

24  the strong negative reaction of the public to errors

25  associated with the release of dangerous persons.  Whereas,

1  there is relatively little concern about unnecessary

2  confinement."

3          MR. GRADY:  Again, your Honor, this needs to be

4  confined to violence.

5  Q.  Let me ask you, does that need to be confined to

6  violence?

7  A.  Well --

8          THE COURT:  You need to ask that differently.

9          MR. SWOMLEY:  Okay, I certainly will.

10 Q.  The concern of psychologists that either a jury or the

11 public at large might be unhappy with you if you were to

12 opine someone wasn't dangerous, they get out and they commit

13 an offense, the political or social or whatever implications

14 that weigh on you, whether it's conscious or unconscious,

15 would you agree that is one of the factors that plays on why

16 psychologists overpredict dangerousness, whether it be

17 sexual or violent?

18         MR. GRADY:  Your Honor, this has been --

19         THE COURT:  Is there an objection?  Sustained.

20 Q.  I know there are a lot of components to that.  Let me

21 break it down.  What is your understanding of the dynamic of

22 the false positive with respect to societal pressure

23 involving letting a sex offender go?

24 A.  Well, look, certainly I'm well aware, as any citizen

25 is, that there are certain issues in the press and in public

1  discourse about sex offenders, their risk to the community,

2  and how society is dealing with sex offenders.  I mean, I've

3  been working with them for twenty years, and I've seen quite

4  a change in the last twenty years from the point where I

5  started working with them.

6           So I would say to you this in response to your

7  question:  I understand that perhaps individuals who even

8  are professionals may be swayed by nonscientific issues in

9  issuing ultimate judgments, and that is the reason why I

10  approach what I do in the way that I do.  I'm in a unique

11  situation here on the witness stand.

12  Q.  Doctor, I'm not -- when I ask you the question of

13  whether or not psychologists overpredict or pick the false

14  positive box, I'm not saying you.  I'm asking you as an

15  expert in the field, do others like you maybe do that?

16  A.  I'm well aware that that argument has been raised, but

17  I cannot in good conscience say what others do.

18  Q.  What others do, okay, fair enough, fair enough.

19  A.  I can talk about what I do.

20  Q.  Okay.  Doctor, let me ask you another question then

21  having to do with what is important to know when you engage

22  in risk prediction, and let me ask you whether you would

23  agree with, again, the National Academy of Sciences'

24  position with respect to what -- well, let me just ask you

25  whether you would agree with this proposition or not, that

1   "Psychological theory is not as effective as statistical

2   theory in selecting what is relevant and important in risk

3   considerations."

4   A.    That is true.

5   Q.    And does that mean then that if you are in the business

6   of risk prediction as a psychologist, you'd better have a

7   background in statistics?

8   A.    That's correct, because what we trained and what I

9   trained in and what I've identified as certain factors that

10  I've even thought used to be very important or would be

11  important in predicting risk, as the research has evolved,

12  I've learned that some of these factors are not.  So

13  conventional wisdom, if you will, is not concordant with

14  what the research is discovering in terms of what factors

15  have at least some ability to predict future recidivism

16  vis-a-vis sex offending.

17          So if I'm relying just on these clinical issues

18  and what my conceptions are, however well-intentioned or

19  founded, I might be wrong about that.  So one needs to have

20  a grounding in the research, in the statistics, and one

21  should be appropriately and validly reflecting what those

22  factors are.

23  Q.    Okay.  And now we're entering into the modern era of

24  risk prediction as far as your field is concerned, right?

25  And that's the research that began on -- really on whether

1   doctors could do what they were saying they could do,

2   clinically evaluate somebody and say, "All right, based on

3   their lack of empathy, based upon the way I think they're

4   thinking basically, they're dangerous," right?

5   A.   Yes.  I mean, this took place in the context of a

6   changed incentive.  When you're referring to the NAS or the

7   APA, the American Psychological, or the American

8   Psychiatric, these were in the context of older civil

9   commitment laws that were generally repealed, such that by

10  the end of the 1980s, I don't think there were any left,

11  talking about civil commitment of sex offenders.  The first

12  new one happened in the early 1990s in the state of

13  Washington, and so the renewed civil commitment issue and

14  the redefinition of civil commitment and what sexually

15  dangerous or sexually violent entailed brought new research

16  addressed to studying quantifying factors that might give

17  psychologists and psychiatrists utility to being able to

18  make predictions.

19  Q.   Okay.  So if I can take what I understand from your

20  testimony, you're saying that under some new laws, they were

21  based on the notion that there is new evidence that suggests

22  that there is some ability to predict; is that right?

23  A.   Well, it was an open question.

24  Q.   Okay, still an open question.  Then the next question,

25  though, I would have for you is, are you saying that the

1   doctors that are doing this new round of risk prediction are

2   any better at it?

3   A.   Well, again, you're asking me to comment on -- I can

4   talk about the research.

5   Q.   Okay, let me ask you what the research shows.  You

6   would agree that doctors still to this day engage in nothing

7   more than the clinical method for risk prediction, right?

8   A.   No.  Well, some do and some don't.

9   Q.   Okay.  And you would agree that those that do have been

10  universally discredited, at least at this point in time, in

11  the scientific research?

12  A.   Well, they have been just because of the outcome data

13  that shows that clinical methodology is basically like

14  flipping a coin.

15  Q.   Okay.  Well, according to the National Academy of

16  Sciences, it's worse than flipping a coin.  It's you're

17  wrong two out of three times, right?

18          MR. GRADY:  Your Honor, this was in the '80s.

19  He's now attempting to incorporate that into modern --

20          THE COURT:  Well, why don't you answer it today.

21  That's a good point.  As you're sitting here today, is it

22  your opinion that clinical methodology is like flipping a

23  coin or worse?

24          THE WITNESS:  That is correct.  The average ROC --

25  well, it's .51, okay.  That's flipping a coin, 50/50.

1          THE COURT:  All right, so by clinical methodology,

2     you just mean meeting with the person, looking at the

3     records, and you making a judgment, is that right?

4          THE WITNESS:  Yes, Judge.  What I described

5     yesterday is, based on one's training and experience working

6     with this clinical population, one makes decisions based on

7     their own knowledge, training, experience, whatever that is.

8          THE COURT:  And what you're saying is that when

9     you actually look at psychiatrists who make a decision based

10    on their clinical method and look at what happened, their

11    prediction is no better than flipping a coin?

12         THE WITNESS:  That's right.

13         THE COURT:  Now, I'm asking these questions

14    because I get confused, so you can ask these questions.

15    Don't feel shy, all right?

16         Go ahead.

17    Q.   Now, without a background in statistics, you really

18    can't articulate how those numbers turn out the way they do,

19    right?

20    A.   Right.

21    Q.   Okay.  And beyond just evaluating whether the clinical

22    method predicts -- and a lot of this has to do with the

23    research of Dr. Karl Hanson, right?

24    A.   It does.

25    Q.   And I'm not minimizing the work of others, but he's one

1   of the big ones in your field, right?

2   A.   He's a biggy.

3   Q.   And I believe we established yesterday he does the

4   research.  He's not really a clinician in the sense that he

5   does risk evaluations or even does testimony, right?

6   A.   Correct.

7   Q.   Okay.  And beyond being able to demonstrate that he's

8   got a system that's more predictive than the clinical method

9   and chance, what he did was research the individual

10  variables that were historically or traditionally thought to

11  be predictive, right?

12  A.   Right.  He looked at, he investigated, he took outcome

13  data from separately published studies over a period of

14  time, as well as on some unpublished studies, that address

15  specific measurable issues that could be categorized; and

16  the question is, is there evidence that this issue, this

17  factor, this variable has any relationship to understanding

18  or predicting sexual recidivism?

19  Q.   And in order to come up with what he did, which was,

20  first, he came up with the RRASOR, right?

21  A.   That is correct.

22  Q.   And then he came up with the Static-99, right?

23  A.   That's right.

24  Q.   Both of them are actuarial tools, and all of the items

25  on the RRASOR are contained within the Static-99.  He just

1   added more variables, right?

2   A.   That's right.

3   Q.   Now, before he came up with either of those

4   instruments, he had done research, right, on the individual

5   variables?

6   A.   Correct.

7   Q.   And he made actually a list of every variable he could

8   think of that was studied in these previously engaged in

9   studies, right?

10  A.   Yes.

11  Q.   And some of the surprising results were that victim

12  empathy, ability to express remorse and concern for the

13  persons you victimized, is not a predictor, right?

14  A.   If you're referring to what became published in 1998 as

15  the meta-analysis, that is a finding, correct.

16  Q.   Right.   Now, in that meta-analysis --

17              THE COURT:   What does "meta-analysis" mean?

18              THE WITNESS:   A meta-analysis, Judge, is

19  essentially a study of studies.   In other words, you take a

20  number of studies, and they almost become like the

21  participants in a research study.   And so a number of

22  studies, for example, looked at, measured victim empathy.

23  So he took that construct from all of those studies, took

24  the data from those studies, and then as a group correlated

25  that with recidivism to find out if there was an effect for

1    that particular factor.

2            THE COURT:  And what do you mean by "victim

3    empathy"?

4            THE WITNESS:  Victim empathy essentially means

5    taking on -- having -- well --

6            THE COURT:  So you're talking about the person who

7    did the sex offense and whether or not they felt sorry for

8    the person that they hurt?

9            THE WITNESS:  Well, that's one way to put it, yes,

10   that's correct, identifying or understanding --

11           THE COURT:  All right, so whether that predicted

12   future dangerousness?

13           THE WITNESS:  That's right.

14           THE COURT:  All right, and what was the result of

15   the study?

16           THE WITNESS:  Well, in the meta-analysis, victim

17   empathy was reported not to be a predictor of recidivism.

18   So, in other words, there was no difference between those

19   who had or demonstrated in their therapy, in their

20   treatment, victim empathy versus those who did not or were

21   struggling with that, there was no difference in the rates

22   at which they reoffended.  It's a little more complicated

23   than that, but that's probably the best way to say it.

24   Q.   Okay.  Well, let me ask you whether there were any

25   other surprising results.

1  A.    There were a number of surprising results, yes.

2  Q.    Just give us two or three of them.

3  A.    Okay.  Well, the overall most surprising result was

4  that, really, there wasn't any one factor or variable that

5  was a home run, that really, if you knew this data, you

6  pretty much could predict whether or not a person would

7  reoffend.  In other words, there was no smoking gun.  There

8  was no one thing or two things you could point to, and

9  that's one of the reasons which led to actuarials having

10  multiple items, but there was no single predictor that was

11  very, very good.  There were a few that were okay, and

12  that --

13  Q.   Your field uses the word "robust" when there's a good

14  predictor, right?

15  A.    That's the term that's used, yes.

16  Q.    Okay.  And nothing in your view was, according to

17  Hanson, was robust in itself?

18  A.    Right, that's correct.

19  Q.    And in fact when Dr. Hanson did tease out these

20  numbers, he found whatever the R was, which was the

21  correlation coefficient, the significance of the presence of

22  that risk factor in the prediction of risk, right?

23  A.    Yes.

24  Q.    And he found most individual variables, whether it be

25  the ones that did predict -- you know, prior sexual

1   offenses, for example, or -- well, that's one of the

2   middle-range ones, sexual deviancy -- I mean, he studied a

3   bunch of other ones that he found not predictive, but let me

4   ask you, in the ones that he did find predictive, he

5   cautioned that just looking at that variable and trying to

6   weigh it and figure out if it's present in somebody, how

7   much weight to give it and then predict something, he says

8   you can't do that, right?

9           MR. GRADY:  Your Honor, I'm going to object to the

10  question.  Counsel first read several facts.

11          THE COURT:  Yes, sustained.  Don't give a speech.

12          MR. SWOMLEY:  Breaking it down.

13          THE COURT:  Just object.  Sustained.

14          MR. SWOMLEY:  Breaking it down.

15  Q.   Dr. Hanson cautioned against considering any variable

16  in isolation?

17  A.    That's right.

18  Q.   And cautioned that if you do that, you have essentially

19  no real basis, scientific basis for doing so?

20  A.    Correct.

21  Q.   And that's because almost every one of these variables

22  has such a tiny risk-predictive percentage, that you have to

23  really figure out some way to aggregate them into something

24  that has more significance, right?

25  A.    Well, I wouldn't put it quite that way, but I would

1    agree with most of what you said.  Yes, the bottom line is

2    that no single predictor -- that's why I described it as a

3    smoking gun -- no one or even two predictors that if you

4    have information about this is, "Aha, since this is the

5    case, I know, I'm pretty sure this person is going to

6    reoffend."  That is true, even the highest predictors were

7    not in a range that I would be comfortable using them in

8    isolation.

9    Q.   Okay.  And that is why after Dr. Hanson conducted that

10   research -- and all by itself -- well, withdraw.  All by

11   itself that research brought the field a long way, at least

12   in figuring out, "Oh, we've been thinking these are

13   predictive for years, and we've been making decisions about

14   people for years, and now we know we don't have any basis

15   for having done so," right?

16              MR. GRADY:  Objection.

17              THE COURT:  Sustained.

18   Q.   Beyond debunking past common wisdoms, Dr. Hanson tried

19   to come up with ways to improve risk prediction, right?

20   A.   Yes.

21   Q.   Now, the RRASOR was his first instrument, right?

22   A.   Yes.

23   Q.   And that was in '96?

24   A.   That's when it was published.

25   Q.   Okay.  And just so we're clear, when that was published

1   doesn't mean that's when the research was conducted, right?

2   A.   Right.   The research that went into the publication

3   preceded.   It was before the publication of the

4   meta-analysis, although data that ultimately resulted in the

5   meta-analysis were used because many of the factors or some

6   of the factors that loaded highest or had the highest

7   correlations, ultimately when the meta-analysis was

8   published, were put into the equation to try to come up with

9   the greatest amount of variance accounted for with the

10  fewest number of adding variables together.

11  Q.   Okay.   And Dr. Hanson created these actuarial

12  instruments, first the RRASOR and then the Static-99, in

13  1999, right?

14  A.   Yes.

15  Q.   And he did so in Canada, right?

16  A.   That's where he was.

17  Q.   And he did so for the Canada Solicitor General's

18  Office, right?   He was a government employee?

19  A.   Yes.

20  Q.   And in Canada that information was used to aid in

21  treatment decisions; is that correct?

22  A.   Yes.

23  Q.   Both of those actuarial instruments were designed to

24  help government entities figure out what to do with that

25  population for treatment, right?

1   A.   In part, yes.

2   Q.   Whether that means, "You score high on it, we give you

3   more -- we allocate more resources for treatment," is one of

4   the decisions that the Static-99 and the RRASOR assisted

5   Canada in making, right?

6   A.   Correct.

7   Q.   Canada does not have civil commitment, correct?

8   A.   That's right.

9   Q.   And in fact neither of those instruments were created

10  for the purpose of civilly committing individuals?

11  A.   Yes, they had no legal end to them.  They were as

12  stated:  They were risk predictions.  What you do with that

13  information is another question.

14  Q.   So while Canada used that data to figure out who to

15  give more resources to to deal with, we're using that data

16  to lock people up; is that right?

17            MR. GRADY:  Objection.

18            THE COURT:  Overruled.

19  A.   Well, I wouldn't say in totally.  I mean, not solely,

20  but, yes, that information is routinely being used in

21  committing individuals civilly in the United States, that's

22  right.

23  Q.   Now, one of the things I believe you testified about on

24  direct examination yesterday was the concept that when

25  you're going to make risk-predictive comments about a

1    particular individual, all you're able to do is comment

2    about where that individual fits in terms of a group, right?

3    A.   When we talk about actuarials now?

4    Q.   Yes.

5    A.   Yes.

6    Q.   And if you're conceptualizing this, one of the ways

7    that your field conceptualizes it is in terms of putting

8    people in bins according to what they score, right?

9    A.   Yes.

10   Q.   And a bin is just the group they find themselves in

11   after they have been scored?

12   A.   Correct.

13   Q.   Now, before you get to even figuring out whether

14   someone's in the right bin, you have to also look at whether

15   or not anybody in the entire study or anybody in any

16   particular bin is similar to the person you're evaluating,

17   right?

18   A.   Yes.

19   Q.   So do you agree that both the RRASOR and the Static-99

20   are based on research done on a population set other than

21   the United States largely?

22   A.   Yes.  The seven basic sample groups of the RRASOR and

23   the four in the Static-99 were largely outside the United

24   States.

25   Q.   And would you agree that the question of whether or not

1   those people are like sex offenders in the United States,

2   that's an open question, right?

3   A.   True.

4   Q.   And in order to make use of the Static-99 or the

5   RRASOR, one has to either assume or take a leap of faith

6   that they are like American offenders, right?

7   A.   I would say, in any type of measurement, we're making

8   certain assumptions.  This is no different.  I would agree

9   with that.

10   Q.   Okay, I'll get back to that in a second.  If we take

11   the assumptions as true -- and I'm only going to do that for

12   a minute here -- but if we take these assumptions as true

13   that Mr. Shields is like the people that the research went

14   into, the RRASOR and the Static-99 were based on, if we

15   locked up everybody that had the same score as Mr. Shields

16   on the RRASOR -- and I'm going to ask you about the

17   five-year time gate, five years out -- if we locked up

18   everybody, how many out of a hundred would we be locking up?

19              MR. GRADY:  Your Honor, I object to this.

20              THE COURT:  Overruled.  This is under the RRASOR,

21   the one we talked about at length.

22              MR. SWOMLEY:  Right, the one that he uses.

23              THE COURT:  That chart you saw yesterday.

24              MR. GRADY:  Your Honor, can I be heard at side bar

25   very briefly?

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1         THE COURT:  No, no.

2         MR. GRADY:  Can I ask the question be rephrased,

3    if he's found sexually dangerous rather than --

4         MR. SWOMLEY:  Yes, it was a clumsy question.  I

5    will reword the question.

6         THE COURT:  Yes, that's fine.

7    Q.   You have a number of people that reoffend after five

8    years that scored a 5 on the RRASOR, right?

9    A.   Yes.

10   Q.   Now, if you locked up everybody that scored a 5 on the

11   RRASOR, just taking it a hundred people --

12        MR. GRADY:  I object.

13   Q.    -- how many recidivists versus how many nonrecidivists

14   would you be locking up?

15        MR. GRADY:  Can I be heard?

16        THE COURT:  Is he phrasing that question

17   correctly?  You --

18        MR. GRADY:  Your Honor, I'd like to just --

19        THE COURT:  All right, all right.  Why don't you

20   stand and stretch.

21   SIDE-BAR CONFERENCE:

22        THE COURT:  There's some nuance I'm missing.  What

23   do you think he's getting wrong?

24        MR. GRADY:  Your Honor, you've repeatedly asked

25   the jury not to be told about being locked up.  He's

Page 44

1   continuing to refer to Mr. Shields being locked.  And I

2   think that if the Court wishes to have that issue, you know,

3   separated --

4           THE COURT:  Well, it's civil commitment.  They're

5   going to know that.

6           MR. GRADY:  That's fine, but the Court indicated

7   yesterday you didn't want them --

8           THE COURT:  No, that's fine.  If that's the issue,

9   that's fine.  But let me ask, are you saying that he didn't,

10  I mean, that he's not asking the question correctly?

11          MR. GRADY:  Your Honor, I was simply attempting to

12  protect -- the Court had indicated earlier it did not wish

13  the jury to be told about the consequences of its findings.

14  These questions --

15          THE COURT:  Well, maybe "civilly committed" might

16  be a better phrase, but it is in fact -- if both sides agree

17  this is where it's going to end up, that's fine with me.  I

18  mean, basically -- I'm happy to have it in.  It affects --

19          MR. GRADY:  I have to say, your Honor, how I've

20  proceeded under the Court's original ruling, and now

21  we're --

22          THE COURT:  Excuse me.  I ducked the question

23  would be the best way of describing how I've dealt with it

24  because both sides were uneasy with it, okay?  It's in, all

25  right?  It's in.

1          MR. GRADY:  Okay.

2          (End of side-bar conference.)

3          THE COURT:  All right, so by "locked up," you mean

4    civilly committed.

5          MR. SWOMLEY:  Correct.

6          THE COURT:  All right, so we're talking about

7    civil commitment proceedings as I mentioned earlier on, so

8    just so we're clear about what the reference is to.  I'm

9    sure I lost the question, so maybe the jury has as well.

10   Q.   Out of a hundred people, if you civilly commit a

11   hundred people that score a 5 on the RRASOR, using the

12   five-year data, how many people will you be civilly

13   committing that are not, according to the research, likely

14   to reoffend out of a hundred?

15   A.   Are you asking just for people who score 5 or up to 5?

16   Q.   Just the people who score 5.

17   A.   It's a good question.  The answer would be, what is the

18   specificity of the RRASOR at a score of 5?

19   Q.   Right.

20   A.   And I would have to look up that data.  I mean, I don't

21   want have it on the tip of my tongue.  I mean, I don't know

22   exactly -- I do know if I refer to the data.

23   Q.   Could you, please.

24   A.   Yes.

25          THE COURT:  Just to clarify for me, is that

1    different from the chart we saw with that --

2          THE WITNESS:  Yes, Judge.  At every score on the

3    RRASOR from 0 to 5 that you saw on the table, each score --

4    in other words, the question is, if someone scores a 0 on

5    the RRASOR and you use 0 as the cutoff to say they're going

6    to reoffend, or if someone scores a 1 on the RRASOR and you

7    use 1 as the cutoff, down the line all the way to 5, how

8    many true positives, using the terminology from yesterday,

9    how many true positives are you going to get, how many true

10   negatives are you going to get, how many false positives are

11   you going to get, how many false negatives are you going to

12   get?

13         THE COURT:  I see.  We're talking about 5 now, and

14   there was a statistic given yesterday of about 49.8.  Is

15   that not what you're thinking about?

16         THE WITNESS:  Well, that's not the question he

17   asked.  The 49.8 was the five-year recidivism rate of that

18   original validation samples, the five-year recidivism rate.

19         THE COURT:  Who were a 5?

20         THE WITNESS:  Of a 5, the people who scored a 5.

21         THE COURT:  But now you're looking at some other

22   data?

23         THE WITNESS:  Right, because his question was, if

24   we locked all those people you, the people who scored a 5,

25   none of them are going to reoffend, obviously, because

1    they're all locked up.  But the question is, if we didn't,

2    how many of them wouldn't have reoffended?

3    Q.   And isn't that, Doctor, the converse?  If you're at a

4    five-year time gate and you're at something less than

5    50 percent, isn't it a logical conclusion that more than

6    half of the people you're locking up won't reoffend?

7    A.   I'm sorry, ask me that again.

8    Q.   Sure.

9               THE COURT:  Can I ask it a certain way?  If you

10   let them all go, how many, based on this study, would

11   reoffend?

12              THE WITNESS:  About half of them, 49.8 percent.

13   Q.   So am I making any logically incorrect conclusions?

14   When you look at that data set, that if you decide you're

15   going to lock everybody up who gets a 5, after five years, I

16   mean, based upon the five-year data, half of the people that

17   you're locking up are not going to reoffend, right?

18              MR. GRADY:  Your Honor --

19              THE COURT:  I'll allow it that way.

20   A.   Okay, yes.

21              THE COURT:  So you made a mistake with half?

22              THE WITNESS:  Approximately.

23              THE COURT:  If you let them go, half will

24   reoffend?  If you lock them up, half of them are mistakes?

25              THE WITNESS:  Right.

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1    MR. SWOMLEY:  Thank you.

2  Q.   Now, using -- and you're familiar enough with the

3  Static-99 to also talk about that, right?

4  A.   Yes.

5  Q.   Okay.  And, again, I'm asking you to assume the

6  validity of this, and we'll get into not assuming it in a

7  minute, but assuming that all of the numbers that

8  Drs. Hanson and his associates come up with are accurate,

9  using the Static-99 after five years, the five-year figure,

10  how many people, if you lock up all the people that score

11  the highest score on that, a 6 and above on that, how many

12  people would you be civilly committing that wouldn't

13  reoffend after five years?

14  A.   Approximately 60 percent.

15  Q.   So 40 out of 100 would be a correct lockup, and 60 out

16  of 100 would be incorrect?

17  A.   Right.

18  Q.   Now, statisticians have gone on ahead and tried to

19  calculate the predictive accuracy of these instruments

20  themselves, right?

21  A.   Yes.

22  Q.   They've turned statistics on the instruments to figure

23  out how much they actually really do predict, right?

24  A.   That's right.

25  Q.   And like the variable, the individual variable that's a

1    risk predictor, they can look at the Static-99 as a whole as

2    a risk predictor, right?

3    A.    That's right.

4    Q.    And all of the risk predictors are measured against

5    being a perfect predictor and not predicting at all, right?

6    A.    Yes.

7    Q.    Okay.  And a perfect predictor in the mathematical

8    model is a 1, right?

9    A.    Or a minus 1.

10   Q.    Okay.  And something that's not predictive at all is a

11   0, right?

12   A.    Yes.  If you look at 1 -- we'll start with positive 1

13   to negative 1, okay?  Each -- the sign whether it's positive

14   or negative just has to do with the relationship of the two

15   factors.  So, for example, if one factor perfectly,

16   perfectly, and it never happens, but perfectly predicts

17   another factor, and the more you have of one, the more you

18   get of the other, that would be a positive 1.  If the factor

19   perfectly predicts but in an inverse fashion, you get a

20   negative 1.  So as one goes up, the others goes down.  And 0

21   or anything close to it, depending upon some other factors,

22   is a statement of no relationship whatsoever.

23   Q.    Okay.  And .5 is chance, right, basically?

24   A.    Yes.

25   Q.    Meaning flip a coin, .5 times out of however many

1    you're doing will come up heads, and .5 will come up tails

2    theoretically, right?

3    A.   Yes.

4    Q.   And the analysis of the predictive value of any

5    actuarial instrument is only slightly better than chance,

6    right?  And I'll ask you for the actual number, so if you

7    don't like the word "slightly," let's go with, the Static-99

8    has a predictive value of .63, right?

9              MR. GRADY:  Your Honor, may I just move to strike

10   that last comment?

11             MR. SWOMLEY:  I withdrew whatever the last

12   question was, I'm sorry, slight.

13   Q.   I won't ask you to characterize it, but in terms of the

14   predictive value of these actuarial instruments, Hanson

15   would say it's a moderate predictive value, right?

16   A.   Yes.  I mean, we're mixing up several different types

17   of statistics here.  We're just talking about correlation

18   coefficients, and then probability, and now what you're

19   referring to are some what we call receiver operating

20   characteristic data, which these are --

21   Q.   Okay.  To the extent that you think I am confusing the

22   jury or the Judge or anybody else, including myself, please

23   chime in, tell me what I'm doing wrong and --

24   A.   Well, if you want an answer to the basic question --

25             THE COURT:  Why don't we just, what is the

1    question in plain English?

2    Q.   My question is in plain English, how much more

3    predictive than chance is the Static-99, and then the

4    RRASOR, is really what I'm trying to get at?

5    A.   Well, it is a statistically significant predictor of

6    risk.  We'll establish that.

7              THE COURT:  What's the "it," RRASOR or Static-99?

8              THE WITNESS:  Both, both of them are better than

9    chance.

10             THE COURT:  Are they accepted by the psychological

11   community as reliable?

12             THE WITNESS:  Yes, Judge.

13             THE COURT:  Both of them?

14             THE WITNESS:  Both of them are.

15   Q.   Well, by the psychological community that does what you

16   do, right?  Not by the psychological community at large.

17   There is no acceptance in the psychological community at

18   large that this is acceptable, right?

19   A.   I'm talking about the community of those who do risk

20   assessments.

21   Q.   Okay.

22   A.   It is utilized.  It's not without controversy.  It's

23   not perfect.  That's why I purposely stated it the way I

24   did.  You know, there's an abundance of cross-validated

25   studies that show that the RRASOR and the Static-99 are

1    statistically significant predictors of risk.  What I mean

2    by that is, they're better than flipping a coin.  It's

3    better than no relationship.  It's better than saying that

4    they're not related to risk prediction.

5              But that's only question one.  Question two is,

6    how good are they?  And that's in my testimony yesterday,

7    and I used the word "moderate," and that's why I use it as a

8    baseline.  They are moderate predictors of risk.  They

9    provide us with some information but certainly not all the

10   information.

11   Q.   Using the terminology, they're not "robust," right?

12   A.   They're not robust.

13   Q.   And if you would, the Static-99's ability to predict

14   better than chance is what?

15   A.   Well, I can throw out a lot of numbers at you, but --

16   Q.   Okay, well, what is .63?

17             THE COURT:  Excuse me.  Did you rely on the

18   Static-99 in your --

19             THE WITNESS:  No, Judge.

20             THE COURT:  Just move on.

21   Q.   We'll talk about the RRASOR then.  What's the

22   predictive value of the RRASOR?

23   A.   Well, if you look at -- going back to the correlation

24   coefficient that we started to talk about, if you look at

25   the RRASOR, the RRASOR in different cross-validation studies

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1  to date has ranged basically between .25 to .38 essentially.

2  That's the range of the correlation coefficients in

3  cross-validation studies, okay?

4         If you look at what we call ROC analysis, or

5  receiver operating characteristics, and what that is -- I'll

6  make this simple, use the same terms from yesterday.  I wish

7  I could draw, but if you had on one axis false positives --

8  in other words, those I'm saying will offend based on the

9  actuarial and they don't, that's a false positive -- and I

10  contrast that or plot that a function of true positives,

11  those who I say based on this calculation will reoffend and

12  they do, the ROC, the receiver operating characteristic, is

13  the graph of that function, okay?  True positives versus

14  false positives.

15         So what happens if I study 100 people and I find

16  50 false -- and I say a score of 4 on the RRASOR is what I'm

17  using to say that they'll reoffend -- and I study 100

18  people, and I find 50 reoffend and 50 don't?  Well, what

19  you're going to see is a slope of 1 on that graph.  It's

20  going to be a 45-degree angle because for each one false

21  positive I have, I'm going to have one true positive.  It's

22  going to match going all the way up the value.  So that's an

23  ROC of .50.  That's chance.  That's chance prediction.

24  Q.   Okay.

25  A.   As I go above .50, that means, and it's statistically

1   significant, my ability to cull out true positives from

2   false positives will be greater.  So if I get to .7, .8,

3   that means essentially -- essentially -- that I'm starting

4   now to identify more true positives than false positives.

5           And the question then becomes -- and this is where

6   courts and everybody else gets involved -- how good is good

7   enough?  So if I can tell you I can based on this test, ROC

8   of .72, I can pick out more true positives than false

9   positives, it's going to be true, but I'm still going to

10  have a lot of false positives.  And the question is, how

11  many are enough?  You know, go to Supreme Court, William O.

12  Douglas, you know, better to release a hundred guilty --

13          THE COURT:  William O. Douglas died years ago.

14          THE WITNESS:  All right.  I'm just illustrating

15  the point that that's another issue that goes beyond the

16  statistics of a situation.

17  Q.   Which is, based upon your testimony or anyone's

18  testimony, how many people are going to be falsely locked up

19  because you're wrong, right?

20  A.   Right.

21  Q.   Okay.  And so the ROC number that you were talking

22  about, .72, according to Hanson, the Static-99 gets you at

23  .63, right?

24  A.   Well, again, they're a range.  This is an average ROC,

25  and it's evolving because of more studies coming out.  But

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1   the actuarials in terms of ROCs do generally average --

2   sometimes they actually get into the .80s in some studies,

3   but between .60s and .80s.  I would say it's probably close

4   to .68 to .70 now in total now with all the data.

5           THE COURT:  And that's what, the Static-99 or the

6   RRASOR?

7           THE WITNESS:  Well, I was referring to basically

8   both of them, if you look at them in the studies, because

9   frequently these studies, Judge, do study both of them.

10          THE COURT:  All right, so both of them have that

11  degree of predictability?

12          THE WITNESS:  Yes.

13          THE COURT:  And for five-year and ten-year?

14          THE WITNESS:  Well, it depends on the study, but

15  it's generally five years what's being looked at.  Some look

16  longer.

17  Q.   Now, if you take Dr. Hanson studying himself, and I'm

18  going to ask you about, "Does Static-99 predict recidivism

19  among older sexual offenders?"  Are you familiar with that

20  article?

21  A.   I am.

22  Q.   Published in 2006 in the Sex Abuse Journal?

23  A.   Yes.

24  Q.   Do you agree with Dr. Hanson that the ROC -- that is,

25  the predictive accuracy -- is lowest for the 40- to

Page 56

1    49-year-old age group?

2    A.   Yes.

3    Q.   That's the age group Mr. Shields is in right now?

4    A.   Yes.

5    Q.   And that's, I believe, a .66 ROC, right?

6    A.   I'd have to look at the study.

7         MR. SWOMLEY:  Can I just run up next to him,

8    Judge?  Page 351 of that journal.

9         MR. GRADY:  Your Honor, could the government be

10   provided with a copy?

11        THE COURT:  You know, I can't hear you.

12        MR. GRADY:  If the government could be provided a

13   copy of these materials before or --

14        MR. SWOMLEY:  I believe they were provided with

15   this, which is --

16        THE COURT:  I know, but just show him what he's

17   looking at.

18        (Document shown to Mr. Grady.)

19        (Witness examining document.)

20   A.   Yes.

21   Q.   Thank you.  Now, most of the measurement, as it were,

22   for either the RRASOR or the Static-99 that measures Jeffrey

23   Shields, most of the data that fills in those instruments

24   comes from one variable, right, and that's the prior sex

25   offenses?

1    A.    You mean most points?

2    Q.    Most points.

3    A.    Yes.

4    Q.    Okay.  And would you just for everybody, would you

5    explain what weighting a variable mean.

6    A.    Yes.  Weighting a variable means you assign a certain

7    significance to that variable based upon its original

8    loading in the matrix that came up with the variable.  So

9    that if you take, for example -- well, we'll use the

10   RRASOR's four factors.  Well, out of the four factors on the

11   RRASOR, and if you go back and look at Table 1 of the

12   Hanson/Bussiere meta-analysis, you'll find that prior

13   offenses to the governing offense singly was the greatest

14   out of those groups correlation.  It loaded highest on

15   recidivism prediction, such that when it was translated into

16   the instrument itself, its greater significance as a

17   predictor was quantified in such a way that half of the

18   total point spread of the RRASOR was allocated to that one

19   factor.

20   Q.    And so you were here for Mr. Grady's opening, right?

21   A.    Yes.  Part of it, not all of it.

22   Q.    Where he basically said you look at past offenses as

23   the best predictor of future offenses, and he said it over

24   and over again.  And it's true, right?

25   A.    Well, is that two questions or one?

1   Q.   Okay, he said it over and over again?

2   A.   I did hear him --

3   Q.   And it's true, right?

4   A.   That past behavior, it is a predictor, not the best,

5   but it is a predictor of future --

6   Q.   And you would say, even with the fact that both the

7   Static-99 and the RRASOR loaded, that if you look at it all

8   by itself, it's still down there in the modest predictor

9   range, right, according to Hanson's meta-analysis?

10  A.   That's true.

11  Q.   And it may even be smaller.  I want to make sure I

12  didn't give it more credit than it's due.  Hold on.

13          It's .19, which is actually in the small range,

14  just barely.  And the .10 to .20 --

15          THE COURT:  You know what, I know you know a lot.

16  Just let him answer.  So what's the question?

17  Q.   Would you please describe for the jury what Hanson

18  quantifies in his meta-analysis as low predictor, modest

19  predictor, high predictor.

20  A.   Well, you know, Hanson does use terms in the 1998

21  meta-analysis, I'm not fond of them, but essentially, I

22  mean, if you have a correlation coefficient under .10,

23  Hanson in that article states that it's basically useless.

24  If you're in the .10 to .19 range, it's a small predictor.

25  Over .20 is more moderate, and then over .30 would be a

Page 59

1   stronger predictor.  That's the way it is, and there's only

2   one variable in the '98 meta-analysis that even got over

3   .30.

4              THE COURT:  Which was?

5              THE WITNESS:  Which was a PP, physiological

6   arousal to children that's measured via penile penile

7   plethysmography.

8   Q.   And just so the jury knows what that means, that's

9   putting a turgidity indicator on someone's penis and showing

10  them stimuli and measuring blood flow, right?

11  A.   Correct.  It's a direct physiological measurement of

12  penile tumescence.

13  Q.   Okay.  And that has not been a test that has been

14  performed on Mr. Shields, correct?

15  A.   Correct.

16  Q.   So when you characterize the information that's being

17  conveyed to the listener with respect to a Static-99 or a

18  RRASOR as it pertains to Mr. Shields's scores on those two

19  instruments, would you agree that the bulk of the risk

20  numbering comes from the single factor, prior sex offenses?

21  A.   Yes.

22  Q.   And so there's nothing magical about the fact that the

23  Static-99 comes up with its message:  Mr. Shields has

24  committed past sex offenses.  Therefore his risk is higher

25  than persons who haven't.  Right?

1    A.    As a general statement, yes.

2    Q.    Okay.  And in terms of some of the other variables, let

3    me ask you, the point that Mr. Shields gets for his -- well,

4    I don't want to say his sexual orientation, but the fact

5    that his sexual orientation is homosexual and his offense

6    history involves homosexual offending gets him another

7    point, right?

8    A.    Well, I really don't like to use the term "homosexual"

9    with victims because it muddies the water up.  He has male

10   victims, and that's why he has a point.

11   Q.    Let me ask you, and I think when you were asked this

12   question by Mr. Grady yesterday about whether you agreed

13   with the research concerning that issue, you were not

14   quite -- you didn't jump in there and say, "Yeah, I do."

15   What is your understanding of the problems with the research

16   on that particular itemized risk factor?

17   A.    Well, my problem is, it overestimates how you see it.

18   It overestimates having male victims on recidivism.  I

19   agree, and I agreed yesterday in my testimony, that having

20   male victims does, all things else being equal, make one

21   more risky in that sense.  But its ultimate utility as a

22   risk predictor is not nearly as great.  I think, for

23   example, in DSM-IV it actually makes a preposterous

24   statement about making a person, I forget, but twice as

25   likely to reoffend I believe is there.  That is not true.

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1          THE COURT:  That's not statistically true?

2          THE WITNESS:  That is not statistically true, that

3     is correct.

4     Q.   What is statistically true is that men who offend

5     against male victims versus men who offend against female

6     victims offend at a slightly higher rate, right?

7     A.   That's correct, slightly higher.

8     Q.   Now, but that's one of his points on both the RRASOR

9     and the Static-99?

10    A.   Yes.

11         THE COURT:  When you said before that your prior

12    offense record is not a good predictor, does it matter how

13    many prior offenses there are?

14         THE WITNESS:  Well, I didn't say it wasn't a good

15    predictor.  I just said it was a predictor, not the best

16    predictor.

17         THE COURT:  Right, it had a low correlation, you

18    would say, right?

19         THE WITNESS:  .19 in the meta-analysis.

20         THE COURT:  Right.  So does that vary depending on

21    how many prior offenses there are?

22         THE WITNESS:  That's a very good question, and the

23    way it was measured in the meta-analysis, just if you had

24    any prior offenses.

25         THE COURT:  So it could have been one?

1            THE WITNESS:  It could have been one, just having

2    any prior offenses.  And the RRASOR and the Static-99 give a

3    degree of magnitude to that by listing out charges and

4    convictions, each coded up to a maximal three points.  So

5    it's trying to get at a magnitude of how many times by

6    assigning extra weight to that, with the notion that it is a

7    somewhat continuous function.  So that if we agree that even

8    having one makes you at higher risk, the notion is, to a

9    certain extent, having more than one makes you at even

10   more --

11            THE COURT:  But you can't simply just multiply .19

12   for one --

13            THE WITNESS:  No.

14            THE COURT:  -- and times three if you have three

15   or times six if you have six?

16            THE WITNESS:  If life were that easy -- that's

17   correct.

18            THE COURT:  So do you know if there's any data

19   sort of showing whether the more convictions you have, the

20   more a predictive force it is, or does that data not exist?

21            THE WITNESS:  That data is not clear, such that I

22   would want to make any statement one way or the other.

23   Q.   Let me ask you, though, just if you can correctly

24   characterize where we are in that research, and would you

25   agree that what has been research, by Hanson and others, is

1   that it's not the raw number of offenses that is what you're

2   finding has the predictive value; it's the number of times

3   you haven't learned your lesson, right?  So for Mr. Shields,

4   it's the number of times -- for example, the 1989 series of

5   offenses, and you have three convictions and one

6   nonconviction, one where he was charged but ultimately never

7   convicted, those all are clustered around one sentencing

8   date, right?

9           MR. GRADY:  Your Honor, counsel is testifying and

10  then asking a question.

11          THE COURT:  Yes.  Actually --

12  Q.   Are they clustered around one sentencing date?

13  A.   Yes.

14          THE COURT:  So just so I can clarify to make sure

15  the jury gets it, there were three prior convictions, three

16  separate incidents up in Maine, but he was sentenced on the

17  same date.  Is this correct?

18          MR. SWOMLEY:  That's correct.

19          THE COURT:  For all three them, so it makes it a

20  little more complicated, all three.  So he was sentenced in,

21  say, March of 1990, roughly, on all three of them.  So you

22  don't have these records all sitting in front of you, so

23  understand, there's one sentence to -- what was the sentence

24  for?

25          MR. SWOMLEY:  Three and a half years, if I'm not

1   mistaken.

2          THE COURT:  Three and a half years.  All right, so

3   with that background, why don't you ask a question.

4   Q.   So it's fair to say that the way the science is now

5   conceptualizing prior offenses, it's not the raw number

6   necessarily but getting whacked and then going forward and

7   not getting it, doing it again, right?

8   A.   This is a very important distinction on both the RRASOR

9   and the Static-99.  Correct, when you define the factor and

10  you score it, it's prior offenses to the governing offense.

11  So the key issue is the intervention of the legal system,

12  which the front door of that is just being arrested.  Okay,

13  you don't have to be convicted to score points on that, but

14  there has to be at least being arrested -- well, actually

15  being charged, not arrested, charged for a sexual offense.

16  So the notion there is that you were detected by the legal

17  system for committing a sex offense, and that's the key

18  issue.

19          THE COURT:  So the issue is the charge and his

20  knowledge of it?

21          THE WITNESS:  Well, the notion is, Judge -- and

22  this is where the scoring can get a little confusing because

23  say, for example, you have someone who was arrested,

24  charged, released, a week later commits another sexual

25  offense, versus someone who committed two sexual offenses in

1  the same period of time but were just detected after the

2  second one.  You have the same number of victims, the same

3  time period.  The only difference is, in one case you'd have

4  a person who was --

5            THE COURT:  Caught.

6            THE WITNESS:  -- caught the first time and then

7  reoffended.  The second time you have a guy who had two

8  victims and then was caught.  Their scores would be

9  different on that item.

10            THE COURT:  So walk us through what happens here.

11            THE WITNESS:  Well, here it's a little different

12  because the governing offense becomes the pornography

13  offense, so it all then comes into the hopper after that.

14  But what I'm saying is, in the case example I gave you, the

15  difference is, even though the behavior was the same, two

16  victims over a two-week period, one person would score a

17  point on that item, and the other person would score no

18  points on that item because the second person was only

19  detected after the second victim.  In his case --

20            THE COURT:  So the first offense happens, and then

21  what happens chronologically?

22            THE WITNESS:  Well, if all one date is before the

23  governing offense --

24            THE COURT:  No, but we're talking about here.  So

25  he has a first offense and --

1          THE WITNESS:  That would all be considered a

2     cluster, a cluster offense, and in and of itself would get

3     no points for that because it all happened at the same time

4     in the sense of how the legal system dealt with it.

5          THE COURT:  Well, let me just ask you.  When you

6     reviewed the records, he was -- he did something in January

7     of 1989.  Was he arrested and charged with that before he

8     did the something else in July of 1989?

9          THE WITNESS:  I would have to go back.  I don't

10     recall just sitting here.

11          THE COURT:  So that would be relevant to your

12     analysis, right?

13          THE WITNESS:  Well, no, because of this:  Because

14     you have the pornography offense as the governing or index

15     offense, it didn't matter.  All of it comes in in this case.

16     He scored 3 out of 3 points on Item 1 on the RRASOR, and

17     that's the reason for it.

18          THE COURT:  But in your clinical judgment, would

19     it make a difference if he got charged and then did it again

20     right away, as opposed to if he did three in a row, and then

21     he was picked up for the first time?

22          THE WITNESS:  Well, we're going back to twenty

23     years basically then.  So my clinical judgment would not be

24     affected because I'm doing a present-day risk assessment.

25     So what may have been operative back then may be different

1   today.

2   Q.   I'm now going to ask you about the assumptions that we

3   agreed upon up to this point and one that is having to do

4   with the bin number you put Mr. Shields in for a 5 on the

5   RRASOR.  Your testimony yesterday was, I believe, there were

6   56 people in the original data set that formed the

7   statistical framework for that risk analysis, right?

8   A.   Fifty-two.

9   Q.   Fifty-two people.  What do you know about those 52

10  people?

11  A.   What I know about them is that they were in one of

12  seven settings that were detailed in the original

13  validation.

14  Q.   Okay, when did they offend?  When did those 52 people

15  commit their crimes?

16  A.   I don't know.

17  Q.   It wouldn't have been in the '90s, right?  It would

18  have been before that?

19  A.   I would have to -- I don't know, to be honest with you.

20  Q.   Well, without knowing more about those 52 people, it's

21  pretty difficult to say Mr. Shields fits into that group,

22  right, other than that they share the same score, right?

23  A.   That's correct.

24  Q.   And you know, based upon research that's been done

25  since either the Static-99 or the RRASOR was developed, that

1    changes sometimes the numbers that the Static-99 and the

2    RRASOR reach, right?  And I'm talking about age, age

3    research.

4    A.   Well, changes, it depends what numbers you're talking

5    about.

6    Q.   Okay.  Well, let's start with just some concepts

7    regarding age.  Would you agree that age is a risk reducer?

8    A.   It is.

9    Q.   And age, would you agree that according to the

10   subsequent research done on both the Static-99 and the

11   RRASOR, that neither of those instruments accurately capture

12   the risk reduction over the life span of an individual as

13   measured by those two instruments?

14   A.   My response to that would be, as I said yesterday, age

15   is measured in a dichotomous fashion, with age 25 as the

16   cutoff between one point or no points.  Subsequent to that

17   publication of both of these tools, outcome data has

18   uncovered a significant more amount of information on the

19   impact of aging, getting older, on reoffending, such that it

20   can be a significant reducer of risk.  The RRASOR's average

21   age of the 2,592 studies was approximately 34 years old, so

22   that's, you know, approaching thirteen years younger than

23   Mr. Shields as we sit here today.  So that would have, or

24   could have, I should say, another layer of analysis, yes.

25              THE COURT:  Excuse me.  The average age of

1    offending or reoffending?

2          THE WITNESS:  No.  The average age of the groups

3    for the RRASOR 2,592 sex offenders who served in these

4    samples as the validation group for the tool, their average

5    age was about 34 years old.

6    Q.   And you're aware that after Hanson published the

7    Static-99, that he underwent some criticism for his tool not

8    accurately accounting for age?

9    A.   Well, there was some outcome data that specifically

10   looked at age, and because of the lessened recidivism rates,

11   and the fact that in the Static-99 and in the RRASOR, and in

12   all tools prior to the publication of a later actuarial

13   that's not widely utilized right now, yes, that was an

14   implication of that, that it was not capturing; by measuring

15   it only at age 25 and not accounting for it later in the

16   life cycle, that that could be a confounding factor.

17   Q.   And there's no dispute in the scientific community that

18   you're in that younger offenders are more dangerous,

19   generally speaking, than older offenders?

20   A.   That rates of recidivism are generally higher, that's

21   correct.

22   Q.   And according to Hanson, when he has now reresearched

23   or has researched this issue specifically, he has concluded

24   that individuals 50 or older recidivate at about half the

25   rate of everyone that's 50 or younger, right?

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1    A.    I would agree with that statement, yes, as an aggregate

2    statement.    There are a lot of subissues going on, but, yes,

3    that's true.

4    Q.    Okay.  And in 2002 Dr. Hanson published a new study

5    having to do with the effects of aging on recidivism, right?

6    A.    Right.

7    Q.    Now, before we get into the numbers that he came up

8    with, are you familiar with the physiological reasons why

9    older men commit fewer sex offenses, and if so, would you

10   opine what you know?

11   A.    When you talk about physiology, I mean, this has been

12   an area that I've studied.  I've actually published in this

13   particular area, not -- I'm talking about sexual functioning

14   and decreased sexual functioning as a function of aging and

15   chronic medical illness, which answers the question you just

16   posed.  Why older offenders from a physiological perspective

17   may be at reduced risk to reoffend has to do with a number

18   of physiological factors that are related to aging; and that

19   ranges from just testosterone, which even in one's 30s

20   starts going down, and other neurotransmitters such as

21   oxytocin.  It has to do with the ability of men to, in the

22   pre-Viagra age, to sustain erections when they get older.

23              And the reasons for that are numerous, and it can

24   be related either to some direct issues, again, relating to

25   testosterone, to more peripheral issues such as, for

1    example, peripheral neuropathy that has to do with diabetes,

2    or smoking which can damage capillaries, to other types of

3    medical illnesses that just decrease or in many cases

4    eliminate a man's ability to function in a sexual manner.

5    And the chances of that happening are positively correlated

6    the older one gets, and even men who are otherwise generally

7    healthy have these issues as well, as the pharmaceutical

8    industry has picked up on.

9              THE COURT:  Joking aside, though, has that

10   availability of those drugs made a difference to your

11   analysis?

12             THE WITNESS:  Well, that's an open question.  And

13   if there are no other more significant organic issues going

14   on, and to the extent that that does, it could influence.  I

15   haven't seen it being shown in the data.  You know, the blue

16   pill didn't come out that long ago, so there's no data

17   really to support it.

18   Q.   But there is now, finally, data that documents that

19   it's true, this decrease in --

20   A.   Oh, yes, it's clearly true.  The older one gets, for

21   males especially, you know, it's different, but, yes, it

22   does interfere with one's ability to both achieve and

23   sustain or maintain erections.  There's a decreased libido

24   as a function of decreased testosterone, yes.

25   Q.   Okay.  And this research is not limited to Hanson

1  right?  It's been replicated?  Barbary has done it?

2  A.   Richard Wollert.  There's a number.

3  Q.   Right.  And yet Dr. Hanson in 2002 in the Journal of

4  Interpersonal Violence published a chart which breaks out

5  sexual reoffending over a life span of individuals, right?

6  A.   Yes.  He subdivided offenders into three groups and

7  then charted recidivism rates throughout the life cycle.

8  Q.   Okay.  And what were the three groups that he broke out

9  of sex offenders?

10  A.   They were men who raped females, adult female rapists,

11  and then two classes of child molesters; extrafamilial,

12  meaning those who offend outside of the family, and incest,

13  intrafamilial offenders.

14  Q.   And just so the jury understands some of the quirks of

15  the differing definitions of sex offenders, incest offenders

16  actually have been studied as a separate class and found to

17  be among the lowest recidivism risks of all types of sex

18  offenders, right?

19  A.   Correct.

20  Q.   So it's helpful to break them out, right?

21  A.   Yes.

22  Q.   Okay.  And Hanson did that, right?

23  A.   He did.

24  Q.   Now, Mr. Shields would fit into the category of

25  extrafamilial child molester; is that right?

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1   A.   Correct.

2   Q.   And that's not differentiated between an adolescent or

3   a preadolescent, right?  That's just all individuals who

4   offend against a child, as defined as being either under the

5   age of 16 or 18, right?

6   A.   Right.

7   Q.   Okay.  And it's fair to say, those three groups

8   reoffend in different ways, or at different times?

9   A.   Well, at different rates as a function of age, if

10  that's the issue.

11        MR. SWOMLEY:  I'm going to put up on the screen

12  that chart.

13  Q.   I'm going to show you what's been previously marked as

14  Exhibit 32 by the government, that chart.

15        MR. GRADY:  No objection.

16        THE COURT:  Excuse me?

17        MR. GRADY:  No objection.

18  Q.   And you can even see the one that applies to

19  extrafamilial child molesters in the yellow, right?

20  A.   Correct.

21  Q.   Now, it's fair to say, when you look at extrafamilial

22  child molesters, they offend in a different manner than, for

23  example, the adult female rapist?

24  A.   Yes.

25  Q.   And the more dangerous periods of time in an

1  extrafamilial child molester's life comes at a later time

2  than an adult female rapist, right?

3  A.   Yes.  The function, the impact of aging on recidivism

4  for this one group, although you see generally up to age 45

5  it is a generally decreasing function, it remains higher

6  than the other two groups throughout those years.

7  Q.   And let's just peg Mr. Shields here for a second in

8  this continuum here.  He fits in right around there, right?

9  That's the time gate that applies to him?

10  A.   The next one over.

11  Q.   Oh.  Oh, I'm sorry, this one right here.  And that is,

12  if you look at it around 18, between 18 and 20 percent,

13  right?

14  A.   Yes.

15  Q.   And that's where Hanson pegs individuals who are

16  between 45 and 49, their rate of reoffense, right?  And

17  these are ages -- I'm sorry.

18  A.   Yes.

19  Q.   And these are ages that are not the age in which they

20  offend; it's the age at which they're released, right?

21  A.   That's correct.

22  Q.   And Mr. Shields, I believe you said, is almost 47?

23  A.   Correct.

24  Q.   And will be on probation for the next three years,

25  right?

Page 75

1   A.   Correct.

2   Q.   So probation -- let me ask you, how, in your opinion,

3   how likely is Mr. Shields to engage in a sex offense while

4   on probation?  Do you have any breakout of that?

5   A.   No.

6   Q.   At the time he stops being on probation, he's now at

7   the next time gate, right?

8   A.   Yes.

9   Q.   And that is a time gate estimated to be somewhere

10  between 8 and 10 percent?

11  A.   Around 10 percent, yes.

12  Q.   Okay.  And just. . .

13          MR. SWOMLEY:  One moment, your Honor.

14          (Pause.)

15          THE COURT:  So is this chart people of all scores?

16  In other words, it doesn't matter whether you were a 5 or a

17  6 or a 2?

18          THE WITNESS:  That's correct, Judge.  This is the

19  overall group of offenders.

20  Q.   Okay, now, those are lower numbers than the Static-99

21  or the RRASOR come up with, right, for that age group?  I

22  mean, I'm sorry, for -- let me withdraw that question.

23  Dr. Hanson would agree that his two instruments don't

24  account for all of the aging decrease that occurs, right?

25  A.   Correct.

1   Q.   And this chart pretty much documents why the Static-99

2   doesn't accurately measure age, right?

3   A.   Correct.

4   Q.   Because if the Static-99 is normed on the population

5   group, the 24- to 30-year-old group, it's a higher rate,

6   right, first off?

7   A.   Correct.

8   Q.   And the Static-99 measures dangerousness without

9   accounting for anything other than the fact that offenders

10   that offend between the ages of 18 and 25 are the most

11   dangerous, right?

12   A.   Right.

13   Q.   And so his loading of that variable only addresses age

14   as you're either before the age of 25 and you get an extra

15   point, or you're after the age of 25 and you don't get any

16   points?

17   A.   Correct.

18   Q.   Okay.  So with this new data, one can demonstrate that

19   older offenders are overpredicted, generally speaking, by

20   those two actuarial instruments, right?

21   A.   Yes.

22   Q.   Now, the overall rate of recidivism -- and I'll take

23   this off for a second just so it doesn't confuse people --

24   the overall rate of recidivism, according to Dr. Hanson's

25   initial 1998 meta-analysis, for all child molesters is what?

1  A.   Well, just for child molesters?

2  Q.   Yes.

3  A.   There is a 13.4 reported overall.  It's 13.2 percent

4  for the RRASOR and 13.4 percent.  But there is a subdivision

5  between rapists and child molesters too.  That was the

6  aggregate of 13.4, so I'll need a minute to locate that

7  data.

8         THE COURT:  I tell you what, we're likely to go

9  past the break, so why don't you, to move this along, could

10 you keep asking, and then he could do that data over the

11 break?

12        MR. SWOMLEY:  Sure.

13 Q.   I guess where I'm going with this, Doctor, is the

14 analysis of -- you have an overall recidivism rate, let's

15 say, of 13 percent for all child molesters, right?

16 A.   Yes.

17 Q.   And that doesn't help you figure out among that whole

18 group of child molesters who are the more dangerous and who

19 are the less dangerous, right?

20 A.   That's right.

21 Q.   Using the chart you have, you've got a much better

22 sense of who are the more dangerous versus who are the less

23 dangerous by virtue of the age discrepancy, right?

24 A.   Well, yes, what that shows is there is a relationship

25 among all three groups of offenders between getting older

1    and the rates at which, just knowing age alone, the rates at

2    which reoffense occurs.  That is, if you look at it, it is a

3    generally decreasing function that has some more spectacular

4    results at certain time periods in the age cycle.

5    Q.   Okay.  Actually I've found -- Dr. Wollert reanalyzes

6    all this data, right?

7    A.   Yes.

8    Q.   And he has a publication that came out in 2006, "Low

9    base rates limit experts' certainty when current actuarials

10   are used to identify sexually violent predators"?

11   A.   He does.

12   Q.   Are you familiar with that article?

13   A.   Very.

14   Q.   And let me ask you, generally speaking, do you agree

15   with it?

16   A.   I do.

17   Q.   And so if we have a low base rate for a particular

18   occurrence -- that is, recidivism of a child molester -- and

19   we're starting at 13 percent, is that one of the base rates

20   that's commonly accepted?

21   A.   Five years?  Yes.

22   Q.   Okay.

23            THE COURT:  I don't know what you're talking about

24   here.  So can we --

25            MR. SWOMLEY:  Okay, yes.

1 Q.   When you start with a rare -- well, let me ask you to

2 put it because I'm not the doctor.  You tell me.  Why is it

3 that if you have low base rates for particular events, that

4 you have problems extrapolating outward to numbers that mean

5 something?

6          THE COURT:  Actually, back up.  What's a base

7 rate?

8          THE WITNESS:  A base rate is a natural free

9 occurrence of any type of phenomenon.  So if we're talking

10 about sex offense recidivism, that means if I could get all

11 the data for people who are convicted of a sex offense,

12 released from confinement, the question is, at what rate --

13 don't give me anything particular, how old they are -- just

14 what rate do they reoffend, just in general?  And you study

15 it, and you look over five years, and you say 13.4 percent

16 of them reoffend.  That's your base rate.  That's the

17 free-occurring rate of some phenomenon, in this case, sexual

18 reoffending.

19          And that's what all of this prediction and

20 actuarial and overprediction of dangerousness that we're

21 talking about, it all stems from the base rate.  I tried to

22 get at this yesterday in my direct testimony by saying and

23 using an example:  If the base rate were 90 percent, this

24 would be very easy to do.  I could say everybody's

25 dangerous, and I'd be right 90 percent of the time because

1   90 percent reoffend.  But what we find in sexual

2   reconviction is the opposite, that it's in a range that's on

3   the lower end.

4            THE COURT:  When they say low base rate, they're

5   referring -- this expert is referring to 13 percent?

6            THE WITNESS:  Yes.

7            THE COURT:  Overall?

8            THE WITNESS:  Overall.

9            THE COURT:  Over five years, is that it?

10           THE WITNESS:  That's correct.

11           THE COURT:  All right, so what's your question

12   now?

13   Q.   Why do low base rates make it difficult to achieve

14   accurate predictive measurements?

15   A.   Because if you just said nobody would reoffend, and

16   you're just assuming a 13 percent base rate, and you said

17   nobody will reoffend, you're still going to be right

18   87 percent of the time, okay?  So you have to know something

19   very special, and you have to get in there to parse that

20   13 percent, to say, okay, well, we have this sense over five

21   years, about 13 percent of this group is going to reoffend.

22   The big issue is correctly identifying who they are.  And if

23   you just say, well, none of them will, you'd still be right

24   almost 90 percent of the time.

25            And the actuarials and all of this is to try to

1    get into that 13 percent, to identify groups that are much

2    more likely to reoffend than that 13 percent.  And then you

3    can use different criteria:  Well, how much more likely?

4    Over 50 percent?  I mean, what's the criteria?

5              States in civil commitment are all over the place.

6    They all have different definitions of "likely to reoffend."

7    The Commonwealth of Massachusetts has a nonstatistical

8    definition by the Supreme Judicial Court, meaning it is

9    reasonable to expect, whatever that means.  I was in

10   Washington state testifying a couple of weeks ago.  Their

11   criterion is more likely than not, 50.1 percent or greater.

12             So it's trying to get into this 13 percent and

13   saying, well, he represents or he does not represent that

14   smaller cohort who are much more likely than the base rate

15   to reoffend.  And that is exactly the task in trying to do

16   what I'm doing in this context, is taking a person, knowing

17   what the base rates are, what the research are, and saying,

18   well, is Mr. Shields in this high rate, however it's

19   defined, or not?  And if I just -- and I can't -- well, I

20   could go on for three days.  I'll just leave it.

21   Q.   Okay.  Let me ask you whether you agree with some of

22   the particulars that Dr. Wollert describes in the article I

23   just mentioned, and that is, do you agree that "Recidivism

24   rates consistently decline with age, paralleling the age and

25   variance pattern found for other offenders"?

1   A.   Yes.

2   Q.   Do you agree that "Actuarials were efficient for only

3   the youngest group, were inaccurate for identifying

4   recidivists, and misclassified many nonrecidivists as

5   recidivists, and opinions about the accuracy of actuarials

6   are therefore often wrong, and actuarials need to be

7   reformulated.  Finally, that actuarials are useless for

8   identifying likely sexual recidivists from populations with

9   recidivisism base rates below .25"?

10  A.   I am in agreement with that statement, and the

11  take-home message is, if you use 50 percent as a cutoff,

12  more than 50 percent likely, and the person scores high on

13  all the actuarial tools that they were studying in that

14  article, and they are of a age range essentially above 25,

15  that you're going to be below that 50 percent threshold,

16  even for high-risk groups on the actuarials.  So only when

17  you're going to be getting around age 25 do you even go

18  above that 25 percent, and that's all the functions of the

19  base rates.

20  Q.   Let me ask you whether you agree with this statement

21  contained on Page 72 of that article:  "By indicating an

22  error rate in excess of 50 percent for those older than the

23  18- to 24-year-old group, the results of the study at hand

24  raise an important practice question:  Do test efficiencies

25  for current actuarials deteriorate so rapidly with age that

1  they are useful only for the very youngest group of

2  offenders?"  And let me ask you that question.

3  A.   Well, that's essentially what I just said.  And you

4  reference the 18 to 24.  That's why I said over age 25, the

5  base rate, given the base rate of reoffending, that when you

6  get over age 25, the base rate data are such that even if

7  you use high risk -- this is when you do subdivide in the

8  actuarials -- use only the high-risk people, that you're

9  still not going to get to the 50 percent.  You're going to

10 be below 50 percent accuracy.  And that then becomes a

11 question.  It's not 0 percent, so how comfortable are you

12 going to be before you're going to say the person is

13 dangerous or not?  And after age 25 or 25 and above, what's

14 going to happen is, even for high-risk people in actuarials,

15 the likelihood that if you use that to say they will

16 reoffend, you're going to be right less than half the time.

17 That's the real take-home message of that study.

18 Q.   Okay.  And Dr. Wollert offers a real easy way of

19 conceptualizing how the Static-99 and the RRASOR

20 mischaracterize risk, right?

21 A.   Yes.

22 Q.   And in doing that, you know that the Static-99 and the

23 RRASOR are measuring static variables, right, variables that

24 aren't going to change?

25 A.   Correct.

1   Q.   His numbers aren't going to change when he's 47, when

2   he's 57, when he's 67, all things being equal, right?

3   A.   He cannot change.  On the RRASOR, his score is fixed

4   for the rest of his life.

5   Q.   And so when you take that score and say that puts him

6   in a high-risk category, what you're ignoring is the

7   breakout in each of the bins, the risk categories, depending

8   upon age?

9   A.   That's one factor, that's correct, and that is referred

10  to in this case as what we would call the "broken leg

11  problem."

12  Q.   Okay.  Well, the way Wollert make it's easy to talk

13  about is in terms of breaking out accurately the relative

14  risks of any class of offender by age, he gives this way of

15  thinking about it, and I'm going to ask you whether you

16  agree with this or not.  If you apply his method of analysis

17  to the Static-99, for example, the highest-risk group would

18  include offenders who are 18 to 24 years old with a score of

19  6 or above, right?

20  A.   Correct.

21  Q.   The next highest group would include offenders who are

22  25 to 29 years old with a score of 6 or above?

23  A.   Correct.

24  Q.   And offenders who are 18 to 24 with scores of 5?

25  A.   Correct.

1   Q.   In contrast, offenders who were 60 to 69 but had scores

2   of 6 would fall in a very-low-risk group.

3   A.   Extremely low.

4   Q.   So the fact that they score the 6 isn't what puts them

5   in the high-risk group, if you really apply the age data?

6   A.   Correct.

7   Q.   As the last step, the performance --

8        MR. GRADY:  Could we qualify whether that's

9   according to Wollert and he's agreeing with Wollert saying

10  that or whether he is --

11       THE COURT:  Do you agree with that statement?

12       THE WITNESS:  I do agree with that, Judge.

13       THE COURT:  The "broken leg" problem I assume

14  means, if someone has a broken leg, they can't do much?

15       THE WITNESS:  That's correct.

16       THE COURT:  So this data --

17       THE WITNESS:  It doesn't tell us about dynamic

18  factors.  It gives us a snapshot based on information that

19  doesn't or may not account for a number of factors.  If

20  someone scores a 12 out of 12 on the Static-99 or a 6 out of

21  6 on the RRASOR and they're young, they're 18 years old, but

22  they have a stroke -- in other words, they're in a coma --

23  the likelihood that they're going to reoffend at that point

24  is going to be zero.  So it's not taking into consideration

25  the present-day dynamic factors.

1  Q.   And, of course, that's the extreme case, right?

2  A.   I'm using the extreme case to illustrate the rule

3  because there's a lot being talked about.

4  Q.   Now, much, if not all, of the data that Hanson and the

5  other professionals that created the Static-99 and the

6  RRASOR reoffended at what is turning out to be higher rates

7  than the most recent data about what U.S. offenders are

8  doing, right?

9  A.   Would you ask that question again?

10 Q.   Yes.  Static-99 and the RRASOR.

11 A.   Yes.

12 Q.   Normed on 34-year-olds, based on research of those

13 34-year-old average-aged people in Canada, Great Britain,

14 other places than the United States, right?

15 A.   Yes.

16 Q.   And by virtue of how long ago that research had to have

17 been done, those people weren't even released under maybe

18 the most recent series of conditions that they might be

19 released under today?

20 A.   True.

21         MR. GRADY:  Objection.

22 Q.   So from that data set, you have a recidivism rate, or

23 several, depending on how you break it out for individual

24 types of offenders, right?

25 A.   Correct.

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1  Q.   All of that data is one older than some of the more

2  recent data coming out of the United States, right?

3  A.   True.

4  Q.   And, two, higher than some of the more recent data in

5  terms of recidivism rates coming out of the United States?

6  A.   That's true, there are some more recent data sets that

7  are suggestive of less recidivism rates than the initial

8  publication.

9           THE COURT:  All right, it's a good time for a

10 break.  Do you have one last question?

11          MR. SWOMLEY:  No.

12          THE CLERK:  All rise for the jury.

13          (Jury excused.)

14          THE COURT:  I just had one or two questions for

15 you, if it's okay, if we could just be seated for a second.

16 On the RRASOR, there's a challenge to the five-year and

17 ten-year out statistics, the 48, 49 percent statistic and

18 then the 70 plus statistic?

19          THE WITNESS:  Yes.

20          THE COURT:  As I understand your testimony on the

21 stand, there are studies that have validated the five-year

22 out prediction, is that right?

23          THE WITNESS:  There are.

24          THE COURT:  And they're peer reviewed in the

25 literature?

1          THE WITNESS:  Yes, Judge.

2          THE COURT:  And they're accepted in your field?

3          THE WITNESS:  Yes.

4          THE COURT:  All right, that's what I understood

5     you to say, but you seemed to be more equivocal about the

6     ten-year out.

7          THE WITNESS:  Well, no, I'm not more equivocal.  I

8     just want to be clear about where those estimates came from,

9     and when we get into a courtroom, sometimes -- the studies

10    that went into the validation of the RRASOR had different

11    study periods in terms of recidivism, how long were they

12    measured.  Some went out I think up to 23 years on the

13    RRASOR, on the seven samples that comprised the RRASOR

14    validation samples.  But they wanted to standardize them

15    because most of them didn't have the ten-year data.  They

16    all had the five-year data, so the five-year data and the

17    five-year data.  And what Hanson and colleagues did to

18    extrapolate out to the ten years was take the five-year data

19    and use a model based on recidivism rates after five years,

20    from five to fifteen years that were essentially halved,

21    half the rate of recidivism per year added on.

22          So how you get to the ten-year rates for all

23    categories on the RRASOR are the five-year rates with a

24    model applied, a statistical model based on research of

25    recidivism from the five years to fifteen years, with the

1   notion that after fifteen years, you had such negligible

2   recidivism that you could just throw it out.  That's what I

3   tried -- maybe I did it inartfully yesterday, but that's

4   what I'm trying to get at.

5              THE COURT:  Is there peer-reviewed literature

6   which would accept the ten-year out statistics?

7              THE WITNESS:  Yes.  There is peer-reviewed

8   research that would say that the RRASOR for its different

9   categories, when measured with different groups, still

10  basically stands the test to a statistical degree that's

11  acceptable.

12             THE COURT:  I fully understand that, and I've

13  allowed it in.  I'm just sort of saying, there's a number of

14  70 percent that is the ten-year out model which you said was

15  based on an extrapolation.

16             THE WITNESS:  Right.

17             THE COURT:  Is that 70 percent statistic accepted

18  in the peer-reviewed literature?

19             THE WITNESS:  Yes.

20             THE COURT:  And is it generally viewed as reliable

21  in the field of what, forensic psychology, people who make

22  these risk predictions?

23             THE WITNESS:  Yes.  It's validated at the score of

24  5 over ten years, yes.

25             THE COURT:  So at this point, are there -- maybe

1    you don't have them at your fingertips -- are there

2    particular articles you could point to?

3                THE WITNESS:  I wish you asked me this question

4    yesterday.  I would have brought them with me this morning.

5    I may have some with me.  I will look.

6                THE COURT:  If you can, just to let me know.  I

7    have this problem, in that I spent three days doing the

8    Static-99.  I think that if he's telling me that, then I'm

9    going to allow in the chart.  I'm allowing your age chart.

10   I'm going to allow in these statistics, and so --

11               MR. SWOMLEY:  I wasn't thinking I would introduce

12   the age chart, but if you're allowing it in, let's --

13               THE COURT:  Of course I'll allow it in.  I mean,

14   they've been sitting there staring at them, and they're

15   helpful statistics for me, and he's accepted them.

16               MR. SWOMLEY:  Well, can I show you what the

17   statistics look like that disprove them?  They are

18   complicated mathematical formulas based --

19               THE COURT:  Excuse me.  Disprove what?

20               MR. SWOMLEY:  Disprove the accuracy those numbers.

21               THE COURT:  It's long past the time when I can do

22   that.  If you want to ask him about it, that's fine.  I held

23   the Daubert hearing on the Static-99.  I understand that

24   RRASOR was mentioned during that time period.  There hasn't

25   been a separate Daubert challenge.  The document was agreed

1  upon.  I can't do any more other than ask the expert whether

2  or not the basic factors of Daubert have been there.  If you

3  want to impeach the weight of them, it's fair game.

4          MR. SWOMLEY:  That's what I've been doing.

5          THE COURT:  You have, fair enough, but I'm

6  allowing in the exhibit.  And I'm allowing in your age

7  exhibit, which is incredibly helpful as well in

8  understanding this issue.

9          Now, the next issue, what I want is, I had at the

10  government's request knocked out all the docket sheets from

11  all these convictions, and I still think most of it is a

12  waste.  However, in my mind what -- not a waste but

13  cumulative and confusing.  We can do it by stipulation, or

14  we can do it by just photocopying.

15          I actually don't know what happened.  So let's say

16  he was indicted in January of 1989 for molesting a child.

17  Then he was charged again in -- I can't remember -- in July.

18  So was he arrested in between?

19          MS. KELLEY:  Your Honor, if this isn't made clear

20  in the government's case, it's going to be made clear in

21  ours.

22          THE COURT:  Well, was he arrested in between?

23          MS. KELLEY:  I don't think so.

24          MR. SWOMLEY:  I think that he got arrested, and

25  then they figured out what else he had done.  But I don't

1   want to be --

2          MR. GRADY:  That's not inconsistent with my

3   understanding.

4          THE COURT:  Can I just say, it would be really

5   useful, because as I'm seeing this case boil down, at least

6   in my mind, very nicely put by Mr. Swomley, did he get it at

7   some point?  Well, what did it take to get it?  That's the

8   defense.  Okay, your point is, he never got it, and yours

9   is, yes, he did.  And we're past prong one and two, if you

10  will, so --

11         MR. SWOMLEY:  I've got some questions on --

12         THE COURT:  All right, maybe, maybe, but there's a

13  strong case on pedophilia.  Fair enough, I haven't heard the

14  whole thing, but I think three experts out of three is a

15  tough road for you.  But, anyway, but let me at least get to

16  the point of, did he get it at some point?  And it's useful

17  for me to understand the chronology and for the jury, I

18  think.  I think that's what they were trying to get at here.

19         MS. KELLEY:  Well, I think the dates of the

20  offense, et cetera, will be clear by the end of the case for

21  sure.

22         THE COURT:  But also, when did he do it, when was

23  he -- did he know he was charged, or was he arrested, and

24  when was he sentenced, and when was there a revocation?

25  Just maybe a summary document that just sort of lays out the

1    chronology, because if you're right that there were three

2    separate incidents, but he was only actually picked up at

3    one time and then sentenced, then I'd want to know, well,

4    how soon after he got out did he do it again in '98, and

5    what was the kind of treatment he got in between?  In other

6    words, literally the chronology of what happened here, as

7    I'm having trouble reading the documents.  You'll do it,

8    fine, but I just want to make sure the jury gets it, too,

9    because I'm going to be able to sit here and stare at it.

10            MS. KELLEY:  Okay, that will be done.

11            MS. STACEY:  It's already in progress in our

12   office, your Honor.

13            THE COURT:  Good, that's fabulous.  I'll see you

14   at 11:30.

15            (A recess was taken, 11:10 a.m.)

16            (Resumed, 11:40 a.m.)

17            THE COURT:  You're going to try and wrap it up

18   today?

19            MR. SWOMLEY:  I am going to make that rough

20   promise to everyone that I will do everything in my power to

21   do that, yes, and do it in enough time for Mr. Grady to

22   redirect.  That's my goal.

23            THE COURT:  And you're still planning on --

24            MR. SWOMLEY:  I don't know what the predictive

25   accuracy of that would be.

1          MR. GRADY:  Dr. Tomich -- I spoke to him

2     yesterday -- was still on for Monday.  He couldn't be

3     available today because of a biopsy, but we're expecting him

4     Monday ready to go.

5          THE COURT:  Could I just play this out just for

6     one minute.  So if there's a crisis and it's a bad biopsy

7     and the doctor says --

8          MR. GRADY:  I'll speak to him this afternoon.

9          THE COURT:  We just need to know as soon as

10    possible.

11         MR. SWOMLEY:  Your Honor, I have premarked a

12    couple of exhibits that we talked briefly about yesterday,

13    the DSM-IV cautionary note and stuff like that.  I don't

14    know if we have agreement about whether it's admissible or

15    not.

16         THE COURT:  The DSM should come in.

17         MR. SWOMLEY:  That's what I thought.

18         THE COURT:  The whole section applying to

19    pedophilia, do you have a problem with that?

20         MR. GRADY:  No, I don't.

21         THE COURT:  That's number two.  That's the second

22    prong.

23         MR. GRADY:  What he is speaking about is something

24    different, however, your Honor.

25         MR. SWOMLEY:  I'm speaking about the cautionary

Page 95

1    and the use of clinical judgment cautionary in the front of

2    the manual as it relates to pedophilia.

3            THE COURT:  If it's part of the DSM-IV-TR,

4    whatever it is, it comes in.

5            MR. GRADY:  All right.

6            THE COURT:  All right, let's go.

7            (Pause.)

8            THE COURT:  I have some questions.  One is quite

9    simple.  "We are asked to rule whether Mr. Shields is

10   sexually dangerous.  Please define sexually dangerous."  So

11   I can sort of tell them that I will define that all for them

12   in the jury instructions.

13           The second question, "Will the test for penis

14   arousals be a more predictor of repeat offense, and if so,

15   why has it not been administered?"

16           THE WITNESS:  That's a great question.

17           THE COURT:  So anyone have good ideas on the

18   response to that question?

19           MR. SWOMLEY:  Typically that gets litigated ages

20   ago, and the evidence is what it is, is the way I would --

21           THE COURT:  Well, let me just start from basics.

22   I take it he hasn't been given that test?

23           MR. SWOMLEY:  No.

24           THE COURT:  I don't know whether that is something

25   that is routinely done.

1          MR. GRADY:  I would say "no."  I would say the

2     government was given no opportunity to do it, since

3     Mr. Shields refused to meet with the government's experts at

4     all.

5          MS. KELLEY:  Oh, that's totally unfair.

6          THE COURT:  Well, let me just put it this way:  As

7     I understand it, no one has done the test, and I think I

8     have to say, to protect both sides, that no one should draw

9     any inference from that.

10          MR. SWOMLEY:  That's fine.  That's a great

11     response.

12          THE COURT:  Because it's not a criminal case.  On

13     the other hand, it's criminal-like, and I don't want to draw

14     an inference against him for not having taken it.  On the

15     other hand, I don't think it's fair to draw the inference

16     against the government, since he's refused to cooperate with

17     them, and --

18          MR. SWOMLEY:  It's data not available is what it

19     is.

20          THE COURT:  It's just data not available, I think

21     is the best way I should deal with that.  Okay, let's bring

22     them in.

23          THE CLERK:  All rise for the jury.

24          (Jury enters the courtroom.)

25          THE COURT:  Thank you.  I received two questions.

1  One is about the definition of sexually dangerous.  We'll be

2  spending a lot of time on that in the instructions of law,

3  and I will talk to you about it at that point.

4          The next one involves the test for what the juror

5  called penis arousal.  That has not been administered.  That

6  data is not available, and you shouldn't draw any inferences

7  either way about that or guess why it isn't available.

8          All right.

9  BY MR. SWOMLEY:

10  Q.  Dr. Plaud, if we could return to the study we were

11  discussing before the break by Dr. Wollert regarding why the

12  error rate goes up dramatically in actuarial risk assessment

13  when you have lower base rates and try to make predictions

14  based upon them.  We talked about how the data set coming

15  out of the United States has been demonstrated to have a

16  lower recidivism rate, even than those used by Dr. Hanson,

17  right?

18  A.  There are some studies, cross-validation studies, yes,

19  that support that conclusion.

20  Q.  Well, Dr. Wollert refers to the most recent just pure

21  recidivism data out of the United States in his article,

22  right?

23  A.  Yes.

24  Q.  And that data comes from the Bureau of Justice

25  Statistics, right?

1   A.    Correct.

2   Q.    And the Bureau of Justice is essentially the U.S.

3   Department of Justice, the government, as it were, right,

4   our federal government?

5   A.    Correct.

6   Q.    And it concerns sex offenders?

7   A.    It does.

8   Q.    Right?

9   A.    Yes.

10  Q.    And it concerns sex offenders released from federal

11  facilities, right?

12  A.    Correct.

13  Q.    And would you agree that at least as to the pool of

14  individuals that are being released across this country that

15  are sex offenders, Mr. Shields is far more like that group

16  because he is among that group, although he's not in the

17  study set, but he is a federal detainee being proposed for

18  commitment or release, right?

19  A.    Well, I'm not prepared to endorse or not endorse that.

20  The bottom line is that I don't know.  I mean, under federal

21  jurisdiction of the United States, it could be, for example,

22  a number of Native Americans that would present some

23  cultural differences perhaps, so --

24  Q.    Okay.  But you would agree that the data set from the

25  U.S. Department of Justice certainly does pertain to people

1    released in the United States --

2    Q.    Yes.

3    Q.    -- from federal facilities?

4    A.    Yes.

5    Q.    And whether you would make any comment about whether

6    that means Mr. Shields is like them or not I'll leave for

7    another day, but in terms of what I'm looking at -- and

8    you're familiar with this research, right?

9    A.    I am.

10   Q.    And do you agree that what the U.S. Department of

11   Justice has learned is that as to sex offense recidivism

12   over short time gates -- because we're talking about 1994 is

13   the data set, right?

14   A.    Correct.

15   Q.    That's people that were released in 1994?

16   A.    Yes.

17   Q.    Now, you'd agree that, bizarrely, that's the most

18   recent data, right?  There's nothing from 2007, for example,

19   that's published yet?

20   A.    Correct.

21   Q.    Okay.  And the publication of this didn't come out in

22   '94.  It came out recently, right?

23   A.    It did.

24   Q.    And it breaks out the various recidivism rates for all

25   different kinds of offenders, right?

1    A.    It does.

2    Q.    It breaks out recidivism rates for people that are

3    convicted of nonsex crimes that go on to commit sex crimes,

4    right?

5    A.    Correct.

6    Q.    It breaks out people that commit sex crimes and go on

7    to commit sex crimes?

8    A.    Yes.

9    Q.    Or people that commit sex crimes that go on to commit

10   nonsex crimes?

11   A.    Correct.

12   Q.    It breaks out all different kinds of data?

13   A.    Yes.

14   Q.    Of the subset of data that might be useful to this

15   setting, it breaks out the number of sex offenders released

16   from prison in 1994 and the percent that were rearrested for

17   a sex crime against a child?

18   A.    Yes.

19   Q.    So what we're talking about is a group that is not

20   defined by whether they offended against a child the first

21   time but whether they committed any sex offense the first

22   time?

23   A.    Yes.

24   Q.    And whether they reoffended against a child?

25   A.    Right.

1   Q.   That statistic, all individuals released in 1994 that

2   committed a sex offense, any kind of sex offense, that went

3   on to commit a sex offense against a child in the next three

4   years, the total percent was 2.2, right?

5   A.   Correct.

6   Q.   And if you look at the next statistic, which is the

7   number of people classified as child molesters that then go

8   on to reoffend against a child in a sex crime, the percent

9   rearrested for a sex crime against a child within three

10  years for a person classified as a child molester is

11  3.3 percent?

12  A.   Correct.

13  Q.   And that data is dramatically lower than the recidivism

14  rates used by Dr. Hanson, right?

15  A.   The recidivism range is more truncated, but, yes, it is

16  lower.

17  Q.   Okay, Dr. Hanson was able to go out further in time,

18  right, to larger time gates?

19  A.   Correct.

20  Q.   But still, even with extrapolations, you're starting at

21  lower numbers, right?

22  A.   You are.

23  Q.   Okay.  And when you get to what's been premarked as

24  Exhibit 27 by the government on the estimated recidivism

25  rates for people with a score on the RRASOR -- and I don't

1    know why we can't see that.  Is that better?

2            THE COURT:  Is that translucent or something?  Can

3    I see the -- all right, that's fine.

4            MR. SWOMLEY:  Is that all right?

5    Q.   We have this kind of scary number with a score of 5 on

6    the RRASOR after ten years of 73.1 percent, right?

7    A.   Yes.

8    Q.   We've talked about that a bit today and why that's an

9    overprediction?

10   A.   Correct.

11   Q.   Just to make clear, that data is based upon Hanson's

12   numbers, not even the U.S. Department of Justice data,

13   right?

14   A.   It's based on the Hanson sample data, which had an

15   average recidivism rate over five years of 13.2 percent, as

16   reflected under the total.  If you look at the bottom, you

17   sum across the bottom, you see five-year, go to the very

18   bottom of the five-year column, you see 13.2 percent, that

19   was the --

20   Q.   And the U.S. DOJ data is less than a third of that,

21   right?

22   A.   Correct.

23   Q.   Okay.  Now, in addition to there being a different data

24   set that would produce a lower score, there is also the age

25   stuff that we just talked about, right?

1   A.   Yes.

2   Q.   And if you --

3            THE COURT:  Can I ask, do you know what would

4   account for that difference?

5            THE WITNESS:  I've given the matter some thought,

6   Judge, yes.

7            THE COURT:  What's your opinion?

8            THE WITNESS:  Well, there are some differences in

9   the way recidivism, number one, is defined that could enter

10  into the analysis.  In other words, what is recidivism?  Is

11  it re-arrest versus reconviction?  The more stringent the

12  criterion, obviously, the less high the numbers will be

13  because there were people who will be rearrested, for

14  example, who will not be convicted.  So that's one issue

15  that needs to be considered.

16           Number two, it's over a period of time that's less

17  than five years.  And if you look at some of the Hanson

18  data, you do get movement, maybe not in the first year, the

19  second year, but it's not homogenous recidivism within that

20  five years year by year.  It straightens out more after five

21  years, in terms of the decrease is more orderly after five

22  years.  That didn't go out a full five years, so it's

23  truncated --

24           THE COURT:  When you say "that," you mean the

25  Department of Justice data?

1          THE WITNESS:  The Bureau of Justice data, correct.

2     So there may be some interplay there as a virtue of the time

3     period.  I wish they measured it a little longer.

4          THE COURT:  Is there a difference in the way sex

5     offenders are treated between the two countries?

6          THE WITNESS:  I don't -- well, I mean --

7          THE COURT:  You don't know.

8     Q.   And we're not talking about just two countries.  We're

9     talking about Canada and England predominantly for Hanson,

10    right?

11    A.   Correct.

12    Q.   And, obviously, only the United States for this data?

13    A.   Correct.

14    Q.   Now, you had mentioned that it could be differences in

15    the way recidivism is measured.  Let's just be clear.  The

16    U.S. DOJ's data measures it in the most lenient manner,

17    meaning the way that accounts for the most recidivism.  It

18    measures re-arrest?

19    A.   Yes.

20    Q.   Not reconviction?

21    A.   I have to look, but I don't know.  I think that's

22    right.

23    Q.   I don't want there to be any confusion here.

24          MR. SWOMLEY:  I'm showing him Page 31 of the DOJ

25    stuff.

1   Q.   That says "Percent Rearrested," right?

2        (Witness examining document.)

3   A.   That's what it says, that's right.

4   Q.   Thank you.  Now, the other big attack on this, other

5   than the recidivism rates that they start from are

6   different, when you get to these numbers is that since age

7   isn't accounted for, if you were to look at somebody that is

8   ten years older than Mr. Shields is, 57 -- he's a month shy

9   of 47 right now, right, thereabouts?

10  A.   Correct, a couple weeks.

11  Q.   A couple weeks, all right.  Give you credit for the two

12  weeks.  Fifty-seven is where Mr. Shields would be ten years

13  out, right?

14  A.   Yes.

15  Q.   And there's no data, looking at the other chart,

16  Exhibit 32, that --

17            MS. KELLEY:  John, push it up.

18            MR. SWOMLEY:  Oh, I'm sorry.

19  Q.   -- no data that suggests that people are reoffending

20  at 73 percent rate in their late 50s, right?

21  A.   That's right.

22            MR. SWOMLEY:  Okay, I want to move both of

23  these -- I don't know that they're actually in evidence or

24  not, but I move these both in evidence.

25            MR. GRADY:  I think the first of the two was --

1        MR. SWOMLEY:  Okay, then I would move 32 into

2   evidence.

3        MR. GRADY:  Certainly no objection.

4        THE CLERK:  This is already in, yes.

5        THE COURT:  So what numbers are they, the two

6   charts?  32 is the age one, and 27 is that RRASOR chart.

7        (Petitioner Exhibit 32 received in evidence.)

8   Q.  Just to be very clear, Doctor, would you agree that the

9   72 percent number, knowing all you know about the current

10  state of recidivism research, cannot be accurately applied

11  to Mr. Shields?

12  A.   It would be my judgment that given the fact that he is

13  approximately thirteen years older, and, again, with the

14  other issues that I've testified about in the last two days,

15  I would say that there are doubts about whether there's

16  applicability over a ten-year period to Mr. Shields, yes.

17  Q.   And, while you're not the witness that is advocating

18  for the utility of the Static-99, there might come to be

19  one, and let me ask you, since you are an expert in the

20  field, whether you feel qualified to opine about the

21  applicability of Static-99 time gates ten, fifteen years

22  out?

23  A.   I would reach an entirely similar conclusion.

24  Q.   And especially if you got to a fifteen-year time gate,

25  he's looking at --

1   A.   Over sixty.

2   Q.   And the recidivism rate for over 60 is --

3   A.   Well, statistically it's going to be below 4 percent.

4   Q.   Now, Dr. Wollert takes the new DOJ research and does an

5   analysis of age and the ability to predict sexual

6   dangerousness with an actuarial instrument, also accounting

7   for the low base rates, right, just so I'm getting the

8   important variables that he was addressing in his study?

9   A.   Would you ask me that again?

10  Q.   Sure, talking about the Wollert article entitled "Low

11  base rates limit experts' certainty when current actuarials

12  are used to identify sexually violent predators."

13  A.   Yes.

14  Q.   And he tries to account for what happens when you have

15  a low base rate and when you have differing age groups,

16  right?

17  A.   Yes.   That's the gist of the study.

18  Q.   Okay.   And I believe you have already agreed that you

19  accept the basic conclusions of Wollert in this study?

20  A.   Yes, I do.   Your question, though, I thought had to do

21  with the database.   You're talking about the Bureau of

22  Justice.

23  Q.   I'm just trying to get you to -- well, if you look at

24  Page 72 under "Major findings" in that discussion of

25  Wollert, under "Actuarial limitations and implications for

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1   the future development of ATSRs -- " that's what he calls an

2   actuarial, right?

3   A.   Correct.

4   Q.   He talks about, "If you assume that the rates are this

5   low in the United States, it is almost certain that the

6   15-year recidivism rate does not exceed the overall rate of

7   25 percent reported by Hanson and Thornton in 2000, and that

8   the levels of E," which is I believe efficiency, "as

9   measured in Figure 4 are overestimates," meaning whatever he

10  ends up with are still overestimates of risk?

11  A.   Yes, but he didn't base that on the Department of

12  Justice data.  He's just referencing that data.  He's using

13  going back to the Hanson data.

14  Q.   So he's not using the DOJ plug-ins in that analysis?

15  A.   Right.  That's what I want to be clear about.

16  Q.   He does, however, come up with a graph that plots the

17  efficiency of all of the major actuarials, right?

18  A.   Yes.  There are five tools that he measures, which

19  includes both the Static-99 and the RRASOR.  It also

20  includes the Minnesota Sex Offender Screening Tool Revised,

21  or the MnSOST-R.  It also includes the SORAG, the S-O-R-A-G,

22  which stands for the Sex Offender Risk Appraisal Guide, and

23  it also includes the VRAG, or the Violence Risk Appraisal

24  Guide.  And what this Figure 4 is doing graphically is

25  saying, if a person scores in a high-risk range on these

1    actuarial tools -- okay, so that's the first point, they're

2    high by definition -- you score them on the actuarial, they

3    fall in the high-risk category -- then you take note of what

4    their age is at the time you're scoring them.  And then you

5    make your opinion whether or not they're going to be a

6    recidivist at the 50 percent line, meaning more likely than

7    not.  That's your criteria for recidivism, they're more than

8    50 percent likely to reoffend, and then you study this based

9    on that, you will find that only in the 18- to 24-year age

10   range do you go above that 50 percent criterion.

11   Q.   And if I can --

12   A.   That's the bottom line.

13            MR. SWOMLEY:  I think I need to turn the light off

14   here.

15            (Discussion off the record.)

16   Q.   Okay, can you see that?  Maybe I can zoom too.  Okay,

17   you said that -- and if you would, Doctor, go through what

18   you've just testified to again, and if you can reference

19   what I have on the screen, that would be helpful.

20   A.   Sure.  Okay, well, you see on the Y axis, on the

21   ordinate, it says "Efficiency Levels/Recidivism Rates,"

22   okay?  So .5 as you go up there, which is a darkened line

23   with the circles running across horizontally, that is the

24   .5, 50 percent recidivism risk.  So anything over that means

25   that if you say they're going to reoffend, you're going to

1   be right more than half the time.

2           On the X axis, you see the age at release, so it's

3   in blocks.  So you have 18 to 24 all the way up to 60 to 69

4   running across horizontally.  All those graphical lines you

5   see, which you can see actually parallel each other rather

6   nicely, each represent a different actuarial tool.

7   Q.   And I am sorry.  If I zoomed out, you would see on the

8   right-hand margin there the different actuarial tools named,

9   right?

10  A.   That's correct, so the diamond is the MnSOST-R.  The

11  RRASOR is not readily discernible from what you see, but it

12  is the square that is not filled in.  The SORAG is the

13  triangle.  The Static-99 is the X.  The VRAG is the box with

14  the X superimposed on it.  And what you see is, for the 18-

15  to 24-year group, people who score high on the actuarials

16  actually do have a greater than 50 percent chance at

17  reoffending.  So you would be right more often than you

18  would be wrong if you were using that as your cutoff.

19          As you go to 25 to 29, you'll see that they just

20  dip below 50 percent, such that you will be wrong more than

21  half the time.  If you base your decision on people who are

22  25 to 29 years old and who also score high on these

23  actuarial tools, you will be wrong more than you're right.

24  And if you go across all the way to 60 to 69, once you get

25  to age 60, you will be wrong 90 percent of the time.

1    Q.   So putting in words what the chart says in Wollert's

2    words, I'm going to ask you if you agree with it:

3    "Remarkably, similar efficiency levels were obtained for all

4    the tests evaluated in this study.  Setting the commitment

5    standard at 50 percent, however, none of the tests were

6    efficient for subjects over 24 years old.  These results

7    also indicate that experts who rely on actuarial tests for

8    predicting likely recidivists for all but the youngest age

9    group will be wrong most of the time."

10   A.   That's correct.

11   Q.   "And for a population similar to Hanson's 2002 sample,

12   this error rate will vary from about 52 percent for

13   offenders in the 25- to 29-year age range to almost

14   90 percent for those in the 60- to 69-year age range."

15   A.   That's essentially what I just said.

16   Q.   Okay.  And you would agree with that then?

17   A.   Yes.  That's the data.

18   Q.   Okay.  Now, Dr. Wollert goes on to do one more

19   evaluation, and that is applying his math for individuals

20   who score a 6 or higher on the Static-99.  And that's, I

21   believe, what you would score him at if you had used the

22   Static-99, right?

23   A.   Yes.

24   Q.   Okay.  And he does the math for commitment decisions

25   based on committing everyone who scores a 6 or above on the

1   Static-99 using the DOJ, Department of Justice, data, right,

2   using the percentages contained in the U.S. Department of

3   Justice's own recidivism data, right?  And I'm looking at

4   Page 79, "Implications for commitment issues and policies"

5   section under Wollert.

6   A.   Yes, if you give me just a moment.

7   Q.   Sure.

8        (Witness examining document.)

9   A.   Yes.

10  Q.   Okay.  And I'm going to ask you whether you will agree

11  or disagree with the findings contained on Page 79 of this

12  study:  "The Justice Department report indicating that 517

13  of 9,691 sex offenders released from prison in 1994

14  committed new offenses in a three-year period, compared with

15  3,328 sex offenses that were committed by 269,174 other

16  released offenders."  That is, offenders that were not sex

17  offenders, right?

18  A.   Yes.

19  Q.   "If all sex offenders in this cohort had been screened

20  as possible civil commitment cases using Static-99, a

21  relatively small number of sex crimes would have been

22  averted by the detention of 129 likely recidivists," and he

23  gives the Static-99 T score and how he arrives at it.

24  "Whereas, 734 offenders with high test scores would have

25  been unjustly detained.  The Static-99 screen would have

1    missed 388 recidivists, however, and all of the sex crimes

2    committed by the other released offenders --" those that

3    weren't prior classified as sex offenders -- "all of the sex

4    crimes committed by the other released offenders would also

5    have been missed, setting the stage for the commission

6    of --"

7              MR. GRADY:  Your Honor, I'm going to object at

8    this point.  If we could have a question as to an individual

9    statement instead of reading the article into evidence.

10             THE COURT:  Yes, sustained.  And, also, it's just

11   really hard to follow numbers.  I'm trying to follow the

12   numbers in my mind too.

13   Q.   Dr. Wollert applies the Static-99 with a cut score of 6

14   or above, the highest classification you can get on the

15   Static-99?

16   A.   Right.

17   Q.   And he takes that data or that process and he applies

18   it to --

19             THE COURT:  Actually, you know, what does he say?

20             THE WITNESS:  Okay, Judge, what he's saying is

21   this, that -- and here he's referencing the Department of

22   Justice data, which are lower recidivism rates.  As the base

23   rate of recidivism goes down, that has implications for the

24   actuarial tools, because, as I said earlier, each score, 6

25   and above score, for example, on the Static-99, is

1    associated with data that reference the test's ability to

2    correctly identify true recidivists and to correctly

3    identify true nonrecidivists, and then by implication, you

4    can get the error rates around that, the false positives and

5    the false negatives.

6              If you plug in the DOJ recidivism data into the

7    Static-99 computational model, which is based on what we

8    call Bay's theorem or Bay's formula, what's going to happen

9    is, it's going to make the number of false positives

10   skyrocket.  So you'll detain the individuals, whatever, I

11   think 129 of them, correct; but you'll also get many, many

12   more false positives.  So, in other words, you're

13   misclassifying people.  You're saying they're going to be

14   dangerous when in fact they wouldn't be.

15             THE COURT:  You're committing too many people?

16             THE WITNESS:  You're committing too many people.

17             THE COURT:  So let me ask you this:  How does that

18   affect your opinion in this case?

19             THE WITNESS:  Well, I'm not basing -- I didn't do

20   the Static-99, first of all, but --

21             THE COURT:  Okay, all right, so that applies to

22   the Static-99?  Would you say it was applied to the RRASOR?

23             THE WITNESS:  I would have to look at the

24   calculations.  He didn't do it for it.  I could do it.

25   Given some time, I could actually calculate the numbers.

d6c4ea7d-3307-4778-858f-6c6546c9eea1

Page 115

1    But I don't think I'd be out on a limb if I said they would

2    be somewhat similar to what he's reporting for the

3    Static-99.

4            I didn't base my -- my conclusion -- you know, I'm

5    sitting here as the court-appointed expert, and I have my

6    opinion.  Is my opinion impeachable?  Yes, it is, okay?  And

7    it's a different situation than I normally find myself in

8    here in this condition.  I didn't base it only on the

9    actuarials, though.  If you do, that's the problem.  That's

10   what this article is pointing out to.

11           THE COURT:  The flaws?

12           THE WITNESS:  That's the flaw.

13   Q.   I'm going to leave recidivism research and the risk

14   prediction alone now and move to some of the other things

15   that were testified about, if you don't mind.  You come up

16   with a diagnosis of pedophilia, right?

17   A.   Correct.

18   Q.   And the DSM-IV or part of it was introduced in

19   evidence, and you indicate that you have considered it and

20   conclude that based on the available information, it is

21   likely that Mr. Shields could be reasonably diagnosed with

22   that disorder, right?

23   A.   Correct.

24   Q.   Now, you are also familiar with what the knowledge of

25   that diagnosis does not imply, correct?

1   A.   Correct.

2   Q.   And can we agree that according to the DSM-IV, there

3   are at least two cautionary references that suggest that one

4   not take too much in terms of risk prediction from that

5   diagnosis?

6   A.   That's right.

7   Q.   And fair to say that according to -- and there's a

8   section called "Use of Clinical Judgment."  It's at the very

9   beginning of the DSM, right?

10  A.   Yes.

11  Q.   And you're familiar with that, right?

12  A.   I am.

13  Q.   And under that is a heading "Use of DSM-IV for Forensic

14  Settings."

15  A.   Yes.

16  Q.   This is a forensic setting; is that right?

17  A.   It is.  Yes, it is.

18  Q.   And in that section, let me ask you whether you would

19  agree or disagree with these cautions:  "When the DSM-IV

20  categories, criteria and textural descriptions are employed

21  for forensic purposes, there are significant risks that

22  diagnostic information will be misused or misunderstood."

23  Do you agree with that?

24  A.   I do.

25  Q.   "These dangers arise because of the imperfect fit

1   between the question and --"

2          THE COURT:  Why don't you -- it's too hard.  You

3   read too fast.  Put it on the screen.

4          MR. SWOMLEY:  Okay.

5          THE COURT:  Okay, actually, that's not -- I need

6   glasses.

7          MR. SWOMLEY:  I'll try and just zoom it to just

8   that section, Judge.  How's that?

9          THE COURT:  Great.  And, you know, this is

10  fabulous, you can also just put a big circle around it, and

11  it will show up on the screen.  No, with your finger.  Put a

12  big circle around it.  There we go.

13         MR. SWOMLEY:  Okay, I got it.  I don't know what

14  I'm doing, though.

15         THE COURT:  You know, while he's playing with

16  this, this is a state-of-the-art courtroom.  So we're very

17  lucky here in Federal Court to have this technology, and it

18  isn't available in a lot of the courts still in the

19  Commonwealth.  So I would say about half of our courtrooms

20  here in the Federal Court have it, and it's very useful for

21  these high-document cases because you can actually read it.

22  At least for me, when it's read out loud, I have a harder

23  time sometimes capturing it.

24         So literally you can point, you can touch it in

25  the margin and show people where to start reading.

1          MR. SWOMLEY:  There.

2          THE COURT:  Very good.

3          MR. SWOMLEY:  And I'll stop reading down there.

4   So if you read everything that's on the screen, that's

5   really what I'm trying to get at.

6          THE COURT:  You can read it out loud if you want,

7   but it's just a bouncing ball.

8   Q.   Okay, well, let me read it out loud and see if you

9   agree with this, Doctor:  "These dangers arise because of

10  the imperfect fit between the questions of ultimate concern

11  to the law and the information contained in a clinical

12  diagnosis.  In most situations, the clinical diagnosis of a

13  DSM-IV mental disorder is not sufficient to establish the

14  existence for legal purposes of a mental disorder, mental

15  disability, mental disease, or mental defect.  In

16  determining whether an individual meets a specified legal

17  standard (e.g., for competence, criminal responsibility, or

18  disability) additional information is usually required

19  beyond that contained in the DSM-IV diagnosis.  This might

20  include information about the individual's functional

21  impairments and how these impairments affect the particular

22  abilities in question.  It is precisely because impairments,

23  abilities, and disabilities vary widely within each

24  diagnostic category that assignment of a particular

25  diagnosis does not imply a specific level of impairment or

Page 119

1    disability.

2            "Nonclinical decision-makers should also be

3    cautioned that a diagnosis does not carry any necessary

4    implications regarding the causes of the individual's mental

5    disorder or its associated impairments.  Inclusion of a

6    disorder in the classification (as in medicine generally)

7    does not require that there be knowledge about its --" and I

8    can't pronounce that word no matter how many times I try.

9    Etiology?

10           THE COURT:  Which means its origin?

11           THE WITNESS:  Correct.

12   Q.   Now I'm lost.

13           THE COURT:  A good SAT word.

14   Q.   "Moreover, the fact that individual's presentation

15   meets the criteria for a DSM-IV diagnosis does not carry any

16   necessary implication regarding the individual's degree of

17   control over the behaviors that may be associated with the

18   disorder.  Even when diminished control over one's behavior

19   is a feature of the disorder, having the diagnosis in itself

20   does not demonstrate that a particular individual is (or

21   was) unable to control his or her behavior at a particular

22   time."

23           Do you agree with that?

24   A.   Yes.

25           MR. SWOMLEY:  I move that into evidence.

1          THE COURT:  That's just the preface to the

2     Diagnostic -- what's it, the DSM is --

3          THE WITNESS:  Diagnostic and Statistical Manual.

4          THE COURT:  Right.

5          MR. SWOMLEY:  Then there is, and I'll?

6          THE COURT:  You're not going to read in another

7     long passage, right?

8          MR. SWOMLEY:  No, it's much, much shorter, but it

9     is a passage, Judge, and it's under the cautionary

10    statement.  And I'll just skip to there.

11    Q.   "It is to be understood that inclusion here, for

12    clinical and research purposes, of a diagnostic category,

13    such as pathological gambling or pedophilia, does not imply

14    that the condition meets legal or other nonmedical criteria

15    for what constitutes mental disease, mental disorder, or

16    mental disability."  And then you can read the rest of it,

17    but that's basically what it says, and do you agree with

18    that?

19    A.   I do.

20         MR. SWOMLEY:  All right, I would move all of that

21    into evidence.  It's premarked as Exhibit 101.

22         THE COURT:  What's the DSM, what exhibit is that?

23         MR. SWOMLEY:  It's Exhibit 22.

24         THE COURT:  Why don't we just call it 22-A and B

25    so the jury can get it in one place.

1          MR. SWOMLEY:  Okay, 22-B.

2          THE COURT:  That's all one book basically, and

3    instead of the big thick thing, we're going to just give you

4    these excerpts.

5          (Respondent Exhibits 22-A and 22-B received in

6    evidence.)

7    Q.   Now, let me ask you, you're familiar with the various

8    subcategories of a diagnosis of pedophilia, right?

9    A.   Yes.

10   Q.   And you, I believe, subclassified Mr. Shields as

11   nonexclusive, right?

12   A.   Right.

13   Q.   And within the broader diagnosis of pedophilia,

14   nonexclusive means that such an individual with such a

15   diagnosis is capable of having sexual relations with people

16   outside of that category?

17   A.   With postpubescents, with adults, yes.

18   Q.   And in terms of predictive value, when we talk about

19   child molesting or sexually offending against children,

20   that's not the same thing as saying someone's a pedophile,

21   right?

22   A.   That's correct.  Child molestation, child sexual abuse

23   is behavior.  It's sexual behavior.  It shares a lot of

24   variability, a common variability with people who are

25   pedophilics or who have pedophilia, but they're not one and

1   the same thing.  People, in other words, will sexually abuse

2   children who are not pedophiles, and there are other issues

3   explanatory in nature that go into that understanding.

4   Q.   Okay.  Would you agree that according to the recidivism

5   research -- and, again, this may be one of those

6   counterintuitive things, but in terms of the predictive

7   value of someone who has an offense history involving

8   sexually offending against postpubescents, but still under

9   the legal age of consent victims, that is not by itself

10  predictive of some sort of deviant pattern, right?

11  A.   That is right.

12  Q.   And there's a whole body of research done on people

13  that have never offended, normal people that have not

14  offended, college students or what not?

15  A.   We call them analog subjects.

16  Q.   Analog, okay.  And that research concludes that it is

17  not only perfectly normal but it is the single largest

18  attraction group to have normal people be attracted to

19  postpubescent, prelegal individuals, right, across the

20  board?

21  A.   Yes.  Those who are attracted to adults are generally

22  referred to as teliophiles, and there is data that supports

23  the fact, data that I myself have generated, that those who

24  are sexually attracted to adults also will show sexual

25  attraction to those who are still minors, still technically

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1   children but who are postpubescent.  And then it becomes a

2   statutory issue of age of consent, because what the person

3   is responding to are the secondary evidence of the secondary

4   sexual characteristics.  So if an adult male is attracted to

5   an adult female and there is a 16- or a 15-year-old who is

6   showing breast development, then at the basic physiological

7   level, there's a very high chance that they're going to show

8   attraction to that as well.  Now, it doesn't mean they're

9   going to act on it.  It doesn't mean they don't understand

10  that it's wrong to do.  But that's not the question.  The

11  issue is, are they attracted?  And the answer is "yes."

12  Q.   Okay.  And in fact there's been research that shows for

13  all age groups, whether you're talking about a college kid

14  or you're talking about a 40- or 50- or 60-year-old person,

15  the attraction to whatever the object of attraction is in

16  terms of humans, the largest degree of measurable attraction

17  is the 14- to 17-year-old age group, and then next up is the

18  17 to 24, and then it diminishes --

19            MR. GRADY:  Objection, your Honor.

20            THE COURT:  Sustained.  Ask him.

21            MR. SWOMLEY:  Okay.

22  Q.   Would you describe what is the diminishing attraction,

23  not as the person who is the person that's getting attracted

24  gets older --

25            THE COURT:  Whoa.  Start again.

1  Q.   You know what I'm talking about, where you just

2  testified to what you understand to be the science there.

3              THE COURT:  Wait, wait, wait.  Is it a mental

4  disorder for an adult to be attracted to a postpubescent

5  person?

6              THE WITNESS:  There's no recognized disorder in

7  the DSM for that.  There are attempts.  I mean, we can have

8  a -- there are some --

9              THE COURT:  So there's nothing in the DSM about

10 that?

11             THE WITNESS:  There's nothing in the DSM about it.

12             THE COURT:  So when you say pedophilia, you're

13 only referring to prepubescent?

14             THE WITNESS:  Prepubescent children, correct.

15             THE COURT:  And prepubescent means what?

16             THE WITNESS:  Those who have not shown or

17 evidenced the development of secondary sexual

18 characteristics that are associated with pubescence.  So for

19 females, that involves breast development, hip development,

20 pubic hair, facial feature changes; in males, again, pubic

21 hairs, hair in other parts of the body away from the

22 genitals, et cetera.

23 Q.   Now, you've classed Mr. Shields as nonexclusive, and in

24 fact you, I believe, have noted that he is capable of

25 forming age-appropriate relationships, right?

Page 125

1   A.   Correct.

2   Q.   And would you agree that that is a risk-reducing

3   characteristic?

4   A.   Yes.

5   Q.   And in fact when Hanson, and getting briefly back to

6   the actuarial business, tried to capture the beneficial part

7   of this research, someone that's capable of forming

8   relationships with others, age-appropriate relationships,

9   and sustaining them for a length of time show a different

10  level of emotional maturity, as it were, and are a less

11  risky population than those that can't do that?

12  A.   Yes, Hanson does discuss that in terms of the intimacy

13  deficits issues that he talks about, and it is reflected on

14  the Static-99 to the extent that it's one of the questions.

15  Q.   Okay.  But, in any case, Mr. Shields has in his history

16  the ability to form age-appropriate relationships and

17  sustain them?

18  A.   Yes.

19  Q.   Now, is there any method under the actuarial or any

20  other that you are aware of -- well, let's start with the

21  actuarial -- any way to quantify therapeutic breakthroughs?

22  Does the Static-99 or the RRASOR measure for "I got it.  I

23  get it now.  I'm done"?

24  A.   No.

25  Q.   So if it doesn't measure that, how does it account for

1   something like that?

2   A.   It doesn't.

3   Q.   And you would agree that there are persons that can

4   never get it, people with brain injury that causes them to

5   commit sex crimes?  Nothing you can do about that, right?

6   A.   Yes.

7   Q.   Okay.  Mr. Shields is not in that category, right?

8   A.   No.

9   Q.   He is someone who has the brain functioning that would

10  permit him to have a therapeutic breakthrough, for example?

11  A.   By therapeutic breakthrough, or getting it, you're

12  referring to successful participation in sex offender

13  treatment?

14  Q.   Well, whether it's sex offender treatment or it's just

15  getting to the point in life where a light bulb goes off,

16  and you go, "I'm done doing this."

17  A.   Okay, so becoming insightful of one's behavior, okay.

18  Q.   That's not measured, and that does occur; is that

19  correct?

20       THE COURT:  Well, ask it separately.

21       MR. SWOMLEY:  Okay.

22  Q.   Would you agree that none of these actuarials really

23  can measure -- well, none of the actuarials we've talked

24  about can measure that, right?

25  A.   They don't, right.

Page 127

1        THE COURT:  Is that what you would call a dynamic

2  factor?

3        THE WITNESS:  Yes, Judge.

4  Q.   Now, would you agree there is no real actuarial measure

5  that can accurately capture that that exists today?

6  A.   Well, the way you're talking about it, I would agree

7  with that.  There is an actuarial tool that does try to

8  measure some treatment variables, although I have problems

9  with it, so --

10  Q.   Well, we're talking about research that's in such an

11  infant stage that there's no real reliable way to measure

12  that, right?

13  A.   I would agree with that.

14  Q.   Okay.

15        THE COURT:  So there's no reliable method for

16  measuring the effectiveness of sex offender treatments that

17  you know of?

18        THE WITNESS:  Well, there are scales that measure

19  treatment outcome, but with regard to any actuarials it was

20  being asked, if any of the actuarials can capture that

21  information, my answer would be "no," they do not.

22  Q.   Okay.  And in terms of treatment, you're familiar with

23  the different kinds or different names given to different

24  types of treatment, right?

25  A.   I am.

1   Q.   The dominant model today is called the "cognitive

2   behavior model," right?

3   A.   Yes.

4   Q.   And that's really a sex offender therapy that basically

5   says, "We don't really care how or why you got to where you

6   are.  You're offending, and we want to apply interventions

7   that stop it and teach you how to use those interventions,"

8   right?

9   A.   Yes.

10  Q.   The psychodynamic model may be the older, you know,

11  "sit on a couch and talk about your problems" kind of

12  approach --

13  A.   Yes.

14  Q.   -- goes about trying to find out what happened to you

15  in your past that may have caused you to get to the point

16  where you are offending, right?

17  A.   Correct.

18  Q.   And there's no harm in engaging in that kind of

19  therapy, is there?

20  A.   No.

21  Q.   It doesn't make you more dangerous, does it?

22  A.   No.

23  Q.   And if someone both engages in sex offender therapy

24  but -- well, let me ask you a hypothetical.  If someone does

25  engage in sex offender therapy but hasn't, for example, put

1    their psychological house in order, is it possible that they

2    can't benefit from that therapy because they can't get

3    through their own issues that led them to offend in the

4    first place?

5              MR. GRADY:  Objection.

6              THE COURT:  Sustained.

7    Q.    You know that Mr. Shields engaged in therapy with a

8    Dr. Graney when he was down at FCI Butner, right?

9    A.    I'm aware of it.

10   Q.    And you've described it a little bit, I believe.  You

11   also know that he engaged in substance abuse therapy as

12   well, right?

13   A.    I am, yes.

14   Q.    Okay.  And the origins of the model that are used for

15   sex offenders now was largely derived from the model that is

16   in use for substance abusers, right?

17   A.    Well, it's not that simple.  There are elements of what

18   we could call relapse prevention planning that certainly,

19   some of it has taken its lead from substance abuse; but

20   there are other elements for the addictive model of

21   substance abuse that are not so applicable to cognitive

22   behavioral issues, but --

23   Q.    Okay, but the "one day at a time" is in use.

24   A.    Generally, there's the twelve-step type of --

25   Q.    Okay.

Page 130

1    A.   I would not subscribe to cognitive -- to good cognitive

2    behavioral therapy.

3              THE COURT:  Wait.  So let me just back up.  He was

4    down in a federal prison, right?

5              THE WITNESS:  Yes.

6              THE COURT:  And during that time, he got two kinds

7    of therapy?

8              THE WITNESS:  Yes.

9              THE COURT:  So one was sex offender therapy,

10   right?

11             THE WITNESS:  Correct.

12             THE COURT:  And so -- was it or not?

13             THE WITNESS:  Yes.

14             THE COURT:  Sex offender --

15             THE WITNESS:  Sex offender treatment.

16             THE COURT:  Is that your understanding?

17             THE WITNESS:  Yes, that's my understanding, that

18   he received sex offender treatment.

19   Q.   He received sex offender therapy at an earlier stage,

20   Doctor.  He received --

21             MR. GRADY:  Objection.  Counsel is just testifying

22   right now.  The witness is testifying --

23             THE COURT:  So let me just say, what records did

24   you review with respect to the kind of therapy he got?

25             THE WITNESS:  Let me just review, and I'll tell

1    you exactly.

2              THE COURT:  I just want to make sure we're all

3    talking about the same thing.

4              THE WITNESS:  According to the records I reviewed,

5    that Mr. Shields participated in sexual offender treatment

6    for approximately three years, from 1993 to 1996, following

7    his incarceration in 1990.  Then --

8              THE COURT:  That was in state --

9              THE WITNESS:  That was earlier.

10             THE COURT:  That was in Maine?

11             THE WITNESS:  Right.  Then later he was on a

12   waiting list while he was at Butner at the Federal --

13             THE COURT:  Which is a federal prison, right?

14             THE WITNESS:  Right, the Federal Correctional

15   Institution at Butner, he was on a waiting list for the sex

16   offender treatment program.  Then an opening then became

17   available.  However, at that time -- and we discussed this

18   during the interview -- at that time he did not participate

19   in the sex offender therapy because he was in what was

20   described as an intensive therapy, intensive psychotherapy.

21   So he was in a therapeutic environment that was not

22   sex-offender-specific at the time, and he didn't leave that

23   therapy in order to go to the more standard sex offender

24   therapy model at Butner.

25             THE COURT:  So how long was he in this intensive

Page 132

1    psychotherapy which was not sex offender treatment?

2           THE WITNESS:  Right here, I don't have the record

3    right here of how long it was, Judge.

4           THE COURT:  So, to your knowledge, while he was at

5    Butner, did he ever get sex offender treatment?

6           THE WITNESS:  No, not sex-offender-specific.  When

7    he was transferred to the Federal Medical Center, he had not

8    yet begun specific sex offender treatment.

9           MR. SWOMLEY:  That's my understanding, that's

10   right.  Okay.

11   Q.   Now, the question, Doctor, is -- well, you described my

12   mischaracterization of cognitive behavioral about the twelve

13   step.  It has a whole host of different -- it has aversion

14   therapy, for example.  They show you pictures of things you

15   shouldn't be looking at, and they snap an ammonia cap

16   underneath your nose and make you really not happy.

17          MR. GRADY:  Objection, your Honor.

18          THE COURT:  Sustained.  Actually, can I see

19   counsel at side bar for one minute.

20   SIDE-BAR CONFERENCE:

21          THE COURT:  Let me script this.  Unfortunately, I

22   actually have something I have to do at 1:00 o'clock today,

23   so I cannot stay late.  So essentially, if he finishes in

24   five minutes, how much redirect do you have?

25          MR. GRADY:  I wouldn't think that it would be more

Page 133

1    than an hour.

2            THE COURT:  All right, so we're not going to

3    finish him?

4            MR. GRADY:  Yes.

5            THE COURT:  You're not going to do an hour

6    redirect, I guarantee you.  But, in any event, we're not

7    going to finish him.  I'm just trying to figure out how much

8    pressure to put on.  If he finishes at quarter of, are you

9    going to finish your redirect by 1:00?

10           MR. GRADY:  If he finishes at quarter of?  No.

11           THE COURT:  I just want to know.

12           MR. GRADY:  No, I don't think so.

13           THE COURT:  So if he finishes --

14           MS. KELLEY:  What if he just stops now?

15           MR. SWOMLEY:  What if I stop now?

16           THE COURT:  No.  We'll finish it whenever we

17   finish it.  We'll get him going, because I'm assuming

18   there's some recross, maybe five minutes anyway.

19           MR. SWOMLEY:  I don't know, I don't know.

20           THE COURT:  I can't stay till 1:30 today as a

21   practical matter, but we'll wrap him up within an hour on

22   Monday, I think is the reality of it.

23           MR. GRADY:  Certainly.

24           THE COURT:  Probably in a half an hour.

25           MR. GRADY:  I bend to the Court's will.

1                    (End of side-bar conference.)

2    Q.   Doctor, let me ask you whether you take issue with the

3    wisdom of investing in figuring out your own history of

4    victimization before you go into a regimen where you're

5    snapping an ammonia capsule under your nose for your own --

6                    MR. GRADY:  Objection, your Honor.

7                    THE COURT:  Sustained.

8    Q.   Well, you indicated that Mr. Shields declined to switch

9    into or to add this aversion kind of therapy or this

10   cognitive behavioral modification therapy to his treatment

11   schedule back then.

12                   THE COURT:  Wait.  You need to take baby steps.

13   So the sex offender treatment at Butner was of what kind?

14                   THE WITNESS:  To my knowledge, Judge, from what I

15   read, it was a cognitive behavioral treatment or behavioral

16   programming, which did involve more what we would call

17   intensive behavioral techniques such as covert

18   sensitization.

19                   THE COURT:  Such as what?

20                   THE WITNESS:  Which is what --

21                   THE COURT:  What did you call it?

22                   THE WITNESS:  Covert sensitization.

23                   THE COURT:  That means what?

24                   THE WITNESS:  That means it's more behavioral

25   technique where -- what happens is, you develop scripts, and

1    it involves setting events around where you might commit sex

2    offenses, and actually committing or beginning to commit a

3    sexual offense, and then something happens to you, and

4    that's usually in two classes:  Either an aversive

5    physiological stimulus happens as a punishment for that

6    behavior, or some kind of imaginal legal, people notice, the

7    police come, you're arrested.  In other words, consequences

8    are provided, and it can be imaginally, or it can be by the

9    presentation of stimuli where you start evidencing arousal,

10   and then a direct punishment.  And it's usually what we call

11   olefactory aversion which talk about snapping the ammonia

12   inhalant capsule.  That's designed, again, to punish the

13   arousal directly.

14          THE COURT:  So that's what he declined to do at

15   Butner?  Is that right or not?

16          THE WITNESS:  Well, what I'm saying is, that's

17   elements of the behavioral elements, cognitive behavioral.

18   I don't know specifically that that's exactly what he would

19   have been offered, but --

20          THE COURT:  But it's cognitive rather than sitting

21   on a couch with a psychiatrist?

22          THE WITNESS:  Right.

23          THE COURT:  All right.  So the kind of thing he

24   was getting at Butner was working with a psychotherapist,

25   right?

1          THE WITNESS:  It seems to be, yes.

2          THE COURT:  And so do you know whether that

3     involved sex offender treatment?

4          THE WITNESS:  From what I read, my recollection,

5     Judge, is it was not a sex-offender-specific treatment the

6     way I would define cognitive behavioral treatment.  I think

7     a lot of it had to do with exploration of past issues in a

8     therapeutic environment.

9          THE COURT:  And what about the Maine sex offender

10     therapy?  What was that, cognitive or --

11          THE WITNESS:  I have absolutely no idea.

12     Q.   You'd mentioned several probation surrenders back when

13     you were testifying yesterday, right?

14     A.   Yes.

15     Q.   Are you aware of the basis for any of those surrenders?

16          MR. GRADY:  I'm going to object, your Honor.

17          THE COURT:  Overruled.

18     Q.   Actually, before I get to that question, I want to back

19     up, withdraw it, and ask you one more about the previous

20     subject matter, which is the therapy.  Is there anything

21     that is necessarily evidence of sexual dangerousness for

22     Mr. Shields to have said, "I'm going to remain in my therapy

23     group with Dr. Graney instead of switching or adding the

24     sex-offender-specific treatment"?

25          MR. GRADY:  Objection.

1          THE COURT:  Overruled.

2     A.   No.

3     Q.   Okay.  Now, the next question then is, with the

4     probation surrenders, are you familiar with whether or not

5     any of those probation surrenders by themselves, with what

6     you know, can demonstrate evidence of sexual dangerousness?

7     A.   I'm reviewing, but, no, there was no --

8          THE COURT:  Do you know why he was revoked?

9          THE WITNESS:  I did.

10          MR. GRADY:  Your Honor, for the record, if I could

11    state the objection, if it's based on hearsay from

12    Mr. Shields, it is not an admission --

13          THE COURT:  Overruled.  Do you know whether or not

14    the revocations were based on a failure to comply with sex

15    offender treatment in any way, or were they based on

16    something completely extraneous?

17          THE WITNESS:  I would need a moment to locate

18    them.

19          THE COURT:  Yes.

20          MR. SWOMLEY:  Could I ask just quickly a couple of

21    leading questions, and that will hopefully get it out.

22          THE COURT:  Yes.

23    Q.   You know that the last one, the last probation

24    surrender involved the child porn charge, right?

25    A.   Right, the governing offense, yes.

Page 138

1    Q.   Besides that --

2            THE COURT:  So, in other words, when he was picked

3    up for the child pornography, which he eventually was

4    convicted of which brought him into Federal Court, that was

5    one of the two revocations.

6            MR. GRADY:  One of the three.

7            THE COURT:  One of the three, I'm sorry, one of

8    the three.  So I guess we're talking about two more.

9    Q.   Do you know whether one of the revocations was because

10   of adverse publicity of him being in a probation outpatient

11   program, whether it's a halfway house or something like

12   that, that that was the basis?

13           THE COURT:  What?

14           MR. SWOMLEY:  I'll rephrase the question.

15           THE COURT:  No.  I strike the question.  Just do

16   you know based on the records you reviewed or anything that

17   was stated by --

18           MR. SWOMLEY:  I'll withdraw the question, your

19   Honor.  In fact, I think that I need to give some time for

20   my brother.  Let me look at one more thing.

21           THE COURT:  I want to finish.  Do you know why he

22   was revoked the other times?

23           THE WITNESS:  Well, I understand the governing

24   offense, the last one, but it's my understanding, as I'm

25   sitting here without finding the record, that it didn't

1   involve any type of sexually inappropriate behavior, any

2   accusation of any sexually inappropriate behavior.

3          THE COURT:  Do you know whether it had anything to

4   do with his compliance with the treatment?

5          THE WITNESS:  It may have. I don't --

6          THE COURT:  That's what you don't know.

7          THE WITNESS:  That's what I don't recall.  There's

8   a lot of records, and my memory is a good one but not

9   perfect.  Do you want me to look for that information?

10         MR. SWOMLEY:  I think it's --

11         THE COURT:  Excuse me.  It may come out --

12         MR. SWOMLEY:  Yes, in subsequent testimony.  I'm

13  not concerned about it.  So I'll withdraw the question.

14         Thank you.  No further questions.

15         THE COURT:  Do you know whether --

16         MR. GRADY:  I will start and get as much done as I

17  can today.  I don't think I'll finish.

18         THE COURT:  All right, so if we're not going to

19  finish today, you can find it over the weekend.

20         THE WITNESS:  Okay.

21  REDIRECT EXAMINATION BY MR. GRADY:

22  Q.  Dr. Plaud, I just want to start with one thing.  We've

23  heard a great deal of evidence of the limitations of

24  mathematics.  You have answered those questions about the

25  limitations, but despite all of those limitations and all of

1   the limitations you acceded to Attorney Swomley exist, what

2   is your opinion, as you testified yesterday, about whether

3   Jeffrey Shields meets the criteria of this statute?

4           MR. SWOMLEY:  Objection.  Asked and answered.

5           THE COURT:  Overruled.

6   A.   I testified -- I did testify as to my opinion as a

7   professional, and I am here because after reviewing the data

8   and reflecting on the data, it is my judgment for myself

9   that he is at a significant risk to reoffend.  That's my

10  opinion.

11  Q.   And you testified yesterday, despite all of these

12  limitations that you acceded to --

13          THE COURT:  Now we're leading.

14          MR. GRADY:  Well, because he's attempting to --

15  your Honor, I apologize.

16  Q.   Doctor, specifically with respect to some of the issues

17  that have been raised, Doctor, I'm just going to start with

18  the ones I remember, and I'll go through my notes as we go.

19  Doctor, based on those Department of Justice statistics we

20  heard about, why shouldn't we simply reject your opinion?

21  A.   You very may well.

22  Q.   But could you explain for us why we shouldn't?

23  A.   Well, no, I can't give you an answer to that question

24  because my opinion is my opinion, and it resides with me.

25  I'm being asked to give an opinion, and I had an opinion.

1    And in normal circumstances, the way that I work, I probably

2    wouldn't be testifying, but --

3    Q.   Can you explain for me why it is that you continue to

4    have the opinion you have despite those statistics?

5    A.   Because in my review of the data, my meeting with

6    Mr. Shields, and going over everything concerning the

7    offenses and his course of incarceration and treatment

8    thereafter, I do not believe that I would be satisfied that

9    at this time, if he were released, he would not have the

10   ability to control his impulses.  And I wish I could be more

11   scientific about it in the end, and I guess I'm not being,

12   but that's my opinion, and now I'm being asked to share it

13   in the courtroom.

14   Q.   And despite all of the testimony we just heard about

15   age-related data, you still have the same opinion?

16   A.   I'm not saying I'm right.  I'm just saying that's what

17   my opinion is.

18   Q.   In your professional judgment?

19   A.   Yes.

20   Q.   And with respect to the criteria on the RRASOR, you

21   mentioned that the prior offenses were the .19, the

22   correlative factor

23   A.   In the meta-analysis, yes.

24   Q.   And was that the highest correlative factor of the data

25   that ended up in the RRASOR?

d6c4ea7d-3307-4778-858f-6c6546c9eea1

1   A.   Correct.  That's why it's counted for half of the point

2   spread.

3   Q.   So among the factors that are in the RRASOR, it was the

4   best predictor?

5   A.   The single of the four items, yes.

6   Q.   Okay.  And as we talk about RRASOR and Static-99 and

7   predictive validity, while you indicated -- what is the

8   total predictive validity if one were to describe it as

9   robust, moderate, low, based on the totality of the factors,

10  first, for the RRASOR, second, for the Static-99, using the

11  terminology Attorney Swomley did, robust, moderate?

12  A.   I would say, as I testified to today, that actuarial

13  tools such as the RRASOR and Static-99 are moderate

14  predictors of risk.

15  Q.   Now, we heard a little bit about Dr. Hanson's

16  subsequent studies of age.  Do you remember that?

17  A.   Yes.

18  Q.   And Attorney Swomley had you look at a chart, correct?

19  A.   Correct.

20  Q.   Do you recall what Dr. Hanson specifically said about

21  child molesters and what that chart showed?

22  A.   Well, I can paraphrase him on the article, but

23  essentially, as the data reflect, that extrafamilial child

24  molesters' rate of reoffending compared to the other two

25  groups were higher, and for a period of time in the life

1   cycle, the longest.  So that if you weren't well into your

2   50s, the graphs, the lines didn't intersect one another.

3   Q.   Would it refresh your recollection to say extrafamilial

4   child molesters showed little decline in their recidivism

5   risk until after the age of 50?

6   A.   Right.  That's what I said.

7   Q.   Are you familiar with a recent study by Prentky and

8   Lee?

9   A.   I am.

10          THE COURT:  Do you agree with that, by the way?

11          THE WITNESS:  Well, yes, but you have to

12   understand it's relatively speaking.  That's exactly what

13   the data show.  There's nothing in that Hanson statement

14   that is not reflected in the graph that's shown.  It's a

15   relative question.  The issue is 0 to 100 percent

16   recidivism.  They showed little decline, but, still, most of

17   them are not reoffending.  I mean, we're below 20 percent,

18   even that.  So relatively speaking, absolutely true.  In the

19   context of the whole world and the range of responding?

20   That would be a caveat to that.

21   Q.   I want to see, if I can, within the context of the

22   RRASOR and this chart, how do the two interact?  Can you

23   explain that?  Like --

24   A.   Well, they don't interact.  This is not -- this is all

25   offenders.  So the RRASOR takes a group of offenders, if

1    you're doing a validation study, and subdivides them

2    according to their score on the instrument.  They were not

3    scored on the RRASOR.  So this doesn't have separate

4    calculations for different groups or bins, or however you

5    want to put it, on the RRASOR.

6    Q.   So when you account for age, you're not accounting for

7    age as part of the RRASOR, in your opinion?  Or strike that.

8    A.   I don't understand that.

9    Q.   But given the fact that age matters, you consider it

10   separately after considering the RRASOR?

11   A.   Well, the implication of these data are, you can see

12   that the aging does affect recidivism rates.  So if you're

13   starting with a baseline recidivism rate on the RRASOR in a

14   specific bin category, given these data, I think it is

15   reasonable to conclude that that may not be a proper risk

16   percentage on older groups of individuals.  That's the

17   implication of it.

18   Q.   And how, if at all, did you take account of that fact

19   in your opinion you present today?

20   A.   Well, I did consider the fact that he is in his late

21   40s.  I think it is a factor that should be considered.  If

22   we were sitting here five years from now, my opinion may

23   have been different.  I just think he's not quite there yet

24   agewise.

25   Q.   Coming back to that Prentky and Lee study, are you

1    familiar with its findings?

2    A.    I am.

3              MR. SWOMLEY:  May we have a side bar, please?

4              THE COURT:  No.  Let's just go home.

5              (Laughter.)

6              THE COURT:  I'll see them, but it's too close to

7    the end.  You're not going to finish, are you?

8              MR. GRADY:  No.

9              THE COURT:  Good-bye.  Have a fabulous weekend.

10   Let me do this, give you a little prediction here myself.

11   Next week we're going Monday, Tuesday, Wednesday.  You've

12   graciously agreed to sit in the afternoon to accommodate

13   some people that are coming in from out of town.  Wednesday

14   afternoon will be 2:00 to 4:00.  On Thursday, September 11,

15   that's when all the courts here do their law clerk hiring,

16   so that basically I'm not sitting in court.  So on Thursday

17   we will not be sitting, and on Friday we will.  We're

18   actually moving exactly at the pace that we expected, indeed

19   may well be a little bit a head of schedule.  So I just

20   wanted to give you that for next week.  So it's Monday till

21   1:00, Tuesday till 1:00, Wednesday you're staying later,

22   Thursday you've got off, and Friday till 1:00.  Thank you.

23             THE CLERK:  All rise for the jury.

24             (Jury excused.)

25             MR. GRADY:  Your Honor, I apologize.  I have a

1    hard time knowing when I'm cross-examining and when I'm not

2    this witness.

3         THE COURT:  Well, let me just say this for the

4    record.  I start off by thanking you, Dr. Plaud, for serving

5    because I think you are a joint -- a court-appointed expert.

6    It's been, in your words, an uneasy position for you to be

7    in; and I think from the point of view of both the attorneys

8    here, actually, it's unusual for them because they haven't

9    really got you as their witness either.  So from the point

10   of view of what's direct and what's cross, I understand that

11   because he's a neutral expert, and I think that's been very

12   clear to the jury here.

13        At some point when this is all over -- this is new

14   to us in Federal Court, very new, it's my first one, and so

15   I actually wouldn't mind finding out from you whether you

16   thought the process of being appointed a neutral expert

17   works and how to do it better.  But for right now, I

18   understand your dilemma.  So why don't I do this.  I think

19   you can go home right now.

20        MR. GRADY:  Yes.

21        THE COURT:  We'll need you for no longer than an

22   hour first thing Monday morning.  I always say that, you

23   know, and then Murphy's law hits, and a juror is a half an

24   hour late, and there's nothing I can do, but as far as it's

25   in my control, it will be in that range.

1          THE WITNESS:  Okay, absolutely fine, except I am

2    scheduled for a deposition Monday morning.  It's actually at

3    my office.

4          THE COURT:  How long would it be?

5          THE WITNESS:  It's the Attorney General of

6    Missouri who's deposing me, and the attorney is flying in,

7    the defense attorney is flying in, so it's somewhat

8    complicated, and I have to try to resolve this.

9          THE COURT:  We could possibly do you out of order.

10   Are you available Tuesday morning?

11         THE WITNESS:  Yes, that, I think, would be --

12         THE COURT:  Just take him out of order.

13         MR. GRADY:  Okay.

14         THE WITNESS:  That would be much better.

15         THE COURT:  That's fine.  I mean, I think we've

16   got the gist of what you have to say, and I don't want to

17   totally turn your life topsy-turvy.  The only question I

18   have is, short of a juror being late or the plumbing not

19   working or Hurricane Hanna closing us down, I can pretty

20   much guarantee you'll be about an hour.  Where's your

21   office?

22         THE WITNESS:  It's in Whitinsville.  It's only

23   35 miles away as the crow flies, but as the car travels --

24         THE COURT:  Where's Whitinsville?

25         THE WITNESS:  It's Northbridge.  It's southeastern

Page 148

1    Worcester County.

2            THE COURT:  All right.  I should know that, having

3    lived here my whole life.  But let's do this:  I will assume

4    you're not coming till Tuesday morning unless you can

5    somehow rearrange it.

6            THE WITNESS:  Well, I think I could rearrange it.

7    If it's not going to take all morning, maybe I could get it

8    scheduled later in the day.  Let me try that.  It will

9    probably be easier for the Court here for me to do that.

10           THE COURT:  At 10:00 o'clock it will take you an

11   hour to get home, right?

12           THE WITNESS:  Right, exactly.

13           THE COURT:  Then let's do it this way:  I will

14   plan on seeing you at 9:00 unless you call either of the --

15   have you worked with either of these attorneys?

16           THE WITNESS:  I've worked with Mr. Swomley before,

17   yes.

18           THE COURT:  No, but I mean in this case, have you

19   been talking to any of them?

20           THE WITNESS:  No, no.

21           MS. KELLEY:  We've been doing like e-mails, your

22   Honor.

23           THE WITNESS:  Every time I've had any

24   communications, it's been with about ten attorneys.

25           MR. SWOMLEY:  I do not have a problem with them

1   communicating directly with him to figure out whether --

2          THE COURT:  Just call to figure out the scheduling

3   thing.  I just wouldn't want to make the Attorney General in

4   Missouri wait.  Just if that's not going to work, we'll fill

5   in someone else and see you Tuesday.  Thank you.

6          All right, we can go off the record on scheduling,

7   I think.

8          MR. SWOMLEY:  I think we had one issue that --

9   that one issue has to do with an article or research and I'm

10  sure a table that he wants to make use of.  I think I know

11  what the article is he's talking about.  It applies to

12  people that are released from the Mass. Treatment Center,

13  the Nemansket Correctional Center, which means they are

14  already classified as sexually dangerous; and they have a

15  dramatically different recidivism rate than people being

16  proposed for civil commitment.  So if you look at the first

17  page of that study, it says you can't use that on his

18  population group.  I mean, you can't.  So I would object to

19  him using it.

20         THE COURT:  Well, we'll leave it this way:  I know

21  you know a lot of this, but he can ask the question, and if

22  your expert -- but you can't flash it up there unless --

23         MR. GRADY:  No, no, I'm not putting it up

24  unless -- I wasn't going to put this one up without your

25  permission.  The other ones were agreed except --

1          THE COURT:  It would be useful for me to actually

2     see it first.

3          MS. KELLEY:  I might have an extra copy.  What

4     number is that?

5          MR. SWOMLEY:  Exhibits 30 and 31.

6          THE COURT:  All right, now, let's go off the

7     record.

8          (Discussion off the record.)

9          (Adjourned, 1:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 151

1                C E R T I F I C A T E

2

3

     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Court Reporter, do

8    hereby certify that the foregoing transcript, Pages 1

9    through 150 inclusive, was recorded by me stenographically

10   at the time and place aforesaid in Civil Action No.

11   07-12056-PBS, United States of America V. Jeffrey Shields,

12   and thereafter by me reduced to typewriting and is a true

13   and accurate record of the proceedings.

14           In witness whereof I have hereunto set my hand

15   this 30th day of September, 2008.

16

17

18

19

20

              /s/ Lee A. Marzilli
21           _____

              LEE A. MARZILLI, RPR, CRR
22            OFFICIAL COURT REPORTER

23

24

25