```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                              )
                Petitioner    )
                              )
          -VS-                ) CA No. 07-12056-PBS
                              ) Pages 1 - 132
JEFFREY SHIELDS,              )
                              )
                Respondent    )




                   JURY TRIAL - DAY FOUR

            BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE




                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        September 8, 2008, 9:00 a.m.
```

```
                    LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
              United States District Court
              1 Courthouse Way, Room 3205
                   Boston, MA  02210
                     (617)345-6787
```

```
 1    A P P E A R A N C E S:

 2        MARK J. GRADY, ESQ. and EVE A. PIEMONTE-STACEY, ESQ.,
      Assistant United States Attorneys, Office of the United
 3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
      02210, for the Petitioner.
 4
          PAGE KELLEY, ESQ, Federal Defenders,
 5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
      for the Respondent.
 6
          JOHN G. SWOMLEY, ESQ. Swomley & Associates,
 7    227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
      for the Respondent.
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

    WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS
3
    Joseph J. Plaud                             14          22
4
    Niklos Tomich             39      125
5

6   EXHIBITS        FOR IDENTIFICATION    RECEIVED IN EVIDENCE

7   Petitioner

8   2                                            39

9
    35                                           53
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                P R O C E E D I N G S

2            THE COURT:  Is the jury all here?

3              THE CLERK:  Yes.  Please be seated.

4            THE COURT:  So I understand there are a few

5      preliminary issues?

6            MR. GRADY:  There were at least two, one which may

7      or may not need to be addressed.  The first was, when we

8      concluded Friday, Attorney Swomley objected to the

9      government's use of the article by Drs. Prentky and Lee in

10     2007.

11           THE COURT:  Well, it struck me in thinking about

12     it over the weekend that there are two issues:  One is, can

13     you cross based on it, or examine based on it?  It's a

14     little fluid here, since he's a court-appointed expert.  And

15     the second is whether you can introduce it.  Are you seeking

16     to introduce it?

17           MR. GRADY:  I was not seeking to introduce the

18     article.  I would likely seek to introduce the chart that is

19     at --

20           THE COURT:  There's an objection to introduction

21     or --

22           MR. SWOMLEY:  If you look at the front --

23           THE COURT:  I read it over.  I skimmed it on

24     Friday.  So your argument is, it's a different cohort of

25     people?
```

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1          MR. SWOMLEY:  Completely.

2          THE COURT:  But he can cross-examine based on it.

3     It just won't be introduced, so --

4          MR. SWOMLEY:  But, your Honor, it is so

5     prejudicial to talk about my client in reference to an

6     already civilly committed population, and unless there's

7     some good-faith basis for this witness being able to say

8     that there is any way you can use a different cohort with

9     him --

10         THE COURT:  Well, he can ask, but I'm not allowing

11    it to be introduced.  If it's not a learned treatise, it

12    doesn't come in.  There was no prior agreement on it.  It's

13    not coming in.  There was no objection on the age chart, and

14    the RRASOR thing was a very belated objection.  So as far as

15    I'm concerned, it was agreed upon, and unless there was

16    something, like, extraordinary, I wasn't going to keep it

17    out.  This one there's an objection to, and you can cross

18    based on it, or examine based on it.

19         MR. GRADY:  Certainly, but Dr. Plaud would say

20    this is an article he relies on.  He relies on the work of

21    Dr. Prentky.  This is routinely relied upon in the field.

22         THE COURT:  Did you give advanced notice as a

23    learned treatise?

24         MR. GRADY:  Not only is this listed as their

25    exhibit --

1          THE COURT:  Did you?  I think under the rule, it

2    says --

3          MR. GRADY:  We had previously provided a copy of

4    this at the outset.

5          THE COURT:  I believe under the rules you have to

6    give advanced notice that you're planning on introducing

7    something as a learned treatise.  Right, something like

8    that?  Am I remembering that wrong?

9          MR. GRADY:  I don't actually believe the rule says

10   that.

11         THE COURT:  It may not be.

12         MR. SWOMLEY:  Your Honor, the gravamen of the

13   objection is that it's not admissible with respect to --

14   it's not probative of anything with respect to Mr. Shields.

15   The government can't make a good-faith --

16         THE COURT:  It says, "If admitted, the statements

17   may be read into evidence but may not be received as

18   exhibits."  So that's what's going to happen here.

19         MR. GRADY:  Okay.

20         THE COURT:  So what's the next issue?

21         MR. GRADY:  I was just -- given that the Court has

22   decided that the issue of Mr. Shields being locked up is in,

23   so to speak, I was wondering if the Court planned on

24   instructing the jury about the possibility of conditional

25   release; that is, sort of the true scope of the pending

1    consequences for a finding of dangerousness, rather than

2    simply the notion that he would be locked up?

3            THE COURT:  I haven't thought about it.  Why?  I

4    mean, it strikes me -- what's the exact statutory language?

5            MR. GRADY:  The statute provides in 4248 that he

6    may be released on conditions if it's found by this Court

7    that he could be safely released on a regimen of psychiatric

8    treatment or under various conditions the court could --

9            THE COURT:  That I could do this?

10           MR. GRADY:  Based on a preponderance of the

11   evidence, yes.  And under 4247 --

12           THE COURT:  We could work out some jury

13   instruction about that, and the fact that I think it's that

14   they need to take into account from their point of view,

15   it's not just -- as I've said, it's not just whether or not

16   he'd have difficulty controlling himself.  It's not like

17   he's going to be released willy-nilly to the public.  It

18   would be subject to all the conditions of release.  I mean,

19   it cuts both ways, right.

20           MS. KELLEY:  If I can just say, my reading of

21   4248(e), "Discharge," is that the director of the facility

22   has to first --

23           THE COURT:  Well, but why do I have to fight about

24   this now?

25           MS. KELLEY:  -- determine -- well, I wonder if we

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1    could do this at the time we talk about the charge.

2           THE COURT:  Yes.

3           MR. GRADY:  There's two issues.  First, 4247 says

4    notwithstanding anything the director says, at any time, the

5    respondent may move to be released under those conditions.

6    So it's sort of an incomplete reference.  Second --

7           THE COURT:  Well, you may want to hold the

8    government to that one, so --

9           MR. GRADY:  There is a limitation that you can

10   only file once every six months, you know, six months after

11   any determination, you should continue to be held.  So there

12   is some limitation but not necessarily one that applies

13   until --

14          THE COURT:  Why do I have to do this now?  I've

15   got the whole jury here.

16          MR. SWOMLEY:  Here's the one reason, your Honor,

17   and that is, typically in the stateside, when the

18   government -- and it cuts both ways -- when the government

19   does get to go into this and get to say "but they can

20   petition to get out," I am typically then allowed to ask of

21   witnesses that know, Tomich or Plaud, that the average stay

22   of someone civilly committed is 17 years, so --

23          THE COURT:  Yes, but that would be unfair here

24   because we don't have a track record.

25          MR. SWOMLEY:  Well, but then that means that they

1    can get an unfair advantage here because they get this

2    suggestion that somebody can get out really quickly, and

3    that's just patently false.

4              THE COURT:  Well, I don't know what's going to

5    happen on the federal side, but what's sauce for the goose

6    is sauce for the gander.  I think one of your defenses, as

7    I'm seeing it play out, is going to be, "Yeah, he has a

8    problem, but he gets it, and he can work through --"

9    Dr. Graney?

10             MS. KELLEY:   Yes.

11             THE COURT:  "And he has had treatment, and, yes,

12   he's had this sordid past, but he gets it now, and he's not

13   going to be dangerous.  You don't have to incarcerate him."

14   You know, someone put in the language "short of

15   incarceration."  And so it cuts both ways.  You can ask; you

16   can defend on that.  But I'm going to say at the spot

17   moment, is he able to -- will he have serious difficulty

18   controlling himself short of incarceration?  I think that's

19   a fair way of putting it.

20             MR. GRADY:  I ask now simply because if the Court

21   were going to instruct on the issue, then as a matter of law

22   I wouldn't necessarily need to delve into it with --

23             THE COURT:  I don't know.  You can't pounce it on

24   me.  I don't know.  I don't know.  It's a good question.

25   It's a fabulous question.  I in general feel that this is

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1    not a criminal trial.  I've said it over and over again.  In

2    criminal trials we typically, except in insanity cases,

3    don't tell people.  That having been said, this is a civil

4    trial, and they're going to wonder.  So I'm going to be

5    sympathetic to my putting that in, but also telling them but

6    they also have to think about what supports would be in

7    place as to whether he could control himself.

8              So let's bring them in.

9              MR. SWOMLEY:  The last matter, your Honor, I just

10   gave --

11             THE COURT:  You're going to keep it down because

12   who do we have?  Do we have Dr. Tomich today?

13             MR. GRADY:  Dr. Plaud for about fifteen minutes

14   tops for the government's redirect, and then we have

15   Dr. Tomich, who should be here momentarily.

16             THE COURT:  Where's Dr. Plaud?

17             MR. GRADY:  He said he would be here.

18             THE COURT:  I don't see that familiar bow tie.

19             MR. GRADY:  He had indicated to us over the

20   weekend that he had moved that deposition and could be here

21   for the morning, so we're --

22             THE COURT:  We can't bring them in without a

23   witness.

24             MR. SWOMLEY:  I gave this to Mr. Grady this

25   morning.  This is an editorial from the DSM-IV editor and

1    the text and --

2              THE COURT:  Is it in the DSM?

3              MR. SWOMLEY:  It is not in the DSM.  It is

4    proposed for the DSM-V.  It was testified to at a recent --

5              THE COURT:  Well, you're just going to ask about

6    it.  You're not going to put it in, right?

7              MR. SWOMLEY:  No, I'm not going to put it in, but

8    I just wanted to make sure that the Court understood that

9    I've just given it to them.  This came out in a case in

10   California just recently and bears on the issue of

11   pedophilia directly.

12             THE COURT:  Mr. Grady, what's the deal?  Is he

13   here?

14             MR. GRADY:  He is not outside, your Honor, no.

15             THE COURT:  He said he was going to be here?

16             MR. GRADY:  He did.  We had communications with

17   him this weekend.

18             MS. PAGE:  We had our big group communication, and

19   I can vouch for, he said he would be here at 9:00.

20             THE COURT:  Is Dr. Tomich out there?

21             MR. GRADY:  He is not yet here either.

22             THE COURT:  Is he a doctor?

23             MR. GRADY:  I believe he's a licensed

24   psychologist, so, yes.

25             THE COURT:  Is he out there yet?

1          MR. GRADY:  He is not, but I had told him that he

2     would not start exactly at 9:00 because we had to finish

3     Dr. Plaud at 9:30.

4          THE COURT:  Well, there's nothing I can do right

5     now.

6          MS. PAGE:  It's a bad feeling, isn't it?

7          THE COURT:  We could start the instructions.  All

8     right, so does anyone have his cell phone?

9          MR. GRADY:  I do not have his cell phone, but I

10    think the number we have from his reports actually is.  We

11    had left him a message previously on Friday.

12         THE COURT:  Why don't we try and call.

13         MR. GRADY:  I actually don't have mine.  I don't

14    bring it in the courtrooms.  Do you have --

15         THE COURT:  We have an old-fashioned land line.

16         MS. PAGE:  I guess one sort of evidentiary

17    question I had was, you had ruled in your Daubert hearing

18    order that Dr. Tomich will not be permitted to testify to

19    statistics because he isn't qualified.

20         THE COURT:  Well, he can give the bottom line.  He

21    just can't talk about the methodology.

22         MS. PAGE:  Well, it's a problem if you're going to

23    allow him to give the bottom line and we can't question him

24    about how he got there in his --

25         THE COURT:  Well, maybe if it's just a question of

1   math, I'm not a statistical guru, but I could do the scoring

2   system.

3           MS. PAGE:  Well, I think this line of cross on him

4   is, he's incompetent to understand the process he's

5   employing, and --

6           THE COURT:  So if you want to cross on it, cross

7   on it.

8           MS. PAGE:  Okay.

9           THE COURT:  This was designed for your benefit.

10  It's what you requested, not what I imposed on you.

11          MS. PAGE:  Well, we wanted him off entirely as

12  being incompetent, but you sort of gave us half the loaf,

13  and now I don't know exactly how it will play out, but it

14  could be --

15          THE COURT:  If you cross, though, you sort of open

16  the door to it.  I mean, that's the problem.

17          MS. PAGE:  Okay.

18          (Discussion off the record.)

19          (A recess was taken, 9:15 a.m.)

20           (Resumed, 9:30 a.m.)

21          THE WITNESS:  I apologize, Judge.

22          THE COURT:  Traffic?

23          THE WITNESS:  Yes.

24          THE COURT:  So how long do you have, Mr. Grady?

25          MR. GRADY:  Five minutes.

1           THE COURT:  How long will you have?

2           MR. SWOMLEY:  I don't think I will have much at

3  all, depending on what he has to ask.

4           (Jury enters the courtroom.)

5           THE COURT:  Good morning to everyone.  Did anyone

6  see anything in the press or talk about this case at all?  I

7  find the jury has complied.

8           I'm sorry for the delay.  As you heard, our

9  witness was held up by traffic.  So we're here, we're ready

10  to go, and we're doing the redirect.

11           MR. GRADY:  Thank you, your Honor.

12                     JOSEPH J. PLAUD

13  having been previously duly sworn, was examined and

14  testified further as follows:

15  REDIRECT EXAMINATION BY MR. GRADY:

16  Q.   Dr. Plaud, you recall on Friday it was suggested that

17  the data underlying the RRASOR came from places other than

18  the United States?

19  A.   Yes.

20  Q.   And was that your testimony?

21  A.   The validation data originally, yes.

22  Q.   And what about the data underlying the development of

23  the RRASOR, did that come from outside the United States?

24  A.   Well, if you look at all the data, it did include --

25  you know, you can ask that question a number of different

1    ways, and I could answer it differently depending on the way

2    it's asked.

3    Q.   Was the data underlying the development of the RRASOR,

4    did part of it come from California?

5    A.   Yes, it did.  And I would add to that too that it came

6    from the meta-analysis, which, if you add up all the

7    subjects, was almost 29,000 sex offenders geographically in

8    a very dispersed area, including the United States.

9    Q.   Okay.  And with respect to the subsequent studies of

10   the validity of the RRASOR, in what countries have there

11   been peer-reviewed studies of its validity?

12   A.   There have been peer-reviewed studies that have

13   surveyed Europeans as well as Americans, Australians, New

14   Zealanders.  So it's certainly broadened the base from the

15   original data sets.

16   Q.   And those subsequent studies have confirmed its

17   validity?

18            MR. SWOMLEY:  Objection.  Leading.

19            THE COURT:  Overruled.

20   A.   In the way in the sense that I have described the

21   actuarial, I would say "yes."

22   Q.   And is the same true for the Static-99?

23   A.   Yes.

24   Q.   Multiple countries, multiple peer-reviewed articles?

25   A.   Correct.

1  Q.   Now, there's been a substantial discussion of age.  Are

2  you familiar with a recent study prepared by Drs. Prentky

3  and Lee?

4  A.   I am.

5  Q.   In 2007?

6  A.   Yes.

7  Q.   And actually you've relied on Dr. Prentky's work

8  before, correct?

9  A.   I have.

10 Q.   And with respect to this specific 2007 study called

11 "Effective age at release on long-term sexual reoffense

12 rates in civilly committed sexual offenders," you testified

13 at your deposition that was something you routinely relied

14 upon?

15 A.   Correct.

16       MR. SWOMLEY:  Objection to its relevance in this

17 context.

18       THE COURT:  Overruled.

19 Q.   With respect to that study, what did that involve -- or

20 strike that.  Who were the pool that Drs. Prenkey and Lee

21 looked at there?

22 A.   The pool were men who actually were already adjudicated

23 as sexually dangerous in the Commonwealth of Massachusets

24 and who were housed at the Massachusetts State Treatment

25 Center.

1   Q.   And what offenses were those individuals or what

2   offenses did they identify as part of the pool?

3   A.   Well, there were sex offenders which included child

4   molesters as well as adult rapists.

5   Q.   That was a bad question.  How did they break down the

6   sex offenses in their article for purposes of analysis?

7   A.   Well, they did look at those who had sex crimes against

8   children versus those who were adult rapists.

9   Q.   Okay.  And with respect to those who had crimes against

10  children, approximately how many individuals were in that

11  study?

12  A.   I would have to look.  You'd have to give me a moment.

13  Q.   If you were to direct your attention to Exhibit 29 in

14  your binder.

15  A.   Thank you.

16  Q.   And right, on the first page, first sentence.

17  A.   Thank you.

18          (Witness examining document.)

19  A.   The data in the study, the Prentky and Lee study,

20  included 136 men who were classified as rapists and 115

21  child molesters.

22  Q.   Okay.  And for how long were they followed in this

23  study?

24  A.   Approximately 25 years.

25  Q.   And what was the average number of prior sex offenses

1   for the child molesters in that study, if you were to look

2   at Page 57 at the very bottom.

3           (Witness examining document.)

4   A.   They had an average of 2.5 known prior sex offenses for

5   the rapists, 3.6 known prior sex offenses for the child

6   molesters.

7   Q.   And that 3.6, how does that compare to the number of

8   prior offenses of Mr. Shields?

9   A.   Well, if you look at the number of victims that he's

10  been adjudicated for or admitted to, that is greater than

11  the average.

12  Q.   Mr. Shields is greater than the average here?

13  A.   Correct, that's right.

14  Q.   Drs. Prentky and Lee attempted to follow up on Hanson's

15  work on age with respect to these specific offenders

16  correct?

17  A.   That was a key issue in this particular reanalysis,

18  yes.

19  Q.   Okay.  And one of the cautions they had with respect to

20  this article was the fact that these are generally high-risk

21  individuals and these findings might not translate to the

22  general population; is that correct?

23           MR. SWOMLEY:  Objection, not --

24           THE COURT:  Sustained.  Leading.

25  Q.   What, if any, finding or what, if any, cautions were

1   there with respect to the general applicability of this

2   study?

3   A.   Well, the two major issues that came out of this

4   particular study in terms of limitations had to do -- I just

5   a moment ago stated the number of subjects, and if you look

6   at, for example, the Hanson data and other data, they

7   generally have a lot more subjects in their analysis, ten

8   times as many subjects.  And what that does is, it certainly

9   puts a limit on statistical power to be able to delve into

10  the data and make some types of statistical analyses that

11  other studies with larger samples with greater power would

12  be able to do, number one.

13          Number two, and importantly as well, is, these

14  data came from individuals who had already gone through a

15  legal process, individuals who were already civilly

16  committed as sexually dangerous persons.  So to compare

17  these results or to try to generalize these results to

18  individuals, as in this case who have not yet been

19  adjudicated as such, I think may prove problematic.

20  Q.   Okay.  But with respect to individuals previously

21  committed, what, if any, treatment would they have had in

22  Massachusetts?

23          MR. SWOMLEY:  Objection.  Irrelevant.

24          THE COURT:  Overruled.

25          MR. GRADY:  Your Honor --

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1          THE COURT:  Overruled.

2   Q.   While committed, would they have been receiving sex

3   offender treatment?

4   A.   Some of them, yes.

5   Q.   And so this is a pool of individuals who on average had

6   likely received more treatment than Mr. Shields and had

7   fewer offenses?

8          MR. SWOMLEY:  Objection.

9          THE COURT:  Sustained.

10  Q.   With respect to this particular study, what does the

11  chart -- or strike that.  Did Drs. Prentky and Lee create a

12  chart of their results?

13  A.   There were several figures and tables in this study,

14  yes.

15  Q.   Page 48 has a graph, a chart?

16         (Witness examining document.)

17  A.   Yes.  Well it does, it has one of them, correct.

18  Q.   Okay.  What does the chart show with respect to the

19  recidivism rate of these child molesters with 3.6 prior

20  offenses between ages 40 and 50?

21         MR. SWOMLEY:  Objection.

22         THE COURT:  Overruled.

23         MR. SWOMLEY:  Irrelevant.

24         THE COURT:  Overruled.

25  A.   Well, the category is done a little differently

1    agewise, but if you look at the 40- to just under

2    50-year-old category for the child molesters, the rate at

3    reoffense was a little over 35 percent.

4    Q.   And what rate of reoffense does the chart show for

5    child molesters with 3.6 prior offenses that have been

6    previously civilly committed for ages 50 to 60?

7    A.   A little under 25 percent.

8    Q.   Okay.  And what rate of reoffense does that chart show

9    for child molesters with 3.6 prior offenses who had been

10   previously civilly committed at age 60 plus?

11   A.   Approximately in the area of point -- 16 to 18 percent.

12   Q.   And how do those rates compare to the reoffense rates

13   for individuals over 60 that was noted by Dr. Hanson in his

14   2002 article?

15   A.   Well, there are two things that come out from these

16   data:  Number one, they are higher in absolute percentages,

17   so certainly not 50 percent or above, but they are higher,

18   relatively speaking, number one.

19              Number two, if you delve into these data, what you

20   find is, what best describes the function of the reoffense

21   for child molesters was a quadratic function rather than a

22   linear one.  You can see that in the data, how they go up

23   and then they go down again, so it's not as neat an analysis

24   as --

25   Q.   We don't have the chart in front of us.  Can you

1   explain what you mean by how they go up and then go down,

2   what you mean by a quadratic --

3   A.   Yes.   If you recall the other chart that was shown with

4   the three lines from the Hanson data, what you generally

5   found after age 25, with some variability but as a general

6   function and certainly captured statistically, is decreasing

7   rates of recidivism as a function of increasing ages.   They

8   all go down, in other words; and they go down in a manner

9   that can be described statistically by a linear model.

10          In these Prentky and Lee data, essentially that

11   could be the case for rapists, but for child molesters in

12   their sample, what you found is a significantly increasing

13   rate of recidivism from the 18 to 30 age range and then a

14   decreasing range.   And it looks almost like an inverse or a

15   bell-shaped curve, an inverse U.   And that's a quadratic

16   function.   It's not linear.   And what that means is, for

17   certain age ranges, it's an increasing function; for other

18   age ranges, it's a decreasing function.   And to explain the

19   whole age phenomenon requires something beyond linear

20   analysis.

21   Q.   But, in sum, for this particular study, contrary to

22   Hanson's 2002 which found almost no recidivism over age 60,

23   Prentky and Lee found the child molesters who had been

24   previously committed and had an average of 3.6 prior

25   offenses, that the reoffense rate over 60 was around 17,

1    18 percent?

2    A.    That's the data.

3    Q.    Doctor, what records did you receive from Mr. Shields

4    about his prior sex offender treatment?

5    A.    I didn't receive anything directly from him.

6    Q.    Did you receive any records of prior sex offender

7    treatment for Mr. Shields?

8    A.    No.

9           MR. GRADY:  Thank you.

10   RECROSS-EXAMINATION BY MR. SWOMLEY:

11   Q.    Do you know who has the burden of proof in these

12   proceedings?

13   A.    I hope it's not me.

14   Q.    Well, do you know where the records generally come

15   from, and they're produced by the government?

16           MR. GRADY:  Objection.

17           MS. PAGE:  Can we be seen at side bar on this

18   issue?

19           THE COURT:  Sustained.  What's the next question?

20   Q.    Are you aware of any affirmative obligation of

21   Mr. Shields to provide you with evidence against him?

22           MR. GRADY:  Objection.

23           THE COURT:  Sustained.

24   Q.    Did the government provide you with the documents that

25   you think you may have needed during your evaluation?

Page 24

1    MR. GRADY:  Objection.

2    THE COURT:  Overruled.

3  A.   Yes, all the documents I received in the two batches

4  separated by several months came from the government.

5  Q.   Okay.  Now, the last study that you talked about with

6  Mr. Grady, you know, whether Mr. Grady does or doesn't know,

7  you know that that is a study that can't be used on a

8  population group that includes Mr. Shields, right?

9  A.   Right.  That's why I said that's one of the two

10  limitations.

11  Q.   I understand that's why you said it, but I want to make

12  very clear that in the field, to do what Mr. Grady asked you

13  to just do with respect to Mr. Shields and a comparison to

14  that population group is totally scientifically unfounded?

15  A.   I would say it has significant limitations and would

16  myself not apply it to Mr. Shields, that's correct.

17  Q.   And in fact, on the front page of the study, if anybody

18  that wanted to read this honestly --

19    MR. GRADY:  Objection, your Honor.

20    THE COURT:  Sustained.

21  Q.   Well, on the front page of the study, does it not say,

22  Doctor, "We found marked differences, however, in the

23  reoffense patterns of rapists and child molesters, with the

24  latter group evidencing a distinct quadratic rather than

25  linear pattern.  Since these findings derive from a

1    population screened for civil commitment by virtue of their

2    presumptive dangerousness, they may not be generalizable to

3    samples of sex offenders drawn from the general prison

4    population," right, right on the front page?

5    A.    That's correct.

6    Q.    And it doesn't say "might not be."  It says "may not

7    be."  And in your field, does that mean you don't do this,

8    you don't do what Mr. Grady just asked you to do?

9              THE COURT:  Excuse me.  Please.  Excuse me.  Down.

10   Why don't you ask it a different way.

11   Q.    Is there anything dishonest about making such a

12   comparison?

13             MR. GRADY:  Objection.

14             THE COURT:  Sustained.

15   Q.    All right.  You go to what Mr. Grady asked you about

16   with respect to the average number of sex offenses committed

17   by the committed population, right?

18   A.    Yes.

19   Q.    And we're clear about what a committed population is?

20   A.    Right.

21   Q.    This is a group of individuals who have already been

22   through some sort of a proceeding like this and have been

23   determined to be in fact sexually dangerous?

24   A.    That's right.

25   Q.    Now, under the law in Massachusetts, one of the things

1   that is considered in a proceeding such as this is the

2   relative risk of harm, right?

3   A.   That's right.

4   Q.   Meaning all sex offenses are not created equal in that

5   universe, right?

6   A.   Right.

7   Q.   And the people that are committed, already committed,

8   are in a different class, having committed a different kind

9   of sex offense, say, than someone from the general

10  population?

11  A.   Yes.  They have been adjudicated as sexually dangerous

12  already, so it has been judged that the nature of their

13  sexual crimes warrants their civil commitment already.

14  Q.   And in the analysis that led to them being committed,

15  the crimes they committed may not be the same -- even if

16  numerically they are similar to a noncommitted sex offender,

17  they may not be of the same quality, right?

18  A.   That is true, and it actually goes beyond that, but I

19  would agree with that.

20  Q.   Now, we didn't talk about this on cross-examination

21  when I asked you questions last week, but now that you've

22  been presented with this study, I think we may need to.  And

23  that is, with respect to the nastiness, relatively speaking,

24  of what Mr. Shields has done and when he did them, can we

25  agree that the spate of criminal activity that was the most

1   serious involving Mr. Shields occurred in 1989?

2           MR. GRADY:  Objection, your Honor.  He's comparing

3   contact offenses to possession of child pornography.  The

4   victims of child pornography --

5           THE COURT:  Overruled.

6   A.   Yes, I would agree with you.

7   Q.   And that his offense, while it continues to be within

8   the category of committable offenses in 1998, is of a

9   different quality than the ones committed in 1989?

10  A.   True.

11  Q.   The one committed in 1998 involved what was by some

12  suggestion a male prostitute; yes, an underage one, but a

13  male prostitute nonetheless?

14  A.   Yes.

15  Q.   Would you agree that when judges sentence people to

16  jail terms for crimes they've committed, oftentimes they

17  take into account the seriousness of the offense?

18          MR. GRADY:  Objection.

19          THE COURT:  Overruled.

20  A.   That's my experience in the cases I've worked in, yes.

21  Q.   And, indeed, with sex offenders, generally speaking,

22  the criminal sentences escalate with each successive

23  criminal sexual act?

24  A.   Yes.

25  Q.   And with Mr. Shields, the suggestion was that he had

1  mutually masturbated -- that is, in the same proximity with

2  this fellow -- a number of times --

3          MR. GRADY:  Objection.

4  Q.   -- and he --

5          THE COURT:  What's the basis?

6          MR. GRADY:  He's defined what mutual masturbation

7  meant.  There's been no testimony that mutual masturbation

8  was separate.  I believe --

9          THE COURT:  Excuse me.  The jury can bring in some

10 collective knowledge.

11 Q.   Fair to say that when Mr. Shields pled guilty to the

12 acts that he committed against that individual, he received

13 time served as his sentence?

14 A.   That's right.

15 Q.   So his most serious offenses occurred in 1989, and by

16 your understanding of the most damaging or most serious

17 component of any of those offenses was the 6-year-old boy

18 where there was some anal penetration with a finger; is that

19 right?

20 A.   Correct.

21 Q.   And other than that, are you aware of there being any

22 penetration crimes involving Mr. Shields?

23 A.   I am not.

24 Q.   Any in the 1990s?

25 A.   No.

1   Q.   Any in the 2000s?

2   A.   No.

3   Q.   Last penetration event was in 1989?

4   A.   Correct.

5   Q.   And that is the most serious offense for which he has

6   ever been convicted, is that correct, in terms of the level

7   of force used, level of contact used?

8   A.   Yes.

9   Q.   Now, not trying to diminish the wrongfulness or

10  seriousness of the conduct he engaged in, are you familiar

11  with the population that lives at the Nemansket Correctional

12  Center, also affectionately known as the Massachusetts

13  Treatment Center?

14  A.   As I am there approximately every week for the last

15  eight years, I would say "yes."

16  Q.   And would you agree that, typically speaking,

17  individuals that are committed already to the Nemansket

18  Correctional Center are by and large a more dangerous

19  population than those that have not been committed, that

20  have in fact engaged in sex offenses?

21  A.   Well, by and large, I would say, given that modifier,

22  yes.

23  Q.   And knowing that Dr. Prentky says that you can't even

24  compare the sample groups, does a rough comparison of raw

25  numbers of sex offenses between Mr. Shields and that

1   population group in any way make Mr. Shields more like them?

2   A.   No.

3   Q.   Even if you want to use the data that Mr. Grady showed

4   you or talked to you about on his redirect, fair to say that

5   the most dangerous age group for that population is around

6   30 to 39?

7   A.   Yes.

8   Q.   Mr. Shields is already out of that, right?

9   A.   Correct.

10  Q.   So even if you have a quadratic equation as opposed to

11  a pure linear one and the quadratic talks about the upswing

12  and the downswing, he's already passed the up swing, right?

13  A.   That is right.

14  Q.   He's already on the downswing?

15  A.   Yes.

16  Q.   He's already in the linear part of that equation?

17  A.   Correct.

18  Q.   And even if you buy the recidivism rates documented by

19  Dr. Prentky from a population group that is, by

20  Dr. Prentky's own directive, not to be compared to people

21  like Mr. Shields, but if you want to go ahead and do that,

22  the most significant rate of recidivism for a 30-year-old to

23  40-year-old is what?

24  A.   The highest rate is low 40, 40s, so approximately 40 to

25  42 percent.

1  Q.   And in Mr. Shields's age group, what is the percentage

2  rate of recidivism for that population?

3  A.   Well, if you look at where he is, and if you want to

4  extrapolate the data, he's in a range on the high end of

5  approximately 35 percent to a lower range of under

6  25 percent.

7  Q.   And you get that data from the next time gate, which is

8  the 50- to 60-year-old population, right?

9  A.   Right.  He'll be 47, like I said, in a week or so.  So

10  if you want to extrapolate on the linear portion of the data

11  from that age range, he would be actually closer to the -- I

12  mean, we use the greatest integer function, but that would

13  be my estimate.  I'd put it in a range if you were to apply

14  it.

15  Q.   Okay.  And by the time Mr. Shields would be off federal

16  probation, he would be in the range of less than 25 percent

17  recidivism, if he were one of the more dangerous sex

18  offenders, right?

19  A.   According to these data.

20  Q.   And, again, one of the limitations of this data,

21  besides the fact that the author of the data says you can't

22  compare it to Mr. Shields, the other limitation is that

23  it -- it really is a limited data set, right?

24       MR. GRADY:  Objection, your Honor.  The article

25  says in quotes --

1      THE COURT:  Excuse me.  No, we don't have a

2   speech.

3      Why don't you rephrase the question.

4   Q.   The other limitation of this study that I believe you

5   mentioned is that it really is a small study, right?

6   A.   Given it comes from one site with a particular type of

7   sex offender, meaning those already adjudicated at one

8   institution, it is, relatively speaking, when you look at

9   the Hanson data and other data generated from elsewhere and

10  studied by other researchers, yes.  And I think the authors,

11  the researchers, appropriately point that out right from the

12  outset in their study.

13  Q.   And there's a big difference between 115 people in a

14  data set and, say, 20 some thousand people in a data set,

15  right?

16  A.   Well, insofar as the types of statistical analyses you

17  can bring to bear and the types of generalization that that

18  data can be applied to, meaning other populations that would

19  be representative of that original sample, I would agree

20  with you.

21  Q.   Now, in addition to those two points, the Prentky

22  analysis tries to go out longer periods of time by doing a

23  survival analysis, right?

24  A.   That's right.

25  Q.   And a survival analysis requires some statistical

1   background, right?

2   A.   It does.

3   Q.   And that's something you are qualified to talk about,

4   right?

5   A.   Correct.

6   Q.   Survival analysis doesn't mean that they start at the

7   moment when people are released and go forward 25 years,

8   does it?

9   A.   No.

10   Q.   What does it mean?

11   A.   Well, essentially it looks at -- it statistically

12   models for the fact that, as the name would imply, survival;

13   that as individuals recidivate, or in the case if they drop

14   out for other reasons, but if they recidivate, they are then

15   removed from the potential number of recidivists out there.

16   And so it takes into consideration over the long terms the

17   rate at which people are being removed from the population,

18   and then how long do you have to go out before a significant

19   enough people, a number of subjects would be removed that

20   you don't have any more variability to deal with.

21   Q.   So does it presume people live longer than they

22   necessarily do in the study?

23   A.   Well, it could certainly.

24   Q.   And it presumes they would be still out and able to

25   reoffend if they got caught at an early point?

1   A.   Right.

2   Q.   And so what it does is, it actually beefs up the raw

3   numbers?

4   A.   It removes potential confounds such as, you know,

5   people just -- one of the arguments, for example, is, well,

6   why do older offenders not reoffend or reoffend at such low

7   rates?  And the idea or one of the issues is, even with

8   large data sets is, well, there's relatively few of them

9   compared to the younger offenders, and they can die.  And if

10  they die, that's the only one true way you're not going to

11  get a reoffender, and that's death.  But they then drop out

12  of the analysis, and how do you account for that?  That's

13  the question.

14  Q.   And the way Prentky accounts for that is by presuming

15  they lived a little longer?

16  A.   Right.

17  Q.   And in that presumption, the rate can increase because

18  they're somehow left in this hypothetical data pool that can

19  continue to reoffend, hypothetically, into the future?

20  A.   Correct.

21  Q.   Now, you were asked about the RRASOR and the Static-99

22  having been subject to a fair amount of cross-validation,

23  right?

24  A.   Yes.

25  Q.   And, generally speaking, Dr. Hanson has done a very

1    good job of continuing to improve on and make relevant his

2    actuarial instruments, right?

3    A.   Ask me that again.

4    Q.   Okay, I will.  Doctor, you know that Dr. Hanson didn't

5    just fling the Static-99 and the RRASOR out to the world of

6    science and say "Use it."  He continued to document how good

7    it was, right?

8    A.   Yes, correct.

9    Q.   And in that documentation, people like you, people

10   around the world have made use of it and tried to replicate

11   his studies, right?

12   A.   True.

13   Q.   And they used his own data, right --

14   A.   Yes.

15   Q.   -- in trying to do that?  And in many cases researchers

16   will take exactly the same data that he used just to see if

17   he was right?

18   A.   Especially for aging research, yes.

19   Q.   Now, the aging research is the main area where

20   Dr. Hanson's data has not proved to be as consistent over

21   all sex offender populations, right?

22   A.   I want to make sure I understand that question,

23   "consistent."  Can you ask me that again?

24   Q.   Well, yes.  The robustness of the predictive values of

25   his instruments, and I believe we agreed they were not

Page 36

1  robust; they were of moderate predictive value, right?

2  A.   Correct.

3  Q.   So the less than robustness of these instruments has

4  continued to be documented for the younger populations that

5  are analyzed using the instruments and less so with the

6  older populations, right?

7        MR. GRADY:  Can I first object to the form, and,

8  second, this has been covered on --

9        THE COURT:  Yes, sustained.  You need to wrap this

10  up.  We need to move this forward.  We're now going over

11  stuff from before.

12  Q.   Doctor, the fact that it has been replicated -- and you

13  were asked this on redirect -- doesn't change the

14  criticisms, for example, of Dr. Wollert that for the older

15  populations, it is even less than modestly predictive,

16  right?

17  A.   True.  What I describe in terms of the age ranges, the

18  base rate data, using 50 percent or above as criterion for

19  dangerousness, and the results, for example, in the Wollert

20  research, I would certainly stand by those data and my

21  opinions thusly expressed.

22  Q.   And I show you what I showed you last week, the chart

23  that shows the decrease in its predictive accuracy as the

24  population ages.

25  A.   Right.

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1   Q.   It's fair to say, and I believe you testified last

2   week, that at 60 to 69, the error rate is about 90 percent,

3   right?

4   A.   Right.  In all of the major actuarials, if you are

5   making a risk prediction with the criterion for recidivism

6   being more likely than not, meaning greater than

7   50.1 percent, and high on the actuarials above age 60,

8   you're going to be wrong according to these data about

9   90 percent of the time.

10   Q.   And in the population group that Mr. Shields will be in

11   in three years, it's 80 percent of the time, right?

12   A.   Correct.

13   Q.   Wrong 80 percent of the time?

14   A.   Correct.

15           MR. SWOMLEY:  I move that into evidence.

16           THE COURT:  It's already in evidence, and it's all

17   been asked and answered.  Are you done?

18           MR. SWOMLEY:  Your Honor, I read to him a section

19   of Wollert that had the numbers.

20           THE COURT:  We're not going to do this in front of

21   the jury, so --

22           MR. SWOMLEY:  I'd like the data to be in front of

23   the jury, so can I ask him whether he would adopt it?

24           THE COURT:  I'll deal with it -- oh, yes, and then

25   we're done.  This is recross.

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1    Q.   The data with respect to applying the Static-99 to the

2    older offenders, if you assume, as Wollert did, a 6 on the

3    Static-99, the numbers that Dr. Wollert arrived at for

4    error, if everyone were committed that scored a 6 on the

5    Static-99, do you agree with that data on Page 79 and 80 of

6    his report?

7    A.   Yes.

8    Q.   And that is that if everyone were committed above a

9    6 --

10        MR. GRADY:  Your Honor, this was covered, and it

11    wasn't within the scope of the redirect.

12        THE COURT:  I'm going to let him read it, and then

13    he's going to be over, he's going to be done, and then we're

14    going on to the next witness.

15    Q.   "388 recidivists would have been mistakenly released;

16    whereas, 734 nonrecidivists would have been unjustly

17    detained."  Do you agree with that data?

18    A.   Yes.

19    Q.   And of the 388 recidivists who would have been

20    mistakenly released, those were individuals who were never

21    even sex offenders, according to the Bureau of Prisons, when

22    they were initially released, the bulk of that data?

23    A.   Yes.

24        THE COURT:  Thank you.

25        MR. SWOMLEY:  Thank you.  No further questions.

1          THE WITNESS:  Thank you, Judge

2          (Witness excused.)

3          THE COURT:  All right, who's your next witness?

4          MR. GRADY:  Your Honor, the government would call

5     Dr. Niklos Tomich.

6                    NIKLOS TOMICH

7     having been first duly sworn, was examined and testified as

8     follows:

9          THE CLERK:  Would you please state your name and

10    spell it for the record.

11         THE WITNESS:  My name is Niklos, N-i-k-l-o-s

12    Tomich, T-o-m-i-c-h.

13    DIRECT EXAMINATION BY MR. GRADY:

14    Q.   Dr. Tomich, what's your occupation?

15    A.   I'm a psychologist.

16    Q.   In the binder in front of you that was left -- is there

17    a binder that was left?

18    A.   There is.

19    Q.   Can you look at Exhibit 2 and tell me what that is.

20    A.   It's a copy of my CV.

21    Q.   Okay, is that the most recent copy?

22    A.   Yes.

23         MR. GRADY:  I move to admit that, your Honor.

24         MR. SWOMLEY:  No objection.

25         (Petitioner Exhibit 2 received in evidence.)

Page 40

1    Q.    Doctor, can you tell us, in what state do you practice

2    psychology?

3    A.    Massachusetts.

4    Q.    Do you have any licenses or certifications from the

5    Commonwealth of Massachusetts?

6    A.    I'm licensed as a psychologist, a clinical psychologist

7    in Massachusetts, and as a designated forensic psychologist

8    by the Commonwealth's Department of Forensic Mental Health,

9    and as a qualified examiner by the Commonwealth's Department

10   of Correction.

11   Q.    What do you have to do in order to be licensed to

12   practice psychology in Massachusetts?

13   A.    Complete a doctoral program.  I completed mine at the

14   Chicago School of Professional Psychology in 1988.  Then one

15   must take a test, pass that test -- it's a national test --

16   pay a fee, of course, and one can be granted the license to

17   practice psychology in Massachusetts.

18   Q.    Doctor.  What's a Psy.D degree?

19   A.    A Psy.D degree is a scholared professional degree as

20   opposed to a Ph.D. degree which is a research degree.

21   Q.    Why would one get a Psy.D degree?

22         THE COURT:  Psy.D stands for what?

23   A.    P-s-y-D, that's doctor of psychology.  One would get a

24   Psy.D if they wanted to practice as opposed to engage in

25   research.

1   Q.   What do you have?

2   A.   I have a Psy.D.

3   Q.   Do states distinguish in any way between Psy.D and

4   Ph.D. degrees in licensing?

5   A.   No.

6   Q.   You testified that you became licensed to practice

7   psychology in Massachusetts in 1989?

8   A.   Yes.

9   Q.   And have you been licensed since then and maintained it

10  in good standing?

11  A.   Yes.

12  Q.   You also mentioned you were a designated forensic

13  psychologist.  What does that mean?

14  A.   A designated forensic psychologist is a licensed

15  psychologist who has additional training and experience in

16  the specific area of the interface between psychology and

17  the law.

18  Q.   And what did you have to do to obtain that

19  certification?

20  A.   I was assigned a supervisor from the Department of

21  Forensic Mental Health in Massachusetts, which is a

22  subdepartment of the Department of Mental Health.  I had to

23  be supervised in terms of completing cases under the mental

24  health law in Massachusetts, and I had to pass another test

25  and pay more fees.

1   Q.   Okay.  What type of court matters does your

2   certification as a forensic psychologist pertain to?

3   A.   On forensics, it's mental health law, Chapter 123.

4   Q.   What types of things does that cover?

5   A.   Competency to stand trial, criminal responsibility, age

6   at sentencing, need for hospitalization, things like that.

7   Q.   Have you held that designation continuously since you

8   were certified?

9   A.   Yes.

10  Q.   Have you had any requirements to keep that

11  certification?

12  A.   Yes.

13  Q.   What are those?

14  A.   It's similar to keeping the license for the doctoral

15  license in psychology.  It's attaining trainings on a yearly

16  basis and maintaining the license in good stead in that

17  sense.

18  Q.   After obtaining your doctorate in 1988, what was your

19  first professional employment?

20  A.   In 1988?

21  Q.   1988.

22  A.   Mind if I refer to my CV there?

23  Q.   No.  Go right ahead.  Or I could even assist you.  Did

24  you work for the Mass. Society of Prevention of Cruelty to

25  Children?

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

Page 43

1   A.   Yes, I did.

2   Q.   And when was that?

3   A.   Between 1988 and 1994.

4   Q.   And what did you do for them?

5   A.   I started out as a psychologist, and I eventually

6   became chief of psychology.  I provided treatment to sex

7   offenders and victims of sex offense, not at the same time,

8   obviously.  I also consulted and supervised other

9   clinicians.

10  Q.   Okay.  What happened in 1994 or what position did you

11  take?

12  A.   I briefly took a position at HRI Hospital as an

13  attending psychologist.  I had worked at HRI Hospital in

14  Brookline prior to becoming a doctor as well, and I was

15  asked to come back there for a brief amount of time by the

16  medical director of that facility.

17  Q.   Okay.  Did you subsequently begin to work at the state

18  facility at Bridgewater?

19  A.   I did.

20  Q.   Okay, can you describe that facility and that position.

21  A.   Sure.  Bridgewater State Hospital is the state forensic

22  psychiatric hospital.  It's a secure psychiatric hospital,

23  meaning that it's surrounded by a fence, and once people are

24  in there, they're not allowed to leave unless the court

25  orders it.  I was originally there as a unit director for

1    the maximum security units at that facility, and later took

2    my training there in forensics.

3    Q.   Okay.  What did you do as a unit director, and who were

4    the population that you were working with?

5    A.   Well, the population were generally convicted felons

6    who also were mentally ill and were committed to Bridgewater

7    State Hospital.  There were times when individuals were

8    awaiting trial there as well, but that was relatively rare.

9    Q.   And what was it that you did as a unit director?  What

10   were your duties?

11   A.   Provide treatment and supervise the staff.

12   Q.   And what was your next position at Bridgewater State?

13   A.   As a forensic evaluator.

14   Q.   And what did you do as a forensic evaluator with

15   respect to that population you described?

16   A.   That's when I began.  I left the unit director

17   position, moved off of the units, and began evaluating

18   people as to the need for hospitalization, competency to

19   stand trial, criminal responsibility, aid in sentencing, for

20   those types of reasons; only as a result of court orders,

21   however.

22   Q.   During your time at Bridgewater State Hospital, can you

23   tell us what professional experience you had with sex

24   offenders.

25   A.   At Bridgewater State Hospital, there was a group for

1   sex offenders that were there.  They also had a dual

2   diagnosis of mental illness.  Additionally, there were

3   individuals who may have been charged with sex offenses who

4   had been awaiting trial, and on the unit I worked at,

5   individuals were sometimes provided treatment who had been

6   convicted of sex offenses and also had a mental illness.  As

7   a forensic psychologist, sex offenders might be committed

8   under any one of those types of commitments I alluded to

9   earlier, aid in sentencing, competency to stand trial,

10  criminal responsibility, or need for hospitalization, and I

11  would evaluate them in that sense as well.

12  Q.   With respect to sex offenders, what, if anything,

13  happened to the law in Massachusetts in 1999?

14  A.   Well, there had been laws concerning sex offenders

15  since just after World War II.  Those laws were rescinded

16  for the most part in the early 1990s but then were passed

17  again in Massachusetts in 1999, allowing for initial

18  commitments of sex offenders to the Massachusetts Treatment

19  Center.

20  Q.   Okay, you mentioned you were a qualified examiner.

21  What role, if any, within the context of Massachusetts sex

22  offender civil commitments do qualified examiners play?

23  A.   Qualified examiners are appointed, are given the

24  designation by the Commissioner of Corrections, and their

25  job within the Commonwealth is to evaluate individuals who

Page 46

1    are being considered for commitment by the courts.

2    Q.   If you could, just briefly outline the process by which

3    Massachusetts commits individuals and where the qualified

4    examiners come in.

5              MR. SWOMLEY:  I'm going to object as irrelevant,

6    your Honor.

7              THE COURT:  Yes, sustained.

8    Q.   In your capacity as a qualified examiner, what are your

9    duties with respect to the process?

10              MR. SWOMLEY:  Objection.  Irrelevant.

11              THE COURT:  Overruled.

12   A.   Well, again, I evaluate people for the courts.  What I

13   generally do is review a record, interview an individual,

14   complete an actuarial tool, write a report and make a

15   recommendation to the court, and, when called upon, I make

16   myself available to testify.

17   Q.   When you say "I evaluate people," who are you referring

18   to for purposes of qualified examiner examinations?

19   A.   Well, in Massachusetts, an individual who has been

20   convicted of a sex offense, six months prior to their

21   scheduled release date --

22              MR. SWOMLEY:  Objection.  Irrelevant.

23              THE COURT:  Yes.

24   Q.   Doctor, the qualified examiner evaluations you conduct

25   are of sex offenders who are potentially going to be civilly

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1   committed; is that correct?

2          MR. SWOMLEY:  Objection.  Leading.

3          THE COURT:  Sustained.

4   Q.   Doctor, who do you evaluate in your capacity as a

5   qualified examiner?

6   A.   Individuals being considered by the court for civil

7   commitment.

8   Q.   Okay.  And you provide an opinion or risk assessment to

9   the court with respect to --

10         MR. SWOMLEY:  Objection.  Leading.

11  Q.   What report do you provide to the court?

12  A.   I provide a report to the court which is written in the

13  form of a risk assessment.

14  Q.   Okay.  What, if any, other position do you hold in the

15  context of the Massachusetts civil commitment scheme with

16  respect to the release of individuals?

17  A.   I'm sorry, could you ask that again?

18  Q.   Sure.  Besides being a qualified examiner, is there any

19  other role or position that you have in the context of the

20  Massachusetts civil commitment scheme?

21  A.   No.

22  Q.   What is the Community Access Board?

23  A.   Oh, I'm sorry.  The Community Access Board is a

24  statutorily defined board of psychologists who review an

25  individual's treatment at the Massachusetts Treatment

Page 48

1    Center.

2                    MR. SWOMLEY:  Objection.

3                    THE COURT:  Overruled.

4                    MR. SWOMLEY:  Irrelevant.

5    Q.   And what is the role of the Community Access Board?

6    A.   To review an individual's treatment and to make

7    recommendations as to community access.

8    Q.   Whether they'll be released?

9    A.   Well, actually there is a law on the books --

10                   THE COURT:  You know, I don't want to go into too

11   much.  We're in the federal system, and the state system is

12   different, and he works in the state system, so just enough

13   to know what he's done.  I don't want to go into it in

14   detail.

15                   MR. GRADY:  Very well, your Honor.

16   Q.   Generally speaking, approximately how many evaluations

17   of sex offenders have you conducted in your capacity as a

18   qualified examiner in the past?

19   A.   Approximately 170.

20   Q.   And have you been qualified as an expert in the field

21   of sex offender risk assessment by the state courts of

22   Massachusetts?

23   A.   Yes.

24   Q.   Have you ever not been qualified as an expert?

25   A.   No.

1    Q.   Do you currently follow a particular protocol when

2    performing examinations with respect to sex offender risk

3    assessments?

4    A.   Yes.

5    Q.   What is that?

6    A.   I review an individual's record.  I seek to interview

7    the individual.  I score an actuarial tool, the Static-99.

8    I try to synthesize that material in the form of a report

9    where I make a recommendation to the court as to whether the

10   individual should or should not be civilly committed.

11   Q.   Okay.  And approximately how many of the 170

12   examinations have you followed this protocol with respect to

13   the use of actuarial instruments?

14   A.   My last count, it looks like 58 I recommended as not

15   sexually dangerous and 112 as sexually dangerous.

16   Q.   That's not what I asked.  For how long have you

17   followed the protocol of using actuarial assessment?

18   A.   Oh, I'm sorry.  Uhm, well, I first recommended it to

19   the department in 2001.  I think --

20              MR. SWOMLEY:  Objection.

21   A.   I think I have been following it consistently since

22   2005.

23              THE COURT:  Do you have a number?

24              THE WITNESS:  I'm sorry?

25              THE COURT:  Ballpark as to how many times?

1          THE WITNESS:  Oh, how many times I use the

2     actuarials in that?  Uhm. . . probably I'd say between 50

3     and 75 times.

4     Q.   And that's just with respect to testimony?

5     A.   Well, no.  That's in respect to all the evaluations

6     I've done.

7     Q.   Okay.

8     A.   But I'm usually called to testify in almost all of

9     those cases.

10    Q.   What is an actuarial instrument, very briefly, in your

11    understanding?

12    A.   Well, an actuarial instrument is just what it implies:

13    It's a statistical instrument that in the case of the

14    Static-99 looks at ten variables that an individual may or

15    may not possess in terms of his history involving sexual

16    offenses.

17    Q.   How have various instruments been developed in the sex

18    offender risk assessment field?

19          MR. SWOMLEY:  Objection.  Beyond the scope of his

20    knowledge.

21          THE COURT:  Sustained.

22    Q.   Before the development of actuarial instruments, can

23    you describe how psychologists assessed or evaluated sex

24    offender's risks?

25    A.   Usually clinically.

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1    Q.   Okay, what does that mean?

2    A.   Well, a psychologist would evaluate an individual based

3    on their clinical presentation and take into consideration

4    their own knowledge of sexual offenders and sexual offenses.

5    Q.   And what, if anything, generally speaking, has research

6    in the field shown with respect to clinical judgment?

7    A.   That the use of actuarial tools enhances clinical

8    recommendations or clinical findings.

9    Q.   What actuarial instrument do you use?

10   A.   I use the Static-99.

11   Q.   And who developed that?

12   A.   Karl Hanson.

13   Q.   If you could look at Exhibit 33 in your binder, could

14   you tell me what that is?  I'm sorry, I apologize.

15   Exhibit 34.

16   A.   That is a coding form for the Static-99.

17   Q.   Has that been scored for anyone?

18   A.   No.  Oh, I'm sorry, it has been scored, yes.

19   Q.   That's been scored for someone?

20   A.   No, I'm sorry.  Again, let me go back to my original

21   answer.  No.  It's just a blank form.

22   Q.   Okay.  Doctor, who qualifies for scoring under the

23   Static-99?

24   A.   Individuals who have been trained within its use.  It

25   doesn't necessarily have to be a psychologist or a

1   psychiatrist.  It can be a paralegal.

2   Q.   A probation officer?

3   A.   Yes.

4   Q.   Who qualifies to be scored under the Static-99?  Who is

5   it meant to be applied to?

6   A.   Individuals who have committed a sex offense, contact

7   sex offense, males, adults.

8   Q.   As you understand it, can you briefly describe the

9   theory behind the Static-99?

10  A.   Research has shown that there are certain factors that

11  are indicative of increased recidivism or increased risk of

12  recidivism.  For example, one of those factors are the

13  number of previous sexual offense arrests and previous

14  convictions.  Another example is whether an individual has

15  or has not committed a sexual offense against a male or an

16  unrelated victim.

17         The Static-99 synthesizes that data and tries to

18  combine those risk factors into a tool that can be used to

19  assess recidivism risk.  It does so by looking at ten

20  variables that are indicative of risk and by simply adding

21  those numbers.

22  Q.   And after scoring each of the ten questions, what do

23  you do?

24  A.   I check a chart that is within the Static-99 Coding

25  Manual to determine what level of risk the individual

Page 53

1    presents with.

2    Q.   Okay, I'd ask you to look at Exhibit 35.  Do you know

3    what that is?

4    A.   Yes.  That's the Recidivism Percentage By Risk Level.

5    Q.   Is that a recognized part of the Static-99?

6    A.   Yes.

7    Q.   And --

8         MR. GRADY:  Actually, I'd move to move this into

9    evidence, your Honor?

10        MR. SWOMLEY:  Objection.

11        THE COURT:  Overruled.

12        (Petitioner Exhibit 35 received in evidence.)

13   Q.   Doctor, I just want to make sure when we begin to

14   discuss this that we do understand what's going on.  Can you

15   explain for us the columns and then what is reflected in

16   those columns.

17   A.   Did you just put something up on this?

18   Q.   Yes.

19   A.   I'm not getting it.

20        (Discussion off the record.)

21        MR. GRADY:  I have an extra copy I can give to the

22   witness, your Honor.

23   Q.   Just very quickly, Dr. Tomich, tell us what that first

24   column is.  What does that represent?  What's listed there?

25   A.   The Static-99 score.

1   Q.   The second?

2   A.   The sample size for each score.

3   Q.   And these three columns?

4   A.   The sexual recidivism rates for five, ten, fifteen

5   years.  Percentages, I should say.

6   Q.   Corresponding to each score?

7   A.   Yes.

8   Q.   And the last three?

9   A.   The violent recidivism rates, percentages by risk level

10   corresponding to each score for five, ten, fifteen years.

11   Q.   How was this chart developed, briefly?

12   A.   Well, Karl Hanson looked at those risk factors that I

13   alluded to earlier and looked at recidivism rates as defined

14   by reconviction from a sample of a total of 1,086

15   individuals, and looked at how often they recidivated

16   outside of ten and fifteen years for both sexual and violent

17   recidivism.

18   Q.   Okay, I'd like to direct your attention specifically to

19   your purpose for being here.  Were you asked to conduct a

20   risk evaluation of Jeffrey Shields?

21   A.   Yes.

22   Q.   Did Mr. Shields make himself available to you for an

23   interview?

24   A.   No.

25   Q.   Did Mr. Shields provide any documentation to you?

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1    A.    No.

2    Q.    Did you offer to review any documentation provided by

3    Mr. Shields?

4    A.    I did.   In a conversation, I think, in 2007 with

5    Mr. Shields's attorneys, a telephone conversation, I asked

6    if I could interview Mr. Shields, and I asked if they wanted

7    to supply me with any documentation.   The interview was

8    declined, and I have received no documentation from

9    Mr. Shields or his attorneys as of this date.

10   Q.    Nonetheless, were you able to review reports conducted

11   by other examiners who did interview Mr. Shields?

12   A.    Yes.

13   Q.    And were you able to review depositions of those

14   individuals?

15   A.    Yes.

16   Q.    Could you just tell us the doctors whose reports you

17   had an opportunity to review?

18   A.    Dr. Renaud from the Bureau of Prisons, Dr. Plaud who

19   testified a little earlier, and a Dr. Rypma, who I believe

20   is an expert assigned to this case.

21   Q.    What, if any, other materials did you review in this

22   matter?

23   A.    Information provided by the government, and that

24   included a Bates stamped copy, which just means that every

25   page was stamped in terms of the page number.   Uhm --

1   Q.   Okay, Doctor, what was included, generally speaking,

2   within those materials?

3   A.   Sentence computation records, records of psychological

4   treatment, medical records, other Bureau of Prisons

5   documents, copies of convictions, court records, other

6   materials relevant to court records, et cetera.

7   Q.   What, if any, records of prior treatment of Mr. Shields

8   were included?

9   A.   There were records of prior treatment with Mr. Shields.

10  Mr. Shields did have psychological treatment, not

11  sex-offender-specific treatment but psychological treatment

12  within the Bureau of Prisons, and those records were

13  included.  He had in the past had sex offender treatment in

14  the community.  Those records were not included.

15  Q.   For purposes of your conducting your evaluation, what

16  did you do with the documents you received, these reports,

17  these depositions?

18  A.   I reviewed all of them.

19  Q.   And with respect to Mr. Shields's history of sexual

20  offenses, what did you do?  What were you looking for?

21  A.   What did I do and what was I looking for?

22  Q.   Yes.

23  A.   Well, I reviewed all the records, and I believe I may

24  have asked for some clarification with records.  Records

25  were not all given at one time, so records were sometimes --

1    groups of records were given at various times, but I

2    reviewed all the records and then summarized them in a

3    report to the court.

4    Q.   With respect to specifically to Mr. Shields's

5    chronology of offending, did you participate in the creation

6    of a chart of those offenses?

7    A.   Well, I actually asked the chronology be provided, and

8    I also looked at the records that were provided to me, and I

9    did participate in putting together a chronology of events

10   that reflected arrests and convictions regarding

11   Mr. Shields's history of sexual offending.

12   Q.   Can you look at Exhibit 36 in the binder, please.

13            MR. SWOMLEY:  Your Honor, may we approach

14   side bar, please?

15            THE COURT:  Yes.

16   SIDE-BAR CONFERENCE:

17            THE COURT:  Let me start off by saying, I don't

18   think I have a complete exhibit book because I don't have

19   some of these exhibits that you've been mentioning in the 30

20   range.

21            MS. KELLEY:  34 was missing from ours too, but

22   it's the scoring sheet, so --

23            THE COURT:  All right.  What's the problem?

24            MS. KELLEY:  Have we seen this before?

25            MR. GRADY:  Yes.  It was a pretrial conference

1    exhibit.  They did object to this.

2            MR. KELLEY:  If he's going to bring these out,

3    that's fine.  In his report is a lot of uncharged rumor-like

4    conduct that we would strongly object to being brought out.

5            THE COURT:  Right, but at this point, it either

6    comes in through a conviction or through an admission, and

7    that's all.

8            MR. KELLEY:  Okay.

9            THE COURT:  Okay.  But I'll allow this in.

10           MR. SWOMLEY:  Your Honor, can I just, on the last

11   exhibit allowed into evidence, the recidivism rates, there's

12   a section that pertains to violent recidivism.  That should

13   never come in because, one, it's not committable; two, it's

14   prejudicial.

15           THE COURT:  Yes, I actually think, I thought as I

16   looked at it, and I think you should actually explicitly say

17   that, and that part should be deleted out, because I didn't

18   realize that was coming up until it actually flashed on the

19   screen.

20           MR. GRADY:  I'll just clarify that that's not

21   relevant here.

22           THE COURT:  Yes.  And the question I have for you,

23   which I didn't pop in on, is, it's not clear to the jury who

24   is the court-appointed.  We've mentioned it before, but this

25   is your witness and that the other one was --

1           MR. SWOMLEY:  I'll make that very clear on cross.

2           MR. GRADY:  I don't think that's going to be a

3     problem, but I can ask.

4           THE COURT:  But I think the nuances don't always

5     hit them.  I mean, you were by the end louder-toned with

6     Dr. Plaud too, so I just want to make sure that they're

7     understanding.

8           MR. KELLEY:  What's the number of this exhibit?

9           MR. GRADY:  36.

10          (End of side-bar conference.)

11          THE COURT:  Did someone have a question?

12          A JUROR:  We just wanted to ask the witness to

13    speak up.  At the end of his sentences, he runs down

14    quietly.

15          THE COURT:  Okay.  Pull that mike in.  Perfect,

16    I'm glad to hear that.

17          This is what I'll call a summary document I've

18    just allowed in, and it really puts in chronological order

19    the charges and convictions, so that, you know, you'll have

20    that back in the jury room.

21          And also, in case it's unclear, it was mentioned

22    in passing, Dr. Plaud who you just heard was the

23    court-appointed expert who was -- not everything for sure

24    was agreed upon in what he said by either said, but he was

25    someone that was appointed by the Court, and both sides

1   agreed to his designation.  In contrast, Dr. Tomich is the

2   government's expert; and you'll hear from Dr. Rypma, who's

3   been sitting here, who's the defense expert.  So just to

4   give you a sense of the differences between who these

5   various psychologists are.

6   Q.   Doctor, one more point of clarification, the last

7   exhibit listing recidivism rates, the violent recidivism

8   rates have nothing to do with sex offender recidivism,

9   correct?

10  A.   Yes.

11  Q.   Okay.  I'm just going to show you what's been marked as

12  Exhibit 36, and I don't know if it can be read, but I

13  include the whole thing.  Is that legible to everyone?

14  Okay.  Directing your attention to the first listed offense,

15  speaking specifically only to conduct that is admitted by

16  Mr. Shields in the records and not referring to simply

17  police reports, referring only to conduct that is

18  admitted --

19             MR. SWOMLEY:  Objection.

20             MR. GRADY:  Very well.

21  Q.   Dr. Tomich, tell us the facts of the first offense.

22  A.   Mr. Shields had been arrested on March 7 of 1988 for

23  lewd and lascivious phone calls.  Mr. Shields admitted to

24  making the phone calls.  Specifically he asked the victims,

25  who were identified as children, to engage in oral sex with

1   them.  He mentioned that he would pay them.  The phone calls

2   came into a specific home on what was called the children's

3   phone line.  He was convicted of the offense and sentenced

4   to six months probation on May 10, 1988, pled guilty.

5   Q.   Doctor, can you tell us what's relevant about that

6   offense that you've just described for purposes of your

7   assessment of Mr. Shields's future risk.

8   A.   Well, first, it's a sexual offense.  Second, it seems

9   to be a sexual offense involving children, although the

10  record was unclear as to the exact ages of the children, but

11  they were referred to as children.  It's an arrest which is

12  relevant in terms of individuals who are arrested and also

13  convicted of sexual offenses are more at risk to present

14  with further sexual offending or recidivate.

15          The offenses involved males.  Individuals who

16  offend against males research shows are at more risk to

17  recidivate.  It's unclear to me whether the victims were

18  strangers.  Individuals who offend against strangers are

19  more at risk to recidivate than people that offend against

20  people that are known to them.  Mr. Shields at that time, I

21  believe, worked at a Hardy's Restaurant and may have known

22  the boys from his employment.  They did involve unrelated

23  victims, however.  Individuals who offend against unrelated

24  victims are more at risk to recidivate than individuals who

25  do not.

1   Q.   Okay.

2   A.   The other thing is that Mr.  -- the other thing that

3   was important about this offense -- I'm maybe going beyond

4   the question --

5   Q.   What else was important about this offense, in your

6   opinion?

7   A.   In terms of what Mr. Shields told other evaluators --

8   specifically, Drs. Renaud and Plaud -- he didn't mention

9   this offense.  In other words, he didn't admit it or deny

10  it.  He just didn't tell them about it.  When Dr. Rypma

11  confronted him about it, he said that he was calling a teen

12  line, although, again, the calls came in on a specific phone

13  line.  So there was a failure to disclose there, and also he

14  seems to have been less than a reliable informant to

15  Dr. Rypma.

16  Q.   Okay.  With respect to the second listed offense, what

17  were the facts of that offense?

18  A.   This occurred in January of 1989 in Camden, Maine.  An

19  individual later identified as Mr. Shields claimed to have

20  lost his wallet and approached a 13-year-old boy as he was

21  walking down the streets.  Mr. Shields was driving a vehicle

22  at the time.  He stopped and got out and told the boy he

23  lost his wallet and asked for help finding it, and then he

24  led the boy to an abandoned building and then fondled the

25  boy's genitals.  The boy tried to resist Mr. Shields by

1    hitting him, and Mr. Shields then fled.  He later was

2    convicted after pleading guilty to unlawful sexual contact.

3    Q.   Doctor, what was significant about this offense for

4    purposes of your opinion?

5    A.   Well, it's a second sexual offense that resulted in an

6    arrest and a conviction.

7              THE COURT:  Do you know when the date of the

8    arrest was?

9              THE WITNESS:  I have January 9, 1989.

10             THE COURT:  The arrest?

11             THE WITNESS:  I don't -- I think it was -- I think

12   it was indicted.  I don't have it in my records.  I need to

13   look it up.

14             THE COURT:  Do you have the date of the first

15   court appearance?

16             THE WITNESS:  No, I don't, not in my report.  If

17   it's --

18             MR. GRADY:  Certainly, your Honor.

19   Q.   If you were to look at Exhibit 4 in the binder in front

20   of you, Doctor.

21             (Witness examining document.)

22   A.   Well, again, it looks like it occurred, the event

23   occurred --

24   Q.   There's no question.

25   A.   I'm sorry.

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

Page 64

1   Q.   Doctor, I'm just going to bring up some binders.  These

2   were the materials provided to you by the U.S. Attorney's

3   office?

4   A.   Yes.

5   Q.   If you can look at Page 580 of that.

6   A.   You said Page 580?

7   Q.   Yes.

8   A.   All right.

9   Q.   The Court had asked you when he was indicted.

10       THE COURT:  No, I didn't ask him when he was

11   indicted.  I asked when he was arrested.

12       MR. GRADY:  You had asked both, your Honor.  I

13   apologize.  I'll deal with the arrest then.

14   Q.   Doctor, going to Pages 672 and 673 --

15       MR. GRADY:  I apologize, your Honor.  I just need

16   a moment to locate the relevant record with respect to the

17   arrest date.

18   A.   And, I'm sorry, you're referring me to Page 672?

19   Q.   Okay, Doctor, if you could look at Page 575 and the

20   first paragraph of that page.

21   A.   9/19/89.

22   Q.   And that was the date of his arrest?

23   A.   Yes.

24   Q.   So he wasn't arrested for the January offense until

25   September?

1   A.   Yes.

2   Q.   Coming back to that description you provided of that

3   offense, what for purposes of your evaluation was

4   significant about that offense?

5   A.   Well --

6            MR. SWOMLEY:  I'm sorry.  Your Honor, I need to

7   either object or get some clarification here.  I'm looking

8   at the screen, and it says 1/19/89 is the charge and

9   conviction, and I'm looking at a date of arrest of 9/19/89?

10  It doesn't flow.

11           THE COURT:  Right, the conviction doesn't happen

12  until March, '90, right?

13           MR. GRADY:  Correct, your Honor.

14           MR. SWOMLEY:  So I would object to this document

15  as inaccurate.

16           THE COURT:  Yes, I'm going to sustain that as

17  coming in.  You can revise it so it's accurate.  He's

18  convicted actually in March of 1990, I think, right, of the

19  three of them?

20  Q.   Doctor, the offenses coming down the left-hand side,

21  that's the date of the offense; is that correct?

22  A.   Yes.

23           MR. SWOMLEY:  I move to exclude this document

24  and --

25           THE COURT:  Yes, it needs to be revised.  I

1   completely agree.

2          MR. GRADY:  Then I'd ask for a fifteen-minute

3   break, your Honor.  I'll revise the document to reflect the

4   dates of conviction.

5          THE COURT:  Well, I think we can keep going for

6   fifteen minutes, and then you'll revise it during the break.

7   It just won't be admitted as it is, so --

8          MR. GRADY:  Okay.

9   A.   Should I answer the question?

10  Q.   Hold on.  Continuing, with respect to the second

11  offense occurring on January 9, 1989, what was relevant

12  about the facts of that offense for purposes of your

13  evaluation?

14  A.   Well, what was significant was that, again, this is a

15  stranger, or this is a stranger victim this time.  Research

16  has shown that individuals who offend against strangers are

17  more at risk to recidivate than those who offend against

18  individuals that are known to them.  Likewise, it is an

19  unrelated victim.  It's also the fact that this individual

20  is 13 years old, which brings me to question whether

21  Mr. Shields might be sexually attracted to prepubescent

22  boys.  He's right on the cusp of prepubescent to pubescent.

23          Mr. Shields kind of engaged in goal-directed,

24  purposeful behavior in terms of stating to the boy that he

25  had lost his wallet and asked the boy to help him find it,

1  and then lured him to an abandoned building where he fondled

2  the boy's genitals, and would only stop when the boy

3  resisted physically.  So all those things are important to

4  me and contribute to my recommendation.

5          Mr. Shields also did not inform Drs. Plaud and

6  Renaud about this particular offense.  When confronted by

7  Dr. Rypma, however, he did give a similar account as to what

8  was in the record.

9          MR. KELLEY:  Can we be seen at side bar?

10          THE COURT:  No, but --

11          MR. GRADY:  Okay.

12  Q.   With respect to Dr. Renaud and Dr. Rypma --

13          THE COURT:  Well, let me see you.

14  SIDE-BAR CONFERENCE:

15          THE COURT:  Here's the issue, which is the

16  documents, as we all know, came in at the eve of trial last

17  time.  I'd have to know a whole lot more before I would want

18  an adverse inference to be raised because he was never

19  actually asked about these before.

20          MR. GRADY:  Well, I'll frame the questions --

21          MR. SWOMLEY:  Your Honor, when I object --

22          THE COURT:  I think we need to stay away from this

23  in general because otherwise we get into when the documents

24  were produced and when they weren't.  And Plaud stayed away

25  from this pretty much, and so we can deal with this at the

1    break, but for right now, we should leave this alone.

2            MR. KELLEY:  Furthermore, the report of Dr. Renaud

3    was really his certification.  It was just done in -- it was

4    a screening done.

5            THE COURT:  Renaud was a Bureau of Prisons person,

6    right?

7            MR. KELLEY:  She did the certification evaluation.

8    She's not testifying here.  She didn't opine --

9            THE COURT:  I'm not as worried about that as much

10   the adverse inference from --

11           MR. SWOMLEY:  The adverse inference that he's

12   trying to draw is as well founded as the inference that I

13   would be saying, that they engaged in bad faith in not

14   turning this over.  To move stuff in, I need to be able to

15   go into their own bad faith.

16           THE COURT:  I want you to stay away from this

17   whole thing.

18           (End of side-bar conference.)

19           THE COURT:  Dr. Renaud, you've heard that name

20   mentioned.  I just wanted to find out who that was.  It's

21   the woman at the Bureau of Prisons who did some screening

22   here.  So she's not going to be testifying, and therefore I

23   want you to put that out of your mind, all right?  I think

24   she did the initial screening.  So you won't be hearing from

25   her, and we're going to put that piece out of your mind.

1    Q.   Doctor, with respect to what was the third listed

2    offense, were you made aware of the documents you were

3    provided of an April 19, 1989 charge of indecent assault

4    against a 9-year-old boy?

5    A.   Yes.

6    Q.   What were the facts there, Doctor?

7    A.   The charge was unlawfully assaulting a minor in a lewd

8    or lascivious or indecent manner; and a 9-year-old boy was

9    approached by Mr. Shields, allegedly, in a bathroom of a

10   local elementary school.  He was then asked by Mr. Shields

11   to pull his pants down so Mr. Shields could see his

12   privates.  He was eventually charged by complaint.

13   Q.   There was no conviction?

14   A.   There was no conviction.

15   Q.   Dpes anything in the records tell you why?

16   A.   Mr. Shields had gone to Maine after the incident, and

17   when Florida was contacted, they said they did not want to

18   come and get him because of financial constraints.

19   Q.   What, if any, admissions were there with respect to

20   this conduct in the records you reviewed?

21               MR. SWOMLEY:  Objection.

22               THE COURT:  Overruled.

23   A.   He doesn't admit it to Drs. Plaud or Renaud --

24               THE COURT:  No, I strike that.

25               THE WITNESS:  I'm sorry.

1    Q.   With respect to your review of Dr. Rypma's report,

2    what, if any, admissions were there in the record?

3    A.   He told Dr. Rypma that he had verbally assaulted the

4    boy, that it was verbal only, he did not touch the child.

5    Q.   With respect to the records reviewed, you've become

6    aware of conduct that occurred on July 15, 1989?

7    A.   Yes.

8    Q.   Okay, can you describe, first, was that something that

9    the records revealed was charged and convicted?

10   A.   Yes.

11   Q.   Okay.  Can you describe the conduct that you reviewed.

12   What were the facts of that offense?

13   A.   Mr. Shields approached a 14-year-old boy in the

14   bathroom of the Hyde School.  That's the name of the school

15   in Bath, Maine.  The boy had been practicing musical

16   instruments with friends at the school.  They noticed a man,

17   unknown to them, walking back and forth in the hallway

18   checking doors.

19         At approximately 9:45 p.m., the victim went to the

20   bathroom which was unoccupied at the time.  He was standing

21   at the urinal when the door flew open, and Mr. Shields came

22   in.  The victim finished urinating and pulled up his zipper

23   and noticed Mr. Shields leaning against the wall behind him.

24   As he was leaving, Mr. Shields grabbed --

25         MR. SWOMLEY:  May the record reflect the witness

1   is reading and not testifying from any recollection of his

2   own?

3        THE COURT:  Yes, it will.  Go ahead.

4   A.   He grabbed the victim by the genitals and put him in a

5   headlock.  He threatened the individual and said, "Let me

6   take off your pants or I'll hurt you."  He pulled his own

7   pants down and said to the victim, "Jerk me off."  The

8   victim said he would do that for five seconds and then

9   scream.  The victim pulled back and forth on Mr. Shields's

10  penis, and Mr. Shields ejaculated.  He then pulled up his

11  pants and said to the victim, "I'll be back to get you if

12  you come out before five minutes."

13  Q.   What was relevant for purposes of your report with

14  respect to solely the facts of that incident as you've

15  described them?

16  A.   Well, the victim is a 14-year-old boy, older than the

17  13-year-old but still quite young, so I still have the

18  question as to whether or not Mr. Shields is attracted to

19  prepubescent males.  Again it's a stranger victim, which

20  indicates the increased risk of recidivism.  Again it's an

21  unrelated victim.  Here there are threats used as well as

22  violence.  All those, I think, are important in terms of my

23  making a risk assessment.

24  Q.   Doctor, in your review of the records, did you become

25  aware of conduct that occurred on September 7, 1989?

1   A.   Yes.

2   Q.   And can you describe -- first, was that something that

3   you became aware was charged and convicted?

4   A.   Yes, it was.

5   Q.   Can you describe the fact of that offense.

6   A.   At that time, Mr. Shields sexually assaulted a boy in a

7   wooded area of the Hyde School.  The victim was 6 years of

8   age.  He was catching frogs at the time.  Mr. Shields asked

9   him if he wanted to catch more frogs, that he knew of

10  another place.  He lured the boy deeper into the woods.  He

11  assaulted the boy by inserting his finger in his anus and

12  fondled the boy's genitals. He then told the boy to stay in

13  the woods until he left, or he would, quote, "get him,"

14  unquote.

15  Q.   Okay, what was relevant with respect to your opinion

16  today about the facts of that offense?

17  A.   Well, the age of the victim is certainly relevant.

18  Here we have age 6, so clearly we're dealing with a

19  prepubescent boy.  So now we have two victims of the phone

20  calls that were characterized as children, a 6-year-old boy,

21  a 13-year-old boy, and a 14-year-old boy.  So the issue of

22  his sexual attraction or sexual arousal to children is

23  becoming apparent to me as I'm reading the record.  We have

24  another stranger victim, another male victim, and another

25  unrelated victim, all of which are indicative of increased

1   recidivism risk, and again there's threats utilized here as

2   well.

3   Q.   What, if any, statements of Mr. Shields to the police

4   during this time have you become aware of in the course of

5   your review of records?

6   A.   Mr. Shields at one point told the police that he was

7   sick and needed help.  At one point he pointed to his head

8   and said, "It's Another Person."

9   Q.   I refer you to what is Exhibit 10 in evidence and just

10  show you, have you seen -- this is a redacted version of a

11  report at Page 6997?

12  A.   Yes.

13  Q.   Was this among the materials that you reviewed?

14  A.   Yes.

15  Q.   And I'm going to show you what was the second page of

16  that.  Is that the statement you referred to with respect to

17  Mr. Shields asking for help?

18  A.   Yes.

19  Q.   With respect to that same offense, were you also --

20  again, this is in Exhibit 10 in evidence -- shown a victim

21  statement?

22  A.   Yes.

23  Q.   Okay.  And this was the statement that you reviewed, or

24  among the materials you reviewed?

25  A.   Yes.

1  Q.   And there was a second page.  Was that among the

2  materials you reviewed?

3  A.   Yes.

4  Q.   I'm also going to show you what's in evidence as

5  Exhibit 11.  This is again a redacted portion of that

6  affidavit for a warrant of arrest prepared by the officer

7  involved in the investigation of the 6-year-old.  Was this

8  something you reviewed, or in a complete form, were you

9  given a complete copy of this?

10  A.   Yes, and I reviewed it.

11  Q.   When you refer to statements by Mr. Shields about being

12  sick, looking at the screen, are those the statements to

13  which you refer that are contained in Exhibit 11 in

14  evidence?

15  A.   Yes.

16          THE COURT:  This might be a good time to take our

17  morning break.

18          THE CLERK:  All rise for the jury.

19          (Jury excused.)

20          THE COURT:  All right, excuse me, Dr. Tomich.  Let

21  me explain.  I don't want you to go into any adverse

22  inferences or adverse conclusions you may draw from the fact

23  that he didn't tell Renaud or Rypma about the offenses; and

24  that stems from the fact that, as you mentioned, the

25  documents were produced in two big batches, and we didn't

1  find out about some of the documents until right beforehand.

2  It's not a hundred percent clear to me he had an obligation

3  to tell the Bureau of Prisons.  With respect to his own

4  doctor, that may be ripe ground for cross-examination of the

5  doctor.  I'm not ruling on that.  But I think at this point

6  I'd have to go into too much to explain to the jury that it

7  wasn't that he denied something; he wasn't really asked

8  about it.  I don't even know what the question was that

9  Renaud asked.

10        THE WITNESS:  Right.

11        THE COURT:  I don't even really know what the

12  question was that Renaud asked.  So at this point, rather

13  than get into it under Rule 403 with you, we're not getting

14  into it.  Now, it may well come in with Dr. Rypma on cross.

15  First of all, Renaud is not coming on the stand, as far as I

16  know; and, second of all, I don't know what the buildup was

17  that led to the failure to disclose these offenses.  We may

18  find out but not from you, all right?

19        THE WITNESS:  Thank you, your Honor.  That's

20  clear.

21        THE COURT:  I just wanted to be clearer to you.

22  Let me also say, this turns out to be wrong, not in ways

23  that are nefarious or anything, but I think what we need is

24  the date of the offense, the date he was arrested, the date

25  he was convicted and/or sentenced -- in state court, that

1  tends to be the same date -- and how long he was on

2  probation for, so that you can see how often he offended

3  while on probation and how much he didn't, whether or not he

4  reoffended after an arrest or whether there was a cluster

5  arrest.  I don't know how to describe it.  In other words,

6  it may well be, and it may help to support either side, that

7  he did these four boom, boom, boom right in a row, and then

8  was arrested and got the sex offender treatment.  I still

9  don't know if he got sex offender treatment.  It's been

10  mentioned, but I don't even know.

11         MR. KELLEY:  Well, if I could just say, the

12  government has brought up on Dr. Tomich's direct that he

13  wasn't given any sex offender treatment records.  We have

14  tried very diligently to obtain those sex offender treatment

15  records.  If I have to put on my paralegal, I will.

16         THE COURT:  That's fair enough.

17         MR. KELLEY:  We can't get them, so to have an

18  adverse --

19         THE COURT:  Apparently the government can't

20  either.  What was the name of that house?  Pharos House.

21         MS. KELLEY:   The Pharos House records they lost,

22  those aren't sex offender treatment records.  Those are his

23  halfway house records.  But there are two times he received

24  sex offender treatment while on probation; once with a

25  fellow named Russell Moat, once with Kay Landry of Klinikos.

1   We have this very unsatisfactory document from his probation

2   officer, Mr. Onacki, that says, "I looked in my probation

3   records, and I can see that he did receive some treatment

4   for this one year, but I don't know anything else."  We

5   could not get Kay Landry to provide the records.  We can't

6   get Russell Moat to provide the records, and we tried.

7             THE COURT:  When you say you can't get them, they

8   lost them, or they're just intransigent?

9             MR. KELLEY:  We could never get either one of them

10  to talk to us, so --

11            THE COURT:  You can do this either by putting on

12  your paralegal, or we can do this by stipulation.  But let

13  me just say this:  It's not a hundred percent clear to me

14  from this record he got any because while there's some

15  reference that he got some, there's also some reference to

16  him petitioning for something from the judge because the sex

17  offender treatment had been canceled or wasn't available.

18            MR. KELLEY:  Well, that was while he was

19  incarcerated.  Both of the times he got treatment was while

20  he was out, so --

21            THE COURT:  It's just not clear to me.  I don't

22  know when he got it or what he got.  Maybe Dr. Rypma can

23  help me with that.  I think you can't probably.

24            THE WITNESS:  I think I can't.  I mean, I know

25  what it says in the records.

1          THE COURT:  Maybe Graney knows.

2          MR. KELLEY:  Well, Dr. Graney does not know this.

3    She knows that he was offered a spot at the sex offender

4    treatment program at Butner which he turned down.

5          THE COURT:  But didn't Mr. Shields describe to you

6    what he did there?

7          MS. KELLEY:  Yes, he may have described to her

8    that he had previously had sex offender treatment, but as

9    far as her having those records, she's not going to be of

10   any help on that.

11         THE COURT:  Well even if we -- I don't know basic

12   things like, A, did he get it, B, how long, C, when in this

13   interval?  I mean, it may be that we'll never find out in

14   detail whether it was, what is it, cognitive or behavioral.

15   I may know nothing.  But I'm assuming Dr. Rypma will know

16   some of this.

17         MR. KELLEY:  Dr. Rypma went into some detail on

18   that in his report --

19         THE COURT:  Anyway, that's your hunt, but at this

20   point on the document thing, I just don't want to go there

21   because it came up in an odd way on the eve of trial when

22   they found out about all these other offenses.

23         THE WITNESS:  That's true, your Honor.  I

24   understand.

25         THE COURT:  So see you.  Then if you can't get

1    this done -- you have twenty-five minutes -- you'll do it

2    tomorrow.

3            MS. BOAL:  Your Honor, it's already done.  It just

4    was not brought today.

5            THE COURT:  All right.

6            (A recess was taken, 11:05 a.m.

7            (Resumed, 11:45 a.m.)

8            THE COURT:  Did you have a revised summary or --

9            MR. GRADY:  Not that could be prepared with

10   respect to what the Court wanted in this time frame.  We

11   will have one.

12           THE COURT:  All right.

13           MR. GRADY:  I would like to, for purposes at least

14   of assisting and going through this witness's testimony,

15   this is a chart the witness prepared --

16           THE COURT:  This one?

17           MR. GRADY:  Yes, in consultation with myself --

18           THE COURT:  Well, you can just have it as a chalk.

19   I'm just not going to put it in as an exhibit.

20           MR. GRADY:  That's fine, if I can use it as a

21   chalk.

22           THE COURT:  That's fine.  That's why I let you

23   continue.  For example, it says "January 9, 1989, charged

24   and convicted."  Well, he's a psychologist, so maybe -- but

25   the conviction happened in March, 1990.

1        MR. GRADY:  Sure, I can clarify it, but it's

2   not --

3        THE COURT:  So it can be flashed up there, but

4   we're not going to put it in as an exhibit.

5        MR. GRADY:  Okay.

6        MS. BOAL:  The chart that we have, your Honor, we

7   just noticed some omissions.

8        THE COURT:  Yes, all right.  Let's get this jury

9   in here.

10        And I should just tell you, by the way, Mr. Grady,

11   I don't really have a full set of exhibits.  I'm a little

12   confused at this point.  I have two separate binders, and

13   I'm not sure what's -- eventually for me, I just will have

14   to get the whole --

15        MR. GRADY:  There's a few issues there.  One, they

16   objected to our putting in full copies of the convictions,

17   and what we came up with were agreed, and the Court ordered

18   we not provide full dockets initially.

19        THE COURT:  Right, and --

20        MR. GRADY:  So now we have to go back and provide

21   full dockets.

22        THE COURT:  I totally understand.  It's just that

23   there are certain things, even apart from that.  Like, I

24   don't have anything past 25 or something in here, so --

25        MR. GRADY:  Sure.

1          THE COURT:  There are things in the 30s, so I'm

2     just saying I don't have them.  That's all.  It's not

3     saying -- eventually I want them.

4          MR. GRADY:  Really?  I'm sorry, your Honor.  I

5     apologize for having omitted that and not having accounted

6     for it.

7          (Jury enters the courtroom.)

8     BY MR. GRADY:

9     Q.   Dr. Tomich, I'm just going to go over one more police

10    report from Exhibit 11 in evidence.  Was this one of the

11    materials that you reviewed?

12    A.   Yes, it is.

13    Q.   And it reflects statements made by Mr. Shields when he

14    was arrested?

15    A.   Yes.

16    Q.   What was relevant to you about those statements, and if

17    I could refer to the second page of that report?

18          MR. KELLEY:  What is the Bates number, please?

19          MR. GRADY:  700701.

20    A.   Well, what's significant is Mr. Shields basically

21    stating that he feels there was something wrong with him

22    that made him engage in this type of behavior, and

23    specifically his quote, "Why don't they just put me in a

24    hospital where I can get help."

25    Q.   Why is that relevant?

1    A.   Well, statutorily what I'm looking for is evidence of a

2    mental abnormality or a mental disorder or mental illness

3    that might result in serious difficulty in Mr. Shields

4    refraining from engaging in sexual offenses, and I think

5    this small piece of data is indicative of his difficulty in

6    terms of refraining from engaging in that type of activity,

7    and also, to his credit, his ability to recognize and ask

8    for help in that area.

9    Q.   Okay.  And that was back in 1989?

10   A.   Yes.

11   Q.   Okay.  I'm just going to show you what we previously

12   marked just as a chalk to illustrate your testimony.  With

13   respect to this document, the dates listed on this left-hand

14   side, what are those?

15   A.   Well, those are approximate dates of when these

16   offenses occurred.

17   Q.   Okay.  And with respect to when you say next charged or

18   convicted, that means that the documents you showed reflect

19   the charge or conviction, not that that occurred on the date

20   March 7, for instance?

21   A.   Yes.  It should be read charged and convicted in

22   Wakulla County, not charged and convicted on March 7, 1988.

23            THE COURT:  You know, remember what the jury said

24   because I just lost you at the end of your sentence.

25            THE WITNESS:  Oh, okay, sorry.  I'll try to speak

1   up.  Not charged and convicted in March 7, 1988, but charged

2   and convicted in Wakulla County so it's read that way -- I'm

3   sorry -- read that way.

4   Q.   With respect to the seventh listed offense, that

5   occurring in March, 1998, what were the facts of that

6   offense?

7   A.   Well, it occurred in Portland, Maine, and at that time

8   the offense consisted of a 12 year-old victim that

9   Mr. Shields knew.  He had befriended the victim.  The victim

10  had helped him move into an apartment.  At times he would

11  give the victim some spending money.  He had contact with

12  Mr. Shields over time.  At one point while at Mr. Shields's

13  apartment, Mr. Shields touched him in the genital area, and

14  this placed the victim in fear of being raped by

15  Mr. Shields.  The contact lasted approximately two minutes.

16  He was indicted -- Mr. Shields, that is -- and later pled

17  guilty to unlawful sexual conduct -- I'm sorry -- contact.

18  Q.   Okay.  What, if anything, do reports of other

19  individuals that examined Mr. Shields, such as Dr. Plaud and

20  Dr. Rypma, reveal with respect to what admissions

21  Mr. Shields made about this contact?

22  A.   Well, he referred to the boy as a prostitute, a

23  12-year-old prostitute.  I think he referred to the boy as a

24  little older than that, than 12 years old.  He also

25  reported -- Mr. Shields reported that he did not touch the

1   boy.  He said he basically insighted the boy to masturbate.

2   He said this to Dr. Rypma.  He told Dr. Plaud that it was

3   mutual masturbation.

4   Q.   What, if anything, was significant about any of the

5   facts you've just described with respect to your opinion

6   today?

7   A.   Well, again, it's a 12-year-old boy, so it's a male

8   victim.  It's not a stranger this time, so that piece of

9   risk is not present in this particular offense.  But the

10  fact that it's a male, the fact that it's an unrelated

11  victim is indicative of risk.  He's also offending against

12  someone he's known now.  And he seems to tell different

13  stories to different individuals who evaluate him, so again

14  that goes to whether he can be considered a reliable

15  informant of his past behavior.

16  Q.   And with respect to the last listed offense, that dated

17  September 12, 2002, that's the date the offense occurred; is

18  that correct?

19  A.   Yes.

20  Q.   Okay.  And he wasn't charged and convicted on that

21  date?

22  A.   Yes.

23  Q.   With respect to that offense, can you tell us the

24  facts.

25  A.   Well, this is a child pornography offense.  The police

1    investigated.  Mr. Shields was interviewed.  He originally

2    denied the offenses.  However, images of children were found

3    on a computer that he had, as well as disks and CDs in

4    Mr. Shields's possession.  He originally placed the blame on

5    a friend but then later pled guilty to the offense.  He also

6    committed this offense while he was on probation from the

7    1998 offense.

8    Q.   What facts that you just described are relevant to your

9    opinion here today and why?

10   A.   Well, it's a noncontact sexual offense.  That's

11   indicative of risk.  On the Static-99, noncontact sexual

12   offenses receive a point in terms of the summing up of data.

13         This is now Mr. Shields's seventh arrest and sixth

14   conviction for a sexual offense, so he's been arrested,

15   incarcerated.  Records also indicated that he had received

16   some treatment in the community, sex offender treatment; but

17   despite all of this, he nevertheless downloaded figures of

18   children engaging in sexual activity.  The judge in the

19   particular case found that pictures of prepubescent children

20   were involved, so, again, that goes to whether Mr. Shields

21   is sexually aroused by prepubescent children, which

22   certainly seems to be the case, given the totality of data

23   in all these offenses.  So all those pieces of information

24   are relevant in terms of my being able to form an opinion.

25   Q.   Okay.  As a result of your review of these records,

1   these offenses, and the reports and depositions of other

2   experts in this matter, did you reach any conclusion as to

3   what, if any, mental illness, abnormality, or disorder

4   Mr. Shields suffered from?

5   A.    Yes.

6   Q.    And what, if any, was that conclusion?

7   A.    That he suffers from pedophilia.

8   Q.    What was the basis for the criteria that you used to

9   diagnose pedophilia?  Where do you know what the criteria

10   are?  Where do you go?

11   A.    The criteria are listed in the Diagnostic and

12   Statistical Manual of Mental Disorders, Fourth Edition, Text

13   Revision, which lists the criteria of the individual for the

14   diagnosis of pedophilia.

15   Q.    I'm going to show you what's been previously marked as

16   Exhibit 22-A.  Do you recognize those?

17   A.    I do.

18   Q.    What is it?

19   A.    It's the diagnostic criteria for pedophilia as stated

20   in the Diagnostic and Statistical Manual of Mental

21   Disorders, Fourth Edition, Text Revision.

22   Q.    Okay.  Doctor, in your opinion, is pedophilia a serious

23   mental disorder?

24   A.    Yes.

25   Q.    Can you explain for us what the basis for your

1   diagnosis of pedophilia is within the context of those

2   criteria.

3   A.   Well, if we look at the first criteria, we have, "Over

4   a period of at least 6 months --" and here we have a period

5   of approximately 14 years -- "recurrent, intense sexually

6   arousing fantasies, sexual urges, or behaviors --" and

7   clearly we have these behaviors, as admitted to by

8   Mr. Shields himself at the time of his guilty pleas --

9   "involving sexual activity with a prepubescent child or

10  children, generally age 13 years or younger."

11          His offenses involve victims between the ages of 6

12  and 14, and only one victim was over the age of 13, and that

13  was a 14-year-old victim.  So he clearly meets the first

14  criteria.

15          "The person has acted on these sexual urges, or

16  sexual urges or fantasies cause marked distress or

17  interpersonal difficulty."  Well, he's clearly acted on the

18  sexual urges or fantasies.

19          "He's at least 16 years of age and at least five

20  years older than the child or children in Criterion A."  And

21  that's clear.  He was age, I believe, 26 at the time of the

22  first offense, and in 2002, I believe he was 41 at the time

23  of his last offense.  So he clearly meets that criteria.

24  Q.   What, if any, statements existed in the record

25  reflecting that Mr. Shields suffered distress as a result of

1   these sexual urges?

2   A.   Well, Mr. Shields stated -- I think we went over it a

3   little earlier, that he -- he was crying to police.  He

4   informed the judge that he wanted to have help, that he was

5   willing to go to Augusta, said it was in his head, pointing

6   to his head.  So clearly he expressed at least some level of

7   despondency and distress as a result of his behavior in this

8   area.

9   Q.   What is your opinion today, to a reasonable degree of

10  professional certainty, as to the diagnosis of Jeffrey

11  Shields?

12  A.   That he's a pedophile.  Pedophilia does not

13  automatically abate or go away with time.  There's no

14  indication that there's been any change that I could see in

15  the record.

16  Q.   I'm just going to show you the first page of what's

17  been introduced into evidence as Exhibit 22-A.  Looking at

18  the last section, what does the DSM say about the course of

19  pedophilia?

20  A.   "The course is usually chronic, especially in those

21  attracted to males."

22  Q.   What does that mean, Doctor?

23  A.   That it usually continues, especially in those who have

24  an attraction to males.

25  Q.   And when you say "continues," for a week, a month?

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

Page 89

1    A.   Forever.

2    Q.   Doctor, we talked earlier about the use of actuarial

3    instruments.  Did you score Jeffrey Shields on the

4    Static-99?

5    A.   Yes.

6    Q.   Can we go back to the exhibit that we identified as the

7    blank sheet, which is which is 34.

8            MR. GRADY:  May I approach the witness, your

9    Honor?

10           THE COURT:  Yes.

11   Q.   Doctor, I'm going to put this up on the screen.  Can

12   you walk us through the scoring of the Static-99 that you

13   did.

14   A.   Sure.  The first risk factor is "Young, age 25 or

15   older."  Mr. Shields is over the age of 25 presently, and at

16   the time I scored this, he received a 0.

17   Q.   Will you score the sheet in front of you as you go

18   through.

19   A.   Oh, all right.

20           THE COURT:  Well, I'm confused now.  He's not

21   scoring this thing?

22           MR. GRADY:  No, but I can -- zero.

23   Q.   And, Doctor, what about Question 2?

24   A.   Well, "Ever lived with," which means ever lived with a

25   significant other or lover, as it says here, "for at least

1  two years?"  The records indicate, and I think there was a

2  presentencing report in there, that he had done so, so I

3  scored him a 0 on this particular item.

4  Q.   And what is the significance of that factor?  Why is it

5  there?

6  A.   Individuals who have not lived with an individual for

7  two years are more at risk to recidivate than those who

8  have, a basic research finding.

9  Q.   Okay, what about Question 3?

10 A.   "Index non-sexual violence -- any convictions."

11 Q.   What does that mean?

12 A.   That means nonsexual violence at the time of the index

13 offense, which is the time of the most recent or governing

14 offense.  "Index" and "governing" are used relatively

15 interchangeably.  There was no nonsexual violence for the

16 child pornography charge, so he receives a 0 in that

17 particular item.

18 Q.   And the next question?

19 A.   "Any prior non-sexual violence -- any convictions."  I

20 did not see prior nonsexual violence in his record.  He had

21 been arrested for shoplifting in the past.  I think -- well,

22 he was violated for probation for theft but no violence, so

23 I scored him as a 0 on Item No. 4.

24 Q.   Okay.  And what about No. 5?

25 A.   "Prior sex offenses," and then in the right-hand column

1   you have a column underneath the word "Charges" and one

2   underneath the word "Convictions."  Mr. Shields, in terms of

3   the offenses we just went over, had seven charges and six

4   convictions.  So he scores a 3 in the far right-hand corner,

5   and I scored him a 3.

6   Q.   And when you say prior sex offenses, does that include

7   the index offense?

8   A.   I was counting it as the index offense, but, yes.

9   Q.   Okay.  So he gets a 3 either way?

10  A.   He gets a 3 either way.

11  Q.   Okay.  What about "Prior sentencing dates," what does

12  that factor as?

13  A.   Prior sentencing dates are whenever he was sentenced

14  for any crime at all.  I think in these particular

15  circumstances, he received -- I have sentencing dates

16  occurring on May 10, 1988, for the first sexual offense.

17  Q.   The telephone calls?

18  A.   Yes.  On March 21, 1989, for the next three sexual

19  offenses that occurred in 1989.  So that's one sentencing

20  date that encompasses those three different offenses.

21          MR. SWOMLEY:  Can the record reflect it's March 1,

22  1999.

23          MR. GRADY:  I was just going to clarify.

24  A.   I'm sorry, correct.

25  Q.   March, 1990, is one sentencing date --

Page 92

1    A.    Yes.

2    Q.    -- for the January, July, and September offenses?

3    A.    In 1989.

4    Q.    In 1990, the sentencing date is 1990?

5    A.    The offenses occurred in '89.

6    Q.    Yes, okay.

7    A.    Then we have a shoplifting offense in '96 which he

8    received probation for, and then there was also a theft by

9    deception charge in '98 for which violation was --

10   probation, it was a probation violation, which counts as a

11   sentencing date as well.  And then the governing offense --

12   I'm sorry -- and then the offense, the sentencing date for

13   the '98 offense.  So it's clearly four or more.

14          THE COURT:  So this includes prior sentencing

15   dates that have nothing to do with sex offense?

16          THE WITNESS:  That's correct.

17   Q.    And what is the significance of prior sentencing dates

18   in general?  What, if anything, do studies show?

19   A.    Well, you're looking at a recidivist in general.  So

20   you see him as recidivating, both in terms of the sexual

21   offenses and in other offenses.

22   Q.    And for purposes of its inclusion in the Static-99,

23   what, if anything, has research shown about the number of

24   prior sentencing dates --

25   A.    That individuals who have four or more sentencing

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1    dates, excluding the index offense, that's indicative of

2    future risk to reoffend sexually.

3    Q.   Okay.  He gets a 1?

4    A.   He gets a 1 on that.

5            THE COURT:  If you just counted sex offenses,

6    would he get that 1?

7            THE WITNESS:  If you just counted sex offenses,

8    you would have one, two, three, excluding the index offense.

9            THE COURT:  He'd get a 0 if you didn't?

10           THE WITNESS:  Yes.

11           THE COURT:  Because you exclude the pornography?

12           THE WITNESS:  Yes.

13   Q.   With respect to Question No. 7, can you tell us, you

14   know, what is the question, why is it important, and what

15   did you score Mr. Shields?

16   A.   "Any convictions for noncontact sexual offenses."

17   Noncontact sexual offenses are offenses such as the

18   telephone offense or the child pornography offense where

19   specific physical contact doesn't take place.  Mr. Shields

20   has been convicted of noncontact sexual offenses, so he gets

21   a 1.

22   Q.   What has research shown about how conviction for a

23   noncontact sex offense can affect future risk to recidivate

24   sexually?

25   A.   That it increases the risk for future sexual

1  recidivism.

2  Q.   Okay.  What is Question 8, and can you explain for us

3  how you scored Mr. Shields and why it's relevant?

4  A.   "Any unrelated victims."  Any unrelated victims means

5  victims that are not physically related to Mr. Shields, such

6  as son, daughter, brother, sister, cousin.  Research has

7  shown that individuals who offend against unrelated victims

8  are more at risk to recidivate than against related victims,

9  so Mr. Shields receives a 1 in the score column.

10  Q.   And Question 9, can you describe the question, what it

11  asks, why it's relevant, and what you scored Mr. Shields.

12  A.   "Any stranger victims."  Hanson's research shows that

13  individuals who offend against strangers are more at risk to

14  reoffend sexually than individuals who do not offend against

15  strangers, so Mr. Shields scores a 1 in that column.  He

16  does have stranger victims.

17  Q.   And with respect to male victims, again the same

18  question?

19  A.   Again, research has shown that individuals who offend

20  against males, as opposed to those who offend against

21  females, are more at risk to reoffend in the future,

22  sexually reoffend, so Mr. Shields receives a 1 in the

23  scoring column.

24  Q.   Okay.  What was the total score?

25  A.   8.

1  Q.   Okay.  And on the same scoring sheet, does that

2  translate to a particular risk category?

3  A.   It does.

4         MR. SWOMLEY:  Objection.

5  Q.   And what is that?

6  A.   6 plus, high.

7  Q.   Okay.  I'm going to show you what's been previously

8  marked as Exhibit 35.  Just with respect to sex offender

9  recidivism, Doctor, we've previously talked about

10  Exhibit 35.  What is it?

11  A.   It is the recidivism percentages by risk level.

12  Q.   Doctor, this goes only as high as 6 plus.  Can you

13  explain, why is that?  Why wouldn't it go higher?

14  A.   Well, statistically, the authors the Static-99

15  indicate that there's insufficient evidence to conclude that

16  offenders who score more than 6 are at higher risk to

17  reoffend than individuals who scored 6.  So they're still in

18  the highest risk category, but there's insufficient evidence

19  to indicate that a score of 8 is actually more indicative of

20  risk than an individual who scores a 6 or a 7.  So if you

21  look on the chart at the five- and ten-year, fifteen-year

22  recidivism rate, that score of 52 for the fifteen years is

23  the same as the score of 6, 7, or 8.

24  Q.   What is the significance of scoring a 6 or 7 or 8 --

25  excuse me -- strike that.  What is the significance of

1   scoring a number higher than 6, if any?

2   A.   The only significance that's stated by the authors in

3   the Coding Manual is that a score higher than 6 can give one

4   some surety that the individual actually scores in the

5   highest risk level.  All Static-99 scores are generalizable.

6   Mr. Shields was not in the original sample, so findings of

7   the Static-99 are being generalized to Mr. Shields.  They're

8   an underrepresentation of true risk potential because

9   they're based on reconviction rates, not reoffense rates.

10  Q.   Can you explain why it is that reconviction rates might

11  underestimate future sexual offenses or the likelihood that

12  they would occur?

13  A.   Because not everyone who commits a sexual offense is

14  convicted of that offense.  Individuals may commit a sexual

15  offense and may not be found out.  They may not be arrested.

16  Even individuals who are arrested may plead down or may not

17  be convicted for one reason or another.  But reconviction

18  rates are robust in terms of being easy to count because you

19  can get an NCIC record of an individual.  So Hanson uses

20  reconviction rates in terms of his samples and in generating

21  his statistics, but Hanson says that these are an

22  underrepresentation of true risk in the community.

23  Q.   Doctor, was that the end of your analysis?

24  A.   No.

25  Q.   Okay.  What did you do with the information derived

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1   with the actuarial -- first, what did you do with that

2   information?

3   A.   Well, I put it in a report.  I included it in my

4   report, and I made the caveats that I stated earlier in

5   terms of risk level of 8 as opposed to 6.  I also noted the

6   caveat that this may be an underrepresentation of true risk,

7   and that we're generalizing to Mr. Shields in this respect

8   because he wasn't a member of the original study, he wasn't

9   in the group of individuals studied to generate these

10  statistics.  So all science works by generalizability, and I

11  put all that information in my report.

12          But the Static-99 score is kind of only a

13  beginning.  It's a moderate predictor of sexual offense

14  recidivism.  It isn't the be-all and end-all.  There's not a

15  one-to-one correlation.  So I also include in my report the

16  offenses themselves, the nature of the offenses, and the

17  things I observe that I think are important in terms of

18  looking at whether or not risk exists to the point where

19  Mr. Shields should be committed or should be released to the

20  community.

21  Q.   What other things besides the actuarial did you look at

22  or what other things were important besides this actuarial

23  scoring?

24  A.   Well, what was important to me, in addition to the

25  score of 8 on the Static-99, was the nature of Mr. Shields's

1    offenses across victims, and what we see is that Mr. Shields

2    went to sometimes extraordinary lengths to gain access to

3    victims.  He would lure them into isolated places.  He would

4    assault or accost them in those situations.

5            Mr. Shields reported at various times that he

6    couldn't remember some of his offenses because he was either

7    drunk or somehow incapacitated due to drugs or alcohol.  But

8    when you look at the nature of the offenses themselves, you

9    find that the offenses are pretty well goal-directed, and he

10   engages in very purposeful behavior.  For example, in one of

11   the offenses, he reports he was working at the time, he was

12   working as a pizza delivery man; so he was driving a car, he

13   was making change, he was, you know, doing his usual

14   deliveries, finding addresses, things like that.  Yet he

15   says he was so incapacitated by drugs or alcohol, he can't

16   remember the offenses.  So this and the other information

17   that I had presented earlier about his telling different

18   things to different people makes me question how reliable

19   Mr. Shields is as a reporter of his own behavior.

20           Of course, there's another explanation that could

21   be that Mr. Shields himself literally does not understand

22   the risk of which he presents --

23           MR. SWOMLEY:  Objection.  Calls for speculation.

24           THE COURT:  Yes.  Sustained.

25   Q.  Coming back to the information that you considered

1    important, you had just discussed that while Mr. Shields had

2    claimed to be under the influence of alcohol, on at least

3    one occasion he was actually at work delivering pizzas,

4    driving a car, et cetera.  What other things did you

5    consider important?

6    A.   That his behavior was not only goal-directed and

7    purposeful in that respect, but there's also a compulsive

8    element to it.  The question is, why does Mr. Shields engage

9    in these offenses, you know, seven arrests, six convictions

10   over approximately fourteen years, when he knows the

11   consequences of his behavior, when he has been exposed to at

12   least some level of treatment, and yet he goes back and

13   offends again and again and again and again?  There's

14   something driving this man's behavior.  I think it's a

15   deviant sexual arousal pattern.  I think it's pedophilia.

16   This compels him to act in a certain way, especially towards

17   prepubescent children, and I believe that's what makes him

18   dangerous.

19           So it's not just the fact that he got an 8 on the

20   Static-99.  It's also that his behavior is purposeful,

21   goal-driven, and compulsive.  So all those things together

22   make me or made me make the recommendation that he should

23   remain committed or be committed and engage in a treatment

24   program to diminish risk.

25   Q.   Doctor, there have been references in this trial to

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1   what are called dynamic factors.  What are those, and what,

2   if any, role did they play in your opinion?

3   A.   Well, the Static-99 is just what I said:  It's static

4   factors.  It's historical factors that are unchangeable.

5   Dynamic factors do change.  Dynamic factors can be anything

6   that's changeable.  Mr. Shields has recently been sober for

7   quite a period of time, but really as a result of forced

8   incarceration.  So his drug abuse and alcohol abuse may be

9   considered a dynamic factor.

10          Records indicate that Mr. Shields was treated for

11  depression while he was incarcerated.  He reports that at

12  times he thought that maybe some of his sexual offending

13  behavior was due to depression.  That can be considered a

14  dynamic factor.  Depression waxes and wanes over time and

15  may wax and wane as a result of treatment, especially

16  medication treatment, which Mr. Shields has received in the

17  past.

18          Mr. Shields's age is kind of what might be called

19  a stable dynamic factor, but that's something that I looked

20  at as well in terms of a factor that might be indicative or

21  not indicative of risk.

22  Q.   Okay.  Now, coming back to the issue of sex offender

23  treatment, have you in the past -- or what, if any,

24  experience have you had with providing sex offender

25  treatment directly to sex offenders?

1    A.    Well, I provided treatment directly to sex offenders

2    when I worked at the Massachusetts Society for the

3    Prevention of Cruelty to Children, both in group and

4    individual formats, and also while I worked at Bridgewater

5    State Hospital as a unit director.

6    Q.    What, if you know, is the present thinking on -- what

7    does it look like today?  What is sex offender treatment?

8    A.    Well, generally sex offender treatment is provided in a

9    cognitive behavioral format.

10   Q.    What does that mean?

11   A.    Well, cognitive behavioral psychotherapy seeks to

12   change an individual's cognitions, which will then thereby

13   change a person's behavior.  So treatment consists usually

14   of group therapy, augmented by psychoeducational classes,

15   and at times behavioral treatment as well.  Did you want me

16   to explain all those things?

17   Q.    Please.

18   A.    Well, group treatment is the traditional kind of

19   treatment that everybody thinks of.  Usually it consists of

20   six to eight to ten to twelve sexual offenders in a group,

21   usually with one or two therapists.  Therapists are usually

22   male and female.  The individuals engage in that group

23   process, sometimes for a number of years.  The sex offenders

24   themselves challenge each other in group.  They talk about

25   their offenses, the things that motivated their offenses,

1   what precipitated their offenses.  They might identify their

2   sexual assault cycles, those things that caused them to

3   offend in the first place.  They identify what cognitive

4   distortions might be present that allowed the offending to

5   continue over time, and they discuss ways in which they can

6   stop offending in the future.  At times they will generate a

7   relapse prevention plan, which is a very detailed plan as to

8   how an individual can be in the community but not reoffend.

9   And it might be detailed to the point where an individual

10  will discuss where they're going to be going to therapy, who

11  their therapist will be, how often they'll be in treatment,

12  what safety nets they have out there in terms of contacts

13  and personal contacts in the community, those type of thing.

14  So all that's part of the group cognitive behavioral relapse

15  prevention process.

16          Concomitant with that or happening at the same

17  time as that group process are psychoeducational classes,

18  where individuals will attend certain classes to learn what

19  sexual offending is generally, why it occurs and what can be

20  done about it.  And sometimes even augmenting this is

21  behavioral types of therapy, which is covert

22  desensitization, break an ammonia capsule under one's nose

23  when one is listening to a tape of someone being assaulted.

24  Obviously, these are not real assaults but -- but all that

25  type of treatment is involved in kind of modern

1   sex-offender-specific treatment.

2   Q.   What kind of things can impede treatment or suggest

3   that an individual won't succeed in treatment?

4   A.   Well, there's a number of things that can impede

5   treatment, but the primary thing that impedes treatment is

6   somebody just being resistant; not talking about what had

7   happened, not being involved in treatment, and kind of

8   refusing treatment when they can.  Sometimes people will

9   begin treatment and then drop out of treatment.  Treatment

10   dropout is actually considered an additional risk factor.

11   So being an unreliable informant, not being straightforward

12   in treatment, and just resisting treatment in general can

13   certainly impede treatment.

14   Q.   What, if any, of these things has Mr. Shields exhibited

15   in your review of the records in your professional opinion?

16   A.   Well, he rejected sex-offender-specific treatment while

17   he was in the Bureau of Prisons.  It was offered to him, and

18   he rejected it.  He did avail himself of drug and alcohol

19   treatment while he was within the prison system, and he did

20   avail himself of psychotherapy, but at times those

21   therapists he had recommended that he involve himself in

22   sex-offender-specific treatment, but even then he said "no."

23   So at this point he's essentially an untreated sex offender.

24   Q.   Today?

25   A.   Yes.

1   Q.   What about -- what is failure to empathize?

2   A.   Well, failure to empathize is an inability to put

3   yourself in the position of the victim.

4   Q.   Okay.  What is an example of that?  Is describing a

5   12-year-old as a prostitute an example of that?

6   A.   Yes, or seeing children in general as the same as

7   adults.

8   Q.   Doctor, what, if any, of these problems that may impede

9   treatment are indicated by Mr. Shields's description of a

10  12-year-old boy as a prostitute?

11  A.   Well, that may indicate a failure in empathy.  And

12  empathy, failures in empathy are not necessarily considered

13  risk factors, but it certainly could inhibit one's

14  treatment; and certainly dropping out of treatment or not

15  being able to avail oneself of treatment might increase

16  risk.

17          But I think that -- I mean, my impression of

18  Mr. Shields when I look at the totality of data, not at any

19  one specific event, but the totality of the data meaning the

20  offenses themselves and what he said to others about them,

21  is that he simply hasn't dealt with it, that he doesn't want

22  to deal with it.  He wants to kind of do his time quietly

23  and get out, and he doesn't want to be bothered with doing

24  the work necessary to reduce the risk he presents to

25  children in the community today.

1  Q.   So in the context of your opinion, were you aware of

2  any potential future treatment Mr. Shields may have or

3  conditions of probation requiring that?

4  A.   Well, I know he's got probation.  He's got three years

5  of probation.

6  Q.   Okay.

7  A.   I don't know what conditions he'd be saddled with

8  should he be released to the community.

9  Q.   Was that in the records you were provided?

10 A.   I can't recall it offhand.

11 Q.   I'm just going to show you a portion of what's

12 previously been marked as Exhibit 8 and introduced into

13 evidence.  These are a portion of his release conditions.

14 Do you recall seeing this document as part of the materials

15 you were provided?

16 A.   I do.

17 Q.   Okay.  And can you tell us, what conditions of release

18 will he have?

19            THE COURT:  Now, this is for the

20 pornography offense?

21            MR. GRADY:  This is from the federal conviction

22 which has been introduced into evidence as Exhibit 8, and

23 this is a portion of the record.

24            MR. SWOMLEY:  Can the record be clear, this

25 witness has claimed he has not seen this and knows nothing

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1    about this, and is now being shown this ostensibly for the

2    first time.

3              MR. GRADY:  That's not true.  The witness

4    testified --

5              THE COURT:  Have you ever seen this before?

6              THE WITNESS:  I have seen this.

7    Q.   Can you tell us what conditions with respect to sex

8    offender treatment Mr. Shields will have?

9    A.   Well, they ask that he participate in a program of

10   mental health treatment to include sexual offender treatment

11   as dictated by the probation officer, until such time as

12   he's released from the program by the probation officer.

13   Q.   Do you recall how long he will be on supervised

14   release?

15   A.   Three years.

16   Q.   Okay, so the longest he could be required by Probation

17   to undergo this treatment is three years?

18   A.   Yes.

19   Q.   And at what age will he be in three years?

20   A.   Well, exactly from today, 49.

21   Q.   And how close to 50 would he be at that point?

22   A.   I think he's 50 on the 16th.  He's going to be 47 on

23   the 16th.

24   Q.   What, if any, role do these conditions play in your

25   opinion in terms of reducing risk?

1   A.   Well, I mean, obviously I'm a psychologist, so I

2   believe in treatment.  I do think that treatment reduces

3   risk.  There is a study by Hanson, a meta-analysis that

4   indicates that treatment does reduce risk.  I think if

5   Mr. Shields had availed himself of treatment in the past,

6   his risk may be reduced.  I mean, I wasn't able to interview

7   Mr. Shields, so I don't know that offhand, but I think that

8   given the data and the research, I certainly think that's

9   viable.  I'd like to see Mr. Shields undergo treatment in a

10  secure setting prior to release, given his history.

11            MR. SWOMLEY:  Objection.

12            THE COURT:  Yes, sustained.

13  Q.   With respect to your finding of risk, does your

14  awareness of these conditions and the length of the term

15  change your opinion?

16  A.   No.

17  Q.   Can you explain some of the reasons why it is that even

18  though he has these conditions, it wouldn't change your

19  opinion.

20  A.   Well, it's essentially been done before, and he's

21  reoffended anyway.  He's had treatment in the community,

22  sex-offender-specific treatment, and he's reoffended.  He's

23  been placed on probation before in the community, and he's

24  reoffended.  I think between his 1998 offense and the child

25  pornography offense of 2002, he was pulled back twice, not

1   counting being pulled back for the child pornography offense

2   itself, so --

3   Q.   When you say pulled back, you mean he was brought in,

4   found to be in violation, and sentenced?

5   A.   Yes.

6   Q.   Two occasions?

7   A.   Yes.

8   Q.   Prior to violating the probation in September, 2002, by

9   possessing child pornography?

10  A.   Yes.  So -- well, I mean to be colloquial about it,

11  he's been there and he's done that.  He's tried that, and it

12  hasn't worked.

13            THE COURT:  Do you know what those two revocations

14  were for other than the child pornography offense?

15            THE WITNESS:  I might.  Let me look at my report.

16  One was theft by deception, and the other was --

17            THE COURT:  What does that mean?  Does it show in

18  the record?

19            MR. GRADY:  A charge, a new offense.

20            THE COURT:  Excuse me?

21            MR. GRADY:  It was a charge of a new offense.

22            THE COURT:  Not sex?

23            MR. GRADY:  Not sex.

24            THE COURT:  Not sexual?

25            MR. GRADY:  No.

1           THE COURT:  All right, so a nonsexual offense, is

2    that right?

3              THE WITNESS:  That's correct.

4           THE COURT:  All right.  And what's the other one?

5              THE WITNESS:  The other one was --

6           (Witness examining document.)

7           THE WITNESS:  I have to look for it, your Honor.

8    I apologize.  Shop -- oh, no, I'm sorry.  I don't recall,

9    your Honor.  I'm sorry.

10          THE COURT:  Are you sure there were two prior

11   ones?

12             THE WITNESS:  Yes.

13          THE COURT:  Before the pornography one?  You're

14   sure?

15             THE WITNESS:  Yes.

16   Q.   I'm just going to show you a portion of what's been

17   previously marked in evidence as Exhibit 7.  Exhibit 7 is

18   the 1998 conviction.  Do you recognize this?  Have you seen

19   this before?

20   A.   Yes.

21   Q.   And for the record, this is a portion of the docket

22   sheet from the 1998 offense?

23   A.   Yes.

24   Q.   And what does it reflect, at least --

25   A.   Conditions of probation.

1   Q.   Okay.  Now, with respect to Condition 1, what is that?

2   A.   "Refrain from all criminal conduct in violation of

3   federal, state, and local laws."

4   Q.   And Mr. Shields was found not to have complied with

5   that, correct?

6   A.   That's correct.

7   Q.   Both by committing an offense of theft by deception and

8   by possessing child pornography?

9   A.   Yes.

10          THE COURT:  Excuse me.  This just isn't clear.  Is

11   that pornography the one that led to the index offense or

12   something else?

13          THE WITNESS:  No.  It's the one that led to the

14   index offense.

15          THE COURT:  So what's the third one?

16          THE WITNESS:  I don't know.  That's what I can't

17   recall.

18          THE COURT:  So the third one is in question,

19   though.

20          THE WITNESS:  It was not a sex offense.  I am sure

21   of that.

22   Q.   Again, this is Exhibit 7 in evidence.  I'm just going

23   to show you another portion.  What is this?  Can you tell me

24   what that document is?

25   A.   I'm having a hard time reading it because it's a little

1    out of focus here, but it looks like the guilty charge from

2    1998.

3    Q.    Okay.  He pled guilty on what day?

4    A.    10/30/98.

5    Q.    Okay.  And turning to the next page, what, if anything,

6    does that document reflect with respect to what occurred on

7    December 9?

8    A.    Motion for probation revocation, which was filed on

9    December 2, 1998.

10   Q.    So within a month of the guilty plea and the sentence

11   being imposed?

12   A.    Yes.

13            THE COURT:  Was he revoked?

14   Q.    The next page, what does that reflect with respect to

15   what occurred on March 19, 1999?

16   A.    "Revoked entered by court on 2/2/99."

17   Q.    Okay.  And what was the result of that revocation?

18   A.    Serving 125 days at the Cumberland County Jail.

19   Q.    And what, if anything, else was the result?

20   A.    The court added further conditions of probation, to

21   submit to random search for compliance of treatment

22   conditions, and --

23            THE COURT:  So this revocation had to do with

24   substance abuse?

25            (Witness examining document.)

1   Q.   Doctor, in your review of the records, do you recall in

2   Dr. Rypma's report whether there was any mention of failure

3   of a drug test?

4   A.   I have Dr. Rypma's report, if I could refresh my memory

5   with it.

6   Q.   Okay, if you could review that.

7        (Witness examining document.)

8   A.   Your question is?  I'm sorry.

9   Q.   Do you recall what, if any, mention there was of

10  failure of a drug test by Mr. Shields while on probation?

11  A.   That there was a urinalysis failure.

12  Q.   Okay.  And that's what he told Dr. Rypma?

13  A.   Yes.

14  Q.   Coming back to this particular document in front of

15  you, besides the 125-day sentence, can you read what it is

16  that resulted in addition to that sentence?

17  A.   "The court adds conditions of probation:  Defendant to

18  want to submit to random search by P and P for compliance

19  and treatment conditions; 2:  Defendant need not limit to

20  sex offender and substance abuse programs specifically

21  described prior, and approved Program M is acceptable,"

22  et cetera.

23  Q.   Okay, a couple of things.  What, if anything, does that

24  indicate with respect to whether sex offender treatment was

25  a requirement of his probation in 1998?

1    A.    It seems that it was.

2    Q.    And based on your review of the prior records with

3    respect to the 1989 offenses to which he was found guilty in

4    March of 1990, what, if anything, do you recall from your

5    review of records about whether sex offender treatment was

6    required for that as well?

7    A.    I don't recall.

8    Q.    Okay.  Let's finish with this offense first.  I'm just

9    going to show you further along in time.  What does the

10   document reflect as to what occurred in February of 2001?

11   A.    This is a probation revocation that was held on

12   February 23, 2001.

13   Q.    This is the second probation violation?

14   A.    Yes.

15   Q.    What, if anything, does the record reveal about the

16   results of that probation revocation hearing that occurred?

17   A.    The ruling was that the probation revocation was issued

18   on 2/23/01.

19   Q.    2/23 or 2/28?

20   A.    I'm looking at the last line, "Ruling, 2/23."

21   Q.    Okay, I'm sorry.  And what was the result of that

22   finding of revocation?

23   A.    I'm sorry, what was the result of the finding of

24   revocation?

25   Q.    Yes.

Page 114

1   A.   The court ordered him to serve one year and six months

2   of the suspended sentence.

3            MR. SWOMLEY:  Can I understand whether the

4   government is representing that's the second violation?

5            MR. GRADY:  Sure.

6            MR. SWOMLEY:  Okay.

7   Q.   Go back to March 19, 1999.  Does that reflect a court

8   entry, "Probation revoked on March 19, 1999"?

9   A.   Yes.

10  Q.   Okay, that would be the first?

11  A.   Yes.

12  Q.   Okay.  Then on February 23, 2001, when that happens

13  again, that would then be the second?

14  A.   Yes.

15  Q.   Okay.  Was that unclear to you, Doctor?

16  A.   No.

17  Q.   I'm just going to come back.  The last one,

18  September 24, 2002, what happened?

19  A.   There was a subsequent motion for a revocation filed.

20  Q.   Okay.  Doctor, based on your review of the records, do

21  you know what the basis of that motion to revoke his

22  probation in September of 2002 was?

23  A.   I believe it was the child pornography offense.

24  Q.   Which occurred when?

25  A.   Uhm --

1   Q.   Well, in what month did those offenses occur?

2   A.   September.

3   Q.   Of 2002?

4   A.   Yes.

5   Q.   Let's just go through the final page.  What, if

6   anything, is entered in the docket on October 10, 2003, with

7   respect to proceedings in December of 2002?

8   A.   Well, there was a plea agreement or there was a plea

9   entered by the defendant on 12/6/2002.  Is that what you're

10  referring to?

11  Q.   And what was he admitting?

12  A.   That he had engaged in the child pornography offense.

13  Q.   Looking at the entry above, what is the title?

14  A.   Oh, I'm sorry.  "Probation revocation."

15  Q.   So that in December of 2002, he admitted to violating

16  his probation?

17  A.   Yes.

18  Q.   As a result of the child pornography offense?

19  A.   Yes.  That's my understanding.

20  Q.   Doctor, there has been some discussion here that the

21  offenses here were committed under the influence of alcohol,

22  and you started to discuss that.  And you've explained why

23  it is that you think it might not be that an individual who

24  was extremely under the influence of alcohol --

25            MR. SWOMLEY:  Objection.  Leading.

1      THE COURT:  Overruled.

2  Q.   Well, can you explain again, Doctor, why is it that you

3  would think that, based on your knowledge of these offenses,

4  that alcohol can't explain them?

5      MR. SWOMLEY:  Objection.  Asked and answered.

6      THE COURT:  Overruled.

7  A.   Well, again, the record indicates that Mr. Shields

8  engaged in purposeful, goal-oriented behavior.

9      THE COURT:  That was asked and answered.

10 Q.   Doctor, with respect to the use of alcohol, what, if

11 any, role can that play in making one offend against

12 children?

13 A.   I'm not aware that alcohol causes one to sexually

14 offend against a child.  Alcohol does not cause pedophilia.

15 Q.   Okay.  With respect to the prior offenses and whether

16 there had been sex offender treatment, I'm going to refer

17 you to the docket of Docket No. 927, which has been admitted

18 into evidence as Exhibit 6.  And just to refresh the jury's

19 recollection, the indictment charged that on or about

20 September 7, 1989 -- or strike that.  What did this

21 particular offense involve or who?

22 A.   Well, this was the offense against the 14-year-old that

23 we talked about earlier.

24 Q.   The September offense against AC?

25 A.   Yes.  Oh, I'm sorry, this is the one that does not say

1    he's 14, so let me -- this was the 6-year-old child.

2    Q.   Thank you, Doctor.  I'm just going to show you the

3    second page of the docket.

4              MR. KELLEY:  What Bates number, please?

5              MR. GRADY:  548.

6    Q.   What does this reflect with regard to the date he was

7    sentenced and what conditions there were imposed among the

8    other sentences, but this particular sentence, what does it

9    reflect with respect to sex offender treatment?

10   A.   There were special conditions of probation.  Well, he

11   was sentenced to five years and called a three-and-a-half

12   suspended.  And then he was sentenced to counseling and

13   treatment to the satisfaction of his probation officer.  And

14   they asked that he specifically participate in a program of

15   chemical treatment, behavioral modification for sexual

16   abuse, and counseling and treatment, as recommended, and

17   upon terms and conditions established by his probation

18   officer.

19   Q.   Okay.  And that probation began in March of 1990?

20   A.   Yes.

21   Q.   I'm just going to back up for a moment and show you the

22   judgment and commitment from Docket No. 89-589.  And for the

23   record, just to refresh the jury's recollection about the

24   conduct in question, I'm just going to show you the

25   indictment.  When was this offense or what was the date of

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1  offense for this offense?

2  A.   January 8, 1989.

3  Q.   And with respect to this offense, the judgment and

4  commitment reflects a sentence of what, if you look on

5  bottom?

6  A.   A five-year term.

7  Q.   Okay.  And the sentence is, the document reflects,

8  served consecutive to 90-27 and 89-297.  What does that

9  mean, "consecutive to"?

10 A.   At the same time.  Oh, I'm sorry.

11 Q.   That's concurrent, Doctor.  What is consecutive to?

12 A.   "Consecutive to" means consecutive to after that --

13 after the previous.

14 Q.   Okay.  And essentially he was ordered -- strike that.

15 What does the next entry reflect?

16 A.   "It's ordered that the foregoing sentence be suspended

17 and that the defendant be committed to the custody and

18 control of Probation and Parole for a term of three years,

19 consecutive to CR-90-27."

20 Q.   So if we add up the three years and the three years --

21 that is, they are consecutive from March of 1990 -- he was

22 on probation for six years through March of 1996?

23 A.   Yes.

24 Q.   Okay.  And during that time, he was required to undergo

25 sex offender treatment?

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1   A.   Yes.

2   Q.   To your knowledge, he successfully completed that first

3   probation, correct?

4   A.   Yes.

5   Q.   Did that enter into your consideration of the issue of

6   his future probation?

7   A.   Yes.

8   Q.   Why is it that that doesn't suggest he will complete

9   his future probation?

10  A.   Because he continued to commit crimes afterwards.  He

11  may.  There's no doubt that he's got the capability of

12  completing probation.  He's got the capability of going to

13  treatment.  I question the capability of whether that will

14  keep him safe in the community in terms of his reoffending.

15  As I said, I think he's driven and compelled to offend, and

16  I think he has a serious difficulty refraining from doing

17  that, independent of his past treatment.

18  Q.   What, if anything, do past failures to comply with

19  probationary terms tell us about future probationary terms?

20  A.   Well, it's the same as anything else that one looks at

21  historically, that, you know, history tells us what might

22  happen in the future.  Mr. Shields has been given periods of

23  probation in the past.  He's been given treatment in the

24  past, yet he's reoffended.  So there's no reason to think --

25  I didn't see anything in the data that would cause me to

1   think that that would not happen again in the future.

2   Q.   Doctor, what role did Mr. Shields's age play in your

3   opinion?

4   A.   I considered Mr. Shields's age as a possible protective

5   factor.

6   Q.   Okay.  And what, if any -- well, can you walk us

7   through how you consider it as a protective factor, maybe

8   what you relied upon and what conclusion you drew with

9   respect to Mr. Shields's age and whether that reduced risk.

10  A.   Well, as individuals age, their risk to recidivate

11  diminishes.  And, well, I was sitting in court earlier when

12  Dr. Plaud testified, and I think that what he testified to

13  in terms of the various studies he looked at, which is

14  Hanson's 2006 study and the Prentky 2007 study, and other

15  studies involving age, Doren has done some work on that in

16  2006 --

17            MR. SWOMLEY:  Objection.

18  Q.   With respect to the Prentky 2007 study, it has been

19  suggested that it can't apply to Mr. Shields because he

20  hasn't been civilly committed.  Do you understand that to be

21  the case?

22  A.   I understand that that was suggested, yes.

23  Q.   Okay.  Do you agree with that?

24  A.   Well, I agree with what the author said.  It may not be

25  generalizable.

1        MR. SWOMLEY:  Objection.

2        THE COURT:  Yes, sustained.

3   Q.   Doctor, are you familiar with a 2007 study conducted by

4   Drs. Prentky and Lee?

5   A.   Yes.

6   Q.   And could you generally discuss for us who --

7        MR. SWOMLEY:  Objection.

8        THE COURT:  Yes, sustained at this point.  Move on

9   to another topic.

10       MR. GRADY:  Can we be heard briefly at side bar,

11  your Honor, on this issue?

12       THE COURT:  Yes.

13  SIDE-BAR CONFERENCE:

14       THE COURT:  How much longer do you have?

15       MR. GRADY:  I'm done.  Not much.

16       THE COURT:  You're done?

17       MR. GRADY:  Yes.  This is the last.

18       THE COURT:  Was this part of his expert report?

19       MR. GRADY:  The consideration of age was.

20       THE COURT:  Was this report part of his report?

21       MR. GRADY:  The specific reference to --

22       THE COURT:  My concern is here, as you remember,

23  there were some doubts as to whether he had the ability to

24  make statistical comparisons, and I'm remembering that.  And

25  I think at this point, if it wasn't in his report, we're

Page 122

1     just going to move on.

2              MR. GRADY:  Okay, note my objection.

3              THE COURT:  But if you raise some of these issues,

4     it may open the door, so we'll have to see what goes on.

5              MR. GRADY:  Thank you.

6              (End of side-bar conference.)

7              MR. GRADY:  If the Court would permit some general

8     questions not specific to the study?

9              THE COURT:  About age.

10    Q.   At the end of the day, Doctor, what, if anything, does

11    Dr. Hanson say about what data on age requires with respect

12    to adjustments?

13             MR. SWOMLEY:  Objection.

14             THE COURT:  Overruled.

15    A.   Hanson says that's one of the things that should be

16    considered in doing a risk assessment.  Hanson is pretty

17    much -- well, let me put it this way:  Hanson is pretty much

18    a statistician, and he likes to go by the numbers, so he

19    says one should rarely deviate from the risk categories when

20    a particular individual scores a particular score on the

21    Static-99.  However, in his 2006 article on age, he does say

22    that should be taken into consideration because the only

23    age-related question on the Static-99 is the age at the time

24    the Static-99 is given, and the only cutoff is age 25.

25    Hanson does recognize that the literature indicates that as

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1   an individual ages, their recidivism rate decreases,

2   especially after age 60.

3   Q.   And did you consider this when you reached your opinion

4   with respect to Mr. Shields?

5   A.   Yes.

6   Q.   Okay.  And, nonetheless, it didn't change your opinion?

7   A.   Well, I didn't consider that his current age 46, soon

8   to be 47, was significant enough for me to change my

9   opinion.  I certainly don't think he's anywhere close to age

10   60.  He offended with the child pornography offenses while

11   he was on probation in 1998 when he was 41 years of age -- I

12   mean 2002 when he was 41 years of age.  So I think at this

13   time there is insufficient data that would cause me to

14   change my opinion regarding his current risk.

15   Q.   Doctor, what, if any, conclusion have you reached with

16   respect to whether Jeffrey Shields has engaged in past acts

17   of child molestation?

18   A.   I'm sorry, what is that?

19   Q.   What, if any, conclusion have you reached with respect

20   to the question of whether Jeffrey Shields has engaged in

21   past acts of child molestation?

22   A.   That he has.

23   Q.   What, if any, opinion, to a reasonable degree of

24   professional certainty, do you have about what mental

25   illness, abnormality, or disorder Mr. Shields suffers from?

1   A.   That he suffers from pedophilia.

2   Q.   And is that a serious mental condition?

3   A.   It is.

4   Q.   Excuse me, a serious mental disorder?

5   A.   It is.

6   Q.   And what, if any, opinion do you have today, to a

7   reasonable degree of professional certainty, about whether

8   Jeffrey Shields will have serious difficulty in refraining

9   from future acts of child molestation?

10   A.   In my opinion, he will.

11   Q.   Doctor, I just had a couple of things to clear up.  Can

12   you explain, what is the patient-psychotherapist privilege?

13   A.   That unless there is permission on the part of the

14   patient, information is not disclosed.

15   Q.   Okay.  So someone can't just walk into a facility where

16   an individual has received sex offender treatment and get

17   those records without a release?

18        MR. SWOMLEY:  Objection.

19        THE COURT:  Well, why don't you just ask him the

20   question.

21   Q.   Okay, could the government here have gotten

22   Mr. Shields's prior sex offender treatment records without a

23   release?

24        MR. SWOMLEY:  Objection.  May we have a side bar,

25   please?

Page 125

1         THE COURT:  Well, we'll deal with it afterwards.

2    Keep going, some other issue.

3         MR. GRADY:  May I just have a moment, your Honor.

4         (Discussion off the record between Petitioner

5    attorneys.)

6         MR. GRADY:  Nothing further.  Thank you.

7         MR. SWOMLEY:  Could we have a side bar?  Could I

8    make a suggestion?

9         THE COURT:  Five minutes is great.  I don't want

10   to give it up.

11        MR. SWOMLEY:  Okay.

12   CROSS-EXAMINATION BY MR. SWOMLEY:

13   Q.   Good afternoon, Dr. Tomich.

14   A.   Good afternoon.

15   Q.   You and I have met before, haven't we?

16   A.   Once in a while we have, yes.

17   Q.   Without being facetious, you and I have met a number of

18   times, right?

19   A.   Yes.

20   Q.   And, in fact, you are the person who holds the contract

21   with the state for providing what is now known as privatized

22   services to the state of Massachusetts and the Department of

23   Corrections here, right?

24        MR. GRADY:  Your Honor --

25        THE COURT:  Overruled.

1   MR. GRADY:  There's been a motion in limine on

2   this.

3   THE COURT:  Yes, overruled.

4   A.   No, that's inaccurate.

5   Q.   Well, fair to say that at least as of the time you last

6   gave testimony in this proceeding, you were working under a

7   contract with the Department of Corrections and Forensic

8   Health Services, right?

9   A.   Well, Forensic Health Services is a company that has

10  the contract, and I work for Forensic Health Services.

11  Q.   So just so we're clear, you are employed, as it were,

12  by an entity called Forensic Health Services, right?

13  A.   Yes.

14  Q.   And Forensic Health Services is a company that bids for

15  contracts, really around the country, to provide services to

16  departments of correction, right?

17  A.   Yes, but to be accurate, FHS is a wholly owned

18  subsidiary of a company called MHM, which is also a national

19  behavioral health care organization that holds contracts

20  around the country to provide mental health care.

21  Q.   Okay.  And fair to say, you're familiar with the manner

22  in which services are now provided to the Department of

23  Corrections in Massachusetts, right?

24  A.   Yes.

25  Q.   And you're familiar with enough of the history to know

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

1    that up until about 1990, '92, the Department of Mental

2    Health in Massachusetts provided all of those services?

3    A.   Yes.

4    Q.   And along about 1992, in the wisdom of the legislature,

5    it was decided that these services would be privatized and

6    put out to bid, right?

7              MR. GRADY:  I just object to "legislative wisdom."

8              THE COURT:  Yes, sustained.  I strike the

9    question.

10   Q.   Well, Doctor, you testified on direct examination that

11   back in 1990 Massachusetts did away with civil commitment,

12   right?

13   A.   For sex offenders?  Uhm, yes.  They did not release the

14   people that had been committed, but they did away with

15   initial commitments.

16   Q.   And in fact they did away with them because there were

17   findings that the Department of Mental Health had no ability

18   to predict future dangerousness, and so it was considered

19   that the Department of Mental Health would no longer permit

20   its employees to do that kind of work because it was

21   unethical, right?

22             MR. GRADY:  Objection.

23             THE COURT:  Sustained.

24             MR. GRADY:  Move to strike.

25   Q.   Well, you're familiar with the findings by the

1   Governor's Council in 1990 that did away with civil

2   commitment, aren't you?

3   A.   Yes.

4   Q.   And you're aware that a Department of Mental Health --

5            THE COURT:  Is it the Governor's Council.

6            MR. SWOMLEY:  Yes.

7            THE COURT:  Or a commission?

8            MR. SWOMLEY:  A Governor's Council was convened

9   with respect to this issue, not the Governor's Council that

10  appoints judges, no.

11           THE COURT:  All right, so this is like a separate

12  commission?

13           MR. SWOMLEY:  Yes.

14  Q.   And that commission --

15           THE COURT:  Excuse me.  And that was appointed by

16  the Governor?

17           THE WITNESS:  Yes.

18           THE COURT:  And it made public findings?

19           MR. SWOMLEY:  Yes.

20           THE COURT:  All right, are you familiar with those

21  public findings?

22           THE WITNESS:  Yes.  I can't recall them off the

23  top of my head, but I am familiar with what Mr. Swomley is

24  describing.

25  Q.   And you know that a mental health director named Fein,

1   F-e-i-n, testified that there is no mental health ability to

2   engage in risk prediction, and so the Department of Mental

3   Health won't do it anymore?

4            MR. GRADY:  Objection.

5   Q.   Right?

6            MR. GRADY:  The form of the question and --

7            THE COURT:  Overruled.

8            MR. GRADY:  Your Honor --

9            THE COURT:  Do you know about that?  Is that what

10  you believe the finding is?

11           THE WITNESS:  I'd need to see that.  I don't know

12  if I trust Mr. Swomley's characterization.

13           THE COURT:  Okay, don't forget, the question is

14  not evidence; it's only the answer.

15  Q.   And the Department of Mental Health stopped doing it,

16  right?

17  A.   That, I do know, yes.

18  Q.   And there stopped being civil commitments in

19  Massachusetts for about ten years, right?

20  A.   Initial civil commitments, yes.  Individuals who had

21  been committed and were petitioning the court for

22  recommitment would continue to go to a hearing, and they

23  could be recommitted.

24  Q.   Okay, so what you had was a dwindling population of

25  aging sex offenders inside a facility that basically wasn't

1    putting new people in but wasn't letting other people out,

2    right?

3    A.   Yes.

4    Q.   And during that about about nine-year period, there

5    were no civil commitments, right?

6    A.   No new, new civil commitments.

7    Q.   No new civil commitments.

8    A.   There were still recommitments.

9    Q.   There were still people trying to get out, and there

10   were still people trying to keep them in, right?

11   A.   Well, the court was continuing to commit individuals

12   who had been petitioning for release.

13   Q.   Right, okay.  And in about 1999, there was Jeffrey

14   Curley murder in Cambridge, and that prompted the

15   legislature to reenact civil commitment, right?

16            MR. GRADY:  I'm going to object, your Honor.

17            THE COURT:  If you know.  Is that correct?

18            THE WITNESS:  In my opinion, that's not what

19   prompted the legislature to act.

20            THE COURT:  All right.

21   Q.   Okay.  In any event, Doctor, what happened in the late

22   '90s is that there were civil commitments again, right, or

23   the beginnings of them?

24   A.   Yes.

25   Q.   And during that time you came into the mental health

1    community, as it were, in Massachusetts in the '90s, right?

2    A.   Yes.

3    Q.   And you, as far as involving yourself in the commitment

4    scheme in Massachusetts, were a "qualified examiner,"

5    quote/unquote, right?

6    A.   Well, I was actually asked by the Governor in 1997 --

7    Q.   To do SORB evaluations.

8    A.   -- to do the Sex Offender Registry Board.

9    Q.   I understand that.  I'm asking you about the civil

10   commitment --

11             THE COURT:  You know, they don't know SORB.

12             MR. SWOMLEY:  Okay.  Well, I wasn't asking him

13   about it either, Judge, but if he wants to talk about it --

14   Q.   Sex Offender Registry Board, right?

15   A.   I thought you were asking how I became involved.

16   Q.   No.  I was asking you about your involvement in the

17   civil commitment scheme.  Pare it down, if you don't mind.

18             MR. GRADY:  Your Honor, could you instruct

19   Mr. Swomley not to interrupt the witness?

20             THE COURT:  Yes, yes, all right, so what's the

21   question on the table?  Actually, as I said, let's go home.

22   It's 1:00 o'clock.  I'll see you tomorrow morning.

23             THE CLERK:  All rise for the jury.

24             (Jury excused.)

25             THE COURT:  Okay, so just up here at side bar on

3a28d7d1-9f04-431f-9caa-0c0a86d7dcb9

Page 132

1    scheduling.  Thank you.  I'll see you tomorrow.  And it

2    should probably, as we were estimating it, I think, before,

3    be over tomorrow by 1:00.

4              THE WITNESS:  Thank you, your Honor.

5              THE COURT:  And then you have a bunch of other

6    witnesses, right?  Let's talk off the record.

7              (Discussion off the record at side bar.)

8              (Adjourned, 1:10 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 133

                    C E R T I F I C A T E

1

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7            I, Lee A. Marzilli, Official Court Reporter, do

8   hereby certify that the foregoing transcript, Pages 1

9   through 132 inclusive, was recorded by me stenographically

10  at the time and place aforesaid in Civil Action

11  No. 07-12056-PBS, United States of America V. Jeffrey

12  Shields, and thereafter by me reduced to typewriting and is

13  a true and accurate record of the proceedings.

14           In witness whereof I have hereunto set my hand

15  this 3rd day of October, 2008.

16

17

18

19

20

               /s/ Lee A. Marzilli
21           _____

             LEE A. MARZILLI, RPR, CRR
22           OFFICIAL COURT REPORTER

23

24

25