```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                              )
                Petitioner    )
                              )
            -VS-              ) CA No. 07-12056-PBS
                              ) Pages 1 - 126
JEFFREY SHIELDS,              )
                              )
                Respondent    )
```

                    JURY TRIAL - DAY FIVE

              BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE

                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        September 9, 2008, 9:05 a.m.

                    LEE A. MARZILLI
                  OFFICIAL COURT REPORTER
                United States District Court
                1 Courthouse Way, Room 3205
                    Boston, MA  02210
                     (617)345-6787

58ebae98-583d-411e-b341-eb5986c3d9f3

1    A P P E A R A N C E S:

2        MARK J. GRADY, ESQ. and EVE A. PIEMONTE-STACEY, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the Petitioner.

4
         PAGE KELLEY, ESQ, Federal Defenders,
5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
     for the Respondent.

6
         JOHN G. SWOMLEY, ESQ. Swomley & Associates,
7    227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
     for the Respondent.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2    WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

3
     NIKLOS TOMICH                    5       103         107
4

5    CRAIG B. RYPMA        110

6
     EXHIBITS        FOR IDENTIFICATION    RECEIVED IN EVIDENCE
7

8    Petitioner

9    3                                              111

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

58ebae98-583d-411e-b341-eb5986c3d9f3

1               P R O C E E D I N G S

2          THE COURT:  The last juror arrived a couple

3     minutes ago.  I'm told you have nothing you need to see me

4     about, is that right?  Perfect, let's get this.

5          (Pause.)

6          THE COURT:  "Question:  The current witness is

7     being asked about state regulations and changes to those

8     regulations over the past ten years or so.  What is the

9     applicability of those regulations to the Federal Court

10    system?"  And I will say, "None.  However, it may bear on

11    his experience or his background."

12          MR. GRADY:  That's fine, your Honor.

13          THE CLERK:  All rise for the jury.

14          (Jury enters the courtroom.)

15          THE COURT:  Good morning to all of you.  Did

16    anyone see anything about this case in the press?  I find

17    the jury has complied.

18          One of the jurors wrote me a question.  I'll read

19    it to you and give you an answer:  "The current witness is

20    being asked about state regulations and changes to those

21    regulations over the past ten years or so.  What is the

22    application of those regulations to the Federal Court

23    system?"  Good question.

24          So as you noticed, you are in Federal Court, and

25    this proceeding is under a brand-new federal statute.  So

1   there is a state statute that's been in effect, and you've

2   heard a little bit about that.  The actual state laws and

3   regulations have nothing to do with this case, but what they

4   do have to do with is, this witness has experience under the

5   state system, which has somewhat different standards and

6   regulations.  So it's relevant, if at all, as to what his

7   background and experience has been.  So that is why I have

8   certainly permitted Mr. Swomley to ask about it, and it goes

9   to whether or not he has experience and whatever his biases

10  or prejudices, if any, might be.  So go.

11            MR. SWOMLEY:  Thank you.

12                     NIKLOS TOMICH

13  having been previously sworn, was examined and testified

14  further as follows:

15  CONTINUED CROSS-EXAMINATION BY MR. SWOMLEY:

16  Q.   Doctor, have you ever testified in Federal Court

17  before?

18  A.   Just in this case in a previous preliminary hearing.

19  Q.   So other than this case, you have never testified in a

20  federal proceeding?

21  A.   That's correct.

22  Q.   Your experience is in testifying in state court, right?

23  A.   Yes.

24  Q.   And almost exclusively in the state of Massachusetts?

25  A.   Yes.

1    Q.    Can we say exclusively in the state of Massachusetts?

2    A.    I believe I testified in Illinois at one point.

3              THE COURT:  In where?

4              THE WITNESS:  Illinois.

5              THE COURT:  Illinois.

6    Q.    And when was that?

7    A.    That was early on in a civil, uhm, a mental health

8    commitment trial.

9    Q.    And was that prior to you obtaining a Ph.D. or Psy.D in

10   psychology?

11   A.    Uhm, it may have been as part of a hospital staff.

12   Q.    So you were not the expert in that case?

13   A.    That's correct.

14   Q.    Okay.  Your entire career in expert witness testimony

15   or in evaluations is here in Massachusetts, right?

16   A.    Yes, in mental health and sexually dangerous persons

17   cases.

18   Q.    Okay.  Now, I asked you a little bit yesterday about

19   the evolution of the law of civil commitment in

20   Massachusetts, right?

21   A.    Yes.

22   Q.    And you had asked me if you could see a portion of the

23   Governor's Special Advisory Panel on Forensic Mental Health

24   Final Report from September of 1989 as it pertained to the

25   abolition of civil commitment for new committees in

1   Massachusetts in 1990, thereabouts, right?  Remember?

2   A.   I think the Judge actually asked me about that.  I

3   don't think --

4   Q.   Well, let me just ask you whether you agree with the

5   findings as I read them to you:  "These laws which came

6   into --" referring to civil commitment laws -- "which came

7   into vogue in the 1940s and '50s were predicated on the

8   assumption that a specific mental illness exists which is

9   characterized by the commission of sex crimes.  Closely

10  linked to this assumption is that if sexual dangerousness is

11  an illness, then there must be a cure.  Today, mental health

12  professionals generally question both assumptions and use

13  sexual dangerousness as a legal category rather than a

14  clinical diagnosis.  In fact, only a handful of men at the

15  treatment center suffer from a diagnosable mental illness."

16                    Do you agree or disagree with that

17  statement?

18  A.   It's too long.  Can I see it?  I think I probably agree

19  with some of it.  Some of it I may not agree with.

20  Q.   Well, we can break it down into one --

21                    THE COURT:  Well, just let him see it.

22  Q.   If you want to authenticate what I'm reading from --

23  A.   I trust you.

24  Q.   Okay, starting at the paragraph I read to you right

25  there.

1   A.   "These laws which came into vogue in the --"

2          THE COURT:  No, don't read it because the court

3   reporter has to take it down.  Just read it to yourself and

4   tell us whether you agree with those statements.

5          (Witness examining document.)

6   A.   Uhm, I think when this was written, I would have agreed

7   with some of it in the sense that the final language is

8   rather general.  In fact, they use the word "generally

9   question."  But I think since it was written, there's been

10  additional research that would indicate that some sexual

11  offenses are the result directly of pathology.

12         THE COURT:  Of?

13  A.   And specifically psychopathology.

14         THE COURT:  Just make sure they can hear.  Of

15  pathology?  We can't hear you.  Pull it way in.

16         THE WITNESS:  How's that?

17         THE COURT:  Belt it out.  Good.  All right, so,

18  now, what did you just say?

19  A.   The way that it was constructed was, it was a general

20  statement.  In fact, the word "generally" was used.  And had

21  I seen it at that time, I might agree with most of it.  I

22  think since that time, there's been additional research that

23  indicates that some sexual offending behavior is generated

24  as a result of psychopathology.  Some is not.

25  Q.   Doctor, you would agree that the laws are what changed

1   as opposed to the science of psychology, right?

2   A.   Both, both have changed over time.

3   Q.   Well, it's fair to say that when you, as you say, the

4   psychopathology is reformulated, what you're talking about

5   is that mental illness ceased to be the question that was

6   sought to be answered -- that is, do sex offenders possess a

7   mental illness? -- and instead it was reformulated into a

8   mental abnormality, which is not a diagnostic term in the

9   DSM-IV, right?

10  A.   Well, I think the law also uses the term mental

11  illness, mental abnormality, or mental disorder, so it kind

12  of covers all the bases.

13          MR. GRADY:  Your Honor, yesterday you instructed

14  Attorney Swomley not to interrupt the witness.  He's doing

15  it again.

16          THE COURT:  Yes.  Were you finished?

17          THE WITNESS:  Yes.

18  Q.   It's fair to say, Mr. Shields doesn't have a mental

19  illness?

20  A.   Uhm, are you talking about an Axis 1 psychotic

21  disorder?  I mean, how are you defining mental illness?

22  There's legal definitions of mental illness.  Mental illness

23  is also defined as mental disorders in the DSM-IV, the

24  Diagnostic and Statistical Manual of Mental Disorders.  I

25  think all the experts in this case diagnosed Mr. Shields

1    with pedophilia, so --

2              THE COURT:  Well, what is pedophilia?

3              THE WITNESS:  Pedophilia is a diagnostic term

4    stated specifically in the Diagnostic Manual of Mental

5    Disorders.  The law uses the term "mental disorders," so if

6    we wanted to be as accurate as we could be at this point, we

7    could call it a mental disorder.

8    Q.   And do you consider a mental disorder to be different

9    than a mental illness?

10   A.   It could be.

11   Q.   And in fact would you agree with the statement in the

12   Governor's Advisory Panel report that says that most people,

13   even the ones that are dangerous enough to be committed now

14   to the Massachusetts Treatment Center, don't suffer from a

15   major mental illness?

16             MR. GRADY:  Your Honor, I'm going to object to the

17   form of the question.  He's talking about a 1989 report now.

18             THE COURT:  Yes, sustained.

19   Q.   Doctor, what's changed since this document was drafted

20   in 1989 is that rather than call what sex offenders have a

21   mental illness, it's now called a mental abnormality.  And

22   it is predicated -- that is, civil commitment statutes are

23   predicated on a mental abnormality existing, by and large,

24   right?

25             MR. GRADY:  Objection.

1   Q.   Most people that are committed are --

2          THE COURT:  Sustained.  It's multiple questions.

3   Q.   Okay.  It's fair to say that based upon your

4   understanding of who gets committed in the last, say, ten

5   years -- actually, there's only been civil commitment in

6   Massachusetts now for the last nine years, right?

7   A.   That's correct,

8   Q.   And, in reality, after some legal challenges, it really

9   has only been going on for six or seven, right?

10  A.   Okay.

11  Q.   And in that six or seven years, fair to say most of the

12  people that are proposed for commitment do not have a major

13  mental illness?

14  A.   Well, again, it depends on how you're defining that.

15  Q.   Well, why don't you define it.

16  A.   There's a legal definition --

17         MR. GRADY:  Your Honor --

18         THE COURT:  Yes, you did interrupt then.  You've

19  just got to let him finish his sentence.

20  A.   Again, there's a legal definition for that.  I think

21  what I said was that what I look for in terms of definition

22  is whether the person presents with a viable mental disorder

23  as outlined by the criteria present in the Diagnostic and

24  Statistical Manual of Mental Disorders.  I do that because

25  that's the book the field uses.  That's the commonly

58ebae98-583d-411e-b341-eb5986c3d9f3

1    accepted psychological practice in the United States today.

2              So whether you want to call pedophilia a

3    mental disorder, or depression a mental disorder, or

4    schizophrenia a mental disorder, those are considered

5    diagnostic entities within that specialized text, and that's

6    what I'm agreeing with.

7    Q.   Well, let me ask you, how do you define a major mental

8    illness?

9              MR. GRADY:  Your Honor --

10   A.   Well, again, I utilize the DSM-IV's specific criteria

11   to define a major mental illness.  In other words, if it's

12   not in the DSM-IV and I can't diagnose it based on the

13   criteria there, or based on the exclusion of criteria there,

14   then I won't make that diagnosis.  But a diagnosis in and of

15   itself, just to be clear, is shorthand for a compendium of

16   symptoms or behaviors.  So one can call depression

17   depression, or one can call it a state of sadness that is

18   persistent across time, and each different type of disorder

19   or illness has a different definition.

20             Now, there is a legal definition for mental

21   illness.  I'd need to look that up.  I don't think I could

22   quote it directly, but that's defined in state statutes,

23   usually for civil commitment purposes.

24   Q.   So the jury is not confused, civil commitment has two

25   incarnations, right?

1    A.    Yes.

2    Q.    One is a straight mental health civil commitment?

3    A.    Yes.

4    Q.    And that has occurred on the federal level for quite

5    some time, right?

6    A.    Yes.

7    Q.    And it occurs on the state level all the time, right?

8    A.    Well, I don't know what you mean by all the time.

9    There's certainly --

10   Q.    Well, what you understand to be traditional civil

11   commitment has nothing to do with sex offending, right?

12   Danger to self or others?

13   A.    Yes.

14   Q.    Right?  And that criteria applies to persons with major

15   mental illness, for example, that are a danger to themselves

16   or others, right?

17   A.    Well, maybe I could just characterize this.  What we're

18   talking about in terms of the state statutes is mental

19   health law, which is Chapter 123, and then sex offender law,

20   which is 123(a).  There are civil commitment statutes for

21   both.  They are not equal or the same.  So there is a

22   specific definition for what is a mental illness in the law,

23   and there is a specific definition for what is a mental

24   disorder that exists or a mental abnormality that exists

25   within the state statute.  Usually that's put together via

1    case law.

2              So my experience with this civil commitment

3    sex offender laws is that the term "mental abnormality" is

4    used, which is different than the definition of mental

5    illness in state mental health law.

6    Q.   Now, Doctor, back when the civil commitment of sex

7    offenders was being evaluated in 1989 and ultimately

8    abolished in Massachusetts, the conclusions that led to its

9    abolition -- and I'm going to ask you now whether you agree

10   with the next paragraph that follows the one I read to

11   you -- "Reliance on these basic misconceptions is

12   troublesome for several reasons.  Primarily, mental health

13   professionals are asked to make decisions in areas more

14   traditionally and appropriately within the criminal justice

15   arena.  For example, release decision-making with regard to

16   all other sentenced offenders, including decisions regarding

17   community access, has traditionally been the province of

18   probation, correctional, and parole officials.  At the

19   treatment center, these decisions have become the

20   responsibility of mental health professionals.  If sexually

21   dangerous persons are not mentally ill and only questionably

22   treatable, it is also improbable that mental health

23   professionals can predict their potential for future

24   violence with any degree of certainty."

25              MR. GRADY:  Objection.  Form.

1   Q.   Do you agree with that statement?

2            THE COURT:  Do you agree?

3            THE WITNESS:  Uhm, I agree with most of it except

4   for probably that last sentence.  I do agree that mental

5   health professionals should not be making release decisions.

6   I think that should be the purview of the courts.

7            In terms of the last sentence, could you read that

8   again, Mr. Swomley.

9   Q.   "It is also improbable that mental health

10  professionals can predict their potential for future

11  violence with any degree of certainty."

12  A.   Well, actually, I think since that was written, there's

13  been great strides in the area of risk assessment.  And I'm

14  differentiating the word "risk assessment" from prediction.

15  So to that extent, I would disagree with that last sentence.

16  Q.   It's fair to say, regardless of whether you agree or

17  disagree with those statements, in Massachusetts, the

18  Department of Mental Health basically got out of the

19  business of risk prediction and got out of the business of

20  quote/unquote "treatment" at the New Hampshire correctional

21  center, also known as the treatment center?

22  A.   Yes.

23  Q.   And when the Department of Mental Health got out of

24  that business, the Department of Corrections stepped in and

25  took bids from private entities to provide those services,

58ebae98-583d-411e-b341-eb5986c3d9f3

1    right?

2    A.    Yes.

3    Q.    And you work for an entity that bid for the contracts

4    to provide those services, right?

5    A.    Yes.

6    Q.    Forensic Health Services, Incorporated is that company,

7    right?

8    A.    Yes.

9    Q.    And that company -- well, actually you on behalf of

10   that company -- bid to provide evaluations as qualified

11   examiners under Massachusetts's involuntary commitment laws,

12   right?

13   A.    No, and the only thing I'm kind of rejecting there is

14   the fact that I didn't make the bid on it.

15   Q.    Okay.

16   A.    Another person who was the executive director, a

17   gentleman, a psychologist by the name of Joel Hancock, did

18   the bid.  I was hired to first do evaluations and then later

19   hired to administer the program.

20   Q.    Okay.  So there have been now two separate contracts,

21   right, two bids since you've been working with Forensic

22   Health Services?

23   A.    Well, I actually worked for the previous company that

24   had the bid, Psychological Consulting Services, I think?  So

25   I actually first became a QE when I worked for them.  And

1    then later Joel hey cock at Forensic Health Services bid on

2    the contract, and I continued to do evaluations, and then

3    was later hired to administer that contract.

4    Q.   Okay.  And in state civil commitment proceedings, that

5    panel, that group of individuals that you're a part of that

6    holds the contract, is the exclusive group entitled to

7    testify pursuant to statute in Massachusetts, right?

8    A.   Well, the qualified examiners?

9    Q.   That's right.

10   A.   Yes.

11   Q.   Okay.  And a qualified examiner is nothing other than a

12   psychologist with a couple of years' experience in sex

13   offender treatment or evaluation who is appointed by the

14   Commissioner of the Department of Corrections, right?

15   A.   Yes.

16   Q.   And what is your understanding of the mental health

17   background of the Commissioner of the Department of

18   Corrections?

19   A.   I'm not aware of his background.

20   Q.   Okay.  And fair to say that the basis for getting onto

21   that panel is one's reliability in opining dangerous?

22           MR. GRADY:  Objection.

23           THE COURT:  I'll allow that to be answered.

24   A.   You need to define the question.  Reliability means

25   repeatability.  If the implication of your question is that

1    they will say a person is dangerous, then, no, I would

2    vehemently disagree with that.  Qualify examiners are

3    required by statute to testify in cases independent of the

4    recommendation to the court.

5    Q.   This panel exists by virtue of Chapter 123(a), right?

6    A.   Yes.  It's statutorily defined.

7    Q.   Okay.  And the company you work for now both controls

8    who testifies on behalf of the 123(a) law, and that is

9    people going into civil commitment now, right?  And you and

10   people that you supervise do those evaluations, correct?

11   A.   Well, I don't do that any longer, but when I did do it,

12   I did assign the evaluators to cases.

13   Q.   Okay.  And Forensic Health Services both provided the

14   evaluators for people going into the treatment center,

15   right?

16   A.   Yes.

17   Q.   They also provide the evaluators to the Community

18   Access Board that makes recommendations on whether they

19   should stay at the treatment center, right?

20   A.   No.  The Community Access Board is made up of five

21   individuals, two of which are independent consultants that

22   are supplied by Forensic Health Services, two of which are

23   employed directly -- or three of which that are employed

24   directly by the Department of Correction.

25   Q.   Okay.  So in terms of the gatekeepers that work within

58ebae98-583d-411e-b341-eb5986c3d9f3

1    the institution, two are supplied by FHS, and the rest are

2    directly employed by the Department of Corrections, right?

3    A.    Yes.

4    Q.    So everyone that does evaluations there is in some way

5    beholding to the Department of Corrections, correct?

6    A.    No, because every resident at the treatment center,

7    every civil committee at the treatment center is also

8    represented by their own counsel and their own experts.

9    Q.    Doctor, not at the CAB board they are.

10   A.    No, they often are.  I mean, sometimes they will not

11   have a lawyer present, but they may bring one in at any

12   time.

13   Q.    It's fair to say, Doctor, that the evaluators are all

14   government agents, either directly or through subcontract?

15   A.    The members of the board are.

16   Q.    And those are the decision-makers, right?  The lawyer

17   for the petitioner is not a decision-maker, is he, Doctor?

18   A.    Well, I think it's a mischaracterization because

19   whether you're a QE or a CAB member or an evaluator hired by

20   the defense, the most you can do -- and this has to do with

21   your previous question of release decision-making -- the

22   most one can do as an evaluator is make a recommendation, a

23   recommendation to commit, a recommendation to return to the

24   community.

25   Q.    Doctor, Forensic Health Services supplies the

1   evaluators on the outside, the evaluators on the inside, and

2   they also provide the treatment, don't they?

3            MR. GRADY:  Your Honor, I object.  Will the Court

4   all a motion to exclude?

5            THE COURT:  I'll allow that.  What's wrong -- I'll

6   allow that.

7            MR. GRADY:  If I may be heard, your Honor?

8            THE COURT:  No.

9            THE WITNESS:  Is that overruled, your Honor?

10           THE COURT:  Yes, yes, overruled.

11  A.   I believe there's a second contract or a third contract

12  for treatment, yes.

13  Q.   So Forensic Health Services has a piece of putting them

14  there, keeping them there, and getting money for treating

15  them, right?  They have basically the whole ball of wax?

16           MR. GRADY:  Your Honor, again I'm going to object

17  for the grounds stated --

18           THE COURT:  Overruled.  We need to move on to this

19  case, okay?

20  Q.   Now, my question to you earlier was whether it was fair

21  to say you were appointed because you will reliably say

22  individuals are dangerous, and you indicated that it depends

23  upon the definition of "reliable," right?

24           MR. GRADY:  Objection.

25           THE COURT:  Sustained.

1   Q.   For people petitioning to get out of the treatment

2   center in Massachusetts, it's fair to say you have opined

3   only three in your lifetime have been not sexually

4   dangerous?

5   A.   No.  I think I testified that it was 54.

6   Q.   People petitioning to get out of the treatment center?

7   A.   Oh, I'm sorry.

8   Q.   You have testified --

9   A.   I've done 30 evaluations of that nature, and I've

10  opined on three occasions that they no longer met the

11  criteria for commitment.

12          THE COURT:  So describe the difference between

13  those two sets of numbers.

14          THE WITNESS:  Okay.  As a qualified examiner, I've

15  evaluated 170 individuals.  54 I've recommended as not

16  sexually dangerous.  Functioning as a qualified examiner for

17  the Community Access Board, which is --

18          THE COURT:  That's once the people are already in?

19          THE WITNESS:  Once they're in, they've been

20  committed, and now they're petitioning the court to leave,

21  I've done approximately 30 cases, and on three occasions

22  I've recommended them as ready to return to the community.

23  Q.   Doctor, you testified at a prior proceeding that in

24  fact you have evaluated 40, not 30, right?

25  A.   I may have.  I said approximately 30.

1   Q.   Well, you had testified previously that you had

2   testified in 30 proceedings, but you had conducted 40

3   evaluations, right?

4   A.   I was appointed to the Community Access Board as an

5   independent evaluator in 2007, so I was including that

6   number as a member of the board as well, not only as a QE.

7   Q.   Doctor, I asked you a specific question about the

8   number of times you opined "not sexually dangerous" for a

9   population seeking to get out of the treatment center.  Do

10  you recall the preciseness of that question?

11  A.   Sure.

12  Q.   And will you answer precisely that question and no

13  other?

14  A.   As a QE, I've opined on approximately 30 occasions that

15  an individual -- I've written approximately 30 reports and

16  opined on three occasions or so that an individual was ready

17  to leave the treatment center.  I've also done additional

18  reports for the Community Access Board as a Community Access

19  Board member.

20           MR. SWOMLEY:  Your Honor, could I ask you to ask

21  the witness to answer the question posed?

22           THE COURT:  Wait.  What's the question?

23  Q.   The question is, how many evaluations, not testimony,

24  how many evaluations did you do pursuant to Section 9,

25  people petitioning to get out of the treatment center?

1          THE COURT:  This is all in state court, right?

2          MR. SWOMLEY:  Yes.

3   A.    As a QE or as a Community Access Board member?

4          THE COURT:  What's a QE?  We don't know the lingo.

5   Q.    As a qualified examiner, Doctor.

6   A.    Approximately 30.

7   Q.    You testified in a prior proceeding that you did

8   approximately 40 evaluations, Doctor.  Which is the truth?

9          MR. GRADY:  Your Honor, if there's an inconsistent

10  statement that he's being crossed with, he should be read

11  the inconsistent statement or the alleged inconsistent

12  statement.

13         THE COURT:  You know what, you know what?  If

14  there's a problem, "objection."

15         MR. GRADY:  I'm sorry, your Honor.

16         THE COURT:  Do you have that document?

17         MR. SWOMLEY:  I do.  Page 96, Mr. Grady.

18  Q.    You were asked these questions --

19         THE COURT:  No, no, let him see it.

20         MR. SWOMLEY:  I'm impeaching him, your Honor.  I'm

21  not refresh his recollection.

22         THE COURT:  Excuse me.  Let him see it.  Read it

23  with him.

24         (Witness examining transcript.)

25  A.    Well, for the sake of accuracy --

1          THE COURT:  No.  You can impeach him.  Now ask

2     him.

3     Q.   It's fair to say, Doctor, you were asked -- were you

4     asked --

5          THE COURT:  By the way, you can use the screen too

6     to show --

7     Q.   In a prior proceeding in this case, were you asked by

8     me, "As a qualified examiner, how many times have you

9     testified in Section 9 proceedings, somebody challenging to

10    come out of civil commitment?"  You said "Approximately

11    thirty occasions."

12    A.   Yes.

13    Q.   And you said that of the thirty times you testified,

14    you opined someone wasn't sexually dangerous approximately

15    three times, right?

16    A.   Yes.

17    Q.   And I asked how many more evaluations you did than you

18    were asked to testify about, and you said approximately ten,

19    right?

20    A.   Yes.

21    Q.   "And in those ten cases, how many did you opine

22    dangerous or not dangerous?"  And you opined dangerous in

23    all of those cases.  And so essentially what you're saying

24    is, there were forty times you evaluated somebody, and only

25    three times you found somebody not sexually dangerous,

1    right?

2    A.    Yes.

3    Q.    And in your mathematic universe, that's ten percent,

4    right?

5    A.    Well, yes, in terms of the thirty cases.

6    Q.    And in everyone else's, it's 7.5 percent?

7              THE COURT:  Let him finish the sentence.  In terms

8    of what?

9              THE WITNESS:  In terms of the thirty times I was

10   asked to testify.

11   Q.    Doctor, in terms of the forty times you conducted

12   evaluations on that population, however, your rate of

13   opining not sexually dangerous was 7.5 percent, right?

14   A.    Yes.

15   Q.    And that would mean your rate of considering these

16   individuals dangerous is 92.5 percent, right?

17   A.    Yes.

18   Q.    And are you aware of any statistic, even those out of

19   the treatment center, where the rate of recidivism is as

20   high as 92 percent?

21   A.    Well, I think most individuals -- individuals at the

22   treatment center may petition the court once a year for

23   release, so I think individuals that have already been

24   committed and gone through the civil commitment process, I

25   believe that other evaluators' rates of recommendations as

1    to release or commitment are approximately the same.

2    Q.   Doctor, are you aware of any published statistic that

3    has recidivism rates that high, any?

4    A.   Well, I don't think they have to do -- there's nothing

5    that has anything to do with recidivism here.

6    Q.   Doctor, the question as to whether or not you will

7    reliably testify that individuals should belong and remain

8    civilly committed, you're reliable in the sense that?

9    92.5 percent of the time you say they belong there and

10   should stay there, right?

11   A.   Yes.

12   Q.   Now, you are willing to testify that these people

13   should stay there until they die, right?

14             MR. GRADY:  Objection.

15             THE COURT:  Sustained.

16   A.   I've --

17             THE COURT:  Sustained.  I strike it.

18   Q.   You testify to that degree because you can't tell which

19   ones will reoffend and which ones won't, and you are willing

20   to make sure that almost no one gets out, and are willing to

21   allow people that are not sexually dangerous to remain

22   committed?

23             MR. GRADY:  Objection.

24   Q.   Correct?

25             THE COURT:  Sustained.

1   Q.   People like Dr. Plaud routinely testify against you,

2   right?

3   A.   Yes.

4   Q.   And --

5   A.   Well, I don't know if they testify -- you know, I guess

6   I don't see things the way you're seeing them.  He doesn't

7   testify against me.  He is hired by the defense as a defense

8   expert.

9   Q.   To rebut --

10  A.   And he conducts a risk assessment in the same way I

11  conduct a risk assessment, and he presents a recommendation

12  to the Court.

13  Q.   Actually, Doctor, he doesn't conduct a risk assessment

14  in the same way you do, does he?

15  A.   I think it's pretty similar.

16  Q.   Okay.  You testified yesterday that you started using

17  the Static-99 in 2005, but you'd been advocating its use

18  since 2001, right?

19  A.   I said I began advocating its use.  I didn't

20  automatically accept the actuarial data at face value when

21  it first came out.

22  Q.   Doctor, fair to say that the first time you ever put in

23  writing that you advocated the use of the Static-99 was in

24  November of 2005?

25  A.   Yes.

58ebae98-583d-411e-b341-eb5986c3d9f3

1   Q.   And --

2   A.   Well, no.  Actually, I presented to the Massachusetts

3   District Attorney's Association in 2001 and advocated its

4   use at that point.

5   Q.   Your testimony is that you advocated its use in 2001?

6   A.   Yes.

7   Q.   And did you put that in writing in some document

8   somewhere, or is that just your mental recollection of what

9   you did?

10  A.   Well, I recall presenting it to the Massachusetts

11  District Attorney's Association.  I don't know if I gave

12  them the paper of my talk, but I certainly said it out loud

13  in front of jurists and attorneys at that meeting.

14  Q.   In 2001?

15  A.   In 2001.

16  Q.   Doctor, you know that in multiple proceedings since

17  2001, several of which involved cases of mine where I

18  represented an individual, you routinely got on the witness

19  stand and said that the actuarials did not have sufficient

20  validity to be used, and you did so after 2001, didn't you,

21  Doctor?

22  A.   Right.  I began advocating for them.  I do think that

23  there was a lot of changes in those actuarials after 2001,

24  including Hanson's revision in 2003, and even a previous

25  revision to that in 2002.  So I began advocating their use

58ebae98-583d-411e-b341-eb5986c3d9f3

1  as a way to partially conduct a risk assessment; and as the

2  test became more and more accepted in the scientific

3  community and became more and more refined, I not only

4  advocated for it, I began to demand it, and then I asked

5  that all qualified examiners use it in their evaluations.

6  Q.   Doctor, up until 2005, you routinely testified in state

7  courts that when one of the independent examiners like

8  Dr. Plaud came in and testified about a low score on the

9  actuarials, that, according to your testimony, such

10  actuarials weren't ready for use yet, they hadn't been

11  studied enough.  You routinely testified to that, didn't

12  you?

13         MR. GRADY:  Objection.

14         THE COURT:  Overruled.

15  A.   Well, I think I answered the question.  I was taking

16  that position for a time until the scientific community

17  moved to further accept the field and as the tests were

18  refined.  I did routinely say that until I stopped saying

19  it.

20  Q.   Doctor, you testified yesterday that since 2001, you'd

21  been advocating its use.

22  A.   I'm agreeing with you.  I'm not disagreeing with you.

23  Q.   Then you're agreeing that you privately would say,

24  "We've got to use it," but on the record under oath would

25  routinely tell a jury, "Uh-uh-uh, we can't do it," and do

1    you see that there's any ethical problem --

2            THE COURT:  Sustained.  You've got four questions

3    in every question.

4    Q.   If you are conceding, Doctor, that you routinely

5    advocated privately for the actuarials' use, yet publicly

6    under oath told a jury something different, do you think

7    there's an ethical problem with that, Doctor?

8            MR. GRADY:  Objection.

9            THE COURT:  Sustained.  First, ask him whether

10   that's what he was doing.

11   Q.   Was that what you were doing --

12   A.   No.

13   Q.   -- testifying one way and --

14   A.   No.  I said I began advocating for its use.  I began to

15   let individuals know that I thought this might be a viable

16   addition to the risk assessment process.  I didn't think it

17   was a panacea or that I switched from not wanting to use it

18   to wanting to use it immediately.  As I said, the Static-99

19   is an instrument.  It's self-evolved in terms of its

20   refinement.  And my thinking about it, as well as many other

21   people's, evolved as well.

22            Presently, even presently, it's only considered a

23   moderate predictor.  So I think, even now, that the

24   Static-99 is something that can be utilized within a risk

25   assessment.  I don't think it's a panacea.  I think one has

58ebae98-583d-411e-b341-eb5986c3d9f3

1    to take into consideration the historical and clinical

2    aspects of the case, including an interview with the person

3    and a review of the person's records.

4                    So all those things go into a risk

5    assessment.  My thinking did not go from black to white or

6    white to black at one point in time.  It evolved over time.

7    Q.   It's fair to say, Doctor, you've only been using

8    actuarials for the last year and a half?

9    A.   Well, I think I began using them in 2005, so we're now

10   at the end of 2008.

11   Q.   Doctor, we tried a case at the end of 2005,

12   Commonwealth V. Healey, and I asked you specifically, why

13   are you not using the Static-99?  Do you remember that?

14   A.   Well, as I recall, I was a representative of the

15   Community Access Board on that case.

16   Q.   Doctor, my question was, why are you not using the

17   Static-99 in the end of 2005, right?

18   A.   As I recall, I was a member of the Community Access

19   Board in that case, and the Community Access Board was not

20   utilizing the Static-99.

21   Q.   Okay.  And that brings up another ethical question,

22   Doctor:  If your employer says "Don't use it," even though

23   you say your profession says "Use it," you'll do what your

24   employer tells you to do, won't you?

25                    MR. GRADY:  Objection.

58ebae98-583d-411e-b341-eb5986c3d9f3

1          THE COURT:  Sustained.

2   Q.   It's fair to say the only reason the qualified

3   examiners began using the Static-99 is because the

4   Department of Corrections said, "Okay, you can," right?

5          MR. GRADY:  Objection.

6          THE COURT:  Overruled.

7   A.   Uhm, the Department of Correction did say, "Okay, you

8   can," but I think there was an evolution in terms of its use

9   over time, not only at the Massachusetts Treatment Center

10  but everywhere these type of evaluations are done.

11  Q.   Doctor, the question, though, is --

12  A.   In 2005 I told the department that I did not think it

13  was appropriate to continue to do risk assessments for

14  individual qualified examiners unless the Static-99 was

15  utilized because I thought the field was moving in terms of

16  its common acceptance of that actuarial tool.

17          The Community Access Board is a different entity,

18  however, and individuals do not testify on behalf of their

19  own opinion, but they testify on behalf of the Board's

20  opinion.  So to utilize the Static-99 in a case such as the

21  Healey case you mentioned would require every Community

22  Access Board member to independently score the Static-99 and

23  then testify at that trial.  That was not being done at that

24  time, and that's the answer as to why I didn't utilize it in

25  that particular case.

58ebae98-583d-411e-b341-eb5986c3d9f3

1   Q.   Doctor, generalizably, though, the reason you didn't

2   use it in many cases, in fact at all, was until the

3   Department of Corrections said you could, right?  Not

4   because the science said you should but because the

5   Department of Corrections said you could?

6            MR. GRADY:  Objection to form.

7            THE COURT:  Sustained.

8   Q.   It's fair to say that in the contracts that you operate

9   under with the Department of Corrections, the Department of

10  Corrections essentially holds veto power on what instruments

11  you can use, right?

12  A.   Well, I suppose if you take it to its logical extreme,

13  the Department of Correction holds veto power over

14  everything including --

15           MR. SWOMLEY:  Objection.  Not responsive.  Your

16  Honor, can you ask --

17           THE COURT:  Yes.  What's the question?

18  Q.   The Department of Corrections holds veto power over

19  what instruments you can use?  Yes or no, Doctor.

20  A.   Well, I disagree.  I don't think they use the term

21  "veto."

22           THE COURT:  No, you don't agree.  What's the next

23  one?

24           (Pause.)

25  Q.   Under the bid for the contract for qualified examiners,

1  it's fair to say this is the language:  "The qualified

2  examiners shall also use any tests or other instruments

3  which the vendor and department deem appropriate to evaluate

4  the person's present sexual dangerousness.  Prior to using

5  any test or instrument, the qualified examiner shall obtain

6  the approval of the contractor.  If the contractor

7  recommends the use of the test or instrument, it must first

8  obtain approval from the department--" that would be the

9  Department of Corrections, right? -- "prior to permitting

10  the qualified examiner to use the test or instrument."

11  A.   Well, I think you're looking at the old contract, not

12  the more recent one.

13  Q.   I'm looking at the one you're operating under now.

14            MR. GRADY:  Objection.

15            THE COURT:  Sustained.

16  A.   And I think what that says pretty plainly to me --

17            MR. SWOMLEY:  There's no question before the

18  witness.

19            THE COURT:  Well, actually, it wasn't clear.

20  Q.   Doctor, it's fair to say, what determines the use of

21  scientific instruments in your world is the Department of

22  Corrections, not the latest science?

23  A.   No, it's not fair to say.

24  Q.   You claim to use the adjusted actuarial approach,

25  right?

1    A.    Yes.

2    Q.    And you claim that the actuarial you utilize is the

3    Static-99, right?

4    A.    Yes.

5    Q.    And you then claim that you adjust it based upon

6    factors that may not be present within?  Is that your

7    understanding of what you do?

8    A.    If the data is indicative of that being done, I do.

9    Q.    Okay.  And let me ask you, was there any, in this

10   particular case, any item that you believe justified an

11   upward adjustment of your scoring of the Static-99?

12   A.    No.

13   Q.    And so in that respect, you did not adjust anything in

14   this proceeding upwardly, right?

15   A.    Well, the score is the score, so you don't adjust the

16   score.  You might adjust the risk assessment based on

17   material that the Static-99 doesn't cover.

18   Q.    I'm sorry, I wasn't precise.  Did you in this case

19   adjust your understanding of the risk that Mr. Shields

20   presents above the score you place him at in the Static-99?

21   A.    No.

22   Q.    So in this particular case, you did not upwardly adjust

23   the actuarial?

24   A.    No.

25   Q.    In this case, I believe you testified that you did not

1    downwardly adjust it either, right?

2    A.   Well, I don't think I testified to that.  I think I was

3    asked on direct if I had taken into account protective

4    factors, and I did, those being treatment, probation, and

5    age, because obviously individuals who are on supervised

6    release may recidivate less, individuals who have treatment

7    may recidivate less, and individuals who grow older may

8    recidivate less, so I did take those into consideration.  I

9    did not think any one of them or the combination of them in

10   Mr. Shields's particular case would cause me to alter my

11   recommendation as to his current dangerousness.

12   Q.   Okay.  And all of the other testimony you gave

13   yesterday then essentially suggested why you shouldn't do

14   anything to adjust the Static-99; is that right?

15   A.   Well, I don't base my recommendation on the Static-99.

16   I think that the static -- I agree with Carl Hanson that

17   it's a moderate predictor, so I take that into account with

18   the rest of the information in the record and come to an

19   understanding of whether or not the person is at risk to the

20   point where he would require civil commitment.  So I take an

21   amalgam of the data.  I don't -- I don't, like, do the

22   Static-99 and then think of factors that would seem to

23   support it.

24   Q.   So if I'm understanding you correctly then, Doctor,

25   what you're saying is, you look at the Static-99, you look

1   at the score, and then you look at everything else to see

2   whether the Static-99 score makes you feel good once you've

3   looked at the rest of the data?

4        MR. GRADY:  Objection.

5        THE COURT:  Sustained.

6   Q.   Well, Doctor, would you agree that that's not -- that

7   Dr. Hanson tells you you really have to stick with the score

8   or adjust it based upon hard data, right?

9   A.   Yes.

10  Q.   And not upon any clinical feeling you might have,

11  right?

12  A.   Yes.  I mean, there's -- Dr. Hanson says that.  The

13  other author, David Thornton, says that you shouldn't -- you

14  know, you shouldn't adjust it at all, but I agree with Carl

15  Hanson.

16  Q.   Okay.  And you go through the, for example, individual

17  offense history of Mr. Shields, not to demonstrate that he

18  has any more or less danger by virtue of any particular fact

19  within that offense history, but as evidence that he has

20  committed the crimes that the Static-99 measures?  Is that

21  why you went through it all?

22  A.   Well, I don't want to double whammy him, if that's what

23  you're implying.

24  Q.   In fact, that's one of the big "no-no's" that

25  Dr. Hanson talks about, right?

58ebae98-583d-411e-b341-eb5986c3d9f3

1   A.   That's right.

2   Q.   When you start adjusting, and and if I can ask you if

3   whether you agree with this -- this is in "What Do We Know

4   About Sex Offender Risk Assessment" -- this is an old

5   article --

6   A.   An old article, but we'll see if we agree.

7   Q.   "Following are some additional questions that should

8   be considered when evaluating an adjusted actuarial

9   prediction:  1.  To what extent are the variables used to

10   justify the adjustment already addressed by the actuarial

11   instrument; i.e., how highly are they intercorrelated,"

12   right?

13   A.   Right.

14   Q.   Meaning that if you talk about prior sex offenses and

15   they're measured in the Static-99, talking about them and

16   giving the fact-finder the details, even if they're gory,

17   shouldn't change one's assessment of risk, right?

18   A.   No.

19   Q.   No, it shouldn't, or, no, it should?

20   A.   No, it could, and the reason being is -- well, there's

21   not a question before me.

22   Q.   Okay.  Doctor, let me get to the other two before we

23   digress.  "Is there a compelling rationale or evidence

24   strong enough to justify changing the actual prediction?"

25   And 3 is "The amount of adjustment proportional to the

1  importance of the external variables being considered,"

2  right?

3  A.   Right.

4  Q.   Now, all that means is, before you start changing the

5  actuarial score, you ought to have something that has some

6  scientifically measurable distinction, right?

7  A.   Well, you need to have a good reason, yes.  The

8  question of whether it's scientifically measurable or not,

9  you know, depends on how far science has gone in that

10  particular area.  I think in -- well, go ahead.

11  Q.   With respect to the crimes themselves, and you've

12  testified in prior proceedings that the overall picture of

13  an individual's offense history is an important way to

14  conceptualize things, right?

15  A.   Yes.

16  Q.   And when you can in cases, you are quick to point out

17  that there is what is defined as an escalation in offense

18  history, right, in offending as time passes, right?  You've

19  testified about that?

20  A.   Well, I wouldn't agree with the way you've

21  characterized it.  I don't point anything out unless

22  somebody asks me.

23  Q.   Okay, let's put it in terms you would agree with.  You

24  would agree that in the past you have testified when someone

25  has an escalating criminal history -- that is, the crimes

58ebae98-583d-411e-b341-eb5986c3d9f3

1  they commit seem to get more serious -- that's important for

2  a jury to think about, right?

3  A.   If it's obvious enough so that that's the case, yes.

4  Q.   You didn't mention in this case that there seems to be

5  an obvious counter pattern; that is, a deescalation in

6  seriousness of offenses involving Mr. Shields, right?  You

7  didn't mention that.

8  A.   Well, I don't agree that there is.

9  Q.   Well, all right, then let's take a look at it.  1989

10  appears to be the time period when Mr. Shields has a number

11  of contact sex offenses, right?

12  A.   No.  That's not the way I look at it.  The way I look

13  at it is that the first offense --

14  Q.   Doctor --

15        THE COURT:  No, wait,wait,wait.  He gets to ask.

16  A.   The first offense --

17        THE COURT:  Wait, hold it.  What's the question?

18  Q.   It's fair to say, Doctor, that in 1989 Mr. Shields has

19  a cluster of contact sex offenses?

20  A.   Subsequent to the noncontact offense in 1988, yes, it

21  is fair to say that.

22  Q.   Okay.  And from 1988 to '89, you might actually even

23  say he's escalating, right?

24  A.   Uhm, well, it's kind of a short time period to say

25  that, and so I don't know if I'd say that at that point, but

Page 41

1   he could.

2   Q.   Okay.  Well, you testified yesterday that there is a

3   compulsive quality to Mr. Shields's sex offending, right?

4   A.   Yes.

5   Q.   And indeed, in 1989, that might be a good way to

6   characterize it, right, because there appears to be one

7   after another sex offense, right?

8   A.   I also think it's a good way to characterize it today

9   too.

10  Q.   I understand that, but we're talking about just one

11  piece at a time, Doctor.  In 1989 that is a very accurate

12  way to characterize what he was doing, right?

13  A.   Okay.

14  Q.   And just speaking about those offenses, you have had

15  enough experience in this field to know that even the worst

16  of those offenses don't match some of the worst offenses

17  you've seen committed against children, right?

18           MR. GRADY:  Objection, your Honor.

19  Q.   Let me ask you.  When you do an evaluation, at least in

20  state court, you consider the seriousness of the threatened

21  harm, right?

22  A.   Yes.

23  Q.   And you know that there are civilly committed

24  individuals where there is penile penetration, tissue

25  tearing, physical injuries, weapons used, restraints used,

58ebae98-583d-411e-b341-eb5986c3d9f3

1   gags used, duct tape used, all of those things used against

2   child victims, right?  You're aware of that?

3   A.   That's right.  I've done cases where children have been

4   murdered.

5   Q.   Right.  So when you look at Mr. Shields's baseline of

6   willingness to harm -- and I'm not trying to minimize it at

7   all -- in terms of what Mr. Shields did, he when hit by one

8   of his victims was not willing to exercise the force

9   necessary to overcome that child and continue to perpetrate.

10  Do you consider that to have any clinical significance

11  whatsoever, Doctor?

12            MR. GRADY:  Objection to form.

13            THE COURT:  Overruled.

14  A.   The question was, is there any clinical significance to

15  that one event?

16  Q.   Yes.

17  A.   There may be.  I'd need to -- I look at that as a

18  totality.

19  Q.   Okay.  Well, in looking at it as a totality, you know

20  that there are individuals who will use any force necessary

21  to overcome resistance, right?

22  A.   Yes.

23  Q.   You know there are individuals who have absolutely no

24  problem committing acts that require physical injuries to

25  accomplish their acts, right?

1   A.   Oh, sure.   There are people that are sexually aroused

2   by that.

3   Q.   And you in evaluating Mr. Shields can have a baseline

4   from 1989, right, what he's willing to do to accomplish his

5   sexual acts, right?

6   A.   Yes.

7   Q.   Now, you know that Mr. Shields was put on six years

8   probation after his three-and-a-half-year sentence for that

9   cluster of sex crimes, right?

10  A.   Yes.

11  Q.   And he actually completed his probation without

12  violation, right?

13  A.   Yes.

14  Q.   Six years of probation he completed?

15  A.   Well, I know there were no records indicating that he

16  was arrested or convicted during that time.

17  Q.   And no evidence that he violated his probation at any

18  point in time either, right?

19  A.   I believe that's the case, yes.

20  Q.   And by saying that, are you trying to suggest that

21  because you didn't read it, it might still have happened?

22  A.   Yes.

23  Q.   Well, Doctor, do you realize that -- well, you're a

24  forensic psychologist, right?

25  A.   Yes.

1   Q.   And you know that a forensic psychologist has to deal

2   with both the law and psychology, right?

3   A.   Yes.

4   Q.   And you know that the absence of evidence can't be used

5   by a jury for anything, right?

6              MR. GRADY:  Objection.

7              THE COURT:  Sustained.

8   A.   Well, I still have to consider it.  I mean, I have to

9   consider --

10  Q.   Okay, so do you rely on the absence of evidence to find

11  Mr. Shields sexually dangerous?

12             MR. GRADY:  Objection.

13  Q.   Is that what you do?

14  A.   No.

15  Q.   That would be --

16  A.   But,

17  Q.    -- improper, wouldn't it, doctor?

18  A.   When I answer your questions, I try to answer it

19  accurately, so --

20             MR. GRADY:  Your Honor --

21             THE COURT:  You know, why don't we just move on.

22  Q.   Doctor, any evidence that Mr. Shields failed to

23  complete six years of probation from his most serious sex

24  offending cluster in --

25             MR. GRADY:  Objection.

1          THE COURT:  Sustained.  Asked and answered.

2    Q.   In 1998, nine years later, Mr. Shields is convicted of

3    another contact sex offense, right?

4    A.   Yes.

5    Q.   And in that case and at any point in time after 1989,

6    do you have any evidence that Mr. Shields used physical

7    force to perpetrate a sex crime?

8    A.   No.

9    Q.   And Mr. Shields, to your knowledge, has one hands-on

10   sex offense since 1989, right?

11   A.   Yes.

12   Q.   And that hands-on sex offense involves an individual

13   whom was known to Mr. Shields, right?

14   A.   Yes.

15   Q.   And I believe your testimony was that he gave him

16   spending money and placed the victim in fear of being raped.

17   I believe that was your testimony.

18   A.   Yes.

19   Q.   And then he pled guilty to unlawful sexual contact?

20   A.   Yes.

21   Q.   Now, do you know anything more about the facts of that

22   particular case?

23   A.   Just what was in the record.

24   Q.   Well, do you know whether or not this boy was paid

25   money multiple times?

1  A.   Well, I think I mentioned in direct that Mr. Shields

2  had given him spending money in the past.

3  Q.   Okay.  Do you know whether or not the spending money

4  was compensation for something?

5  A.   Well, I think Mr. Shields reported that --

6  Q.   Forgetting what Mr. Shields reported now, just what you

7  understand from the records.

8  A.   Well, that was part of the record.

9  Q.   Okay.

10 A.   So the answer to your question is "yes," Mr. Shields

11 has utilized the word "prostitution" in that regard.

12 Q.   Now, you testified that for Mr. Shields to use the word

13 "prostitution" essentially demonstrates that he -- well, I

14 guess the way you put it is, it goes to whether he can be

15 considered a reliable informant of his past behavior, right?

16       MR. GRADY:  Objection.

17 Q.   Is that what you testified to yesterday?

18 A.   Uhm, I think I was referring to that, but also the --

19 you know, he also characterized it as mutual masturbation.

20 Q.   Okay.  Well, what do you know about --

21 A.   But then he pled guilty to unlawful sexual contact.

22 Q.   Well, what do you know about the facts of the sexual

23 encounter or encounters that would dispute Mr. Shields's

24 version?

25 A.   The boy said that he had been accosted, sexually

58ebae98-583d-411e-b341-eb5986c3d9f3

1    accosted, that Mr. Shields grabbed his genitals without

2    asking and without asking for payment, and that he placed

3    the victim in fear of being raped.  So that was the report

4    in the record.  Mr. Shields later used the word

5    "prostitution" and also "mutual masturbation" and also

6    "insighted to masturbate."

7    Q.   Now, Doctor, you know that Mr. Shields was sentenced to

8    time served, right, in that case?

9    A.   Yes.

10   Q.   112 days.  And based on your understanding of how the

11   criminal justice system works and how seriously the

12   authorities treated the allegations and the conviction, that

13   there may be some truth to what Mr. Shields is saying,

14   right?

15             MR. GRADY:  Objection.

16             THE COURT:  Sustained.

17   Q.   Well, let me ask it.  Do you always believe what's in

18   the police reports as true?

19   A.   Uhm, unless there's evidence to the contrary, maybe not

20   always.  I mean, do I always believe something's true in a

21   police report?  Not necessarily.

22   Q.   Well, you weren't present then, right?

23   A.   Right.

24   Q.   And you have no way of knowing whether, as Mr. Shields

25   described, the boy was given money on multiple occasions for

1  multiple mutual masturbations, you don't know whether that's

2  true or not, do you?

3  A.   I don't know.

4  Q.   And yet you're willing to conclude that the fact of

5  Mr. Shields even saying it means he's deceiving you, right?

6  A.   Well, no.  I think that what I'm responding to is the

7  fact that he pled guilty to unlawful sexual contact.  Now, I

8  suppose you could plead guilty to unlawful sexual contact if

9  you're having sexual contact with a prostitute, but I think

10 what I was really referring to was Mr. Shields's

11 interpretation of a 12-year-old being a prostitute, as if

12 it's okay that they had sexual contact because the

13 12-year-old was a prostitute.  That doesn't -- I mean,

14 that's a sexual assault to me.

15 Q.   Right, Doctor.  And you are willing to import a moral

16 component to the statement Mr. Shields made such that even

17 saying, "I was engaged in sexual relations with a child

18 prostitute," implies that he must think it's okay, right,

19 morally?

20 A.   Well, I would say, at the least, if not that, at least

21 it's a misunderstanding of what happened between him and

22 that child.  It's a justification to engage in unlawful

23 sexual contact.

24 Q.   You know that Mr. Shields himself was a child

25 prostitute, right?

1    A.    I do know that.

2    Q.    You know that?

3    A.    Yes.  I would think that would make him more able to

4    understand the contact was unlawful and destructive as

5    opposed to less able to understand that.

6    Q.    Doctor, Doctor, he pled guilty.  What is it about him

7    not understanding that it was unlawful?  He understood it

8    was unlawful.

9    A.    Oh, that's good.

10   Q.    Doctor, you are trained to find fault with almost

11   anything a sex offender says and find pathology in it,

12   right?

13             MR. GRADY:  Objection.

14             THE COURT:  Sustained.

15   Q.    It's fair to say, most people that you evaluate won't

16   talk to you?

17   A.    No, it's not fair to say.  Most do talk to me.

18   Q.    It's fair to say that I routinely tell my clients not

19   to talk to you?

20             MR. GRADY:  Objection.

21             THE COURT:  Sustained.

22             MR. GRADY:  Move to strike.

23             THE COURT:  I do strike that.

24   Q.    Doctor, there may be absolutely nothing inaccurate

25   about the manner in which Mr. Shields described sexual

1    contact with that child in the 1998 offense, right?

2    A.    Well, to who?  He's given three separate explanations:

3    He's pled guilty to unlawful sexual contact, he's said it

4    was mutual masturbation, and he said he insighted him to

5    masturbate to three different evaluators, which --

6    Q.    Doctor, wouldn't mutual masturbation be unlawful sexual

7    contact?  Are you familiar with Chapter 255 of the Maine

8    Revised Statutes?

9    A.    No.

10   Q.    So you can't even say whether or not what Mr. Shields

11   described would fit the definition of unlawful sexual

12   contact as you sit here on the witness stand, can you?

13   A.    I don't understand the question.

14   Q.    The question is, you want to suggest to this jury that

15   what Mr. Shields described he did doesn't fit the definition

16   of unlawful sexual contact?

17   A.    I've never said it doesn't fit the definition.

18          MR. GRADY:  Objection, your Honor.

19          THE COURT:  Sustained.

20   Q.    Does what Mr. Shields describes he did fit the

21   definition of unlawful sexual contact, Doctor?  Yes or no.

22          MR. GRADY:  Objection.

23          THE COURT:  Overruled.  Do you know?

24   A.    I need to see the law.

25   Q.    Fair to say, as you sit here today right now, you don't

Page 51

1    know?

2    A.   I don't know what, what Mr. Shields said or whether it

3    fits the law?

4              THE COURT:  Wait.  Do you know what the law is

5    right now?

6              THE WITNESS:  No.

7              THE COURT:  All right, next question.

8    Q.   And yet a moment ago you were quite willing to say he

9    described what he did, and that doesn't fit the definition,

10   right?

11   A.   No.  I said he described what he did on three separate

12   occasions, and I asked you, which description do you want me

13   to utilize?  That's as far as we got on the topic.  And then

14   you asked me what was in the law.

15   Q.   Doctor, if you would, please, will you tell us what is

16   in your view evidence of dangerousness about Mr. Shields's

17   description of what happened in 1998, any version you want

18   to pick.

19   A.   Okay, and the question is, what indicates that it might

20   be dangerous?

21   Q.   What about any of those, if you say they're multiple,

22   what about any of those descriptions that you have claimed

23   to have read indicate sexual dangerousness?

24   A.   Well, the fact that the individual is 12 years old.

25   There's further evidence --

1   Q.   I'm asking about the statement, Doctor.

2           MR. GRADY:  Objection.

3           MR. SWOMLEY:  Objection.  None responsive.

4           THE COURT:  Excuse me.  Let him finish.

5           MR. SWOMLEY:  Your Honor, could you ask --

6           THE COURT:  No, no.  Let him finish his sentence.

7   A.   The fact that the individual is 12 years old is further

8   evidence of pedophilia.  The fact that it was a male is

9   indicative of possible recidivism, given that research has

10  shown that individuals who offend against males are more

11  likely to recidivate than those that offend against females.

12  The fact that the individual was unrelated to him is also

13  another risk factor that is shown to be scientifically

14  relevant in the literature.  The fact that it was an

15  additional sex offense, which was his fifth conviction and

16  sixth arrest, is indicative of the repetitive aspect of his

17  sexual offending behavior.  So that 1998 offense contributes

18  in those areas in the Static-99 and also in my evaluation of

19  him as being presently sexually dangerous.

20  Q.   Now can you answer the question I asked, Doctor?

21          MR. GRADY:  Objection, your Honor.

22          THE COURT:  Sustained.

23          MR. SWOMLEY:  Your Honor --

24          THE COURT:  Sustained.

25          MR. SWOMLEY:  -- would you instruct the witness to

1   answer the question?

2            THE COURT:  Sustained.  No.

3   Q.   Doctor, I asked you what about the statement

4   Mr. Shields made or statements Mr. Shields made.  I didn't

5   ask you about the elements of the crime itself.  I

6   understand that part you like to tell over and over again,

7   but would you answer the question, which is the statement --

8            MR. GRADY:  Objection.

9            THE COURT:  I strike all of that.

10  Q.   The statement that Mr. Shields made, whether you say

11  it's one, two, or --

12           THE COURT:  Excuse me.  Just parse, just ask him,

13  ask him about his statement and what about it is dangerous.

14           MR. SWOMLEY:  That, your Honor, was the little --

15           THE COURT:  Excuse me.

16  Q.   Do you understand what I'm asking, Doctor, about what

17  Mr. Shields said himself, not about what the implications of

18  the offense history, but -- well, I'll withdraw that

19  question.

20                 You're aware that Dr. Hanson, corresponding

21  to his research, would say that nothing, not a word out of

22  Mr. Shields's mouth is predictive of whether or not he will

23  reoffend, right?

24  A.   Yes.  Dr. Hanson would say that it's the static factor

25  itself which is indicative, not the nature of it.

1  Q.   And when we had this line of cross-examination where I

2  was asking you about the words Mr. Shields said, you were

3  characterizing that calling his victim a prostitute means --

4  and you gave a number of different things it means, right?

5  A.   Yes.

6  Q.   That has nothing to do with risk prediction in terms of

7  Mr. Shields, right?

8  A.   Well, in Hanson's view of the Static-99, yes, it

9  contributes to my understanding of Mr. Shields.

10  Q.   And the way it contributes to your understanding of

11  Mr. Shields is, you think he must be incorrect in his

12  description of what that crime was, right?

13  A.   Well, he's incorrect one way or another because he said

14  a couple of different things.  But, no, the answer to your

15  question is actually "no."  What informs --

16          THE COURT:  The answer is "no."  What's the next

17  one?

18  Q.   Doctor, you know denial -- that is, saying he never

19  committed the crime at all -- isn't predictive, right?

20  A.   Yes.

21  Q.   You know that minimizing --

22          THE COURT:  Excuse me.  "Yes" means you agree with

23  Mr. Swomley?

24          THE WITNESS:  I do agree with Mr. Swomley.

25          THE COURT:  I just want to make sure that --

1        THE WITNESS:  Sometimes I agree with him.

2   Q.   Minimization of the crime, saying, "I did only a little

3   bit of it, not the rest," isn't predictive?

4   A.   Yes.

5   Q.   Lack of victim empathy, trash talking, saying bad

6   things about a victim isn't predictive of sexual recidivism?

7   A.   Not unless it crosses into threats, yes.

8   Q.   Has it?

9   A.   No.

10  Q.   You testified that Mr. Shields suffers from pedophilia,

11  and I know we talked about that a little earlier generally,

12  but I'm going to ask you the points of reference that allow

13  you to make that diagnosis.  Your testimony -- I just want

14  to make sure I have them all --

15  A.   Well, I think I testified on --

16       THE COURT:  No, no, you let him finish the

17  question because we're going to get through this hopefully

18  today.  So you've got to listen to his question and answer

19  succinctly, he needs to ask it succinctly, and then we'll

20  get through it so.  What's the question?

21  Q.   You permit yourself the diagnosis of pedophilia based

22  upon, as I understand your testimony, the offense against a

23  6-year-old, an offense against a 9-year-old, the obscene

24  phone calls, and I believe you added in the 12-year-old from

25  the '89 offense and the child pornography, right?

Page 56

1   A.   Yes.

2   Q.   Did I miss anything?  Six things.

3   A.   Uhm. . . well, to be accurate, there was no ages of the

4   children in the telephone call.  There was the 6-year-old,

5   the 9-year-old, the 12-year-old, and then the court made the

6   finding that the images of the children in the child

7   pornography case involved prepubescent children.

8   Q.   Okay, so see what you're conceding here.

9   A.   Did I concede to you?

10   Q.   Well, I'm not sure.  I want to see.  The obscene phone

11   calls, you called it a children's line.  I think the

12   literature or I think the accurate understanding is, it was

13   a teen line, right?

14   A.   He said he called it a teen line.

15   Q.   Well, who called it something else?

16   A.   The victim's mother called it the children's phone.

17   Q.   Okay.  But in terms of and if you remember back to the

18   day where people were a little bit more free with the

19   information they put in phone books, it used to say "teen

20   line" under the parents' phone number, right, so you could

21   call the teens as opposed to the parents, right?

22   A.   Well, I hate to plead ignorance, but I've never seen

23   that.

24   Q.   Well, to your knowledge, do parents put phone numbers

25   for their prepubescent children in the phone book that you

1    know of anywhere, anytime, anyhow?

2    A.    I don't know.

3    Q.    Okay.  Well, it's fair to say that if it's a teen line,

4    we're talking postpubescent, right?

5    A.    You know, my interpretation of the teen line was that

6    it was like a hot line, a public hot line or something, so

7    that's what I thought it meant, the teen line.  I didn't

8    know that he was talking about a published number in a phone

9    book of, like, an adult's house with a separate phone for

10   the children that was called a teen line.

11   Q.    Okay.  Well, if that's now your understanding, does

12   that maybe take that offense out of the diagnosis you made

13   of pedophilia?

14   A.    Well, I think what I said was, I didn't have those

15   children's ages.  For all I knew, they could have been older

16   than 13, or they could have been adolescents or

17   postpubescent.  But the word "children's" was used in terms

18   of the mother's description, so it also could have been

19   prepubescent children.  So it contributed to the extent that

20   I'm qualifying it in terms of the diagnosis of pedophilia.

21   Q.    All right.  And did you or did you not rely on it,

22   Doctor, in forming --

23   A.    Yes, I relied on it, both in terms of scoring the

24   Static-99 and in making the diagnosis, yes.

25   Q.    You relied on it in making a diagnosis of pedophilia?

1    A.    Partially, yes.

2    Q.    And you did so without any knowledge as to the ages of

3    the children?

4    A.    Yes.

5    Q.    And would you agree --

6    A.    Although the knowledge I had was that it was called the

7    children's phone.

8    Q.    Doctor, in your view, is that sufficient to call that a

9    pedophilic incident?

10   A.    Not in and of itself but in conjunction with the other

11   offenses.  And I think even any of the other offenses, even

12   if you take any offense in isolation, it's not enough to

13   make the diagnosis.  It's the totality of the nature of the

14   offenses over time that allows one to make the diagnosis,

15   all of which has been made by every expert in this case.

16   Q.    Doctor, can I ask you whether you feel that to a

17   reasonable degree of professional certainty, it is

18   permissible to use these convictions for obscene phone calls

19   without knowing the age of the children?

20   A.    Not in and of itself.

21   Q.    Okay.  In fact, it would be impermissible to make a

22   diagnosis with that --

23   A.    Well, it would be inaccurate.

24   Q.    I'm sorry?

25   A.    It would be inaccurate.

1   Q.   Thank you.  Now, with respect to the 1998 offense

2   involving the individual that you say Mr. Shields has called

3   a child prostitute and that you conclude was not --

4   A.   I didn't conclude he was not.

5   Q.   Well, to form your understanding that Mr. Shields was

6   wrong about his description, you had to credit something

7   else, right?

8   A.   No.  I'm just saying it's indicative -- Mr. Shields's

9   description of him as a child prostitute, in the sense that

10  you used it, is indicative of Mr. Shields excusing himself

11  for the offense.  The fact that he was 12 years old and then

12  admitted to the unlawful sexual contact is indications that

13  he did understand that he was sexually assaulting a child,

14  and pled guilty to it in court and was placed on probation

15  as a result.

16  Q.   Doctor, you know that when using the word "child" while

17  engaged in an examination about pedophilia is using a word

18  that does not provide useful information, right?

19  A.   I don't know, I don't understand the nature of the

20  question.  Why couldn't you use the word "child"?

21  Q.   Well, you know that in terms of the definition of

22  pedophilia and whether or not it is a mental abnormality

23  that can be diagnosed in an individual, you have to be

24  talking about children who are prepubescent, right?

25  A.   Yes.

58ebae98-583d-411e-b341-eb5986c3d9f3

1   Q.   And you know that simply using the word "child" allows

2   the listener to think you're talking about someone under the

3   age of puberty, when you may indeed be talking about anyone

4   up to the age of 18, for example?

5              MR. GRADY:  Objection.

6              THE COURT:  Overruled.  Is that true?

7   A.   No, I would generally use the word "adolescent" to

8   apply to somebody who's pubescent.

9   Q.   Okay.  So when you use the word "child," you're

10  referring to someone who has not attained puberty?  Can we

11  be clear on that?

12  A.   Yes.  When I'm using the word "pedophilia," I'm trying

13  to -- or using the word "child," I have the definition of

14  pedophilia in my mind, and pedophilia is generally

15  considered -- the word is generally 13 years or younger.

16  Now, reason I use the word "generally" is because there are

17  some 13-year-olds that are postpubescent, some 13-year-olds

18  are prepubescent; but the hallmark or the sin qua non of

19  pedophilia is sexual arousal to prepubescent children.

20  Q.   And you know that pubescence has been going down in the

21  American child population, the age of pubescence has been

22  going down consistently over the last twenty plus years,

23  right?

24             MR. GRADY:  Objection.

25             THE COURT:  Well, if you know.

1    A.    I do know, but not since the DSM-IV-TR was written,

2    which is the book where I got the criteria for the

3    definition of pedophilia.

4    Q.    And you know that the DSM-IV says, "We're just talking

5    about generally," but the actual, whether or not puberty has

6    occurred, is what really defines, right?

7    A.    Yes.

8    Q.    And you know that puberty has actually been going down,

9    the age of puberty, in American females and males, right?

10   A.    Less for males, but, again, I'm not sure that that's

11   true since the DSM-IV-TR was written.  I mean, I think you

12   mentioned the last twenty-five years, which I would agree

13   with.

14   Q.    And is it your testimony that the DSM editorial staff

15   has been adjusting the age of puberty downward as it goes,

16   or merely sticking with 13 and relying upon the good

17   clinicians that use it to apply it accurately and only apply

18   it when the child is in fact prepubescent?

19   A.    Well, I don't think they use 13 as a bright line.  I

20   think they use generally 13.

21   Q.    So when we talk about the --

22   A.    And they do ask that the clinician use his own judgment

23   in that regard.

24   Q.    When we talk about the 1998 incident involving the

25   12-year-old boy, do we know whether he was 12 years and 11

1   months?  Do we know whether he was 12 years and a day?

2   A.   I don't know.

3   Q.   Do you know, based upon the facts described, whether it

4   appears that the boy had secondary sex characteristics?

5   A.   Not in the record.

6   Q.   Evidence of ability to obtain an erection?

7   A.   Not in the record.

8   Q.   Any evidence that would indicate the contrary; that is,

9   evidence that would allow you to conclude that he was not of

10  the age of puberty?

11  A.   Aside from his age, no.

12  Q.   So you have not enough information about that

13  12-year-old to make any conclusions about whether or not

14  that individual was pre- or postpubescent, right?

15  A.   His age.

16  Q.   Well, do you know the circumstances surrounding where

17  he was and what he was doing, and can you infer anything

18  from that?

19  A.   He was befriended by Mr. Shields.  He had helped him

20  move into an apartment.  He was in the apartment one day.

21  He had a hole in his pants.  Mr. Shields fondled him, placed

22  him in fear of being raped.  He went to the authorities.

23  Q.   And you accept that completely at face value, right?

24  A.   Given Mr. Shields's plea of guilty, yes.

25  Q.   And given the judge's imposition of time served?

58ebae98-583d-411e-b341-eb5986c3d9f3

1    A.    Yes.   I mean, when someone pleads guilty to an offense,

2    to me it means that they did it.   If Mr. Shields would have

3    been acquitted of the offense, I would say that he didn't do

4    it.

5    Q.    Well, Doctor, you've now said you don't credit the fact

6    pattern as given to you by the police as true, but you're

7    doing precisely that right now in order to be able to say,

8    "I'm going to diagnose pedophilia here," right?

9    A.    No.   I'm diagnosing the pedophilia, or the situation

10   described in the 1998 offense aids in my diagnosis of

11   pedophilia, due to the fact that the victim was 12.   Now, if

12   he was a 12-year-old prostitute or a 12-year-old rocket

13   scientist, it wouldn't matter to me because absent other

14   information of postpubescent descriptions, then he's

15   generally younger than the age of 13, which is the

16   diagnostic criteria present through the Diagnostic and

17   Statistical Manual of Mental Disorders.

18   Q.    So to be clear, Doctor, without any affirmative

19   evidence of pubescence one way or the other, you as an

20   expert in forensic psychology believe that it is acceptable

21   in a court of law to testify that that individual -- do you

22   have enough information to conclude that individual is

23   prepubescent?

24              MR. GRADY:   Objection.

25              THE COURT:   Overruled.

1    A.    To the extent that it contributes to my diagnosis, all

2    I have is the age.  I'm trying to be clearer about that.

3    All I have is his age, the age of 12.

4    Q.    And with only that, you are willing to say that is

5    enough to conclude that was a pedophilic act, correct?

6    A.    No, no.  I'm saying that that along with his other

7    offenses indicates to me that he suffers from pedophilia.

8    In and of itself, I don't think it's enough to make the

9    diagnosis.  I don't even think it's enough to make the

10   diagnosis if all I had was the 6-year-old victim.  What I'm

11   saying is that over time he has demonstrated a sexual

12   arousal pattern to children, and that is indicative of

13   pedophilia.  The 1998 offense involved a 12-year-old boy,

14   and that contributes to my understanding of the diagnosis.

15   Q.    Please, Doctor, explain how an individual who offends

16   against someone who is above the age of puberty -- let's

17   just start there -- how an individual who offends against

18   someone above the age of puberty can have that act count as

19   evidence of pedophilia.

20   A.    Well, it depends on how much above.  If you're talking

21   about somebody who's 13 or 14 years of age that may not be

22   pubescent, it could certainly contribute to the fact that an

23   individual is a pedophile.  I mean, to use the term

24   generally 13, so it can cut both ways; it can cut to a

25   postpubescent 12-year-old or a prepubescent 14-year-old.

58ebae98-583d-411e-b341-eb5986c3d9f3

Page 65

1  Q.   Doctor, that was not my question.  If you would please

2  answer the question I posed to you.  What about an offense

3  against a postpubescent individual can provide evidence that

4  an individual is a pedophile?

5  A.   If the postpubescent -- I'm sorry, the postpubescent

6  individual or individual --

7  Q.   Yes, what about as an example --

8  A.   It wouldn't -- it wouldn't contribute to that

9  diagnosis.

10  Q.   Okay, it could not, could not contribute to that

11  diagnosis?

12  A.   Right, would not, could not.

13  Q.   Okay. So when you don't know, you can't presume that

14  the individual is prepubescent, right?  You can't presume

15  it?

16  A.   Right, but that wasn't the nature of your question.

17  The nature of your question was postpubescent.

18          THE COURT:  Excuse me.  What's the next question?

19  Q.   That's the next question, Doctor.  Presuming the

20  truthfulness of the last answer you gave, if you don't

21  know -- that is, with respect to the 1998 incident with the

22  12-year-old -- if you don't know, you can't presume they are

23  prepubescent in a court of law, can you?

24          MR. GRADY:  Your Honor, he's asked the question

25  talking about the --

1          THE COURT:  You know, I can't even hear you,

2    Mr. Grady.  I've got a problem.  If you're objecting,

3    overruled.  You know, it's a big courtroom.  We don't have

4    trouble hearing Mr. Swomley, so --

5    A.   No.  I'm guided by the Diagnostic and Statistical

6    Manual.  The answer to your question is "no," I'm guided by

7    the Diagnostic and Statistical Manual of Mental Disorders,

8    which sets the cutoff at generally 13.  So if it was

9    somebody that was 14 and the cutoff is generally 13, and I

10   know nothing about it, just as in this case where

11   Mr. Shields assaulted a 14-year-old, I did not utilize that

12   to inform my diagnosis of pedophilia.

13   Q.   But you did use the 1998 incident?

14   A.   I did use the 12-year-old in the 1998 incident.

15   Q.   You used it.  You also, I believe, used the 2002

16   conviction for child pornography, right?

17   A.   Yes.

18   Q.   Now, you know, again, child pornography encompasses a

19   range of ages, right?

20   A.   Yes.

21   Q.   Under the law in Massachusetts and in the United

22   States, possession of sexually explicit images of anyone

23   under the age of 18 is child pornography, right?

24   A.   Yes.

25   Q.   It is legal in Massachusetts to have sex with a

1   16-year-old, right?

2   A.   Yes.

3   Q.   You just can't take pictures of it until after they're

4   19, right?

5   A.   Yes.

6   Q.   Or 18 and a day?

7   A.   Right.

8   Q.   And you know that when you talk about child pornography

9   as evidence of pedophilia, you have to be talking about an

10  age group that is, again, now, before the age of pubescence,

11  right?

12  A.   Yes.

13  Q.   So we can eliminate from the diagnosis of pedophilia

14  images of postpubescents all the way up to 18, or all the

15  way up to 100, if you want, right?

16  A.   I suppose.  Yes, the answer to your question is "yes."

17  Q.   Okay.  Do you testify very often in child pornography

18  cases?

19  A.   I've done a couple.

20  Q.   And are you familiar with the general methods of

21  receipt of child pornography in the modern age?

22  A.   Receipt?  What do you mean?

23  Q.   Well, receipt is actually the crime.  Receipt of child

24  pornography is one of the crimes.

25  A.   What are you asking me?

1   Q.   Are you familiar with the manner in which pornography

2   is received by individuals who end up being charged with

3   that crime?

4   A.   You mean in terms of downloading or receiving

5   information in the mail or purchasing it in the store?

6   Q.   Downloading, let's talk about downloading.

7   A.   Yes, I've done cases that involve downloading child

8   pornography.

9   Q.   You know that Mr. Shields was convicted of possession

10  of child pornography which included both post and pre, and

11  even some adult pornography, but he was not charged with any

12  of that, right?

13  A.   I don't know.  What I know is from the record, that the

14  judge made findings that images involved prepubescent

15  children.

16  Q.   You know that the judge made findings that among the

17  images with which Mr. Shields was charged was a subset of

18  pictures that involved prepubescent children, right?

19  A.   Yes.

20  Q.   And under federal law, that's what's called enhanced

21  conduct; that is, it gets you a bigger sentence if you have

22  them?

23  A.   Yes, I am aware of that.

24  Q.   Okay.  And so a judge made a finding that there was

25  that class, that prepubescent class found within the images

1    that Mr. Shields was convicted of, right?

2    A.    Yes.

3    Q.    Now, you know essentially nothing more than that with

4    respect to what Mr. Shields was interested in in terms of

5    images of children, right?

6    A.    Yes.

7    Q.    And knowing nothing more than that, you can conclude

8    that Mr. Shields possessed those pictures, right?

9    A.    Yes.

10   Q.    And you know that when an individual oftentimes

11   downloads images, they download in bulk; that is, a bunch of

12   images?  They all come streaming into the hard drive, right?

13   A.    Well, I think people can download what they want to

14   download.  They can download in bulk, they can download

15   single documents, they can download multiple documents.

16   They can be discriminatory, or they cannot be

17   discriminatory.

18   Q.    Do you have any information about the method in which

19   the images Mr. Shields had were downloaded?

20   A.    No.

21            THE COURT:  Let me finish this line of

22   questioning, and we'll take our break?  We got going a

23   little late, so we'll finish this line.

24   Q.    Did you have an opportunity to review the offense

25   conduct of the September 18, 2002 charge involving child

1    pornography?

2    A.   Is it a Bates-stamped record?

3    Q.   Yes.

4    A.   Then I reviewed it.

5    Q.   No. 77 and 78.

6    A.   I don't have it here.

7         MR. GRADY:  It's No. 9 in evidence, your Honor.

8         MR. SWOMLEY:  I'm sorry, I didn't hear you.

9         MR. GRADY:  Exhibit 9 in evidence.

10   A.   Oh, Exhibit 9?  Thank you.

11   Q.   If you go to 5 --

12        THE COURT:  So what's on the screen?  This is the

13   write-up of the federal offense, right?

14        MR. SWOMLEY:  It is Page 2 of Exhibit 9, write-up

15   of the federal presentence report regarding the child

16   pornography conviction.

17   Q.   "Analysis revealed hundreds of images of adolescent and

18   preadolescent children, predominantly boys, engaged in

19   sexually explicit conduct."  And if you go on down,

20   "Pornographic images of minors had been downloaded on

21   September 12 using Kazaa, an Internet-based file transfer

22   program."  Are you familiar with Kazaa?

23   A.   No.

24   Q.   Do you know whether or not this demonstrates that they

25   were downloaded in bulk?

Page 71

1   A.   No.

2   Q.   If I tell you they were downloaded in bulk, do you have

3   any evidence that Mr. Shields focused specifically on the

4   prepubescent photographs?

5              MR. GRADY:  Objection, your Honor.  It assumes

6   facts not in evidence.

7              THE COURT:  Overruled.

8   A.   No.

9   Q.   Do you have any, for example --

10             THE COURT:  Don't forget, what the attorney says

11  isn't evidence, so --

12  Q.   Do you have any evidence, for example, that Mr. Shields

13  created a folder on his hard drive saying, "I love

14  pedophilic images.  I'm putting them here"?

15  A.   No.

16  Q.   No self-reports that Mr. Shields was attracted to the

17  prepubescent images as opposed to the other images?

18  A.   No.

19  Q.   You know that cataloging is an additional component of,

20  well, compulsivity, if you want to talk about it that way,

21  right?

22  A.   No.

23  Q.   You're not familiar with that?

24  A.   No.

25  Q.   You're not familiar with pathology of individuals who

58ebae98-583d-411e-b341-eb5986c3d9f3

1   collect things and then like to make, you know, itemized

2   lists and put them in particular folders and keep detailed

3   history and things like that?  You never had a case like

4   that?

5   A.    No.

6   Q.    Okay.  You know that there's no evidence of, from the

7   fact pattern that you have, of a particularized instance in

8   the prepubescent photographs, right?

9            MR. GRADY:  Your Honor, I'm going to object and

10   ask to be heard at side bar.

11            THE COURT:  Sustained.

12   Q.    Unless you can demonstrate that Mr. Shields was

13   particularly interested in the prepubescent photographs,

14   looking at postpubescent pictures is not evidence of

15   pedophilia, right?

16   A.    I'm sorry, repeat that.

17   Q.    Looking at postpubescent pictures of individuals is not

18   evidence of pedophilia, right?

19   A.    That's correct.

20   Q.    And you're familiar with the recent developments by the

21   authors of the DSM-IV section on pedophilia, right?

22   A.    Recent development?

23            THE COURT:  Is this a new line of questioning?

24            MR. SWOMLEY:  Yes.

25            THE COURT:  You're past that federal conviction?

1          MR. SWOMLEY:  Yes, guess it's on the same subject

2     matter, but you're right, we can take a break here.

3          THE CLERK:  All rise for the jury.

4          (Jury excused.)

5     SIDE-BAR CONFERENCE:

6          MR. GRADY:  Your Honor, before we go to this,

7     since it's been raised, would the Court entertain a motion

8     for judicial notice of the elements of the offense of

9     unlawful sexual contact at this point?  I'm sure I could

10    prepare it in just a few minutes over the break.

11         THE COURT:  Am I going to instruct them now?  No.

12    But maybe if you put in the statute, I don't care.

13         MR. GRADY:  Sure, thank you.

14         THE COURT:  I'm not prepared to -- contact says

15    contact.

16         MR. GRADY:  And there's a definition for what that

17    contact requires.

18          THE COURT:  Okay, maybe.

19          So how much longer?  In other words, I'm hoping

20    we'll finish him today.

21         MR. SWOMLEY:  I'm hopeful that we will too.  I'm

22    getting there.  I think I'm getting -- I think we're still

23    on track to do that.

24          THE COURT:  Okay.

25          MR. GRADY:  And also, your Honor, to the extent

1   he's asking about -- we had an agreement as to facts so that

2   certain police reports wouldn't come in, that the PSR would

3   serve in lieu of that.  If they're suggesting that the PSR

4   is incomplete, I am going to go back and ask about the

5   police reports.

6           THE COURT:  Maybe, maybe, maybe.  Maybe.  Just

7   show it to them.

8           MR. SWOMLEY:  What did I open the door to?  I

9   haven't done anything other than talk --

10          MR. GRADY:  He's asked about categorization.  The

11  police reports refer to that.  He's asked about sorting --

12          THE COURT:  There may be a rebuttal estimate, but

13  show it to them first so it's not sprung on them.

14          MR. GRADY:  They have it.  I'll specifically show

15  them the paper.

16          THE COURT:  Just because I don't want it to come

17  out if it's in fact some sort of impermissible hearsay.

18  That's the issue.  If it's something, the basic principles

19  that Judge Collings outlined, it's got to be something the

20  policeman saw rather than hearsay within a report, so we

21  just have to have that basic parameter.

22          Okay, so we'll try and finish it today.  You get

23  very carried away -- you both have the opposite problem.

24  You get way too loud, and I'm going to start tamping you

25  down and, like, pouncing.  You, I can't even hear you.

58ebae98-583d-411e-b341-eb5986c3d9f3

1   You've got to pop up and object, okay, just "objection."

2            MR. GRADY:  Yes, I agree.  But that's not my

3   guide.

4            THE COURT:  All right, fair enough.

5            (End of side-bar conference.)

6            (A recess was taken, 11:10 a.m.)

7            (Resumed, 11:50 a.m.)

8            (Jury enters the courtroom.)

9   BY MR. SWOMLEY:

10  Q.   Doctor, have you been following the discussions had by

11  the authors of the DSM-IV with respect to whether or not the

12  diagnostic criteria in pedophilia that forms the basis of

13  Exhibit 22-A are somehow misleading?

14  A.   Uhm, well, I follow the general literature of the

15  field, and in that sense, I think there's been some things

16  written about that from a number of sources.  But I don't

17  recall anything specifically written about the criteria

18  being misleading.

19  Q.   Let me ask you if you're familiar with the names

20  Michael First or Allen Frances?

21  A.   Not off the top of my head.

22  Q.   Well, if I show you the DSM-IV, there's two

23  incarnations; there's the IV and then the TR, right?

24  A.   Right.

25  Q.   Allen Frances is the chairperson of the task force on

1  the DSM-IV?

2  A.   Right.

3  Q.   And Dr. First is the editor of the Text and Criteria

4  section, right?

5  A.   Right.

6  Q.   And the Text and Criteria section would be what's on

7  the board right here, right?  This is the diagnostic

8  criteria?

9  A.   Yes.

10  Q.   So First would be the editor of that section?

11  A.   Right.

12  Q.   All right, and he's also still -- in the original

13  DSM-IV, those are the same two people, right?

14  A.   Yes.

15  Q.   Now, have you read the editorial that they have been

16  circulating with respect to Errors of Unintended

17  Consequences of Small Changes in Diagnostic Criteria?  Have

18  you seen that document?

19          (Witness examining document.)

20  A.   Now, is this published?

21  Q.   If you are familiar with --

22          THE COURT:  Do you have the question?  Are you

23  familiar with it is this?

24          THE WITNESS:  No, but it's --

25          THE COURT:  No, okay.  What's the next question?

1   Q.   You've never seen it?

2   A.   Well, I don't know if I've seen it in published form.

3   Q.   Well, if you would look at it -- it's only three pages

4   long -- if you would look at it and see if there's a chart

5   at the end of it that lists the differences between the

6   three most recent versions of the DSM.  First, there's the

7   DSM-III, the DSM-IV, and now the DSM-IV-TR, right?

8   A.   I don't recall seeing this previously.

9   Q.   Okay.  Let me ask you whether you would agree that

10  Drs. First and Frances are experts in the field of mental

11  health diagnoses?

12  A.   Yes, well, in the sense that they're chairmen of the

13  committee that write this.  I don't know them independently.

14  I know them in terms of the fact that they're editors of the

15  DSM-IV and the DSM-IV-TR.

16  Q.   Okay.  And in knowing that they are those individuals,

17  fair to say those individuals are considered experts in the

18  field of mental health diagnoses?

19  A.   Yes.

20  Q.   Okay.  Are you aware of the changes that have been made

21  in the DSM with respect to the paraphilia pedophilia from

22  one version to the next?

23  A.   Well, in the sense of just looking at that chart, yes.

24  Q.   Okay.  And you've been a psychologist long enough to

25  have been around when the DSM-III was in use, right?

1    A.    Yes.

2    Q.    And if I just leave the chart with you, just for ease

3    of comparison, would you agree that from the DSM-III to the

4    DSM-IV, First Edition, there were changes in the diagnostic

5    criteria for pedophilia?

6    A.    Yes.

7    Q.    And when the DSM-IV came out -- well, let me ask you.

8    If you look at the column DSM-III-R, do you agree that that

9    was what the diagnostic criteria was in that publication?

10   A.    I don't have any independent memory of that, but I

11   certainly trust you in that regard.  I mean. . .

12   Q.    Okay.

13            MR. SWOMLEY:  Well, I guess the question is, can I

14   put this chart up on the big screen?

15            THE COURT:  Sure.

16   Q.    Okay, this chart compares the three different versions

17   of the DSM most recent versions, starting on the left with

18   the DSM-III, then the DSM-IV, and then the DSM-IV-TR, right?

19   A.    Yes.

20   Q.    Now, starting with just the Section A, Criteria, fair

21   to say that what is changed from the DSM-III-R to the DSM-IV

22   is that "or behaviors" was added?

23   A.    Yes.

24   Q.    And in the "or behaviors" section, would you agree that

25   when you yourself diagnosed Mr. Shields with pedophilia, you

1 relied upon behaviors to form the predicate for your

2 diagnosis?

3 A.   Yes.

4 Q.   And those behaviors we went over just before the break

5 were the two incidents involving a 6-year-old and a

6 9-year-old, right?

7 A.   Yes.

8 Q.   And then you also credited the offense against a

9 12-year-old and the child pornography subset of pedophilic

10 images, right?

11 A.   Yes.

12 Q.   And those are the behaviors that you relied upon to

13 form your diagnosis, right?

14 A.   Yes.

15 Q.   And fair to say that in the paper history of

16 Mr. Shields, you do not have, other than the evidence of the

17 committed act, whether it is a 6-year-old or a 9-year-old,

18 you do not have evidence of intense sexual urges or sexually

19 arousing fantasies, right?

20 A.   Yes.

21 Q.   "Yes" meaning you don't have evidence of that?

22 A.   Yes, I'm agreeing with you.

23 Q.   Okay.  So all you have to make your diagnosis are the

24 behaviors, right?

25 A.   Yes.

Page 80

1   Q.   And --

2   A.   Well, there is -- there was -- on direct I was asked

3   about statements Mr. Shields made at one point to the court

4   and to police about being in distress and about it's not him

5   or it's not in his head.  So there was that aspect of

6   distress.

7   Q.   Okay.  And the distress comes out in Section B, right?

8   A.   Yes.

9   Q.   Okay, we're sticking with A for the time being.

10  A.   Okay.

11  Q.   All right?  Under A, you would agree that you don't

12  have Mr. Shields self-reporting that he is sexually

13  interested in prepubescent children, for example, in the

14  record?

15  A.   Yes, that's correct.

16  Q.   And what you have are, if you take the totality, as you

17  do, of Mr. Shields's offending history, is you have a number

18  of situationally different aged individuals and different

19  sex crimes, right?

20  A.   Yes.

21  Q.   You have those both post- and prepubescent individuals,

22  right?  Let me ask you whether the apparent randomness of

23  the ages of his victims reflect more on the opportunistic

24  nature of the crimes he's committed than it does on his

25  predisposition towards any particular age group?

1        MR. GRADY:  Objection.

2        MR. SWOMLEY:  I'll rephrase the question.

3        THE COURT:  Yes.

4  Q.   Would you agree, Doctor, that the apparent random ages

5  of his victims in all of these cases reflect more that the

6  crimes he committed were opportunistic in nature rather than

7  directed at any particular age group?

8        MR. GRADY:  Objection, your Honor.  There's been

9  no evidence these were random.

10        THE COURT:  Well, yes, sustained.

11  Q.   Well, he in 1989 offended against a number of different

12  vulnerable persons, right?

13  A.   Yes.

14  Q.   Some post-, some prepubescent, right?

15  A.   Yes.

16  Q.   And in your understanding of the victimization, they

17  were crimes of opportunity, right?

18  A.   Uhm, we're only talking about the '89 offenses?

19  Q.   Well, you don't have -- yes.

20  A.   Well, let me look.

21        (Witness examining document.)

22  A.   You know, I might need to ask you to define, how are

23  you defining opportunistic?

24  Q.   Well, let me ask you.  Do you have evidence that

25  Mr. Shields set out on any given occasion to find a

1    6-year-old prepubescent individual and have sexual relations

2    with him; I mean, a fact pattern that demonstrates before he

3    gets in a car, he's going looking for a 6-year-old?

4    A.   I don't have any evidence that indicates that he told

5    someone or wrote something that would indicate, "I'm going

6    to go look for a 6-year-old."

7    Q.   Okay.  Now, I'm going to ask you whether you would

8    agree or disagree with the statement of Dr. First and

9    Dr. Frances of the DSM that "The adjustment in Criterion A

10   from urges and sexually arousing fantasies to behaviors has

11   created an unintended consequence in these involuntary

12   commitment proceedings"?

13             MR. GRADY:  Your Honor, I'm going to object.  I

14   don't think there's been any foundation --

15             THE COURT:  I can't hear a word you're saying.

16             MR. GRADY:  I'm sorry.  I don't wish to give a

17   speaking objection in front of the jury.

18             THE COURT:  All right, you want to see me at

19   side bar?

20             MR. GRADY:  Please.

21   SIDE-BAR CONFERENCE:

22             MR. GRADY:  I'm going to object to this document

23   and this statement.  There's been no evidence that this is a

24   published statement of these doctors.  All we have is a

25   piece of paper with their names on it.  It's not been

1  published anywhere.  It could be a draft for all we know.

2        THE COURT:  Well, he's not going to put it in

3  front of them.  He can ask, and if he adopts it, he adopts

4  it; if he doesn't, he doesn't.  I don't treat this as a

5  learned treatise or --

6        MR. GRADY:  Okay, thank you, your Honor.

7        (End of side-bar conference.)

8        THE COURT:  Do you agree with that statement?  Do

9  you remember it?

10        MR. SWOMLEY:  I haven't read the statement in yet,

11  your Honor.

12        THE COURT:  I thought you just asked him, but go

13  ahead.

14  Q.   Do you agree or disagree with this statement:  "The

15  reworded definition --" that is, adding "behavior" --

16  "resulted in two unanticipated problems:  First,

17  conservative religious groups mistakenly worried that this

18  change was a signal that the ABA was moving towards

19  eliminating pedophilia from the DSM by requiring that the

20  individual experience distress or impairment.  To eliminate

21  this confusion in the DSM-IV-TR, the original DSM-III-R

22  Criterion B was reinstated in the DSM-IV-TR for those

23  paraphilias"?

24  A.   Well, it seems to be saying something historical there,

25  so I can't disagree.  If he knows that as a historical fact,

58ebae98-583d-411e-b341-eb5986c3d9f3

1    then, you know, whether it's true or not --

2              THE COURT:  All right, what's the next one?

3    Q.   The next one is, do you agree with this, that "The

4    minor adjustment in Criterion A wording ultimately caused a

5    far more damaging unintended consequence.  This was in the

6    application of the paraphilia definition in the context of

7    state statutes authorizing the indefinite civil commitment

8    of sexually violent predators (SVPs) after their prison

9    terms are completed.  The constitutionality of SVP

10   commitment statutes depends --"

11             MR. GRADY:  Objection, your Honor.

12             THE COURT:  Sustained.

13   Q.   Let me ask you whether you agree with this then,

14   Dr. Tomich:  "Unfortunately, many forensic evaluators have

15   mistakenly concluded that the revised wording of

16   Criterion A -- i.e., including 'or behaviors' -- allows them

17   to diagnose paraphilia based on a history of repeated acts

18   of sexual violence, and that this satisfies the statutory

19   mandate for the presence of mental disorder.  This was never

20   our intent in the DSM-IV.  Defining paraphilia based on acts

21   alone blurs the distinction between mental disorder and

22   ordinary criminality.  Decisions regarding possible lifelong

23   psychiatric commitment should not be made based on a

24   misreading of a poorly worded DSM-IV criterion."

25             MR. GRADY:  Objection.

1          THE COURT:  What's the question?

2   Q.   Do you agree or disagree with that?

3   A.   Uhm, well, it's kind of a long statement, so it's going

4   to require a little bit of a longer answer in terms of agree

5   or disagree.  I agree with the general sentiment of that,

6   but in my experience as a qualified examiner, and as someone

7   who's testified in a number of these cases in Massachusetts,

8   I have, and I know others have, diagnosed individuals with

9   pedophilia based on this criteria, the DSM-IV-TR criteria,

10  but recommended "not sexually dangerous."  I think what is

11  being said here is that there may not -- there should not be

12  a one-to-one correlation; in other words, pedophilia should

13  not necessarily equal civil commitment.  And in that sense,

14  I agree with the statement.

15  Q.   And that merely defining someone as being a pedophile

16  based upon sexually criminal conduct in the past by itself

17  is not warranted, right?

18  A.   No.  I think that you can make the diagnosis based on

19  behavior.

20  Q.   Even though the authors of the DSM-IV say now that's --

21          THE COURT:  Objection sustained.

22          MR. GRADY:  Move to strike, instruct the jury to

23  disregard.

24          THE COURT:  I strike it, I strike it.  Don't

25  forget, it's his answers, not his testimony, that's evidence

Page 86

1   in this case.

2   Q.   You know that the authors of the DSM-IV have taken a

3   contrary position to the one you've just espoused?

4                MR. GRADY:   Objection, your Honor.

5                THE COURT:   Sustained.  Asked and answered.  Let's

6   move on.

7                MR. GRADY:   Again, I'd ask that the Court

8   specifically instruct the jury to disregard these comments.

9                THE COURT:   I've done what I've done.  Let's move

10  on.  Next topic.

11  Q.   You testified yesterday that if Mr. Shields availed

12  himself in the past of treatment, it would be a risk

13  reducer, right?

14  A.   It could be considered a protective factor.  I mean,

15  you know, I would probably want to see some indication that

16  the treatment was successful, that he engaged in treatment

17  to the best of his ability, that he was able to progress in

18  treatment.  I think just sitting in treatment is not enough.

19  Q.   You know that Mr. Shields has engaged in at least two

20  periods of sex-offender-specific therapy, right?

21  A.   Yes.

22  Q.   And you know he participated from 1993 to '96 in a

23  community-based program in Cumberland County, Maine, right?

24  A.   Yes.

25  Q.   And that he again participated in sex-offender-specific

58ebae98-583d-411e-b341-eb5986c3d9f3

1    cognitive behavioral therapy from 1999 to 2001, right?

2    A.   Yes.

3    Q.   Now, you know most recently he has engaged in two years

4    of therapy with Dr. Graney at FCI Butner during his most

5    recent incarceration, right?

6    A.   Well, that was not sex offender therapy.  That was

7    psychotherapy.

8    Q.   No, just saying therapy at this point, right?  And he

9    also engaged in substance abuse therapy up to and including

10   AA and NA programs, right?

11   A.   Yes.

12   Q.   Now, is it your testimony that Hanson would call that

13   treatment history a treatment refuser?

14   A.   No.

15   Q.   Now, your testimony, I believe on direct examination,

16   is that Mr. Shields should still have to undergo sex

17   offender therapy now before he should be released, right?

18   A.   Yes.

19   Q.   And let me ask you.  You described what that

20   sex-offender-specific therapy is.  Is it your testimony that

21   you would want Mr. Shields to participate in aversion

22   therapy now for a person without a hands-on sex offense

23   since 1998?

24   A.   Well, I don't make as much of a distinction as you do

25   between the child pornography and the 1998 offense.  I think

1    the child pornography is just as heinous, given the fact

2    that real children are sexually abused.  So I disagree with

3    the premise of your question; but even if I were to accept

4    the premise of your question, I would say "yes."

5    Q.   So aversion therapy should be used on a person who

6    looks at child pornography?  Is that your testimony?

7    A.   Well, I think if it would help Mr. Shields diminish the

8    risks he presents, he should consider that form of

9    treatment.  I don't think treatment should be forced on him.

10   Q.   Now, you know that he has not been convicted of a

11   forcible act on a child since 1989, right?

12   A.   Well, the 1998 offense was not a forcible act, an

13   unlawful sexual contact?

14   Q.   Doctor, you, I believe, testified that it didn't

15   involve the use of physical force, right?

16   A.   Oh, I see what you mean.  Yes.

17   Q.   Okay.  Now, do you know whether or not your field

18   recommends aversion therapy for noncontact sex offenses?

19   A.   Uhm, I think -- I think if it's part of the overall

20   treatment program, it could be recommended.

21   Q.   And you, you're recommending it as you sit here today,

22   right?

23   A.   I said I think it's something that Mr. Shields should

24   consider in context of his overall treatment.  I think what

25   I said on direct was that treatment should consist of

1   cognitive behavioral, group treatment, psychoeducational

2   classes, and, if indicated, behavioral treatment.  I think,

3   if it could help Mr. Shields, he should do it to reduce

4   risk.

5   Q.   Doctor, you have a very brief history of providing

6   therapy yourself, right?

7   A.   Yes.

8   Q.   And that brief history included providing -- I believe

9   you testified in a previous occasion you treated five

10  individual adolescent sex offenders in group therapy, right?

11  A.   Yes, approximately.

12  Q.   You treated another five to seven individuals in an

13  individual setting, right, adolescents?

14  A.   At various times, it waxed and waned, but those are

15  approximate numbers.

16  Q.   So we're talking about ten to twelve adolescent sex

17  offenders you have provided therapy to.  You have provided

18  in addition, when you were at the Mass. Society for

19  Prevention of Cruelty to Children, another fifteen to

20  twenty -- I'm sorry.  You have separate and apart from

21  MSPCC, Mass. Society for Prevention of Cruelty to Children,

22  you've treated another fifteen to twenty adult sex offenders

23  right?

24  A.   Probably, yes.

25  Q.   And that would be later on at the state hospital?

Page 90

1    A.    The state hospital.

2    Q.    Okay.  So all total, you have treated maybe

3    twenty-seven to thirty-two sex offenders?

4    A.    Yes, I was going to say about thirty to forty.

5    Q.    Okay.  And that's in your entire career?

6    A.    Uh-huh.

7    Q.    All right.  Now, you have provided therapy, I believe

8    you testified in a previous proceeding, to 150 victims of

9    child sexual abuse, right?

10    A.    Probably over time.

11    Q.    And that was at the MSPCC, right?

12    A.    Yes.

13    Q.    And that was from 1988 to '94?

14    A.    Yes.

15    Q.    So the 150 victims you provided therapy to were

16    children, right?

17    A.    Some were children, some were adolescents.  Some were

18    adults.

19    Q.    Now, when you provided that therapy to someone, for

20    example, who was orally and anally sodomized as a

21    7-year-old, did you recommend aversion therapy to the

22    7-year-olds?

23              MR. GRADY:  Objection.  Relevance, your Honor.

24              THE COURT:  Sustained.

25    Q.    Well, Doctor, how do you provide therapy to someone who

1   has been orally and anally sodomized as a 7-year-old?

2              MR. GRADY:  Objection.

3              THE COURT:  Sustained.  Irrelevant.

4   Q.   You know that Mr. Shields was orally and anally

5   sodomized as a 7-year-old, right?

6   A.   Yes.

7   Q.   And you know that that was an ongoing victimization

8   pattern that went on for three or four years, right?

9   A.   Yes.

10  Q.   What kind of therapy is appropriate for someone who has

11  been so victimized?

12  A.   For a 7-year-old?

13             MR. GRADY:  Objection, your Honor.

14  Q.   For anybody that has been victimized --

15             THE COURT:  Excuse me.  It's for him now, for him

16  now, given that history.

17  A.   The type of therapy I outlined:  individual, group,

18  psychoeducational classes, and aversive treatment, if that's

19  helpful.  I mean, done forget, we're not only treating him

20  as a victim, but we would be treating him as an offender as

21  well.

22  Q.   Well, Doctor, you're saying that treating him as a

23  victim is pointless at this point in time?

24  A.   No, I didn't say that at all.

25  Q.   Well, Doctor, you're saying that the work that he did

Page 92

1    with Dr. Graney didn't address his issues, right?

2    A.   As a sex offender, I don't think it was specific sex

3    offender treatment.

4    Q.   Do you agree that sex offenders who have had a long

5    history of victimization might need some good therapy

6    dealing with those issues?

7    A.   Sure.

8    Q.   And that Mr. Shields as he sits here today, and I

9    believe you testified yesterday, is not just an untreated

10   sex offender, is he?

11   A.   Yes.

12   Q.   That's what you say he is right now?

13   A.   Well, I'm saying, yes, he's virtually untreated.  He's

14   had treatment in the past.  That treatment hasn't worked.

15   So I think that he should have treatment before he's

16   released to the community.

17   Q.   He had sex-offender-specific treatment in the past, and

18   that didn't work, and he had never had treatment that helped

19   him deal with his own underlying issues of victimization

20   until recently, did he, Doctor?

21   A.   My reading of the notes of Graney was that for the most

22   part he was --

23              THE COURT:  Wait a minute.  Dr. Graney you will

24   hear from tomorrow.  So just back up who this is.  So

25   Dr. Graney was somebody who -- help me with this -- he was

1    somebody -- who was Graney?

2         THE WITNESS:  She was a therapist that worked in

3    terms of treating Mr. Shields for depression and what's

4    called here and now problems while he was incarcerated.

5         THE COURT:  So you reviewed her notes, is that it?

6         THE WITNESS:  I did.

7         THE COURT:  Just so we know what you're talking

8    about.  So, now, what's the question?

9    Q.   It's fair to say, Doctor, that Jeffrey Shields worked

10   on his own history of victimization and his clinical

11   presentation during therapy with Dr. Graney?

12   A.   I don't know what you mean by clinical --

13   Q.   He was depressed?

14   A.   Oh, he was depressed, that's fair to say.

15   Q.   Now, Doctor, in terms of your own expertise, fair to

16   say, in addition to not really having much of a background

17   in providing therapy, you also have no background in

18   research?

19   A.   Well, first, I think that's a mischaracterization.  I

20   think I have a significant amount of background in terms of

21   providing therapy, both in terms of psychotherapy and in

22   terms of treating victims and offenders.  In terms of

23   research, I am not interested in doing research.

24   Q.   So, fair to say, Doctor, you have done no research in

25   the field of sex offender recidivism?

1    A.    That's correct.

2    Q.    You have never written a peer-reviewed article?

3    A.    That's correct.

4    Q.    You've never been on a peer-review panel that reviews

5    other psychologist's academic work?

6    A.    Yes.

7              THE COURT:  "Yes" means he's correct?

8              THE WITNESS:  Yes.

9              THE COURT:  Just to make sure it's clear.

10   Q.    And, Doctor, in fact you chose your schools based upon

11   their lack of requirements that you do research or clinical

12   work or anything other than actually -- well, I believe, as

13   you put it --

14             MR. GRADY:  Objection.

15   Q.    -- community psychology?

16   A.    No, that's incorrect.

17   Q.    Well, let me ask you.  You went to George Williams

18   College and graduated in 1976, right?

19   A.    Yes.

20   Q.    It's fair to say that that was a college named after

21   the founder of the YMCA?  It was an unaccredited

22   institution, except for the master of social work program?

23   A.    My understanding is that it was fully accredited, and

24   it was a YMCA school in the sense that it trained ministers

25   in 1890.

1   Q.   Doctor, it's fair to say it was not a science- or

2   mathematics-intensive curriculum?

3   A.   It was -- it was primarily a school that looked at --

4   that was for the social services and psychology.  I actually

5   majored in psychology at that school.

6   Q.   And after you graduated from that school, you found the

7   least rigorous academic institution for a psychological

8   degree in Chicago?

9              MR. GRADY:  Objection.

10             THE COURT:  Sustained.

11  Q.   It's fair to say, Doctor, that the Chicago School of

12  Professional Psychiatry is, I believe you characterized it

13  in an earlier proceeding, is a doctorate program in

14  psychology with a nonprofit organization that's an outgrowth

15  of the University of Chicago, with an emphasis on community

16  psychology, right?

17  A.   Yes.

18  Q.   It's fair to say it had no research requirements?

19  A.   No.  It did have research requirements.

20  Q.   Doctor, the admissions policy of the Chicago School of

21  Professional Psychology, all it required was a BA or at

22  least three undergraduate psych courses?  There was no

23  minimum GPA, no minimum GRE score, not even a requirement

24  that you take the GRE, right?

25             MR. GRADY:  Objection, your Honor.

58ebae98-583d-411e-b341-eb5986c3d9f3

1          THE COURT:  Overruled.

2  A.   Uhm, it required the Miller Analogies Test as opposed

3  to a GRE, uhm, and it required --

4          THE COURT:  A GRE is a graduate record exam that's

5  administered for some graduate schools, is that right?

6          THE WITNESS:  Yes, and the Miller Analogies Test

7  is another test of general academic excellence.  It also

8  required experience in terms of the field of working in

9  psychology prior to admission.

10  Q.   Doctor, it had as its requirement for a doctorate three

11  years of course work and one year of an internship, no

12  requirement of a dissertation, and no more than 90 semester

13  hours, right?

14  A.   Well, I actually did a two-year externship, one-year

15  internship, and wrote a dissertation.

16  Q.   And you did more than was required, right?

17  A.   Well, I didn't do it on purpose.  They told me it was

18  required.  I probably wouldn't have done it if it wasn't

19  required.

20  Q.   Doctor, you know that the Illinois School of

21  Professional Psychology requires 118 hours as opposed to 90

22  and five to six years as opposed to three years for a

23  degree, right?

24  A.   Well, I think you're mixing apples and oranges.  Those

25  are trimester hours versus semester hours.

58ebae98-583d-411e-b341-eb5986c3d9f3

1  Q.   Well, do you know the Illinois Institute of Technology

2  offers a clinical Ph.D. with 110 semester hours, a

3  dissertation and research, right?

4          MR. GRADY:  Objection, your Honor.

5          THE COURT:  Sustained, sustained.

6  Q.   Doctor, you testified yesterday that you were licensed

7  in Massachusetts as a clinical psychologist, and that is not

8  true, is it?

9  A.   I think it's true.

10  Q.   You know that there is in fact no licensure in

11  Massachusetts of "clinical" in front of the name?

12  A.   All right.

13  Q.   And you're a licensed psychologist, period?

14  A.   My degree is in clinical psychology.  I think all

15  psychologists in Massachusetts are licensed as

16  psychologists, using the generic term.

17  Q.   Doctor, you cannot even hold yourself out as a clinical

18  psychologist because you do not have the research training

19  to call yourself a clinical psychologist?

20          MR. GRADY:  Objection, your Honor.

21          THE COURT:  Overruled.  I'll allow that.

22          MR. GRADY:  There's no foundation that --

23          THE COURT:  Overruled.

24  A.   No, that's not true.  The degree is in clinical

25  psychology.

1    Q.   It's fair to say you have no accreditation by the

2    American Psychological Association in a subcategory of

3    clinical psychology?

4    A.   The school I graduated from is accredited, and the

5    degree is in clinical psychology.

6    Q.   Doctor, my question is, you are not a member of any

7    sub-board of the American Psychological Association

8    affiliated with clinical psychology, are you?

9    A.   A sub-board?  I don't know what you mean.  I mean, in

10   terms of the APA --

11   Q.   Area of specialization, you're familiar with that,

12   right, Doctor?

13   A.   I'm in Division 41 of the APA, which is the law and

14   psychology.  If that's what you mean by a sub-board, that's

15   the sub-board.

16   Q.   Doctor, when is Mr. Shields going to reoffend?

17   A.   I don't know.  I conducted a risk assessment.  I didn't

18   consult a crystal ball or the lumps on his head.

19   Q.   Well, is he going to reoffend in the first three years

20   while he's on intensive probation with conditions?

21   A.   He did the last time.

22   Q.   Well, my question is, is he going to reoffend in a

23   sexual manner in the next three years, Doctor?  Yes or no.

24   A.   I don't know.

25   Q.   It's fair to say you have no ability to testify when

1    Mr. Shields is going to reoffend?

2    A.   Yes, that's fair to say.

3    Q.   It's fair to say that the actuarials that you use,

4    under the best interpretation, doesn't even get you over the

5    50 percent threshold for fifteen years, right?

6    A.   It's a moderate predictor, yes.

7    Q.   And in fifteen years, and, really, let's just say

8    fifteen years from when Mr. Shields gets off intensive

9    probation, he'll be 65, right?

10             MR. GRADY:  Objection, your Honor.

11             THE COURT:  Overruled.

12   Q.   What's the recidivism rate for a 65-year-old

13   extrafamilial child molester, if you know?

14   A.   I don't know off the top of my head, but I imagine the

15   rates drop precipitously after age 60.

16   Q.   Less than five percent, right?

17   A.   I was going to say two actually, but I didn't have the

18   direct data.  The chart you're putting up there doesn't

19   really give exact numbers.

20   Q.   Now, if you can go and draw a kind of imaginary line

21   across 5 percent over here to that figure -- I'm sorry.

22   A.   No, you're right.

23   Q.   No, actually, I think that Mr. Grady misdrew the line

24   here, and the last one is -- this is the line for --

25             THE COURT:  Let me ask you this:  Where do you get

1    the figure fifteen years for intensive probation?

2            THE WITNESS:  I don't know.  I thought --

3    Mr. Swomley asked me the question.  I thought it was three

4    years he's on probation.

5            MR. SWOMLEY:  Fifteen years from the end of the

6    intensive probation was my question.

7            THE COURT:  I'm sorry, I misunderstood the

8    question.  So his intensive probation from Federal Court is

9    three years.  And so now you're asking about what will

10   happen fifteen years after he gets off of it?  Is that what

11   the question is?

12   Q.   Right, the recidivism data that you are using suggests

13   in fifteen years, the people that Mr. Shields, you say,

14   belongs in the group of, fifteens year out reoffend at a

15   rate of 52 percent, right?

16   A.   Well, I think if we're going to be exact about

17   statistics, which is not my strong suit, but what I know

18   about the Static-99 is that of that 52 percent that reoffend

19   at fifteen years out, 39 percent of the 52 percent

20   reoffended within the first five years.

21   Q.   All right, let's take that number for a moment.

22   A.   Okay.

23   Q.   Actually, we'll take that number in two seconds.  The

24   reality is, in fifteen years, the group that Mr. Shields

25   finds himself in reoffends at a rate of about 5 percent, a

1    little less, right?

2    A.   Yes.

3           MR. SWOMELY:  And I did want, your Honor, for the

4    record to note that the line Mr. Grady drew credits us a

5    little bit more than we deserve here in terms of risk; that

6    the more sloping thing that I circled that is actually the

7    trajectory of extrafamilial.

8           MR. GRADY:  I wouldn't want to be accused of

9    slanting, so I apologize for my mistake.

10   Q.   Doctor, you know that when you are looking at an

11   actuarial that has Mr. Shields's risk category below

12   50 percent, you're here telling a jury that you can testify

13   to, I believe a reasonable degree of professional certainty?

14   A.   Yes.

15   Q.   Now, your data has yet less than 50 percent, meaning --

16   A.   Well, no, he scores over 50.  He scores in that

17   52 percent category out at fifteen years.

18   Q.   Well, you wanted to use the five-year time gate,

19   Doctor.

20   A.   Oh, I see what you mean.  Well, I think what I was

21   saying was that of that 52 percent, 39 percent recidivate

22   within the first five years.  And I think that --

23   Q.   Taking your numbers, Doctor -- that's what I'm trying

24   to do, move things along here -- taking your numbers, your

25   data can't have you saying he's reoffending more likely than

1    not.  And that's not the standard in this court, right?  The

2    standard is significant difficulty to a --

3    A.   It's actually serious difficulty.

4    Q.   Clear and convincing evidence of significant

5    difficulty, right?

6    A.   And I never mentioned "more likely than not."  And I

7    think what I -- well, I don't think.  I know, when I make my

8    recommendation to the jury, I think your original question,

9    that what I'm taking into account is not only the scores on

10   the Static-99, but also the totality of data present in

11   Mr. Shields's case, which includes the nature of his

12   offending, as well as the protective factors that we talked

13   about, including age.

14   Q.   Doctor, you just testified before the break that you

15   did not adjust the Static-99 upward or downward, you

16   accepted it.  And I am now taking you at your word and

17   asking you how, with an offense likelihood less than

18   50 percent, you can say to a jury to a reasonable degree of

19   professional certainty --

20            MR. GRADY:  Your Honor, objection.  He's now

21   arguing.

22            THE COURT:  Yes, sustained.

23            MR. SWOMLEY:  One moment.  I'm done.  Thank you.

24            MR. GRADY:  Very quickly.

25

1   REDIRECT EXAMINATION BY MR. GRADY:

2   Q.   Dr. Tomich, does any of the discussion regarding the

3   DSM changes with respect to behavior have any relevance to

4   this diagnosis whatsoever?

5   A.   No.

6   Q.   Okay.  And that's because he would meet the criteria

7   for the DSM-III diagnosis?

8   A.   Yes.

9   Q.   So any change between DSM-III and DSM-IV doesn't

10  matter?

11  A.   That's correct.?

12  Q.   Doctor, there have been some suggestions that

13  Mr. Shields needed to deal with his historical victimization

14  before being able to deal with sex offender treatment.  Do

15  you know, or maybe I could refresh your recollection about

16  whether or not he's made this -- whether he's recognized

17  this before?

18  A.   Not to my knowledge.

19  Q.   Okay.  I'm going to show you a police report Bates

20  stamped 700.  This is in evidence, one of the exhibits in

21  this matter.

22         MS. KELLEY:  Do you know the number of the

23  exhibit?

24         MR. GRADY:  Exhibit 11.

25         MS. KELLEY:  Thank you.

1   Q.   Now, this is -- let me just scroll up a little bit.

2   Now, Doctor, have you seen this document?

3   A.   Yes.

4   Q.   And can you tell us what this is?  What is it?  When is

5   it dated?

6   A.   It's a supplemental fourth report from the Bath Police

7   Department dated September 15, 1989.

8   Q.   Okay.  And as you've testified on direct, in September

9   of 1989, that was the first time Jeffrey Shields was ever

10  arrested for any of these three 1989 offenses, correct?

11  A.   Yes.

12  Q.   Okay.  And in this report, what does he indicate with

13  respect to his mental health counseling, if anything?

14  A.   He said he had been seeing a psychiatrist and asked to

15  call a counselor at the mental health center.

16  Q.   Okay.  So with respect to treatment for sex offending,

17  do you know -- well, certainly he hadn't been convicted or

18  arrested of anything to this point, correct?

19  A.   That's correct.

20  Q.   And he was treating with a psychologist or psychiatrist

21  at the time?

22  A.   Yes.  Well, he mentioned a psychiatrist, yes.

23  Q.   Okay.  That's some twenty odd years ago?

24  A.   Yes.

25  Q.   Okay.  I show you another item from Exhibit 5 in

1    evidence.  Have you seen this before?

2    A.   Yes.

3    Q.   Okay, what is it?

4    A.   It's a motion to correct or reduce sentence.

5    Q.   Okay.  Now, this will be in evidence, but -- now, this

6    is back from 1991, correct, Doctor?

7    A.   Yes.

8    Q.   Okay.  And in this document, what, if any, indication

9    is there that Jeffrey Shields wished to treat his past

10   history or wished to, you know, treat and come to terms with

11   his past history of sexual abuse?

12   A.   Well, he says that when he reenters the community, he's

13   going to attend Sex and Love Addicts Anonymous, sexual

14   offender programming, and try to recover from his traumatic

15   childhood, which includes both emotional, physical, and also

16   sexual abuse.

17   Q.   Okay.  And is there something further?

18   A.   He says he was doing everything in his power to correct

19   that situation, and he feels that his own childhood abuse

20   was in part of a reason for the end result in the

21   perpetration of the crime.

22   Q.   Okay, what does that say about his recognition of his

23   past history of abuse as an issue vis-a-vis his mental

24   health care since 1991?

25   A.   It says that he recognizes his history of childhood

58ebae98-583d-411e-b341-eb5986c3d9f3

Page 106

1    abuse was at least part of the reason for his perpetration

2    of the crime.

3    Q.   And that he intended to seek treatment for it?

4    A.   That's what it says.

5    Q.   Back in 1991?

6    A.   Yes.

7    Q.   Doctor, there was a great deal of discussion of reports

8    about the 12-year-old.  Now --

9              MR. GRADY:  If I can just have a moment.

10   Q.   Do you recall the page number on which your version of

11   the facts occurred?

12   A.   I'm sorry?

13   Q.   With respect to the 12-year-old and the allegation that

14   he was placed in fear, do you remember what the page number

15   was?

16   A.   I don't.

17   Q.   Doctor, there's been some discussion of the fact that

18   the child was a 12-year-old prostitute.  Does that make it

19   okay?

20   A.   No.

21   Q.   Doctor, there's been some discussion or there was some

22   issues raised on cross about your reviewing the facts of the

23   crime.  Why are the facts of the crimes relevant, or why are

24   they relevant here?

25   A.   Well, I think I testified that the nature of

1    Mr. Shields's behavior is important in terms of determining

2    risk; that when one does a risk assessment, one goes beyond

3    just looking at the static risk factors.  I want to know if

4    there's a pattern involved in his criminal activity, whether

5    he did do so as a result of a sexual arousal pattern, or a

6    result of some other reasons.  In order to do that, one must

7    look at the nature of the criminal behavior itself.

8    Q.   Okay.  Doctor, there's been some discussion of bulk

9    downloading of child pornography.  If you had had an

10   opportunity to interview Mr. Shields, could you have asked

11   about that?

12   A.   Yes.

13   Q.   Okay, but you weren't given that opportunity?

14   A.   No.

15           MR. GRADY:  Thank you.  I have nothing further,

16   your Honor.

17   RECROSS-EXAMINATION BY MR. SWOMLEY:

18   Q.   Briefly, Doctor, Florida Probation -- I'm sorry, let me

19   actually use the exhibits that were discussed first.  You

20   were shown just a second ago Exhibit 11 with respect to

21   Mr. Shields having already gotten treatment for his own

22   victimization, right?

23   A.   Yes.

24   Q.   And you were shown that he said he wanted to see his

25   psychiatrist, right?

1   A.   Yes.

2   Q.   And you know that he was returned from Florida on the

3   obscene phone call matter?

4   A.   Yes.

5   Q.   And as a condition of that, he went to Catholic

6   Charities and saw someone for his offending behavior, not

7   for his own victimization, right?

8   A.   I don't recall that specifically.

9   Q.   Well, you know chronologically this event postdates the

10  obscene phone call case, right?

11  A.   Yes.

12  Q.   And do you know what he had to do as a result of the

13  obscene phone call case?

14  A.   I don't recall specifically.  Are you referring me to

15  the conditions of probation?

16  Q.   No.  I'm just referring you to the understanding that

17  he had when he left Florida from that conviction and had to

18  come back to Massachusetts.  Do you know anything about

19  that?

20  A.   I don't recall specifically.

21  Q.   Okay.

22  Q.   And do you know whether he did receive therapy to come

23  to terms with his own victimization at any point in time

24  after the 1989 convictions?

25  A.   Do I know that he --

1    Q.   He received therapy dealing with his own victimization

2    at any point in time after the -- well, they're really

3    convictions in 1990 but for the 1989 crimes?

4    A.   Well, that's what's implied in the 1991 document that I

5    was just shown, that he talked about he was getting therapy

6    for his past --

7    Q.   Do you know whether he did is what I'm asking you?

8    A.   I don't know for certain that that's the case.

9              MR. SWOMLEY:  No further questions.  Thank you.

10             THE COURT:  Thank you.

11             THE WITNESS:  Thank you.

12        (Witness excused.)

13             THE COURT:  Government?

14             MR. GRADY:  Your Honor, reserving the right to

15   submit additional evidence or exhibits that have been agreed

16   to.

17             THE COURT:  I can't hear you.

18             MR. GRADY:  Reserving the right to submit

19   additional evidentiary exhibits, the government has no

20   further witnesses, but will not presently rest until we put

21   in those --

22             THE COURT:  All right, so you rest short of some

23   exhibits you might not have put in?

24             MR. GRADY:  Yes.

25             MS. KELLEY:  That's fine with us about the

Page 110

1   exhibits.

2          THE COURT:  All right, your first witness.  Why

3   don't we just get started, and then we're going to take your

4   other witnesses out of order.

5          MS. KELLEY:  Okay.  Dr. Rypma.

6          THE COURT:  So there are some folks coming in from

7   out of town, most notably, we hope Dr. Graney, and maybe a

8   few others.  So because he's been here as their expert

9   watching, he's going to start so we don't lose any time, and

10  then we'll break for him and go to the others, okay?

11                      CRAIG B. RYPMA

12  having been first duly sworn, was examined and testified as

13  follows:

14         THE CLERK:  Would you please state your name and

15  spell it for the record.

16         THE WITNESS:  Yes.  Dr. Craig Blaine, B-l-a-i-n-e

17  Rypma, R-y-p-m-a.

18  DIRECT EXAMINATION BY MS. KELLEY:

19  Q.   Okay, Dr. Rypma, are you looking at a copy of your CV?

20  A.   I am.

21         MS. KELLEY:  Okay.  And we have a copy that's been

22  premarked and agreed to  I'd like to move into evidence,

23  your Honor.

24         MR. GRADY:  No objection.

25         THE COURT:  All right, what exhibit number?

1          THE CLERK:  Exhibit 3.

2          (Defendant Exhibit 3 received in evidence.)

3   Q.   Dr. Rypma, where do you live?

4   A.   I live in Des Moines Iowa.

5   Q.   And do you have any other homes?

6   A.   I do.

7   Q.   Kind of like John McCain, can you remember them?

8   A.   Yes, I can.

9   Q.   Okay, where else do you live?

10  A.   I have an office and home in Ellsworth, Maine, and I

11  have a place in Tempe, Arizona.

12         THE COURT:  Where's Ellsworth, Maine?

13         THE WITNESS:  Ellsworth, Maine, is about 25 miles

14  northeast of Bangor and about 25 miles southeast of Bar

15  Harbor.

16  Q.   What do you do for a living, Dr. Rypma?

17  A.   I'm a clinical and forensic psychologist.

18  Q.   And presently, at the present time, what does your work

19  consist of?

20  A.   I am exclusively in private practice.

21  Q.   Can you just tell the jury a little bit about your

22  educational background.

23  A.   Certainly.  I received a bachelor's degree in

24  psychology from Ohio University, a master's degree in human

25  development from the University of Maryland, and then a

58ebae98-583d-411e-b341-eb5986c3d9f3

1   doctoral degree in clinical psychology from the University

2   of Maryland at College Park.  I subsequently completed an

3   internship and residency through the Iowa Methodist Medical

4   Center in Des Moines Iowa.

5   Q.   And did you graduate with any honors?

6   A.   I did.

7   Q.   And what were those?

8   A.   Magna cum laude for my undergraduate degree.

9   Q.   And can you just say timewise, how long did your

10  master's degree take you?

11  A.   Two years.

12  Q.   And then how about your Ph.D.?

13  A.   Well, it was approximately a five- to seven-year

14  program.  The course work took five years, and then there

15  was the internship and residency.

16  Q.   Now, can you just briefly summarize your sort of

17  distant past employment for the jury.

18  A.   My distant past?

19  Q.   What did you do when you graduated from school?

20  A.   With my doctoral degree?

21  Q.   Yes.

22  A.   Yes, initially I was hired as a staff psychologist at

23  the hospital that I had been doing my residency at.  I

24  believe that was approximately 1988 without looking.  I

25  worked in the psychology department of that hospital for

1    approximately a year and then was given a job as the

2    clinical director of an adolescent inpatient unit at that

3    hospital.  I worked there for a while and then -- I have the

4    dates wrong.  I just realized that because I went into

5    privity practice full time in 1987.

6    Q.   So you were at the hospital a total of about two years?

7    A.   Correct.  Yes, ma'am.

8    Q.   And that would have been '85 to '87?

9    A.   '85 to '87, correct.

10   Q.   And can you just tell the jury, when you were working

11   on that adolescent unit, did that have anything to do with

12   sex abuse?

13   A.   Well, many of the adolescents that were hospitalized,

14   and I would estimate, and I don't have a hard number, but a

15   frequent cause of their hospitalization fundamentally had

16   been sexual abuse issues.

17   Q.   And what did you do with regard to those victims of sex

18   abuse?  What were your responsibilities?

19   A.   Well, I provided both group and individual treatment

20   and consultation to medical staff that were involved in that

21   program.  It was a multidisciplinary program involving

22   psychology, medicine, and social work.

23   Q.   Now, you said that by 1987 you were in private

24   practice?

25   A.   Yes.  I had actually started a small part-time private

1    practice in 1986, and then by 1987 left the hospital to do

2    full-time private work.

3    Q.   And at some point -- well, let me just ask you, what

4    did your private practice consist of?

5    A.   Well, at that point in time, it was a pretty general

6    psychotherapy practice.  I saw a mixture of diagnoses, both

7    children and adults.  Approximately within the year that I

8    had started my full-time private practice, one of the things

9    that I did was, I began consulting to the Department of

10   Corrections in what at that time was called the Intensive

11   Supervision Program, the ISP program, as it was referred to.

12   The ISP program was a program that any offender that was

13   deemed to be high risk for a number of reasons, general

14   violence included, were placed in.  And I consulted that

15   program for approximately a year until the State of Iowa

16   decided to start its own sex offender treatment program.

17             A request for proposal went out.  My practice bid

18   on that contract and was awarded that contract, and then

19   annually was awarded that contract up through 2007, to

20   initially develop the program but ultimately to run it and

21   to evaluate all the offenders that go into that program.

22   Q.   So for how many years did you have this contract to

23   provide services to the state?

24   A.   I think about nineteen years.

25   Q.   And were you the only provider?  You say you bid on it?

1   A.   My practice was the only provider, although my practice

2   was multidisciplinary at that time.

3   Q.   Okay.  And can you say what "multidisciplinary" means?

4   A.   Well, I was the owner of the practice.  There were

5   other psychologists, there were other social workers that

6   were employed at that private practice by me.

7   Q.   And when you provided these services for the state,

8   what exactly did you do there?  What were you doing to

9   provide?  I mean, did you have groups or -- what did it

10  consist of?

11  A.   Yes, it consisted -- well, first of all, specifically

12  me.  I did all of the initial psychosexual evaluations for

13  everybody entering that program over that nineteen-year

14  period.

15  Q.   And if I can just stop you, are these people who are

16  serving time in a state facility or out?

17  A.   These people were out, either on parole, having been

18  released from prison, or people who had been placed on

19  probation as a result of a sex crime.

20  Q.   And how did they get involved with your program?

21  A.   They were ordered there by the court.

22  Q.   And at any given, say, year, can you estimate how many

23  people were in that program, how many clients you had?

24  A.   There were -- I mean, it fluctuated, of course, based

25  on those being released from prison and those being

1   sentenced for various sex crimes, but it fluctuated between

2   70 and 85 people per year.

3   Q.   And can you just tell the jury briefly, how did you

4   provide treatment to them?  What did you do?

5   A.   Myself or the practice?

6   Q.   Excuse me, let me back up a minute.  You said that

7   first you would evaluate them?

8   A.   Yes.

9   Q.   And what would the evaluation consist of?

10  A.   Psychological testing and an analysis of other things,

11  like their amenability to treatment and their degree of risk

12  for being in the community, and for the purpose of placement

13  in that program.

14  Q.   And then what would you do for the treatment component?

15  A.   Well, we ran the practice as a whole.  There were

16  sometimes up to eight groups that were being run

17  simultaneously throughout any one-week period.  Myself

18  specifically in the early years of that practice did three

19  of the groups, and then later on two of the groups, and then

20  right at the end, I was only doing one because I had turned

21  a lot of the work over to staff members as my forensic

22  practice continued to grow.  I also provided individual

23  treatment to offenders from that program within the context

24  of the contract with the state.

25  Q.   And did you also or did your practice at this time also

1    provide treatment to victims of sex abuse?

2    A.   Well, my practice did.  I had stopped sometime --

3    Q.   Why did you stop?

4    A.   Well, after we had gotten the contract with the state,

5    it occurred to me that there would be potential conflicts

6    with victims being referred to me, especially if it were

7    ever to occur that I may also have a relative in that sex

8    offender treatment program.  So I brought in a specialist

9    that dealt specifically with child victims, and all of those

10   cases began going to her.

11   Q.   And this was just also physically within your office?

12   A.   She was housed physically within my office.  The group

13   treatment actually occurred at one of the facilities owned

14   by the Department of Corrections, and that changed from here

15   to there occasionally throughout the course of that nineteen

16   years.  The individual treatment did occur within our

17   offices.

18   Q.   And so in the course of this nineteen years, did your

19   responsibilities change at all through time with regard to

20   how you were treating those sex offenders, the treatment you

21   were providing to those sex offenders?

22   A.   When you say my responsibilities, I did less group

23   treatment, so I suppose it changed in that regard.

24   Q.   And what happened at the end of the nineteen years that

25   you no longer had the state contract?

58ebae98-583d-411e-b341-eb5986c3d9f3

1   A.   The state decided to hire staff in-house and begin to

2   operate the program internally and no longer outsourced that

3   contract.

4   Q.   So in 2007 you no longer were doing that work, right?

5   A.   For the state, that's correct.

6   Q.   Okay.  Now, with regard to the way you're testifying

7   now, who do you understand yourself to be testifying for

8   here?  Who's calling you?

9   A.   I understand that I am court appointed but requested by

10  defense.

11  Q.   Under the statute, correct?

12  A.   Correct.

13          THE COURT:  Well, as I understand it, you were

14  hired by defense, right, just as Dr. Tomich was hired by the

15  prosecution?

16          MS. KELLEY:  Can we be seen at side bar?

17          THE COURT:  Yes.

18  SIDE-BAR CONFERENCE:

19          MS. KELLEY:  That's not correct.

20          THE COURT:  I paid for it, but he's not a neutral,

21  agreed-upon court-appointed expert.

22          MS. KELLEY:  He is an expert under the statute

23  requested by the defense.

24          THE COURT:  Right, but I think it's misleading to

25  say I appointed him.  I paid for it.  I'm willing to say

Page 119

1   you're entitled to him, but you can't put him in the same

2   status as Plaud.

3              MS. KELLEY:  He's not in the same status as Plaud.

4              THE COURT:  Well, then make that clear.

5              MS. KELLEY:  Okay.

6              (End of side-bar conference.)

7   Q.   Okay, Dr. Rypma, you are not in the same status as far

8   as being court appointed as Dr. Plaud, correct?

9   A.   That's my understanding, yes.

10  Q.   Because you are being called by the defense in this

11  case, right?

12  A.   That's correct.

13             MS. KELLEY:  I think this might be a good place to

14  stop.

15             THE COURT:  Perfect.  All right, see you tomorrow.

16  Don't forget, tomorrow is the day we'll give you lunch and

17  we stay late.  We're going to stay till roughly 3:30 or

18  4:00, whenever we finish the witnesses, not later than 4:00

19  because I have another hearing.

20             THE CLERK:  All rise for the jury.

21             (Jury excused.)

22  SIDE-BAR CONFERENCE:

23             THE COURT:  So let's talk about scripting

24  tomorrow.  Who's coming?

25             MS. KELLEY:  Dawn Graney.  I think we'll put her

Page 120

1   on first.

2             THE COURT:  And so, roughly speaking, she's --

3             MS. KELLEY:  I think we might have an hour of

4   direct at the outside for her.

5             THE COURT:  Cross?

6             MS. STACEY:  Not more than an hour.

7             MS. KELLEY:  So let's say she's off by 11:00.

8             MS. KELLEY:  Raenae Moore.

9             THE COURT:  Assuming -- you know, I don't know if

10  it's the same juror, but actually people, we've had one

11  coming in at 9:15, so we're losing that 15 -- I know that

12  doesn't sound like a big deal, but we're losing that 15

13  minutes in there.

14            MS. KELLEY:  It's a big deal, especially tomorrow,

15  but --

16            THE COURT:  Excuse me.  Off the record.

17            (Discussion off the record.)

18            MS. KELLEY:  Then we're putting on Raenae Moore,

19  the halfway house case worker who's coming down from Maine,

20  and I think maybe 30 minutes on direct or maybe a little bit

21  more.

22            MS. STACEY:  I mean, I did her depo in less than

23  two hours, so it's going to be somewhere between

24  30 minutes --

25            THE COURT:  Who is she?

1          MS. KELLEY:  She was the case worker who

2    supervised Jeff at the halfway house in Maine.

3          THE COURT:  After the '89 -- which offenses?

4          MS. KELLEY:  Most recently when he was in the

5    community, he was at this halfway house in Maine.

6          THE COURT:  Oh, oh, oh, okay.

7          MS. KELLEY:  And it was from there that he got

8    taken into Devens to await the --

9          MS. STACEY:  She was his case manager.

10         MS. KELLEY:  She was his case manager.

11         MR. GRADY:  He got pulled back from a prerelease.

12         THE COURT:  Okay.

13         MS. KELLEY:  Then I have Dan Kelly from Maine in

14   probation.  He's going to testify about his conditions of

15   probation.  I'm thinking he's like a 45-minute to an hour

16   witness total.

17         THE COURT:  So now I'm getting lost here.  So

18   let's assume it's 11:30, and then the case worker is going

19   to be till when?

20         MS. KELLEY:  Well, I think we'll definitely be

21   done with the case worker and starting on the probation

22   officer by 1:00, don't you think?

23         MS. STACEY:  I do.

24         MS. KELLEY:  I mean, I don't know what your cross

25   looks like but --

Page 122

1        MS. STACEY:  Well, we just got the probation

2   officer and the detective, so we haven't spoken --

3        MR. SWOMLEY:  Your Honor, I'm supposed to be in

4   court at 2:00, so I'll just -- I'm not part of this.

5        MS. STACEY:  We haven't spoken to the -- we got

6   the names over the Labor Day weekend.

7        THE COURT:  Yes, but here's the issue:  We've got

8   to finish these people.

9        MS. KELLEY:  I intend to do that.  The other two

10  witnesses we have is the sex offender treatment guy who

11  works with the Probation Office in Maine, who would describe

12  the treatment Jeff would be receiving if he's out; and then,

13  lastly, this very short witness who's a police detective in

14  Portland who registers sex offenders there.  And she would

15  just describe, "Here's what you do to be on the registry,

16  here's how we supervise them," et cetera.

17       THE COURT:  Can we do this?  Can we script it,

18  though?  Can you just give times because -- I'm happy to do

19  all this, but because I'm taking Thursday off, I hate to

20  force these people to wait.

21       MS. KELLEY:  Well, can I just say, the reason I

22  was just having a conniption about Mr. Swomley going past

23  12:30 is, I wanted to be done with Dr. Tomich today so we

24  could definitely just squeeze all these people in.

25       THE COURT:  I know you'll do your best.  I'm just

1   simply saying, what we're going to try and do is -- unlike

2   most cases where if worse comes worse, people stay over a

3   night, here it would be two nights.

4          MS. KELLEY:  I don't want to do that to them.

5   And, also, the people from Maine can come and go in one day.

6   That's why we really want to get Dawn Graney on and off

7   because she's from North Carolina.  But I don't anticipate

8   any of those witnesses -- I mean, they're short, sweet.  I

9   don't think it's going to take a long time to cross them.  I

10  mean, you tell me if I'm wrong.

11         MS. STACEY:  And we haven't tried, but I don't

12  really know what the sex offender in Maine kind of testimony

13  is about.  I mean, maybe we can reach some stipulations as

14  to the --

15         MS. KELLEY:  Well, the witness is coming.  I want

16  the witness on.  She is the person who will see Jeff every

17  90 days, take any pictures, et cetera, so --

18         THE COURT:  Okay, we don't need this on the

19  record.  Any, you can do that.  I'm just --

20         MS. KELLEY:  I want her on, and I think it's

21  important to our case to have her on, but she's not a long

22  witness.  There's no reason why she'd take a long time.

23         THE COURT:  Okay.  And then we're going to do

24  Rypma on Friday morning.

25         MS. KELLEY:  I mean, it may well be we can get

58ebae98-583d-411e-b341-eb5986c3d9f3

1   through Rypma all day Friday.  I don't know.

2            MS. STACEY:  I don't know.

3            MS. KELLEY:  I mean, I'll just clue the Court in.

4   One thing that may slow us down on Dr. Rypma's cross is if

5   the government has transcripts of his prior testimony they

6   intend to use to impeach him.  I don't know what the answer

7   to that is.

8            THE COURT:  But you'll need Friday for him on

9   direct.

10           MS. KELLEY:  I assume all day.

11           THE COURT:  Maybe a little less now that we've

12   gotten fifteen minutes.

13           MS. KELLEY:  Maybe less, maybe less, but at any

14   rate --

15           THE COURT:  Excuse me.  When should we do the

16   charge conference?  Robert, what do we have on Friday

17   afternoon?

18           THE CLERK:  I think we -- we have a 2:00 o'clock

19   criminal conference, and that's it, so 2:30-ish?

20           THE COURT:  Okay, so we'll plan on the charge

21   conference then, and I'm thinking, the way we're going, we

22   may actually get to them on Monday.

23           MR. GRADY:  There is one issue.  Go ahead.

24           MS. STACEY:  No, no, that's okay.  I will be

25   crossing Dr. Rypma and doing these Maine witnesses, but

58ebae98-583d-411e-b341-eb5986c3d9f3

1  there is the other issue with whether or not -- and that's

2  where Ms. Kelley and I were when court started -- we're

3  trying to get an answer whether or not Mr. Shields is

4  testifying.  We don't know that as we stand here now.

5        THE COURT:  Oh, I had assumed he actually wasn't,

6  but maybe I'm wrong.

7        MS. KELLEY:  Well, we were assuming Mr. Shields

8  would not testify.  You know, our feeling is, if he sits

9  through this and is feeling strongly that he wishes say

10  something and testify, we can't really prevent him from

11  doing so.

12        THE COURT:  Of course not.  It's just a scheduling

13  issue.

14        MS. KELLEY:  Right.  I mean, we're talking to him

15  about that.  I really don't know until our case gets going

16  and we see how that goes how he's going to feel, so that's

17  what I've been telling the government.

18        MR. GRADY:  Your Honor, we'd ask for 48 hours

19  notice.  It is a civil case.

20        THE COURT:  Excuse me.  This is what I'm going to

21  do:  If he takes the stand, then I will not make them cross

22  that day.  I will give them that night to prepare.

23        MR. GRADY:  Thank you, your Honor.

24        MS. STACEY:  And if he takes the stand, we never

25  deposed him and --

1          THE COURT:  Well, you can ask that.

2          MR. GRADY:  You did have an instruction earlier on

3    that we could bring out the fact that he refused to be

4    deposed and refused to answer question --

5          THE COURT:  Yes, yes, yes.  It's a civil case,

6    yes.

7               (End of side-bar conference.)

8               (Adjourned, 1:10 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5

6

7          I, Lee A. Marzilli, Official Court Reporter, do

8  hereby certify that the foregoing transcript, Pages 1

9  through 126 inclusive, was recorded by me stenographically

10 at the time and place aforesaid in Civil Action No.

11 07-12056-PBS, United States of America V. Jeffrey Shields,

12 and thereafter by me reduced to typewriting and is a true

13 and accurate record of the proceedings.

14

15          In witness whereof I have hereunto set my hand

16 this 13th day of September, 2008.

17

18

19

20

21

            /s/ Lee A. Marzilli
22         _____
            LEE A. MARZILLI, RPR, CRR
23 OFFICIAL COURT REPORTER

24

25

58ebae98-583d-411e-b341-eb5986c3d9f3