```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                              )
              Petitioner      )
                              )
         -VS-                 ) CA No. 07-12056-PBS
                              ) Pages 1 - 199
JEFFREY SHIELDS,              )
                              )
              Respondent      )
```

JURY TRIAL - DAY SIX

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
September 10, 2008, 9:10 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2         MARK J. GRADY, ESQ. and EVE A. PIEMONTE–STACEY, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the Petitioner.
4
          PAGE KELLEY, ESQ, Federal Defenders,
5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
     for the Respondent.
6
          JOHN G. SWOMLEY, ESQ. Swomley & Associates,
7    227 Lewis Wharf, Boston, Massachusetts, 02110–3927,
     for the Respondent.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2  WITNESS                    DIRECT    CROSS    REDIRECT    RECROSS

3  Dawn Graney                  7        60        87          99
                                                   100
4
   Melissa Raenae Moore       101       126
5
6  Daniel P. Kelly            133       150
7
   Stephen P. Thomas          156       174
8
   Kelly Gorham               182       194       197
9

10  EXHIBITS          FOR IDENTIFICATION      RECEIVED IN EVIDENCE

11
    Respondent
12
    103                                           11
13
14  105                                           56
15
    104                                           57
16

17

18

19

20

21

22

23

24

25

1             P R O C E E D I N G S

2             THE COURT:  We lost someone.

3             THE CLERK:  Page.

4             THE COURT:  Yes, apparently Mr. Alba tells me that

5      Ms. Kelley may have said something that a juror may have

6      overheard.  What do you want me to do about it?  Do you know

7      what I'm talking about?

8             MR. SWOMLEY:  I have no idea what you're talking

9      about.

10            MS. STACEY:  I know what you're talking about.  I

11     mean, I suppose I suggest inquiring, without mentioning what

12     it was that she said, if they overheard any statements made

13     by any counsel in this case.

14            THE COURT:  The way I heard it -- it's like

15     playing telephone -- is she said something like, "Predicting

16     sexual recidivism is bullshit," or words to that effect, and

17     she thinks that maybe a juror overheard it.

18            MS. STACEY:  It's my understanding that she was

19     walking down the hallway with Dr. Graney.  She said, "I'm

20     glad you're not one of those psychologists that predicts

21     recidivism.  It's such BS," and then that's when she saw the

22     juror.

23            THE COURT:  We're talking about you.  The question

24     is, what do you want me to do about it?

25            MS. KELLEY:  Well, I don't know if your Honor

1   wants to speak to the juror or just leave well enough alone.

2           THE COURT:  Well, my first instinct was, of course

3   she thinks that, so it's not going to be any big shock to

4   this juror.  I mean, I sort of hate to stir the pot up in

5   case somebody didn't hear it; but if you want, I'll ask the

6   general question, "Did anyone hear any comments made by any

7   attorneys?"  Your call.

8           MS. KELLEY:  I just wonder if you should qualify

9   that by saying, "Will that affect your views of the case

10  or --"

11          THE COURT:  First, I'll get to whether or not

12  anyone heard anything.

13          MS. KELLEY:  Okay, yes.

14          THE COURT:  And then if anyone did --

15          MS. KELLEY:  I mean, I hate to single out the

16  juror for fear he'll feel put on the spot or that there's

17  some --

18          THE COURT:  Just my sense is so they know that?

19  At first, when I heard that some juror may have heard

20  something you said, I thought maybe it would be something

21  that they otherwise might not know about Mr. Shields, in

22  which case we'd have a big problem.

23          MS. KELLEY:  Yes.  No, it's just my views --

24          THE COURT:  Your views on this subject are real

25  clear.  I'm not too worried about it, but I'm happy to make

1   the inquiry of the jurors when they get in here.

2          MS. STACEY:  Thank you, your Honor.  We'd like

3   that.  Thank you.

4          THE COURT:  Good.  Is Dr. Graney here?

5          MS. KELLEY:  She's here, and I'm going to bring

6   her in.  Do you want me to go ahead and have her on the

7   stand?

8          THE COURT:  Why don't we just wait till we talk

9   after the jury, but she should be in the courtroom.  Okay,

10  let's get this jury.

11         (Discussion off the record.)

12         THE CLERK:  All rise for the jury.

13         (Jury enters the courtroom.)

14         THE COURT:  Good morning to you all.

15         THE JURY:  Good morning.

16         THE COURT:  Did anyone speak about this case or

17  see anything in the press about it?  I find the jury has

18  complied with my instructions.

19         One other question:  Did anybody overhear any

20  conversation with one of the attorneys by accident?

21         THE JURY:  No.

22         THE COURT:  If anyone did, please -- okay, fine,

23  great.  Next witness.

24         MS. KELLEY:  Good morning.

25         THE JURY:  Good morning.

1    MS. KELLEY:  We're calling Dr. Graney to the

2  witness stand.

3    THE COURT:  Remember, we're we're taking her out

4  of order because she's out of town, so Dr. Rypma will get

5  back on the stand afterwards.

6                    DAWN GRANEY

7  having been first duly sworn, was examined and testified as

8  follows:

9    THE CLERK:  Would you please state your name and

10  spell it for the record.

11    THE WITNESS:  Dawn, D-a-w-n, Graney, G-r-a-n-e-y.

12  DIRECT EXAMINATION BY MS. KELLEY:

13  Q.   Okay, Dr. Graney, are you comfortable there?

14  A.   Yes.

15  Q.   I think you might want to push the microphone up a

16  little closer to your mouth when you talk so we'll be able

17  to hear you.

18  A.   Okay.

19  Q.   Dr. Graney, where are you from?

20  A.   I currently reside in North Carolina.

21  Q.   And what do you do in North Carolina?  What's your job?

22  A.   I'm a psychologist at the Federal Correctional

23  Institution in Butner.

24  Q.   Okay, I just want to talk a little bit about your

25  background.  Where did you go to school?

1    A.    I received my bachelor's degree at the University of

2    Maryland, Baltimore County, and my master's degree and my

3    doctorate degree at the California School of Professional

4    Psychology.

5    Q.    And what is your doctorate degree?

6    A.    In clinical psychology with a specialization in

7    forensics.

8    Q.    And after you graduated -- well, first of all, what

9    year did you graduate?

10   A.    I completed internship in 2001.

11   Q.    And then what did you do?

12   A.    Did a post-doc in forensic work from 2001 to 2002.

13   Q.    And when you say forensic work, what do you mean?

14   A.    Primarily doing competency and responsibility

15   evaluations for the courts.

16   Q.    And who did you do that with?

17   A.    Federal Bureau of Prisons as well.

18   Q.    And then what did you do after that?

19   A.    In 2002 I took a staff psychologist position at the

20   Federal Correctional Institution, where I am currently

21   employed.

22   Q.    And which Federal Correctional Institution is that?

23   A.    In Butner.  It's called Federal Correctional

24   Institution, Butner, North Carolina.

25   Q.    And can you just give us a sense of how big that

1   institution is?

2   A.   That particular institution houses approximately 800

3   inmates, although we are one in a complex of five

4   facilities, so it's a very large correctional complex.

5   Q.   And what is your title there at Butner?

6   A.   Currently I'm the mental health programs coordinator.

7   Q.   And what does that mean?  What are your

8   responsibilities there?

9   A.   We have two mental health programs that I oversee the

10   clinical services provided to those inmates, and then I also

11   myself provide clinical services to the general population

12   inmates, who are inmates who are sentenced but not

13   participating in any particular programming.

14   Q.   And when you say you provide counseling to people, what

15   exactly do you do?

16   A.   We do standard evaluations as well as provide brief

17   counseling or individual therapy to assist them in issues

18   that may affect their incarceration or after their

19   incarceration.

20   Q.   And when you say brief counseling, how do you define

21   that?

22   A.   Typically brief functioning is when you see someone for

23   sessions, maybe a few sesssions, five, six times.  It's not

24   typically long-term, ongoing therapy.

25   Q.   Now, are there a lot of resources at Butner, how does

1    that work, with regard to counseling?

2    A.   There are a lot of --

3              THE COURT:  Is that that you personally do the

4    grief counseling, or those are the programs that you

5    oversee?

6              THE WITNESS:  I oversee two programs, and then I

7    also personally do the counseling.

8              MS. KELLEY:  This is "brief" with a B.  It's not

9    "grief."

10             THE COURT:  Oh, I thought it was "grief."

11             MS. KELLEY:  Well, I think there is a lot of grief

12   there, right.

13             THE WITNESS:  There is grief, but this is brief

14   counseling.

15   Q.   The counseling that you do is brief counseling?

16   A.   Brief, yes, yes.  The institution as a whole has quite

17   a few resources for the inmate population.  As far as the

18   general population that I work with, there's anywhere from

19   350, I'd say, to 400 inmates that I'm primarily responsible

20   for.

21   Q.   And when you say you are primarily responsible for up

22   to 400 people, what does that mean?

23   A.   I complete a lot of the standard paperwork that we do

24   on any new inmate coming into the institution; but if

25   there's also a need for services, I'm usually either the one

1    to provide those services or will assign those to another

2    available clinician, or we also have psychology interns who

3    will oftentimes assist in providing clinical services.

4    Q.   Is it fair to say you're really busy?

5    A.   Yes, very busy.

6         MS. KELLEY:  And, your Honor, I would like to move

7    that Dr. Graney's resume go into evidence.

8         MS. STACEY:  No objection.

9         MS. KELLEY:  That's 101.

10        MR. SWOMLEY:  No, 103 for the record.  I put in

11   101 and 102.

12        MS. KELLEY:  Okay, 103.  Pardon me.

13        (Respondent Exhibit 103 received in evidence.)

14   Q.   And I'm not quite sure I asked you this, but how long

15   have you been doing that job at Butner now?

16   A.   Six years.

17   Q.   Now, at some point when you were at Butner working, did

18   you meet Mr. Shields here?

19   A.   I did.

20   Q.   And how did he come to your attention?

21   A.   He was seen for a standard intake screening, which is

22   basically, when a new inmate arrives, a psychologist meets

23   with them to determine if there are any mental health issues

24   that we need to address; and it was at that time that he

25   reported a history of some mental health issues and also had

1    requested services.

2    Q.   And when you say he requested services, what precisely

3    does that mean?

4    A.   He had asked for counseling to address some of these

5    issues.

6    Q.   And is this common for people to seek out counseling?

7    A.   I wouldn't say that it's common.  You know, a large

8    percentage of our inmates, despite possibly having a need

9    for some type of treatment, do not always request those

10   services; but occasionally when someone new does arrive to

11   the institution, they will request services from the very

12   beginning.

13   Q.   And as far as you know from your records, from the very

14   beginning when he arrived at Butner, he was asking for help,

15   correct?

16   A.   Yes.

17   Q.   And did you proceed then to follow up with that

18   request?

19   A.   I did.

20   Q.   And did you talk to him about his problems and why he

21   wanted help?

22   A.   I did.

23   Q.   And what did he tell you?

24   A.   May I refer back to the notes?

25   Q.   Yes, you may.  First of all, did you keep notes of your

1    contacts with Mr. Shields?

2    A.    I did, yes.

3    Q.    And is that part of your practice to do that?

4    A.    Yes.

5    Q.    Do your notes show the first date that Mr. Shields made

6    contact with the counseling services?

7    A.    He was seen for intake by an intern on August 2, 2004,

8    and then my first contact with him was on August 19.

9    Q.    And what is it he requested on the 19th?

10   A.    At that point he talked about a history of childhood

11   sexual abuse, some family issues such as witnessing the

12   suicide of his grandfather, not having a father present in

13   his life, a history of depression, and he had expressed just

14   a desire to address these issues in general.

15   Q.    Now, when he talked to you about his childhood sex

16   abuse, you talked to him in more detail later about that

17   part of his life, correct?

18   A.    Yes.

19   Q.    And did you have any sense he was malingering or making

20   anything up with you?

21   A.    No.  He was very consistent in what we discussed, and

22   you could tell it was a very difficult topic for him to

23   discuss as well.

24   Q.    And did he tell you roughly the onset of the age at

25   which he was abused?

1    A.   I don't remember specific age.  I know it was a young

2    age, maybe like a school-aged child.  I don't remember off

3    the top of my head a specific age at which the abuse

4    started.

5    Q.   And we'll get a little bit more into that later, but

6    can I also ask you about these other issues he raised

7    initially.  What were his family problems, if you remember?

8    A.   Like I said, he had a father that was absent from his

9    life.  He had witnessed the suicide of his grandfather at a

10   young age, and he had a mother who, although I could tell he

11   loved her and cared for her very much still, at the time

12   that I was working with him, felt that she had not always

13   maybe protected him through his life and had maybe known

14   about some of the abuse and had not intervened.

15   Q.   And when you say his father abandoned the family, did

16   he ever tell you any particular memories he had of his

17   father's not being present in the family?

18            MS. STACEY:  Objection.

19            THE COURT:  Overruled.

20   A.   I seem to recall him talking a couple of times about

21   the memory of his father telling him he would come spend

22   time with him or come spend the day with him to pick him up,

23   and that he would stand in the driveway for hours waiting

24   for his father who never showed.

25   Q.   So at this initial meeting on August 19 of 2004, did he

1  tell you also about his own offense history?

2  A.   Yes, he did.

3  Q.   And what did he tell you about that?

4  A.   At that time he had told me that he had been convicted

5  of unlawful sexual contact on two prior occasions.

6  Q.   Okay.  And you know that in fact he has more individual

7  convictions than that, correct?

8  A.   Yes.

9  Q.   And you know the details of those convictions, right?

10  A.   I know the basics of them, yes.

11  Q.   And you do know, however, that he was sentenced on two

12  prior dates, correct?

13  A.   Yes.

14  Q.   So he essentially served two prior sentences for

15  unlawful sexual contact?

16  A.   Yes.

17  Q.   And you also understood, obviously, that he was in

18  prison serving 57 months for child pornography offenses,

19  right?

20  A.   Correct.

21  Q.   And you had access to all the information, like his

22  presentence report, right?

23  A.   Yes.

24  Q.   So you knew the details of that offense?

25  A.   Yes.

1  Q.   Let me just ask you on this topic, was it really

2  important to you to go over point by point his prior

3  offenses with him?

4  A.   In my role, with the type of treatment I provide, that

5  was not as important as addressing some of these other

6  issues, like his depression and family history.

7  Q.   And why not?

8  A.   Butner at that time had a sex offender treatment

9  program, and the clinicians like to keep a pretty strict

10 division of the type of services that are offered because

11 you don't want to confuse treatment issues basically.  So if

12 I was working with someone in the general population who had

13 a history of sex offending, while they might discuss that at

14 some level during sessions, I did not provide treatment

15 specifically for that issue.  I would encourage them to

16 address that in the sex offender treatment.  So I might

17 know, again, some generalities about their offense history,

18 but I never went into detail discussing that or bringing up

19 that information.

20 Q.   Now, if I could still direct you to your notes from

21 Thursday, August 19, did Mr. Shields talk about his state of

22 mind at the time of his pornography offense?

23 A.   If I can read through this one moment.

24          (Witness examining document.)

25          MS. KELLEY:  I don't know if it would help, your

1   Honor, if I put this up on the screen.  There's no objection

2   to that.

3            MS. STACEY:  I have no objection.

4   Q.   Let's just put your notes up here, Doctor?

5   A.   Okay.

6   Q.   I'll just direct you to the third paragraph there.

7   Okay, so what did he tell you he experienced around the time

8   of that pornography offense?

9   A.   Did report experiencing some depressive symptoms, and

10   did talk about realizing that he did not want to reoffend,

11   and he thought that the pornography was kind of a harmless

12   act.

13   Q.   Did you talk to him about that?

14   A.   I don't remember specifically.  I know we talked at

15   various times throughout the couple of years that we were

16   together about his need for sex offender treatment, even

17   with the Internet charges.

18   Q.   Well, did you ever specifically address with him his

19   idea that pornography doesn't harm anyone, child

20   pornography?

21   A.   I would say, based on my interaction with other

22   individuals with similar offenses, I'm sure that I did.  I

23   don't specifically note it in my notes, and I don't know a

24   specific occasion that we had that conversation.

25   Q.   What would you in your practice say to an inmate that

1   says, "Oh, child pornography pornography isn't harmful to

2   anyone"?

3   A.   I do point out that in fact the children that are in

4   these pornographic images are continuing to be abused, and

5   that their viewing pornography perpetuates that kind of

6   behavior and attitude.

7   Q.   Now, did Mr. Shields talk to you on this occasion about

8   how he felt about himself?

9   A.   He did.

10  Q.   And what did he tell you?

11  A.   In general, he described having a poor self-image.  He

12  used the words "ugly, dirty, cheap," and just had a

13  generally poor view of himself as a person.

14  Q.   And in your role as his counselor, is this kind of

15  self-attitude typical of certain types of people?

16  A.   For some inmates.  Some inmates are very ashamed of the

17  behaviors they've engaged in, the choices they've made in

18  their lives; and that does affect, of course, the way they

19  see themselves, the way that they interact with the world

20  around them.

21  Q.   And does having been victimized oneself sometimes lead

22  to these types of feelings?

23  A.   Yes, that can contribute to those feelings.

24  Q.   And you diagnosed him as having borderline personality

25  disorder tentatively at that stage?

1   A.   Yes, and that was, again, the first contact that I had

2   directly with him, and some of the statements he made, some

3   of the information he provided about his history raised that

4   as a possible diagnosis.

5   Q.   And after --

6           THE COURT:  So these notes are all from your first

7   meeting with him?

8           THE WITNESS:  Yes, from the August 19 contact.

9           THE COURT:  In 2004?

10          THE WITNESS:  Uh-huh.

11   Q.   And for how long did you see Mr. Shields?

12   A.   On this given day?

13   Q.   I'm sorry, in totality, what period of time?

14   A.   For two years.

15   Q.   And how often did you see him during those two years?

16   A.   It was at least once a month.  Toward, I'd say,

17   probably the -- somewhere in 2005, the beginning or middle

18   of 2005, we were seeing each other usually two, maybe three

19   times a month.

20   Q.   So we're talking about maybe fifty visits, face-to-face

21   visits you had with him one on one?

22   A.   I'd say rought, yes.

23   Q.   And then did you also see him in other contexts in the

24   prison?

25   A.   Yes.

1    Q.    And how did that happen?

2    A.    My office is actually on an inmate housing unit.  The

3    inmates actually roam pretty freely throughout the day, so

4    you see them going to work, you see them interacting with

5    their peers, you see them interacting with other staff.  So

6    I often have opportunity to observe the individuals I work

7    with oftentimes when they don't know I'm observing them.  So

8    I see them kind of just in their day-to-day activities.

9    Q.    And was this true with Jeffrey Shields?

10   A.    Yes.

11   Q.    And later on, how did you feel about this tentative

12   diagnosis at first?

13   A.    I don't think he fit the diagnosis fully.  There may

14   have been some traits of that, but I really think some of

15   the behaviors that he had described were better accounted

16   for by his history of abuse and his depression.

17   Q.    And just in case the jury is wondering, can you just

18   define borderline personality disorder.

19   A.    Personality disorders are different than like a major

20   form of mental illness like schizophrenia or bipolar

21   disorder.  They're a collection of traits that affect,

22   again, one's emotions, how they view themselves and how they

23   interact with other people.

24            Individuals with borderline personality disorder

25   tend to have a very unstable view of their self-image.  They

1    tend to have very unhealthy relationships.  It's either a

2    love-hate relationship.  There's no gray area with them.

3    They tend to have a lot of mood instability, self-injurious

4    behaviors, which what you often see with borderline

5    personality disorder individuals is cutting behavior.  Just

6    in general their way of relating to the world is very

7    unstable and for them very chaotic.

8    Q.   And, as you said, later on you thought it wasn't so

9    much borderline personality disorder as some of these other

10   causes that were bringing out these behaviors?

11   A.   Yes, because, you know, a history of childhood sexual

12   abuse, depression, of course, those things can affect your

13   view of yourself, how you relate to people, how you trust

14   other people, how you connect with other people, mood.  So

15   it can have -- I can see where there would be some

16   similarities there.

17   Q.   And was it clear to you from this very first meeting

18   that Mr. Shields had some pretty serious problems with

19   depression?

20   A.   He did.

21   Q.   And what were those symptoms that you observed?

22   A.   Initially, in my early contacts with him, he was

23   typically very irritable, just had kind of a very negative,

24   pessimistic, bitter attitude about himself, about things in

25   his life.  He described being very helpless, feeling

1    hopeless, feeling worthless, feeling like he didn't deserve

2    good things in life.  He was not very engaged with other

3    people, spent more time isolating himself, and he did have a

4    history of suicide attempts years prior to when I had met

5    him.

6    Q.   So what were your goals with Mr. Shields as you set out

7    on this two-year course with him of counseling him?

8    A.   My initial goal was to address the depression because

9    if somebody is depressed enough that it's affecting their

10   thinking, it's affecting their motivation, their

11   concentration, their daily mood, it's very difficult for

12   them to become engaged in the therapeutic process.  They

13   either don't have the energy to do that, they don't have the

14   desire to do that, they don't think that they deserve to be

15   better or feel better.  So initially addressing those

16   depressive symptoms and trying to get those under control

17   was the initial goal.

18   Q.   Dr. Graney, if a sex offender is in prison serving his

19   time, isn't the point that they're supposed to be miserable,

20   they're supposed to be punished, they're supposed to feel

21   bad?  Why are you trying to make somebody feel better in

22   prison?

23            MS. STACEY:  Objection.

24            THE COURT:  Sustained.

25   Q.   Why are you working with these inmates to improve their

1   mental health?

2   A.   One, it's to manage them within the prison environment,

3   to make it a safer environment for the staff and inmates,

4   and to make their time there more productive, but I also

5   feel I have a responsibility to help prepare them for return

6   to society.  And a large number of inmates come into the

7   system with various histories of abuse, substance

8   dependence, family turmoil, you know a whole range of very

9   unhealthy issues; and when they see themselves as damaged,

10  when they have a lot of shame, when they have a lot of

11  guilt, it's very hard to help them see that there are other

12  ways of living their lives and that they are worthy of

13  something different.  And so the incarceration itself is the

14  punishment; the time separated from society and family is

15  itself the punishment.  My goal is to help them hopefully be

16  able to identify a better side of themselves, to live a

17  healthier and more productive life-style, and hopefully a

18  noncriminal life-style when they return to free society.

19  Q.   Now, Dr. Graney, at some point early on, you started

20  seeing -- this first meeting was August 19 of 2004, right?

21  A.   Correct.

22  Q.   And at some point you asked Mr. Shields -- if I can

23  just direct you to the January 7 counseling session, you

24  were talking about Mr. Shields both being a victim and a

25  victimizer; is that correct?

1    A.    Correct.

2    Q.    And you talked with him then about going into the sex

3    offender treatment program at Butner, correct?

4    A.    Correct.

5    Q.    In the time you had been seeing him from August to

6    January, what was notable about his development during that

7    time?

8    A.    He was starting to connect more with me, to be more

9    open about the issues he was addressing.  There were some

10   things that he would still kind of glaze over when it came

11   to his history of abuse, but he was more open to talk about

12   his depression, how it affected his self-esteem, and

13   starting to see some more motivation for him to do things

14   differently in his life.

15   Q.    When you talked about him being glazed over when he's

16   talking about his own abuse, what do you mean by that?

17   A.    You know, if someone's talking about a history of

18   sexual abuse, you know, their own history, you would expect

19   it to be a very emotional issue.  He tended to talk about it

20   very matter-of-factly, like he was so separated from it that

21   he had kind of cut off the emotions related to it, and so he

22   could talk about it very matter of fact and kind of like,

23   "Oh, yeah that happened but --" and so he never really got

24   into a lot of emotional depth with it initially.

25   Q.    And as you note here, in early January of 2004, he was

1   beginning to be more open about those things?

2   A.    January of 2005?

3   Q.    Excuse me, yes.

4   A.    Okay.  Yes, he was talking more about his

5   victimization, but also his offenses as well.

6   Q.    Okay.  Now, I just want to switch gears a little bit,

7   and just explain, if you would, to the jury, what is the sex

8   offender treatment program at Butner?

9            MS. STACEY:  Objection.

10           THE COURT:  Overruled.

11  Q.    If you know.

12  A.    As of now, the program is no longer in place, but at

13  that time, the sex offender treatment program was a program

14  for individuals convicted of any range of sex offenses.

15  It's a residential unit, meaning all these individuals live

16  on the same unit.  They program throughout the day, meaning

17  they go to --

18           THE COURT:  So you're describing it as it would

19  have been while he was there?

20           THE WITNESS:  Yes, uh-huh.  They go through a

21  series of psychoeducational groups and what they call

22  process groups where they talk more in depth about their

23  offense and the impact of that and those sorts of things.

24           They had what they would call community meetings

25  where the inmates as a whole would come together and really

623aeb73-4fb3-4b26-ba0d-4edab4b5c7bd

1  challenge each other when they saw somebody engaging in

2  inappropriate or unhealthy or unproductive kind of

3  behaviors.

4          I don't recall exactly how long the program

5  typically lasts.  Usually people are in the program for at

6  least a year or more, and then I think there are seven

7  phases, and if they successfully complete those, then they

8  were considered, of course, a successful completer of the

9  program.

10  Q.   And when the men were in the sex offender treatment

11  program, they were segregated on that unit, correct?

12  A.   On that housing unit, so they resided on a unit among

13  other sex offenders.  But as far as their day to day when

14  they would go to work or when they would go to meals or

15  recreation, they did interact with the other general

16  population inmates.

17  Q.   Now, I think when men were coming off that unit where

18  they lived -- the unit only contained sex offender treatment

19  participants, right --

20  A.   Correct.

21  Q.   -- that housing unit?  And when they came off and mixed

22  with the general population, they were marked, right?

23  A.   Yes.

24          MS. STACEY:  Objection.

25          THE COURT:  Overruled.

1    Q.   Let me say --

2              THE COURT:  Wait.  When she objects, we just have

3    to slow down a minute so I can rule.  So I've overruled it.

4    So what do you mean by "marked"?

5              THE WITNESS:  In general, in a prison population,

6    sex offenders are not well received, even by the other

7    inmates.  They tend to often be harassed, intimidated,

8    taunted.  In our particular facility, because we had a sex

9    offender treatment program, the other inmates tended to

10   tolerate this population more, but because they knew they

11   were on this particular unit, they knew what their history

12   of offending was, and they tended to sometimes give those

13   individuals a more difficult time.

14             MS. STACEY:  I object and move to strike.

15             THE COURT:  Overruled.

16   Q.   So there was --

17             THE COURT:  You know what, when you want to

18   object, get up and object.  You can't wait till the whole

19   testimony is in, okay?

20   Q.   So just to clarify, there wasn't going to be a lot of

21   violence at Butner against these guys, right?  That's what

22   you said?

23   A.   No.  I've been there six years, and there's maybe only

24   been one or two occasions that I've known of a sex offender

25   being assaulted because he was a known sex offender.  It's

623aeb73-4fb3-4b26-ba0d-4edab4b5c7bd

1   actually a kind of unique institution as far as prisons go.

2   There's not a whole lot of violence.  It still is a prison

3   setting, so there is potential for that, but they are much

4   safer, sex offenders are typically much safer in our

5   population than they would be in a lot of other

6   institutions.

7   Q.   Okay, but, nevertheless, you would be noted to be a sex

8   offender if you were coming off that unit and mixing with

9   the general population?

10          MS. STACEY:  Objection.  Asked and answered.

11          THE COURT:  Yes, the objection is sustained as

12   leading.

13          MS. KELLEY:  Okay.

14   Q.   And aside from that, if Mr. Shields had gone into that

15   unit, could he have continued to see you?

16   A.   No.

17   Q.   His relationship with you would have ended?

18   A.   Yes.  Again, we have some other programs, like we have

19   a residential drug abuse program, and then at that time we

20   had the sex offender treatment program.  And once an inmate

21   entered one of those programs, they were only allowed to

22   receive clinical services from the staff that worked for

23   that particular program, again, just not to confuse

24   treatment issues.

25   Q.   And Mr. Shields at the time you were seeing him was

1    living on the unit where you worked, correct?

2    A.   No.  He lived in another general population unit, but

3    the inmates, I pretty much have an open-door policy, so they

4    have set times during the day where they move freely about

5    the compound.  It's every half hour on the hour.  So I

6    frequently have them show up at my door with a problem or a

7    concern or issue, and I'll either address it there, if I

8    have the time, or schedule them for an appointment to

9    address it.

10   Q.   Did Mr. Shields rely on you in that way?

11   A.   Yes.

12   Q.   So you saw him even sort of clinically at other times

13   other than these notes reflect?

14   A.   Yes.  These notes reflect really our scheduled

15   sessions, which were typically an hour long, but there were

16   many other times that he would show up at my door and tell

17   me he was having a bad day or this had happened to him or

18   that had happened to him.  And you kind of address that

19   issue very quickly in the moment, try to calm things down or

20   help them figure out where to go from there, and then we

21   would often address those issues more in depth during

22   session.

23   Q.   And just one final question about the sex offender

24   treatment program.  That program, you mentioned there are

25   sessions where people are challenging each other?

1   A.   Yes.

2   Q.   And it can be a very rigorous kind of heart-wrenching

3   process, correct?

4   A.   Very much.

5   Q.   And part of the ethos of that program is, they sort of

6   break guys down and build them up, right?

7           MS. STACEY:   Objection.

8           THE COURT:   Sustained.   Leading.

9   Q.   Okay, well, I won't ask you to confirm that.

10          Now, very shortly after the January 7 meeting, you

11  had a meeting in which Mr. Shields talked to you about not

12  going into the sex offender treatment program, right?

13  A.   Yes.

14  Q.   And what was the date of that meeting?

15  A.   I believe January 26?

16          (Witness examining document.)

17  A.   Yes, January 26.

18  Q.   Okay.   And what were the reasons that Jeff gave you for

19  not wanting to participate in that program?

20  A.   He felt that before he could participate in that type

21  of programming, that he needed to address some of the other

22  issues that we had already been discussing, such as his

23  depression.

24  Q.   And what was your response to him when he had declined

25  that program?

1    A.   You know, I recognized that it was his right to decline

2    it if he chose to do so.  We did still discuss that he

3    definitely had a need for such treatment, and that at that

4    point the option for him was to obtain that treatment in the

5    community when he released.

6    Q.   And what kind of attitude did he show you about needing

7    that treatment?

8    A.   He agreed, he did agree that he needed treatment and

9    that he planned to pursue it once he was in community.

10   Q.   Did you later reach any conclusions about or further

11   insight about the consequences of this decision that he had

12   made?

13   A.   I'm not sure if I fully understand that question.

14   Q.   After seeing Mr. Shields for two years, do you feel, if

15   he had gone into treatment at that time, he would have made

16   it through?

17             MS. STACEY:  Objection.

18             THE COURT:  Overruled.

19   A.   Based on my knowledge of the program, knowledge of the

20   staff that work in that program, how it's run, and other

21   inmates who have been involved in that program, I believe

22   that while he recognized that he needed treatment, had he

23   gone into treatment at that time, because of the depression

24   he was dealing with, because he didn't have, I think, the

25   self-esteem to maybe handle that level of challenging in the

1   program, to open up about his offending, and to tolerate

2   that well, I don't think he would have done well in the

3   program because I think those other issues would have

4   interfered with his ability to really successfully complete

5   the program.

6   Q.   Now, I want to jump ahead to March of 2005.  Did

7   Mr. Shields talk with you about his own problems having

8   relationships with people, with other people?

9   A.   Yes.

10      MS. KELLEY:  This is Bates 383 to 384.

11  Q.   So what did he say about that?

12  A.   He talked about how it was very difficult for him to

13  have close relationships with others, that when somebody

14  started to become close to him, he typically would sabotage

15  the relationship or push them away.  It was very difficult

16  for him to feel comfortable with kind of healthy intimacy,

17  so he tended to have more very superficial types of

18  relationships, although at that time he started to -- while

19  he recognized he was uncomfortable with kind of a close

20  healthy relationship, he started opening up to the idea of

21  wanting that for himself.  He just didn't really know how to

22  achieve that.

23  Q.   And so did you counsel him about normal relationships?

24  A.   Yes, we did talk about that.

25  Q.   And why is this important for a sex offender to talk

1   about these things?

2   A.   You know, oftentimes the way, again, they view

3   themselves and their ability to relate to other people can

4   impact their offense behavior.  And so for him to be able to

5   feel like he could connect to other people in a very healthy

6   way with appropriate boundaries and being able to trust

7   other people was important for him to have some additional

8   connection to the world.

9           Also, with individuals with a history of Internet

10  pornography, sometimes they tend to isolate into themselves,

11  into their homes, and into that world of pornography; and so

12  to have other social connections and a life outside of that

13  is important.

14  Q.   Were you able to do anything within the prison setting?

15  I mean, that's a pretty confined environment, but were you

16  able to make any strides with him in being less socially

17  isolated?

18  A.   We worked on that quite a bit.

19  Q.   How did you do that in a prison?

20  A.   Well, you know, they still have their peers to

21  socialize with.  Some inmates will isolate themselves

22  essentially to their cells all day.

23  Q.   To their c-e-l-l-s?

24  A.   To their cells, yes.  But there are a lot of

25  activities.  There's a lot of educational activities,

1   recreational activities.  Of course, they have jobs that

2   they need to hold down, and so they have opportunity to

3   socialize and to establish peer relationships.  And so he

4   was very isolative at first, and we talked about very

5   concrete examples of, "I want you this many days a week to

6   go out and just walk the track in the recreation yard," or,

7   you know, get engaged in this, that, or the other, to kind

8   of force him to engage with others.

9   Q.   And did you see that happening?

10  A.   It did, uh-huh.

11  Q.   Now, just as an aside, Mr. Shields, did he present to

12  you as a heterosexual person or a gay person?

13  A.   A homosexual.

14  Q.   Were you ever aware of any kind of sexual acting out or

15  any kind of misbehavior in that regard?

16  A.   No, nothing that came to my attention.

17  Q.   He never received any disciplinary reports for that

18  type of conduct?

19  A.   Again, this is from my recollection.  I don't remember

20  any such incident reports.

21  Q.   So when you worked with Mr. Shields on just sort of

22  getting out of his cell and engaging more, what were the

23  results of that?

24  A.   He started to do that.  He became more active in some

25  recreational activities.  I know softball was kind of

1   something he was into.  He started participating in more

2   educational activities, and I believe for a good majority of

3   the time he was at Butner, he basically led the Alcoholics

4   Anonymous group for the other inmates.

5   Q.   So he was active in Alcoholics Anonymous while he was

6   at Butner?

7   A.   Yes.

8   Q.   And you said he led the group?

9   A.   Yes.

10  Q.   What do you mean by that?

11  A.   Basically he's responsible for the meetings and

12  overseeing those and running those and making sure they

13  follow the AA standards.

14  Q.   And do you know, did he present to you with a history

15  of substance abuse?

16  A.   Yes.

17  Q.   Can you just tell the jury a little bit about that.

18  A.   I know he talked about specifically alcohol being his

19  kind of drug of choice, although he did have a history of

20  using other substances, but alcohol was the big issue for

21  him, I think in large part in dealing with his depression

22  went he was in the community.

23  Q.   I'm going to direct you to the April 26, 2005, meeting

24  and just some issues you discuss with Mr. Shields about sex.

25  A.   Uh-huh.

1   Q.   Now, was this the focus of your work with him?  Was

2   talking about his sexual contact a big focus of your work

3   with him?

4   A.   It wasn't the focus, but of course it was a component.

5   Q.   And at this point, did Mr. Shields talk to you about

6   his preference, sexual preferences?

7   A.   He did.

8   Q.   And who did he tell you he preferred to be romantically

9   involved with?

10  A.   He said that he preferred younger men in their twenties

11  or thirties.

12  Q.   And did he give a reason for that or any insight into

13  why he thought he felt that way?

14  A.   A quote from him is, "Older men are what killed me,"

15  and he was referring to having been sexually abused by older

16  men when he was a child.

17  Q.   Now, I just want to ask you a little bit about

18  self-help books.

19  A.   Uh-huh.

20  Q.   In your view, if someone were to tell someone else that

21  in treatment they relied on self-help books, what is your

22  understanding of that coming from Mr. Shields?

23          MS. STACEY:  Objection.

24          THE COURT:  Sustained.

25  Q.   Did you do any work with him with self-help books?

1    A.    I did.

2    Q.    What did that consist of?

3    A.    He was provided with a book on managing depression and

4    as well as a book on male survivors of childhood sexual

5    abuse.

6    Q.    Let me just show you something that you brought with

7    you.  Do you recognize this book?

8    A.    Yes.

9    Q.    And what is this?

10   A.     "Victims No Longer."

11   Q.    Is this a book you asked Jeffrey Shields to read?

12   A.    I did.

13   Q.    And did you have a whole group of these books --

14   A.    Yes.

15   Q.    -- and materials?  What did you call the place where

16   they were stored?

17   A.    We call it the self-help library.

18   Q.    Okay.  And was this an integral part of your work with

19   him?

20   A.    We used this as something in addition to what we were

21   doing in session, and oftentimes I'll use books as homework

22   assignments.  So it's just an opportunity to give them

23   something to focus on outside of session to keep them on

24   track with what we're discussing inside of session.  This

25   particular book I provided to him because it does have

1    accounts from other men who were sexually abused as

2    children, and I wanted him to at least read these accounts

3    and be able to relate to other individuals who had similar

4    backgrounds, and see that many of the issues and problems he

5    had had over the years as a result of this are not uncommon

6    for those individuals.

7    Q.   Now, do you recall that he actually read that book?

8    A.   He did read portions of the book.  I don't think he

9    read it cover to cover.

10   Q.   And did you discuss what he took away from that?

11   A.   We did.

12   Q.   What did he say?

13   A.   He did admit that reading the other stories, I think

14   the comment he made was that "It gave me chills."  So

15   initially he started showing some more signs of that kind of

16   emotional relating to his history of abuse.

17   Q.   Why would it be important for somebody to have some

18   kind of emotional understanding of what had happened to

19   them?

20   A.   In my opinion, when they repress those types of issues

21   and, again, they feel a lot of shame and guilt, and, you

22   know, often individuals who have experienced abuse kind of

23   feel like they're the only ones, so for him to see that his

24   emotional reaction, his feelings, his attitudes were very

25   normal in those situations was important so that he could

1   move beyond those things and essentially start to heal from

2   those things.

3   Q.   Now, at some point did Mr. Shields begin taking

4   medication?

5   A.   He did.

6   Q.   And how did that come about?

7   A.   I had recommended that he consult with a psychiatrist

8   because despite efforts to manage his depression through

9   behavior techniques and then cognitive techniques, basically

10  challenging some of his ideas and thoughts, he still had

11  what I would call low-grade depression, irritability and

12  fatigue and those types of things, and so I thought that he

13  could benefit from medication treatment.

14  Q.   And did he accept your recommendation that he start

15  that?

16  A.   He did.

17  Q.   And can you just describe for the jury what was the

18  course of that treatment for him?  How did it go?

19  A.   He was prescribed Prozac, which is a common

20  antidepressant medication, and he had -- I think it was

21  probably -- I'm trying to think how many months he was on

22  the medication before he released, but he had some periods

23  where, like particularly on the weekends, he wouldn't

24  necessarily comply with the medication because the inmates

25  go to what's called a pill line.  And basically they line up

1   and they receive their medications at certain times

2   throughout the day.  And this line can be pretty lengthy at

3   times, and the inmates don't enjoy standing in it, so

4   sometimes on the weekend they skip doing that.  So there

5   were times he would miss it occasionally, and I really

6   talked to him about the importance of complying with the

7   medication to get the full benefits.  He eventually started

8   doing that, and I believe the medication had a significant

9   impact on some of the changes that we saw at that point.

10  Q.   At some point after he was taking the medication, did

11  he have a big personal tragedy in prison?

12  A.   He suffered the death of his mother.

13  Q.   And is this typically something that really affects

14  people in prison?

15  A.   Yes.

16  Q.   Why is that?

17  A.   Because of the separation from family, they often feel,

18  again, a lot of guilt when they can't be there.  When a

19  family member passes, they feel that they've let this person

20  down.  There's also simply the fact that they were not able

21  to say good-bye to this person and see this person one last

22  time.  So death of a significant other or immediate family

23  member in prison is typically pretty difficult for inmates

24  to handle.

25  Q.   And would you say Mr. Shields was -- how would you say

1   he was affected by the death of his mother?

2   A.   He grieved what I would say an appropriate way, but it

3   clearly impacted him very much.

4   Q.   And typically when somebody has this kind of loss when

5   they're in prison, do you sometimes see some effect in their

6   behavior?

7   A.   Sometimes, yes.

8   Q.   And what kind of things do you typically see people

9   doing?

10  A.   They might withdraw more from others.  They might be

11  more irritable.  They might tend to either act out more in a

12  verbal manner, sometimes a physical manner; and usually over

13  days or weeks you'll start to see some of that subside for

14  the most part.

15  Q.   I just want to direct you to the June 14 meeting that

16  you had with Mr. Shields.

17  A.   Could it be June 15?

18  Q.   I'm sorry, June 15.  Oh, I'm sorry.  Strike that for

19  now.  And did you do anything with Mr. Shields to kind of

20  commemorate his mother's death?

21  A.   We did.

22  Q.   What did you do?

23  A.   I had contacted the chaplain and asked if we could

24  reserve some time in the chapel at the same time that his

25  mother's funeral would have taken place, so that he could go

1    to the chapel and kind of use that time to grieve and

2    commemorate her death.  We had somebody there from Religious

3    Services that read a bible passage, and he talked to us a

4    little bit about some of his memories with his mother, and

5    then we allowed him some private time to grieve the loss.

6    Q.   Now, I want to direct you to November 15 of 2005, and

7    you've roughly been seeing Mr. Shields about a year at this

8    time?

9    A.   Yes.

10   Q.   And he's been taking his medication?

11   A.   Yes.  I think he'd been taking it maybe about five

12   months or so by that time.

13   Q.   And was he expressing any interest in planning for

14   release at that time?

15   A.   Yes.

16   Q.   When we talk about somebody planning for release, what

17   do you mean by that?

18   A.   They have some release preparation courses that they do

19   in the facility, but typically when I talk with inmates

20   about preparing for release, it's, one, getting them in the

21   right attitude for release; getting them to recognize what

22   mental health aftercare they may need or substance abuse

23   treatment they may need, or in his case, the sex offender

24   treatment; helping them to start thinking of options for

25   housing, for employment, any support network they might

1   have.

2   Q.   And as time went on from this date in November until

3   you saw him for the last time the next September, did

4   Mr. Shields show an interest in planning for his release?

5   A.   Yes.

6   Q.   And just switching gears a little bit focusing back to

7   the November, '05 meeting you had with him, did he open up

8   about his childhood sexual abuse, his feelings about that?

9   A.   Yes.

10  Q.   And what did he tell you about that?

11  A.   He talks a little bit more about the abuse.  He

12  specifically said, if he could live his life over again, he

13  would never, quote/unquote, never allow himself to be

14  abused.  And then he discussed how the abuse and the lack of

15  a father figure often contributed to him seeking love and

16  attention through abuse, through the abuse.

17  Q.   And is this unusual for victims of abuse to talk this

18  way about themselves?

19  A.   No.

20  Q.   And just so we're being complete here, you make some

21  observations about how he's talking about his abuse there,

22  right?

23  A.   Uh-huh, yes.

24  Q.   And how did you feel he was still dealing with it?

25  A.   I remarked that he still seemed emotionally detached in

1    the sense that he would talk about it, you know, in very

2    matter-of-fact terms like you would, "Oh, this happened to

3    me while I was at work today."  There wasn't a whole lot of

4    emotional content there, and so we had discussed allowing

5    him to -- him allowing himself to address some of his more

6    painful emotions before he released so that he could kind of

7    start that process before he returned to the community.

8    Q.   Okay.  And I just want to take a moment to go over with

9    you some of the programs he was in.

10   A.   Okay.

11   Q.   This is at Bates 205.  This is a partial list of the

12   programs he participated in in the Bureau of Prisons.  Let

13   me just ask you, the Bureau of Prisons keeps a lot of

14   records, right?

15   A.   Yes.

16   Q.   Like, a lot of records.

17   A.   Yes.

18   Q.   So do you recognize this?

19   A.   Yes.

20   Q.   Yeah.  This is something they generate to just show

21   what people are doing with their time?

22   A.   Uh-huh.

23   Q.   And what programs do you recognize on here?

24   A.   Well, the Alcoholics Anonymous that he had been

25   involved with for a long time when he was there.  The

1  courses that say RPP before them are the release preparation

2  programs.

3  Q.   So, for example, the job skills class he took was just

4  an hour, but obviously the focus of that is on getting a

5  job, right?

6  A.   Yes.  Like I said, they have this kind of standard

7  curriculum of courses that they have inmates go through

8  before they return to the community, just to, again, get

9  them thinking about job skills and, you know, how to write a

10 resume' and those types of things.

11 Q.   And then this 40-hour drug abuse program, and it shows

12 he completed 32 hours of that.  What is that?

13 A.   The 40-hour drug abuse program is one of the drug

14 programs that's offered by the Bureau of Prisons, and it

15 basically introduces individuals to the different physical

16 and psychological effects of substance use.

17 Q.   And that's different from AA, but that's kind of a

18 complementary program?

19 A.   Yes.

20 Q.   And the fact that he did 32 out of 40 hours is not of

21 concern, right?

22 A.   No.  There are a number of reasons why he might have

23 missed those hours.

24 Q.   And then there's several other RPP courses,

25 Relationships, AIDS Awareness, et cetera?  Those are all, as

1    you said, preparing-for-release classes?

2    A.   Yes.

3    Q.   And there are some things that aren't on here, right,

4    that he did that you knew about?

5    A.   Yes.

6    Q.   For example, does this look familiar?

7    A.   Yes.

8    Q.   What is that?

9    A.   ServeSafe certification.  I'm not very familiar with

10   the food service industry, but I know that's an important

11   certificate to have, and I remember him working very hard up

12   until his release date to get this completed.

13   Q.   And the purpose of this is to improve his chances of

14   getting a job when he gets out?

15   A.   Correct.

16   Q.   And then could you just say a few words about the code

17   program.

18   A.   The CODE Program is another program offered by the

19   Bureau of Prisons.  It's typically offered at the United

20   States penitentiaries, which are the highest security level

21   institutions, and Mr. Shields was, I believe, at USP

22   Lewisburg before he came to Butner.  And the CODE Program is

23   a voluntary program for individuals who maybe have some form

24   of mental illness, who tend to be more easily victimized in

25   the penitentiary setting; and it focuses on communication

1   skills, problem-solving skills, criminal thinking patterns,

2   and relapse prevention.  And my understanding of the program

3   is that the length or end of program is tailored to your

4   needs, based on your needs.

5   Q.   And just to be clear, when people first get sentenced

6   and are in the Bureau of Prisons, they typically go to a

7   higher security facility?

8   A.   Depending on their offense history, and I believe there

9   are some other factors involved, but it's not uncommon that

10  they start at a higher security level and then can work

11  their way down to a lower security based on their behavior

12  in prison.

13  Q.   And that's what happened with Mr. Shields?

14  A.   I believe so.

15  Q.   He started at Lewisburg, which is a higher security

16  than Butner?

17  A.   Yes.  He did come for the sex offender treatment

18  program, but I believe, if I'm not mistaken, that he was a

19  medium-security inmate at that time.

20  Q.   And he participated in the code -- that's C-O-D-E --

21  Program at Lewisburg, right?

22  A.   Yes.

23  Q.   And as far as you know from his institutional history,

24  he successfully completed that program, right?

25  A.   Yes.

1    Q.    Now, if I could just direct you to April of 2006, your

2    meeting with Mr. Shields.

3    A.    Okay.

4           (Witness examining document.)

5    Q.    So you note here that you continued to talk about his

6    release plans with him?

7    A.    Yes.

8    Q.    And in your experience with inmates, was Mr. Shields's

9    level of participation in programs above average or below

10   average?

11   A.    I would say that of the inmates I've worked with, he

12   did the most preparation of anyone I've seen.

13   Q.    And you note here that -- did you notice anything by

14   April of 2006 about his depressive symptom?

15   A.    At that time he was having no symptoms.

16   Q.    Now, I'm just going to direct you to May of 2006, and

17   at this point you were actually talking about the particular

18   place he was going to be released to, correct?

19   A.    Yes.

20   Q.    The city, right?

21   A.    Yes.

22   Q.    And when he's talking about temptations being present

23   in Portland, can you just explain to the jury what the

24   substance of your conversation was.

25   A.    With Portland being more of a city compared to Bangor,

1   which I believe was the initial release destination --

2   Q.   I think Portland is about as citified as they get up in

3   Maine, right?

4   A.   Okay.  "Temptations" referred to, you know, the

5   availability of, like, night life; you know, I guess social

6   networks where alcohol could be involved, that sort of

7   thing.

8   Q.   So if he's talking to you about these temptations, what

9   does that tell you as his therapist about his thought

10  process?

11  A.   That he's aware of those and that he's looking to avoid

12  those, I would hope.  You know, his conversation was, he

13  wanted to -- we talked quite a bit about what he wanted to

14  achieve and where he would best be able to attain the

15  resources he needs, while at the same time being able to

16  stay a steady course on his treatment and still do the right

17  things.

18  Q.   I'd just like to direct you to May 16.  And what kind

19  of insight -- now, we're nearing the end of your time with

20  him because he's going to leave in September, right?

21  A.   Correct.

22  Q.   And this is the spring before that.  What kind of

23  insights has he gotten into his personal life?

24  A.   He started to understand more about how his childhood,

25  particularly his abuse and lack of a father figure, had

1   contributed to his difficulty attaching with others in

2   adulthood in a healthy, productive way.

3   Q.   And so you're talking to him about having normal

4   relationships with other adults, correct?

5   A.   Correct.

6   Q.   If I could just direct you to June 14, again he's

7   deciding between Portland and Bangor, Maine, right?

8   A.   Yes.

9   Q.   And what did he say?  If it just wasn't going to work

10  out for him in Portland, what would he do?

11           (Witness examining document.)

12  A.   He said that he would try Portland because he knew

13  there would be additional resources for him there,

14  particularly through the halfway house; but he said,

15  quote/unquote, if it's" overwhelming," he would move to

16  Bangor.

17  Q.   And what did he say about his feelings about himself

18  and what he had done and where he was in life?

19  A.   He had talked about feeling that he had wasted his life

20  since the late '80s, and he said he had been incarcerated

21  three times for sexual offending and has, quote, "become the

22  person he despised."

23  Q.   What did you understand him to mean, he had become the

24  person he despised?

25  A.   My understanding of that was in committing the sexual

623aeb73-4fb3-4b26-ba0d-4edab4b5c7bd

1  offenses, that he had become the perpetrator, which, of

2  course, as a child he despised because he was the victim of

3  sexual abuse.

4  Q.   And did he talk about having a different attitude upon

5  his release than he had had in the past?

6         (Witness examining document.)

7  A.   I'm looking specifically for where I addressed this.  I

8  knew we had talked about it.  I just couldn't find

9  specifically where.  But he did talk about how during

10 previous incarcerations, he had failed to plan for release

11 and had really no concern about his release, and he had

12 messed up his prior releases from prison.

13 Q.   Now, I just want to talk about during that summer --

14 well, let me just say, do you remember that Mr. Shields did

15 get a couple disciplinary reports while he was at Butner?

16 A.   I seem to recall that he did have more of a minor

17 incident report.  I can't remember what it was for.  I want

18 to say it was something for like being out of bounds, but I

19 don't remember specifics.

20 Q.   Do you recall there being a time where he was using a

21 work computer to write therapy assignments?

22 A.   Yes.

23 Q.   Okay.  And what happened as a result of that, if you

24 know?

25 A.   He was removed from that job.

1   Q.   He lost his job?

2   A.   Yes.

3   Q.   Had you told him he could use a work computer to write

4   down his thoughts about himself and his therapy?

5   A.   No.

6   Q.   No.  And you communicated that to him --

7   A.   Yes.

8   Q.   -- that that was not okay to do?

9   A.   Yes.

10  Q.   And I just direct you to July of 2006, July 7.

11  A.   Uh-huh, yes.

12  Q.   He got in trouble again?

13  A.   Yes.

14  Q.   And what did that have to do with?

15  A.   Inmates have what they call PIN numbers for phone

16  usages, kind of like you have a PIN number with your debit

17  card.  And so they use this PIN number to make phone calls,

18  and they're not allowed to share that with other inmates,

19  they're not allowed to let other inmates use their PIN

20  number for the phone, and he had done that on that occasion.

21  And so what he described to me is:  Another inmate had

22  promised to help him, promised him a lead in finding

23  employment, and so he allowed this inmate to use his phone

24  access for that reason.  And he said, "Subconsciously, I

25  knew it was too good to be true, but I was desperate for

1   help."

2   Q.   Okay, because he really wanted to get a job, right?

3   A.   Yes.

4   Q.   Did you ever work with him on job possibilities in

5   Portland?

6   A.   Yes.  We actually spent a few occasions.  I would try

7   to get online and find classified ads to see what jobs were

8   available in the area at that time, just to give him some

9   initial leads and some ideas of what was available in the

10  community.

11  Q.   And if I can just direct you to August of 2006, this is

12  just briefly, and I'm about to wrap up here, but what other

13  plans was he making as he neared his release date?

14  A.   He took it upon himself to come up with a budget plan

15  where he was looking at what his expenditures would be each

16  month.  We talked about his continued need for mental health

17  treatment, particularly the treatment with the

18  antidepressant medication; and then also talked a little bit

19  about how he could continue to do some of the journaling

20  work in the meantime until he got involved in treatment

21  community.

22  Q.   Okay.  And I'll just show you, this is one of your last

23  meetings with Mr. Shields on September 6 of 2006?

24  A.   Yes.

25  Q.   And you say you discuss his initial plans following

1   release.  What do you mean by that?

2   A.   We go over things, where they're supposed to report,

3   priorities, getting employment, starting to look for housing

4   options, identifying a mental health provider, identifying

5   where his AA meetings would be located, looking for him to

6   get involved in the sex offender treatment program, so just

7   really prioritizing what he needed to do to kind of get

8   himself off to a good start.

9   Q.   And can I just ask you, is all this discussion about

10  what he's going to do when he gets out, is this at your

11  instigation?

12  A.   In this case, it was really more his part.  As we

13  noted, I believe it was in September of '05, so almost a

14  year or a year prior to his release he had started

15  expressing a desire to really work on these issues and focus

16  on the release issues.

17  Q.   Dr. Graney, did you in September of 2006 write some

18  letters for Mr. Shields?

19  A.   I did.

20  Q.   And what was the point of that?

21  A.   He and I actually had very good rapport.  You know, I

22  felt like he trusted me and had really put forth good effort

23  in working with me, and he was concerned that the next

24  therapist he worked with may not try to understand his

25  issues or may not work with him in the same manner.  And so

1    one of the things we discussed was me writing a letter about

2    the process that he and I had gone through in treatment so

3    that they would have an idea of his level of motivation and

4    the issues that were being addressed.

5    Q.   And other than a letter to a future therapist, did you

6    also write a letter for his probation officer?

7    A.   I did.

8    Q.   I'm just going to show you.  This is Bates 239 and 240.

9    Is this the letter you wrote?

10   A.   Yes.

11           MS. KELLEY:  Okay, I just ask that this be moved

12   into evidence.

13           MS. STACEY:  I object.

14           THE COURT:  Sustained.  But you can ask about it.

15           MS. KELLEY:  Okay.

16   Q.   What points did you think it was important to

17   communicate to his future probation officer --

18           THE COURT:  Let me ask for that matter, these

19   notes are all in, right?  Are you objecting to those?

20           MS. STACEY:  The notes aren't in evidence yet.

21           THE COURT:  Maybe I should see you at side bar.

22   SIDE BAR CONFERENCE:

23           THE COURT:  You haven't put in these notes.  I

24   mean, I've been reading them all, as has the jury.  Every

25   single one of them have been up on the screen.  Are you

Page 56

1   offering them?

2          MS. KELLEY:  Well, I'm happy to put them all in.

3   They're quite bulky, and we kind of thought -- I think

4   Ms. Stacey and I had worked out that we would read relevant

5   portions to the jury, et cetera.  We can put them in, if the

6   Court would prefer.  There's nothing in there I wouldn't

7   want the jury to see.

8          THE COURT:  The notes should go in.  I mean,

9   you've all been reading them.  But the objection is this

10  letter, as I understand.  Is this part of the official

11  record?

12         MS. KELLEY:  Yes, I mean --

13         THE COURT:  Well, I haven't had that established

14  whether that's part of the official record or not that's

15  kept in the prison.  If it's something done on her own, I

16  feel differently, but you can ask her about what her views

17  are.

18             (End of side-bar conference.)

19         THE COURT:  Both sides just discussed this, and

20  the notes will be part of the record as what number exhibit?

21         MS. KELLEY:  We're on 105.

22         THE COURT:  Okay, so were those kept in the

23  ordinary course of your professional business at Butner?

24             THE WITNESS:  Yes.

25             (Respondent Exhibit 105 received in evidence.)

1  Q.   Okay, now, with regard to this letter, was this part of

2  your duties to communicate something to Mr. Shields's

3  probation officer?

4  A.   It's not something I do with every inmate but something

5  I sometimes do in my line of work, yes.

6  Q.   And you kept this letter yourself as part of your

7  record of your treatment of him?

8  A.   Yes.

9        MS. KELLEY:  Okay, I'd like to ask that that be

10  admitted into evidence.

11        MS. STACEY:  No objection.

12        THE CLERK:  What number is it?

13        MS. KELLEY:  104.

14        THE COURT:  That's just part of the packet, right,

15  of her notes at the institution?

16        MS. KELLEY:  We can attach it to the end of the

17  notes.

18        THE COURT:  All right, so --

19        MS. KELLEY:  Okay.

20        (Respondent Exhibit 104 received in evidence.)

21  Q.   So what points did you think it was important for

22  Mr. Shields's probation officer to know about him?

23  A.   Some of the things highlighted in the letter --

24        THE COURT:  You can put it up on the screen now.

25  It's in.

1    MS. KELLEY:  All right, I'll do that.

2    Q.   Or you could just talk about it.

3    A.   Okay.  One was his need for sex offender treatment in

4    the community, and I did talk a little bit about my opinions

5    as to why I think he might not have done well in treatment

6    in the prison setting but why he did need treatment in

7    community.  Talked about his initiating treatment at Butner

8    and the progress I had seen in treatment in the time that I

9    worked with him, his continued need for mental health

10   treatment in regards specifically to his antidepressant

11   medication, recommended his continued involvement in AA.

12   Off the top of my head, I'm not remembering what else, but

13   just giving him a general sense of the type of individual he

14   was when I began working with him versus the type of

15   individual he was before he left, and pointing out his

16   expressed desire to change and the noticeable improvement he

17   had made in the time that I worked with him.

18       MS. KELLEY:  Okay, this is a pretty dense letter,

19   so rather than put it on here and have everybody speed read

20   it, we'll just admit it into evidence.

21       THE COURT:  Your choice.

22       MS. KELLEY:  Okay.

23   Q.   Dr. Graney, did Jeff Shields give you anything as he

24   was leaving Butner?

25   A.   He did.

1   Q.   And I'm going to show you something.  What is this?

2   A.   This is a card he had made for me.

3   Q.   And at the time he gave you that, did you have any

4   sense you would ever be testifying here?

5   A.   No.

6   Q.   Or ever in regards to him?

7   A.   No.

8   Q.   And this is a communication he made to you at the end

9   of his treatment; is that correct?

10  A.   Yes.

11  Q.   Would you read that card, please.

12          MS. STACEY:  Objection.

13          THE COURT:  I will allow this in for his state of

14  mind with respect to his treatment.  Go ahead.

15  A.   He writes, "I don't think there are words enough to

16  describe how you have touched my life.  I came to Butner a

17  brassy, miserable person full of fear, anger, frustration,

18  resentment, revenge and hatred, but will be leaving in just

19  a few short days a better man, more polished and confident

20  because of you.  You accepted me and all my baggage without

21  giving a second thought, and that says a lot.  You put up

22  with my highs and lows, my showing up unannounced, my weekly

23  traumas, which most of the time were not.  I just needed

24  your reassuring words that all would be fine.  You never

25  gave up on me or pushed me off to someone else.  You stuck

1   it out with me all the way to the end.  You were there for

2   me during a very painful time, my mother's death, and for

3   that alone is something I could never forget.  There is so

4   much you have done for me that I will never forget you.  You

5   should consider yourself an honor to your profession.  If

6   there were more people like you, the world would be a more

7   loving and caring place.  Dr. Graney, you are my rock, my

8   higher power, and inspiration to leave here and succeed.

9   From the bottom of my heart, thank you for all your support,

10  effort, and time to see me through.  Thank you."

11              MS. KELLEY:  I'd like to move that into evidence.

12              MS. STACEY:  I object.

13              THE COURT:  I'll put that in as part of the whole

14  record.  This is something you got while he was still at

15  Butner?

16              THE WITNESS:  Yes.

17              THE COURT:  There will be just one big packet of

18  everything involving her.

19              MS. KELLEY:  Thank you for coming, Dr. Graney.

20              THE WITNESS:  Thank you.

21  CROSS-EXAMINATION BY MS. STACEY:

22  Q.   Dr. Graney, you don't provide sex offender treatment at

23  FCI Butner, do you?

24  A.   No.

25  Q.   And you had testified that it was uncommon for a

Page 61

1   prisoner to seek out treatment at Butner; is that correct?

2   A.   Given the number of inmates that we have, yes.

3   Q.   But that's exactly why Mr. Shields was at Butner, was

4   to get treatment, right?

5   A.   Yes.  My understanding was that he was initially sent

6   there for the sex offender treatment program.

7   Q.   And it's important in treatment that a patient be open

8   and honest with you, isn't it?

9   A.   Yes.

10  Q.   Now, you testified earlier about your meeting with him,

11  and let's start at the beginning.  When he first came into

12  Butner, he met with an intern; is that correct?

13  A.   Yes.

14  Q.   And I think you testified that was the intake

15  screening?

16  A.   Yes.

17  Q.   And at that time he reported a history of substance

18  abuse?

19  A.   Yes.

20  Q.   And at that time -- and I'm referring now under "Drug

21  Abuse History" -- at that time he reports to the intern a

22  history of substance abuse, but he's not interested in drug

23  abuse treatment at the time he comes into Butner; is that

24  right?

25  A.   Correct.

Page 62

1   Q.   And you reviewed all these notes as part of your

2   duties, right?

3   A.   Correct.

4   Q.   And in fact this is your signature at the bottom of

5   those notes that you reviewed them?

6   A.   Yes.

7   Q.   And in reporting his past history, he talks to you --

8   or he talks about he had previous convictions for unlawful

9   sexual contact in 1989 and 1998, correct?

10   A.   Correct.

11   Q.   But he doesn't report any other convictions, correct?

12   A.   No, not at that time that I can see.

13   Q.   And at that time he doesn't report any other charges,

14   correct?

15   A.   Correct.

16   Q.   And at that time he doesn't report that he's previously

17   violated any probation conditions, correct?

18   A.   Correct

19   Q.   And he doesn't talk to you or anyone at that time about

20   the ages of his victims, does he?

21   A.   Correct, not at that time, I don't believe.

22   Q.   He doesn't tell you about a 6-year-old victim?

23   A.   No.

24   Q.   He doesn't tell you --

25            THE COURT:  Did you talk to him at all about these

1    prior offenses?

2             THE WITNESS:  Later in treatment he did -- he

3    would reference them.  I don't know if I always specifically

4    remember the exact ages.  I did know they were young

5    children, so he did talk about a few of those occasions.

6    Q.   And are his mention of the ages of the children

7    anywhere in the notes that you have with you today?

8    A.   No.  I don't believe that was documented anywhere.

9    Q.   He also reported -- and I will underline here -- that

10   at the age of seven he started seeing a psychologist.  Is

11   that right?

12   A.   Correct.

13   Q.   So at least at the time he comes into Butner, he's been

14   seeing help and seeking help since the age of seven?

15   A.   Yes.

16   Q.   Now, on August 19 Mr. Shields again requests -- or you

17   see Mr. Shields again; is that correct?

18   A.   Correct.

19   Q.   And at that time, he was on the waiting list for the

20   sex offender treatment program at Butner?

21   A.   Yes.

22   Q.   And at that time, Mr. Shields told you that he had

23   completed another sex offender treatment in 1996, correct?

24   A.   Yes

25   Q.   And I'm referring you to the August 19 notes toward the

1   bottom half of the second paragraph.  He told you that he --

2            THE COURT:  Let's all -- why don't you touch the

3   screen so people can --

4   Q.    "He stated he completed a three-year sex offender

5   treatment in 1996," correct?

6   A.    Correct.

7   Q.    And then he admitted he committed his next or a second

8   offense in 1998 after treatment; is that correct?

9   A.    Correct.

10  Q.    And he told you it was with a male prostitute, didn't

11  he?

12  A.    Yes.

13  Q.    And he reported that he was depressed around the time

14  of his offense, didn't he?

15  A.    Yes.

16  Q.    He did not report being drunk at the time of the

17  offense, did he?

18  A.    No.  I don't recall that.

19  Q.    And at that time he's also telling you that he doesn't

20  believe child pornography was any harm to anyone, and so you

21  discussed how it's harmful, correct?

22  A.    Yes.

23  Q.    And you testified that at that time, Mr. Shields

24  described how he felt about himself?

25  A.    Yes.

1  Q.   Okay.  You testified about his poor self-image and his

2  difficulties in trusting others, correct?

3  A.   Correct.

4  Q.   But he also reported and admitted to you that he was

5  very manipulative in his relationships, didn't he?

6  A.   Correct.

7            THE COURT:  Did he ever discuss with you what he

8  got out of the sex offender treatment in the state court?

9            THE WITNESS:  He didn't discuss what he got out of

10  treatment.  He did later, much later on, again, he talked

11  about how he didn't feel that in the past he had really put

12  much effort into making change.

13  Q.   And when you saw him on August 19, 2004, you emphasized

14  to him that his sexual offense issues wouldn't be addressed

15  in your sessions with him, right?

16  A.   Correct.

17  Q.   And you told him, you emphasized to him that he had to

18  go to sex offender treatment, correct?

19  A.   Correct.

20  Q.   Now, I'd like to direct your attention to September 1,

21  2004.  Is that September 1, 2004?

22  A.   Yes.

23  Q.   At that time you discussed sex offender treatment again

24  with Mr. Shields, correct?

25  A.   Yes.

1    Q.   And again you told him it would be best for him to wait

2    to address most of his therapy issues until he entered the

3    sex offender treatment program, correct?

4    A.   Yes.

5    Q.   And directing your attention to September 27, 2004, you

6    saw him again on that date?

7    A.   Yes.

8    Q.   You had a brief counseling session with him, correct?

9    A.   Correct.

10   Q.   And at that time you told Mr. Shields that individual

11   therapy was not optional for him, but you would see him on a

12   regular basis, correct?

13   A.   Yes.

14   Q.   You didn't engage in long-term individual therapy with

15   Mr. Shields, did you?

16   A.   Not at that time, no.

17   Q.   You saw Mr. Shields again in October 28 of 2004?

18   A.   Correct.

19   Q.   And that was part of his monthly monitoring?

20   A.   Yes.

21   Q.   And at that time, Mr. Shields told you that he had no

22   family support; is that correct?

23   A.   Correct.

24   Q.   And he told you -- and let me get the correct page up

25   here -- and he told you he had no current peer support in

1    the community, correct?

2    A.    Let's see.

3           (Witness examining document.)

4    A.    Yes.

5    Q.    And you also discussed concerns about his childhood

6    sexual abuse issues because he was slated to enter the sex

7    offender treatment program, correct?

8    A.    Correct.

9    Q.    And you agreed to work with him at that time on his

10   depression and his anxiety, correct?

11   A.    Yes.

12   Q.    Now, you testified earlier about an incident involving

13   the work computer, the computer that Mr. Shields was using

14   during his work time at Butner to complete personal

15   assignments.  Do you recall that testimony?

16   A.    Yes.

17   Q.    I'm going to show you a memorandum that's part of his

18   official record dated December 10, 2004.  Do you see that

19   memorandum?

20   A.    Yes.

21   Q.    And it's from Operations Lieutenant David Moses to you?

22   A.    Actually, it was from me to --

23   Q.    I mean from you.

24   A.    Yes, to Lieutenant Moses, yes.

25           MS. KELLEY:  What's the Bates number, please?

Page 68

1          MS. STACEY:  1612.

2          MS. KELLEY:  Thank you.

3   Q.   And the purpose is, you're informing Lieutenant Moses

4   that Mr. Shields was suspected of using a word processor at

5   work to complete his therapeutic work, correct?

6   A.   Correct.

7   Q.   And Mr. Shields said that you were aware he was using

8   the computer for work, correct?

9          (Witness examining document.)

10  A.   Yes.

11  Q.   And that was not true, was it?

12  A.   No.  I was aware that he was completing his journaling

13  assignments, but not at work on government computers.

14  Q.   You had never authorized Mr. Shields to use a computer

15  during work time to complete his assignments?

16  A.   No.

17  Q.   Now, you saw Mr. Shields again on January 7 of 2005; is

18  that correct?

19  A.   Correct.

20  Q.   And at that time you're discussing, again, many issues,

21  including his -- I believe your testimony was that you're

22  discussing issues about being both a victim as well as a

23  victimizer; is that correct?

24  A.   Yes, yes.

25  Q.   And at that time, Mr. Shields is telling you that he

Page 69

1    wants to break the cycle; is that right?

2    A.   Correct.   "Break the pattern" is the words he used,

3    yes.

4    Q.   And again you reminded him, "This will be addressed in

5    sex offender treatment program," right.

6    A.   Correct.

7    Q.   And then on January 26, 2005, Mr. Shields requested a

8    meeting with you, didn't he?

9    A.   Yes.

10   Q.   And the purpose of his requesting a meeting is to tell

11   you, "I refuse to participate in the sex offender treatment

12   program," right?

13   A.   Correct.

14   Q.   And you testified it was his right to refuse to be in

15   the program, right?

16   A.   Yes.

17   Q.   But that's the reason he was transferred to Butner,

18   isn't it?

19   A.   Correct.

20             THE COURT:   Just leave it up there for a second.

21   Q.   He told you during this conversation that he had to

22   deal with other issues first, correct?

23   A.   Correct.

24   Q.   You had been aware that he was dealing with these

25   issues since he was seven years old with another

1    psychologist, right?

2              MS. KELLEY:  Oh, objection as to

3    mischaracterization of the record.

4              THE COURT:  Well, is that the correct

5    characterization?

6              THE WITNESS:  He had said that he had been engaged

7    in treatment since age seven.  I do not have any records.  I

8    don't know the extent or type of treatment, but he had said

9    that he was engaged in treatment since that time.

10   Q.   And he recognized that he needed counseling, correct?

11   A.   Correct.

12   Q.   And you again reinforced the need for sex offender

13   treatment program, correct?

14   A.   Correct.

15   Q.   And Mr. Shields agrees he needs sex offender treatment,

16   but he doesn't go, does he?

17   A.   No.  He at that point is saying that he plans to

18   participate in treatment in the community.

19   Q.   And his plans to participate in treatment in the

20   community, they aren't a guarantee that he will participate

21   in treatment in the community, are they?

22   A.   Well, I can't guarantee that he'll participate.  I

23   assume he'll be mandated for the treatment yes.

24   Q.   He'll be mandated to attend, but it's not guaranteed

25   he'll participate, correct?

Page 71

1  A.   Correct.

2  Q.   And there's no guarantee that mere participation in

3  treatment will be successful, correct?

4         THE COURT:   Mere participation, what kind of

5  treatment?

6  Q.   Sex offender treatment.

7  A.   There's no guarantee that treatment will be successful,

8  yes.

9  Q.   Now, in February 17 of --

10        MS. STACEY:   Is that all right to take this down?

11        THE COURT:   You'll be getting all of this.

12  Q.   On February 17 of 2005, you saw Mr. Shields again,

13  didn't you?

14  A.   Yes.

15  Q.   And at that time, did Mr. Shields tell you that he had

16  no regret refusing sex offender treatment program?

17  A.   Yes.

18  Q.   And you saw Mr. Shields again on June 10 in 2005; is

19  that correct?

20  A.   Yes.

21  Q.   And on June 10, 2005, Mr. Shields told you that he used

22  alcohol to take away the bad parts of him and make him

23  lively; is that correct?

24  A.   Correct.

25  Q.   He didn't tell you alcohol had caused him to commit

Page 72

1    these sex offenses, did he?

2    A.   No.   He didn't phrase it that way, no.

3    Q.   And he told you on June 10 that he had to stay away

4    from the restaurant business when he was released for fear

5    of returning to drugs and alcohol, right?

6    A.   Correct.

7    Q.   And are you aware that he returned to the restaurant

8    business when he was released?

9    A.   I know he was -- my understanding is that he was

10   handling banquets in a hotel setting.

11   Q.   He was in the dining portion of the Holiday Inn?

12   A.   Yes.

13   Q.   Now, you saw Mr. Shields again on November 15, 2005; is

14   that correct?

15   A.   November 15?

16            (Witness examining document.)

17   A.   Yes.

18   Q.   And during the session on November 15, 2005,

19   Mr. Shields is discussing his past child abuse history with

20   you, correct?

21   A.   Correct.

22   Q.   And you had to emphasize to him in November of 2005

23   that his childhood victimization wasn't an excuse for

24   actions as an adult; is that correct?

25   A.   Correct.

1   Q.   And on that date, you also emphasized that Mr. Shields

2   needed to address his issues as a perpetrator upon his

3   release; is that right?

4   A.   Yes.

5   Q.   I'm going to take you to December 9 of 2005.

6   A.   Okay.

7   Q.   And you saw him again on that date?

8   A.   Correct.

9   Q.   And you're noting on that date that his primary

10  treatment need was for sexual offending; is that correct?

11          (Witness examining document.)

12  A.   Let me just find it in the note.  Okay, yes, I wrote,

13  "He asked this writer for her input as to what issues she

14  believes are most pertinent for him to address.  His sexual

15  offending was noted as being a primary treatment need,

16  although he was reminded that this will need to be addressed

17  in a group treatment setting following release."

18  Q.   You noted that he opted not to take part in the sex

19  offender treatment.  Those are those parens?

20  A.   Correct.

21  Q.   And SOTP means "sex offender treatment program"?

22  A.   Yes.

23  Q.   You told him individual therapy was not an appropriate

24  type of treatment for sexual offending issues?

25  A.   Correct.

1   Q.   And as of this date in 2005, Mr. Shields remained

2   guarded in opening up to deeper issues; isn't that right?

3   A.   Yes.

4   Q.   And opening up is necessary for successful treatment,

5   isn't it?

6   A.   Yes.

7   Q.   You saw Mr. Shields again on January 5, 2006, correct?

8   A.   Correct, yes.

9   Q.   He was not taking his medication at that time, correct?

10  A.   Correct.

11  Q.   He told you about the length of the pill line or

12  conflicts with his work schedule, correct?

13  A.   Correct.

14  Q.   And he admitted to you at this time that he's starting

15  to instigate problems with staff?

16  A.   Yes.

17  Q.   And at that time you determined that that's a direct

18  result from his not being medication-compliant, correct?

19  A.   Yes.  I believe that a lot of his irritability stemmed

20  from the depression, and he demonstrated much less of that

21  when he was medication-compliant.

22  Q.   And whether it's within Butner or outside of the

23  institution, there's no guarantee that someone is going to

24  take their medication as directed, correct?

25  A.   Correct.

1   Q.   Now, you saw Mr. Shields again in April, 2006, I

2   believe you stated.  On April 18, 2006, you saw Mr. Shields?

3   A.   Correct, yes.

4   Q.   And part of the reason for your seeing him is, you're

5   starting to prepare him for release planning; is that

6   correct?

7   A.   Yes.

8   Q.   And one of the things you do as you're going over

9   release planning with him is, you're noting treatment

10  activities that he should be completing?

11  A.   Correct.

12  Q.   And you're setting goals?

13  A.   Yes.

14  Q.   And one of those goals was to establish a support

15  system; is that right?

16  A.   Yes.

17  Q.   He didn't have a ready support system waiting in the

18  community, did he?

19  A.   No.

20  Q.   And another thing you're telling him at this time is to

21  get sex offender treatment, correct?

22  A.   Correct.

23  Q.   And you're telling him to continue your therapy for

24  depression, correct?

25  A.   Correct.

1   Q.   And to participate in Alcoholics Anonymous?

2   A.   Correct.

3   Q.   And the goal here, as you're preparing for release

4   planning, is to reduce his active symptoms, right?

5   A.   Yes.

6   Q.   He is still exhibiting symptoms of depression?

7   A.   Yes, some symptoms at that time, yes, April, '06.

8   Q.   At the bottom of the first page of your notes of

9   April 18, 2006, you set out the goal:  "Reduce active

10  symptoms," correct?

11  A.   Yes.

12  Q.   And you want to prevent a risk of relapse, correct?

13  A.   Correct.

14  Q.   There's always a risk that he could relapse at this

15  time, correct?

16  A.   Correct.

17  Q.   Now, you see Mr. Shields again on June 14 of 2006,

18  correct?

19  A.   Correct.

20  Q.   And he recounts again his history of past sexual

21  offending, correct?

22  A.   Yes.

23  Q.   And he doesn't tell you anything more than the three

24  sexual offenses, correct?

25  A.   I noted that he said he had been incarcerated three

Page 77

1    times for sexual offending, so I don't remember if he talked

2    of anything outside of that, but I know he mentioned those

3    occasions.

4    Q.   Okay, certainly nothing more than that is reflected in

5    your notes of that day, correct?

6    A.   Yes, yes.

7    Q.   And he confirms to you in June of 2006, he tells you

8    there's no current social support in the community, correct?

9    A.   Correct.

10   Q.   And in fact when you're talking about his release time,

11   he's telling you he's still confused sometimes about how to

12   proceed?   I believe it's the second-to-last sentence.

13              (Witness examining document.)

14   A.   Yes.

15   Q.   So when he's talking to you about how he's going to do

16   things differently this time, he's still confused?

17   A.   Yes, still was not always quite sure about how he was

18   going to achieve those things, but at least moving in that

19   direction.

20   Q.   And on July 7 you saw Mr. Shields again, correct?

21   A.   Correct.

22   Q.   And he says to you, "I'm making bad choices lately"?

23   A.   Yes.

24   Q.   And he's not thinking clearly?

25   A.   Yes.

1   Q.   And this is nearing his release date, correct?

2   A.   Yes.  This would have been about two months prior to

3   release.

4   Q.   And you saw Mr. Shields again on July 21, 2006; is that

5   correct?

6   A.   Correct.

7   Q.   And in July of 2006, you're again reinforcing his need

8   to go to sex offender treatment; is that right?

9   A.   Yes.

10  Q.   And at this time in July of 2006, Mr. Shields is

11  hesitating with you, saying he's not sure he can relate to

12  someone else, right?

13  A.   Yes.  He was concerned about what type of relationship

14  he would be able to establish with another therapist.

15  Q.   You saw Mr. Shields again on August 2, 2006, correct?

16  A.   Correct.

17  Q.   And you remind him again -- he's medication-compliant

18  at this point?

19  A.   Yes.

20  Q.   And you remind him again that he needs to continue with

21  his treatment, correct?

22  A.   Correct.

23  Q.   And it's depression, this treatment was to address his

24  depression, correct?

25  A.   Correct.

1   Q.   And you tell him he has to address his personal

2   history?

3   A.   Yes.

4   Q.   And he has to address his sexual offending, right?

5   A.   Correct.

6   Q.   And so at least as of August 2, 2006, you're still

7   recognizing a need for sex offender treatment, correct?

8   A.   Correct.

9   Q.   I'm going to September 1 of 2006 when you meet with

10  Mr. Shields again.

11  A.   Okay.

12  Q.   And at that point he only had a couple of more sessions

13  with you; is that right?

14  A.   Correct.

15  Q.   And he again expresses his concern that a therapist out

16  in the community might not understand his issues or his

17  progress?

18  A.   Correct.

19  Q.   And it's in response to this concern that you write

20  those letters for Mr. Shields, right?

21  A.   Correct, yes.

22  Q.   The letters that you wrote to his therapist, that was

23  to give future therapists information about Mr. Shields,

24  right?

25  A.   Yes.

1    Q.   And the letter to the probation officer, that was to

2    alert them to the resources that Mr. Shields might need once

3    he's out in the community, right?

4    A.   Correct.

5    Q.   Now, you were asked about disciplinary reports for any

6    type of sexual behavior at FCI Butner regarding Mr. Shields.

7    Do you recall that line of questioning?

8    A.   Yes.

9    Q.   Now, there are no children in the population at FCI

10   Butner, are there?

11   A.   No.

12   Q.   And you spoke about Mr. Shields's statement to you that

13   older men are what killed him.  Do you recall that

14   statement?

15   A.   Yes.

16   Q.   You were aware, were you not, that Mr. Shields claims

17   he was also abused by other children in his childhood?

18              MS. KELLEY:  Objection.  I don't know about that.

19              THE COURT:  Yes, sustained as to -- unless you

20   have that -- do you have that knowledge?

21              THE WITNESS:  I -- I don't really have that

22   recollection.  I'm sorry.

23   Q.   Did Mr. Shields ever tell you that other children in

24   his neighborhood growing up abused him?

25   A.   I really can't recall, and I don't think it's

Page 81

1   referenced in my notes.  He may have.  I don't know.

2   Q.   In testifying about Mr. Shields's compliance with

3   medication, that was medication for his depression?

4   A.   Correct, yes.

5   Q.   And failing to be compliant with medication for

6   depression could lead to a regression, right?

7   A.   You would still expect to see symptoms, yes.

8   Q.   You would expect to see symptoms.  He would be

9   depressed, correct?

10   A.   Yes.

11   Q.   And he told you that when he was depressed, that's when

12   he committed his other offenses, didn't he?

13   A.   He talked about -- I know he talked about some

14   depression during the time that he was viewing the Internet

15   pornography.  I don't specifically remember if he referenced

16   being depressed at the time of his other offenses.

17            THE COURT:  How much longer do you have?

18            MS. STACEY:  I would say fifteen minutes, outside.

19   It's one page of notes and one set of questions.

20            THE COURT:  Will you have any redirect?

21            MS. KELLEY:  A slight amount.

22            THE COURT:  I think we'll take our morning break.

23            THE CLERK:  All rise for the jury.

24            (Jury excused.)

25   SIDE-BAR CONFERENCE:

1        THE COURT:  I'm worried now about scheduling.

2  Excuse me.  I need you all up here.

3        MS. KELLEY:  This is going to go faster.  I think

4  we'll be done with the second witness by 1:00, and then the

5  last three are, like, boom, boom, boom.

6        THE COURT:  Well, hold on.  Okay, so let's go.  So

7  you're going to be about 11:30  till quarter of, and then

8  you're not going to be --

9        MS. STACEY:  At the latest.

10       MS. KELLEY:  Definitely not past 12:00, or less.

11       THE COURT:  So then who's on?

12       MS. KELLEY:  Raenae Moore.  She's right outside.

13       THE COURT:  Who is she?

14       MS. KELLEY:  She's the halfway house person.

15  She's very quick.

16       THE COURT:  Let me tell you how bad my day is

17  today, okay, if you want to hear my angst.  I have to swear

18  in all these new immigrants downstairs at 1:30, okay?  I

19  just found out Immigration has invited a speaker, okay?  I

20  didn't know about that, okay?  And then I've got all these

21  people flying in for the pretrial, the people that are

22  starting right after you at 4:00 o'clock.

23       MS. STACEY:  Everybody else is local, I think,

24  from Maine.

25       MS. KELLEY:  I think the government can forgo

Page 83

1    cross as well.

2              MS. STACEY:  Oh, I think you can forgo redirect.

3              THE COURT:  But my point is only, I'm not in

4    control of my own scheduling today.

5              MS. KELLEY:  All right.

6              THE COURT:  So what I might want to do is, if you

7    could squeeze, maybe go to 1:15.

8              MS. KELLEY:  Yes.

9              THE COURT:  Okay, now, play this out.  If I went

10   to 1:15, not to give you more leeway on this one, that way

11   I'd let the jury go until 2:15, so if Immigration went over,

12   I've got the extra fifteen.

13             MR. KELLEY:  Love it, that's great.

14             THE COURT:  So you just have to script it that

15   way.

16             MS. KELLEY:  We're going to go fast.

17             THE COURT:  All right, thank you.

18             (End of side-bar conference.)

19             (A recess was taken, 11:05 a.m).

20             (Resumed, 11:35 a.m.)

21   MS. STACEY:

22   Q.   Dr. Graney, were you aware through your treatment of

23   Mr. Shields that he had made plans for release into the

24   community before?

25   A.   Following prior incarcerations?

1    Q.   Prior to the incarceration for which he pleaded.

2    A.   He had indicated that he had not done so in the past.

3    Q.   I am showing you what's in evidence as Exhibit No. 5 in

4    this case, and I'll ask you to take a look at that document,

5    particularly the last page of Exhibit 5.

6              MS. KELLEY:  Objection.

7              THE COURT:  Is this part of the notes?

8              MS. STACEY:  No.  I'm asking her if she's -- it's

9    in evidence.  I'm asking her if she's seen the document

10   before.

11             THE COURT:  Overruled.

12   Q.   Do you see the part entitled "Argument" on the last

13   page, Bates No. 00907?

14   A.   I do.

15   Q.   Okay, have you seen that document before?

16   A.   I have not.

17   Q.   So he told you he had not made plans before?

18   A.   Yes, that he had not prepared for release during prior

19   incarcerations.

20   Q.   And looking at this document, does it refresh your

21   recollection --

22             THE COURT:  Just so the jury knows, what date is

23   this document?

24             MS. STACEY:  I'm sorry.  This document is dated

25   February 7, 1991.

1      THE COURT:  So this was after he was released from

2  the 1998 situation, right?

3      MS. STACEY:  '89.

4      THE COURT:  All right, yes, from the first --

5  we're going to give you a time line, by the way, which

6  hopefully will be prepared.

7      MS. STACEY:  The first.

8      THE COURT:  So it's from the first one, right.

9      MS. STACEY:  It's prior to his current

10 incarceration and treatment by Dr. Graney.

11 Q.  And so looking at that, where Jeffrey Shields told the

12 court that he planned on going to Sex and Love Addicts

13 Anonymous, does that refresh your recollection as to whether

14 he's ever told you that during treatment, that those were

15 plans for his prior release?

16 A.  No.  I do not recall him discussing that.

17 Q.  Do you ever recall him discussing that he had planned

18 to go to sex offender treatment in preparation for his other

19 releases?

20 A.  I know he had previously participated in sex offender

21 treatment, but I'm not sure where that falls in the time

22 frame of when he was incarcerated and released, so I don't

23 know if that relates to his releases from state prison.

24 Q.  And during his treatment with you, he never told you

25 that he was genuinely remorseful for his crimes in 1991, did

1    he?

2    A.    He talked about remorse with me, but I don't remember

3    him referencing that experience previously, no.

4    Q.    And when you saw him on August 19, 2004, one of the

5    things he mentioned was that he had been involved in an

6    incident with a younger male prostitute, I believe is the

7    term.  Do you recall that?

8    A.    Correct.

9    Q.    Did he ever tell you that the prostitute was 12 years

10   old?

11   A.    No, I don't believe that -- I don't have that note in

12   front of me, but I seem to recall --

13   Q.    I've put it up on the screen, if that helps you.

14   A.    Okay -- that he reported him as being in his teenage

15   years, but I don't specifically remember an age quoted.

16   Q.    Didn't he tell you that he had been involved in an

17   ongoing relationship with this prostitute?

18   A.    Yes.

19   Q.    He didn't tell you, or your notes don't reflect, that

20   the child pornography that he downloaded in 2001 included

21   images of prepubescent children, did he?

22   A.    No.  I don't remember discussing that.

23   Q.    Now, Dr. Graney, you never did a full-out risk

24   assessment of Mr. Shields, did you?

25   A.    No.

1  Q.   You never evaluated Mr. Shields for his risk of

2  recidivism, did you?

3  A.   No.

4  Q.   You don't specialize in the sex offender treatment

5  field, do you?

6  A.   No.

7  Q.   And your letters that you wrote weren't an endorsement

8  of Mr. Shields, were they?

9  A.   No.  It was just to assist whoever may be working with

10 him in the future to have a better understanding of what we

11 had worked on in treatment.

12 Q.   And when he left FCI Butner in 2006, he left without

13 ever having had a sex offender treatment program, right?

14 A.   Yes.

15 Q.   And, to your knowledge, he's never received sex

16 offender treatment since his incarceration at Butner to this

17 time, correct?

18 A.   His further incarceration at Devens?

19 Q.   At Butner, yes.

20 A.   I'm sorry, I think I'm confused.

21 Q.   Since your treatment with him, you have no knowledge of

22 him receiving any sex offender treatment until today?

23 A.   No.

24        MS. STACEY:  I have nothing further.

25 REDIRECT EXAMINATION BY MS. KELLEY:

1   Q.   Just a few things.  Doctor, do you have any

2   understanding of why the sex offender treatment at Butner

3   has been shut down?

4   A.   It was a result of the Adam Walsh Act.

5   Q.   And the Adam Walsh Act is why we are here today?

6   A.   Correct.

7            THE COURT:  That's a statute we're talking about.

8   You'll hear a lot of about that when I give the jury

9   instructions.

10  Q.   This law, the sexually dangerous person law in Federal

11  Court, is new, isn't it, relatively speaking?

12  A.   I believe within the last couple of years, yes.

13  Q.   And since the Adam Walsh Act has begun to be enforced

14  people in the federal system who go into sex offender

15  treatment are finding their treatment records being used

16  against them in these proceedings; isn't that true?

17           MS. STACEY:  Objection.

18           THE COURT:  Sustained.

19           MS. STACEY:  Move to strike.

20           THE COURT:  I sustain the objection, and, as you

21  know, you shouldn't consider anything in an attorney's

22  question unless I allow in the answer.

23  Q.   Ms. Stacey asked you if you know about Mr. Shields

24  receiving treatment since he has left Butner.  Do you

25  remember those questions?

Page 89

1   A.   Yes.

2   Q.   When he left Butner, where did he go?

3   A.   To a halfway house.

4   Q.   In Portland, Maine, correct?

5   A.   Correct.

6   Q.   And do you know approximately how long he was there?

7   A.   I don't even know if it was a month.  It wasn't very

8   long.

9   Q.   And then what happened to him at the end of his stay at

10  that halfway house?

11              MS. STACEY:  Objection.

12              THE COURT:  Overruled.

13  A.   My understanding was that before he completed his time

14  at the halfway house, the U.S. Marshals Service picked him

15  up and brought him back into federal custody.

16  Q.   And the reason for that?

17  A.   Was because of the Adam Walsh Act.

18  Q.   Because the government had moved to have this

19  proceeding initiated against him, correct?

20  A.   Correct.

21  Q.   And, to your knowledge, was that because of anything he

22  did wrong at the halfway house?

23  A.   No.

24  Q.   Did he have any incidents of bad behavior at that

25  halfway house?

Page 90

1   A.   Not to my knowledge, no.

2   Q.   So do you know how close to his release date he got

3   arrested and taken back into a secure facility?

4   A.   I don't know the exact date.  I know he released from

5   our facility on September 11 of '06, and, like I said, I

6   believe it was only a month later.  And, if I'm correct, I

7   think the Adam Walsh Act went into effect maybe two months

8   prior to his release.

9   Q.   So are people typically released to halfway houses

10  close to the end of serving their time?

11  A.   Yes.

12  Q.   And the time in the halfway house is actually part of

13  their sentence, right?

14  A.   Correct.

15  Q.   It's just, instead of being behind the wall, they're in

16  a community setting so they can kind of release gradually

17  into the community, right?

18  A.   Correct.

19  Q.   And the place where Mr. Shields was, he was still

20  technically serving his time, right?

21  A.   Correct.

22  Q.   So it's very close to the end of his prison sentence

23  that he gets arrested and taken back to Fort Devens; is that

24  right?

25  A.   Correct.

1  Q.   That's in the fall of 2006, right?

2  A.   Correct.

3  Q.   Now, sadly, we are now in 2008, aren't we?

4  A.   Correct.

5  Q.   So it's been two years Mr. Shields has been at Devens

6  awaiting this proceeding; is that correct?

7            MS. STACEY:  Objection.

8            THE COURT:  It's Fort Devens, which is a federal

9  institution.

10  Q.   It's a prison, right?

11  A.   Correct, yes.

12  Q.   And, to your knowledge, is there a sex offender

13  treatment program there?

14  A.   The treatment program that was at Butner has been

15  recently relocated to Devens.

16  Q.   And are you familiar with the waiver they make people

17  sign before they enter that program at Devens?

18            MS. STACEY:  Objection.

19            THE COURT:  Overruled.

20  A.   No, I'm not familiar with that.

21  Q.   Are you familiar with the fact that when people go into

22  that program --

23            THE COURT:  She's not familiar with it.

24  Q.   Do you have any information, from being part of the

25  psychological staff in the Bureau of Prisons, as to whether

1    people in a present sex offender treatment program have

2    confidentiality rights?

3    A.   Before the Adam Walsh Act, it was very different.  My

4    understanding is, before the Act, it was very different than

5    it is now.

6    Q.   And how is it now, as far as you understand?

7            THE COURT:  Do you know firsthand?

8            THE WITNESS:  I just know from colleagues that

9    worked in the sex offender treatment program.  I don't have

10   firsthand knowledge, no.

11           MS. KELLEY:  May she answer?

12           THE COURT:  No.  Hearsay.

13           (Discussion off the record between defense

14   counsel.)

15   Q.   Let me just ask you, since the Adam Walsh Act, what

16   have you seen in terms of people seeking sex offender

17   treatment within the Bureau of Prisons?

18   A.   There are still some inmates that have expressed a

19   desire to seek treatment.  Others are reluctant because

20   they're afraid that the information that they reveal in

21   treatment could be used against them under this Act.

22   Q.   And so in fact the treatment program at Butner is gone,

23   right?

24   A.   Correct.

25   Q.   Ms. Stacey asked you about whether there are any

1    children in prison.  In your experience working inside

2    prison, do you have experience observing people who have

3    sexual issues, aggression issues, or even just pedophiles?

4    A.   Yes.

5    Q.   And, in your experience, do those people act out

6    sexually often?

7    A.   Some do, yes.

8    Q.   And what are the types of things a person who has

9    pedophilia will do in a prison, even though there are no

10   children there?

11             MS. STACEY:  Objection.

12             THE COURT:  Sustained.

13   Q.   Do you see people who have compulsive sexual behavior?

14   A.   Yes.

15   Q.   And what kinds of things are they doing in prison?

16             MS. STACEY:  Objection.

17             THE COURT:  Sustained.

18   Q.   Do you see people with compulsive sexual behaviors

19   acting out?

20   A.   Yes.

21   Q.   And did you see any of that type of behavior or

22   compulsion in Mr. Shields?

23   A.   No.

24   Q.   And does the fact that there are no children in prison

25   mean anything in that context?

1  A.   No.  They do find other ways to gratify their sexual

2  fantasies.

3  Q.   Do you often find people with the diagnosis of

4  pedophilia doing things that are highly inappropriate short

5  of sexually acting out?

6           MS. STACEY:  Objection.

7           THE COURT:  Do you have experience with that?

8           THE WITNESS:  With the general population inmates

9  who are convicted of sex offenses, yes.

10           THE COURT:  All right, I'll allow that.

11  Q.   What types of behaviors do you commonly see?

12  A.   Some of them do engage in sexual activity with other

13  inmates.  I've also had particular cases where, when

14  officers have searched their cells, you'll find magazine

15  cutouts or brochure cutouts with children.  They're not

16  really pornographic images.  It might be a child in a

17  bathing suit, but it's the closest thing they can get to

18  pornography, so they will use that for sexual behaviors or

19  sexual fantasies.

20  Q.   And these are people who are compulsively attracted to

21  children, correct?

22  A.   Correct, some of them, yes.

23  Q.   And even in prison they're collecting pictures of

24  children, right?

25  A.   Correct.

1    Q.    Did you see any of that behavior with Mr. Shields?

2    A.    No.

3    Q.    Ms. Stacey went over with you that toward the end of

4    Mr. Shields's treatment, he still was showing some

5    depressive symptoms.  Is that a problem in your mind?

6    A.    Toward the end of his treatment, a couple months prior

7    to release, he still had some depressive symptom.  It was

8    not at the level as it was when I first started working with

9    him.  And then, from my recollection and my notes, at the

10   time that he released, he was not showing any symptoms.

11   Q.    Are the kind of problems Mr. Shields has something you

12   just, like, one day you're just all better, or what?

13   A.    No.

14   Q.    How does your recovery progress?  What's normal?

15   A.    Well, I mean, that varies by the individual and the

16   issues they're dealing with, how motivated they are, how

17   capable they are to engage in treatment, so there's a number

18   of factors.  Mr. Shields in particular had a number of

19   issues that he came into prison with.  I don't know the

20   extent to -- what he had been addressing over the years,

21   what he did with prior therapists, how long he had been in

22   treatment.  I just know that in the time that I worked with

23   him, I did see a steady progression and improvement in the

24   sense of his willingness to open up to treatment.

25   Q.    There's a lot of discussion on cross about the sex

1    offender treatment program and Mr. Shields's need to have

2    sex offender treatment.  Can you just address the need or

3    talk about just briefly about the need for somebody to

4    change and how important that is.  Is sex offender treatment

5    the be-all and end-all here?

6              MS. STACEY:  Objection.

7              THE COURT:  Sustained.

8              MS. KELLEY:  A really bad question.  I'm sorry.

9              THE COURT:  We need to wrap this up.

10             MS. KELLEY:  Okay.

11   Q.   Did you see a distinct change in Mr. Shields?

12   A.   Yes.

13   Q.   With regard to sex offender treatment, I'd just like

14   you to look at the notes from June 21.  What are DAP

15   classes?

16   A.   Drug abuse program classes.

17   Q.   And on June 21, which is fairly close to his release,

18   did he report something to you about being in the drug

19   offender, a drug whatever, the drug program group?

20   A.   Yes.

21   Q.   And what happened to him on that date?

22   A.   He had been in a drug abuse program class, and for

23   whatever reason, there were very few inmates in class that

24   day.  And he revealed to me that two other individuals, the

25   two other individuals that were in class with him that day

1    were known sex offenders.  And because of that, he used that

2    opportunity to open up and talk a little bit about his own

3    history of abuse as well as his own history of offending.

4    Q.   And what did he say that experience was like for him?

5    A.   I asked him how he felt after doing that.  He said he

6    didn't have any regret sharing that information, which is

7    sometimes very difficult for individuals to share, and he

8    said, quote/unquote, "That was cool.  It was all right."

9    Q.   And so how do you think this -- does this have any

10   significance for his openness to sex offender treatment?

11   A.   That would suggest to me that in an environment where

12   he felt safe revealing that information, that he would be

13   willing to do so.

14   Q.   Is it unusual for people to express a need for

15   treatment or wanting to get help before they're really ready

16   to engage?

17   A.   Is that unusual?

18   Q.   Yes.

19   A.   No.

20   Q.   Is there something wrong with somebody realizing they

21   have a problem but not being ready to go there yet and deal

22   with it?

23   A.   No.  Recognizing that there's a problem is the first

24   step.

25   Q.   Is it possible for people to sit through treatment and

1   not engage?

2   A.   Yes.

3   Q.   And then is it possible for somebody who did that in

4   the past to really commit themselves to change?

5   A.   That could happen, yes.

6   Q.   Did you get a sense from working with Mr. Shields that

7   he was ready for that?

8   A.   I did.

9   Q.   Now, I just finally want to ask you, the government

10  pointed out that Mr. Shields said he was often manipulative

11  in relationships in one of his meetings with you.  Do you

12  have as part of your job, do you have a way yourself of

13  measuring somebody's genuineness and sincerity?

14  A.   I've been in corrections now for ten years, and I'd

15  say --

16  Q.   Let me just, let me just -- there's no manipulative

17  people in that population, are there?

18  A.   I was going to say, I would say the majority of inmates

19  are manipulative to some extent.  But, like I said, I had a

20  unique opportunity; not only do I see him in session, I

21  talked to staff who dealt with him on a daily basis; I was

22  able to observe him when he may not have known he was being

23  observed.  And so because I have that opportunity, I can

24  often look at what inmates are telling me and then look at

25  how they're behaving and see if those two things match up.

1    And in his case, the change he was talking about in

2    treatment and the change he was showing in treatment carried

3    through in other areas of the institution.

4            MS. KELLEY:  I have no further questions.

5    RECROSS-EXAMINATION BY MS. STACEY:

6    Q.   Dr. Graney, all of your testimony and your sessions

7    with Mr. Shields are based on Mr. Shields's self-reporting

8    of information to you, right?

9    A.   In large part, yes.

10   Q.   And and you rely on Mr. Shields to tell you the truth,

11   right?

12   A.   Often, yes.

13   Q.   And you have no other basis for knowing about, say, his

14   past history without finding out just from Mr. Shields

15   himself, right?

16   A.   Other than typically like a presentencing report or,

17   you know, I could refer to other psychology records from

18   when he was in the Bureau of Prisons, but beyond that, no, I

19   had no other particular information about him.

20   Q.   You didn't review his prior psychological records from

21   the institution he was at before he went to you?

22   A.   At Lewisburg?

23   Q.   Right.

24   A.   I remember looking at, I think, the CODE, the

25   information from the CODE program.

1  Q.   You didn't go through a bunch of those psychology data

2  system notes or PDS notes, did you?

3  A.   No.  I don't know exactly how many there were from

4  Lewisberg.

5  Q.   So all of your testimony today is based 95 percent or a

6  100 percent on Mr. Shields's reports to you?

7  A.   His self-report, but also my observations of him and

8  other staff observations.

9         MS. STACEY:  Thank you.  I have nothing further.

10         MS. KELLEY:  I just have one question.

11  FURTHER REDIRECT EXAMINATION BY MS. KELLEY:

12  Q.   Since Mr. Shields has been at Fort Devens for two

13  years, have you had access to his records?

14  A.   I do.  It's a national database.

15  Q.   And have you periodically checked on those?

16  A.   I have.

17  Q.   And what have you deduced from that?

18  A.   From what I have seen since he has been at Devens, he

19  has continued to remain free of depressive symptoms and has

20  required really only minimal psychology contact and appears

21  to be functioning well.

22         MS. KELLEY:  Okay, thank you very much.  No

23  further questions, your Honor.

24         THE COURT:  All right, thank you.  Your next

25  witness?  Thank you very much.

1          (Witness excused.)

2          MS. KELLEY:  Mr. Shields calls Raenae Moore.

3                    MELISSA RAENAE MOORE

4    having been first duly sworn, was examined and testified as

5    follows:

6    DIRECT EXAMINATION BY MS. KELLY:

7    Q.   Hi, Ms. Moore.  Will you state your name for the

8    record, as you pour your water, if you can.

9    A.   Melissa Raenae Moore.

10          THE COURT:  Much louder.  Speak right into the

11   mike so we all hear you.  It's a huge courtroom.  No, pull

12   it in like this.  You can adjust it.  Good.

13   A.   Melissa Raenae Moore.

14   Q.   And where are you from, Ms. Moore?

15   A.   I'm originally from the state of Kentucky, but I

16   currently reside in Portland, Maine.

17   Q.   And can you just give the jury briefly why you're here.

18   How do you know Jeff Shields?

19   A.   I was Jeffrey's case manager at the Pharos House, which

20   is a federal halfway house in Portland, Maine.

21   Q.   And that's P-h-a-r-o-s, Pharos House, right?

22   A.   Correct.

23   Q.   And what's your educational background?

24   A.   I've studied social work and have a degree in social

25   work and in rehabilitation medicine from the University of

1    Kentucky.

2    Q.   And do you have any other postgraduate work?  What was

3    that, an undergraduate degree?

4    A.   Postgraduate work I did with Capella University, which

5    is an accredited online university.

6    Q.   And what was that work in?

7    A.   Organizational psychology.

8    Q.   And what kind of work have you done other than your

9    work at the Pharos House?

10   A.   I've worked in various social work positions that dealt

11   with policy, people with disabilities.  I was the social

12   worker for a juvenile correctional facility for five years.

13   Q.   And where was that?

14   A.   That was in Lexington, Kentucky.

15   Q.   And when did you move to Maine?

16   A.   In '05.

17   Q.   And how long were you working at the Pharos House?

18   A.   Fifteen months.

19   Q.   And were you there at the time Mr. Shields got there?

20   A.   Yes.

21   Q.   Can you just tell us, when you first met Mr. Shields as

22   his case manager, what did you do with him?

23   A.   As when all residents arrive, once they arrive at the

24   halfway house, we no longer address them as inmates.  We

25   address them as residents.  My job is to immediately search

1   their belongings when they arrive.  In the cases of people

2   that are classified as a sex offender, we're looking for

3   what we consider to be inappropriate materials because they

4   sometimes have those from the prison and bring them with

5   them to the halfway house.

6   Q.   Now, let me just ask you, typically, how do people get

7   from the prison to the halfway house?

8   A.   Usually a bus.

9   Q.   So, for example, Mr. Shields was in North Carolina,

10  right, when he was released to Maine?

11  A.   Correct.  The government arranges for them to come

12  unescorted on a bus from whatever institution, and then they

13  arrive at the bus station in Portland.  Then they have to

14  get themselves from the bus station to the halfway house.

15  Q.   And do you sometimes find people straying as they make

16  their way to the halfway house?

17  A.   Yes.

18  Q.   Was that the case with Mr. Shields?

19  A.   No, it wasn't.

20  Q.   And when you searched or went through Mr. Shields's

21  belongings, did you find anything that you considered to be

22  contraband or suspect in any way?

23  A.   No, I didn't.  When Jeffrey arrived, he was prepared,

24  as when we write letters back to the institution letting

25  them know what their arrival date is and what they need to

1    be prepared to bring with them, such as Social Security

2    card, birth certificate, anything that's going to help jump

3    start their process to getting back into the community for a

4    job.  And Jeff had a folder with all of his paperwork.  He

5    had all the necessary identifying information, plus a

6    resume', plus he had printouts for job leads.  He was the

7    most prepared inmate to that date that I had worked with.

8    Q.   And when a person first gets there, do you go over the

9    rules of the Pharos House with them?

10   A.   Yes.  It's my job that before they can even be assigned

11   to their room, that I meet with them and I go over the

12   probably five pages of rules and regulations, which is a lot

13   to digest.  And we have to go over that.  The resident has

14   to sign it.  I have to sign it.  I have to go over their

15   conditions and standards of their probation or their

16   supervised release.

17   Q.   So let me just stop you there.  If the person is going

18   to be on supervised release, are they on supervised release

19   when they get there?

20   A.   No.

21   Q.   But you have a list of their conditions that they're

22   going to be living under?

23   A.   Correct.  I'm the first person to make them aware of

24   that because they immediately, within 24 hours, need to do

25   certain things that's part of that standards; and for him,

1   it was that he needed to go to the local police station and

2   register as a sex offender, and give the halfway houses his

3   address.  And he has to go to the marshal's office to get

4   his picture taken, which he did.

5              And then in that same orientation meeting, I have

6   to set up the first treatment plan for him and what he needs

7   to be accountable for and needs to immediately start working

8   on.  And those are usually -- the standard is is that every

9   person become employed within fifteen days.  And that's not

10  working days; that's fifteen continuous days.  And for him,

11  it was to register as a sex offender, attend weekly AA

12  meetings, open a bank account and immediately start saving

13  money for release.  And I can't remember what the other ones

14  are, but those are sort of the things that you have to start

15  people off with immediately the next day.

16  Q.   It's fair to say, the packet of information you would

17  go over with somebody is about 15 pages long?

18  A.   Correct.

19  Q.   And in addition to the person's conditions of

20  supervised release that the court has imposed, the Pharos

21  House had a lot of particular rules, right?

22  A.   A lot.

23  Q.   A lot.  For example, did they have rules about a

24  curfew?

25  A.   Yes.  You know, there was a curfew.  There was

1   accountability.

2   Q.   Can you just explain what accountability checks are.

3   A.   Accountability checks are that every resident cannot

4   leave the front door without an approved itinerary of their

5   whereabouts.  And I'm talking exactly the route that they're

6   taking from the time they leave the front door to where they

7   visit, they're going, the estimated time, you know, a time

8   frame.  And if they are one minute off, then that is grounds

9   for an incident.

10          And so with the accountability checks is based on

11  their approved itinerary, which is only from the case

12  manager, such as I was at that time.  I could look and know

13  his whereabouts 24 hours a day.  And then I had forms where

14  that we had paid staff that no one else knew except for

15  those people that were doing accountability checks who I

16  filled out for and wanted those checks done.  And that meant

17  that that person took their itinerary and could follow that

18  person for eight hours a day without being seen, recognized,

19  or aware of, and make sure that they arrived where they were

20  supposed to on their itinerary; that they went a route,

21  whether it was walking, or if they were in a car or on a

22  bus, if it was an appropriate route and not one that was the

23  long way around.  And then I would receive a report within

24  24 hours of that accountability check whether that person

25  followed the letter of that itinerary.

1   Q.   And did you ever do or request these itinerary checks

2   for Jeff Shields?

3   A.   Yes, I did.

4   Q.   And how would you characterize the number of times you

5   did that in the about 60 days he was there?

6   A.   Probably excessively because --

7   Q.   And why would you say excessively?  Why did you do

8   that?

9   A.   Because Jeffrey was the first sex offender on my case

10  load that I had dealt with, and I wanted to test.  I wanted

11  it for my own security, and I just felt like that it was in

12  the interest, you know, of the community to do so.

13  Q.   And in the times, excessive number of times you had him

14  followed as you described, did you ever get back any single

15  even minor negative report?

16  A.   Not one.

17  Q.   Now, are there --

18          THE COURT:  Excuse me.  Over what period of time

19  was this that you had him followed?

20          THE WITNESS:  A two-month period of time.

21  Q.   Did you have him followed every single day?

22  A.   I would say, probably for the first month, even I had

23  him followed to the marshal's office.

24  Q.   Okay, you wanted to make sure, if he said he was going

25  somewhere, that's where he was going?

1   A.   Yes.

2   Q.   Did the guys who live in the house, did they know you

3   were doing this?

4   A.   Some would joke that they thought that they were being

5   followed, but, no, they didn't know.

6   Q.   Did you ever do accountability checks yourself?

7   A.   Yes, I did.

8   Q.   And, of course, Mr. Shields would recognize you, right?

9   A.   Right, but --

10   Q.   Did it ever seem odd that you were popping up in places

11   where he was?

12   A.   He would know that I was doing accountability checks

13   because I would do them on my off-hours when I wasn't

14   working; and basically that would be that if I knew that he

15   was going to an AA meeting, I would be driving there and

16   parked somewhere along the side, just to watch him walk into

17   the building.

18   Q.   Now, her Honor, Judge Saris, just asked you about the

19   time period.  He was admitted to the Pharos House on

20   September 12 of '06?

21   A.   Correct.

22   Q.   And then he was arrested and removed on November 2 of

23   '06?

24   A.   Correct.

25   Q.   Okay, so that's the time period we're talking about?

1    A.   Yes.

2    Q.   Now, the rules you went over with him included some

3    reference to the YMCA and that the people at Pharos House

4    were allowed to go and have recreation at the YMCA; is that

5    right?

6    A.   Correct.   It was --

7    Q.   And was there ever a problem that arose with regard to

8    that in general, not with Mr. Shields?

9              MS. STACEY:   Objection.

10             THE COURT:   Sustained.

11   Q.   Did you talk with Mr. Shields about his going to the

12   YMCA?

13   A.    I informed him that he was not allowed to go to the

14   YMCA because there's a rule that if you're a sex offender,

15   you're not allowed to use the facilities at the Y.   And he

16   informed me that he was so afraid to walk by the Y, that he

17   would cross the street three blocks before he got there

18   because he didn't want anyone to mistakenly think that he

19   was walking by the YMCA for a wrong reason.

20   Q.   Did Mr. Shields obtain a job?

21   A.   Yes, he did.   He was employed by the Holiday Inn By The

22   Bay within 24 hours of his arrival.

23   Q.   In your experience, was that a quick job obtainment?

24   A.   World record.

25   Q.   Okay.   And what was he doing at the Holiday Inn?

Page 110

1  A.   He was working in the main dining room, and he was

2  working banquets.

3  Q.   Now, this is the dreaded restaurant business, so was

4  there alcohol available to Mr. Shields at his job?

5           MS. STACEY:  Objection.

6           THE COURT:  Overruled.  If you know.

7  A.   I do know.  Not the shift that he was working at the --

8  the dining hall in the morning, there was not a bar there in

9  the morning; and then the banquets that he worked, there was

10  not alcohol involved either, because in doing my job

11  certification check, I had made it very clear that he

12  couldn't be bartending or working around alcohol.

13  Q.   So you referred to your job certification check.

14  What's that?

15  A.   For all the residents, as a case manager, I was

16  required to, once the person was offered employment, I had

17  to verify that.  I had to verify that the resident informed

18  the employer of their status at the halfway house, that they

19  were a felon; and that if they were a sex offender, they had

20  to inform them that they were a sex offender.  So I had to

21  verify that, verify the hours, verify the job.  And I had to

22  do it in person, and I had to show up at least once, if not

23  twice, a week to their job site; and I had at least

24  twice-a-week contact with his supervisor at the Holiday Inn.

25  Q.   And was Mr. Shields a hard worker?

Page 111

1    A.   Yes, he was.

2    Q.   What was your experience with him as far as his work

3    history while he was living at the Pharos House?

4    A.   He was -- he was really motivated, and he took a lot of

5    pride in what he was doing because he had actually came to

6    the Pharos House prepared to work in this industry, that he

7    had gained a certification in being able to be an inspector

8    for food services.  From my understanding, it was equivalent

9    of like a health inspector, so the Holiday Inn was really

10   interested in employing him because of that certification

11   because they needed it to have him there.  And he was

12   motivated to work as many hours as he could because he

13   needed to save money because his stay there was only two

14   months, and two months is not a lot of time to save enough

15   money to find, you know, your own apartment.  He had to

16   basically use what he made from that job to prepare for

17   release.

18   Q.   And at the Holiday Inn, was his work such that he was

19   ever offered any type of a promotion?

20   A.   Yes.  He was offered a promotion into the management

21   program, and we discussed that.  That was something that I

22   would have to approve.  I approved it, but I had felt like

23   that he needed to wait until he was released and had that

24   transition before that he start the management program.

25   Q.   Now, during his time at the Pharos House, was he

1  involved in any alcohol treatment or substance abuse

2  treatment?

3  A.   He attended AA meetings.

4  Q.   And did he do this sporadically or regularly or what?

5  A.   He did this, I would say, more often than other

6  inmates, given the fact that his work schedule was that he

7  would work a morning shift and then sign up for -- he would

8  be working banquets in the evening, or sometimes his shift

9  would run all day.  He would actually use his lunch break to

10  actually go to an AA meeting that would be within walking

11  distance to his job.  So he was busy either working or

12  meeting with his sponsor or going to AA from 5:00 o'clock in

13  the morning to 11:00 o'clock at night.

14  Q.   Now, did he also attend a sex addicts group?

15  A.   Yes, he did, and I believe that he only attended two

16  meetings.

17  Q.   Let me ask you, first, what is that?  What is the

18  purpose of that group?

19  A.   Sex and Love Addicts Anonymous is a group that is very

20  similar to Alcoholics Anonymous or NA that focuses on

21  unhealthy sexual relationships, and it's a group that helps

22  each other to keep themselves in check of behaviors that are

23  associated with --

24  Q.   Promiscuity?

25  A.   Yes, promiscuity, monogamy, or those such issues.

1  Q.   And do you know why he only attended two of those

2  meetings, as far as you know?

3  A.   His work schedule was a priority.  He worked so many

4  hours.  His attending AA meetings was a priority as well.

5  And in Portland, the SLAA meetings are very few, and you

6  have to go through this process to even know where that

7  they're at.

8  Q.   They're like -- well, they're not -- well, okay --

9          THE COURT:  Well, would that be called a sex

10 offender treatment program?

11         THE WITNESS:  No.  It's just like Alcoholics

12 Anonymous.  It's just a different group that deals with, you

13 know, what people consider their emotional and sexual

14 behavior.

15 Q.   Does the group promote monogamy?

16         MS. STACEY:  Objection.

17 A.   Yes, they do.

18         THE COURT:  Well, have you ever been there?  Do

19 you know?

20         THE WITNESS:  Yes, I have.

21 Q.   And do you know whether the group -- the point of the

22 group is to encourage responsible sexual behavior between

23 adults, right?

24 A.   Correct.

25 Q.   Okay.  Now, with regard to sex offender treatment,

1    what, if anything, did Mr. Shields do?

2    A.    Part of his special conditions under supervised release

3    was to attend sex offender treatment.  Well, as I was

4    reading all of his information, I attempted to get him

5    enrolled in sex offender treatment while he was at the

6    Pharos House with Steve Thomas.

7    Q.    Let me just ask you, was he resistant to that?

8    A.    No.  He was ready to start, but when I called Steve

9    Thomas to actually --

10              MS. STACEY:  Objection.

11   Q.    Let me just ask you, do you see Steve Thomas in this

12   room?

13   A.    Oh, I seen him earlier, but I don't see him now.

14   Q.    Okay, the screen is in your way, but he's sitting here,

15   right?

16   A.    Correct.

17   Q.    And who is Steve Thomas?

18   A.    Steve Thomas is the contracted sex offender treatment

19   provider for U.S. Probation and Parole in the city of

20   Portland.

21   Q.    Okay.  And you know him professionally, right?  You

22   know who he is?

23   A.    Correct.

24   Q.    And he is the guy who would be giving Mr. Shields sex

25   offender treatment in Portland, right?

1          MR. GRADY:  Objection.

2     A.    Correct.

3     Q.    He's the only guy who does it, right?

4          THE COURT:  You know, when she objects, just --

5          MS. KELLEY:  Oh, I'm so sorry.

6          THE COURT:  I overrule it, but I've got to be able

7     to rule first.

8          MS. KELLEY:  I'm sorry.  Just on a roll here.

9     Q.    So what did you do with regard to Steve Thomas?  Let me

10    just go back to that for a second.

11    A.    I attempted to set up a meeting with Steve and

12    Mr. Shields for him to begin his sex offender treatment, and

13    Steve Thomas made me aware directly that he did not have a

14    referral from the BOP --

15         THE COURT:  Bureau of Prisons.

16    A.    The Bureau of Prisons -- sorry -- and that unless he

17    had that referral, that he would not be allowed to work with

18    him until that he was on supervised release.

19    Q.    So at the time Mr. Shields is at the Pharos --

20         THE COURT:  So let me explain something.  So he

21    was in this halfway house under the control, shall I say, of

22    the Bureau of Prisons at the end of his prison sentence.  He

23    wasn't technically on supervised release, which is the term

24    we call, as I'm understanding it, what you might call

25    parole.  He was still finishing off his federal sentence.

1    He was still part of the Bureau of Prisons, right?

2              THE WITNESS:  Correct.

3              THE COURT:  So when we say "conditions of

4    supervised release," that federal judge in Maine, when he

5    got out from the child pornography charge, had imposed as a

6    condition sex offender treatment, but he wasn't yet on

7    parole, so he was in this twilight zone right in between the

8    two, right?

9              THE WITNESS:  Correct.

10             THE COURT:  I think I have this chronology

11   correct.

12             MS. KELLEY:  Yes, that's exactly right.

13   Q.   So whatever happened with Mr. Thomas and Mr. Shields?

14   A.   Nothing.

15   Q.   Okay, because Mr. Shields --

16             THE COURT:  Did you provide your own sex offender

17   treatment in the halfway house?  Not you personally, but

18   does the halfway house provide it?

19             THE WITNESS:  No.

20   Q.   So, to your knowledge, has that policy been changed now

21   since that time?

22             MS. STACEY:  Objection.

23             THE COURT:  Sustained.

24             MS. KELLEY:  Okay.

25   Q.   Let me ask you about individual counseling.  Did

1   Mr. Shields say anything to you with respect to that?

2   A.   Yes.  Jeff was -- he came prepared at the halfway house

3   with a letter from Dr. Graney explaining the amount of work

4   therapeutically those had did together.  And Jeff was used

5   to what I would call a great deal of support and therapy in

6   a therapeutic relationship, and that was not my role at the

7   halfway house.  But with my -- you know, I'm technically a

8   social worker; I was not acting as a social worker.  And

9   Jeff was expressing a need and a desire to be in another

10  therapeutic relationship with a therapist, and he was, in my

11  opinion, he was really trying to continue the momentum that

12  he had came there with from what he'd accomplished with

13  Dr. Graney.  And in my attempts to get an appointment for

14  Mr. Shields with the community counseling agency, once

15  again, similar to the sex offender treatment, after four

16  weeks of trying to get an appointment, being put off,

17  finally I --

18              MS. STACEY:  Objection.

19  A.   -- called the executive director demanding to know why

20  that they would not make an appointment for Mr. Shields, and

21  the answer I finally got from the director was --

22              MS. STACEY:  Objection.

23              THE COURT:  Yes, sustained.  That's hearsay.  So

24  the community --

25              MS. KELLEY:  Counseling.

1        THE COURT:   -- counseling, is that different from

2   sex offender treatment?

3        THE WITNESS:  Yes.

4        THE COURT:  All right, so that's mental health

5   counseling, like Dr. Graney gave him?

6        THE WITNESS:  Right, because that was the question

7   she asked me.

8   Q.   So you were also trying to get him into individual

9   therapy at his request, correct?

10  A.   Correct.

11  Q.   And this is part of your job at the Pharos House is to

12  see that the people there are getting their act together and

13  getting their support going for when they're going to be

14  released, right?

15  A.   Correct.

16  Q.   But you also met with negative results in that regard,

17  right?

18  A.   Correct.

19  Q.   And was it your understanding that that would be fixed

20  once he was on supervised release?

21  A.   Yes, that was what I was told, that he would be able to

22  start counseling once he was on supervised release because

23  that agency has a contract with the U.S. Probation office;

24  and then, once he was on supervised release, then he could

25  begin counseling there.

Page 119

1    Q.   Now, let me --

2              THE COURT:  How long was he supposed to be in the

3    halfway house all together?

4              THE WITNESS:  Excuse me, ma'am?

5              THE COURT:  How long was he supposed to have been

6    with you?

7              THE WITNESS:  Two months.

8              THE COURT:  So the two months was the -- he was

9    only going to be in the halfway house for two months?

10             THE WITNESS:  Yes.  He was due to release in about

11   five days when the marshals picked him up, so he was five

12   days away from beginning all of his conditions.

13   Q.   Now, at the time he was in the Pharos House, was he

14   planning to live somewhere else after the Pharos House?

15   A.   Yes.  He made arrangements -- in my work with him, we

16   were looking at the amount of money he was making, what he

17   had saved, what his best options were, and Mr. Shields chose

18   to live in what's called a sober living house association,

19   the Oxford House.  So he had met people through the network

20   of him attending AA meetings, and he got accepted into

21   Oxford House, which is a sober living house.  And I had to

22   coordinate where he was going to live with who was going to

23   be his supervising officer, which is Dan Kelly, if that is

24   an appropriate place for him to live.  I had to go check it

25   out, meet with all of the residents there, ask them how they

1    felt about Mr. Shields's status.  And no one had a problem

2    with it and --

3    Q.   Let me just interrupt you for a minute.  Do you see

4    Mr. Kelley here too, Dan Kelly?

5    A.   Yes.

6    Q.   And he would have been Mr. Shields's probation officer,

7    as far as you know?

8    A.   Correct.

9    Q.   And so you're telling --

10            THE COURT:  Don't forget, she's your witness.

11            MS. KELLEY:  I'm sorry.

12   Q.   So you had some communications with Mr. Kelley?

13            THE COURT:  That's leading.

14   Q.   Did you have communications with anyone in the

15   Probation Department?  I think you said this.

16   A.   Yes.

17   Q.   Okay.  And was Mr. Shields mandated to go to the Oxford

18   House?  Did someone tell him he had to go there?

19   A.   No.

20   Q.   And is this a place that had some restrictions?

21   A.   Yes.

22   Q.   And when you say it's a sober house, what do you mean

23   by that?

24   A.   That means you have to continue to attend AA meetings

25   while you live there.  You have to maintain your sobriety.

1  They actually have a house meeting within the actual place

2  that you live.

3  Q.   And when you said you met with people to talk about

4  Mr. Shields's status, what do you mean by that?  What's that

5  a reference to?

6  A.   In my communications with Dan Kelly, his probation

7  officer, my job was to make sure that before he released,

8  that the place that he was going to be living, whether it

9  was a sober house or a private landlord, that they were

10 aware that Jeff Shields was a sex offender.  And --

11 Q.   Okay.  And is it difficult to place sex offenders in

12 residential settings?

13             MS. STACEY:   Objection.

14             THE COURT:   Overruled.

15 A.   Extremely.

16 Q.   Okay.  And is this something you do so that when the

17 person gets where they're going, it doesn't all blow up and

18 then they're homeless?

19 A.   Correct, and I had a lot of experience with making sure

20 that the places that residents released to were not going to

21 be short-term and blow up in their face.

22 Q.   Now, I just have two quick points.  With regard to

23 Mr. Shields getting ready to move into Oxford House, what

24 kind of preparations did he make?

25 A.   He had bought items that you would need to move into a

1   place when you're transitioning from an institution.  And

2   Mr. Shields didn't have anything.  He had to go buy linens

3   and towels and bedding, and, you know, his own personal, you

4   know, like, kitchen items and that sort of thing.  So he had

5   done well with saving his money and spending it

6   appropriately so that he would have these things when he

7   released.

8   Q.   And, finally, with regard to a social network, what are

9   you looking for with somebody who's transitioning back into

10  the community with regards to a social network?

11  A.   Ones that are like minded, such as people that he

12  wanted to maintain his sobriety, his associations with

13  people in AA, people that are not known felons.

14  Q.   Excuse me.  Did you find Mr. Shields trying to build --

15  did you witness him trying to build a social network?

16  A.   Yes, I did.

17  Q.   And what did he do?

18  A.   He had a sponsor that he met with weekly.

19  Q.   From?

20  A.   An Alcoholics Anonymous sponsor.  He was networking

21  with other members of the AA community, and those were

22  people that would give him a ride if he needed to go; when

23  he was trying to prepare for release, to go buy some bedding

24  and stuff like that, or give him a ride to an AA meeting.

25  And he was going to social functions that were sober

1    functions that were organized by AA members.

2    Q.   Did Mr. Shields ever have any friends that you knew of?

3    A.   He had a gentleman friend that he relayed to me that he

4    had ran into on the city bus, that he was the first person

5    that he had ran into in public in Portland since his return,

6    and that this person was a positive person from his past,

7    and that he had to explain to him what all had been going on

8    in his life.  And he was working on building a friendship

9    with this gentleman, and this gentleman friend, he actually

10   brought items to the halfway house for Mr. Shields, such as

11   like a winter coat that he didn't have and some other

12   clothing items, and --

13   Q.   When someone visits the halfway house, do you run their

14   criminal record?

15   A.   Yes.  I actually have to give that to --

16        THE COURT:  Yes, you need to pick up to make sure

17   we finish this.

18   Q.   Okay, I just want to show you one document that we have

19   from the Pharos House, and do you recognize that?

20   A.   Yes, I do.

21   Q.   What is that?

22   A.   It's a terminal report from the halfway house.

23   Q.   And is that the only documentation you've seen from the

24   Pharos House?  I mean, in connection with this case here, is

25   that the sum total of the documents from the Pharos House,

1    as far as you know?

2    A.   Yes, but there's a whole file of my documentation of a

3    weekly basis --

4            MS. STACEY:  Objection.  Move to strike.

5    Q.   Have you seen that at all?

6    A.   No.

7    Q.   Okay, so as far as we know, this is the only surviving

8    documentation from the Pharos House concerning Jeff Shields,

9    right?

10   A.   Correct.

11           MS. STACEY:  Objection.

12           THE COURT:  Are you at the Pharos House now?

13           THE WITNESS:  No.

14           THE COURT:  You don't work there anymore?

15           THE WITNESS:  No, ma'am.

16   Q.   When did you leave the Pharos House?

17   A.   October of '07.

18   Q.   And why did you leave there?

19   A.   I was offered a better position with more

20   responsibility and much better pay.

21   Q.   Is that what you're doing now?

22   A.   Correct.

23   Q.   And just briefly, what is that job?

24   A.   I'm the director of Reducing Homelessness Initiative

25   for Cumberland county.

Page 125

1          MS. KELLEY:  Now, I'd like to move that this

2     terminal report go into evidence.

3          MS. STACEY:  No objection.

4          THE COURT:  What number?

5          MS. KELLEY:  I think it's 104.

6          (Respondent Exhibit 104 received in evidence.)

7          THE COURT:  You need to wrap it up.

8     Q.   Okay, I just have one question.  At the end of that

9     report, it states that Mr. Shields left because of program

10    failure, right?

11    A.   That was --

12    Q.   Can you just quickly explain why you wrote "program

13    failure."

14    A.   There was no other choice.  This terminal report is

15    generated from a document that comes from the Bureau of

16    Prisons, and there's only three choices.  And basically,

17    when Mr. Shields was picked up by the marshals, no one, not

18    myself, not the U.S. Probation Office, not the BOP office in

19    Philadelphia which we were tied to, could explain why

20    Mr. Shields was picked up.  And to this day sitting here, I

21    had -- I had a conversation with the director, and he --

22         MS. STACEY:  Objection.

23         THE COURT:  Objection sustained.  We do need to

24    finish it, or we can't get her out of here before the lunch

25    break.

Page 126

1    MS. KELLEY:  Okay, no further questions.  Thank

2    you.

3    CROSS-EXAMINATION BY MS. STACEY:

4    Q.   Ms. Moore, during your time at Pharos House, you had

5    about eight sex offenders on your case load?

6    A.   About, yes.

7    Q.   And Mr. Shields was your first?

8    A.   Correct.

9    Q.   And you did a high amount of accountability checks on

10   Mr. Shields because he was a sex offender, right?

11   A.   Correct.

12   Q.   And Mr. Shields knew about these accountability checks,

13   didn't he?

14   A.   They're aware of the process of accountability checks,

15   but not -- they never knew when that they took place or who

16   did them.

17   Q.   Sure.  So when they come to the Pharos House, you go

18   over the rules, and you tell -- you told Mr. Shields

19   accountability checks would happen, right?

20   A.   If that's in the pages of the orientation, then, yes.

21   Q.   Well, you just testified that they knew that

22   accountability checks would happen.  How is that?

23   A.   If I'm remembering correctly, it's in the rules.

24   Q.   Okay.  And you testified about Mr. Shields's job at the

25   Holiday Inn in the dining room.  Do you recall that

1    testimony?

2    A.   Correct.

3    Q.   And that you had contacted the Holiday Inn and said he

4    wasn't supposed to be around alcohol; is that right?

5    A.   Correct.

6    Q.   And certainly the Holiday Inn has functions in the

7    dining hall that include alcohol, right?

8    A.   Correct.

9    Q.   You just made sure he wasn't working those functions,

10   right?

11   A.   That he was not allowed to serve the alcohol.

12   Q.   So he could be in the room where alcohol was served?

13   A.   Yes.

14   Q.   And once he was out from under your supervision, there

15   was no guarantee that he wouldn't be serving the alcohol, is

16   there?

17   A.   Uhm, no.

18             MS. KELLEY:   Objection.

19             THE COURT:   Overruled.

20   Q.   Now, during his time at Pharos House, Mr. Shields had

21   no contact with his brothers, right?

22   A.   Not to my knowledge.

23   Q.   You testified -- this is in terms of his community

24   support -- he had a sponsor, correct?

25   A.   Correct.

1  Q.   He didn't develop any support from Sex and Love Addicts

2  Anonymous meetings, correct?

3  A.   Not that I'm aware of.

4  Q.   And he didn't develop any relationships with any other

5  people at Pharos House, correct?

6  A.   Correct.

7  Q.   And you're not aware of any friends that he had from

8  the Portland community, are you?

9  A.   Just the one that I spoke of earlier.

10  Q.   When we talk about the one that you spoke of earlier,

11  you don't know that person's name, do you?

12  A.   I can't remember his name, but his name was submitted

13  to me for me to give to Mr. Kelly to do a background check.

14  Q.   And you never met this person, did you?

15  A.   No.

16  Q.   And you never saw him bringing the clothes you

17  testified about to the halfway house, did you?

18  A.   No.

19  Q.   And you never met anyone by the name of Todd Woodsom

20  that was associated with Mr. Shields, did you?

21  A.   No.

22  Q.   And you never met anyone by the name of Frank Kramer

23  that was associated with Mr. Shields, did you?

24  A.   No.

25  Q.   Now, it's your testimony that Mr. Shields intended to

1   participate in the Sex and Love Addicts Anonymous meetings,

2   correct?

3   A.   Could you repeat that question?

4   Q.   Well, Mr. Shields intended to participate in Sex and

5   Love Addicts Anonymous meetings, correct?

6   A.   Yes.

7   Q.   And he only attended two; is that right?

8   A.   Yes.

9   Q.   And that's because, you testified, his work was a

10  priority?

11  A.   Yes.

12  Q.   So he was putting his work before any benefit he would

13  get from treatment in SLAA?

14  A.   SLAA is not a treatment program.  It is a volunteer

15  program that people choose to go to.

16  Q.   Okay.  So he was putting his work before any benefit he

17  might receive from a voluntary program that he intended to

18  go to, right?

19  A.   I disagree because he was attending AA, which is the

20  same and similar.  It's all part of the same self-help

21  recovery.

22  Q.   Now, you don't know whether Mr. Shields has reoffended

23  while he's been out on supervised release before, do you?

24  A.   (No response.)

25  Q.   Do you need me to repeat the question?

Page 130

1    A.   Yes.

2              THE COURT:  Well, you need to clarify that.  This

3    is the first time he was on federal supervision, but in the

4    state court, he was released several times.  Do you know

5    what his history was there?

6              THE WITNESS:  Yes.

7    Q.   Do you know whether Mr. Shields has reoffended before,

8    before you became involved?

9    A.   Yes.  It was all in his paperwork that I received.

10   Q.   Do you recall being deposed in this matter up in Maine?

11   A.   Yes.

12   Q.   And do you recall me asking you, "Do you have a memory

13   of whether or not Mr. Shields offended while out on

14   supervised release at any time?" and your answer was, "I

15   have a memory that he -- oh, on supervised release?  No, I

16   don't know."  Do you recall testifying that?

17             MS. KELLEY:  What page is that on?

18             MS. STACEY:  45.  Would you like me to --

19             MS. KELLEY:  No.  That's fine.

20   A.   If that's what I said, that's what I said, but he's not

21   been on supervised release, so I guess that was a -- the

22   question is moot because he's never been on federal

23   supervised release.

24   Q.   Mr. Shields was at Pharos House for a little short of

25   two months, correct?

623aeb73-4fb3-4b26-ba0d-4edab4b5c7bd

Page 131

1   A.    Correct.

2   Q.    And that is the total amount of time that you've had to

3   be his case manager, correct?

4   A.    Correct.

5   Q.    And you are a degreed social worker, correct?

6   A.    Correct.

7   Q.    You're not a licensed social worker?

8   A.    Correct.

9   Q.    And you have never treated Mr. Shields as a sex

10  offender, have you?

11  A.    No.

12  Q.    You've never done any kind of risk assessment on

13  Mr. Shields, have you?

14  A.    No.

15          MS. STACEY:  I have nothing further.

16          MS. KELLEY:  Can we have a stipulation about the

17  fate of the records from Pharos House?

18          THE COURT:  No.

19          MR. SWOMLEY:  Side bar, please.

20          THE COURT:  No, not right now.  So do you have

21  anything else with her?

22          MS. KELLEY:  I have no further questions.

23          THE COURT:  Thank you very much for coming from

24  Maine.  Who else do we have --

25          MR. SWOMLEY:  Your Honor, could we, please, just a

1    two-second side bar with specificity.

2    SIDE-BAR CONFERENCE:

3            THE COURT:  That was inappropriate to do in front

4    of the jury. Now we're doing it at side bar.  Is there a

5    stipulation the BOP lost the records?.

6            MS. STACEY:  No, because they didn't.  I filed a

7    pleading with this court in response stating that those

8    records were destroyed in their usual and customary document

9    destruction policy years before prior to this litigation,

10   so, in other words, it was like about 30 days out.

11           THE COURT:  Thirty days after he left?

12           MS. STACEY:  After he left.

13           MS. KELLEY:  They were destroyed?  I didn't see

14   that, but can the jury be informed of that?

15           THE COURT:  You know what?  You work out a

16   stipulation, and I'll read it to them.

17           MR. SWOMLEY:  The witness is still here, though,

18   and if she has knowledge of that --

19           MS. STACEY:  She doesn't have knowledge of it.

20           (End of side-bar conference.)

21           (Witness excused.)

22           THE COURT:  Just so I have a sense, how many

23   people are sitting here from Maine?  And, Mr. Kelly, you're

24   with who?

25           THE WITNESS:  U.S. Probation.

1     THE COURT:  I don't know who's faster.  I'm

2  wondering whether we should put the other gentleman on, get

3  him out of here.

4     MS. KELLEY:  Well, I think Mr. Kelly.  I think

5  we're really doing well on the schedule.

6     THE COURT:  All right, all right.

7     MS. KELLEY:  I don't think you have to worry.

8     THE COURT:  All right, I just want to make sure,

9  not that Maine is so far away, to get everyone home today.

10     MS. KELLEY:  Mr. Kelly is very terse, I think.

11                  DANIEL P. KELLY

12  having been first duly sworn, was examined and testified as

13  follows:

14     THE CLERK:  Would you please state your name and

15  spell it for the record.

16     THE WITNESS:  Daniel P. Kelly, K-e-l-l-y.

17  DIRECT EXAMINATION BY MS. KELLEY:

18  Q.   Hi.  Mr. Kelly, what do you do for a living?

19  A.   I'm a U.S. probation officer.

20  Q.   And where are you right now?

21  A.   Portland, Maine.

22  Q.   Can you just explain a little bit about your

23  professional background to the jury.

24  A.   Eight years as a state probation officer and sixteen

25  and a half years as a federal probation officer.

1    Q.   And where have you spent those sixteen and a half years

2    as a federal probation officer?

3    A.   I initially started off here in Boston as a Pretrial

4    Services officer and then went to Portland, Maine.

5    Q.   Now, comparing state probation to federal probation,

6    what's your opinion of the kind of level of supervision and

7    professionalism of the federal system versus state?

8            MS. STACEY:  Objection.

9            MS. KELLEY:  He's done both.

10           THE COURT:  Overruled.  Go ahead.

11   A.   Generally, it's hard to go from state to state, but

12   what I can compare to in the state of Maine with the federal

13   probation, I believe the degree of professionalism, the

14   amount of education needed to perform the position, as well

15   as the training opportunities are a lot more for the federal

16   probation officer.

17   Q.   And as a federal probation officer, what exactly do you

18   do?

19   A.   I'm in charge of supervising people.

20   Q.   And when you say you supervise people, what do you

21   mean?

22   A.   Anybody coming out of the Bureau of Prisons that's on

23   supervised release, I take care of the supervision of their

24   conditions that were imposed by the judge.

25   Q.   And can you just explain to the jury, what does

Page 135

1    supervised release mean in the federal system?

2    A.    Supervised release came out in, I believe it was 1984

3    when the Sentencing Commission came out with the Guidelines,

4    and --

5                THE COURT:  You know, we don't need that level of

6    detail.

7                MS. KELLEY:  Let's not go back to the Guidelines.

8    A.    Well, basically it does take the place of parole, and

9    it's just like probation, only it's a sentence by itself.

10   We have certain standard conditions that everybody's

11   required to follow and then special conditions that are

12   imposed by the judge for the specific case.

13   Q.    Now, when you say it took the place of parole, when

14   someone is on supervised release, is their sentence running

15   during that time, their prison sentence?

16   A.    No.  Their prison sentence has been completed.

17   Q.    And so a person is placed on supervised release for a

18   term of years?

19   A.    That's correct.

20   Q.    And how long will Mr. Shields's term of years be, do

21   you know?

22   A.    I believe it is for three years.

23   Q.    And that is imposed at the time of sentencing for his

24   federal offense?

25   A.    That's correct.

Page 136

1    Q.   Now, when someone is on supervised release --

2              THE COURT:  Can we back up for a minute?  Were you

3    his assigned probation officer if he had been released?

4              THE WITNESS:  Yes, I was.

5              THE COURT:  Oh, I'm sorry.  I asked whether he

6    would have been the assigned probation officer if he had

7    been released, and the answer is  "yes," as I understand it.

8    Is that right?

9              THE WITNESS:  That's correct.

10   Q.   Now, when someone's on supervised release, they have a

11   lot of conditions they are supposed to follow, right?

12   A.   Correct.

13   Q.   And if they violate the conditions of their supervised

14   release, some of those conditions, you could violate them

15   without breaking any law, right?

16   A.   Yes.  It's called a technical violation.

17   Q.   And even for a technical violation, what happens if you

18   think it's a serious violation?

19   A.   We generally ask the court for a summons or an arrest

20   warrant and have the person arrested.

21   Q.   And then what happens when they get brought into court?

22   A.   They have a preliminary hearing, and then we have what

23   we call a revocation hearing that follows.

24   Q.   And when you have a revocation hearing, who oversees

25   that?  Who's the judge presiding at that hearing?

1    A.    The revocation hearing is usually presided by the

2    sentencing judge.

3    Q.    In Mr. Shields's case, is the sentencing judge still

4    there?

5    A.    Yes, he is.

6    Q.    Who is that?

7    A.    Judge Woodcock.

8             THE COURT:  So he's a federal judge in Maine.

9    Q.    And does he have a reputation for being soft on crime,

10   that guy?

11            MS. STACEY:  Objection.

12            THE COURT:  Sustained.

13   A.    Uhm --

14   Q.    Don't answer.

15   A.    Okay.

16   Q.    So when you go in front of the judge on a supervised

17   release violation, what happens in the courtroom?

18   A.    Could you be more --

19   Q.    What's the proceeding?

20   A.    First of all, if he does want to -- a preliminary

21   hearing is held in front of a magistrate judge, a U.S.

22   magistrate judge, and if he wants to contest it, we have to

23   bring witnesses in and prove our alleged charges against

24   him.

25   Q.    And at the end of the day, if you prove that the person

1   has violated a condition of their supervised release, what

2   happens in court?

3   A.   As I mentioned, it goes at a later date for a

4   revocation hearing.  It gives us a chance to prepare a

5   report indicating some of the background of the person while

6   he was on supervised release.

7   Q.   And then ultimately what is the judge able to do?

8   A.   Sentence him.  And he can sentence him to a straight

9   sentence of imprisonment, he can modify conditions, or he

10  can revoke him, and also put him back on another term of

11  supervised release.

12  Q.   And when you say put him back on another term of

13  supervised release, does that mean he can extend the term of

14  supervised release, the judge?

15  A.   Not more than what could have been imposed originally

16  at the original sentencing.

17  Q.   But he could, for example, if somebody violated their

18  supervised release a year into it, the judge could extend it

19  beyond the original term of supervised release?

20          MS. STACEY:  Objection.

21          THE COURT:  Sustained.  Leading.

22  Q.   Okay.  Can the judge extend the term of supervised

23  release at the time of revocation?

24  A.   He cannot extend it beyond what was available at the

25  original sentencing.

1  Q.   Okay.  Now, with regard to incarceration, if the judge

2  decides the violation is serious enough that the person

3  needs to go to prison for that, in this case, do you know

4  what the maximum term Judge Woodcock could give Mr. Shields

5  would be?

6  A.   I believe it was two years.

7  Q.   Okay.  And that's determined by statute, right?

8  A.   By statute.  There's also Chapter 7 guidelines that are

9  available for the judge to use as well.

10 Q.   So are those guidelines mandatory?

11 A.   No.  They're advisory in nature.

12 Q.   But there is a statute that sets out suggested

13 sentences for types of violations?

14 A.   Yes, there is.

15 Q.   And the judge can use that as a guide?

16 A.   Yes.

17 Q.   But he doesn't have to go by that?

18 A.   That's correct.

19 Q.   Now, I just want to go over with you Mr. Shields's

20 terms of supervised release under standard conditions.  This

21 is Bates No. 5.  Do you have a copy of these?

22 A.   Yes, I do.

23 Q.   Okay, I just ask you to refer to that.  Can you just go

24 over these quickly for the jury.  Like, what kinds of things

25 would Mr. Shields be prohibited from doing?

1    A.   Well, first of all, you have the conditions that are

2    contained in the preamble which mention that defendant shall

3    refrain from any unlawful use of a controlled substance,

4    defendant shall submit to one drug test within fifteen days

5    of release from imprisonment, and at least two periodic drug

6    tests thereafter, as directed by the probation officer.  He

7    also had a condition imposed that he shall not possess a

8    firearm, destructive device, or any other dangerous weapon.

9    Q.   And then down under "Standard Conditions of

10   Supervision"?

11   A.   The standard condition --

12           THE COURT:  We're not reading them all.  They're

13   up on the screen.  They can see them.

14           MR. GRADY:  They're in evidence as well.  They're

15   Exhibit 8.

16   Q.   Okay.  And these are conditions that basically

17   everybody who's on supervised release has, right?

18   A.   That's correct.

19   Q.   Okay.  But Mr. Shields has special conditions, right?

20   A.   Yes, he does.

21   Q.   And these were imposed by Judge Woodcock at the time of

22   sentencing?

23   A.   Correct.

24   Q.   And I'm just showing you those now.  And they have to

25   do with -- if you could just look at No. 1 and quickly

1    summarize that.

2    A.    "Defendant shall participate in a program of mental

3    health treatment, to include sexual offender treatment, as

4    directed by the probation officer, until such time as the

5    defendant is released from the program by the probation

6    officer."

7    Q.    Now, let me just stop you for a second.  You heard

8    Raenae Moore testify about her efforts to get Mr. Shields

9    into sex offender treatment and individual treatment?

10   A.    Yes.

11   Q.    And her explanation was, at that time the BOP wouldn't

12   pay for it?

13   A.    That's correct.

14   Q.    Is your understanding that's true, that was true back

15   then?

16   A.    Yes.

17   Q.    And has that been corrected since?

18   A.    Yes, it has.

19            MS. STACEY:  Objection.

20            THE COURT:  Sustained.

21   Q.    And this is in evidence for the jury.  I just direct

22   you to No. 3.  This is a special condition that was imposed

23   on Mr. Shields.  Can you just explain to the jury what that

24   entails?

25   A.    Basically, if we have reason to believe that he's

Page 142

1    committed some kind of violation, we have the right to

2    search his home, a complete search of the home or where he

3    might be living, any vehicle under his control, or his

4    person.

5    Q.   And typically you couldn't just do that to anyone,

6    right, go in and search their home?

7    A.   That's correct.

8    Q.   Okay, but this is like a release for you to have access

9    to those places, right?

10   A.   Correct.

11   Q.   And then No. 4, is this something that's a special

12   condition that's commonly included for child porn offenders?

13   A.   Yes, it is.  It's been changed or modified since the

14   imposition of this sentence.  We have new technologies, and

15   the condition has been modified to address the new

16   technologies.

17   Q.   This sentencing took place back in 2003, almost five

18   years ago?

19   A.   Yes.

20   Q.   And would you go into court and seek to modify some of

21   these conditions, given new developments in your ability to

22   supervise people?

23            MS. STACEY:  Objection.

24            THE COURT:  Overruled.

25   A.   Yes, I would.

1   Q.   What new tools do you have now to monitor convicted sex

2   offenders?

3            THE COURT:  Well -- well, all right.  All right,

4   go ahead.

5            MS. KELLEY:  Okay, thank you.

6   A.   Well, one thing that we make more specific as far as

7   the counseling, sexual offender treatment counseling, is

8   that they be subjected to polygraph.  And other things that

9   we have going on that have changed is GPS systems with

10  active -- you can actively follow where a person is going

11  from place to place.

12  Q.   But let me just stop you right there.  You have a GPS

13  system that you can hook people up to?

14  A.   Correct.

15  Q.   And what does that look like physically?

16  A.   A bracelet fits on his ankle, and then there's a little

17  wand that he wears on a belt.

18  Q.   And what is your control over the person if they have

19  such a device?

20  A.   Basically we can follow them to any place they go, to

21  and from work, to and from counseling.  We can also put an

22  exclusion and inclusion zones in to prevent him going near a

23  school or something of that nature.

24  Q.   So let's say just theoretically you had a sex offender,

25  you did not want him approaching a school, you could program

1   that device so you would know if he went near a school?

2   A.   That's correct.

3   Q.   You have that technology now?

4   A.   Yes, we do.

5   Q.   And what other techniques would you use now that were

6   not included in these conditions?

7   A.   If anybody was released, we generally would recommend

8   that they be released to a halfway house initially.

9   Q.   And is there any technology concerning a person's use

10  of a computer that you utilize?

11  A.   Yes.  At present we have a system where we have a disk

12  that we can put in the computer and basically can trace

13  wherever the person has been, Web sites and things of that

14  nature.  And if we find anything that's -- any evidence that

15  a person has gone onto an illegal Web site, then we can

16  seize the computer and have it analyzed forensically.

17          THE COURT:  So what is the practice in Maine if

18  somebody was sentenced before all these things went into

19  effect and now you have them?

20          THE WITNESS:  Generally we'd seek modification.

21  Q.   And when you say you seek modification, you would ask

22  the judge.  You would say to the, "Judge, modify these

23  conditions to reflect our new technology," right?

24  A.   Correct.

25  Q.   And I'm looking down at No. 5 of the special

1   conditions.  You're allowed to remove any equipment from a

2   person's home when you feel like it to check it out?

3   A.   If we have reason to believe there's some kind of

4   violation existing on the computer equipment.

5   Q.   So you can run a disk on the spot, right, just to see

6   where the person has been?

7   A.   Yes.

8   Q.   Or you could also just take the whole thing back to the

9   office and go through it as you wish, right?

10  A.   Generally we try to find evidence of violations

11  initially, and then bring the computer back and have it

12  analyzed by a forensic expert in computers.

13  Q.   And with this condition, you don't need to get a

14  warrant?  You don't need to involve the police at all, do

15  you?

16  A.   No, we do not.

17  Q.   And the person is going to give you their personal and

18  business phone records if you ask for them?

19  A.   That's correct.

20  Q.   And the person can have no contact with children?

21  A.   That's also correct.

22  Q.   Now, when someone is about to be released, you know it,

23  right?

24  A.   Yes.  We're notified by -- first of all, if they're

25  going through the halfway house, we're notified by the

Page 146

1    halfway house as well as the Bureau of Prisons.

2    Q.   And you get ready for them, right?

3    A.   Yes, we do.

4    Q.   You don't wait until they show up in your office to

5    have a plan for their supervision, right?

6    A.   That's correct.

7    Q.   And when you're supervising somebody like Mr. Shields

8    with the kind of criminal history he has, how often would

9    you want to see such a person?

10   A.   Again, it depends on the individual officer.  It could

11   be weekly.  It could be biweekly.  We do announce,

12   on-announce home visits, nights, weekends.

13   Q.   Do you ever go to their place of employment?

14   A.   Yes, we do.

15              THE COURT:  How much longer do you think you have?

16              MS. KELLEY:  I think four minutes.

17              THE COURT:  How long do you think you have?

18              MS. STACEY:  Very quick, less than ten minutes or

19   less.

20              THE COURT:  Try and wrap up.  We'll try and get

21   you out of here in the next few minutes.

22              MS. KELLEY:  Yes, I'm hoping for that, leaving

23   them minimal time for cross.  Just kidding.

24   Q.   So you see Mr. Thomas here?

25   A.   Yes, I do.

1   Q.   Steve Thomas?  Do you work with him?

2   A.   Yes, I do.

3   Q.   What's his role in a person's probation, as would be in

4   Mr. Shields's probation?

5   A.   He's been contacted to provide sex offender treatment

6   for U.S. Probation and Parole in Portland, Maine.

7   Q.   And has Mr. Thomas, do you have a lengthy relationship

8   with him?

9   A.   Yes, I do.

10  Q.   How long has he been doing this, to your knowledge?

11  A.   I would guesstimate three to four years.

12  Q.   And when someone is having sex offender treatment with

13  Mr. Thomas, is there a confidentiality wall between

14  Mr. Thomas and U.S. Probation?

15  A.   None whatsoever.

16  Q.   Okay, so what does that mean?

17  A.   We have free -- anything that's said in group or in

18  private to Mr. Thomas is available to us.

19  Q.   And do you often communicate with Mr. Thomas about

20  what's happening in sex offender treatment with your

21  probationers?

22  A.   As part of the contract, he's required to give us

23  monthly reports, and we also talk very often on the phone

24  about different individuals.

25  Q.   And when you talk on the phone, what are the kinds of

1    things that trigger those conversations?

2    A.    Whether somebody may have mentioned trying to access an

3    Internet through, say, like an X box or something of that

4    nature, whether a person is not participating in group.

5    Just basic information like that.

6    Q.    Let's say you got word that one of the people who's one

7    of your supervisees is not participating in treatment

8    according to Mr. Thomas, what would you do?

9    A.    Depending on what information we received, if it was

10   information such as a person admitting to trying to access

11   the Internet, we'd go to the person's house and check out

12   the computer, and possibly seize the computer if we found

13   any evidence of violation.

14   Q.    Now, I just want to ask you, Mr. Shields is required to

15   register as a sex offender under Maine state law, correct?

16   A.    Correct.

17   Q.    But there's also a federal Sex Offender Registry,

18   right?

19   A.    Yes, there is.

20   Q.    And he has to comply with that to be in compliance --

21   well, he has to comply with the Maine Sex Offender Registry

22   to be in good stead with you, right?

23   A.    That's right.

24   Q.    Because if he doesn't, he's breaking the law, right?

25              MS. STACEY:   Objection.

1      THE COURT:  Overruled.

2   A.   That's correct.

3   Q.   But he also has to comply with the Federal Sex Offender

4   Registry law, right?

5   A.   That's correct.

6   Q.   And that has a ten-year penalty if he fails to obey

7   that law, right?

8   A.   I'm not certain what the penalty is.

9   Q.   Now, the last thing I want to ask you about is, the

10  statute for possessing or receiving child pornography has

11  been changed since Mr. Shields was convicted of that, right?

12  A.   Yes, it has.

13  Q.   And now if Mr. Shields is convicted again of receiving

14  child pornography, it's a fifteen-year minimum, isn't it?

15      MS. STACEY:  Objection.

16  A.   I'm not sure.

17      THE COURT:  Overruled.

18  A.   I'm not sure.

19  Q.   Can I show you the statute, 2252(d).  It's down at the

20  bottom here.

21      (Witness examining document.)

22  Q.   So the statute is 18 U.S.C. 2252?

23  A.   (B)(1).

24  Q.   That's receipt of child pornography?

25      THE COURT:  You know, we don't need to be taking

1  the time to do this now.  We can try and figure that out

2  later.

3          MS. KELLEY:  Okay, that's fine.  I have no further

4  questions for you, sir.  Thank you.

5  CROSS-EXAMINATION BY MS. STACEY:

6  Q.  Your initial contact with Mr. Shields was when he was

7  at the Pharos House, right?

8  A.  That's correct.

9  Q.  And you no longer cover the Portland area, correct?

10  A.  Correct.

11  Q.  You have about 60, 65 people in your case load?

12  A.  Yes.

13  Q.  And if Mr. Shields were released, he would have to

14  register with the Sex Offender Registry Board?

15  A.  Yes, he would.

16  Q.  And he would be considered a lifetime registrant?

17  A.  Yes, he would.

18  Q.  And that's due to the nature of the crimes that he's

19  committed?

20  A.  Yes.

21  Q.  And if he were released, you would score Mr. Shields,

22  right?

23  A.  Anybody that's released to supervised release, we do

24  what we call RPI score.  It's a risk prediction index, and

25  he would be scored, yes.

Page 151

1    Q.   And knowing what you know about Mr. Shields,

2    Mr. Shields would be in the high-risk offender category for

3    an RPI score?

4              MS. KELLEY:  Objection, objection.

5              THE COURT:  Overruled.

6    A.   Again, I can't tell offhand.  It's based on a number of

7    criteria.  It's based on substance abuse history, the

8    criminal history, if guns were used in the offense, you

9    know, education levels, things of that nature.

10   Q.   If Mr. Shields were released, you would go to the court

11   and you would request additional conditions be imposed?

12   A.   Yes, I would.

13   Q.   And those are conditions that don't exist right now,

14   correct?

15   A.   There would either be a modification of the current

16   conditions or the ones that aren't on there already.

17   Q.   And one of the conditions that you would request is

18   this live GPS that you just testified about, correct?

19   A.   Yes.

20   Q.   And that GPS tracks an offender's movements in the

21   community, right?

22   A.   Yes, it does.

23   Q.   And you testified you could set up exclusion zones like

24   schools or day-care centers?

25   A.   Yes, we could.

1   Q.   And your initial request, though, would be for six

2   months on a GPS, correct?

3   A.   Yes.

4   Q.   And if he had no incidents during those --

5   A.   That would be my own personal preference.

6   Q.   And if he had no incidents during those first six

7   months, he could then be off GPS, correct?

8   A.   That's correct.

9   Q.   And then you would have no monitoring of his movements

10  in the community after six months; is that right?

11  A.   Other than our own surveillance and things of that

12  nature.

13  Q.   And you would also request sex offender treatment with

14  the polygraph examination, correct?

15  A.   Yes, I would.

16  Q.   And that's also a more restrictive condition, correct?

17  A.   Yes, it is.

18  Q.   And it's because Mr. Shields is at a high risk to

19  reoffend, correct?

20          MS. KELLEY:  Objection.

21          THE COURT:  Sustained.

22  Q.   Have you determined whether or not --

23          THE COURT:  He said he didn't determine that.

24  Right?  He said he didn't make a calculation.  Is that

25  right?

Page 153

1   Q.   Have you made the calculation?

2   A.   No, I have not.

3   Q.   Have you estimated a calculation based on knowing what

4   you know about his history?

5            MS. KELLEY:  Objection.

6            THE COURT:  Sustained.  He said he didn't.  Asked

7   and answered.

8   Q.   All of these conditions that you request wouldn't

9   guarantee that Mr. Shields won't commit another offense, do

10  they?

11  A.   That is correct.

12  Q.   And the amount of time for Mr. Shields's release would

13  end after three years, correct?

14  A.   Yes, it would.

15  Q.   And he would then have no conditions of supervision

16  after that point, would he?

17  A.   That's correct.

18  Q.   And your testimony here is not to testify in support

19  for Mr. Shields's release, is it?

20           MS. KELLEY:  Objection.

21           THE COURT:  Well, overruled.

22  A.   No.  I'm just presenting the facts of anybody that

23  would be on supervision.

24  Q.   Do you have concerns about Mr. Shields's release to the

25  community?

Page 154

1   A.   Yes, I do.

2            MS. STACEY:  Nothing further.

3            MS. KELLEY:  No further questions, your Honor.

4            THE COURT:  Thank you.

5            (Witness excused.)

6            THE COURT:  All right, so here's the situation.

7   It's now about ten past.  That's a little slow.  I have to

8   swear in, I think, 200 or 300 new citizens downstairs, and

9   the ceremony should begin, I don't know, no later than 1:30.

10  I think I should be back here by 2:00.  One of the reasons I

11  went a little late is, there's another speaker and I don't

12  know how long he's going to be, but that's where I am.  So

13  as soon as I'm done, I'm going to come right back up here.

14  So I'm going to have you not come back here until 2:15.  So

15  I understand a bunch of you want to go out on the town.

16           (Laughter.)

17           THE COURT:  We've got lots of nice fish

18  restaurants around here.  Enjoy it.  I think the weather is

19  nice, but who would know?  So I'll see you back here around

20  2:15, and we will stay no later than 4:00 o'clock.  Thank

21  you.

22           THE CLERK:  All rise for the jury.

23           (Jury excused.)

24           (Resumed, 2:20 p.m.)

25           MR. SWOMLEY:  Can I move to strike the last

1   comment from the last witness, who was asked essentially an

2   opinion question as a nonexpert witness, which was --

3            THE COURT:  Do you want me to remind them of it?

4            MS. STACEY:  I asked him if he personally, he was

5   his probation officer, and I asked him if he had concerns,

6   and he said "yes."

7            THE COURT:  That wasn't objected to at the moment

8   at that time, so it's untimely, so let's go.  But you cannot

9   argue it at this point.

10           MS. STACEY:  I think this is a treatment book that

11  I believe Steve Thomas -- it was just dropped here for the

12  first time.  I've never seen this before.

13           MS. KELLEY:  Steve Thomas brought with him the

14  treatment book they use in treatment.  I'm not going to seek

15  to admit it into evidence.  If he needs to refer to it to

16  talk about his treatment program --

17           THE COURT:  Good.

18           MR. SWOMLEY:  And if the Court would like a copy.

19           THE COURT:  I don't know what it is.  We'll see.

20  Is it Dr. Thomas?

21           THE WITNESS:  It's Mr. Thomas.

22           THE COURT:  Mister?

23           MR. THOMAS:  If you want to elevate me, that's

24  okay, but it's not --

25           THE COURT:  I feel the same way.  All right.

1          THE CLERK:  All rise for the jury.

2          (Jury enters the courtroom.)

3          THE COURT:  All right, so your next witness,

4    Ms. Kelley?

5          MS. KELLEY:  This is Stephen Thomas.

6                    STEPHEN P. THOMAS

7    having been first duly sworn, was examined and testified as

8    follows:

9          THE CLERK:  Would you please state your name and

10   spell it for the record.

11         THE WITNESS:  My name is Stephen, S-t-e-p-h-e-n,

12   P, middle initial, Thomas, T-h-o-m-a-s.

13   DIRECT EXAMINATION BY MS. KELLEY:

14   Q.   And, Mr. Thomas, you have some water there if you need

15   it.

16   A.   Thank you very much.

17   Q.   That's unused water, an unused glass of water.

18         THE COURT:  As opposed to --

19         MS. KELLEY:  As opposed to what the past witness

20   has been drinking out of.  It's been known to happen.

21         (Laughter.)

22         THE COURT:  After lunch we get a little punchier

23   here.

24         MS. KELLEY:  Sorry.

25   Q.   Okay, so where are you from?

1   A.   I work in Portland, Maine.

2   Q.   And what kind of work do you do?

3   A.   I'm a clinical social worker in private practice, and

4   for twenty-one years I've operated an independent practice,

5   where most of the work I do is evaluating and treating

6   people who have been convicted of sexual offenses.

7   Q.   And can you just briefly say what your academic

8   background is.

9   A.   I have an undergraduate degree from George Washington

10  University, and I have a master's degree from Boston College

11  Graduate School of Social Work.

12  Q.   And for how many years have you been providing

13  treatment?

14  A.   In a private practice setting, for twenty-one years.  I

15  worked for six years at a community mental health

16  agency after -- this was after my graduate degree -- and

17  also did two years as a child protective supervisor for the

18  Maine Department of Health and Human Services.

19  Q.   And can you just summarize or estimate, in your career,

20  approximately how many offenders have you treated, sex

21  offenders?

22  A.   I've evaluated or treated approximately a little bit

23  more than 1,600 people of committed sexual offenses, sexual

24  crimes.

25  Q.   Do you also treat victims of sexual crimes?

1    A.    At this point, no, but I probably in the past have

2    treated between 800 and 1,000 victims of sexual offenses.

3    Q.    Now, where do you work right now?

4    A.    222 Saint John's Street in Portland.  It's a very large

5    red brick, former headquarters of Maine Centrail Railroad,

6    office building.

7    Q.    And what is the organization you work for?

8    A.    I'm the leader of something called Supervised Community

9    Treatment, and there are other staff who work with me.

10   Q.    How many staff members are there?

11   A.    There are three counselors in addition to myself.

12   There is a bookkeeper and a typist and records clerk.

13   Q.    And you said that you have a contract with the U.S.

14   Probation Office?

15   A.    At this point we have a contract with the U.S.

16   Probation, and we also have a contract with the U.S. Bureau

17   of Prisons, which operates the halfway house called Pharos

18   House.

19   Q.    And for both of those contracts, what are you

20   contracted to do?

21   A.    Let me talk about the Bureau of Prisons.  We're

22   contracted -- I'm contracted to do evaluations while people

23   are residing at Pharos House.  Most people, if the person is

24   going to stay in greater Portland or in Cumberland County,

25   we can start that person into an ongoing individual or group

1   treatment while they're at Pharos House.  For those who are

2   on U.S. Probation, the contract has us, or me, doing an

3   evaluation, and then we provide people with weekly group sex

4   offender treatment.

5   Q.   And when you say "we" provide people with weekly sex

6   offender treatment, what exactly does that consist of?

7   A.   It's a complicated thing, but to make it simple, the

8   first order of business is to determine with the other

9   members of the containment team -- think of a three-legged

10   stool.  One leg is the treatment provider.  One leg is the

11   probation officer, such as Mr. Kelly who testified this

12   morning.  The other leg is a polygraph examiner.  We work

13   together.  We have full range -- I mean full ability to

14   communicate with releases of information with the U.S.

15   probation officer and also state probation.  In this case

16   it's U.S.  The polygraph examiner has a complete -- has a

17   waiver to allow him to communicate and provide the polygraph

18   examination to the U.S. probation officer.  We work as a

19   team.  Our goal, first of all, the goal of the probation

20   officer is to contain the person's behavior, to see that

21   that person is safe in the community in which they live, and

22   to see whether the person is willing to be contained because

23   some people are not.

24          Once there is this -- and this process of

25   assessing containment and dangerousness doesn't stop after

1    some first two-month period or one-month period.  It's an

2    ongoing discussion and concern for the U.S. probation

3    officer, for our treatment providers, and for the polygraph

4    examiner.

5    Q.   So your testimony is, after this first goal is met of

6    watching out for the community safety, what is the next

7    step?

8    A.   This often occurs concurrently with that same first

9    goal, and that is to try to determine -- try to get a full

10   honest and open disclosure.  In other words, the person who

11   comes in to see me, this is not some treatment in some

12   private practice cushy office.  This is very rigorous kind

13   of treatment.  We're asking questions about one's emotional

14   history, one's family development, one's educational

15   development, one's criminal history, one's sexual

16   development, both the normal sexuality and development that

17   all of us have and the special sometimes deviant sexual

18   proclivity that some of our clients have, or all of our

19   clients have.

20   Q.   And after this second step of disclosure and the person

21   telling you about themselves, what's the next step?

22   A.   We ask people to participate -- or we have a polygraph

23   examination which helps to -- a sexual history polygraph

24   helps to determine whether there is more sexual

25   inappropriate behavior that the person has not informed us

1   of, because we need to know what the range of someone's

2   inappropriate sexual behavior is so that we can know how to

3   treat them.  We can't -- I mean, if you're going for heart

4   surgery, of course you're going to have a whole series of

5   CAT scans and PET scans and all sorts of scans to determine,

6   blood tests to determine what -- we're not doing invasive

7   procedures, but their behavior has been invasive to others,

8   whether it's molesting children, exposing whatever, so we

9   need to do as thorough a job as we can to understand

10  someone's history.

11  Q.   And just to take a little sidetrack here, your use of

12  the polygraph is continuous; is that correct?

13  A.   It is.  The first polygraph is the full sexual history

14  disclosure.  After that, routinely, if there are no specific

15  risks identified by the treatment provider, the probation

16  officer, or the polygraph examiner, we're going to do a

17  maintenance and monitoring test.  That is a test to

18  determine whether the person is living according to the

19  rules set down by the federal judge, and we have a whole set

20  of our own rules.

21  Q.   Okay, so the people you're treating are not only under

22  supervised release conditions, but you set additional

23  conditions for them?

24  A.   Absolutely.

25  Q.   And in order to successfully comply with your

1    treatment, they have to obey those conditions?

2    A.   Yes.  We usually suggest they obey the most restrictive

3    reading of the U.S. Probation restrictions and our

4    restrictions.

5    Q.   And can you just give the jury a kind of sense of what

6    kind of restrictions you impose on these people.

7    A.   Yes.  Although the condition of the court is usually

8    that you can't have any contact with children, we are even

9    more specific.  You can't go to McDonald's.  You can't go to

10   fast-food restaurants.  If you drive through, you can order

11   that food.  You can't go and sit down because those are the

12   places -- it depends on the day of the week.  If it's during

13   school, it's probably less likely that kids will be there

14   with their parents.  But if it's on the weekend, if it's a

15   Saturday or a Sunday, if it's near the time when the Sea

16   Dogs, which is the local baseball team in Portland, plays,

17   the big McDonald's is about two and a half blocks from it,

18   so people can't go to that kind of restaurant.  That's one

19   of the examples.

20   Q.   And you test people's compliance with this on an

21   ongoing basis through the use of what techniques?

22   A.   Well, through the polygraph.

23   Q.   Now, when people are in their weekly groups, is there

24   just one --

25              THE COURT:  So what happens if somebody flunks a

1   polygraph?

2           THE WITNESS:  If somebody flunks the polygraph, it

3   triggers a meeting with the treatment provider and the U.S.

4   Probation officer, and the U.S. Probation officer determines

5   whether this is a technical violating, whether this is a

6   true violation that indicates dangerousness.  The probation,

7   as Mr. Kelly described, the probation has -- probation has a

8   variety of possibilities, GPS.  And, by the way, the GPS

9   that they're using -- and I know this because I'm a federal

10  licensed captain for ships -- the GPS they use is accurate

11  to 9 feet.  So they can tell whether someone's going into

12  McDonald's.  They can tell whether somebody walks by a

13  school.  But that's one of the ways, your Honor.

14  Q.   So when you have the -- any other?  No.  So when you

15  have the weekly groups, is there just one of the treatment

16  providers there?

17  A.   All of our treatment groups are co-led with a male and

18  a female team.  All of the providers have master's degrees.

19  Q.   What's the advantage of having two pairs of eyes there

20  as far as testing out people's, whether they're being good

21  reporters about themselves?

22  A.   Well, one is that -- let me jump back.  Well, I'll

23  answer your question.  I'm not sure that it -- it does help

24  identify people who are trying -- if I ask a question of an

25  individual, he may answer me, and because I'm involved in

1    that discussion, I may not be as attentive to some of his

2    body language or other kinds of reactions that he's giving.

3    The co-leader may observe that, and she is out of the fray

4    for that moment and can pick up on something that I might

5    have missed.

6    Q.   Now, let me ask you, do you only speak with a person's

7    probation officer if you think they flunk a polygraph or

8    some big event occurs?

9    A.    No.  We have routine discussions, probably once a

10   month, at least, with each U.S. Probation officer and each

11   state probation officer we work with.  At some point we're

12   just -- I mean, we can get a call from a probation officer,

13   or we can call them.  If we sense that something is a little

14   bit risky, we will in fact call the probation officer.  If

15   someone who has succeeded and done very well in treatment is

16   nearing the end of their treatment, wants to do something

17   that would be normally not permitted by the treatment

18   contract, we need to do some special procedures.  We have

19   safeguard meetings.  We have a variety of things where we

20   will talk with family members to see whether someone can

21   come to a family wedding of his sister, and we'll do a whole

22   series of interviews on that, but we will communicate with

23   the U.S. Probation officer about that.

24   Q.   Now, let me just ask you a couple things about the

25   curriculum, what you're going through with people.  And if

1  you need to refer to this book -- what is this book you have

2  with you?

3  A.   This notebook is -- and I think the government's

4  attorney has a blue copy -- this is a client packet manual

5  called "It Doesn't Just Happen."  And we essentially have

6  taken information from a variety of other sources, have

7  written our list of assignments.  There are 29 different

8  assignments.  And if we find that someone has a history that

9  needs to be explored, we will divert from this series of

10  assignments and ask someone to do a series of assignments

11  based more on their specific issues.

12  Q.   Now, when you say you have assignments, how many

13  assignments would you give a person, say, in a given week?

14  A.   Well, I would give them one assignment in a week, and

15  some of the assignments can be done very easily in a week.

16  Some of them will take two months.

17  Q.   And can you give the jury just some examples of the

18  types of things you're taking these people through.

19  A.   There is in this packet -- and I have extra copies of a

20  treatment contract.  The treatment contract is this list of

21  "Tho shall nots."  Essentially you can't go -- very, very

22  picky things.  If you're in a house where there is -- you're

23  in a house with adults, you have to knock on the door before

24  you go in the bathroom.  This is really picky.  It's

25  micromanaging people's behavior who in the past have proven

1    themselves not responsible.

2            So we go through a -- the first thing is rewrite

3    the treatment contract.  There is another description on the

4    polygraph examination.  There are a series of philosophy and

5    policies.

6            The biggest -- you haven't asked me, but the most

7    responsible sex offender treatment, whether it's in an

8    institution or in the community, is called cognitive

9    behavioral.

10   Q.   And can you just explain what the idea behind that is.

11   A.   The idea behind it is that people think before they

12   act.  They may not give it legitimate thought about what's

13   the effect of this, but there is a process of thinking and

14   feeling that goes before actions.  Again, we're micro --

15   we're looking under a microscope at someone's behavior:

16   What are the factors that contribute from how they got over

17   here where they had not offended to the point over here

18   where they had offended?  What's the series of thoughts,

19   feeling, needs, behaviors?  The goal here -- and it's not

20   rocket science -- the goal here is to help people understand

21   what are the factors, what are the risky situations and what

22   are the benchmarks that they can identify which is where

23   they're getting close to a risky situation?

24           The Star Wars analogy is most apt.  When an ICBM

25   would have been launched from Russia, the United States

1  would determine by satellites in the sky, and within five

2  minutes, ten minutes theoretically, an interceptor would be

3  sent.  The goal here is that if the offender knows what are

4  the risk factors and the benchmarks that they can say,

5  "Ah-Ha, I'm getting close to something that's risky.  I've

6  got to do something different to get myself out of the

7  situation."

8          Cognitive behavioral therapy takes a lot -- one of

9  the assignments here is to identify the thinking errors.  So

10  the thinking errors for cognitive errors, cognitive

11  dissidence, the goal there is to think and to evaluate how

12  not only I, if I were the offender, how I think; but if I'm

13  in a group with nine other people -- and our groups have

14  nine people and two co-leaders -- it's always easier to

15  identify the thinking that's wrong of someone else.  When it

16  gets to identify your own thinking, it's much harder to do

17  that.  But we are training people constantly to do that, so

18  these are some of the assignments.  There are some on

19  empathy.  There are some on what are the wounds or things

20  that are terribly troubling to someone about their past.

21  There are a series of red flags, and we work with a relapse

22  prevention plan at the very even of this.

23          Postscript for the end of the treatment is that

24  where there -- we try to get people to write a victim

25  clarification letter.  This is not a letter of apology.

1    This is an empathy exercise for the offender so that the

2    offender ends up knowing what the effect of what they've

3    done has caused another person.

4    Q.   Now, can I just ask you, if someone had been through

5    treatment before but had then reoffended, does that mean

6    they're not going to succeed in your program?

7    A.   I'm sorry, you said been reoffended or had reoffended?

8    Q.   Had reoffended.

9            THE COURT:  Well, let's be very specific.  Someone

10   who had been through, what, three years of treatment in

11   Maine and then reoffended.  That was in when, the early

12   '90s?

13           MS. KELLEY:  Yes.

14           THE COURT:  Are you familiar with the Maine

15   program?

16           THE WITNESS:  Well, there are a lot of different

17   Maine programs, your Honor, and I think the one -- first of

18   all, I want to say that before I came today and sat in in

19   the courtroom, I knew nothing about Mr. Shields.

20   Q.   Can I just ask you --

21   A.   But I'm now learning.

22   Q.   -- do you know anything about Mr. Shields other than

23   what you've learned pretty much today from being here?

24   A.   No.

25   Q.   Did you know anything -- okay, so you haven't reviewed

1   his history?

2   A.   I have not reviewed any history, any documentation,

3   anything.

4   Q.   But let me ask you just this kind of hypothetical

5   question:  If someone had been in a couple of years of

6   treatment with Russell Moat -- incidentally, do you know

7   what ever happened to Russell Moat?

8        MS. STACEY:  Objection.

9   Q.   Was he providing sex offender treatment in Maine?

10        THE COURT:  Wait, wait.  We've now gotten multiple

11   questions.

12   A.   Could you do it one question at a time for me?

13   Q.   Okay.  Are you familiar with the name Russell Moat?

14   A.   I am.

15   Q.   And what did he used to do?

16   A.   He used to provide individual sex offender treatment,

17   and maybe groups, but I didn't know about that.

18   Q.   And what's happened to him now?

19   A.   Well, very sadly, it's my understanding that Russell

20   Moat, who when I was in Child Protective, I knew him and

21   supervised him, he had a very serious case of Lyme disease

22   and was forced to give up his private practice.  So I don't

23   know where he is.

24   Q.   Okay.  And do you know the name Kay Landry who ran a

25   program called Klinikos?

1   A.    I do know Kay Landry.

2   Q.    Do you know any reason why she would not be providing

3   past records to people who are asking for them?

4              MS. STACEY:  Objection.

5              THE COURT:  Sustained.  Now, let's go back.  So

6   what kind of programs -- are they the ones who provided the

7   treatment before?

8              MS. KELLEY:  Yes, they are.

9              THE COURT:  So assuming he went through treatment

10  with those folks in the mid-'90s, what would be different

11  from what they provided versus what you provide?

12             THE WITNESS:  Well, first of all, your Honor, I'm

13  not familiar with what Russ Moat did.  I have to beg out of

14  that.  With Kay Landry, she did some kind of behavioral

15  work.  One of my struggles with Kay is that she had

16  individually led or mostly individually led, sometimes dual

17  led groups, but they were for twelve or thirteen people.

18  And, honestly, the Medicare, federal Medicare regulations

19  say you shouldn't have more than ten people in a group, and

20  we've always tried to do under that.  So I can safely say it

21  would be a much more intense experience -- it would be a

22  more intense experience, and I don't know whether

23  Mr. Shields went through treatment with a single-led person

24  or two leads.  I don't know that.

25             THE COURT:  But was it cognitive behavioral

1  therapy?

2          THE WITNESS:  It was cognitive behavioral therapy.

3  I don't know how stringent she was, meaning strict.  I know

4  that there is a variety of strictness with which different

5  providers do their services.  I know people have told us

6  that we're probably the strictest in the state.

7  Q.   Can I just ask you, if somebody had gone through that

8  type of treatment generally and then reoffended, is it a

9  waste to go to your program?  Are they not going to succeed

10  in your program?  Is that an indication they're going to

11  fail your program?

12          MS. STACEY:  Objection.

13          THE COURT:  Overruled.

14  A.   I'd like to say -- I'll answer the question, but

15  there's a potential conflict of interest.  I don't want to

16  be seen as necessarily trying to pick up another client.  I

17  mean, I just want to put that out there.

18          I think that -- I think that what has happen since

19  19 -- this is now -- when was the last treatment that

20  Mr. Shields attended?

21  Q.   Early 2000.

22  A.   Okay.  We're eight years beyond that now.  I think

23  Probation, Federal Probation has learned a lot in terms of

24  these extra devices to better insure adequate safety,

25  community safety.  We have evolved -- the reason this is in

1    a looseleaf binder and not printed is because it's

2    constantly under revision.  We have evolved our treatment

3    program significantly in the last eight years, the last ten

4    years.

5              So we have had people who have come and had

6    offended previously and sometimes two and three times.  We

7    have treated them.  You always, although we've done some

8    basic kind of looking and research of the success rate of

9    our treatment program, it's not peer reviewed.

10   Q.   If the Court will allow me, have you done any or tried

11   to do any studies yourself of the recidivism for people who

12   complete your program and go on out into the community?

13   A.   We have, and what we looked at in January of 2006 is

14   looking back for the previous 200 clients, and it went back

15   to about 2003.  We looked at 200 clients, and we knew, I as

16   the main contact person and the state Probation Department,

17   who I'm in constant touch with, knew of only six people out

18   of 200 who had reoffended sexually.

19              Now, they may have reoffended in terms of theft,

20   they may have reoffended in other kinds of criminal

21   behavior, but I was interested in terms of the sexual

22   reoffending.  So really what that speaks to, if it's six out

23   of 200, it's three percent.

24   Q.   Well, let me go back to the question of failing a

25   program.  Is there some analogy here to AA or alcoholism?

1   A.   The best analogy to all sex offender treatment is

2   substance abuse treatment.   Sometimes when people have a

3   serious alcohol problem and maybe they go to detox and go to

4   rehab, they go back out, meaning they start drinking.   I

5   guess that most alcohol treatment providers would say they

6   didn't get it or they didn't want it enough.   I say the same

7   thing if someone has reoffended.   We are much more cautious

8   and we're working with the state or federal probation

9   officer about what are the conditions for safety, and

10  Mr. Kelly already talked about electronic monitoring as a

11  proposal for six months, and he doesn't do that lightly.

12              MS. STACEY:   Objection as to Mr. Kelly's habit.

13              THE COURT:   Well, do you know that from your own

14  personal observations?

15              THE WITNESS:   Yes, and I have worked with

16  Mr. Kelly since 1996.

17  Q.   So for somebody to succeed in sex offender treatment, a

18  lot of it has to do with what their head and heart are ready

19  for, right?

20  A.   Yes.

21  Q.   And can you tell when somebody's in a treatment group

22  if they're ready?

23  A.   Not initially, but over time, when we see the quality

24  of work that they do, when we see whether they followed the

25  rules with probation, whether they followed the rules in

1   treatment, whether they are trying to live a pro-social,

2   meaning moving towards more mainstream in terms of American

3   behaviors, when I see someone who finally decides that he's

4   tired of doing grunt work as a construction worker and

5   decides to buy a fixer-upper, I say, "This guy has bought

6   into the American dream."  It doesn't mean that he will

7   never reoffend, but there are certain kinds of things that

8   indicate pro-social kinds of behaviors.

9           Mr. Kelly referred to a quarterly progress report.

10  We ask people to write their goals on this progress report.

11  One of those goals has to be pro-social.  And for some

12  people, they never think about pro-social:  "What do I got

13  to do to be pro-social?  What the heck is that?"  They never

14  think about it.  They don't have the vocabulary; they don't

15  have the thought process.  So we're starting to move people

16  into, how do they live not violating the laws?

17          We also spend a significant amount of time with

18  people about how do you cope with registering for ten years

19  or up to -- Maine will change in November of 2009 with the

20  federal requirement of Adam Walsh, so it will be 15 years,

21  25 years, or life.  So some of the group time is spent with,

22  how do you cope with this?  How do you find a job?

23          MS. KELLEY:  No further questions.  Thank you,

24  sir.

25  CROSS-EXAMINATION BY MS. STACEY:

1  Q.   Mr. Thomas, before your testimony today, you spoke to

2  Dr. Rypma about areas of testimony, correct?

3  A.   Yes.  Dr. Rypma was on the phone when Attorney Page

4  Kelley called me.

5       THE COURT:  Did you know him otherwise?

6       THE WITNESS:  I did not know him otherwise.

7  Q.   You currently have a contract with the State of Maine

8  to provide treatment, correct?

9  A.   No.  I have a contract with U.S. Probation.  I have a

10 contract with the U.S. Bureau of Prisons.  And for four

11 years from '87 to '91 until Maine -- Maine suffers periodic

12 budget crises, and in  '91 they canceled a contract with

13 about 20 days' notice, so I was pleased.  I was not pleased.

14 Sorry.

15 Q.   You view treatment in the context of community safety;

16 is that right?

17 A.   Absolutely, and I think if someone doesn't and they're

18 working with this kind of clientele, they're irresponsible.

19 Q.   And you do a risk assessment on the individuals that

20 enroll in your program?

21 A.   I do.  I do the Static-99.

22 Q.   And one of the first things an offender who's in your

23 program must do is, they must take full responsibility?

24 A.   Well, that's our goal.

25 Q.   And you also look as to whether or not the offender has

1   had thoughtful reflections on his past, correct?

2   A.   Yes, whether -- can I expand a little on that?

3   Q.   You want him to look at his past offenses and see if

4   he's thoughtfully reflecting on what he's done, who his

5   victims are --

6   A.   Yes.

7   Q.   -- the impact on his victim's family, correct?

8   A.   Yes.

9   Q.   If he's not disclosing sexual offenses in treatment,

10  that's not yet taking full responsibility, correct?

11  A.   That's true.

12  Q.   If an offender is denying sexual offense, that would

13  impede treatment, wouldn't it?

14  A.   Yes, but the use of the polygraph is very instrumental

15  with that because it is part of the evaluation, especially

16  when people are in federal probation.  And we try to do it

17  on state probation, but the state doesn't pay for it where

18  the feds will.  It is part of the process, often before

19  someone enters into a formal treatment group, to have a

20  polygraph so that we have a baseline, we have some sort of a

21  baseline in terms of what their criminal inappropriate

22  sexual behavior has been.

23  Q.   And in fact you mention the polygraph.  In your

24  experience, 57 to 60 percent of offenders have said that

25  they've been sexually abused as a child, correct?

1   A.   I think you're referring to the telephone conversation

2   we had the other day.

3   Q.   I am.

4   A.   That was me telling you about a psychologist or a

5   therapist named Jan Hinman out in the state of Oregon or

6   Washington.  She found that a lot of people were saying, who

7   were in her treatment program for sexually offending, had

8   said that they were molested themselves.  Ultimately she

9   began to be a little suspicious, and she asked people to

10  take a polygraph about their sexual history; and that only

11  30 percent of those who said they had been sexually offended

12  had in fact been sexually offended, or passed the polygraph

13  to that effect.

14  Q.   It's not uncommon for a sex offender to make

15  justifications for his offenses, is it?

16  A.   That's not uncommon at all.

17  Q.   And it's not uncommon for an offender to rationalize

18  his offenses, is it?

19  A.   Not at all.  I mean, some people come straight out and

20  tell you, and they say there's no excuse and they shouldn't

21  have done it, but it's very common to have people justify,

22  rationalize, and excuse.

23  Q.   And abuse as a child, it may be a factor, but it is not

24  the cause of an offender then molesting other children,

25  right?

1    A.    Well, I don't think it's the cause because there are

2    many people who have been -- if you look at the research by

3    David Finkel, there are about 19 percent of college students

4    in the University of New Hampshire who said they had been

5    inappropriately sexually touched before they were 18.  You

6    look at a lot the feminist literature of 33 percent of women

7    report inappropriate sexual touch before 13 or onset of

8    puberty.  There are millions of people who have had these

9    horrible experiences, and they don't offend.

10   Q.    Now, another thing that you do in treatment is, you

11   create a relapse prevention plan; is that right?

12   A.    Yes, ma'am.

13   Q.    And if followed, it can prevent an offender from

14   reoffending, correct?

15   A.    The important words are "if followed."

16   Q.    So there's no guarantee that an offender won't reoffend

17   just because he has a relapse prevention plan?

18   A.    There is no guarantee that an offender will not

19   reoffend because he has the relapse prevention, no.  The

20   question is whether he uses it.

21   Q.    And one of the goals of your treatment is to help an

22   offender monitor his or her own risks; is that right?

23   A.    Monitor, yes, but when you encounter a risk, the goal

24   is to do something different so you get out of the risky

25   situation.

1   Q.   So you teach them about risky situations and help them

2   figure a way out of a risky situation?

3   A.   It would be presumptuous of me to teach them about it.

4   If you teach them about the concept, you try to elicit from

5   them what are the risky situations in their lives, because

6   what might be risky for one person in a room might not be

7   risky for another person.

8   Q.   And the key for that is whether an offender is willing

9   to pay attention and make the effort in treatment with these

10  risky situations, right?

11  A.   That's my belief.

12  Q.   An offender has to be an active participant in

13  monitoring his own risk in the risky situations, correct?

14  A.   Yes.  This is not treatment that you can do -- I mean,

15  if I had needed heart surgery, a surgeon could come in and

16  do the adequate testing and then do it to me.  When you're

17  doing sex offender treatment or any behavioral treatment

18  with a goal to try to reduce behavior, you can't do it to

19  someone.  They have to want to do it themselves.  You can

20  guide them, and that's what we do.

21  Q.   And in your experience, you've seen offenders have a

22  slip or a relapse; is that right?

23  A.   We have.  I have.

24  Q.   And there are consequences for that, aren't there?

25  A.   Yes, and some of the consequences were ones that Dan

1    Kelly referred to earlier.  In the state system, people can

2    be -- the state system is different than federal.  In the

3    state system, people can be sent to jail for a weekend, or

4    they can be sent for a revocations hearing for 30 days or

5    60 days and then placed back on probation.  U.S. Probation

6    is a little more restrictive than that, but they can do the

7    electronic monitoring.  They can do home confinement.  They

8    can do various things.  They can do more surveillance, which

9    can be a pain in the butt for someone.

10   Q.   Am I correct that treatment typically takes two to four

11   years?

12   A.   Two to four years.

13   Q.   And if an offender's conditions of release are for

14   three years only, they can potentially be leaving your

15   program before their treatment is complete; is that right?

16   A.   Potentially.

17   Q.   You don't know Mr. Shields?

18   A.   I do not, but I -- I understand that -- that he may

19   have given me a call at some point in 2006 to seek

20   treatment.  But, honestly, it's not personal, but I get a

21   lot of calls and people are asking about treatment, and I

22   don't write everyone's name down unless they make an

23   appointment.

24   Q.   And you've never treated Mr. Shields?

25   A.   No, not that I know of.

1   Q.   Treatment doesn't cure anybody, does it?

2   A.   No.  I don't think there is a cure.  It's like

3   substance abuse:  There is no cure.  One maintains sobriety

4   or recovery, and hopefully one lives a good enough life that

5   they are not moving down a slippery slope to do something

6   that's wrong or harmful to others.

7   Q.   Treatment can't make an offender's sexual attraction,

8   for example, to children go away, can it?

9   A.   No, it cannot.

10  Q.   And in your experience, you've had offenders that have

11  done psychotherapy and sex offender treatment program at the

12  same time, haven't you?

13  A.   Yes, we have.

14  Q.   And the key is that, if I've got the phrase right, as

15  long as they're not working at cross-purposes, an offender

16  can do both types of treatment at the same time?

17  A.   Yes.

18  Q.   And you as you sit here today cannot say whether

19  Mr. Shields will succeed in treatment if he enrolls, can

20  you?

21  A.   No.  I don't have a crystal ball.

22  Q.   And you can't say whether or not Mr. Shields will or

23  won't reoffend in the future, can you?

24  A.   Again, I do not have that crystal ball.  I wish I did.

25              MS. STACEY:  I have nothing further.

Page 182

1          MS. KELLEY:  No further questions.  Thank you.

2    Thank you so much, Mr. Thomas.

3          THE COURT:  Thank you.

4          (Witness excused.)

5          MS. KELLEY:  We have one last witness.  I know

6    she's here.

7          (Discussion off the record.)

8          THE COURT:  I think she's going to be a very brief

9    witness, so we won't have to take a recess.  We'll just

10   leave right from here, so you can stand and stretch for a

11   few minutes.

12         MR. SWOMLEY:  Your Honor, could I have a side bar?

13   I mean, it doesn't need to be --

14         (Discussion off the record.)

15         THE COURT:  All right, come on up.

16                      KELLY GORHAM

17   having been first duly sworn, was examined and testified as

18   follows:

19         THE CLERK:  Would you please state your name and

20   spell it for the record.

21         THE WITNESS:  Kelly Gorham, K-e-l-l-y G-o-r-h-a-m

22   DIRECT EXAMINATION BY MS. KELLEY:

23   Q.   And you're a detective with the Portland Police?

24   A.   Yes, I am.

25   Q.   So how long have you been doing that?

1   A.   I made detective approximately one year ago, and I've

2   been on the force seven years.

3   Q.   Can you just tell us briefly your educational

4   background.

5   A.   I have received a bachelor degree in criminology from

6   Anna Maria College in Massachusetts and a master's degree in

7   criminology from the same college.

8   Q.   And other than the Portland Police, where else have you

9   work?

10   A.   I worked two years for the United States Border Patrol

11   stationed in Narco, Arizona.

12   Q.   Now, as part of your -- well, let me just ask you this:

13   What's your main responsibility at the Portland Police

14   Department, Detective?

15   A.   I'm a detective in the Intelligence Unit, and my main

16   responsibility is registering, monitoring, and maintaining

17   the Sex Offender Registry in the city of Portland.

18   Q.   Now, Maine has a Sex Offender Registry law, right?

19   A.   Yes.

20   Q.   And you're responsible for enforcing that in Portland,

21   right?

22   A.   Yes.

23   Q.   And under that law -- well, first of all, do you have a

24   file on Mr. Shields already?

25   A.   I do.

1    Q.   And that's because he registered before, right?

2    A.   Yes.

3    Q.   When he lived in Portland?

4    A.   Yes.

5    Q.   But he's not on your present Web site, right?

6    A.   Correct.  He's on -- it's an inactive site.

7    Q.   I mean, he's inactive, but the site is active, right?

8    A.   Yes.

9    Q.   Now, as part of your duties there, you keep this

10   Web site, right?

11   A.   Correct.

12   Q.   And can you just tell the jury, what's on the Web site?

13   A.   I maintain a Web site, and basically we have 162 sex

14   offenders in Portland, and I created a Web-based page for

15   each sex offender, so that internally all law enforcement in

16   the city of Portland can access it.  And it's a Web page of

17   a sex offender.  It has a photo, name, date of birth,

18   address, prior convictions, the victim's age, sex, whether

19   or not alcohol and drugs were involved when the crime was

20   committed, probation, if they're on probation or not, their

21   employment, whether they're a lifetime sex offender or a

22   ten-year sex offender registering, and their phone number.

23   Q.   And that information is available to whom?

24   A.   Police only, law enforcement only within the city of

25   Portland.

1   Q.   And what information do you make available to the

2   general public on your Web site?

3   A.   There's another -- it's almost an external site for the

4   city of Portland.  Any civilian can log on, and they'll view

5   the sex offender's photo, their address, and the crime they

6   were convicted of, but it does not go into specifics on the

7   crime.

8   Q.   And if somebody who's logged on there wants additional

9   information about a specific person, can they get it?

10  A.   They cannot get it through the city of Portland, and I

11  will not release it if they contact me unless there's

12  certain reason they need something.  But if they go through

13  the state Web site, they can pay to basically get the

14  address or additional information.  But it's not specific

15  information on the crime committed.  That's not available.

16  Q.   Okay.  And why would you not make available everything

17  to the general public?

18           MS. STACEY:  Objection.

19           THE COURT:  Overruled.

20  A.   If the in-depth information and the critical

21  information was available to the public, it could -- I'm not

22  saying it would, but it could cause an uproar in the

23  communities.  If, say, Joe Smith lived next door to someone

24  and they knew exactly what he did to, you know, a certain

25  male or female and the age, it could cause them to seek or

1    retaliate or something, cause harm to an individual.

2    Q.    And in fact in recent history, were two sex offenders

3    who were registered in Maine murdered?

4           MS. STACEY:  Objection.

5           THE COURT:  Sustained.  I think that's beyond.

6    Q.    Well, it's a public safety issue, right, to release too

7    much information about people?

8    A.    I believe it is.

9    Q.    Okay.  Now, when a person who is registering in

10   Portland is released from custody, they're going to live in

11   Portland, what are their obligations under the law?

12   A.    Under the state law, they have 24 hours to notify me,

13   by telephone, in person, that they're in my city, in my

14   jurisdiction; and at that point I have to make an

15   appointment, meet with them, and register them as a sex

16   offender according to their status, lifetime or ten-year.

17   Q.    And do you happen to know from Mr. Shields registering

18   previously what type of registrant he is?

19   A.    He would be a lifetime registrant.

20   Q.    And what does that mean exactly?

21   A.    That means that lifetime registrants register.  They

22   meet with me every 90 days.  The state will mail them their

23   registration forms.  They bring them in to me.  I take their

24   photo and their fingerprints many.  I update their address,

25   their employment, and they sign the paperwork.

1   Q.   And that is for -- what period of time do they have to

2   do that?  I mean, lifetime suggests that --

3   A.   Oh, lifetime is indefinite.  It's for the rest of their

4   life.

5   Q.   Okay, is there any way that, like, if they don't get in

6   trouble for a number of years, is there any way to waive out

7   of that?

8   A.   No, not at this time.

9   Q.   So Mr. Shields will be doing this for the rest of his

10  life?

11  A.   Correct.

12  Q.   Now, when you say they have to come in every 90 days,

13  how do you arrange for that?

14  A.   I request that they call for appointment only because I

15  have other cases or whatever, I may be busy.  So it's

16  appointment only.  I'll make it convenient.  They come in,

17  we meet, and we take care of their paperwork, and at that

18  time I check if their address has been changed or their

19  employment has been changed.

20  Q.   And is it a crime for them to lie to you?

21  A.   Yes.

22  Q.   Is there a specific statute that says it's a crime?

23  A.   Under Title 34A, Section 11227 in the state of Maine,

24  it's called "failure to register or update address

25  information as a sex offender."  So basically, if they lie

1   to me about where they're living or where they're working,

2   it's a violation, and that is a Class D crime first offense

3   in Maine.

4   Q.   When they register, do they also, other than their

5   address and their place of employment, do they have to give

6   you any other information?

7   A.   It's mandatory that they provide a mailing address.

8   Q.   And if they're going to school anywhere or getting

9   education somewhere?

10  A.   Yes, they must also supply that information.

11  Q.   And do you have their telephone numbers?

12  A.   It's not mandatory, but I ask for their phone number,

13  and the majority of the time I get it.

14  Q.   And how come they're giving you their phone numbers?

15  A.   Well, if I have a question and I need to touch base

16  with them, or if they've had police contact, if I need them,

17  it's the best way for me to get in touch with them.

18  Q.   And how do you know if a registered sex offender has

19  police contact?

20  A.   In the city of Portland, when an officer has contact

21  with a sex offender, it automatically comes back as a hit as

22  a violent sexual predator.  An officer would run their name

23  and date of birth, and it automatically comes up in our

24  system in the state of Maine that they're a violent sexual

25  predator.  And at that point I'll get a notification or a

623aeb73-4fb3-4b26-ba0d-4edab4b5c7bd

1   printout that, you know, so-and-so officer had contact at

2   this time for this reason, and if there's any further

3   information, I can investigate that.

4   Q.   Do you have any way of checking if somebody's late,

5   like, getting in to see you?

6   A.   Yes.  On the intranet system that I created, it goes --

7   there's two sections.  One says upcoming registrants, and

8   the other is late registrants.  And I can just click on the

9   link, and it will show me who's late.  And by late, I mean,

10  if they haven't come in for their 90 days or contacted me,

11  I'll wait seven days, and at that point -- seven days past

12  the due date because they have a due date for the state when

13  their paperwork is supposed to get back, and that's when

14  I'll -- I'll initially go out and try to locate them at

15  their address, and if I can't, I'll request a warrant.

16  Q.   And when you say you request a warrant, what do you

17  mean by that?

18  A.   I will create an incident report for failure to

19  register or update information as a sex offender; and

20  depending on their priors, it could be -- a first offense is

21  a Class D crime, and the second one goes right into a

22  felony, a Class C felony.  And at that point I just send the

23  incident report over with their prior convictions or any

24  other related information to the District Attorney's office,

25  and the warrant comes out within 72 hours.

1  Q.   When people give you their address and place of

2  employment and potentially the place they're going to

3  school, do you ever check on that information to see if it's

4  accurate?

5  A.   Yes, I do.

6  Q.   Do you do it in every case?

7  A.   Yes.  On the books once a year in the city of Portland,

8  we go out, and we call it a sex offender sweep, if you will,

9  and we'll go out.  The media likes to tag along, and we'll

10 check on all 163 of them to make sure that everyone is

11 compliant and living where they're saying.  And the rest of

12 the time throughout the year, I could just go out on a

13 hunch, or if have, you know, the police contacts, I'll just

14 go out and check on them at random.

15 Q.   And do you do that regularly?

16 A.   Yes.

17 Q.   Just generally, you say you have -- did you say 160?

18 A.   162, I believe, today.

19 Q.   And are the policemen in Portland familiar with those

20 people?

21 A.   Not all.  They're familiar with some just from their

22 regular contacts, whether -- most of the contact is from

23 transient sex offenders.

24 Q.   Now, you have this Web site.  Do you have other methods

25 of warning the public about registered sex offenders?

1    A.   We do.  Under our standard operating procedures in the

2    city of Portland, we have guidelines.  What that is is, if a

3    certain sex offender, if they come in and I feel that their

4    history or their past is going to create red flags, then I

5    will put together a packet with all their prior convictions,

6    regardless of the crime.  And I will send it up to my chief,

7    he'll review it, and then we'll decide whether or not a

8    neighborhood notification is warranted.

9    Q.   And can you just explain what a neighborhood

10   notification is.

11   A.   Basically I'll take a photo of the sex offender on a

12   flier and create it on a computer, and I will list his

13   crime, his or her crimes and conviction dates, victim.  And

14   we usually go out about, I'd say, jeez, four or five blocks

15   around where the sex offender lives, and we paper.  I mean,

16   we're putting it in everyone's doorstep, telephone poles,

17   local businesses, schools, if there are schools in the area.

18   Q.   And are you limited in your ability to do that by any

19   law or regulation?

20   A.   No.  It's by department policy that we do it based on

21   our red flag system and according to our standard operating

22   procedures.

23            THE COURT:  What happens if someone moves out of

24   the state?

25            THE WITNESS:  When an offender moves out of the

Page 192

1   state, they're required to notify me within 24 hours, again,

2   even if they're moving.  And then if they said, "I'm moving

3   to Worcester, Massachusetts," I would call Worcester and let

4   them know that Joe Smith is moving to your jurisdiction, and

5   then they could take it upon themselves if they were not

6   notified.

7              THE COURT:  And if someone moved without telling

8   you first, what happens?

9              THE WITNESS:  At that time -- it's happened most

10  recently, and I've requested a warrant for their arrest.

11  Q.   So that person becomes a wanted person?

12  A.   Yes.

13  Q.   If they were -- are you familiar with the NCIC program?

14  A.   I'm familiar with NCIC.

15  Q.   Yes, so if they were arrested --

16             THE COURT:  That's the national computer program

17  law enforcement?

18             THE WITNESS:  Yes.

19  Q.   So if they were arrested in another state, your warrant

20  would show up?

21  A.   Yes.

22  Q.   Now, just, finally, there's a relatively new statute

23  that was passed in Maine prohibiting sex offenders from

24  having contact with minors.  Are you familiar with that law?

25  A.   I am.

1   Q.   And that is 17A of the Maine laws, Section 261?

2   A.   Correct.

3   Q.   And it makes it a crime for a person who is a

4   registered sex offender in Maine to intentionally or

5   knowingly have direct or indirect contact with a person

6   under the age of 14, correct?

7   A.   Correct.

8   Q.   And there also is a second part of the statute that

9   sets up sex-offender-restricted zones, correct?

10  A.   Yes.

11  Q.   Which are defined as child care centers, nursery

12  schools, athletic fields, or camps, or other places where

13  children are the primary users?

14  A.   Yes.

15  Q.   And it makes it a crime for a registered sex offender

16  to have direct or indirect contact in a

17  sex-offender-restricted zone with a person under the age of

18  14, correct?

19  A.   Yes, correct.

20  Q.   Now, just to be clear here, you told me -- this is a

21  relatively new law, right?

22  A.   Yes.  It was enacted in September of 2007.

23  Q.   And so, so far, you don't really know how this is going

24  to be enforced, right?

25  A.   No, I do not.

1   Q.   Okay, but it's on the books in Maine, right?

2   A.   Yes.

3   Q.   The legislature passed it, right?

4   A.   Yes, and it's enforceable.

5        MS. KELLEY:  I have no further questions.  Thank

6   you.

7   CROSS-EXAMINATION BY MS. STACEY:

8   Q.   Detective, all these Maine laws don't stop sex

9   offenders from offending; isn't that right?

10  A.   No, they don't.

11  Q.   You've had no personal involvement with Mr. Shields,

12  have you?

13  A.   No, I have not.

14  Q.   You as a detective, you're currently monitoring 162 or

15  163 sex offenders?

16  A.   It will be 163 tomorrow, so it's 162 today.

17  Q.   And it's only you that's monitoring the sex offenders?

18  A.   Yes.

19  Q.   Now, in monitoring your cases, you generally direct

20  your attention or your resources to cases where red flags

21  are raised; is that right?

22  A.   Yes.

23  Q.   And you've had experience with sex offenders who

24  register with you who reoffend, right?

25  A.   Yes.

1    Q.   The process you've just described in Portland, is it

2    fair to describe it as an effective process for knowing

3    where offenders are?

4    A.   Knowing where they are --

5    Q.   You know where they are, but you don't know what

6    they're doing, right?

7    A.   No, correct.

8    Q.   And about 70 percent of the offenders you're monitoring

9    end up with some type of police contact; isn't that true?

10   A.   Correct.

11   Q.   And that may be nonsexual contact, right?

12   A.   Correct, yes.

13   Q.   And in Portland in particular, you have a problem with

14   the young juvenile transient population, right?

15   A.   We have a lot of transient population with minors.

16   Q.   And in your supervision of the sex offenders on your

17   case load, you can say that that juvenile transient

18   population, they're targeted by sex offenders; isn't that

19   true?

20   A.   In my experience in two years, I've had three cases

21   that, yes, that has been true.

22   Q.   Because the juveniles are on the street --

23             THE COURT:  When you say juveniles, how old are

24   they?

25             THE WITNESS:  Anywhere from 10 years to 15 years

1    old, your Honor.

2    Q.   And in the two years of your experience --

3              THE COURT:  Are they transient?

4              THE WITNESS:  Yes.

5              MS. KELLEY:  I'm going to object to this line of

6    questioning.

7              THE COURT:  Well, at this point it's a little

8    late, but why don't we move on.  But let me just ask about,

9    you're saying there are 10-year-olds who are transients on

10   your streets?

11             THE WITNESS:  Yes, whether they're run-aways or

12   they've left parental guidance or the parents were locked

13   up.  Unfortunately, yes.

14   Q.   And the age range --

15             MS. KELLEY:  Objection.

16             THE COURT:  We're going to move on.

17   Q.   Are sex offenders allowed to stay at the homeless

18   shelters in Portland?

19   A.   No, they are not.

20   Q.   And testifying here today, are you supporting

21   Mr. Shields's release?

22             MS. KELLEY:  Objection.

23             THE COURT:  Sustained.

24   Q.   Now, while Mr. Shields is on supervised release, you

25   have access to Mr. Shields and you work with Probation,

1    right?

2    A.   Yes, I do.

3    Q.   But after three years when probation ends, Mr. Shields

4    can turn you away, can't he?

5    A.   Refuse to register, you mean?

6    Q.   I'm sorry.  If you have a suspicion and you want to get

7    access to Mr. Shields's home -- you said you sometimes

8    check?

9    A.   Yes, he could deny my access to his dwelling.

10   Q.   After three years?

11   A.   Yes.

12   Q.   And if he moves out of Maine, you're no longer in

13   charge of monitoring him, right?

14   A.   Correct.

15   Q.   And some states, their sex offender registries are more

16   lenient than others, correct?

17   A.   Correct.

18        MS. STACEY:  I have nothing further.

19   REDIRECT EXAMINATION BY MS. KELLEY:

20   Q.   Detective Gorham, do you sometimes go into these guys'

21   homes and look around?

22   A.   Yes, I do.

23   Q.   And do you have any kind of computer device, a disk you

24   sometimes take with you?

25   A.   Yes, we do.  We have a scan disk.  Essentially it's a

1  disk that we can insert into the computer.  I have retrieved

2  it from the Maine State Police crime lab, and it's just

3  another tool that I can use.  I put it in their computer.

4  Obviously I have to have consent, unless they're on

5  probation.  And it can almost immediately tell me whether

6  there's child pornography on the computer.

7  Q.   And in your experience, even when people aren't on

8  probation, do they still let you in into their house?

9  A.   In the last two years, yes, I've had the majority allow

10  me in.

11  Q.   Then when they let you in, do they let you put your

12  disk in their computer, even though they don't have to?

13  A.   Last year alone, I had five out of twelve allow me to

14  access their computers.

15  Q.   Just because you asked?

16  A.   Yes.  They think they had pulled one over on me, I'm

17  sure.

18  Q.   Okay.  And when you put the disk in, you can take it

19  away with you, right?

20  A.   Yes.  And the second I see any image of child

21  pornography, that's when I have to write the warrant to go

22  further.

23  Q.   And when you write a warrant, what do you mean by that?

24  A.   I'm drafting basically the warrant to seize the

25  computer, to access all of the files that are on that

1  computer hard drive.  Basically that image that I found with

2  the scan disk was my probable cause to do so.

3  Q.   And this is the instigation of a new criminal case

4  against that person, right?

5  A.   Correct.

6              MS. KELLEY:  No further questions.

7              MS. STACEY:  I have no questions.

8              THE COURT:  Thank you for coming up.

9              THE WITNESS:  Thank you.

10         (Witness excused.)

11             THE COURT:  We're done with the out-of-town

12  witnesses?

13             MS. KELLEY:  Yes.

14             THE COURT:  All right, so although I hate missing

15  a minute -- I know you've book till 4:00 -- I think

16  everyone's tired.  So why don't we just go home, and Friday

17  we'll start with Dr. Rypma, is that right?

18             MS. KELLEY:  Yes, we will.

19         (Jury excused.)

20             THE COURT:  I'll see counsel on scheduling,

21  please.  Actually I don't need you, Lee.  It's been a long

22  day.

23         (Discussion off the record.)

24         (Adjourned, 3:50 p.m.)

25

Page 200

1                   C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Court Reporter, do

8  hereby certify that the foregoing transcript, Pages 1

9  through 199 inclusive, was recorded by me stenographically

10 at the time and place aforesaid in Civil Action No.

11 07-12056-PBS, United States of America V. Jeffrey Shields,

12 and thereafter by me reduced to typewriting and is a true

13 and accurate record of the proceedings.

14         In witness whereof I have hereunto set my hand

15 this 15th day of September, 2008.

16

17

18

19

20
            /s/ Lee A. Marzilli
21         _____

            LEE A. MARZILLI, RPR, CRR
22          OFFICIAL COURT REPORTER

23

24

25