IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,    )
                             )
              Petitioner     )
                             )
         -VS-                ) CA No. 07-12056-PBS
                             ) Pages 1 - 164
JEFFREY SHIELDS,             )
                             )
              Respondent     )


JURY TRIAL - DAY SEVEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
September 12, 2008, 9:10 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2        MARK J. GRADY, ESQ. and EVE A. PIEMONTE-STACEY, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the Petitioner.

4
         PAGE KELLEY, ESQ, Federal Defenders,
5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
     for the Respondent.

6
         JOHN G. SWOMLEY, ESQ. Swomley & Associates,
7    227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
     for the Respondent.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

    WITNESS                  DIRECT    CROSS    REDIRECT    RECROSS
3
    Craig B. Rypma              5        83
4

5

6

7   CHARGE CONFERENCE:   Page 133

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

289d4937-08e6-428a-9052-d23ac805602e

1                    P R O C E E D I N G S

2          THE COURT:  The jury is now here.  Good morning to

3    everyone.  We'll call the jury in.  No one needs me, right?

4          MR. GRADY:  No.

5          THE COURT:  Good.  Has any judgment been made yet

6    about when this case is likely to end?

7          MS. KELLEY:  Well --

8          THE COURT:  In other words, not to put it in code

9    too much, as to whether or not Mr. Shields will testify?

10          MS. KELLEY:  We don't anticipate Mr. Shields

11    testifying at this time.

12          THE COURT:  I know he reserves the right, I'll

13    always give him that right, but just for timing purposes.

14          MR. SWOMLEY:  I think we've come to an

15    understanding that at this point, unless there's a train

16    wreck here, we don't need him.

17          MS. KELLEY:  I'm hoping that -- okay.

18          THE CLERK:  All rise for the jury.

19          (Jury enters the courtroom.)

20          THE COURT:  Good morning to everyone.

21          THE JURY:  Good morning.

22          THE COURT:  Did anyone speak about the case or see

23    anything in the press?  I find the jury has complied.

24          I think we have Dr. Rypma back up on the stand.

25    Is that right?

1          MS. KELLEY:  Yes, we do.

2          THE COURT:  Come on up, sir.

3                    CRAIG B. RYPMA

4     having been previously duly sworn, was examined and

5     testified further as follows:

6          THE COURT:  So, if you may remember, we did about

7     fifteen minutes for him before we took the break for all

8     those folks in Maine.  We went through his background, and I

9     think we're pretty much starting on the opinion now, right?

10         MS. KELLEY:   Yes, although I have a couple more

11    points.

12    CONTINUED DIRECT EXAMINATION BY MS. KELLEY:

13    Q.   Dr. Rypma, your CV is in evidence, so I'm not going to

14    go through every point on it, but just briefly, I think you

15    said the last time you testified you spent about 19 years

16    providing sex offender treatment for the State of Iowa?

17    A.   Correct.

18    Q.   And during that time, can you just estimate

19    approximately how many sex offenders you treated or you

20    supervised the treatment of?

21    A.   At any one time, there would have been somewhere in the

22    vicinity of 70 to 90 people in the program at any one time

23    in the actual treatment phase.  Now, there were, oh, 30 to

24    40 others that were called -- that were in what we called

25    aftercare that met once a month, okay.  So whether you

1   include those or not, I mean, they were still sex offenders.

2           So over a 19-year period of time, I think it would

3   be fair to say, in that program, somewhere in the vicinity

4   of 2,000 plus.

5   Q.   Now, you say that your contract with the state ended in

6   2007?

7   A.   Correct.

8   Q.   And then after that -- or let me just ask you.  You

9   also do sexually dangerous person, or as you call them in

10  Iowa, sexually violent person evaluations, right?

11  A.   Yes, ma'am.

12  Q.   And approximately when did you begin doing those?

13  A.   Approximately 1999, I think.

14  Q.   And is the Iowa statute fairly recent?

15  A.   I think the Iowa statute was passed, if I recall, in

16  1996.

17  Q.   And since you've been doing those evaluations, can you

18  just give us a rough number of how many of those you've

19  done?

20  A.   Approximately at this point 120, 123 perhaps.

21  Q.   And in those evaluations, who has asked you to do those

22  evaluations?

23  A.   Primarily defense attorneys.  Well, exclusively defense

24  attorneys.

25  Q.   Okay, so you have never testified for the government or

1    been asked to evaluate someone for the government?

2    A.    In an SVP case, that's correct.

3    Q.    And out of those cases, roughly 120 cases, in how many

4    instances have you testified for the defense?

5    A.    Approximately 42 times.

6    Q.    So we can infer that the other times your opinion was

7    such that the defense would not call you?

8    A.    For one reason or another, that's correct.

9    Q.    And when you say "one reason or another," what do you

10   mean?

11   A.    Well, the vast majority of those, of course, they would

12   not call me because I would not be helpful to them in their

13   case.

14   Q.    Okay.  And are there other reasons why you would not

15   end up being called?

16   A.    You know, there is at least one, and there may be more,

17   I'm not sure, where the petition was ultimately dismissed,

18   but that doesn't happen very frequently.

19   Q.    And so in that case, it doesn't say anything about your

20   opinion.  It's just you didn't end up testifying?

21   A.    That's correct.

22              THE COURT:  Excuse me one second.

23              (Discussion off the record.)

24   Q.    So you've testified in what different states?

25   A.    I have testified in Arizona.  Are you talking about SVP

289d4937-08e6-428a-9052-d23ac805602e

1   cases?

2   Q.   Yes, I am.

3   A.   I have testified in Arizona, Wisconsin, Iowa,

4   Massachusetts.  I think that's all.

5   Q.   Have you testified in Federal Court before?

6   A.   In SVP cases?

7   Q.   Yes.

8   A.   No.

9   Q.   Okay.  And that's because the statute is so new,

10  correct?

11           MS. STACEY:  Objection.

12           THE COURT:  Well, yes, sustained.

13  Q.   Do you know how many SVP hearings there have been in

14  the country?

15  A.   I know there's been very few.  I understand that there

16  was one that was recently completed in Hawaii, but I don't

17  really know much of the details.

18  Q.   Now, why have you only testified for the defense and

19  not for the government?

20  A.   The government hasn't asked me.

21  Q.   Okay.  And why is that?

22           MS. STACEY:  Objection.

23           THE COURT:  Overruled.

24  A.   You know, are you asking for my opinion about that?

25  Q.   Yes.

1   A.   I think that there -- you know, I practiced this

2   profession for 30 years now, and there really is no area in

3   psychology where the issues are more controversial, more

4   divided into two very distinct groups of people.  My own

5   observation is --

6            THE COURT:  What do you mean by two distinct

7   groups of people?  You mean government witnesses and defense

8   witnesses?

9            THE WITNESS:  Those that exclusively testify for

10  the government and those that exclusively testify for

11  defense.  Now, I think there are some other reasons why you

12  exclusively testify for the defense, but I think in this

13  field there are people who, I think, read the research and

14  follow the numbers and have a different exposure to sex

15  offenders.  It seems to me that people -- there are a group

16  of people that seem to make these decisions based on their

17  emotion.

18            MS. STACEY:  Objection.

19            THE COURT:  Well, yes, I'm going to strike that

20  comment.  So you're saying that, just so I understand it,

21  people are categorized into one camp or another?

22            THE WITNESS:  That's correct.

23  Q.   Now, with regard to Dr. Plaud, you heard him testify

24  that in Massachusetts he only testifies for defense and has

25  never testified for the government before?

1    A.    Correct.

2    Q.    And can you just explain why the Massachusetts system

3    engenders that type of situation?

4    A.    Yes.  My understanding is that in Massachusetts, in

5    order to testify for the government, it is necessary to be

6    listed as a qualified examiner in the state of

7    Massachusetts; and the government is required to choose

8    those individuals from that list of qualified examiners.

9    Q.    And so if you're not on that list, you never get called

10   by the government, correct, by statute?

11   A.    You never get called by the government?

12   Q.    Right.  The government only calls people from that

13   list?

14   A.    That's my understanding, yes.

15              THE COURT:  So could you apply if you wanted to?

16              THE WITNESS:  I could apply if I wanted to, yes.

17   Q.    Given what you know about the decision-making about who

18   gets on that list, would you ever get on that list?

19   A.    No.

20   Q.    Or would Dr. Plaud ever get on that list?

21   A.    No.

22   Q.    Approximately how many people are on that list?

23   A.    Approximately twenty-five is my understanding.

24   Q.    Now, you are not a researcher, correct?

25   A.    That's correct.

1    Q.    Have you ever done any sex offender recidivism

2    research?

3    A.    No.

4    Q.    Have you ever written an article about sex offender

5    recidivism?

6    A.    No.

7    Q.    Have you been on a peer-review board to review other

8    people's articles?

9    A.    No.

10   Q.    And why is that?

11   A.    You know, as my career evolved, I mean, I certainly --

12   in my earlier years, I did research that was not related to

13   sex offender recidivism, or sex offenders at all, as a

14   matter of fact.  I do have a background, although distant,

15   doing some research, but, you know, you can't do everything.

16   You can't do everything there is to do in any profession.

17   And I felt that it was important to maintain direct patient

18   contact rather than -- and I was not in an academic setting.

19   I mean, I was in a private practice setting that also

20   provided some barriers, if you will, to access to large

21   groups of sex offenders.

22   Q.    And have you continued your treatment involvement since

23   2007 when you were no longer working as a contractor for the

24   state?

25   A.    I'm sorry, have I continued contact?

289d4937-08e6-428a-9052-d23ac805602e

1   Q.   Treatment.

2   A.   Treatment?  Yes.

3   Q.   Now, I want to just ask you about the -- when you're

4   doing a sex offender evaluation, what is the methodology you

5   employ?

6   A.   In general what I do is -- these cases typically come

7   with very large files of records, sometimes up to 2,000,

8   3,000 pages of records.

9   Q.   Do you know roughly how many pages of records were in

10  this case?

11  A.   Yes.  There were roughly around 1,000 pages in this

12  case.

13  Q.   Okay, I'm sorry to interrupt you.  Go on with your

14  methodology.

15  A.   I initially do a brief review of those records and then

16  schedule an interview with the individual.  I conduct an

17  interview.  Sometime after having conducted the interview, I

18  go back to the records and literally read each page.  Now, I

19  want to say there's no way that I can keep each page of the

20  record in my mind, but, I mean, there are certain things I'm

21  looking for in the record that relate to my ultimate scoring

22  of actuarial instruments, my understanding, which is the

23  next step.  I ultimately do score a Static-99, but I'm also

24  looking for information that is useful in -- we've heard

25  some about dynamic variables, so I'm looking for information

1    in those records that give me data that I can use in scoring

2    dynamic variables.  After I have that information, I produce

3    a report.

4    Q.   Now, in this particular case, did you end up scoring an

5    actuarial instrument?

6    A.   I did.

7    Q.   And what was that?

8    A.   The Static-99.

9    Q.   And why do you use the Static-99?

10   A.   The Static-99, of the various actuarial instruments we

11   have available to us, really is the state of the art.  I

12   mean, it is the instrument that is the most widely

13   researched instrument.  It is the one that is the most

14   widely used instrument in the field of sex offender

15   recidivism.

16   Q.   And when you scored the instrument, that instrument in

17   this case, what score did you ultimately arrive at?

18   A.   8.

19   Q.   And did that change?

20   A.   Did that change?

21   Q.   Did you originally score --

22   A.   I originally scored him at a 7, and then there was some

23   confusion with regard to, I believe the item "Prior

24   Offenses."  The way the data came in to me in this case,

25   frankly, was a little bit confusing because the records were

289d4937-08e6-428a-9052-d23ac805602e

1   not produced in one large block.  The crimes we were dealing

2   with all were in some cases, of course, twenty years old.

3   They were difficult to make sense of because, as we have

4   heard throughout the trial so far, there was that cluster of

5   offenses there in 1989.  And it was unclear to me, for

6   example, whether some of the cases were actually charged.

7   One of them I wasn't sure had ever been prosecuted, and

8   there was just basically some confusion.

9           As my understanding of the case evolved, it became

10  clear that he had an 8 on the Static-99.  But, you know,

11  that really doesn't matter.  Once you get past 6, you're in

12  the highest category the Static-99 has, so the difference

13  between a 7 and an 8 is immaterial.

14  Q.   Can you just explain -- I think the jury will have a

15  scoring sheet that shows that if you're above 6, you're at

16  high risk, and can you just discuss that term "high risk"

17  and what it means in the context of the Static-99.

18  A.   Well, we're not sure exactly what it means because of

19  the controversy surrounding the statistics that underlie the

20  instrument itself.  The authors have suggested that there is

21  low, medium, and high categories, depending on numbers that

22  are produced on this instrument.  So basically it is a term

23  that is in the manual for scoring the Static-99.

24  Q.   And do you know without looking at the chart what the

25  numbers are for recidivism rates for someone at

289d4937-08e6-428a-9052-d23ac805602e

1   Mr. Shields's level?

2   A.   Yes.  I can tell you pretty quickly here.  The people

3   who score a 6 or above are at 52 percent over -- if you're

4   looking at a fifteen-year window, for those individuals who

5   are in the five-year, I believe it is 33 and 40 --

6            (Witness examining document.)

7   A.   It's 39 and 45 percent.

8   Q.   So five years is 39 percent?

9   A.   Ten-year is 45 percent.

10  Q.   And the fifteen-year is 52 percent?

11  A.   Yes.

12  Q.   Now, if you're going to look at the 52 percent number

13  just straight on, what does that 52 percent mean?  Does that

14  mean that he has a 52 percent chance of recidivating?

15  A.   No.  It means that the individuals in that bin for the

16  development of sample recidivate -- and I think it's

17  important maybe at this time also to say, if I might, that

18  the developmental sample of the Static-99 -- I mean, this

19  has been important for me to consider throughout the course

20  of these evaluations that I've used this instrument -- this

21  instrument was developed only looking at 1,084 people.

22  Q.   And is that, relatively speaking for statistical

23  purposes, is that a large or a small sample group?

24  A.   Well, not only is that a small sample size, but even

25  more importantly, the individuals in that sample that scored

1   a 6 were only 129 people.  So we're making judgments of

2   people who committed crimes, you know, in some cases in the

3   late 1940s, that were released in Canada and Wales, but

4   outside the United States, that 129 people that we're making

5   judgments on by asking them ten questions.

6   Q.   So let me just ask you, with regard to that 52 percent,

7   what does it actually mean, though?  I think you interrupted

8   yourself.  For people who are in that bin, what can we say

9   about 52 percent of them?

10  A.   What we can say is, of the developmental sample,

11  52 percent of them recidivated in fifteen years.

12  Q.   And how do we apply that to Mr. Shields?

13  A.   I don't know that it can be applied to Mr. Shields, and

14  that's the problem.  Basically what it says is that

15  Mr. Shields's score alone is similar to the score of that

16  developmental sample.

17  Q.   Does it mean he correlates to the half of the sample

18  that recidivated?

19  A.   Not necessarily, no.

20  Q.   How could we as decision-makers try to figure out, is

21  he in the half that recidivated or the half that didn't?

22  Does the instrument allow you to differentiate between those

23  two groups?

24  A.   It does not.

25  Q.   At all?

1   A.   At all.

2   Q.   So how come you use the Static-99?  I mean, what is the

3   utility of this?

4   A.   Well, I use the Static-99, as I said, it is -- it's the

5   only thing we have as a starting point.  I mean, it's just

6   not -- I refer to it as an instrument that's still in its

7   infancy.  Now, theoretically, the idea of being able to come

8   up with factors that ultimately will contribute to our

9   ability to make these predictions in theory, you know, maybe

10  in another 20 years we'll know more factors that really

11  relate, but our research isn't there yet.

12  Q.   Now, did you use another checklist when you were

13  evaluating Mr. Shields's case?

14  A.   Yes, I did.

15  Q.   And is that a second actuarial instrument?

16  A.   It's not an actuarial, no.

17  Q.   What is it called?

18  A.   It's called the Sexual Violence Rating Scale, referred

19  to as the SVR-20.

20  Q.   And what is the SVR-20?

21  A.   Well the SVR-20 is, as you alluded to, is a checklist

22  of variables that a clinician, after having read records,

23  can go through and check to see how many of these twenty

24  variables the individual is similar to.

25  Q.   Does a person's score or however many little checks you

289d4937-08e6-428a-9052-d23ac805602e

1   put on that list correlate to any number, any quantifiable

2   recidivism rate?

3   A.   No.

4   Q.   And so -- I don't know if you answered this, but why

5   did you do that?  Why did you use that?

6   A.   Well, again, it's a -- I don't know, it's another slice

7   of the pie, if you will.  And both of these instruments, and

8   I think all experts that are doing these evaluations right

9   now will say that these are kind of starting points.  I

10  mean, they're sort of a baseline, if you will, of

11  understanding where this individual might be on some

12  variables that are related to sex offense recidivism, maybe.

13  Q.   Now, after you use these so-called actuarial

14  instruments or checklist or whatever, what else do you

15  consider?

16  A.   Well, then we begin looking for dynamic variables.

17  Q.   And what are dynamic variables?  How do you define

18  that?

19  A.   Well, dynamic variables are essentially variables that

20  we believe moderate risk or could in some cases contribute

21  to higher levels of risk.

22  Q.   Now, let me just ask you, the name "Static-99" has some

23  relevance here, correct?

24  A.   Yes.

25  Q.   And why is that?

1  A.   Well, because, as the name implies, the variables on

2  the Static-99 are static.  That is, they don't change.  A

3  person is going to have the same score on the Static-99, the

4  same estimate of risk on the Static-99 after they are

5  deceased as they do when they're 20.

6  Q.   And so, for example, does the Static-99 take into

7  account somebody's age?

8  A.   Not well.  It does take it into account.

9  Q.   Okay.  And just briefly, I think we went over this with

10  one of the other experts, but just briefly, what's the

11  problem with the age on the Static-99?

12  A.   Well, it doesn't account for it adequately.

13  Q.   It has a --

14  A.   A cutoff of 25.  You get a point if you're below 25,

15  and you don't if you're above 25.

16  Q.   And why is that inadequate?

17  A.   Well, because as research has evolved, we have come to

18  understand that age is a significant dynamic variable that

19  must be accounted for in estimating an individual's risk for

20  dangerousness.

21  Q.   So age is a dynamic variable.  What are some other

22  dynamic variables you considered as part of your

23  methodology?

24  A.   Well, sexual deviance is an important dynamic variable,

25  as is treatment an important dynamic variable.  A man by the

289d4937-08e6-428a-9052-d23ac805602e

1   name of Andrew Harris is currently looking at dynamic

2   variables that he refers to as "intimacy deficits," okay.

3   Q.   And can you just define intimacy deficits.

4   A.   Problems in establishing long-term intimate

5   relationships.

6   Q.   And can you just explain -- we won't go into all the

7   dynamic variables in such detail right now, but if you could

8   just explain, what is a significant intimacy deficit that

9   you would consider to be affecting your opinion on

10  somebody's dangerousness?

11  A.   An individual who has either never been able to

12  establish a relationship in what the field says is of at

13  least two years or more.

14  Q.   And that is taken into consideration on the Static-99,

15  right?

16  A.   That is correct.

17  Q.   And then what more do you consider than that as part of

18  your examination of it as a dynamic factor?

19  A.   Are you speaking of intimacy deficits?

20  Q.   Yes.

21  A.   Yes, in terms of whether there has been, for example,

22  multiple relationships that have failed.

23  Q.   And when you say relationships that have failed, what

24  do you mean by that?

25  A.   That have failed.  I don't know, I'm not sure what your

289d4937-08e6-428a-9052-d23ac805602e

1    question is.

2    Q.   Okay.  And what other dynamic variables would you

3    consider as part of your methodology?

4    A.   I also looked at social support system, cooperation

5    with supervision, sexual self-regulation, and in general

6    self-regulation.

7    Q.   Now, then after you look at the dynamic variables and

8    you've done your work with the actuarials, what do you do?

9    A.   Then I write a report.

10   Q.   And form your conclusion?

11   A.   Correct.

12   Q.   Do you also give any consideration, if the person is

13   incarcerated, to their release plan?

14   A.   I do.

15   Q.   And in this case, did you find anything notable about

16   Mr. Shields and what he told you about his release plan?

17   A.   I thought that it was an adequate release plan.  I

18   thought that he had clearly spent a lot of time thinking

19   about what he needed to do when he was released.  He

20   certainly was sincere.  The records suggested that he had

21   spent a lot of time with Dr. Graney.  I was here in the

22   courtroom when she testified, and I went over those records.

23   I was convinced that he had put quite a bit of effort into

24   planning for his ultimate release.

25   Q.   And has he said anything to you about his plan or what

289d4937-08e6-428a-9052-d23ac805602e

1  he would wish to see happen if he is released after this

2  proceeding?

3  A.   Yes, I am aware of what he hopes to have happen.

4  Q.   What did he tell you?

5  A.   Mr. Shields does not want to be released immediately to

6  the streets.  He hopes that he is placed in a halfway house,

7  and he, I believe, hopes that it's the Pharos House again.

8  He thought that he had begun making good progress there when

9  he was released before and feels that he's ready to go back

10 there.  He wants to return to Portland.  He wants to get

11 involved with the AA community that he already has some

12 knowledge of.

13 Q.   And do you know, did he talk to you about what one of

14 his goals would be while he was at the halfway house?  Did

15 he say anything concerning money?

16 A.   Oh, he needs to make money so he can ultimately -- yes,

17 that is the reason.  Obviously he's been incarcerated now

18 for seven years and has no resources.

19 Q.   Now, when did you meet with Mr. Shields and for how

20 long?

21 A.   Well, actually I met with him twice.  The first time I

22 met with him was in March of this year.

23 Q.   And do you recall when the second time was?

24 A.   Yes, in August of this year.

25 Q.   And the first time, how long did you spend with him?

289d4937-08e6-428a-9052-d23ac805602e

1   A.   Five hours.

2   Q.   And this was at the Federal Medical Center or the

3   prison at Devens?

4   A.   Correct.

5   Q.   And the second visit was also there?

6   A.   Correct.

7   Q.   How long was the second visit?

8   A.   Four hours.

9   Q.   And why did you go back a second time?

10  A.   Well, I understood my evaluation to be focused on

11  whether or not Mr. Shields was presently dangerous.  The

12  trial had gotten continued.  There had been several months

13  that had passed prior to my last contact with him, and I

14  thought it was professionally responsible that I update my

15  report.

16  Q.   And why is that?

17  A.   Well, because the data was -- I mean, there are things

18  that could have happened in the meantime.  I didn't know --

19  he could have deteriorated emotionally.  He could have been

20  disciplined for sexually acting out.  There are many things

21  that could have happened that I felt that I needed to

22  evaluate him for.

23  Q.   And when you saw him the second time, did your opinion

24  change from the first time?

25  A.   No.

1   Q.   Did you discuss his or was it important in your

2   evaluation to talk to him about his life history?

3   A.   Yes.

4   Q.   And what did he tell you about that?

5   A.   Well -- and, again, we've heard some about that.  I

6   mean, his life is really quite tragic.  His parents divorced

7   when he was seven.  About the time that his father abandoned

8   the family at age seven, he began getting sexually abused by

9   two boys in the neighborhood, I believe a 15- and a

10  16-year-old.

11  Q.   Now, just to interrupt you, you heard the government

12  asking one of the witnesses if they understood that

13  Mr. Shields had been abused by other children?

14  A.   Yes.

15  Q.   As a clinician, do you consider that abuse between a

16  7-year-old and a 15- or 16-year-old to be child's play or

17  abuse by other children?  Is that how you would characterize

18  that?

19             MS. STACEY:  Objection.

20             THE COURT:  Sustained.

21  Q.   Because of the age of the perpetrators, would you

22  minimize the abuse that he suffered there?

23  A.   Would I minimize the -- no.  I think it was severe

24  abuse.

25  Q.   And can you explain to the jury what the abuse

1   consisted of.

2   A.   Both oral and anal sex that was forced upon him, and

3   then ultimately these two boys brought other friends of

4   theirs to basically abuse him in the same manner.

5   Q.   At some point did Mr. Shields move away from his

6   mother?

7   A.   Yes.  At age eleven he moved in with his maternal

8   grandmother.

9   Q.   And what happened in that household?

10  A.   When he arrived to begin living with his grandmother,

11  there was a 15 year-old cousin who was also living there

12  that immediately began abusing him.

13  Q.   And did he also experience any other significant trauma

14  in that household?

15  A.   Yes.

16  Q.   What was that?

17  A.   At the age of 13, he walked in the house one day and

18  saw his grandfather with a gun held to his head, and as he

19  walked in, his grandfather pulled the trigger.

20  Q.   And did his grandfather die from that wound?

21  A.   Certainly.

22  Q.   So what happened to Mr. Shields after that event when

23  he was 13?

24  A.   The grandmother moved back with Mr. Shields's mother,

25  and Mr. Shields at that point in his life began, if you

289d4937-08e6-428a-9052-d23ac805602e

1  will, drifting from initially one relative to another was my

2  understanding, but basically became homeless.

3  Q.   And did he have a job at that point in his life?  What

4  did he do for money at that point?

5  A.   He prostituted for money beginning at about age 13.

6  Q.   Now, as part of your assessment of Mr. Shields, is it

7  your opinion that he's experienced so much abuse that he's

8  just too damaged to function?

9            MS. STACEY:  Objection.

10           THE COURT:  No.  Overruled.

11  A.   No.  I think it certainly delayed his development in

12  many ways and certainly disturbed his development in many

13  ways, but has not -- I think your question was "made him

14  untreatable."  I don't think he's untreatable, no.

15  Q.   Do you have any indication that Mr. Shields has any

16  type of organic brain problem?

17  A.   No.

18  Q.   And what's the meaning of that?

19  A.   What's the meaning of organic brain damage?

20  Q.   Yes.

21  A.   Organic refers to physical brain damage, so an

22  individual who has either suffered a stroke or in some cases

23  as the result of birth trauma, or in some cases as the

24  result of chromosomal damage, end up with what is referred

25  to as organic brain damage.

1   Q.   And do you see sex offenders who have that type of

2   problem?

3   A.   All the time.

4   Q.   And what's the problem with those people?

5   A.   Those individuals are very challenging from a treatment

6   perspective.

7   Q.   Why is that?

8   A.   Because they have difficulty learning.  They have

9   difficulty in decision-making process.  They have difficulty

10  learning kind of the cognitive behavioral model sex offender

11  treatment.  They just present significant challenges.

12  Q.   Now, you heard Dr. Tomich testify that he thought

13  Mr. Shields is compulsive and that his offending was

14  compulsive.  Can you just -- well, first of all, do you

15  agree with that?

16  A.   Not at all.  No, no way.

17  Q.   And why not?

18  A.   Well, you know, there is some compulsivity, some

19  compulsive behavior demonstrated in that period of time,

20  roughly between January and perhaps September of 1989 when

21  there was the cluster of offenses that we've heard about;

22  but having a period of time that we demonstrate some kind of

23  compulsive behavior doesn't rise to the level of a

24  compulsive pattern of behavior.  From that point on, if you

25  carefully look at the record, it appears to me, it was my

289d4937-08e6-428a-9052-d23ac805602e

1    opinion from looking at the record, that his sexual acting

2    out actually diminished.

3    Q.   And can you just explain.  Why do you say his sexual

4    acting out diminished after that cluster of offenses?

5    A.   Well, he was sent to prison for three years, or just

6    under three years, was given a six-year probation term, just

7    under three years of which was in a prison setting; but he

8    was out on the street for at least three years, and that

9    behavior didn't continue.

10   Q.   When you say he was out on the street for three years,

11   the jury will have the chronology, but during that time,

12   it's your understanding he was on probation.

13   A.   Correct.  That's what I meant.

14   Q.   And does the record reflect any probation violations

15   during that time period?

16   A.   It does not.

17   Q.   Okay.  And assuming he finished that probationary

18   period in 1996, do you know off the top of your head when

19   the next offense was?

20   A.   1998.

21   Q.   And which offense was that?

22   A.   That was with the 12-year-old boy.

23   Q.   And then his next offense was --

24          THE COURT:  So just could you walk us through this

25   chronology.  So what year does he get out of jail from those

1    cluster of offenses?

2              THE WITNESS:  I'm sorry.  Say that again.

3              THE COURT:  What year does he get out of jail from

4    the cluster of offenses?

5              THE WITNESS:  He got out of jail approximately

6    1993.

7              THE COURT:  And then he was on probation?

8              THE WITNESS:  He was on probation until 1996.

9              MS. KELLEY:  I believe the chronology is going to

10   state January of '92, but, anyway, for --

11             THE COURT:  January of 1992 he gets out?  Can we

12   all agree on that?

13             MS. KELLEY:  Yes.

14             THE COURT:  And then he's on probation until when?

15             MS. KELLEY:  I believe his probation ends in March

16   of 1996.  The chronology states all of this.

17             THE COURT:  Yes, but they don't have it, so they

18   need to understand this testimony.  We're going to give you

19   a typed-out chronology.  So 1996 he then gets off probation,

20   is that right?

21             THE WITNESS:  In March of 1996, that's correct.

22             THE COURT:  All right, now, during probation, that

23   three- to four-year period of time, is that when he's on sex

24   offender treatment for three years?

25             THE WITNESS:  Yes.

1          THE COURT:  Okay, so can you tell us about that.

2          MS. KELLEY:  Well, can I get to that later?

3          THE COURT:  You're coming back to that?

4          MS. KELLEY:  Yes, we will.

5          THE COURT:  Fine.  I just want to make sure they

6     understand this chronology.

7          MS. KELLEY:  Yes, and I think that we've been

8     working -- even now we're working on the chronology.  It is

9     very confusing.

10         THE COURT:  I know, but it's hard to understand

11    the testimony because they don't have it.

12    Q.   So, at any rate, as best we can tell, in 1998 is the

13    offense with the 12-year-old boy, and then in 2001 is the

14    child pornography offense, right?

15    A.   Correct.

16    Q.   Now, with regard to his -- 2002 is the pornography I'm

17    being told.  Even I don't follow this completely.  We're

18    talking about him being compulsive, and I just want to ask

19    you, if somebody were truly sexually compulsive, would you

20    expect to see that activity going on in prison?

21    A.   Yes.

22    Q.   And why is that?

23    A.   Because an individual who is compulsive has no control

24    over their ability to stop their deviant behavior.

25    Q.   And obviously, as the government has so nicely pointed

289d4937-08e6-428a-9052-d23ac805602e

1   out, there are no children in prison, right?

2           MS. STACEY:  Objection.

3           THE COURT:  Overruled.

4   Q.   Okay, you can say "no" to that.  Hopefully there are no

5   children in prison, not in federal prison.  So how would you

6   see a child sex abuser acting out in prison, a compulsive

7   person?

8   A.   You know, those of us that work with sex offenders see

9   that all the time.  I mean, it is quite remarkable.  A

10  person who is --

11          THE COURT:  You're talking about people who are

12  child sex offenders?

13          THE WITNESS:  Yes, who are compulsive pedophiles.

14  They're really quite sad.  They frequently dress like

15  children.  They cut pictures out of magazines that are not

16  necessarily pornographic, but that's what they have

17  available to them.  They compulsively masturbate.

18  Frequently in the prison record they are written up for

19  misconduct because they are masturbating in front of guards

20  that walk by and don't stop.  They're pretty sad people.

21  Q.   In any prison population, are there prisoners who look

22  more or less adult themselves?

23  A.   Yes.

24  Q.   And what do you see compulsive pedophiles, how do you

25  see them behaving with regard to those people?

289d4937-08e6-428a-9052-d23ac805602e

1    A.    They are sexually attracted to the younger inmates,

2    and, again, that's reflected in the prison record because

3    there's often many complaints that inmates have, or there

4    are instances where there actually is sexual contact that

5    they end up getting a discipline report for.

6    Q.    Now, in Jeff Shields's prison record, do you see any

7    type of behavior like that referenced whatsoever?

8    A.    I do not.

9    Q.    Now, the government has pointed out that when Mr. --

10   and we have records that will be admitted into evidence

11   here -- that when Mr. Shields was arrested after the 1989

12   group of incidents, that he made statements about needing

13   help and being sick, correct?

14   A.    That's correct.

15   Q.    This is going to be Government's Exhibit 10 and 11.

16   So, for example, you remember Mr. Shields repeatedly saying

17   he was sick and no one would help him, asking if he could go

18   home; "I'm sick.  It's not me that does these things.  It's

19   not me," pointing to his head, "It's another person."

20             "It started when he was young.  Nobody would

21   listen to him.  He didn't do anything.  He was seeing a

22   psychiatrist.  He wanted to see his mother.  He was visibly

23   upset and anxious."

24             So does this indicate to you that he was

25   compulsive -- or maybe I'll just ask you, what does this

289d4937-08e6-428a-9052-d23ac805602e

1   indicate to you?  What is the significance of these

2   statements?

3   A.   I recall reading that record, and as I read that, it

4   looked to me as if he was distraught.  He was asking for

5   help, but at that point in time, what I took out of that

6   record was that he was distraught at that time.

7   Q.   And what do you make of the fact that Mr. Shields over

8   time has repeatedly asked for help, and he's seen mental

9   health professionals over time, and he's been to sex

10   offender treatment?  Is that something negative that you

11   take away from all those facts?

12          MS. STACEY:  Objection.

13          THE COURT:  Sustained.

14   Q.   What do you make of the fact that over time he keeps

15   asking for help?

16   A.   I don't think it's unusual at all.  You know, when

17   you're evaluating emotional change, it doesn't occur -- we

18   as human beings don't change in a perfectly linear fashion.

19   And we change for different reasons.  Some of us change

20   because our mothers die.  Some of us change because we find

21   a therapist that we can finally work with.  Some of us

22   change because we grow up.  Change is a complex phenomena

23   that from a research perspective has escaped our capacity to

24   effectively define in ways that we can accurately measure

25   it.  It is a broad phenomena that, frankly, is different for

1    every human being.

2    Q.   Do you think the fact that in the past Mr. Shields has

3    asked for sex offender treatment and it hasn't "worked,"

4    quote/unquote, for him is indicative of his being

5    manipulative or lying about wanting that treatment?

6    A.   I certainly did not read the record in that manner, no,

7    ma'am.

8    Q.   When he was saying he wanted sex offender treatment,

9    for example, after the 1989 offense, I think something is

10   coming into evidence about him requesting sex offender

11   treatment after those charges, after his sentence was

12   imposed.

13   A.   In what case are you --

14   Q.   In the 1989 cluster of cases.  Did he in fact, to your

15   knowledge, get sex offender treatment after that?

16   A.   That is my understanding, yes, ma'am.

17   Q.   Now, do we have records of that sex offender treatment?

18   A.   I have seen none.

19   Q.   And do you know the approximate dates of that

20   treatment?

21   A.   Yes.  From approximately 1993 through 1996.

22   Q.   And do you know the name of the treatment provider up

23   in Maine?

24   A.   Yes.  His name was a guy by the name of Russell Moat.

25   Q.   And are you personally familiar with him?

1   A.   I'm not.

2   Q.   Did you get any information about him from Mr. Thomas?

3   A.   I did.

4   Q.   And what was that information?

5           MS. STACEY:  Objection.

6           THE COURT:  Sustained.

7   Q.   So you don't have treatment records from that

8   treatment.  Did you talk to Mr. Shields about that

9   treatment?

10  A.   I did.

11  Q.   And was it your impression he was lying about it?

12  A.   No.

13  Q.   What did he tell you about the course of that

14  treatment?

15  A.   He described the treatment in a manner that suggested

16  to me that it was basically what we would refer to as

17  psychodynamic, perhaps a little behavioral; but it certainly

18  was not described to me as a treatment program that was

19  cognitive behavioral in its format.  And it did not have a

20  curriculum; it did not have psycho-educational material

21  associated with it.  It essentially was a group that met two

22  hours a week.  He said the individuals sat around and talked

23  about any number of problems, not focused necessarily on

24  issues relating to sexuality or their arousal patterns at

25  all; that he thought that he had gotten very little out of

Page 36

1    it.

2              Now, that's also consistent with what we know

3    about the evolution of sex offender treatment throughout

4    this country, and that's very consistent with how treatment

5    programs were indeed being run in the early 1990s.

6    Q.   So did he have a second round of sex offender

7    treatment?

8    A.   He did.

9    Q.   And do you know roughly when that took place?

10   A.   That was roughly in the period of time after his 1998

11   offense.

12   Q.   And did he tell you who he got that treatment from?

13   A.   Yes.  It was a woman by the name of Kay Landry.

14   Q.   And were we able to get those records?

15   A.   No.

16   Q.   And do you know what Mr. Shields told you about that

17   treatment?

18              THE COURT:  Excuse me.  That was sex offender

19   treatment in Maine, is it?

20              THE WITNESS:  Yes.

21              MS. KELLEY:  These are all up in Maine?

22              THE WITNESS:  Yes.

23   Q.   So what did he say about that treatment?

24   A.   He described that treatment as being treatment that was

25   focused on sexual issues.  It did have a curriculum.  It

1    involved both group treatment as well as individual

2    treatment.  There was a psycho-educational component to it.

3    There were homework assignments.  I asked him, "Well, Jeff,

4    can you tell me what you learned from sex offender treatment

5    in roughly 1998 through 2001?"  And he was able to use what

6    in my field we would call treatment language.

7    Q.   And what do you mean by that?  What kinds of things did

8    he say to you?

9    A.   Well, he talked about, for example, his offense cycle.

10   Now, offense cycles are things that we teach offenders.

11   That's part of the cognitive behavioral model; and that the

12   idea is that offenders are required to look at antecedents,

13   those things that are occurring in their lives prior to an

14   offense happening, and they're able to look at those factors

15   hopefully because by recognizing them, by recognizing those

16   factors, they're able to intervene in that cycle at an

17   earlier moment and prevent another offense.

18   Q.   And is this the type of program that Mr. Steve Thomas

19   runs?

20   A.   Yes.

21   Q.   Is it that same model?

22   A.   Yes, it is.

23   Q.   Now, what about the fact that he went through that

24   treatment and then he offended with the child pornography

25   charge?  Does that have any significance for you?

289d4937-08e6-428a-9052-d23ac805602e

1    A.    Not a lot of significance, no.

2    Q.    Why not?  Because he's reoffending, right?

3    A.    Well, technically he broke a law that has to do --

4    that's considered a sex offense, yes.  Individuals who are

5    arrested for computer-related crimes, what the research is

6    saying right now is that there's really no evidence that men

7    watch images on the computer for sexual reasons.  Frequently

8    they do it because they're depressed and they're isolated in

9    their room, and they're, you know, scanning the computer.

10          The other thing is that these file-sharing

11   programs that are discussed in the records, I'm familiar

12   with them because of prior cases I've done; and basically

13   what happens, they're like -- most of us are familiar with,

14   like, Google where you can type something in that you're

15   looking for, and it gives you a long laundry list of places

16   to go look.  Well, these file-sharing programs, you can type

17   in something like "boys having sex" or "men having sex," and

18   over the course of the evening, this program will go out and

19   look for thousands of different sites that may have

20   something that relates to that, and then begin to dump tens

21   of thousands sometimes, 30,000, 40,000 images at a time in,

22   as many as your hard drive will allow it to do.  And then

23   what happens is that you go through little thumbnail

24   pictures that have been produced by these file-sharing

25   pictures, and keep the ones you want and delete the ones you

289d4937-08e6-428a-9052-d23ac805602e

Page 39

1  don't want.

2  Q.   Now, let me ask you about his so-called refusal to

3  enter the sex offender treatment program at Butner.  He's

4  been incarcerated for some time, right?

5  A.   Yes.

6  Q.   And he's offered a slot in that treatment program, and

7  he doesn't want to go.  Can you just comment on the

8  significance of that.

9  A.   The significance to me is, I thought it was a good

10  decision.  It was a decision that I think, if I had been

11  working with Jeffrey Shields at that point, I would have

12  advised him to make.  The reason I say that, that opinion is

13  based on my understanding of the relationship he had

14  established with Dr. Graney; the progress that he was

15  making, he appeared to be making with Dr. Graney; and the

16  fact that the course of his sex offending was so intimately

17  tied to his own victimization as a child and the resulting

18  substance abuse and anger that children who are victims of

19  child abuse frequently develop.  He needed, in my opinion,

20  to work on some fundamental issues before he was going to be

21  completely successful in completing a sex offender treatment

22  program.

23  Q.   And with regard to his depression, how would a person

24  who was depressed, what kind of problems would they have in

25  a sex offender treatment program?

289d4937-08e6-428a-9052-d23ac805602e

1  A.   I think their performance would be sporadic.  I think

2  that the depression would impede their capacity to

3  concentrate, to interact effectively in a group,

4  cognitively-based group treatment format.

5  Q.   Now, do you know why Mr. Shields has not engaged in any

6  treatment at Devens for the last two years where he's been

7  incarcerated?

8            MS. STACEY:  Objection.

9            THE COURT:  Overruled.

10  A.   Yes.  It is my understanding from Mr. Shields that he

11  was advised by his attorneys not to engage in sex offender

12  treatment.

13  Q.   And do you know the reason for that?

14            THE COURT:  Well --

15  A.   Yes.

16            MS. KELLEY:  I mean, there's a very good reason,

17  your Honor.

18            MS. STACEY:  I object to the reason.

19            THE COURT:  Well, don't state it in front of the

20  jury.  Let me just see you.

21  SIDE-BAR CONFERENCE:

22            THE COURT:  What's the answer?

23            MS. KELLEY:  We know with certainty that to enter

24  the sex offender treatment program at Devens, people sign a

25  release specifically stating anything they say will be used

1   against them under Adam Walsh, and we advised him in no

2   uncertain terms he could not --

3              THE COURT:  My only concern is, are you waiving

4   attorney-client because she can start probing?  I mean,

5   that's the -- I don't know if she's going to, but --

6              MS. STACEY:  I would intend to, plus this

7   really --

8              THE COURT:  Just it opens it.  That's fine.  It's

9   just a waiver on that point.  It's an attorney-client

10  privilege, so --

11             MS. STACEY:  But, your Honor, she's also filed

12  motions to get those records excluded because the waiver

13  wasn't a real waiver.

14             MS. KELLEY:  That's prior to Adam Walsh and not in

15  this case.  It has nothing to do with this case.

16             THE COURT:  Regardless, as soon as someone asks

17  about what an attorney says, I go up, and so I'll let her

18  probe it.

19             MS. KELLEY:  I will just say, yesterday there was

20  a suggestion with one witness that he should have engaged in

21  sex offender treatment in the last?

22             THE COURT:  I know, but it wasn't a big deal

23  actually.  I think I sustained an objection.  But anyway --

24             MS. STACEY:  Finally, your Honor, none of this

25  opinion is in the report, nothing about why he didn't go to

1   treatment at Butner.

2          THE COURT:  Well, you can't argue it either.  You

3   can pursue it if you want.  I'm just simply -- just

4   understand there's a waiver that comes with it.

5          MS. KELLEY:  Okay.

6          (End of side-bar conference.)

7   Q.   Do you know why Mr. Shields was counseled not to go

8   into treatment at Devens?

9   A.   Yes.

10  Q.   Why?

11  A.   In that treatment program, as is the case in

12  Mr. Thomas', as it was the case in my own sex offender

13  treatment program, offenders are required to sign a release

14  that basically indicates that anything they say in that

15  treatment program can be used against them in a court of

16  law.

17  Q.   Now, when you saw Steve Thomas testify about his

18  program, what is your opinion of the quality of that

19  program?

20          MS. STACEY:  Objection.

21          THE COURT:  Sustained.

22  Q.   Based on your expertise as a sex offender treatment

23  provider, do you have an opinion about the type of program

24  Mr. Shields would be participating in when he is released?

25          MS. STACEY:  Objection.

Page 43

1      THE COURT:  Well, I'll allow that.  Is it state of

2  the art?

3  A.   Yes, I do.

4      THE COURT:  Why don't you go through what you

5  think was appropriate in the -- I don't want to say in

6  the -- in your profession at this point.

7      THE WITNESS:  Okay.  Well, essentially his program

8  is a state-of-the-art program.  It is continually evolving.

9  It is clearly one that utilizes a curriculum that is based

10  on latest treatment research.  It has a tight supervision

11  component to it, and the utilization of polygraph

12  examinations every six months is precisely what we're doing

13  these days.

14  Q.   And how does Mr. Thomas' treatment program compare with

15  the one Mr. Shields would receive if he is committed?

16      MS. STACEY:  Objection.

17      THE COURT:  Sustained.

18  Q.   Do you know anything about such a program for people

19  who are committed?  Do you have any information about what

20  programming Mr. Shields would receive?

21      MS. STACEY:  Objection.

22      THE COURT:  Sustained.

23  Q.   I just want to ask you a few questions about

24  Dr. Tomich's testimony.

25      THE COURT:  Well, can I ask you, how does that sex

1  offender treatment he'd get with Mr. Thomas or Dr. Thomas

2  compare with what he got in 1998 in Maine?

3        THE WITNESS:  Well, of course, I don't have

4  records from the 1998 --

5        THE COURT:  By the way, that's no one's fault

6  here.  We couldn't get the records, so we're somewhat

7  relying -- as far as I know.  So what do you understand --

8  the way you described the program sounds similar to the way

9  Mr. Thomas --

10        THE WITNESS:  Yes, but what I don't know, I don't

11  know exactly what the curriculum was.  I don't know if they

12  used a polygraph component, but it appeared to be, from the

13  cognitive behavioral component, it appeared to be some of

14  the early curriculum that was first utilized.  It was

15  published by a group called The Safer Society, and they came

16  up with three series of curriculum:  Who Am I and Why Am I

17  in Treatment?  Why Did I Do It Again?  And the third book

18  was What Can I Do to Stop?  And those books were a series of

19  assignments and group exercises that offenders were required

20  to work on throughout the course of treatment.

21        Now, since then, that curriculum has evolved, and

22  there's been other curriculum introduced to other programs.

23        THE COURT:  Let me just ask you, was it a similar

24  program except for this more intensive supervision?

25        THE WITNESS:  I'm not understanding your question,

1  ma'am.

2          THE COURT:  Was it a cognitive behavioral program

3  that was similar to what Mr. Thomas would offer except for

4  the polygraph and other supervision?

5          THE WITNESS:  That's my understanding, yes, ma'am.

6  Q.   Now, Dr. Rypma, does the fact that he went through a

7  similar program and then offended with the child pornography

8  charge, and that Mr. Thomas is offering him a second crack

9  at that curriculum, assuming it's similar, does that have

10 any import to you or any significance to you?

11         MS. STACEY:  Objection.

12         THE COURT:  Overruled.

13 Q.   Do you think it's a waste for him to go back to

14 treatment?

15 A.   Not at all.

16 Q.   Why not?

17 A.   As I have already testified, change doesn't happen in a

18 linear manner.  There's been a lot of things that have

19 occurred in Mr. Shields's life subsequent to that 1998

20 treatment, most notably his contact with Dr. Graney and his

21 commitment to maintain a sober life-style.

22 Q.   And when you talk about his commitment to maintaining a

23 sober life-style, what role -- you know, you heard

24 Dr. Tomich say being an alcoholic doesn't make you molest

25 children or some such statement like that.  What's wrong

1   with that statement?

2              MS. STACEY:  Objection.

3              THE COURT:  Yes, sustained as phrased.

4   Q.   What role does substance abuse play in this kind of

5   cycle of child abuse?

6   A.   Alcohol and other substances are essentially

7   disinhibitors, okay.  Now, if you think about it, an

8   individual who has to be intoxicated in order to commit an

9   offense are really less risky.  They're really more

10  manageable in a community-based program because in a

11  community-based program, we have these people drop

12  urinalyses very frequently, sometimes weekly.  They now have

13  instrumentation that they wear on their ankle that's part of

14  the GPS system, but it also can detect consumption of

15  alcohol or other intoxicants and immediately warn a

16  probation officer that the individual is beginning to, if

17  you will, fall off the wagon.

18  Q.   And are there sex offenders who do not have to be

19  disinhibited to commit their offenses?

20  A.   Absolutely.

21  Q.   So, to your knowledge, what has Mr. Shields done to

22  work on his sobriety?

23  A.   He has been involved over a long period of time now

24  with AA.  He has -- he gave me a date that I'm not recalling

25  right now that -- if you want me to take a second and look

289d4937-08e6-428a-9052-d23ac805602e

Page 47

1  for it --

2  Q.   What was --

3  A.   He's been sober for approximately ten years now.

4  Q.   And that's just your guesstimate trying to remember the

5  date he gave you?

6  A.   Yes.

7  Q.   And in prison, did he do anything significant to

8  address the substance abuse issues?

9  A.   Yes.  He completed substance abuse treatment and

10  continues to attend AA within the confines of his prison

11  setting.

12  Q.   And when he was in the halfway house, the Pharos House,

13  did you find his conduct there to be significant regarding

14  substance abuse?

15  A.   Did he -- I'm sorry.

16  Q.   Did he do anything to address substance abuse issues at

17  the Pharos House?

18  A.   Oh, yes.  He was actively involved in AA at the Pharos

19  House.

20  Q.   If I could just talk about Dr. Tomich a little bit

21  more.  Does Dr. Tomich's statistical -- what he testified to

22  as to his statistical rate of finding people dangerous cause

23  any concern to you?

24            MS. STACEY:  Objection.

25            THE COURT:  Sustained.

1  Q.   I believe Dr. Tomich testified that given the number of

2  evaluations he's done and number of people he's found

3  dangerous, he's somewhere up in the 90 percentile,

4  92 or 96 percentile for finding people dangerous.

5            MS. STACEY:  Objection.  Mischaracterization as

6  well.

7            THE COURT:  Well, how do you remember Dr. Tomich's

8  testimony with respect to percentages?

9            THE WITNESS:  I remember his testimony indicating

10  that he found people sexually dangerous approximately

11  96 percent of the time.

12  Q.   And is that possible?  I mean, I guess it's possible,

13  but what does that tell you about Dr. Tomich?

14  A.   Well, to the extent that that's accurate --

15            MS. STACEY:  Objection.

16            THE COURT:  Sustained.

17  Q.   Statistically speaking, is it possible, out of the

18  people he evaluated, 96 percent of them were going to

19  recidivate?

20  A.   That would be extremely unusual.

21  Q.   Even if he's --

22            THE COURT:  Ask direct.

23  Q.   Would you still have that opinion or what would your

24  opinion be if you considered the fact that he might be

25  evaluating a high-risk population?

1         MS. STACEY:  Objection.

2    Q.    What's your opinion of that 96 percent number?

3         THE COURT:  Overruled.

4    A.    It would still be very unusual to find 96 percent of

5    these people to be sexually dangerous.

6    Q.    Now, you heard Dr. Tomich's testimony that he didn't

7    consider Mr. Shields's age to be a protective factor.

8         MS. STACEY:  Objection.

9    Q.    Can you just comment on his analysis.

10        MS. STACEY:  Objection.

11        THE COURT:  Yes, sustained.  You can give your

12   views on it.  Is age a protective factor, in your view?

13        THE WITNESS:  Yes.

14        THE COURT:  Would you please tell us why.

15        THE WITNESS:  Because the research over

16   approximately the last ten years, but particularly over the

17   more recent past, has conclusively indicated that as an

18   individual ages, their rate of recidivism precipitously

19   drops.

20   Q.    What about if someone were to say that because

21   Mr. Shields last offended when he was about 41 years old,

22   that that means that age doesn't -- the protective factor of

23   age just doesn't apply to him anymore?

24        MS. STACEY:  Objection.

25        THE COURT:  Sustained.

1    Q.   Do you think there is ever a time when age as a

2    protective factor would cease to apply to someone?

3    A.   No.

4    Q.   And can you just explain why not.

5    A.   Because it has a -- starting at about age 25, there is,

6    generally speaking, a decline in rates of recidivism

7    throughout the age span.

8    Q.   And what happens when somebody reaches age 50?

9    A.   According to the Hanson research that we saw here in

10   court two days ago, there is a precipitous decline,

11   significant decline starting at about age 50.

12   Q.   And does it matter -- does that decline depend on the

13   last date of your offense?

14   A.   No.  It depends on your age.

15   Q.   Now, Dr. Tomich did not interview Mr. Shields, correct?

16   A.   That's my understanding, yes, ma'am.

17   Q.   And do you know, are there some ethical problems --

18        MS. STACEY:  Objection.

19   Q.   Well, does your field have a code of ethics?

20   A.   Yes.

21   Q.   And do any of those ethics talk about --

22        MS. STACEY:  Objection.  May we approach?

23        THE COURT:  Yes.  I'm going to sustain that.

24        MS. KELLEY:  Can we be seen?

25        THE COURT:  Yes.

1  SIDE-BAR CONFERENCE:

2          THE COURT:  Listen, you're not going to go into

3  this because he declined to be interviewed, and I declined

4  at the government's request for a deposition, and I think

5  that that is totally unfair game.

6          MS. KELLEY:  Well --

7          THE COURT:  You ask it, and I'm going to let them

8  go into it.  I'll give an instruction on that.  That's not

9  fair.

10          MS. KELLEY:  Well, can I just make a record on

11  this?

12          THE COURT:  Yes.

13          MS. KELLEY:  There's an ethical rule that says, if

14  it's not practical or if somehow the person cannot interview

15  their subject, which the jury already knows from Tomich's

16  testimony that we refused to have him interviewed -- they

17  know, that he could have talked to him, but we said "no" --

18  but there is an ethical rule that says that the person

19  should qualify their opinion --

20          THE COURT:  You can ask that, but I'm going to let

21  them go into everything, and I'm going to tell them that I

22  declined to force a deposition on him.  So you take what you

23  want.

24          MS. STACEY:  And I'd like a copy of the ethical

25  rule.

1          (End of side-bar conference.)

2   Q.   Dr. Rypma, Dr. Tomich -- well, without referring

3   directly to Dr. Tomich, is there a scientific basis to say

4   that sex offender recidivism is underreported?

5   A.   No.

6   Q.   And can you just explain -- I think there may be a

7   commonly held belief that sex offenders recidivate a lot

8   more and they're just not caught.  Can you just explain what

9   the scientific basis is for saying that's not true?

10  A.   Well, let me start by saying that there is really no

11  debate as to whether or not more sex offenses may occur than

12  what are reported.  We know that.  What we don't know and

13  what we have information to the contrary about is whether

14  the sex offenses that are committed are indeed committed by

15  those who have previously committed a sex offense, or are

16  they just new sex offenders that have committed a new sex

17  crime?

18          Now, there is some research that we've talked

19  about here in court already, one study, a 1997 study by the

20  U.S. Department of Justice that followed 9,671 offenders

21  over a three-year period of time; and over that three-year

22  period of time, 517 of those sex offenders committed a new

23  sex offense.  But we also know during that same period of

24  time, looking at crime statistics, that there were 3,328 new

25  sex offenses that occurred by people who had not ever

289d4937-08e6-428a-9052-d23ac805602e

1   committed a sex offense before.  So clearly there, in that

2   same period of time, there were more sex offenses being

3   committed by nonsex offenders than there were by those

4   individuals who had already committed a sex offense.

5   Q.   I just want to turn your attention to the subject of

6   minimization and denial.

7   A.   Okay.

8   Q.   How is minimization and denial relevant to someone's

9   treatment?

10  A.   Well, it's relevant from the standpoint that in a sex

11  offender -- I assume you're talking about a sex offender

12  treatment program.

13  Q.   Yes.

14  A.   Well, actually, any treatment program, to the extent

15  that individuals are in denial or individuals who are

16  working in that treatment program are minimizing their

17  conduct, it impedes treatment.

18  Q.   Now, with regard to you evaluating this case, in

19  speaking with Mr. Shields, did you go over the offense

20  conduct with him?

21  A.   I did.

22  Q.   And during your review of the offense conduct with him,

23  what did you find?

24  A.   I -- you mean throughout the course of all of the

25  offenses that I talked to him about?

289d4937-08e6-428a-9052-d23ac805602e

1    Q.    Yes.

2    A.    Basically what we're trying to do when we talk to

3    offenders about their offense conduct is, we're looking for

4    discrepancies between what they report and what is in the

5    official record, and there were some minor discrepancies.

6    There weren't discrepancies that I would evaluate as

7    significant examples of minimization.  Now --

8    Q.    Can you give us some examples of what would be a

9    significant example of minimization?

10   A.    You know, offenders that I work with are always saying,

11   "That young child came on to me.  I was the victim.  They

12   came up and touched me and got me aroused.  I didn't intend

13   to do anything to them."  That's significant minimization.

14   Q.    Did you hear any minimization or denial of that type

15   from Mr. Shields?

16   A.    None whatsoever.

17   Q.    And let's just talk some specifics that came up when

18   the other experts were testifying.  What did Mr. Shields

19   tell you with regard to the obscene phone calls, the 1988

20   incident in Florida where he made obscene phone calls?

21   A.    He told me he randomly made a telephone call to a teen

22   line that was published in the telephone book.

23   Q.    Now, what is a teen line?  Do you know?

24   A.    I had teen lines at my home when I had teenagers.

25   Prior to the advent of cell phones, for a very nominal cost

1   you could have a telephone put in your teenager's bedroom

2   that had a separate number, so you had access to your own

3   telephone so your teenager wasn't hanging on the phone all

4   day long.  And they were quite popular, and numbers were

5   published in the telephone book.

6   Q.   And when they were --

7               MS. KELLEY:  Yes, your Honor?

8               THE COURT:  Would they say "teen line" in the

9   phone book?

10              THE WITNESS:  That's exactly what they'd say, yes.

11              THE COURT:  Was that in Iowa or across the

12   country?

13              THE WITNESS:  It was certainly true in Iowa.  You

14   know, it was --

15              THE COURT:  Are you familiar with whether that was

16   common across the country?

17              THE WITNESS:  I can't answer as to whether -- when

18   you say "common," no, I can't answer that.  But my sense,

19   your Honor, is -- I mean, I think it was common.

20   Q.   And when you were talking to Mr. Shields, is that what

21   you -- I mean, the point is, is that what you understood him

22   to be talking about?

23   A.   That's exactly what I understood him.  When he said

24   "teen line," from my perspective, I knew exactly what he was

25   talking about.

1    THE COURT:  Was that in Florida?

2    THE WITNESS:  Yes, ma'am.

3  Q.   And then with regard to the incident with the

4  6-year-old, what did Mr. Shields tell you about the details

5  of that?

6  A.   He told me that he touched his butt.

7  Q.   Okay.  And did he have a clear memory of that incident?

8  A.   He did not.  Well, actually what he told me, what he

9  told me about the 6-year-old was that he didn't remember the

10  offense, that he had read the police report and was sure

11  that it was him after he read the police report, but really

12  didn't remember having committed that particular offense.

13  Q.   And what was your impression as a psychologist

14  listening to him say he doesn't remember that offense?

15  A.   As I was interviewing Jeffrey throughout the course of

16  those nine hours, a comment that formed a basis of my

17  understanding of that particular offense was that he

18  explained that during that period of time in 1989 when he

19  was committing those cluster of offenses, he said that there

20  was a whole time in his life that basically was just blotted

21  out; that he had lots of things that he didn't remember

22  during those years; that that was a period that he did his

23  heaviest drinking and his heaviest drug use.

24  Q.   Now, in your report, did you make a diagnostic note

25  about his memory?

1    A.    Yes.

2    Q.    And what was your note?

3    A.    Well, are you referring to my mental status checklist?

4    Q.    Yes.

5    A.    I indicated that I thought his memory was intact.

6    Q.    And why then do you also say he has parts of that time

7    of his life -- I mean, how is that consistent, if it is,

8    with saying parts of his life then are missing?

9    A.    Well, anyone that has worked with a severely alcoholic

10   population knows something about what we refer to as

11   "alcohol blackout."

12   Q.    Let me just ask you, have you ever worked with such a

13   population?

14   A.    I have.

15   Q.    And when did you do that?

16   A.    Well, currently I do evaluations in Iowa for

17   individuals who have violated driving laws while

18   intoxicated, and that requires a certification in our state.

19   Q.    And so what is your certification?  What's it called,

20   if you remember?

21   A.    I'll look here.

22            (Witness examining document.)

23   A.    It is Adult and Juvenile Assessment and Evaluation on

24   Substance Abuse Treatment.

25   Q.    And have you done any other work specifically with

1    substance abusers?

2    A.    Yes.

3    Q.    When was that?

4    A.    When I was employed at Iowa Methodist Medical Center,

5    they had an inpatient chemical dependency program there

6    called the Powell, P-o-w-e-l-l, Chemical Dependency Program

7    that I was involved with.

8    Q.    And that was quite a long time ago, though, right?

9    A.    That was quite a long time ago, yes.

10   Q.    Okay.  So can you just explain -- you know, there was

11   testimony that if somebody's driving and they're working and

12   they're doing purposeful activities, they can't have been in

13   a blackout stage.  Can you just explain that phenomenon.

14              MS. STACEY:  Objection.

15              THE COURT:  Was there an objection?

16              MS. STACEY:  Yes.

17              THE COURT:  Oh, I'm sorry.  I'm busy writing away.

18   Overruled.

19   A.    Yes.  It's not at all unusual.  With alcohol blackout,

20   basically there are two kinds of blackout.  There's what's

21   called an en bloc blackout, and there's what's called

22   fragmentary blackouts.  Anyone who has had too much to drink

23   is familiar with having experiences the next day when you

24   realize something that you've just remembered that you did

25   while drinking, and that's called a fragmentary blackout,

1   okay.  But there are also things that occur that never come

2   back to your memory, and that's called an en bloc blackout,

3   okay.

4           Now, the example I've used before to help people

5   understand why there's no association between alcohol

6   blackout and memory function is sort of like, you know, if

7   you were under anesthesia, you wouldn't remember what

8   happened.  Even if you were under a kind of anesthesia where

9   you are actually awake, you don't recall the events that

10  occurred.  That doesn't mean you have a memory impairment.

11  That memory blackout is due to the ingestion of a substance

12  that interrupts the memory process.

13  Q.   When you talked to Jeffrey Shields about the incident

14  with the 6-year-old, did he deny it?

15  A.   No.

16  Q.   Did he ever comment to you how he felt when he was

17  reading these police reports?

18           MR. GRADY:  Objection.

19           THE COURT:  Overruled.

20  A.   Yes.

21  Q.   What did he say?

22  A.   He told me that he felt sick, that it sickened him to

23  read over the police reports of his behavior back in those

24  years.

25  Q.   Now, with regard to -- I believe there was some

1   testimony about the 13-year-old looking for the wallet

2   incident?  That's one of the 1989 --

3                   THE COURT:  You know, I should tell you, when he's

4   going through the things that Mr. Shields told him, that's

5   the basis for his expert opinion, but it is all hearsay.  So

6   it's not for the truth of the matters that he's stated; it's

7   to understand the basis for the doctor's opinion.

8   Q.   I believe there was some testimony concerning

9   Mr. Shields saying he touched -- well, there's an incident

10  with a 13-year-old where he goes to a building looking for

11  his wallet, right?

12  A.   Correct.

13  Q.   And there's testimony Mr. Shields said he touched the

14  child over his clothing, but actually the police report said

15  he touched the child under his clothing, right?

16  A.   Well, that's not how I read the police report.

17  Q.   Well, how do you read the police report in this case?

18  A.   Well, I read the police report that it was consistent.

19  Q.   That what was consistent?

20  A.   The report that Jeffrey Shields gave me that he was --

21                   THE COURT:  Well, I've got to see you at side bar.

22  SIDE-BAR CONFERENCE:

23                   THE COURT:  Is this police report in evidence?

24                   MS. STACEY:  No.

25                   MS. KELLEY:  No, but --

1            THE COURT:  If you ask about it, it comes in.

2            MS. KELLEY:  Okay.

3            THE COURT:  Because I don't think I even saw this.

4    This part may have been cut out by Judge Collings.  But, you

5    know, if it's just a question of how you read a report, then

6    I'm going to put the report in.

7            MS. KELLEY:  Well, if I can just say, perhaps I

8    will save this line for redirect, depending on how much the

9    government goes into it.

10            THE COURT:  That's possible.  I'm just simply

11    saying, I'm not even sure this is the part that -- just for

12    the record, what we did is Judge Collings, because I'll be

13    partly a fact-finder as well, cut out everything, and then

14    there's just certain parts I just had to review.  I don't

15    even remember this, so if you ask about it and there's a

16    dispute about how to read that police report, I'll put it

17    in.

18            MS. KELLEY:  But if I can just say something, in

19    his testimony Dr. Tomich really highlighted that Mr. Shields

20    gave different accounts to the people he did interview with

21    that were in the police reports, and he was just wrong about

22    some of the things he said.

23            MS. STACEY:  That's not fair.

24            THE COURT:  I don't remember exactly how he worded

25    it.  I'm focusing on it now.  If there's a dispute as to how

1    it's read, all I'm saying is, I'll put in that portion,

2    because I don't even remember myself, that's all.  I mean,

3    you can ask.  I'm just going to put in that portion.

4              (End of side-bar conference.)

5    Q.   Dr. Rypma, just a few more questions about the

6    minimization and denial subject.  You have heard that

7    Mr. Shields characterized the 12-year-old as a prostitute?

8    A.   Yes.

9    Q.   Do you find that to be indicative of minimization and

10   denial?

11   A.   No.

12   Q.   Why not?

13   A.   Well, first of all, I think it's important that we put

14   this issue in the context of understanding that Mr. Shields

15   himself was a prostitute during the same time period in his

16   life.  Secondly, it is consistent in the records that he was

17   indeed giving this boy money in exchange for sexual favors.

18   I think that from Mr. Shields's perspective, that's exactly

19   what the boy was, was doing was prostituting, from

20   Mr. Shields's perspective, at least.

21   Q.   What is your view as far as your evaluation of him and

22   his sexual dangerousness, what is your view of the

23   significance of this minimization that he did around his

24   offenses?

25   A.   I don't think there's any significance.  You know,

1  we're poring over these police records and, you know, and

2  pulling out little pieces of information and trying to

3  debate whether he was touched under or over the clothing.

4  It doesn't matter.  He committed an offense.  He was acting

5  out in an inappropriate and deviant sexual manner.  I think

6  it may have more relevance for a long-term cognitive

7  behavioral treatment format than it does in the

8  determination of whether he's sexually dangerous.

9  Q.   What relevance does it have in risk prediction as to

10 whether someone penetrates a victim or touches their skin as

11 opposed to over their clothing?

12 A.   It has a lot of relevance for the victim.  You know, it

13 has little relevance in terms of predicting dangerousness.

14 Q.   Are there any studies that show that those types of

15 details would affect a statistical analysis of recidivism?

16 A.   No.

17 Q.   Can you comment on the PPG and what that is and what

18 the problems with it are.

19 A.   Yes.

20 Q.   What is that?

21 A.   I conducted penile plethysmography for fifteen years

22 when I was working through the sex offender treatment

23 program there in Iowa.  It is primarily, the PPG, as it's

24 referred to, is a treatment tool.  It's not a forensic

25 instrument that has any place in the evaluation of sexual

1    dangerousness.  It is probably, on the positive side, the

2    best instrument we have to look at whether there is deviance

3    presence, okay.  But it's not very reliable because what

4    happens is, the way a PPG occurs is, there is a sensitive

5    gauge that the subject places on their own penis that is

6    hooked to a computer that measures a trace, similar to a

7    polygraph.  And there's a series of images and an audio

8    format that plays at the same time this image is produced,

9    and the theory being that if an individual is presented with

10   a prepubescent image and there is an audio signal that is

11   talking about sex with this prepubescent child, that you're

12   going to get an increase in blood flow.  But, again, like

13   with all of our procedures at this point, it doesn't take

14   into account the complexity of human behavior, and it

15   doesn't take into account for age.

16          So what can happen is that an individual who is

17   having this test performed on them can actually get aroused

18   after that image is taken off the screen and the next one

19   comes on.  So, you know, from a large format, we have kind

20   of a gross measure of whether or not we're getting arousal,

21   you know, but we don't have necessarily an accurate measure.

22   And it's not just children.  You know, they're interspersed

23   with adults, interspersed with appropriate sexual images.

24   It's interspersed with violence, you know.  So it really is

25   attempting to measure a broad range of sexual arousal.

1    And, as I said, it's a treatment tool, especially

2    in circumstances where it can be utilized multiple times

3    throughout the course of treatment.  It's a nice thing to

4    have available but it's bulky.  You know, it's not the kind

5    of thing that you load up in your briefcase and take into a

6    prison and administer to someone.

7    Q.   Can I ask you just to look at -- there was some

8    testimony about the RRASOR, I think from Dr. Plaud, and I'm

9    just going to ask you, is this -- this is Exhibit 27 already

10   in evidence.  I'm just going to ask you to look at the

11   RRASOR score of 5 and go across to the ten-year number there

12   of 73.1 and just ask you to comment on that number.  Does

13   that number apply to Mr. Shields, in your opinion?

14   A.   Well, to the extent that he got a 5, I guess the number

15   applies, but I would say it's not an accurate number for a

16   couple of reasons:  One, as we've heard continually, the

17   RRASOR, as with the Static-99, does not take into account

18   age; and, secondly, that ten-year figure is mathematically

19   derived.  It's not based on the observation of real people

20   recidivating out ten years.

21        And, finally, you know, the RRASOR is, in my

22   opinion, really an obsolete instrument, and in fact, in Karl

23   Hanson's opinion, is an obsolete instrument.

24   Q.   And who developed the RRASOR?

25   A.   Who developed the RRASOR, yes.

289d4937-08e6-428a-9052-d23ac805602e

1  Q.   Who developed the RRASOR?

2  A.   Karl Hanson.

3  Q.   Okay.  And you say he has an opinion about it?

4  A.   Yes.  When he published the Static-99, he indicated the

5  RRASOR was now obsolete and that the Static-99 should be

6  used instead of the RRASOR.

7  Q.   Do you know what the number of questions on the RRASOR

8  is?

9  A.   Four.

10  Q.   As opposed to the Static-99 having how many?

11  A.   Ten.

12  Q.   And do you know what the four questions are?

13  A.   Yeah.  I don't use the RRASOR, but I think I can

14  remember.  I think there's the question about prior

15  offenses, a question about male victims.  Uhm, uhm --

16  Q.   Is there one question concerning age at release?

17  A.   Age of release.

18  Q.   And relationship to victims?

19  A.   And relationship to victim, right.

20  Q.   And those are the four questions?

21  A.   That's correct.

22  Q.   And with regard to the ten-year 5 on the RRASOR score

23  number of 73 percent, do you have anything to say about the

24  sample size there?

25  A.   Fifty-two people.

1    Q.   And is that a large sample?

2    A.   That's an extremely small sample.

3    Q.   Now, with regard to Dr. Plaud, did you talk to

4    Mr. Shields about his experience with Dr. Plaud?

5    A.   I did.

6    Q.   And what did he tell you?

7              MS. STACEY:  Objection.

8              THE COURT:  Sustained.

9    Q.   When you were making your evaluation, did you read

10   Dr. Plaud's report?

11   A.   I did.

12   Q.   And did that factor in any way into your opinion?

13   A.   In the opinion I derived?

14   Q.   Yes.

15   A.   No.

16   Q.   You heard Dr. Plaud testify here?

17   A.   I did.

18   Q.   Do you have any information concerning how long

19   Dr. Plaud spent with Mr. Shields?

20             MR. GRADY:  Objection.

21             THE COURT:  Well, I'll allow how long he spent

22   with him.

23             THE WITNESS:  Are you allowing?

24             THE COURT:  Yes.

25   A.   My understanding from Jeffrey Shields --

1    THE COURT:  This isn't from Dr. Plaud's report?

2    THE WITNESS:  Oh, not from Dr. Plaud's report, no,

3    I don't.

4    Q.   Does Dr. Plaud state in his report how long he spent

5    with Mr. Shields?

6    A.   He does, but I don't recall from the report right now.

7    Q.   When you heard Dr. Plaud testify, he mentioned three

8    things that he took into consideration as dynamic factors?

9    A.   Yes.

10   Q.   Do you remember what those were?

11   A.   They were sexual deviance, age, and treatment, if I

12   recall correctly.

13   Q.   And with regard to Dr. Plaud's report, what did he say

14   about Mr. Shields's treatment?

15   A.   Well, first of all, he only mentioned the first

16   treatment.  He didn't discuss in his report the more

17   effective treatment, at least what I thought was the more

18   effective treatment.

19   MS. STACEY:  Objection.

20   THE COURT:  Which was which one?  Now I'm

21   confused.  Which one do you think that he didn't mention?

22   THE WITNESS:  He did not mention the treatment

23   from 1998 to 2001.

24   Q.   And in Dr. Plaud's report, does he at any time give a

25   little list of things Mr. Shields reported to him were

1    reasons why Mr. Shields would not reoffend?

2    A.    Yes, he does.

3    Q.    And do you remember what that little list consisted of?

4    A.    One of them was that he was now sober.  One was that he

5    had changed as a result of treatment, and one of them had to

6    do with his having read self-help books.  I think that's

7    correct.

8    Q.    Was there any further discussion that you recall,

9    either in his testimony or in his report, about the

10   self-help books?

11   A.    No.

12   Q.    And did you talk with Mr. Shields about self-help

13   books?

14   A.    Yes.

15   Q.    And what did you understand him to be referring to?

16   A.    They were self-help books that he had been assigned to

17   read by his therapist at that time, Dr. Graney, that was

18   part of her treatment regimen.

19   Q.    With regard to deviancy, can you just explain to the

20   jury, what is that?

21   A.    Well, in Mr. Shields's case, of course, what we're

22   dealing with is the issue of whether or not he is attracted

23   to prepubescent children.

24   Q.    And does the child pornography offense provide you with

25   evidence that Mr. Shields still has this deviancy in 2002?

1   A.   Not good evidence, no.  Now, I did utilize it.  I mean,

2   I want to say, when I was deriving my diagnosis, I did say,

3   well, we have the child pornography offense and we have the

4   9-year-old and the 6-year-old.  But, you know, I say that

5   very cautiously because, again, we do not have information

6   as to what Mr. Shields was seeking during this child

7   pornography episode, this crime.

8   Q.   Did you ask him about that?

9   A.   I did.

10  Q.   And what did he tell you?

11  A.   Mr. Shields indicated to me that he was looking for

12  younger-looking men but had no interest in prepubescent

13  children.

14  Q.   Now, what about his interest in younger-looking men?

15  Is that deviant?

16  A.   No.

17  Q.   What if the younger-looking men are postpubescent but

18  below the age of consent?

19  A.   Well, that's against the law, but it's not deviance.

20  You know, from a psychological standpoint, from a standpoint

21  of sexual arousal, we actually know that human beings are

22  attracted to adolescent females in heterosexual cases, and

23  homosexual individuals who -- adolescent males.

24  Q.   And the fact that Mr. Shields told you he was

25  interested in smooth-skinned younger men, does that have any

Page 71

1   other significance for you, given the fact that he is
2   homosexual?
3   A.   Maybe I'm not understanding your question, but I don't
4   think it has any significance to me, no.
5   Q.   In the homosexual community, are you aware of any kind
6   of pattern of people being attracted to certain types?
7   A.   I don't think it's specific to the homosexual
8   community, frankly.  I mean, I think that in the
9   heterosexual world, I think we frequently see older men in
10  intimate relationships with younger females.  It's less
11  usual to see the opposite.  That stands out more.  But it's
12  not at all unusual to see older men attracted to younger
13  people.
14  Q.   Now, I would like to talk about your diagnosis of
15  pedophilia.  What did you diagnose Mr. Shields with?
16  A.   I diagnosed him with pedophilia.
17  Q.   And according to the statute here, is that a serious
18  mental illness or abnormality?
19  A.   According to the statute, it is, yes.
20  Q.   And can you just tell us -- well, can you just tell us
21  about your diagnosis.
22  A.   Well, I have to say I struggled with this diagnosis,
23  and the reason I struggled with it is, there is a very
24  lively debate going on in our profession right now regarding
25  the diagnosis of pedophilia.

1    Q.   Let me just --

2              MS. STACEY:  Objection.  May we approach on this

3    one?

4              THE COURT:  Let me just ask you, you diagnosed him

5    with pedophilia.  Is that within a category set forth by the

6    DSM-IV-TR that we've been hearing about?

7              THE WITNESS:  Yes, ma'am.

8              THE COURT:  So when you talk about the debate, is

9    that the debate over those categories?

10             THE WITNESS:  Yes, ma'am.

11   Q.   Okay, let me just put this up here for everyone to see.

12             THE COURT:  Now, that's the one you've heard about

13   now.  Why don't you tell them what it is again so I'm not

14   testifying.  Dr. Rypma, tell the jury what that is that

15   they've got up there.

16             THE WITNESS:  Those are the diagnostic criteria

17   out of the DSM-IV-TR concerning the diagnosis of pedophilia.

18   Q.   And with regard to Part A, what do you have to find in

19   order to diagnose somebody as a pedophile?

20   A.    "Over a period of at least six months, recurrent,

21   intense sexually arousing fantasies, sexual urges, or

22   behaviors involving sexual activity with a prepubescent

23   child or children (generally age 13 or younger)."

24   Q.   Now, you said there was a debate within the

25   psychological community about this diagnosis -- or excuse

Page 73

1  me -- about the form of this criteria.  What is the debate?

2  A.   The author of the DSM-IV-TR and the DSM-IV, the editor

3  of the DSM-IV and IV-TR, are two men by the name of Michael

4  First and Allen Frances.  Michael First --

5              MS. STACEY:  Objection, your Honor.  He's

6  referring to that contested exhibit now about the DSM-V or

7  whatever it was, the unpublished, unpeer-reviewed --

8              THE COURT:  Well, she's not putting it in.

9              MS. KELLEY:  No.  I'm just having him testify

10 about it.

11             THE WITNESS:  Continue?

12             MS. KELLEY:  I think so.

13             THE COURT:  Yes.

14 A.   Michael First, in addition to being the editor of the

15 DSM-IV and the IV-TR, also was specifically responsible for

16 writing the criteria that's on the screen right now.  In

17 other words, he had the additional responsibility of writing

18 that chapter, okay.

19             The controversy surrounds the word "or" because

20 according to Michael First -- and he has discussed this not

21 only in articles that he's written but also in testimony

22 that I have reviewed out of the state of Washington -- that

23 the intent was, the word "or" should have been "and

24 behaviors."  And it resulted in an unintended consequence of

25 taking clinicians like myself and placing us in positions of

289d4937-08e6-428a-9052-d23ac805602e

1    diagnosing an individual with pedophilia based on behavior

2    alone, and that was never the intent.  That's not the real

3    way this diagnosis should occur, but that's what the book

4    tells us to do.  So we're in this quandary as to whether or

5    not to technically follow the diagnostic manual, which we

6    all end up doing, but also knowing that in order to be a

7    pedophile, you need to have more than behavior, you know,

8    because if you don't have more than behavior, you can't

9    distinguish the disorder from normal criminality, just

10   someone who has committed a crime of opportunity that,

11   really, from the standpoint of their sexual arousal

12   interests may not be pedophiles at all.  They may have

13   committed crimes that involve prepubescent children, but

14   without this additional intense sexual fantasy and intense

15   urge that accompanies these behaviors over a long period of

16   time in an individual's life, they're really not pedophiles.

17   And that debate is currently going on, and I assume it will

18   be resolved when the committee that is now formulated

19   ultimately functions -- publishes the update to the

20   DSM-IV-TR.

21   Q.   Does it seem credible to you that a person working in

22   your field would not know about this controversy?

23            MS. STACEY:  Objection.

24            THE COURT:  Sustained.

25   Q.   Is this controversy common knowledge across the country

1  among people in your field?

2  A.   Yes.

3            THE COURT:  How much longer do you have?

4            MS. KELLEY:  I think just a few minutes, but we

5  can come back if you want.

6            THE COURT:  Are we talking about two minutes, or

7  are we talking about fifteen minutes?  It's 11:00 o'clock.

8            MS. KELLEY:  How about five minutes?

9            THE COURT:  So finish it now.  Five minutes we can

10  handle, and then we'll --

11            MS. KELLEY:  Okay.

12  Q.   But, nevertheless, you did diagnose Mr. Shields with

13  pedophilia?

14  A.   I did.

15  Q.   Okay.  Is it not true also that people may engage in

16  pedophilia episodically?

17  A.   Absolutely, yes.

18  Q.   And can you just explain what you mean by that.

19  A.   They engage in pedophilia -- well, episodically means

20  at different periods in their life.

21  Q.   And what is -- if you can just say, how would you

22  characterize your diagnosis of pedophilia here?

23            MS. STACEY:  Objection.

24  Q.   Are there people who are more clearly pedophiles based

25  on their record of behavior?

1        MS. STACEY:  Objection.

2   Q.   What would you consider -- what type of behavior would

3   you see that would lead you to say that you have a very

4   strong diagnosis of pedophilia?

5        MS. STACEY:  Objection.

6        THE COURT:  Sustained.

7   Q.   Let me just ask you quickly, with regard to Mr. Shields

8   violating while on supervision previously, how do you feel

9   about that fact as regards his risk?

10  A.   Well, my understanding of his violations during his

11  last period of probation is that the nature of his

12  violations were not sexual in nature.

13  Q.   And, excuse me, but do we have those records?

14  A.   We don't.

15  Q.   Okay, so what are you basing that understanding on?

16  A.   On information I have from Mr. Shields.

17  Q.   Okay.  But while he's on supervision, to your

18  knowledge, were there violations of any hands-on sexual

19  offenses?

20  A.   No.  There's nothing in the record either that led me

21  to -- and I did check that, of course.

22  Q.   And we have, obviously, the list of conditions of

23  probation that he was under, right?

24  A.   Yes.

25  Q.   What do you know about the level of supervision or the

1    involvement of the probation officers, et cetera?

2    A.    Not much.

3    Q.    What do you know?

4    A.    Other than those conditions were placed on him, we

5    don't know -- I don't know if they were followed.

6    Q.    And when you say "followed," you mean followed by whom?

7    A.    By a probation or parole officer.

8    Q.    So let me just ask you, under the statute, did you find

9    that Mr. Shields suffers from a serious mental abnormality?

10   A.    I did.

11   Q.    And that abnormality is --

12   A.    Pedophilia.

13   Q.    And does the DSM-IV provide for a possible diagnosis of

14   pedophilia in remission?

15   A.    No.

16   Q.    If you had had that option, what would you have done?

17              MR. GRADY:  Objection.

18              THE COURT:  Sustained.

19   Q.    And then with regard to --

20              THE COURT:  Well, first of all, what is -- is

21   there such a concept as pedophilia in remission; that is,

22   recognized by your profession?

23              THE WITNESS:  Not recognized by the DSM.

24   Q.    And with regard to whether that serious mental illness

25   or abnormality causes Mr. Shields to have serious difficulty

1    in refraining from future child molestation, from committing

2    acts of future child molestation, what is your opinion?

3    A.   My opinion is that he is not at serious risk for

4    committing child molestation.

5    Q.   And is that to a reasonable degree of professional

6    certainty?

7    A.   It is.

8    Q.   And can you just very finally -- this is my final

9    point, your Honor -- can you just tell the jury, what is

10   that standard to a reasonable degree of professional

11   certainty?  What does that mean in your profession?  Let me

12   just ask you this:  Is it a legal standard?

13   A.   It is not a legal standard, no.

14   Q.   Is it the legal standard for clear and convincing

15   evidence?

16   A.   Yes.

17   Q.   I'm sorry.  Is to a reasonable degree of professional

18   certainty the same as to the legal standard clear and

19   convincing evidence?

20            MS. STACEY:  Objection.

21            THE COURT:  Sustained.  I'll give you an

22   instruction on this.

23   Q.   Clear and convincing evidence is the legal standard,

24   correct?

25   A.   Yes.

1  Q.   That is not the same as the standard you were using,

2  right?

3            MS. STACEY:  Objection.

4            THE COURT:  Sustained.  Why don't you do it

5  question by question.  When you decided he had pedophilia,

6  that was under what standard?

7            THE WITNESS:  I'm not hearing.

8            THE COURT:  When you diagnosed him with

9  pedophilia, what standard were you using?

10           THE WITNESS:  Reasonable degree of professional

11  certainty.

12           THE COURT:  All right, so the point is, when you

13  make this judgment, I'm going to tell you that the legal

14  standard is clear and convincing evidence.

15           MS. KELLEY:  I think we're ready to take the break

16  now.

17           THE COURT:  Are you done?  Are you done short of

18  one or two questions that you think of?

19           MS. KELLEY:  Right.  I have Bill Nye the Science

20  Guy here, if I can just confer with him.

21           THE COURT:  Fair.  We'll take our break.  Just if

22  you could come see me on scheduling, off the record, Lee.

23           (Side bar off the record.)

24           (A recess was taken, 11:15 a.m.)

25           (Resumed, 11:50 a.m.)

1    THE COURT:  Did you have any others?

2    MS. KELLEY:  Two questions, very quick.

3    (Jury enters the courtroom.)

4  BY MS. KELLEY:

5  Q.  Dr. Rypma, two quick questions.  Number one, did you

6  ask Jeff Shields what kind of relationships he wants now?

7  A.  Yes.

8  Q.  What did he say?

9  A.  He told me that he was still interested in someone

10  somewhat younger than himself.  He told me he was interested

11  in finding someone that he could relate to on, if you will,

12  an intellectual level.  He wanted someone to essentially do

13  things with, go to the theater, share ideas, have someone to

14  share his life with.

15  Q.  And just to sum up, can you state your reasons in a

16  brief form for why you find that Mr. Shields is not sexually

17  dangerous.

18  A.  I'll try.  I feel that he's not sexually dangerous

19  because he does not lack control over his sexual behavior

20  anymore.  In fact, if you closely inspect the record, in my

21  opinion, even during the time, the short period of months in

22  1989 that he was acting out, if you will, in a more

23  compulsive manner, there still were indicators that he had

24  some control, as bad as that series of offenses were.  For

25  example, the crime reports regarding the 13-year-old boy

1   that he molested that hit him, he ran away.  Now, anyone

2   that works with compulsive sex offenders, that doesn't stop

3   them.  I mean, they cause damage to get what they want if

4   they have no control.  If they've decided they're going to

5   engage in a sexual act with a victim, running away doesn't

6   indicate lack of volitional control.  And it's not that

7   point at all.  I mean, I admittedly say that's a relatively

8   minor thing, but I still paid attention to that as I was

9   looking at his record.

10          As you go through the life and particularly the

11  criminal history of Jeffrey Shields, what you see is a

12  diminishing nature to his criminal activity in terms of the

13  qualitative nature of it.  The 1998 offense was not with a

14  stranger.  It wasn't impulsive.  It wasn't a crime that was

15  of the same caliber, if you will, of the 1989 charges.  And

16  then certainly the last one that we have in 2002, the child

17  pornography crime is, again, qualitatively much different

18  than the crimes that we saw in 1989.

19          So, in my opinion, this is not an individual right

20  now that has no control over his sexual urges.  I mean, I

21  just don't see the evidence that there is no control or that

22  he has serious difficulty controlling his sexual behavior.

23  I don't see that in the records.

24  Q.   Anything else that really stands out as a strong basis

25  for your opinion?

1   A.   Well, I guess you look at this man's total history.

2   You know, he was abandoned by his father at age seven.  At

3   age eleven his mother made a choice between the man that she

4   wanted to marry and her son, and chose the man that she

5   wanted to marry, and therefore abandoned Jeff herself.

6           He has gone through a significant period of his

7   life, admittedly, where he has engaged in incredibly bad

8   behavior, behavior that has caused damage, certainly damage

9   to his victims and damage to his life as well.  But there's

10  evidence that he has changed.  Following the treatment from

11  Dr. Graney, he began doing quite well at the Pharos House.

12  He was rearrested and has been essentially in prison since

13  2002, but nevertheless has not changed in terms of his

14  motivation for change.  He could have decompensated at that

15  point; he could have given up.  He didn't.  He remains an

16  individual who is very engaged in the whole concept of

17  change.

18          One of the comments he made to me that --

19          MS. STACEY:  Objection.

20          THE COURT:  Sustained.  We need to wrap up.

21          MS. KELLEY:  All right.

22  Q.   Any other major factors other than the change and the

23  volitional control, just to sum up now?

24  A.   His age would be the only other factor, and, now, we've

25  talked about that.  He is getting to a point where his

1  sexual interests are different now.  He isn't interested in

2  sexually offending anymore.

3            MS. KELLEY:  Okay, thank you, sir.

4  CROSS-EXAMINATION BY MS. STACEY:

5  Q.   Dr. Rypma, you have been present in this courtroom for

6  the entire trial, haven't you?

7  A.   Correct.

8  Q.   And you've heard the testimony of all of the doctors in

9  this case?

10 A.   I have.

11 Q.   And you've heard the testimony of all of the witnesses

12 in this case?

13 A.   I have.

14 Q.   And you've actually helped prepare the testimony of

15 some of the witnesses in this case?

16 A.   No, I would not have --

17 Q.   You participated in telephone calls about the

18 witnesses' testimony in this case, didn't you?

19 A.   For the purpose of information gathering only.

20 Q.   And you were hired by Mr. Shields's defense team,

21 right?

22 A.   Correct.

23 Q.   And you are helping Mr. Shields prepare his case,

24 aren't you?

25 A.   Uhm, I don't know that I would characterize it that

289d4937-08e6-428a-9052-d23ac805602e

1   way, no, ma'am.

2   Q.   Well, Dr. Rypma, you've been here the whole time,

3   correct?

4   A.   I have.

5   Q.   And after court you're working with the attorneys on

6   what happened in court that day, aren't you?

7   A.   Uhm, I think that's a bit of a stretch, but I am

8   following up on issues that have emerged throughout the week

9   by looking at articles and reviewing information in

10   preparation for my own testimony.

11   Q.   Now, both of your evaluations of Mr. Shields were done

12   at the request of his attorney, correct?

13   A.   Correct.

14   Q.   And you completed a draft report before you completed a

15   final report in this matter, didn't you?

16   A.   I did.

17   Q.   And in that draft report, you had used an instrument

18   called the Psychopathy Checklist Revised.  You referenced

19   that in your draft report, didn't you?

20   A.   I did.

21   Q.   And that particular instrument is used to assess

22   psychopathy in people?

23   A.   That's correct.

24   Q.   And that's because psychopathy is known to be

25   associated with violent behavior in the community, right?

1  A.   That's correct.

2  Q.   And psychopathic persons reoffend sooner after release?

3  A.   Correct.

4  Q.   And in your draft report, you concluded that

5  Mr. Shields fell below the generally accepted cutoff score

6  on this particular instrument, didn't you?

7  A.   Correct.

8  Q.   And you did that at the time that your draft report

9  stated, "Mr. Shields received a score of XX"; is that right?

10  A.   That's correct.

11  Q.   You didn't even have the score at that time, did you?

12  A.   I had not -- I ended up not scoring him on that

13  instrument.

14  Q.   Yet you concluded he was at low risk, correct?

15  A.   Yes.

16       THE COURT:  So which instrument didn't you use?

17       THE WITNESS:  It's an instrument called the

18  Psychopathy Checklist Revised, referred to as the PCLR.  As

19  part of my interview, I'm able to go through and ask --

20       THE COURT:  I just wanted to understand.  I didn't

21  know if it was the same thing as the other thing beginning

22  with a P that we heard about.

23       MS. STACEY:  It's yet another acronym.

24  Q.   When you evaluated Mr. Shields, you did use the

25  Static-99, correct?

289d4937-08e6-428a-9052-d23ac805602e

1   A.   I did.

2   Q.   And you would agree that the Static-99 is a moderate

3   predictor of reoffense?

4   A.   Statistically, that's correct.

5   Q.   And in fact all of the doctors in this case have used

6   the Static-99, correct?

7   A.   No.

8   Q.   Well, I'm sorry.  Both Dr. Tomich and you have used the

9   Static-99, correct?

10  A.   Correct.

11  Q.   And Dr. Plaud used the RRASOR?

12  A.   Correct.

13  Q.   And you've never done a sexually dangerous person risk

14  assessment in Federal Court before, correct?

15  A.   Correct.

16  Q.   And in fact because of that, the first report you wrote

17  referenced proposed regulations for definitions of a

18  sexually violent person, correct?

19  A.   Correct.

20  Q.   And when you interviewed Mr. Shields for your risk

21  assessment, you took what he said, and you compared it to

22  the records that you had before you, correct?

23  A.   Correct.

24  Q.   And where there were conflicts, you would note that in

25  your report, wouldn't you?

1   A.   Yes.

2   Q.   Now, your evaluation of Mr. Shields was based upon

3   information that you had, right?

4   A.   Yes.

5   Q.   Or information that was available to you, correct?

6   A.   Correct.

7   Q.   And some of that information was just Mr. Shields's

8   self-report, correct?

9   A.   Correct.

10  Q.   So where no records were available, you were depending

11  on Mr. Shields's account of whatever he was telling you

12  about, right?

13  A.   Yes, ma'am.

14  Q.   And if Mr. Shields lied or Mr. Shields omitted

15  information, then that part of your report would be

16  incorrect; is that right?

17  A.   That part of my report would indicate correctly what he

18  had said.

19  Q.   That's right, but if he had said something to you that

20  wasn't true, the accuracy of your report would be lower,

21  right?

22  A.   Well. . . I'm not sure whether I'm able to give you a

23  one hundred percent "yes" on that.  You'd have to direct me

24  to a specific issue, and I would have to conclude that the

25  inaccuracy was such that it would have changed my opinion.

289d4937-08e6-428a-9052-d23ac805602e

1  Q.   Okay.  And, incidentally, in your report you begin by

2  referring to Mr. Shields as "Mr. Shields," and then you

3  start referring to him as "client" in your report; isn't

4  that right?

5  A.   I hadn't noticed that.  That may be right.

6  Q.   Would you like to review your report?

7  A.   No.  I think that probably is accurate.  I. . .

8  Q.   "Client reports that his parents divorced when he was

9  seven years old."

10  A.   Correct.

11  Q.   Does that sound correct?

12  A.   Yes.

13  Q.   And that is because you're working for Mr. Shields,

14  correct?

15  A.   That is because I'm what?

16  Q.   Working for Mr. Shields, he's your client.

17  A.   Uhm, if the meaning of your question suggests that the

18  opinion would ultimately be less than unbiased, I would

19  disagree with that.

20  Q.   I said nothing about bias, Doctor, but my question is,

21  he's your client, isn't he?

22  A.   Actually, my client per se would be the defense

23  attorneys who hired me, and I think --

24  Q.   So each time you referred to "client" in your report,

25  you're referring to the defense attorneys?

289d4937-08e6-428a-9052-d23ac805602e

1   A.   No.  I'm referring to Mr. Shields, but that I think

2   is --

3   Q.   Okay, thank you.  Now, in your report, Mr. Shields told

4   you that he maintained contact with his younger brother;

5   isn't that right?

6   A.   In my initial report, yes.

7   Q.   And you heard the testimony of Raenae Moore, didn't

8   you?

9   A.   Yes.

10   Q.   And you heard her testify that he was estranged from

11   his brothers?  Did you hear that testimony?

12   A.   Yes.

13   Q.   So which story is correct, Dr. Rypma, what was told to

14   you or what was told to Ms. Moore?

15   A.   When I followed up with Mr. Shields in my supplemental

16   report, I focused specifically on that as one of the issues.

17   Basically what Mr. Shields told me was that he was indeed

18   estranged from his older brother, felt that a relationship

19   with his younger brother was possible, although had not seen

20   him since his mother's funeral, and desired to initiate a

21   relationship with both of them once he was out of prison and

22   gainfully employed and living on his own again.

23   Q.   So when he told you the first time he met with you on

24   March 28, 2008, that he maintained contact with his younger

25   brother, that was not true, right?

1    (Witness pausing.)

2   A.   I didn't specify a time period, and that's why I

3   followed up on that.

4   Q.   And you say you followed up on that, but that following

5   up, the fact that that was one of the areas of follow-up,

6   that's not listed anywhere in your supplemental report, is

7   it?

8   A.   The fact that I followed up on that?

9   Q.   No.  The fact that you went back to see him about

10  whether or not he was estranged from his brother, that's not

11  listed in your report, is it?

12  A.   If you look at Page 3 of the supplemental report under

13  "Family Background" --

14  Q.   There's a paragraph that talks about Mr. Shields

15  reporting that he last spoke to his older brother in 2005,

16  correct?

17  A.   Yes.

18  Q.   But on the reason for the supplemental evaluation, the

19  purpose of the evaluation, you don't say the purpose is to

20  find out whether or not he is reunited with his brother, do

21  you?

22  A.   That's correct.

23  Q.   Now, you knew that Mr. Shields had no peer support in

24  the community, in the Portland community, when you

25  interviewed him on both occasions, correct?

1    A.    Correct.

2    Q.    And that's not mentioned in your report, is it?

3          (Witness examining document.)

4    A.    What I say in my original report on Page 10 under

5    Social Support, "Mr. Shields appears to have social support

6    available from his support group in AA and from past friends

7    in the community."

8    Q.    And so you don't mention that -- you just testified

9    that you knew he had no peer support?

10   A.    Well, he has some past peer support.  Perhaps I

11   misspoke.

12   Q.    Now, Mr. Shields told you that he was seven years old

13   when he was molested by two neighborhood boys who were

14   brothers, correct?

15   A.    Correct.

16   Q.    And he told you other boys abused him as well?

17   A.    Correct.

18   Q.    And he didn't give you those ages, did he?

19   A.    They were -- my understanding from Mr. Shields was it

20   was ongoing from the age of seven through eleven.

21   Q.    Those other boys?

22   A.    Yes.

23   Q.    And that's nowhere in your report, is it?  And I'll

24   refer you to Page 6 where you discuss the incident.

25          MS. KELLEY:  Your Honor, could we just have a

289d4937-08e6-428a-9052-d23ac805602e

Page 92

1  clarification as to the age of Mr. Shields or the age of the

2  perpetrators against him that we're speaking about?

3            MS. STACEY:  I think, if the witness is confused,

4  he can ask me.

5            THE COURT:  Do you understand the question?

6            THE WITNESS:  I think her question has to do with

7  his sexual abuse as a young child.

8  Q.   And the question I asked was, you don't know the ages

9  of the other boys that abused him, do you?

10  A.   Somewhere in the record I recall the ages of the

11  initial boys being ages fifteen and sixteen.

12  Q.   Okay.  And then my follow-up question, because I think

13  we've now heard seven to eleven and fifteen to sixteen --

14  A.   I understand.  I'm sorry.

15  Q.   So my question is, any ages at all, those aren't listed

16  in your report of those other boys; is that correct?

17  A.   Yes.

18  Q.   But it's fair to say he wasn't just sexually abused by

19  older men?  Is that fair to say?

20  A.   I'm sorry, I'm still not quite following you.  It's not

21  fair to say what?

22  Q.   Mr. Shields was sexually abused by two brothers in the

23  neighborhood, correct?

24  A.   Correct.

25  Q.   And then you say he brought other boys that also abused

1  him, correct?

2  A.    Correct.

3  Q.    And we don't know the age of those boys, do we?

4  A.    That's correct.

5  Q.    And then my question to you is, it's fair to say that

6  any abuse of Mr. Shields was not just by older men?

7  A.    That remains my impression, but that is not in my

8  report, that's correct.

9  Q.    Now, you mentioned a relationship that Mr. Shields said

10  he had with his cousin who was four to five years his senior

11  after he moved in with his grandparents.  Do you recall that

12  testimony?

13  A.    Yes.

14  Q.    Now, you testified today that his cousin abused him; is

15  that correct?

16  A.    Correct.

17  Q.    The fact that his cousin abused him is not in your

18  report, is it?

19         (Witness examining document.)

20  Q.    Again I'll refer you to Page 6, Dr. Rypma.

21  A.    Yes, it does.  It says, "The client began having sex

22  with his cousin who was four to five years his senior."

23  Q.    "And this relationship continued throughout their adult

24  years."  Have I read that correctly?

25  A.    Yes.

1    Q.   The word "abuse" is not mentioned in either of those

2    two sentences, is it?

3              MS. KELLEY:   What page are we on?

4              MS. STACEY:   Page 6.

5    A.   Oh, I see what you're saying.  No, I did not use the

6    word "abuse," that's correct.

7    Q.   And you reviewed Dr. Graney's treatment records in this

8    case; is that right?

9    A.   I did.

10   Q.   And you heard her testimony here before this Court?

11   A.   I did.

12   Q.   And nowhere in discussing his issues with Dr. Graney

13   did he raise his relationship with his cousin, did he?

14   A.   Not that I recall, no.

15   Q.   And if he's working through these issues in treatment

16   with Dr. Graney, he should be talking about them, shouldn't

17   he?

18   A.   Uhm. . . I can't answer that "yes" or "no."  I'm not

19   sure whether he should have.  I mean, it's not in her notes,

20   that's correct.

21   Q.   And nowhere in your report do you indicate that

22   Mr. Shields was drunk or "blotto" at the time he committed

23   his offenses; is that correct?

24   A.   That's correct.

25   Q.   And nowhere in either of your reports do you state a

289d4937-08e6-428a-9052-d23ac805602e

1    GPS ankle bracelet is able to detect alcohol or consumption

2    of narcotics?

3    A.   That's correct.

4    Q.   And you were here for the testimony of Probation

5    Officer Kelly, right?

6    A.   I was.

7    Q.   And Probation Officer Kelly never mentioned that this

8    GPS bracelet could detect whether he consumed alcohol or

9    narcotics, correct?

10   A.   Correct.

11   Q.   The purpose of the GPS was to know where he is,

12   correct?

13   A.   That's correct.

14   Q.   Now, I'd like to start with the January, 1989 incident

15   involving the 13-year-old, WH.  Mr. Shields told you that he

16   touched the 13-year-old victim over his clothes in the

17   genital area, correct?

18   A.   Correct.

19   Q.   He was able to tell you the details of whether he

20   touched WH over his clothes or under his clothes, correct?

21   A.   I'm sorry?

22   Q.   He was able to distinguish for you where exactly he

23   touched the 13-year-old boy?

24   A.   As I recall, that's what he told me it was; he touched

25   him over the clothing in the genital area.

1   Q.   And that is inconsistent with someone who's having an

2   alcoholic blackout, correct?

3   A.   He recalled that incident, so, yes, I would say that's

4   inconsistent, that's correct.

5   Q.   Now, at the July, 1989 incident involving the boy in

6   the bathroom at the school, Mr. Shields told you that he was

7   working as a pizza delivery man that day?

8   A.   Yes.

9   Q.   And he was driving a car?

10   A.   Correct.

11   Q.   And Mr. Shields told you that he pushed the boy into a

12   stall and began masturbating; is that right?

13   A.   Correct.

14   Q.   And that he told the boy to pull his pants down,

15   correct?

16   A.   Correct.

17   Q.   And that he finished masturbating, and that he told the

18   boy not to tell, he left the restroom, and ran to his car?

19   A.   Correct.

20   Q.   He did not tell you that he grabbed that boy by the

21   groin area, did he?

22   A.   He did not.

23   Q.   And he did not tell you that while grabbing him in the

24   groin, he was using his other hand to put the boy in a

25   headlock, did he?

1   A.   He did not tell me that.

2   Q.   And he didn't tell you that he told the boy to, quote,

3   "jerk me off," unquote?

4   A.   That's correct.

5   Q.   In fact he told you he finished masturbating himself?

6   A.   Correct.

7   Q.   And he didn't tell you that he told that boy that if

8   the boy came out in the next five minutes, he would come

9   back to get him?

10  A.   That's correct.

11  Q.   But he pled guilty to unlawful sexual contact, correct?

12  A.   Correct.

13  Q.   And those facts were in the records that you reviewed,

14  correct?

15  A.   They are.

16  Q.   And you put none of those facts into your report, did

17  you?

18  A.   That's correct.

19  Q.   Moving on to the September, 1989 incident involving the

20  Hyde School and the 6-year-old boy.  Mr. Shields told the

21  6-year-old boy to pull his pants down, didn't he?

22  A.   Yes.

23  Q.   And he told you that he touched the boy's buttocks?

24  A.   I think so, yes.

25  Q.   And I believe he also told you -- this is the incident

289d4937-08e6-428a-9052-d23ac805602e

1   he told you he doesn't have a recollection at all of the

2   incident; is that right?

3   A.   That's correct.

4   Q.   Now, Mr. Shields was arraigned for this offense in

5   February of 1990, correct?

6   A.   Correct.

7   Q.   And it's fair to say he wasn't drunk when he was

8   arraigned?

9   A.   I think that's fair to say, yes.

10  Q.   It's fair to say he wasn't drunk when he pled guilty to

11  this conduct?

12  A.   Correct.

13  Q.   And you had the materials about the incident with the

14  6-year-old that you reviewed as part of your assessment of

15  Mr. Shields?

16  A.   Yes, ma'am.

17  Q.   And the police records show that Mr. Shields also

18  pulled his own pants down during that incident.  Do you

19  recall that?

20  A.   Yes, I do.

21  Q.   And Mr. Shields didn't tell you that?

22  A.   That's correct.

23  Q.   And in the words of the 6-year-old, Mr. Shields put his

24  finger in the child's, quote, "bung hole," unquote.  Do you

25  recall that?

1   A.   Yes, I do.

2   Q.   And yet you reported that Mr. Shields touched his

3   buttocks?

4   A.   Correct.

5   Q.   And you would call that a material difference in the

6   facts, wouldn't you?

7   A.   Uhm, yes.

8   Q.   And Mr. Shields also held the boy's penis, didn't he?

9   A.   That's what the records say, yes, ma'am.

10   Q.   And those facts are not included in your report either,

11   are they?

12   A.   Correct.

13   Q.   Mr. Shields told the boy to stay in the woods -- this

14   is the 6-year-old boy -- and that if he left, he'd come back

15   to get him.  Do you recall reading that?

16   A.   Yes.

17   Q.   And Mr. Shields didn't report that to you, did he?

18   A.   Correct.

19   Q.   And that's not in your report either, correct?

20   A.   That's correct.

21   Q.   Mr. Shields pled guilty to the conduct, correct?

22   A.   Yes.

23   Q.   And it's fair to say he wasn't drunk at the time that

24   he pled guilty to this conduct?

25   A.   Correct.

1  Q.   And so with regard to the 6-year-old boy, the only

2  facts that are in your report are facts that are favorable

3  to what Mr. Shields told you, correct?

4  A.   Uhm, they were points that Mr. Shields told me, yes,

5  that part is correct.

6  Q.   And you don't make a note in your report that it's

7  inconsistent with some of the police records, do you?

8  A.   That's correct.

9  Q.   Now, referring to the 1998 incident involving WM who is

10  12 years old, Mr. Shields admitted that the victim was 12

11  years old, correct?

12  A.   Correct.

13  Q.   And what he told you is that he insighted the

14  12-year-old boy to masturbate.  Do you recall that?

15  A.   Yes.

16  Q.   He denied ever touching the 12-year-old?

17  A.   That's correct.

18  Q.   Do you recall that?

19  A.   Yes.

20  Q.   And he claimed to you that that 12-year-old was a

21  prostitute, correct?

22  A.   That's correct.

23  Q.   Now, you have the records regarding that boy to review,

24  correct?

25  A.   I do.

289d4937-08e6-428a-9052-d23ac805602e

1    Q.   And Mr. Shields pled guilty in that case to unlawful

2    sexual contact, right?

3    A.   That's right.

4    Q.   And it requires contact, doesn't it?

5    A.   Uhm, I don't know.

6    Q.   And where in your report does it indicate whether or

7    not you asked Mr. Shields if that 12-year-old boy was

8    prepubescent or postpubescent?

9    A.   It doesn't say in my report whether I specifically

10   asked him that question.

11   Q.   Now, the victim said that Mr. Shields touched him in

12   the groin area, correct?

13   A.   Yes.

14   Q.   And that's what Mr. Shields pled guilty to?

15   A.   Correct.

16   Q.   And Mr. Shields also asked the twelve-year-old boy, he

17   said, "Let's go into the back room," correct?

18   A.   Yes, I recall that.

19   Q.   And it's at that point that the 12-year-old boy gets up

20   and runs out of the apartment out of fear he'd be raped,

21   correct?

22   A.   Yes.

23   Q.   And you are aware that Mr. Shields told the 12-year-old

24   not to tell anybody, correct?

25   A.   Yes.

1    Q.   And you're aware that that 12-year-old boy was a

2    transient who was staying in a shelter, aren't you?

3    A.   Yes.

4    Q.   You didn't include any of those facts in your report,

5    did you?

6    A.   That's correct.

7    Q.   You heard the testimony of Dr. Graney in this case,

8    didn't you?

9    A.   Yes.

10   Q.   And you heard her testimony that Mr. Shields had an

11   ongoing relationship with the 12-year-old boy?

12   A.   I did.

13   Q.   It's fair to say that Mr. Shields has told more than

14   one version of his events about the 12-year-old boy?

15   A.   How so?

16   Q.   First, he doesn't touch him, right?

17   A.   Correct.

18   Q.   Then he has an ongoing relationship with him, right?

19   A.   Yes.

20   Q.   Then he's a prostitute?

21   A.   I don't see that as different versions.  I'm sorry.

22   Q.   After the incident with the 12-year-old boy,

23   Mr. Shields was placed on probation?

24   A.   Correct.

25   Q.   And he only served 112 days.  Do you recall that

289d4937-08e6-428a-9052-d23ac805602e

1    testimony?

2    A.    I do.

3    Q.    And what Mr. Shields told you is that he only received

4    112 days because the 12-year-old boy's story was suspect,

5    right?

6    A.    Correct.

7    Q.    And you didn't explore that any further with

8    Mr. Shields, did you?

9    A.    No.

10   Q.    You just accepted that as the reason why he served 112

11   days?

12   A.    No.  I looked at the record subsequently, yes, but I

13   didn't -- I thought your question was, did I ask him any

14   other questions regarding the 112 days?

15   Q.    Well, did you push him about how difficult it can be

16   for child victims to testify?

17   A.    No.

18   Q.    Did you ask him about whether the police were able to

19   find this transient boy that was living in a shelter to

20   testify?

21   A.    There was some discussion around that issue, yes.

22   Q.    And that's not in your report, though, is it?

23   A.    That's correct.

24   Q.    So there are a number of factors that could have

25   contributed to the reason he only served 112 days, correct?

1    A.    Theoretically, I think I'd have to say "yes" to that.

2    Q.    There is nothing that documents that he only served 112

days because the victim's story was suspect, is there?

4    A.    You know, I -- I don't recall whether there is

5    information in the police report or not, frankly.

6    Q.    Now, Mr. Shields's first probation offense occurs in

7    December of 1998, right?

8    A.    Correct.

9    Q.    And Mr. Shields pled guilty to that offense?

10   A.    Yes.

11   Q.    And during this time, Mr. Shields is writing bad checks

12   or negotiating worthless instruments, correct?

13   A.    Correct.

14   Q.    And you saw records that support that?

15   A.    Yes.

16   Q.    Now, you said in your report that Mr. Shields wrote, I

17   believe, two bad checks, correct?

18   A.    Correct.

19   Q.    And that is based upon what Mr. Shields told you?

20   A.    Yes, ma'am.

21   Q.    But court records indicate that Mr. Shields in fact

22   wrote 128 bad checks, doesn't it?

23   A.    Several.  I don't know, I didn't count them up, but I'm

24   aware that there were several.

25              MS. STACEY:  May I approach?

289d4937-08e6-428a-9052-d23ac805602e

1    Q.   Do you recognize that document as a court document

2    involving negotiating worthless instruments?

3              (Witness examining document.)

4    A.   Yes.

5    Q.   And does that refresh your recollection as to whether

6    or not he wrote 128 checks?

7    A.   Yes.

8    Q.   He did?

9    A.   He did.

10   Q.   Thank you.  So when Mr. Shields told you he wrote two

11   checks, that was not the truth, was it?

12   A.   Correct.

13   Q.   Mr. Shields was at one point in Serenity House; is that

14   right?

15   A.   I'm sorry, in what?

16   Q.   Was at Serenity House, is that correct?

17   A.   Yes, yes.

18   Q.   And he went to Serenity House in, I believe, April of

19   '98; is that correct?

20   A.   Yes.

21   Q.   Now, Serenity House has a requirement of random

22   urinalysis, don't they?

23   A.   Yes.

24   Q.   And Mr. Shields told you he was kicked out of Serenity

25   House due to some type of TV coverage, right?

1   A.   That's what he told me, yes, ma'am.

2   Q.   And if that were the case, everyone in Serenity House

3   would have been kicked out, right?

4   A.   He was the only sex offender in Serenity House is my

5   understanding.

6   Q.   And you've never seen records from Serenity House, have

7   you?

8   A.   That's correct.

9   Q.   So you can't confirm whether Mr. Shields was kicked out

10  of Serenity House due to a TV campaign or because of a dirty

11  urinalysis, can you?

12  A.   Correct.

13             MS. KELLEY:  Objection.

14             THE COURT:  Well --

15             MS. KELLEY:  He's totally speculating.

16             THE COURT:  Well, he said he doesn't know.  Then

17  there's no evidence one way or another about it.

18             MR. SWOMLEY:  Right.  Could we have a side bar,

19  your Honor?

20             THE COURT:  No.  I strike it.  Don't forget, the

21  information in the question is not evidence.

22             MS. STACEY:  And I'm leading up to the relevance

23  of the question, your Honor.

24             THE COURT:  We don't have any information about

25  the Serenity House.

289d4937-08e6-428a-9052-d23ac805602e

1  Q.   You know that after he was out of Serenity House, the

2  conditions of his bail were to obtain substance abuse

3  treatment and follow treatment recommendations, correct?

4  A.   Yes.

5  Q.   And you know that after he pled guilty to the violation

6  of his probation involving Serenity House, an added

7  condition of his release was random search for compliance

8  with treatment and continue with his treatment

9  recommendations, correct?

10 A.   Correct, yes.

11 Q.   Now, less than -- on February 2, 1999, he goes to the

12 Hope House, correct?

13 A.   Yes.

14 Q.   And in December of 2000, he failed an urinalysis,

15 correct?

16 A.   Uhm, that's what he told me was alleged; but he also

17 told me that he was not using at that time, that it would

18 have been impossible for him to have dropped a dirty UA, and

19 that he indicated at that time I would find no indication in

20 the record that there was indeed a dirty UA.

21 Q.   And so it wasn't him?  It was his probation officer,

22 right?

23 A.   I'm sorry?

24 Q.   It wasn't his fault?  It was his probation officer's

25 fault?  He had a conflict with him?

289d4937-08e6-428a-9052-d23ac805602e

1   A.   He indicated that he did not get along well with his

2   probation officer, that's correct.

3   Q.   And so the inference he asked you to make was that

4   therefore this dirty urinalysis was just made up?

5   A.   Uhm, I don't know if that was his inference or not.  He

6   was simply reporting to me at that point in time, as I

7   recall, what he recalled from that period of time.

8   Q.   And there's nothing in your report to indicate that you

9   saw any records either way on that, correct?

10  A.   That's correct, yes.

11  Q.   But yet Mr. Shields did serve 18 months?

12  A.   Correct.

13  Q.   Now, in 2001, Mr. Shields rented a computer and failed

14  to return it in time, didn't he?

15  A.   Yes.

16  Q.   And a complaint for theft by deception then entered; is

17  that right?

18  A.   Yes.

19  Q.   Now, a computer has an Internet connection, correct?

20  A.   Yes.

21  Q.   And this theft by deception, this was a violation of

22  his probation, right?

23  A.   Yes.

24  Q.   And he told you that these computer charges were

25  dismissed, right?

1          (Witness examining document.)

2    A.   Yes.

3    Q.   And so someone who has a computer with an Internet

4    connection --

5               MS. KELLEY:  Objection.  There's no evidence of

6    any Internet connection.

7               MS. STACEY:  Sorry.  I thought he testified that

8    it did.

9               THE COURT:  Well, do you know one way or another?

10              THE WITNESS:  I don't know if it had an Internet

11   connection or not.  I thought the question was, do computers

12   have Internet connections?

13   Q.   In light of the fact that Mr. Shields' index offense is

14   receipt of child pornography over the computer, did you

15   think to inquire with Mr. Shields why he wasn't returning

16   that computer on time?

17   A.   I did inquire, yes.

18   Q.   And that's not in your report, though, is it?

19   A.   That's correct.

20   Q.   And he told you that that charge was dismissed, didn't

21   he?

22   A.   I believe so, yes, ma'am.

23   Q.   When in fact on March 1, 2001, Mr. Shields pled guilty

24   to theft by deception, didn't he?

25   A.   Correct.

1   Q.   And he told you that the charge of theft by deception

2   alone, that was enough to revoke his probation, right?

3   A.   That's what he told me, yes, ma'am.

4   Q.   He didn't tell you he pled guilty?

5   A.   That's correct.

6   Q.   Now, regarding the index offense, the 2001 child

7   pornography offense, Mr. Shields admitted to the conduct as

8   it's written in your report, correct?

9   A.   Yes.

10  Q.   He admitted to downloading child pornography files that

11  included prepubescent children, correct?

12  A.   Yes.

13  Q.   And there were hundreds of images of prepubescent boys

14  engaged in sexually explicit conduct, weren't there?

15              MS. KELLEY:  Objection.

16              MS. STACEY:  Your Honor, I'm reading from

17  Exhibit 9.  I'd be happy to put it up on the screen.

18              THE COURT:  Overruled if she's reading.

19              MS. KELLEY:  She's leaving out the "and

20  postpubescent," hundreds of images of both.

21              THE COURT:  Put it up on the board so the jury can

22  see what it says.  It's an exhibit.

23  Q.   Okay, so in terms of the offense conduct, when the

24  police first arrived on the tip that Mr. Shields had child

25  pornography, first, Mr. Shields admitted to having a

1   computer with Internet access, correct?

2   A.   Correct.

3   Q.   And he told the police that a week earlier he had let

4   this friend use the computer and that his friend was viewing

5   pornographic images, right?

6   A.   That's correct, yes.

7   Q.   And then he said he deleted all of the images on the

8   computer, right?

9   A.   Correct.

10  Q.   And that no one else had access to his computer since

11  his friend had left?

12  A.   Correct.

13  Q.   And then during the police visit, Mr. Shields let the

14  police look at his computer, correct?

15  A.   Correct.

16  Q.   And the detectives quickly found images of minor boys

17  engaged in sexually explicit conduct, right?

18  A.   Correct.

19  Q.   And Mr. Shields continued to blame the images on his

20  friend, correct?

21  A.   Yes.

22  Q.   And when the detectives checked the computer, they

23  learned that the files had been modified right shortly

24  before the police had arrived that morning, right?

25  A.   Yes.

1    Q.    So saying that the computer hadn't been touched and

2    that it was his friend's is not true, was it?

3    A.    That's correct.

4    Q.    And then the police searched the apartment and found a

5    number of CDs and disks; is that correct?

6    A.    Yes.

7    Q.    And I'll refer you to the second sentence of

8    Paragraph 5:  "An analysis of what the police recovered

9    revealed hundreds of images of adolescent and preadolescent

10   children, predominantly boys, engaged in sexually explicit

11   conduct."  Is that correct?

12   A.    That's what it says, yes, ma'am.

13   Q.    And they had been downloaded on September 12, the day

14   the police had visited the apartment?

15   A.    Correct.

16   Q.    And just for the sake of completeness, the last

17   paragraph is that Mr. Shields's friend hadn't been there

18   that day?

19   A.    Correct.

20   Q.    Now, you gave some testimony about this computer file

21   that had been used to download all of these images?

22   A.    Yes.

23   Q.    And you said you were familiar with it, right?

24   A.    Yes.

25   Q.    Yet nothing about the familiarity with the program or

289d4937-08e6-428a-9052-d23ac805602e

1   all these images being downloaded all at once, none of that

2   is in any of your reports, is it?

3              (Witness examining documents.)

4   A.   No.

5   Q.   In fact, your report indicates only that he downloaded

6   child pornography.  You leave out the prepubescent part in

7   your report, don't you?

8              (Witness examining document.)

9   A.   Yes.

10  Q.   And the analysis about individuals, your earlier

11  testimony today about individuals who sit in their room and

12  they're not really looking at child porn, none of that is in

13  any of your reports, is it?

14  A.   That's correct.

15  Q.   Now, you are aware of research that says possession of

16  child pornography is a valid indicator of pedophilia, right?

17  A.   I'm aware of research that says that, yes.

18  Q.   Seto 2005?

19  A.   Yes.

20  Q.   And you're aware of research that indicates that child

21  pornography offenders who commit a sexual offense are most

22  likely to reoffend again, right?

23  A.   Yes.

24  Q.   And that's also Seto 2005?

25  A.   Yes.

1   Q.   And you're also aware of research by Hanson that

2   suggests prior sexual offending is specifically predictive

3   of sexual recidivism?

4   A.   Yes.

5   Q.   Now, Mr. Shields has been through two sex offender

6   treatment programs per his self-report, right?

7   Q.   Correct.  And the first treatment program was in 1993

8   to 1996, correct?

9   A.   Yes, ma'am.

10  Q.   And Mr. Shields told you he got very little out of it?

11  A.   That's correct.

12  Q.   And after treatment in 1996, he began reoffending again

13  in 1998; is that right?

14  A.   That's right.

15  Q.   Now, other than what Mr. Shields has told you, you have

16  no knowledge of whether or not he was successful in that

17  treatment program from '93 to '96, do you?

18  A.   I have an opinion that he was not, but --

19  Q.   But you haven't seen thinking that would indicate

20  either way?

21  A.   Correct.

22  Q.   Mr. Shields told you about a second sex offender

23  treatment program he went to from 1999 to 2001, correct?

24  A.   Yes.

25  Q.   And he tells you, "The second treatment program, this

1    is more helpful for me," right?

2    A.   Correct.

3    Q.   And in 1999, the first year that he's in the sex

4    offender treatment program, Mr. Shields admits to probation

5    violations, and he's sentenced to 125 days, right?

6    A.   I think that's right, yes.

7    Q.   And then while he's still in this treatment program in

8    the year 2000, he is sentenced to 18 months?

9    A.   Yes.

10   Q.   So he's incarcerated from approximately February 23,

11   2001, until August 23, 2001?

12   A.   Okay.

13   Q.   Do you have that knowledge?

14   A.   Yes.

15   Q.   And then in 2002, after finishing all or part of the

16   second sex offender treatment program that is more helpful

17   to him, he's arrested for possession of child pornography?

18   A.   Correct.

19   Q.   Now, you've used the Static-99 to assess Mr. Shields's

20   risk for reoffense?

21   A.   I did.

22   Q.   And the Static-99 is an actuarial tool that's designed

23   to estimate the probability of sexual and violent recidivism

24   for adult males who have already been charged or convicted

25   of at least one sexual offense against a child, right?

289d4937-08e6-428a-9052-d23ac805602e

1   A.   That's correct.

2   Q.   Or nonconsenting adult?

3   A.   Yes.

4   Q.   And Mr. Shields scored in the highest risk category

5   possible, right?

6   A.   That's correct.

7   Q.   And where an offender states intentions to further harm

8   or get his victims, that offender is at a higher risk of

9   reoffense, isn't he?

10   A.   I didn't hear all of the question.

11   Q.   My apologies.  Where an offender states an indication

12   of further harm or to "get" his victims, that offender is at

13   a higher risk of reoffense, isn't he?

14   A.   When he seeks further harm?  I'm not following you.

15   Q.   Where he states to his victims that he'll cause them

16   further harm, "Stay in this bathroom or I'll get you, stay

17   in the woods or I'll get you --"

18   A.   Oh.

19   Q.    -- that puts him at a higher risk of reoffense,

20   doesn't it?

21   A.   I don't know that it puts him at a higher risk of

22   reoffense, no.

23   Q.   Well, you're familiar with the Static-99 Coding Manual,

24   aren't you, Doctor?

25   A.   I am.

1    Q.   And you're familiar with the principle stated in the

2    Coding Manual that "An obvious example is where an offender

3    states intentions to further harm or get his victims, higher

4    risk"?

5    A.   Uhm, I would like to review that whole preface

6    actually.  It might say that.  I don't doubt that you're

7    reading it correctly.

8    Q.   Well, that's good.  There you go.

9              (Witness examining document.)

10             MS. STACEY:  After the fact, may I approach, your

11   Honor?

12             THE COURT:  Yes.

13   A.   Well, that does indeed say that and, I don't know what

14   it goes on to say, but I guess my reluctance is that I am

15   aware of no research that substantiates that statement.

16   Q.   Well, the Static-99 --

17             MS. STACEY:  May I approach to take this away?

18             THE COURT:  Yes.

19             MS. STACEY:  Thank you.

20   Q.   The Static-99 has been cross-validated in 65 studies,

21   hasn't it?

22   A.   Well, it's been cross-validated except for the

23   predictive levels of each of the events.

24   Q.   It's been studied in over 65 studies, hasn't it?

25   A.   It has been studied in 65 studies, yes.

289d4937-08e6-428a-9052-d23ac805602e

1    Q.   It has been studied in 13 countries, correct?

2    A.   Correct.

3    Q.   It has been peer reviewed, correct?

4    A.   It has been, yes.

5    Q.   The Coding Manual of the Static-99 also says that when

6    reviewing a criminal history, that you are supposed to use

7    the official criminal history, which includes what was

8    recorded by police officers in the court, right?

9    A.   Yes.

10   Q.   Okay, it says, don't rely on a self-report, right?

11   A.   Correct.

12   Q.   And after scoring Mr. Shields on the Static-99, I think

13   you said his score changed to an 8, correct?

14   A.   Correct.

15   Q.   And you said, your testimony was, there's really no

16   difference between a 7 and an 8; high is high?

17   A.   Correct.

18   Q.   But the Coding Manual for the Static-99 says that,

19   actually, as the scores get substantially higher over that

20   high-risk number, it actually does matter because you can be

21   more assured a person is at high risk?

22   A.   Well, but I think you're misleading a little bit.  I

23   mean, I agree the technical answer to your question is

24   "yes," the manual does say that.

25   Q.   That's not misleading, right?  I mean, do you need to

1   rephrase?

2   A.   Well, but it is, though.  Can I explain or not?

3   Q.   Let me ask the question better.

4   A.   All right.

5   Q.   Tell me if I've --

6        MR. SWOMLEY:  Your Honor, can he explain his

7   answer?

8        MR. SWOMLEY:  You have a right to redirect.

9   Q.   "If the offender's score is substantially above 6

10  (high risk), there is greater confidence that the offender's

11  true score is greater than 6 than if the offender had only

12  scored a 6."  Is that correct?

13  A.   I agree that is the correct reading of that paragraph

14  in that manual.

15  Q.   Thank you, Dr. Rypma.  Now, Mr. Shields told you that

16  his outlook changed after being incarcerated in Lewisburg;

17  is that right?

18  A.   Yes.

19  Q.   And you didn't review any records about his treatment

20  from Lewisburg, did you?

21  A.   That's correct.

22  Q.   You are relying on Mr. Shields's word?

23  A.   Correct.

24  Q.   You said that you reviewed Dr. Graney's repords, and I

25  believe your testimony was that you had reviewed

1  Dr. Graney's records, and you were convinced that

2  Mr. Shields had made an effort in treatment.  Do you recall

3  that testimony?

4  A.   Yes.

5  Q.   That is not anywhere in your reports, is it?

6  A.   That's correct.

7  Q.   That's an opinion you formed while sitting in court?

8  A.   Oh, no.  I had that opinion from the outset.

9  Q.   Okay.  And Mr. Shields told you he planned to live in

10  Portland, Maine?

11  A.   Correct.

12  Q.   And he told you the plan was for him to remain on

13  supervised release?

14  A.   Yes.

15  Q.   And he was on supervised release when he offended

16  before, wasn't he?

17  A.   Yes.

18  Q.   So supervised release doesn't guarantee someone won't

19  commit an offense, does it?

20  A.   That's correct.

21  Q.   And Mr. Shields would be accountable to his probation

22  officer; is that right?

23  A.   Yes.

24  Q.   And he was accountable to a probation officer before

25  when he's reoffended, hasn't he?

289d4937-08e6-428a-9052-d23ac805602e

Page 121

1   A.   Yes.

2   Q.   In fact he blamed a conflict with his probation officer

3   on one of his reasons for reoffending, right?  I'm sorry,

4   for the charges, right?

5   A.   Uhm, I don't know that he blamed his probation officer,

6   but there was a conflict, yes.

7   Q.   Didn't he say, "I had a conflict with my probation

8   officer, and that's why I was revoked?

9   A.   Yes, he did say that.

10   Q.   He didn't say, "I had a dirty UA"?

11   A.   That's correct.

12   Q.   Urinalysis, he didn't say, "I had a dirty urinalysis"?

13   A.   That's correct.

14          MR. SWOMLEY:  Objection.  No evidence of that

15   either.

16          THE COURT:  Do you know one way or another?

17          THE WITNESS:  I'm sorry?  I saw no record of a

18   dirty UA.

19   Q.   Well, you did see a record, though, didn't you,

20   Dr. Rypma, that immediately after this supposed conflict, a

21   condition of comply with treatment and submit to random

22   search was added to his conditions?

23   A.   That's correct.

24   Q.   Now, your report states he planned to go to the Oxford

25   House after he was released?

Page 122

1    A.    Yes.

2    Q.    And today you testified that his plan was to go to the

3    Pharos House; is that right?

4    A.    Correct.

5    Q.    Has that plan changed since you wrote your report?

6    A.    I don't think it has changed.  I think The Oxford House

7    is a sober-living facility.  I think he hopes that he has

8    some time to get his affairs in order before going to the

9    Oxford House.

10   Q.    Where do you get that he wants to go to the Pharos

11   House?

12   A.    I'm sorry?

13   Q.    Where do you get your testimony that he now wants to go

14   to the Pharos House?

15   A.    That's what I recall from my discussion with

16   Mr. Shields.

17   Q.    That he wants to go to the Pharos House now is nowhere

18   in either your first report or your supplemental report, is

19   it?

20   A.    That's correct.

21   Q.    Now, you heard the testimony of Mr. Thomas that said

22   sex offender treatment programs can last two to four years,

23   correct?

24   A.    Yes, I heard that.

25   Q.    And you know that it's Mr. Shields's plan to go to sex

289d4937-08e6-428a-9052-d23ac805602e

Page 123

1   offender treatment, right?

2   A.   Correct.

3   Q.   And there is no guarantee that Mr. Shields will

4   complete treatment before his conditions are lifted; is that

5   right?

6   A.   That's correct.

7   Q.   Now, Mr. Shields has made a number of reasons for not

8   going to sex offender treatment before, hasn't he?

9   A.   Yes.

10  Q.   And he actually asked to go to Butner to get sex

11  offender treatment, didn't he?

12  A.   That's correct.

13  Q.   He wrote a letter?

14  A.   Yes.

15  Q.   And that letter was part of the record that you

16  reviewed?

17  A.   Yes.

18  Q.   And in that letter he says, you know, "Please send me

19  to sex offender treatment --"  Give me a minute.  I'm trying

20  to locate the letter.

21  A.   Yes, I do recall that.

22  Q.   Here we go.  He says -- it's a letter from Mr. Shields

23  to the clerk of the Superior Court in Bangor, Maine, right?

24  A.   Correct.

25  Q.   And he writes about his detainer that he has in Maine,

1   about his sentence in Maine?

2   A.   Yes.

3   Q.   And he says he's sentenced in the Bangor Federal

4   District Court, but he has been recommended to go to Butner

5   correctional facility in North Carolina by a federal judge,

6   right?

7   A.   That's right.

8   Q.   And he wants to do that because he wants to take

9   advantage of the 500-hour drug treatment program and sex

10  offender treatment program, right?

11  A.   Yes.

12  Q.   And he says, "These are two very important programs

13  that I want to be a part of so that when I'm released, I'll

14  be able to reenter society"?

15  A.   Yes.

16  Q.   And when he gets to Butner, he doesn't do the sex

17  offender treatment program, does he?

18  A.   That's correct.

19  Q.   He does do the drug treatment program?

20  A.   Yes, that's correct.

21  Q.   Now, you testified today that it was a good decision

22  for him not to go into the sex offender treatment program.

23  Do you recall that testimony?

24  A.   I do.

25  Q.   That opinion is nowhere in any of the reports that you

Page 125

1   filed with this court, right?

2   A.   That's correct.

3   Q.   And there's been some discussion about he didn't go on

4   the advice of counsel, right?

5   A.   Yes.

6   Q.   And the discussion was because those records, they'll

7   be used against him in these commitment proceedings here,

8   right?

9   A.   Correct.

10  Q.   But when you met with Mr. Shields on your nine or ten

11  hours, your waiver was exactly the same, wasn't it?

12  A.   Correct.

13  Q.   You told Mr. Shields, "Whatever you tell me is going to

14  the court," right?

15  A.   That's correct.

16  Q.   You also heard the testimony of Dr. Graney in this

17  case, right?

18  A.   Yes, I did.

19  Q.   So when Mr. Shields gets to Butner, instead of going to

20  sex offender treatment, and despite the fact that he's been

21  seeing a psychologist since the age of seven, he goes to see

22  Dr. Graney, right?

23  A.   I didn't understand the question.  In spite of the fact

24  that he had --

25  Q.   Seen a psychologist since the age of seven --

1          MS. KELLEY:  Objection.

2     Q.   -- he goes to see Dr. Graney?

3          THE COURT:  Yes, sustained.  Sustained as worded.

4     Q.   You're aware that instead of entering sex offender

5     treatment, he goes to see Dr. Graney, right?

6     A.   I am aware of that, yes.

7     Q.   And Dr. Graney's records reflect he had been seeing a

8     psychologist since he was seven years old, right?

9     A.   Yes, that's correct.

10    Q.   And he decides, after getting the transfer to go to

11    Butner to get sex offender treatment, Mr. Shields decides

12    he's not ready for sex offender treatment, right?

13    A.   That's correct.

14    Q.   And at the end of Mr. Shields's treatment with

15    Dr. Graney, he starts hesitating about getting treatment

16    outside of Butner, right?

17    A.   What do you mean, he starts hesitating?

18    Q.   Well, doesn't he tell Dr. Graney, "I'm afraid no one is

19    going to connect to me the same way," right?

20    A.   He did say that, yes.

21    Q.   And, "I'm not sure I can go through counseling with

22    someone else.  They may not understand my past"?

23    A.   I do recall that, yes.

24    Q.   And he also tells Dr. Graney that when he's released,

25    he plans to go to SLAA, Sex and Love Addicts Anonymous?

1   A.   Correct.

2   Q.   And you heard the testimony of Raenae Moore?

3   A.   I did.

4   Q.   And according to Ms. Moore, he went to two SLAA

5   meetings, right?

6   A.   Correct.

7   Q.   He put work before any benefit he would get, according

8   to Ms. Moore's testimony, he put work before SLAA meetings?

9           MS. KELLEY:   Objection.

10          THE COURT:   Sustained.

11  Q.   Do you have knowledge that rather than attend SLAA

12  meetings, Mr. Shields worked instead?

13  A.   That's not my understanding of the testimony I heard,

14  ma'am.

15  Q.   You have testimony that he went to two meetings?

16  A.   I heard that.

17  Q.   You know that he didn't go to any other meetings for

18  SLAA?

19  A.   Would you like me to say what my memory of the

20  testimony is or not?

21  Q.   Yes.

22  A.   I may?

23  Q.   Yes, sure.

24  A.   My memory was that the testimony said that the meetings

25  in the Portland area of that organization were few and far

1   between, that it was not a situation like AA where he was

2   able to find a meeting almost any time of the day, and that

3   work was necessary for him to prepare in the short amount of

4   time that he was at the halfway house so that he could have

5   resources when he moved out.

6   Q.   Did you take all these limitations into consideration

7   when you decided that these plans, whether or not they were

8   credible?

9   A.   I think so, yes.

10  Q.   Now, you credited him, though, for a release plan,

11  right?

12  A.   I did.

13  Q.   And I think you said it was a pretty thorough release

14  plan, right?

15  A.   I thought it was adequate.

16  Q.   And the details of the release plan are not mentioned

17  in either of your reports, are they?

18  A.   There are some details, I believe, mentioned.

19  Q.   And are those his plans?  Are those Mr. Shields's

20  plans?

21  A.   In general, yes, they're his plans.

22  Q.   So "I plan to go to AA," that's part of the release

23  plan?

24  A.   Yes.

25  Q.   And "I plan to go to SLAA"?

Page 129

1   A.   Yes.

2   Q.   And "I plan to meet up with the brothers that I'm

3   estranged with"?

4   A.   That's correct.

5   Q.   And part of his release plan was to get back into the

6   restaurant management business, right?

7   A.   Correct.

8   Q.   And you are aware from the records you've had before

9   you that Mr. Shields told Dr. Graney he would avoid the

10   restaurant business, right?

11   A.   That's not what he told me, that's correct.

12   Q.   So he told Dr. Graney he would avoid the restaurant

13   business for fear of returning to drugs and alcohol due to

14   the stress of the business, right?

15   A.   Correct.

16   Q.   And he told you he was going back into the business?

17   A.   Yes.

18   Q.   Now, you diagnosed Mr. Shields with pedophilia?

19   A.   I did.

20   Q.   And pedophilia is a serious mental, illness

21   abnormality, or disorder, right?

22   A.   Correct.

23   Q.   And it is a chronic condition, right?

24   A.   That's how the DSM characterizes it, yes.

25   Q.   That's how you testified at your deposition, right?

289d4937-08e6-428a-9052-d23ac805602e

Page 130

1   A.   Yes.

2   Q.   That it's a chronic condition; is that right?

3   A.   In general, that's correct.  That's what the DSM says.

4   Q.   And after your second interview, you still determined

5   that Mr. Shields suffers from pedophilia?

6   A.   Correct.

7   Q.   Now, there is absolutely nothing about episodic

8   episodes of pedophilia in either of your reports, is there?

9   A.   Uhm, I don't recall, but I know that to be the case.

10  Q.   But it's not in your reports, is it?

11           (Witness examining documents.)

12  A.   Yes, as a matter of fact, it is.

13  Q.   Could you please show me where in your report.

14  A.   Yes.  Page 11, the last paragraph, the fourth line down

15  notes that "Individuals with a paraphilia may engage in

16  these activities episodically and otherwise be able to

17  function sexually without these urges."

18  Q.   And that's general to what the DSM notes for

19  individuals, right?  You did not make that diagnosis

20  specifically for Mr. Shields, did you?

21  A.   Well, of course I did.

22  Q.   Well, your diagnostic impression says "pedophilia."  It

23  doesn't say "episodic," does it?

24  A.   I think you're mischaracterizing how diagnoses occur.

25  Q.   Okay.  I'm going to move on at this time.

Page 131

1          THE COURT:  How much longer do you have?

2          MS. STACEY:  I've got -- I'm about two-thirds.

3          THE COURT:  Okay.  I'll see you on Monday.  Now,

4    let me talk to you a little bit about what to expect.  There

5    is a decent chance that this case will go to you on Monday.

6    If not Monday, I'm quite certain it will go to you on

7    Tuesday.  So that's sort of the timing of the case.  There

8    will be some testimony Monday morning, but I think, if we

9    can finish by 11:00, I can get you -- I have to get you both

10   closing arguments as well as my jury instructions.  Assuming

11   I can get it to you Monday, then you'd stay until 5:00

12   o'clock.  If not, it would be Tuesday.  And, obviously,

13   you're all going to have to talk about it.  So even if you

14   went on Monday, I'm quite sure it would take you the morning

15   just to get the case, so that deliberations could easily

16   swing into Tuesday.  So I would suggest blocking Monday and

17   Tuesday until 5:00, and then it goes as long as you want it

18   to, but at least those two days.

19          THE CLERK:  All rise for the jury.

20          (Jury excused.)

21          THE COURT:  So you think you'll be maybe another

22   half an hour?

23          MS. STACEY:  I think so.

24          THE COURT:  And then maybe a little redirect?

25          MS. KELLEY:  Well, given the unexpected

289d4937-08e6-428a-9052-d23ac805602e

1    introduction of the Seto studies, et cetera --

2           THE COURT:  They weren't introduced.

3           MS. KELLEY:  No.  They were brought up.  I'm

4    wondering if your Honor would allow me to fall back and for

5    Mr. Swomley to do the redirect.

6           THE COURT:  No.  It's just too complicated.  I

7    mean, as it is, both of you were popping up with objections

8    in some places.  So it's your witness, that sticks.  That

9    having been said, it's a fair game on redirect.

10          MS. KELLEY:  Yes, assuming I can figure out what

11   the thing says, but I'll work on that over the weekend.

12          THE COURT:  Yes.  So I just want to know, for

13   point of his getting on a plane, you're going to be half an

14   hour?

15          MS. STACEY:  Yes, I'll do my level best.

16          THE COURT:  Because I think we can get this to the

17   jury in the vicinity of 10:00 o'clock, but let's talk about

18   scheduling this afternoon.  So, like, 2:30 I'll see you all

19   on a charge conference.  All right, thank you very much.

20          MS. STACEY:  Thank you, your Honor.

21          THE COURT:  I think you are pretty safe on making

22   a plane reservation.

23          THE WITNESS:  In the afternoon on Monday?

24          THE COURT:  Well, that I'm certain, or maybe late

25   morning.

289d4937-08e6-428a-9052-d23ac805602e

1        THE WITNESS:  See, the problem is, I'm going to

2  have to get kind of organized back at the hotel too.

3        THE COURT:  You can go off the record.  This is

4  just scheduling.

5           (Discussion off the record.)

6           (Adjourned, 1:05 p.m.)

7           (Resumed for charge conference, 2:40 p.m.)

8        MS. KELLEY:  Good afternoon.

9        THE COURT:  Good afternoon.

10        MS. STACEY:  Good afternoon.

11        THE COURT:  So, Mr. Grady, Ms. Stacey, what do you

12  want?  Do you have any objections?  And then I'll go to the

13  defense.

14        MR. GRADY:  Sure.  Do you want to --

15        MS. STACEY:  So, your Honor, on the draft jury

16  instructions, I'm going to go to Page 6.  It was your

17  Instruction No. -- well, it's "evidence."  And this really

18  isn't an objection except that I'm wondering if the section

19  on stipulations that starts at Page 13, if that might be a

20  natural place for it to go.

21        THE COURT:  Oh, please don't do that to me.  I

22  just want to know if there's a substantive objection.  I

23  don't want to go through where it should be placed.

24        MS. STACEY:  Yes.  The other thing is -- if you

25  give me a minute because I have them written on here.

289d4937-08e6-428a-9052-d23ac805602e

Page 134

1   Page 17 of the instructions after the first paragraph, the

2   last line states, "If you conclude that the government has

3   failed to establish either of these elements by clear and

4   convincing evidence, you may not find that Mr. Shields is a

5   sexually dangerous person."  We're requesting that it go on

6   to say, "On the other hand, if you find the government has

7   proved that, you must find that. . ." you know, the

8   corollary.

9           THE COURT:  Yes, that's fair enough.  I do that in

10  the criminal cases.

11          MS. KELLEY:  Which page is it?

12          THE COURT:  It's on Page 17, end of first

13  paragraph.  You know, so you say, "But, on the other hand,

14  if you find that he is, then you should," or something like

15  that.

16          Okay, anything else?

17          MS. STACEY:  Page 19 under Element No. 2, I

18  believe the government had previously requested an

19  instruction, Instruction No. 5.

20          THE COURT:  And it says?

21          MS. STACEY:  And this is where -- "Determining

22  mental disorder is defined in part to include an abnormal

23  mental condition.  A generally accepted mental health

24  resource for mental disorders is the Diagnostic and

25  Statistical Manual of Mental Disorders, Fourth Edition Text

1    Revision, which was referenced by experts during --"

2            THE COURT:  No, but you can argue that.  I mean,

3    they got the picture.  If they win this one, they're the

4    best lawyers in America because all three experts have

5    agreed to the contrary, so --

6            MS. KELLEY:  You just win that element, not win

7    the whole trial, I hope.

8            THE COURT:  Oh, no, no, no, I just meant that

9    element.  No, no, no, you know, the --

10           MS. KELLEY:  I know what you meant.  I'm just

11   joking.

12           MS. STACEY:  And I apologize for trying to combine

13   three sets of notes that I have.

14           THE COURT:  Go ahead.

15           MS. STACEY:  On Page 20, we had asked to strike

16   the second sentence of the second paragraph, the one that

17   starts, "It is this link between."  We think it's not

18   helpful for the jury and adds confusion for the jury.

19           THE COURT:  Well, I thought about that.  I mean,

20   it came out of a Supreme Court case that was obviously

21   linked to a separate state statutory scheme, Kansas, to be

22   exact.  On the other hand, it emphasized the link piece:  It

23   can't just be a mental disorder, and it can't be -- you have

24   to link it to difficulty refraining.

25           MS. STACEY:  Right, and the statute, I think

1    elsewhere in the instructions -- and, again, I don't want

2    to get into, your Honor, but elsewhere in the instructions,

3    the statute itself says that it has to be a condition, a

4    result of which they would have --

5              THE COURT:  Well, yes, yes, because the statute

6    says that.  This is just like a -- this is consistent with

7    that, though.  I think I -- I'm positive we plagiarized the

8    Supreme Court case.

9              MS. STACEY:  Oh, that's right.  And the other

10   piece was the confusion between the reference to the civil

11   and criminal commitment proceedings.  We thought that was

12   just --

13             THE COURT:  Are we on the same page?

14             MS. STACEY:  It's on that same sentence.  It talks

15   about distinguishing a person subject to civil commitment --

16             THE COURT:  Oh, I see.  Well, that might be --

17             MS. STACEY:  And then the quote talks about

18   criminal proceedings.  So the whole thing --

19             THE COURT:  All right, fair enough.  Let me

20   just -- but I like mentioning there's got to be a link.  I

21   think that's the heart of this case.

22             MR. SWOMLEY:  You don't want to invite comment on

23   whatever they're asking right now or --

24             THE COURT:  You should, you should, but --

25             MR. SWOMLEY:  Just back and forth?  Because the

289d4937-08e6-428a-9052-d23ac805602e

1   Kansas V. Hendricks and then Kansas V. Crane both talk about

2   distinguishing someone with a mental abnormality who can't

3   control their impulses from an ordinary criminal recidivist,

4   which, I mean, staying true to the reasoning, even if

5   someone is committing repetitive sexual acts and would do so

6   after they got released, if they don't have the mental

7   abnormality, it's just criminal conduct; and it's the people

8   that can't control their impulses that get civilly

9   committed.  The people that can but choose not to just need

10  more jail time.

11          THE COURT:  Yes, I'm inclined to keep it just

12  because I basically took it right out of the Supreme Court

13  case talking about the policies, unless I think it's wrong,

14  which I'm not sure it is wrong.  We actually toned -- not

15  toned down, but we didn't take it directly from their brief.

16          MR. GRADY:  No, and I don't think we're suggesting

17  right now that the Supreme Court is wrong when you quote

18  from it, but --

19          THE COURT:  No, but, I mean --

20          MS. KELLEY:  Mr. Grady.

21          THE COURT:  Mr. Grady, I'd never suggest.  I just

22  meant if it was wrong because it was geared to a particular

23  statute.

24          MR. GRADY:  Highlighting the link is great.  What

25  I think we're starting to meld into here, your Honor, are

289d4937-08e6-428a-9052-d23ac805602e

1    legal distinctions that are made for purposes of preserving

2    constitutionality, which have nothing to do with the

3    elements of this statute, that's -- and when Ms. Stacey says

4    you're mixing civil-criminal, here when you start to say

5    what distinguishes this from civil commitment to criminal

6    proceedings is --

7              THE COURT:  Well, I might play with wording it,

8    but I'm going to mention the word "link."

9              MR. GRADY:  Absolutely, certainly.

10             THE COURT:  The nexus piece is the essential

11   piece.  I agree this was written sort of by the Supreme

12   Court, not for a jury, so, I mean, I can play with it a

13   little bit.  I might say, "To prevail, the government must

14   establish this link between," or something like that.

15   Anyway, okay.

16             MS. STACEY:  And I think we have Page 21, the last

17   paragraph that begins -- it's actually the last two

18   paragraphs, so Page 21, last paragraph that begins "Because

19   your inquiry is whether," we'd just again ask that that be

20   stricken.  I think you're instructing other places in the

21   instructions, you're instructing as to that principle,

22   and --

23             THE COURT:  Say it again?  Is it wrong?

24             MS. STACEY:  I'm sorry, the paragraph that begins

25   with "because" on Page 21.

1           THE COURT:  Yes, what's wrong with that?

2           MS. STACEY:  It's also taken from a state civil

3    commitment statute, and the standards are a little

4    different.  And so later on in this --

5           THE COURT:  Excuse me.  You've got to be very

6    clear.  What's wrong?

7           MS. STACEY:  I think -- again, it says, "You may

8    consider the conditions of such release in assessing his

9    risk of reoffending."  The statute says, after you find

10   someone sexually dangerous, then you may decide.

11          THE COURT:  So in assessing whether he can refrain

12   if released.

13          MS. KELLEY:  Well, this is an old argument we've

14   been having with the government.  They think that because

15   the statute provides for the potential of somebody being

16   released on conditions, that's the only time you can mention

17   conditions.  And we've argued all along, and your Honor has

18   allowed us to put on evidence here, that the conditions of

19   their release affect the decision on dangerousness.  All the

20   experts think so, and we know the jury wants to know about

21   that because they even asked a direct question about it.

22   And I think what your Honor is saying here is correct; that

23   if you're going to assess whether when released someone is

24   dangerous, you must consider, like, released how?  Just put

25   out on the street, or are they going to be supervised?  And

289d4937-08e6-428a-9052-d23ac805602e

Page 140

1   that was the purpose of our whole defense case.

2          THE COURT:  I can probably tailor it more closely

3   to the statute, though:  "You may consider the conditions of

4   such release in assessing his ability to refrain from such

5   conduct if he were to be released from custody."

6          MS. KELLEY:  Okay.

7          MS. STACEY:  All right, and that would be fine.

8   And then on Page 22, "It is sad but true that persons

9   released from prison," again, I think that was taken --

10         THE COURT:  Yes, that was from the defendant.  So

11  how would -- what you don't want is it to just be a general,

12  you know, something like Steven Spielberg's the Minority

13  Report, that you're just going to lock up everyone you think

14  might --

15         MS. KELLEY:  You can say that.

16         THE COURT:  You know what I'm talking about?

17         MS. KELLEY:  Yes.

18         MR. GRADY:  Yes, I do.

19         THE COURT:  This is really geared towards a mental

20  disability.

21         MS. STACEY:  That's right.  And so I think maybe

22  if you take out the first two sentences and start with, "I

23  therefore instruct you, you can't conclude a sexually

24  dangerous simply because you think some crime might be

25  committed," I think that takes some of the objection out

289d4937-08e6-428a-9052-d23ac805602e

Page 141

1   of --

2           THE COURT:  Well, I might play with the wording,

3   but I'm going to do something like, "This is not about just

4   preventing recidivism.  It has to --"

5           MS. STACEY:  Right, and again --

6           MR. GRADY:  But not "sad but true."

7           THE COURT:  Yes, I'll get rid of "sad but true."

8   I might say something like, "While persons released from

9   prison sometimes commit new crimes, this fact alone is not

10  an impermissible basis -- this fact alone is an

11  impermissible basis. . ."  Anyway --

12          MS. STACEY:  And that objection is consistent with

13  the last paragraph on Paragraph 24.  Again, it's, "If you

14  find he's not sexually dangerous, he'll be released from

15  custody on supervised release --"

16          THE COURT:  So on page where?

17          MS. STACEY:  24, it's just being consistent with

18  the objection.

19          THE COURT:  Wait.  Just let me get there, let me

20  get there.

21          MS. STACEY:  Oh, sorry.  I'm a little sleep-

22  deprived.  I apologize.

23          THE COURT:  Now, what's wrong with this?

24          MS. STACEY:  I'm sorry, I'm looking at someone

25  else's notes, but I think it's just to be consistent with --

Page 142

1    we had argued that, again, you have to find sexual dangerous

2    first, and then you look at the conditions.  And so I just

3    want to make a record of the objection, that's all.

4           For the homosexual respondent, your Honor, I just

5    move to strike it.  You've done the voir dire on paper and

6    verbally at side bar.  That would be our motion.  Finally --

7           THE COURT:  Yes, do you really want that, the

8    homosexual thing?

9           MS. KELLEY:  Yes, we do.  I mean, I know we asked

10   people beforehand, but there's been a lot of testimony about

11   homosexual this or that, and I think it's important to tell

12   them that is not -- you really can't consider that.

13          MS. STACEY:  And then, finally, on Page 26, the

14   third sentence, "The question before you now is not whether

15   he committed sexual offenses in the past," that actually is

16   a question.  I mean, we've stipulated --

17          THE COURT:  I thought it was stipulated.

18          MS. STACEY:  But it's an element of a finding of

19   sexually dangerous person, so we're being required to prove

20   it, and it's stipulated --

21          THE COURT:  Well, because there's a stipulation

22   that he has.

23          MS. STACEY:  Right.

24          THE COURT:  But I could add that.

25          MS. STACEY:  And then I think we would then just

Page 143

1    ask you to take a second look at the government's proposed

2    Instruction No. 1, which was just an overview of the case.

3              THE COURT:  Is that there's a new statute and what

4    it's all about kind of thing?

5              MS. STACEY:  Right.

6              THE COURT:  You can argue it.  I mean, you can

7    just mention it.  I mean, everyone's heard it's a brand-new

8    statute.  They're probably still thinking, why me?

9              MS. KELLEY:  I know we are.  We're all wondering

10   that question.

11             THE COURT:  The thought has crossed my mind,

12   but. . .

13             MS. STACEY:  Well, when this is over -- we're

14   one-third of the way there in terms of the SDP cases before

15   this court, I think.

16             MR. SWOMLEY:  We're not back to back --

17             THE COURT:  I have another very large case coming

18   in right behind you.  So who's the next one?

19             MR. GRADY:  Peavey or Wetmore.

20             THE COURT:  We really do have to -- these people

21   are sitting in jail.  I actually do have to make sure that

22   they're heard, but I do have one that's going to come in in

23   between it, so --

24             MS. KELLEY:  We still haven't figured out

25   Mr. Wetmore's medical condition, as you know, but we're

289d4937-08e6-428a-9052-d23ac805602e

Page 144

1    working on that.

2              THE COURT:  All right, are you done?

3              MS. STACEY:  Yes, your Honor.

4              MS. KELLEY:  Okay, quickly, just to go through,

5    your Honor, we object to your not including the presumption

6    of not sexually dangerous.

7              THE COURT:  All right.

8              MS. KELLEY:  I can argue --

9              THE COURT:  For the record, I mean, I'm not going

10   to put in that.

11             MS. KELLEY:  You're not going to do it, okay, for

12   reasons, for obvious reasons, I'll just say.

13             The other thing is, in our --

14             THE COURT:  That's not part of any statute, right,

15   or case law?

16             MS. KELLEY:  No, it's not, and --

17             MR. SWOMLEY:  I tried the very first case,

18   Commonwealth V. Wyatt where Judge Brady did give that

19   instruction.  It went up on appeal, and what was sustained

20   was that you can do it either way.  You can give the

21   presumption or not.

22             THE COURT:  I misspoke.  There's no federal case

23   law or --

24             MS. KELLEY:  Even the presumption of innocence

25   isn't constitutional, but I do think it --

289d4937-08e6-428a-9052-d23ac805602e

1          THE COURT:  It isn't?

2          MS. KELLEY:  It's not in the Constitution.  Can

3    you believe it?  Because it's so -- it's such a fundamental

4    explanation to a jury of how to begin.  And in that vein, I

5    would also like to object to your not including our request

6    in the middle of our Page 17:  "The burden of proof never

7    shifts.  It's always on the government.  It's always their

8    burden."  I think that is important.

9          THE COURT:  I don't have a serious problem.  The

10   burden is always on the government?  I don't have a problem

11   with that.  Where is that?  What page is that?

12         MS. KELLEY:  It's in the middle of Page 17.

13   There's a partial paragraph, and then that's the first full

14   paragraph.

15         THE COURT:  Well, why would you have a problem

16   with that?  That's like a classic --

17         MR. GRADY:  Well, the government bears the burden

18   of proving that Mr. Shields is a sexually dangerous person,

19   but the fact that the government always bears the burden of

20   proof isn't true in a civil case.

21         THE COURT:  Well, we're not talking about Civil

22   Procedure 101.  I'm just saying, in this case, it never

23   shifts.

24         MS. KELLEY:  It can't shift if it's their burden,

25   and there's no statutory burden-shifting mechanism.

1           THE COURT:  I'm going to say, "The burden of proof

2   never shifts to the defendant."  Is that what you want?

3           MS. KELLEY:  Yes, and --

4           MR. SWOMLEY:  Any time "defendant" is used, I'd

5   rather it say "respondent."

6           THE COURT:  The respondent, fair enough.

7           MS. KELLEY:  Then with regard to "serious

8   difficulty," we had filed a supplemental proposed jury

9   instruction, including language for the Abregana case that

10  was just decided in Hawaii; and the Chief Judge there had

11  written this order in which she says, "Serious difficulty

12  does not require total or complete lack of control, but does

13  require that it must be difficult, if not impossible, for

14  the person to control his dangerous behavior."

15          THE COURT:  I'm not sure I agree, the impossible.

16  I just am not going to put in the "impossible."

17          MS. KELLEY:  Okay, well, we object to not

18  including that.

19          And then with regard to --

20          THE COURT:  The issue is serious difficulty.  I

21  mean, that's why I added your stuff, "serious" and how

22  serious "serious" is, but I'm not going to say "impossible"

23  because I think "impossible" is not a synonym.

24          MS. KELLEY:  Just note our objection to that.  And

25  on Page --

1          THE COURT:  You all know you have to preserve

2     these again after the charge, right?

3          MS. KELLEY:  Yes.  On Page 24, at the end of

4     this -- you know, we don't object to your telling the jury

5     that annual reports will be filed, he can request a review

6     of his commitment in 180 days; but I do think the jury

7     should be further alerted that, and our language would be

8     suggested, "The law does not require, however, that if he

9     requests a review, he gets one."  There is absolutely

10    nothing in the statute that guarantees that a request will

11    be honored.  In other words, there's no guarantee that

12    Mr. Shields will be released at any particular time.  The

13    confinement is potentially for life.  I think that they

14    should know there's no set into it.  And he can request a

15    review at these intervals.  The statute says nothing about

16    him getting a review or even really what it consists of.

17         THE COURT:  I don't know.  I'm not sure I agree

18    with that legal ruling, and I'm just not sure you would want

19    to take that position.  I think -- I haven't looked -- maybe

20    I can look at the statute again.  I thought once -- well,

21    maybe I -- I assumed that once he requested it every 180

22    days, I had to give it to him.  What section is it?

23         MS. STACEY:  18 U.S.C. 4247.

24         MR. SWOMLEY:  47 and 48.

25         MS. KELLEY:  (d), I believe.  I think it's in 47

Page 148

1   as opposed to 48, but I could be --

2          THE LAW CLERK:  Yes, I think (d) is hearing,

3   that's for the hearing.  (e) is periodic.

4          MS. STACEY:  Or is it 4248(d)?  I mean, my reading

5   of the statute when I read it was that they do get one if

6   they petition.

7          MS. KELLEY:  It doesn't say they get one, and it

8   doesn't say what it consists of.  It doesn't say they get a

9   new trial.

10         MS. STACEY:  But it doesn't say either way, and

11  I --

12         THE COURT:  Guys, you can talk over each other.

13         MS. KELLEY:  It's really crummy.

14         MR. GRADY:  There are two provisions at issue,

15  your Honor:  One is that the government can come at any

16  time, the director of the facility can come and tell the

17  court either they are not dangerous or there's a prescribed

18  regimen under which they can be released.  There is a

19  separate provision in 4247 that speaks to notwithstanding

20  whether the government comes forward under that provision,

21  every 180 days the respondent can come forward pursuant to

22  that provision.

23         THE COURT:  So where is it?

24         MR. GRADY:  At 4248, I want to say probably (8).

25  It will say "release" under 4248(8).  It will say "release,"

1  and then there will be a provision about the conditions of

2  release, and that directs itself to if the government comes

3  forward.

4          THE COURT:  I'm not --

5          MR. GRADY:  You're not seeing it.

6          MS. KELLEY:  Erica will see it.

7          THE COURT:  Well, I'll look at it.  I'll look at

8  it, but apart from that, I'm not going to make that ruling

9  now unless it's crystal clear because I'm not sure you want

10  that legal ruling, and I don't know that that's right, but

11  I'll just say there's no guarantee that he will ever be

12  released.  I won't --

13          MS. KELLEY:  Yes.

14          MR. GRADY:  But it would be your decision, though.

15          MS. KELLEY:  Well, it's not even clear it's her

16  decision, that she will be the one to decide it.  It's not

17  clear what court will be making the decision.  I'll shut up.

18          MR. GRADY:  If in fact what they want to argue

19  is -- right now, for all intents and purposes, it will

20  return to you.  Perhaps President Obama will see fit in his

21  wisdom to put you on the Supreme Court, and you won't be

22  here, but, you know, unless that is the case --

23          THE COURT:  So let me ask you this:  So how about

24  if I just said something like, "There's no guarantee that he

25  will ever be released"?  That would be accurate.

1         MR. GRADY:  What was it?  I'm sorry, your Honor, I

2    missed it.

3         THE COURT:  "There is no guarantee that he will

4    ever be released."

5         MR. GRADY:  But, again, that puts in, I think, the

6    prospect of lifetime commitment when in fact that's not

7    true.  The statute says he can be released if the court

8    determines by a preponderance of the evidence that there is

9    a regimen of psychiatric care under which he can be

10   released.  And, actually, you know what?  I can give you the

11   cites because you put them in your jury instructions.

12        THE COURT:  Well, we'll try and find something

13   that would create both things, which is -- let me ask you

14   this.  It did occur to me because under my constitutional

15   ruling, one of the things, if he were committed -- this is

16   reminding me of this -- you were going to try -- you have to

17   try and get it into the state system, right?

18        MR. GRADY:  There has to be some attempt to have

19   the state take custody, but if the state wouldn't take

20   custody of him --

21        THE COURT:  Right, but if they took custody, am I

22   the one who decides his viability for release, or is it

23   under the state system?

24        MR. GRADY:  I think, if the state decided it would

25   take custody of him, they'd likely have to do a recommitment

1    procedure.  I don't think the state could rely on our

2    commitment to then enforce their rules.

3                MS. KELLEY:  The states will not take these guys.

4    They won't take them under 4246.  I don't think you will end

5    up with these guys at the Bridgewater Treatment Center.

6                MR. GRADY:  The statute says we have to ask.

7                THE COURT:  You have to try.

8                MR. GRADY:  There isn't any likelihood that it's

9    going to happen, based on my knowledge.

10               THE COURT:  So as a practical matter --

11               MR. GRADY:  I will ask.  I will have BOP inquire,

12   but, by and large, the states essentially say, "Why should

13   we take on the expense of this individual if you are already

14   doing it?"  And that's been the case, not for 4248, but if

15   you were to --

16               THE COURT:  But, in any event, what I'm saying

17   inartfully is, if the state took him, would the federal

18   release provisions govern?

19               MS. KELLEY:  Yes, I think that they do in 4246,

20   but the states never take these guys.

21               THE COURT:  All right, so then I shouldn't worry

22   about it.

23               MS. KELLEY:  It's just this crazy thing they put

24   in the statute.  But then the last thing --

25               THE COURT:  So I'll say something like, "Thus,

1    while the court could release him on certain conditions once

2    he's had treatment, there is no guaranty that he will ever

3    be released."  I'm going to say something like what I could

4    do or what a court could do and that it could --

5              MR. GRADY:  At least that the statute allows

6    for --

7              THE COURT:  That the statute allows for it, if

8    he's treated.  But, anyway, I'll try and find the -- I'm not

9    as I stand here seeing the statutory section.

10             MR. SWOMLEY:  I've got a problem with that because

11   then you're inviting the jury to speculate that they're

12   going to get treatment when they go somewhere and what

13   that's going to be and that --

14             THE COURT:  It's not speculating.  I'm going to

15   order that he get treatment.

16             (Discussion off the record between the Court and

17   Law Clerk.)

18             THE COURT:  You know, actually, Ms. Kelley has an

19   excellent point that maybe she doesn't want to win on.  It

20   says "may."  "The counsel for the person may at any time

21   during such commitment file with the court."  So the court

22   isn't sua sponte doing anything, so let's say --

23             MR. GRADY:  Well, the government is required to

24   do -- on the other side of that statute, the government is

25   required to send supplemental reports on a yearly, if not

Page 153

1    every-six-month basis, to the court.

2              THE COURT:  That's fair enough, but that's

3    different from -- it doesn't say what I have to do.

4              MS. KELLEY:  No.  It's totally silent.  It doesn't

5    require -- there's no kind of due process protections after

6    somebody's committed.  It's totally up in the air.  They

7    could petition the court for forty years, and they never get

8    another hearing; not that you would ever do that, but I

9    don't think the statute mandates that you take this case

10   either.

11             MS. STACEY:  I think it does.

12             THE COURT:  It does, it does.  It says the court

13   that ordered the commitment.  That actually --

14             MS. KELLEY:  Well, then do you really want to be

15   stuck with this for the rest of your life?  No.  So I think

16   that -- so let him go.

17             THE COURT:  All right, so, in any event, I'll play

18   with some language because I think I do, now that we look at

19   the statute, it does seem as if it's not a "shall," it's a

20   "may."  And it doesn't even really address what my

21   obligations are.  Really, it's more what the petitioner's

22   options are.  And I don't -- I'm going to -- I'll do

23   something.

24             MS. STACEY:  And I think that we wouldn't have any

25   objection to something that, you know, closely mirrored the

289d4937-08e6-428a-9052-d23ac805602e

1    statute.  It's hard because it's not like this is an area of

2    the law where you've got a bunch of cases that you can say,

3    "Well, this case said this."  So I think the "may" is fine.

4    That's what the statute says.  But then the sentence saying

5    he could be in for life or he could not be in for life,

6    that's where the problem was, if you just say "he may."

7                MR. SWOMLEY:  It does say a day to life, doesn't

8    it?

9                MS. KELLEY:  It doesn't say a day to life, and the

10   truth is, there's no guarantee he will ever be released.

11   There's no end to the --

12               MR. GRADY:  You could safely say that he will be

13   released at 60 if he's committed; the guards will have

14   known, based on the testimony in this trial, that at age

15   60 --

16               THE COURT:  At age 60, it drops to zero.

17               MR. GRADY:  -- it drops to zero.

18               MS. KELLEY:  So my final request is in the very

19   last line, you say "conditions of release monitored by the

20   Maine United States Probation Office" because we didn't make

21   a distinction state probation offices and U.S. probation

22   offices.

23               THE COURT:  Maine Federal.  Okay, anything else?

24               MS. KELLEY:  No.

25               MR. SWOMLEY:  I have one thought, and it's come

289d4937-08e6-428a-9052-d23ac805602e

1    out because of the way the PPG testimony has come in in this

2    case.

3              THE COURT:  PP what?

4              MR. SWOMLEY:  PPG, penile plethysmograph.

5              THE COURT:  Right, I got some of my acronyms mixed

6    up, so I thought he -- he thought he was talking about PPGs,

7    and I'm sitting there thinking, "You did what?"

8              MR. SWOMLEY:  In state court, like the polygraph,

9    it has been ruled inadmissible.  It just doesn't come in.

10             THE COURT:  It hasn't happened in this case,

11   right?

12             MS. STACEY:  Right.

13             MR. SWOMELY:  It did not happen in this case.  I

14   know that there's no instruction here.  I would like an

15   instruction that it can't be used as -- I mean, I think you

16   said something at the time, that they cannot -- failure to

17   have submitted to or failure to have any PPG done cannot be

18   used against Mr. Shields.

19             THE COURT:  Well, if you want to draft something.

20   I'm not sure that's such a big issue in the case, but --

21             MR. GRADY:  You had earlier said to the jury that

22   there is no evidence of this in this case, and, you know,

23   there's no data and you shouldn't consider it.  I think

24   that's fine if you want to repeat --

25             THE COURT:  You might want to just leave it there.

1  It's up to you.  I'm sorry if I raised it again.  I just

2  thought the acronym he was referring to was back to that

3  other test.

4            MS. KELLEY:  I did too.  Could I just say one

5  other thing?  I don't want to embarrass him.  He is hard of

6  hearing.

7            THE COURT:  Oh, is that it?

8            MS. KELLEY:  So he cannot hear you.  I'm yelling

9  at him over there, but he has a difficult time hearing,

10 so --

11           THE COURT:  It's a good thing Mr. Grady wasn't

12 doing the --

13           MR. KELLEY:  He said he never heard a word out of

14 this guy's mouth the whole trial.  So that's why he keeps

15 asking you to repeat things.

16           THE COURT:  You know what?  Ask him.  I've had

17 this happen with other witnesses.  Just say, "Do you have

18 some trouble hearing?" so that it doesn't become a matter

19 that they'd factor into on credibility.

20           MS. KELLEY:  Right, it seems like he's asking her

21 to repeat a lot of questions, and it seems like he -- I

22 don't know what it seems like, but, anyway, that's why he's

23 doing it.  He's hard of hearing.  He should wear a hearing

24 aid, but he doesn't.

25           THE COURT:  I will either tell them that, or you

1    can ask it.

2             MS. KELLEY:  Okay.

3             THE COURT:  I think, truthfully, it should come

4    out because sometimes people factor that into a credibility

5    assessment that he seems to be dragging his heels answering

6    something.

7             MS. KELLEY:  Exactly.  That's what I thought.

8             THE COURT:  Fair enough.  Anything else?  Anyone

9    have a problem with the verdict form?

10            MS. KELLEY:  The verdict form looks good.

11            MR. GRADY:  No.

12            THE COURT:  All right, any problem -- not problem,

13   but how long will your closing be?

14            MR. GRADY:  Under thirty.

15            MS. KELLEY:  You'd better stay --

16            MR. GRADY:  I wanted to say an hour.  I just don't

17   know whether that -- that would be, I think, what would be

18   needed here.

19            THE COURT:  I don't have a problem with an hour.

20   Just at some point they stop listening.  It's just that

21   simple.

22            MR. SWOMLEY:  I know.

23            THE COURT:  At some point they stop listening.  So

24   I'm good with the hook, all right?

25            MS. KELLEY:  I've noticed that about you.

1          THE COURT:  So at fifty-five minutes I'll give you

2     a five-minute warning, so I will save you from yourself,

3     okay?  So an hour you've got, but it will be a true hour.

4     And if you want an hour, you can have an hour, or you can do

5     a half an hour.

6          MR. GRADY:  Okay.

7          THE COURT:  Because this is a civil case and not a

8     criminal case, the party with the burden of proof goes last,

9     and so that's how we will do it.

10         MS. KELLEY:  Have you ever argued first,

11    Mr. Swomley?

12         MR. SWOMLEY:  Yes, in all these cases.

13         MR. GRADY:  He's started a lot of arguments, Page.

14         THE COURT:  And so then I will send them out.  And

15    a few things you all have to think about, because I've been

16    trying to, having never done one of these before, is "what

17    ifs."  So if the jury comes back for you, you would probably

18    want an opportunity to argue in front of me.  And,

19    similarly, if it comes in for you, you might want an

20    argument in front of me.  But it should be a pretty fast

21    turnaround, particularly if they win, because there is a

22    liberty interest.  I likely, even if he won and even if I

23    ruled off the bench, wouldn't release him immediately

24    because I would want to make sure that there were all these

25    things in place in Maine, so --

1        MR. SWOMLEY:  He really wants to be put back in

2    Pharos House so that he can earn the money so that he can

3    get --

4        MS. KELLEY:  And I talked with -- can we just say,

5    in the "what if" category, he does not need to -- if by some

6    miracle we win this case with the jury and your Honor agrees

7    with them, just this big "what if," he does not want to walk

8    out of here.  He wants Dan Kelly to help him find a place.

9    He would love the Pharos House.  There are some other places

10   too.

11       THE COURT:  My only point is, so he doesn't have

12   any false expectations, nothing is happening on Monday other

13   than I am going to schedule some other date upon which

14   everybody can make an argument.

15       MS. KELLEY:  Well, he is fine with that.

16       MR. SWOMLEY:  He's already fully apprised of that,

17   and that's what he wants.

18       THE COURT:  Soon thereafter, because otherwise I

19   forget.  I mean, it comes with age.  I mean, I now sort of

20   am on top of the facts, but I won't be in a month.  So I'll

21   hear oral argument.  I'll probably ask Lee, you know, I

22   might for a rough draft of at least some of the testimony.

23   And I think I either orally or in writing have to make my

24   own fact findings, I actually think.

25       MS. KELLEY:  Well, his big nightmare is to be

289d4937-08e6-428a-9052-d23ac805602e

1   homeless.  He doesn't want to be homeless, so --

2          MR. GRADY:  Can we get back to the issue of the

3   case?

4          MS. KELLEY:  Yes.

5          MR. GRADY:  There are a few issues.  One, he can't

6   be released, or the government would ask the Court not

7   release him, even if he were found not responsible and the

8   court then itself found he were not sexually dangerous,

9   because the government would like an opportunity of perhaps

10  seven days to seek appeal.  If in fact he is released, the

11  case moves out.  He can no longer be held under the Adam

12  Walsh Act because it only applies to a person in the custody

13  of BOP, and that's why --

14         THE COURT:  Say this again now?

15         MR. GRADY:  Sure.  The statute only applies to

16  individuals in the custody of the BOP.  If he were released

17  by this Court, that's the end of the case.  We couldn't even

18  win on appeal, if we wanted to, because he's no longer

19  subject to the statute once released.

20         THE COURT:  I don't know what team you have

21  downstairs, but here's my -- it's not going to happen right

22  away.  I don't play the game that way.  It will be within a

23  week or two.  And I'll allow you to prepare.  Maybe you want

24  a transcript of a little piece of it the way I do.  She's

25  going to be in the middle of a monster civil case, so it

289d4937-08e6-428a-9052-d23ac805602e

1   can't happen right away.  It just can't happen right away.

2   And I'm glad he knows that because I wouldn't want that

3   sense of utter frustration if he wins.

4           I will give the jury verdict a huge amount of

5   weight.  I think it's a very, very difficult case, which

6   maybe all of them are like this, but it's my first.  So all

7   you have to do is file a notice of appeal, right?

8           MR. GRADY:  Well, I just wouldn't want him let out

9   the door, at which point then the notice of appeal is

10  useless because --

11          THE COURT:  I understand that, but it's not such a

12  big deal.  You file a notice of appeal.  Do what you need to

13  do with the Solicitor General, start the process, if that's

14  what you think you're going to do.

15          MR. GRADY:  Oh, we're, you know, we're prepared

16  for the -- like having an umbrella.

17          THE COURT:  Excuse me?

18          MR. GRADY:  Well, it keeps it from raining if you

19  carry an umbrella.  We're prepared for the eventuality of

20  losing.

21          THE COURT:  I don't know what's going to happen.

22  I think it's been -- I will say this before we go:  I think

23  it's extremely well litigated.  And I am a little bit

24  worried about the long-term repercussions of this case

25  because I actually do believe what Dr. Rypma said, which is

1  there are two distinct groups of psychiatrists who bookend

2  each other.  And I very much -- maybe you didn't love it --

3  respected Dr. Plaud, who in the most uneasy way possible

4  went against what he usually does.  But how am I supposed to

5  in the future deal with this court-appointed expert concept?

6  I can't pick either of your staples, really.  I mean,

7  it's -- I don't know what I'm -- I may be back to where

8  Judge Wolf is.  I don't know what I do in the future.

9           MS. KELLEY:  This has been so crazy because in our

10  office, this fellow Barry Mills that Judge Wolf chose has

11  cleared everyone, and the defense-chosen experts in Tim

12  Watkins' cases have not cleared his guys.  So you're in this

13  odd position where you're picking an expert, and honestly we

14  didn't know if Dr. Rypma was going to clear him or not

15  before we picked him.

16           THE COURT:  I'm simply saying it's -- well, I was

17  thinking long-term when I heard his testimony because I do

18  think that at least when they testify, Tomich always

19  testifies, when he's actually testifying, as opposed to, you

20  know, preliminary reviews, testifies for the government, and

21  Rypma and Plaud typically testify for the defense.  So

22  what's a judge supposed to do?  How do I pick somebody?  I

23  don't know.  I could pick someone out of the blue.  I could

24  go back to Dr. Mills, but you people -- you know, I don't

25  know what I do.  It may be worthwhile asking the Federal

1    Judicial Center to put together a list of experts who --

2            MR. GRADY:  We tried that, and it didn't get very

3    far.

4            MS. KELLEY:  You can't find them because the whole

5    field is so polarized over whether you can actually do this

6    or not.

7            MR. GRADY:  I think that's not the polarization

8    because Dr. Plaud would then never have come back dangerous.

9            THE COURT:  I have never seen someone testifying

10   more reluctantly and uneasily, his words, both of them, I

11   think, with double negatives.  That was very helpful

12   actually to me, and maybe to the jury, because he was not

13   completely helpful to either side here.  But put that aside,

14   it's late on a Friday, but on a systemic basis, I don't know

15   what we do.

16           MS. KELLEY:  Yes, it's a mess, I agree.

17           THE COURT:  How I jointly -- you two will never

18   agree on anyone probably.

19           MR. GRADY:  I think it has to be adversarial

20   because I don't think there's many, if we do find some; and

21   then if they go a particular way, those first three or four,

22   then either side would stop agreeing.

23           MR. SWOMLEY:  I think what it's illustrative of

24   is, there is really no professional certainty in this field,

25   period.

289d4937-08e6-428a-9052-d23ac805602e

Page 164

1              THE COURT:  Thank you, Mr. Swomley.  Have a lovely

2      weekend.

3              (Adjourned, 3:15 p.m.)

4                    C E R T I F I C A T E

5

6

   UNITED STATES DISTRICT COURT )
7  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
8

9

10             I, Lee A. Marzilli, Official Court Reporter, do

11     hereby certify that the foregoing transcript, Pages 1

12     through ^  inclusive, was recorded by me stenographically at

13     the time and place aforesaid in Civil Action No.

14     07-12056-PBS, United States of America V. Jeffrey Shields,

15     and thereafter by me reduced to typewriting and is a true

16     and accurate record of the proceedings.

17             In witness whereof I have hereunto set my hand

18     this 9th day of October, 2008.

19

20

21

22

23
              /s/ Lee A. Marzilli
24            _____
              LEE A. MARZILLI, RPR, CRR
25            OFFICIAL COURT REPORTER

289d4937-08e6-428a-9052-d23ac805602e