```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                              )
                 Petitioner   )
                              )
           -VS-               ) CA No. 07-12056-PBS
                              ) Pages 1 - 145
JEFFREY SHIELDS,              )
                              )
                 Respondent   )
```

JURY TRIAL - DAY EIGHT

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
September 15, 2008, 9:15 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2        MARK J. GRADY, ESQ. and EVE A. PIEMONTE-STACEY, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the Petitioner.
4
         PAGE KELLEY, ESQ, Federal Defenders,
5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
     for the Respondent.
6
         JOHN G. SWOMLEY, ESQ. Swomley & Associates,
7    227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
     for the Respondent.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3   Craig B. Rypma                5        28         49

4

    EXHIBITS         FOR IDENTIFICATION    RECEIVED IN EVIDENCE
5

6   Petitioner

7   39 and 40                                     50

8

9                                             PAGE

10
    CLOSING ARGUMENT BY MR. SWOMLEY:            53
11  CLOSING ARGUMENT BY MR. GRADY:              87
    CHARGE BY THE COURT:                        116
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2          THE COURT:  Hi.  Good morning.  The last juror

3    just got in a few minutes ago, and we got this question.

4    Did you both read it?

5          MS. KELLEY:  Yes.

6          MR. GRADY:  Yes.

7          THE COURT:  So are you going to ask it, or should

8    I?

9          MS. KELLEY:  I think we can cover that in

10   redirect.

11         THE COURT:  Okay.  So you want me to leave it up

12   to both of you?

13         MS. STACEY:  Yes, I don't intend, I mean --

14         THE COURT:  Did you see it, Dr. Rypma, this

15   question?

16         THE WITNESS:  Yes.  I didn't read it, but I heard

17   what it was.

18         THE COURT:  Okay, let's bring the jury in.  You

19   have what, another how long?

20         MS. STACEY:  I was about two-thirds through.  I

21   have no idea how long I went on Friday, but I was two-thirds

22   through.

23         THE COURT:  Yes, but we're going to want to get

24   this to them by 11:00, so --

25         MS. STACEY:  I think I can definitely be done by

1   10:00, maybe even sooner.

2           THE COURT:  Sooner, like half an hour and half an

3   hour?

4           MS. KELLEY:  Okay.

5           THE COURT:  I just have a logistical issue, which

6   is, unfortunately, I have to be at a funeral tomorrow, so I

7   need to get it to them today.

8           MS. KELLEY:  I don't think we'll have any problem.

9           THE CLERK:  All rise for the jury.

10          (Jury enters the courtroom.)

11          THE COURT:  Good morning.

12          THE JURY:  Good morning.

13          THE COURT:  Did anyone see anything in the press

14  about this case or discuss it?  Thank you.

15          We're going to be finishing up this witness today.

16  And as I mentioned to you before, this is a long day, so

17  we're going to be providing lunch for you.  Oh, there was

18  two jury questions which I've shared with the attorneys, who

19  will be asking the questions.

20                  CRAIG B. RYPMA

21  having been previously duly sworn, was examined and

22  testified further as follows:

23  CONTINUED CROSS-EXAMINATION BY MS. STACEY:

24  Q.   Now, Dr. Rypma on Friday you testified that you took

25  age into consideration when assessing Mr. Shields's risk of

1   reoffending; is that correct?

2   A.   That's correct.

3   Q.   And you are aware of research about child molesters who

4   molest children outside of the family, showing that they

5   show relatively little decline in recidivism risk until

6   after the age of 50?

7   A.   I am aware of some research that says that, yes, ma'am.

8   Q.   And you're also aware that when Mr. Shields reoffended

9   with a child pornography offense that contained images of

10   prepubescent children, he was 41?

11   A.   Would you repeat that question, please?

12   Q.   You are also aware that when Mr. Shields reoffended in

13   2002 with the child pornography offense that contained the

14   images of prepubescent children, he was 41?

15   A.   I'm aware of his age, and I'm aware that there may have

16   been some prepubescent images, yes, ma'am.

17   Q.   Now, in your report you refer to dynamic factors,

18   including intimacy deficits and social support, as factors

19   that you took into consideration in assessing Mr. Shields's

20   risk of reoffending, right?

21   A.   That's correct.

22   Q.   And you gave Mr. Shields credit for being able to

23   discuss his offense history, didn't you?

24   A.   I did.

25   Q.   And you gave Mr. Shields credit for being able to

1   describe his ideal relationship with -- I'm sorry -- of

2   mature goals, right?

3   A.   Yes.

4   Q.   And you have no way of knowing whether Mr. Shields was

5   telling you the truth, do you?

6   A.   I thought he was telling the truth, but I didn't have

7   polygraph information, that's correct.

8   Q.   But you did have other records before you that showed

9   everything Mr. Shields was telling you wasn't the truth,

10  right?

11              MS. KELLEY:   Objection.

12              THE COURT:   Overruled.

13  A.   I am not sure that I had records that indicated to me

14  that he was lying.  I had records that indicated some what I

15  ultimately thought were relatively minor points that he

16  either didn't include by omission or misreported, but I

17  don't think that that was an indication of his dishonesty.

18  Q.   Now, you testified on Friday that one of Mr. Shields's

19  goals was to reunite with his brothers, from whom he had

20  been estranged, correct?

21  A.   Correct.

22  Q.   And you testified on Friday that Mr. Shields told you

23  he last saw his brother at his mother's funeral.  Do you

24  recall that testimony?

25  A.   Yes, I do.

1  Q.   And you know that that's not true, don't you?

2  A.   That he last saw his brother?

3  Q.   At his mother's funeral.

4  A.   I don't recall.

5  Q.   You were here for the testimony of Dr. Graney when she

6  testified that he was in prison at the time of his mother's

7  funeral.  Do you recall that?

8  A.   That's correct.

9  Q.   And you had records before you, Dr. Graney's treatment

10  records, that talked about ways that they would have a

11  mock -- have a ceremony in her Honor in prison at the time

12  of her funeral, correct?

13  A.   All right, I -- I think perhaps I misspoke because the

14  contact he had, I think, was telephonically.

15  Q.   Well, you know that the relationship between

16  Mr. Shields and his brother was so strained that he wouldn't

17  even write a letter to be read at his mother's funeral

18  because he didn't think his family would do it, correct?

19            MS. KELLEY:  Objection.

20            THE COURT:  Sustained.

21  Q.   Did you see the records before you in Dr. Graney's

22  treatment records that indicated she suggested to

23  Mr. Shields that he should write a letter to be read at his

24  mother's funeral?

25  A.   I do recall that, yes.

1   Q.   And that Mr. Shields said to Dr. Graney, "I don't think

2   they'll even do it"?

3   A.   I do recall that, yes, or something along that line.  I

4   don't recall those exact words, but I do essentially recall

5   reading it.

6              MS. STACEY:  May I approach?

7              THE COURT:  Yes.

8   Q.   "It was suggested yesterday he could write something to

9   be read at the funeral.  However, he noted he had a strained

10  relationship with his family, and he did not feel the family

11  would do that for him."  Did I read that correctly?

12  A.   You did, but I'm not sure if that's exactly how I heard

13  your question.

14  Q.   Okay.  And, Dr. Rypma, just so that everyone's clear, I

15  was informed on Friday -- do you have difficulty hearing?

16  A.   I do have a slight hearing impairment, yes, ma'am.

17  Q.   So if you don't hear a question, please ask me --

18  A.   I will.  Thank you.

19  Q.   Now, you also gave Mr. Shields credit for a support

20  system that included a Mr. Woodsome and a Mr. Kreamer.  Do

21  you recall that in your report?

22  A.   Yes, I do.

23  Q.   And you don't know who those people are, do you?

24  A.   I have not talked with those people, no, ma'am.

25  Q.   Okay.  It's fair to say, Mr. Shields could have just

1   given you two names?

2   A.   He could have, I suppose, but I also saw those names in

3   other places, I think.

4   Q.   Ms. Moore, his case manager at Pharos House, didn't

5   know those two individuals, did she?

6   A.   I don't believe she did, no.

7   Q.   Now, another thing that you look to when assessing risk

8   of reoffending is something called general self-regulation;

9   is that right?

10   A.   Correct.

11   Q.   And that's an inability to follow through with stated

12   plans?

13   A.   Correct.

14   Q.   And you have evidence that Mr. Shields planned to go to

15   sex offender treatment and did not; is that right?

16   A.   Previously, yes, that's right.

17   Q.   And you know that he reoffended after attending sex

18   offender treatment two times; is that right?

19   A.   I am aware of that, yes, ma'am.

20   Q.   And you have evidence that he is not following through

21   with the stated plans to stay away from the restaurant

22   business by going into the restaurant business; is that

23   right?

24   A.   Yes, but I'm not sure that those factors -- I think it

25   would be unfair to characterize those as being relevant to

1    the dimension of general self-regulation.

2    Q.   But you don't mention that in your report.  You don't

3    say, "These are some failed plans, but they're not relevant

4    to the analysis," do you?

5    A.   I typically don't put things I feel are not relevant

6    into my report.  That's correct, they were not in my report.

7    Q.   Now, cooperation with supervision is another risk

8    factor; is that right?

9    A.   Correct.

10   Q.   And the records that you had showed that Mr. Shields

11   reoffended many times before while on supervision; isn't

12   that so?

13   A.   That's correct.

14   Q.   And you're aware of research that says, if you violate

15   while you're out on supervision, that's a factor that can

16   increase recidivism; isn't that right?

17   A.   That is a factor that is listed on the actuarials, yes.

18   That is one of the ones that load higher than the others.

19   Q.   Now, that research, that violating while out on

20   supervision is one factor that may increase recidivism,

21   that's not in your reports, is it?

22   A.   I mention failure of supervision in my report, yes.

23   Maybe I'm not understanding your question.

24   Q.   The research that says it's a factor for increased

25   recidivism is not in your reports, is it?

1   A.   I think that's correct, yes.

2   Q.   Now, Mr. Shields told you, I believe you testified on

3   Friday, that he no longer has poorly controlled sexual

4   habits, right?

5   A.   That's correct, he did tell me that.

6   Q.   And sexual self-regulation is another dynamic factor

7   that you looked at?

8   A.   It is.

9   Q.   Now, you told Mr. Shields that whatever he was telling

10  you would be put into a report for this Court, right?

11  A.   That's correct.

12  Q.   And he was told that the report would be provided in

13  these proceedings, right?

14  A.   That's correct.

15  Q.   And he was told that the results of your evaluation

16  could influence the proceedings, right?

17  A.   Yes.

18  Q.   And he was aware that the proceedings were to determine

19  whether or not Mr. Shields was a sexually dangerous person,

20  right?

21  A.   That's correct.

22  Q.   And he knew that was the question that would be asked

23  in this case, whether or not Mr. Shields --

24            MS. KELLEY:  Objection.

25  Q.   -- was a sexually dangerous person, correct?

1        THE COURT:  Overruled.

2   A.   Yes, he knew that.

3   Q.   And so he had absolutely no incentive to tell you he

4   was still sexually attracted to children, did he?

5   A.   Uhm, I don't know that the fact that I had given him

6   the information that things he said would be repeated in

7   court necessarily would impact the quality of information he

8   provided.  I was struck by the fact that he did admit to

9   things that he had not been convicted of, and I took that

10  factor into account I think more than the point that you're

11  raising.

12  Q.   And he lied about things that he was convicted of as

13  well, right?

14  A.   I'm not sure that he lied about things.

15  Q.   Well, theft by deception, do you recall that testimony

16  on Friday?

17  A.   I do.

18  Q.   He told you the charges were dismissed, and in fact he

19  had pled guilty and served a sentence for those?

20  A.   Yes, but, ma'am, I guess where I am --

21  Q.   Is that correct, Dr. Rypma?

22       MS. KELLEY:  May he --

23       THE COURT:  Sustained.  He can answer.  Go ahead.

24  A.   I guess where I am differing with you is your

25  suggestion that he was lying about that.  I mean, it seems

1    to me that you can pick a little point like that about

2    some --

3            THE COURT:  Well no, excuse me, excuse me.  You

4    can explain, but you can't --

5    Q.   On Friday, Dr. Rypma, you testified he lied, correct?

6            MS. KELLEY:  Objection.

7            THE COURT:  Did you?  I don't remember.

8    A.   I don't remember either.  If I said that, then I

9    misspoke then on Friday because I don't think that he was

10   being dishonest with me in providing answers.  I think there

11   were some memory issues from trying to remember things years

12   ago.  I think that there were some instances where he

13   reported two charges, and what he meant was that he had pled

14   to two counts of something.

15   Q.   And where did you get that information, Dr. Rypma,

16   information that you're giving me today that you did not

17   testify to on Friday?

18   A.   Yes, that piece of information?

19   Q.   Yes.

20   A.   Yes, I went back and looked at the records.  I asked

21   Ms. Kelley about the number of check charges because I was

22   concerned because I had remembered that he had said two

23   charges, and then I got to looking at the information and

24   realized that -- I think what happened was that he reported

25   two counts, he reported two charges as two counts, not being

1   an attorney and not understanding the terminology.   I

2   believe that's what happened.

3   Q.   So, Dr. Rypma, after your testimony on Friday, you went

4   back and reviewed the records for a couple of days?

5   A.   Well, I didn't review them for a couple of days.   I

6   reviewed them for --

7   Q.   You spoke with the attorneys over the weekend?

8   A.   I did, yes.

9   Q.   And you spoke with them again this morning in fact in

10  preparing for your testimony today, didn't you?

11  A.   Not substantially, no.   I did have interaction with

12  them, but I did not meet with them this morning, no.

13  Q.   Now, on Friday you testified that the Static-99, you've

14  used that because it's state of the art; is that right?

15  A.   I did say that, yes, ma'am.

16  Q.   You are aware of the Association of Treatment for

17  Sexual Abusers?   Are you aware of that?

18  A.   I'll sorry, am I aware of the organization?

19  Q.   Yes.

20  A.   Yes.

21  Q.   And you're aware of their position that to most

22  accurately evaluate the risk of sexual violence, the

23  evaluator should include the best available actuarial

24  instruments?

25  A.   I'm aware of that, yes, ma'am.

1   Q.   And you're aware of the position of ATSA, the

2   Association for Treatment of Sexual Abusers, that actuarial

3   tools should be used in a meaningful risk assessment?

4   You're aware of that?

5   A.   I am aware of that, yes, ma'am.

6   Q.   And you testified on Friday that these actuarial tools

7   actually overestimated risk.  Do you recall that testimony?

8   A.   I do.

9   Q.   And you're aware of ATSA's position that the vast

10  majority of sex offenses are unreported and undetected, so

11  as a consequence, all methods of assessing the risk of

12  future sex offenses rely on rearrests, reconvictions, and

13  produce substantial underestimates of risk?  You're aware of

14  that?

15  A.   That mischaracterizes my testimony on Friday, ma'am.

16  Q.   So now you're saying that the actuarial instruments

17  underreport?

18  A.   I'm saying that they overreport.

19  Q.   That's right, and you're aware of the ATSA position

20  that says they underestimate, correct?

21  A.   But I think there's been substantial information to the

22  contrary, and --

23  Q.   Dr. Rypma, my question is, are you aware of the

24  research that says they underestimate risk?  It's yes or no.

25  A.   That they underestimate risk?

1   Q.   Yes.

2   A.   No.

3          MS. STACEY:  May I approach?

4          THE COURT:  Well, you can, but we've gone over

5   this three times.

6          MS. STACEY:  Okay, then I'll move on.

7   Q.   You have diagnosed Mr. Shields with pedophilia,

8   Dr. Rypma?

9   A.   I have.

10   Q.   It is a serious mental disorder or abnormality?

11   A.   Yes.

12   Q.   Pedophilia is a chronic condition?

13   A.   According to the DSM, that's correct.

14   Q.   And on your report, your first report, Page 12, you

15   stated, "Thus, Mr. Shields qualifies as a sexually dangerous

16   person according to statutory criteria," didn't you?

17          MS. KELLEY:  Objection.  This is incorrect.  Can

18   we be seen at side bar?

19          THE COURT:  Yes.

20          MS. KELLEY:  This is so misleading.

21   SIDE-BAR CONFERENCE:

22          MS. STACEY:  I move to strike.  This is so

23   misleading.

24          THE COURT:  Yes, I strike that comment.

25          MS. KELLEY:  If I may, this is going to take so

1   much time now to clear up.  He was given the proposed

2   regulations, which are a model of confusion and say that if

3   you suffer from a mental disease or disorder, you are a

4   sexually dangerous person, and then you have to decide if

5   because of the mental disease or disorder you're going to

6   have serious difficulty.  And he concluded in his report

7   under the regs he was sexually dangerous and then concluded

8   he was not going to -- he did not pose a substantial risk of

9   reoffending.

10          MS. STACEY:  My next question, have you concluded

11   that yet --

12          MS. KELLEY:  That is totally from a semantic

13   misunderstanding of the regs.

14          THE COURT:  Excuse me, excuse me, excuse me.  What

15   you need to say is, just so apparently if he later qualifies

16   this, it may be a misunderstanding but if it doesn't include

17   refraining -- excuse me.  So you shouldn't ask it this way

18   if it isn't including the prong of refraining from.

19          MS. STACEY:  And I don't know that, so then my

20   next question is, yet is your opinion that --

21          THE COURT:  No.  That is misleading if he then

22   bumps away from the third prong.

23          MS. KELLEY:  If I may --

24          THE COURT:  Excuse me.  You can ask about it

25   because it's in the report, but ask it as an open question.

1    In other words, "What did you mean by that?" or something

2    like that, or "You called him that," but it's really --

3                MS. KELLEY:  If I may just say one thing, your

4    Honor.  At the deposition they questioned him about this.

5                MS. STACEY:  I was not at his deposition.

6                MS. KELLEY:  Well, you have the transcript,

7    Ms. Stacey.

8                THE COURT:  Excuse me.  It's in his report.  She

9    can ask him.  That having been said, if it's misleading,

10   I'll jump all over it.

11               (End of side-bar conference.)

12   Q.   Dr. Rypma, in your report you stated that Mr. Shields

13   qualified as a sexually dangerous person according to

14   statutory criteria, correct?

15   A.   Yes.

16   Q.   What is it that you meant by that?

17   A.   What I meant by that is that I was looking at the

18   statute -- and this is the first time, of course, I've seen

19   the federal statute -- as if there were two criteria:  One

20   was whether or not he qualified with a mental abnormality,

21   and the second being whether or not he had serious

22   difficulty as a result of that controlling himself.  So what

23   I meant by that statement was, since he qualified for the

24   diagnosis of pedophilia, he qualified for one of the prongs;

25   but then I went on to explain that it's my position that he

1   does not have serious difficulty controlling his sexual

2   behavior.

3   Q.   And it's your opinion that Mr. Shields does not pose a

4   serious risk for predatory sexual violence; is that right?

5   A.   That's correct.

6   Q.   He poses some risk?

7   A.   Yes, I would say he poses some risk.

8   Q.   Now, you went back to interview Mr. Shields a second

9   time on August 18, 2008; is that correct?

10  A.   Correct, yes.

11  Q.   And you testified on Friday that you went back to see

12  him a second time because, in your professional opinion, and

13  I'm paraphrasing, in your professional opinion, you thought

14  it deserved a second interview to make sure he was

15  presently -- to determine whether he presently was a

16  sexually dangerous person; is that right?

17  A.   Correct.

18  Q.   And your report says you went back a second time at the

19  request of Mr. Shields's attorneys, doesn't it?

20  A.   It may say that, yes.

21  Q.   Now, one of the areas of inquiry that you reviewed with

22  Mr. Shields when you went back the second time was the

23  offense involving the 6-year-old boy.  Do you recall that?

24  A.   Yes, I do.

25  Q.   And you stated in your report that there was no

1  significant change from what you reported in the first

2  report.  Do you recall that?

3          (Witness examining document.)

4  A.   Yes, I did say that.

5  Q.   Knowing what you know now about the facts of the

6  6-year-old offense, would you change your opinion that what

7  he reported to you, a pat on the buttock, is significantly

8  different from what happened with the 6-year-old boy?

9  A.   Yes.

10 Q.   Now, Dr. Rypma, you haven't provided Mr. Shields with

11 sex offender treatment, have you?

12 A.   I have not.

13 Q.   And you gave credit to Mr. Shields for his sobriety for

14 a number of years; is that right?

15 A.   Yes.

16 Q.   And you're aware that he was sober in 2002 when he

17 committed the child pornography offense?

18 A.   I think I recall that, yes.

19 Q.   Was your testimony on Friday that he has been ten years

20 sober?

21 A.   Yes.

22 Q.   So ten years sober would be since 1998; is that

23 correct?

24 A.   Approximately, yes, ma'am.

25 Q.   So in 2002, to the best of your knowledge --

Page 22

1    A.    Yes, that's right.

2    Q.    -- Mr. Shields was --

3    A.    To the best of my knowledge, that's correct, yes.

4    Q.    -- was sober in 2002 when he committed this child

5    pornography offense?

6    A.    Correct.

7    Q.    Now, after seeing Mr. Shields a second time, your

8    diagnosis of pedophilia remained; is that right?

9    A.    Yes, ma'am.

10   Q.    And your opinion is that presently Mr. Shields doesn't

11   have difficulty refraining from sexually violent conduct; is

12   that right?

13   A.    That's correct.

14   Q.    And you're aware of research that suggests prior

15   convictions are found to be significant predictors of

16   recidivism, right?

17   A.    Yes.

18   Q.    And you're aware of research that suggests child

19   molesters, and especially if those victims were male, are at

20   a higher risk of committing new offenses, correct?

21   A.    In general, that's correct, yes, ma'am.

22   Q.    And you're aware of research that says child

23   pornography offenders who ever committed a contact hands-on

24   sexual offense were most likely to reoffend, correct?

25   A.    In one study that we talked about on Friday, that's

1    correct, I'm aware of it from the Seto 2005 study.

2    Q.   You know that whether Mr. Shields will have serious

3    difficulty refraining from child molestation can change,

4    right?

5    A.   I suppose it can change.

6    Q.   Well, that was the basis of your going back in August,

7    wasn't it, to see if it had changed?

8    A.   Yes.

9    Q.   And that was five months after you first saw him,

10   correct?

11   A.   Correct.

12   Q.   Now, Dr. Rypma, you've never written a peer-reviewed

13   article regarding sex offenders, have you?

14   A.   That's correct.

15   Q.   And you've not conducted research on sex offenders,

16   have you?

17   A.   That's correct.

18   Q.   And you've never served on a peer-review board, have

19   you?

20   A.   That's correct.

21   Q.   You've done sexually violent evaluations before,

22   correct?

23   A.   Yes.

24   Q.   And in all of those times, you've testified for the

25   defense; is that right?

1   A.   Yes, ma'am.

2   Q.   Now, Mr. Shields in your supplemental report,

3   Mr. Shields said his capacity for cooperation is most

4   evident when seen from how he behaved following his release

5   from prison in 1993.  Do you recall mentioning that?

6   A.   Yes.

7   Q.   And you had records before you about his behavior in

8   1993, didn't you?

9   A.   Yes.

10  Q.   And you had Bangor Police Department records involving

11  the investigation of the 2002 child pornography offense,

12  didn't you?

13  A.   Yes.

14  Q.   And you were aware that in 1993, a 13-year-old boy

15  named PS met Mr. --

16              MS. KELLEY:  Objection.

17              THE COURT:  Why don't you talk to her for a

18  minute.

19              MS. STACEY:  Bates 00641.

20  Q.   And you're aware that --

21              THE COURT:  No.  Wait till she gets there.

22              MS. STACEY:  Oh.

23              MS. KELLEY:  Can we be seen at side bar?

24  SIDE-BAR CONFERENCE:

25              MS. KELLEY:  I don't know what this is.

1          THE COURT:  What are you going to ask?

2          MS. STACEY:  I'm going to ask, it's about four or

3     five questions where according to this police report, which

4     is part of the child pornography investigation, the

5     investigator goes out --

6          THE COURT:  You know what, I'm not a speed reader.

7     I can't even figure out what it is.  So just let me read it,

8     okay, just two seconds.

9          (Pause.)

10         THE COURT:  Well, isn't this hearsay that I said

11    couldn't come in?

12         MS. STACEY:  Well, I'm not offering the report,

13    but he didn't even ask him about any of these offenses.

14         MS. KELLEY:  I'd like to move for a mistrial at

15    this point.

16         THE COURT:  No.  That's ridiculous.

17         MS. STACEY:  I didn't even get the question out.

18         THE COURT:  That's ridiculous.  On the other hand,

19    I think you need to put this under his face, let him read

20    it, and if he didn't ask him about it, you're not going to

21    ask him any questions.  You're not going to insert those

22    issues.  So if defendant affirmed it, then it comes in.  If

23    he didn't affirm it, you're not even going to ask him about

24    it.

25         MS. STACEY:  The problem I'm having, your Honor,

1    is, Mr. Shields is being allowed to tell his story without

2    testifying.

3              THE COURT:  Excuse me.  I and Judge Collings made

4    certain rulings about hearsay within police reports.  I've

5    never seen this before, all right?  This must have been one

6    of the ones he deleted out, so it doesn't come in.

7              MS. STACEY:  Okay.

8              THE COURT:  So unless he asked about it and

9    Mr. Shields affirmed it, it's inadmissible hearsay and will

10   not be put before this jury.

11             MS. KELLEY:  May I just say, I think to even ask

12   this much in front of the jury, this is such trial by

13   innuendo.

14             THE COURT:  Overruled.  Just put it in front of

15   him.  If he's never seen it before --

16             MS. STACEY:  I just want the record to note --

17             (End of side-bar conference.)

18   Q.   Dr. Rypma, I'm showing you a Bates-stamped document for

19   identification, Bangor Police Department report, Bates

20   No. SH00641.  Have you seen that report before?

21   A.   I don't recall seeing this.

22   Q.   Did you ask -- and I'll ask you to --

23   A.   Can I have a second to look at it?

24   Q.   That's what I was going to ask.  Thank you.

25             (Witness examining document.)

1    A.    Okay, I have not seen this before, no.

2    Q.    It was within the universe of documents that you were

3    given to review, though, wasn't it?

4    A.    It may have been, yes.  If it was Bates stamped, it was

5    given to me.

6    Q.    So you didn't ask Mr. Shields about any of the

7    allegations in that document?

8    A.    I did not.

9    Q.    And Mr. Shields didn't --

10               MS. KELLEY:  Motion to strike.

11               THE COURT:  Overruled.  We're moving on.

12               MS. STACEY:  Can I ask him one more question?

13               THE COURT:  No.

14               MS. KELLEY:  Can we have an instruction to the

15   jury on this?

16               THE COURT:  It's not admissible.  He didn't see

17   it.  He didn't ask about it.  It's hearsay.

18   Q.    Now, when Mr. Shields said to judge him by his behavior

19   after 1993, Mr. Shields sexually reoffended after 1993,

20   didn't he?

21   A.    He did.

22   Q.    And he had a number of probation revocations after

23   1993?

24   A.    Yes, ma'am.

25   Q.    And he failed at the Serenity House after 1993?

1   A.    Yes, ma'am.

2   Q.    And he failed at the Hope House after 1993?

3            MS. KELLEY:  Objection.

4            THE COURT:  Overruled.

5   A.    Yes, ma'am.

6   Q.    And after 1993 he was in possession of child

7   pornography, correct?

8   A.    Correct.

9   Q.    And that is what he says is the best evidence of how to

10  judge him today?

11           MS. KELLEY:  Objection.

12           THE COURT:  Sustained.  Argumentative.

13  Q.    And that is what you credited in your report as the

14  best way to judge him today?

15  A.    Those were not factors that I credited him in my report

16  as ways to judge him today.

17  Q.    Knowing what you know now, Dr. Rypma, have you changed

18  your opinion of whether Mr. Shields is able to refrain from

19  child molestation if released to the community at this time?

20  A.    I have not.

21           MS. STACEY:  Thank you.

22  REDIRECT EXAMINATION BY MS. KELLEY:

23  Q.    Okay, just quickly, Dr. Rypma, Ms. Stacey had just

24  asked you about the ATSA paper?

25  A.    Yes.

1   Q.   Is that a research article?

2   A.   No.

3   Q.   Is that based on any particular research or studies

4   that you are aware of?

5   A.   No.  It's a political position that was voted on by the

6   Board of Governors with the association.

7   Q.   Now, we had a question from the jury this morning

8   concerning episodic pedophilia.  Can you just explain a

9   little bit more about that.

10  A.   Yes.  Basically what that means, episodic means

11  episodes of, and what the DSM basically says is that it's

12  not unusual in this disorder for people to have control over

13  their behavior for periods of time and there to be a

14  demonstration of episodes of pedophilic behavior.

15  Q.   How do you relate this to your diagnosis of

16  Mr. Shields?

17  A.   Well, as I think I testified on Friday, this diagnosis

18  of pedophilia is being heavily discussed in our profession

19  right now, particularly amongst those people who do sexually

20  violent predator evaluations, because of several reasons:

21  One, the editor of that section has indicated that it has

22  been printed incorrectly, that there has to be more than

23  behaviors.  You can't just take a behavior and indicate that

24  a person has a disease because there's a lot of other

25  factors that may come into play.  It may be opportunistic

1   crimes.  It may not be that the individual has persistent

2   fantasies and urges that drive them in that direction.  The

3   reason that's important is because of the whole issue of

4   serious difficulty, okay.  There may be examples that we can

5   point to, as I was able to with Mr. Shields, where there was

6   illegal behavior that occurred, and there may be examples of

7   where they have indeed offended against children; but if

8   there are also examples where they have had control, you

9   don't have to lock them up to get treatment.  You know, they

10  can be treated in an outpatient community-based setting.

11  Q.   Now, let's just talk about your report because there

12  was also a jury question about your report.  First of all,

13  when you got this case, began working on this case, who

14  contacted you about the case?

15  A.   John Swomley.

16  Q.   Have you had other cases with Mr. Swomley?

17  A.   Never.

18  Q.   And when he contacted you, what was your understanding

19  of what you were to do in the case?

20  A.   I was to evaluate Mr. Shields and do a sexually violent

21  person evaluation.

22  Q.   Had you ever done one of these in the federal system

23  before?

24  A.   No.

25  Q.   And does the phraseology and the different steps you go

1   through for this kind of evaluation vary from jurisdiction

2   to jurisdiction?

3   A.    Yes.

4   Q.    And they call the proceeding by a different name in

5   different jurisdictions, right?

6   A.    Correct.

7   Q.    And when you were first given the materials about this

8   case, were you given some regulations from the Bureau of

9   Prisons?

10  A.    I was.

11  Q.    And did you at that time put those regulations in your

12  report as part of your standard?

13  A.    I did.

14  Q.    And did you later come to understand, those regulations

15  are just proposed?

16  A.    That's correct.

17        MS. STACEY:  Objection.

18  Q.    And was there anything confusing in those regulations

19  about how --

20        THE COURT:  You know what, I understand it's

21  redirect, but this is very leading.

22        MS. KELLEY:  Well --

23        THE COURT:  No.

24        MS. KELLEY:  Okay.

25  Q.    And when in your report you write that Mr. Shields

1    qualified as a sexually dangerous person, what did you mean

2    by that?

3    A.   I think I've already testified what I meant was that

4    purely based on the diagnosis of pedophilia, he met a

5    criteria in the regulations concerning sexually violent

6    persons.

7    Q.   Okay.  And you're even calling this sexually violent

8    person.  This is actually called sexually dangerous person,

9    right?

10   A.   That's correct.

11   Q.   Where is it called sexually violent person?

12   A.   It is called sexually violent person in Arizona and in

13   Wisconsin, and in Iowa it's called sexually violent predator

14   and --

15   Q.   Okay.  And as far as you're concerned, it's a very

16   similar bunch of questions you answer, right?

17   A.   Yes.

18   Q.   And when you said in this first report that he was a

19   sexually dangerous person, he qualified under the statute,

20   what did you then go on to conclude in the same report?

21   A.   I went on to conclude that he did not qualify as a

22   sexually dangerous person because he did not suffer serious

23   difficulty in controlling his sexual urges.

24   Q.   And were you questioned about this line in your report

25   at a deposition?

1    A.    I was.

2    Q.    By government lawyers?

3    A.    Yes, ma'am.

4    Q.    And did you explain this to them at that time?

5              MS. STACEY:  Objection.

6              THE COURT:  Overruled.

7    A.    Yes.

8    Q.    And when was that deposition?

9    A.    I don't recall the date, but it was --

10   Q.    If I tell you it was May 5, does that refresh your

11   memory?

12   A.    Yes.

13   Q.    Of this past year?

14   A.    Yes, of this past year.

15   Q.    And as far as you know, was a transcript made of that

16   deposition?

17   A.    Yes, ma'am.

18   Q.    And was that made available to everyone?

19   A.    Yes, ma'am.

20   Q.    Has there ever been any question since you wrote this

21   report of what your final conclusion was?  Have you waffled

22   about your final conclusion?

23   A.    I don't believe so, no.

24   Q.    Now, you testified that there is some risk that

25   Mr. Shields will reoffend.  And what is your, to the best of

1   your professional ability, what is your opinion of how risky

2   he is under the standards of this statute?

3   A.   You know, I don't know that I can give you an estimate

4   of how risky.  What I would say is that generally the

5   feeling in the profession is there always is some risk for

6   anyone, not just a person who has committed a crime

7   previously, but even when you're doing an evaluation for an

8   individual who has been accused of a sexual crime, there's

9   always some risk that they did it, you know.  So it's

10  difficult to say a percentage.  Really what you're looking

11  at more globally is whether they meet the standard of

12  "serious difficulty."

13  Q.   And your conclusion with regard to Mr. Shields?

14  A.   Was that he did not.

15  Q.   Now, you've been asked about this article by Michael

16  Seto.  Are you familiar with that article?

17  A.   I am.

18  Q.   And what was the question that this researcher set out

19  to answer in his article?

20  A.   Whether or not there was an increased risk for

21  recidivism for individuals arrested for child pornography.

22  And he looked at several groups, but particularly relevant

23  to my testimony on Friday was whether or not it increased

24  the risk for an individual who had previously been arrested

25  for a contact sex offense.

1   Q.   So for someone who had previously been arrested for a

2   contact sex offense and then has a child pornography

3   conviction, what again was the question he's seeking to

4   answer?  For that group of people, what was the question

5   posed by the article?

6   A.   Was whether or not there was an increased risk for

7   recidivism.

8   Q.   And was there found to be an increased risk?

9   A.   Yes.

10   Q.   And what was the percentage of those people who went on

11   to reoffend?

12   A.   This was a single study that was done by Michael Seto

13   in 2005.  It had 201 people in the sample.  Four percent of

14   them ultimately were rearrested for a contact sex offense,

15   four percent.  It was a Canadian group of people, and they

16   did not -- this particular study did not control for another

17   dimension called antisocial personality disorder, which the

18   authors indicate may have confounded the results.  So we've

19   got a very small group of people, a single study.  There's a

20   lot more research that needs to be done before we can really

21   make that association very strongly.

22   Q.   But the bottom line was, the quote/unquote "increased

23   risk" was four percent?

24   A.   Yes.

25   Q.   Now, Ms. Stacey took you through some criteria:  prior

1  convictions for child molestation, child pornography,

2  et cetera.  Are the characteristics she set out as

3  indicating higher risk, are those for the most part taken

4  into consideration in the Static-99?

5  A.   Yes, ma'am.

6  Q.   And the offense rate you get when you consider all

7  those factors is what?

8  A.   I'm sorry, the --

9  Q.   The offense rate, the number you get?

10  A.   You mean the 52 percent over 15 years?  Yes, ma'am.

11  Q.   Yes, it's 52 percent, correct?

12  A.   That's correct.

13  Q.   Now, let me just ask you a few other things about your

14  report.

15  A.   Which?

16  Q.   Let's talk about the initial report that's dated

17  April 1 of '08.  And, you know, Ms. Stacey pointed out many

18  things, details that were not in this report, okay?  Let's

19  just talk for a minute about what is in the report.  First

20  of all, how long is this report?  How many pages?

21  A.   Thirteen pages.

22  Q.   And it's fair to say it's single-spaced?

23  A.   Yes, ma'am.

24  Q.   And you told him that what he said to you was going to

25  be used in this evaluation; is that right?

1   A.   I did.

2   Q.   And you -- well, why don't you just look at the general

3   headings and explain to the jury what you did include in

4   your report, starting on Page 4.

5   A.   Starting on Page 4, I included a list of documents that

6   I had considered.  I have the warning of nonconfidentiality

7   in there.  There is a mental status exam, a summary section.

8   There is a family background section.  There is a personal

9   background section.  There is a section concerning his own

10  sexual development.  There is a section discussing his

11  substance abuse history.  There is a section discussing

12  offense history.  There is a section discussing his

13  discipline while incarcerated.  There is a section

14  discussing treatment history.  There is a section discussing

15  his release plan.  And then I give the diagnostic

16  impression, and I discuss the risk assessment, and then have

17  a conclusion section.

18  Q.   Now, when you are doing this initial report, do you

19  include every detail about the case?

20  A.   Oh, no.  You can't include every detail.  I might also

21  mention, I --

22          THE COURT:  No.  We are trying to finish this up.

23  Go ahead.

24  Q.   Did you understand that you would be testifying in the

25  case?

Page 38

1   A.   I did.

2   Q.   Did you make yourself available to the government in

3   this case?

4   A.   I did.

5   Q.   And did you come to Boston for a deposition in this

6   case?

7   A.   I did.

8   Q.   How long did it last?

9   A.   It seems to me five or six hours.

10  Q.   Were they limited in any way to the questions they

11  asked you during that time?

12            MS. STACEY:  Objection.

13            THE COURT:  Overruled, but we need to finish this.

14            MS. KELLEY:  Well, I'm almost done.

15  A.   I don't believe they were.  I think they were allowed

16  to ask me anything they wanted.

17  Q.   When you did your supplemental report, Ms. Stacey asked

18  you if it was done at the request of his attorneys, and I'm

19  just going to direct you to that report, Page 2.  Under

20  "Informed Consent," you told him it was requested by his

21  attorney?  Do you see on Page 2 of your supplemental report

22  about the --

23  A.   Yes, I do.

24  Q.   And that's where you told him that his attorney had

25  requested this?

1    A.    Yes.

2    Q.    Did his attorney specifically request the follow-up

3    interview?

4    A.    No.  Just the evaluation.

5    Q.    And so why did you do the follow-up interview?

6    A.    I did the follow-up interview because I was interested

7    in looking at his present dangerousness and updating my

8    information from the original evaluation.

9    Q.    Now, Ms. Stacey asked you -- well, let me just ask in

10   conclusion, in regard to information not being in your

11   report, did you leave anything that you considered to be

12   important or material out of your reports?

13   A.    No.

14   Q.    And since the time you wrote your reports, have you,

15   obviously, been here at this trial?

16   A.    Yes.

17   Q.    And were there things you testified to as a result of

18   hearing other things at the trial?

19   A.    Yes.

20   Q.    Let me just ask you.  She asked you about your

21   relationship with Mr. Swomley and me in this case.  When you

22   took this case from Mr. Swomley, what was your understanding

23   about even communicating with us about the case?

24   A.    We had no communication.

25   Q.    And do you know, why was that?

1   A.   Because it was -- I was informed by -- I don't remember

2   if it was Mr. Swomley or your office, that I was to have no

3   communication with you whatsoever.

4   Q.   And when did the time come when Mr. Swomley and I

5   actually sat down and talked to you about the case?

6   A.   The first time I sat down and talked to you about the

7   case was during the deposition.  Just previous to the

8   deposition, I requested a meeting with yourself and

9   Mr. Swomley's office, and it seems to me that we went over

10  four points that I needed clarification on that were largely

11  administrative in nature.  Even at that point, there was no

12  substantive discussion regarding my findings or what I was

13  going to say or anything like that.  And then after the

14  deposition, there seemed to be a change in everyone's

15  understanding about communications, so after the deposition,

16  we did begin to have more communication.

17  Q.   So prior to the deposition, we weren't even sure,

18  because of the way the statute is set up, that we should

19  even sit down and talk with you at all about the case; is

20  that correct?

21            MS. STACEY:  Objection.

22            THE COURT:  Well, sustained as worded.  But this

23  is a brand-new statute, and so this is, I think, what's

24  being alluded to here.

25            MS. KELLEY:  Just a lot of confusion about the

1    statute, yeah.

2    Q.   So before you went and saw Mr. Shields and as you were

3    looking through all the documents in this case, was anybody

4    from this side of the room whispering in your ear or

5    encouraging you to find a certain way?

6    A.   Oh, no.

7    Q.   What was your understanding would happen if you after

8    reviewing everything had found that Mr. Shields was sexually

9    dangerous under the statute?

10   A.   The same thing that's happening right now:  I'd be

11   called to testify, but likely by the other side.

12   Q.   Did the fact that we had requested your involvement in

13   the case make you somehow beholding to us to find a certain

14   way?

15   A.   Oh, no.

16            MS. STACEY:  Objection.

17            THE COURT:  Sustained.  Leading.

18   Q.   Was it your understanding when you were contacted by

19   Mr. Swomley's office that you were being contacted to become

20   our advocate?

21   A.    No.  My understanding was that I was court-appointed

22   but at the request of the defense attorneys.

23   Q.   Now, I just want to ask you briefly, yesterday

24   Ms. Stacey questioned you about the 1998 case and whether

25   the 12-year-old in that case was unavailable at the time of

1    trial.  Have you looked at the materials you were given

2    about that case?

3    A.    Not recently, but I recall it.

4    Q.    Do you recall anything in the materials suggesting that

5    that young man was not available at the time of trial?

6    A.    I remember seeing nothing --

7              MS. STACEY:  Objection.

8    A.    -- in the record at all about that.

9    Q.    Now, with regard to the bad check case, did you look at

10   the documents pertaining to that?

11   A.    I did.

12   Q.    I'm just going to put this up on the screen.  This is

13   Bates 24.  Do you recognize this document?

14   A.    Yes.

15   Q.    And this is the judgment and commitment sheet in that

16   case, right?

17   A.    I believe so, yes, ma'am.

18   Q.    And does this sheet show two counts for negotiating a

19   worthless instrument?

20   A.    Yes.

21   Q.    Does it set out the specific number of checks?

22   A.    It does not.

23   Q.    I want to show you this paper that is in evidence.

24   This has to do with the child pornography offense.  Sorry

25   it's so blurry.  Looking at No. 5 -- this is part of the

1   presentence report?

2   A.   Yes, ma'am.

3   Q.   What does this say about the specific number of

4   pictures of prepubescent children?

5   A.   It says, "Analysis revealed hundreds of images of

6   adolescent and preadolescent children, predominantly boys,

7   engaged in sexually explicit conduct."

8   Q.   So does it parse out how many prepubescent pictures

9   were in that group?

10  A.   No.

11  Q.   And it then says what about some of the images?

12  A.   Well, I can read it on, but what I recall is that some

13  of the images had been downloaded the day the police were

14  there.  Let me see.  "Analysis revealed that many of the

15  pornographic images of minors had been downloaded on

16  September 12, 2002, the date police visited the apartment,

17  using Kazaa, an Internet-based file transfer program."

18  Q.   And it also says some of the images were deleted?

19  A.   Yes.

20  Q.   Does it say which types of images had been deleted?

21  A.   No.

22  Q.   And can I just ask you, in your understanding, a person

23  can be charged with and convicted of possessing images that

24  had been deleted on their computer, correct?

25             MS. STACEY:   Objection.

1          THE COURT:  Sustained.

2    Q.   Okay, now, Ms. Stacey asked you about whether if a

3    person is known to have threatened a victim, like, "I'm

4    going to get you," that that increases their risk?

5    A.   That, if I recall the testimony yesterday, or Friday

6    rather, from the Coding Manual of the Static-99 perhaps?

7    Q.   Yes.

8    A.   Yes.

9    Q.   So, first of all, what is the Coding Manual?  How does

10   it relate to the Static-99?

11   A.   Well, the Coding Manual basically is advisory or a

12   guide to clinicians who are using the Static-99 in terms of

13   how to score it and administer it.

14   Q.   And did you go back and look at the Coding Manual after

15   that series of questions?

16   A.   I did.

17   Q.   And what is your understanding of that portion of the

18   Coding Manual?  What is it actually saying?

19   A.   Well, basically, again, it's advisory in nature.  It's

20   not saying that an individual who -- it's not saying

21   anything about the individual's risk for recidivism.  It's

22   saying that one should consider certain facts.  I guess I'd

23   have to look at the manual once again.  Do you have it

24   available?

25   Q.   I don't have a copy of the manual.

Page 45

1      MS. STACEY:  I have a copy.

2      THE COURT:  Did you want the copy?

3      MS. KELLEY:  Yes.

4      (Manual handed to witness.)

5   Q.   I think it might be on Page 6 or 8.

6   A.   I think it's on Page 3.  Yes, it's on Page 3.

7   Q.   And what does that say?  If you could just read the

8   part about making threats.

9   A.   "The Static-99 does not address all relevant risk

10  factors for sexual offenders.  Consequently, a prudent

11  evaluator will always consider other external factors that

12  may influence risk in either direction.  An obvious example

13  is where an offender states intentions to further harm or

14  get his victims, like higher risk."

15  Q.   Now, what do you understand that to mean?

16  A.   Well, first of all, it's not well spelled out, I mean,

17  what "get them" means.  My experience in using the Static-99

18  and in talking with colleagues who score that particular

19  item, we're really talking about serious physical harm.  I

20  mean, some predators will tell you that "If you let me out

21  of jail, I'm going to molest that boy."  And that isn't

22  really qualitatively the same thing that we're talking about

23  that was pointed out in the record, without some comment,

24  that Mr. Shields made while he was running from the

25  bathroom.

1    Q.   So, for example, you might be evaluating somebody,

2    interviewing them, and they're telling you, when they get

3    out, they're going to further harm their victims?

4    A.   Correct.

5    Q.   And the Coding Manual is telling you, obviously, you're

6    going to take that into consideration, even though it's not

7    part of the Static-99, right?

8    A.   Correct.

9    Q.   And what do you think are the three relevant dynamic

10   factors that are not in the Static-99 that one should take

11   into consideration?

12   A.   Well, age, for example.  We've already talked about

13   that.  Age is not adequately accounted for.  Sexual

14   deviancy, which subsumes some of the information like sexual

15   self-regulation and so forth.  And, let's see, age,

16   treatment -- and treatment is the third one.

17   Q.   And did you consider those three dynamic factors for

18   Mr. Shields?

19   A.   I did.

20   Q.   And your conclusion was?

21   A.   That he is not currently having serious difficulty in

22   controlling his sexual behavior.

23   Q.   And, now, just finally, the many points that Ms. Stacey

24   raised that you didn't include in your report about the

25   differences between the police reports and what Mr. Shields

Page 47

1  told you, why wouldn't you put those in your report?  Why

2  didn't you?

3  A.   Well, in many cases, I didn't see them as relevant.  I

4  mean, they were relatively minor discrepancies.  Whether or

5  not he touched a boy under the clothing or over the

6  clothing, that's relevant for the victim, but in terms of

7  estimating risk, it makes no difference.  He has still

8  assaulted a minor.  So some of the points that were brought

9  up I didn't put in because I just didn't see them as being

10  significant things to put in.  And I was under a time

11  constraint.  I had to get this report out.  You can't put

12  everything in a report that you're trying to write in a

13  matter of a couple of days.

14  Q.   Is there any scientific basis for finding that a person

15  who admits the offense but tells you a different version is

16  at higher risk to reoffend?

17          MS. STACEY:  Objection.

18  A.   No.

19          THE COURT:  Overruled.

20  A.   No, there's no scientific basis for that.

21          MS. KELLEY:  If I could just ask Mr. Swomley. . .

22          (Discussion off the record between defense

23  counsel.)

24  Q.   And just, finally, if --

25          THE COURT:  You can stay there.  You don't need

1   to --

2              MS. KELLEY:  Okay.

3   Q.   Is there any -- I'm going to draw your attention to the

4   meta-analysis by Hanson and Bussiere.  Is that a

5   well-respected article?

6   A.   Yes, ma'am.

7   Q.   And they list out a lot of predictors of recidivism and

8   give statistical numeric values to those, right?

9   A.   They do.

10  Q.   And is force used or the injury to a victim a

11  predictor, a strong predictor of recidivism?

12  A.   No, it's not.

13             THE COURT:  Thank you.

14             MS. KELLEY:  I have one more point.

15  Q.   With regard to his social network, he mentioned to you

16  a man named Todd Woodsome?

17  A.   Yes.

18  Q.   And you've said, I think, you thought that name came up

19  in the records?

20  A.   I've seen it somewhere.  I just don't recall where.

21  Q.   Okay, I'm going to show you a document, 243.

22             (Witness examining document.)

23  Q.   That's something to do with Mr. Shields's finances?

24  A.   Yes.

25  Q.   And what name appears there on that document

Page 49

1    handwritten on there?

2    A.   Todd Woodsome.

3    Q.   And does it appear to you why his name is on there?

4    A.   It says "In care of."  It appears that Todd Woodsome

5    was perhaps acting on Jeffrey's behalf.

6             MS. KELLEY:  Okay, nothing further, your Honor.

7             THE COURT:  Anything?

8             MS. STACEY:  One question.

9    RECROSS-EXAMINATION BY MS. STACEY:

10   Q.   Dr. Rypma, you testified that you followed up with

11   Mr. Shields five months later to take a look at his present

12   dangerousness; is that right?

13   A.   Yes.

14   Q.   It's fair to say his present dangerousness could change

15   in five months from now?

16   A.   Possibly, yes.

17            MS. STACEY:  Nothing further.

18            THE COURT:  Thank you.  Thank you, you may step

19   down.

20            (Witness excused.)

21            THE COURT:  Respondent?

22            MS. KELLEY:  No further witnesses.

23            THE COURT:  You rest?

24            MS. KELLEY:  Yes, we do.

25            THE COURT:  You rest?

Page 50

1          MS. STACEY:  We rest.

2          MR. GRADY:  Other than just going over some

3     exhibits with the Court.

4          THE COURT:  Now is the time.

5          MR. GRADY:  Very well.  Your Honor, there was

6     Exhibit 39 which was a stipulation between the parties to be

7     entered.

8          THE COURT:  Is that the chronology?

9          MR. GRADY:  A chronology.

10         THE COURT:  Yes, that would be very helpful.  I've

11    had them put what happened when, and you can consider that.

12    So, yes, I'll mark it Exhibit 39.

13              (Petitioner Exhibits 39-40 received in evidence.)

14         THE COURT:  Anything else?

15         MR. GRADY:  39 was the stipulation.  40 was the

16    chronology.

17         THE COURT:  Fine.  Anything else?

18         MR. GRADY:  The government has nothing.

19         THE COURT:  Rest, okay.  So we've just checked,

20    the morning snack is out there.  And I hate to split up

21    people's closing arguments, so what I'm thinking of doing is

22    taking our morning break just a little early and for a

23    little shorter period of time.  And then we'll get through

24    the closings, and then I'll see what time it is.  If

25    possible, I'm going to try and give you the instructions

1   before lunch, so we may go a little into the lunch hour,

2   even though that's a long haul.  If not, we'll break for

3   lunch and then come back for the charge afterwards, but I'd

4   love to get it to you so you can all start talking over

5   lunch.  So it's going to be a shorter period of time.  If

6   there's a question, ask Mr. Alba, okay?  So maybe come back

7   at quarter of, which is a little shorter than our normal

8   one, but I'm going to try and get this through.  Okay?

9   Thank you.

10              THE CLERK:  All rise for the jury.

11              (Jury excused.)

12              THE COURT:  Okay, so just on the -- I forget, we

13   go in the reverse order, don't forget.  This is a civil

14   case, so you all go first, and how long did you think you

15   need?

16              MR. SWOMLEY:  I asked for an hour.

17              THE COURT:  So let's say quarter of 11:00 to

18   quarter of 12:00.

19              MR. GRADY:  Thirty to forty minutes, your Honor.

20   I think I can try to get it in.

21              THE COURT:  To 12:15, to 12:30.  We'll have to

22   play it by ear as to whether I can get -- I don't think the

23   charge is very long.  We just handed out the redraft.  I

24   think I would like to try, even if it means you have a

25   five-minute bathroom break, come back, and then just shoot

1    them through, even if it makes 1:15 or 1:30, just so they

2    can have it for the afternoon.  But we'll play it by ear as

3    to how tired Lee is and how big a deal it is.  We have,

4    unfortunately, an afternoon that's pretty full, but I would

5    obviously give this the priority.

6            So, excuse me, can I go on the record for one

7    minute?  The thing that that woman wanted, the juror in the

8    front row wanted, was just to know, would they get a copy of

9    the Adam Walsh statute or would someone explain it to them?

10   So he said, "Well, we're going to have a jury charge," so

11   just so you know what her inquiry was.

12           MS. KELLEY:  Okay.

13           (A recess was taken, 10:30 a.m.)

14           (Resumed, 10:55 a.m.)

15           THE COURT:  I'm going to ask Mr. Alba to hand out

16   the jury verdict forms as the jury comes in so they'll know

17   what the questions are that they're going to be expected to

18   answer.  Mr. Swomley will go first.  It's about five of

19   11:00, and I'll give you a five-minute warning, then the

20   hook.

21           THE CLERK:  All rise for the jury.

22           (Jury enters the courtroom.)

23           THE COURT:  So we just handed you a copy of the

24   verdict form, and why don't you take a few minutes and read

25   it because those are the two questions that you will be

1   asked.  Of course, at the end, all I want is a unanimous

2   verdict.  So, you know, you can rip up the rest of them, but

3   you can take notes on them now, and I wanted you to have a

4   sense of what the questions were before you heard the

5   closing arguments.

6           I also want to remind you that the closing

7   arguments are not evidence, and it's, rather, the

8   opportunity of each attorney to sum up the evidence and urge

9   you to make certain findings; but if your memory conflicts

10  with what their memory is, it's your collective memory that

11  governs.  So why don't we take two seconds.  When you're

12  done, look up again, and then we'll start with Mr. Swomley.

13          (Pause.)

14          THE COURT:  All right.

15  CLOSING ARGUMENT BY MR. SWOMLEY:

16          MR. SWOMLEY:  Jeffrey Shields is not sexually

17  dangerous.  The best evidence that is Dr. Dawn Graney, a

18  little Bureau of Prisons government psychologist from North

19  Carolina; not any of the experts, not any of the science,

20  Dr. Graney.  Dr. Graney is a woman who invested in Jeffrey

21  Shields.  She's a woman who offered Jeffrey Shields

22  redemption, and she's a woman who came here to bear witness

23  that Jeffrey Shields took her up on that offer.

24          Jeffrey Shields gets it.  Jeffrey Shields is not

25  the same person that he was before he met Dr. Graney.

1    Jeffrey Shields is on that road to redemption.

2            Now, the Static-99 doesn't measure redemption.

3    Science can't quantify almost all of the things that predict

4    whether or not someone is going to reoffend.  And I'm not

5    going to actually focus at the beginning of my summation

6    here on the science, but if you just bear in mind a couple

7    of tiny stats that came out, I think during Dr. Plaud's

8    testimony.  One is that the Static-99 is a moderate

9    predictor.  It's a moderate predictor that predicts about

10   12 percent better than chance, a little bit better than

11   flipping a coin.

12           It also is able to account for, according to

13   Dr. Plaud, approximately 20 percent of the things that are

14   out there in the world that might actually predict

15   recidivism, meaning 80 percent of the things that might be

16   useful to you all to figure out whether he's going to

17   reoffend, the Static-99 doesn't know how to account for,

18   can't account for, and certainly can't account for this

19   concept that people change, that people can by virtue of the

20   death of a loved one, by virtue of figuring out that you're

21   just tired of doing this, and you don't want to live that

22   kind of life anymore.

23           And you heard mostly from Dr. Graney about those

24   changes in Jeffrey Shields's life.  Those are the changes,

25   ladies and gentlemen, that I submit nothing, nothing about

1    science, nothing about prediction, are going to help you

2    with.  And that's why ultimately in these kinds of cases the

3    science fails, and the science fails because it can't get

4    you past a certain point.  Even if you're one of these

5    psychologists that buys the science hook, line, and

6    sinker -- and I would suggest Dr. Plaud is one of those

7    science guys -- even if that's how you do things, at a

8    certain point you're either going to acknowledge you're not

9    accounting for all of the things that predict risk, and

10   you're going to just live with the actuarials, or you're

11   going to say, "I'm going to take that step off, and I don't

12   have anything to guide me."  And the reality is, you don't.

13   And the reality is, everybody, including the doctors, at a

14   certain point have to stop and say, "The science isn't going

15   to help me."

16          Now, I guess I will go into the science a little

17   bit right here.  In terms of what is known by psychology in

18   the science of risk prediction, very little is known.  And

19   in terms of whether there's consensus in the scientific

20   community, I would submit there really isn't.  And if you

21   think about what is the universe of things that

22   psychologists actually have some talent at doing, whether

23   it's brief counseling, whether it's marriage counseling,

24   whether it's dealing with depression, even making short-term

25   predictions of risk, like, "I foam at the mouth, and he

1    tried to stab me, oh, yeah, let's lock him up for few days

2    until he calms down and is not florid," those things could

3    be in this little circle right here, the universe of things

4    psychologists actually have training and ability to do and

5    know.

6          Risk prediction for sex offenses is, I would

7    submit, not within their job description, not within their

8    ability to actually do what they're asked by the court, the

9    law, to do.  And in fact that, I would submit, is the main

10   problem with these kinds of proceedings.  If you talk about

11   the universe of what psychologists do and know how to do,

12   that was it.  Risk prediction is like tea leaf reading.

13   It's like tarot card reading.  It's like crystal ball

14   reading.  If the universe of psychology is over there where

15   I'm standing, the science of risk prediction by

16   psychologists is out the door, out in the hall, way out in

17   the stratosphere, and that's not what we make serious

18   decisions about human life based upon.

19          Now, everybody, every one of us has an inalienable

20   right to be free, and this country chooses to take away that

21   right when you commit a crime against other human beings or

22   against property, and it's well-defined.  And what happens?

23   What our criminal justice system does is hold the

24   individual, the person who did the crime, accountable for

25   his or her actions.  And we punish them based upon the

1   knowledge that "You do something wrong, you pay for it, and

2   you should figure out that if you do something wrong again,

3   you will pay for it more severely."  And in fact that is

4   what was done to Mr. Shields.

5            A new law has come into effect, a new law which

6   allows us as a society to take away someone's liberty, not

7   based upon what they have actually done.  Make no mistake,

8   ladies and gentlemen, he has been punished for what he has

9   done.  What he and what you are here to decide is whether or

10  not he is at serious risk; that is, has a serious inability

11  to control himself now and going forward.  And that is the

12  question as to whether or not you all think you can say he's

13  going to reoffend in the future.  You are essentially asked

14  to take away Mr. Shields's liberty based upon the notion

15  that we in our society have gotten to the point where we,

16  one, can and have the scientific ability to predict that

17  he's an unacceptable danger to us.  First of all, you have

18  to believe we can do that.  And then if you do that and you

19  believe we can, you have to think about, what are the

20  safeguards that we will impose upon ourselves to make sure

21  we don't screw up?

22           Now, Mr. Shields earned the right to breathe free

23  air when he wrapped his criminal sentence, and in fact he

24  was well on his way to reintegrating into society when this

25  new law came down the pike.  He was yanked back from a

1    program which he was, by all admissions, doing very well in;

2    not any issues, not any problems.  And he took Dr. Graney's

3    advice, and he was enrolled in substance abuse programming.

4    He was getting enrolled in the sex offender program.  He was

5    transitioning to a sober house where he would have to be

6    drug-free, and he's on serious federal probation, different

7    than anything he'd been on before.

8           Now, he was yanked back from that program to be

9    evaluated by you all, to be evaluated by the doctors, and

10   you essentially are the gatekeepers.  Not Dr. Tomich,

11   thankfully, but you, you all are the gatekeepers.  You all

12   will decide whether or not Mr. Shields has a serious

13   difficulty controlling himself.

14          Now, there are sex offenses committed all the

15   time, and no one, no one is suggesting that it's not a

16   serious problem; but what this statute, what this law is

17   designed to do is put the most serious offenders off the

18   streets, incapacitate them, as it were.  And you are able to

19   consider, and the Judge will instruct you, that it's --

20   well, obviously it's an inexact science, but you can

21   consider the seriousness of the threatened harm, you can

22   consider the relative certainty of that harm, and you can

23   consider the ability to successfully intervene to prevent

24   that harm.  Those are things you can think about as you try

25   to figure out what to do with Mr. Shields.

1    Now, I would submit when you listen to the Judge's

2    instructions, you will conclude you're not supposed to

3    impose civil commitment on someone who commits sex offense

4    after sex offense after sex offense by choice.  Got that?

5    You have to have a mental abnormality that causes them to do

6    that.  If they just want to commit sex offenses, our

7    criminal justice system is supposed to solve that problem.

8    Ordinary sexual recidivists, if they don't learn their

9    lesson, more time, more time, more time, and up to life in

10   prison.  That's how society deals with people that choose to

11   commit sex offenses.

12   People that can't control themselves have this

13   statute.  That is, the government has to prove -- and make

14   no mistake, the government has to prove everything in this

15   case.  We didn't have to put on any witnesses.  We didn't

16   have to put on Dr. Rypma, didn't have to put on any of the

17   doctors from Butner, North Carolina, or up in Maine.  The

18   government had to prove to you -- we did put on evidence,

19   and I would submit that when you think about this case,

20   Mr. Shields, one, does not fit in the most dangerous

21   category.  I know, I am -- and please don't find me guilty

22   of minimizing, and I am not trying to minimize what

23   Mr. Shields did.  He did serious crimes against children.

24   But in the world of sex offender crimes research,

25   recidivism, I'm sorry to say there are much more dangerous

1    people out there in the world and in our prisons than

2    Jeffrey Shields.

3              And if I can operationalize what I would submit

4    this law is designed for, it is designed for -- you know

5    that cartoon character, the Tasmanian Devil, it is designed

6    for people like that; that when you open the door, they jump

7    out, and they're looking, "What can I offend against?"

8    That's what we're trying to lock up.

9              And as far as the science goes, the only

10   scientifically valid application, as I believe you've heard

11   from the doctors that talk about the research, using the

12   Static-99, the highest-scoring people with the lowest age

13   are the only people that the Static-99, as it is devised

14   now, accurately predicts as dangerous.  Once you start

15   leaving the 24-year-old age group and heading up into 30,

16   40, 50s, the accuracy of the Static-99 goes down

17   dramatically.  And when you're talking about who to lock up,

18   I would submit the science is sure enough ground for you to

19   say, "Okay, we got somebody with a high score on the

20   Static-99 that is a very young age -- i.e., 18 to 24 -- we

21   can feel confident."  And the research is pretty clear on

22   that.  Dr. Wollert, a researcher, concluded that that age

23   group the Static-99 is accurate on.  It's not accurate as

24   you go into the older age groups, and certainly not

25   accurate, it's about 70 percent wrong if you apply it to the

Page 61

1   older age group that Mr. Shields fits in, and 90 percent

2   wrong when you get into the 60s.

3            Now, you have that data, and that I would submit,

4   if you have a 23-year-old with a 6 or above on the

5   Static-99, you should feel relatively confident you're

6   dealing with a pretty dangerous individual.  That's not

7   Jeffrey Shields.

8            The other kind of person that I think the science

9   readily accepts as go there, you can commit somebody like

10   that, is someone who says, "I can't wait out to do it

11   again."  And there are people like that, and those people,

12   you bet, you should have no difficulty getting to that clear

13   and convincing evidence standard.

14            Now, what is clear and convincing evidence?  Clear

15   and convincing evidence, you'll hear the instruction from

16   the Judge, but if you take nothing more from it, it is

17   "leaves you with no substantial doubt."

18            Okay, are there any substantial doubts in this

19   case?  I would submit there are huge substantial doubts,

20   first and foremost, deposited in your minds by Dr. Graney;

21   but next, and the other biggy, and I'll go into the science

22   here, is age.

23            Now, Dr. Hanson, a brilliant researcher.

24   Dr. Hanson has been doing more work in this field than

25   probably any other doctor.  And when he devised the RRASOR

1    in 1996-1997, there was no meta-analysis; there was no

2    global research done on the things that predict recidivism.

3    He based his sample on a pretty small sample set, and then

4    he extrapolated out with numbers.  I would submit that the

5    RRASOR and the figures that you hear about it have been

6    subsumed now within the Static-99.  And the data on the

7    RRASOR, the scary data, the data that talks about 70 percent

8    risk, one, doesn't account for any age; two, has been

9    essentially debunked by Hanson himself as not being the

10   state of the art, as it were.  And you, your left with the

11   Static-99, his second generation of actuarials.

12            Now, what's wrong with the actuarials?  Well, some

13   of you have a mathematical background, and I'm going to

14   hopefully not tax anyone who doesn't have that background.

15   And I'll confess right off the bat, I don't have that

16   background, but I've been reading a whole bunch of this

17   stuff.  And the bottom line is, ladies and gentlemen, that

18   the Static-99 was borrowed from the insurance agency,

19   borrowed from a group of economists who thought, "Okay, we

20   can make money off of predicting when people will die."  And

21   the truth is, they can, and they do.  There's a big

22   difference, though, between being able to make money off of

23   a risk prediction and being able to predict with accuracy as

24   to what you're doing.

25            And look at it this way:  The economists, all they

1   have to do is be right about a group of people more than

2   50 percent of the time.  Let's take that Static-99

3   fifteen-year time gate.  Lots of things wrong with it, I'll

4   get to that in a moment, but let's just accept it for a

5   moment.  If this were an actuarial for life insurance

6   purposes, the life insurance industry will make money, even

7   knowing nothing more than a group will die 52 percent of the

8   time at a certain age.  They can make money at that.  What

9   they can't do is tell you which of those 52 percent are

10  going to die, and it doesn't really matter for making money

11  purposes.  It does, though, for liberty interest purposes.

12  It does because you all can't just say, "Well, he fits in

13  the 52 percent group."

14          And this is a group that reoffends at a rate of

15  52 percent.  52 out of 100 people reoffend, if you believe

16  the data; 48 people out of 100 don't.  And your job isn't to

17  figure out whether he belongs in that group.  Your job is to

18  figure out whether he is one of the 52 or one of the 48.

19  And nothing about the Static-99 can help you with that.  And

20  if you just decide, "Well, I'm going to throw up my hands, I

21  can't figure this one out, I'm going to commit everybody

22  that scores a 6 or above on the Static-99," this is -- this

23  is the scary part about Dr. Wollert's research.  And I had

24  both Dr. Tomich and Dr. -- well, Ms. Kelley talked to

25  Dr. Rypma about it, but if you apply the Static-99 to

1    everyone that gets a 6 or above and commit them, and you do

2    that using the most recent data from the federal government

3    on recidivism, not stuff from Hanson from Canada and Wales

4    from the '70s and '80s but the most recent data, which

5    actually shows a much lower recidivism rate than some of the

6    earlier stuff, if you do apply this data using the

7    assumption that you're going to commit everyone above a 6 on

8    the Static-99, this is what you'll end up with, and based

9    entirely upon the U.S. Department of Justice data:

10           "Using the Static-99, a relatively small number of

11   sex crimes would have been averted by the detention of 129

12   likely recidivists based upon this data; whereas, 734

13   offenders with high test scores would have been unjustly

14   detained.  The Static-99 screen would have missed 388

15   recidivists, however," meaning from this data, people that

16   score a 6 or above, if they committed everyone, they would

17   be committing more people erroneously than correctly, and

18   they would be missing people in the 5s and the 4s that were

19   committing sex crimes too.

20           But the big number -- and this has a great

21   implication for some of the other things that the government

22   was suggesting you believe -- is that most of the sex

23   offense recidivism, as documented by the U.S. Department of

24   Justice, is committed by people that weren't prior sex

25   offenders.  That is, they've committed other crimes within

1   the criminal justice system, gotten out, and their next

2   offense was a sex crime.  No Static-99 score would have

3   predicted anything having to do with that, and that is the

4   largest category of sexual recidivists, a sexual recidivist

5   recidivating after committing a nonsex crime and having no

6   history of having committed a sex crime ever before in their

7   lives.

8          He goes on to say, "All of the sex crimes

9   committed by the other released offenders would have also

10  been missed, setting the stage for the commission of 3,716

11  sex crimes within a relatively brief span of time.  Whereas,

12  overall, only three percent of those who committed new sex

13  offenses would have been incapacitated under these

14  conditions."

15         So what you're getting by committing every Level 6

16  or above is essentially a three percent commit rate of

17  accuracy based upon your commitment.  And the total numbers,

18  the total aggregate numbers of wrongful incarcerations would

19  have been this:  "388 recidivists would have been mistakenly

20  released.  734 nonrecidivists would have been unjustly

21  detained.  This means that the result of dividing the first

22  quantity by the latter, also known as R, approximates .5.

23  In other words, only one dangerous respondent would have

24  been mistakenly released for every two nondangerous

25  respondents unjustly detained."

1        I would submit that data alone suggests that the

2   government cannot do what it is saying it can do in this

3   case, and that is accurately predict what Jeffrey Shields is

4   going to do.  And if they can't accurately predict it, I

5   would submit they cannot meet their burden here, which is

6   proof by clear and convincing evidence; and that is that

7   they eliminate all substantial doubts in your mind.  I would

8   submit they can't do that.

9        Now, another way of looking at the flaws in the

10  Static-99 have to do with age directly.  And forgetting the

11  Static-99 for a second and just talking about age and

12  getting an understanding of what age does to the sexuality

13  of a human being -- anybody here over 30? -- I would submit,

14  if you think about your own existence, you can readily get

15  that people change.  And Dr. Tomich said basically

16  Mr. Shields hasn't changed a bit; he's an untreated sex

17  offender; and therefore he poses the same risk today as he

18  did the day he went into the system, and don't analyze any

19  more than that.

20       If you think about how you and your own sexuality

21  has changed over the years, I would submit you will know the

22  obvious, the things that science can tell us:  Your serum

23  testosterone levels decrease as you age.  Your interest in

24  sex decreases as you age.  Your aches and pains increase as

25  you age, and your desire to go out and do really risky

1    things decreases with age.  All of that happens to all of

2    us, and, believe it or not, the science bears out that it

3    happens to sex offenders as about the same way that it

4    happens to the rest of us.

5            Now, what wasn't in existence at the time

6    Dr. Hanson did his initial research, wasn't in existence

7    with the RRASOR, wasn't in existence with the Static-99,

8    was:  Well, okay, we got these rates.  Are they accurate?

9    Start testing them.  Oops, we're not controlling for age.

10   Age makes a big difference.  And Dr. Hanson quickly

11   published a study, came out in 2001.  The Static-99 was

12   generated in 1999.  Two years later Dr. Hanson is going on,

13   "Hold on, everybody, my numbers are off.  They're off

14   because I did not account for age, and now that we're

15   studying age, oh, my God, it makes a big difference."  And

16   the big difference is across the board.

17           You heard some red herrings by the government

18   about whether or not it's a linear decline or whether there

19   is a -- I'm not going to get this right, but a covariable

20   rate which goes up and then down.  And the truth is --

21           THE COURT:  Quadratic?

22           MR. SWOMLEY:  No, but something like that.  In any

23   case, it goes up and then comes down.  And it doesn't matter

24   for Jeffrey Shields.  We're already on the downhill decline.

25   You can look at the -- I've got to straighten out.  Okay.

1          What we're talking about here that's the

2   difference between, say, a rapist, which just basically has

3   a pretty much straight down, is that here you have an up.

4   And the up is what's covariant basically.  So you have an

5   extrafamilial child molester.  No doubt, that's the category

6   Mr. Shields would find himself in.  The rate of recidivism

7   goes up for a while before it starts to come down.

8   Mr. Shields is way up over here in the 45 to 49 category,

9   and it's pretty much linear all the way.  It's going down.

10  It's not looking to go up again.

11          So whether or not it's static covariant, it

12  doesn't matter for Mr. Shields.  We're all on the decline.

13  Yes, it's true that for extrafamilial child molesters, the

14  rate of decline is slower.  It's slower, but it's still

15  there.  And it's slower until you get to about the 45- to

16  49-year-old age group.  And then, while it seems to kind of

17  meander for a while here, shoong, it's taking a pretty

18  precipitous decline right at the age where he is right now.

19  And any of you that have gone through your mid-forties -- I

20  don't want to look at anyone directly -- but any of you that

21  have gone through your mid-forties know it can be

22  substantial.

23          Now, the actual rates, when you think about the

24  rates, the 52 percent number, out the window; the 70

25  something percent, 73 percent number out the window.  None

1  of that accounts for age, not a bit.  Well, I take that

2  back -- not a bit beyond 25, because back when these things

3  were created, everybody knew that the most dangerous sex

4  offenders were the kids, the ones that really didn't have

5  any fear and not a lot of reflection.  And those individuals

6  have skyrocket recidivism rates.  And they knew that, and

7  they took that into account.  But that's all they took into

8  account.  They didn't take into account that aging, and

9  that's what now the data has taken into account, and the

10  recidivism rates are lower.  They are dramatically lower.

11  They are, for his age group, right now less than 20, but

12  when he hits 50, it's down to like 12 percent recidivism.

13         Now, you can think about this:  Okay, well, does

14  he deserve that three-year benefit?  He is on serious

15  federal probation for three years.  That gets him to the

16  50-year bracket.  That guess him to the point where his

17  recidivism rate has now dropped down into the 10, 12 percent

18  range.

19         Think for yourselves where you're going to say

20  "serious difficulty," where you're going to say, "I have no

21  substantial doubt."  Is it going to be if they can't prove a

22  recidivism rate greater than 50 percent for this guy?  Even

23  if they do, even if you buy their numbers, is 50/50 good

24  enough to take someone's liberty away?  I would submit it's

25  not, ladies and gentlemen.

1          Now. . .you listened to the last, really the last

2     witness, a lot of questioning -- you can call it harsh

3     questioning -- I won't actually -- of Dr. Rypma by

4     Ms. Stacey; and you heard her essentially say, "You didn't

5     put this in your report, you didn't consider that, you

6     didn't do this, you didn't do --"  I'm going to go through

7     these because I think I have to, and I'm going to go through

8     them, and I'll put this all under the heading "A little

9     knowledge is a dangerous thing," and that heading is, you

10    can cherry-pick lots of little things from the research

11    literature.  And you saw my boxes out there.  There's a lot

12    of it -- they're not all here now -- there's a lot of it,

13    and almost all of it is based upon tiny little data sets,

14    tiny little samples, people -- in fact, the number, the

15    number on the RRASOR is based on 52, 53 people.  That's how

16    you got a recidivism rate that the government wants to apply

17    to the world.  I submit there's some real, real flaws in

18    doing that; but the main flaws have to do with being able to

19    say Mr. Shields fits within this group, and this group

20    reoffends at whatever rate.  If you buy the data, it doesn't

21    get you beyond the group, and that's the problem.

22          Now, I'm going to go through some of the things

23    that were questionably relevant.  The big one, pedophilia.

24    All three doctors, including Dr. Rypma, said Mr. Shields

25    fits that diagnosis.  That diagnosis, I would submit,

1    probably evokes a fair amount of, oh, my God, revulsion,

2    fear, whatever, of this person.

3              And you know from the DSM-IV itself that the

4    diagnosis implies no degree of volitional impairment.  Now,

5    what do I mean by volitional impairment?  I mean the

6    inability to control oneself; that is, to regulate and say,

7    "I'm not doing that."  There is no comment by the DSM-IV

8    that a diagnosis of pedophilia implies any level of

9    impairment, meaning, again, you want to take that data; you

10   want to use it to make a decision; you are left with that

11   leap of faith, as it were, to decide how you're going to

12   apply that, because it doesn't just by saying, "Oh, God,

13   he's a pedophile.  All right, we don't have to make any more

14   hard decisions here.  We can just lock him up."  It's just

15   not true.  It's not true because there is no diagnosis

16   "pedophilia in remission," no way to quantify how to

17   articulate present risk within that diagnosis.

18             There is a substantial degree of internal debate

19   in the psychological and psychiatric community right now

20   about whether or not the diagnosis that wasn't made for

21   these civil commitment proceedings, but was made for doctors

22   to think about and understand and try and figure out how to

23   talk about and treat individuals.  What's being used now is

24   a diagnosis for the government to claim they can have the

25   requisite characteristics for civil commitment; not the

1    intention of the DSM-IV, not the intention of Dr. Hanson and

2    the Static-99 and his RRASOR.  None of these instruments

3    were created for civil commitment purposes.  They're being

4    used for it now, but they weren't created for that purpose.

5           And, again, when you operationalize the thought of

6    pedophilia, one, I would submit even -- even the government

7    side doctors -- well, Dr. Plaud anyway -- thought it was a

8    particularly weak diagnosis, and it is weak for these

9    reasons:  Beyond that there's no implied loss of control by

10   diagnosing it, it is a weak diagnosis all by itself because

11   Mr. Shields doesn't fit the definition cleanly.

12          Now, interestingly, Dr. Tomich hadn't even heard

13   of the controversy that Dr. Rypma was testifying about, but

14   you heard him say what he thought were the data points that

15   allowed him the make the diagnosis.  And I take issue with

16   some of them, although I'm not really going to spend a lot

17   of time really arguing with you about them.  I would suggest

18   adding the obscene phone calls into it, you don't have any

19   evidence of prepubescence in there.  And that's the

20   hallmark; you've got to have evidence of prepubescence.  You

21   don't have evidence of prepubescence in the 14-, 13- or

22   12-year-old.  And the child pornography evidence, icky as it

23   is, child pornography by definition is pictures of anyone

24   under the age of 18.

25          And you heard that, according to Dr. Rypma, what's

1    at the heart of what's predictive and what you're trying to

2    figure out is whether there is this entrenched deviant

3    pattern where all this person can think about is, "I need to

4    offend against prepubescent children," and that is not the

5    hallmark of his offending when it occurred.  It's not the

6    hallmark of even within the child pornography conviction

7    because the evidence with respect to that is ambiguous at

8    best.  One, it's both pre- and post-pubescent.  There is no

9    articulation of the circumstances of the finding on the

10   computer that demonstrate that he spent time looking at

11   them, was looking at them, organized them in any particular

12   fashion.  And there's evidence that he deleted a number of

13   them.  And there's no, from the description of the crime,

14   there's no evidence whether or not the prepubescent was in

15   the deleted space or not, just no way of knowing.  And

16   there's no particularized evidence as to what he actually

17   looked at.

18              Now, you have a weak diagnosis, and you have to

19   ask the next question, and really this is where the

20   battleground is is the next question:  Whether or not, if

21   you believe he has pedophilia, it causes a serious

22   difficulty in controlling his behavior.  But before we get

23   there, I want to point out how and why I think an example is

24   particularly weak.  Let me just state the obvious:  If

25   Mr. Shields is correctly diagnosed as a pedophile, as

1    defined in the DSM as recurrent, intense sexually arousing

2    fantasies, urges, or behaviors -- it's the "or," and that's

3    the issue of why it's weak -- we can clearly understand that

4    that diagnosis did not cause him to offend against, by my

5    count, at least -- and it depends on how you want to

6    articulate this -- at least three of his victims.  That is,

7    it did not -- pedophilia cannot have caused him to offend

8    against the postpubescent victims he has.  So, clearly,

9    something else caused him to do that.  What is that?

10   Anything offered from the government as to explain why he

11   did his postpubescent offending?  No.

12           And I would submit what more likely explains

13   Mr. Shields's total offending pattern history is that he

14   didn't really care back in '88, '89 who he was offending

15   against or what he was doing.  And I'm not saying that as an

16   excuse for anything other than if you look at his cluster of

17   offenses, his hands-on offenses, and even the one where he

18   says to a 9-year-old, "Pull your pants down" -- that's not a

19   hands-on, but it's an offense -- they are more readily

20   defined by being whatever happened to be in his path at the

21   time he was sexually offending, as opposed to, "Hmm, I've

22   got to go out and find a prepubescent boy, and I'm going to

23   do that."

24           I would submit, that's not what was going on in

25   Mr. Shields's mind.  What was going on in Mr. Shields's mind

1   was, "I don't care.  I'm in pain.  I'm angry.  I'm going to

2   do what I want to do, and I'm acting out."  It doesn't mean

3   at the time he wasn't acting compulsively, and, you know, if

4   you were all here 20 years ago and they hauled him in here

5   after he committed, boom, boom, boom, boom, right in a row,

6   you might have a different set of data to decide he's

7   dangerous because you wouldn't have age in his category or

8   in his corner.  You'd have a young man who was acting out a

9   lot; and maybe 20 years ago, they could say he's sexually

10  dangerous, but not today.

11          Now, the government has to prove causal link

12  between the mental abnormality that they claim he suffers

13  from and the sex offending.  That's what they have to do for

14  you to be able to say, "We can lock him up."  I would submit

15  that's the missing link.  There is no way to demonstrate

16  that the pedophilia causes the acting out, certainly because

17  at least half of his crimes don't involve prepubescent

18  children.

19          Now, you heard some testimony from Dr. Rypma about

20  what constitutes compulsivity; somebody basically acting

21  out, not being able to control themselves.  And you know

22  from that that maybe in  '89 he was pretty compulsive.

23  Since then, you really don't have any evidence of that, and

24  most recently -- and Dr. Rypma, who has treated sex

25  offenders for 30 years, can tell you that just because you

1   lock somebody that's compulsive up doesn't mean they don't

2   have the ability to feed their compulsivity.  And in fact

3   truly entrenched pedophiles in the prison community cut out

4   pictures from catalogs of little kids, masturbate repeatedly

5   and without concern for who is watching, get written up for

6   having sex with young-looking individuals, get written up

7   for masturbating, get written up for being unable to control

8   themselves.  You have no evidence, zero evidence of that

9   with respect to Mr. Shields.

10              Now, and again this is hard and ugly to even say,

11   but when you go back and look at Mr. Shields's serious

12   offending back in the late '80s, even then he exhibited

13   controls that aren't always seen in true pedophiles.  Ugly

14   as it sounds, somebody who wants to accomplish their crime

15   has a really driven quality, is not going to take a smack

16   and run away.  They're going to finish their crime.  They're

17   going to take whatever force is necessary and do the crime.

18              Mr. Shields, for better or worse, had some

19   controls, some breaks.  And if you don't like him for

20   that -- and I'm not asking you to -- I'm not asking you to

21   like him at all -- I'm only asking you to apply what little

22   science there is to him and figure out what it is you can

23   know and you can't know.  And what you can know is that back

24   in  '89, he didn't do some of the worst things that these

25   doctors have seen sex offenders in his circumstance do.

1           Now, okay, at this point I want to go through a

2     number of the things that the government wanted you to think

3     were indicative of risk or that suggests that you

4     shouldn't -- shouldn't credit that Mr. Shields is ready to

5     be released into the community.  And, again, a little bit of

6     knowledge is a dangerous thing.  The government is trying to

7     get you to focus on things that don't matter, and they're --

8     and I'm going to ask you, because I don't get to get up here

9     after I sit down, and Mr. Grady is going to get to come up

10    here and sum up, and he's going to get to sum up on some of

11    the things that Ms. Stacey elicited on cross-examination,

12    and I'm going to take the opportunity now to try and think

13    of the things that I need to address, and I probably won't

14    get them all, but that are not predictive, that you should

15    not consider outside of what the doctors already testified

16    about.  And here's just a couple of themes:

17          One is, you heard Ms. Stacey ask Dr. Rypma, "Well,

18    did you write this down in your report?  Did you consider

19    this?  Did you consider that?"  And when the answer is "No,"

20    there's kind of an "Aha, you're biased, you're in favor of

21    Mr. Shields."  First and foremost, toss Dr. Rypma's, toss

22    Tomich's, toss Plaud's testimony, and listen to Dr. Graney.

23    And Dr. Graney is a government psychologist.  Dr. Graney has

24    no reason to come here other than that she thinks

25    Mr. Shields gets it.  She doesn't have to come up here and

1    testify in behalf of people she therapizes.  She did, and

2    she came up here, and you know what?  You may think of her

3    as an advocate for him, you may think of Dr. Rypma as an

4    advocate for him, just because they're willing to articulate

5    things that demonstrate he's not dangerous.  And I would

6    submit that's an awful way of conceptualizing what they came

7    up here to do, and essentially it suggests that anybody that

8    says anything good about Mr. Shields is either lying or

9    stupid, basically, or ignorant in ignoring the important

10   scientific data.

11           Here we go:  Dr. Tomich left out the PCLRA scores.

12   PCLRA is the Psychopathy Check List Revised created by

13   Dr. Hare, who essentially is trying to figure out who's a

14   psychopath.  Now, Jeffrey Shields scored so low, he didn't

15   even include this in the scale.  And he didn't do that, but

16   we turned over and we're supposed to turn overdrafts of

17   reports.  Okay, he considered it, he considered psychopathy,

18   and he's, like, "He's scoring so low, I'm not even going to

19   worry about it."

20           That's important when you get back to the

21   Tasmanian Devil thing because if you think about -- forget

22   the Tasmanian Devil.  Let's just think about Jeffrey Dahmer

23   for a second.  When you think about Jeffrey Dahmer, somebody

24   who's a psychopath, he isn't even on the radar screen.  He

25   is not what we're trying to commit.  He is not a psychopath.

1    And Dr. Rypma, mind you, neither Tomich nor Plaud considered

2    him one either, and they don't really care that -- they

3    didn't write about that in their report.

4            The fact that it's not in the report is utterly

5    irrelevant to your consideration.  First of all, they have

6    no reports from the doctors.  The doctors had to actually

7    get up here and testify, so you got to hear what's out of

8    their mouths.  Their report is not evidence.  Their words

9    are evidence.  They had the opportunity to examine them to

10   their heart's content in depositions as long as they wanted

11   to talk to them.  Any questions they wanted to ask about

12   what their opinions were, they had ample opportunity to do

13   so.  So whether or not it's in a report matters nothing to

14   this equation.

15           The innuendo, and there were a number of questions

16   where the government asked, "Well, couldn't it be that --"

17   one example -- "that the 12-year-old wasn't available at the

18   time of trial?"  That's why he got 112 days, not because

19   there's some credit to the fact that this kid was in fact

20   prostituting himself, had been paid for these acts.  And the

21   government realized they had a weak case, and they realized

22   112 days was exactly what the case was worth.  The

23   government wants you to think, well, maybe the 12-year-old

24   wasn't available.

25           One, the Judge will instruct you not to speculate.

1    That is not evidence.  It's not evidence.  You heard

2    Dr. Rypma say, "I looked, and I didn't see it anywhere in

3    the reports," not in the government reports, not anywhere.

4            Now, they want you to think, okay, that's the

5    reason.  That, I would submit, is innuendo, but this was

6    1998.  This wasn't the ancient past.  We don't lose

7    12-year-olds in 1998, and there's no evidence that we did.

8            Now, check, first of all, there's no evidence that

9    writing bad checks proves you're sexually dangerous, no

10   scientific data, no evidence at all.  Now, did Mr. Shields

11   lie to Dr. Rypma?  Did Dr. Rypma fail to disclose to you

12   some important data?  Well, the reality is, and you heard it

13   on redirect, Mr. Shields was convicted of two counts of

14   writing a forged instrument, two counts, one each.  That's

15   what's in the record, that's what Dr. Rypma read, that's

16   what the testimony concerned.  Did he write more checks than

17   that?  I don't know.  Did Dr. Rypma ask him?  I don't know.

18   Does it matter to this proceeding?  No.

19           A quote from Seto, a researcher that did a very

20   small study on people that commit child pornography crimes

21   and also hands-on sex offending, a tiny study, a small

22   recidivism increase.  You can accept it, not accept it, but

23   you shouldn't change anybody's testimony based upon it.  It

24   didn't change Dr. Rypma's testimony.  It didn't change

25   Dr. Tomich's or Dr. Plaud's testimony.  And I actually asked

1   Dr. Tomich point-blank:  "You applied the Static-99.  What

2   factors did you use to increase the score?  None.  What

3   factors did you use to decrease the score?  None."  That's

4   it.  He considered it and didn't increase or decrease risk.

5           Now, Dr. Tomich talked about and Ms. Stacey talked

6   about other risk factors.  Now, be careful when you think of

7   any risk factors or protective factors that you want to make

8   use of because if the Static-99 measured for that variable

9   and you then think about it, you are doing the

10  double-dipping thing.  You are overpredicting because you're

11  basically saying, "Okay, we've got a Static-99 score, and

12  we're going to consider prior sex offenses."  No, no, no.

13  They're in the Static-99.  They're measured.  "Well, we're

14  going to consider male victims."

15          THE COURT:  You're at about the five-minute point.

16          MR. SWOMLEY:  Okay.  The double-dipping, basically

17  there's nothing that elevates risk in this case, nothing

18  that elevates it over the Static-99 score.  There's plenty

19  that decreases it.  Age is the big one.  Getting it is the

20  big unquantifiable one.

21          Operationalizing how you look at the past

22  offenses, and I've got to go quickly about this.  Here's the

23  important part:  What is predictive is getting the full

24  whammy of the criminal justice system and not getting it.

25  You bet, he did, he reoffended.  Here's what he did:  He has

1    a cluster of offenses.  He has a cluster of offenses from

2    1989.  If you wanted to commit him in 1990, more power to

3    you, but 20 years later I would submit there is no evidence

4    that he has that inability to control himself and is

5    impulsive.  He had the cluster of offenses.  All of them,

6    all of them were sentenced on one date in 1990, one date.

7    So you get one whammy, and in that whammy, he gets

8    probation; he completes it.  He does his jail time; he

9    completes it.  He doesn't have any more forcible -- and this

10   is important -- forcible sex crimes ever again.  The

11   government wants to talk about the '98 one.  That, I think,

12   is qualitatively different than anything else he did in

13   '89.

14          And you have somebody who gets it to a certain

15   extent, offends again.  He thinks he's not wrong.  You've

16   got to look at this guy who has the history of victimization

17   that he had.  He didn't learn boundaries.  He didn't learn

18   restraint.  This is a guy who was victimized, raped a year

19   later than, yes, his 6-year-old victim, but as bad, if not a

20   million times worse.  He was offended against repeatedly

21   from 7 to 11, rejected by his father at 7.  At 11 his mother

22   made a decision:  "I'm going to choose my new husband over

23   my son.  My son can't along with my new husband."  He goes

24   off to live with grandma and grandpa.  Grandpa is an

25   alcoholic.  Grandpa feeds him liquor all the time.  Grandpa

1  blows his head off with a shotgun.  He then goes back to mom

2  for a few days, a few weeks.  He can't live at home again.

3  He's homeless.  He's prostituting himself by the age of 13.

4  By the age 13, he is a child prostitute.  He's a child

5  prostitute.  And somewhere, somewhere you can say, okay, at

6  7, whatever has happened to him makes him so damaged, we

7  should lock him up.  Let's just say he can't be redeemed at

8  7.  Let's say we can't redeem him at 13.  Let's say we can't

9  redeem him once he starts sexually offending himself.

10         Ladies and gentlemen, there is nothing, nothing

11  organically wrong with his brain.  He is capable of

12  appreciating the wrongfulness of his conduct.  He didn't.

13  He didn't care to.  He didn't care about anybody and

14  anything.  And the only reason he does now is because of the

15  trust given to him by Dr. Graney.  And none of that can be

16  quantified in any scientific reports.  And that, ladies and

17  gentlemen, is what I would submit is what you should base

18  your decision upon, the nonexpert witnesses, the people who

19  come in here and read to you why they think he gets it.  And

20  this is in Jeffrey's own words submitted to his psychologist

21  long before the Adam Walsh Act was passed and

22  operationalized, before he had any thought that he was ever

23  going to come before you all, and I'm going to end with

24  this:

25         "I don't think there are words enough to describe

1    how you have touched my life.  I came to Butner a brassy,

2    miserable person, full of fear, anger, frustration,

3    resentment, revenge, and hatred, but will be leaving in just

4    a few short days a better man, more polished and confident

5    because of you.  You accepted me and all my luggage without

6    giving a second thought, and that says a lot.  You put up

7    with my highs and lows, my showing up unannounced, my weekly

8    traumas, which most of the time were not.  I just needed

9    your reassuring words that all would be fine.  You never

10   gave up on me or pushed me off to someone else.  You stuck

11   it out with me all the way to the end.  You were there for

12   me during a very painful time, my mother's death, and for

13   that alone is something I can never forget.  There is so

14   much you have done for me that I will never forget you.  You

15   should consider yourself an honor to your profession.  If

16   there were more people like you, the world would be a more

17   loving and caring place.  Dr. Graney, you are my rock, my

18   higher power, and inspiration to leave here and succeed.

19   From the bottom of my heart, thank you for all your support,

20   effort, and time to see me through.  Thank you."

21            No doubt, he's been a liar, he's been a sex

22   criminal, he's said what he needed to say to get out from

23   under many a situation; but what you have is someone who has

24   demonstrated that he gets it and that he can be redeemed.

25   And, ladies and gentlemen, we as a society should not be

Page 85

1    throwing away our people lightly.  And when you think about

2    Mr. Shields today, today, you should consider that he is, if

3    not a redeemed man, someone who can be redeemed, someone who

4    is hopefully on the road to redemption, someone who, when

5    50 years old comes around, wants to live a risk- and

6    offense-free life.

7            He didn't wake up when he was born or 2 or 3 years

8    old and say, "Mommy, I want to be a sex offender when I grow

9    up."  He didn't want any of the things that happened to him

10   after that, nor did he want, really, what he did to other

11   people.  He didn't have another way of dealing with his

12   pain.  Hopefully he does, and hopefully the constraints that

13   will be placed on him till the age of 50 will take him to

14   the clearly low-risk zone.  And I would ask you all, when

15   you think of all the evidence, consider the things that I

16   haven't been able to say that I would submit aren't

17   predictive, you will consider the only conclusion possible

18   here, and that is that Mr. Shields is not sexually

19   dangerous.

20           Thank you.

21           THE COURT:  Why don't we stand and stretch for a

22   second.

23           MR. GRADY:  Your Honor, could we be heard at

24   side bar briefly?

25

Page 86

1    SIDE-BAR CONFERENCE:

2              THE COURT:  What's the issue?

3              MR. GRADY:  There was a string of facts by

4    Mr. Swomley that Dr. Graney didn't have to be here.

5    Dr. Graney was subpoenaed and had to be here.

6              THE COURT:  I know.  Just move in, just move in a

7    little.  I understand it's a fine line, but she's got to

8    hear and they don't.

9              MR. GRADY:  Dr. Graney was subpoenaed.  She had to

10   be here, and I would ask that you tell the jury that.

11             THE COURT:  Was she subpoenaed?

12             MS. KELLEY:  We did subpoena her.  I think it was

13   a requirement for her job.  I don't think the Bureau of

14   Prisons would have allowed her to come.

15             MR. GRADY:  She had to be here.

16             MS. KELLEY:  She would have come if she weren't

17   subpoenaed, but, I mean, it's true.

18             THE COURT:  Well, not right now.  I'll throw it

19   somewhere in the jury instruction.

20             MR. SWOMLEY:  I'll say it right now.

21             THE COURT:  Either that or put it in the jury

22   instructions.

23             MR. SWOMLEY:  Okay.

24             THE COURT:  I don't think it's necessary.

25             MS. KELLEY:  John, come back.

1          MR. SWOMLEY:  I just don't want to be seen as --

2          THE COURT:  Whatever you want.

3          MR. SWOMLEY:  I'll say it right now.

4          (End of side-bar conference.)

5          MR. SWOMLEY:  There is an agreement that

6   Dr. Graney was subpoenaed to be here.  And if she's

7   subpoenaed to be here, she'd best be here, but she was not

8   required to say anything that she said.

9          MR. GRADY:  If it's okay with you, I'm going to

10  stand over here because I'm going to use the electronic

11  system.

12  CLOSING ARGUMENT BY MR. GRADY:

13         MR. GRADY:  Jeffrey Shields today as we stand here

14  in this courtroom is a pedophile.  Jeffrey Shields will as a

15  result have serious difficulty refraining from future acts

16  of child molestation.  And how do we know this?  We know

17  he's a pedophile because no one's disagreed that he's a

18  pedophile.  You've heard from three different experts in

19  this case that Jeffrey Shields meets the diagnostic criteria

20  for pedophilia.  Over a period of at least six months, he

21  experiences recurrent, intense sexually arousing fantasies,

22  sexual urges, or behaviors involving sexual activity with a

23  prepubescent child or children.  And you heard the basis,

24  and you're going to see not only a chronology but certified

25  records of convictions to prove that he has offended against

1   a 6-year-old boy, a 9-year-old boy, a 12-year-old boy, and

2   he has possessed child pornography images of prepubescent

3   children.

4          Attorney Swomley has told you that there is a

5   debate going about whether an individual can be diagnosed

6   with pedophilia based solely on behaviors because this

7   doesn't tell you anything about their sexual attractions.

8   You're here, and we have juries so that all of you can use

9   your common sense.  Mr. Shields mutually masturbated with a

10  12-year-old boy.  Has he offered some explanation of why he

11  did that beyond his sexual interest in children?

12  Mr. Shields fondled the penis of a 6-year-old boy and put

13  his finger in the boy's rectum.  That's a behavior, but what

14  does that tell us about his sexual interests and desires?

15  Does this argument about behavior make sense?  Mr. Shields

16  possessed images of preteen children, and he was convicted

17  for it, and now you hear parsing of the facts to which he

18  pled guilty.  You're going to have those facts.

19         Mr. Shields walked up to a 9-year-old boy and told

20  him to show him his penis.  Has he offered some plausible

21  explanation for this behavior that doesn't go directly to

22  Mr. Shields's sexual attraction to children?

23         Mr. Shields is a pedophile.  This isn't a weak

24  diagnosis.  You can see the criteria yourself, and you heard

25  every expert agree.  And you heard the testimony.  This is a

1   chronic condition.  One doesn't wake up tomorrow and no

2   longer have sexual attraction to children.  This is a mental

3   disorder.  There is something wrong with Mr. Shields.  He

4   has a serious mental disorder.  And this serious mental

5   disorder is chronic.  It doesn't go away, and you heard that

6   from the experts.  And you even heard from a witness called

7   by the defense, Mr. Thomas, that even if he successfully

8   completes treatment, treatment which, by the way, would be

9   his third time through sex offender treatment -- he

10  reoffended after the first two -- even if he successfully

11  completes treatment, he can't be cured of his sexual

12  attraction to children.  His own witness testified he can't

13  be cured.  We will teach him ways to avoid acting on it.

14  That's successful treatment.  That's the treatment that he

15  is at best going to get.  It will not cure him.

16          You have the jury verdict form.  The first

17  question I've talked to you about.  He has a serious mental

18  illness pedophilia.  You heard every expert testify to it.

19  You've heard every expert say it's serious, and you

20  yourselves can figure out this is a serious mental disorder.

21          The second question, and pay a lot of attention to

22  the language that this jury question uses and the statute

23  uses.  You've heard a lot of testimony about whether or not

24  Mr. Shields, it can be proved that he will reoffend.  Read

25  the language:  Will as a result of a serious mental illness,

1    abnormality, or disorder, Mr. Shields have serious

2    difficulty in refraining from child molestation?  It is not

3    the question that you have heard argued.  The question

4    before you is whether he would have serious difficulty

5    refraining.  It's not whether he will reoffend.  I would

6    suggest the evidence proves he will, but that's not the

7    question that you're being asked to answer.  You're being

8    asked to answer the question whether he will have serious

9    difficulty refraining.

10           And how do we determine this?  Well, you heard

11   from experts.  And I told you at the beginning of the trial,

12   what happens in the past tells us what will happen in the

13   future.  But I want to talk first about the experts.  You

14   heard from a court-appointed expert, appointed by agreement

15   of both of the parties, Dr. Plaud.  And you heard Dr. Plaud

16   has done thousands of these evaluations, and in all that

17   time, he has never testified for the government.  He's never

18   worked for the government, and he has never testified before

19   that someone is sexually dangerous.  But Jeffrey Shields is.

20           You heard from Dr. Tomich, the government's

21   witness, and you heard his background.  He works for the

22   Commonwealth of Massachusetts, and he works as a qualified

23   examiner.  And he has done hundreds of these evaluations,

24   and he found that Jeffrey Shields would have serious

25   difficulty refraining.  And you heard from them about how

1   they did it.  I'll spare you going through any math.  They

2   used those actuarials, they used the RRASOR, they used the

3   Static-99.  But that was the starting point.  It's not the

4   be-all and end-all.  Dr. Plaud told you endlessly he

5   recognizes limitations.

6          At the end of the day -- and this isn't something

7   Dr. Rypma disagrees with -- Dr. Tomich scored him as an 8 on

8   the Static-99.  Once you hit 6, you're in the highest risk

9   category.  Dr. Rypma agrees with that score.  And you heard

10  Dr. Plaud say, on the RRASOR he gets a 5.  That's the

11  highest risk factor as well.  So what does it tell us, even

12  if we discount that in the RRASOR, for instance, Jeffrey

13  Shields shares the characteristics of a group of sex

14  offenders who reoffend 73 percent of the time over ten

15  years?  73 out of 100 of them will be rearrested or

16  reconvicted of a new offense according to the RRASOR.  But

17  even if we discount that, what can the RRASOR tell us about

18  Jeffrey Shields versus other sex offenders?

19         Well, if you look, you're going to have the

20  numbers, and I'll put them up now.  An individual scoring a

21  0 has a ten-year recidivism rate of 6.5 percent.

22         MR. SWOMLEY:  Objection.  That is not what the

23  science says.

24         THE COURT:  Overruled.  It's up to you to decide

25  based on the evidence.

1        MR. GRADY:  This is in evidence.  You have this

2   right in front of you.  It says 6.5 percent.  What does a

3   guy with a 5 have?  73.  He is ten times more likely within

4   that group to reoffend.

5        What can you learn about Jeffrey Shields by

6   looking at the data just from this group?  He's almost --

7   well, almost ten times as likely to reoffend.  He shares the

8   same characteristics of the group.  And Attorney Swomley

9   said there's only what, 52 in that number 5 group?  That's

10  52 out of 2,500 offenders, only 52 score as high as Jeffrey

11  Shields.  What does that tell you about him?  Does that mean

12  the sample size is too small, or does it tell you something

13  else?  What does your common sense say about Jeffrey Shields

14  based on that?  He's in the top two percent.

15       You heard about the Static-99.  You heard Jeffrey

16  Shields scored an 8, and you saw and you're going to have in

17  evidence the recidivism rates associated with that score.

18  And, again, he's in the highest possible risk group.  And

19  compare that to the lowest possible risk group.  Even if you

20  discount those numbers, what does it tell you about Jeffrey

21  Shields, what characteristics he has as compared to other

22  sex offenders?  If you look at groups or characteristics

23  that make you more likely to reoffend, why do you end up in

24  the higher risk category, and how much more likely are you

25  to reoffend when you're in the higher risk category than

1   when you're in the low?  It's not the be-all and end-all,

2   and it doesn't -- that goes to reoffense.  It doesn't answer

3   the question about substantial difficulty refraining.  But

4   it's some evidence, and it informs your decision, and it

5   tells you something about Jeffrey Shields.  And that's why

6   these experts use it, and it's why they rely upon it.

7           But it's also why it's not the only thing they

8   look at because if you want to know about Jeffrey Shields,

9   you have to look at Jeffrey Shields.  And I told you at the

10  beginning of the trial, what happens in the past tells us,

11  it informs our judgment about what will happen in the

12  future.  And what do we know about Jeffrey Shields?  What do

13  we know about his present condition?  What do we know about

14  the past?

15          We know he suffers from pedophilia.  We know he

16  molested four children in 1989.  He did it, even though he

17  knew he could go to jail.  His sexual attraction to children

18  compelled him to commit those offenses.  And we know he went

19  to jail for more than, you know, the better part of three

20  years; and that he sat in a jail cell for those three years,

21  and he had a chance to think about what he had done and how

22  to not do it in the future, and to really think sitting in a

23  jail cell day after day after day about the consequences of

24  acting sexually against children.  And for most people, for

25  someone in control of their sexual urges, that would be

ed4ec87f-52e1-4e25-a25b-72c4c192c53c

1  enough to never do it again.  Someone in control of their

2  sexual urges would learn their lesson.  It wasn't enough for

3  Jeffrey Shields.

4        You heard that he went to sex offender treatment

5  after his 1990 offense and after he had spent three years in

6  prison.  And for some people who are in control of their

7  sexual attraction to children, sex offender treatment can

8  work.  They can learn about the victim.  They can learn

9  about the effect of their crimes.  They can learn how to

10  avoid doing it again.  And it didn't work for Jeffrey

11  Shields.  We know that because in 1998 he offend with a

12  12-year-old boy.  His sexual attraction to children

13  compelled him to reoffend.  He knew he could go to jail.  He

14  had been to jail.  He knew about the effect on the victims.

15  He had been to sex offender treatment.  He knew ways to

16  avoid it, or would have at least learned them had he

17  participated fully in the sex offender treatment.

18        Now, when you hear today today that he gets it,

19  now he understands, it sounds a lot like something I've seen

20  before.  And I want to show you something again that's in

21  evidence and you'll have with you in the jury room, and it

22  goes back to 1991.  And at this time, if you remember,

23  Jeffrey Shields was serving his sentence for his first four

24  crimes, and he was telling the judge in a motion, "Upon my

25  reentry into society, I plan on going to SLAA."  You heard

1   what that was, Sex and Love Addicts Anonymous.  It's like AA

2   for sex offenders.  "I plan on going to sex offender

3   programming.  I'm going to go to treatment, and I'm really

4   going to commit myself.  I am genuinely remorseful.  I'm

5   doing everything in my power to correct the situation."

6           Does that sound like the story you're hearing

7   today?  It should.  It's the same story 17 years ago Jeffrey

8   Shields said.

9           Now, you heard from Dr. Graney, he needed to treat

10  his history of abuse.  He knew about that 20 years ago.

11  He's been treating, you heard, for these history of abuse

12  since he was 7.  He's been seeing a psychiatrist since then.

13  For 40 years he's been seeing a psychiatrist, and a light

14  dawned --

15          MR. SWOMLEY:  Objection.  It's not the evidence.

16          MR. GRADY:  There are reports in evidence --

17          THE COURT:  Well, you'll have the evidence in

18  front of you.

19          MR. GRADY:  You will have the evidence, and if you

20  look in Dawn Graney's reports, you'll have them in evidence,

21  the reports will say, and I quote, "He has been seeing a

22  psychiatrist since age 7."  I can't find it right now

23  because I'm in the middle of this, but you'll see it and

24  you'll have it in evidence.  And I would stop and get it,

25  but I'm on a roll.

1          Don't be fooled by his treatment with Dawn Graney.

2  He went to Butner where Dawn Graney works for sex offender

3  treatment, and when he got there, he didn't do it.  He

4  treated for depression.  He went in for sex offender

5  treatment, and he fixed depression.  He went into the

6  hospital to treat cancer and treated a cold.  Depression

7  doesn't make you offend against children.  Depressed people

8  don't molest kids.  Pedophiles do.

9          And you heard Dawn Graney say, "I didn't treat him

10  at all for his attraction to children or his sex offenses."

11  And you know what?  She couldn't have.  And you know why?

12  Because he never told her the whole truth.  Even with

13  Dr. Graney, who he told you, really, he opened up to, he

14  finally realized how to, you know, really move forward in

15  his life, Dr. Graney -- you'll have this in evidence -- to

16  the court, August 19, 2004, he admitted to two prior

17  convictions for unlawful sexual conduct.  If you look at

18  Exhibits 4, 5, 6, and 7, just those alone, four prior

19  convictions for unlawful sexual contact.  He wasn't telling

20  Dawn Graney the whole truth because it didn't suit his

21  purposes.

22          He didn't tell her the ages of the victims.  She's

23  never diagnosed him with pedophilia because she never knew

24  that he offended against children at all.  Look through the

25  records, see if she's diagnosed him with pedophilia.  She

1   doesn't.  And you know why?  Because he's not telling her

2   the whole story.  Don't be fooled.  He treated for

3   depression.  He used it as a way not to treat first as a sex

4   offender.  He said, "Oh, I can't go to sex offender

5   treatment because I need to deal with these issues," which

6   he's been treating for for 40 years.  Don't be fooled.  You

7   heard Dr. Graney say he told her he was manipulative.  She

8   just didn't realize how much.

9            You've heard about probation that he will be on.

10  If you -- and I'll get to whether or not we think he can

11  finish that -- if you are worried that he needs it now, you

12  should be just as concerned that it disappears in three

13  years, that in three years there would be no restriction on

14  him; no restriction on where he went from probation, no

15  restrictions on who he went with, no one restricting his

16  owning a computer, no one restricting his use of that

17  computer.  But I want to come back.  So think about that,

18  he'll be 50 years old.  How significant is that drop-off,

19  and where is Jeffrey Shields in that group?  Where does the

20  evidence tell you Jeffrey Shields is?  That's a group.

21  That's evidence about a group.

22            You know about Jeffrey Shields.  What do you know

23  about him on probation?  You know in 1998 he was put on

24  probation for molesting that 12-year-old boy; and 30 days,

25  give or take, after being put on probation, Probation was in

1    seeking a warrant because he was thrown out of the Serenity

2    House he was living in.  And you have heard evidence about a

3    dirty urinalysis.  You've heard evidence about reasons --

4              MR. SWOMLEY:  Objection.

5              THE COURT:  Overruled.  Once again, it's people's

6    memory of what's in the evidence.  You'll see it or not.

7              MR. GRADY:  You'll have the certified conviction.

8    You can look at it.  You can look at the court's records,

9    and you can see that in December of 1998 -- he was sentenced

10   in October -- in December of 1998, a probation violation

11   warrant is sought.  And the court, when he shows up to

12   appear on that warrant, imposes the condition that he

13   undergo random drug testing.  What does that tell you?  What

14   does your common sense tell you about the reason for that

15   probation violation?  And you heard he went to jail for four

16   months as a result of this.  He can't comply with probation.

17             Now, there's a second probation violation, and

18   it's for a charge that you heard was theft by deception.

19   It's kind of a fancy term, but what it was about was his

20   failure to return a rented computer.  He chose to go to jail

21   while on probation for 18 months rather than return a rented

22   computer.  Knowing what you know about Mr. Shields, what

23   does your common sense tell you about why someone would want

24   to go to jail for 18 months rather than return a computer?

25   And this is in February of 2001, 19 months before he goes to

1  jail for possession of child pornography.  What does your

2  common sense tell you about why it is he would not -- it

3  seems to me a very simple task -- return the computer?  No

4  criminal charges, no probation violation, end of story.

5  Mr. Shields pled guilty to a probation violation, pled

6  guilty to not returning that rented computer.

7         Based on what you know about Mr. Shields, what

8  does your common sense tell you about why that might be?

9         MR. SWOMLEY:  Objection.  It calls for

10 speculation.

11        THE COURT:  Yes, I will sustain that one.

12        MR. GRADY:  And you heard that even on probation

13 in September of 2002, after in February of 2001 he did 18

14 months in jail, a month after he gets out of jail, September

15 of 2002, he's arrested for possession of child pornography.

16 He is on probation and reoffending.  His attraction to

17 children compelled him to reoffend again, and the fact that

18 he might go to jail didn't stop him.  The fact that he was

19 on probation didn't stop him.  The fact that he was a hare's

20 breath from jail, it didn't matter.  He's reoffended, and

21 none of these things have ever deterred him.  His sexual

22 attraction to children has compelled him to reoffend over

23 and over again.  That is serious difficulty refraining.  And

24 that isn't something from a chart.  That isn't something

25 about a group.  That's Jeffrey Shields.  That's the evidence

1    you have as to him.

2           He's not going to comply with the terms of

3    probation, I would suggest to you, and the evidence shows

4    it.  He hasn't done it, didn't do it in 1998, and he won't

5    do it now.  But even if he did, remember -- and I remember

6    there was a jury question about what conditions he might

7    have -- if you thought he needed them now, you should be

8    just as concerned about him not having them in three years.

9           You've heard discussion about Mr. Shields's age,

10   that he's 47-year old and that these mathematical group

11   studies don't account for it.  You heard Dr. Plaud, a

12   court-appointed expert, and Dr. Tomich say they considered

13   it.  It wasn't enough of a protective factor for Jeffrey

14   Shields, not for some group, for this person based on what

15   they knew about him, based on what they knew about his

16   history of offending.  And I want to talk about that because

17   both of those experts told you they looked at his offenses,

18   and you heard testimony about it.

19          Now, you've seen this before.  This was just a

20   chalk.  This is not the chronology you will have in

21   evidence, but you saw this when Dr. Tomich testified.  I

22   want to come back to those experts, Dr. Tomich and

23   Dr. Plaud.  They told you they looked at thousands of

24   documents.  Dr. Rypma says he did the same things.  In the

25   case of Dr. Plaud, he did two interviews, and that's kind of

1    important to remember in his testimony; and Dr. Tomich

2    looked at the interviews that Dr. Rypma and Dr. Plaud had

3    done, and they came up with an offense history because this

4    matters.  You haven't heard about Jeffrey Shields's

5    offenses.  All you've heard is, they could have been worse.

6    And that means he's not dangerous?  He could have killed a

7    child?

8             You heard that in March, 1998, he's convicted of

9    obscene phone calls.  You heard that in January of 1989 he

10   lured a 13-year-old boy into an abandoned building.  And if

11   you remember the opening statements, you heard you were

12   going to hear evidence that he was blottoed, he was drunk,

13   falling-down drunk when he committed these offenses, it

14   wasn't really his fault.  He's fixed that since.  What did

15   the evidence tell you about that?  On one of these occasions

16   in July, he's driving a car working as a delivery person.

17   In this particular instance, he's concocting a story.  You

18   didn't hear any expert at trial testify that any police

19   report said the victim reported the perpetrator was slurring

20   his speech, stumbling, smelled of alcohol, no evidence of

21   that.  And when you listen to the evidence, think of the

22   things they told you they would prove that didn't turn out

23   to be true.  But I want to come back to this.

24             In January, 1989, he lures a 13-year-old boy to an

25   abandoned building saying, "I need help finding my wallet."

1   And if you remember Dr. Plaud's testimony, he tells you,

2   "Jeffrey Shields never told me about that.  In November of

3   2007, he didn't tell me about that," had to go back to March

4   of 2008.

5            Offenses:  In April of 1989 he assaults a

6   9-year-old boy in the bathroom in Florida.  He's charged.

7   He's never convicted of that.  That charge is actually

8   dismissed.  Florida didn't want to fly him down and pay to

9   either send someone up to get him or fly him down for the

10  charges.  You heard that testimony.  Those were ultimately

11  dismissed in 2003, you'll see in the chronology, when he was

12  serving the time for the federal sentence.  But he goes back

13  to Maine, and in July he commits an assault on a 14-year-old

14  boy, and you heard about that.  And even now, after

15  Dr. Graney, he's omitting that January offense, and he's not

16  telling Dr. Plaud the whole truth about this offense.  If

17  you remember his testimony, Dr. Plaud told you -- now, you

18  know what the facts were.  Let's be clear about that.  He

19  grabbed a 14-year-old boy in the bathroom of this school,

20  put him in a headlock, dragged him into a stall, pulled his

21  pants down, fondled the boy's penis, and forced the boy to

22  fondle his until he ejaculated.  Not a very serious crime.

23  And he threatened the boy.

24            But what he told Dr. Plaud was:  He went in.  He

25  didn't tell him about the headlock, didn't tell him about

1    dragging the boy into the stall, didn't tell him about

2    forcing the boy to touch his penis, or even touching the

3    boy's penis.  He's still lying today.  He gets it?  This is

4    the guy that gets it?  He's not honest with Dr. Graney about

5    his offenses; he's not honest with the doctors here about

6    his offenses.

7           The next offense:  He returns to the same school

8    in September of 1989, and he encounters a 6-year-old boy at

9    a frog pond.  You heard these facts.  And he tells the boy

10   there is another frog pond deeper in the woods and it's a

11   better frog pond.  And when he gets there, he pulls the

12   boy's pants down, he fondles the boy's penis, and he

13   digitally penetrates the boy's rectum.  And you know those

14   are the facts.  That's what you heard.  And you heard

15   Dr. Rypma say, "Well, I read those reports, and I wrote down

16   what Jeffrey told me.  Jeffrey told me, 'I patted him on the

17   butt.'"  He gets it?  And you even heard Dr. Rypma say --

18          MR. SWOMLEY:  Objection.  That is not his

19   testimony.

20          MR. GRADY:  You even heard Dr. Rypma say that

21   didn't really matter.  He noted all the important stuff in

22   his report.  It didn't matter he patted the kid on the butt,

23   the 6-year-old on the buttocks; it didn't matter if he

24   digitally penetrated the boy's rectum.  Dr. Rypma said, "It

25   didn't matter.  It didn't need to be in my report."

1          And he gets, I told you, three years in jail as a

2     result of these offenses, but in March of 1989 he offends

3     with a 12-year-old boy, and you've heard a number of

4     descriptions of this as well.  You heard he told Dr. Graney

5     he was in a relationship with the boy.  You heard that he

6     said this was mutual masturbation, and you heard he told

7     Dr. Rypma that he never touched the boy.  He pled guilty to

8     unlawful sexual contact is what he pled guilty to, contact.

9     Is he telling Dr. Rypma the truth about this?  He can't even

10    tell his own expert the truth about his offenses.  This is

11    the guy that gets it?

12         And you'll see from the offense, you'll have these

13    facts, that after this, while on probation for that 2002

14    conviction involving the 12-year-old, he's possessing child

15    pornography.  Jeffrey Shields's attraction to children,

16    Jeffrey Shields's pedophilia, has compelled him to reoffend

17    and reoffend.  He will have serious difficulty refraining.

18         I have to talk a couple seconds about Dr. Rypma.

19    You heard testimony from Dr. Rypma, and you even heard the

20    argument here, that Jeffrey Shields isn't dangerous because

21    when he molested the first child in January of 1989, the kid

22    hit him and he ran away, and that's evidence that he's not

23    dangerous.  Ladies and gentlemen, the evidence is exactly

24    the opposite.  Jeffrey Shields learned from that.  You know

25    what he did next?  He picked victims who couldn't possibly

1    resist.  He picked a 9-year-old boy and a 6-year-old boy.

2    Can you imagine a 6-year-old boy trying to fight off a

3    28-year-old man?  He learned from that first offense.  He

4    wasn't not dangerous because of it; he became more

5    dangerous.  And when he did offend against another teenager,

6    a 14-year-old boy, he used physical force immediately.  He

7    put the boy in a headlock.  He didn't give the boy a chance

8    to resist.  That first offense isn't evidence that he's not

9    dangerous.  That's not credible.

10            Now, you heard testimony about these probation

11   violations.  Now, obviously a significant issue in this case

12   is his ability to comply with probation.  They brought in a

13   whole day of witnesses about his probation he'll be on in

14   the future.  So the probation he's been on in the past,

15   that's important.  That's significant.  And you heard what

16   Jeffrey Shields told Dr. Rypma about that probation.  I told

17   you, in 1989 he was violated three times, the last time for

18   the child pornography offense, but that second time for not

19   returning that computer.  And he told Dr. Rypma it was

20   dismissed.  And, again, Dr. Rypma told you that's not

21   important.  When on cross, Dr. Rypma acknowledged, oh, yeah

22   he pled guilty.  You heard the same kind of thing about the

23   checks.  He pled guilty to two; he had 128.  Even if you

24   believe that story about the checks, he says the charge of

25   not returning the computer was dismissed.  He actually pled

1    guilty.  Those two don't sound the same.  You didn't hear

2    any explanation of that.  Jeffrey Shields lied to his own

3    expert.  That's the guy that gets it.

4         Jeffrey Shields isn't a new man.  He is the same

5    guy that in 1991 told the same story to the court:  "I'm

6    really, really sorry.  I'm truly remorseful," just like he

7    said in 1991, but this time, this time he means it.  "I'm

8    going to go and commit myself to sex offender treatment,"

9    just like he said in 1991, but he wants you to believe that

10   today he actually means it.  "I'm going to keep this from

11   happening again because now I get it."  That's what he said

12   in 1991.  This time he means it?  He wants you to trust him,

13   and you didn't even hear from him.

14         MR. SWOMLEY:  Objection.

15         THE COURT:  Sustained.

16         MR. GRADY:  What does your common sense tell you

17   about why you didn't?

18         MR. SWOMLEY:  Objection.

19         THE COURT:  Yes, sustained.

20         MR. GRADY:  I told you at the beginning of this

21   trial, the past tells us about the future.  He has been to

22   jail and reoffended.  He has been on probation and sexually

23   reoffended.  He has been to sex offender treatment, and he

24   has sexually reoffended.  Mr. Shields may be on the path to

25   rehabilitation, but he's not very far along if he is, and he

1   hasn't proved that he is because --

2          MR. SWOMLEY:  Objection.  Has no burden of proof.

3          THE COURT:  That's right, the burden of proof is

4   on the government.

5          MR. GRADY:  I apologize.  The government has

6   proved that he isn't.  He went into federal prison, and even

7   if we assume Dr. Graney's story, he couldn't have done sex

8   offender treatment until she finished treating him for

9   depression, he finished in 2006.  He hasn't treated since.

10  You heard it:  He hasn't gone to sex offender treatment in

11  prison since then.  And you heard it was because he was

12  afraid it might be used against him here.  If he has been

13  honest about his past offenses, what would it have shown?

14  Nothing you don't already know about his past offenses.  If

15  he's been truthful, what will it show?  It would have shown

16  he was actually committed to doing things.  He's only afraid

17  it would be used against him here because he's not being

18  honest.

19         MR. SWOMLEY:  Objection.

20         THE COURT:  Yes, sustained.  Let me just say that

21  the time he was there, the Adam Walsh Act hadn't yet passed.

22         MR. GRADY:  He gets it?  Ladies and gentlemen,

23  Jeffrey Shields is exactly the same person who told the

24  court in 1991 exactly what you're hearing today:  "I'm

25  really sorry, now I get it, and I'm really going to commit

1    myself to changes," and he's reoffended and reoffended.

2            At the end of the day, the evidence has shown by

3    clear and convincing evidence that Jeffrey Shields, not some

4    group of sex offenders, Jeffrey Shields is a pedophile --

5    you heard that from every expert -- and that Jeffrey

6    Shields, based on his history, will have serious difficulty

7    refraining from future acts of child molestation, and I ask

8    that you find "yes" on both questions.

9            Thank you.

10           THE COURT:  Thank you.  This is what I'd like to

11   do.  It's a long time to just sit here.  I think we should

12   at least take a bathroom break, and then I'm going to see if

13   we could just -- even if the lunch is out there, what I'm

14   sort of thinking of doing is just doing a ten-minute break

15   just to go to the bathroom and then come back.  And then you

16   can eat your lunch -- I mean, if you want to grab a

17   sandwich -- I think it may be out there -- I have no problem

18   with that.  But, really, I think maybe you can discuss this

19   while you're eating lunch so I don't have that one-hour

20   hiatus, because once I let them all go to have lunch, it

21   will take me an hour to get everyone back in the room.

22           So let's do this:  a ten-minute bathroom break,

23   and then I'm going to do a charge, which is actually nowhere

24   near as long -- you'll see everyone clear out -- it's

25   nowhere near as eloquent.  And then I can get you going on

Page 109

1   the deliberations, all right?  So ten minutes.

2           THE CLERK:  All rise for the jury.

3           (Jury excused.)

4           THE COURT:  Let me say this:  We never really did

5   discuss what you could and couldn't say about Mr. Shields.

6   This is not a criminal case, so I'm not saying what you did

7   is in bad faith.  On the other hand, it has a criminal

8   feeling to it.  And I don't -- I declined to give any kind

9   of adverse inference kind of instruction.  The only question

10  is what kind of instruction I do give, if any.  We just

11  didn't discuss it, and it's a fairly important point.

12          MR. GRADY:  Your Honor, I wouldn't have done it

13  had we not, and the Court --

14          THE COURT:  I don't think we discussed it.

15          MR. GRADY:  I think we did, your Honor, that we

16  could comment on his failure to both testify, failure to go

17  to deposition, refuse to be interviewed by the government's

18  examiner.

19          THE COURT:  But, in any event, let me think about

20  it anyway.

21          MR. GRADY:  I didn't do it in bad faith.  I did

22  it --

23          THE COURT:  I absolutely find you did not.  This

24  is a civil case, not a criminal case, but it feels

25  uncomfortable to me.

1          MR. GRADY:  Well, I think it feels unnatural.

2          THE COURT:  So I'm trying to think in my mind what

3     to say about it because I wish this had been flagged.

4          MR. SWOMLEY:  Can I say that unless there is a

5     good-faith basis for saying that that is evidence of any

6     kind in any way of being sexually dangerous, that's a

7     problem because I would have been -- I mean, there wasn't

8     any testimony.

9          MR. GRADY:  They specifically raised this issue,

10    if you recall, saying that they advised him not to go to sex

11    offender treatment, and you said that we could comment on

12    that, and that's specifically what I commented on.

13         THE COURT:  Let me put it this way:  It sounded as

14    if it was the Butner piece that you were saying the reason

15    he chose not to go to the sex offender treatment.

16         MR. GRADY:  No.  I was saying specifically in

17    response to what they had said after he finished.

18         THE COURT:  Excuse me.  We're not going there at

19    this point, but what I am going to say is, "You shouldn't

20    draw any adverse inference from the fact that he may or may

21    not have decided to testify."

22         MR. GRADY:  Well, it's a civil case, your Honor.

23    I think you're now importing the criminal rule, and that's

24    not true, or I would argue --

25         THE COURT:  I wish I had more time to think about

1  it, is the real truth of it, and I will think about it over

2  the break, but it feels very uncomfortable for me.  And I

3  don't know what people have done in state court.  Do people

4  have the right not to testify in state court?

5      MR. SWOMLEY:  Mostly "yes" is the answer.

6      MR. GRADY:  They were allowed to put in evidence

7  as to why he didn't go.  Counsel testified she advised him

8  not to go.

9      MS. KELLEY:  Are we talking about him testifying

10  or him having sex offender treatment?

11      THE COURT:  There are two issues.

12      MS. KELLEY:  Can I just say, we understood -- and

13  I'm not accusing Mr. Grady of bad faith -- I just never

14  would because I feel like he's a very honorable person --

15  but we understood that that was not going to be commented on

16  and that there was not going to be an inference either way.

17  There's nothing in your jury instructions about it.

18      MR. GRADY:  I would not have a problem with the

19  Court saying the government has the burden of proof and

20  Mr. Shields did not have a burden of proving anything, but I

21  would object to the notion he has a similar Fifth Amendment

22  right in a civil proceeding.

23      THE COURT:  No, I'm not going to say that.  I'll

24  just say they can't draw an adverse inference.  They know

25  what the deal is at Butner.  When did the Adam Walsh Act

Page 112

1    pass?

2              MR. GRADY:  July of '06.  He got pulled back -- it

3    was mid-summer '06, and he got pulled back in November.

4              MS. KELLEY:  Well, can I just say, I don't think

5    there was sex offender treatment at Devens until very

6    recently.  And we deposed Cheryl Renaud on this point.

7    She's there, and she's the person who did his certification

8    evaluation.  They have started a treatment program there.  I

9    don't know, number one, it was ever offered to these guys,

10   even if they had wanted to be in it; and, number two, she

11   specifically testified they sign away all their rights when

12   they go into the program.  So this is a very complicated

13   issue to have an argument made to the jury on it.

14             THE COURT:  Well, let me put it this way:  I had

15   misunderstood what you were saying.  I had thought you were

16   commenting on his refusal to have sex offender treatment in

17   Butner.  Now, to the extent I'm wrong about that, I have to

18   apologize to you because that's what I thought you were

19   referring to.

20             MR. GRADY:  You never have to apologize.

21             THE COURT:  Being a judge means never having to

22   say you're sorry.  Maybe I just heard it too quickly and

23   missed that point.

24             Now, with respect to the post period of time --

25             MS. KELLEY:  In Devens, I mean --

Page 113

1          THE COURT:   -- that is a mixed bag.  I don't know

2     what to say about that.

3          MR. GRADY:  Well, they were allowed to put in some

4     evidence of it.  They opened the door.

5          MS. KELLEY:  We did not put in evidence of it.

6          THE COURT:  Excuse me.  They've got the issue fair

7     and square, and I think I'm not going to wade back in.

8          MS. KELLEY:  I never would have brought that up in

9     these proceedings, except on Tomich's direct he testified,

10    "And he's never gotten treatment at Devens," suggesting that

11    he should have and that would have made a difference.  And I

12    just think that is a very complicated question with a lot of

13    legal --

14         THE COURT:  I'm just going to stay out of it.

15         MR. SWOMLEY:  I think that the argument was

16    prejudicial.  And while I'm not saying that you can make an

17    instruction that would cure it, there's prejudice that

18    attaches.  And several times there have been suggestions

19    that --

20         THE COURT:  I think it's such a minor point of

21    minor, minor, minor points, that is not the big issue.  The

22    big issue of all the points there are, I am worried about

23    what inference can be drawn from -- I'm not worried about

24    the sex offender treatment.  That's been fully played out by

25    the jury.  It is confusing because it's a civil case, but it

1    has a criminal feel to it.  So we've done certain things

2    here.  I mean --

3              MR. GRADY:  I wouldn't say it didn't feel

4    uncomfortable to me.  I'm a former prosecutor, and it was

5    very odd to say --

6              THE COURT:  I think I'm just simply going to say

7    they bear the burden, and you shouldn't draw an adverse

8    inference from the fact he's chosen not to testify.  That's

9    where I'm going to leave that.

10             MR. SWOMLEY:  I need to make my record with

11   respect to the other objections.

12             THE COURT:  No, not now.  She's been going

13   since -- you'll have to to do it later.

14             MR. SWOMLEY:  When?

15             (A recess was taken, 12:40 p.m.)

16             (Resumed, 12:55 p.m.)

17             THE COURT:  Mr. Swomley is desperate to put a few

18   things on the record.

19             MR. SWOMLEY:  My objections, he called pedophilia

20   a serious mental illness.  It is not a serious mental

21   illness.

22             THE COURT:  Please, just say them through or we'll

23   be here all afternoon.  You objected about ten times.

24             MR. SWOMLEY:  I object to that.  He closed on the

25   individual risk rate of Jeffrey Shields was 72 percent, and

1   that is not accurate either.  It's the group rate, not the

2   individual.  Can't say anything about the individual;.

3          Depressed people don't molest.  Actually, I don't

4   think there was any evidence of that whatsoever, but in fact

5   the truth is that it is a predictor, and if you treat them

6   with SSRIs, they don't molest.

7          He closed on, no one will be watching him after

8   three years.  It's not true.  There's a Sex Offender

9   Registry Board, and that is a lifelong watching vehicle.

10         The child porn, there was a suggestion that he

11  would reoffend again, and I actually think there might need

12  to be an instruction here with respect to that.  Reoffending

13  for even the crime of child pornography, by my reading of

14  the Adam Walsh Act, is not a basis for commitment.  Even if

15  you believe he's going to reoffend by looking at child

16  pornography again, I would submit that's not one of the

17  hands-on offenses that is a committable offense.

18         THE COURT:  That is a legal question.

19         MR. GRADY:  I think the child pornography is

20  covered by child molestation.  Those children are certainly

21  victims --

22         THE COURT:  No, I'm not going to have this case

23  turn on that.  I am going to say that molestation is not the

24  same as looking at kiddy porn, and I'm not going to have

25  this case go up or down on that.  The rest is just argument,

Page 116

1   but that's a serious legal point.

2           MR. GRADY:  Note the government's objection.

3           MR. SWOMLEY:  I've got a couple more, Judge.

4           THE COURT:  Well, come on, move it because --

5           MR. SWOMLEY:  I'll be quick.  We heard about

6   drinking, that he said the drinking made him not at fault

7   for what he did, and I submit there was no evidence to that

8   effect whatsoever, of denying fault by saying he was

9   drinking.  And then that he hasn't been treated since, and

10  we talked about it at side bar, but I would move for a

11  mistrial based on those --

12          THE COURT:  Denied.  All right, let's go.

13          (Jury enters the courtroom.)

14          THE CLERK:  Members of the jury, please remain

15  standing.  Everybody else, you may be seated.

16          THE COURT:  Good afternoon.

17          THE JURY:  Good afternoon.

18  CHARGE BY THE COURT:

19          THE COURT:  There's an old traditional in the

20  Federal Court and in the courts of our Commonwealth that at

21  this stage of the proceeding, the judge stands and faces the

22  jury, and the jury faces the judge.  This is the best way

23  that I know how to symbolize the important role that we both

24  play at this trial.

25          My job has been threefold:  The first has been to

ed4ec87f-52e1-4e25-a25b-72c4c192c53c

1    impanel a fair and impartial jury.  I want to thank you on

2    behalf of everybody in this room for being willing to serve.

3    You saw that whole long line of people who could not or

4    would not serve, and I thank you on behalf of everyone here.

5           My second job was to rule on the evidentiary

6    objections.  Sometimes we did that before you came in, so if

7    we were a few minutes late, I apologize.  We did it during

8    the breaks, and we did it after you left.

9           My third and final task is to give you the

10   instructions of law.  You must follow those instructions,

11   whether you agree with them or not.

12          Now, as I'm sure you would agree, that although I

13   wear the black robes, you've got the tough job here because

14   you're the ones who have to answer this verdict form that I

15   handed out.  You're the ones who needs to speak the truth,

16   and that's what "verdict" comes from, the Latin words that

17   say "speak the truth," verdict.  So you're the ones who have

18   to render a unanimous verdict.

19          My charge will be divided into three portions.

20   The first portion is very general and is not so different

21   from what you heard on the first day of this trial, what is

22   evidence, what isn't evidence, but it will have a whole new

23   meaning to you now because you've just sat through this

24   trial.  My second portion of the jury instructions will be

25   very, very specific to the questions you have to answer

1    unanimously.  And the third and final part will be what I

2    call the mechanics of deliberating, which means getting this

3    case out, choosing a foreperson -- there will be no

4    alternates -- and also how to go about deliberating.

5            Now, although we have the world's greatest court

6    reporter, you will not be getting an instant transcript of

7    this charge.  It takes a while to put together a charge, and

8    you don't want to be waiting if you want one.  So I very

9    much encourage you to take notes on the charge, and

10   hopefully you will be able to pool together your notes to

11   get exactly what the charge is.  Now, if for some reason you

12   don't, I will also be giving you this tape recording of what

13   the charge is, so you will have that with you in the jury

14   room.  So why don't we now sit down and get going.

15           These instructions are about the law you must

16   apply.  I do not mean any of my instructions to be

17   understood by you as a comment by me on the facts or on the

18   evidence in this case.  You are the judges of the facts and

19   the sole judges of the credibility of the witnesses.  You

20   should consider the instructions as a whole.  I may repeat

21   some portions, but that's simply to make sure that you can

22   get them down, but that doesn't mean that the parts that I

23   repeat are any more important.  All of the instructions are

24   equally important.  Even if you disagree with some of the

25   rules of law or don't understand the reasons for them, you

1   are bound to follow them as jurors in this case.  This is a

2   fundamental part of our system of government by law rather

3   than by the individual views of the judge and the jurors who

4   have the responsibility for deciding the case.

5         To the extent I say something differently from

6   what the attorneys say, you must follow my instructions of

7   law.  However, I'm not the judge of the facts here, and I

8   have no opinion as to what your verdict should be.  You must

9   disregard any facial expressions that you think I have.

10  Also, if during the course of the instructions I state the

11  evidence differently than the way you remember it, you must

12  disregard my memory of the evidence and the attorneys'

13  memory of the evidence.  It's your memory of the evidence

14  that counts.

15        So what is evidence?  The evidence consists of the

16  sworn testimony of the witnesses, all exhibits received in

17  evidence, and all facts that have been admitted or

18  stipulated to.  The mere number of witnesses or length of

19  the testimony or number of exhibits has no bearing on what

20  weight you give to the evidence or on whether you find that

21  a party's burden of proof has been met.  Weight does not

22  mean the amount of the evidence.  It means your judgment

23  about the credibility and importance of the evidence.

24        Now, there are many things that happen over the

25  course of a trial which are not evidence.  Opening

1    statements and closing arguments made by the lawyers are not

2    evidence in the case.  Questions which were not answered or

3    as to which objections were sustained also are not evidence

4    in the case.  As you noticed, there were many questions that

5    were chockful of information, and there was an objection,

6    and I sustained it or the witness said "no."  It's not the

7    information in the question that is evidence in this case

8    unless there is an independent admissible basis for it.

9          The function of lawyers in making their arguments

10   is to point out things that are most significant or most

11   helpful to their side of the case, and in so doing, to call

12   your attention to certain facts or inferences that might

13   otherwise escape your notice.  But in the final analysis, it

14   is your own recollection and interpretation of the evidence

15   that controls in the case.

16         Now, at times, as I said before, lawyers objected

17   to questions, and that simply meant that the lawyers were

18   asking that I make a decision on a particular rule of law.

19   We have these thick -- they're up there -- Rules of

20   Evidence, so they were asking me to make a legal ruling.

21   These only relate to the legal questions that I had to

22   determine and should not influence your thinking.  So when I

23   sustained an objection to the question, the witness was not

24   allowed to answer, and you should not attempt to guess what

25   the answer might have been.  Also, if I overruled the

Page 121

1    objection, you can consider that evidence like any other.

2           Sometimes -- I think it didn't happen very often

3    here -- I received evidence for a limited purpose.  So I

4    said, "This isn't for the truth of the matter but maybe what

5    someone's state of mind was when he was saying something."

6    I remind you of that now and urge you only and order you

7    only to use the evidence for that purpose.

8           Now, during the trial I occasionally may have made

9    comments to the lawyers or asked questions of a witness or

10   said something.  Please do not assume from anything I may

11   have said that I have an opinion about what your verdict

12   should be in this case.  Except for my instructions to you

13   on the law, you should disregard anything that I've said to

14   you during the trial at arriving at your findings of fact.

15          You can consider both direct and circumstantial

16   evidence.  Remember, we went through this.  Direct evidence

17   is where a witness testifies directly about the fact that is

18   to be proved based on what he or she claims to have seen or

19   heard or felt with his or her own senses, and the only

20   question is whether you believe the witness.  Circumstantial

21   evidence is where no witness can testify directly about the

22   fact that is to be proved, but you are presented with

23   evidence of other facts, and then asked to draw reasonable

24   inferences from them about the fact which is to be proved.

25          The law allows either type of proof in a civil

1    trial.  While you may rely entirely on circumstantial

2    evidence, any inferences or conclusions which you draw must

3    be reasonable and natural based on your common sense and

4    experience of life.  In a chain of circumstantial evidence,

5    it is not required that each one of your inferences and

6    conclusions be inevitable, but it is required that each of

7    them be reasonable.  Direct and circumstantial evidence have

8    equal standing in the law.  That is, with respect to what

9    weight should be given to the evidence before you, the law

10   makes no distinction between direct and circumstantial

11   evidence.  Also, no greater degree of certainty is required

12   of circumstantial evidence than of direct evidence.  You're

13   to consider all of the evidence in the case and give each

14   item of evidence the weight you believe it deserves.

15          As jurors, your function is to evaluate the

16   exhibits that have been introduced and to determine the

17   credibility of the witness's testimony.  "Credibility" is

18   another word for "believability."  It is your function to

19   determine the believability of the witnesses who testified.

20   You're free to decide that you believe all of what a witness

21   told you, none of what a witness told you, or some of what a

22   witness told you.  You're free to do that in accordance with

23   your collective judgment as to the believability of what it

24   was that the witness told you while testifying.

25          Neither I nor anyone else can tell you all the

1    ways that you go about making this important judgment about

2    credibility.  However, I can suggest to you some of the

3    things you can consider in making that judgment.  You can

4    consider the conduct and demeanor of the witness while

5    testifying, the frankness or lack of frankness that the

6    witness showed while testifying, the reasonableness or the

7    unreasonableness of the witness's testimony, the probability

8    or improbability of the testimony, the opportunity or lack

9    of opportunity that the witness had to see and know the

10   facts about which he or she was testifying, the accuracy of

11   the witness's recollection, the degree of intelligence shown

12   by the witness, the witness's prior conduct for

13   truthfulness, and whether the witness has attempted to fill

14   in gaps in his or her memory of events with the information

15   he or she obtained after the event.  You also may consider

16   whether the witness has a motive for testifying and the

17   interest or lack of interest that the witness may have in

18   the outcome of the case.  You may take into consideration

19   the character and the appearance of the witness at trial and

20   any bias he or she has shown in his or her testimony.  This

21   list isn't exhaustive but a list of the things that you

22   should take into consideration.

23          You may also consider inconsistencies or

24   differences as you weigh the evidence, but you do not have

25   to discredit testimony merely because there are

1    inconsistencies or differences in the testimony of a witness

2    or between the testimony of different witnesses.  Two or

3    more persons witnessing an incident or transaction may see

4    or hear it differently.  In weighing the effect of any

5    inconsistency or difference, you may consider whether it

6    concerns a matter of importance or an unimportant detail,

7    and whether it results from innocent error or intentional

8    falsehood.  You are not required to accept testimony, even

9    if it is uncontradicted.  You may decide, because of the

10   witness's bearing and demeanor, or because of inherent

11   improbability, or for other reasons sufficient to you, that

12   the testimony is not worthy of belief.

13        You will recall that during the trial a witness

14   was sometimes asked to give testimony about a statement made

15   by that witness or some other witness before trial.  Unless

16   I tell you otherwise, a before-trial statement is brought to

17   your attention only to help you decide whether you believe

18   and credit the testimony at trial of the witness who made

19   the statement before trial.  If you find that a witness

20   knowingly gave a false statement concerning any material

21   matter before trial, you may take that into account in

22   deciding whether to distrust the testimony at trial.  You

23   may credit the testimony of that witness or give it no

24   credit, or whatever credit you think it deserves.  Also, if

25   a witness said something different about this matter

1   earlier, even though truthfully, and you decide that the two

2   statements are in conflict, then you may consider whether

3   there is reason for you to doubt or discredit that

4   testimony.

5          Except as I tell you otherwise in these

6   instructions, you cannot treat a statement made before trial

7   as evidence in this case for any other purpose than to

8   decide how it bears on the credibility of the witness, but

9   there are two exceptions to this rule:  One, the statements

10  made under oath at a deposition by a witness and offered at

11  trial, and any statements made by the respondent can be

12  considered as evidence.

13         Now, stipulations of fact, you've heard about

14  those.  A stipulation of fact is an agreement between the

15  parties that a certain fact is true.

16         Now, you've heard from three expert witnesses.

17  You have heard testimony from persons described as experts.

18  An expert witness has special knowledge or experience that

19  allows the witness to give an opinion.  You may accept or

20  reject this expert testimony.  In weighing the testimony of

21  the experts, you should consider the factors that generally

22  bear upon the credibility of a witness, as well as the

23  expert witness's education and experience, the soundness of

24  the reasons given for the opinion, and all other evidence in

25  the case.  Remember that you alone decide how much of a

1   witness's testimony to believe and how much weight it should

2   be given.

3           Now I am going into what I call the middle portion

4   of the instructions that are very specific to what it is

5   that the government has the burden of proving and very

6   specific to that verdict form, so I've passed the general

7   instructions, what is evidence, what isn't, and we're going

8   right into that verdict form that you have.

9           This is a civil proceeding in which you, the jury,

10  must determine if the government has proven that the

11  respondent, Mr. Shields, is a sexually dangerous person as

12  that term is defined by federal law.  In order for you to

13  find Mr. Shields a sexually dangerous person, you must find

14  that the government has proven the following three elements:

15          First -- and I'll repeat them -- first, that

16  Mr. Shields engaged in or attempted to engage in sexually

17  violent conduct or child molestation.  First, that

18  Mr. Shields engaged in or attempted to engage in sexually

19  violent conduct or child molestation;

20          Second, that Mr. Shields suffers from a serious

21  mental illness, abnormality, or disorder.  Second, that

22  Mr. Shields suffers from a serious mental illness,

23  abnormality, or disorder;

24          Third, that as a result of the serious mental

25  illness, abnormality, or disorder, Mr. Shields would have

1  serious difficulty in refraining from sexually violent

2  conduct or child molestation if he were to be released.

3  Third, that as a result of the serious mental illness,

4  abnormality, or disorder, Mr. Shields would have serious

5  difficulty in refraining from sexually violent conduct or

6  child molestation if he were to be released.

7          Now, I'm going to go into those in greater detail

8  right now.  Let me talk to you about element one.  As to the

9  first element, whether Mr. Shields has engaged in or

10  attempted to engage in sexually violent conduct or child

11  molestation, Mr. Shields has agreed that he has convictions

12  that meet this definition.  Because he has agreed, this is

13  not an issue that you need to decide.  That's why it's not

14  on the verdict form.  Mr. Shields may not, however, be found

15  to be a sexually dangerous person solely because he has

16  convictions that meet this first element.  The government

17  must also prove the two remaining elements.

18          So before I get to the two remaining elements, I

19  need to talk to you about the burden of proof.  For the

20  remaining two elements, the government has the burden of

21  proving by clear and convincing evidence -- by clear and

22  convincing evidence -- that Mr. Shields suffers from a

23  serious mental illness, abnormality, or disorder, and that

24  as a result of the serious mental illness, abnormality, or

25  disorder, Mr. Shields would have serious difficulty in

1    refraining from sexually violent conduct or child

2    molestation if he were to be released.  The burden of proof

3    never shifts to the respondent, Mr. Shields.  You should

4    draw no inference from the fact that he did not testify.  If

5    you conclude that the government has failed to establish

6    either of these elements by clear and convincing evidence,

7    you may not find that Mr. Shields is a sexually dangerous

8    person.  On the other hand, if you conclude that the

9    government has established both of these elements by clear

10   and convincing evidence, you must find that Mr. Shields is a

11   sexually dangerous person.

12            What does "clear and convincing evidence" mean?

13   Clear and convincing evidence is a more exacting standard of

14   proof than proof by a preponderance of the evidence where

15   you need believe only that a party's claim is more likely

16   true than not true.  This stricter standard is sometimes

17   used in a civil case when, as here, an important individual

18   liberty interest is at stake.  On the other hand, clear and

19   convincing proof is not as high as the standard of proof

20   applied in criminal cases, which is proof beyond a

21   reasonable doubt.  Clear and convincing proof leaves no

22   substantial doubt in your mind.  It is proof that

23   establishes in your mind not only that the proposition at

24   issue is probable, but also that it is highly probable.

25            It is enough if the party with the burden of

1    proof, here the government, establishes its claim beyond any

2    substantial doubt.  The government, however, does not have

3    to dispel every reasonable doubt.

4            Clear and convincing evidence refers to the

5    quality and persuasiveness of the evidence, not to the

6    number of witnesses or documents.  In determining whether a

7    claim has been proved by clear and convincing evidence, you

8    may consider the relevant testimony of all witnesses,

9    regardless of who may have called them, and all the relevant

10   exhibits received in evidence, regardless of who may

11   introduced them.

12           Now let me move on to further discussion of the

13   second element.  The second element the government is

14   required to prove is that Mr. Shields currently suffers from

15   a serious mental illness, abnormality, or disorder.  To find

16   for the government on this element, you must find that it

17   has proven this element by clear and convincing evidence.

18           Now I move on to element three.  The third element

19   that the government must prove by clear and convincing

20   evidence is that as a result of the serious mental illness,

21   abnormality, or disorder, Mr. Shields would have serious

22   difficulty in refraining from sexually violent conduct or

23   child molestation if released.  By child molestation, I do

24   not include child pornography.

25           The government must prove that the serious mental

1    illness, abnormality, or disorder would cause Mr. Shields to

2    have serious difficulty in refraining from sexually violent

3    conduct or child molestation if released.  To prevail, the

4    government must establish this link between the finding of a

5    serious mental condition and a finding of serious difficulty

6    in controlling behavior.  This link distinguishes a person

7    subject to civil commitment based on a finding of sexual

8    dangerousness from those other dangerous persons who are

9    perhaps more properly dealt with exclusively through

10   criminal proceedings.

11        To determine whether Mr. Shields today suffers

12   from a serious mental illness, abnormality, or disorder that

13   would cause him to have serious difficulty in refraining

14   from sexually violent conduct or child molestation if

15   released, you may consider the totality of the evidence.

16   You may draw inferences from Mr. Shields's past conduct and

17   evaluate the testimony of experts.  The respondent's past

18   sexual misconduct need not have led to criminal charges

19   and/or convictions for you to consider it in answering this

20   question.

21        As I mentioned before, however, you may not

22   determine that Mr. Shields is a sexually dangerous person

23   solely because of his past sexual misconduct.  While you may

24   consider past conduct to the extent that you find it is

25   relevant, your focus must be on the present and the future.

1    The question you must decide is whether the government has

2    proven that Mr. Shields today suffers from a serious mental

3    illness, abnormality, or disorder, as a result of which he

4    would have serious difficulty from engaging in sexually

5    violent conduct or child molestation if he were to be

6    released, not whether Mr. Shields suffered in the past from

7    such a serious mental illness, abnormality, or disorder.

8           Because your inquiry is whether Mr. Shields would

9    experience serious difficulty in refraining from sexually

10   violent conduct or child molestation if he were to be

11   released, you may consider the court-imposed conditions of

12   his supervised release in assessing Mr. Shields's ability to

13   refrain from such conduct if released.  Such a determination

14   is an individualized one, and it must be made on a

15   case-by-case basis.  While persons released from prison

16   sometimes commit new crimes of one sort or another, this

17   fact alone is an impermissible basis upon which to find that

18   Mr. Shields is a sexually dangerous person.  I therefore

19   instruct you that you may not conclude he is sexually

20   dangerous simply because you think he might commit some

21   crime if released.  Rather, the only way that you may

22   conclude that Mr. Shields is sexually dangerous is if you

23   find that the government has proven by clear and convincing

24   evidence that Mr. Shields has a mental illness, abnormality,

25   or disorder, as a result of which he would have serious

1   difficulty in refraining from sexually violent conduct or

2   child molestation.

3          What do I mean by "serious"?  You'll notice that

4   "serious" is in both places, serious mental illness

5   abnormality or disorder, question one, serious difficulty in

6   refraining.  You notice that word is in both questions.

7   What do we mean by "serious"?

8          You have heard that the law uses the word

9   "serious" twice in regard to the determination as to whether

10  or not someone is sexually dangerous.  First, a person may

11  not merely have a mental illness, abnormality, or disorder.

12  You must find that the illness, abnormality, or disorder is

13  serious.

14         Second, the law requires that the government must

15  prove by clear and convincing evidence not just that

16  Mr. Shields might have some difficulty in refraining from

17  sexually violent conduct or child molestation, but that he

18  would have serious difficulty in refraining.  "Serious"

19  means grave, important, significant, weighty, difficult.  In

20  the context of this case, "serious" means of such a

21  considerable or grave degree so that Mr. Shields would have

22  a substantial difficulty in refraining from certain

23  behavior.  It is thus insufficient for you to find sexual

24  dangerousness if you only conclude that he would have had

25  some difficulty in refraining.  The difficulty must be

Page 133

1    serious.

2            Now, what are the consequences of this finding?

3    If Mr. Shields is found to be a sexually dangerous person --

4    that's the statutory term -- then Mr. Shields will be

5    civilly committed for treatment in a suitable facility.

6    Mr. Shields will be confined to this suitable facility until

7    it is found that he is no longer sexually dangerous to

8    others, or will not be sexually dangerous to others if

9    released under a prescribed regimen of medical, psychiatric,

10   or psychological care or treatment.  If Mr. Shields is so

11   confined, annual reports concerning Mr. Shields's mental

12   condition and the need for his continued commitment will be

13   filed with the court.  Mr. Shields will be permitted to

14   request that I as the committing court conduct a judicial

15   review of the need for his continued commitment and

16   determine whether he should be discharged from the facility.

17   Mr. Shields may file such a request at any time during his

18   commitment so long as it is 180 days after a court last

19   determined that he should continue to be committed.  Still,

20   there is no guarantee that he will ever be released.

21            If you find that Mr. Shields is not a sexually

22   dangerous person, he will be released from custody on

23   supervised release for three years with certain conditions

24   of release monitored by the Maine Federal Probation Office,

25   as you heard about.

1       Evidence has been presented that Mr. Shields is a

2   homosexual, or gay man.  The issue in this case is not

3   Mr. Shields's sexual orientation but whether he is a

4   sexually dangerous person as I have defined that for you in

5   prior instructions.  You all swore that you could be fair

6   with respect to his sexual orientation, and I am reminding

7   you of that oath right now.

8       So I remind you that the sole issue in this case,

9   and the only issue to be decided by you as jurors, is

10  whether or not the government has proven to you by clear and

11  convincing evidence that he is a sexually dangerous person.

12  You have heard some graphic evidence concerning his past

13  misconduct in relation to sexual matters.  The question

14  before you now is not whether he committed these sexual

15  offenses in the past because there are stipulations that he

16  has.  The question is whether Mr. Shields is a sexually

17  dangerous person today; in other words, whether he suffers

18  from a serious mental illness, abnormality, or disorder, as

19  a result of which he would have at this time serious

20  difficulty in refraining from engaging in future sexually

21  violent conduct or child molestation if released.

22      Now I am moving on to the third and final part of

23  these jury instructions.  You have the special verdict form,

24  and let me talk to you about that right now.  The first

25  thing you should do when you go back into that jury room is

1   to choose a foreperson.  That foreperson is not more equal

2   than the rest.  You all come from different backgrounds.

3   None of you knew each other beforehand.  You all bring to

4   bear very important perspectives here.  The foreperson has

5   certain obligations to me as the Court.  The first is that

6   the foreperson will fill in the jury verdict slip.  As you

7   noticed, there are two questions.  If you answer Question 1

8   "yes," you move on to Question 2.  If you answer it "no,"

9   the foreperson would move on, certify that it's unanimous,

10  sign it, and date it.

11          Now, so the jury foreperson will fill in the

12  verdict form.  The jury foreperson certifies that it's

13  unanimous.  I never want a running tally.  I don't want to

14  know, "We're at six-six, ten-two."  I don't want to know

15  until it's unanimous.  So, please, that is not something you

16  should communicate to me.  At this point, the foreperson

17  simply certifies it's unanimous, signs it, and dates it.

18          Second, the foreperson can ask me questions.  I

19  urge you to refer to your notes.  I went through what the

20  law is under the Adam Walsh Act.  I urge you to listen to

21  the tape recording.  If, though, that doesn't answer your

22  question, write out the question on a form that Mr. Alba

23  will give to you.  Don't ask him the question.  That's like

24  playing telephone when you were a kid; you know, you say

25  something to him, and he tries to interpret it to me.  Don't

Page 136

1    ask the court security officer.  Write it down, sign it, and

2    date it.  I may not get back to you immediately.  So, for

3    example, I'm going to let everyone go have lunch.  So, you

4    know, if there's a question that comes in right away, I

5    won't probably see them again until, let's say, 2:30-ish.

6         Secondly, I have various other matters on this

7    afternoon, but what I will do is call them in and as soon as

8    possible get back to you, either call you back in here to

9    answer it or write it out on the piece of paper and send

10   that piece of paper back to you.  So the second job of the

11   foreperson is to write me questions about the law.

12        Please don't ask me questions about the facts.  I

13   took notes; you took notes.  You heard that the attorneys

14   don't even remember exactly -- have disagreements about what

15   the evidence said.  It is your collective memory, your notes

16   that govern here.  Now, if you wanted a transcript of a

17   particular witness's testimony, that takes a long time to

18   prepare.  I urge you before you get to that point to go back

19   and refer to your notes.  So the second thing the foreperson

20   does, as I said, will ask me questions about the law, but if

21   you simply ask me about what my memory of the evidence is,

22   I'm going to turn it around and say, "My notes are no better

23   than your twelve collective notes."

24        So moving on to the third part, the third and

25   final task of the foreperson will be to announce, or what we

Page 137

1   sometimes legally call publish, the verdict in court.  But

2   the foreperson will not be standing alone.  The foreperson

3   will be standing with all twelve members of the jury.  And

4   you'll hear us say, "So say you, Mr. Foreperson?  So say

5   you, Madam Foreperson?  So say you, all members of the

6   jury?"  So those are the three functions of the foreperson.

7           How do you go about this very important task of

8   deliberating?  I've watched you all.  You've been paying

9   attention.  Many of you have been taking notes.  When you go

10  into this jury room, no one should go in with, "I know what

11  I'm going to do, and I'm not going to change my mind no

12  matter what."  That's not deliberating.  Deliberating means

13  you go in there with your sense, "Who made sense?  Who

14  didn't make sense?  What's my sense of justice?  What seems

15  right here?"  But you go in there with an open mind to have

16  someone persuade you to take another position.  You've got

17  to go in and deliberate and be thoughtful and talk about the

18  matters.

19          On the other hand, no one should change their mind

20  because you've got to go back to work, you have kids, it's

21  gorgeous outside, which it is, you know, you want to get

22  back to the political stuff or the Red Sox or anything.

23  That shouldn't -- it's too important.  You know how

24  important this is.  Of all people, you know how significant

25  this is.  I've just told you, you cannot change your mind

1    simply because someone else believes differently.  Make sure

2    there's a principled basis for changing your mind, a

3    principled basis.

4            So I send you in to deliberate, and I want to

5    remind you not to ask any questions from Mr. Alba, the court

6    security officer, about anything other than, well, maybe you

7    need like a paper easel or some pens or something, but do

8    not ask them about the substance of this case.

9            We will be sending in exhibits to you.  Remember

10   that they are my only exhibits.  So if you're a klutz like I

11   sometimes am, please do not put all the papers next to the

12   can of Coke or the mustard, because I have a tendency, maybe

13   none of you, boom, and it tips over.  I really need all the

14   exhibits.  I'm letting you deliberate over lunch.  There

15   will be no alternates here.  So, please, you know, keep the

16   exhibits to one side.

17           Now, I make it a practice to go see the attorneys

18   at side bar.  We had a chance to talk about these

19   instructions.  They may have some really good ideas for me

20   if I read something incorrectly or they had a thought as I

21   was going through it to clarify the instructions.  They're

22   going to come tell me all about it.  You can stand and

23   stretch, but don't try and listen.  You know, some of my

24   colleagues actually -- you know, I hate to complain about

25   this beautiful courthouse because it is a beautiful

1   courthouse, but actually the acoustics are too good because

2   the sound, if anyone knows anything about it, goes up over

3   that dome, and it goes right, boom, right into what we're

4   saying, so please don't try and listen.  And some of my

5   colleagues have white noise and they play jazz and they do

6   all sorts of things.  So we're going to try and huddle, and

7   you can stand and stretch while we're doing that.

8   SIDE-BAR CONFERENCE:

9           THE COURT:  The government?  Ms. Stacey?

10          MS. STACEY:  Your Honor, I'm just objecting again

11  to Instruction No. 14 where the jury has been instructed on

12  the conditions of release.  The government maintains that

13  the conditions are something to be determined after a

14  finding of sexually dangerous person.  That same objection

15  would go to Instruction No. 16.  It's for the Court to make

16  the determination, not the jury.

17          MR. GRADY:  For the record, the government objects

18  to the instruction on not drawing a negative inference from

19  not testifying as well.

20          THE COURT:  Okay.

21          MS. KELLEY:  Objection to the no instruction on

22  the presumption of not sexually dangerous, which we

23  discussed yesterday at greater length.  Objection to not

24  including the language from the Abregana case about

25  volitional control.  We object to the --

ed4ec87f-52e1-4e25-a25b-72c4c192c53c

Page 140

1          THE COURT:  Actually --

2          MS. KELLEY:  -- difficult, if not impossible, to

3    control your impulses.

4          THE COURT:  Okay, the impossibility piece of it --

5          MS. KELLEY:  Yes, we had filed a written request

6    with that language in it.

7          And then we object to the jury's being told so

8    much detail about what happens after the verdict, which

9    really I think gives the --

10          THE COURT:  The flip side of it basically.

11          MS. KELLEY:  Yes, gives the jury the impression

12    that this is not a big deal, he can always petition to get

13    out, when in fact the statute doesn't say what kind of new

14    hearing he gets.  The court never has to hear him if the

15    court decides not to, and that, in reality, people committed

16    under these kinds of laws typically stay in prison for

17    decades, also.

18          THE COURT:  You just need to move along.

19          MS. KELLEY:  One last thing.  There was a

20    suggestion that there is a suitable facility, which we

21    maintain there is not.

22          THE COURT:  Okay, all right.

23          MR. SWOMLEY:  At one point you neglected to say

24    "refraining."  I know you said it enough times.  I don't

25    think that's a big deal.  You declined to give the Bouche

Page 141

1    part of the instruction.

2           THE COURT:  You're right.  There was an objection

3    to -- I went back and read that.

4           MR. SWOMLEY:  I closed on it.

5           THE COURT:  I know.  That's why we handed it out

6    before the break.  I went, "Oh, he didn't read it."

7           (End of side-bar conference.)

8           THE COURT:  I have nothing else to say.  Enjoy

9    your lunch, if you haven't eaten it already, and I'll see

10   you when you want to see me.  Otherwise, we'll let you go

11   home in the vicinity of 5:00.  We're never trying to rush

12   you.  We'll probably come in around quarter to 5:00 and say,

13   you know, "Do you want to go home now?"  So, okay.

14          THE CLERK:  All rise for the jury.

15          (Jury excused.)

16          THE COURT:  All right, so let me just say this,

17   two things.  One is it's now twenty of 2:00.  We've been

18   going a long time.  Just take an hour, go wherever you want

19   to go.  Now, in terms of if there's a question after the

20   lunch break, I don't demand that you be here.  Is this thing

21   in front of Judge Sorokin a two-minute thing or --

22          MS. KELLEY:  Two status conferences.  It should be

23   very quick.

24          THE COURT:  Are you going to stay, or are you

25   going to go back to the office?

ed4ec87f-52e1-4e25-a25b-72c4c192c53c

Page 142

1          MR. SWOMLEY:  I'll stay.

2          THE COURT:  Where's your office?

3          MR. SWOMLEY:  Lewis Wharf.

4          THE COURT:  Oh, that's so close.

5          MR. SWOMLEY:  Well, I'm happy to go back.

6          MS. KELLEY:  Like a 15- or 20-minute walk.

7          THE COURT:  Anyway, we'll get your cell phone.

8          MR. SWOMLEY:  I'll come back here after lunch just

9    to see if anything's going on.

10          THE COURT:  I make it a practice at 5:00 o'clock

11   to release the jury from the courtroom.  I'll do it by

12   myself, or I want both sides here.

13          MR. GRADY:  By yourself is fine with the

14   government.

15          MR. SWOMLEY:  I prefer being here.

16          MS. STACEY:  Yes, I do too.

17          THE COURT:  Okay, if one side is here, both sides

18   are here.

19          MR. SWOMLEY:  And Mr. Shields.

20          (Discussion off the record.)

21          THE COURT:  I make it a practice that both sides

22   say they're content with the form of the evidence before I

23   send it in.  So I'll be upstairs if there's any challenge.

24   We have a full afternoon, so I would love it if Lee could

25   leave for 20 minutes, half hour.

1          (Discussion off the record.)

2          MR. GRADY:  The government is content for the

3   record.

4          MS. KELLEY:  I am content.

5          THE COURT:  You're content?  The government is

6   content?

7          MR. GRADY:  I'm content we're done.  I don't know

8   if anyone else feels that way.

9          MS. KELLEY:  I think Mr. Swomley went to get one

10  page of one exhibit.

11         MR. GRADY:  There is one page of 22-A that --

12         THE COURT:  You'll just give it to them when --

13         MS. KELLEY:  If he finds it, we'll bring it in.

14  If not --

15         THE CLERK:  Should I bring these in, Judge?  Bring

16  them in?

17         THE COURT:  Yes, bring the exhibits in.  So,

18  anyway, Lee, I'll see you at 2:15.

19         (A recess was taken, 1:45 p.m.)

20         (Resumed, 4:45 p.m.)

21         THE CLERK:  All rise for the jury.

22         (Jury enters the courtroom.)

23         THE COURT:  Please don't be seated.  I just wanted

24  to make sure you knew what's going to happen tonight.

25  Obviously, I'll send you home right now.  You requested to

1    go home a few minutes early, well deserved.  Tomorrow

2    morning I don't want you to talk about the case until I tell

3    you you can.  Basically I'll wait until all of you are

4    present.  I'll count you, just as I did right now, and then

5    I'll say, "Go out and deliberate."  So it should take two

6    seconds.  As soon as you're here, I'll send you to out to

7    deliberate.  Remember not to talk about it at home or to

8    read anything in the press.  Thank you.

9                    (Jury excused.)

10                   THE COURT:  I'm assuming you all want to be here?

11                   MR. SWOMLEY:  Yes, please.

12                   MR. GRADY:  We'll be here.

13                   THE COURT:  9:00 o'clock.

14                   MR. SWOMLEY:  Can I understand what your schedule

15   was tomorrow?  Were you not going to be here?

16                   THE COURT:  I have a hearing all morning.  I'll be

17   here.  I have a funeral at 1:30, so I'll probably shoot out

18   of her around 1:00.  My guess is, the funeral will be an

19   hour to two hours, and then I'll be back in case I need to

20   take a verdict later on in the day.  So that's basically

21   what the schedule is.

22                   MR. SWOMLEY:  Could I ask Mr. Alba to help me with

23   an obligation I have for -- I'm supposed to be conducting a

24   Sex Offender Registry Board hearing tomorrow --

25                   THE COURT:  At what time?

1           MR. SWOMLEY:  -- at the New Chardon Street

2     courthouse.  From 9:00 o'clock on.

3           THE COURT:  Well, how long a hearing is that?

4           MR. SWOMLEY:  They've blocked a day.

5           THE COURT:  Oh.

6           MR. SWOMLEY:  So --

7           THE COURT:  Just we can go off the record.

8           (Discussion off the record.)

9           (Adjourned, 4:47 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2


3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Court Reporter, do

8   hereby certify that the foregoing transcript, Pages 1

9   through 145 inclusive, was recorded by me stenographically

10  at the time and place aforesaid in Civil Action

11  No. 07-12056-PBS, United States of America V. Jeffrey

12  Shields, and thereafter by me reduced to typewriting and is

13  a true and accurate record of the proceedings.

14          In witness whereof I have hereunto set my hand

15  this 12th day of October, 2008.

16

17

18

19

20
                    /s/ Lee A. Marzilli
21              _____

                LEE A. MARZILLI, RPR, CRR
22              OFFICIAL COURT REPORTER

23

24

25