```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
                 Petitioner    )
                               )
           -VS-                ) CA No. 07-12056-PBS
                               ) Pages 1 - 32
JEFFREY SHIELDS,               )
                               )
                 Respondent    )
```

```
                      JURY TRIAL - DAY NINE
                       JURY DELIBERATIONS

              BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT JUDGE
```

```
                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         September 16, 2008, 9:07 a.m.
```

```
                         LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 3205
                        Boston, MA  02210
                        (617)345-6787
```

229305e1-50ed-4504-b6c7-a8ef42461d7d

1

A P P E A R A N C E S:

2

3      MARK J. GRADY, ESQ. and EVE A. PIEMONTE-STACEY, ESQ.,
Assistant United States Attorneys, Office of the United
States Attorney, 1 Courthouse Way, Boston, Massachusetts,
4  02210, for the Petitioner.

5      PAGE KELLEY, ESQ, Federal Defenders,
408 Atlantic Avenue, Boston, Massachusetts, 02210,
6  for the Respondent.

7      JOHN G. SWOMLEY, ESQ. Swomley & Associates,
227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
8  for the Respondent.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Just quickly, I understand there's

4   some scheduling issues.  What I'm hoping we'll do is, I have

5   that funeral from 1:30, so I'll probably leave here at 1:00,

6   and I'll be back here at around, I think, no later than, I'm

7   hoping, 3:30.  It's always a little hard to predict.  But

8   the big issue, I understand Ms. Kelley has a conflict

9   between 12:00 and when?

10          MS. KELLEY:  Well, my son has an orthodontic

11   emergency.  His braces broke last night, and it's hurting

12   him, so I have an appointment at 1:00 in Reading.  I have to

13   go to Newton and pick him up from his middle school and take

14   him to Reading and then come back here, so --

15          THE COURT:  So could you ask that you be available

16   if --

17          MR. SWOMLEY:  I'm going to tell them and make sure

18   I'm --

19          MS. KELLEY:  But I would ask that your Honor not

20   tell the jury you're unavailable from 1:00 to 3:00 because I

21   think it's going to put a lot of pressure on them to decide

22   the case before you go.

23          THE COURT:  I have to tell them.  I'm going to

24   tell them because I want basically, if they come back in two

25   hours, they're not just sitting there thinking I'm twiddling

1   my thumbs.  I'm just going to say I have a funeral this

2   afternoon for an hour or two.  I won't even tell them when.

3           MR. SWOMLEY:  You don't want to tell them at 12:30

4   maybe?

5           THE COURT:  No.

6           MR. SWOMLEY:  Just one more thing just in terms of

7   when you want to do this.  I think -- and I don't know

8   what -- the way we're doing it here is different than in

9   state court, but typically, at the end of the case, I make a

10  motion for a required motion of not sexually dangerous, and

11  I'd like to put that on the record.  If you want to do that

12  right this second, I could do it orally real quick.  If you

13  want to do it after you send the jury back out, I'd like to

14  just do that for the record.

15          THE COURT:  Well, why don't I just get the jury

16  out of here, or you can just do it.  Do it.

17          MR. SWOMLEY:  Okay.  Well, motion for required

18  finding of not sexually dangerous, the grounds being,

19  there's uncontroverted evidence that on the science, you

20  don't get past the group; and that is not enough, I would

21  submit, to get you to clear and convincing that an

22  individual, Mr. Shields, is likely to reoffend.  Beyond

23  that, if you rely on clinical judgment to get you the rest

24  of the way, the evidence, I think, is uncontroverted that a

25  person that applies the clinical method is wrong two out of

1  three times.  So under almost any circumstance, with the

2  exception being the 18- to 24-year age group where

3  Dr. Wollert suggests you are above the predictive accuracy

4  that allows for some sort of a scientific finding, with him,

5  you're in the error rate of 70 percent.  So under any form

6  of science or the science of clinical judgment, you can't

7  get to the burden that the government has to meet in this

8  case.

9           THE COURT:  Denied.  Let's bring the jury in.

10          MR. GRADY:  We would oppose that, your Honor.

11          THE COURT:  But let me just say that if you have

12  spare time in the next day or two, you might want to start

13  writing, both sides, proposed findings of fact because I

14  think whatever happens, it's ultimately -- I'm going to give

15  great weight -- I'm not sure how much weight yet, I have to

16  think about that, I have to look at it -- but great weight

17  to what the jury does, but I still need to, I think, say

18  something myself.

19          MS. KELLEY:  I think previously we had said that

20  if we wanted to draft proposed findings, they would be due

21  two weeks after the transcripts were prepared, so I was kind

22  of counting on that time, but --

23          THE COURT:  I don't know.  Lee is entering into a

24  major trial I'll tell you about in a minute.

25          MS. KELLEY:  Okay.

1              MR. SWOMLEY:  Does that mean that the pretrial

2      conference on Wetmore is off the day after tomorrow or

3      tomorrow?

4              MS. KELLEY:  I think that was --

5              MR. SWOMLEY:  Has that already been off?

6              THE COURT:  Can we wait for the jury?  We'll talk

7      about it.

8              MR. SWOMLEY:  Sure.

9              THE CLERK:  All rise for the jury.

10             (Jury enters the courtroom.)

11             THE COURT:  Good morning.  Please don't be seated.

12     I counted you.  You're all there.  Did anyone speak about

13     the case or see anything in the press?  I find the jury has

14     complied.  Unfortunately, I have a funeral this afternoon,

15     but I will be back, if necessary, for any questions.

16             All right, so I'll see you when you want me to.

17     Thank you.

18             (Jury excused.)

19             THE COURT:  All right, now, you all said something

20     that I lost.  Are we supposed to have a conference this week

21     in Wetmore?

22             MS. KELLEY:  Yes, and it's my understanding that

23     since his trial was sort of taken off the list, that the

24     pretrial would also be pushed back to some other date.

25             THE COURT:  Yes, but we need to put him on the

1  list.  It's a huge -- it's a huge --

2          MS. KELLEY:  Can I ask the Court for one thing in

3  that case, which is --

4          THE COURT:  I don't even remember what it's about.

5  Which one is he as opposed to Peavey?

6          MS. KELLEY:  He's the guy that had a bunch of

7  tests to see if he could go on Depo-Provera, which is like a

8  chemical castration drug; and our doctor looked at the test

9  results and said, "Oh, he has a lesion on his thyroid, and

10 that's fatal, according to these test results."  So we asked

11 the BOP to redo the results.  They have done that, and I

12 think about three weeks have gone by now, and I can't get

13 the test results.

14         THE COURT:  Which test results, for whether he's

15 dying or whether or not this chemical will work?

16         MS. KELLEY:  Whether he's dying.

17         THE COURT:  Will this chemical work?

18         MS. KELLEY:  Well, if this is just a lab error,

19 which is a strong possibility, then he's all set to take the

20 medication, he's fine.  But our doctor will not say he's fit

21 to have this medication until we get the lab results.

22         THE COURT:  Do you know what the story is?

23         MS. STACEY:  Yes, your Honor.  It was a two-step

24 process.  It was the lab results plus an appointment with an

25 endocrinologist this month.  Now, I don't think that

1   appointment has taken place yet, and I don't have the

2   reports.  It's my understanding that there is no cause for

3   alarm from the test results.

4           THE COURT:  I tell you what, why don't you -- you

5   know, you've got some at least theoretical dead time now --

6   why don't you just call there and see if you can see what it

7   is so you can let her know.  You know, we've all been pretty

8   intense on this, but let's get to that.

9           But let me just ask you this:  Regardless of

10  whether he can or can't take this medication, I don't know

11  if that's a way of resolving it, but if it's not, I need to

12  go through a trial.  So --

13          MS. STACEY:  As it stands, your Honor, there are

14  actually some deadlines that have past, so we have to file a

15  motion to extend those deadlines.  I think we had some

16  filings due for you.

17          THE COURT:  But what's the case -- let me just put

18  it this way.  Is this a -- you can be seated.  Is this a --

19          MS. STACEY:  It's a child molestation.

20          THE COURT:  The other guy is the one with the --

21          MS. STACEY:  Peavey has antisocial, right.

22          THE COURT:  So is there a diagnosis yet on

23  Wetmore?

24          MS. KELLEY:  He has not been seen by the experts

25  because his SOTP records have been suppressed by Judge Dein.

1   The government is appealing that.

2            THE COURT:  All right, see, this is what I need to

3   know.  So that the block here, before anything can be moved

4   forward, is my ruling on Judge Dein, is that right?

5            MS. STACEY:  That's right.

6            MS. KELLEY:  And we have a response to the

7   government's filing that we will file this Friday, so that

8   will all be set for you to look at.

9            MS. STACEY:  And my response to the designated

10  documents that were designated as privileged is due on

11  September 22.

12           THE COURT:  So let me see.  If I uphold

13  Judge Dein, what happens?

14           MS. STACEY:  Then the documents would go to the

15  experts, and then the experts would need to schedule

16  appointments to see Mr. Wetmore.

17           THE COURT:  Excuse me.  If I uphold Judge Dein, it

18  means -- she said they were privileged, right?

19           MS. STACEY:  Right, but there are other documents.

20           THE COURT:  Well, why aren't you doing that?  Just

21  do it.

22           MS. KELLEY:  Well, I think we actually are doing

23  that.  I think we are segregating out the nonprivileged

24  documents and getting them to the experts.  But can I just

25  say, there isn't really any point in sending the experts

1  piecemeal documents.  We're in the same situation we were in

2  in this case.

3           THE COURT:  Who's the lawyer for him, you?

4           MS. KELLEY:  Yes.

5           THE COURT:  Just you, both of you.  So who's the

6  expert?

7           MS. KELLEY:  Dr. Fred Berlin.

8           MS. STACEY:  And Dr. Sacks, your Honor.  You

9  designated them both.

10           THE COURT:  I designated two as court-appointed

11  neutral experts.

12           MS. STACEY:  Yes, yes.

13           MS. KELLEY:  But may I just say --

14           THE COURT:  Excuse me, excuse me.  And the two of

15  them are on board, but they haven't done anything yet?

16           MS. STACEY:  That's right.

17           THE COURT:  Because they don't have the documents?

18           MS. STACEY:  That's right.

19           THE COURT:  I'm just trying to understand where

20  we're at.

21           MS. STACEY:  That's right.

22           THE COURT:  So how long does it take usually once

23  they get the documents, 30 days?

24           MS. KELLEY:  I think it's a 45-day process.  But

25  if I can just say, I would really like to know what his

1    medical situation is before we schedule a trial or that kind

2    of thing.

3              THE COURT:  I understand.  Listen, it's taken us

4    two years to get here.  Now, part of that was a full year

5    that went off for the constitutional briefing.  I understand

6    that.  That was by choice by everyone on the challenge to

7    the statute, and it's fully teed up for the Circuit.  But

8    the other part was unbearable.  It was beginning because

9    the documents came in late, and then it was a problem with

10   people's trial schedules, and then it was a problem with the

11   experts' schedules.  It was -- I kept making the place

12   available, and things kept happening.  So I would like -- we

13   need to get this scheduled, or it will go off another year

14   with everybody's expert schedules and trial schedules and

15   the like.  So I just want to come up with a schedule, and

16   then I get the doctors locked in.

17             MR. SWOMLEY:  Well, I don't want the doctors

18   locked in until you have said "No more discovery," period,

19   because it really is not fair.

20             THE COURT:  Well, are all the documents now

21   available?

22             MS. STACEY:  I believe so, your Honor.

23             THE COURT:  All right, so no more --

24             MS. KELLEY:  May I make a suggestion, that we get

25   his medical test results.  He also has to see an

1   endocrinologist this month.

2           MS. STACEY:  Right.

3           MS. KELLEY:  I mean, my doctor thought the lab

4   results suggested he had very, very serious health problems,

5   and it's very interesting to me that the government has

6   total access to his medical records, but as his lawyer, I do

7   not, so --

8           THE COURT:  Well, let's put it this way:  You find

9   out today.  We're going to be seeing a lot of each other

10   today, and you've sort of got this time blocked off for this

11   trial.  So find out today about what his status is.  You're

12   going to get me the brief on the privilege Friday, right?

13           MS. KELLEY:  Yes, and she has a response due on

14   September 21.

15           THE COURT:  Response to what?

16           MS. STACEY:  The way it was, Judge Dein's order

17   ruled that counsel is supposed to identify which documents

18   she thought were privileged, and then we were supposed to

19   file a response within two weeks.  That response is now due

20   on September 22.

21           THE COURT:  So that's apart from the appeal on the

22   privilege?

23           MS. STACEY:  Right.

24           THE COURT:  So is that fully teed up, the appeal

25   on the privilege?

1        MS. KELLEY:  It will be this Friday once I file

2    the response, yes.

3        THE COURT:  So I will have it completely in my

4    hands on Friday, is that it?

5        MS. KELLEY:  Hopefully, yes.

6        THE COURT:  Good.

7        MS. KELLEY:  And then --

8        THE COURT:  Excuse me.  Even if I uphold

9    Judge Dein, do you still have a case?

10       MS. STACEY:  Yes.

11       MS. KELLEY:  Yes.

12       THE COURT:  And the diagnosis is, you think,

13   pedophilia?  Is that the kind of case this is?

14       MS. STACEY:  It's hard -- I believe so, given the

15   age of the victims, yes, but I don't -- you know, the

16   experts haven't made that diagnosis.

17       THE COURT:  Right, but that's what you think is

18   likely.  It's not like the other guy?

19       MS. STACEY:  Right.

20       THE COURT:  All right.  And then we need to

21   have -- is it going to be a similar trial to this except

22   we'll have two experts?

23       MS. KELLEY:  I don't know until I know what is

24   happening with those documents.

25       THE COURT:  Could you both talk about a protocol

1   for talking to these two neutral experts?

2          MS. KELLEY:  Yes.  And if you would like, I think,

3   once we get these other things filed, like, I would like to

4   see her response to my privileged document list, I think

5   Ms. Stacey and I could very easily sit down and work out a

6   timetable and also consult with the experts about their

7   availability.  Dr. Berlin is a nationally renowned expert on

8   chemical castration.  He's the guy.  He's like the inventor

9   of the procedure.

10          MR. SWOMLEY:  He runs the Johns Hopkins Sexual

11  Disorders Clinic, founder actually.

12          MS. KELLEY:  So he has limited availability.  We

13  can work out some dates for the Court and come back and set

14  us a trial and stick to that timetable, so -- but I think it

15  would be nice to finish this last little round of briefing.

16          THE COURT:  So just for my information, if you

17  chemically castrate someone, does their risk of reoffending

18  drop to zero?

19          MS. KELLEY:  Yes.

20          THE COURT:  Excuse me?

21          MR. GRADY:  I would think until they stop taking

22  the drugs, and if they're under no compulsion to do so, then

23  it seems to essentially have no point if all we're doing is

24  asking, "We trust that you will continue to do this once you

25  leave the prison."

1          THE COURT:  What if you had some agreement that --

2     let me put it this way:  As far as I'm concerned, you still

3     need the trial because you need to decide today whether they

4     are.

5          MS. STACEY:  Right.

6          THE COURT:  But that having been said, as I

7     understand, you can release on conditions; and if one of the

8     conditions is a permanent reporting in to the Probation

9     Office and take your pill in front of the guy, the woman --

10         MS. STACEY:  The person.

11         THE COURT:  -- the person --

12         MS. STACEY:  I don't know enough about it, your

13    Honor.

14         THE COURT:  It's very interesting.

15         MS. STACEY:  I know that we deposed another

16    doctor, a Dr. Saylan, in another one of these cases, and he

17    had different variations on the effectiveness of chemical

18    castration.

19         THE COURT:  That may be an interesting issue, but

20    it won't resolve the trial.

21         By the way, you should just know I had to Google

22    Tasmanian Devil.  They're horrified.

23         MS. KELLEY:  Mr. Wetmore is not asking for a jury

24    trial either, so that should simplify things.

25         THE COURT:  Actually that will.  Thank you.  Go

1   off the record.

2               (Discussion off the record.)

3               (Resumed, 12:10 p.m.)

4               THE COURT:  We can go on the record for a minute.

5   Then we'll do it again when he gets here.  So I know you

6   have to leave, and I'll do it again when he gets here, but

7   the thought, the question that I have, I'm going to, I

8   think, send them back again to try it again on Question 2.

9   They said they're deadlocked on Question 1.

10              MS. KELLEY:  No.  They're deadlocked on 2.

11              THE COURT:  Right, I'm sorry.  That's not so

12  surprising.  The real question I have at the end of the day

13  is, I'm not going to redo this trial, and so whether we want

14  a count, a vote count.

15              MR. SWOMLEY:  What information would you make use

16  of from that vote count?

17              THE COURT:  I'm not sure, because the reality is,

18  in the state court you could do ten out of twelve, right?

19              MR. SWOMLEY:  On coming out.  On going in, I don't

20  think so.  If it's unanimous going in, it's --

21              THE COURT:  Do you know?

22              MR. SWOMLEY:  I think it's coming out that it

23  doesn't have to be unanimous.  I think it does going in.  I

24  may be wrong because Eric is my law guy, and he's not here.

25              THE COURT:  Call and ask.

229305e1-50ed-4504-b6c7-a8ef42461d7d

1          MR. SWOMLEY:  I will, sure.

2          THE COURT:  Because that's really the key question

3   I have.  Typically in state court it's ten out of twelve on

4   a civil case.  The statute might be unique.

5          MR. SWOMLEY:  It does.  The statute does have

6   written into it that five out of six jurors on the coming

7   out side, I know that's there; but going in, I don't

8   remember.

9          THE COURT:  So I would want to know whether it was

10  one holdout or a hopeless split.

11         MS. STACEY:  If they had come back against the

12  government, we were going to make a request to poll the

13  jury, so I think that's.  .  .after verdict, so I'm just

14  alerting.

15         THE COURT:  So just think about that, but I think

16  what I'm going to do is just simply write a note and say

17  "Go back in," but I want you to be able to confer with your

18  client first.

19         MR. SWOMLEY:  Okay.  And you're not going to bring

20  them out here?

21         THE COURT:  No.

22         MS. KELLEY:  Oh, you're not?  In that case, I will

23  go.

24         THE COURT:  Unless -- I don't know how long it's

25  going to take him to be up here.  Unless you want to see

1    him.

2              MS. KELLEY:  So you're going to send a note in

3    to -- I'm just worried about appearances.  He can talk to

4    the client.  You're going to send a note in to the jury

5    saying "Keep going"?

6              THE COURT:  Yes.

7              MR. SWOMLEY:  You're not reading the charge or

8    anything like that?  That's great.

9              (Discussion off the record.)

10             (Respondent enters the courtroom, 12:20 p.m.)

11             (Discussion between Mr. Swomley and Respondent off

12   the record.)

13             MR. SWOMLEY:  We're ready.

14             THE COURT:  So, all right.

15             MR. SWOMLEY:  I've given him what we know at this

16   point.

17             THE COURT:  All right, basically, for the record,

18   we talked about it a little bit before you came in, the jury

19   has reached a verdict on Question 1 but say they cannot

20   reach a verdict on Question 2.  And I am simply going to

21   write in the fact that they should keep deliberating.  I'm

22   going to say "Keep deliberating."  And then, if they come

23   back a second time, that's where I wanted your guidance.

24   Right now it's quite clear to me what to do, and I think I'm

25   correct, neither side objected to that piece of it.  The

1   issue is what to do if they come back a second time because

2   this is not a criminal case; it's a civil case.  Typically,

3   I've read some sort of Allen charge, even in a civil case,

4   you know what I mean, Rodrigues?  Sort of, like, "no one can

5   do it better" kind of --

6          MR. SWOMLEY:  I haven't talked to him about that,

7   but I will.

8          THE COURT:  Typically, unless anybody objects, I

9   will do that the next time they came back they were

10  deadlocked.  But then the third time is the charm if they

11  come back again.  And I predicted this.  I think this is a

12  difficult case.  The issue really would be, do want a vote

13  count?

14         MR. SWOMLEY:  Well, I've spoken with my client,

15  and what he would be content to have you do is have you end

16  the proceeding now and not send them back.  I don't know

17  whether resolution is going to -- I mean, more time will

18  change where they are.  I did find out from my office that I

19  was correct in my representation.  It is unanimous going in.

20         THE COURT:  Going in the first time around.

21         MR. SWOMLEY:  Yes.

22         THE COURT:  So what do you want, do you know?

23         MS. STACEY:  Your Honor, we'd like to proceed with

24  the course of action you set out.

25         THE COURT:  I'm going to say "Keep deliberating."

1    I'm not going to retry this case.  I mean, if I have to, I'm

2    going to do it, as much as I know you would all enjoy

3    retrying this.  But I for a reason wanted their guidance on

4    this.  I think it's good to have a -- we all agreed that

5    there would be a jury trial, and I'd like to see if I can

6    get some unanimous verdict here.  And so I'm going to send

7    them out again, and then I will deal with it.  If there's a

8    second declaration of being hung, which there could be, I'm

9    probably going to read them some version of the Allen

10   charge; and then if they are hung again, what I intend to do

11   is to send them home without asking them what the vote count

12   is, unless you all want to know.  One question might be

13   whether you want to talk with them.

14            MR. SWOMLEY:  Interesting.  Well --

15            THE COURT:  Actually, you know what?  I don't

16   think I want to do that either.  I'm wondering whether

17   you'll all stick that into your proposed findings of fact,

18   so, I think since it's ongoing, I think that maybe that

19   wouldn't be the best thing to do.  But, anyway, think about

20   that.

21            MR. SWOMLEY:  You mean whether or not we actually

22   want to advocate you polling them?

23            THE COURT:  Yes, whether I should poll them.

24            MS. STACEY:  Okay, and we'll confer on that as

25   well.

229305e1-50ed-4504-b6c7-a8ef42461d7d

1          THE COURT:  All right.  Is there a particular

2    Allen charge?  I don't know if -- we have the one that I

3    would just essentially use from, if I can find it -- here it

4    is.  I would have to modify the Allen charge from the First

5    Circuit pattern instructions for a civil case.

6          MS. STACEY:  We'd have no objection to that.

7          THE COURT:  Okay, so good.

8          Are you back for good, or are you --

9          MR. SWOMLEY:  I am back for good.

10         THE COURT:  Okay, so --

11         MR. SWOMLEY:  And if they come back anytime till

12   you get back, they're just going to be there, right?

13         THE COURT:  Yes.  I'm going to tell them I'm

14   leaving at 1:00, and I'm going to tell them now to keep

15   deliberating, and then I'll be back at around between 3:00

16   and 4:00, depending on how long the funeral is.

17         THE CLERK:  Do you want to write on it?

18         THE COURT:  I'm just simply going to write "Keep

19   deliberating."

20         (Adjourned, 12:30 p.m.)

21         (Resumed, 3:35 p.m.)

22         THE COURT:  Well -- Mr. Swomley is somewhere else?

23         MS. KELLEY:  Mr. Swomley is here.

24         MR. GRADY:  He is here now, your Honor.

25         THE COURT:  There's some new information.  The

1    first question received at 3:14 was, "The jury would like a

2    copy of Dr. Plaud's testimony."  And I was driving in and on

3    my cell phone asked Lee to start doing that.  But then on

4    the way walking in here I got a second note at the time,

5    which is weird, which is at 3:32 p.m., which is eight

6    minutes before the other one, so -- but, in any event, it

7    says, "We are hopelessly deadlocked on Question No. 2.

8    Further deliberations will not resolve the issue."  So I've

9    got two of these.

10           I am going to ask my law clerk to hand out my

11   redraft of the so-called Allen charge.  I took the First

12   Circuit instruction and essentially plugged in "clear and

13   convincing evidence" rather than "proof beyond a reasonable

14   doubt."  And I'm going to bring them in.  My thought is, I

15   would read it to them, and I would also ask them whether any

16   portion of Dr. Plaud's testimony or the whole thing would

17   help resolve the matter.  I'll send them out again, and then

18   we'll deal with what they come back with.

19           MR. SWOMLEY:  We haven't talked about this.  I do

20   have a problem with the words "absolute certainty" in

21   Paragraph 2 because --

22           THE COURT:  That is flat out of the First Circuit

23   instruction.

24           MR. SWOMLEY:  I know, but that's when you're

25   talking reasonable doubt.  And I think, if we're at a lower

1  standard, then to give the "absolute certainty" gives them

2  this kind of telegraph, "oh, well, I'm not absolutely

3  certain, but it's okay."

4          THE COURT:  Let me put it this way:  Your argument

5  would be all the stronger on a "proof beyond a reasonable

6  doubt" standard.  But let me just say this:  I'm going to

7  give it.  That's flat out of every boilerplate that every

8  judge has ever given that I know about.  The only thing I

9  changed is from "reasonable doubt" to "clear and

10 convincing."

11         THE LAW CLERK:  Just also "government" instead of

12 "prosecution" and "respondent" instead of "defendant."

13         MS. KELLEY:  Well, I object to this being given.

14 The jury has said twice now that they can't decide, and I

15 think the message "hopelessly deadlocked" is a clear message

16 that they're firmly entrenched, and I object to their being

17 given, you know, the so-called dynamite charge or whatever

18 you call it.

19         THE COURT:  Thank you.  Anything from the

20 government's point of view?

21         MS. STACEY:  While Mr. Grady finishes reading the

22 charge, we have no objection to this charge being given and

23 to proceed in the manner that the Court has set out.

24         (Discussion off the record.)

25         MR. SWOMLEY:  I also disagree and note that it's

1    often entitled such "civil commitment."  I think the more

2    accurate term is "involuntary commitment."  "Civil" makes it

3    seem so civil.

4              THE COURT:  That's fine.

5              MR. GRADY:  I think I have been very polite about

6    it, John.

7              MR. SWOMLEY:  I agree.

8              THE CLERK:  All rise for the jury.

9              (Jury enters the courtroom.)

10             THE COURT:  You may be seated.  Good afternoon.

11             THE JURY:  Good afternoon.

12             THE COURT:  So when I was off at the funeral, I

13   understand that you asked for a copy of Dr. Plaud's

14   testimony; and then as I was walking in, I got the second

15   note which essentially says, "We are hopelessly deadlocked

16   on Question No. 2.  Further deliberation will not resolve

17   the issue."

18             So I have an additional instruction to give you,

19   and then I want to talk to you about the request for

20   Dr. Plaud's testimony.  Or maybe I should start off with

21   that.  I've just talked with the Court Reporter.  A couple

22   hundred pages of testimony.  It would not be available till

23   tomorrow, so if you do -- I can't figure out which trumps

24   what because the timing on this is a little different.  So

25   if you do want it, it will take until tomorrow to get it.

1    But it could be that you want one small part of it, and that

2    might be able to be turned around more quickly, and I leave

3    that up to you as to what you want.  I just wanted you to

4    understand that.  But more generally, what I'd like to do is

5    to talk to you.

6         I'm going to instruct you to go back and resume

7    your deliberations.  I will explain why and give you further

8    instructions.  In trials, absolute certainty can be neither

9    expected nor attained.  You should consider that you are

10   selected in the same manner and from the same source as any

11   other jury would be selected.  There is no reason to suppose

12   that this case would ever be submitted to twelve men and

13   women more intelligent, more impartial, or more competent to

14   decide it than you, or that more or clearer evidence would

15   be produced in the future.  Thus, it is your duty to decide

16   the case if you can conscientiously do so without violence

17   to your individual judgment.

18        The verdict to which a juror agrees must, of

19   course, be his or her own verdict, the result of his or her

20   own convictions, and not a mere acquiescence in the

21   conclusion of his or her fellow or sister jurors.  Yet, in

22   order to bring twelve minds to a unanimous result, you must

23   examine the questions submitted to you with an open mind and

24   with proper regard for and deference to the opinion of the

25   other jurors.

229305e1-50ed-4504-b6c7-a8ef42461d7d

1        In conferring together, you ought to pay proper

2    respect to each other's opinions, and you ought to listen

3    with an open mind to being convinced by each other's

4    arguments.  Thus, where there is disagreement, jurors

5    favoring Respondent should consider whether the conclusion

6    that there is not clear and convincing evidence is a

7    reasonable one when it makes no impression upon the minds of

8    the other equally honest and intelligent jurors who have

9    heard the same evidence with the same degree of attention

10   and with the same desire to arrive at the truth under the

11   sanction of the same oath.

12       On the other hand, jurors favoring involuntary

13   commitment ought seriously to ask themselves whether they

14   should not distrust the weight or sufficiency of evidence

15   which fails to persuade the other jurors that there is clear

16   and convincing evidence.  Not only should jurors in the

17   minority reexamine their positions, but jurors in the

18   majority should do so also to see whether they have given

19   careful consideration and sufficient weight to the evidence

20   that has favorably impressed the persons in disagreement

21   with them.

22       Burden of proof is a legal tool for helping you

23   decide.  The law imposes upon the government a high burden

24   of proof.  The government has the burden to establish its

25   case by clear and convincing evidence.  It is your duty to

229305e1-50ed-4504-b6c7-a8ef42461d7d

1    decide the case if you can conscientiously do so without

2    violence to your individual judgment.  It is also your duty

3    to return a verdict on any questions as to which all of you

4    agree, even if you cannot agree on both questions; but if

5    you cannot agree, it is your right to fail to agree.

6              I now instruct you to go back and resume your

7    deliberations.  Let me know what you want to do with

8    Dr. Plaud's testimony.

9              THE CLERK:  All rise for the jury.

10             THE COURT:  We'll wait here to hear about

11   Dr. Plaud.

12             (Jury excused.)

13             THE COURT:  We'll just wait a few minutes, and I

14   think they'll probably come back as to whether they want it

15   or not.

16             MR. SWOMLEY:  Judge, just for the record, can it

17   reflect that the date here is the wrong date?

18             THE COURT:  Yes, I know.  I'm not going to give it

19   to them anyway.

20             (Discussion off the record.)

21             MR. GRADY:  Your Honor, there was one issue.  What

22   were the times of the --

23             THE CLERK:  The last two?

24             MR. GRADY:  It seemed like you said one was before

25   the other, but the times didn't mesh with what you --

1        THE CLERK:  The question about Dr. Plaud was

2   signed off at 3:40 p.m. by the Foreperson.  That's got to be

3   wrong.  And the question about or the indication that they

4   were hopelessly deadlocked was signed off at 3:32.  I think

5   3:40 is wrong because I received it at 3:14.  Maybe they

6   meant to put 3:10.

7        MS. STACEY:  Or they're thinking 20 of 3:00.

8        THE COURT:  Whatever it was, it was confusing

9   enough on the sequence.

10       THE CLERK:  I put the time I received it, which

11  is, you know --

12       THE COURT:  Okay, so we just think they're wrong

13  on that first timing.

14       MR. GRADY:  Holding it in their pockets perhaps.

15       THE CLERK:  Yes, oh, that's right because they

16  knew she was out.  3:40, that was ten minutes ago.

17       THE COURT:  So I think what I'm going to do is

18  have Robert go and ask if we should be expecting something

19  else from them so I can release you.

20       (Discussion off the record.)

21       THE COURT:  "We would like the entire testimony of

22  Dr. Plaud."

23       MS. KELLEY:  No, no, no, no, no.

24       MR. GRADY:  The one that has to do with it

25  isn't --

1          THE COURT:  If you want to look at it, they

2    crossed something out and said something like "While we are

3    waiting" and then crossed it out, so --

4          (Discussion off the record.)

5          THE COURT:  It should be all and not in segments.

6    I think it should be all.  Good.

7          (Adjourned, 3:55 p.m.)

8          (Resumed, 4:45 p.m.)

9          MR. KELLEY:  I think it's very prejudicial to

10   Mr. Shields to be having the jury apparently base their

11   testimony on one witness, and it looks to me like this is a

12   setup for the testimony of this one person to have undue

13   weight, and I really would at this point object to the jury

14   being given this transcript.  It's going to cause a big

15   delay.  I don't know what the effect of that will be on

16   their deadlocked status.

17         THE COURT:  The objection is overruled.  So now I

18   have this question, which is it's going to take a long time

19   to get this.  It's 250 pages.  They've agreed to come in

20   tomorrow at 11:00, but now I'm even worried that that is not

21   going to be time enough.  So one thought is just to have

22   them skip tomorrow and come back Thursday morning.

23         MR. SWOMLEY:  You could ask them whether they have

24   other things that they can work on in their deliberations.

25         THE COURT:  Yes, they already told us 11:00, they

1  could come in at 11:00 when I told them I didn't know when

2  it could come in.  I wanted to have Robert ask them before

3  they came in about, since we're not sure when it will be

4  ready, whether they could skip tomorrow and then come in the

5  next day.

6         MR. SWOMLEY:  No, I guess what I'm saying is, if

7  they're continuing to deliberate --

8         THE COURT:  Right, ask them that.

9         MR. SWOMLEY:  -- and they can continue to

10 deliberate without that testimony, then they should come in

11 whenever they need to come in, 9:00 or 11:00.

12        THE COURT:  Well, that's what I'm going to ask

13 them.  They're going to come in at 11:00 as we have left it

14 with them, but I'm a little worried that even then it won't

15 be ready.  All right, go ask them, Robert.  See if they want

16 to come in tomorrow, that we're not sure when it will be

17 done, or whether they want to come in the next day.

18        MR. GRADY:  The only caveat being, I actually have

19 jury duty Friday in Suffolk Superior Court, so Ms. Stacey

20 can -- I'm sure I could move that as well, but I'd prefer

21 not to because there's liable to be more of these trials.

22        THE COURT:  I can't do anything about it.

23        (Discussion off the record.)

24        THE COURT:  What do they want?

25        THE CLERK:  They want to come in at 11:00.

229305e1-50ed-4504-b6c7-a8ef42461d7d

1          MR. KELLEY:  Tomorrow.

2          THE CLERK:  They're right out here.  Do you want

3   me to bring them in?

4          THE COURT:  Yes.

5          (Jury enters the courtroom.)

6          THE COURT:  Please don't be seated.  We'll see you

7   tomorrow morning at 11:00, which I understand is what you

8   prefer to do.  I don't know how long it will take to produce

9   this transcript.  Lee's counted.  It's about 250 pages, it

10  spans two or three days, and it needs to be certified

11  according to certain standards for accuracy.  So we will try

12  and get that to you tomorrow, and we'll see you tomorrow at

13  11:00.  Thank you.

14         (Jury excused.)

15         (Discussion off the record.)

16         THE CLERK:  One of the things the jurors did ask

17  us, it would be helpful whether or not they could have the

18  transcript as it was being produced; and I told them that

19  the parties decided that it would be best to give them the

20  entire transcript rather than in pieces.

21         THE COURT:  No.  I want to make sure they get the

22  direct and cross, et cetera.

23         THE CLERK:  Right, that's what I told them.  So

24  they had asked me that, just so you know.

25         MR. SWOMLEY:  Blame it on us.

1          THE CLERK:  I told them it was a unanimous

2     decision, not my decision.

3          MR. GRADY:  They could have had it word by word as

4     far as I was concerned.

5          THE COURT:  In any event, I'll see you at 11:00

6     tomorrow, and we're going to send them out regardless of

7     whether we have it.  I have to say, I have another

8     scheduling problem tomorrow, which is I'm swearing in 2,500

9     new immigrants as citizens at Fenway Park.

10          MR. SWOMLEY:  Have they been registered to vote

11     yet or not?

12          THE COURT:  And so it means that I'll probably be

13     leaving here around 1:15 -- it's actually 1:45 -- and I'll

14     be gone about an hour at Fenway, just so you should know

15     that's a time period you can sort of basically schedule.

16     You're all welcome to come if you want, but --

17          MR. SWOMLEY:  Pass.

18          MR. KELLEY:  It sounds like fun.

19          THE COURT:  It's the first immigration ceremony

20     every at Fenway Park.  Luis Tiant is doing the Pledge of

21     Allegiance, so --

22          (Discussion off the record.)

23          (Adjourned, 4:45 p.m.)

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Court Reporter, do

8  hereby certify that the foregoing transcript, Pages 1

9  through 32 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action

11 No. 07-12056-PBS, United States of America V. Jeffrey

12 Shields, and thereafter by me reduced to typewriting and is

13 a true and accurate record of the proceedings.

14          In witness whereof I have hereunto set my hand

15 this 13th day of October, 2008.

16

17

18

19

20
                /s/ Lee A. Marzilli
21          _____
                LEE A. MARZILLI, RPR, CRR
22              OFFICIAL COURT REPORTER

23

24

25