UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO. 07-12056-PBS |
| | ) | |
| JEFFREY SHIELDS | ) | |
| | ) | |

**RESPONDENT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Respondent Jeffrey Shields respectfully requests that the Court enter the following

findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules

of Civil Procedure.

INTRODUCTION

The United States brought this action pursuant to 18 U.S.C. § 4248, seeking the Court's

determination that Jeffrey Shields is a "sexually dangerous person" subject to mandatory

involuntary civil commitment under the Adam Walsh Child Protection and Safety Act of 2006,

Pub. L. No. 109-248, Title 111 § 302(4), 120 Stat. 620 (July 27, 2006), codified at 18 U.S.C. §

4248 (the "Adam Walsh Act").  To order such commitment, the Court must conclude, after an

evidentiary hearing at which the government bears the burden of proof, that Shields is a sexually

dangerous person as defined by the Adam Walsh Act.

Under 18 U.S.C. § 4247(a)(5), a "sexually dangerous person" is one "who has engaged or

attempted to engage in sexually violent conduct or child molestation and who is sexually

dangerous to others."  A person is "sexually dangerous to others" if he suffers from a "serious

mental illness, abnormality, or disorder as a result of which he would have serious difficulty in

1

refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).  Thus, the statute requires first, that a person "has engaged or attempted to engage in sexually violent conduct or child molestation."  This must be proved beyond a reasonable doubt. United States v. Shields, 522 F.Supp. 3d 371, 330 (D. Mass. 2007).  The factfinder then must decide if the person "is a sexually dangerous person" because he has a "serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).  See Kansas v. Crane, 534 U.S. 407, 413 (2002) (holding that proof of "serious difficulty in controlling behavior" is a necessary for commitment).  This must be proven by clear and convincing evidence.

## PROCEDURAL HISTORY

At a  preliminary hearing in this matter on November 26 and 27, 2007, two psychologists, Dr. Niklos Tomich and Dr. Daniel Kriegman, testified concerning the science of risk prediction. The Court also reviewed an affidavit filed by Dr. Kriegman discussing the development of actuarial instruments to aid in risk prediction and the limitations of those instruments.   This Court held that actuarial risk assessments are reliable under the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and that the government's expert, Dr. Niklos Tomich, was qualified to testify under Federal Rule of Evidence 702.  Although the Court found Dr. Tomich qualified to testify about his own assessment of respondent and the assessment tools that he utilized, the Court held that he was not qualified to testify about statistical matters. United States v. Shields, 2008 WL 544940 (D. Mass. February 26, 2008) at * 1.

The Court conducted an evidentiary hearing on the merits on September 2, 4, 5, 8, 9, 10, 12, 15, 16, and 17, 2008.[1]   The Court heard testimony from three expert witnesses: Dr. Joseph Plaud, the independent examiner appointed by the Court pursuant to 18 U.S.C.§ 4247,  Dr. Niklos Tomich, the government's expert, and Dr. Craig Rypma, respondent's expert.   The Court also heard testimony from Dr. Dawn Graney, Shields' treating psychologist while he was incarcerated at FCI-Butner, and Melissa Raenae Moore, Shields' case manager while he was at Pharos House, a federal halfway house in Portland, Maine.   Finally, the Court heard testimony from three individuals who would be responsible for various aspects of Shields' supervision and treatment were he to be released:   Daniel Kelley, Federal Probation Officer;  Stephen P. Thomas, a sex offender treatment provider; and Kelly Gorham, a police detective responsible for registering and monitoring offenders on the Sex Offender Registry in Portland, Maine.

The Court, having considered the evidence, makes the following findings:  the government has not proven by clear and convincing evidence that Shields is a sexually dangerous person; Shields shall be on supervised release for a term of four, rather than three years; and the Court stays the entry of an order of discharge until the United States Probation Office in Maine presents the Court with a release plan, including a suitable place for Mr. Shields to live.

---

[1]At the parties' request the evidentiary hearing was conducted before an advisory jury pursuant to Federal Rule of Civil Procedure 39(c).  The advisory jury found that Shields suffers from a serious mental illness, abnormality, or disorder, but deadlocked on the question whether the government proved by clear and convincing evidence that, as a result, Shields would have serious difficulty in refraining from sexually violent conduct or child molestation if released. (D. 174).

## FINDINGS OF FACT

Shields' Offense History

1.  Shields was born in September, 1961; he was 47 years old at the time of the hearing.

2.  In May, 1988, at the age of 26, Shields was convicted in Wakulla County, Florida of making obscene phone calls to two brothers, ages unknown.  He was sentenced to six months of probation.

3.  From January to September, 1989, Shields committed four sexual offenses:

4.  On January 9, 1989, Shields committed Unlawful Sexual contact on W.H., a thirteen-year-old boy in Camden, Maine.  Exh 4.

5.  On April 19, 1989, Shields committed an indecent assault upon a nine-year-old boy in an elementary school bathroom in Florida.

6.  On July 15, 1989, Shields committed Unlawful Sexual Contact with M.S., a fourteen-year-old boy in Bath, Maine.  Exh. 5.

7.  On September 7, 1989, Shields committed Unlawful Sexual Contact with A.C., a six-year-old boy in Bath, Maine.  Exh. 6.

8.  Shields was arrested in Maine on September 14, 1989.   He plead guilty on September 21, 1990, to charges involving all three Maine victims.  The Florida case was never prosecuted and was dismissed in 2003, however, Shields has admitted to the conduct.

9.  As a result of his plea on the three Maine cases, Shields was incarcerated from March, 1990 to January, 1992.  Upon his release in January, 1992, he was on probation until March,

1996.  Shields successfully complied with the terms of his probation, which included sex

offender counseling.[2]  Exh. 39.

10.  In March, 1998, Shields committed the offense of Unlawful Sexual Contact with

W.M., a 12 year old boy.  He was arraigned on this charge on September 11, 1998, and held in

custody.  On October 30, 1998, Shields plead guilty to Unlawful Sexual Contact with W.M. and

received a sentence of five years' imprisonment.  All but 112 days of the sentence was suspended

for a four year period of probation, with special conditions.  During this period of probation

Shields attended sex offender counseling in Portland, Maine with Kay Landry.  Exh. 7.[3]

11.  While on probation imposed after his 1998 offense, Shields' probation was revoked

twice, however, neither revocation involved allegations of new sexual misconduct.

12.  On September 18, 2002, Shields was arrested for violating his 1998 probation for

possessing child pornography.  A charge of possession of child pornography was filed in the

United States District Court for the District of Maine.  A motion for a probation revocation in his

Maine case was also filed.

---

[2]During his initial period of probation, Shields participated in sex offender counseling with Russell Moat. No records of this treatment are available.  During the hearing the Court heard testimony from Stephen Thomas, another sex offender provider in Portland, Maine, that Russell Moat was forced to close his practice due to illness.  The Court is unable to determine how Moat's treatment compared to the cognitive behavioral model which is considered state of the art for sex offender treatment today.

[3]No records of this treatment are available, thus, the Court is unable to determine how this treatment compared to the cognitive behavioral model which is considered state of the art for sex offender programs today.  Testimony presented from Steve Thomas and Dr. Rypma indicated that this treatment might have been closer to the type of treatment provided by Steve Thomas.

13.   Shields pled guilty to possession of child pornography in federal court in Maine on July 22, 2003.  He received a sentence enhancement for possessing images of prepubescent children.   He was sentenced to 57 months of incarceration with a three year period of supervised release.  The remainder of his Maine sentence was imposed concurrently with his federal sentence.[4]

14.   Shields served his federal sentence at USP Lewisberg and FCI Butner.  He had no significant disciplinary problems and did not engage in any inappropriate sexual behavior while incarcerated.  At FCI Butner he participated in individual therapy for depression with a BOP psychologist, Dr. Dawn Graney.

15.   On September 12, 2006, Shields was released to the Pharos House, a federal halfway house in Portland, Maine.  He was to remain there for two months and then be released from BOP custody to begin his supervised release.

16.   The Bureau of Prisons certified Shields as a sexually dangerous person five days prior to Shields' scheduled release date.  As a result, Shields' release has been stayed as required by 18 U.S.C. § 4248(a).  He was removed from Pharos House and has remained in custody at FMC Devens during these proceedings.  He has not commenced his term of supervised release.

17.   Were the Court to release Shields, he would commence his three year term of supervised release.  Shields has submitted an affidavit, discussed below, affirming that he is willing to extend his supervised release for an additional year to ensure that he completes sex offender treatment, which Stephen Thomas testified could take as long as four years.

---

[4]Shields was ordered to serve 34 months of the suspended portion of his Maine sentence, and his probation was terminated. Exh. 7.

Shields' Personal History

18.   An understanding of Shields' personal history is helpful in assessing whether he would have serious difficulty controlling his behavior.  Shields' history is significant for sexual abuse victimization, homelessness, drug and alcohol abuse, and depression.

19.   The evidence at trial, introduced through Dr. Graney and Dr. Rypma, indicates that Shields' parents divorced when he was seven, and his father then left the family.  Around the same time, two older boys in the neighborhood, who were approximately 15 and 16 years old, began sexually abusing Shields.   Both oral and anal sex were forced on Shields.  The older boys allowed some of their friends to abuse Shields in the same manner.  At age 11 Shields left his mother's home to live with his maternal grandmother.  There, a fifteen-year-old cousin who was also living there began to sexually abuse him.  At 13, Shields witnessed his grandfather commit suicide: he saw his grandfather point a gun to his head and pull the trigger.  After his grandfather's suicide, Shields' grandmother moved back in with Shields' mother.  Shields began drifting from one relative to another and had periods of homelessness.  At about 13, Shields began prostituting himself to survive on the street.   (Tr. 6 at 13-14, Tr. 7 at 24-26).

Expert Testimony

20.   The Court qualified Drs. Plaud, Tomich, and Rypma as experts in the field of forensic psychology with a speciality in the assessment of sex offenders, which includes the diagnosis of mental disorders and the assessment of recidivism risk.

21.   The expert testimony in this case focused on several key areas.  Each expert diagnosed Shields with pedophilia according to the DSM-IV-TR.   However, there was

contradictory testimony about whether pedophilia is necessarily a "chronic" condition, or one that may remit with time.  There was also controversy regarding whether a diagnosis of pedophilia based on an individual's past behavior rather than persistent sexual fantasies or urges can provide the factfinder with sufficient information to find that the individual currently has "serious difficulty controlling behavior."

Dr. Joseph Plaud's Diagnosis and Opinions

22.  Dr. Plaud has been a licensed psychologist in the Commonwealth of Massachusetts since 1998.  He is also licensed in New York, and was previously licensed in North Dakota.   He received his Ph.D. from the University of Maine and has over twenty years of professional experience in the field of sex offender evaluation.  He serves on two editorial boards and has published articles on human sexual behavior.  Dr. Plaud's practice consists almost entirely of performing sex offender risk assessments.  He estimated that he has conducted over one thousand sex offender risk assessments.  He has testified as an expert over one hundred times in Massachusetts and in several other states.

23.  Dr. Plaud interviewed Shields in November 2007. Subsequent to that interview he received additional records and re-interviewed Shields in March, 2008.   (He did not testify regarding how long each interview took or the total amount of time he spent with Shields.)

24.  Dr. Plaud diagnosed Mr. Shields with pedophilia, non-exclusive type.  (Tr. 4 at 111). The subclassification of "non-exclusive type" indicates that Shields is not only attracted to children but also is attracted to adults.  (Tr. 3 at 121).  Dr. Plaud testified that Shields is capable of forming age-appropriate relationships and has done so in the past.  He noted that this was a risk-reducing characteristic.  (Tr. 3 at 124-125).

25.  Dr. Plaud testified that his diagnosis of pedophilia was based on Shields' sexual offenses against the six and nine year old boys in 1989, and the conviction for possession of child pornography in 2002.  (Tr. 2 at 101, 105).  Dr. Plaud conceded, however, that this behavior might not warrant the diagnosis.  He stated: "Child molestation, child sexual abuse is behavior. It's sexual behavior.  It shares a lot of variability, a common variability with people who are pedophilics or who have pedophila, but they're not one and the same thing.  People, in other words, will sexually abuse children who are not pedophiles, and there are other issues explanatory in nature that go into that understanding."  (Tr. 3 at 121-122).

26.  With regard to whether pedophilia is always a chronic condition, Dr. Plaud explained, "It's oftentimes considered to be a chronic condition, which would seem to indicate it has a longevity or is fairly resistant to change over time.  There is no one answer I can give you about curing pedophilia.  It depends.  It's a case-by-case basis.  Individuals who may have the diagnosis have other factors, physiological, psychological, behavioral factors that would make that, even though technically a diagnosis, something that they could reorient to.  Others it, would be more difficult to do that." Dr. Plaud testified that the term "reorient" means "not show any patterns of sexual arousal any longer to prepubescent children, males or females." (Tr. 4 at 109-110).

27.  Dr. Plaud's testimony about whether Shields would have "serious difficulty refraining" from future acts of child molestation was ambiguous.   Dr. Plaud first testified that he was "unable to say that Mr. Shields is not sexually dangerous." (Tr. 2 at 64).  He explained that the negatives in his statement were introduced for a particular reason -  because he would not be able to testify that Mr. Shields *was* sexually dangerous, but also could not say that Mr. Shields

was not sexually dangerous. (Tr. 2 at 64-65).  When asked whether Shields met the criteria in the statute he stated: "Well, I believe he is at risk to reoffend.  I believe that I am unable in totality to say that he would not meet those criteria."  (Tr. 2 at 65).  Later in his testimony he stated, "I believe there is a risk there.  I am not prepared and I will not say definitively that he will reoffend, but - and that's why I used negatives in my initial - I cannot say that he is not a risk to reoffend." (Tr. 2 at 130).  When asked whether Shields was a sexually dangerous person as that term is defined under the Adam Walsh Act, Dr. Plaud responded that "[i]t's a very uneasy 'yes'." (Tr. 2 at 131).

28.  Dr. Plaud testified that when conducting a sex offender risk assessment he generally reviews and analyzes the subject's  records, and then scores the Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR), a risk assessment actuarial tool.  Then he conducts an interview.  He characterized his methodology as the "adjusted actuarial approach" and stated that he computes an actuarial tool in order to get a "baseline" and then "look[s] for other factors that research has shown may or may not be predictive of risk." (Tr.2 at 66)

29.  Dr. Plaud emphasized that the ability to predict recidivism is limited.  He testified that the state of the science in this area is such that "there is error in judgment, error in prediction."  (Tr. 2 at 69).   Although he considered himself to be an expert, he stated that he was " no better as a person or a professional at being able to predict the future than anybody else in this courtroom."  (Tr. 2 at 68-69).   Plaud acknowledged that it is the position of the American Psychological Association and the National Academy of Sciences that the ability of psychologists to reliably predict future dangerousness is unproven.  (Tr. 3 at 20).

30.   All three doctors used an actuarial instrument in their analysis.  Dr. Plaud used the Rapid Risk Assessment for Sexual Offense Recidivism ("RRASOR"), while Drs. Tomich and Rypma used the Static-99.

31.   The RRASOR was developed in 1997 by statistician Dr. Karl Hanson, a researcher at the Solicitor General's Office of Canada.  The RRASOR consists of four questions concerning: 1) a person's prior sex offenses, 2) his age, 3) whether he has a male victim, and 4) whether he has a victim outside his family.  An individual can receive a score from 0 to 6.  Dr. Plaud scored Shields as a 5.  Exh. 26.

32.   A score of 5 on the RRASOR indicates that the individual received the same score as a test group which had a recidivism rate of 49.8 % at 5 years post-release and 73.1 % at 10 years post release.   Dr. Plaud testified that this test group was extremely small:  The total RRASOR development sample consisted of 2,592 people.  Of those individuals, 52 scored a 5 on the instrument.  49.8% of those 52 people (those who scored a 5) recidivated after 5 years.  Dr. Plaud testified that the 5 year figure was obtained through an analysis of the actual data, while the 10 year figure was arrived at through an extrapolation of the data through a mathematical model.  Thus, the RRASOR data tells us only that Shields scored similarly to a group of 52 individuals.  Of those 52 individuals, 49.8 % had reoffended within 5 years of release.    Dr. Plaud testified that he viewed the risk percentage associated with the actuarial as "establishing a baseline" and "not something that was entirely true."  (Tr. 2 at 74).   Dr. Plaud characterized the risk prediction numbers associated with the RRASOR as an "overprediction."  (Tr. 3 at 102).  For example, he testified that he had doubts that the 10 year risk percentage of 71% which is associated with

Shields' score of 5 on the RRASOR would apply to Shields, who would be 57 years old in ten years.  (Tr. 3 at 106).

33.  Although he did not score the Static-99, Dr. Plaud was familiar with it and familiar with the scientific literature surrounding its usage.  The Static-99 incorporates the RRASOR's four questions and adds six additional questions.  The Static-99 was developed by Karl Hanson and is considered the successor to the RRASOR.

34.  Dr. Plaud testified that both actuarial instruments were developed after Hanson engaged in a "meta-analysis" to identify the factors most strongly correlated with recidivism.[5] Hanson used that data to develop the RRASOR, and later the Static-99.   Dr. Plaud testified that no single predictor was "robust" (i.e. a good predictor).  (Tr. 3 at 36).  Thus, the factors are only modest predictors of risk. (Tr. 3 at 58-61).[6]   Because the factors would have no predictive value if used in isolation, Hanson combined them into a multi-factored actuarial instrument.  (Tr. 3 at 36).

35.  Dr. Plaud characterized the RRASOR as moderate predictor of recidivism. (Tr. 2 at 113).  He testified that cross-validated studies show that the RRASOR and the STATIC-99 are "statistically significant predictors of risk.  What I mean by that is they're better than flipping a coin.  It's better than no relationship.  It's better than saying that they're not related to risk prediction." (Tr. 3 at 52).

---

[5]This document was previously submitted to the Court with Respondent's Post Daubert Hearing Brief (D. 82).  See R. Karl Hanson & Monique Bussiere, *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies*, 66 J. Consulting & Clin. Psy. 348 (1998).

[6]For example, prior convictions are weighted to serve as the most significant factor for both the RRASOR and the Static-99, however the meta-analysis found that the correlation coefficient between past offenses and recidivism is was .19, which was in the "small" range.

36. Dr. Plaud testified that neither risk assessment instrument accurately accounted for the affects of aging. (Tr. 3 at 67-68). He testified that age can be a significant reducer of risk and that there is no dispute in the scientific community that the rates of recidivism are higher for younger offenders. (Tr. 3 at 69). Dr Plaud agreed with a conclusion of a 2006 paper authored by Karl Hanson, that "the predictive accuracy of the Static-99 is lowest in the 40-49 year old age group." (Tr. 3 at 55-56).[7] For high risk offenders in Shields' age group (40-49 at release), the age-adjusted recidivism base rate at 5 years post-release was 25.7% – not 39% as reported in the original Static-99. Plaud also agreed with a conclusion by researcher Richard Wollert that "actuarials were efficient for only the youngest group, were inaccurate for identifying recidivists." (Tr. 3 at 82).[8]

Dr. Tomich's Diagnosis and Opinions

37. Dr. Tomich is a licensed psychologist in Massachusetts. He obtained a Psy. D. from the Chicago School of Professional Psychology in 1988. (Tr. 4 at 40). Tomich is employed by Forensic Health Services, a company that contracts with the Commonwealth of Massachusetts to provide sex offender risk assessments for the Department of Correction. He has been certified as a designated forensic psychologist by the Commonwealth's Department of Forensic Mental

---

[7]This document was previously submitted to the Court with respondent's Post Daubert Hearing Brief [D. 82]. This study showed that the Static-99 did not sufficiently capture declines in recidivism risk associated with age, and concluded that older offenders had lower sexual recidivism rates than would be expected based on their Static-99 scores. The study contained a chart which gave new Static-99 recidivism rates.

[8]This document was previously submitted to the Court with respondent's Post Daubert Hearing Brief [D. 82]. See R. Wollert, *Low Rates Limit Expert Certainty When Current Actuarials Are Used To Identify Sexually Violent Predators*, 12 Psy. Pub. Pol. & Law 56 (2006).

Health and has been certified as a qualified examiner by the Commonwealth's Department of

Correction.   Dr. Tomich had never testified in federal court before, nor has he ever testified in

any state other than Massachusetts.

38.  Dr. Tomich has not done any research in the field of sex offender recidivism.  He has

never written a peer-reviewed article.  He has never served on a peer-reviewed panel that reviews

other psychologists' academic work.  (Tr. 5 at 94).   Dr. Tomich provided treatment to sex

offenders from 1988 to 1994, when he worked at the Massachusetts Society for the Prevention of

Cruelty to Children, and from 1994-1997, when he worked as a Unit Director at the Bridgewater

State Hospital.   Exh. 2.  He estimated that during his entire career he has provided therapy to

approximately 30-40 sex offenders, of which only approximately 15-20 were adults.  (Tr. 5 at 89-

90).

39.  Dr. Tomich reviewed information provided to him by the government, which included

court records of Shields' prior offenses.  Shields declined to be interviewed by Dr. Tomich.

40.  Dr. Tomich diagnosed Shields with pedophilia.  (Tr. 4 at 86).  He based this

diagnosis on the offenses against the six year old and the nine year old in 1989, the obscene

phone calls in 1989,[9]  the offense against a twelve year old in 1998, and the child pornography

offense in 2002.  (Tr. 5 at 55-56, 63-64).

41.  Unlike Drs. Plaud and Rypma, Dr. Tomich testified that pedophilia does not " go

away with time.  There is no indication that there's been any change that I could see in the

record."  (Tr. 4 at 88).

---

[9]Dr. Tomich relied on the obscene phone call charge because police reports state that
Shields called a "children's" phone line, although the reports do not mention the ages of the
children.  (Tr. 5 at 58).

42.   Dr. Tomich opined that Shields would have serious difficult refraining from child molestation if released.  He testified that he used the "adjusted actuarial method" to assess Shields.  (Tr. 5 at 34-35).    Dr. Tomich first scored the Static-99.  The Static-99 is an actuarial measure consisting of 10 items.  Scores on the Static-99 range from zero to twelve.  A score of six or above places an individual in the high risk category.  Shields' score was 8.

43.   A score of 6+ on the Static-99 indicates that the individual scored similar to a test group which had a recidivism rate of 39% at 5 years post-release, 45% at 10 years post-release, and 52% at 15 years post-release.   The total Static-99 development sample consisted of 1,086 people.  Of those individuals, 129 scored a 6+ on the instrument.  Thus, the scoring indicates that Shields scored similarly to a group of 129 individuals whose recidivism rates were 39% at 5 years post-release, 45% at 10 years post-release, and 52% at 15 years post-release.  Exh. 35.[10]

44.   Dr. Tomich asserted that the Static-99 underrepresents true risk potential because it is based on reconviction rates, not reoffense rates.  (Tr. 4 at 96).  Dr. Tomich did not provide any support for this statement and did not explain the "underrepresentation hypothesis" or how this hypothesis was affected by more recent recidivism statistics demonstrating decreases in

---

[10]Pursuant to the Static-99 coding manual, there is no increased recidivism rate for scores higher than 6, however, as the score increases there is increased confidence that the individual is a member of the "high" risk group.

recidivism.[11]   Dr. Tomich did agree that the Static-99 was, statistically speaking, only a

"moderate" predictor of sexual offense recidivism. (Tr. 5 at 30).

45.  Dr. Tomich found the following facts relevant to his risk assessment: 1) Shields did

not inform Drs. Plaud or Renaud about the January 9, 1989, offense;  2) He did not inform Drs.

Plaud or Renaud about the 1988 obscene phone call charge;  and 3) Shields minimized the April

19, 1989 charge to Dr. Rypma.   However, on cross-examination Dr. Tomich admitted that denial

or minimization of an offense or lack of empathy for a victim are not predictive of sexual

recidivism.  (Tr. 5 at 54-55).   Dr. Tomich's remaining relevant factor was the nature of the July

15, 1989 incident, which he characterized as one where threats and violence were used. (Tr. 4 at

71).

46.  Dr. Tomich testified that he considered the "possible protective factors" of age,

treatment, and probation, but said they did not cause him to alter his conclusion. (Tr. 5 at 36).

47.  Thus, for example, Dr. Tomich testified that he did not consider Shields' age, almost

47, to be significant enough to change his opinion about whether Shields was sexually

dangerous.  (Tr. 4 at 120, 122).   However, he admitted that, even using the data from the Static-

99 without any adjustment for age, the highest recidivism estimate, and the only one that is over

50%, is the 15-year estimate.  Dr. Tomich acknowledged that in 15 years Shields will be over 60

---

[11] Although it is undeniable that more sex offense are committed than reported, there is no evidence that this discrepancy is attributable primarily to sex offenders.  Richard Wollert's 2006 article, previously submitted to the Court, surveys some of arguments and statistical sources underlying the "underestimation hypothesis" and concludes that "it is virtually impossible to derive a defensible formula for adjusting actuarials for the effect of undetected recidivism or any other factor associated with the underestimation hypothesis."  Wollert, *supra*, at n. 13.  This accords with the testimony of Dr. Rypma.  (Tr. 7 at 52-53).

years old, and therefore would actually be in an age group that has a lower than 5% recidivism rate.  (Tr. 5 at 98-101).

48.  Tomich also testified that he did not consider Shields' history of treatment, including his history of individual treatment with Dawn Graney, to be a protective factor.  Despite not having interviewed Shields, Tomich opined that Shields had the following attitude toward treatment: "[H]e simply hasn't dealt with it, that he doesn't want to deal with it.  He wants to kind of do his time quietly and get out, and he doesn't want to be bothered with doing the work necessary to reduce the risk he presents to children in the community today."  (Tr. at 104).

49.  Dr. Tomich opined that Shields would have serious difficulty controlling behavior if released, and characterized Mr. Shields' behavior as "purposeful, goal-driven, and compulsive." (Tr. 4 at 99).  He did not agree with the characterization that Shields' offense history had de-escalated despite the fact that Shields' most serious offenses took place twenty years ago and since that time he had only one hands-on offense, which took place ten years' prior to the date of the hearing.   With respect to the evidence that Shields' offenses in 1989 occurred during a time when he was heavily abusing alcohol and other drugs,  Dr. Tomich said, "I'm not aware that alcohol causes one to sexually offend against a child.  Alcohol does not cause pedophilia."  (Tr. 4 at 116).   Unlike Dr. Rypma, he did not address the concept of alcohol as a disinhibitor, or the differences in risk between individuals who require a disinhibitor in order to offend and those who do not.

Dr. Craig Rypma's Diagnosis and Opinions

50.  Dr. Rypma is a clinical and forensic psychologist in private practice who specializes in sex offender treatment.  He received his Ph.D. from the University of Maryland.   From 1987

17

until 2007 his practice contracted with the Iowa Department of Corrections to provide sex offender treatment to offenders on probation and parole.  In that capacity he has provided sex offender treatment to approximately 2000 sex offenders.  (Tr. 7 at 5-6).   In 1999 he began conducting independent evaluations for individuals facing potential civil commitment in Iowa and other states.  He has conducted approximately 123 sexually dangerous person evaluations.  Of the approximately 123 evaluations he has conducted, he has testified for the defense approximately 42 times.  In the majority of the remaining approximately 80 cases he was not called by the defense because his opinion would not have been helpful (i.e. he found the individual sexually dangerous).

51. Dr. Rypma testified that prior to interviewing Shields he conducted a brief review of approximately 1000 pages of records.  He then interviewed Shields in March, 2008, for approximately five hours.  After the interview he went back to the records and reviewed each page.  On the Static-99 he gave Shields a score of 8.  After this proceeding was continued due to scheduling, Dr. Rypma re-interviewed Shields for four additional hours.  Thus, Dr. Rypma spent a total of nine hours with Shields.

52. Like Drs. Plaud and Tomich, Dr. Rypma also diagnosed Shields with pedophilia, but he said that he "struggled with the diagnosis." (Tr. 7 at 71).   He testified that the diagnosis was difficult first, because there is a debate within the field about whether a person can be diagnosed with pedophilia based on behaviors alone.  Second, he testified that the DSM-IV-TR does not provide for a diagnosis of "pedophilia in remission."  (Tr. 7 at 72-74, 77).

53. Dr. Rypma testified that the debate within his field was prompted by a change in the wording criteria of the DSM-IV-TR, which resulted in the unintended consequence of allowing

18

the diagnosis of pedophilia to be based on past behavior alone, without a finding that the subject

also has sexually arousing fantasies or urges concerning prepubescent children.  He testified that

this was never the intent of the DSM and that it was "not the real way this diagnosis should

occur, but that's what the book tells us to do."  (Tr. 7 at 74).   He testified that pedophilic

behavior alone, without sexually arousing fantasies or urges, does not allow the examiner to

distinguish an individual with pedophila from one who "committed crimes that involve

prepubescent children, but without this additional intense sexual fantasy and intense urge that

accompanies these behaviors over a long period of time in an individual's life."  (Id.).  Despite

this controversy, Dr. Rypma followed the letter of the DSM-IV-TR and diagnosed Shields with

pedophilia.

54.  Dr. Rypma also noted that DSM-IV-TR did not provide for a possible diagnosis of

"pedophilia in remission," however he testified that it was possible for person to engage in

pedophilia "episodically." (Tr. 7 at 77).

55.  Dr. Rypma found that Shields would not have serious difficulty in refraining from

sexually violent conduct or child molestation if released.  Dr. Rypma did not find that Shields'

was "compulsive" in his sexual offending.  He testified that although Shields demonstrated some

compulsive behavior in 1989 when he engaged in four sexual offenses in a short period of time,

in the twenty years since then, Shields' sexual acting out has diminished.   (Tr. 7 at 27-30).

56.  Dr. Rypma noted that after the offenses in 1989, Shields successfully completed a

three year term of incarceration, followed by a three year term of probation, followed by a two

year period in the community without a new offense.  Thus, Shields was released from custody in

1992 and did not commit another offense until 1998.  Rypma testified that because "the behavior

didn't continue," Shields did not exhibit a  "compulsive pattern of behavior."  (Tr. 7 at 27-31).

57.  Dr. Rypma testified that it is common to see compulsive pedophiles exhibit deviant

behaviors even in prison due to their inability to control their behavior.  For example, it is not

unusual to see compulsive pedophiles dress like children, cut out pictures of children from

magazines, or compulsively masturbate in prison.  He also testified that individuals with

compulsive sexual behavior often receive disciplinary reports while in prison for sexual contact

with other inmates or masturbating in front of others.  Dr. Rypma testified that Shields has not

exhibited any compulsive sexual behaviors in prison. (Tr. 7 at 30-31).

58.  Dr. Rypma characterized Shields' decision to not participate in sex offender

counseling at FCI Butner, but instead to continue individual therapy with Dr. Graney as "a good

decision" and one which Dr. Rypma would have advised him to make, given the relationship

Shields had established with Dr. Graney and the remarkable progress he appeared to be making

in individual therapy.  Dr. Rypma opined that Shields' sexual offending was "intimately tied to

his own victimization as a child and the resulting substance abuse and anger that children who

are victims of child abuse frequently develop."  Dr. Rypma testified that Shields needed to

address mental health issues such as depression before he could be completely successful in a sex

offender treatment program.  (Tr. 7 at 39).

59.  With regard to Shields' previous two experiences in sex offender treatment, Dr.

Rypma testified that the sex offender treatment Shields attended from 1993 through 1996 did not

appear to be cognitive-behavioral in format.  According to Rypma, Shields described a group that

met for two hours a week that did not necessarily focus on issues relating to sexuality or arousal

patterns.  Dr. Rypma testified that Shields' description of the program was consistent with what he knew about the evolution of sex offender treatment programs in the country and how programs were being run in the early 1990s.   Shields indicated to Dr. Rypma that he thought he had gotten very little out of his first encounter with sex offender treatment.  (Tr. 7 at 35-36).

60.  Dr. Rypma testified that the sex offender treatment Shields attended in 1998 in Maine appeared, from Shields' description, to be an early version of a cognitive behavioral model.  (Tr. 7 at 36-37).

61.  Dr. Rypma observed Stephen Thomas' testimony in this proceeding.  He opined that his sex offender treatment program was "state of the art" because it utilizes a curriculum based on the latest treatment research, a tight supervision component, and a polygraph examination every six months.  (Tr. 7 at 43).   According to Rypma, the fact that Shields was in sex offender treatment and then reoffended in 1998 did not mean that he would not benefit from further treatment, because change in an individual's life does not occur in a linear fashion and many things have occurred in Shields' life since his 1998 treatment, most notably his contact with Dr. Graney and his commitment to maintain sobriety.  (Tr. 7 at 45).

62.  Dr. Rypma testified that Shields has been sober for approximately 10 years, and that Shields' commitment to maintaining a sober lifestyle decreased his risk of reoffense.  Shields reported that his heaviest period of drinking and drug use was in 1989.  Dr. Rypma testified that this fact was significant because drugs and alcohol are disinhibitors to offending.  Dr. Rypma testified that an individual who has to be intoxicated to commit an offense is considered less risky than an individual who does not have to be disinhibited in order to offend.   These

21

individuals are more manageable in a community-based program where they can be monitored with frequent tests to detect substance abuse. (Tr. 7 at 45-46).

63.  Dr. Rypma asked Shields about his offense conduct.  Although he noted some discrepancies between the records and Shields' self-report, he did not consider those discrepancies to be significant examples of "minimization."  (Tr. 7 at 54).  When asked for an example of significant minimization he testified that it was common for offenders to minimize their crimes by characterizing themselves as the victim or stating that the victim was sexually attracted to them and initiated the contact.  He noted none of this type of minimization or denial from Shields.  (Tr. 7 at 54).   Thus, for example, Dr. Rypma did not find Shields' description of the crime against A.C. (touching his buttocks over clothing versus digitally penetrating A.C. under clothing) to be a significant example of minimization.  He testified that Shields had told him that he didn't remember the offense, but had read the police report and was sure he had committed the crime after he read the police report.  (Tr. 7 at 56).  He testified that this offense took place during a period when Shields was heavily drinking and using drugs.  (Id.).  He also testified that, while the distinction between digital penetration and non-penetration over clothing was very important to the victim, it was not particularly relevant in estimating risk. (Tr. 7 at 63). He testified that there are no studies showing that differences in these types of details affect recidivism.  (Id.).

II.      FACT WITNESSES

Testimony of Dawn Graney

64.  Dawn Graney is a clinical psychologist who works as the mental health programs coordinator at FCI Butner.  Exh. 103.   She provided individual therapy to Shields for

approximately two years.  Dr. Graney estimated that she had approximately fifty formal therapeutic visits with Shields during a two year period at FCI-Butner.  In addition, because her office is located on an inmate housing unit, she had many opportunities to interact with Shields and to observe him in his day-to-day activities when he did not know he was being observed. Her presence on the housing unit also afforded Shields and other inmates the opportunity to come to her informally with problems.  Dr. Graney testified that Shields often relied upon her in that way.  (Tr. 6 at 19-20, 29).

65.  Dr. Graney does not specialize in sex offender treatment or sex offender risk assessment.  However, as Shields' treating therapist, she has the most extensive knowledge of him as an *individual* of any of the witnesses who testified in this proceeding.  The Court thus accords her testimony, and her assessment of Shields' positive progression in treatment, substantial weight.

66.  Dr. Graney testified that the primary issue she worked on with Shields was his depression.  It  was clear to her from the outset of her treatment of Shields that he had serious problems with depression.  He described himself as being helpless, and feeling hopeless and worthless.  She observed him to be negative, pessimistic, and isolated and noted that he had a history of suicide attempts.  (Tr. 6 at 18, 21-22).

67.  Dr. Graney testified that during the two years she worked with Shields she saw a "steady progression and improvement in the sense of his willingness to open up to treatment." (Tr. 6 at 94).  She reported that at the time of his release he was not showing any depressive symptoms. (Tr. 6 at 95).

68.  Dr. Graney testified that during therapy Shields discussed the traumatic events in his childhood, including his history of childhood sexual abuse by multiple abusers and witnessing the suicide of his grandfather.  (Tr. 6 at 13).

69.  Dr. Graney and Shields also discussed his feelings about his history of sexual offending.  He talked about realizing that he did not want to reoffend and stated that he had "become the person he despised."  (Tr. 6 at 50). [12]

70.  In addition to becoming more open in treatment, Dr. Graney testified that Shields made other positive progress in the time she worked with him.  She testified that she observed him become less isolated.  He participated in more activities and began to lead the Alcoholics Anonymous group for the other inmates.  (Tr. 6 at 35).   When asked about his level of participation in programs to prepare for his release, she stated that, of the inmates she had worked with, "he did the most preparation of anyone I've seen." (Tr. 6 at 48).  In the context of planning for his release, he spoke to Dr. Graney about the "temptations" of life in Portland, such as social networks where alcohol could be involved.  (Tr. 6 at 48).  She testified that "we talked quite a bit about what he wanted to achieve and where he would best be able to attain the resources he needs, while at the same time being able to stay a steady course on his treatment and still do the right things."  (Tr. 6 at 49).

---

[12] The Court notes that the government questioned Dr. Graney about her conversations with Shields about his sexual offense history, specifically about discrepancies between Shields' statements about his sexual offense history as reflected in her notes and other records.   Dr. Graney testified that she did not go through Shields' sexual offense history with him point by point.  The Court finds this explanation credible.  In treating Shields for depression, rather than providing sex offender treatment, it would not be necessary, or productive, to review Shields' history of sexual offending in the same in-depth and challenging manner as sexual offending is addressed in the context of "cognitive behavioral" sex offender therapy.

71. Dr. Graney testified that Shields agreed that he needed sex offender treatment, but declined to enroll in the treatment at Butner and planned instead to participate in treatment in the community after his release. (Tr. 6 at 31).   Dr. Graney testified that the sex offender program at Butner lasts a year or more.  All of the individuals in the program live in the same residential housing unit and go through a series of psychoeducational groups throughout the day.  Dr. Graney testified that if Shields had gone into the sex offender program, his treatment with her would have ended: once an inmate enters the sex offender program, he may only receive clinical services from the staff of that program.  (Tr. 6 at 28).   Dr. Graney believed that "if he had gone into treatment at that time, because of the depression he was dealing with, because he didn't have, I think the self-esteem to maybe handle that level of challenging in the program to open up about his offending, and to tolerate that well, I don't think he would have done well in the program because those other issues would have interfered with his ability to really successfully complete the program."  (Tr. 6 at 31-32).

72. Dr. Graney testified that during the two years she worked with him she did not observe Shields exhibit any compulsive behavior.  She testified that although inmates do not have access to children inside the prison system, inmates with compulsive sexual problems act out in other ways, such as engaging in sexual activity with other inmates or collecting pictures of children to use in sexual fantasies.  Dr. Graney testified that she did not observe any of these behaviors in Shields.  (Tr. 6 at 93).

73. Dr. Graney testified that she and Shields had a good rapport.  She felt that he trusted her and she felt that he had put forth good effort in working with her.  He was concerned that the next therapist he worked with would not work with him in the same manner and asked her to

write a letter about the process that they had gone through in treatment to give the new therapist an idea of the issues that were being addressed. Dr. Graney also wrote a letter for his future probation officer. Prior to leaving FCI Butner Shields gave Dr. Graney a card expressing his gratitude for her help and support, and for helping him deal with the death of his mother. This card was read into evidence. (Tr. 6 at 59-60).

74. Dr. Graney testified that she has periodically checked on Shields' psychology records during the two years that he has been incarcerated at FMC Devens after his removal from the pre-release program at Pharos House. She testified that, based on those records, Shields has required only minimal pyschology contact, has continued to remain free of depressive symptoms, and appears to be functioning well. (Tr. 6 at 100).

<u>Melissa Raenae Moore</u>

75. Melissa Raenae Moore is a social worker who was Shields' case manager at the Pharos House, a federal halfway house in Portland, Maine, when Shields resided there after his release from FCI Butner. He was admitted to the Pharos House on September 12, 2006, and removed on November 2, 2006, to be taken to FMC Devens. (Tr. 6 at 108). Mr. Shields was scheduled to be in the Pharos House for approximately two months. He was removed five days prior to his release. (Tr. 6 at 107).

76. Ms. Moore testified that Shields arrived at Pharos House on time with all his identifying paperwork plus a resume and printouts for job leads. Ms. Moore characterized Shields as "the most prepared inmate to that date that I had worked with." (Tr. 6 at 104). After his arrival he immediately registered as a sex offender with the local police as he was required to do. While residents at the Pharos House must obtain employment within fifteen days, Shields

was offered a job at a nearby Holiday Inn within 24 hours of his arrival, which she characterized as a "world record."  (Tr. 6 at 109).

77. Ms. Moore testified that one of her responsibilities was to meet with new residents and review the rules and regulations of Pharos House.   Residents are subject to restrictions, including a curfew and "accountability checks."  Ms. Moore explained that residents cannot leave Pharos House without an approved itinerary.  This itinerary includes their destination, the exact route taken to and from their destination, and an approved time frame.  Ms. Moore testified that Pharos House checks whether residents follow the approved itinerary by employing paid staff, who are unknown to the residents, to follow them in order to make sure they go where they are supposed to go, and to ensure that they do not go "the long way around."   Ms. Moore had staff members follow Shields, and in addition she did accountability checks on him herself.

78. Ms. Moore testified that she did accountability checks for Shields "excessively" because he was the first sex offender she supervised.  During the first month of his stay at Pharos House, she probably had him followed every day.  She did not get back a single negative report on Shields from the accountability checks.  (Tr. 6 at 105-108).

79. As his case manager, Ms. Moore was responsible for approving and verifying Shields' employment.   She visited Shields' job site twice a week and had contact with his supervisor.  (Tr. 6 at 110-111).

80. Ms. Moore testified that Shields had come to Pharos House well prepared to work in the restaurant industry:  Shields had received a certificate for food service inspection while incarcerated.  This certificate was valued in the industry and, as a result, the Holiday Inn was very interested in employing him because of it.   Moore testified that Shields was "really

27

motivated, and he took a lot of pride in what he was doing."  She also noted that during his stay

at Pharos House, the Holiday Inn offered Shields a promotion to the management program.

However, Ms. Moore declined to approve his transition to the management program until he was

released from Pharos House and was on supervised release.   (Tr. 6 at 109-111).

81.   While at Pharos House Shields obtained an AA sponsor and attended AA meetings

regularly.  Ms. Moore characterized his AA attendance as "more often than other inmates" given

his work schedule of working the morning shift and banquets in the evening.  She testified that

he would use his lunch break to go to AA meetings that were within walking distance from his

job.  She testified that he was "busy either working or meeting with his sponsor or going to AA

from 5:00 o'clock in the morning to 11:00 o'clock at night."  (Tr. 6 at 112-113).

82.   Ms. Moore testified that Shields also attempted to attend a sex addicts group called

Sex and Love Addicts Anonymous, which is a twelve-step program similar to AA and focuses on

unhealthy sexual relationships.  She testified that Shields attended SLAA two times.  However,

she indicated that SLAA meetings in Portland were infrequent and that AA and going to work

were Shields' priority.  (Tr. 6 at 113).

83.   Ms. Moore attempted to enroll Shields in sex offender treatment with Steve Thomas,

the contracted sex offender treatment provider for U.S. Probation in Portland, Maine.  Ms. Moore

could not enroll Shields because he could not start until he was on supervised release.   (Tr. 6 at

114-116).

84.   Shields wanted to continue individual treatment.  In Moore's opinion, Shields "was

expressing a need and a desire to be in another therapeutic relationship with a therapist" and was

"really trying to continue the momentum that he had came there from what he'd accomplished

28

with Dr. Graney." (Tr. 6 at 117).   Ms. Moore attempted to get an appointment for Shields with

the community counseling agency, but was informed that he would not be able to start counseling

until he was on supervised release.  (Tr. 6 at 118).

85.  Ms. Moore testified that Shields prepared for his release from Pharos House.  With

the help of the network of people he met at AA meetings, he was accepted to Oxford House, a

sober house in Portland.  She testified that she coordinated with Dan Kelley, Shields' future

probation officer, to verify that the Oxford House accepted Mr. Shields despite his status as a sex

offender.  (Tr. 6 at 119-120).

Daniel Kelly, Federal Probation Officer

86.  Daniel Kelly is a United States Probation Officer in Portland, Maine.   He testified

that once on supervised release, Shields will be subject to the standard conditions of supervision

as well as special conditions imposed by Judge Woodcock of the United States District Court for

the District of Maine at the time of sentencing.  (Tr. 6 at 133, 139).  These restrictions include the

following:

1)   Defendant shall participate in a program of mental health treatment, to
     include sexual offender treatment, as directed by the probation officer,
     until such time as the defendant is released from the program by the
     probation officer.  Defendant shall pay / co-pay for services provided
     during the course of such treatment, to the supervising officer's
     satisfaction;

2)   Defendant shall not use or possess any controlled substance or intoxicants;
     and shall participate in a program of drug and alcohol abuse therapy to the
     satisfaction of the supervising officer.  This may include testing to
     determine if the defendant has made use of drugs or intoxicants.
     Defendant shall pay/co-pay for services provided during the course of such
     treatment, to the supervising officer's satisfaction.

3)   Defendant shall at all times readily submit to a search of his residence, and
     of any other premises under his dominion and control, by his supervising

officer.  Upon the officer's request when the officer has reasonable basis to believe that such a search will lead to the discovery of evidence of the defendant's violation of the terms of his supervised release.  Failure to submit to a search may be grounds for revocation.

4)     Defendant shall not possess or use a computer to access an "online computer service" at any location, including his employment, without prior approval of the U.S. Probation Office. This includes any internet service provider, bulletin board system, or any other public or private computer network.

5)     Defendant shall consent to the U.S. Probation Office conducting periodic unannounced examinations of his computer(s) equipment, which may include hardware, software, and copying of all data from his computer(s). This also includes removal of such equipment, when necessary, for the purpose of conducting a more thorough examination.

6)     Defendant shall provide personal and business telephone records to the U.S. Probation Officer as directed.

7)     Defendant will have no contact with children under the age of sixteen without permission from his supervising officer.

Exh. 8.

87. Mr. Kelly testified that the assigned probation officer would determine how often to see Shields.  He testified that probation officers often do home visits on nights and weekends and visit supervisees at their places of employment.  (Tr. 6 at 142).

88. Since Shields' sentencing in 2003, there have been advances in technology that enhance the Probation Department's ability to monitor sex offenders on supervised release.   Mr. Kelly testified that Probation normally seeks to modify an individual's conditions of probation to reflect these technologies. (Tr. 6 at 142).

89. U.S. Probation Office now has the capability to monitor supervisees with a live GPS system.  This system allows them to track the offender's movements in the community.  The system also has the capability of denoting "exclusion zones."  For example, the GPS can be

programed to notify the probation department if the offender goes near a school or daycare center. (Tr. 6 at 143-144).

90. Probation also has new technology for tracking computer use. Mr. Kelly testified that there is a disk which can be put into a computer to track the websites that the computer has accessed. This can be done in the supervisee's home, without removing the computer. Submitting to these checks is a condition of supervised release. (Tr. 6 at 144-145).

91. Mr. Kelly testified that Probation works closely with Steve Thomas, the provider contracted to provide sex offender treatment for Probation in Portland, Maine. Mr. Kelly testified that anything that is said during sex offender therapy is available to the probation officer. As part of his contract with U.S. Probation, Mr. Thomas is required to give monthly reports to Probation on offenders whom he is treating. (Tr. 6 at 147-148).

Stephen Thomas, Sex Offender Treatment Provider

92. Stephen Thomas is a clinical social worker in private practice. For the last twenty-one years he has operated an independent practice evaluating and treating sex offenders. His practice, Supervised Community Treatment, contracts with U.S. Probation to provide sex offender treatment in Portland, Maine. (Tr. 6 at 157-158).

93. Mr. Thomas described the treatment as "cognitive behavioral" therapy. The cognitive behavioral model attempts to help the participant understand the series of thoughts, needs, and behaviors that contributed to his offending. The goal is to help offenders understand the risk factors that contributed to their offending so they can identify and avert them. The program consists of weekly group meetings, co-led by a male and female treatment team, a curriculum, and assignments. The "cognitive behavioral model" of sex offender therapy used in

31

this program, coupled with intense supervision and monitoring through periodic polygraphs, is considered state of the art sex offender treatment.  (Tr. 6 at 164-167).

94.  Mr. Thomas testified that his program typically takes two to four years to complete. He agreed that if an offender's conditions of release are for three years, they could potentially leave the program before treatment is complete.  The Court notes that Shields executed an affidavit, attached, stating his willingness to extend his supervised release for an additional year.

95.  Participants in the program are required to submit to an initial "sexual history polygraph."  This polygraph is designed to determine the range of an offender's inappropriate sexual behavior so that the provider can know how to treat them.  Participants are also subject to routine "maintenance" polygraphs.  If a participant does not pass a polygraph, that triggers a meeting with the treatment provider and the probation officer.  (Tr. 6 at 163).

96.  Participants in the sex offender treatment are required to sign a treatment contract and abide by additional conditions.  Mr. Thomas described the treatment contract as "really picky.  It's micromanaging people's behavior who in the past have proven themselves not responsible." (Tr. 6 at 165-6).  Thus, for example, he described that while a condition of supervised release is to have no contact with children under the age of sixteen without permission, the treatment contract takes this a step further, and precludes participants from going to places where children are likely to be, such as fast-food restaurants.  (Tr. 6 at 162).

97.  Mr. Thomas testified that, in his opinion, sex offender treatment has evolved significantly in the eight years since Shields last attended sex offender treatment with Kay Landry.  (Tr. 6 at 170).  He testified that his program was considered extremely strict.  (Tr. 6 at 171).  It was also his opinion that having no more than 10 people in a group which is lead by two

providers leads to a more intense experience in therapy.  Mr. Thomas testified that in January, 2006, his program examined its internal recidivism rates.  As of that date only 6 out of 200 clients had reoffended sexually. (Tr. 6 at 171-172).

98.  Mr. Thomas testified that prior treatment failure does not mean that an individual will fail treatment in the future.  Whether an individual is successful depends on his state of mind and whether he is ready.  "When you're doing sex offender treatment or any behavioral treatment with a goal to try to reduce behavior, you can't do it to someone.  They have to want to do it to themselves.  You can guide them, and that's what we do."  (Tr. 6 at 179).

Detective Kelly Gorham

99.  Kelly Gorham is a detective with the Portland Police Department.  She is responsible for registering, monitoring, and maintaining the sex offender registry in the city of Portland, Maine.[13]  (Tr. 6 at 183).

100.  Detective Gorham testified that under Maine law, when an individual who will be residing in Portland, Maine is released from custody, they have 24 hours to notify her by telephone that they are in the city.  She then makes an appointment to meet with them and register them.  At the meeting she obtains their photograph, fingerprints, address, mailing address, and employment information.  They must also provide the address of any school they may be attending.  Although it is not mandatory, Detective Gorham also asks for a phone number.[14]  (Tr. 186-188).

---

[13]See 34-A M.R.S.A. §§11201-11256, the Maine sex offender registry law.

[14]It is a violation of Maine law for a registrant to lie to the police about this information, see 17-A M.R.S.A. § 453.

101.   Detective Gorham testified that Shields is a lifetime registrant.   As such, he is required to meet with her every 90 days to update his registration information.  She testified that the website she maintains tracks who is late updating their registration.  If someone is late registering, after a brief grace period, she tries to locate the individual.  If she cannot locate them, she creates an incident report for failure to register or update information as a sex offender and requests a warrant for their arrest.   (Tr. 6 at 189).

102.   If a registered sex offender moves out of state, they are required to notify Detective Gorham within 24 hours of their move.  In turn, she calls the local police department of the city they are moving to and notifies that police department that the sex offender is moving to their jurisdiction.  If an individual moves without notifying her, she requests a warrant for their arrest. (Tr. 6 at 191-192).

103.    Detective Gorham testified that she is aware when one of her registrants has contact with the police because it automatically comes up as a hit in the computer system and she receives a notification. (Tr. 6 at 188-189).

104.   In addition to registering individuals, Detective Gorham is responsible for checking to see that each person's registration information is accurate.  Thus, every year the city of Portland does a "sex offender sweep," where they check on all 163 sex offenders living in Portland.  During the rest of the year Detective Gorham checks registrants at random or in response to police contacts.  (Tr. 6 at 190).

105.   In September of 2007 Maine enacted new laws which make it a crime for a registered sex offender to intentionally or knowingly have direct contact with a person under the

age of fourteen.[15]  The law also sets up sex-offender-restricted zones, which include child-care centers, nursery schools, athletic fields, camps, and other places where children are the primary uses.  The statute makes it a crime for a registered sex offender to have direct or indirect contact in a sex-offender-restricted zone with a person under the age of fourteen.  (Tr. 6 at 193-194).

<u>CONCLUSIONS OF LAW</u>

106.  Under 18 U.S.C. § 4247(a)(5), a "sexually dangerous person" means "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."

107.  There is no dispute that Shields has engaged in child molestation in the past. Consequently, I find that the government has proven this element beyond a reasonable doubt, as required in <u>United States v. Shields</u>, 522 F.Supp.3d 371, 330 (D. Mass. 2007).

108.  "Sexually dangerous to others" means that the person "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).  The statute specifies that the mental illness, abnormality, or disorder must be "serious."  The statute does not further define the term "serious," however, the  Supreme Court has instructed that the mental disorder must exist to such a "considerable" or "grave" degree so as to make it substantially difficult to refraining from sexually violent conduct.  <u>Crane</u>, 534 U.S. at 413.

109.  All three experts diagnosed Shields with pedophilia according to the criteria in the DSM-IV-TR.  However, Drs. Plaud and Rypma testified that, although Shields meets the criteria

---

[15]See 17-A M.R.S.A. §261.

for pedophilia as presently written, the diagnosis is not strong.  The evidence that Shields suffers from pedophilia is garnered from an examination of his past behaviors, most of which occurred over 20 years ago.  There is no evidence that Shields has current deviant sexual urges or fantasies.   Shields has not had a "hands-on"offense since 1998, ten years ago, and there is no evidence that he has engaged in any compulsive sexual behavior in prison.

110.  18 U.S.C. § 4248 requires a finding that, as a result of the serious mental illness, abnormality or disorder, a person has  "serious difficulty in refraining from sexually violent conduct or child molestation if released."  This standard is taken directly from the language of Kansas v. Crane, 534 U.S. at 413.  Unlike many other state civil commitment statues which frame their inquiry as whether an individual is "likely" to reoffend, section 4248 does not specifically call for a risk-to-reoffend analysis.  Rather, section 4248's language of "serious difficult in controlling" behavior requires an individualized assessment of the individual's volitional capacity, and not merely a probabilistic risk assessment.

111.  The Court notes that a diagnosis of pedophilia does not necessarily imply volitional impairment, or a "serious difficulty" in controlling behavior.  The DSM-IV-TR itself cautions that the diagnosis does not imply anything about the individual's degree of control over the behaviors associated with the disorder.  "Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time." Exh. 22A.

112.  All three experts incorporated an actuarial risk assessment into their evaluation.  During the course of these proceedings the Court heard testimony and received numerous scientific articles regarding actuarial risk prediction.   This Court has previously ruled that

36

actuarial risk assessments are admissible under Daubert.  However, although admissible, they carry little weight.  The evidence presented in this case demonstrates that, although actuarial risk assessments are used by the relevant research and clinical community because they are more reliable than clinical judgment, they are too poorly predictive of any specific individual's degree of risk to be of much assistance in predicting future behavior.  The reasons for this are multiple: they are based on group data, and do not take into consideration important specific factors such as age, treatment, or conditions of release that may greatly reduce an offender's risk to reoffend.

113.   The statute also directs the Court to consider whether an individual will have serious difficulty in refraining from violent sexual conduct if they are released.   This risk assessment requires an individualized inquiry into the restrictions that the individual would live under if released.  The Court must consider the seriousness of the threatened harm (if any), the relative certainty of the anticipated harm, and the possibility of successful intervention to prevent the harm.  See e.g Commonwealth v. Boucher, 438 Mass. 274, 276 (2002) (interpreting Massachusetts statute's likely to re-offend standard).

114.   A commonsense reading of Section 4247(a)(6) compels the conclusion that the Court must consider whether any alternative to civil commitment is sufficient to render the risk of violent sexual conduct less than serious and substantial.  Courts have traditionally engaged in this analysis when determining whether commitment is appropriate under § 4246.  See, e.g. United States v. Sharkany, 1998 U.S. App. LEXIS 853 (4th Cir. 1998) (unpublished) (district court properly considered conditions of supervised release and was entitled to weigh those conditions in considering dangerousness); United States v. Michael B. Thompson, M.B.D. No.

00-10516-MLW, Memorandum and Order of May 7, 2001 (commitment calculus included finding "no feasible conditions of release that would eliminate the substantial risk" to public of committed person). There is no indication that Congress, in enacting the parallel provisions of § 4248, intended to alter the traditional analysis. Cf. Kansas v. Hendricks, 521 U.S. 346, 387-88 (1997) (discussing the importance of consideration of least restrictive alternatives as a factor in establishing the civil character of commitment regimes.)

115. For four years after release, Shields will be subject to standard conditions of supervised release and additional conditions testified to by Daniel Kelly, Stephen Thomas, and Detective Gorham. For at least the first six months after release, Shields will be subject to live-GPS monitoring by probation. During the four years he is on supervised release, he will meet frequently with his probation officer, who will have the ability to search his home and any computers that he has access to.   He will be required to participate in sex-offender treatment which will include frequent polygraphs. His treatment provider, polygraph examiner, and probation officer will work as a team and have the ability to fully communicate about his progress.

In addition, Shields must register for life with the Portland police department, and will be subject to the restrictions testified to by Detective Gorham. His address and place of employment will be known to the police, and he will be subject to public notification as provided for by the Maine sex offender registry.

116. The Court concludes that the government has failed to show by clear and convincing evidence that Shields will have serious difficulty refraining from sexually violent conduct or child molestation if released. The Court therefore finds that Shields is not sexually

dangerous.  The Court orders that his supervised release be extended to a four year period and

that entry of this Order be stayed until the U.S. Probation office produces a release plan for

Shields, including a suitable place for him to live.

JEFFREY SHIELDS
By his attorney,

/s/ Page Kelley
Page Kelley
  B.B.O. 548237
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

November 17, 2008

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non registered participants on November 17,
2008.

 /s/ Page Kelley
Page Kelley

39