IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                              )
                Petitioner    )
                              )
          -VS-                ) CA No. 07-12056-PBS
                              ) Pages 1 - 58
JEFFREY SHIELDS,              )
                              )
                Respondent    )




                  FINAL PRETRIAL CONFERENCE

            BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE




                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts 02210
                        August 27, 2008, 2:10 p.m.




                        LEE A. MARZILLI
                    OFFICIAL COURT REPORTER
                  United States District Court
                  1 Courthouse Way, Room 3205
                      Boston, MA  02210
                        (617)345-6787

1    A P P E A R A N C E S:

2         MARK J. GRADY, ESQ., JENNIFER BOAL, ESQ., and
     JENNIFER SERAFYN, ESQ., Assistant United States Attorneys,
3    Office of the United States Attorney, 1 Courthouse Way,
     Boston, Massachusetts, 02210, for the Petitioner.

4
          PAGE KELLEY, ESQ. and WILLIAM FICK, ESQ., Federal
5    Defender Office, 408 Atlantic Avenue, Boston, Massachusetts,
     02210, for the Respondents.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE CLERK:  The case of the United States V.

3   Charles Peavy, Civil Action No. 07-12059, will now be heard

4   before this Court.  Will counsel please identify themselves

5   for the record.

6          MS. BOAL:  Good afternoon, your Honor.  Jennifer

7   Boal, Jennifer Serafyn, and Mark Grady for the government.

8          MR. FICK:  Good afternoon, your Honor.  William

9   Fick for Mr. Peavy.

10          THE COURT:  If I look puzzled, it's because I

11   thought we were doing Shields first.

12          MS. BOAL:  Your Honor, actually, that might make

13   sense, and I believe Mr. Fick has to leave, so I don't mean

14   to unfairly change the schedule on him, but I think the

15   timing for the Peavy trial may depend on the --

16          THE COURT:  Well, let me just start, the trial for

17   the Shields trial starts on Tuesday, and what I wanted to do

18   was to go through, so why don't we have Ms. Kelley just

19   right up here.  We don't have to be too formal here.

20          MS. KELLEY:  I'll just stay here.  Just kidding.

21          THE COURT:  I really want to know how long it's

22   going to be.  I mean, that really was going to be my first

23   question.  I was going to ask the government who the

24   witnesses were, how long that they would take, how long the

25   expected cross is.  This is a civil case, not a criminal

1    case, and I want to tell the jury with some reasonable

2    degree of certainty how long the case will take.  And then

3    what I want to do is from that -- I actually, because of the

4    unfortunate timing of this, having been bumped by that trial

5    that took forever in the state court, et cetera, I actually

6    have a really, really busy fall.  I have another criminal

7    trial.  I've got a huge civil trial.  I'm just really backed

8    up, so I want to get a sense of how long this will be.  Then

9    we'll make a decision about what to do with Peavy.  And we

10   have some outstanding privilege issues, right?  Or is that

11   Wetmore?

12             MR. GRADY:  That's Wetmore.

13             THE COURT:  That's Wetmore, all right.  So let's

14   start off, who are your witnesses.

15             MR. GRADY:  Your Honor, I would anticipate at this

16   point, in terms of real witnesses, the government would just

17   have Dr. Tomich, Dr. Plaud, and potentially a district

18   attorney who prosecuted some of the crimes.

19             THE COURT:  So who's your first witness?

20             MR. GRADY:  The first witness is going to have to

21   be Dr. Plaud, and he is not available until the 4th.  As I

22   explained to the Court earlier, Dr. Tomich's wife was

23   recently diagnosed over the weekend with lung cancer.  It is

24   believed to be terminal and malignant.  She is currently

25   undergoing a battery of tests.  This week he was not in any

1   position or did not feel capable of preparing this weekend.

2   We had prepared for him to be the witness starting Tuesday,

3   but --

4              THE COURT:  Well, why can't Plaud be here on --

5              MR. GRADY:  I believe he's testifying in New York

6   state on the 2nd and 3rd, and his first available date is

7   the this.  I am perfectly willing to start with Dr. Plaud

8   on the 4th, and getting back to Dr. Tomich, he has indicated

9   that barring some new development in the situation, he would

10  be ready to start on 9/8, so --

11             THE COURT:  Well, I did see Dr. Tomich, but if you

12  have Plaud, why do you even need him?

13             MR. GRADY:  I would say that we need -- they both

14  cover different areas.  Dr. Plaud doesn't rely on the

15  Static-99.  He covers the RRASOR.  Dr. Tomich is the

16  government's witness.  The government can meet with

17  Dr. Tomich.  To the extent there are issues that are not

18  necessarily covered by Dr. Plaud, you know, we had an

19  opportunity to sit down and meet with --

20             THE COURT:  Well, when can the DA be here?

21             MR. GRADY:  If in fact he will testify, I will see

22  if he can be here the 3rd; but in terms of scheduling, right

23  up until yesterday, there had been no plan on calling anyone

24  other than Tomich that week and potentially Plaud on that

25  Friday, so I don't know the answer to that.

1            THE COURT:  Well, the 4th is what, the Friday?

2            MR. GRADY:  The 4th would be the Thursday.

3            THE COURT:  That Thursday, that makes some sense.

4            MS. KELLEY:  Well, I wanted to ask your Honor to

5      consider beginning our trial on September 8 for a couple of

6      reasons.  One is, I just think, from experience, it's very

7      inefficient to begin a trial with a key witness unavailable.

8      Secondly, I have witnesses coming from out of state who are

9      telling me they have 24-hour periods, 48-hour periods, and I

10     would really like to know with a little more specificity

11     when they need to come into town.

12            THE COURT:  Well, let's walk through it.  Let's

13     assume we're starting on the Thursday with Plaud.  How long

14     will you take with Dr. Plaud?

15            MR. GRADY:  9:00 to 12:00, maybe 1:00.  I think

16     that we may finish direct and start some cross in that time.

17            THE COURT:  Okay.  And I'm assuming right now

18     there's no district attorney, right?

19            MR. GRADY:  I would assume right now, if in fact

20     he's required to be here on the 3rd.  I don't know the

21     answer to that, and I'm prepared to go forward without him.

22            THE COURT:  So what would the DA do?

23            MR. GRADY:  The district attorney -- there are no

24     plea transcripts available for the '89-'90 convictions.  The

25     district attorney would testify about those and possibly

bb71e78d-1578-45db-97a6-e0aa6e1cb3da

1   about probation violations from the records.  But if -- you

2   know, again, your Honor, I'm prepared to go forward without

3   him.  This is not critical testimony, in my view.  It is

4   helpful testimony.  I'd like to have it.  I don't want to

5   waive it right now, but am I prepared to go forward without

6   him?  Absolutely.

7           MS. KELLEY:  Well, if I can just say, I think

8   also, in light of our just having gotten Judge Collings'

9   decision late last night, I haven't really had a chance to

10  look at it vis-a-vis the highlighted documents, but I think

11  we would like to respond to that order.  Also --

12          THE COURT:  Excuse me.  I'm not even there yet.

13  So Plaud is 9:00 to 12:00.  How long do you think you would

14  need for cross?

15          MS. KELLEY:  Mr. Swomley who is out of town and

16  has not yet returned, which is another reason why I would

17  like to begin on the 8th --

18          THE COURT:  You know, I took two weeks.  Everyone

19  takes two weeks.  He took a month.  There's nothing I can do

20  with that, okay?  I've bent over backwards for Mr. Swomley.

21  And I'm not faulting you; I know you're sort of in between

22  on this.  But how long will it take?  I need to tell the

23  jury.  Who's doing the cross?

24          MS. KELLEY:  Mr. Swomley is, and it's my

25  understanding from our talking about the trial schedule that

1   we would have expected the government's case, including our

2   cross, to take a week, five days, and then --

3           THE COURT:  So would you say like a day?  I'm just

4   trying to get a --

5           MS. KELLEY:  I would say two days of cross for

6   each of the government's experts.

7           THE COURT:  So, all right, so 9:00 to 12:00.  And

8   then assume -- I'm just playing it through -- is it possible

9   to see if Plaud can get in here on the day before?

10          MR. GRADY:  It is, but the last communication we

11  had with him literally was, he is testifying on September 2

12  and 3 in New York.

13          THE COURT:  But things change, so see if you can

14  get him in here on the 3rd.

15          MR. GRADY:  Absolutely.

16          THE COURT:  Okay, so Plaud, so that's one trial

17  day, let's just say, just as it works.  I'm going to say two

18  trial days on cross, okay?  So that essentially means about

19  six to seven hours on cross.  All right, so assume -- and

20  then if Tomich can't come, he can't come.  That's what's

21  going to have to happen because we're not putting it off

22  again.  He's not critical.  If he can come, he can come.

23          MR. GRADY:  Oh, Tomich is critical, your Honor.  I

24  said the DA was not critical.  I believe Tomich is critical

25  to the government's case.

1        THE COURT:  Well, right now, you said he can come

2   that Monday, and I'm accommodating that.

3        MR. GRADY:  Okay, yes, and you'll allow me to call

4   him on Monday?

5        THE COURT:  Yes.

6        MR. GRADY:  Okay.  But if in fact in the

7   intervening time there is some emergency surgery with his

8   wife or something, your Honor -- I also want the Court to

9   contemplate, I'll proceed to the advisory jury without

10  Tomich, but in the event -- and the Court is the fact-finder

11  here -- if something horrendous occurs and there is some

12  surgery, I would ask that the Court take Dr. Tomich's

13  testimony separately at bench.

14       THE COURT:  I'll deal with it when it happens.  So

15  right now, if Tomich then comes on, let's say the worst-case

16  scenario, we have Plaud on Thursday, and let's say it takes

17  Friday, Monday for cross, and Tuesday would be Tomich.  I

18  mean this might work out.  I will totally adjust for his

19  schedule if his wife is going into surgery.  So Tuesday is

20  Tomich.  Let's say, how long do you think he would take?

21       MR. GRADY:  One day direct, the same as --

22       THE COURT:  One day.  We'll say two days on cross.

23  So that's Tuesday, Wednesday, Thursday.  And then I'm going

24  to say that the government is going to rest, right?

25       MR. GRADY:  Yes, and if there is that one

bb71e78d-1578-45db-97a6-e0aa6e1cb3da

1   additional witness, it would be very short, a half hour.

2          THE COURT:  And you'll give me a heads-up on it.

3   Now, what I need from you, just what Ms. Kelley is really

4   talking about here is, are you challenging any of

5   Judge Collings' rulings?  Have you even had a chance to read

6   them?

7          MR. GRADY:  From the government's perspective of

8   what I've seen, I think he struck only two or three things,

9   and they didn't cause me immediate concern, so if you were

10  to press me right now --

11         THE COURT:  So what I need you to do is give me a

12  redacted exhibit as to what you want to be introducing.

13         MR. GRADY:  Absolutely.

14         THE COURT:  He didn't rule on relevance.  He

15  didn't rule on authenticity.  You're going to have someone

16  to authenticate it?

17         MR. GRADY:  Yes.  We have a number of 90-211

18  certificates for the police records, or may have a police

19  officer available to come and authenticate if we can't work

20  that out.

21         THE COURT:  From what I gather that you're saying,

22  you want to object to some of it, and so this might give us

23  some of that time.  If you can file any objections by --

24  what's today, Wednesday? -- by Friday.  And then maybe I can

25  try and rule --

bb71e78d-1578-45db-97a6-e0aa6e1cb3da

1          MS. KELLEY:  I can try.  And also the Wetmore

2     response is due on Friday, and I've been --

3          THE COURT:  I'm not worried about Wetmore.  He's

4     down the line.  I'm worried about Shields which is going to

5     finally get tried, so --

6          MS. KELLEY:  Okay.  Well, could I have until

7     Tuesday morning?  I'm working this weekend, so --

8          THE COURT:  You're working --

9          MS. KELLEY:  I'm working this weekend, so I could

10    work on it over the weekend and get it in by Tuesday morning

11    at the latest.

12          THE COURT:  Well, I --

13          MR. GRADY:  I'd at least like to have some time to

14    look at it, your Honor.

15          THE COURT:  I need to rule.  I don't even know,

16    how many documents are we talking about?

17          MS. KELLEY:  Well, just for example, I haven't had

18    a chance to study it myself because I wasn't in my office

19    this morning.  I just came into the office about an hour

20    ago, but he rules that the NCIC document is admissible as an

21    exhibit.  It says on its face that it's unreliable and you

22    should rely on court documents, so we're objecting to that.

23          THE COURT:  Well, that's -- excuse me.

24          MS. KELLEY:  Yes.

25          THE COURT:  All I asked Magistrate Collings to do

1   is to rule on the hearsay aspect of it, so the question is

2   whether or not it's a court document under the business

3   records or the public records exception.  And so that may be

4   a valid objection as to -- you know, reliability is the

5   touchstone of the whole thing, if it is or it isn't.  That

6   having been said, I don't know if it even matters.  I don't

7   even know what the NCIC document is.  So I think we should

8   try and hold a hearing on it.  I don't know what Monday

9   afternoon looks like for us.

10        MS. KELLEY:  That's Labor Day.

11        THE COURT:  Tuesday afternoon.  But if you get it

12   to me in the morning and I'm impaneling all day, that's

13   hopeless.  I just won't be able to prepare.  So what I'd

14   like you to do is try and get it to me Friday afternoon, and

15   then if you want to supplement, supplement, if there's

16   something else that comes up over the weekend, but at least

17   get me the big issues.  Has anyone looked at it at all to

18   see whether overall you think he struck the right balance

19   and may have a few nitpicks, or do you know?

20        MS. KELLEY:  I don't think police reports should

21   be admissible in a case where people have confrontation

22   rights.

23        THE COURT:  That objection is overruled because

24   it's a civil case, not a criminal case.  So you'll preserve

25   that.

1    MS. KELLEY:  If you read the statute, it says you

2    have a confrontation right.  So it's a civil case, but I

3    think he's dead wrong on the whole memo, on his whole order,

4    but I haven't really had a chance to study it.

5    THE COURT:  He is across the board saying it's

6    denied, but there may be individual pieces of it that are

7    hearsay within hearsay, or unreliable, as you say, that you

8    want me to look at, and I will.  So you can preserve the

9    across-the-board objection, but I need to have something so

10   I can read it over the weekend and really spend some serious

11   time with the document.  That's why I need you to file,

12   let's say -- when can you get the redacted versions of what

13   you plan on introducing?

14   MR. GRADY:  Tomorrow certainly I can have it to

15   the Court.

16   THE COURT:  Okay.  And if she's got a problem, I

17   don't whether the NCIC thing is even important.

18   MS. KELLEY:  Well, the NCIC is his criminal record

19   that is disseminated nationally by computer, and --

20   THE COURT:  But do you in addition have certified

21   copies of each of the convictions?

22   MR. GRADY:  We have certified copies of every

23   court document that is presently available to show

24   convictions.  With respect to the NCIC, it shows a

25   conviction for one document for which they can't find a

1    court document that shows the conviction.

2           THE COURT:  Right, so that would be useful to have

3    briefs so I don't think about that on the fly.  That's the

4    issue.  That's the issue?

5           MS. KELLEY:  Yes.  They're using it to get -- on

6    its face it says, "Please refer to court documents.  This is

7    not reliable."  They're using that in lieu of a court

8    document.

9           THE COURT:  Well, sometimes when documents are

10   lost, there are ways of doing alternatives as long as it's

11   reliable.  Do you have anyone who can verify it's reliable?

12   Is that the DA?

13          MR. GRADY:  If we were going to have the NCIC in,

14   we would need to have it authenticated, and we would need to

15   have a witness.  It would be someone from the FBI.  The FBI

16   maintains the NCIC records, your Honor, if there is a

17   witness on it and if it's coming in.

18          THE COURT:  Is that the district attorney you were

19   talking about?

20          MR. GRADY:  No, your Honor.  I had indicated there

21   would be witnesses to authenticate various documents if the

22   authenticity were an issue.  So that if police reports are

23   challenged and we can't get sworn statements from the

24   departments under 902-11, which allows business records to

25   be so certified by affidavit, we would have to call an

1    officer.  There is at least one officer I would anticipate,

2    a Detective Marsh to authenticate his own records and own

3    reports, but that would be the extent of his testimony, if

4    we are required to call an individual down here to testify

5    to that effect.

6              THE COURT:  Is that about that conviction?

7              MR. GRADY:  No.  The conviction --

8              THE COURT:  Is there anyone who remembers anything

9    about that conviction?

10             MR. GRADY:  No, I don't have an officer for that,

11   but with respect to the --

12             THE COURT:  What conviction is it, for what, so I

13   don't play games?

14             MR. GRADY:  There is a telephone calls conviction

15   from 1988 in Florida, and the court documents do not reflect

16   it.  Now, we got some documents from the court.  We have a

17   charging document?

18             THE COURT:  You've got so much here.  Why do you

19   even care?  In other words, is that part of the Static-99?

20             MR. GRADY:  No.  I don't believe that calculated

21   in --

22             THE COURT:  This is what I don't want to do is --

23   I'll go through this.  I'm not sure Judge Collings did.  I

24   don't know if he teed up this issue.  Now, maybe it's a new

25   challenge.  I'll resolve it.  I'm just simply saying, if it

1    matters or if it doesn't matter, it's --

2         MR. GRADY:  I will endeavor to pare the issue to

3    those that matter the most to the government's case, your

4    Honor.

5         THE COURT:  So assuming for a minute then Plaud is

6    Thursday and Friday, what I'm thinking of doing is doing

7    opening statements, if I have time, on Tuesday, but if it

8    looks from what I've got that -- what I don't want people to

9    do is to mention the documents that are challenged, okay?

10   And then we'll jump a day, if you can't get Plaud in here a

11   day earlier, we'll just jump a day.  And then we'll go

12   Thursday, Friday, Monday Plaud, roughly; Tuesday, Wednesday,

13   Thursday Tomich.  Oh, Thursday, yes there's an issue with

14   Thursday, law clerk hiring day.  So that's September 11, an

15   inauspicious day, so unfortunately we're then going to jump

16   to Friday because I'm going to be doing law clerk hiring on

17   the Thursday morning.

18        So then your witnesses will probably come in.  Who

19   do you have?

20        MS. KELLEY:  We have Dr. Rypma, who -- that's

21   another matter I'd like your Honor to address as to whether

22   he can be present during the trial.

23        THE COURT:  Sure.  Experts are routinely available

24   in each other's cases.  Fine.

25        MR. GRADY:  Your Honor, the government would for

1   the record object to that.

2          THE COURT:  Why?  They always are.  They're not

3   fact witnesses.  Of course.  So that's Friday?

4          MS. KELLEY:  That would be Monday, the 15th, we

5   would start, I believe with Dr. Rypma.

6          THE COURT:  Why?  Why not the Friday?  We're only

7   missing Thursday.  Did I miss -- oh, Tomich was on for

8   Friday, so Rypma is the 15th, okay.

9          MS. KELLEY:  And I think his direct would probably

10  take one day.

11         THE COURT:  Okay.  And then your opposition?

12         MR. GRADY:  The cross would be a day and a half.

13         THE COURT:  All right, so that's Tuesday,

14  Wednesday, and then we're likely -- so 9/18.  Are there any

15  other witnesses?

16         MS. KELLEY:  We have three other witnesses.  One

17  is a Dr. Grainy who treated Mr. Shields at Butner from North

18  Carolina.

19         THE COURT:  She, is that the woman who liked him?

20         MS. KELLEY:  Yes.

21         THE COURT:  So when is she coming?  Not liked

22  him --

23         MS. KELLEY:  Yes, she's the one liked him.

24         THE COURT:  Thought that he could make it.

25         MS. KELLEY:  Yes.  I think her direct might take a

1    couple of hours, two hours maybe.

2              THE COURT:  Cross?

3              MR. GRADY:  An hour and a half tops.

4              THE COURT:  Okay, I'm losing track of my own days.

5    We're up to --

6              THE CLERK:  That would be Thursday, the 18th.

7              THE COURT:  Okay, so that's Thursday.  And then

8    who?

9              MS. KELLEY:  Then we have a witness from the

10   Pharos House who was his case worker when he was in a

11   halfway house, Rene Moore for Friday.

12             THE COURT:  How long is she going to be?

13             MS. KELLEY:  Not a whole day.  I mean, I don't

14   know how much cross the government has, but -- and then our

15   final witness is a police detective from Portland who

16   registered the sex offenders and can explain the sex -- I'm

17   sorry, we have another witness too -- but can explain the

18   sex offender registry.  And then the final witness would be

19   someone from U.S. Probation to talk about supervised

20   release.  And I believe I have never been able --

21             THE COURT:  So that's like an hour each?

22             MS. KELLEY:  Yes.  Those are not long, but, I

23   mean, I guess maybe we'll see how we're going that week, and

24   I can either tell them to be here on Friday or on Monday,

25   the 22nd, depending on where we are.

1          THE COURT:  Yes, we can play that out.  So when I

2    tell the jury, if I can, when I'm impaneling them on the

3    Monday -- I'm going to try and move it a little faster, but,

4    I mean, at least what I'll take really seriously is -- now,

5    of course I don't have -- is that it will go roughly through

6    the -- it's really going to be a two-and-a-half-week trial,

7    realistically, and I'm going to hold people to that because,

8    first of all, I think I have a trial right back to back with

9    it and a huge civil trial, but, more importantly, I start

10   losing jurors.  I think it's going to be hard enough to get

11   a jury as it is, so it's going to be a trial in that time

12   period.

13          So let me now speak about jury questionnaires.

14   I've drafted something.  I didn't want something as

15   elaborate as you had.  My basic philosophy is that jurors

16   have a hard time talking about sexual things, particularly

17   involving children.  So I was thinking of handing something

18   like this out to every juror and essentially asking

19   everybody who's answered "yes" to any of the questions to

20   come up and see me at side bar.  I will also in addition

21   orally ask a lot of the other questions.  In other words,

22   it's not embarrassing to say, "Do you work at DSS?"  But it

23   is embarrassing to talk about whether you yourself were

24   either a victim or accused of a sex crime involving kids.

25   So that's the kind of thing I'm going to ask and ask all

1  those people to come up, and we'll do a little individual

2  voir dire if anyone has answered "yes" to any of those

3  questions.  Obviously, number one would be an automatic bar,

4  but the other one, maybe four would be an automatic bar.

5  But the mere fact that someone was either -- you know, let's

6  say had a sister who was a victim of a sexual assault or had

7  a brother who was accused of being would not necessarily

8  disqualify them.  You can challenge them on peremptories,

9  but I would hear what they had to say.

10           MR. GRADY:  If they themselves had been accused,

11  your Honor?  I think that individual might harbor some sense

12  of being unfairly accused.

13           THE COURT:  Well, would you say the reverse if

14  they themselves were a victim?

15           MR. GRADY:  I don't think you're going to let the

16  victims stay either, your Honor.

17           THE COURT:  I'd have to think about it.  It

18  depends what they told me.  It depends what happened.

19           MS. KELLEY:  If I could just, for the record, I

20  would rather our specific questions be asked.

21           THE COURT:  They'll all be asked or most of them

22  will be asked orally, but I'm not going to do that kind of a

23  questionnaire.  First of all, I thought some of them were

24  inappropriate because it just assumed a lot of legal

25  questions that would just be confusing at this point, but I

1    am willing to ask some in writing because I think in these

2    kind of cases you get more honest responses if someone

3    doesn't have to raise their hand.

4         MS. KELLEY:  Right.  Well, I would like to ask the

5    Court to add to this or I guess subtract from this No. 2 and

6    3 just to say, "Have you ever been the victim of a sexual

7    assault?"  Because I think if you had been the victim of a

8    rape, for example, as an adult, listening to this kind of

9    testimony could be just as emotional as if it had been when

10   you were a child, et cetera, because these are pretty -- I

11   think they're going to hear some pretty graphic and kind of

12   compelling evidence about sexual assaults.

13        THE COURT:  What do you think?  Are they really?

14   I thought this was mostly just going to be convictions.

15        MR. GRADY:  There are five convictions involving

16   four contact offenses against children and one child

17   pornography.  There are other charges without convictions

18   that are considered to be relevant by the experts in the

19   field.  He has acknowledged committing or engaging in the

20   conduct so charged to the experts in this case, and it is

21   therefore both admissible and relevant.

22        THE COURT:  Like what, though?

23        MR. GRADY:  Obscene phone calls was one.

24        THE COURT:  Where he admitted to an expert on

25   that?

1       MR. GRADY:  Yes, and sexual assault on

2   nine-year-old boy in a bathroom was another.

3       THE COURT:  What kind of sexual assault?

4       MR. GRADY:  It was an attempt to fondle the penis

5   of a nine-year-old African-American male in a bathroom,

6   similar to conduct he's convicted for in Maine, assaulting a

7   fourteen-year-old in a bathroom.

8       THE COURT:  A boy?

9       MR. GRADY:  Yes.

10      THE COURT:  So just going back to your question, I

11  don't really care if I ask about it.  I just don't view,

12  let's say, a stranger rape as similar to these kinds of

13  things.  Now, if you feel strongly about it, I don't care,

14  but I'm not going to view it as an automatic disqualifier.

15  They're so different in kind.

16      MS. KELLEY:  Oh, I'm not saying it should be an

17  automatic disqualifier, but I don't think you want somebody

18  who kind of earnestly fills this out and slips onto the jury

19  to start hearing the evidence and think to themselves, "Oh,

20  my God, I can't take this."

21      THE COURT:  Well, I'm happy.  I don't really care.

22  I mean, I don't care.

23      MR. GRADY:  Is the Court proposing some change to

24  the questions?

25      THE COURT:  I'm just going to get rid of "as a

1   minor" in both questions.

2       MR. GRADY:  Yes, I think that I don't have a

3   general objection, your Honor.

4       THE COURT:  That's fine, good.

5       MS. KELLEY:  I would also ask your Honor to at

6   least, if not on the questionnaire, when the jurors are

7   here, mention the fact that it's going to be part of the

8   evidence in this case that Mr. Shields has convictions for

9   child molestation because I think we need to be very

10  explicit about that.  I think there are a lot of people who

11  just reading this, "sexually dangerous person, is there

12  anything about this allegation --"

13      THE COURT:  Well, I might read that whole thing

14  you gave me.  I'm just not going to put it on this

15  questionnaire.  That was fair, I thought that was fair

16  description.  That's fair enough.

17      MR. GRADY:  The jury voir dire they submitted,

18  your Honor, the government only had two real objections to

19  that, the first being the notion that the commitment is one

20  day to life, that's drawn from the Massachusetts statute.

21  It's not the Adam Walsh commitment that's contemplated.

22  Adam Walsh contemplates this Court having the ability to

23  release him on conditions.  That's not something

24  contemplated by the Massachusetts statute.  And we'd ask

25  that if you're going to describe the consequence of finding

1  sexual dangerousness, that you do so completely, explaining

2  not just that the individual will go to prison but that the

3  individual could be released on conditions that the Court

4  sees fit to do so if it finds that they could be released

5  without being dangerous.

6          THE COURT:  You just taught me something.  I

7  didn't even know I had that discretion.

8          MR. GRADY:  Yes, you do.

9          MS. KELLEY:  Well, I just think that's too

10 complicated to go into with the jury.  It's going to raise

11 more questions than it answers.

12         THE COURT:  I don't know if I'm going to say

13 anything at this stage about that at all.  Whether I do it

14 in the final instructions, you know, so be it.  I do get

15 worried of that same issue that comes up in the insanity

16 world, which is, you know, you have these people with

17 serious problems, and no one wants to let them go.  So I

18 think they need to understand actually.  I don't know which

19 side it helps that they actually go into a place for

20 treatment, but there's no guarantee they'll come out.  So,

21 you know, anyway, we'll work that out in the final

22 instructions.  I won't do it here.

23         So have I missed any other issues?  I mean, I

24 ruled on -- I think I know that we have things outstanding

25 in your world, but do we have anything else outstanding?  I

1    think the big issue for me was essentially getting this

2    tried at this point.  And I understand Judge Wolf, by the

3    way, is starting his trial Monday.  Is that correct?

4                MR. GRADY:  Yes.

5                THE COURT:  But his is not a jury trial.

6                MR. GRADY:  No, it is not.

7                THE COURT:  And as I understand, there been

8    two prior trials, but neither of them have had an advisory

9    jury.  So to some extent, I'm trying this out, and I'm

10   making no commitments for either Mr. Peavy or Mr. Wetmore.

11   I want to try this out and see how it goes.  I've never done

12   this before.  I don't know if it's a good thing.  It's been

13   such a hassle schedulingwise.  It's easier when it's just a

14   judge.  But I don't want to do it just based on what's

15   easier.  I want to see how this plays out and how hard it is

16   to find a jury, how good the decision-making seems to be,

17   how thoughtful and that sort of thing.  In the beginning,

18   everyone agreed to that in this case, and I actually think

19   this is a good case for it.  It's not a slam dunk either

20   way, and it's the kind of thing I think would be useful for

21   a jury to hear.

22                MS. KELLEY:  If I may just about other issues, I

23   think one of the things Judge Collings has done is decided,

24   as you pointed out, this very narrow issue about hearsay.

25   But really your Honor is going to have to rule at some point

1   about what we were just kind of arguing about, which is,

2   there's uncharged conduct, unproven.  There are facts the

3   government asserts are true based on some of these documents

4   that Mr. Shields has a different memory of.  And the experts

5   have relied on some of it.  Some of it they've rejected, the

6   document in favor of what he says, et cetera.  And I just

7   think to some extent there's going to be a big battle over

8   what actual facts come in about the underlying offenses.  I

9   don't really think it's relevant if Mr. Shields is slightly

10  giving a different version of an offense that he's admitting

11  to than what is in a police report.  I don't think that --

12          THE COURT:  I don't know.  I can't do it in

13  advance.

14          MS. KELLEY:  Right, you can't do it in advance,

15  but I'm just warning you, that's a big issue Judge Collings

16  has not settled.

17          THE COURT:  I haven't even read these yet because

18  partly I thought it made sense when someone asked me to have

19  him do it, just mostly because I'm busy on other stuff and I

20  thought it made some sense, and, also, why unnecessarily

21  expose me, as I'll be the ultimate fact-finder to these

22  documents, if I don't need to be?  But at some point that's

23  what I've done always as a judge in motions to suppress.

24  So, I mean, I'll take into account -- I'll have to read them

25  to make these ultimate rulings, and so that's why I want you

1   to delete out stuff that there's no dispute about, and then

2   I can't be unnecessarily, you know, tainted.  And I'll roll

3   up my sleeves; I'll read them over the weekend.  It will be

4   my Labor Day challenge.  But I need to at least understand

5   how much you object to.  You know what?  I don't even need a

6   brief.  I know that sounds -- just even if you took whatever

7   they redact -- this is what I do when we have deposition

8   disputes in civil -- and just yellow highlight what you

9   object to, "hearsay, irrelevant, prejudicial, 403."  That

10  would be really useful.  And then I don't want a brief.  You

11  can brief if you want.  You've briefed it for Collings.

12  You've preserved your objection.

13          MS. KELLEY:  Okay.  Well, if you look at Rule 703,

14  it says that experts are able to rely in formulating their

15  opinion on inadmissible evidence.

16          THE COURT:  Right.

17          MS. KELLEY:  So whether it comes in at trial or

18  not is for the trial judge to decide whether those facts are

19  more probative than prejudicial, so that's one of the issues

20  that's going to be really coming up during the trial.

21          THE COURT:  Absolutely.  And the big issue is, if

22  in fact there's a prior conviction, it comes in.  If he's

23  admitted to it to the expert, it comes in.  If neither of

24  those are true, I'm going to have to understand why it's

25  reliable.

bb71e78d-1578-45db-97a6-e0aa6e1cb3da

1          MS. KELLEY:  Well, what I think is more likely the

2     question to be, your Honor, is more likely to arise is, if

3     he tells an expert about an incident and he has the

4     conviction for the incident, and then the government wants

5     to put in other information that has sort of worse facts in

6     it, then you're going to be called on to rule, is this

7     something that's admissible?  Is it relevant?  Does it even

8     matter here?  Is what the government wants to put in

9     reliable, and so on?

10          THE COURT:  I don't know.  That's where I'll have

11     to look at those reports and see -- if it's admissible

12     through the report, maybe they do get to put it in.  If it's

13     not, no.

14          MR. GRADY:  Is there some procedure you would wish

15     the government to follow in terms of asking such questions?

16     That is, rather than perhaps the government asking, you

17     know, "Are you aware of a version of event that's

18     inconsistent with what he told Rypma?" that we bring it to

19     you at side bar?

20          THE COURT:  Don't even ask it unless it's

21     admissible somehow.

22          MR. GRADY:  Well, but you're suggesting that no

23     facts that aren't based on admissible evidence can be

24     considered at this trial, even though the rule allows for

25     the admission of those facts when you deem it to be more

1    probative than prejudicial.

2            THE COURT:  No.  What I'm saying is, don't ask it

3    in front of the jury.  If you know in advance it's

4    admissible evidence, you don't have to ask my permission

5    first.  If you say it's not admissible evidence, I need to

6    do this either at the side bar or -- I don't want it to come

7    out and then have it be like I'm shielding -- no pun

8    intended -- I'm stopping the jury from seeing stuff.

9            MR. GRADY:  That's what I will do, your Honor.

10           THE COURT:  Well, how much of that is there?

11           MR. GRADY:  There is not a great deal that I

12   believe is not contained in admissible conviction records.

13           THE COURT:  So give me an example of something

14   that isn't if you can think off the top of your head.

15           MR. GRADY:  I'm not certain I would ask about it,

16   but there's at least several police reports regarding an

17   incident where an unknown male was at an elementary school,

18   was confronted by a principal and jumped into a car when

19   confronted by the principal, fled, and the license comes

20   back to Shields.  That's one example of something of that

21   type.

22           THE COURT:  What would Shields have said

23   differently?

24           MR. GRADY:  I'm sorry?

25           THE COURT:  Shields denies it, is that what you're

1    saying?

2              MR. GRADY:  I presume he either denies it or

3    hasn't been asked about it by those experts.

4              THE COURT:  Well, then why would this be relevant

5    to what an expert had to say?

6              MR. GRADY:  Well, it simply has to do with more

7    conduct that looks like he's stalking at an elementary

8    school.  Now, that's not necessarily what I'm thinking of

9    admitting.

10             THE COURT:  I tell you what, I tell you what:

11   You've now got the lay of the land.  You're right, experts

12   are allowed to rely on inadmissible evidence, but it's also

13   got to be something that an expert in his field would view

14   as reliable.

15             MR. GRADY:  They have a lower standard than the

16   Court does for hearsay, your Honor, I would suggest.

17             THE COURT:  I understand they do, but I ultimately

18   would have to rule on it.  So if it's clearly admissible

19   through one of these reports, fair game to you.  If he

20   admitted to it, if it's in one of these police reports, if

21   it's in the conviction, go for it.  If it's not admissible,

22   you're right, sometimes it's admissible, sometimes it's not.

23   I might -- so if, for example, suppose it's the mother

24   saying what the child said --

25             MR. GRADY:  I don't propose --

1        THE COURT:  -- fifteen years ago three weeks later

2   to a police officer, I probably wouldn't allow that in, it's

3   just so remote, okay?  So you're pretty sensible, you can

4   draw these lines.

5        MR. GRADY:  I will, your Honor.  I will say, I can

6   prepare the government's expert, Dr. Tomich, in this regard.

7   I am not really allowed to communicate with Dr. Plaud as the

8   Court's expert in terms of a direct, so if something comes

9   up through him --

10        THE COURT:  You raise a great point.  How are you

11   going to refer to Plaud?

12        MR. GRADY:  They had something in their proposed

13   instructions that was along the lines of both Plaud and

14   Rypma were court appointed, were court doctors, and the

15   government's is not, and I think that's probably not the

16   correct way to go.  If it's going to be discussed, it should

17   be accurate.  It should be that Plaud was appointed by the

18   court with the agreement of both parties; Rypma was

19   appointed by the Court pursuant to a provision allowing the

20   respondent to pick Rypma, and the government picked Tomich.

21   I think that's the way --

22        THE COURT:  That's fair, that's accurate.

23        MS. KELLEY:  Well, he's mischaracterized what we

24   proposed in our jury instructions, but Dr. Rypma says in his

25   report that he was appointed at our request.  So it's going

1    to be obvious to the jury who's on which side, I think,

2    so --

3              THE COURT:  Although let me say this:  When you're

4    going through the evidence, if there's anything that you

5    think is a really big problem, let me know because I hate

6    doing huge numbers of side bars.

7              MS. KELLEY:  Well, can I just say one --

8              MR. GRADY:  Before you go, actually, I would

9    insure that Dr. Tomich is not going to do this without us

10   going over there.  What I do want to make clear, your Honor,

11   I'm not prepping Dr. Plaud, and if I ask a question that

12   seems open-ended and he brings one of these up, I mean, I'm

13   not going to be searching for it, but I don't also want to

14   be censored for it.

15             THE COURT:  All right, fair enough.

16             MS. KELLEY:  Well, if one party is calling

17   Dr. Plaud, I think we can all agree that that party can

18   communicate enough with him to tell him that certain things

19   are off-limits for his testimony so he doesn't blurt

20   something out and cause a mistrial or prejudice the jury.

21             THE COURT:  Right, if they don't object, just

22   transmit the basic message.

23             MR. GRADY:  Certainly.

24             THE COURT:  Fine.

25             MS. KELLEY:  But I would just like to say, I

1    think, for me, the thing I am most frightened about in this

2    trial is the kind of emotional impact of having these

3    experts repeating very explicit and detailed factual

4    allegations that may or may not be true, when Mr. Shields

5    has already sat down with two of the experts and gone over

6    in detail the facts of the cases.  And I think there's a

7    great possibility for extreme prejudice with the jury, and

8    also with your Honor, of hearing unnecessarily these very

9    detailed graphic allegations about what happened, and

10   getting us all into a big argument over whether --

11              THE COURT:  I can't prescript that.

12              MS. KELLEY:  Well, I just think --

13              THE COURT:  It's relevant.

14              MS. KELLEY:  Well, I don't think it's relevant.

15              THE COURT:  I mean, the only issue is under 403.

16   I think it is relevant, but the question is prejudice versus

17   probative, and I understand that.  And so can you think of

18   your most -- I mean, most of the things I've heard about are

19   fondling boys in bathrooms.  Is there something that's a lot

20   worse than that?

21              MS. KELLEY:  Well, yes, I think one of the big

22   battlegrounds here is going to be over this case where a

23   six-year-old, a stranger, was allegedly taken into the woods

24   by Mr. Shields and digitally penetrated in his anus.

25              THE COURT:  Okay, so did he say that he did that?

1          MS. KELLEY:  Well, when he spoke with the experts,

2     he admits to it.  He has the conviction.  And he says that

3     when he went into the woods, he doesn't remember a lot about

4     the offense because he was using a lot of illegal substances

5     during that time, but that he touched the child on his

6     buttocks.  So the government obviously wants the jury to

7     know there was a penetration.  At Dr. Rypma's deposition,

8     they asked Dr. Rypma, "What difference does it make to you

9     in predicting his dangerousness if there was penetration or

10    not?"  And Dr. Rypma said, "It makes absolutely no

11    difference except it's very emotional.  It kind of hits you

12    in your gut."

13         THE COURT:  Well, legally it's a huge difference.

14         MS. KELLEY:  Well, perhaps, but not for these

15    legal proceedings because the question is, how does that

16    impact his dangerousness?

17         THE COURT:  Anyway, I'm not going to preclude

18    that, so you'll object, and that's where we're going to go

19    on this, as long as it's admissible.  That's my -- and now

20    I've got to do a 403, but a rape is different.  I mean, I'm

21    hearing it as I'm going, but a rape is different than a

22    fondling.

23         MS. KELLEY:  Well, I think for our purposes of

24    predicting dangerousness, where you have several offenses

25    and the person is admitting to them and they have

bb71e78d-1578-45db-97a6-e0aa6e1cb3da

1    convictions for them, I just think it's very distracting.

2    It stirs up your emotions --

3              THE COURT:  It's a 403 issue, so --

4              MS. KELLEY:  -- to hear these kind of things, and

5    I don't think it's necessary for anybody's decision-making.

6    Even the experts will say that.

7              THE COURT:  If somebody decides whether it's

8    dangerous, for me it matters -- I mean, I'm a fact-finder --

9    if someone just fondled someone in the bathroom in terms of

10   how sexually dangerous they are as opposed to whether --

11   now, maybe when I hear this expert, I'm going to end up not

12   feeling that way, but I don't know why it's not highly

13   relevant if somebody raped a child rather than whether

14   there's touching.

15             MS. KELLEY:  Well, I think it's more disgusting,

16   and it makes you dislike the person more and feel like

17   they're more dangerous, but as far as predicting their

18   future behavior --

19             THE COURT:  You may be right.  I may rule with

20   you.  I'm just saying, I mean, if the doctor says it doesn't

21   make a difference -- I forget, does it on that Static-99

22   matter if it's a rape or a touching?

23             MS. KELLEY:  No, it doesn't, and there's a reason

24   for that, and I think -- I mean, you can just see from your

25   Honor's own kind of visceral reaction to that, it's very,

1    very prejudicial, and it's not relevant and it's not

2    probative to the question we need to decide here.

3             THE COURT:  Okay, right now I'm not deciding that.

4    What?

5             MR. GRADY:  They're duly prejudicial.  I mean,

6    they're not unduly prejudicial; they're duly prejudicial.

7             THE COURT:  Am I done with all the legal issues?

8    I think I am because I want to move on.  So basically, as a

9    practical matter, we're not sitting on September 11 because

10   I am interviewing law clerks.  We are not sitting on Labor

11   Day because it's Labor Day.  We will impanel on the Monday.

12            MS. KELLEY:  Tuesday.

13            THE COURT:  Tuesday.  The question is whether or

14   not we do opening statements on the Tuesday.  I would like

15   to do opening statements on the Tuesday if we have time.  If

16   not, we will jump over Wednesday, unless you can get

17   Plaud in here.  I would really, if he can do it, I'd really

18   like it, simply because I have another trial starting the

19   following week, and it will be hopeless otherwise.  I'm not

20   going to tie people to the minute to these schedules, but

21   I'm going to basically tie people -- I mean, it's a generous

22   schedule.  I'm actually thinking it will probably go less

23   than this, but I'm not going to let it go on forever on

24   either side, so --

25            MR. GRADY:  Certainly.

1          THE COURT:  So you can plan on that.  Now,

2     assuming that that's true and I wrap up in the vicinity of

3     the week of the 22nd, is that right, does anyone know -- and

4     I wish I had brought my calendar -- does that bring in any

5     of the Jewish holidays, does anyone know, because I may run

6     into that issue?

7          THE CLERK:  No.

8          MS. KELLEY:  Rosh Hashanah is on the 29th.

9          THE COURT:  So I think we'll be in good shape on

10    that.  We'll be done by then with the whole --

11         MS. KELLEY:  We should be done early the week of

12    the 22nd.

13         THE COURT:  That's what I'm thinking too.  So let

14    me move on to scheduling the next trial.  I understand

15    Mr. Wetmore just wanted to bump it because he's sick, is

16    that right?

17         MR. GRADY:  Wetmore I think needs to be moved back

18    because the experts still don't have any of the documents.

19         MS. KELLEY:  Yes, he's got some problem, and I

20    guess it was either a lab error or he's gravely ill, and

21    they retested him.  They took more blood from him last week,

22    but they don't have the results back, as far as I know.

23         THE COURT:  Well, why don't we do this:  Why don't

24    we at least wait to see if it's an error or not before I

25    rule on that.  And so if it's an error, we'll be back on

1    track and I'll worry about documents.  If it's not an error,

2    then we should really try and move it.

3            MS. KELLEY:  If we can just say for our peace of

4    mind that we don't have a trial date right now in

5    Mr. Wetmore's case, because he's on for, like, next week or

6    something.

7            THE COURT:  When is Peavy on?

8            MR. FICK:  Peavy, your Honor, was originally on

9    for the 8th of September, which of course is going to get

10   swallowed now by Shields.  The government, I think, would

11   like to put it off to October.  I may concede to that.  His

12   position at this point is, he wants to go as soon as the

13   trial can go because he's sick of waiting.

14           THE COURT:  Wasn't there some sense of working

15   that out or some discussion about it?

16           MR. FICK:  There was some effort to do that.

17   Ultimately my understanding is, the Bureau of Prisons looked

18   at him for a 4246 commitment and decided he didn't meet

19   their criteria for that, and so we're still going forward.

20           THE COURT:  Well, I haven't decided yet whether to

21   do a jury trial on that.  I want to get through one

22   experience to see if it's worth it, all right?  I am the

23   only judge doing this, so, you know, when my colleagues who

24   are very smart aren't doing it, I'd like you all to pool

25   your experience with the ones who aren't doing it versus me

1  who is, and we'll just make a judgment.  I'll talk to them

2  too.  One idea I got from that Hawaii judge -- I read the

3  opinion -- calm down -- is I loved the fact she got the

4  post-findings of fact and law with a transcript.  I thought

5  that was really useful.  So I think, regardless of what this

6  jury does, I need to write something.  And so one of my

7  thoughts is that, you know, within two weeks after the close

8  of it, you can give me basic findings of fact and law,

9  something like that.

10        MR. GRADY:  That works, your Honor.  Generally

11  speaking, bench trials when I've done that based on

12  transcripts, the date has been tied to when we get the

13  transcript rather than the trial, you know, two weeks from

14  the production of the transcripts, but that would be the

15  only caveat I would have to what the Court suggested.

16        THE COURT:  Fair enough, maybe two weeks after the

17  transcript comes in or something like that.  My only concern

18  is, he's been sitting there so long.  So if the jury says he

19  should be committed, I don't feel such a sense of rushing

20  unless I come to a gut opposite instinct; you know, like I'm

21  coming out the other way.  But if in fact they come out,

22  "Let him go," now, if I instantly agree with them, I may put

23  him on bail.  If I don't instantly agree with them -- what I

24  don't want is it to take two or three months while he's been

25  sitting there if there's, you know, a real sense that

1    they'll let him go.  So just think about that timingwise.

2            MR. GRADY:  Yes.  And for the Court's edification,

3    not that the government wishes to presuppose a loss, the

4    government would likely be asking for a stay of release

5    pending appeal, or at least pending an opportunity to

6    consider appeal or seek a stay in the First Circuit

7    because --

8            THE COURT:  Sure.  Let me deal with that at some

9    other point because --

10           MR. GRADY:  Okay.

11           THE COURT:  -- it's a different issue.  Your issue

12   is, when am I going to get your guy to trial, right?

13           MR. FICK:  Correct, your Honor.

14           THE COURT:  And how long is your trial going to

15   be?

16           MR. FICK:  It's probably a little bit shorter than

17   Mr. Shields, but I think, to be safe, we ought to give it

18   two weeks.

19           THE COURT:  I feel as if I have senior moments all

20   the time.  I keep mixing up which motions are filed in Peavy

21   and which ones in Wetmore.  Shields I think I've got under

22   my thumb here, so what's pending in your case?

23           MR. FICK:  And many of these motions actually

24   mirror what has already been filed in Shields and/or

25   Wetmore.

1          THE COURT:  So motion to impanel an advisory jury,

2     maybe.

3          MR. FICK:  Okay.  There was a motion in limine to

4     exclude any reference to criminal dispositions as to which

5     there are no court records because, peculiarly, for many of

6     the dispositions here there are no court records.  And so

7     separate from the kind of hearsay objections, which I've

8     also made, I make an argument sort of derived from the

9     reasoning in Shepard but grounded in due process and

10    Rule 403 that says, if the government can't come up with

11    some kind of court record, you shouldn't be referring to

12    these things as conviction.

13         THE COURT:  In general, when the courts lose

14    records, you try and reconstruct, and so have those efforts

15    been made to reconstruct any records?

16         MR. GRADY:  I'm sorry, your Honor?  I apologize.

17         THE COURT:  How many records are we talking about

18    with Peavy?

19         MR. GRADY:  I know I had briefed the convictions

20    response, your Honor.  With respect to the convictions in

21    Miami, not only had we requested them from the clerk's

22    office, we actually had sent an investigator from the U.S.

23    Attorney's office down there to the clerk's office who's

24    familiar with the people, goes and gets convictions all the

25    time.  These convictions for Peavy in the Miami Dade court

1   do not exist.

2          THE COURT:  Well, how do we know that they exist?

3          MR. GRADY:  I don't know.  Now, this is

4   essentially the crux of the dispute.  The government has

5   records from both the Miami Dade Police Department and from

6   the Florida Department of Corrections.  The Miami Dade

7   Police Department recorded not only police reports of the

8   incident, but they also had tracking of case issuances, case

9   dispositions, charges, et cetera.  So there are records from

10  the Miami Dade Police Department with respect to charges and

11  their disposition that are maintained in the regular course

12  of their business.

13         Further, we have corresponding records from the

14  Florida Department of Corrections that correlate to the

15  charges and dispositions.  For instance, in or about 1981

16  Mr. Peavy is committed to the custody of the Florida

17  Department of Corrections for ten years for involuntary

18  sexual assault or rape, and these correlate along.  So with

19  respect to those charges, those are the documents primarily

20  at issue, but there are further admissions by Peavy that he

21  actually did these things and was convicted for them.

22         THE COURT:  All right, so essentially what I'm

23  going to have to do is -- I'm not going to do it now -- is

24  go through them one by one.  You don't have to have a

25  certified record, but you do have to have admissible

1   evidence to document it.  So if this is admissible and these

2   people fly up, and if he's admitted to them, certainly an

3   expert can rely on it.

4           MR. FICK:  Yes, I mean, I think each individual

5   alleged disposition, though, has its own separate questions

6   as to what's the basis of the reconstruction, is it

7   reliable?  In terms of Mr. Peavy's admissions, I mean,

8   certainly an admission that he makes would be admissible.

9   There's a question of even the detail and reliability of his

10  admissions.  I mean, this is somebody who really is in many

11  ways not all there, and if someone asks him, "Well, did this

12  and this happen, can you tell me about it --"

13          THE COURT:  Sure, but if I've got an admission

14  corroborated by a police record which is then corroborated

15  by a prison record, I'm going to let it in.

16          MR. FICK:  Yes, I agree, at some level, when there

17  is enough corroboration, I think it ceases to be an issue.

18  But I think individually in many of these, we're dealing

19  with simply in some cases just an NCIC record with no

20  corroboration.  So if that's the case, I think it's more

21  problematic, and we'll have to look at each one separately.

22          THE COURT:  We'll have to look at each one

23  separately, fine, all right.  And then there's the -- you've

24  rechallenged Daubert, but it didn't seem to be any

25  different?

1       MR. FICK:  No, I think, your Honor --

2       THE COURT:  You're preserving it.

3       MR. FICK:  -- basically in order to make the

4  record in this case --

5       THE COURT:  I agree, I agree.  I don't need a

6  separate hearing.

7       MR. FICK:  I assume the Court is likely to rule

8  the same way, but I wanted to make sure that the record is

9  all here for appellate purposes, if we get there later.

10       THE COURT:  All right.  So assuming for a

11  minute -- I just skimmed it.  Has it been documented

12  conviction by conviction so that we can rule at this point

13  on what's corroborated enough, or should I schedule a

14  separate hearing?

15       MR. FICK:  Well, in the pretrial memorandum, there

16  are identified collections of documents for each one, and I

17  guess both sides should sit down and see if we can't nail

18  down what we think the universe of corroboration is on each

19  one of them.

20       MR. GRADY:  We can get back to the Court

21  certainly.

22       THE COURT:  That's fine.  Just sort of make sure

23  you do it a week before the trial, which gets us to the next

24  point which is, assuming this finishes the week of the 22nd,

25  don't I have a criminal trial in there?

1          THE CLERK:  Yes.

2          THE COURT:  The 15th?  There's a criminal trial

3    that will be in between, and then if you want, you could

4    just follow right up on that.

5          MR. FICK:  Which would be?  I know the government

6    wanted to speak to potentially moving into October, I think.

7          MS. SERAFYN:  Your Honor, there are a couple of

8    issues with the trial schedule.  Most importantly is, the

9    government's expert Dr. Fields has, I believe, five or six

10   trials in which she's testifying in the month of September,

11   so she's not available until October.  Certainly it would be

12   a lot easier without an advisory jury because the Court

13   could take her testimony out of turn, but with an advisory

14   jury, it doesn't seem like we could start before the first

15   week of October, which would be October 6, given

16   Dr. Fields's schedule.

17         THE COURT:  Well, why don't we do this:  Why don't

18   as soon as this case is over we figure out what's going on.

19   I have to do the criminal trial.

20         MR. FICK:  I mean, frankly, your Honor, it sounds

21   like, if there's a criminal trial that's at least a week

22   after Shields, we're going to be in October anyway, is what

23   it sounds like, frankly.

24         THE COURT:  Part of the problem is, by this having

25   been bumped and taking longer than you originally had

1    predicted, I may have expert problems with the other trial

2    as well.  It's Laura Foley, is it, and Charles Rankin and a

3    doctor who's impossible to get, and, of course, we said it

4    was an immutable date.  So I don't know what I'm going to do

5    with that expert either, so I'm juggling all this.  We'll

6    just have to play it by ear.

7              MS. SERAFYN:  And, your Honor, that proposal seems

8    to make some sense, except what we have learned is that

9    these experts have impossible schedules, and unless --

10             THE COURT:  What do you want me to do?

11             MS. SERAFYN:  Unless we can give them at least a

12   range and say, "Please hold this week for us," you know, we

13   might be looking at November or December.

14             THE COURT:  Fine.  I'll have Mr. Alba call

15   Mr. Rankin.  But, see, I hate to do this because this case

16   has had so many problems with it.  What if he called me

17   up -- I don't want anybody to be released -- and told me

18   that something else terrible happened; you know, a murder

19   trial that goes double the amount of time as opposed to

20   emergency surgery.  Until I get going on this case, I don't

21   want to release anybody.  This case has been, I think,

22   despite at least my best efforts, very difficult to

23   schedule, and I understand that Peavy would be the same.  I

24   want to kick start this, get it going, and as soon as we

25   have some really good sense that it's chugging along, we'll

1    get in touch with Mr. Rankin, whose doctor it is, see what

2    his schedule -- I mean, you're welcome to call him

3    yourself -- what that doctor's schedule is.  If that

4    doctor's schedule can't move a week, then what I'm going to

5    do is maybe slot you in, okay?  And then we could work

6    around schedules.  Maybe I won't do jury; maybe I will.  I'm

7    just not willing to commit right now, but I'll give you a

8    range to commit to.  I can't do it right now.  It totally

9    depends on the Rankin trial.

10           MR. FICK:  And, your Honor, is that anticipated to

11   be a one-week or a two-week trial?

12           THE COURT:  One, but the issue really is the

13   expert.  There's one expert that's impossible to get in the

14   front door, and it's critical to his case.  I think it's

15   Laura Foley picked this up from Paul Moore, so this is a

16   retry.  That's why I know so much about the scheduling

17   difficulties.  And then I've got a huge qui tam civil case.

18   So that's what I'm juggling.  They obviously come behind all

19   of you.  So that's it.  And we'll do a jury charge

20   conference at some point.

21           MR. FICK:  Your Honor, just in terms of the

22   pending motions, I also filed sort of parallel hearsay

23   motions for King to let Judge Collings rule on.  I assume I

24   would want to supplement that with a reaction to whatever

25   Judge Collings wrote in the Shields case.  And then there

1   was also a privilege motion sort of akin to what had been

2   filed in Wetmore where Judge Dein had ruled, and I assume

3   the government --

4          THE COURT:  That's a really interesting issue.

5   You're going to be filing an opposition to that, right?

6          MS. SERAFYN:  Yes, your Honor.  Attorney Fick

7   filed five motions in limine last week, and we tried to

8   divide and conquer as best we could.  And we responded by

9   opposing three of the five, but our time to oppose the other

10  two has not expired yet, so we intend on filing --

11         THE COURT:  That's a fascinating issue, and I

12  understand Judge Tauro may come out a different way, is that

13  right?  Does anyone know?

14         MR. GRADY:  On the privilege?  He did.

15         THE COURT:  What?

16         MR. GRADY:  Judge Tauro came out a different way,

17  yes.

18         THE COURT:  That's a very interesting issue.

19         MS. KELLEY:  But Judge Tauro came out a different

20  way in about three sentences, so, I mean. . .

21         THE COURT:  I don't know.

22         MR. FICK:  In any event, I think that because

23  there's going to be some lag before the trial happens,

24  there's plenty of time to finish tying down the briefing on

25  these pending motions, so --

1         THE COURT:  Okay.

2         MS. KELLEY:  And for the Wetmore response which

3   was due this Friday, may we have an additional week?

4         THE COURT:  Absolutely, yes.  You could probably

5   actually have two weeks.

6         MS. KELLEY:  Oh, thank you.

7         THE COURT:  I'm really just focused on getting

8   Shields done.  We all hoped -- you all insisted that this go

9   forward last January, and it has been elusive.  We've just

10  got to do it.  And Shields is coming in with clothes?

11  Someone is bringing clothes?

12        MS. KELLEY:  He has clothes, yes.  I've got them

13  myself.

14        THE COURT:  It won't go through the normal marshal

15  thing, does it?

16        MS. KELLEY:  No.  I think I have to take his

17  clothes down to him every morning.

18        THE COURT:  It's the same routine as with a

19  criminal defendant?  Does he have clothes that he's allowed

20  to keep?

21        MS. KELLEY:  No, he does not.

22        MR. GRADY:  I would imagine "no," but I don't know

23  the answer to that.

24        MS. KELLEY:  I looked into that.  He's the same as

25  a regular prisoner, so -- I also just meant to give you a

bb71e78d-1578-45db-97a6-e0aa6e1cb3da

1    heads-up.  Because I'm subpoenaing someone from Probation in

2    Maine, they're gladly coming here, it's not like they're

3    adverse, but there's a very long process you have to go

4    through to subpoena a government witness like that.  So

5    that's coming shortly.

6              THE COURT:  It's called the Touhy regulation.

7              MR. GRADY:  Touhy.

8              MS. KELLEY:  I didn't even know about it until

9    last night.  I was so clueless.

10             THE COURT:  Welcome to the world of civil

11   litigation.  Can't you just bypass that?

12             MS. BOAL:  Your Honor, I had a long conversation

13   with John Bocon in general about Probation in these cases,

14   and, as you know, we usually represent the Probation

15   Department in Touhy matters, and it was decided that that

16   probably wasn't the best thing to do because we have sort of

17   a conflict.  So I think -- I don't know if Ms. -- it sounds

18   like Ms. Kelley has not issued the subpoena yet.  As I

19   recall, that was one of the problems Judge Wolf had with the

20   Western District of New York, and we agreed that that U.S.

21   Attorney's office would handle that once the subpoena was

22   issued, but I don't think this --

23             THE COURT:  I'm sort of assuming -- I don't want

24   to devise a strategy -- it's going to be quite general to

25   what kinds of supervision do you provide these people while

1   on release?

2           MS. BOAL:  Yes, and I believe Mr. Grady is going

3   to address our objections to that testimony.

4           THE COURT:  Well, let me say this.  I think --

5           MR. GRADY:  Not generally speaking.  An objection

6   to, I don't know who this witness is and what they're going

7   to say.  I need to know that, at least.

8           THE COURT:  Well, so what's the name of the

9   person?

10          MS. KELLEY:  Well, I have been trying to get --

11   the reason John Bocon is calling around is, I've been trying

12   to get the people in Maine to call me back for a month; and

13   finally Mr. Bocon called the head of their Probation Office,

14   and someone called me this morning to say they can come,

15   they do not have a problem with it, and they're sorry they

16   never called me back.  But I do need to go through this

17   process.  All I want, I don't want the jury going back to

18   the jury room and saying, "what's supervised release and

19   what does it mean?"

20          THE COURT:  Sure.

21          MS. KELLEY:  And also, since 2003, there's just no

22   question, they have new methods of controlling people and

23   supervising people than they did.

24          THE COURT:  Sure, I just did one of these the

25   other day.  I don't think anyone is going to ask any private

bb71e78d-1578-45db-97a6-e0aa6e1cb3da

1   things like, you know, do you have lie detector tests, and

2   do you provide, you know, outpatient counseling, and do you

3   have to report so many times a week?

4           MS. KELLEY:  Exactly.

5           MR. GRADY:  If Ms. Kelley knows the name of this

6   individual, would it be possible to disclose that to the

7   government?

8           MS. KELLEY:  Yes, I'm sorry, I just found out this

9   morning.  Bob Jeffreys or someone else, Matt Brown may come.

10  I mean, as soon as they tell me, I'll let you know.

11          THE COURT:  Is Maine different from Massachusetts?

12  Can't we have one of our people do it?

13          MS. KELLEY:  Well, this is exactly the issue.  I

14  spoke with Jonathan Hertig and tried to get him to come.

15  They're saying, no, they may do things differently in Maine.

16  John Bocon finally made an executive position that the

17  person from that district should travel here.  It's going to

18  be a very quick witness.  I've explained this to the

19  government before what I intend to elicit from such a

20  witness.  I want them to explain what supervised release is,

21  what Mr. Shields's conditions were in 2003, what new tools

22  they have they could use.  They have GPS now.  They have all

23  kinds of different computers.

24          THE COURT:  Sure, I'll allow that testimony.

25          MR. GRADY:  And the second, your Honor, apparently

1   there's another witness, a detective that was disclosed

2   yesterday as a potential witness.  We've had some

3   preliminary discussion about who that is and what that

4   testimony would be, but it seems a bit late.

5              MS. KELLEY:  I e-mailed them some time ago about

6   this witness.  It wasn't just yesterday.  But this is a

7   police detective in Portland who registers people.  And she

8   will be testifying, as I've told them, there's a sex

9   offender registry in Maine.  Mr. Shields will be a lifelong

10  registrant.  He has to come to the police station every 90

11  days.  They take his fingerprints.  They know where he

12  lives.  They know where he works.

13             THE COURT:  You know, one of the things that you

14  might do with both of those is, like, for example, my guess

15  is the Maine Probation Office can probably say that.

16             MS. KELLEY:  Well, I don't think -- actually, they

17  can testify to the details of the Maine sex offender

18  registry law as well as this policewoman who administers it

19  can.

20             THE COURT:  That's what I'm saying, you may not

21  need two witnesses there, or it's possible that you could

22  even get a stipulation.  I leave that up to you, but, in any

23  event, it seems admissible.  It seems like it's the Part B

24  of this, does he have a mental disorder?  Is that even

25  disputed, by the way?  I don't think it is, right?

1          MS. KELLEY:  Well, yes, I think it is.

2          MR. GRADY:  It's not by the experts, but there may

3     be some dispute as to whether it meets the legal criteria.

4          THE COURT:  Oh, I didn't know that actually

5     because I thought your expert said "yes" -- I haven't read

6     it in a really long time -- I plan on reading it -- "Yes, he

7     has a mental disorder, but he can control himself," for want

8     of a better word, "so he's not dangerous."  And so I think

9     that's at least where the experts are going on that.

10         MR. GRADY:  There's no dispute as to the diagnosis

11    of pedophilia.  I think, without speaking for counsel, they

12    may dispute for purposes of legal purposes whether it's a

13    serious mental disorder.

14         MS. KELLEY:  But with regard to these two

15    witnesses, there's no surprises here, there's no --

16         THE COURT:  Sure, you're entitled to them.  If you

17    can do it by stipulation, you may not need two, but, in any

18    event, that's your call.  But I am going to hold people to

19    this timetable.  I am worried about that because I own the

20    jury, and also I've got a lot on my plate.

21         Let me just say this to you as far as, do your --

22    I read the Hawaii opinion with some interest, particularly

23    with respect to the diagnosis of hebephilia, a word I'd

24    never even heard of before.

25         MR. GRADY:  It came up in the Daubert hearing.

1        THE COURT:  I know, but before --

2        MS. KELLEY:  Before all this.

3        THE COURT:  -- this range of cases.  Now, what I

4   don't want to do is at this late date revisit that.  She

5   apparently got some testimony I never heard before, but, in

6   any event, as far as I'm concerned, the diagnosis here is

7   pedophilia, right?

8        MR. GRADY:  Yes.

9        THE COURT:  There is paraphilia NOS which I did

10  not address.

11       MR. GRADY:  It's not a diagnosis the government

12  seeks to elicit through its expert, nor do I expect

13  Dr. Plaud to testify to it.

14       THE COURT:  Okay, good.  I just wanted to make

15  sure.  I don't know if you saw, but she actually dealt with

16  hebephilia.

17       MR. GRADY:  Yes.

18       MS. KELLEY:  Well, Dr. Doren, the expert in that

19  case, is like the big daddy of hebephilia.  He's made it a

20  mental disease.

21       THE COURT:  I might not have put it that way

22  but --

23       (Laughter.)

24       MS. KELLEY:  But that's his deal.  He's the only

25  expert.  I mean, he has little disciples, but he's the guy,

1   and he's made a fortune going around testifying about it,

2   so --

3         THE COURT:  Anyway, that's somewhere else.  I

4   don't want to revisit it at this point, so we're sticking

5   with pedophilia, okay?

6         MS. SERAFYN:  Your Honor, just going back to Peavy

7   with the two motions that are still outstanding, the motions

8   in limine, given that there are two trials starting next

9   week, could the government have an extension of time to

10  respond?

11        THE COURT:  When do you want?

12        MS. SERAFYN:  Perhaps until September 26.

13        THE COURT:  No.  No, I mean, I've got to rule.

14  There's a chance that if the Foley-Rankin trial, otherwise

15  known as the United States V. Kamen, if that trial gets

16  bumped, I could move right into his.  I won't want to be

17  that close up to it.

18        MS. SERAFYN:  I'm sorry, your Honor, I wasn't

19  clear about when is the earliest we could possibly start in

20  Peavy.

21        THE COURT:  The earliest we could possibly start

22  is that Monday, which would be the 29th, is that it?

23        MS. KELLEY:  Although that's Rosh Hashanah.

24        THE COURT:  Does anyone celebrate both days.

25        FROM THE FLOOR:  I'm going to try.

1          (Laughter.)

2          THE COURT:  In any event, we would check with the

3     jury and see if anyone did both days, so --

4          MS. SERAFYN:  Monday, the 22nd of September, your

5     Honor, for the two motions in limine?

6          THE COURT:  Yes.

7          MS. SERAFYN:  Thank you.

8          THE COURT:  The problem is, you back me up so

9     close I couldn't rule.  And I think both of these cases have

10    been delayed.  I'd like to get to them, there's no way of

11    resolving.  So BOP says that a plain old civil commitment

12    isn't in order?

13         MS. SERAFYN:  Your Honor, they essentially bent

14    over backwards to get his risk assessment panel done, looked

15    at a lot of documents.  And we believe that 4246 is a

16    different standard, and they found that he didn't meet the

17    criteria for a 4246.

18         THE COURT:  There we go.

19         (Discussion off the record.)

20         THE COURT:  I should do one more thing which he

21    reminded me of.  There's a Wetmore pretrial on September 17

22    which we are bumping.

23         THE CLERK:  Canceled, all right?

24         MS. KELLEY:  Just bump him.  One thing at a time.

25         THE COURT:  I have an immigration proceeding that

Page 58

1   afternoon which I really want to do because it's the first

2   one in Fenway Park, so -- and since he's likely to go off

3   anyway, we'll come up with a new date on him.  It's

4   primarily awaiting his medical condition, in any event.  So

5   you'll let us know, and we'll reschedule that, okay?

6               MS. KELLEY:  Yes.  Thank you.

7               (Adjourned, 3:15 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2


3

     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5


6


7            I, Lee A. Marzilli, Official Court Reporter, do

8    hereby certify that the foregoing transcript, Pages 1

9    through 58 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in Civil Action

11   No. 07-12056-PBS, United States of America V. Jeffrey

12   Shields, and thereafter by me reduced to typewriting and is

13   a true and accurate record of the proceedings.

14            In witness whereof I have hereunto set my hand

15   this 17th day of May, 2009.

16

17

18

19

20
                 /s/ Lee A. Marzilli
21              _____

                 LEE A. MARZILLI, RPR, CRR
22               OFFICIAL COURT REPORTER

23

24

25