IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,        )
                                 )
               Petitioner        )
                                 ) MC No. 06-10427
       -VS-                       ) MC No. 06-10449
                                 ) MC No. 06-10439
JEFFREY SHIELDS, CHARLES PEAVY, ) Pages 1 - 61
JOEL WETMORE,                    )
                                 )
               Respondents        )



MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts  02210
September 17, 2007, 3:15 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

6dea3ec5-68f6-4318-b400-1486731cc129

1

A P P E A R A N C E S:

2

3       MARK T. QUINLIVAN, ESQ., Assistant United States
Attorney, Office of the United States Attorney,
1 Courthouse Way, Boston, Massachusetts, 02210,
4   for the Petitioner.

5       PAGE KELLEY, ESQ., JUDITH H. MIZNER, ESQ., and
WILLIAM FICK, ESQ., Federal Defender Office,
6   408 Atlantic Avenue, Boston, Massachusetts, 02210,
for the Respondents.

7

ALSO PRESENT:

8

9       HELEN H. HONG, ESQ., Department of Justice, Civil
Division, Washington, D.C.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           THE CLERK:  The case of the United States V.

3   Jeffrey Shields, Miscellaneous Case No. 06-10427, United

4   States V. Charles Peavy, Miscellaneous Action No. 06-10449,

5   and United States J. Joel Wetmore, Miscellaneous

6   No. 06-10439, will now be heard before this Court.  Will

7   counsel please identify themselves for the record.

8           MR. QUINLIVAN:  Good afternoon, your Honor.  Mark

9   Quinlivan for the United States.  With me at counsel table

10  is Helen Hong from the Civil Division of the U.S. Department

11  of Justice.

12          THE COURT:  Welcome.

13          MS. MIZNER:  Judith Mizner appearing for all of

14  the respondents, along with William Fick and Page Kelley who

15  are actually representing the three respondents.

16          THE COURT:  Okay, great.  Have you set up a

17  schedule between you?  I sort of assume that it's your

18  motion, so --

19          MS. MIZNER:  Thank you, your Honor.  First, I

20  would like to provide --

21          THE COURT:  Actually, what is this formally?  It's

22  a motion to --

23          MS. MIZNER:  This is a motion to dismiss --

24          THE COURT:  To dismiss.

25          MS. MIZNER:  -- challenging the civil commitment

1   statute on its face.  And I would like to provide the Court

2   with copies of two opinions.  One is an opinion issued by

3   Judge Tauro, and the other is an opinion from the Eastern

4   District of North Carolina by Judge Britt, both of which

5   address the same issues.

6           THE COURT:  Thank you for those copies.  I have

7   read them.  I just saw them this morning, so I don't pretend

8   to be expert on --

9           MS. MIZNER:  In an excess of caution, your Honor.

10          THE COURT:  Especially on the North Carolina one,

11  it's very lengthy, and I've just had a chance just to skim

12  it, but you can assume I've at least got the highlights for

13  both of those opinions.

14          MS. MIZNER:  Thank you.  This is a motion to

15  dismiss challenging the constitutionality of the Jimmy Ryce

16  Civil Commitment Program, which is part of the Adam Walsh

17  Act.  The statute, which is codified in the Criminal Code at

18  18 U.S.C. Sections 4247 and 4248, provides for the

19  open-ended potentially lifetime commitment of certain

20  classes of persons on a finding by a judge based on clear

21  and convincing evidence that they are sexually dangerous

22  persons.  And if the statistics from states with civil

23  commitments for sexually dangerous persons is any

24  indication, fewer than 10 percent of those committed have

25  been discharged from custody to date.

1          Now, there are three classes of persons covered by

2     the federal statute:  those in the custody of the Bureau of

3     Prisons; persons committed to the custody of the Attorney

4     General pursuant to 4241(d), which addresses incompetent

5     criminal defendants; and persons as to whom criminal charges

6     have been dismissed solely for reasons relating to mental

7     conditions.  It is not limited to persons who are in custody

8     for sex crimes or to persons who have been convicted for sex

9     offenses.

10          The definition of sexually dangerous person is

11     "Engaged or attempted to engage in sexually violent conduct

12     or child molestation and who is sexually dangerous to

13     others."

14          "Sexually dangerous to others" is defined as, "The

15     person suffers from serious mental illness, abnormality, or

16     disorder, as a result of which he would have serious

17     difficulty in refraining from sexually violent conduct or

18     child molestation, if released."  There is no further

19     definition in the statute of those terms.

20          The Bureau of Prisons in December issued a

21     memorandum with interim definitions, and those have

22     subsequently been set out in the Federal Register.  The

23     citation alludes me, but it is the same definition, and we

24     can provide that citation to the Court, but it in essence

25     defines sexually violent conduct as including "engaging in

1   any conduct of a sexual nature with another person with

2   knowledge of having tested positive for the human

3   immunodeficiency virus, or other potentially

4   life-threatening sexually transmissible disease, without the

5   informed consent of the other person to be potentially

6   exposed to that sexually transmissible disease."  So it

7   certainly encompasses conduct that exceeds what you would

8   normally view as violent.

9           THE COURT:  So that's -- maybe I read it too

10  quickly.  Is that cite in your brief?

11          MS. MIZNER:  No, it's not.  I will provide it to

12  your Clerk.

13          THE COURT:  If you could.  Do the regulations

14  address other things like the procedures to be followed and

15  the timing of these certifications?

16          MS. MIZNER:  Yes, those are -- the Federal

17  Register has a -- there's a proposed rule in the Federal

18  Register that addresses --

19          THE COURT:  Which provides what?

20          MS. MIZNER:  Well, some of the procedures are set

21  out in the statute.

22          THE COURT:  Right, but let me just -- I understand

23  your really, an excellent brief on everyone's part, broad-

24  brush attack on so many fronts.  To the extent, though, that

25  there's a procedural due process challenge, and a sort of

6dea3ec5-68f6-4318-b400-1486731cc129

1    one of the more typical -- not typical but easier conceptual

2    ones is the lack of a hearing before you're actually held,

3    is there a regulation that actually addresses that?

4            MS. MIZNER:  I do not believe there is.  The

5    statute does not provide for any particular -- does not

6    provide -- it provides for a time frame of --

7            THE COURT:  Does it fill in the gaps; in other

8    words, that you have to have a hearing by a neutral

9    decision-maker before you're actually held past your prison

10   date?

11           MS. MIZNER:  No.  No, to my knowledge, the

12   regulation does not provide those kinds of gaps, and those

13   addressing that issue, those are the --

14           THE COURT:  You know, I'll let them address.  I

15   don't want to hold up your argument.

16           MS. MIZNER:  That's okay, that's part of the

17   argument.

18           THE COURT:  So once you were in the register, I

19   hadn't known that the Department of Justice had actually

20   issued any proposed regulations.

21           MS. MIZNER:  It's 72 Federal Register --

22           THE COURT:  I'll find it.

23           MS. MIZNER:  I have it somewhere.

24           THE COURT:  Okay.

25           MS. MIZNER:  But the procedures in the statute

1    provide for certification which then stays the release of

2    the person.  It is then sent to -- the certification is sent

3    to the court in the district of confinement, which is why

4    we're here.  The clerk is to send notice to the person and

5    the attorney for the government, and the court orders a

6    hearing.  Prior to any hearing, the courts may order a

7    psychiatric or psychological examination and the filing of a

8    report.  And the examination is defined in 4247(b) as being

9    done by a licensed or certified psychiatrist or psychologist

10   or more than one with the defendant able to select an

11   additional examiner.

12          THE COURT:  Can you tell me a little bit about the

13   three men who are in front of me now?  Were they actually

14   certified before the end of their prison sentence?

15          MS. MIZNER:  Yes, but very close -- I'll let

16   Mr. Fick and Ms. Kelley address that.

17          THE COURT:  Can I just find out what happened in

18   real life.

19          MR. FICK:  At my fingertips, I don't have the

20   exact dates.  In Mr. Peavy's case, though, it was a matter

21   of days or weeks, I believe, before his release date.  I

22   want to say his release date was in October or November of

23   '06, and the docket would reflect the day the paper hit the

24   court.

25          THE COURT:  And have you -- just I noticed one of

1    the judges in addressing one of these kind of cases,

2    actually while probing the very, very difficult

3    constitutional issues, made sure that there was at least

4    probable cause with respect to the people in front of him,

5    and there was a little bit of a back-and-forth in footnotes

6    about whether or not that had been waived or not with

7    respect to each individual defendant.  So assume for a

8    minute that you're one of these people, would you want any

9    kind of a probable cause hearing while I'm working through

10   the constitutional issues?

11            MR. FICK:  Potentially I think, your Honor, the

12   answer would be "yes."  What we had agreed to the government

13   in initial discussions --

14            THE COURT:  I'm sorry to jump in here, but --

15            MS. MIZNER:  No, that's fine.

16            MR. FICK:  We had talked about how we would not

17   argue to the Court that because of -- we would not argue

18   that there was something unconstitutional in the delay

19   required to adjudicate the motion to dismiss.  However, our

20   understanding was that that would not in any way waive the

21   argument, which is part of the motion in fact, that there

22   ought to be a probable cause hearing, and the lack of a

23   probable cause provision in the statute is one of the

24   constitutional defects of the statute.  And to the extent

25   the Court were inclined to ingraft onto the statute a

1    probable cause requirement, I think we would certainly want

2    to reserve the option of going forward with that for each of

3    the clients, depending on the specific circumstances.  We'd

4    have to think about that strategically for each one, I

5    think.

6              THE COURT:  All right.  Well, the reason I say

7    that is, apparently the case was argued in North Carolina

8    last May -- I was looking -- and I don't know how quickly

9    Judge Tauro must have turned the thing around.  I think you

10   all really did -- I have to congratulate you -- a fabulous

11   briefing, but it took a very long time, and then it made no

12   sense at that point to start with the old clerks and move to

13   the new clerks.  But that having been said, it could take

14   another month or two anyway to write some sort of opinion,

15   and your people are just sitting in jail, so what is your

16   view on all that on the probable cause determination?

17             MR. QUINLIVAN:  Thank you, your Honor.  May it

18   please the Court, we are not opposed to that.  In fact, it

19   was my understanding when the schedule was initially set

20   that the respondents were disavowing any sort of hearing

21   until the constitutional questions were adjudicated, but

22   it's always been our position that we are not opposed and

23   we're ready to go forward with a hearing.

24             THE COURT:  But I'm not talking about the big mega

25   hearing.  I noticed the softest piece of your brief is sort

1   of, "Let's work out the procedural piece as we go."  And you

2   did not flat out say that there shouldn't be some sort of a

3   probable cause hearing on the lines of -- a bad analogy but

4   a probation revocation, at least something, some neutral

5   person other than somebody at BOP saying that this person

6   should be held.  And I think, at a bare minimum, I would

7   like to, without waiving any rights on their part, give

8   these gentlemen, who have been sitting in jail for a while,

9   right, just while this thing has been briefed, this very

10  important set of constitutional issues, the right to do

11  that, without waiving any rights that somehow that that

12  obviates a facial challenge to the procedures or the other

13  constitutional kinds of issues.  So do we all agree?  That's

14  sort of one key thing I wanted to accomplish here today

15  because it's been a longish period of time for the briefing.

16          MR. QUINLIVAN:  That's agreeable to the

17  government.

18          THE COURT:  Is that agreeable to everyone here

19  that you'll go back and discuss with your clients whether or

20  not you want such a probable cause hearing?

21          MS. KELLEY:  Yes.  And if I may just briefly say,

22  I have another client before Judge Tauro, but all of my

23  clients were certified either on the day of their release or

24  within days of their release dates.  Mr. Wetmore to my left

25  and Mr. Shields to my right were both at halfway houses very

1    assiduously following the rules there, lining up apartments

2    and jobs and treatment programs for when they were to be

3    released, and they were just arrested out of the blue from

4    the halfway houses and taken to Fort Devens.

5              THE COURT:  Taken where to Fort Devens?

6              MS. KELLEY:  They are incarcerated at the prison

7    at Fort Devens.

8              THE COURT:  In a treatment center or at the farm?

9              MS. KELLEY:  There is no treatment center there.

10   There is what they call a sex offender management program,

11   which is, I think, a very optimistic title, that I don't

12   think there's any treatment component whatsoever.  It's

13   just, I think, really for people who are there --

14             THE COURT:  So they're not seeing psychiatrists or

15   whatever?

16             MS. KELLEY:  No, and I think they're just

17   stigmatized by being labeled under the rubric of that

18   program.

19             THE COURT:  Sure, I will get back to the broad

20   facial, but your representation is that none of the three

21   men in front of me now are receiving any treatment?

22             MS. KELLEY:  Well, that's correct, although

23   another problem -- the probable cause hearing question

24   becomes very complicated because to certify these men, the

25   government used for two of my three clients their treatment

1  records as a basis for their certification, which we would

2  be challenging.  We'll be challenging the use of those

3  records.

4          THE COURT:  Your two people were in for some sort

5  of sex offense?

6          MS. KELLEY:  Yes, child pornography.

7          THE COURT:  The possession or receipt?

8          MS. KELLEY:  Yes.

9          THE COURT:  Not touching?

10         MS. KELLEY:  Right.

11         THE COURT:  And what about, is there anyone here

12  who was brought in purely on a like a drug case or an

13  immigration case or some sort of other non-sex kind of --

14         MR. FICK:  Mr. Peavy, the actual charge for which

15  he pled was a simple assault, for which he received a

16  six-month sentence.  The simple assault was on a nurse in a

17  psychiatric facility, and there is sort of a history of

18  other types in his criminal history, but the actual instant

19  charge for which he was in BOP custody was a six-month

20  simple assault.

21         THE COURT:  Sure, but I guess, of course, if he

22  goes in a treatment facility, he's actually sort of in his

23  own category at this point, right, because he's got a mental

24  illness?

25         MR. FICK:  Well, there are certainly some

1    disabilities, I would put it, yes.  And so while he's

2    receiving treatment, I think, ongoing for just the

3    consequences of his stroke and other issues that he has,

4    there's no sort of sexually dangerous person type treatment

5    going on at Devens that I'm aware of, and in fact that would

6    be problematic while the petition is still pending because

7    there's the issue of --

8               THE COURT:  A, it's not being offered, but, B,

9    you're not seeking it?

10              MS. KELLEY:  Well, we would definitely be seeking

11   it.  The problem is, it's just a form of suicide, and in

12   fact --

13              THE COURT:  I understand that.  Given the

14   procedural posture of where we are right now, A, it's not

15   been offered, but, B, you don't want it for right now.  Does

16   everyone agree that that's the record?  Is it correct that

17   Devens hasn't been offering it, from the government's point

18   of view?

19              MR. QUINLIVAN:  Your Honor, I'm not familiar with

20   the specific treatment plans of these three individuals,

21   so --

22              THE COURT:  Well, as you stand here -- this is

23   something Justice Breyer thought a lot about -- as you stand

24   here, are there treatment facilities that are available?

25              MR. QUINLIVAN:  There are treatment facilities

1    that are available.  I do not know whether any of the three

2    respondents in this case have either availed themselves or

3    if they have been put in any of those treatment programs.  I

4    can't -- I don't know the particulars of these three cases,

5    what treatment they may have had.

6             THE COURT:  Let me ask more broadly:  Is there

7    anyone in the United States of America who's been certified

8    under this new Act who has been offered treatment?

9             MS. MIZNER:  I'm not aware of any.

10            MR. QUINLIVAN:  Your Honor, I can answer this.

11   Actually there are 53 pending.  Actually, no one has been in

12   fact certified to date, whether in this district or in North

13   Carolina.

14            THE COURT:  All right, we'll get back to that.

15   Let's go back to the facial, but I think let's do this.

16   Within, what do you want, 30 days?  Or within no later than

17   30 days, you'll let me know, all of you, what you want me to

18   do with respect to a probable cause finding with your

19   clients.

20            MS. KELLEY:  Yes.

21            MR. FICK:  Yes, your Honor.

22            MS. KELLEY:  Thank you.

23            THE COURT:  And that will be without prejudice to

24   any constitutional issues.

25            The other issue you maybe want to talk about is,

1   if they're there, if there's any kind of treatment that they

2   would want of some sort without waiving rights.  I don't

3   know if that's even feasible, okay, so think about that.

4           MR. FICK:  The issue there becomes quite simply,

5   your Honor, whether they have a Fifth Amendment right to

6   anything that might happen in that treatment.

7           THE COURT:  Right, it would have to be like in a

8   presentence report where the stuff couldn't be used against

9   you in this proceeding.  I agree.

10          All right, back to you.  Sorry.  That was the one

11  piece of housekeeping I wanted to deal with are these three

12  people in front of me while this issues get litigated, I'm

13  assuming not just here but on an appellate level, will take

14  quite a while.

15          MS. MIZNER:  It's an important issue.

16          THE COURT:  Yes.

17          MS. MIZNER:  Going back to the statute, it allows

18  for the commitment for up to 45 days for the examination

19  with and a possible extension for another 30 days.  So under

20  the statute, you can have 75 days before there is any kind

21  of judicial hearing.

22          The report --

23          THE COURT:  But let me just ask you point-blank.

24  So if in fact, as you said, I put the judicial gloss on it,

25  you've got to have a neutral fact-finder as in the probation

1  revocation cases, does that solve the problem?  That solves

2  that problem, right?

3        MS. MIZNER:  If you have a probable cause hearing,

4  yes.

5        THE COURT:  Before a neutral magistrate or judge.

6        MS. MIZNER:  Yes, absolutely.  And there are cases

7  that have addressed the time frame for probable cause

8  hearings, 72 hours, 10 days, 15 days.  Judge Selya when he

9  was a District Court judge in Rhode Island addressed the

10  Rhode Island statute for a commitment of alcoholics and did

11  a fairly inclusive discussion of different time frames, and

12  the case there was Donahue V. Rhode Island.  It's not cited

13  in the brief.  It is 632 F. Supp., 1456.

14        THE COURT:  That must be an old case.

15        MS. MIZNER:  It is.  And the statute provided for

16  a hearing after 10 days, and he said that after doing very

17  careful analysis of all of the pros and cons and the

18  purposes of that particular statute and the protections of

19  that statute, concluded that the 10 days was not too long.

20        THE COURT:  So what's your position as far as --

21  let's suppose I agreed with you and you needed a neutral

22  decision-maker.  Of all the things they were vehemently

23  opposing, that wasn't a piece of the brief that they were so

24  vehement on, other than to say, well, we couldn't do it

25  anyway.  Do you think I have the judicial power to simply

6dea3ec5-68f6-4318-b400-1486731cc129

1  say a neutral decision-maker must decide within 10 days of

2  the end of the sentence, or within three days of the end of

3  the sentence, or whatever the number seems to make sense?

4          MS. MIZNER:  I think it would stem from the time

5  that the certification is filed.  And isn't it somewhat

6  similar to a detention hearing?  There is 72 hours.

7          THE COURT:  Your position is, I have the right to

8  just do that, or it invalidates the whole statute?

9          MS. MIZNER:  Well, I think that the statute is

10  deficient because it does not provide for that.  I don't

11  know whether the government's position is that you do not --

12  the statute doesn't provide for it.  I believe that the

13  courts could, as a matter of providing due process, provide

14  a hearing.

15          THE COURT:  We were looking to see if there were

16  severability clauses, or what do you do if you find one

17  piece is and one piece isn't?  You say there's case law out

18  there that simply allows me to just say it must be found or

19  it's unconstitutional on a set of facial matters?

20          MS. MIZNER:  Well, the question of -- we believe

21  that Comstock is a good example of a case in which the Court

22  addressed a facial challenge to certain issues.  The

23  challenge to the -- saying that the statute is outside is

24  not supported, that Congress did not have the authority to

25  pass that statute.  Even if you adopt, as Judge Tauro did,

1   the analysis in Salerno that says a facial challenge -- to

2   prevail in a facial challenge, you must show that the

3   statute cannot be constitutionally applied to anybody.

4           Now, the Supreme Court has subsequently said that

5   that is not the only test, and that that is perhaps not the

6   best test for all circumstances, and in fact they have not

7   applied it in other instances.  But in Comstock, what the

8   Court said was that when you're talking about this kind of

9   challenge to Congress's authority to promulgate the statute,

10  that does apply to everybody.  If Congress didn't have the

11  authority to pass the statute, it shouldn't apply to

12  anybody, and therefore you can have a facial challenge.

13  Similarly with due process issues, if the statute does not

14  provide adequate due process protections, then that applies

15  to everybody across the board.

16          THE COURT:  I'm just simply saying that the court

17  in North Carolina felt that the statute was invalid because

18  Congress didn't have the authority in the necessary and

19  proper clause.  If we went that way, then you invalidate the

20  whole statute.

21          MS. MIZNER:  Yes.

22          THE COURT:  But suppose you don't go that way, as

23  Judge Tauro didn't, and the government is urging me not to,

24  but suppose I find, though, that some of the procedural

25  protections like the one we just discussed weren't adequate,

1    the remedy from your point of view would be what, to order

2    them to do it?

3              MS. MIZNER:  No.  I believe you would have to

4    declare the statute unconstitutional because the statute

5    does not provide for something that the Constitution

6    requires.  And it's not just the probable cause hearing.  We

7    also have due process challenges to the standard of proof

8    that is employed.

9              THE COURT:  Right.  So suppose you won that, you

10   have to prove the past conduct by reasonable doubt.  Let's

11   suppose you won those two, which are stronger arguments

12   here.  It's not eviscerating the entire notion that the BOP

13   can act or that Congress can act, but still it says you need

14   to have a higher procedural level of protection, substantive

15   protections.  So would it be your position that if I took

16   that position, let's say on those two points, better

17   hearings, higher standard of proof, let's say I were to take

18   that, you would say I have to invalidate the whole statute

19   and Congress has to do it again?  Or do I just simply say,

20   prove it beyond a reasonable doubt, give them a hearing

21   before they hold them on sentence?  That's what I've sort of

22   been struggling with in my mind is, if you don't win on the

23   big knock-dead punch the way you did in North Carolina,

24   what's the next step here?  And I'm going to be asking you

25   this too.

6dea3ec5-68f6-4318-b400-1486731cc129

1          MS. MIZNER:  Well, I don't believe that there is a

2    severability clause in the statute, so in the absence of

3    that, I think the Court would have to declare it

4    unconstitutional and let Congress decide what it wishes to

5    do in terms of a remedy.

6          THE COURT:  Okay, thank you.  If you found any

7    case law on that, that would be useful, like another statute

8    where the court felt that Congress had the underlying

9    authority to do something but felt that the procedural

10   protection wasn't high enough, for example, or timely

11   enough.  Anyway, go ahead.  So unnecessary and proper, you

12   think Congress doesn't have the authority at all?

13         MS. MIZNER:  That's correct.

14         THE COURT:  Did you see that comment by

15   Justice Stevens, by the way, who by some concurrence or

16   dissent, he essentially said, no, I'm not willing to go as

17   far as the dissent, and the reason is because, aren't there

18   some people who are just so dangerous that once you have

19   them in your custody, it's almost impossible to say that

20   society can't protect themselves and hold them?

21         MS. MIZNER:  Well, but the question is whether

22   this statute is the appropriate way to address that.  And if

23   you look at the breadth of this statute, I think the answer

24   is clearly "no."  It does not require -- there is no link to

25   federal crimes here.  Our federal government is one of

1    limited jurisdiction, and --

2          THE COURT:  No, but let me just -- the tough case

3    I was thinking about at home this weekend is -- and I'm not

4    saying this applies to any of you gentlemen -- but you had

5    someone in jail for drugs, cocaine, totally unrelated, and

6    yet you know from his presentence report that he's molested

7    three little girls and has confided in both Probation and

8    people in the jail, you know, "I can't hold myself back.  I

9    know as soon as I get out I'm going to rape someone else."

10   So you would say that Congress has no role there?  I guess

11   that's the ultimate bottom line for your opinion?

12         MS. MIZNER:  Yes.  This is not a question that's

13   appropriately a matter of straight federal jurisdiction.

14   And even under that parade of horribles, the fact that

15   something's --

16         THE COURT:  I understand that's an extreme case.

17         MS. MIZNER:  But even under that extreme case, the

18   fact that something is in a presentence report, or that

19   someone says they're going to do something, doesn't

20   necessarily mean that it's going to happen.  That might

21   perhaps provide the basis for some kind of surveillance of

22   that individual or some kind of monitoring.  Presumably

23   they're going to be on, on your hypothetical, probably on

24   supervised release.  So it would perhaps provide for some

25   enhanced monitoring during that time period, but it would

1    not necessarily provide for a statute of this stunning

2    breadth that Congress has passed.

3            THE COURT:  It's interesting because

4    Justice Stevens obviously was not referring at that time to

5    a pedophile.  I think he was referring to a crazy killer

6    type, but, still, it is something that's sort of your

7    inherent instinct to say, if you have someone that bad in

8    your custody and you know they're going to do something, you

9    know, you would say there's no power from the federal

10   government?

11           MS. MIZNER:  I would say that is not -- our

12   society does not work on a "lock them up first and do it

13   later."

14           THE COURT:  You know, I was reading over the

15   weekend all these civil commitment cases from the Supreme

16   Court, one after another after another, and they all say you

17   can do that.

18           MS. MIZNER:  They say -- they approve the states,

19   most of these civil --

20           THE COURT:  Right.

21           MS. MIZNER:  And that's precisely one of the

22   points here is that this is a function for state government.

23   It is the state that is designed to and supposed to address

24   these issues, not the federal government.  And in fact this

25   statute provides for the Attorney General to attempt to pawn

1    off --

2              THE COURT:  To hand them off, right.

3              MS. MIZNER:  -- to attempt to pawn them off on the

4    states.

5              THE COURT:  But isn't that the right answer under

6    your theory is, you don't let them on street because you

7    know they might do something, but then you try under the

8    federal system provide that the state take them?

9              MS. MIZNER:  Then perhaps you provide notice to

10   the state and allow the state to engage in whatever process

11   it deems fair and appropriate.

12             THE COURT:  Oh, I see, so your view would be a

13   handoff to the state, for them to do the civil commitment?

14             MS. MIZNER:  Yes, if there is to be a civil

15   commitment, it should be done by the state.  And most of the

16   states that have civil commitment statutes provide for

17   greater protections than are provided for in this statute.

18             THE COURT:  Yes, but suppose you were to say that.

19   Suppose you say, yeah, you're right, there's no prior

20   conviction here for anything, maybe just an allegation by

21   some jailhouse stooly who says something.  So then you up

22   the ante, and that's what I'll ask them, why shouldn't it be

23   proof beyond a reasonable doubt?  But suppose you get the

24   highest levels of proof that you can imagine and the

25   government can meet it, you would still say that Congress

1    can't do it?

2             MS. MIZNER:  Unless it's linked to a federal

3    crime, which it is not, just as in Greenwood, the Supreme

4    Court upheld the federal civil commitment statute where you

5    had someone who was committed after having been indicted,

6    but they were incompetent to stand trial, and you could --

7    the court said that it was permissible for a civil

8    commitment for that purpose because the federal government

9    had an interest in prosecuting that person at the end of the

10   line, however long that line may be.  But we don't have that

11   here.  This statute is not linked to any federal offense.

12            THE COURT:  But wouldn't it be likely that

13   somebody who is a repeat pedophile would be more likely to

14   look at child pornography or try and solicit someone online?

15            MS. MIZNER:  But looking at child pornography is

16   not the kind of touching that --

17            THE COURT:  But it's a federal crime.

18            MS. MIZNER:  -- that is defined in this commitment

19   statute.

20            THE COURT:  Okay, so where necessary and proper,

21   and you say under no circumstances can the federal

22   government do it.  And then if you don't win that one,

23   you're onto it's not civil, it's criminal.  I'm not sure you

24   have to go that far because even in the civil context

25   sometimes, you have to have a higher standard of proof.

1          MS. MIZNER:  Right, and so --

2          THE COURT:  So the question is, everybody at this

3    point has sort of taken Congress at its word it's civil, but

4    suppose it should be proof beyond a reasonable doubt for the

5    predicate offense, if there's no prior conviction for sex

6    crimes, the question that I have is, does that have to be

7    before a jury if it's a civil proceeding?

8          MS. MIZNER:  Well, again, I'm not sure that the

9    Constitution requires it.

10          THE COURT:  Excuse me?

11          MS. MIZNER:  Some states have required a trial by

12    jury, and perhaps this is close enough to a criminal

13    proceeding, where you're talking about the consequences of

14    up to lifetime commitment, that a jury should be required,

15    just as you would have the increased protection of, be it

16    proof beyond a reasonable doubt, even though it's civil,

17    that this would be an appropriate case to impose a jury

18    trial requirement.

19          THE COURT:  So in the juvenile proceedings -- I

20    can't remember -- that was still a judge decision beyond a

21    reasonable doubt, right?  It didn't need to go to a jury?

22          MS. MIZNER:  Correct, although --

23          THE COURT:  It may technically be civil but --

24          MS. MIZNER:  Although some -- a number of states

25    do provide for jury trials.

1          THE COURT:  Sure.  I think Massachusetts does.

2          MS. MIZNER:  And that's one of the reasons why

3   this should be left to the states which have these developed

4   procedures.

5          THE COURT:  Okay.  Is there anything -- you can

6   tell I've read the papers, so I'm jumping around where I was

7   interested.

8          MS. MIZNER:  Yes.  Well, that's fine.  It's always

9   good to know what the Court is interested in.

10          THE COURT:  Well, let me ask you this.

11   Justice Breyer made a big deal, speaking on a five-four, on

12   whether or not there's treatment being an important part of

13   this.

14          MS. MIZNER:  And I think from the statute itself,

15   in which the Attorney General is to make efforts to pawn

16   these people off, I don't think treatment is a big part of

17   the government's program here.

18          THE COURT:  So I know it's a facial challenge, and

19   we don't really have a record, but as far as you know, there

20   is no treatment?

21          MS. MIZNER:  I'm not aware of any treatment that

22   has been -- as the government said, no one has been

23   certified yet, so it's --

24          THE COURT:  I think in one of these opinions there

25   was criticism of the government that they knew about these

1   people all along, and yet there was no treatment provided

2   during the course of the incarceration for the underlying

3   offense.

4          MS. MIZNER:  I believe that there was -- treatment

5   has been provided in the past at Butner.  There was a

6   treatment program in Butner, but I believe that's been

7   closed and moved somewhere else now.

8          THE COURT:  Okay.

9          MS. MIZNER:  And there was a management program at

10  Devens, which, as I understand it, did not provide a great

11  deal of treatment.

12         THE COURT:  Okay, so it's just a little -- you

13  don't want me to get into that record.  I should assume that

14  we know nothing about treatment.  Is that true?

15         MS. MIZNER:  It's fair to say I know nothing about

16  treatment.

17         THE COURT:  No, I mean treatment about what's

18  provided and what's not.  You're not making any proffers on

19  that point?

20         MS. MIZNER:  We're not making any proffers on what

21  treatment has been provided.

22         THE COURT:  Okay, well, thank you.  I'll give you

23  a chance to respond.

24         MR. QUINLIVAN:  Thank you, your Honor.  If I could

25  begin as my point of departure with actually the very first

1    line that my sister said because this is a facial challenge,

2    and I think that the Salerno "no set of circumstances" test

3    really informs all of this Court's analysis with respect to

4    the differing constitutional standards.  And I'll go

5    through --

6         THE COURT:  Yes, but here's my concern about on

7    the procedural due process thing, which I thought would be

8    the easiest.  Watch, no one will think any of it's easy.  I

9    don't see how you can justify for a guy who's never been

10   convicted of a sex offense -- take that as the cohort of

11   people -- saying, just because the Bureau of Prisons says

12   that there's some evidence that he meets that definition,

13   that he can hold him without a neutral person for 75 days?

14   That's what it sounds like.

15         MR. QUINLIVAN:  Well, I think, and again I'm going

16   back to the facial challenge now, I would say that it is

17   clear that one can envision, as Judge Tauro noted, any

18   number of situations in which a hearing could be held almost

19   immediately or very soon after the certification.

20         THE COURT:  But by statute -- I mean, I

21   understand, I'm always confused a little bit about this

22   facial challenge and when you can do it and when you can't.

23   Let's suppose I say facially that does not provide for

24   procedural due process, going from Goldberg V. Kelly all the

25   way up to the present, what is the remedy?

1          MR. QUINLIVAN:  Well, I think the remedy is that,

2     you know, most statutes, they are presumed to be severable,

3     and so to the extent -- we don't think that a probable cause

4     engrafting onto the statute, that that is constitutionally

5     necessary.  But if this Court were to decide -- and I

6     believe that when we had the first hearing in front of your

7     Honor we provided you with -- it was an unpublished decision

8     from the Central District of California, but the judge in

9     that case I believe went, if not went down that path,

10    decided that to be constitutional, there should be some

11    probable cause hearing.

12          THE COURT:  So you think I have the authority to

13    simply say it's unconstitutional without a neutral

14    decision-maker making an assessment prior to the termination

15    of the sentence, and I don't have to invalidate the whole

16    statutory scheme?

17          MR. QUINLIVAN:  Well, if I could just take a step

18    back, I mean, I don't think that's necessary because what

19    we've pointed to is, in the Briggs case, the Supreme Court

20    summarily affirmed the case involving a 45-day civil

21    commitment period.  So I think that, you know, it was a

22    summary affirmance, but that still is something that the

23    lower courts are bound to look at.

24          THE COURT:  My problem with this scheme is, it's

25    so far beyond at least what used to happen in Massachusetts

1    where I was a state court judge, or almost anywhere else,

2    because the people don't have to have any prior convictions

3    for a sex offense.  There's nothing that's been found beyond

4    a reasonable doubt that actually shows -- so this is

5    actually one step beyond any of the other schemes.  I know

6    you know that.  And so you don't have the proxy of a

7    conviction to give you some assurance that actually the

8    person is dangerous, so you've got to -- what every case has

9    said is, yes, civil commitment for dangerousness is

10   constitutional, assuming you have the correct procedural and

11   evidentiary standards.  I mean, it's said time and time

12   again.  So I'm worried that some of these people may just be

13   there on a cocaine thing, and take my extreme example,

14   someone has allegedly said something to some jailhouse rat,

15   and he announces it, and the Bureau of Prisons thinks that's

16   enough and holds him.  Does that seem fair to you?

17             MR. QUINLIVAN:  Well, I think that -- I mean,

18   putting aside, you know, I think that this statute has those

19   procedures, and if you're looking at -- I still go back to

20   you're looking at this in a facial context.  What we've had

21   in terms of these initial certifications is a situation in

22   which this statute was passed in July of 2006, so most of

23   the initial certifications occurred very soon or near the

24   person's release date.  The anticipation going forward is

25   that the Bureau of Prisons will be certifying people well in

1    advance of --

2             THE COURT:  Well, is that part of these

3    regulations?

4             MR. QUINLIVAN:  No, it's not part of them.

5             THE COURT:  That's what I was looking for.  So why

6    not?

7             MR. QUINLIVAN:  Well, the only time limit, and I

8    think my sister is correct, the only time limit that's set

9    forth in the statute is the 45-day and then the 30-day

10   period with respect to the mental examination.

11            THE COURT:  But the Department of Justice could as

12   a good government thing, not to mention the Constitution,

13   say, but it should be all certified in time for someone to

14   challenge it before sentence is over.

15            MR. QUINLIVAN:  I think that that is certainly a

16   possibility.  When the statute was first put into place and

17   the Bureau of Prisons was trying to enact this and looking

18   at the people who were going to be released, it was

19   impossible for that to be done with the initial

20   certifications.

21            THE COURT:  And I'll take your word for it because

22   they're all night and day, but now we have all these

23   regulations coming through to try and do it in a measured

24   and fair fashion, and that's not even part of it.  So it's

25   of some concern, it's of concern.  But let's assume I find

1  there should be a due process hearing before the loss of

2  liberty, or soon, or within let's say five, ten days

3  afterwards, can I just do that?

4      MR. QUINLIVAN:  I don't think it's necessary, but

5  to save the statute, if your Honor thinks that that's the

6  only way to save the statute from a constitutional, yes, I

7  think your Honor could do that, or your Honor on the burden

8  of proof could sever the clear and convincing.

9      THE COURT:  And do what?

10      MR. QUINLIVAN:  Well, if your Honor --

11      THE COURT:  All right, I'm pushing you.  That was

12  going to be Plan B.  So suppose I say that if you had

13  limited -- not you -- if Congress had limited the statutory

14  scheme to people who had been convicted of sex offenses, as

15  most of the state court statutes are, you might have one set

16  of concerns, but here anything triggers it, right?

17      MR. QUINLIVAN:  It does not have --

18      THE COURT:  Any evidence.  It doesn't have to be

19  even a charge.  It could just be something that someone said

20  in a prison or a probation officer heard or something like

21  that.  You know, a probation officer heard that maybe he

22  touched a niece or something like that, right, in an

23  inappropriate way?

24      MR. QUINLIVAN:  I don't think that one would be

25  certified under those circumstances under --

1          THE COURT:  But suppose -- see --

2          MR. QUINLIVAN:  I would --

3          THE COURT:  No one wants a child to be hurt on

4    their watch, so I've got to assume that Bureau of Prisons

5    people feel this way.  So when in doubt, they're going to

6    dump it to a federal judge, right?

7          MR. QUINLIVAN:  I don't think that's the case,

8    your Honor.  I mean, in fact, although it's not a part of

9    the record, I would note that, you know, there have been 53

10   certifications that have been made.  And I misspoke earlier

11   when I said that no one's been certified.  In fact no one's

12   been committed under the statute, but there have been 53

13   certifications.  This statute has been on the books since

14   July of 2006.

15          Now, if one looks to see that the Bureau of

16   Prisons is looking whether or not anyone who is being

17   released into the community meets the standards set forth in

18   the statute and we have 53 certifications to date, I think

19   your Honor can take judicial notice of the fact that this --

20   it is far from the situation your Honor envisioned where the

21   BOP is simply passing the buck to the federal judiciary.  I

22   think that given those statistics, one could make a fair

23   inference that it's been a very judicious application.

24          THE COURT:  Of the 53, how many don't have

25   convictions for sex offenses?

1        MR. QUINLIVAN:  I don't have the answer off the

2   top of my head.  I'm sorry, your Honor.

3        THE COURT:  Are there any in my horror parade

4   where there's no prior convictions for a sexually violent

5   offense?

6        MR. QUINLIVAN:  I'm not familiar with -- I think

7   that there are a total of nine here in this district.  The

8   majority are in North Carolina.  I don't know the factual

9   records of all 53.  I'd be happy to provide that information

10  to the Court.

11       THE COURT:  So if I were to say that there should

12  be proof beyond a reasonable doubt for any -- what I would

13  call the factual portion, not the -- in other words, I see

14  there are two kinds of findings that you have to make,

15  right?  One is whether or not they factually committed some

16  sort of sexually violent offense, and the second is more

17  predictive, which is, are they likely to hurt someone, or

18  are they likely to be dangerous in the future?  So if I were

19  to say that that should be a higher standard, once again,

20  you would say I can just do that rather than declare the

21  whole statute unconstitutional, is that right?

22       MR. QUINLIVAN:  I think that your Honor could

23  sever the part of the statute that provides for a clear and

24  convincing standard.

25       THE COURT:  But once you sever it, I mean, it then

1   provides for nothing.

2              MR. QUINLIVAN:  Well, your Honor would --

3              THE COURT:  Then rewrite it essentially is what

4   you're saying I should do.

5              MR. QUINLIVAN:  Well, no.  I think your Honor

6   can -- the statute would be severed with respect to that

7   particular aspect.  I would note -- and just I don't want to

8   necessarily move off your Honor's point, but I would note

9   that from our perspective, the Supreme Court's decision in

10  Addington suggests that one doesn't actually bifurcate the

11  differing levels, that actually you look at what the

12  standard of proof is as a whole.  And in fact, even in

13  Addington, the Court suggested that there may be some

14  preliminary factual determinations, and yet ultimately the

15  clear and convincing standard was held to be appropriate,

16  because you do have -- it's application of what is

17  inherently not a factual situation, the determination of,

18  you know --

19             THE COURT:  I forget, was Addington the acquitees,

20  or were they the incompetent ones?

21             MR. QUINLIVAN:  I'm sorry, that was for the

22  incompetent, that's right.

23             THE COURT:  So those were the ones where they had

24  been indicted for some sort of crime and found incompetent,

25  and so a lower court would have had to have found that they

1   actually committed the crime or not?  I don't remember.

2           MR. QUINLIVAN:  I don't think that's exactly how

3   the statute worked.

4           THE COURT:  All right.

5           MR. QUINLIVAN:  It was a civil commitment statute,

6   and in fact what the majority of courts have held following

7   Addington -- and this is really the point of departure --

8   is, you have these sort of two lines of authority, and post-

9   Addington the courts have found that the clear and

10  convincing statute is appropriate.  And I would note that

11  even Judge Britt in his opinion in reaching a contrary

12  conclusion cited to a Seventh Circuit decision, which we

13  note in our brief is a pre-Addington decision.

14          THE COURT:  That was early '70s or '80s?

15          MR. QUINLIVAN:  That's right, that's right.  But

16  just on the procedure of -- because I do think -- I know

17  your Honor is concerned about that, and I would just make

18  two points.  When we were before you, and I believe it was

19  in January or February when we were first setting up the

20  schedule, we made clear that the only -- we were willing to,

21  you know, brief the facial constitutional challenge, that

22  our only caveat was, we did not want this period to be

23  counted against us in any way or held that we had waived any

24  procedural due process protection.  It was my understanding

25  as well that the respondents affirmatively argued that they

1   did not want to go forward with any hearing till these --

2   now, I think they absolutely have the right to change that

3   position.

4           THE COURT:  It just has been a very long time.

5           MR. QUINLIVAN:  It has, and I'm not -- you know, I

6   think it absolutely has, but it has primarily because of the

7   litigation position which the respondents chose to take,

8   which was to make a broad facial challenge to the statute.

9   And I believe that they have every right to change their

10  position and at this point say, "We want to go forward with

11  the hearing," absolutely, but --

12          THE COURT:  But I think there are two kinds of

13  hearings we're talking about.  One is just some decision by

14  some neutral decision-maker that there's enough to hold the

15  person, and the second would be -- maybe you call it a

16  hearing, but I envision it looking like a full-blown trial.

17  Why wouldn't someone?  I mean, it's almost determined an

18  indefinite detention, right?

19          MR. QUINLIVAN:  With the exception that a jury

20  would not be constitutionally required.

21          THE COURT:  But would it be permitted; in other

22  words, if a court wanted a jury?

23          MR. QUINLIVAN:  I haven't thought about that

24  question.  I think your Honor is -- I can see your Honor

25  channeling Judge Young.  I can see that.  I should have

1   thought of that question because I'm sure he would have

2   presented that as well.

3           THE COURT:  Don't forget, the state courts here in

4   Massachusetts have a right to a jury trial.

5           MR. QUINLIVAN:  That's right.

6           THE COURT:  I can't remember if it's by statute or

7   by state constitution, but that's the way it's done in our

8   state.

9           MR. QUINLIVAN:  That's right.  I don't think it's

10  required.  Whether if a court wanted to go forward with one,

11  I don't have an answer.  Certainly it's not provided for in

12  the statute.  In our view, it's not constitutionally

13  required.

14          THE COURT:  Well, assume every judge so far has

15  basically said it's civil because it says it's civil, even

16  though it has a lot of stigma and certainly penalties in the

17  sense of they're in jail.  "Penalties" may be the wrong

18  word.  It has certainly a huge restriction on liberty.  But

19  just because you call it civil, I think Winship makes clear

20  you can still make it proof beyond a reasonable doubt,

21  right?

22          MR. QUINLIVAN:  That's right.

23          THE COURT:  All right.  And once it's proof beyond

24  a reasonable doubt, does that then trigger a right to a jury

25  trial?

1          MR. QUINLIVAN:  No, I don't think it does.  I

2    think that what's constitutionally required is set forth in

3    the Seventh Amendment, and this is not considered one of the

4    proceedings, and this would not be the kind of proceeding in

5    equity that historically has been held to require a jury

6    trial.  So I would start with that premise.  But, again,

7    when even in your Honor's invocation of Winship, I note that

8    Winship is pre-Addington, and we submit that Addington is

9    the correct point of departure for determining the burden of

10   proof in this instance.

11         THE COURT:  What's alluding me is exactly -- there

12   were some procedural protections in Addington that didn't

13   happen here, and I can't remember exactly what they were.

14         MR. QUINLIVAN:  If I could just address briefly,

15   your Honor did raise the question of the civil versus

16   criminal, and I would point out that it seems -- my

17   understanding is that a lot of the argument that's been made

18   is that, you know, it's been placed in 18 U.S.C.  I don't

19   think that's much of an argument for two points.  First off,

20   the provisions which surround this are all civil provisions,

21   and in addition --

22         THE COURT:  But I don't have to decide that

23   because you can require proof beyond a reasonable doubt in a

24   civil proceeding.

25         MR. QUINLIVAN:  Oh, that's right.  I -- that's

Page 41

1   right.

2           THE COURT:  It matters for them for ex post facto

3   and that sort of thing.

4           MR. QUINLIVAN:  That's right.

5           THE COURT:  But for me, I keep coming back to

6   every single Supreme Court case where the justices say, we

7   think it's appropriate in a civil commitment proceeding but

8   only if you have adequate levels of procedural and

9   evidentiary protections because of how severe the restraint

10  on liberty is.  And that's what I'm struggling with here.

11          MR. QUINLIVAN:  And I would submit that, again, I

12  think that the debate that we have on the standard is

13  whether we're talking about Winship or Addington being the

14  point of departure, and I think it is Addington, and I think

15  that what Judge Britt was focused on was -- again, he almost

16  bifurcated the analysis and said that, you know, you would

17  have to have reasonable doubt for the preliminary

18  determination, regardless of whether when you then get into

19  the determination of and mental evaluations, that might

20  suggest, per Addington, that it is something that can't be

21  beyond a reasonable doubt.

22          THE COURT:  Is it true, as the other side argues,

23  that this is the only statute in the United States among all

24  these that doesn't require first a conviction for a sex

25  offense?

1        MR. QUINLIVAN:  I'm not sure.  I can't point your

2   Honor to any other state that --

3        THE COURT:  That's what you say, right?  This is

4   the only one that doesn't piggyback off of a criminal

5   conviction for a sex offender?

6        MS. MIZNER:  The only statute in what sense, your

7   Honor?

8        THE COURT:  A sexually dangerous commitment

9   statute that doesn't first have a predicate of a conviction

10  for a sexually dangerous defendant?

11       MS. MIZNER:  Well, this is the only federal --

12       THE COURT:  No, I'm talking about if you look at

13  the state statutes.

14       MS. MIZNER:  I believe that's true.

15       MR. QUINLIVAN:  I think that there are a few, and

16  I have been informed both North Dakota and Illinois also,

17  and I'd be happy to provide some additional information.

18       THE COURT:  So you don't have to be there pending

19  a charge on sexually dangerous?

20       MR. QUINLIVAN:  That's right.

21       THE COURT:  All right.  So do you want to address

22  necessary and proper?

23       MR. QUINLIVAN:  Certainly, certainly, and let me

24  make two arguments with respect to that because I begin

25  with, again, one of the categories of people who are subject

1    to certification is very much akin to what the Supreme Court

2    upheld in Greenwood, in the sense that what the Supreme

3    Court said in Greenwood is, when you have somebody who the

4    government's power to prosecute has not yet been exhausted,

5    the government has the necessary and proper authority to

6    hold that person.  And while it may be true that the

7    majority of the people who have been certified to date are

8    people who are in BOP custody rather than people who under

9    4241(d) have been determined to be mentally incompetent to

10   stand trial, that is one of the categories of people who can

11   be certified under the statute.  So we would submit that

12   again applying the Salerno test, that is in itself

13   sufficient to defeat the facial challenge.

14            More broadly, I would point out, your Honor,

15   that --

16            THE COURT:  So you're saying Salerno doesn't allow

17   you to do a facial challenge if one large portion of the

18   people who are being affected would be affected across the

19   board?

20            MR. QUINLIVAN:  Absolutely, and the two exceptions

21   being --

22            THE COURT:  By category, I mean --

23            MR. QUINLIVAN:  That's right, that's right, and

24   the two exceptions that the Supreme Court has announced that

25   has expressly held where Salerno doesn't apply, or

1    implicitly has said that Salerno doesn't apply, is either

2    the First Amendment context or the abortion context.  And in

3    fact there was a debate between Justice Stevens and

4    Justice Scalia in the ADA case arising from Hawaii several

5    years ago where Justice Scalia was arguing that the Salerno

6    test should apply in the abortion context, and

7    Justice Stevens was arguing that the Salerno test should not

8    apply at all.

9             We're not dealing with either of those situations

10   here, and I think Judge Tauro correctly noted that that's

11   why it doesn't apply here.  And even if there's some doubt,

12   what the Supreme Court has repeatedly said, and I cite the

13   Agostini V. Felton case, is that if a Supreme Court

14   authority stands and yet somebody argues, "Well, subsequent

15   a Supreme Court authority has called that into question,"

16   you leave it to the Supreme Court to overrule its prior

17   authorities.

18            THE COURT:  So going back to Goldberg V. Kelly,

19   the old procedural due process nugget, so you would argue

20   you could never have a facial challenge to a statute that

21   permitted you to take away something that was protected

22   without a hearing simply because an agency might on its own

23   decide not to do it that way?

24            MR. QUINLIVAN:  I think that's right.  I mean, I

25   think that's why facial challenges are disfavored.  I mean,

1    I think you want to have -- courts generally want to have a

2    concrete set of facts before them before making those kinds

3    of weighty constitutional determinations.

4              THE COURT:  Could I say, across the board, it is

5    unconstitutional to keep someone past his prison term unless

6    a neutral fact-finder has found within a relatively brief

7    amount of time, whatever you want to call that, that there's

8    probable cause to believe they're sex offenders?

9              MR. QUINLIVAN:  Well, I don't think your Honor --

10   I would argue that your Honor should not so hold because in

11   a facial challenge, we know there can be situations where

12   that determination can be made prior to any period your

13   Honor could determine.  I think that you do --

14             THE COURT:  Although in fact it never has, right,

15   of the 53?

16             MR. QUINLIVAN:  That's right because, quite

17   frankly, in almost all of these cases, we're sort of in the

18   same procedural posture we are with this Court, which is,

19   it's been decided largely from the respondent's side that

20   they want to go forward with the constitutional challenges

21   first.

22             THE COURT:  Now, on the treatment end, can you

23   make a proffer one way or another whether or not Devens

24   plans to treat these people?

25             MR. QUINLIVAN:  I can't make a proffer.  All I can

1   say is that the statute itself makes two provisions.  One is

2   that, as your Honor noted it, it says that an attempt will

3   be made to have the states take these people, which I think

4   is something that should be taken into account with respect

5   to the federalism issue.  And then I would just note that,

6   again, we don't have a situation where anyone in fact has

7   been committed.

8         THE COURT:  Can I play this out?  So let's say the

9   states took them.  Who then has the obligation to review the

10  commitment?

11        MR. QUINLIVAN:  Well, I think ultimately it would

12  be -- you would still be in a situation where they've been

13  committed by a Federal Court, and the Federal Court would

14  have the obligation to review it.

15        THE COURT:  And there's no periodic review, right?

16  How does that review process go after the fact?  The inmates

17  or the petitioner can't petition more frequently than every

18  six months or something like that, right?  How does the

19  review process go at the back end?

20        MR. QUINLIVAN:  It's every year there are periodic

21  reports, and the respondent can petition at any time.

22        THE COURT:  So you would envision -- like, say,

23  Bridgewater is our state facility -- you would envision what

24  would happen here is, if Bridgewater took these people,

25  Bridgewater would send me a report every year or would send

1    the Bureau of Prisons a report every year?

2              MR. QUINLIVAN:  I think it would be the Bureau of

3    Prisons would be sending a report, but they obviously would

4    be consulting with the people --

5              THE COURT:  And that's it, so it would just be a

6    report.  There wouldn't be actually a hearing?

7              MR. QUINLIVAN:  Well, I think that's all that's

8    required, but, again, at any time the respondent has the

9    ability to ask for a hearing.

10              THE COURT:  In one of the statutes that went to

11   the Supreme Court, the court actually had to make a finding

12   year by year, and I think that's not here, right?

13              MR. QUINLIVAN:  That's not here.  I would say just

14   in response to my sister's argument about -- I think, you

15   know, we pointed out on the Tenth Amendment that private

16   individuals have no standing to make a Tenth Amendment

17   claim.  But I think there is one point where the Tenth

18   Amendment would come into play, and that was the suggestion

19   that somehow the federal government should, you know, force

20   the states to take these people if the federal government

21   has a concern.  That's where you would have a federal

22   commandeering.  I mean, the federal government, we can

23   petition, we can request the states.  Your Honor knows I

24   have another matter in front of your Honor where that very

25   issue is going forward, but the federal government can't

1    force the states.

2              THE COURT:  What is that?  Which one?

3              MR. QUINLIVAN:  It's the Mr. Phelps matter trying

4    to get him into the Vermont facility.

5              THE COURT:  Oh, Phelps.

6              MR. QUINLIVAN:  So it presents -- and I just use

7    that as an example, but that's a situation in which the

8    Bureau of Prisons is trying to have a state facility take

9    custody, and it's something that the Bureau of Prisons can

10   request but ultimately can't force the state.

11             THE COURT:  So that's a good example.  Suppose you

12   were to not get a state to agree to it.  Why should they

13   after all, it costs them money?  So would Fort Devens be

14   providing treatment?

15             MR. QUINLIVAN:  Fort Devens, in those situations,

16   yes, it would have to be the Federal Medical Center that

17   would be providing treatment.

18             THE COURT:  So is it the federal government's

19   representation that there would be treatment?

20             MR. QUINLIVAN:  Yes.  Now, I can't represent to

21   the Court what that treatment will be.

22             THE COURT:  Are there plans or is it in the

23   regulations to come up with a game plan for treatment?

24             MR. QUINLIVAN:  Your Honor, if I could have just

25   one moment.

1          (Pause.)

2          MR. QUINLIVAN:  Your Honor, Ms. Hong is actually

3    much more familiar with this particular aspect.

4          THE COURT:  I would be delighted to hear from her.

5          MS. HONG:  Good afternoon, your Honor.  With

6    regard to treatment, the statute actually provides that a

7    person may be discharged if they are no longer sexually

8    dangerous, one, or, second, if on a prescribed regimen of

9    medication or treatment the person would no longer be

10   sexually dangerous.  The statute contemplates that if a

11   person can get better with treatment, that they shall be

12   released.  That implicitly suggests, and you may infer from

13   that, that treatment would be provided to persons who --

14         THE COURT:  Do you work with Justice now?

15         MS. HONG:  I work in Main Justice in the Civil

16   Division in federal program regs, your Honor.

17         THE COURT:  So are you working with the Bureau of

18   Prisons to develop such a treatment program?

19         MS. HONG:  I'm not part of the Bureau of Prisons.

20   I've been working with Bureau of Prisons to understand the

21   sort of statutory scheme and regulations that they have in

22   place.

23         THE COURT:  Are there any plans to create that

24   kind of a --

25         MS. HONG:  You know, I don't know that there are

Page 50

1    federal regulations that are being proposed right now.  The

2    Bureau of Prisons is taking it one step at a time.  The

3    first fed regs that were issued in the NPRM in August --

4            THE COURT:  Somebody here wants to talk to you

5    very badly.

6            (Discussion off the record.)

7            THE COURT:  You know what, I think this might be

8    better done through a letter afterwards or something like

9    that.

10           MR. QUINLIVAN:  Yes, certainly, your Honor.

11           THE COURT:  Do you want to respond at all?

12           MS. MIZNER:  Sure.  In terms of the defendant's or

13   the committee's right to seek release, he can or she can

14   request a hearing to determine whether the person shall be

15   discharged, but not within six months of a court

16   determination that the commitment shall continue, and there

17   is no rights to an annual hearing as there is in connection

18   with other statutes.  There's a report, that's it.  If the

19   court then continues the commitment, the person cannot seek

20   release within six months of that date under the statute,

21   under 4247.

22           THE COURT:  Is that unusual among the state

23   statutes?

24           MS. MIZNER:  I believe so, your Honor.  I don't

25   have a listing of all of the state release procedures.  I've

1   got a compilation of which require beyond a reasonable doubt

2   which require jury trials, but I can get that information.

3          THE COURT:  Your brother represented that

4   North Dakota and Illinois don't first require a conviction

5   for a sex offense to trigger the commitment statute.  Do you

6   know one way or another?

7          MS. MIZNER:  I will check that.  Illinois does

8   require proof beyond a reasonable doubt.  North Dakota does

9   require a probable cause hearing.  I'm not sure whether or

10  not -- I will check that.

11         THE COURT:  All right, is there anything else that

12  you wanted to respond to?  The briefing was so outstanding

13  that it's hard to believe --

14         MS. MIZNER:  Well, I have the Federal Register

15  citation for the Court.  It's 72 Federal Register at 43205.

16         And in terms of Addington, I would note that we're

17  talking there about a state civil commitment statute, and in

18  Addington, the Texas statute did provide for a trial by

19  jury.  And the court in upholding the clear and convincing

20  standard talked a lot about the state's interest and

21  responsibility in parens patriae as opposed, I would argue,

22  distinguishable from the federal interest which is much more

23  limited.  They're talking about the state's interest.

24         They also note the stigma attached and the severe

25  restriction on liberty, but I think part of the basis for

1   the decision in Addington is the nature of the decision that

2   is being made.  The court said that "How can you make this

3   predictive finding beyond a reasonable doubt?" which I think

4   is one of the problems with this whole area in terms of the

5   predictive findings, which raises the issue that was not

6   addressed, it was not raised, I don't believe, in the

7   North Carolina proceedings, and --

8           THE COURT:  So this is the psychiatrist who said

9   it's impossible?

10          MS. MIZNER:  Right.

11          THE COURT:  You're raising it, and you preserved

12  it.

13          MS. MIZNER:  Okay.

14          THE COURT:  The issue is, really, Congress has

15  found and the Supreme Court has found and basically every

16  court has said that you can make certain predictions; and

17  while psychiatry isn't perfect, it doesn't mean you have to

18  release everybody.

19          MS. MIZNER:  Sure, and a lot of those were

20  pre-Daubert, and we're saying that Daubert set certain

21  gatekeeping standards for the kinds of evidence that --

22          THE COURT:  Now, that's what I think needs to be

23  done in this case by case.

24          MS. MIZNER:  -- that the court can hear.  The

25  purpose of this was to raise before the Court Dr. Kriegman's

1    position that there is no set of circumstances under which

2    the evidence can meet the Daubert standard.  Therefore, that

3    would make it a facial challenge.  And in terms of the

4    facial challenge --

5              THE COURT:  That's essentially invalidating

6    Congress' finding that you can make that prediction.

7              MS. MIZNER:  Saying that the state of the science

8    at this particular point in time is such that it cannot meet

9    the standard that Congress set.  Congress set a standard,

10   said that you have to establish by clear and convincing

11   evidence that this is a danger.

12             THE COURT:  Suppose -- go back to my parade of

13   horribles -- you have a guy who's got two or three prior

14   convictions for touching, and he's told somebody that he

15   can't control himself in a credible way, a staff

16   psychiatrist, somebody, or a probation officer.  Why can't

17   you say that's enough for clear and convincing?

18             MS. MIZNER:  Well, that's an admission.  If you're

19   saying that that's an admission by the person, that's

20   different from -- that's a different kind of evidence from

21   someone saying, "I'm giving someone the Static-99, and I am

22   concluding from that that this person poses a future

23   danger."

24             THE COURT:  So eliminate the admission.  Some

25   person has raped a little girl four times, a different

1    little girl each time he gets out.  You can make predictive

2    forces about that.

3            MS. MIZNER:  Well, I suppose that would also

4    depend on what kind of treatment was provided and how you

5    view the efficacy of any treatment that was provided during

6    the last one.

7            THE COURT:  I'm just simply saying -- you've made

8    the point -- I'm not likely to go off that way, but I am

9    definitely going to think about these other issues.  But let

10   me just simply say this:  I am worried that this is taking

11   so long and I've got these three individuals.  I have no

12   idea what their backgrounds are.  I have no idea if probable

13   cause would be a slam dunk for the government or whether it

14   wouldn't be.  I have no idea what a probable cause hearing

15   would even look like other than it's got to be either by me

16   or a magistrate judge or somebody who will look at it.  I

17   think under the statute, I don't see any reason why a

18   magistrate judge couldn't be the one.  They're the ones who

19   make the preliminary bail hearings as well as the

20   preliminary findings on a probation revocation, so I see no

21   reason why constitutionally, for a probable cause kind of

22   hearing, it couldn't be a magistrate judge.  But most

23   importantly, I just want to know if you want it, so that

24   while this is being briefed and written by me and resolved

25   by the First Circuit, maybe the Supreme Court, these people

1    aren't just sitting there, if there's not enough to even

2    hold the probable cause.  Or, for that matter, I wondered

3    whether you'd have a whole hearing subject to your

4    constitutional challenges, and then you could challenge it

5    all as it was all going up to the appellate systems.  I

6    mean, my guess is, there's going to be a First Circuit

7    ruling and a Fourth Circuit ruling and at some point maybe a

8    Supreme Court ruling.  I mean, I've just got to assume that

9    that's true, right?  That at least the two circuits will

10   rule.  And so if there's a split in that, I imagine there

11   will be a Supreme Court ruling.  So I just don't want while

12   all this is happening their rights not to be respected.

13   Maybe they won't be found by even the clear and convincing

14   standard to be posing a threat.  So would you please think

15   about that because we can do this on a double track.

16          MR. FICK:  I think that's right.  Now that the

17   briefing at least of these big issues, so to speak, is done,

18   I think we would like to proceed, at least begin to proceed

19   to actual hearings.  Whether we do it in two steps with a

20   probable cause hearing immediately or in a very short time

21   followed by a big hearing, or whether we go straight to the

22   big hearing, we need to sit down and talk about that with

23   our clients and among ourselves.

24          THE COURT:  Are they all my cases, or did I take a

25   couple of others?  Do you remember?

1          MS. KELLEY:  This is all the cases you have as far

2     as I know.

3          THE COURT:  I took them as MBDs, and one

4     apparently got drawn to Judge Tauro, and I don't know if

5     there are others out there and what's happening to them.

6          MS. KELLEY:  Judge Tauro has two, Judge Wolf has

7     one, Judge O'Toole has one.  We're filing essentially an

8     identical motion, the constitutional challenging each of the

9     cases.  But if I may, your Honor, we would very much like to

10    proceed to the hearings, and, of course, I have to speak

11    with the clients further about this.  And to that end, we

12    have exchanged some limited discovery letters.  We expect to

13    file a final letter with the government within the next,

14    say, two weeks.  When we get their response, I think we're

15    going to just come to the Court then with any disputes we

16    have, and we will then be ready to begin the process of

17    getting to the individual hearings, which, as your Honor

18    noted, we are imagining will be like bench trials.

19         THE COURT:  Well, why don't I hold, for want of a

20    better word, a status hearing in two weeks.  Does that make

21    some sense?  And you can talk with your clients.  You, the

22    government, can figure out what you want to do.  Have any of

23    these actually gone through a commitment proceeding yet?

24         MS. HONG:  Not yet, your Honor.

25         MR. QUINLIVAN:  No.

1          MS. HONG:  They're all in the same procedural

2     postures.

3          THE COURT:  My goal will be to set a date for

4     either a probable cause hearing or the final hearing, or

5     both, and we can talk about what that would look like

6     procedurally while I'm doing this piece of it.

7          MS. KELLEY:  Well, one thing we would be asking

8     the Court to do, I think, at this next date is to appoint

9     the expert as the statute requires, and then we do have this

10    70-day or 75-day clock running for the expert.  I mean, as

11    we all know --

12         THE COURT:  Now you're behind.  Just give me a

13    proposed order and I'll -- who do you want?  Do you have

14    somebody?

15         MS. KELLEY:  Well, we've already been discussing

16    that with the government, and we will have an order ready

17    for you shortly.

18         THE COURT:  If you agree, I agree.

19         MS. KELLEY:  Great.

20         THE COURT:  If you don't, I'll deal with it in two

21    weeks.  Does that seem fair to you?

22         MS. KELLEY:  Yes.  I mean, just, also, we really

23    appreciate the Court's concern over the time period here.

24    Everything Mr. Quinlivan said about our concessions about

25    the probable cause, et cetera, are completely accurate.  But

1    the clients, as your Honor is intuiting, are really wanting

2    to get to their hearings now.  So we're prepared for that,

3    and I think a two-week status date is a wonderful idea.

4            THE COURT:  Okay, so my plan is, nobody's waiving

5    anything.  We're going to be on two tracks here.  One is

6    resolving these individual people's problem, and the second

7    is handling the facial challenges to the statute and the

8    standards of proof and the like.  And I may make certain

9    judgments in the course of individual hearings, and

10   obviously one side or the other will object, and then the

11   whole thing can go up on a record too.  So we're just going

12   to jump start this at this point, and I think that's in

13   everyone's interest.  Are they all local at this point

14   still?  They're not down in North Carolina, right?  They're

15   all in Devens?

16           MS. MIZNER:  That's correct, your Honor.

17           MS. KELLEY:  All of the people who were certified

18   in this district are being held in Devens.  There's nobody

19   out of district.

20           THE COURT:  Good.  So two weeks.  Robert, when

21   should we do it?

22           THE CLERK:  October 1 at 3:00 p.m.

23           THE COURT:  And, now, 75 days, I'm sure I had a

24   resonance of people because it probably sounded like a

25   Speedy Trial Act.  So my thought would be that we would be

1    trying it before year end.  Now, can I do three of them?  I

2    don't know.  I don't know.  I've got to assume you don't

3    want to do them all together.

4            MS. KELLEY:  Well, we have several other issues to

5    litigate prior to the hearings; for example, the use of

6    their treatment records.  It's my understanding the

7    discovery is not yet complete, but the men who were in the

8    treatment center at Butner signed release forms before the

9    SDP law was in effect, so they had no idea the release form

10   they were signing was going to be used -- the records were

11   then going to be used to commit them for life.  So we're

12   going to be challenging the introduction of some of their

13   records at the hearings and so on.  And there's also issues.

14   Mr. Wetmore was interviewed and made some admissions to the

15   people who interviewed him as part of the certification

16   process.  He asked for a lawyer, which was denied, so we're

17   going to need to litigate that, although if the process is

18   not criminal, that may be a short part of the litigation.

19   But, at any rate, we do have some --

20           THE COURT:  You need to preserve everything.

21           MS. KELLEY:  Yes, yes.

22           THE COURT:  But even once we get past all that,

23   the issue is also, from the government's point of view,

24   whether I should -- if there's anything objectionable to

25   doing an advisory jury or whether I should do it myself.

1    These were the most hated parts of state court jurisdiction,

2    let me just say it.  It's a very difficult thing to make

3    predictions, and it might be useful to have an advisory

4    jury, but I'm not sure whether, A, I can, or, B, I will.  So

5    let's just think about all these issues as we go through it.

6              MR. FICK:  Your Honor, I'm sorry to jump

7    backwards, but I wanted to answer a question you asked

8    earlier, and that was, had there been any commitments of

9    people who had no touching offenses?  And one of my clients

10   in front of Judge O'Toole has predicates of only interstate

11   travel to meet a cop and child pornography.  So to answer

12   the question, yes, we know of at least one case in which

13   there was no touching offense.

14             THE COURT:  Thank you.  My guess is, there was a

15   transcript there that was hurtful to your client, right,

16   what he wanted to do?

17             MR. FICK:  At this point, frankly, I don't know.

18   Yes, there was certainly an Internet talk between these

19   people; but, you know, talk is cheap, and it's not a

20   touching offense, so that's what the bottom line is.

21             THE COURT:  Thank you.  That's useful to know.

22   Anything else?

23             MS. MIZNER:  I'd just like to submit a letter or a

24   short memo to the Court addressing some of the questions on

25   severability, jury trial, and --

1    THE COURT:  Yes, that's the one that just -- I

2    don't do that many of these, and so obviously the one thing

3    the Supreme Court keeps insisting on is appropriate

4    procedural and evidentiary mechanisms.  And I don't know if

5    I say, "Well, this isn't good, this isn't good."  Can I just

6    do my little checklist and just say "Do it"?  Or do I say to

7    the Justice Department/BOP, "Do it," by regulation or by

8    fiat?  Or do I have to say to Congress, "This isn't good

9    enough, and it goes to the heart of what you're doing, and

10    therefore the whole statute is unconstitutional"?  That's

11    the piece that I'm worrying about, and I don't know what the

12    answer is, and I don't get this that often, thank goodness.

13    MS. MIZNER:  We'll try to address that.

14    MR. QUINLIVAN:  And we will as well, your Honor.

15    THE COURT:  Thank you.  That would be very useful.

16    I think the last time I had something like this it was the

17    Dairy Compact, so it was a little more complex.  Anyway,

18    thank you very much.

19    THE COURT:  Can you do that like within a week?

20    MS. MIZNER:  Yes, your Honor.

21    MR. QUINLIVAN:  Yes.

22    THE COURT:  And if you need a few more days, just

23    let us know.

24    MR. QUINLIVAN:  Certainly.

25    (Adjourned, 4:30 p.m.)

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5

6

7          I, Lee A. Marzilli, Official Court Reporter, do

8  hereby certify that the foregoing transcript, Pages 1

9  through 61 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in MC No. 06-10427, United States

11 of America V. Jeffrey Shields, and thereafter by me reduced

12 to typewriting and is a true and accurate record of the

13 proceedings.

14          In witness whereof I have hereunto set my hand

15 this 12th day of May, 2009.

16

17

18

19

20

                   /s/ Lee A. Marzilli
21          _____

                   LEE A. MARZILLI, RPR, CRR
22                 OFFICIAL COURT REPORTER

23

24

25