```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,        )
                                 )
               Petitioner        )
                                 ) CA No. 07-12056-PBS
          -VS-                   ) CA No. 07-12058-PBS
                                 ) CA No. 07-12059-PBS
JEFFREY SHIELDS, JOEL WETMORE,   ) Pages 1 - 35
and CHARLES PEAVEY,              )
                                 )
               Respondents       )




                       STATUS CONFERENCE

             BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE






                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         March 13, 2008, 10:15 a.m.
```

```
                      LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
                 United States District Court
                 1 Courthouse Way, Room 3205
                      Boston, MA  02210
                       (617)345-6787
```

054eedf1-789e-4cef-aba6-c5686222d2e2

1    A P P E A R A N C E S:

2         TIMOTHY Q. FEELEY, ESQ. and MARK J. GRADY, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the Petitioner.
4
          PAGE KELLEY, ESQ, Federal Defenders,
5    408 Atlantic Avenue, Boston, Massachusetts, 02210,
     for the Respondents.
6
          JOHN G. SWOMLEY, ESQ. and ERIC TENNEN, ESQ.,
7    Swomley & Associates, 227 Lewis Wharf, Boston,
     Massachusetts, 02110-3927, for the Respondent.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

054eedf1-789e-4cef-aba6-c5686222d2e2

1              P R O C E E D I N G S

2              THE CLERK:  The case of the United States V.

3    Jeffrey Shields, Civil Action No. 07-12056, the United States

4    V. Joel Wetmore, Civil Action 07-12058, and the United States

5    V. Charles Peavey, Civil Action 07-12059, will now be heard

6    before this Court.  Will counsel please identify themselves

7    for the record.

8              MR. FEELEY:  Good morning, your Honor.  Timothy

9    Feeley and Mark Grady for the United States.

10             MS. KELLEY:  Good morning, your Honor.  Page Kelley

11   with Eric Tennen and John Swomley, and I'm standing in for

12   Bill Fick, who represents Charles Peavey, and we also

13   represent Mr. Wetmore and Mr. Shields.

14             THE COURT:  Thank you for coming in.  We scheduled

15   this simply because I was sensing -- I have some

16   frustration.  The problem here seems to be getting experts

17   who have the documents they feel that they need and are

18   moving quickly enough to let us all then move.  I'm not sure

19   whether things move more smoothly in the state because they

20   have these designated hitters, but I think, based on a phone

21   call Mr. Alba made, that at least Dr. Plaud is going to be

22   filing his report today.  Have you seen it?

23             MR. FEELEY:  The government has not, your Honor.

24             MR. SWOMLEY:  We have not either.

25             THE COURT:  I know this is a little awkward because

1   he's technically a court expert, so we've called him.   I

2   thought we would set a schedule under two scenarios:   One is,

3   if he came back, quote/unquote, saying "He's not sexually

4   dangerous," I'm assuming you would not want to designate your

5   own expert.   Is that correct?

6           MS. KELLEY:   That's correct.

7           THE COURT:   But you would have Dr. Tomich all ready

8   to go, right?

9           MR. FEELEY:   That is correct.

10          THE COURT:   So that case would be immediately ready

11  to go is my view, and we should do it promptly.   If, however,

12  he comes back and says "sexually dangerous," as I understood

13  what you said, you needed to get an expert for your side,

14  right?   And then that might take a little longer.

15          I haven't talked to him at all, so I literally have

16  no idea what he's going to do, but I thought what we could do

17  today is set two alternative dates, one if he came out one

18  way and one if he came out another way.   And I'm very eager

19  to get at least one of these under our belt because I'm

20  learning as we're going on the pitfalls of this, as I'm sure

21  you are.

22          So on an institutional level -- well, anyway, so

23  let me just ask this.   I know Mr. Alba started to go through

24  dates with all of you.   Assuming he comes back today and

25  says, the way his initial instinct had been, before he saw

054eedf1-789e-4cef-aba6-c5686222d2e2

1    this other stuff, so who knows, but -- and says, "Not

2    sexually dangerous.  I've looked at it all.  I've thought

3    about it a second time.  Not sexually dangerous," can we try

4    this case within the next week or so?  Everyone should be up

5    and ready to go.

6            MR. FEELEY:  You know, your Honor, we inquired of

7    Dr. Tomich just to see what his generally availability was,

8    but we didn't ask him how he was in the next couple weeks in

9    March.  We know what his schedule basically is April

10   forward.  When we get the report, obviously, we have to give

11   it to Dr. Tomich, and then we would need some reasonable

12   period to prepare.

13           THE COURT:  Sure, but I'm thinking a couple of

14   weeks, not a --

15           MR. FEELEY:  And the government would have no

16   problem with that.  I just don't know what Dr. Tomich's

17   availability is in March because we didn't ask him for March,

18   your Honor.

19           THE COURT:  I'm just saying, I understand from

20   Dr. Plaud, because I've been so worried about why -- I mean,

21   really it's not been any fault of any of yours; it's been his

22   not presenting a report.  And he's our guy, all right?  So I

23   can't do anything without him.  I think in the future with

24   the others -- I'm learning -- I'm just going to give an order

25   with a deadline.  And if the expert -- I think that puts

1   pressure on an expert.  I mean, the reality is, I'm not going

2   to cart them off in chains if they don't meet it, but it at

3   least puts some time closure on it.

4           But he says he's coming today, so is there a date

5   in March when I can do this, or April, and then get one of

6   these under our belt, and let me learn with you as to how

7   these things play out?

8           MS. KELLEY:  I'm wondering if we could go to early

9   April because I also have witnesses I didn't ask about March

10  but I know about April for.  I mean, there are some issues.

11  For example, if Mr. Plaud writes a report and then Dr. Tomich

12  writes a new report, I just think we need some time to get

13  ready for these experts.

14          THE COURT:  Although we were all set and ready to

15  go, right?  And so if he comes back the same way -- you were

16  all -- wasn't it the day after New Year's we were going to do

17  it?  So let's come up with a few dates for Shields.

18          MS. KELLEY:  How about April 7?

19          MR. SWOMLEY:  April 7, that week is fine.  I need

20  help moving some other lesser things, but, yes.

21          THE COURT:  How long do we anticipate this might

22  be?

23          MR. SWOMLEY:  I can only tell you how long I

24  have -- I mean, you do half days and not full days, and

25  easily two weeks with all of that.

1        THE COURT:  I have, let me just say, another

2   criminal trial which is ancient on that day which keeps

3   getting bumped.  What's that date I get back, April --

4        THE CLERK:  That you get back?  That would be --

5        THE COURT:  April 26?

6        THE CLERK:  The 28th, you get back that day.

7        THE COURT:  No.  I get back Sunday.

8        THE CLERK:  The 28th

9        (Discussion off the record.)

10        THE COURT:  Okay, so maybe --

11        MR. SWOMLEY:  Judge?

12        THE COURT:  What?

13        MR. SWOMLEY:  I start a May 2 murder trial, and

14   that's been --

15        THE COURT:  That's been the problem all along?

16        MR. SWOMLEY:  Well, that's the one that's been set

17   in stone, really.  It was moved from February, and that's

18   basically --

19        THE COURT:  Okay.  Isn't it hers, or are you doing

20   it together?

21        MR. SWOMLEY:  I'm doing the science, so, yes, we're

22   doing it together.

23        THE COURT:  I'm assuming you're putting "science"

24   in quotes from your point of view?

25        (Laughter.)

1          MS. KELLEY:  Or lack thereof.

2          THE COURT:  Well, we can do it -- we have a

3    criminal trial on April 7, and I go out of town for a week

4    April -- but I could do it the 14th.

5          MR. SWOMLEY:  That's fine.

6          THE COURT:  But I leave -- that's only a week, and

7    then I'm going out of town, so that if there was a problem, I

8    could jump over that.  So is this really going to be within a

9    week, a verdict within that, or --

10          MR. FEELEY:  I think Mr. Swomley just said it's

11    two.  The government has never done one of these, your

12    Honor.  I would have looked at the case and thought it was a

13    week, but Mr. Swomley has the experience in state court.

14    He's going to be the cross-examiner of our expert, and he may

15    have a better sense than we have.

16          THE COURT:  Here's the thing:  I'm going out of

17    town school vacation week.  So that's generally okay because

18    a lot of people can't sit that week, so I can either go a

19    week, jump it, or just start it on the 28th.

20          MR. SWOMLEY:  Well, the problem with starting it on

21    the 28th, it would definitely spill into May 2.

22          THE COURT:  Then you have the May issue.  So it

23    looks like we're going to have to go into May, right?  Three

24    weeks in May, is that it?  You have a three-week trial, is

25    that what the problem is?

1          MR. SWOMLEY:  This murder trial is going to take a

2     long time, yes.

3          THE COURT:  Is it possible to do it -- what's the

4     week before that? -- like, the week of March 24th?

5          MR. SWOMLEY:  That's a week away.

6          THE COURT:  Is that a Monday?

7          MR. SWOMLEY:  March 24 is a Monday.

8          THE COURT:  Now, of course, this is --

9          MR. FEELEY:  Your Honor, that's only a week from

10    Monday.

11         THE COURT:  Yes.

12         MR. FEELEY:  And we don't even have Dr. Plaud's

13    report, and Dr. Tomich is going to have to do a further

14    report based on the additional documents that he got as

15    well.  But he's waiting and we've asked him to wait until we

16    get Dr. Plaud's report.

17         MR. SWOMLEY:  Oh.

18         THE COURT:  What?

19         MR. SWOMLEY:  I didn't -- it hadn't clicked that

20    Dr. Tomich hadn't seen any of the wave of --

21         THE COURT:  Well, what are the dates you all come

22    up with in terms of what you're both available for?

23         MR. SWOMLEY:  We had jumped all the way into June,

24    but --

25         MS. KELLEY:  I wonder if we could do late May,

1    perhaps starting the 19th?

2           MR. SWOMLEY:  I'm happy to schedule it then.  I may

3    still be going.  But that's fine.  I mean, I don't mind

4    back-to-backing.

5           THE COURT:  May 19?  I've got two graduations in

6    June, which means that those are going to be choppy weeks.

7    I'm not out whole weeks, you know, but May 19 we could do

8    one.  We can do another one end of June, and we can do

9    another one in July.  Does that make some sense to you?

10          MR. FEELEY:  That's fine with the government, your

11   Honor.

12          THE COURT:  Is that acceptable to you?

13          MS. KELLEY:  Yes.

14          MR. SWOMLEY:  I'm scheduled to do training on --

15          THE COURT:  Now, excuse me, if your murder trial

16   goes off --

17          MR. SWOMLEY:  And it's still going, what do we do?

18          THE COURT:  No, no, no, no.

19          MR. SWOMLEY:  Oh, you mean goes off the calendar.

20   Oh, I see.  I doubt that, but okay.

21          THE COURT:  Maybe.  Everyone says that to me, and

22   it happens.

23          MR. SWOMLEY:  No, I know, I know.

24          THE COURT:  I want those dates, I want those weeks

25   in there.  So quickly just regroup and bring Shields in the

Page 11

1   beginning of May.

2           MR. SWOMLEY:  Okay.

3           THE COURT:  Because that's the only reason we can't

4   do it then.  I have two criminal trials on for April 7 and

5   another criminal trial on for the week before, and so that's

6   why --

7           MR. SWOMLEY:  Do you think that the April ones

8   might not go, and you want to have us back up?

9           THE COURT:  I never know.  One is Mr. Feeley's,

10  actually, so --

11          MR. FEELEY:  And we're hoping to know this week,

12  your Honor.

13          THE COURT:  And one is United States V. Kamen,

14  which has just got a long -- Charlie Rankin for the defense

15  and Paul Moore for the prosecution.  And then there's one

16  with Toni Leoney for the prosecution and Elliot Weinstein for

17  the defense.  I've got those two backed up.

18          MR. SWOMLEY:  You'll have fun.

19          THE COURT:  I know.  But, in any event, what we're

20  going to do is take these days, but the only reason I'm not

21  doing it earlier in May is because of this murder trial, and

22  this is your request.

23          Let me just ask you.  You could do it, Ms. Kelley.

24  You want this.  You think it's better for your client, right,

25  to wait until Mr. Swomley can be here --

1        MS. KELLEY:  Yes, that's correct, absolutely.

2        THE COURT:  -- for the science?  So we'll do that.

3        MR. SWOMLEY:  And know that we're boxing me on the

4  May 2 trial date.  I just --

5        THE COURT:  Yes, but you're just doing the science

6  and you do this every day.  I bet you dream this stuff, so --

7        MR. SWOMLEY:  It's just my availability.

8        THE COURT:  I saw you.  You don't even have notes,

9  so --

10        MR. FEELEY:  We're probably going to have to work

11  with Dr. Tomich's schedule too because he does have things in

12  the middle of May, but it seems to me that we ought to be

13  able to schedule around him.

14        THE COURT:  Yes, so pick the date, Robert.

15        MR. SWOMLEY:  Could we just pick the 20th, if for

16  no other reason than I am actually scheduled to do an MCLE

17  training of SDP on May 19.

18        THE COURT:  No, May 19.  I don't have a choice.

19        MR. SWOMLEY:  Oh, okay.

20        THE COURT:  But you don't necessarily have to be

21  here on that date.  It's usually just the impaneling and the

22  opening and the government -- well, it might be, it might

23  be.  Your first witness would probably be who?  I don't even

24  know what happens in these cases.

25        MR. FEELEY:  Well, I'd like -- you know, we would

1   expect it to be -- you know, we haven't really sat down to

2   see what could be agreed upon as far as documents, but our

3   first witness will probably be Dr. Tomich.  Now, we may take

4   a deposition of Dr. Plaud in the interim, your Honor.

5           THE COURT:  I see.  So talk this through with me.

6   Technically he's my witness, so it may be I would want him to

7   go on first.  Or you could argue that he should be the person

8   after everybody else.  He's not part of either of your cases.

9           MR. SWOMLEY:  The government has the burden.  If he

10  can't help them sustain their burden, wouldn't it be --

11          THE COURT:  But you wouldn't want to be calling him

12  because he's technically my witness, right?  I'm thinking out

13  loud.  I'm thinking out loud here.

14          MR. SWOMLEY:  If he, for example, clears

15  Mr. Shields, my view is, and the government still wants to go

16  forward, that since they have the burden, they should have to

17  put their witness on first, and then Dr. --

18          THE COURT:  If he doesn't --

19          MR. SWOMLEY:  If he doesn't clear him, you're

20  right, I think you could go with him first and then --

21          THE COURT:  I don't know.  I'm thinking out loud.

22  So what happens in the state?  Who goes first?

23          MR. SWOMLEY:  The government goes first in all

24  respects.

25          THE COURT:  Well, what happens when there's a split

1   between the two?

2          MR. SWOMLEY:  They just don't call the government

3   expert that would clear, and they go forward with the

4   witnesses that --

5          THE COURT:  It makes some sense.  There's always a

6   debate in the literature when a court designates an expert,

7   how do you actually put them on so you don't give it undue

8   weight?  I've never really done it, so it's just an

9   interesting question.  And also whether I should even reveal

10  that he was a consented-to court-appointed examiner; does

11  that give undue weight to one side's position than another?

12  We need to talk about those things.

13         MR. SWOMLEY:  I can tell you how it normally plays

14  out.  Basically there is a cross-examination of both sides.

15  Basically the government often tries to suggest that their

16  own expert is part of a pool that is independent, and we

17  obviously cast that as the government's, and then --

18         THE COURT:  I can deal with that later.  Right now

19  I just need a date.  So the date is, Robert?

20         MR. FEELEY:  The 19th.

21         THE COURT:  The 19th.  And backing up from that,

22  you get Plaud.  Now, suppose he comes out, quote/unquote,

23  "for the government," when can you get us a contrary expert

24  report?

25         MR. SWOMLEY:  If in fact this report comes in today

1    and we learn that -- we're in March -- I see no reason why

2    that would slow the process down for a May 19 date.

3             THE COURT:  Yes, but you've got to give me a date

4    your expert can create a report.

5             MS. KELLEY:  I think we have to talk to the expert.

6             THE COURT:  Give me a ballpark.

7             MR. SWOMLEY:  A month from today.

8             THE COURT:  A month, okay, so we'll put that down.

9             MR. SWOMLEY:  Assuming that Devens doesn't have

10   difficulty in getting them in, basically that would be the

11   rough time frame.

12            THE COURT:  So that would be April, let's say,

13   13th.  It still gives you plenty of time.  When would

14   Dr. Tomich be able to get any report in if it comes out for

15   the -- supplemental report if it comes in for the defense?

16            MR. FEELEY:  Well, we were going to ask him to do a

17   supplemental report after Mr. Plaud's.

18            THE COURT:  So why don't we keep the same date.

19            MR. FEELEY:  So we'll get -- we'll disclose any

20   supplemental report by Dr. Tomich as soon as we have it.

21            THE COURT:  And no later than a month for both

22   sides, and that way I'm not back here where I am, and you can

23   tell your expert there's actually a date.

24            And then in terms of the pretrial order, we'll send

25   out our classic one.  I think you've already done it in

1   Shields.

2           MS. KELLEY:  Well, you know, speaking of that,

3   there are these pesky civil rules.  There's this very

4   elaborate report that Jennifer Boal and I started filling

5   out, and what I think we'll do with --

6           THE COURT:  Pesky civil rules, you mean the joint

7   pretrial memo?

8           MS. KELLEY:  Yes, and --

9           THE COURT:  Aren't you glad you're doing criminal

10  mostly?

11          MS. KELLEY:  I love it.  I never knew it, but I'm

12  glad.  I think, if it's okay with the Court, once we hear

13  from Mr. Plaud and we get those -- we know, are we hiring

14  another expert, are we asking for another expert, et cetera,

15  I think the government and the defense can kind of work out a

16  schedule for filing that with the Court and, you know,

17  telling each other their experts and their witnesses and so

18  on.

19          THE COURT:  Perfect.  Okay, now let's get to

20  Dr. Prentky.  We try to call these people, and then it takes

21  days to get return calls.  So Dr. Prentky's problem is that

22  he hadn't been receiving things from Mr. Fick apparently.  He

23  just hasn't even started on his report because he's been

24  waiting for Mr. Fick's review for privilege.  Does that ring

25  a bell with anybody?

1          MR. FEELEY:  It does, your Honor, and I have spoken

2     with Mr. Fick about it.  The last time we were here in court

3     the government was authorized to send out subpoenas.  We sent

4     them out.  They were complied with by a number of health care

5     providers, your Honor.  Some documents came in to us; some

6     went directly to Mr. Fick.  We didn't even open what came to

7     us.  We sent them all over to Mr. Fick.  He was hoping that

8     he could finish his privilege review this week.  He couldn't

9     promise it, but he did tell me that he's shooting to finish

10    it on Friday.  Nothing has gone to Dr. Prentky or to the

11    government's expert pending the privilege review.

12         THE COURT:  Is he on trial right now?

13         MS. KELLEY:  He has a big evidentiary hearing

14    before Judge Young this afternoon, and he's just had matter

15    after matter.  I happen --

16         THE COURT:  I know how busy defenders are, but it's

17    basically creating --

18         MR. SWOMLEY:  My understanding is that we're well

19    over a thousand pages of documents that got turned over, a

20    huge quantity.

21         THE COURT:  I don't know if that's good or bad, but

22    here's the issue:  We're not going anywhere with that case.

23    Prentky has done nothing.  In fact, Robert sensed a huge

24    frustration on his part because he didn't know what was going

25    on.  I think you should get on a conference call with him and

1   Fick, just as a courtesy to him --

2           MR. SWOMLEY:  To Dr. Prentky.

3           THE COURT:  -- to get a realistic sense of when

4   it's coming in, when he can give us a report.  Why don't I

5   say I'd like a report a month after he gets all the

6   documents, and then you can just jointly report when the

7   documents get turned over and give me a month.  I don't want

8   to crowd Mr. Fick because it's a huge number of documents and

9   I know how busy defenders are, but if I said that all

10  documents should be reviewed within two weeks, would that be

11  doable?

12          MS. KELLEY:  Yes, he can do that.

13          THE COURT:  So why don't we do that.  And why don't

14  we get two weeks for privilege, and then give the doctor a

15  month to provide a report after that.  I think we have to

16  treat these people with respect to their schedules because,

17  you know, we need them, and they're doing a service for the

18  Court.  And then I think that still puts us well within the

19  ability to do this trial at the end of June.

20          Now, suppose he comes back again for one side or

21  the other.  The other side should have a month after that.

22  Does this make sense?

23          MR. FEELEY:  We will be moving forward

24  simultaneously with our expert, not designated examiner, our

25  expert.

1          THE COURT:  Who is it now?

2          MR. FEELEY:  It's Dr. Fields, your Honor.

3          THE COURT:  I don't know that I know him.  Anyway,

4    is he local?

5          MR. FEELEY:  No, no, and it's --

6          THE COURT:  Her?

7          MR. FEELEY:  I think it's a female, your Honor.

8          MR. SWOMLEY:  Sheila.

9          MR. FEELEY:  Sheila, right.  And she has the first

10   set of documents, but she is waiting for the privilege review

11   just like Dr. Prentky is.  So when those documents are

12   available to both experts, we will proceed; we won't wait,

13   your Honor.

14         THE COURT:  So you're writing this down?  So within

15   two weeks there will be a privilege review, and then the

16   doctor will have a month from that to provide a report.  So

17   that brings us to May 1.  And then within, can we say --

18         MR. SWOMLEY:  Both reports are due at the same time

19   then?  There's not going to be any review and then

20   redrafting?

21         THE COURT:  I'm assuming both sides --

22         MR. FEELEY:  Well, we've been permitted to have an

23   expert for purposes of reviewing the Court's examiner's

24   report and the documents as well, your Honor.

25         THE COURT:  You may not want her if he comes out

1   your way, right?  That's the ambiguity we have here, which is

2   you may want -- if it comes out the government's way and you

3   want someone, so we need another time after that.

4           MR. SWOMLEY:  I just was pointing out that you were

5   setting us both down for the same date, and I didn't know

6   whether they wanted more time or not.  They can advocate what

7   they want.

8           THE COURT:  So at this point, so two weeks for the

9   document review, a month for the expert report, another

10  month -- let's just make sure this brings us up right, so

11  that we can have a trial at the end of June?  Does that

12  work?

13          MS. KELLEY:  That works.

14          THE COURT:  Okay, so you'll write all this down and

15  submit it to me and I'll sign it, and you'll give it to the

16  expert.

17          All right, now, last but not least, the Wetmore

18  problem.  I didn't know either of these experts.  They both

19  looked qualified.  And I know Judge Wolf called a friend of

20  his over at a hospital and got someone.  I can't pick.  I

21  don't know.  I could, let me just be clear, start a phone

22  call to my friends on the Superior Court as to who they think

23  is good and who they think isn't.  I was reluctant just to

24  delay it any further, so I just named both of them as my

25  expert.

054eedf1-789e-4cef-aba6-c5686222d2e2

1          My big concern is the fact that you had such a hard

2     time getting through to the gentleman from John Hopkins.  He

3     actually did his report in a timely way.  Can we get a

4     commitment from them about --

5          MR. SWOMLEY:  I can tell you that Dr. Berlin, he

6     has an efficient machine, if that's helpful.  He's always

7     been timely in any work --

8          THE COURT:  So if we stuck to the two of them, can

9     you get us a report within a month?

10         MS. KELLEY:  Well, we have an additional issue with

11    Mr. Wetmore that Mr. Swomley would like to take up with the

12    Court.

13         THE COURT:  Yes, this is the medical, the testing?

14         MR. SWOMLEY:  Right.

15         MS. KELLEY:  Yes.  And one other thing --

16         THE COURT:  But can I at least say, can we get an

17    order out that you can draft that both of those doctors

18    should give us a report within a month, or at least call them

19    and say, when is it reasonable?

20         MR. FEELEY:  I believe the Court's order requires a

21    60-day report period for both of the doctors in the Wetmore

22    case.

23         THE COURT:  Is that doable?

24         MS. KELLEY:  Well, there's two matters:  One is the

25    materials that are to go to the experts are in dispute.  I

1    have a motion that I hope to file by the end of the day this

2    Monday that the sex offender treatment program records from

3    Butner, which there are extensive records on Mr. Wetmore, are

4    privileged and should not be a part of this proceeding.

5         The most damaging evidence against Mr. Wetmore --

6    and I am also filing this motion before Judge Tauro in one of

7    those cases -- comes from admissions made during treatment,

8    and it's our assertion that the waiver form that they have

9    these men sign was not sufficient.  So I have the motion --

10        THE COURT:  You floated that months ago, that that

11   would be an issue, so I've -- I'd forgotten about it, but

12   you've mentioned it before.

13        MS. KELLEY:  I'm sorry for my tardiness, but I do

14   hope that on Monday I'll have something filed.  I believe the

15   Court will need to rule on that before we send the packets of

16   information to the experts for their review, so -- but

17   there's another whole issue in Mr. Wetmore, which we would

18   like to delay the experts evaluating him, and I think

19   Mr. Swomley can address that.

20        THE COURT:  Before I do it, she's raised at least

21   once before this notion of doing certain tests to see if he

22   is amenable to chemical treatment?  Is that basically it?  Do

23   you know what the Bureau of Prisons' position is on that?  Is

24   it expensive?

25        MR. FEELEY:  Well, I do know our position, your

054eedf1-789e-4cef-aba6-c5686222d2e2

1   Honor; that the medical/mental health care that Mr. Wetmore

2   receives within the Bureau of Prisons is a function for the

3   Bureau of Prisons to decide, that there's no constitutional

4   right to have --

5            THE COURT:  Is what they are looking for

6   expensive?

7            MR. FEELEY:  -- an alternative.  Well, I think

8   here's the point, your Honor.

9            THE COURT:  Without seeming gross, can I ask this

10  question?  I've been thinking a lot about this ever since I

11  got these cases.  I don't know how to say this in a polite

12  way, but is there a way of just chemically --

13           MR. FEELEY:  There's a process called chemical

14  castration.

15           THE COURT:  Castration?  All right, I'm obviously

16  hesitating over the word, but --

17           MR. FEELEY:  Yes, there is a process.  Mr. Swomley

18  is probably a lot more familiar with it than me.

19           THE COURT:  Does that work?

20           MR. SWOMLEY:  There are actually two very radically

21  different types of chemical treatment that are practiced

22  routinely in this field.  Dr. Berlin is a practitioner of one

23  type, and he's out of John Hopkins; and Dr. Kafka is a

24  practitioner is an of another type, and he's out of McLean's

25  here in Massachusetts.  I don't know if you want this

1    education.  This is not exactly germane to the --

2              THE COURT:  Is this what he's being tested for?

3              MR. SWOMLEY:  Dr. Saleh is a practitioner under the

4    school that Dr. Berlin practices, which is a Lupron therapy,

5    which, yes, essentially it decreases the level of serum

6    testosterone in the bloodstream so that you essentially don't

7    want to do anything.  It does not remove your testicles.  It

8    does essentially remove the --

9              THE COURT:  The drive.

10             MR. SWOMLEY:  The drive.  It removes what your

11   testicles are producing that make you interested in sex.

12             THE COURT:  Testosterone.

13             MR. SWOMLEY:  Yes.

14             THE COURT:  It stops the testosterone.

15             MR. SWOMLEY:  Yes.

16             THE COURT:  So is that something that the Bureau of

17   Prisons, because they're familiar with this too, has even

18   looked at doing it?

19             MR. FEELEY:  Well, I'm sure they're familiar with

20   it, your Honor, but, you know, people within the Bureau of

21   Prisons don't get to pick the highest level of medical care

22   that they would like.

23             THE COURT:  I understand.  The question is, would

24   this be actually some solution that actually in the long run

25   would be cheaper?

1          MR. FEELEY:  Well, this is an issue, your Honor,

2     that really, in the government's view, is not framed for the

3     initial sexually dangerous person proceeding before this

4     Court because this is just a determination of whether or not,

5     under the defined terms in the statute, the person is

6     sexually dangerous.  If a person is committed as sexually

7     dangerous, then future reviews deal not just with whether

8     they continue to be sexually dangerous, but whether they

9     continue to be sexually dangerous if released under some

10    appropriate medical, mental health, or pharmacological

11    regimen.  So that whether or not some sort of medication can

12    make a person not sexually dangerous is really for the second

13    step of the Adam Walsh Act, not for the first step.

14          THE COURT:  Have you asked Bureau of Prisons

15    whether they are willing to do whatever test he's talking

16    about?

17          MR. SWOMLEY:  Yes, apparently not.

18          MR. FEELEY:  The answer is "no," your Honor.

19          THE COURT:  So why don't you file an opposition,

20    explain it, and I'll rule on it.  If you filed an opposition,

21    I don't remember seeing it.

22          MR. FEELEY:  No, we haven't, your Honor.  And did

23    you file an actual motion --

24          MR. SWOMLEY:  We have not yet filed our own

25    motion.  We asked the Bureau of Prisons.  They just

1   apparently very recently said "no."  So now what we need to

2   do is ask you to order them to, and they can oppose it in any

3   way they see fit.

4           THE COURT:  Is there any precedent for this?

5           MR. SWOMLEY:  I don't know the answer to that

6   question.

7           MS. KELLEY:  Well, if I may, I understand what

8   Mr. Feeley is saying about the statute permitting people to

9   be released under certain conditions.  But as far as whether

10  someone is presently sexually dangerous, if you recall

11  Dr. Kriegman's testimony, he said that the kind of conditions

12  someone would be released under would affect an expert's

13  opinion about how dangerous and how likely they are to

14  recidivate because someone who is under treatment or who is

15  being monitored is much less likely to recidivate.

16          THE COURT:  What kind of a test are you thinking

17  of?

18          MR. SWOMLEY:  The first round basically is blood

19  tests, a blood workup of Mr. Wetmore, and that's really --

20          THE COURT:  Well, can't you send somebody in to do

21  blood?  I mean, that's different from treating him.  I don't

22  know that that would be a problem.  And then he can make a --

23          MR. SWOMLEY:  Dr. Saleh can do it.  There's two

24  ways of doing it:  ordering the BOP to do it, or ordering the

25  BOP to produce him to Dr. Saleh's hospital, and Saleh can do

054eedf1-789e-4cef-aba6-c5686222d2e2

1   it.

2           THE COURT:  Well, where's Saleh's hospital?

3           MR. TENNEN:  He's actually moved here.  He's in

4   Boston, UMass Medical here in Boston.  It's the sexual

5   disorders clinic.

6           THE COURT:  Where's Wetmore now?

7           MS. KELLEY:  He's at Fort Devens.  But I guess the

8   idea, your Honor --

9           THE COURT:  Why don't we just give you a little

10  tube, you know?

11          MS. KELLEY:  Well, before Dr. Saleh knows whether

12  Mr. Wetmore is able to take the medication, he has to know,

13  does he have a liver problem, what's his blood count,

14  et cetera?

15          THE COURT:  He needs a tube of blood?  Is that all

16  he needs?

17          MR. TENNEN:  A little more.  Basically he needs to

18  conduct a physical or get the results of a physical.  He

19  needs to either test the blood or --

20          MR. SWOMLEY:  It's not rocket science.

21          MR. TENNEN:  He needs to test the blood and get the

22  results of the blood.  But I did talk to him about whether if

23  we were able to ship him, for example, a tube of blood, and I

24  guess that's technically okay.  If you could figure out a way

25  to do it --

1          THE COURT:  Are you willing to give him a tube of

2     blood?

3          MR. FEELEY:  Pardon me, your Honor?

4          THE COURT:  Are you willing to give him that?

5          MR. FEELEY:  No, and we're going to fight this,

6     your Honor.  I'm not so sure this Court has the power to

7     order this sort of action on the part of BOP, and that's one

8     of the things that we will address.

9          THE COURT:  I'm not asking for treatment or even

10    discussing treatment.

11         MR. FEELEY:  Well, there's a long list of what they

12    want, your Honor.  It's not just --

13         THE COURT:  Or maybe there are things that are off

14    the chart.  I'm just simply saying, if all they're asking for

15    is a tube of blood, I'm likely to say "yes."  It's his

16    blood.  If he wants to give it to his counsel, that's fine.

17         Now, if we're talking about you've got to give him

18    Lupron, that goes into a whole new range of --

19         MR. SWOMLEY:  But this is uncharted territory for

20    the Bureau of Prisons and the U.S. Attorney's office.  This

21    guy is not a criminal committee.  He's entitled to the rights

22    of a civilian at this point.  So there's a dramatic

23    difference --

24         THE COURT:  I don't know.  If we're only talking

25    about a tube of blood, get it for him.  Do you know how

1   expensive Lupron is, by the way?

2           MR. SWOMLEY:  I haven't needed it.

3           THE COURT:  This is my specialty, okay, drug

4   pricing, so --

5           MR. FEELEY:  You know, there's another point here,

6   your Honor.  Dr. Saleh has never been designated as anything

7   in this case.  He's not their examiner.  He's not their

8   expert.  Well, maybe he's their expert, but there's no Court,

9   you know, permission to Dr. Saleh to do anything.

10          MR. SWOMLEY:  I tell you what, before we start

11  arguing about this, let's get something in writing to you.

12          THE COURT:  Yes, get something in writing.

13          MR. SWOMLEY:  Because I think that there is an

14  argument to be had here, and I think there's a good response

15  both ways, but --

16          THE COURT:  Let's put it this way:  I'm unlikely to

17  require that the actual treatment happen now with Lupron or

18  anything else.  If it's simply the question of getting a tube

19  of blood to check whether or not, I don't see what the harm

20  of that is.  So maybe confer and try and do it.  But that's a

21  different issue from whether someone's -- I don't even know

22  what it goes to, if someone's sexually dangerous --

23          MS. KELLEY:  For example, under 4246, your Honor,

24  if you had a schizophrenic person, the government was moving

25  to have them civilly committed under just the regular civil

1    commitment statute, and you had a doctor come in here to say

2    he's amenable to treatment, if he is having the treatment,

3    which he's very responsive to, he's not dangerous, wouldn't

4    you want to know that?  Or would you want to know he's

5    completely immune to treatment, he'll never get better no

6    matter what you do with him?  I mean, what we're trying to do

7    is present to the Court, if this person were released under a

8    certain treatment regimen, would he be dangerous or not?

9    And, I mean, it's absolutely in the public interest for that

10   information to be presented.

11          THE COURT:  Why isn't it right, if that's what

12   happens if he's committed, then I say to the government then

13   you've got to provide this?

14          MS. KELLEY:  Well, I guess that's another

15   possibility, and we've discussed that with the client, but

16   wouldn't you rather know it up front rather than committing

17   him?  I mean, at any rate, we don't even know right now if he

18   could physically take medication because we're missing these

19   tests.  I mean, at least at the hearing -- and I appreciate

20   what your Honor is saying -- we could have a doctor say,

21   "Yes, physically he's fit to take this medication."  So, I

22   mean, that would be at least one step in the direction we

23   want to go in.

24          But as far as Dr. Saleh not being appointed by the

25   court, neither is Dr. Tomich.  I mean, if the government

1   wants to hire their own experts to testify and do evaluations

2   and so on, the defense ought to be allowed to do that too.

3   But I think Mr. Wetmore actually has a very serious

4   constitutional right to present to your Honor his amenability

5   to treatment.

6           THE COURT:  He may have the constitutional right to

7   give his own blood to his own defense attorney.  That's what

8   he might have a right to do.  Okay, so that point, hopefully

9   you'll work it out.  If it's something much more dramatic

10  than that, I understand your point.  But what I really want

11  to do is try these cases.  And I've never seen a set of cases

12  that I know will not settle.  Is that right?

13          MS. KELLEY:  Right.

14          THE COURT:  Right, under any circumstances.  I've

15  got three cases I know are not going to plead, I know are not

16  going to settle; and I feel as if every time I get close,

17  they allude me, and a new set of issues come up.  I

18  understand there's been one court -- we've called actually --

19  in Oklahoma that's actually tried one of these.  Did he have

20  all of these problems or --

21          MS. KELLEY:  Well, I spoke to the defense lawyer at

22  length just prior to those cases going, and I guess it's one

23  of those kind of free-fall things where you're just, like,

24  "We don't know what we're doing, but we're just going to do

25  it anyway," so -- I think that's what happened out there.

054eedf1-789e-4cef-aba6-c5686222d2e2

1        MR. FEELEY:  Yes, there were competing experts.

2   There was two examiners.  One testified on behalf of the

3   respondent and one on behalf of the government, and the

4   District Court judge issued a 30-something-page opinion.

5        THE COURT:  It sounds like almost all these cases

6   are now going to be in the Fourth Circuit, although those are

7   all frozen now, right, they're all stayed?  But at some point

8   it would be useful to create a list of people who testify

9   both for the government and defense, and are at least, as far

10  as you can possibly make them, not necessarily in one camp or

11  the other, so that judges can pick someone.  I read

12  Judge Wolf's opinion, which I thought was so thoughtful and

13  well-reasoned.  I just didn't know how to find somebody.

14  Yes?

15       MR. SWOMLEY:  I'm happy to give them a large list

16  of people.  I can even put in the ones I know I don't like,

17  but, I mean --

18       THE COURT:  I'm just wondering --

19       MR. FEELEY:  Your Honor, this is the point the

20  government belatedly tried to make with the Court, is that

21  the Court is not in a position to pick between experts.  The

22  way the statute is written, your Honor, the only

23  qualifications necessary is that the person be either

24  licensed or certified.  And the government has been

25  proposing, as this Court did in the Wetmore case, is that

1   each side should be able to pick their own; and that the

2   Court really has no ability, you know, short of an agreement

3   between the parties, to choose between experts.  And it's

4   really more that the Court gives the experts the right to

5   access to the records and requires them to make a report, and

6   it gives the structure to the hearing, more so than the

7   Court's actual, you know, informed appointment of an expert.

8           THE COURT:  I just don't know any of these people.

9   I remember when I used to be a state Superior Court judge, I

10  started learning some of the experts who would testify on an

11  insanity defense.  And there were some people who were

12  clearly government and people who were clearly defense, but

13  there were some people who both sides respected, and I'm

14  wondering whether we could develop a situation where -- maybe

15  this guy Mills will turn out to be the -- does anyone know

16  him?

17          MR. FEELEY:  And he's never testified in

18  Massachusetts.  His last testimony was ten years ago in

19  Texas, we were told by Judge Wolf.

20          THE COURT:  Yes, so maybe he's the kind of guy who

21  doesn't have a stake in the debate.  But, in any event,

22  that's for another day.  I thank you very much for coming in

23  because I was somewhat panicking that I didn't have a hold of

24  this thing.  And if you could just make sure that Mr. Alba

25  has the phone numbers for all the experts so that we can call

1   and get a handle on it.  I won't talk substance with him

2   because I think that might be ex parte, but if I get worried

3   about timing, I might make that kind of a phone call.  And

4   you all are welcome to call these people, but I'd prefer that

5   you didn't do it ex parte, that you did it through a

6   conference call.  Okay?  Thank you.

7             Oh, we didn't pick a for date Peavey?

8             THE LAW CLERK:  End of June.

9             MS. KELLEY:  Could I have Mr. Fick contact Mr. Alba

10  for an end-of-June date?

11            THE COURT:  How about we pick the 17th, and if that

12  doesn't work -- my graduation is the 15th.  Hopefully I'll be

13  back the 16th.

14            THE CLERK:  The 16th, 23rd, or the 30th.

15            MR. FEELEY:  The week of the 30th is a planned

16  vacation for me.  That goes into the 4th of July.  That's the

17  first week of July.

18            THE COURT:  All right, so we'll do the 16th, and

19  hopefully we'll be done in two weeks, unless there's a

20  serious problem with Mr. Fick's schedule.  It may be a little

21  bit of a problem if he has kids in public school; kids get

22  out somewhere in there.

23            MR. SWOMLEY:  Have you decided whether you're going

24  to go with an advisory jury on all of these respondents?

25            THE COURT:  I'm definitely going to go on the first

1   one to see how it works before I -- I just want to see how it

2   works.  I am a big believer that it adds legitimacy.  Whether

3   it's a "Keep him in" or "Let him go," it adds legitimacy to

4   the decision-making process.

5           Now, that having been said, I don't know whether as

6   a practical matter it entails -- there may be certain cases

7   where I think that that's not appropriate or where either

8   side wants to press me hard one way or another.  We've agreed

9   on this, and I'm sticking with it, but I'm not saying it's

10  true for all three.  Okay?

11          (Adjourned, 11:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7

8          I, Lee A. Marzilli, Official Court Reporter, do

9  hereby certify that the foregoing transcript, Pages 1 through

10 34 inclusive, was recorded by me stenographically at the time

11 and place aforesaid in Civil Action No. 07-12056-PBS, United

12 States of America V. Jeffrey Shields, and thereafter by me

13 reduced to typewriting and is a true and accurate record of

14 the proceedings.

15          In witness whereof I have hereunto set my hand this

16 6th day of August, 2008.

17

18

19

20

21
              /s/ Lee A. Marzilli
22  _____

              LEE A. MARZILLI, RPR, CRR
23            OFFICIAL COURT REPORTER

24

25

054eedf1-789e-4cef-aba6-c5686222d2e2