IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
                Petitioner     )
                               )
        -VS-                    ) CA No. 07-12056-PBS
                               ) Pages 1 - 97
JEFFREY SHIELDS,               )
                               )
                Respondent     )



DISCHARGE HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
October 13, 2010, 2:19 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

874c2b56-d757-473f-bdfa-b77bd3db5643

1    A P P E A R A N C E S:

2         MARK J. GRADY, ESQ. and EVE A. PIEMONTE-STACEY, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Boston, Massachusetts, 02210,
     for the Petitioner.
4
          JOHN G. SWOMLEY, ESQ. and ERIC B. TENNEN, ESQ.,
5    Swomley & Associates, 227 Lewis Wharf, Boston, Massachusetts,
     02110-3927, for the Respondent.
6

7
                         I N D E X
8
     WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS
9
     JOSEPH J. PLAUD
10
          By Mr. Grady:          6
11        By Mr. Swomley:                64

12

13

14
     EXHIBITS                 RECEIVED IN EVIDENCE
15
     Government
16
     A, B, C                           6
17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  The case of the United States v. Jeffrey

3   Shields, Civil Action 07-12056, will now be heard before this

4   Court.  Will counsel please identify themselves for the record.

5          MR. GRADY:  Good afternoon, your Honor.  Mark Grady on

6   behalf of the United States.  With me is Eve Piemonte-Stacey.

7          MR. SWOMLEY:  Good afternoon, your Honor.  John

8   Swomley for Mr. Shields, and with me is Eric Tennen.

9          THE COURT:  All right, thank you.  We have Dr. Plaud

10  here, is that right?  Okay, come on up.

11         Let me just start off by saying, there was a little

12  bit of a -- for some reason, this has never been docketed, and

13  I think it needs to be under seal, Dr. Plaud's report.  So does

14  anyone have a problem with that?

15         MR. GRADY:  No, your Honor.  We'd move that it be

16  filed under seal.

17         THE COURT:  Yes, and then similarly the statement of

18  the United States' disclosure of potential testimony of

19  Dr. Andres Hernandez should also be, but I don't know if that

20  needs to be under seal.

21         MR. GRADY:  I think it a better practice to seal it,

22  given that it bears upon psychiatric diagnoses.

23         THE COURT:  Well, at some point the public has a right

24  to know what's happening in these cases, so let's talk about

25  that afterwards.

874c2b56-d757-473f-bdfa-b77bd3db5643

1                          JOSEPH J. PLAUD

2       having been first duly sworn, was examined and testified as

3       follows:

4               THE CLERK:  Would you please state your name and spell

5       it for the record.

6               THE WITNESS:  Yes.  Joseph J. Plaud, P-l-a-u-d.

7               THE COURT:  Thank you.

8               THE COURT:  So does the government want to go first,

9       or do you want to go first, Mr. Swomley?

10              MR. SWOMLEY:  I thought the way this was supposed to

11      proceed, and correct me if I'm wrong, that we were proceeding

12      with --

13              THE COURT:  Right, his report essentially was going to

14      be used as direct testimony.  So we'll mark his report as

15      Exhibit A under seal.  Does anyone have an extra one you want

16      to mark as an exhibit?

17              MR. GRADY:  Just for clarification, the parties have

18      agreed that the testimony and exhibits of the prior proceedings

19      involving Mr. Shields before this Court will be part of the

20      formal record in this matter, and there are materials that were

21      provided to Dr. Plaud for his review --

22              THE COURT:  Well, wait.  I'm not -- you want me to

23      admit everything that came in in the trial?

24              MR. GRADY:  I wish it to be part of the record here.

25      I wouldn't want the Court to decide less.  I believe that

1    information in those proceedings is relevant to the release, to

2    the extent the issue comes up, but if you don't want to take it

3    in --

4            THE COURT:  Fine, but, I mean -- well, it took me

5    months to go through that record, months to write that opinion,

6    so I'm not going to rewrite that opinion.  It's on appeal.  All

7    power to the First Circuit.  So I don't know why you're

8    reintroducing it.  You know, if there's something specific that

9    comes up, pluck it out and bring it out, but I'm not going to

10   go back through all the convictions.  I mean, I think I

11   wrote -- I don't know if any of my fact-findings other than the

12   bottom line were challenged, but I think it's a pretty

13   comprehensive statement of his convictions and that sort of

14   thing, right?

15           MR. GRADY:  Sure, your Honor.

16           THE COURT:  What else do you want?

17           MR. GRADY:  I believe that --

18           THE COURT:  Anyway, I'm not going to reread it.

19           MR. GRADY:  If I can point to something, I'll do it.

20           THE COURT:  Yes, if you can point to something, you'll

21   do it, that's fine.

22           MR. GRADY:  There were post-commitment records,

23   however.

24           THE COURT:  Post-commitment, fine, anything that I

25   didn't look at before, but I'm not going to go back through

1    that.  I found he was sexually dangerous.  I still find he was

2    sexually dangerous at that given point in time, but now we're

3    looking at now, so --

4            MR. GRADY:  I move to admit Bates Stamp Pages 1 to

5    539, which is the materials Dr. Plaud reviewed and which

6    reflect Mr. Shields's post-commitment.

7            THE COURT:  That's fine.

8            MR. GRADY:  You're right, Robert, it should be B.

9            THE COURT:  Yes, the report is A, whatever the

10   post-commitment records are, B.

11           MR. GRADY:  The disclosure of Dr. Hernandez, can we

12   put that in?

13           THE COURT:  Yes, Hernandez is C.

14           (Government Exhibits A, B, and C marked.)

15           THE COURT:  Is Dr. Hernandez here?

16           MR. GRADY:  Yes, he is.

17           THE COURT:  So what's our scheduling on this?

18           MR. GRADY:  We're going to try to get this done as

19   soon as we can, your Honor, and move to Dr. Hernandez.

20           THE COURT:  I, quite candidly, don't see what the

21   issue is that would possibly be confidential in

22   Dr. Hernandez's, as opposed to some of the stuff in

23   Dr. Plaud's, so maybe you all can look through them.  The

24   presumption is of openness.

25           MR. GRADY:  Very well, your Honor.

1        MR. SWOMLEY:  One of the things that I had suggested

2   to the government before we began was that we have Dr. Kunik

3   not cued up for today and the possibility of another day may be

4   necessary.  I have offered to waive all cross-examination, and

5   the government can rely on that report for whatever --

6        THE COURT:  I've not seen that, the Kunik report.  I

7   don't have it.

8        MR. GRADY:  There is the February 10 report and there

9   is a supplement, your Honor.

10        THE COURT:  I'm not sure I ever saw the supplement.

11        MR. GRADY:  I'm not certain it was filed, your Honor.

12   It was provided to the other side.

13        THE COURT:  So I have nothing that I've read.

14        MR. SWOMLEY:  I'm just offering that in terms of time

15   management.

16        THE COURT:  Let's just get going here because I want

17   to get Dr. Plaud out of here, ideally Dr. Hernandez out of

18   here, and then we'll worry about the rest of it.

19        MR. GRADY:  And, your Honor, with the Court's leave,

20   because it's a bench trial, may I be allowed to put exhibits up

21   on the ELMO?

22        THE COURT:  Yes.  I'm not even sure it's technically a

23   trial.  It's a hearing.

24   DIRECT EXAMINATION BY MR. GRADY:

25   Q.   Dr. Plaud, you've opined in your report that Jeffrey

1  Shields no longer suffers from any mental disorder at all,

2  correct?

3  A.   Yes.

4  Q.   You've stated, "There is no indication from any source at

5  this time, including psychophysiological assessment, that

6  Mr. Shields has any ongoing deviant sexual interest patterns.

7  In other words, today he cannot be diagnosed with any mental

8  condition that is a sexual disorder.  He does not meet the

9  diagnostic criteria for any sexual disorder."

10 A.   Correct.

11 Q.   Okay, and you repeat that several times throughout your

12 report, correct?

13 A.   Yes.

14 Q.   And the same page, Page 2, your conclusion is, "Given that

15 there is no evidence of any sexual disorder, it is the

16 conclusion in this case that at this time Mr. Shields does have

17 the capacity to control his sexual impulses and behavior,"

18 correct?

19 A.   Correct.

20 Q.   And on Page 8, just for one last time, Dr. Plaud, "It is

21 my professional opinion that Mr. Shields does not suffer from

22 any sexually-based disorder," correct?

23 A.   Correct.

24 Q.   That's your report?

25 A.   It is.

874c2b56-d757-473f-bdfa-b77bd3db5643

1  Q.   I'm going to read again:  "Mr. Shields is not a pedophile,

2  nor does he currently suffer from any other proper diagnosable

3  sexual disorder," correct?

4  A.   That is correct.

5  Q.   And that is your testimony today as well?

6  A.   It is.

7       THE COURT:  So is it your basic belief that he was

8  cured?

9       THE WITNESS:  That's a good question.  You come right

10 out with it.  Judge, if you recall back to the original trial,

11 Mr. Shields never met, in my judgment, very clearly a

12 diagnosable sexual disorder under the Diagnostic and

13 Statistical Manual of Mental Disorders.  The issue is one in

14 which there are terms that are used in the professional

15 community that have a certain controversy in terms of their

16 diagnostic applicability; for example, hebephilia,

17 ephebophilia, these terms meaning sexual interest, sexual

18 arousal to pubescent/post-pubescent aged males, not real

19 prepubescent aged males, although there was a question that

20 wasn't fully, I think, examined --

21       THE COURT:  Your opinion last time was that he

22 suffered from a mental disease or disorder, right?

23       THE WITNESS:  Right.

24       THE COURT:  And that he couldn't control his conduct?

25       THE WITNESS:  Right.

874c2b56-d757-473f-bdfa-b77bd3db5643

1        THE COURT:  I don't remember what label you put on it,

2   but you felt he had a mental disorder.

3        THE WITNESS:  I did.

4        THE COURT:  Was he cured?

5        THE WITNESS:  I believe he is -- I can't say "cured."

6   "Cured" is not -- it's a medical term that's difficult to

7   apply.

8        THE COURT:  He no longer has the mental disorder that

9   you thought he did last time?

10       THE WITNESS:  That's right.

11       THE COURT:  So if he had it before and he doesn't have

12  it now, it's been fixed?

13       THE WITNESS:  It's been addressed, I think, through

14  his involvement in therapy, and I think that he is able to

15  manage it, yes.

16       THE COURT:  Well, so but that's an important

17  distinction, isn't it?  In other words, he might still have it

18  but be able to control his behavior?

19       THE WITNESS:  Correct.

20       THE COURT:  So are you saying he doesn't have it

21  anymore or that he's able to control his behavior?

22       THE WITNESS:  I believe he's able to control.  I

23  believe that he has and he acknowledges, and its evident in his

24  treatment record subsequent to his commitment, that there's an

25  issue with pubescent aged males.  The question is, it fixed, is

1    it cured?  These are, you know, yes/no, on/off, some medical

2    terms, and it's not that easy; and that's part of what lends

3    itself to the difficulty in this area.  If you have a disorder

4    such as pedophilia, which is universally recognized as a

5    paraphilia, and a person undergoes treatment, and a person

6    learns behavioral skills, and a person may even have direct

7    physiological types of intervention, cure or treatment, it's a

8    tough word.  It's about management.

9            THE COURT:  You know, I'm just a practical

10   bread-and-butter judge, all right?  Does he have a mental

11   disorder that he's able to control, or does he not have the

12   mental disorder at all anymore?

13           THE WITNESS:  I believe that he has -- at this time, I

14   do not believe he has a mental disorder, Judge.

15           THE COURT:  All right, you don't believe he has it at

16   all?

17           THE WITNESS:  I do not.

18           THE COURT:  All right.

19           MR. GRADY:  Thank you.

20   Q.   So you have not left a great deal of room for

21   equivocation.  He has no mental disorder, correct?

22   A.   He has no mental disorder.

23   Q.   And because he has no mental disorder, he may be safely

24   released, correct?

25   A.   Correct.

1    Q.    You don't suggest any conditions under which he should be

2    released?

3    A.    Well, I didn't think that was my role to suggest

4    conditions.  I did note and did investigate and did ask for, as

5    you may recall, follow-up information from Federal Parole in

6    terms of the conditions under which he would be released.  That

7    was important to my decision-making.

8    Q.    So your report doesn't contain any proposed conditions

9    because you didn't think that was your role, correct?

10   A.    That's right.

11   Q.    Now, back in March of 2008, you diagnosed Mr. Shields with

12   pedophilia, correct?

13   A.    Yes.

14   Q.    And in September of 2008, you testified before this Court

15   that, in your opinion, Jeffrey Shields suffered from

16   pedophilia, correct?

17   A.    I did.

18   Q.    So, in your opinion, Jeffrey Shields had pedophilia then,

19   but now he does not?

20   A.    Correct.

21   Q.    I'm just going to show you a document.  I'm going to ask

22   you if you recognize what this is.

23   A.    I should have brought my reading glasses.  It appears to

24   be from the DSM-IV-TR.

25              THE COURT:  Do you want to step down and get them?

1          MR. SWOMLEY:  I have an extra pair, your Honor.

2          MR. GRADY:  I'll zoom in.  I had to zoom out to show

3    the whole document, your Honor.  I apologize.

4          THE COURT:  Do you have glasses you prefer?

5          THE WITNESS:  These will be fine.

6          THE COURT:  Those are fine?

7    Q.   I'm going to represent to you that this is the DSM-IV Text

8    Revision Criteria Text for Pedophilia.

9    A.   Yes.

10   Q.   Is that what it appears to be?

11   A.   It is.

12   Q.   And you're familiar with that, I take it?

13   A.   I am.

14   Q.   And for the record, the DSM, what is it?

15   A.   Diagnostic and Statistical Manual of Mental Disorders,

16   Fourth Edition Under Text Revision.

17   Q.   And it is what you relied upon in diagnosing Mr. Shields

18   originally and what you rely upon in concluding he has no such

19   diagnosis today?

20   A.   Correct.

21   Q.   Now, it's a manual published by the American Psychiatric

22   Association?

23   A.   Yes.

24   Q.   And it is used by virtually every psychologist and

25   psychiatrist for the purpose of making diagnoses?

1   A.   Correct.

2   Q.   Now, just before we get into the reasons why you no longer

3   believe Jeffrey Shields suffers from pedophilia, are you aware

4   of what, if anything, the DSM itself says about the expected

5   course of a diagnosis of pedophilia?

6   A.   Well, as it's discussed in the DSM, it is discussed as

7   usually or typically a chronic disorder.

8   Q.   Okay.  And just so we have the language exactly correct,

9   the DSM itself says, "The course is usually chronic, especially

10  in those attracted to males," correct?

11  A.   Correct.

12  Q.   Okay.  And what does "chronic" mean here?

13  A.   I think "chronic" means what everybody knows it to mean:

14  It endures over time.

15  Q.   Long-lasting?

16  A.   Yes.

17  Q.   Potentially recurring?

18  A.   Yes.

19  Q.   And in some instances, "chronic" can mean unending?

20  A.   Until death, yes.

21  Q.   Now, when you diagnosed Mr. Shields previously, you did so

22  based on behavior, correct?

23  A.   I did.

24  Q.   He did not make any admission to you that he was attracted

25  to prepubescent boys, correct?

874c2b56-d757-473f-bdfa-b77bd3db5643

1   A.    That's correct.

2   Q.    And when you made your diagnosis, you made it based upon

3   criminal offense behavior, correct?

4   A.    Largely based on criminal offense behavior, that's right.

5   Q.    And just for the record, when the DSM says the course is

6   usually chronic, the course is usually chronic for all

7   pedophiles, correct, those both attracted to boys and girls?

8   A.    Yes.

9   Q.    And it is especially chronic or especially so with respect

10  to those attracted to males, correct?

11  A.    That's what it says.

12  Q.    And the offense conduct involving Mr. Shields, his victims

13  were male or female?

14  A.    Males.

15        MR. GRADY:  I apologize for taking a moment, your

16  Honor, but, truthfully, I'm avoiding questions, so I'm saving

17  time hopefully.

18  Q.    Now, in order to diagnose a paraphilia such as pedophilia,

19  you don't simply conduct an interview and take what the person

20  says as gospel, correct?

21  A.    No, you don't take what the person says typically as

22  gospel, unless what he says is against his penal interest.  You

23  might want to put a little more weight in that, yes.

24  Q.    But if Mr. Shields had said to you, "I'm not interested in

25  prepubescent boys," you don't stop the interview, get up and

1  say, "Thank, you we're done"?

2  A.   No.

3  Q.   So previously Mr. Shields did not volunteer to you that he

4  was attracted to prepubescent boys, correct?

5  A.   Correct.

6  Q.   But you nonetheless made a diagnosis of pedophilia,

7  correct?

8  A.   I did.

9  Q.   And in fact you've now reported in your report -- I'm just

10  going to go back to Page 2 -- that today apparently there is

11  "no indication from any source that at this time, including

12  psychophysiological assessment, that Mr. Shields has any

13  ongoing deviant sexual interest patterns," right?  That's what

14  you wrote in your report?

15  A.   Correct, yes.

16  Q.   Now, you were given some materials to review in connection

17  with your opinion, correct?

18  A.   I was.

19  Q.   And those materials were Bates stamped 1 to Page 539?

20  A.   Yes.

21  Q.   Excuse me.  Those materials have been admitted in evidence

22  as Exhibit B in front of you.  Are those the materials you

23  reviewed?

24         THE COURT:  Now, are these the ones I should be

25  looking at, the new ones?

1       MR. GRADY:  These are the new ones.

2       THE COURT:  So where are they?  Oh, he has them, I

3   see.

4   A.   That's correct.

5   Q.   I direct your attention to Page 194 of those records, and

6   that is a report -- let me know when you get there.  Actually,

7   I can just put it up on the screen.  That is a report dated

8   March 23, 2009, correct?

9   A.   It is.

10  Q.   And just Bates stamped down there 194, correct?

11  A.   Okay.

12  Q.   Now, this is an Assessment Scale For Treatment.

13  Mr. Shields is asked a series of questions, and he's asked to

14  answer them, correct?

15  A.   Correct.

16  Q.   And these are Mr. Shields's answers?

17  A.   Yes.

18  Q.   I point you out to the highlighted portion.  Mr. Shields

19  at No. 5 of that assessment is asked, "I don't have a sexual

20  deviance problem.  It wouldn't make sense for me to be in a

21  treatment program," and his answer is "Strongly disagree,"

22  correct?

23  A.   Correct.

24  Q.   And you find that Mr. Shields does not have any sexually

25  deviant problem, but Mr. Shields strongly disagrees with that,

1    according to this report, correct?

2    A.   He circled the 1, correct.

3    Q.   And in fact when asked to respond to the statement, "It

4    worries me that I might get back into committing sex offenses,

5    so I'm interested in getting help," he responded that he

6    agreed, correct?

7    A.   Correct.

8    Q.   But you have concluded there's no evidence of any mental

9    disorder, correct?

10   A.   That's correct.

11   Q.   And on that same date, Page 195, there are additional

12   questions Mr. Shields is asked.

13           THE COURT:  What date?

14           MR. GRADY:  March 23, 2009.

15   Q.   "I have some problems, and I really think I should work on

16   them."  His answer "I strongly agree."

17        "I am afraid I will not follow through with what I have

18   already changed and would be interested in treatment to keep me

19   going in the right direction."  Mr. Shields strongly agrees.  I

20   accurately reported that, correct?

21   A.   You are correct.

22   Q.   And that's in the records you were provided and reviewed,

23   correct?

24   A.   Yes.

25   Q.   And on Question No. 18, "Even when I think I have resolved

1   a problem, I sometimes find myself struggling with it," and

2   Mr. Shields agreed with that statement?

3   A.   Yes.

4   Q.   I've accurately related what's in that report, correct?

5   A.   You have.

6   Q.   And, in addition, the records include what is termed the

7   Multiphasic Sex Inventory II, correct?

8   A.   Yes.

9   Q.   And as part of that test, there is what is called a Sex

10  Deviance Assessment.  I'll direct you to Page 216 of the

11  materials you've been provided.  That includes a Sex Deviance

12  Assessment?  It's highlighted?

13  A.   Yes.

14  Q.   And under there, there's a portion entitled "Sexual

15  fantasies (deviant arousal)," correct?

16  A.   Correct.

17  Q.   And in that portion, it is reported or the report states,

18  "In this client's case --" referring to Mr. Shields, correct?

19  A.   Yes, that's correct.

20  Q.   "-- it was found that, No. 1, he is disclosing of having

21  had deviant sexual desires or having been sexually aroused by

22  fantasies involving a child," correct?

23  A.   Correct.

24  Q.   "And he is disclosing of having obtained and traded

25  pornography involving children," correct?

1  A.    Correct.

2          THE COURT:  Well, what is that?  Is that before I

3  found him --

4          MR. GRADY:  This is a report -- sorry, your Honor --

5  dated April 17, 2009.

6          THE COURT:  Yes, but what is it referring to?  Is it

7  referring to the current point in 2009 or what got him

8  referred?

9          MR. GRADY:  I believe it's referring to an assessment

10  occurring in April, 2009.

11          THE COURT:  No, no, no, no.

12          THE WITNESS:  The MSI II, it's the Multiphasic Sex

13  Inventory, Judge, and what he's referring to in that analysis

14  of the report refers to historical information.  In other

15  words, based on possession of child pornography, past behavior,

16  that's all in that report.

17          THE COURT:  Right, but what he just flashed up, was

18  that historical information or what he was currently feeling?

19  He moved it up and down too fast.

20          MR. GRADY:  I'm sorry, your Honor.

21          THE COURT:  And I don't have a copy, so I'm trying to

22  just keep up with you, Mr. Grady.  Those two things, the small

23  Roman Numeral I and II, is that the historical information

24  before I found he was a sexual deviant?

25          THE WITNESS:  Yes, Judge.  If you'll see, it's "having

1    had" is the tense, and I have some familiarity with the tool.

2            MR. GRADY:  Okay, your Honor, thank you.

3            THE COURT:  Thank you.

4    Q.   I'm going to direct your attention to on the second page

5    of that report, actually, Bates stamp Page 217, and it

6    reports -- again, you would take it historically -- "He," being

7    Mr. Shields, "is very open and honest about having acted out

8    molest assault behaviors involving several children," correct?

9    A.   Right.

10   Q.   And I've read that accurately?

11   A.   You have.

12   Q.   Now, I'm going to direct your attention to a Quarterly

13   Report of Treatment prepared on May 20, 2010, beginning on

14   Page 261.  There's a binder of materials.  Do you agree that

15   that report beginning on Page 261 is dated May 20, 2010?

16   A.   261?

17   Q.   Yes.

18   A.   The date, please?

19   Q.   Is that the report dated May 20, 2010?

20   A.   It is.

21   Q.   Okay.  And it's a report by Dr. Hernandez?

22   A.   It is.

23   Q.   And do you know what Dr. Hernandez's role in Mr. Shields's

24   care has been?

25   A.   He is listed as the attending psychologist.

1    Q.    The treatment provider?

2    A.    That's correct.

3    Q.    And this is a report of Mr. Shields's progress by

4    Dr. Hernandez, correct?

5    A.    That's right.

6    Q.    And I direct your attention to Page 266 of that.  I'll try

7    to zoom in so it's legible to everyone.  Mr. Shields -- and

8    this is a report with respect to child abuse supportive beliefs

9    from May of 2010, correct?

10   A.    Yes.

11   Q.    Okay.  And it says, "He has erroneously believed that his

12   sexual contact with minors in the past has not been abusive."

13   Have I read that will correctly?

14   A.    You have.

15   Q.    "This is partly due to his perception of his childhood

16   history of sexual abuse by adults as consenting and partly

17   enjoyable."  Have I read that correctly?

18   A.    You have.

19   Q.    "He has frequently referred to his behaviors as having sex

20   with instead of sexually abusing minors," correct?

21   A.    Correct.

22   Q.    This is a report from May of 2010?

23   A.    Yes.

24   Q.    I'm going to direct your attention as well to --

25             THE COURT:  Excuse me.  Do you know, based on having

1    reviewed that, is he referring to minors as being children or

2    postpubescent adults, young adults?

3        THE WITNESS:  In my judgment, Judge, both.  We went

4    through a full disclosure during our interview.  I mean, during

5    his treatment, even when he was young himself, we went through

6    a complete history of all of his sexual activity.  So this

7    again refers -- in context of treatment, what he's doing is

8    referring to how he has conceived of this in the past.

9        THE COURT:  Because this looks as if it is more

10   current.

11       MR. SHIELDS:  It's a current assessment, but, in my

12   judgment -- well, you have Dr. Hernandez here, so I suppose you

13   could ask him directly, but, in my judgment, what it has to do

14   with is how he perceived at the time he was committing the

15   abuse and how he had perceived that activity, not today.

16       THE COURT:  Did you ask him all these questions?

17       THE WITNESS:  I did, I did.  We went through the

18   entire thing, and that's why I'm saying, it's not a present-day

19   issue.

20       THE COURT:  So that's what he told you essentially?

21       THE WITNESS:  Right.

22       THE COURT:  That this was all historical?

23       THE WITNESS:  Well, yes, this is --

24       THE COURT:  Did he say anything to you to lead you to

25   believe that this view is his current?

1          THE WITNESS:  No, Judge, not at all.  Quite to the

2   contrary.

3   Q.   I'm going to direct you to Page 265 of that same report,

4   and this is a section of the report addressing specifically

5   "Sexual Preference For Children," correct?

6   A.   Yes.

7   Q.   "Mr. Shields has a long history of sexual interest in,

8   arousal to, and sexual behavior involving prepubescent,

9   pubescent, and post-pubescent minor boys."  Have I read that

10  correctly?

11  A.   Yes.

12  Q.   "He is also sexually attracted to adult men, reportedly

13  his sexual preference with or for postpubescent males; however,

14  he recognizes some sexual interest in pubescent males and

15  acknowledges sexual behavior involving prepubescent children

16  (as evidenced in his criminal history)."  Have I read that

17  correctly?

18  A.   You have.

19  Q.   And there we are actually referring to ongoing sexual

20  interest in pubescent children, correct?

21          (Witness examining document.)

22  A.   No.  Again, look in parens.  It says "as evidenced in his

23  criminal history."

24  Q.   Well, let's break this up, Dr. Plaud.  "Reportedly his

25  sexual preference with/for postpubescent males."

874c2b56-d757-473f-bdfa-b77bd3db5643

1   A.   Yes.

2   Q.   "However, he recognizes --" not "recognized," correct?

3   That's the present tense of "recognize"?

4   A.   Yes, "he recognizes" is present tense.

5   Q.   "-- some sexual interest in pubescent males," correct?

6   A.   Yes.

7   Q.   Okay, that's present tense?

8   A.   Yes, but that's not what I -- I don't think he's referring

9   to what he is experiencing today as sexual interest in

10  prepubescent.  He's recognizing in his history today, as

11  opposed to, I think, two and a half, three years ago when I

12  initially evaluated him, well, I'm not quite sure he had that

13  knowledge or understanding; that in his past, that has been a

14  component of his sexual offense cycle in his past.  He

15  recognizes that today.  That's different.

16  Q.   That's how you read it?

17  A.   That's how I read it, and that's how it's dealt with.

18  Q.   "Acknowledges sexual behavior involving prepubescent

19  children (as evidenced in his criminal history)," correct?

20  A.   Right.

21  Q.   So when they're talking about behaviors as evidenced in

22  criminal history, they're talking about behavior involving

23  prepubescent children, correct?

24  A.   In part, yes.

25  Q.   I'm going to address your attention to another quarterly

1  report dated May 25, 2010, beginning on Page 248.  I'm just

2  going to show you Page 248.  And that reflects Quarterly

3  Progress Review, Review Period 2/22/10 to May 25, 2010?  It's

4  probably easier to see on the screen.

5  A.   Yes.

6  Q.   I'm going to direct you specifically within that report to

7  Page 251.  "Sexual Preference For Children" is the section this

8  report addresses, correct?

9  A.   It do.

10  Q.   And I'm going to read from the highlighted portion:

11  "Mr. Shields has started the process of identifying his sexual

12  preference for children," correct?

13  A.   Yes.

14  Q.   Have I read that correctly?

15  A.   Yes.

16  Q.   "His sexual offense history suggests non-exclusive sexual

17  preference for pedohebephilic minors," correct?

18  A.   That's correct.

19  Q.   And that means both prepubescent and pubescent children,

20  correct?

21  A.   Correct.

22  Q.   "His self-reported sexual arousal patterns involving

23  minors suggest that he predominantly is interested in pubescent

24  and postpubescent minors," correct?

25  A.   Correct.

1    Q.   "He has also, and by self-report, equally been attracted

2    to adult men --" I added "been" -- and has consistently voiced

3    an interest in having sex only in the context of a relationship

4    with an adult (Inaudible) partner."  Have I read that

5    correctly?

6    A.    You have.

7    Q.    And you don't interpret that as evidence of any ongoing

8    deviance, correct?

9    A.    In my final judgment, it is not evidence of ongoing

10   deviance, pedophilic deviance.  The issue of hebephilia is one

11   in which -- it's a question of sexual deviance.  It's deviant

12   behavior.  It's illegal behavior.  The question is, is it

13   sexually deviant behavior?  There's a difference between acting

14   in an illegal fashion with minors and acting based on an

15   underlying pattern of sexual -- that's sexually disordered.

16   There is a difference, and I think where --

17         THE COURT:  All right, so, in your view, when you said

18   he doesn't have a mental disorder, by that you meant he's no

19   longer got pedophilia?

20         THE WITNESS:  That's right, Judge.  During the initial

21   evaluation, as you may recall, I was on a borderline.  I made a

22   diagnosis based on the offense history, lack of treatment and

23   lack of disclosure at the time from him.  It concerned me, and

24   that's what I testified to.  I was on the cusp, so to speak.

25   With further data, with his participation in treatment, I am

1    now satisfied that he really doesn't have pedophilia as a

2    diagnosis.

3            THE COURT:  Well, apart from what he had before I made

4    my finding --

5            THE WITNESS:  Right, I understand.

6            THE COURT:  -- there was an incident with the boy in

7    the frog pond, et cetera.

8            THE WITNESS:  Right.

9            THE COURT:  But that's the past.

10           THE WITNESS:  Correct.

11           THE COURT:  Right now, would you say he still has an

12   attraction to pubescent and postpubescent minor males?

13           THE WITNESS:  Yes, I do believe he still has

14   attraction to both pubescent/postpubescent males and adults,

15   yes, I do.

16           THE COURT:  Well, adults, that's totally legal.  You

17   can do whatever you want as long as it's consensual.

18           THE WITNESS:  Thank you.

19           THE COURT:  What's the difference between pubescent

20   and postpubescent?

21           THE WITNESS:  Well, pubescent is the period of time --

22   there's not -- sorry.  There's not one time, but it involves

23   the development of secondary sexual characteristics.  In other

24   words, with males, certain body shapes maturation, lowering of

25   voice, development of pubic hair, these are the hallmark

1    physiological changes associated with puberty, the onset of

2    puberty.

3         THE COURT:  So while they're developing the hair and

4    that sort of thing is pubescent.

5         THE WITNESS:  That's right.

6         THE COURT:  And postpubescent is, they've acquired it

7    all?

8         THE WITNESS:  They've pretty much acquired it, but

9    it's still below the legal consenting age, whatever that

10   standard is in --

11        THE COURT:  A sixteen-year-old --

12        THE WITNESS:  Are postpubescent, clearly, yes.

13        THE COURT:  So if I were to say that an inability to

14   control your behavior with respect to minor males were a mental

15   illness, maybe a paraphilia NOS, would he be able to control

16   his behavior with respect to minor males?

17        THE WITNESS:  Yes, Judge, that's a key issue, and my

18   answer to you is, yes, I believe right now he is able to

19   control those impulses, yes, he is.

20        THE COURT:  So that even if I disagreed with you and I

21   thought that was a mental disorder --

22        THE WITNESS:  Right, I understand.

23        THE COURT:  -- you say it's not a mental disorder,

24   right, not to -- well, maybe I'm wrong.  Do you think it's a

25   mental disorder not to be able to control your behavior towards

1   minor males?

2          MR. SWOMLEY:  Can I object, just because you're not

3   phrasing the question right.  Minor encompasses everything

4   under the age of consent, technically speaking.

5          THE COURT:  Well, I thought I said "postpubescent."

6          MR. SWOMLEY:  You used the term "minor," and it's

7   undifferentiated.  You've got to get post, pre.

8          THE COURT:  You know this stuff inside out.  I'm happy

9   to.  I dive in and out in yearlong intervals.

10          So, in your view, it is a mental disorder not to be

11   able to control your behavior towards pubescent and

12   postpubescent minor males?  Is that correct?

13          MR. SWOMLEY:  Yes.

14          THE WITNESS:  In my opinion, it's not a mental

15   disorder per se not to be able --  control is not -- control is

16   a different issue.  Control doesn't have much or anything to

17   do.  The DSM in any diagnosis doesn't speak to volitional

18   capacity or volitional control.  What it does is, it speaks to

19   what has to be present in order for a diagnosis to be made.

20   The volitional control is another element of it; so once you

21   have a condition, are you able to control that condition?

22          THE COURT:  I understand because you and I have talked

23   before.  You think it's perfectly normal to be attracted to a

24   pubescent and postpubescent, whether it's a girl or a boy.

25   Aren't you the one who told me all about Victoria Secret and

1    that's why they have advertisements that look like that?

2           MR. SWOMLEY:  That was Dr. Kriegman.

3           THE WITNESS:  I don't think I had the Victoria Secret

4    conversation with you, Judge.

5           THE COURT:  So I've already understood that line of

6    disagreement there.  So what would you call it if someone is

7    not able to control their behavior toward a minor male?

8           THE WITNESS:  A postpubescent minor male?

9           THE COURT:  Yes.

10          THE WITNESS:  Illegal behavior, statutory illegal

11   behavior.

12          THE COURT:  And if he can't control his behavior, you

13   wouldn't call it a mental illness?

14          THE WITNESS:  I wouldn't call it based on that, no,

15   just as if a person cannot control -- take the pubescence out

16   of it.  Just talk about male adults, just to make this easier.

17   If a person can't control their behavior around male adults and

18   is sexually assaulting them, the question is, why is he doing

19   this?  Is it based on a mental disorder?  Well, it could be

20   based on a mental disorder, but is it a sexual disorder?

21   Because if he's attracted to and he's engaging in sexually

22   illegal behavior with male adults, there's no underlying sexual

23   deviance there.  There's something else going on with him.  And

24   that's the issue.  The same thing applies --

25          THE COURT:  How about pubescent males?

1            THE WITNESS:  Well, here's the issue --

2            THE COURT:  Attraction to a pubescent male --

3            THE WITNESS:  Is not disordered, it's not disordered.

4     It's a raging debate.  It's been specifically rejected.  That's

5     why it's not in the DSM-IV-TR, Judge.  It's been rejected.

6     Terms like "hebephilia" and "ephebophilia," which is

7     essentially meaning older postpubescent children, these are

8     terms that we use.  And there's debate right now whether

9     they're going to be included in some way, shape, or form in the

10    DSM-V, but we're not there yet, but they've been rejected in

11    the past.

12           I have researched this physiologically in my own work.

13    If you are attracted to adults, you are attracted to

14    postpubescence of the same sex?  Why?  Because what your sexual

15    attraction is based on is the evidence of secondary sexual

16    characteristics.  And there is a dividing line down there after

17    pubescence in the development of these physiological features

18    that some men have difficulty controlling.  Well, it's not

19    because they're acting on underlying deviance.  They're making

20    judgment errors.  There are other things going on with them.

21    They feel more comfortable around postpubescent as opposed to

22    adults, and maybe that is what --

23           THE COURT:  Just so we can move on, you're not drawing

24    a line between -- with respect to pubescent boys?

25           THE WITNESS:  Between adults and pubescent and

1    postpubescent?

2         THE COURT:  No, just pubescent.

3         THE WITNESS:  That's correct.  As long as there's the

4    evidence of secondary sexual characteristics, that's different.

5    That is different.  Arousal, attraction, interest, behavior

6    with prepubescent is a different issue.

7         THE COURT:  All right.  So when you say there's no

8    mental disorder before, that's because you've taken that line?

9         THE WITNESS:  Right.  There was a question before with

10   pedophilia.  Now I do not believe.

11        THE COURT:  Pedophilia he had.  Now you're saying he

12   doesn't have it anymore?

13        THE WITNESS:  That's correct.

14        THE COURT:  Okay.

15   Q.   Dr. Plaud, just for clarity purposes, your testimony is

16   that, in your view, the DSM-IV does not include as a mental

17   disorder a diagnosis of paraphilia NOS premised upon sexual

18   attraction to pubescent boys, correct?

19   A.   It does not.

20   Q.   And it is your opinion that the DSM-IV Text Revision does

21   not encompass within it a mental disorder of paraphilia NOS

22   characterized by attraction to postpubescent boys, correct?

23   A.   That's right.

24   Q.   But certainly you would acknowledge you are not capable of

25   telling us what Congress intended to mean when it used the term

1    "mental illness, abnormality, or disorder" in the Adam Walsh

2    Act, correct?

3    A.   I never would interpret what Congress means on anything,

4    including this.

5    Q.   And if we presume for the moment that Congress intended to

6    include within the definition of illness, abnormality, or

7    disorder the equivalent of what we're describing, paraphilia

8    NOS diagnosis premised upon sexual attraction to pubescent and

9    postpubescent boys, Mr. Shields has it, correct?

10   A.   I believe he does.

11   Q.   Okay, thank you.

12        MR. SWOMLEY:  Your Honor, are you going to hold us to

13   half-hour time periods because I think we've gone over at this

14   point?

15        THE COURT:  What do you think your timing is?

16        MR. GRADY:  Another half an hour, your Honor.  And

17   truth be told, a lot of my time has been -- and I don't

18   begrudge the Court asking questions, but I haven't had a full

19   half an hour.

20        THE COURT:  Well, you tell me.

21        MR. GRADY:  I've got another half an hour, your Honor.

22        THE COURT:  You've got a half an hour?

23        How long will you have?

24        MR. SWOMLEY:  Right now I could do, I think, a very

25   adequate redirect within a half an hour.  If he goes another

1   half an hour, I think I'm going to need more than that.  But I

2   thought this was supposed to be time limited, and we were going

3   to try and get to Dr. Hernandez too.

4        THE COURT:  Go ahead.

5   Q.   Dr. Plaud, you'd agree the history of sexual offense is

6   thematically related to paraphilia?  For example, arrests for

7   indecent exposure for someone with a possible exhibitionist

8   paraphilia or arrest for child molestation for someone with a

9   suspected pedophilia paraphilia is potential evidence of an

10  underlying paraphilic arousal condition, correct?

11  A.   Oh, very true.

12  Q.   Okay.  And I'm not going to go through the details, but in

13  the prior trial, there was evidence that Mr. Shields offended

14  against a six-year-old boy?

15  A.   Yes.

16  Q.   A nine-year-old boy?

17  A.   Yes.

18  Q.   A twelve-year-old boy?

19  A.   Yes.

20  Q.   And that he possessed child pornography, including images

21  of prepubescent children, correct?

22  A.   Correct.

23  Q.   And based upon that information, you yourself concluded,

24  based on those behaviors, that Mr. Shields suffered from

25  pedophilia, correct?

1   A.    In part, that is correct.

2   Q.   You inferred from those behaviors that he had deviant

3   arousal to prepubescent children, correct?

4   A.    Correct.

5   Q.    It was not in part.  That was the basis for your

6   diagnosis, correct?

7   A.    Well, that was, yes, in part his criminal behavior,

8   including with the prepubescence, was part of my original

9   diagnosis, that's right.

10  Q.    In front of you is a transcript of your testimony in this

11  matter.  I direct you to Page 108, September 4, 2008.  I asked

12  you, "What's the most important piece of information in your

13  diagnosis of pedophilia?"  Correct, have I read that question

14  correctly?

15  A.    Yes.

16  Q.    And your answer was, "Well, what you have here over a

17  period of time is demonstrable sexual behavior with

18  prepubescent children, two of them, and other behavior

19  occurring around the same time with other children.  For

20  example, in 1998, the twelve-year-old male that he was

21  convicted of, that's a borderline case.  I'm not sure because I

22  don't know anything more about that victim, but it would be

23  another piece of information consistent with that.  Then the

24  lapsing of many years and the confiscation of a large case of

25  child pornography, which is a significant diagnostic indicator

874c2b56-d757-473f-bdfa-b77bd3db5643

1    of pedophilia.  So putting all the pieces together, it would be

2    consistent with a diagnosis of pedophilia, sexually attracted

3    to males, and nonexclusive."

4        I have read your testimony correctly, have I not?

5    A.   You have.

6    Q.   So previously we didn't need to have him admitting for you

7    to make a diagnosis, correct?

8    A.   That's correct.

9    Q.   That attraction to prepubescent children for a pedophilia

10   diagnosis, correct?

11   A.   Correct.

12   Q.   Now, by the way, at the time of your testimony in 2008,

13   those offenses were between six and twenty years old, correct,

14   give or take?

15   A.   Give or take.

16   Q.   And they weren't too old to be considered a basis for

17   concluding that Mr. Shields had pedophilia, correct?

18   A.   Correct.

19   Q.   So at the time in 2008, all of these behaviors were

20   sufficient evidence to make a diagnosis of pedophilia, but

21   today they're not?

22   A.   That's correct, I do not --

23   Q.   That's your testimony?

24   A.   That's my testimony.

25   Q.   Now, Mr. Shields reported to you in your most recent

1    interview that there are a number of events that would be high

2    risk for him, correct?

3    A.    Yes.

4    Q.    High risk to sexually reoffend, correct?

5    A.    Correct.

6    Q.    Being around teenagers, going to malls, going to musical

7    events, those types of things would be high risk for him,

8    correct?

9    A.    Those are his identified risk situations, correct.

10   Q.    In your view, he is high risk in those situations, despite

11   the fact he has no mental disorder at all?

12   A.    No, that's not correct.  You're making a conclusion.

13   That's not what I'm saying.  He identified what he considers in

14   his therapy to be high-risk situations.  That's part of

15   therapy.  Every offender has high-risk situations.  It doesn't

16   mean that therefore they are a high-risk offender at the time.

17   Those are high-risk situations.  The high risk refers to

18   places, environments that he can be at that he identifies as

19   raising his relative risk.

20   Q.    Okay.  So if Mr. Shields has potential interaction with

21   teenagers is going to be a problem, correct?

22   A.    It could be, it could be.  I'm not saying it is going to

23   be a problem.  I don't think it would be a problem, but it

24   could be.  There's the potential, given his history and his

25   interest, yes.

1   Q.   And by being a problem, it's a situation in which he might

2   reoffend, correct?

3   A.   It's possible.

4   Q.   Now, I'm going to just move very quickly.  You've reviewed

5   treatment records from Butner, correct?

6   A.   Yes.

7   Q.   And, in your opinion, Mr. Shields can complete his

8   treatment -- he's gone through several phases, correct? -- he

9   can complete his treatment on an outpatient basis?

10  A.   It is my judgment that what remains in treatment can be

11  effectively addressed as an outpatient at this point, yes, it

12  is.

13  Q.   Now, we had some evidence in this case about Mr. Shields

14  undergoing outpatient sex offender treatment in the past, have

15  we not?

16  A.   Yes.

17  Q.   Okay, so between 1992 and 1996 Mr. Shields was released

18  after a conviction and underwent sex offender treatment,

19  correct?

20  A.   Correct.

21  Q.   And in the Court's original opinion, the Court concluded

22  that Mr. Shields successfully completed that period of

23  probation between 1992 and 1996, correct?

24  A.   Right.

25  Q.   Do you agree with that finding?

1   A.   Yes.

2   Q.   Okay.  I'm going to show you Page 509.  Do you know what

3   this document is?

4   A.   Yes.

5   Q.   Okay, what is it?

6   A.   This is Mr. Shields composing what he calls "undocumented

7   criminal sexual offenses"; in other words, his self-disclosure.

8   Q.   Can I move you along because I have limited time.  These

9   are the offenses that we didn't know about before?

10  A.   Right.

11  Q.   Okay, I'm going to just direct your attention to the last

12  three:  "Boy 6, 1993, thirteen years old, persuaded him to let

13  me give him money to perform oral sex," correct?

14  A.   Yes.

15  Q.   That was during this period between 1992 and 1996 where he

16  supposedly completed his probation successfully, correct?

17  A.   Yes.

18  Q.   And he was undergoing outpatient treatment, correct?

19  A.   Yes.

20  Q.   And, similarly, "Boy 7, 1995, fifteen-year-old

21  acquaintance, persuaded him to let me give him money and

22  perform oral sex on him," correct?

23  A.   Yes.

24  Q.   And in 1996, fourteen-year-old, similar situation,

25  correct?

1    A.    Correct.

2    Q.    So during this situation, in fact you previously said you

3    agreed with the Court that Mr. Shields successfully completed

4    his probation between 1992 and 1996.  These records belie that,

5    do they not?

6    A.    No.

7    Q.    Okay, so --

8              THE COURT:  Why not?

9              THE WITNESS:  Judge, I think there's a --

10             THE COURT:  -- a hundred times two times a week for

11   two years.  That sounds terrible.

12             THE WITNESS:  I'm sorry, maybe I'm -- I think maybe

13   I'm answering a different question than is being asked here.

14             THE COURT:  How could it be that his sex offending --

15   I don't remember what I heard at trial, but --

16             MR. SWOMLEY:  I think the question was, "Do you agree

17   that he completed treatment?"

18             THE WITNESS:  Yes.

19             MR. SWOMLEY:  And answer is "Yes, he --"

20             THE COURT:  No, no, no, no.  Completed treatment

21   successfully.

22             THE WITNESS:  No, Judge, that's not what I'm

23   answering.  He was in it -- he said completed probation.  He

24   didn't even say treatment.  He said completed probation

25   successfully, and, yes, he did.

1   Q.   Dr. Plaud, if a condition of his probation was not to

2   commit a new sex offense while he was on probation, based upon

3   this information, did he successfully complete that probation?

4   A.   Well, in that context, no, he didn't.

5   Q.   Thank you.

6   A.   That's different.

7   Q.   So we had at least one occasion where Mr. Shields was out

8   doing outpatient sex offender treatment, correct, and he was

9   actively offending against children while in sex offender

10   treatment, correct?

11   A.   That's correct.

12   Q.   Now, I know Mr. Shields reports these victims to be

13   somewhere between thirteen and fifteen years old, correct?

14   A.   That's right.

15   Q.   And the thirteen-year-old line is fairly significant,

16   according to the DSM, is it not?

17   A.   I'm sorry?

18   Q.   Sure.  What does the DSM say about whether an individual

19   should be considered pre- or postpubescent?

20   A.   Well, in parentheses it says "generally age thirteen years

21   and younger generally," which is what it says.

22   Q.   Well, let me read it, and then we can include the

23   parentheses:  "The paraphilic focus of pedophilia involves

24   sexual activity with a prepubescent child (generally age

25   thirteen or younger),"correct?

1   A.   Yes.

2   Q.   That's what the DSM says?

3   A.   That's right.

4   Q.   Generally a child thirteen or younger is considered to be

5   prepubescent for purposes of a pedophilia diagnosis, according

6   to the DSM?

7   A.   That's what it says.

8   Q.   Okay.  Now, we also know that Mr. Shields previously lied

9   about the age of his victims, do we not?

10  A.   Yes.

11  Q.   Okay.  Specifically we know that in 1998 Mr. Shields

12  engaged in unlawful sexual contact with a twelve-year-old boy?

13  A.   Right.

14  Q.   When you interviewed him about this incident, he reported

15  to you the boy was thirteen or fourteen years old, correct?

16  A.   That's right.

17  Q.   There are documented incidents in this case where

18  Mr. Shields has inflated the age of his victims to go outside

19  of the prepubescent level, correct?

20  A.   That would be one conclusion of why he did it, yeah, and

21  it concerned me at the time.

22  Q.   Now, coming back to this same period of 1992 to 1996,

23  there's an additional disclosure of sexual abuse or exploitive

24  behavior that wouldn't constitute a criminal offense because

25  the individuals involved were over the age of consent.  And

1    this is Bates Page 511 of what you reviewed, correct?

2    A.    Yes.

3    Q.    And that reflects that during the same period, between

4    1992 and 1996, specifically in 1993, Mr. Shields was paying two

5    sixteen-year-old boys for oral sex, correct?

6    A.    Right.

7    Q.    And this is again a time when Mr. Shields had been

8    released to an outpatient sex offender treatment, correct?

9    A.    That's correct.

10    Q.    Now, Mr. Shields next underwent treatment after a 1998

11    conviction for assaulting a twelve-year-old boy, correct?

12    A.    That's right.

13    Q.    Okay.  Now, before we go on, I just want to note that

14    previously we were unaware of any conviction or any sexually

15    criminal behavior going on between 1996 and 1998.  Based on

16    your record review, did you have an occasion to determine

17    whether there was in fact some sexually offensive behavior by

18    Mr. Shields between 1996 and 1998?

19    A.    Just give me a moment.

20    Q.    I direct your attention to Page 509, Boy No. 8 up on the

21    screen.

22    A.    Yes, I have it.

23    Q.    Okay.  So previously at the trial before, we did not know

24    that Mr. Shields or we had no record of any criminal offending

25    by Mr. Shields during this period from 1996 to 1998, right?

1   A.   That's right.

2   Q.   And we now have evidence that Mr. Shields was engaging in

3   oral sex with a fourteen-year-old boy two times a week for a

4   two-year period during this time, correct?

5   A.   That's right.

6   Q.   And, again, this was just after completing outpatient sex

7   offender treatment, correct?

8   A.   That's right.

9   Q.   So Mr. Shields then underwent, after a 1998 conviction,

10   sex offender treatment from 1998 to 2001, correct?

11   A.   Right.

12   Q.   And that was cognitive behavioral treatment, correct?

13   A.   Appeared to be, yes.

14   Q.   Okay.  And it was done on an outpatient basis, correct?

15   A.   It was done on an outpatient basis.

16   Q.   And one year after finishing that treatment he was found

17   with child pornography, correct?

18   A.   Correct.

19   Q.   And we now know, again, facts that we didn't know at the

20   prior trial, and this treatment was going from 1998 to 2001,

21   correct?

22   A.   Yes.

23   Q.   And it was on an outpatient basis, as you recommend

24   Mr. Shields do now, correct?

25   A.   It was on an outpatient basis.

1   Q.   And we now know that during this same period, based on the

2   information contained in Bates Stamp 511, that Mr. Shields was

3   paying a seventeen-year-old boy, during the same time he was

4   undergoing outpatient treatment, to perform oral sex on him,

5   correct?

6   A.   That's what he disclosed.

7            THE COURT:  Well, let me ask you, is that illegal?

8            MR. GRADY:  I think prostitution would --

9            THE COURT:  Yes, but is it a sex offense in terms

10  of --

11           MR. GRADY:  He was never charged.

12           THE COURT:  No, no, no, no, excuse me.  What state was

13  that?

14           MR. GRADY:  Maine.  I believe the age is sixteen, your

15  Honor.

16           THE COURT:  Age sixteen.

17  Q.   However, Dr. Plaud, is it disturbing that an individual in

18  sex offender treatment is paying a seventeen-year-old to give

19  him oral sex?

20  A.   Yes.

21  Q.   Thank you.  So let's sum up.  Mr. Shields has twice before

22  undergone outpatient sex offender treatment, and in both

23  instances he has either been offending against children or

24  paying a seventeen-year-old boy to engage in sex with him,

25  correct?

1    A.    Correct.

2    Q.    Now, in your report you refer to psychophysiological

3    assessment.  What is that?

4    A.    Specifically PPG, penile plethysmography.

5    Q.    Okay.  And you say Mr. Shields had -- specifically when

6    you refer to this, you say, "He had two administrations of a

7    penile plethysmograph, and neither showed arousal to deviant

8    sexual stimuli," correct?

9    A.    Correct.

10   Q.    Is there any other mention of the PPG?

11   A.    In my report?

12   Q.    Yes.  Do you make any mention of any limitations on the

13   test?

14   A.    No.

15   Q.    Or of any other findings?

16   A.    No.  I'm just reporting the findings as I reviewed them.

17   Q.    Okay.  Now, first of all, you understand that Federal

18   Courts have uniformly rejected testimony concerning the

19   presence or absence of deviant arousal based on PPG analysis?

20   A.    Yes.  I'm aware that it's been rejected in terms of an

21   assessment protocol, yes.

22   Q.    And similarly the Commonwealth of Massachusetts has

23   rejected it for that purpose as well?

24   A.    Well, it depends.  It has and it hasn't.  I've been

25   involved in cases where it hasn't.  It's part of the treatment

874c2b56-d757-473f-bdfa-b77bd3db5643

1   record.  I mean, the federal people are the ones who

2   administered it to him at Butner.

3   Q.   I refer you to a decision Commonwealth v. Gerald Souza.

4   Are you familiar with that case?

5   A.   Yes.

6   Q.   You testified on behalf of Mr. Souza, correct?

7   A.   I recall, yes.

8   Q.   Okay, and this is an unpublished opinion in the

9   Massachusetts Appeals Court, 74 Mass. Appeals Court, 1128.  And

10  it reports -- let me know if I read this correctly -- "The

11  reliability of PPG testing has not been established in the

12  Commonwealth, and no case relied upon by the defendant holds

13  that the results of a PPG test are admissible at trial."

14      Have I read that correctly?

15  A.   That's correct.

16  Q.   Okay.  Now, by the way, the Superior Court in that case

17  didn't credit your testimony, correct?

18  A.   Uhm, I don't think -- I don't think I've ever been

19  involved in a case where my testimony was not credited.

20  Q.   Credited, it was not believed.  I did not mean accredited

21  as in you were not an expert.  It was not believed?

22          THE COURT:  Accepted.

23          THE WITNESS:  Judge, I would have to -- I don't

24  recall.

25  Q.   Okay, I'm just going to show you another page under the

1    section entitled "Admissibility of Dr. Plaud's report," and

2    here the Court is addressing a claim by the defendant.

3         "The Judge explained," referring to the Superior Court

4    judge, "that Dr. Plaud 'chose to forgo fair inquiry into the

5    evidence of the defendant's deviant sexual interest in

6    prepubescent children.'"

7         Have I read that correctly?

8    A.   Yes.

9    Q.   So at least on one occasion, the Massachusetts Superior

10   Court has found that you have chosen to forgo fair inquiry into

11   a defendant's sexually deviant behavior, correct?

12   A.   Well, that's what it says.  I'd have to look at it.  I

13   think it's a little more complicated than that.  I think there

14   was even verbiage above that that spoke to some other issues.

15   I mean --

16   Q.   Dr. Plaud, what does the DSM say about the validity of

17   penile plethysmographs?

18   A.   Well, it has a mention of it in a paragraph form

19   concerning whether it's reliable or valid.

20   Q.   I'm going to show you Page 567 of the DSM-IV Text

21   Revision, and it has a section entitled "Associated laboratory

22   findings."  I'm going to read it.  Let me know if I've read it

23   correctly.  "Penile plethysmography has been used in research

24   settings to assess various paraphilias by measuring an

25   individual's sexual arousal in response to visual and auditory

1    stimuli.   The reliability and validity of this procedure in

2    clinical assessment have not been well established, and

3    clinical experience suggests that subjects can simulate

4    response by manipulating mental images."

5        Have I read that correctly?

6    A.   That's what it says.

7    Q.   And that's the DSM says about PPGs?

8    A.   That's what it says.

9    Q.   "It is a recognized flaw that an offender can manipulate

10   the results of the test," correct?

11   A.   If it's not done properly, sure.

12   Q.   That's a recognized flaw of the test?

13   A.   That is a potential pitfall of PPG evaluations if they are

14   not conducted properly, correct.

15   Q.   "With respect to PPG analysis generally, there's a lack of

16   standards for training and administration of the tests"?

17   A.   Yes.

18   Q.   "And there is a lack of norms and a lack of

19   standardization and susceptibility of the data to false

20   negatives and false positives," correct?

21   A.   There is.

22   Q.   Okay, "And despite the sophistication of current equipment

23   and technology, the question remains whether the information

24   obtained from a PPG is valid and reliable as a means of

25   assessing sexual preference," correct?

1    A.   That is correct.

2         THE COURT:  You need to start wrapping it up.  It's

3    well over a half an hour.

4         MR. GRADY:  Okay.

5    Q.   Directing your attention specifically to -- there were two

6    PPGs here, correct, one in June of 2009 and one in August of

7    2010, correct?

8    A.   Correct.

9    Q.   I'm just going to show you Page 129 of those reports.

10        MR. GRADY:  I thought I had until 3:30, your Honor, by

11   my count.

12        THE COURT:  You need to finish.  It's your issue, not

13   mine, which is that we will have to bring Dr. Hernandez back.

14        MR. GRADY:  Okay.

15        THE COURT:  It's your issue, not mine.  I have a

16   revocation hearing at 4:00.  That's the issue.  While it could

17   go at 4:15 or 4:20, I've got to do it today.

18        MR. GRADY:  Okay, I will endeavor to accommodate that.

19   Q.   Dr. Plaud, this is the June 15 PPG result, correct?

20   A.   Yes.

21   Q.   Okay.  And the PPG works by showing various stimuli --

22   adult male, teenage male, grammar school male, prepubescent

23   male -- at least in the case of Mr. Shields, and also females,

24   correct?

25   A.   Correct.

1   Q.   And it has both visual and auditory stimuli, correct?

2   A.   Yes.

3   Q.   But it does not actually show nude children?

4   A.   Right.

5   Q.   Okay.  Now, Mr. Shields in this case, it's reported, had

6   no arousal to any of the stimuli, correct?

7   A.   That's correct.

8   Q.   So if we credit the test, Mr. Shields had no reaction to

9   adult males, correct?

10  A.   No significant arousal, correct.

11  Q.   And no significant arousal to his claimed preferred age

12  group of adult males or teenage males, correct?

13  A.   Correct.

14  Q.   He had the same reaction to prepubescent males as adults

15  and teens, correct?

16  A.   Well, I'm really not at liberty to say because that's all

17  the data I had.  I would have to look at the strip charts and

18  I'd have to look at the Z-scores themselves.  I'd have to look

19  at the raw data in order to answer that question properly.

20  Q.   But according to the report you have, there's no way of

21  differentiating the level of deviant arousal to whether it be

22  prepubescent, postpubescent, teenagers, adults?  He has no

23  measurable reaction?

24  A.   Yes, right.

25  Q.   But you don't say that in your report, do you?

1   A.   I say what the report said.  He didn't have any arousal,

2   any demonstrable arousal to any of the prepubescent children.

3   Q.   Okay, you say he had no deviant arousal, correct?

4   A.   Right.  That's another way to say deviant arousal.

5   Q.   You don't include the fact that he had no arousal to

6   anything, correct?

7   A.   True.

8   Q.   You omit that?

9   A.   Okay.

10  Q.   Correct?

11  A.   Correct.

12  Q.   So you only pick out what helps your case from this

13  result, right?

14  A.   No.  I'm not picking out anything.  I'm reporting -- I'm

15  looking for deviance.  If I don't find deviance -- I'm not

16  looking for the appropriate arousal.  That wasn't what I was

17  looking for.

18        THE COURT:  Let me ask you as you sit here today, does

19  this worry you at all that the test doesn't report arousal to

20  anything?

21        THE WITNESS:  Well, it doesn't offer me any evidence

22  that he does.  Would I like to see a more differential pattern

23  of response?  Yes, of course I would.

24        THE COURT:  Because we know he's attracted, right, to

25  males?

1          THE WITNESS:  Yes.

2          THE COURT:  So this shows at least some problem with

3     the test, right?

4          THE WITNESS:  Well, it doesn't necessarily, Judge,

5     show problems with the test.  They hypothesize it may be, for

6     example, the medication that he's on, Prozac, that may be

7     responsible, which it can.

8          THE COURT:  Fair enough, but at least as applied in

9     that situation, the test may not be reliable?

10          THE WITNESS:  Right, right, exactly.

11    Q.   Prozac can cut one's sexual arousal, correct?

12    A.   Well, it can dampen libido, yes.

13    Q.   In this particular case, it would dampen the arousal to

14    any stimuli, correct?

15    A.   It could, yes.  There's no one way to do -- you know, it's

16    not one answer I can give you, but, yes, it could.

17    Q.   But you didn't include that information in your report?

18    You only included --

19          THE COURT:  I've got the point.  We're trying to move

20    on.  I got the point.

21          MR. GRADY:  Very well.

22    Q.   The same is true -- actually, Mr. Shields himself reported

23    that he was upset and turned off by the coercive images,

24    correct?

25    A.   Right.

1   Q.   He said, "That may have actually affected my ability to

2   respond to the rest of the stimuli," correct?

3   A.   That's what he said.

4   Q.   And that's not in your report?

5   A.   Okay.

6   Q.   Mr. Shields actually reported on several occasions that

7   Prozac produced a significant reduction of sexual desire and

8   preoccupation for him, correct?

9   A.   That's right.

10  Q.   I'm going to direct your attention specifically to

11  Page 266, and in there it says, "In 2005, after he started

12  taking Prozac for depression, the side effects of the

13  medication produced a significant reduction in sexual desire

14  and preoccupation," correct?

15  A.   Yes.

16  Q.   And that's certainly an equally plausible explanation for

17  the lack of reaction to prepubescent children, correct?

18  A.   It could be.

19  Q.   And Mr. Shields in fact reports on Page 258 of the Bates

20  stamped material you have, "Mr. Shields reported that he has

21  been able to abstain from sexually acting out.  He also reports

22  that as a result of his medication treatment --" that's

23  referring to the Prozac, correct?

24  A.   Yes.

25  Q.   "-- his sexual desire, deviant and non-deviant, are much

874c2b56-d757-473f-bdfa-b77bd3db5643

1    more manageable," correct?

2    A.    Yes.

3    Q.    That's what it reads?  And in fact Dr. Hernandez himself

4    reported what with respect to the PPG findings?

5    A.    He called it a non-response profile, inconclusive.

6    Q.    Inconclusive.  But you didn't put that in your report,

7    correct?

8    A.    Correct.

9    Q.    You only put in that he showed no arousal to deviant

10   images, correct?

11   A.    That's correct.

12   Q.    You've also included in your report information that

13   Mr. Shields's age is considered a protective factor, correct?

14   A.    That's right.

15   Q.    Mr. Shields is currently 49, or soon will be?

16   A.    He is 49 now.

17   Q.    And you previously testified, however, that age 50 is

18   where statistics begin showing significant declines in

19   recidivism, correct?

20   A.    That is a beginning point for more precipitous declines in

21   recidivism, yes.

22   Q.    And in 2008, Mr. Shields's age was not enough to protect

23   him for today in conjunction with the other --

24   A.    Well, he's certainly a lot closer to 50 now than he was

25   then, and he does have probation, which will bring him over

1   that 50 mark.

2   Q.   You've noted in your report Mr. Shields has benefited

3   greatly from the accelerated program at Butner, correct?

4   A.   Yes.

5   Q.   He's in Phase 4 of that treatment program, correct?

6   A.   Correct.

7   Q.   And what is that, if you could explain to the Court?

8   A.   Well, that is, as the phases go up, then they learn

9   more -- they go from more generic, general terms about what sex

10  offending is, cognitive distortions, to applying it more to

11  their particular offense history.  In Phase 4, it's more the

12  core concepts:  construction of relapse prevention plan where a

13  person has identification of their sexual deviance, their

14  cycle, their risk situations.  It's all integrated, given their

15  history, and they produce ultimately what's called a relapse or

16  a comprehensive relapse prevention plan.

17           THE COURT:  Is it a good program.

18           THE WITNESS:  At Butner?  From what I've seen, yes,

19  it's an excellent program.  And I've called it an "accelerated

20  program" for a reason, because there's very few people, I think

21  two basically in it right now; and so they're getting a lot of

22  individual attention.  And in Mr. Shields's case, he's

23  progressed very rapidly.  In other words, in a year and a half

24  time, approximately, he has really gone through a lot of the

25  elements of the program.

1        THE COURT:  So how long does it usually take to get

2    through Phase 4?

3        MR. GRADY:  You stole my question, your Honor.

4        THE WITNESS:  Well, it depends.  I don't know what the

5    Butner program is.  Again, Dr. Hernandez is probably better off

6    answering than that I because I'm not in that program; but in

7    my experience as a treatment provider, Phase 4 of treatment can

8    take anywhere from, I mean, eight months to a year and a half.

9    It depends on a person's -- how well they're progressing,

10   how -- each part of a relapse plan is broken up.  It's usually

11   presented, feedback, how long does it take them to react to the

12   feedback they get, reintegrate it, present it back, until

13   everything is signed off on.  So, I mean, typically I would say

14   within a year, maybe a little longer, they're able to do that,

15   if everything is offered to them.

16       THE COURT:  And how long has he been in Phase 4?

17       THE WITNESS:  Not that long.  I believe he started --

18   if you give me a moment, I'll tell you.

19       (Witness examining document.)

20       THE WITNESS:  I mean, I think within the last month or

21   so, two months maybe.  The way it's broken down at Butner is,

22   it's in different modules; and at the time that I interviewed

23   him, he was basically in Module 19, which is Phase 4, the

24   beginning parts of relapse prevention and community building.

25   Q.  By all reports, Mr. Shields is doing well in the program?

1   A.   I would say he's doing very well.

2   Q.   And Mr. Shields has himself said he wants to complete the

3   treatment, correct?

4   A.   He has.

5   Q.   In fact, he said, "My lawyer is going to kill me," but

6   acknowledged he would like to complete the program, correct?

7   A.   Yes.

8   Q.   The treatment has been, in your professional opinion, more

9   successful than past sex offender treatment?

10  A.   I believe it has been completely different, from what I

11  know about his participation with records now, that I've been

12  able to review now, versus those earlier periods we discussed,

13  yes.

14  Q.   And as you noted, Mr. Shields is only one of two

15  individuals currently in the program?

16  A.   That's what I am aware of, I think he's one of two.

17  Q.   And at the prison, he has access on a day-to-day basis to

18  psychologists and treating professionals, correct?

19  A.   Correct.

20  Q.   But if he's released to the street, that's not likely to

21  continue, is it?

22       MR. SWOMLEY:  Objection.  It's not even a realistic

23  proposal, so I would object to that being offered as a

24  hypothetical.

25       THE COURT:  Well, do you know?

1          THE WITNESS:  Well, if he's in outpatient patient, he

2    should have ready access to psychologists.

3    Q.    Where he proposed to live is Pharos House, correct?

4    A.    That's right.

5    Q.    And that is a community corrections center halfway house,

6    correct?

7    A.    Right.

8    Q.    Do they have a staff of psychologists?

9    A.    I don't know.

10   Q.    Unlike Butner, they don't, correct?

11   A.    I don't know.

12   Q.    Basically, do you have any knowledge that they do?

13          THE COURT:  No, I --

14          MR. GRADY:  All right, your Honor.

15          THE COURT:  We have to finish it up right now.

16          Well, let me just ask you one question.  Why wouldn't

17   it make sense just to let him finish the program?  If he's

18   doing well, it's a good program, he likes it, they think

19   he's -- I mean, they're connecting, they're engaging, it's only

20   another six months, why doesn't that make sense?

21          THE COURT:  I'll tell you why it doesn't make sense,

22   because in my training, not just about dealing with sex

23   offenders but every type of psychiatric issue, we employ a

24   least-restrictive alternative model.  In other words, if he is

25   able to get good treatment, appropriate treatment to his level

1    of service need, and there is a lesser-restrictive alternative,

2    then that is the appropriate alternative.  And what I had to

3    do, Judge, is make a decision:  Now that he has really done

4    well in treatment, sustained participation over the last year

5    and a half, from March of 2009 to the present, that he is in a

6    relapse plan, that he has now the tools that he didn't have

7    prior to that, he transitions out, is it reasonable to expect

8    that he will continue this progress in an outpatient setting?

9    And my answer is, yes, it is.  Well, if that is my conclusion,

10   which it is, then I'm not going to recommend that he stay at

11   Butner.

12         THE COURT:  The concern I have is, he's been doing

13   apparently so well with Dr. Hernandez and he's really engaged,

14   how do I know that he'll connect the same way with the

15   treatment providers in Maine?

16         THE WITNESS:  I think it's reasonable to expect that

17   he will because I think he has tools now that he didn't have

18   two, three years ago.  I think it is a very different

19   situation, and I think he will do well.  And, I mean, we're

20   sitting here talking about someone else's ability to live in a

21   community.  And there are two models, one is in a community and

22   one is not, and all the data that I'm aware of suggests that

23   outpatient-based cognitive behavioral treatment is just as

24   effective, if not even more effective in some cases, than

25   inpatient.  Not taking anything away from the quality of what

1    I've seen in the Butner program, which I said I think is very

2    good, I am forced to conclude, given the judgment that he can

3    continue his progress in treatment, that the lesser-restrictive

4    alternative is the more appropriate alternative.

5              THE COURT:  At trial, lots of people were criticizing

6    prior treatments as being poor, the ones he received in Maine.

7    That was viewed as one of the reasons he kept relapsing.

8              THE WITNESS:  Right.

9              THE COURT:  Have you looked at what's available in

10   Maine as to whether or not it's equivalent to what he'd get at

11   Butner?

12             THE WITNESS:  I have not done an exhaustive

13   investigation, other than the fact that I received my Ph.D. at

14   the University of Maine and was a treatment provider of sex

15   offenders in Maine.

16             THE COURT:  I wasn't talking about you.

17             THE WITNESS:  No, no, I didn't take it that way.

18             THE COURT:  Just the general mitigating circumstances

19   why he kept reoffending is, they weren't particularly good

20   programs?

21             THE WITNESS:  I do not think they were cognitive

22   behavioral programs of the sort that he would avail himself of

23   now.

24             MR. GRADY:  Thank you, your Honor.

25             THE COURT:  Thank you.

1   CROSS-EXAMINATION BY MR. SWOMLEY:

2   Q.   If you were to understand that a treatment program could

3   be devised and Mr. Shields would agree to avail himself of it

4   with Dr. Hernandez in a less-restrictive setting in North

5   Carolina, would you agree that that is something that could

6   both make the Judge happy and have Mr. Shields out in the

7   community posthaste?

8   A.   Yes, unequivocally, yes.

9   Q.   So if that is indeed what the Court thought, that Maine is

10  not the best place but North Carolina, you'd have no problem

11  with that being a least-restrictive approach as well?

12  A.   That would be correct.

13  Q.   And your understanding of least restrictive as being

14  beneficial is what?  Is that based on your understanding of the

15  Adam Walsh Act, or is that based on your understanding of the

16  psychological benefits of being in the community?

17  A.   The latter.

18  Q.   Okay.  Now, I'm going to try and take it down from where

19  Mr. Grady began and try and do it quickly, but in terms of this

20  whole issue of hebephilia, ephebophilia, pedophilia --

21       MR. SWOMLEY:  Your Honor, I just want to direct this

22  comment directly to you.  It is my understanding that in the

23  Daubert hearing, you rejected specifically the diagnosis of

24  ephebophilia and hebephilia as being scientifically founded,

25  and so your own questions, your Honor, I would submit you

1    answered by your own ruling in the prior proceeding here.

2         MR. GRADY:  If we're addressing the Court on this

3    issue, the Court should take a look at the opinion in United

4    States v. Carta issued by the First Circuit last year in which

5    they found that, first of all, paraphilia NOS hebephilia is a

6    mental diagnosis in the DSM as a matter of law, based on the

7    record in that case; and they found that even if it weren't a

8    DSM diagnosis, it falls within the definition that Congress

9    intended when it used the term "mental illness, abnormality, or

10   disorder."

11        MR. SWOMLEY:  I don't know what that does to your

12   Honor's previous ruling, but I will now approach.

13        THE COURT:  I think I just said hebephilia.  I don't

14   think I ruled, did I, that it was not paraphilia NOS?  I don't

15   know that we got that far.  It wasn't argued to me.  Am I

16   remembering that incorrectly?  I don't remember it well, and I

17   don't want to take the time now because --

18        MR. SWOMLEY:  Well, I certainly can parse all of that

19   out, but I don't know that I need to.  I guess the question is,

20   if you're really taking it seriously, Judge, I'm going there.

21   If you're not taking it seriously, then I'll punt, but --

22        THE COURT:  I'm taking it seriously.

23        MR. SWOMLEY:  Okay.

24   Q.   Then paraphilia NOS, are you familiar with that diagnosis,

25   Dr. Plaud?

1    A.    Yes.

2    Q.    And are you familiar with whether or not the American

3    Psychiatric Association in their working committees addressed

4    that as a concept when they decided whether or not to include

5    it in paraphilia NOS?

6    A.    They did.

7    Q.    So what you're saying is that the scientific community

8    actually had a discussion about whether or not it should be

9    included and expressly rejected it, regardless of whether the

10   U.S. Supreme Court would like to argue or like to find that it

11   should be part of the Adam Walsh Act?

12   A.    Correct.

13   Q.    As a scientific diagnosis --

14          THE COURT:  Excuse me.  When it was rejected, was

15   there a vote of the American Psychiatric Association?

16          THE WITNESS:  It was in a working committee.  Each

17   section of disorders -- this case, the sexual disorders -- has

18   a working group composed of psychiatrists and psychologists,

19   and they discuss --

20          THE COURT:  Did they have an express vote, or they

21   just never --

22          THE WITNESS:  I'm sure they had an express vote,

23   Judge, yes.  I'm sure they voted on whether or not they were

24   going to include it.  I don't know what the vote was.  I wasn't

25   there.

1    THE COURT:  Do you know one way or another?

2    THE WITNESS:  I know it was rejected.  That's what I

3  know.  I don't know what the vote was, but there had to be a

4  mechanism by which it was rejected, and I would imagine that --

5    THE COURT:  I don't know.  Every day of the week I'm

6  in committees where they just don't reach a decision.  It's not

7  a rejection.  You know, they decide not to decide it or it gets

8  tabled or -- that's different from out-and-out they decide it's

9  not a mental illness.

10    THE WITNESS:  Could be, could be.  Well, they decided

11  not to adopt it for the DSM-IV.  I will say that.

12  Q.   And, Doctor, indeed, when you have your attention drawn to

13  "Paraphilia not otherwise specified," 302.9, is it fair to say

14  that there are examples of paraphilias not otherwise specified

15  that they do suggest are included, right?

16  A.   Correct.

17  Q.   And those would include telephone scatalogia, obscene

18  phone calls, right?

19  A.   Correct.

20  Q.   Necrophilia, sex with corpses, right?

21  A.   Correct.

22  Q.   Partialism, and that would be exclusive focus on part of

23  the body, right?  So if you were a breast man and that's all

24  you got excited about, that would be partialism, right?

25  A.   Yes.

1    Q.    Zoophilia, sex with animals, right?

2    A.    Yes.

3    Q.    Coprophilia, sex with feces?

4          THE COURT:  I get the point.

5    Q.    Well, it's fair to say, those things, like, the frequence

6    of people that are excited or sexually aroused or have -- let's

7    just get that correct -- "intense, recurrent sexually arousing

8    fantasies, urges, behaviors --"

9          THE COURT:  Did you want Lee to get that?

10   Q.    It's a quote out of the DSM, but is that part of the

11   diagnosis of a paraphilia?

12   A.    Yes.

13   Q.    "Intense, recurrent sexually arousing fantasies, urges, or

14   behaviors," right?

15   A.    Right.

16   Q.    Now, when the DSM makers decided to itemize things that

17   are so rare in time that they decided not to break them out as

18   their own paraphilia with individual criteria, they lumped them

19   all together, these are rare, but these are paraphilias, right?

20   A.    Correct.

21   Q.    And they make clear:  We're not going to name them all

22   here because they happen so rarely, but we're going to put them

23   all in the end, right?

24   A.    That's right.

25   Q.    Now, would you agree that sexual arousal to postpubescent,

1  whether they be males or females, occurs far more often in the

2  general population than arousal to having sex with feces?

3  A.   Yes.

4  Q.   So the fact that something occurs far more frequently but

5  is not included here, is that by accident, in your professional

6  estimation?

7  A.   No.

8  Q.   It is because it was rejected, right?

9  A.   That's right.

10 Q.   Now, in terms of what is deviant, and you were asked to

11 help Mr. Grady define deviant in terms of what is a mental

12 abnormality, deviance has more than one definition, maybe to a

13 lay person versus a scientist, right?

14 A.   Correct.

15 Q.   In terms of what the scientific community views deviance

16 as, what is that?

17 A.   The scientific community of which I'm a member views

18 deviance in this regard as something that lies beyond the scope

19 or the realm of the normal human experiences.  Not only is it

20 statistically rare, but it's also outside the bounds of what we

21 consider and agree upon to be normal human experiences; in this

22 case, the expression of one's sexual impulses.

23 Q.   Okay.  Now, when you talk about sexual arousal to someone

24 who has or is developing secondary sex characteristics --

25 A.   Yes.

1   Q.   -- is it abnormal or deviant for an adult male to find --

2   and let's presume we're talking about homosexuality for the

3   time being -- an adult male homosexual, is there anything

4   deviant about being sexually aroused to a fourteen-year-old

5   with an erection that you see naked in a photograph?

6   A.   No.

7   Q.   And why is that?

8   A.   Because you are reacting, that person is reacting to the

9   same type/class of sexual stimuli that would be represented in

10  their attraction to adult males.  That is the key:  Are they

11  reacting to sexually explicit stimulation that evidences the

12  postpubescence?  And while certainly a fourteen- or a

13  fifteen-year-old isn't going to be as developed as a

14  twenty-four- or a twenty-five-year-old physiologically, there

15  are enough overlapping sexual characteristics that makes the

16  same pathway of sexual excitement activated.  It's just that

17  straightforward.

18  Q.   So while we as a society have made laws which criminalize

19  that behavior because it may involve making overt acts against

20  someone we as a society have determined or deemed to be a

21  vulnerable member of our population, the mental process of

22  being attracted is not abnormal, right?

23  A.   Yes.  There is deviant arousal and there's deviant

24  behavior.  They're not one and the same thing.  Deviant

25  behavior, a subset of which is illegal behavior.  It's deviant

1  because it's illegal.  We've decided and each state of this

2  country has decided what the proper age of consent for sexual

3  activity is.  I'm not here to debate it, argue it, question it.

4  It is what it is.  And if a person acts on that, it's deviant

5  behavior, it's illegal behavior.  But it's not a product of

6  underlying sexual deviance.  That is a very important

7  distinction.

8  Q.   And in terms of concluding --

9           THE COURT:  Well, can I ask you, how do you know it's

10  not abnormal to be attracted to a thirteen- or

11  fourteen-year-old?  It sounds based on experience to be

12  abnormal.

13           THE WITNESS:  Well, Judge, to answer your question, I

14  will refer you to the scientific literature, I will refer you

15  to my own research.  I have studied this directly myself using

16  the PPG with a --

17           THE COURT:  That's the thing we were just talking

18  about that's not reliable?

19           THE WITNESS:  Yes.  Well, Judge, it is reliable.  It's

20  not quite as simple as -- and in this case, it's the government

21  administering the test, so -- it's the major research tool.

22  I've been working with it for 23 years.  I have multiple peer-

23  reviewed publications using the PPG, penile plethysmography.

24           THE COURT:  So you would disagree with that court case

25  then?

1        MR. SWOMLEY:  Your Honor, I'm going to ask a few

2    questions that I think will help you.

3        THE COURT:  Okay.

4        THE WITNESS:  But just to answer your question here --

5    I want to be very specific about this -- I in my own research

6    have looked at this issue, and I will tell you that if a man is

7    attracted to women, they're going to be attracted to

8    postpubescent yet underage females.  And the same goes for men

9    who are attracted to men:  Adult men are going to be attracted

10   to postpubescent yet underage men, males.

11       THE COURT:  Right, but bring me back to pubescent.

12       THE WITNESS:  Well, if they're responding to sexual

13   stimulation that are not secondary in terms of their sexual

14   development, then they're pedophiles.  Whether it's exclusive

15   or not, they're pedophiles.

16       THE COURT:  Excuse me.  That's why I asked you the

17   question earlier on, the difference between pubescent and post-

18   pubescent.  A boy starts having cracks in his voice, maybe he

19   starts having a few hairs, he's twelve or thirteen or fourteen,

20   right in that transition moment, are you saying it's normal to

21   be attracted to a boy like that?

22       THE WITNESS:  If it's that development of those

23   characteristics, yes.  You're over the bridge.  Look at it as a

24   dividing line.  If there's any evidence --

25       THE COURT:  You say it's normal.  You've done research

874c2b56-d757-473f-bdfa-b77bd3db5643

1    on pubescent, and you say it's normal?

2         THE WITNESS:  When you say -- maybe it's not normal

3    behavior, but it's normal in terms of underlying -- whether the

4    question is whether the person is sexually deviant or not, yes,

5    it's normal.  It's normal if that's the issue.  Are they

6    sexually deviant?  That is the answer.

7         THE COURT:  So you've researched dealing with

8    pubescent boys?

9         THE WITNESS:  Yes.

10        THE COURT:  Twelve, thirteen, fourteen.

11        THE WITNESS:  Well, not on the boy.  On adults on that

12   area, that age range.

13        THE COURT:  So you'll produce that article afterwards.

14   Q.   By saying it's normal, you're not trying to invalidate the

15   Judge's own going, "Ooh, you were talking about a

16   twelve-year-old here.  Yuck."  That's not what normal is in the

17   scientific community, right?  We're not talking about whether a

18   normal -- i.e., Judge Saris, let's say she is normal, her

19   reaction --

20        THE COURT:  Or Congress.

21   Q.   -- natural reaction to that kind of information is,

22   "That's just not normal."  And I guess, are you saying that

23   she's wrong about that view of "That's just not normal," or

24   what you are talking about is, what is quote/unquote "normal"

25   is a different definition than what she's talking about?

1   A.   A different definition.   That's why I'm trying to

2   disentangle these two issues that I fear have been entangled.

3   And that is, there's deviant behavior and there's deviant

4   arousal, and they're not one and the same thing.   As a matter

5   of fact, some research shows that upwards of 60 percent of

6   those who offend against prepubescent children aren't

7   pedophiles.   Now, how do we deal with that one?   Because there

8   are other issues going on that don't have to do primarily

9   with --

10          THE COURT:   I've got enough problems with --

11          THE WITNESS:   I understand.   I think it's critical in

12   this case to distinguish between deviant or illegal behavior

13   and deviant arousal.   And if pubescent -- if the development,

14   the evidence is there of secondary sexual characteristics that

15   contribute to that person's sexual experience or underlying

16   pattern of arousal, that's not deviant.   Now, if they're

17   thirteen or fourteen or fifteen years old and you're acting on

18   it, that's illegal behavior.   That's deviant behavior in that

19   sense of the term.

20   Q.   Criminally deviant as opposed to psychologically deviant?

21   A.   Criminally, exactly.

22   Q.   Now, you know in this field that there are two aspects to

23   what makes definitionally a sex offender or a sexually

24   dangerous person, and it's not only having a diagnosis but then

25   having a likelihood.   It's the acting on, and we've gotten

Page 74

1    there, right?

2         MR. GRADY:  Objection, your Honor.  That's actually an

3    inaccurate statement of law.  It's not --

4         THE COURT:  No, let's let --

5         MR. SWOMLEY:  Okay.

6    Q.   There are two parts to risk assessment?

7    A.   Yes.

8    Q.   You can break it out any way you want to.  It's not just

9    whether they have a condition that makes them amenable to

10   offending; it's their likelihood of offending, right?

11   A.   Well, ultimately it's an issue of -- having a diagnosis or

12   a condition is a necessary but not sufficient condition.  In

13   other words, it's step one:  Do they have a condition?  If so,

14   the issue that it proceeds on to and the critical issue is one

15   of control, volitional capacity, or, as it reads, based on that

16   condition, "Does the person have a serious difficulty in

17   refraining from sexually violent conduct or child molestation

18   if released?"  That speaks centrally to the issue of volitional

19   capacity for that person at that time.

20   Q.   Okay.  Now, you testified a couple years back here in this

21   very court about Mr. Shields, right?

22   A.   Yes.

23   Q.   And you, I believe, if I'm -- I haven't read the

24   transcript quite as thoroughly as I think Mr. Grady has, but if

25   I'm not mistaken, you barely got over the hurdle there to

1  saying he was sexually dangerous, right?

2  A.   That's correct.

3  Q.   And can I understand that that really had as much to do

4  with volitional capacity as it did to any diagnosis you made?

5  A.   Correct.

6  Q.   And in fact, if I'm not mistaken, you noted correctly that

7  if you looked at Mr. Shields's offense history, his actual

8  hands-on offending of prepubescents, you have to go pretty far

9  back, and it appears that his offending behavior, while it went

10  on in time, went on in time in a fashion which had him

11  offending less against prepubescents?

12  A.   Right.

13  Q.   And moving more into -- I won't say normal behaviors but

14  less evidence of, say, for example, pedophilia?

15  A.   That is right, that's correct.

16  Q.   Now, and in terms of hands-on versus hands-off offending,

17  it appears that there was a decrease in that as well?

18  A.   Yes.

19  Q.   Okay.  Now, does -- and I'm going to jump around a little

20  bit -- does him acknowledging, Mr. Shields, that is, in therapy

21  that he has historically had issues of volitional control mean

22  he has no volitional control when he is explaining that in

23  therapy?

24  A.   No.  That's what I was trying to point out before.  I

25  think those were taken totally out of context.  That's what we

1    do in treatment.  The person is -- I mean, if they don't do

2    this, they're not going to make it through treatment.  They

3    have to acknowledge in as honest and open and forthright as

4    possible what their history is, what their conception of their

5    offense history is, what are the characteristics in any number

6    of domains while they were engaging in this behavior; and it's

7    noted and it's explored.  This is the fodder for which a person

8    analyzes their own abuse cycle.

9    Q.   So if you were, and you were, confronted with

10   Mr. Shields's own assessment, the Change Assessment Scale and

11   Motivation For Treatment dated 3/23/09 -- right, you were asked

12   questions about that?

13   A.   Yes.

14   Q.   And where he says "I need therapy --"

15   A.   Yes.

16   Q.   -- if he said "I don't need therapy," would that be a

17   better answer, one more indicative of low risk?

18   A.   No.  It would be a bad indicator because it would then

19   indicate that he's in some type of minimization or denial,

20   which would be inconsistent with progressing through treatment.

21   Q.   So if he said, "I don't have any problems, I am cured,"

22   would that be the better answer?

23   A.   (The witness nodded negatively.)

24   Q.   Would that be a more honest answer?

25   A.   Well, it might be a more honest answer, but for the

1   purposes of him participating in treatment, it wouldn't be a

2   good answer.

3   Q.   Well, let's presume that "As far as I'm concerned, I don't

4   have any problems that need changing," does an answer of, "I

5   disagree, I need and I have problems that need changing," is

6   that all by itself something that you look at and go, "Oh, my

7   God, he's at elevated risk"?

8        MR. GRADY:  Your Honor, at this point I'm just going

9   to observe in the form of an objection that this is supposedly

10  direct, and while Mr. Swomley is operating under time

11  constraints, I just wish to point it out.  Thank you.

12       THE COURT:  No, overruled.  This is my expert, so you

13  are both entitled to do -- I had forgotten Mr. Swomley's --

14       MR. SWOMLEY:  I'll keep my hands down.

15       THE COURT:  It's a motive, method of examination, but

16  it's keeping me up on a late afternoon after a morning of

17  trial.

18  Q.   I don't know whether you know the question that's still

19  here or not.

20  A.   I recall the question.  Specific to whether him answering,

21  are there areas he can improve or he needs help and him

22  answering "yes," I see that as a good response, something I

23  would like to see, not only as a treatment provider but even as

24  a risk assessor.  I would like to see that, so it reaches the

25  opposite conclusion as to the questions asked earlier.

1  Q.   Dr. Plaud, you were examined based on your prior testimony

2  with respect to the diagnosis pedophilia, and I'm leaving

3  hebephilia and ephebophilia out and going to pedophilia.

4  A.   Yes, yes.

5  Q.   And you were asked by the Judge whether Mr. Shields is

6  cured.  You found that he had pedophilia before, and I believe

7  you said it was based entirely upon historical factors, right?

8  A.   Yes.

9  Q.   And you were asked about chronic as well.

10 A.   Yes.

11 Q.   And I want to draw the Court's attention to a different

12 page than the one that Mr. Grady drew your attention to, but I

13 just want to go ahead and read what your answer was back then

14 for the Court and Mr. Grady, Page 109, Line 9:  "Doctor,

15 there's been some discussion of whether one can be cured of

16 pedophilia.  What is the course of pedophilia?  Is it something

17 that ebbs and flows, goes away?  Answer:  Well, pedophilia is

18 described in the Diagnostic and Statistical Manual using

19 another generic term of 'chronic.'  It's oftentimes considered

20 to be a chronic condition, which would seem to indicate it has

21 a longevity or it is fairly resistant to change over time.

22 There is no one answer I can give you about curing pedophilia.

23 It depends.  It's a case-by-case basis.  Individuals who may

24 have the diagnosis have other factors, physiological,

25 psychological, behavioral factors that would make that, even

1   though technically a diagnosis, something that they could

2   reorient to.  Others, it would be more difficult to do that.

3   We used to use other older terms," and then it goes on.

4   A.   Yes, I think I answered the question better then than I

5   did today.

6   Q.   In terms of what is meant by "chronic" and what you see in

7   Mr. Shields, do you think Mr. Shields -- well, let me just ask

8   the blunt question:  Has Mr. Shields exhibited, since this

9   Judge found him dangerous and committed him, has Mr. Shields

10  done anything or have you seen any evidence post that

11  commitment indicating he has deviant arousal to prepubescent

12  children?

13  A.   No.

14  Q.   And you've looked at everything that is in the

15  government's exhibit there.  Anything that screams out "I'm a

16  pedophile" today?

17  A.   None.

18  Q.   And in terms of definitionally meeting the definition --

19  and I believe we talked about that a second ago -- "intense,

20  recurrent sexually arousing fantasies, urges, or behaviors,"

21  right?

22  A.   Correct.

23  Q.   You have no evidence currently that he has sexually

24  arousing fantasies, right?

25  A.   That's right.

1    Q.    You have no evidence currently that he has sexually

2    arousing behaviors?

3    A.    Concerning prepubescent children, correct.

4    Q.    And no evidence currently that he has any urges?

5    A.    Correct.

6    Q.    That would be what would be required for you to diagnose

7    him currently as a pedophile, right?

8    A.    Yes.

9    Q.    Without those things to diagnose him as a pedophile, you

10   would have to add something like "pedophile in remission" or

11   some diagnosis that would suggest:  At one point in time, we

12   could make a robust diagnosis of pedophilia.  Today, by looking

13   at the DSM-IV's own definition, he doesn't have those three

14   things that we just talked about, right?

15   A.    That's right.

16   Q.    And to say "once a pedophile, always a pedophile" would be

17   essentially the only way you could give him that name today?

18   A.    That would be a way to give him that name today, yes.

19   Q.    And other than that, giving him --

20           THE COURT:  You know, it is useful to let him talk.

21           MR. SWOMLEY:  Okay.

22           THE COURT:  I'm allowing some leeway.

23           MR. SWOMLEY:  Okay.

24   Q.    Is there any further use for that definition or that term

25   if you're not implying volitional impairment?

1        THE COURT:  No come on.  I want him.  He's the expert.

2   Q.   What does giving someone that label today mean?

3   A.   It would be by record.  It would be a diagnosis by

4   historical information going back a number of years, if not

5   decades.  There's no evidence of any current sexually arousing

6   thoughts, impulses, fantasies, desires, or behavior involving

7   prepubescent-age children today.  There is none.  Am I aware of

8   his past activity, behavior, thoughts with prepubescent-age

9   children?  Yes, I am.  I think now what I know, reading his

10  treatment notes, understanding more of his own detailing of his

11  victim histories, that there were many other issues going on

12  with him that I think support a conclusion that a pedophilia

13  diagnosis today is not an appropriate diagnosis.  I would be

14  prepared only to give it by record and not today, not as a

15  current basis of diagnosis.  That's why right out of the gate I

16  said I don't think he is a pedophile today.

17  Q.   Mr. Grady drew your attention to a section in the DSM-IV

18  with respect to the definition of pedophilia that talked about

19  it being chronic?

20  A.   Yes.

21  Q.   And then he went through several definitions of chronic

22  with you, right?

23  A.   Yes.

24  Q.   Are you aware of the DSM-IV addressing the issue of

25  behaviors as it relates to diagnoses and what -- well, you're

1    looking quizzically at me, and I will rephrase the question so

2    you'll understand my question better.

3         Does the DSM-IV, by virtue of offering you a large menu of

4    mental abnormalities or disorders that one can use to diagnose

5    someone with, does the DSM-IV then go on and import some level

6    of impairment based upon just the diagnosis itself?  So when

7    Mr. Grady asked you the question it's chronic, "Isn't it

8    chronic?" and you say "Yes," does that imply that means

9    Mr. Shields, because he will and always will have somewhere in

10   him some diagnosis of pedophilia, that that implies any level

11   of lack of volitional control?

12   A.   No, no.  The DSM -- and it's not only for the sexual --

13   disorders, in all major categories of mental disorders, a

14   diagnosis does not carry with it any current statement about a

15   person's volitional capacity or control over that disorder.

16   That's very important and critical to a case like this because

17   even if you want to give him a diagnosis, the question is, is

18   there evidence that he has appropriate control over it?

19        I myself, Judge, could easily be diagnosed with a specific

20   phobia --

21             THE COURT:  Don't go there.

22             THE WITNESS:  Well just as an example, and I fly --

23   I'm terrified of heights, but I travel, I fly in airplanes.  I

24   don't love it, I don't relish it.  I do it.  I have control

25   over it.  And that is a significant issue.  I believe

1  Mr. Shields now, given the elapsing of not only a year and a

2  half, two years, but with what he has undergone

3  therapeutically, I think it's a different baseline now.  I

4  think he has some tools and awareness he didn't have a couple

5  years ago, and I --

6          THE COURT:  How much time did you spend with him, did

7  you say?

8          THE WITNESS:  I've interviewed him on three occasions,

9  a couple of hours the last time.

10          THE COURT:  So did you go down, or was it on the

11  phone?

12          THE WITNESS:  No, no.  I went down to Butner.

13          THE COURT:  Three times?

14          THE WITNESS:  No, no, no.  I've interviewed him three

15  times total, but one time I spent a Saturday --

16          THE COURT:  No, no, since?

17          THE WITNESS:  Oh, yes, yes.  I went down to Butner,

18  and I interviewed one on one.

19          THE COURT:  A couple of hours?

20          THE WITNESS:  Yes, yes.

21  Q.   Just drawing your attention, is this the section in the

22  DSM-IV, and I believe it's in the introduction, Page iii,

23  "Nonclinical decision-makers caution"?

24  A.   Exactly, that's exactly what I was referring to.  It says

25  that a diagnosis does not carry any necessary implications

1  regarding the causes of an individual's mental disorder or its

2  associated impairments.

3  Q.   Okay.  And in terms of what you know about Mr. Shields

4  since his commitment, what have you seen him do or what is the

5  clinical notes, what have you read or learned from talking to

6  him that indicates that he is able to control his behaviors, is

7  at lower risk, the things that differentiate him from the

8  Mr. Shields that was classed as sexually dangerous by the Judge

9  a year and a half ago?

10 A.   I've seen a very dramatic life-style orientation change

11 through his participation in treatment.  I've seen him

12 addressing very specifically exactly what his history is, what

13 he's done, what his mindset was, what his orientation was at

14 the time, an exploration of himself during this period of time,

15 which I do not think was ever in evidence two and more years

16 ago.  I don't care what treatment he went through, it was not

17 evident.  And during my initial two interviews with him, I saw

18 this evasiveness.  I caught him in untruths during the initial

19 interview.  We went over all this material in the third

20 interview, the one down in Butner since his commitment, and

21 it's clear to me that he has learned significantly from

22 treatment.  He's learned about himself.  He's learned about his

23 motivations.  He's learned some tools.  He's learned about

24 interventions.  He's learned about his cycle.  These are issues

25 that are very important.

874c2b56-d757-473f-bdfa-b77bd3db5643

1    And in earlier testimony I gave, much of what we know

2  about his own offense history is from his own disclosure

3  subsequent to his commitment, which, as you can see, Judge,

4  serves him not very well in the sense of now it can be used

5  against him, and it is being used against him, and the only way

6  we know it is from his own disclosure.  This --

7         THE COURT:  All right, I get it.  We just need to

8  finish, so I understand.

9         THE WITNESS:  It's a dramatic change, and I don't see

10 it very often.  I've been a treatment provider for many years.

11 I've dealt with a lot of sex offenders in a lot of different

12 contexts, both as an assessor and as a treatment provider, and

13 in going through his records, I see some dramatic changes.

14        THE COURT:  Thank you.

15 Q.   I do want to ask you whether you view the fact of his

16 disclosures as being a risk enhancer at all.  Does the fact --

17 and can one say, okay, he's disclosed, but since he lied in the

18 past, we can assume he's lying about these disclosures?  I

19 mean, that was, I believe, what Mr. Grady was --

20        THE COURT:  No.

21        MR. SWOMLEY:  Okay, I'll leave that one alone.

22        THE COURT:  Thank you.  I think that's got to be it.

23 Do you have any other questions?

24        MR. SWOMLEY:  I'm sure I do, and I really haven't had

25 had anywhere near the time --

1      THE COURT:  No, you haven't had what Mr. Grady has,

2   but another fifteen minutes will, and I have another hearing,

3   as I said, and they're all huddling outside, so --

4   Q.   You talked about Phase 4.

5   A.   Yes.

6   Q.   And I believe your familiarity with what you know to be

7   Phase 4 comes mostly from the Massachusetts civil commitment

8   process, right, and how long Phase 4 takes?

9   A.   Well, look, partly from that.  Look, I've been a treatment

10  provider in about twenty-two settings, you know, so --

11  Q.   But when you say eight months to a year, you're not

12  talking about what goes on at Butner?

13  A.   No, I don't know specific to Butner.  I'm guessing based

14  on --

15  Q.   And your eight months to a year is largely looking at the

16  time frame when you have a full house down at the Mass.

17  Treatment Center, 300 plus people trying to get the therapy

18  they need to get, trying to get the individual attention.  With

19  two people, maybe three, I'm not sure what Dr. Hernandez has

20  got right now, but it's fair to say, he's capable of covering a

21  lot more ground more rapidly?

22  A.   I was very impressed by the program and the availability

23  of Dr. Hernandez, yes.

24  Q.   And in terms of whether or not Phase 4 needs to be done in

25  the prison setting, does it need to be to get the benefit of

1   it?

2   A.    No.

3   Q.    And if there were less-restrictive alternatives available

4   and he can still do Phase 4, be insured of doing Phase 4, is

5   there any reason why he should wait to get out?

6   A.    None.

7   Q.    And in terms of the length of time it would take to finish

8   Phase 4, are you familiar with the law as it relates to getting

9   back here in front of this Judge, how long he would have to

10  wait even after finishing Phase 4 if he were to avail himself

11  of another attempt at a hearing?

12  A.    I'm not aware, no.  I imagine it wouldn't be any less than

13  a year, but I don't know.

14  Q.    Okay.  And do you think that there are sufficient

15  safeguards available, both through federal probation and your

16  understanding of what powers federal probation has, to insure

17  the safety of the community and to make him do Phase 4?

18  A.    Yes, I do.

19  Q.    And if he does Phase 4, is it your view that he will be

20  even less dangerous then?

21  A.    I believe he will be less dangerous, yes.

22  Q.    With respect to the PPG -- and I only want to ask you a

23  couple of questions just because I want to differentiate

24  between the value of the PPG as a therapy reinforcement as

25  opposed to a research tool or an admissible procedure in

1    Federal Court -- are you aware of the different uses of the

2    PPG?

3    A.    Yes.

4    Q.    And would you describe how it's different if you're

5    talking about it as a federal question of admissibility versus

6    if it's a treatment tool.

7    A.    Yes.

8    Q.    Please describe.

9    A.    Well, first of all, it's the most utilized tool for

10   research into human sexual arousal.  It has been since the

11   1950s, and it continues to be, albeit the equipment is refined

12   due to technology, but it is and continues to be.  I have used

13   it myself in a variety of contexts for over twenty years.  But

14   beyond that, as a -- and it's used in all the major treatment

15   programs, including Butner.  I mean, it's not there just

16   randomly.  It's there because as a check on certain elements of

17   treatment.  It can be used directly in treatment to target

18   deviant arousal, any number -- as a check on the progress that

19   one is self-reporting in treatment in terms of arousal

20   patterns.  There's any number of reasons it can be used in

21   treatment, but the bottom line is, it is used.  All the major

22   treatment programs use it.  My treatment programs I use it, so

23   it's there.

24         Now, in terms of Daubert standards, Frye standards,

25   et cetera, absolutely right, there's no one way to do a PPG.

1   When I do it, I think I do a wonderful job.  I have published

2   on it.  But I do it my way.

3         THE COURT:  Has any court in the country allowed it in

4   after --

5         THE WITNESS:  Well, I've been involved in cases,

6   Judge, here.  I'm sorry.

7         THE COURT:  -- after a Daubert challenge.

8         THE WITNESS:  I'm not aware of any that have let it in

9   after a Daubert challenge, Judge.  I know that it's been

10   allowed.

11         THE COURT:  Is this the only case out there that

12   doesn't allow -- has excluded it after a Daubert challenge, or

13   are there multiple --

14         THE WITNESS:  No, I'm sure there are multiple ones

15   because there is no one way to do it.  I agree it should be

16   rejected under Daubert because there's no one way to do it.

17   You have to have certain criteria met.  You have to have known

18   error rate.  You know, general acceptance under Frye is just

19   part of that.  And it's difficult with PPG because there is no

20   one standard way to do it, so I understand.  That doesn't mean

21   it's been rejected.  I've certainly had my PPG results admitted

22   in cases.  In some I haven't and some I have.  It has never

23   formed the totality of my opinion, so I take it for what it is.

24         THE COURT:  We do need to finish.

25   Q.   Okay, any reason to believe that Dr. Hernandez and his

1    team didn't use it properly?

2    A.   No.

3    Q.   Or conduct the test properly?

4    A.   No.

5    Q.   And is there any reason to believe that --

6         THE COURT:  You know, this is a wasted question.

7    Okay, thank you.  Thank you very much.

8         (Witness excused.)

9         THE COURT:  Now, what are we going to do?  You have

10   Dr. Hernandez sitting here patiently.  I cannot get to him.  I

11   have to do this revocation hearing.  And I am on trial, and I'm

12   on trial with you all tomorrow.  So what should we do?

13        MR. GRADY:  We have November 12.

14        MS. PIEMONTE-STACEY:  We have a November 12 date, your

15   Honor.

16        THE COURT:  What day is that?

17        MS. PIEMONTE-STACEY:  It's a Friday, your Honor.

18        THE COURT:  I'm not sure that that's going to work.

19        MS. PIEMONTE-STACEY:  Okay.  Well, either way, we can

20   contact Mr. Alba and reschedule.

21        THE COURT:  But let me just ask you this.

22   Dr. Hernandez, could you stand up for a minute because I just

23   want to make sure I know who you are.

24        DR. HERNANDEZ:  Yes, ma'am.

25        THE COURT:  Good.  I read with interest your

1    conditions of release.  Was your assumption that those

2    conditions would take place in North Carolina?

3            DR. HERNANDEZ:  No.  Wherever the Court would release

4    Mr. Shields.

5            THE COURT:  So you're saying that it is or it is not

6    safe to release him with these conditions, because I couldn't

7    quite figure that out?

8            DR. HERNANDEZ:  It would be my opinion that it would

9    not be safe to release him without these conditions.

10           THE COURT:  But if I have those -- I don't want the

11   flip side negative.  If we were able to put together a program

12   with these conditions and with a program you approved, would it

13   be safe to release him?

14           DR. HERNANDEZ:  It would be.  However, as I've

15   consulted with the Assistant U.S. attorneys, it's a bit more

16   complicated than that.  But to answer that question, yes, I

17   would review it and I would be --

18           THE COURT:  Could you all look into the program in

19   Maine and see whether it meets these conditions so this isn't

20   dead time.

21           MR. SWOMLEY:  Can I represent that Mr. Shields would

22   be happy to be released into a halfway house in the

23   neighborhood of Butner and continue with Dr. Hernandez.

24           THE COURT:  Have you looked into whether or not the

25   judge in Maine would transfer jurisdiction down there?

1          MS. PIEMONTE-STACEY:  Your Honor, that's not -- the

2     conditions as outlined in Dr. Hernandez's disclosure is not

3     developed in the context of a halfway house or independent

4     living.  It's developed in the sense of a Phase 5 program.  He

5     hasn't finished Phase 4, so Dr. --

6          THE COURT:  Let me just cut through all this.  I don't

7     have time for this right now because I have a major revocation

8     happening, but what I'd like -- when I read this, my ears

9     perked up because usually what I'd love to know is, and I will

10    ask you at the next hearing is, if there is a program in Maine

11    that would be able to meet his -- Dr. Hernandez seems to be on

12    the same page in some ways with Dr. Plaud in trying to come up

13    with the least-restrictive environment.  I think there's a

14    consensus that Mr. Shields has done well, and that's not always

15    the case, okay.  So what I'd love to do is not have this be a

16    pitched warfare and have some collaborative process in trying

17    to come up with something that will work.  And I was wondering

18    if for the next hour -- what time is your flight?

19         DR. HERNANDEZ:  Tomorrow morning.

20         THE COURT:  Lovely.  Do you all have some time that

21    you could all just sit down and see if there's something that

22    would work?

23         MS. PIEMONTE-STACEY:  It can't be done today, your

24    Honor, but I'm happy to do it.

25         THE COURT:  Why can't it be done today?

1       MS. PIEMONTE-STACEY:  Because I've explored it with

2   Dr. Hernandez.  There are two opinions from the Bureau of

3   Prisons.  He is not aware of any program that has these

4   conditions that he outlines.  That's why it's a little more

5   complicated, as he tried to explain.  He's not aware of any

6   program in Maine, in North Carolina that --

7       THE COURT:  Well, what's the condition that can't be

8   met, because I read them and they seemed like pretty doable

9   things?

10      MS. PIEMONTE-STACEY:  Well, they may have seemed like

11  pretty doable things --

12      THE COURT:  Well, like what?  What can't be done?

13      MS. PIEMONTE-STACEY:  The concept, the team's concept

14  of what would be -- you can't jump to Phase 5 without

15  completing Phase 4.

16      THE COURT:  Can't you do Phase 4 outpatient?

17      MS. PIEMONTE-STACEY:  And I think Dr. Hernandez would

18  testify that his level of confidence isn't as great if he

19  hasn't completed -- it's optimal for him to complete Phase 4

20  before he went to these conditions.

21      THE COURT:  I understand, but what I'm going to ask

22  him is, to a reasonable degree of medical certainty, whether or

23  not Phase 4 can be done outpatient.  That is going to be the

24  key question.  And the second key question is, can Maine do it

25  outpatient?  Because Maine's programs have failed before.  And

1   I am not there yet.  I am not persuaded, I have to tell you,

2   that he no longer has a mental disorder.  However, it just

3   seems too quick to have a lifetime history of being attracted

4   to children and prepubescent males and somehow have it go away.

5   That's a different issue, as you validly have put out, as to

6   whether or not he can control it with the right set of

7   conditions, and so that's what I would like to experiment with.

8   Now, in the meantime, unfortunately, I would rather have him

9   not be up here.

10       MR. SWOMLEY:  He would like to go back to Butner

11  immediately if we're going to have any length of time between

12  hearings.

13       THE COURT:  Yes, I think that's a realistic thing.  I

14  want him to go back and work with Dr. Hernandez and get as far

15  into this phase as we can because this is what's working, this

16  is what's working.  And it's a really good story, not a bad

17  story.  I mean, who knows, maybe the First Circuit will let you

18  out before.  I don't know how that argument went.  But what I

19  really want to happen is that he continue treatment and he not

20  sit in dead time in that awful place.  Where is it, Wyatt?

21  It's got to be that your place is a whole lot nicer than that,

22  right?

23       MS. PIEMONTE-STACEY:  Well, we had recommended that he

24  go back and not --

25       THE COURT:  Yes, he should be sent back.  I can't do

1   it on November 12 because there's a judges' retreat on that

2   Friday, and so Robert is going to have to reschedule it.  What

3   my hope is is that we're going to take a few minutes off now,

4   we're going to come up with another date where we'll finish

5   both doctors.  I haven't received the expert report from your

6   doctor.

7            MS. PIEMONTE-STACEY:  The supplement of Dr. Kunik?

8            THE COURT:  Yes.

9            MR. SWOMLEY:  I'm content to not ever call Kunik, let

10   you rely entirely on everything bad in that report, credit it

11   however you want to credit it, and get rid of that as a witness

12   that we have to come back here for.

13            THE COURT:  I haven't even read it yet.

14            MR. SWOMLEY:  I wanted to streamline this and say, if

15   we could have done this in half an hour, half an hour, and he

16   was then on and off.  My view is with conditions, and he'll

17   agree to any, absolutely any set of conditions.

18            THE COURT:  I understand, I understand.  We're sending

19   him back right now.  He's continuing with Phase 4.  We're

20   coming up with another date.  Do you want your doctor on?

21            MS. PIEMONTE-STACEY:  Yes, your Honor.

22            THE COURT:  But I need his expert report, and I need

23   Dr. Hernandez to try and work with -- I would like right now --

24   in fact, I'm ordering that you spend fifteen or twenty minutes

25   together to see what the issues are, which maybe could be

874c2b56-d757-473f-bdfa-b77bd3db5643

1    ironed out so I'm not bumping this yet again.

2         MS. PIEMONTE-STACEY:  Yes, but, your Honor, just so

3    the record is completely clear, Mr. Shields has no release plan

4    and has never committed to the Bureau of Prisons of going to

5    Maine.  This is one place.  It might be North Carolina, it

6    might be Maine, it might be Boston.  That's one of the

7    fundamental problems.

8         THE COURT:  Yes, I know, but I could help that.  I

9    could contact a judge in Maine.  We could transfer jurisdiction

10   to North Carolina.  I'm the liaison to Probation.  I can figure

11   out whether or not there's a program that would meet Maine's

12   characteristics.  My point is, I don't want to bump this again.

13        MS. PIEMONTE-STACEY:  Right.

14        THE COURT:  And it may be that I decide he needs to do

15   Phase 4 in Butner, but then I want him out because it's eight

16   months.  That's not so far from now.  I want this to work so

17   that I'm not keeping putting it off.  I'm an extremely busy

18   trial judge right now.  For some reason, my bad luck, I am

19   always on trial.  It never stops.  I've been on trial for a

20   year and a half.  And so it's very difficult for me to do these

21   in the afternoons.  Tomorrow I have -- for some reason that's

22   bad luck in the gamble, I've got three of these sex offender

23   cases.  I've got another one tomorrow.  I've got Todd Carta.

24        MS. PIEMONTE-STACEY:  So do I.

25        THE COURT:  I mean, it's just bad luck.

1          MS. PIEMONTE-STACEY:  It is.

2          THE COURT:  The other thing I want from you all is any

3    scientific articles one way or another on this hebephilia

4    issue.  It was also an issue in my last trial.  It was not well

5    vetted, and there was very sparse evidence, and it was hardly

6    addressed at all.  It's obviously a key issue, both in this

7    case and in the Todd Carta case, and I need to know more about

8    it, okay?

9          MR. SWOMLEY:  Can the record be clear you're ordering

10   him back to Butner because otherwise he will just languish?

11         THE COURT:  Yes, he's going back to Butner, and we're

12   going to come up with another date which is acceptable to

13   Dr. Hernandez.  And I'm very sorry, sir, but we have this very

14   serious revocation that's not run-of-the-mill, and it's been

15   bumped once, so I have to finish that today.

16         (Adjourned, 4:18 p.m.)

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2


3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5


6


7          I, Lee A. Marzilli, Official Court Reporter, do hereby

8  certify that the foregoing transcript, Pages 1 through 97

9  inclusive, was recorded by me stenographically at the time and

10 place aforesaid in Civil Action No. 07-12056-PBS, United States

11 of America v. Jeffrey Shields, and thereafter by me reduced to

12 typewriting and is a true and accurate record of the

13 proceedings.

14     In witness whereof I have hereunto set my hand this 6th

15 day of November, 2010.

16

17

18

19

20
                /s/ Lee A. Marzilli
21             _____

               LEE A. MARZILLI, RPR, CRR
22             OFFICIAL COURT REPORTER

23

24

25