```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
                Petitioner     )
                               )
           -VS-                ) CA No. 07-12056-PBS
                               ) Pages 2-1 - 2-87
JEFFREY SHIELDS,               )
                               )
                Respondent     )




                    DISCHARGE HEARING - DAY TWO

                BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE




                           United States District Court
                           1 Courthouse Way, Courtroom 19
                           Boston, Massachusetts
                           December 6, 2010, 2:30 p.m.
```

```
                    LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
               United States District Court
               1 Courthouse Way, Room 7200
                   Boston, MA  02210
                     (617)345-6787
```

91a1bc96-6a29-4aed-80f0-2305a1d61264

1    A P P E A R A N C E S:

2         MARK J. GRADY, ESQ. and EVE A. PIEMONTE-STACEY, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Boston, Massachusetts, 02210,
     for the Petitioner.

4
          JOHN G. SWOMLEY, ESQ. and ERIC B. TENNEN, ESQ.,
5    Swomley & Associates, 227 Lewis Wharf, Boston, Massachusetts,
     02110-3927, for the Respondent.

6

7
                              I N D E X
8

WITNESS                    DIRECT   CROSS    REDIRECT   RECROSS
9

ANDRES HERNANDEZ
10

         By Mr. Swomley:              2-8
11       By Ms. Piemonte-Stacey:               2-43
         By Mr. Swomley:                                  2-47
12

TANYA CUNIC
13

         By Mr. Swomley:              2-62
14       By Ms. Piemonte-Stacey:               2-76

15

16   EXHIBITS                     RECEIVED IN EVIDENCE

17   Government

18   D                                2-8

19   E                                2-60

20   F                                2-61

21

22

23

24

25

91a1bc96-6a29-4aed-80f0-2305a1d61264

1                    P R O C E E D I N G S

2            THE CLERK:  The case of the United States v. Jeffrey

3    Shields, Civil Action 07-12056, will now be heard before this

4    Court.  Will counsel please identify themselves for the record.

5            MS. PIEMONTE-STACY:  Good afternoon, your Honor.  Eve

6    Piemonte-Stacey and Mark Grady for the United States.

7            MR. SWOMLEY:  Good afternoon, your Honor.  John

8    Swomley and Eric Tennen for Mr. Shields.

9            Can you hear us, Mr. Shields?

10           MR. SHIELDS:  I cannot hear you.

11           MR. SWOMLEY:  Can you hear us now, Mr. Shields?  Can

12   you hear us?

13           MR. SHIELDS:  No.

14           THE COURT:  Can you hear me, Mr. Shields?

15           MR. SHIELDS:  No, ma'am.

16           MS. PIEMONTE-STACY:  I think he means not well.

17           THE COURT:  He needs what?

18           MS. PIEMONTE-STACY:  I'm saying, I think it's faint.

19   He can hear it but not --

20           THE COURT:  Can you hear me?

21           MR. SHIELDS:  Yes, I can hear you now, Judge Saris.

22           MR. SWOMLEY:  We have to speak loudly?  Is that the

23   only way you can hear us?

24           MR. SHIELDS:  When you talk into that microphone, I

25   can hear you.

United States v. Shields - Discharge Hearing Day 2

1          THE COURT:  Can you hear me now?

2          MR. SHIELDS:  Yes, ma'am.

3          THE COURT:  So I think it just means speaking directly

4     into the mike.  You don't have to actually shout, which would

5     be a big issue for Lee.  It would be booming all over the

6     place.  So if you can't hear, you'll let us know, right?

7          MR. SHIELDS:  Yes, ma'am.

8          THE COURT:  Okay, thank you.  I can hear you loud and

9     clear.

10         MR. SHIELDS:  I can.  I can hear you guys as long as

11    you talk into the microphone.

12         MR. SWOMLEY:  Okay.

13         THE COURT:  I don't mind if you don't stand in

14    addressing me.  It might be easier to speak into the

15    microphone, since you're so tall, Mr. Swomley.

16         MR. SWOMLEY:  I can't think sitting down, Judge, is my

17    problem.

18         THE COURT:  Do what you need to do.

19         MR. SWOMLEY:  Thank you.

20         THE COURT:  All right, so who's your witness at this

21    point?

22         MR. SWOMLEY:  Your Honor, if you recall where we are

23    in these proceedings, Dr. Plaud came in here and testified on

24    the cross-examination only.  And I know you said you like to

25    hear direct.  I, frankly, was somewhat unhappy with the manner

United States v. Shields – Discharge Hearing Day 2

Page 5

1    of the conducting of that first part because I got the sense

2    that you didn't really get brought along with the -- I mean, he

3    wrote a report that was favorable to Mr. Shields and one which

4    found him to be not sexually dangerous.

5              THE COURT:  Right.

6              MR. SWOMLEY:  And there was no taking you through

7    essentially why it is that he was found not sexually dangerous,

8    and all you got was what I would consider to be a rather

9    scorched-earth, rudimentary cross of Dr. Plaud, as it would be

10   in any beginning first-round hearing.

11             THE COURT:  Excuse me, excuse me.  Who are we supposed

12   to see today?

13             MR. SWOMLEY:  Two government witnesses, one of whom is

14   the BOP's expert and the other of whom is their therapist.

15             THE COURT:  All right, so that's who I'm going to see,

16   and if there's a need for rebuttal, I'll deal with it.  Okay?

17             MS. PIEMONTE-STACY:  Your Honor --

18             THE COURT:  Is Dr. Plaud here?

19             MR. SWOMLEY:  No.

20             THE COURT:  All right.  Well, so this is what we're

21   going to do:  We'll call him to the stand, and then I don't

22   remember, I don't know how much time we have, but we're going

23   to hopefully go through them, and then if there's a need for a

24   response, we'll deal with it.

25             MR. SWOMLEY:  I guess where I am is, in rebutting

United States v. Shields - Discharge Hearing Day 2

Page 6

1   essentially what you heard from the cross of Dr. Plaud, I'm

2   going to do roughly the same thing that they did to Dr. Plaud

3   to Dr. Cunic, and that is, go through pretty much everything

4   that forms the basis of her opinion and the backgrounds of her

5   opinion, and I'm going to even go into her own educational

6   background because I'm going to try and demonstrate --

7          THE COURT:  You know what, don't scare me.  Are you

8   putting on a direct case at all or just the report?

9          MS. PIEMONTE-STACY:  Your Honor, we're putting in the

10  report and then some --

11         THE COURT:  That's what the agreement was, fine.

12         MS. PIEMONTE-STACY:  That's what the agreement was.

13         THE COURT:  So why don't you call her to the stand,

14  please.

15         MR. SWOMLEY:  Can I ask you, if you have extra time

16  next week, can I take some of it?  I'll take Wednesday.

17         THE COURT:  Right now, we're not even dealing with

18  that.  We're going to hear where it goes.

19         MR. SWOMLEY:  Yes.

20         THE COURT:  All right.

21         MS. PIEMONTE-STACY:  The government would call

22  Dr. Andres Fernandez to the stand.

23         MR. SWOMLEY:  Can I say, I thought that we were going

24  with the experts and then we were going with the --

25         MS. PIEMONTE-STACY:  This is the exact order we

United States v. Shields − Discharge Hearing Day 2

Page 7

1    discussed.

2          THE COURT:  We talked about Hernandez because he was

3    sitting here through the whole last one.  We're going to get

4    him out of here today.  Where's your expert from?

5          MS. PIEMONTE-STACY:  Butner, your Honor, North

6    Carolina.

7          THE COURT:  All right, we're going to try and -- if

8    not, we'll spill it into tomorrow morning.

9                    ANDRES HERNANDEZ

10   having been first duly sworn, was examined and testified as

11   follows:

12         THE COURT:  Thank you for coming back, Doctor.

13         THE WITNESS:  You're welcome.

14         THE COURT:  And the key is, now, Mr. Shields, can you

15   see Dr. Hernandez?

16         MR. SHIELDS:  No, ma'am.  I can see you.  I can't see

17   him.

18         THE COURT:  Wouldn't you rather see Hernandez?

19         MR. SHIELDS:  Yes, ma'am.

20         THE COURT:  I think so.  I mean, I'm not taking it

21   personally.  I think you'd rather see him testify.

22         MS. PIEMONTE-STACY:  Your Honor, as a preliminary

23   matter, Dr. Hernandez's disclosure, the statement, summary of

24   his testimony is in already as Exhibit C, and I'd like to offer

25   as Exhibit D his CV.

United States v. Shields - Discharge Hearing Day 2

1        THE COURT:  All right.

2        (Government Exhibit D received in evidence.)

3        MR. SWOMLEY:  May I inquire?

4        THE COURT:  Yes.

5    CROSS-EXAMINATION BY MR. SWOMLEY:

6    Q.   Dr. Hernandez, if you would, please, briefly explain your

7    credentials and the position that you hold at FCI Butner.

8    A.   I am a clinical psychologist.  I am the coordinator, the

9    clinical coordinator of the --

10       THE COURT:  Now, something makes me think that your

11   mike isn't on.  Let me just make sure that it is because he

12   needs that to have you hear it.  Maybe Phil can figure this

13   out.

14       MR. SWOMLEY:  Mr. Shields, can you hear the witness?

15       THE COURT:  It's on.  You'll notice, Dr. Hernandez, it

16   will catch if you speak directly into it in a certain way.

17   Just it's got to --

18       MR. SWOMLEY:  Say "testing, testing, 1, 2, 3."

19       THE WITNESS:  Testing.  Mr. Shields, can you hear me?

20       MR. SHIELDS:  Yes.

21   A.   Clinical coordinator of the Commitment and Treatment

22   Program at FCI Butner.

23   Q.   And I actually asked you what your background is that

24   permits you to hold that position, if you wouldn't mind briefly

25   going through it.

United States v. Shields - Discharge Hearing Day 2

Page 9

1    A.    I am a clinical psychologist.  I have a doctorate in

2    clinical psychology.  I am licensed in the state of North

3    Carolina as well as the state of Texas.

4    Q.    And how long have you been involved in sex

5    offender-specific therapy?

6    A.    A little over 18 years.

7    Q.    And where prior to Butner did you get some of that

8    training?

9    A.    Baylor College of Medicine.

10   Q.    So you went straight from college into the position you

11   hold now?

12   A.    No.  I went from college to graduate school.  I completed

13   an internship at Baylor College of Medicine, a postdoctoral

14   fellowship at the same college of medicine, and then I stayed

15   on faculty in the same department.

16   Q.    And is it your testimony that Baylor in its clinical

17   practicum has sex-offender-specific therapy as part of its

18   practicum?

19   A.    Yes.

20   Q.    And did you treat sex offenders while working at Baylor?

21   A.    Yes, I did.

22   Q.    And how many?

23   A.    I don't know exactly, but I would estimate hundreds that I

24   evaluated and treated over the course of nearly five years.

25   Q.    Inpatient or outpatient?

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 10

1    A.    Outpatient.

2    Q.    So all of your training was in outpatient?

3    A.    Correct.

4    Q.    Did any of your therapies work in outpatient therapy?

5    A.    If you mean by "work," were the treatment programs

6    empirically evaluated to have worked?  Those programs were not.

7    Q.    So if I'm parsing your testimony, what you're saying is,

8    the therapy you provided while you were at Baylor School of

9    Medicine did not have any evaluative component to determine

10   whether or not they worked?  Is that what you're saying?

11   A.    Yes.

12   Q.    Do you have any practical sense of whether or not

13   outpatient therapy works?

14   A.    Yes.  The research literature supports outpatient therapy

15   as an effective therapy.

16   Q.    Did any of the people you treated go on to not offend, or

17   did everyone you treated go on to offend again?

18   A.    Some reoffended.  Some did not reoffend as far as, you

19   know, I could ascertain.

20   Q.    Well, why did FCI Butner hire you with such a spotty

21   record of therapy?

22          MS. PIEMONTE-STACY:  Objection.

23          THE COURT:  Sustained.

24   Q.    Well, how much of the therapy you provided when you were

25   affiliated with Baylor was, in your view, competent therapy?

United States v. Shields – Discharge Hearing Day 2

1    A.    I would say a fair amount.

2    Q.    So did you take the things you learned at Baylor School of

3    Medicine and apply them at FCI Butner?

4    A.    I did.

5    Q.    And does what you learned at Baylor still inform you as

6    you go through your work today?

7    A.    Distally.

8    Q.    And how is it different now than what you learned in

9    school?

10            THE COURT:  What do you mean by "distally"?

11            THE WITNESS:  It's been fourteen years since I left

12   Baylor.  The field of sex offender treatment has evolved

13   considerably.  My training has expanded considerably and so has

14   my experience working with this population.

15   Q.    So can I understand that when you started at Baylor and

16   when you left Baylor, you were still dealing with the

17   precognitive behavioral modeling of sex-offender-specific

18   therapy?

19   A.    I don't know what you mean by precognitive behavioral

20   model.

21   Q.    Well, let me ask you.  Are you familiar with the cognitive

22   behavioral model of providing sex-offender-specific therapy?

23   A.    Yes.

24   Q.    When, in your view, did that method of therapy come into

25   being?

United States v. Shields - Discharge Hearing Day 2

Page 12

1   A.    It's been practiced since the 1970s.

2   Q.    By whom?

3   A.    By the leaders of Bill Marshall and --

4   Q.    Can you name one sex-offender-specific therapy program

5   that employed the cognitive behavioral model prior to 1985?

6   A.    Uhm --

7   Q.    One, just one?

8   A.    No, I cannot.

9   Q.    When was the first cognitive behavioral model of therapy

10  put into practice anywhere in this country?

11        MS. PIEMONTE-STACY:  Objection, relevance.

12        THE COURT:  Sustained, sustained.  Let's just move to

13  this case.

14  Q.    Fair to say your training was in something other than

15  cognitive behavioral therapy, right?

16  A.    No.

17  Q.    If you would, please, describe the cognitive behavioral

18  therapy that you learned prior to becoming employed at Butner.

19  A.    Cognitive behavioral therapy is many techniques.  They

20  address behavior, and, in particular, when dealing with the

21  sexual offender, we are addressing the management of deviant

22  sexual impulses, management of fantasies, issues like arousal

23  control, stimulus control.  In terms of the cognitive aspect,

24  these are interventions designed to help the offender

25  understand the process by which the sexual behavior or deviant

United States v. Shields - Discharge Hearing Day 2

Page 13

1    sexual behavior becomes disinhibited, so to speak.  So the

2    errors in thinking, the rationalizations that are made, those

3    are aspects that are treated within cognitive behavioral

4    treatment.  Relapse prevention is a form of cognitive

5    behavioral treatment which has been in effect for many years,

6    including those years that I trained.

7    Q.    So what you're saying is that the things that you use

8    today, while called by a different name when you learned them,

9    are essentially the same?  Is that what you're saying?

10   A.    Would you repeat the question again.

11   Q.    Sure.  I'll repeat it in line with the relapse prevention

12   model.  When was it that you understood the relapse prevention

13   model to contain a cognitive behavioral component?

14   A.    Back when I was training in 1992.

15   Q.    And it was called "cognitive behavioral therapy" then?

16   A.    Yes.  Relapse prevention is a form of --

17   Q.    Was it called cognitive behavioral therapy back then?

18   A.    Yes, it was.

19   Q.    It was, okay.  Now, in your work at FCI Butner, is any of

20   your work evaluated in the sense that you know how many times

21   you've been right about your sense of whether someone's going

22   to reoffend or not?  Do you have a track record that you can

23   describe to the Court?

24   A.    No, I don't.

25   Q.    How many people have you provided therapy to at FCI

United States v. Shields — Discharge Hearing Day 2

1   Butner?

2   A.   I have not counted, but probably I have provided direct

3   services or supervised the treatment of hundreds of sexual

4   offenders.

5   Q.   Hundreds meaning more than 100 or more than 500?

6   A.   Certainly more than 500.

7   Q.   More than 1,000?

8   A.   Perhaps.

9   Q.   Of the between 500 and 1,000 individuals that you provided

10  treatment for, how many have reoffended?

11  A.   I don't know.

12  Q.   Why don't you know the answer to that question?

13  A.   The identity of those individuals who have reoffended, the

14  tracking of that information is really not part of my job.  I

15  simply don't do that.

16  Q.   Are you familiar with Dr. Karl Hanson?

17  A.   Yes, I am.

18  Q.   And how are you familiar with him?

19  A.   I am familiar with his research studies, and I have also

20  met him in person.

21  Q.   And in being familiar with his research studies, can I ask

22  you whether you agree or disagree with what he has to say?

23  A.   Well, he has said many things, so if you have something

24  specific --

25  Q.   Well, would you agree that the value of an expert in this

United States v. Shields - Discharge Hearing Day 2

Page 15

1    field is determined by his track record?

2           MS. PIEMONTE-STACY:  Objection.

3           THE COURT:  Overruled.

4    Q.   Would you agree with that?

5    A.   I would have to see that source.  It seems to me that that

6    statement would be rather myopic.

7    Q.   So without seeing it, you would say that you would not

8    agree with it?  Is that what you're saying?  But if you saw it,

9    you might agree with it?

10          MS. PIEMONTE-STACEY:  Objection.

11          THE COURT:  Sustained.

12          (Witness pausing.)

13   Q.   Do you, without mentioning the name Karl Hanson for a

14   moment, do you agree that a person who comes to a court to

15   opine as to someone's risk of reoffense should be able to

16   testify without demonstrating any proven ability to opine in

17   that area?

18          MS. PIEMONTE-STACY:  Objection.  Your Honor,

19   Dr. Hernandez is testifying as Mr. Shields's treating

20   psychologist today.

21          THE COURT:  Yes, all right, sustained.  I agree.

22   Let's just get to his opinions.  Well, can I just ask you this:

23   You've now had a month, is that so, since last we all were

24   together?  Two weeks, is that all?

25          MR. SWOMLEY:  Mr. Shields has only been back down in

United States v. Shields - Discharge Hearing Day 2

Page 16

1    Butner for a couple of weeks.

2            THE COURT:  That's probably the more relevant measure.

3    Have you seen Mr. Shields in between when he's been transferred

4    back and the current day?

5            THE WITNESS:  Yes, ma'am.

6            THE COURT:  Have you continued the treatment regimen?

7            THE WITNESS:  I have.

8            THE COURT:  And so just in a nutshell, so what is your

9    current opinion about whether or not he can be released subject

10   to conditions?

11           THE WITNESS:  The issue of whether he can be released

12   to the community with conditions, the answer, as I stated at

13   the last hearing, is "yes."  However, I need to qualify, and I

14   said I need to qualify that because my answer is more

15   complicated.  And that would not be my clinical recommendation

16   for him.  So even though my response to the Court would be,

17   "Yes, he can," it is not my clinical recommendation that he be

18   released at this particular juncture to conditional release.

19           THE COURT:  And your clinical recommendation today is

20   what?

21           THE WITNESS:  My clinical recommendation is that he

22   continue his treatment and finish Phase 4, which is the last

23   phase within the total confinement.

24           THE COURT:  And given how he's been progressing to

25   date, what would be a reasonable estimate of when that is?

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

1          THE WITNESS:  In approximately six or seven months.

2          THE COURT:  All right, so that's the most current.

3    After having seen him, you still are of that opinion?

4          THE WITNESS:  Yes, your Honor.

5          THE COURT:  Okay.  So let's just get to his opinions

6    and --

7    Q.   Dr. Hernandez, how long does it take one to complete your

8    program?

9    A.   That's a difficult question to answer, so, if I may, allow

10   me some leeway in answering that question.

11   Q.   Can I back up and ask, do you have a complete program in

12   place?  Let's start there.

13   A.   I have a program of Phases 1 through 4, which is what is

14   offered within total confinement, and that is what I have been

15   implementing and I am prepared to continue to implement.

16   Q.   Is what you're saying then, that in fact you don't have

17   Phase 5 in any way, shape, or form, anything other than a gleam

18   in your eye or a paragraph on a piece of paper?

19          MS. PIEMONTE-STACY:  Objection.

20          THE COURT:  No, that's fair.  Do you have a Phase 5 at

21   Butner right now?

22          THE WITNESS:  No, your Honor.

23          THE COURT:  So what you're looking to is finish

24   Phase 4, and then we'd release him to the community in Phase 5?

25   Is that your clinical recommendation?

United States v. Shields - Discharge Hearing Day 2

1          THE WITNESS:  Phase 5 has been conceptually argued as

2     a step-down, as a transitional phase.  That is not necessarily

3     the typical conditional release to the community afforded to

4     probationers.  It is viewed as more intensive, more rigorous,

5     and that is what was conceptualized as Phase 5 in the CTP, the

6     Commitment and Treatment Program.

7          THE COURT:  When you talked to me last, though, you

8     were pretty much advocating I let you finish Phase 4.  You

9     hadn't really addressed Phase 5.  Is that right?

10         THE WITNESS:  That is correct.

11    Q.   It's fair to say that when an individual completes

12    Phase 4, you're -- well, you're familiar with -- I don't know

13    who Dr. Cunic is, but you're familiar with Dr. Cunic, correct?

14    A.   Yes.

15    Q.   You've read her reports, right?

16    A.   Yes.

17    Q.   And you're familiar with the notion that really you've got

18    to have this transition into the community, right?

19    A.   Yes.  I agree with that.

20    Q.   And you know that Phase 4 doesn't do that, right?

21    A.   Yes.

22    Q.   Phase 4 talks about doing it, right?  And if you look at

23    the protocols, I believe when you look at what Phase 4 says it

24    is, the second half of Phase 4 is "Community reintegration

25    skills, employment, and independent living skills and community

United States v. Shields - Discharge Hearing Day 2

Page 19

1   building and service," right?

2   A.    Correct.

3   Q.    Now, those last three parts of Phase 4 are done what, in a

4   classroom?

5   A.    Yes.

6   Q.    And so community reintegration skills doesn't really

7   involve any community reintegration, right?

8   A.    Yes.

9   Q.    Right, it does not?

10          THE COURT:  You agree with him?

11   A.    I agree, yes, it does not involve actual community

12   reintegration.

13   Q.    And employment and independent living skills doesn't

14   involve --

15          THE COURT:  So what does it involve if it doesn't

16   involve community reintegration?

17          THE WITNESS:  Planning.  The Phase 4 is an integrative

18   phase where they integrate all of the learning that they have

19   acquired, and conceptually they are prepared for the community,

20   but there is no actual preparation in Phase 4 because it does

21   occur within the confines of the institution.

22          THE COURT:  Can you give me an example of what you do

23   in the classroom?

24          THE WITNESS:  A table-top exercise, for example, would

25   be part of community reintegration, developing a relationship

United States v. Shields - Discharge Hearing Day 2

Page 20

1    with the supervision officer, developing a relationship with

2    the community-based therapist and all the problems,

3    difficulties, obstacles that they may encounter; theoretical

4    exercises or tabletop exercises on employment issues, how to

5    deal with their status as sex offenders during employment

6    interviews.  So all of these --

7             THE COURT:  So problem-solving in the abstract with

8    all the kinds of things they might face?

9             THE WITNESS:  Correct.  We call these exercises

10   "cognitive rehearsal exercises," but they do not expose the

11   individual to the community in real-life circumstances.

12   Q.   Kind of like the difference between playing the Milton

13   Bradley game of "Life" and living, right?  Not the same in any

14   way, shape, or form, right?

15            MS. PIEMONTE-STACY:  Objection.

16            THE COURT:  Sustained.

17   Q.   Employment and independent living skills, how is it you

18   teach employment skills without helping them get a job?

19   A.   You can teach employment skills without the individual

20   necessarily going out and getting a job.  I would concede that

21   that is essential to the process of learning, and that is why

22   the treatment during the total confinement phase is not

23   complete treatment.  And this is the reason why we have

24   envisioned this transitional phase, the Phase 5, that would

25   expose the individual to these real-life scenarios.

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 21

1   Q.   Why isn't Phase 5 in place?

2         MS. PIEMONTE-STACY:  Objection.

3         THE COURT:  I'll allow that.  Why isn't it in place

4   yet?

5         THE WITNESS:  Uhm, it has been discussed.  It was

6   proposed from day one; yet the decision-makers within the BOP

7   have not implemented a Phase 5.

8   Q.   It's fair to say they've had four years to develop this

9   phase and have failed to do so up to this point?

10        MS. PIEMONTE-STACY:  Objection.

11        THE COURT:  Sustained.

12  Q.   Is it going to be in place in the next six months?

13        MS. PIEMONTE-STACY:  Objection.

14        THE COURT:  All right, overruled.

15  Q.   When you say Mr. Shields is ready, are you going to have

16  that program?

17  A.   I don't know.

18  Q.   Why don't you know?

19        THE COURT:  No.  Now, those kinds of questions, we're

20  not wasting --

21        MR. SWOMLEY:  Your Honor --

22        THE COURT:  No, not "Why don't you know?"  What's the

23  next question?

24        MR. SWOMLEY:  Okay.

25  Q.   Okay, it's fair to say you do know enough about the Bureau

Page 22

1    of Prisons to know that there will not be one in six months?

2            MS. PIEMONTE-STACY:  Objection.

3    Q.    Just to be perfectly honest and candid.

4            MS. PIEMONTE-STACY:  Objection.

5            THE COURT:  Overruled.

6    A.    Based on my experience, I don't see one happening in six

7    or seven months.

8    Q.    Thank you.  Now, you, in having read Dr. Cunic's report,

9    know that according to Dr. Cunic, basically, unless there's a

10   step-down community reintegration component, she's not going to

11   find anybody not sexually dangerous, based upon your reading of

12   her report?

13           MS. PIEMONTE-STACY:  Objection.

14           THE COURT:  Overruled.  Do you agree?

15   A.    I would agree that community reintegration, or what we

16   would consider a Phase 5, is in fact vital to the successful

17   reintegration of the offender.

18   Q.    So what you're essentially doing is suggesting that until

19   there's a Phase 5, even if you suggest that someone is ready to

20   engage in a step-down program, you know that the powers that be

21   at the Bureau of Prisons will continue to say, "Nobody is ready

22   because we don't have a step-down program for them"?

23           MS. PIEMONTE-STACY:  Objection.

24           THE COURT:  Sustained, sustained.

25   Q.    Well, you would agree --

United States v. Shields - Discharge Hearing Day 2

1          THE COURT:  Just ask him what he -- excuse me, excuse

2     me.  What would your position be?  Let's assume you finish

3     Phase 4 successfully bringing all your skills to the situation

4     and you think he's ready for Phase 5, can that be accomplished

5     apart from a BOP program?

6          THE WITNESS:  Can Phase 5 be implemented outside of

7     the BOP?  Is that --

8          THE COURT:  Yes, through intensive supervised release

9     or the kinds of skills that Probation brings to bear?

10          THE WITNESS:  Uhm, I have been working with Probation

11     for fourteen years, and I have not seen a program that would

12     meet the requirements of what I would consider a Phase 5,

13     having all the right elements to provide enough assistance,

14     something that would be adequately staffed that would be, in my

15     view, necessary for his successful reintegration.

16          THE COURT:  Excuse me.  When you say by agreement of

17     Probation, is that will state Probation or federal?

18          THE WITNESS:  Federal Probation.

19     Q.   You were present when Dr. Plaud testified last time, were

20     you not?

21     A.   Yes.

22     Q.   And you heard him testify that in fact he thought

23     differently than that, correct?  That in fact Federal Probation

24     with three years of supervised release and the proper protocols

25     put into place as conditions of that supervised release could

United States v. Shields - Discharge Hearing Day 2

1    in fact insure the safety of the community, right?

2            MS. PIEMONTE-STACY:   Objection.

3            THE COURT:   Overruled.

4    A.   I believe that was his testimony.

5    Q.   And you put together, I believe, in a disclosure statement

6    that was provided to me a set of conditions that you know, I

7    believe you said already now, that Probation can never

8    implement, right?

9    A.   I'm saying I have not seen such a rigorous program and

10   well-integrated program be implemented by U.S. Probation

11   anywhere.

12   Q.   Okay.  So what you're saying is, you've never seen it and

13   it isn't what you would want, and therefore you would never be

14   in a position to endorse anyone getting out --

15           MS. PIEMONTE-STACY:   Objection.

16   Q.   -- without such a protocol being in place?

17           MS. PIEMONTE-STACY:   Objection.

18           THE COURT:   Overruled.  Would that be your position?

19           THE WITNESS:   No, your Honor.

20           THE COURT:   Thank you.

21   Q.   So your view is that some people don't need to do Phase 5?

22   Is that your position?  They can be just Phase 4 and released

23   to the community?  Is that your position?

24   A.   No.

25   Q.   Okay.  Well, then if that's not your position and you have

United States v. Shields - Discharge Hearing Day 2

Page 25

1   set out for Mr. Shields a whole list of things, where's the

2   middle ground?  Who can be released without completing Phase 5?

3           MS. PIEMONTE-STACY:  Objection.

4   Q.   Anyone?

5           THE COURT:  Well, no.  This is the issue, so

6   overruled.  So assume for a minute that Phase 5 isn't in place,

7   but what you've seen traditionally out of Probation offices

8   hasn't met muster from what you think is appropriate, where is

9   the middle ground here?

10          THE WITNESS:  The middle ground has to be in response

11  to -- let me backtrack for a second here.  The middle ground

12  has not been stated to me.  I have not been afforded the

13  opportunity to examine, evaluate, critically evaluate a program

14  of supervision that has all, any, or some of the elements that

15  I have proposed.  So I don't know for a fact if a jurisdiction

16  is able to provide 80 percent of those recommendations,

17  50 percent of those recommendations.  Those recommendations are

18  my best recommendations, given what I know about U.S.

19  Probation, given what I know about services in the community

20  and the technology that is used to supervise and manage sex

21  offenders in the community.

22          THE COURT:  Well, tell me, what is it -- you've given

23  a sort of whole panoply of suggestions or requirements.  What

24  is it you think Probation could not do well?

25          THE WITNESS:  I'm not saying that they could not do

United States v. Shields - Discharge Hearing Day 2

Page 26

1    well, but the --

2          THE COURT:  It looks like most of the things I

3    actually think Probation does do.  I can't say every single

4    thing, but we heard from in the basic trial -- who did that

5    then, was it Ms. Kelley? -- we heard from someone in Maine who

6    actually was going to do many of these things.  So is there

7    something here that you feel Probation just can't do because of

8    legal restrictions or money, resources?

9          THE WITNESS:  Resources primarily.  This is -- again,

10   I'm not talking about specific recommendations in that letter.

11   What I did is, I recommended a model of supervision, an

12   integrated model of supervision, which within that model you

13   would have all of these conditions of supervision and

14   management in the community.  That kind of flexible, clinically

15   oriented community containment and management approach, I

16   simply have not been exposed to that.  Now, are some of those

17   conditions part of the conditions that some offenders do have

18   under supervised release?  Yes.  But what I am recommending

19   here is a whole package and an approach to management of

20   Mr. Shields, and primarily a clinical management of Mr. Shields

21   in the community.

22   Q.   But if that is what you've already said basically pie in

23   the sky, how does Mr. Shields ever get out?  Let's just start

24   there.  How does he ever get out?

25   A.   I'm not sure what you mean.

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 27

1    Q.    Freedom, walking out and living life?

2          MS. PIEMONTE-STACY:  Objection, your Honor.

3          THE COURT:  Yes, objection, objection.  The issue is,

4    if the Bureau of Prisons does not have a Phase 5, and the U.S.

5    Probation can't do a hundred percent of these things, what are

6    you recommending that I do as the Court?

7          THE WITNESS:  If I have nothing else to offer to

8    Mr. Shields, and if the Bureau of Prisons does not have a

9    Phase 5, then I understand that at some point he needs to be

10   released.  No program of supervision and community management

11   has been presented to me for me to critically evaluate.  If

12   such program were presented to me, I would be able to say,

13   "Well, we need a little more of this, a little less of that, a

14   lot more of this," and then I would --

15         THE COURT:  See, I've got a lot of power as a federal

16   judge.  I sometimes forget that.  I mean, can't I, either

17   myself or a judge in Maine, if that's where he went, just

18   impose all these things as a condition?  Is there anything you

19   think that would be illegal or inappropriate under the

20   Probation Office guidelines?

21         THE WITNESS:  I don't know what you can, you know --

22         THE COURT:  I mean, couldn't I just do it?  Or I would

23   call -- who would be the Judge up there?  I don't even know --

24   some judge up in Maine and say, this is what needs to happen?

25         THE WITNESS:  I guess you could, and if that were the

United States v. Shields - Discharge Hearing Day 2

Page 28

1    only option, I think it would be a viable option.

2          MR. SWOMLEY:  We could start there.  We could also

3    start --

4    Q.   Why don't you tell the Court what is wrong with what

5    Dr. Plaud recommended or what you would do in addition to what

6    Dr. Plaud has recommended.  Why don't we start there.

7    A.   Well, Dr. Plaud, if I recall correctly, recommended

8    Mr. Shields's conditional release during Phase 4, which is

9    different from my opinion; and my recommendation is that he

10   finish Phase 4 and then be considered for either a Phase 5, or,

11   in the absence of Phase 5, a set of recommendations such as

12   those that I offered in that document.

13   Q.   So what you're saying is, the only issue you have with

14   Dr. Plaud's recommendation is that he is suggesting that the

15   reintegration occur as, instead of you doing these board games

16   in the facility, you do some real-life baby steps?

17         MS. PIEMONTE-STACY:  Objection.

18   Q.   For Phase 4, the last three components, community

19   reintegration skills, employment and independent living skills,

20   and community building and service, take place in some middle

21   ground, whether it be a halfway house in the community

22   supervised by Probation, but that's what he's suggesting,

23   right?

24         MS. PIEMONTE-STACY:  Objection.

25         THE COURT:  Why don't you ask it in a different form.

United States v. Shields - Discharge Hearing Day 2

Case 1:07-cv-12056-PBS   Document 235   Filed 12/23/10   Page 29 of 88

2-29


Page 29

1  Q.   Isn't it true, Dr. Hernandez, that the difference between

2  what you are suggesting and what Dr. Plaud was suggesting is

3  that the Phase 4 part that pertains to community reintegration

4  actually involve community reintegration as opposed to

5  academically learning about it?

6  A.   Well, no.  For me, Phase 5 is that --

7  Q.   That doesn't exist, Doctor.  Can we talk about what exists

8  instead of --

9       THE COURT:  Let him finish his sentence.

10 A.   Phase 5 is that transitional phase.  Phase 4 is an

11 integrative phase, and part of that integrative phase is coming

12 up with a relapse prevention plan.  Part of that has to do with

13 having a good life plan, integrating all of these aspects into

14 a plan, and that is a critical component of treatment.  In the

15 case of Mr. Shields, my recommendation is that that take place

16 at FCI Butner where he is being treated.

17 Q.   Now, you know that you have had discussions with me and

18 with the U.S. Attorney's office about what exists at FCI Butner

19 today, forgetting the Phase 5 pie in the sky, what exists at

20 FCI Butner today, right?  And you know, I believe we talked

21 about, there's a community camp at FCI Butner, right?

22 A.   Yes.

23 Q.   And that's not like living free, right?

24 A.   Correct.

25 Q.   Within the grounds of FCI Butner, right?

United States v. Shields - Discharge Hearing Day 2

Page 30

1   A.   Yes.

2   Q.   And you know that it has been offered as a way of

3   addressing all of this to allow him to go to the camp at FCI

4   Butner, and he's not free, but he's learning and actually

5   having some reintegration, right?

6   A.   In that model, he would.

7   Q.   Okay.  And --

8        THE COURT:  Now you're losing me.  Is this yet another

9   model?

10        THE WITNESS:  Yes, ma'am.  What was discussed back in

11   October was a Phase 5 that could be implemented by the BOP

12   within its minimum security camp, which is adjacent to the

13   prison, and that way we could transition the individual to the

14   community and to conditional release at his release

15   destination.  That concept is not being supported by the BOP at

16   this point.  It was simply my idea that I had voiced to the

17   parties as a viable option, but that is not a viable option at

18   this time.

19        THE COURT:  Thank you.  Well, thank you for also

20   trying.

21   Q.   Is that something that the Court -- and maybe I'm

22   addressing it to the wrong party, but I'm sure you're

23   listening, Judge -- is that something that the Court could

24   order BOP to do?

25        MS. PIEMONTE-STACY:  Objection.

United States v. Shields – Discharge Hearing Day 2

1         THE COURT:  He might not know the answer to that.
2    Sustained.
3    Q.   But, in your view then, there are less restrictive
4    alternatives that would satisfy you -- whether it would satisfy
5    BOP is another question -- but would satisfy you, correct?
6    A.   Yes.
7    Q.   And you know that since there is no Phase 5, essentially
8    Phase 4 is something that you can do with him coming to you
9    from that camp, right?
10   A.   I would come to him.
11   Q.   Okay, you would come to him.  And you can walk there,
12   right?
13   A.   Yes.
14   Q.   It's not that far.  And that would be in keeping with both
15   your understanding of what his needs are and with what he has
16   already expressed that he would be willing to do, right?
17   A.   Yes.
18   Q.   And with the resources that exist right now at the Bureau
19   of Prisons, that could be accomplished now, right?  Getting
20   around what the BOP does and doesn't want to have happen, I
21   understand that.
22        MS. PIEMONTE-STACY:  Objection.
23        THE COURT:  Overruled.  Could it be done now?
24        THE WITNESS:  Potentially, yes.  I do see it as a
25   viable option.  If I may, the camp offers the basic

United States v. Shields - Discharge Hearing Day 2

Page 32

1    infrastructure, though I have talked about the possibility of

2    keeping the individuals, the civilly committed individuals

3    separate from the housing units of the camp but still using the

4    same services, the same infrastructure for medical services,

5    food, work.

6            THE COURT:  So is the theory that you're just

7    essentially conflating Phase 4 and Phase 5 in a camp?

8            THE WITNESS:  No, your Honor.  Phase 4 would continue

9    within the secure perimeter.  Phase 5 would be what I'm talking

10   about --

11           THE COURT:  Oh, so you still need to finish Phase 4 in

12   the secure facility?

13           THE WITNESS:  Yes.  That is my recommendation.

14   Q.   How does the camp prevent you from effectuating what

15   you're trying to do in Phase 4?

16   A.   The intensity of clinical services during Phase 4 are

17   better served within the confines of the FCI, or, that is, the

18   prison where Mr. Shields is currently housed.

19   Q.   Could you say that in laymen's terms?

20   A.   I can offer what I need to offer to him in a more

21   effective and expedient way where he's at.

22   Q.   Why is that?

23   A.   Because I have other individuals in treatment who are

24   receiving the same -- they're in the same groups.  My offices

25   are there.  And the intent of a Phase 5 is to reduce the

United States v. Shields - Discharge Hearing Day 2

Page 33

1    intensity of the clinical services and have more of a regular,

2    if you will, workday experience for the individual.  So the

3    expectation is that right now they are in treatment activities

4    about twelve to fifteen hours a week.  I would anticipate that

5    during the Phase 5, they would probably be receiving about

6    three to four hours, and most of their day would be in

7    activities such as work, educational, vocational activities.

8    Q.   Okay, but I guess what I'm saying is, do you view part of

9    your job to effectuate the Adam Walsh Act, the components of

10   it, and to provide services in the least restrictive manner

11   possible?

12        MS. PIEMONTE-STACY:  Objection.

13        THE COURT:  Overruled.

14   A.   Well, the first part of that question is "yes," I do see

15   myself as part of the implementation of the Adam Walsh Act.  In

16   terms of doing so in the least restrictive manner, that is not

17   within the realm of my responsibilities to determine, you know,

18   the specific context in which the treatment will take place.  I

19   don't make those decisions.

20   Q.   Okay, but let me ask you.  I mean, I understand that

21   convenience-wise, having your office next to the classroom

22   where he might be learning the academic skills to do community

23   building in a classroom; but aside from the convenience of

24   having you right next door and having more other people that

25   you could be providing services to, would you agree that

Page 34

1    there's no difference in Mr. Shields's risk to reoffend whether

2    he's in your facility at Butner or the camp?

3    A.    Well, if he completes Phase 4 --

4    Q.    Setting aside completing anything.  My question is, as he

5    sits here today, is he more likely to reoffend in the camp than

6    he is in FCI Butner?

7    A.    Well, I was going to answer that question, and the way I

8    would answer that is, my confidence in his ability to

9    successfully refrain from the conduct of child molestation is

10   greater if he completes Phase 4, he completes a relapse

11   prevention plan, and completes all of the requirements of

12   Phase 4 within the confines of the FCI under the most

13   controlled conditions.

14   Q.    Can you articulate the risk to the community of his

15   completing Phase 4 at the camp versus his completing Phase 4 in

16   your prison?

17           MS. PIEMONTE-STACY:  Objection.

18           THE COURT:  Overruled.

19   A.    Well, his risk of committing child molestation while

20   confined at the FCI is minimal to none.

21   Q.    Okay, so --

22   A.    His risk of committing child molestation at the camp is

23   greater because potentially he does have the opportunity to

24   leave the federal reservation, get in touch with a minor, and

25   sexually molest that minor.

United States v. Shields - Discharge Hearing Day 2

Page 35

1   Q.   And I'm asking you now to quantify the difference in those

2   risks.

3              THE COURT:  Can you?

4              THE WITNESS:  I cannot.

5   Q.   How many people have escaped from the camp in the last ten

6   years?

7              MS. PIEMONTE-STACY:  Objection.

8              THE COURT:  No, I'll allow that.

9   A.   I don't know.

10  Q.   I'm sorry?

11  A.   I don't know.

12  Q.   It's fair to say you cannot leave the camp but with

13  permission from the Bureau of Prisons?

14  A.   Oh, absolutely.

15  Q.   And are you aware of any -- I mean, have you heard of any

16  publicized escape from the camp?

17  A.   Yes.

18  Q.   In the last ten years?

19  A.   Yes.

20  Q.   And I asked you numbers, and you said you couldn't come up

21  with any.  Do you have any?  Do you have a memory --

22             THE COURT:  He said he didn't have any numbers.

23  Q.   But you can remember at least one?  Is that what you're

24  saying?

25  A.   Oh, yes.

United States v. Shields - Discharge Hearing Day 2

Page 36

1   Q.   And your understanding of what happens to that individual

2   when they escape is what?

3   A.   Well, there is a protocol.  I'm not entirely certain of

4   all the aspects of the protocol, but that is treated as an

5   escape of a prisoner.  The first ones notified are the

6   U.S. Marshals, and there's local law enforcement, state law

7   enforcement notified, and there is an entire protocol that is

8   activated.

9   Q.   Okay, now let's draw this directly into Mr. Shields.  What

10  is your understanding of Mr. Shields's individual likelihood

11  of, if he went to the camp, escaping?

12          MS. PIEMONTE-STACY:  Objection.

13          THE COURT:  Sustained.

14  Q.   Well --

15          THE COURT:  You're asking for an impossible.  How do

16  you know whether the door is going to be left open or -- excuse

17  me.  It's impossible whether --

18          MR. SWOMLEY:  If it's impossible to make that kind of

19  a prediction, your Honor, then I would submit --

20          THE COURT:  No, objection sustained.

21          MR. SWOMLEY:  -- it's impossible to predict whether

22  someone is likely to sexually reoffend.  It's the same --

23          THE COURT:  Objection sustained.  You don't know --

24  no, objection sustained.

25          MR. SWOMLEY:  Your Honor, if this witness --

United States v. Shields - Discharge Hearing Day 2

1          THE COURT:  Objection sustained.  Keep asking

2     questions.

3     Q.    You've had Mr. Shields in treatment for how long?

4     A.    I believe since February, 2009.

5     Q.    Okay.  And is it fair to say that you have evaluated him

6     during that time period?

7     A.    Yes.

8     Q.    And is it fair to say that that evaluation includes

9     evaluations of his criminogenic thinking and life-style

10    psychopathy, right?

11    A.    Yes.  I don't know exactly what you're referring to, but

12    that is a significant component of treatment.

13    Q.    And that you also have evaluated him on management of his

14    paraphilic arousal, right?

15    A.    Yes.

16    Q.    And understanding of his nine steps of offense pathways,

17    right?

18    A.    Yes.

19    Q.    And you've evaluated him on his machiavellianism, right?

20    A.    Yes.

21    Q.    And you've evaluated him on whether or not he maintains

22    antisocial peers, right?

23    A.    Yes.

24    Q.    And his adherence to institutional rules and staff

25    directives, right?

United States v. Shields – Discharge Hearing Day 2

1    A.    Yes.

2    Q.    How did he do on his adherence to institutional rules and

3    staff directives?

4    A.    He has done well.

5    Q.    Meaning what?

6    A.    Meaning that he has done relatively well.  There have been

7    minor episodes of misconduct, but, generally speaking, he

8    follows all rules, all assignments, and he is generally

9    compliant.

10   Q.    And I believe there's a separate category called

11   "resistance to rules and supervision," and how did he do on

12   that?

13   A.    He has done well.  Once again, he has been for the most

14   part quite compliant and cooperative.

15   Q.    And in terms of emotional self-regulation, how is he

16   doing?

17   A.    He has demonstrated considerable improvement in that area.

18   Q.    And I believe you also have a category of general

19   self-regulation.  How is he doing in that?

20   A.    Also done quite well.

21   Q.    And in terms of life-style impulsiveness, how is he doing?

22   A.    He has done well as well.

23   Q.    So what other areas of either psychosexual development or

24   psycho-criminogenic development do you think is important to

25   tell the Court about in terms of his ability to follow the

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 39

1    rules?

2    A.    Mr. Shields has done a very good job of following the

3    rules.  What the next phase, the phase that he --

4    Q.    That's nonresponsive.  That was my question.  Thank you.

5          MS. PIEMONTE-STACY:  I'd ask that he answer the

6    question and then --

7          THE COURT:  No.  He answered the question.  We're

8    trying to finish this.

9          How much longer do you think you have?

10         MR. SWOMLEY:  Your Honor, I don't have an end.

11         THE COURT:  Well, you'll have to because he's leaving

12   today.  He's on a plane out of here.

13         MR. SWOMLEY:  You have -- I heard you have two or

14   three days next week.

15         THE COURT:  He's on a plane out of here.  You've

16   already -- so just plan on being done by another hour.

17   Q.    What can you point to, Dr. Hernandez, that demonstrates

18   that Mr. Shields could not or would not -- based upon the last

19   couple of years that you've had access to him, what is it that

20   he's demonstrated -- and, actually, I'd rather you focus on the

21   last six months or so -- what has he done that makes you think,

22   "Oh, my God, he's going to run from the camp"?

23         MS. PIEMONTE-STACY:  Objection.

24         THE COURT:  Overruled.  He has an hour.  I'm going to

25   let him finish an hour, and then you'll have to redirect if you

United States v. Shields - Discharge Hearing Day 2

1   want, recross, and then you'll go tomorrow morning with your

2   other expert.

3         MS. PIEMONTE-STACY:  Your Honor, Dr. Cunic has a

4   conflict in North Carolina tomorrow morning.  Your Honor, we

5   hadn't set aside -- the rules that this Court laid out were

6   that the report went in, a half hour for cross.

7         THE COURT:  Well, actually, you didn't remind me of

8   that.  I didn't remember that.

9         MS. PIEMONTE-STACY:  So --

10        THE COURT:  Excuse me.  I didn't remember that.

11        MR. SWOMLEY:  I'll remind you that Mr. Grady got far

12   more than a half an hour.  I could finish --

13        THE COURT:  Excuse me.  How much did Mr. Grady get?

14   Whatever he got, he gets.

15        MS. PIEMONTE-STACEY:  I can look, but that's why I

16   hadn't stood up before then, your Honor.  I believe --

17        THE COURT:  I know, but this is just going on and on

18   and on.  So what does she have tomorrow?

19        MS. PIEMONTE-STACEY:  I didn't ask the exact nature of

20   it.

21        THE COURT:  If it's personal, I'm not going to make

22   her miss her kid's graduation, but if it's just another court

23   proceeding or something, I'll just hold her.

24        MS. PIEMONTE-STACEY:  Because the Court hadn't set

25   aside a date for tomorrow, there's no reservation for her, she

United States v. Shields - Discharge Hearing Day 2

Page 41

1   has no clothes, and she told me she has a commitment.  I don't

2   know whether it's professional or personal.

3          THE COURT:  Why don't you go ask her while he

4   continues.  And ideally if you could find out how much

5   Mr. Grady got because I don't remember.

6          MS. PIEMONTE-STACEY:  I'll look at the transcript,

7   your Honor.

8          THE COURT:  Yes, why don't you look at it.  All right,

9   thank you.  Mr. Grady, why don't you check on her schedule.

10  Q.   Doctor, can you answer question?

11  A.   I'm sorry.  I forgot what the question was.

12  Q.   What in Mr. Shields's recent treatment history gives you

13  reason to believe that Mr. Shields would run from the camp and

14  escape and start sexually reoffending against children or

15  anyone else?

16  A.   Nothing.

17  Q.   So in terms of then the reason why he needs to be in a

18  secure facility versus a slightly less secure but still within

19  the prison grounds camp is your convenience as opposed to him

20  not being able to do the lesson plan in a less restrictive

21  setting, right?

22         MS. PIEMONTE-STACEY:  Objection.

23         THE COURT:  Overruled.  Is it primarily your

24  convenience?

25         THE WITNESS:  No, it's not my convenience.  It's first

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 42

1   and foremost my confidence in the fact that there are certain

2   skills that I am in fact more confident in teaching him while

3   he is in total confinement, relapse prevention being one of

4   those critical skills; that I would want to have him master

5   those skills before putting him in a situation where he could

6   reoffend.  And therefore my confidence in knowing that he's not

7   going to not only escape from the camp but effectively apply

8   those relapse prevention skills is increased.

9   Q.   Wouldn't you agree, Dr. Hernandez, that if you had to have

10  the maximal -- or if you wanted to have the maximal therapeutic

11  impact that you as a sex-offender-specific therapist could

12  provide, that it would be the ability to monitor the stepdown

13  into the community?  Wouldn't you say that's the critical where

14  the rubber meets the road with any sex offender?

15  A.   I'm not certain if I understand your question.

16  Q.   Well, if you were given the choice, or if the Court were

17  given the choice, hey, we can go through all of Phase 4 in your

18  lockdown and then there's the door because we don't have

19  Phase 5, or we could implement something akin to an integration

20  of the things in the last part of Phase 4 with a halfway house

21  or with a camp, and you watch, and you get to still provide

22  therapy, and you could do it as many hours a day as you wanted

23  because it's still --

24       THE COURT:  You know, that's just an incredibly long

25  question, so just break it down a little.

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 43

1   Q.   It's a simple question:  Would you rather have the ability

2   to monitor the stepdown, or would you rather say, "I got

3   Phase 4 all the way through a locked facility, and then they're

4   out"?

5   A.   I would much rather be part of that transitional step.

6   Q.   Thank you.  And fair to say that it is possible to do the

7   community reintegration skills, employment and independent

8   living skills, and community building and service in the camp?

9   A.   Is it possible?  Yes.

10  Q.   Thank you.

11        MR. SWOMLEY:  Thank you.  I'm done.

12        THE COURT:  Wow.  Do you have any questions?

13        MS. PIEMONTE-STACEY:  Yes, your Honor.

14  REDIRECT EXAMINATION BY MS. PIEMONTE-STACEY:

15  Q.   You just testified it's possible to do Phase 4 in the

16  camp; is that correct?

17  A.   Yes.

18  Q.   Is it your recommendation that that happen?

19  A.   It is not.

20  Q.   Why not?

21  A.   Again, Phase 4 is an integrative phase.  This is a phase

22  where I am still teaching the individual essential skills, and

23  at least I want to have greater confidence that those skills

24  have been acquired and have been mastered, even though they

25  have not been tested in the community.  So if I have an

United States v. Shields - Discharge Hearing Day 2

Page 44

1   opportunity to see the individual acquire those skills under

2   the safest set of circumstances, that will be my

3   recommendation, knowing full well that those skills do need to

4   be tested at some point.

5   Q.   And is it your opinion, to a reasonable degree of

6   professional certainty, that Mr. Shields is ready for a

7   stepdown at this time?

8   A.   He is approaching that readiness.

9   Q.   So he is currently in what phase?

10  A.   He is in Phase 4.

11  Q.   And what is your opinion, to a reasonable degree of

12  professional certainty, as to a recommendation regarding his

13  release to the community?

14  A.   At this time I would not --

15          MR. SWOMLEY:  Objection because that's not even what

16  the question is for your Honor to decide.

17          THE COURT:  Overruled.

18  A.   At this time I would not recommend release to the

19  community without completion of Phase 5.

20          THE COURT:  You know what, I just want to use our

21  time --

22          THE WITNESS:  Pardon me, Phase 4.

23          THE COURT:  -- wisely.  What is her time limit?

24          MR. GRADY:  I'd ask to approach the Court at side bar,

25  your Honor.

United States v. Shields - Discharge Hearing Day 2

Page 45

1          THE COURT:  Is it something personal?

2          MR. GRADY:  Yes, your Honor.

3          THE COURT:  You don't need to tell me.  Is it that

4    personal?

5          MR. GRADY:  It's not the type I would want to discuss

6    in public.

7          THE COURT:  All right, fine, so she needs to go back.

8    And so when can she get back here?

9          MR. GRADY:  I think we discussed the possibility that

10   next Wednesday could work.

11         THE COURT:  I hate to -- let me just ask you this:  Do

12   you really care about this redirect enough to not see if we can

13   finish her right now, since you're putting in her report, it's

14   short?  We'll see --

15         MS. PIEMONTE-STACEY:  Your Honor, I just think

16   there's -- I literally have not that many questions, and I do

17   think the record needs to be clear.  There's a ton of testimony

18   on this Phase 5 which is --

19         THE COURT:  Fine.  It's your witness.  I'm just

20   saying, there's a chance we could finish her.

21         MS. PIEMONTE-STACEY:  And there still may be if --

22   again, there still may be.  I didn't keep him here this long,

23   your Honor.

24   Q.   Now, you testified that if you had nothing else to offer

25   to Mr. Shields and the Bureau of Prisons didn't have a Phase 5

United States v. Shields - Discharge Hearing Day 2

Page 46

1   at that time, that you recognize Mr. Shields would need to be

2   released; is that correct?

3   A.   Yes.

4   Q.   Do you have more to offer Mr. Shields today?

5   A.   No.

6   Q.   Are you saying then -- I'm sorry.

7   A.   May I?  In terms of anything beyond Phase 4?

8        THE COURT:  We've been through that.

9   Q.   No.  He's currently in Phase 4.  Do you have more to offer

10   Mr. Shields in Phase 4 today?

11   A.   Yes.

12   Q.   And you talked about -- you testified earlier that Phase 4

13   is an integrative phase encompassing a release plan and a good

14   life plan; is that correct?

15   A.   Yes.

16   Q.   And has Mr. Shields completed a release plan and a good

17   life plan?

18   A.   He has not.

19   Q.   Does Mr. Shields continue to have a sexual preference for

20   minors?

21   A.   He does.

22        MR. SWOMLEY:  Objection.

23        THE COURT:  Overruled.

24   Q.   And does he continue to struggle with that sexual

25   preference?

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 47

1  A.   To some degree, yes.

2        MS. PIEMONTE-STACEY:  No other questions, your Honor.

3        THE COURT:  Anything?

4        MR. SWOMLEY:  Those last two questions are going to

5  open up, I would venture, about a half an hour of cross, your

6  Honor.

7        MS. PIEMONTE-STACEY:  Well, I will just say, your

8  Honor -- you asked me to check the time -- the last hearing

9  started at 2:19, it ended at 4:18.  We took approximately

10 somewhere between one-half and two-thirds of that time at the

11 last hearing, 60 pages of a 98-page transcript.

12       THE COURT:  Oh, so it was significantly more than half

13 an hour.

14       MS. PIEMONTE-STACEY:  It was approximately an hour, if

15 my math is right on this paper.

16       THE COURT:  All right, well --

17       MR. SWOMLEY:  So do I look good or not?

18       THE COURT:  So far, he's roughly consistent with that.

19 I mean --

20       MS. PIEMONTE-STACEY:  That's fair, your Honor.

21 RECROSS-EXAMINATION BY MR. SWOMLEY:

22 Q.   You have said he continues to have a sexual attraction to

23 minors.  Is that based upon anything he has said to you, "I

24 continue to want to offend against minors, or that "I concede

25 that I have had an historic attraction"?  Where are we in that

United States v. Shields - Discharge Hearing Day 2

1  continuum?

2  A.   He has had an historic attraction, but he also recognizes

3  that these impulses are enduring.  Is he troubled as he once

4  was in his life?  Absolutely not.  Does he have more effective

5  control over his sexual impulses?  Absolutely.  But does the

6  condition exist and is it likely to continue to exist?  Yes.

7          THE COURT:  What is the basis for that conclusion?

8          THE WITNESS:  The basis for that conclusion is that

9  paraphilic disorders, sexual deviance disorders, tend to be

10 chronic, enduring, lifelong disorders.

11         THE COURT:  So this is based on the literature and

12 your experience, not on anything he said or did?

13         THE WITNESS:  Correct.

14 Q.   In fact you've heard nothing out of Mr. Shields's mouth

15 that says, "I want to offend against anyone," right, in the

16 last six months?

17 A.   You're right.

18 Q.   And in fact you've heard almost exclusively to the

19 contrary, "I don't want to offend against anyone," right?

20 A.   The intent --

21 Q.   I'm just asking you these questions.  It's a "yes" or "no"

22 answer.  I'm not asking you to elaborate.  I'm asking you, did

23 you hear anything?

24 A.   No.

25 Q.   Okay.  Now, in terms of where you were going to go with

United States v. Shields - Discharge Hearing Day 2

Page 49

1   that question, you know that you can look in the DSM-IV and you

2   can see the definition of pedophilia, for example, and you can

3   see and read that it says "is usually chronic," right?

4   A.   Yes.

5   Q.   And you can see that, and you can evaluate and diagnose

6   someone who offended against a prepubescent child, if I'm not

7   mistaken, just using Mr. Shields's history, last offense 1989,

8   if I'm not mistaken, right?

9   A.   Yes.

10  Q.   And today, twenty-two years later, twenty-one years later,

11  you can still say he's diagnosed as a pedophile, right?  Right?

12  A.   You could say that, yes.

13  Q.   The man has a diagnosis of pedophilia.  In fact, everyone

14  says it's still, right?

15  A.   Provisional diagnosis.

16  Q.   Well, would you diagnose him as having pedophilia right

17  now?

18  A.   I would concur with Dr. Cunic's diagnosis that it would be

19  provisional.

20  Q.   Okay.  And when you say "provisional," it's because you

21  have no documentation as you look at him or as you try and

22  diagnose him as you see him today that he has intense

23  recurrent sexually arousing fantasies --

24          THE COURT:  Wait.  You don't possibly think that the

25  court reporter got that down, do you?

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

1        MR. SWOMLEY:  I don't know, but I've said it a few

2    times, and she can probably find it again, but, no.  I'm sorry.

3    Q.   Without going through the details of the diagnosis, you

4    would agree he does not have or does not exhibit those intense

5    recurrent sexually arousing fantasies, urges, or behaviors,

6    right?

7    A.   He does not today.

8    Q.   And so there's nothing in the DSM-IV that says "pedophilia

9    in remission," right?  You're not given that option?

10   A.   Correct.

11   Q.   And in terms of anything that --

12        MR. SWOMLEY:  I don't know whether your Honor still is

13   going to live with the -- I believe you ruled on a Daubert/

14   Lanigan basis at the first hearing that hebephilia is not a

15   diagnosis that you are recognizing, and yet --

16        THE COURT:  No.  I've said there was not enough

17   evidence in that record.  I have that actually coming up in

18   another case.  There was nothing in my record that would

19   support it, but that's different from -- it was a throw-away,

20   if you will, in this case.  It wasn't pressed and documented

21   or --

22        MR. SWOMLEY:  I'd like to address it is I guess where

23   I'm going.

24        THE COURT:  I don't know.

25        MR. SWOMLEY:  Okay.

United States v. Shields - Discharge Hearing Day 2

Page 51

1          THE COURT:  It hasn't been in play in this case.  I

2     didn't rule on that.

3          MR. SWOMLEY:  Let me just --

4     Q.   The data you have available to you, it's fair to say you

5     have had Mr. Shields take the penile plethysmograph, right?  He

6     has had it administered to him?

7     A.   Yes.

8     Q.   And he didn't flat-line it, right?

9     A.   He did.

10         THE COURT:  He didn't what?  No, what did you just

11    say?

12         THE WITNESS:  I said he did, meaning he showed no

13    arousal, no significant arousal on the examinations.

14         THE COURT:  So that's a good thing from a public

15    safety point of view?

16         THE WITNESS:  Uhm, it can be a good thing, yes.

17         THE COURT:  How could it --

18         THE WITNESS:  It is not a -- it is not necessarily a

19    good or bad thing.  It's something that needs to be

20    interpreted.  One could have a no-response PPG for a variety of

21    reasons.  In the case of Mr. Shields, my interpretation has

22    been that it may be as a result of two or three different

23    factors, the first one being, he is less responsive to those

24    stimuli.

25         THE COURT:  So that's good.  Check one, right?

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 52

1        THE WITNESS:  That is good.  And that he is just

2   nonresponsive because of a medication that he's taking, which I

3   believe, and so does he and his psychiatrist believe, that the

4   medication is in fact significantly curbing his sexual desire

5   but also his sexual performance.  So if sexual performance is

6   inhibited by the medication, the likelihood of a positive or

7   significant results of PPG are very low.  And then a third

8   possibility is that he is effectively controlling those deviant

9   sexual responses.

10        THE COURT:  So that's good.  So that factor one and

11   factor three weigh in favor of public safety.  Factor two means

12   you're not quite sure because you don't know the effects of the

13   medication?

14        THE WITNESS:  Correct.

15   Q.   You didn't mention but would you agree that he also was

16   measured as the PPG data or stimulus was being shown to him

17   that he was paying attention?  It wasn't like he was closing

18   his eyes or zoning out, right?

19   A.   No.  It was a valid test.  He paid attention.

20   Q.   He correctly classified 89 percent of the stimulus

21   materials, right?

22   A.   Yes.

23   Q.   And his rate of attention during the examination was

24   95 percent, right?

25   A.   Yes.

United States v. Shields – Discharge Hearing Day 2

Page 53

1   Q.   So it wasn't from trying to block it out or fake a

2   response, right?

3   A.   That is correct.

4   Q.   And so in terms of there being any dynamic demonstrations

5   of sexualized interest in children, you don't have any, right?

6   A.   My conversations with Mr. Shields, he recognizes and he

7   admits to the fact that his sexual interest in pubescent/post-

8   pubescent minors, particularly males, is still there.

9   Q.   And if he were to say to you "not there at all," you would

10  immediately think he was malingering, right?

11  A.   No, I would not immediately think that he was malingering.

12  Q.   You sat here, if I'm remembering correctly, you sat here

13  through Mr. Grady's cross-examination of Dr. Plaud, right?

14  A.   Yes.

15  Q.   And Mr. Grady threw a few haymakers in there suggesting,

16  hey, Mr. Shields correctly -- well, Mr. Shields acknowledges

17  that he has had a sexualized interest in children, right?  To

18  deny that would be something that would be therapeutically

19  counter-indicated, right?  It would be like a red flag if he

20  were to say, "I don't have problems with children, I never

21  have"?  That would be, in your view, problematic, wouldn't it?

22  A.   It would be contradictory to the evidence.

23  Q.   Right.  And so for him to say, "Yes, this has been and is

24  a lifelong problem that I will need to address," that in and of

25  itself, that statement is not a risk enhancer, is it?

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 54

1    A.    It is not.

2    Q.    And in fact, in your world, that's what you should be

3    seeing at this phase of therapy, right?

4    A.    Yes.

5    Q.    And so knowing what you know about Mr. Shields, the

6    answers that he's given you are actually the answers you would

7    hope you would get if your therapy were working, right?

8    A.    That's why he has received a good progress assessment from

9    me.

10   Q.    Okay.  And you do view that he is capable of living in the

11   community, right?

12   A.    Yes.

13   Q.    And all you're trying to do is get him there, right?

14   A.    Yes.

15   Q.    In a safe way, right?

16   A.    Yes.

17   Q.    And you in response to Ms. Piemonte-Stacey's cross or

18   direct of you said that more Phase 4 could be done, but you've

19   also conceded that if it were a question of integrating and

20   stepping down versus doing Phase 4 and being kicked out the

21   door, you'd rather see the stepdown, right?

22   A.    Yes.

23            THE COURT:  Okay.

24   FURTHER REDIRECT EXAMINATION BY MS. PIEMONTE-STACEY:

25   Q.    You mentioned --

United States v. Shields - Discharge Hearing Day 2

1      THE COURT:  Wait a minute.  I'm trying to see.  Direct

2  was the report, cross, redirect, recross.  No more.  Good-bye.

3  Thank you.  Thank you for coming back a second time?

4      THE WITNESS:  You're welcome.

5      (Witness excused.)

6      THE COURT:  Now, off the record.

7      (Discussion off the record.)

8      THE COURT:  Next witness?

9      MR. SWOMLEY:  Your Honor, I don't know where you are

10  in your thinking on all of this.  I know that if we start with

11  this witness, we will not finish.

12      THE COURT:  Well, then we don't.  We still get an hour

13  out.

14      MR. SWOMLEY:  And I guess the real question here is,

15  if I don't insist upon this witness being called, essentially

16  we have Dr. Plaud who is the -- I believe you've defined him as

17  the Court's expert.

18      THE COURT:  Yes.

19      MR. SWOMLEY:  And he has opined that Mr. Shields can

20  essentially do a program in the community that is essentially

21  the stepdown, and Dr. Hernandez --

22      THE COURT:  Excuse me.  At this point, do you want to

23  examine her?

24      MR. SWOMLEY:  Well, I am essentially asking you if

25  based upon what you've heard thus far, presuming everything she

United States v. Shields - Discharge Hearing Day 2

1    says is true, whether you have --

2         THE COURT:  I'll tell you quite candidly where I am is

3    having him finish Phase 4, and then having the Probation

4    Department come up with a set of proposals, and not waiving

5    even if BOP doesn't have a Phase 5, doing something that's a

6    combination of conditions of release in the community.  That's

7    my general instinct right now.

8         Now, I don't know if that helps you one way or

9    another.  I have to say that Dr. Hernandez seems like he's

10   trying to help.  He's not out to get Mr. Shields.  He's trying

11   to help him.  He feels Phase 4 will help him.  He's the

12   treating person.  He's actually made an effort to get him into

13   a camp.  I mean, he's, like, going out of his way for the man,

14   and I'm likely to defer.

15        MR. SWOMLEY:  You asked us out in the hall the last

16   time we were here to see if we could arrive at some agreement,

17   and my view is, we could arrive and we had arrived at whatever

18   agreement you just heard out of Dr. Hernandez, and I would --

19        THE COURT:  Excuse me.  We can talk about that later,

20   but you asked me where I was.  I'm not sure examining her --

21   you're welcome to.  I'll give you the next hour, and if I need

22   to -- I think that's probably going to be enough, or we can

23   just put her report in and just rest it there.

24        MR. SWOMLEY:  Well, if her report goes in unrebutted

25   and you give it any more weight than you've given Dr. Plaud's,

United States v. Shields - Discharge Hearing Day 2

Page 57

1    I'm going to want -- frankly, I see this witness as someone who

2    has, one, an institutional bias that you can clearly consider,

3    but --

4            THE COURT:  Yes, but hear me out.  You may want to

5    think about this, I mean, but the reality is, Dr. Hernandez is

6    the guy in the trenches with Mr. Shields.  He's shown no

7    animosity to him.  If anything, he's gone out of his way to

8    support him, and I credit his statement that the best approach

9    here is doing Phase 4.  I am not crediting the approach that

10   only a BOP Phase 5 is going to pass muster.  As I understand

11   it, we're only talking about a relatively short period of time,

12   most of which would be consumed by my writing this opinion

13   anyway if it's controverted.  And so I am inclined to do what I

14   just said:  Have him finish Phase 4, and then come up with a

15   combination of conditions of release.  I don't know what the

16   exact -- you know, least restrictive setting for Phase 5.  If

17   BOP has a program, I'll consider it.  If not, I'll work with

18   the Maine or possibly Massachusetts.  I mean, I'm comfortable

19   with my Probation team.  I don't know whether Mr. Shields would

20   rather go back to Maine.  I think that might be helpful if he

21   has friends or family up there.  I don't remember whether he

22   did anymore.  I don't remember.  I don't remember.  Whether he

23   wants there, whether he wants Butner camp and that kind of a

24   Phase 5 or whether he wants -- you know, there are three

25   possible locations.  And what I would do is hold a hearing with

Page 58

1   Probation from whatever location we thought made sense and

2   carve a set of conditions of release.  My sense is, he should

3   go back to Maine.  Remember how successful he was up there?  It

4   was a very persuasive statement about how the probation officer

5   was going to be all over it and the woman from the halfway

6   house liked him.  I forget her name.

7          MS. PIEMONTE-STACEY:  Rene Moore, your Honor.

8          THE COURT:  Yes, she'd never seen anyone like him

9   engage.  I mean, that struck me as a helpful setting, but I'd

10  have to work with the judge from Maine to make sure that we

11  modify the conditions of release to match what Dr. Hernandez

12  wants to do.  That's what I would be inclined to do.

13         Now, in light of that, I can write it up.  You asked

14  me my instinct after hearing from him?  That's my instinct

15  because he was not someone who was "Hold him at all costs no

16  matter what, he'll never succeed" kind of guy.

17         MR. SWOMLEY:  And, frankly, where I am right now is --

18  I understand that's your instinct, and obviously I would like

19  to give you an argument with respect to least restrictive and

20  how in fact everything that you're supposed to do under the

21  Adam Walsh Act, considering and weighing all the factors

22  together, you should be putting him in the least restrictive.

23  And obviously he can do that -- you heard from the good doctor

24  that he could do that in the prison camp that they have at

25  Butner, and so that's what I would be arguing.  I don't know

91a1bc96-6a29-4aed-80f0-2305a1d61264

1    that hearing from Dr. Cunic is going to do anything to inform

2    where I am vis-a-vis where you are.  And what I'd hoped was,

3    the last time we were here and you sent us out in the hall to

4    try and do this, is come up with some negotiated agreement.

5    Now, my understanding is, the only reason we couldn't do that

6    was because of what I had heard from Dr. Hernandez and the

7    government, that the Bureau of Prisons can't do it on their

8    own.

9           MS. PIEMONTE-STACEY:  No.  That's a misrepresentation,

10   your Honor.

11          MR. SWOMLEY:  Then tell me what is --

12          MS. PIEMONTE-STACEY:  The answer you heard was the

13   exact answer that was heard today.

14          THE COURT:  Excuse me.  We're a little premature.  You

15   asked me -- that was my sense.  I credit Dr. Hernandez's

16   testimony that he's trying hard to make this work, and he feels

17   clinically Phase 4 makes the most sense to finish, and then

18   we'll move into Phase 5.  Now, I haven't heard oral argument

19   from you.  So you need to make a decision based on that.  The

20   government wants to put in this report anyway, is that correct?

21          MS. PIEMONTE-STACEY:  Yes, your Honor.  And if I may,

22   at the last hearing --

23          THE COURT:  So move it in.  Are you moving in that

24   report?

25          MS. PIEMONTE-STACEY:  Yes, your Honor.

Page 60

1        THE COURT:  All right, Exhibit B.

2        MS. PIEMONTE-STACEY:  E.

3        THE COURT:  E, it's in.  Now, what do you want to do?

4        (Government Exhibit E received in evidence.)

5        MR. SWOMLEY:  My perspective is, if you're going to

6    continue to have the mindset you have, my sense is, the only

7    thing that you would be disabused of by reading and crediting

8    Dr. Cunic's report is, her view is, if you don't have

9    essentially all of Phase 5 done, you never get -- you can't get

10   out is essentially my reading of --

11       THE COURT:  Well, that is not Dr. Hernandez's

12   position.

13       MR. SWOMLEY:  No, it's not.  So essentially, unless

14   I'm going to hear from you, "I'm going to credit Dr. Cunic's

15   report," then I don't need to beat it up.  If I need to beat it

16   up, then I'll put her on the witness stand.

17       THE COURT:  I understand what you're saying.  My only

18   point is, I guess I didn't read it with sufficient nuance to

19   have that issue in mind.  What would you --

20       MS. PIEMONTE-STACEY:  Your Honor, can I just please

21   read two sentences from the transcript, Mr. Swomley's

22   statement:  "I'm content to not ever call Cunic, let you rely

23   entirely on everything bad in that report, credit it however

24   you want to credit it, get rid of that as a witness that we

25   have to come back here for."  That was at the end of the last

United States v. Shields - Discharge Hearing Day 2

Page 61

1   hearing.  I proposed that she not come back today and that we

2   just submit the reports and let you decide.  I make that

3   proposal again today, that her two reports --

4          THE COURT:  Excuse me, I understand.  It's in, but

5   we've now heard Dr. Hernandez.  What do you want to do?  Let

6   him just make a decision.

7          MR. SWOMLEY:  Hold on a second, your Honor.

8          (Discussion off the record between defense counsel.)

9          MR. SWOMLEY:  We'd like to call her.

10          THE COURT:  Okay, let's go.

11          MS. PIEMONTE-STACEY:  May I also move in as Exhibit F

12   Dr. Cunic's CV?

13          THE COURT:  Yes.

14          MS. PIEMONTE-STACEY:  Thank you, your Honor.

15          (Government Exhibit F received in evidence.)

16          THE COURT:  Do what you can do in the next hour, which

17   is basically what you took on Dr. Hernandez, and ideally we'll

18   wrap this up so she doesn't have to come back.  Or maybe, you

19   know, actually -- well, let's talk about it at the end here.

20   Come on up, ma'am.  This is your second time back here for you

21   too?

22          THE WITNESS:  No first.

23          THE COURT:  First time, all right.  Mr. Alba?

24

25

United States v. Shields - Discharge Hearing Day 2

1                        TANYA CUNIC

2    having been first duly sworn, was examined and testified as

3    follows:

4              THE CLERK:  Would you please state your name and spell

5    it for the record.

6              THE WITNESS:  My name is Tanya Cunic, T-a-n-y-a

7    C-u-n-i-c.

8              MR. SWOMLEY:  I am going to just go straight to the

9    Dr. Hernandez issues, and hopefully that will short-circuit a

10   lot.

11             THE COURT:  Good, thank you.

12             MR. SWOMLEY:  Against my better instincts, but I have

13   someone who's talking me down.

14             THE COURT:  It's a stepdown, huh?

15             MR. SWOMLEY:  Well, that's where we're going.

16   CROSS-EXAMINATION BY MR. SWOMLEY:

17   Q.    Doctor, you are not a clinician at FCI Butner, right?

18   A.    Uhm, technically I would be considered a clinician but not

19   a --

20   Q.    Are you on (Inaudible) staff?

21   A.    No, I am not.

22   Q.    So you're saying you do provide clinical therapy there?

23   A.    As needed in crisis situations when I do forensic

24   evaluations, correct.

25   Q.    So when someone breaks down during a forensic evaluation,

United States v. Shields – Discharge Hearing Day 2

Page 63

1   you provide them with the therapy to survive your evaluations?

2   A.   Absolutely.

3   Q.   Other than that, do you provide therapy at FCI Butner?

4   A.   Again, during crisis situations, like suicide

5   interventions, if there is a possible -- another kind of crisis

6   situation; but I believe the kind of therapy that you're

7   referring to, long-term treatment therapy, no, I do not.

8   Q.   Okay.  And in terms of what you do as an evaluator, fair

9   to say you operate within the Bureau of Prisons' protocols?

10  A.   Within the Bureau of Prisons' protocols, yes, and within

11  forensic and ethical guidelines, correct.

12  Q.   Well, you would agree that there is a great deal of debate

13  within the scientific community as to whether or not a

14  psychologist can even make predictions of long-term behavior

15  that hasn't occurred yet?

16  A.   Yes.

17  Q.   And yet you have chosen in your profession to go ahead and

18  do precisely that, right?

19  A.   I've chosen to do some under a court order, yes.

20  Q.   Okay.  Well, no one's ordered you to take the job you're

21  in, right?

22          MS. PIEMONTE-STACEY:  Objection.

23          THE COURT:  Sustained.

24  Q.   With respect to your understanding of what is in the best

25  interest of society and Mr. Shields -- and I guess I'll ask you

United States v. Shields - Discharge Hearing Day 2

1   to tell me when they're in conflict -- would you agree that the

2   mandate under the Adam Walsh Act is that the Bureau of Prisons

3   provide the therapy that is needed in the least restrictive

4   setting possible?

5   A.   I would.

6   Q.   And would you agree that the Adam Walsh Act and the

7   enabling legislation or the enabling regulations contemplate a

8   five-phase program?

9   A.   Yes.

10  Q.   And would you agree that Phase 5 is the program or the

11  part of the protocols that essentially have that community

12  interest and Mr. Shields's interest coming into contact for the

13  first time?

14  A.   No.  I would disagree with that.

15  Q.   Well, what is it about Phase 1, 2, 3, or 4 that has

16  Mr. Shields integrating or interacting with the community in

17  any way?

18  A.   Well, the way you phrased the question to me, you talked

19  about community interest as well as Mr. Shields's interests,

20  and I believe that him actually going through the different

21  phases and going through treatment actually benefits the

22  community as well as benefitting Mr. Shields, so that was the

23  context of my response.

24  Q.   So what you're saying is, Mr. Shields for the last four

25  phases is already demonstrating an interest in getting back to

United States v. Shields - Discharge Hearing Day 2

Page 65

1  that community and is showing value; that is, that he values

2  the community?

3  A.   I'm testifying that Mr. Shields has taken steps to attempt

4  to successfully reintegrate into the community, correct.

5  Q.   Okay.

6  A.   By participating in treatment.  Excuse me.

7  Q.   And in terms of what the community gets from Mr. Shields

8  out of his participation in 1 through 4, is there anything

9  there, or is it just a one-way street at this point?

10  A.   No.  I actually think there is a bit of a symbiotic

11  relationship.  Obviously Mr. Shields has different skills and

12  abilities where he could at some point hopefully be back in

13  society; and in order for him to be a productive member of

14  society, there is being able to not react upon his sexually

15  deviant behaviors.  So therefore he is going through a

16  treatment program, in my opinion, that is helping him to hone

17  those skills so he can be a successful member of society by

18  bringing forth his own skills and abilities and knowledge, as

19  well as not offending against minor children.  So it is a

20  hopefully win-win situation in both.

21  Q.   Okay.  I guess where I was going with all this is not in

22  the abstractions, and we could go to one more abstraction,

23  which is that obviously the community has an interest in

24  believing that we have a court system and an evaluation system

25  that views being at liberty to be one of the prime goals of our

Page 66

1  society, right?  To have liberty for all of us, right?  Liberty

2  and justice for all, right?

3  A.   Correct.

4  Q.   Okay.  So once we get rid of those abstractions and we

5  talk about Phase 5, it's fair to say that Phase 5 is ostensibly

6  where the person who you have been evaluating and Butner has

7  been providing therapy to gets to demonstrate that they can

8  live in society, right?

9  A.   Correct.

10 Q.   And when we talk about -- the most important component of

11 this whole treatment program is getting to that point, right?

12 A.   Correct.

13 Q.   And we can agree, that point, that whole Phase 5 just

14 doesn't exist, right?

15 A.   I'm not privy to what Phase 5 is, nor am I -- nor do I --

16 up until two days ago didn't realize that certain proposals

17 were on the table, nor until hearing --

18        THE COURT:  You know, don't forget, I'm part of this

19 equation too.  I need to understand what you're talking about.

20 So you have no knowledge one way or another about Phase 5?

21        THE WITNESS:  Not really, no.  My understanding

22 regarding the proposal of Mr. Shields going to a camp I

23 actually just learned by hearing Dr. Hernandez's testimony as

24 well as --

25        THE COURT:  Didn't you issue an opinion?  I can't

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

1    remember it.  I don't have it directly in front of me.

2          THE WITNESS:  I did, your Honor.  Essentially my

3    opinion in a nutshell was that he complete Phase 4 and then be

4    evaluated at the end of Phase 4.

5          THE COURT:  For what?

6          THE WITNESS:  To see if he should be released, based

7    on the fact that he hadn't completed his relapse prevention

8    planning yet.

9          THE COURT:  Well, so here you say, "It is recommended

10   that Mr. Shields complete Phase 4 with an evaluation of his

11   progress at the completion of this phase of treatment and prior

12   to advancing to Phase 5."

13         THE WITNESS:  Right.

14         THE COURT:  All right, so let's assume he gets through

15   Phase 4, and Phase 5 doesn't exist because BOP, you know, for

16   whatever set of reasons bureaucratically hasn't reached that

17   point, do you have an opinion as to whether I could release him

18   subject to a combination of conditions of release in a less

19   restrictive setting?

20         THE WITNESS:  I would ask, your Honor, that I would

21   need to review those conditions, but based on a combination of

22   the different things that Dr. Hernandez proposed, I do think

23   that's appropriate.

24         THE COURT:  So you're basically on the same page with

25   Dr. Hernandez?

United States v. Shields - Discharge Hearing Day 2

Page 68

1          THE WITNESS:  With Dr. Hernandez, yes, your Honor.

2          THE COURT:  I haven't sat and read it with

3    Dr. Hernandez's testimony in mind, but there's nothing that you

4    disagree with that Dr. Hernandez said on the stand?

5          THE WITNESS:  No, your Honor.

6    Q.   Your second-to-the-last paragraph, "At this point in time

7    it is --" and this is quoting from your report of October 5.

8    A.   Yes.

9    Q.   "At this point in time, it is unclear to this evaluator,"

10   meaning you, "as to the specific 'prescribed regimen of

11   medical/psychiatric or psychological care or treatment' that is

12   being considered for Mr. Shields if he were to be released to

13   the community."

14        Is that still your understanding?  You don't have a

15   position on conditions of release?

16   A.   Based on reading the materials that were provided to me

17   when I wrote this report, and even now based on some of the

18   ideas that were proposed, it's ideas.  It's not something that

19   is strict and Mr. Shields would actually have to adhere to.  So

20   we're talking about something theoretical and something in the

21   abstract as opposed to actual conditions of release.

22   Q.   So what you're saying is, until you saw what Probation had

23   to offer, you have no opinion whatsoever about release?

24        MS. PIEMONTE-STACEY:  Objection.

25        THE COURT:  Overruled.

Page 69

1   A.   Actually, quite frankly, I think we're jumping the gun.  I

2   think he needs to complete Phase 4.  I think relapse prevention

3   planning is critical.  When you look at the basic tenets of

4   relapse prevention planning and cognitive behavioral tenets,

5   practicing in practice situations prepares one to actually

6   function in the community or function in the actual situation

7   at this point in time; and based on my most recent review of

8   the records, which were on Friday, Mr. Shields has not

9   completed relapse prevention planning, so therefore I think he

10  needs to complete that and successfully complete that.  I would

11  then need to review those records, and then I feel as if I

12  could go forth and make an opinion.

13  Q.   Do you have any experience at all with the prison camp?

14  A.   With the prison camp?  Uhm, what kind of experience are

15  you referring to?

16  Q.   Have you ever evaluated anyone that's there, been there?

17  A.   I have evaluated individuals who have been formerly housed

18  at prison camps, yes.

19  Q.   Okay.  And if you would, just describe the prison camp

20  that exists at FCI Butner.

21  A.   It is an open dormitory housing situation.  Individuals

22  have a prescribed work regimen.  They are required to be

23  accountable for --

24           THE COURT:  Work outside of the prison?

25           THE WITNESS:  Some of them do work on the outside

United States v. Shields – Discharge Hearing Day 2

1   perimeter, yes.

2           THE COURT:  You mean so they go into the community?

3           THE WITNESS:  I don't think so.  When I say on the

4   outside, I mean outside the confines of the secure perimeter.

5   Q.   They're able to mow the lawn?

6   A.   Correct, yes.

7   Q.   They don't leave the grounds?

8   A.   Well, they may escape, but, no, they're not supposed to

9   leave.

10  Q.   And except for with permission, they're required to be on

11  site?

12  A.   Correct.

13  Q.   And do you know whether or not -- well, what is the

14  actual -- you described dormitory style housing.  What else is

15  part of the building structure there?  Is there common areas?

16  A.   Common areas, a visiting room, offices.

17          THE COURT:  Is there a gate, a wall around it?  Could

18  anyone just walk out?

19          THE WITNESS:  People, your Honor, when they typically

20  escape, they're called walkaways.  So regarding the actual

21  structure, if there is a fence, I don't recall.  I apologize to

22  the Court.

23  Q.   Is there a place where learning can occur in that

24  facility?  A classroom setting, I mean.  Is there a room where

25  you can go and talk to someone?

United States v. Shields - Discharge Hearing Day 2

Page 71

1    A.   Yes.

2         THE COURT:  Well, do you happen to know why you

3    couldn't do Phase 4 in the camp?

4         THE WITNESS:  Would I happen to know why you can't do

5    Phase 4 in the camp?  Uhm, no.  I hadn't actually really

6    thought about it, again, until that was offered during

7    Dr. Hernandez's testimony.  My opinion as to hearing about this

8    would be, there may be a portion of Phase 4 where that could

9    happen.  But, again, based on my review of the treatment

10   records as of Friday, Mr. Shields has not, again, successfully

11   completed a relapse prevention plan; and if he is going to have

12   more freedom at a facility like the camp would allow him to

13   have, I would think at the very minimum that relapse prevention

14   plan should be in place prior to increasing a level of freedom.

15   Q.   And in terms of increasing the level of freedom, would you

16   agree that increasing the level of freedom incrementally is

17   better than just unlocking the door and opening it and saying

18   "Leave"?

19   A.   Yes.

20   Q.   So under your current understanding of what Butner has to

21   offer, fair to say it would be better to do a stepdown Phase 4

22   in some part in the secure facility, some part in the camp, as

23   opposed to all in the secure facility and then out the door?

24        MS. PIEMONTE-STACEY:  Objection.

25        THE COURT:  Overruled.

United States v. Shields - Discharge Hearing Day 2

Page 72

1  A.   I -- I -- I think that would be something that would need

2  to be obviously coordinated with his treatment team, and,

3  again, it would be highly dependent upon a relapse prevention

4  plan and other aspects of treatment that haven't occurred yet.

5  Q.   And if it's in the context of a relapse prevention plan,

6  and add to that therapeutic continuity, meaning you've got the

7  same treatment team, the one that's been working with him

8  through all of these phases up to this point, having that same

9  treatment team in place as the stepdown occurs is going to be

10 better than, say, finishing Phase 4 in lockdown and then

11 starting up with an unknown therapy team, say in Maine or

12 Massachusetts or somewhere else?

13 A.   I think that could be beneficial to Mr. Shields, yes.

14 Q.   Would you defer to Dr. Hernandez's thinking on this

15 subject matter in your assessment of Mr. Shields's risk to

16 reoffend under the Adam Walsh Act?

17 A.   Would I defer to Dr. Hernandez?

18 Q.   Would you credit his way -- I mean, essentially you've

19 said in your report, at this point in time it's unclear what

20 you'd be evaluating here.  You're view is, "As he sits here

21 today, I'm not going to say he's not dangerous."  But if you

22 had a plan to evaluate, and you did get to see or hear from

23 Dr. Hernandez about some of his thinking with respect to a

24 stepdown and attempts to have some sort of a prison camp

25 component of all of this, do you credit Dr. Hernandez's views

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 73

1    on that subject of the stepdown and whether or not the camp is

2    appropriate as something that you would consider to be the

3    things you haven't considered thus far?

4              MS. PIEMONTE-STACEY:  Objection.

5              THE COURT:  Sustained.

6              MR. SWOMLEY:  That is a crappy question.  I'm sorry.

7    I'll withdraw it.

8              MS. PIEMONTE-STACEY:  If it was a question.

9              THE COURT:  Well, let me ask you this:  Assuming you

10   could do one of these relapse prevention plans in the next

11   month or so, would he then be an appropriate candidate for this

12   camp?

13             THE WITNESS:  Uhm, again, I -- I -- I hesitate because

14   I feel like there's an intervening variable.  And I don't say

15   that to be difficult.  I say that because there are some

16   intervening variables in the sense of, part of a good relapse

17   prevention plan is having it be specific and concrete, and

18   there is, your Honor, an element of behavioral and cognitive

19   rehearsal that needs to be completed.  It is very common when

20   one --

21             THE COURT:  You know, I'm just a plain old, Judge.

22             THE WITNESS:  Okay.

23             THE COURT:  So talk in plain language.  Give me an

24   example of something that needs to happen before, other than

25   the relapse prevention plan.

United States v. Shields - Discharge Hearing Day 2

1          THE WITNESS:  So in the laymen's term --

2          THE COURT:  Yes.

3          THE WITNESS:  -- if you get nervous about speaking in

4    public, one of the things that's commonly suggested is that you

5    think about it and you practice in front of the mirror and you

6    practice --

7          THE COURT:  I'm talking about --

8          THE WITNESS:  I know, but I'm giving you an example.

9          THE COURT:  But in the context of a sex offender, what

10   would you say it was?

11         THE WITNESS:  In the context of a sex offender,

12   Mr. Shields would have to think about possibly viewing a minor

13   male between the ages of eleven and fourteen, how he would

14   react if he became sexually --

15         THE COURT:  Like role-playing?

16         THE WITNESS:  Correct, your Honor.

17         THE COURT:  So that's what you're saying he would role

18   play?

19         THE WITNESS:  He would have to role play.  Then he

20   would have to --

21         THE COURT:  And that's what you're saying happens as

22   part of Phase 4, right?

23         THE WITNESS:  Correct.

24         THE COURT:  That's what Dr. Hernandez said, right?

25         THE WITNESS:  Correct.

United States v. Shields - Discharge Hearing Day 2

1      THE COURT:  Role play.  So why couldn't you role play

2   in the camp?  Why do you need to role play in the institution?

3      THE WITNESS:  In my opinion, I think having that

4   initial practice in a more confined area, and then being

5   exposed just even to the possibility that one could walk away

6   from the camp by increasing that level of freedom, he's at

7   least then benefitting from having more skills.

8      THE COURT:  Well, is it a requirement to get into the

9   camp that you've already completed Phase 4?  Is there some

10  bureaucratic, you know, rule?

11     THE WITNESS:  Actually, this has never been done

12  before.

13     THE COURT:  So you don't know?

14     THE WITNESS:  I don't know.

15     THE COURT:  Okay.  Maybe we'll get a report on it

16  afterwards and figure it out.

17     MS. PIEMONTE-STACEY:  Well, your Honor --

18     MR. SWOMLEY:  Can we agree --

19     THE COURT:  She doesn't know, so --

20     MR. SWOMLEY:  And I'm going to ask really only one

21  general follow-up to all of this, and that is --

22  Q.  It's fair to say there is no scientific study or objective

23  criteria that's been published anywhere, peer reviewed anywhere

24  that you can point to that permits you to say it's better to

25  have it in the prison than in a prison camp?

United States v. Shields – Discharge Hearing Day 2

Page 76

1    A.    Not to my knowledge, no.

2    Q.    And in fact, if you were to draw on the wealth of

3    scientific literature out there, do you agree that in fact most

4    of the demonstrated successes of sex-offender-specific therapy

5    have occurred in a community setting?

6          (Witness pausing.)

7    A.    I would say "yes."

8          MR. SWOMLEY:  Thank you.  No further questions.

9          THE COURT:  Thank you.  Anything?

10   REDIRECT EXAMINATION BY MS. PIEMONTE-STACEY:

11   Q.    Dr. Cunic, can you opine to a reasonable degree of

12   professional certainty whether Mr. Shields remains a sexually

13   dangerous person?

14   A.    At this point in time, it is my professional opinion that

15   Mr. Shields remains sexually dangerous.

16         MS. PIEMONTE-STACEY:  Nothing further.

17         THE COURT:  Thank you.

18         (Witness excused.)

19         THE COURT:  So we did finish.  Terrific.  Thank you.

20   Is the evidence closed?

21         MS. PIEMONTE-STACEY:  Well, your Honor, if you would

22   like -- you know, Phase 5 and the prison camp options are

23   obviously decided by people other than the clinical coordinator

24   and Dr. Cunic.  If the Court would like a supplemental report

25   from the appropriate decision-makers, respectfully, I think

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

1    it's a --

2         THE COURT:  Let me say this:  I find that I credit

3    Dr. Hernandez's opinion that Phase 4 needs to be completed

4    before I release him to the community.  That having been said,

5    this camp seems tempting.

6         MS. PIEMONTE-STACEY:  Yes, no, your Honor --

7         THE COURT:  So I want to understand it a little bit

8    better.  I want to understand -- obviously Dr. Hernandez

9    thought that that may be appropriate because he recommended it

10   and it didn't happen.  There could be resource problems.  There

11   could be rules.  It could just be a question of timing; he'll

12   be there in a month or two.

13        MS. PIEMONTE-STACEY:  There are certain security

14   issues too, your Honor.

15        THE COURT:  There may be security issues.  I don't

16   know, but it's something no one addressed in the report, it

17   sort of came up at the last minute.  And I think the standard

18   is least restrictive setting, right?  Something of that sort.

19   So I'd like to understand it better, and that just seems to be

20   the tail-end issue here.

21        But the other thing I want to know is, as soon as --

22   six months from now is not a year from now, and I get a review

23   every year.  I don't want him to be sitting there for nothing

24   if there's no Phase 5 in the BOP, and if I can sort of craft a

25   combination of conditions as soon as he's done with Phase 4, I

United States v. Shields - Discharge Hearing Day 2

Page 78

1   don't want to wait a whole year.  So I'm trying to figure out

2   what to do here, and I'm sort of thinking what might make sense

3   is actually not to decide this issue right now but to decide it

4   in six months, which will be part of the one-year review, and

5   then have a probation officer from Maine, which is my

6   presumptive place because that's where we took him from, be

7   down here with a list of conditions that Dr. Hernandez put

8   together, and we'll see how much we can accomplish.

9        MS. PIEMONTE-STACEY:  And, your Honor, I think that by

10  that time -- I don't want to waive the deliberative process

11  privilege, and there are discussions --

12       THE COURT:  What are you talking about?

13       MS. PIEMONTE-STACEY:  There are discussions in the

14  Bureau of Prisons about what happens next after Phase 4.  That

15  decision is obviously not final because you've heard there's no

16  Phase 5, but the issue is not being ignored, and I can also say

17  it's not opening --

18       THE COURT:  Excuse me.  I didn't ask for any

19  deliberative --

20       MS. PIEMONTE-STACEY:  No, no, I'm just trying to --

21  what I'm saying, that's why I'm saying I'm having a hard -- I

22  can tell you it's not unlock the prison and let the person walk

23  through.  So by six months from now, there may be that option

24  in place that would be in addition to or an alternative to also

25  the conditions that Dr. Hernandez proposed.

United States v. Shields - Discharge Hearing Day 2

Page 79

1       THE COURT:  Right, but what I'd like to do, and let me

2  just put it out there, I can either deny it, and then I think I

3  might have the discretion to hold a hearing prior to a year.  I

4  don't know.  I'm not going to make him -- if he's done with --

5  Dr. Hernandez said it could be six months; it could be four

6  months; it could be six months.  So you can't say it with

7  certainty.  It depends how the treatment progresses, but let's

8  say six months.  I could set a hearing and continue this

9  hearing, or I could deny this and then hold the next hearing

10  six months early.  It's a yearly thing, right?  That's right.

11  So I am open to both.

12       At the next hearing what I would want is a probation

13  officer from Maine -- let's assume that that's the -- or

14  possibly from Massachusetts, and I'd like Dr. Hernandez here,

15  and I would like to go through the requirements and either --

16  I'm not positive I can do it, or I would call one of the

17  judges -- I know them all in Maine -- and say that "There needs

18  to be a modification of the conditions of release.  Will you do

19  that, or should I take it here?" or, you know, like, something

20  along those lines.

21       The next thing is, I need to have some sense from you

22  all.  If there is a Phase 5, I'm not going to wait for it.  In

23  other words, if it's not in place, I'm going to do it.

24       MS. PIEMONTE-STACEY:  And we understand, but, your

25  Honor, I just need to make one correction.  Under the statute,

United States v. Shields - Discharge Hearing Day 2

Page 80

1    he can petition no later than 180 days, so the six months

2    fits --

3              THE COURT:  Oh, perfect.  That's perfect actually.

4              MS. PIEMONTE-STACEY:  Yes.

5              THE COURT:  That's actually the right timing on all

6    this.  I would like a report as to why he can't go to the camp

7    now to do Phase 4.  I don't really understand that.  There may

8    be perfectly good reasons, like, there's a protocol he needs to

9    finish a certain plan.  Well, if that's so, then we'll know it,

10   and he can once he's done that phase -- I mean, that makes some

11   sense to me.  It could be he needs to finish all of Phase 4 and

12   that's a requirement, or it could be that he only needs to do

13   certain steps of Phase 4.  I don't think anyone here knows

14   basically.

15             MR. SWOMLEY:  Can I interject just a couple of

16   thoughts that may not have occurred to you?

17             THE COURT:  Yes.

18             MR. SWOMLEY:  One is, if the Bureau of Prisons says,

19   "We can't do it," doesn't mean that you can't say, "I'm sorry,

20   that's unconstitutional.  Under the Adam Walsh Act, you have to

21   provide a less restrictive alternative."  And if there are

22   people, which you have already credited, your own expert says

23   he can do it under less restrictive alternatives, and they just

24   won't because they won't, it's an institution that won't do

25   it --

United States v. Shields - Discharge Hearing Day 2

1          THE COURT:  Excuse me.  We also have two people.  We

2   have Dr. Hernandez, we have the court-appointed expert, and we

3   have actually the government's expert basically all on the --

4   not that different, not that different.  I understand Dr. Plaud

5   wants him out in the community.  I'm not doing that at this

6   point.  He hasn't finished that phase.

7          So what I need to hear is, because it's a brand-new

8   issue, what the Bureau of Prisons' reasons are for why the camp

9   isn't doable.  And I know it's Christmastime.  So, ideally

10  speaking, what will happen is, can you do something in two

11  weeks?

12         MS. PIEMONTE-STACEY:  Yes, I will, your Honor.

13         THE COURT:  I'm out of here the 24th or something for

14  a week.  So it's either -- what's today, the 6th?  So, like,

15  maybe do it by the 20th.  Does that sound like it's feasible?

16         MS. PIEMONTE-STACEY:  Yes, your Honor.  If it's not

17  for some strange reason, I will promptly inform the Court.

18         MR. SWOMLEY:  The other thing is, I was going to put

19  Mr. Shields on.

20         THE COURT:  Oh.  That's a new one.  I didn't realize

21  that.  He's in Butner.

22         MR. SWOMLEY:  As a witness.  He's there.

23         THE COURT:  Oh, right now.  Oh, oh.  I thought you

24  wanted me to bring him up.

25         MR. SWOMLEY:  He can testify from there, can't he?

United States v. Shields - Discharge Hearing Day 2

Page 82

1        THE COURT:  Oh, absolutely.  All right, terrific.  I

2   didn't know that.  So this is all a little premature then,

3   my --

4        (Discussion off the record between defense counsel.)

5        MR. SWOMLEY:  I just know that she'll feel better if

6   she hears from him, or I think she will anyway.

7        THE COURT:  Oh, I'm sorry, I didn't understand that.

8        MR. SWOMLEY:  And I don't know whether you have the

9   time now to do that, I guess now is the other question.

10       THE COURT:  Can we do it tomorrow morning?

11       MR. SWOMLEY:  I'm here for a PSR interview with

12   another fellow in the Marshal's office at 11:00.

13       THE COURT:  Can you all do it tomorrow morning?  Do

14   you have five minutes with him or a half --

15       MS. PIEMONTE-STACEY:  Yes, your Honor.  The afternoon

16   is problem, but the morning is --

17       THE COURT:  Let me go off the record for a minute and

18   just make sure our technical people can do it tomorrow morning.

19       (Discussion off the record.)

20       THE COURT:  So ideally tomorrow at 11:00 we will do

21   the following:  We will hear directly from Mr. Shields.  I do

22   not expect the experts to be here.  Leave.  You're welcome to

23   be here.  But if there could be some discovery about -- not

24   discovery, I didn't mean that in a legal way -- some just sort

25   of checking out what the situation is with the camp.  Are they

United States v. Shields - Discharge Hearing Day 2

Page 83

1   overcrowded?  That might be one reason.  Is there a

2   bureaucratic reason in terms of classifications or mixed

3   classifications?  I mean, there may be a perfectly good

4   institutional reason.  I just think I should give you the

5   opportunity.  It's a brand-new issue for all of us.

6          MS. PIEMONTE-STACEY:  Yes.

7          THE COURT:  And typically I want you to know I have no

8   authority to order the Bureau of Prisons to change

9   classifications in a criminal context.

10         MR. SWOMLEY:  This is not criminal.

11         THE COURT:  Yes, I was just going to make that point.

12  I agree with that.  It's a somewhat different context.  It's a

13  new issue.  There's some deference to institutional needs.

14  That having been said, it can't just be because I said so.  I

15  mean, there's got to be a reason for it, and there may be a

16  perfectly good one.  In the meantime, if you all could check on

17  a date in six months because regardless of what happens with

18  respect to the camp, what I'm quite hopeful for is that he

19  would be done under the good auspices of Dr. Hernandez with his

20  treatment in that facility, and we will either be at Phase 5 or

21  I will be at the situation where I have to work with Probation

22  in Maine.

23         MR. SWOMLEY:  The other glitch that I wanted to throw

24  out there was that he may actually be done in two months, and

25  what do we do then?  Are we stuck there?

United States v. Shields - Discharge Hearing Day 2

91a1bc96-6a29-4aed-80f0-2305a1d61264

Page 84

1          THE COURT:  Petition to come in earlier.  Well, that's

2    why I asked you, would you rather I deny it and then just come

3    back in six months, or would you rather me just hold it open

4    and schedule it in six months, which means you could then come

5    back earlier?

6          MR. SWOMLEY:  Can I answer that question tomorrow?

7          THE COURT:  Yes.  That's why I specifically made --

8          MR. SWOMLEY:  Can you talk to me, Mr. Shields, between

9    tonight and tomorrow?

10         MR. SHIELDS:  Can I call you?

11         MR. SWOMLEY:  I hope so.  I'll be back in the office

12   in an hour.

13         MR. SHIELDS:  Huh?

14         MR. SWOMLEY:  Office in an hour.

15         MR. SHIELDS:  All right, I'll call your office at

16   5:30.

17         MR. SWOMLEY:  Thank you.

18         THE COURT:  And one last question:  Where is this

19   appeal?

20         MS. PIEMONTE-STACEY:  It's been argued, and no

21   decision has issued.

22         THE COURT:  How long ago?

23         MS. PIEMONTE-STACEY:  A month, a month and a half?

24         MR. TENNEN:  No.  The day before we had our hearing

25   they argued it.

United States v. Shields - Discharge Hearing Day 2

Page 85

1          THE COURT:  So were there other issues other than --

2     I'm assuming other than that one constitutional issue, there

3     must have been a whole panoply of issues, right?

4          MS. PIEMONTE-STACEY:  Yes.  It was the

5     constitutionality --

6          THE COURT:  There's always that.  I mean, my guess is,

7     within six months there will be an opinion.

8          MS. PIEMONTE-STACEY:  I think that's fair.

9          THE COURT:  Within two months, who knows, right?

10         MS. PIEMONTE-STACEY:  I think that's fair, your Honor.

11         MR. TENNEN:  Yes.

12         MS. PIEMONTE-STACEY:  It was argued on October 5.

13         MR. TENNEN:  There were certainly issues that might

14    overturn the commitment.

15         THE COURT:  Yes, that's right, that's right.  That's

16    exactly right.  I would be surprised if there was something

17    that just mooted everything.

18         MR. TENNEN:  There could be, but -- there were issues

19    argued that could overturn the commitment, releasing him.  I'm

20    not saying that that's going to happen, but --

21         MS. PIEMONTE-STACEY:  It was whether he was legally in

22    custody.  That issue was on appeal at the time he was

23    certified.  You had denied that earlier on, yes, so that was

24    one issue.  So one was the constitutionality.  The second was

25    the SDP finding.  The third was the custody issue.

Page 86

1          THE COURT:  Good.  All right, so there's one option

2     that may just eliminate the need to do any of this.

3          MS. PIEMONTE-STACEY:  Yes.

4          MR. SWOMLEY:  Right.

5          THE COURT:  There's one that could require retrial.

6          MR. TENNEN:  There is actually, I think, because they

7     challenged just the commitment itself, the evidence.

8          THE COURT:  Oh, sufficiency of the evidence.

9          MR. TENNEN:  Sorry.  Sufficiency of the evidence.

10         MS. PIEMONTE-STACEY:  Right, right.

11         THE COURT:  I'm not as worried about that, but the

12    issue really is, there may be something I did wrong that -- I

13    think this is really the first of its kind.

14         MR. TENNEN:  Actually, I think either of those would

15    vacate it in its entirety and not require a new trial.  If

16    there's not sufficient evidence, there's not sufficient

17    evidence.  You don't need a trial.

18         MS. PIEMONTE-STACEY:  The whole argument at the First

19    Circuit was on the custody issue and the calculation of his

20    sentencing.  That by and large was the whole argument.

21         THE COURT:  It's such a small piece of --

22         MS. PIEMONTE-STACEY:  And it was like -- yes, there

23    was --

24         THE COURT:  That's happened to me before.

25         MS. PIEMONTE-STACEY:  Right.  There was a few minutes

United States v. Shields - Discharge Hearing Day 2

Page 87

1    on either side on the other issues, but the majority of it was

2    that.

3              THE COURT:  That's really interesting.

4              MR. SWOMLEY:  I think Mr. Shields wanted to say one

5    more thing.

6              THE COURT:  Yes, all right, go ahead.

7              MR. SWOMLEY:  You want to say something?

8              MR. SHIELDS:  I just want you to know that if I call

9    you at 5:30 this evening, it's from the prison phone, and I

10   will only have fifteen minutes to speak with you.  Is that

11   going to be sufficient?

12             MR. SWOMLEY:  We'll make sure.

13             THE COURT:  You know, you don't need me for this.

14   Good-bye.  I'll see you tomorrow morning at 11:00.

15             MS. PIEMONTE-STACEY:  Thank you, your Honor.

16             MR. SWOMLEY:  Call me, and we'll see what we can do,

17   okay?  All right.

18             (Adjourned, 4:41 p.m.)

19

20

21

22

23

24

25

United States v. Shields - Discharge Hearing Day 2

1                    C E R T I F I C A T E

2


3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Court Reporter, do hereby

8  certify that the foregoing transcript, Pages 2-1 through 2-87

9  inclusive, was recorded by me stenographically at the time and

10 place aforesaid in Civil Action No. 07-12056-PBS, United States

11 of America v. Jeffrey Shields, and thereafter by me reduced to

12 typewriting and is a true and accurate record of the

13 proceedings.

14      In witness whereof I have hereunto set my hand this

15 21st day of December, 2010.

16

17

18

19

20
                   /s/ Lee A. Marzilli
21                 _____
                   LEE A. MARZILLI, RPR, CRR
22                 OFFICIAL COURT REPORTER

23

24

25