IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
                Petitioner     )
                               )
          -VS-                 ) CA No. 07-12056-PBS
                               ) Pages 3-1 - 3-47
JEFFREY SHIELDS,               )
                               )
                Respondent     )




                    DISCHARGE HEARING - DAY THREE

               BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE




                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         December 7, 2010, 11:10 a.m.








                         LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 7200
                         Boston, MA  02210
                         (617)345-6787

Page 2

1   A P P E A R A N C E S:

2        MARK J. GRADY, ESQ. and EVE A. PIEMONTE-STACEY, ESQ.,
     Assistant United States Attorneys, Office of the United States
3   Attorney, 1 Courthouse Way, Boston, Massachusetts, 02210, for
     the Petitioner.
4
          JOHN G. SWOMLEY, ESQ. and ERIC TENNEN, ESQ.,
5   Swomley & Associates, 227 Lewis Wharf, Boston, Massachusetts,
     02110-3927, for the Respondent.
6

7
                            I N D E X
8

9   WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

10  JEFFREY SHIELDS

11       By Mr. Swomley      3-3
         By Mr. Grady:               3-17
12       By Mr. Swomley:                       3-24
         By Mr. Grady:                                   3-29
13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                   P R O C E E D I N G S

2          THE COURT:  So you're going to call Mr. Shields?

3          MR. SWOMLEY:  Yes, please.  Do you want us to identify

4    ourselves for the record?

5          THE COURT:  Mr. Alba's call.  Go for it.

6          THE CLERK:  Will counsel please identify themselves

7    again.

8          MR. GRADY:  Mark Grady, and with me is Eve Stacey on

9    behalf of the United States.

10         MR. SWOMLEY:  John Swomley for Mr. Shields with Eric

11   Tennen.

12         MR. SWOMLEY:  Mr. Shields, can you hear me?

13         MR. SHIELDS:  Yes, I can.

14         THE COURT:  Should we put him under oath?

15         MR. SWOMLEY:  Oh.  That's a great idea.

16                        JEFFREY SHIELDS

17   having been first duly sworn, was examined and testified as

18   follows:

19         THE COURT:  And for the record, I can see Mr. Shields,

20   he can see me, and he's now under oath.  All right, go ahead,

21   go ahead.

22   DIRECT EXAMINATION BY MR. SWOMLEY:

23   Q.   Mr. Shields, I wanted to ask you a few questions about

24   your stay at Butner.  How long have you been working with

25   Dr. Hernandez doing the therapy regimen?

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

Page 4

1    A.    February, 2009.

2    Q.    And, if you would, briefly describe the kind of work

3    you've been doing.

4    A.    We've been doing everything from self-reflection all the

5    way up to the point where we're at now where we're working on

6    relapse prevention.  Some of the things that we've -- when I

7    came to FCI Butner to the program, I guess you could -- I was

8    emotionally, physically, and mentally bankrupt.  I've been

9    working on myself.  I was angry at myself for my weaknesses and

10   my lack of empathy at times and compassion for people.  The

11   choice is mine now where I could have either stayed in denial

12   and caused greater harm to the people, or I could start working

13   towards a good life and responsible living.  I would have --

14          THE COURT:  Excuse me, sir.  Let me just say, I'm

15   hearing you.  Are you reading something?

16          MR. SHIELDS:  Well, I have my notes that I have as

17   well too, yes.

18          MR. SWOMLEY:  Would you just look into the camera and

19   speak directly to us, if you don't mind.  You don't need to

20   look at anything.  It's --

21          THE COURT:  I don't mind if he checks his notes to

22   make sure he's covered all his territory, but it's better not

23   to sort of read a speech.

24          MR. SHIELDS:  Yes.

25   Q.    Frankly, what I'm interested in is understanding where you

United States v. Shields − Discharge Hearing Day 3

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

1    think you are in the -- you know that there's a four-phase

2    program, right?

3    A.   Yes, sir.

4    Q.   And the four phases that you're familiar with end in where

5    you are right now, which is, you're working on, I believe you

6    said, relapse prevention?

7    A.   Correct.

8    Q.   Okay, would you describe, if you can -- and I -- well, let

9    me actually ask a couple of background questions.  How long

10   were you away from Butner and the therapy program the last time

11   you were brought up here?

12   A.   Approximately three months.

13   Q.   And --

14        THE COURT:  And you got trapped in Brooklyn, is that

15   it?

16        MR. SHIELDS:  Brooklyn, Philadelphia, Petersburg.

17   Q.   Trapped in each of those places?

18   A.   Yes.

19   Q.   And where were you when you left off therapy?  What were

20   you in?

21   A.   I had just completed the third phase.  When I was in

22   Massachusetts for the last hearing, I had completed Phase 3.

23   Q.   Okay.  And what was the end of -- I mean, what were the

24   things that you had completed in Phase 3?

25   A.   Victim empathy, victim impact, the beginning of creating a

Page 6

1    good life plan, learning how to have compassion, forgiveness,

2    doing the right thing, working on the conscience.

3    Q.   Are these things that are textbook things, or are these

4    things that you work on with an actual therapist?  And I guess

5    the question is, is that Dr. Hernandez, or are there others?

6    A.   We have actual textbooks that we work from, but we also --

7    and we have homework assignments, and then we do role playing

8    in group.  And it's with Dr. Hernandez, also with Dr. Mullen,

9    and we also have two other therapists now, Mr. Gallop and

10   Ms. Bator.

11   Q.   How many people are there that are able to do group?  Do

12   you have enough people that you actually have a group?

13   A.   There's myself, Mr. Hunt, who's the other committed

14   individual, and then there's a volunteer that's in the program.

15   So in a sense, there's three of us.

16   Q.   Okay.  And what is the reason for group, if you can

17   explain it?

18   A.   The reason for group is to -- so you can be held

19   accountable for -- you know, so you can't minimize and try to

20   justify your behaviors and stuff.  It's to learn how your ways

21   have been negative in the past and how they've caused harm to

22   other people.  And if you're in a group setting, you have other

23   people that can hold you accountable for when if you start to

24   talk and you try to minimize or deny what it is that you've

25   actually done.

United States v. Shields – Discharge Hearing Day 3

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

Page 7

1       THE COURT:  Excuse me.  Is this volunteer somebody

2   who's incarcerated or from the community?

3       MR. SHIELDS:  No.  They're incarcerated.

4       THE COURT:  So it's somebody who's not civilly

5   committed but serving a sentence?

6       MR. SHIELDS:  Certified.  Now, they're certified as a

7   civil commitment, but they haven't been civilly committed yet.

8       THE COURT:  I understand.  All right.

9       MR. SHIELDS:  Okay.

10  Q.   Other than the three -- well, other than you and Mr. Hunt,

11  there are no other committed individuals; is that right?

12  A.   No.  We're the only two civilly committed individuals in

13  the United States.

14  Q.   And does that afford you a lot more face time with

15  Dr. Hernandez than might be the case in, let's say, a year or

16  two?

17       MR. GRADY:  Objection.  It's speculation.

18       THE COURT:  Well --

19  Q.   Well, what kind of an opportunity does the fact that there

20  aren't very many of you afford you?

21  A.   Well, I have -- it's an open -- first of all, it's an

22  open-door policy with Dr. Hernandez and any of his staff

23  members, but being that there's just -- there's three of us and

24  two of us are civilly committed, we have -- we have his

25  undivided attention from the hours of 8:00 o'clock in the

United States v. Shields - Discharge Hearing Day 3

Page 8

1    morning until 4:00 o'clock in the afternoon.

2    Q.    And do you avail yourself of his attention?

3    A.    Absolutely.

4    Q.    I'm sorry, go ahead.

5    A.    I probably spend anywhere from up to four -- at least four

6    hours a day with him on various different things, either in

7    groups or individual conversations and other things that we may

8    be doing.

9    Q.    Can you explain to me how it is that you come to be

10   evaluated by him?  I mean, I know -- I've read the progress

11   reports, and it appears you've done very well.  How is it that

12   he evaluates you?  Does he talk to you about the goals that

13   he's looking for you to attain and determines himself whether

14   you have attained them?

15   A.    Well, we set every -- at the beginning of the program

16   there was a treatment plan that was put into place, and those

17   are the treatment goals that he would like to see you work on

18   during the different phases.  And as you work through those

19   phases and you come time every 90 days for your evaluation, we

20   talk about each individual component and how I feel I have done

21   and how he feels I have done; and in conjunction with the two,

22   he puts together his recommendation as to how I've done during

23   that phase and how I have -- and how I will continue to improve

24   in the future.  And every 90 days there's a meeting that's

25   called an MTT.  It's a multidisciplinary treatment team, and

Page 9

1    that's made up of my unit team and my treatment team here at

2    the facility along with other staff members from different

3    areas, like recreation, education, the chapel, and other

4    places.  And everybody gets together every 90 days and gives a

5    report on how I've continued to or how I've lacked to continue,

6    either way, of my progress in treatment.  And as the record --

7    Q.   Go ahead, I'm sorry.

8    A.   And as I guess the record would reflect from the treatment

9    plans that Dr. Hernandez has filled out and my treatment team

10   and my MTT team has signed, you can see the progress that I've

11   made.

12   Q.   Do you feel like you have made strides in understanding

13   your offense history and your dynamics of offending as a result

14   of the therapy?

15   A.   Most definitely.

16   Q.   I'm sorry?

17   A.   Most definitely.  I'm in a different place today than I

18   was two years ago.

19   Q.   Do you feel like working with Dr. Hernandez has been a

20   benefit to you?

21   A.   Most definitely, yes.

22       THE COURT:  Is it different in kind from the kind of

23   treatment you got up in Maine?

24       MR. SHIELDS:  Oh, this is completely different.  I

25   don't think the Court has -- I've ever explained to the Court

United States v. Shields - Discharge Hearing Day 3

1    the kind of treatment that I got in Maine, but when I was in

2    treatment back in the early '90s in Maine, I would pay $20 to

3    $40, depending on my income at the time, to go into a room with

4    fifteen other people, and it was like a check-in group; you

5    know, what have you done for the last two weeks?  What are you

6    doing?  What are your plans to return?  So it was never really

7    a treatment.  It was more of a check-in group.  This is the

8    first time in my entire life that I've actually been in a

9    cognitive, structured-based treatment.

10        THE COURT:  Thank you.

11   Q.   You sat through yesterday, and there were comments made

12   about your static risk factors.  You know what I mean by that

13   term?

14   A.   I understand, yes, sir.

15   Q.   Okay.  And among them was a diagnosis of pedophilia that

16   was made and is provisional, as I understand it at this point

17   in time, because -- well, is provisional, and I wanted to ask

18   you, do you have any pedophilic urges as you sit here today?

19   A.   No.  I have no interest in -- in -- in -- in any type of

20   prepubescent, postpubescent relationships with anybody.

21   Q.   Okay.  What is your wish as you go forward in life?  In

22   terms of how you want to live your life, where you see

23   yourself?

24   A.   I want to live a respectable and responsible life that is

25   healthy, that doesn't include the use of drugs and alcohol,

United States v. Shields - Discharge Hearing Day 3

1   doesn't include the use of inappropriate sexual relationships

2   or promiscuous sexual relationships, even those that are above

3   the age.  I would like to have a monogamous, healthy

4   relationship with a person of my own age that can offer me the

5   same thing that I can offer them:  stability, emotional

6   support, financial support, things of that nature.

7           THE COURT:  Where do you want to live, what state?

8           MR. SHIELDS:  Well, you know, I'm not opposed to

9   returning to the state of Maine, but, you know, this is where,

10  Judge Saris, this is where -- you know, I said to my lawyers I

11  want to be released to the place that is going to give me the

12  best percentage of resources that are available to me to have a

13  successful life, and that's not only with my sexual addiction;

14  that is with alcohol and drugs as well.

15          THE COURT:  Thank you.

16  Q.   I don't know whether the Judge knows this or not,

17  Mr. Shields, so I'm going to ask you:  Have you indicated to

18  Dr. Hernandez that you would be willing to work with him if he

19  would continue to work with you at or around Butner?

20  A.   Yes.  I have indicated to Dr. Hernandez that I would like

21  to release to the Durham, the Raleigh-Durham-Butner area when I

22  leave this setting so that I can continue to work with his

23  treatment team and my treatment team, his staff, so that they

24  could come and visit me in the community, they could, you know,

25  still be able to work with me in the community.  I know that,

United States v. Shields - Discharge Hearing Day 3

1   you know, some of the treatment staff here and I have talked

2   about that.

3   Q.   And is that something that they believe is permissible or

4   possible under their own job constraints?

5   A.   Absolutely, absolutely.  I had one of my -- as a matter of

6   fact, we were just talking about this the other day -- one of

7   my treatment providers here, you know, was saying, you know, if

8   I was in the community, he had an extra ticket for a football

9   game, and he would take me to that, you know.  So, yes, I would

10  have -- I would have social connections with them in the

11  community.

12  Q.   I guess what I was asking is, if you are completely out of

13  Butner or out of a U.S. probation, is that something that they

14  can do privately or not?

15  A.   Absolutely.

16  Q.   And I'm not talking about socially.  I'm actually talking

17  about providing continued therapy.

18  A.   Right.

19       MR. GRADY:  Objection, your Honor.  This witness isn't

20  competent --

21       THE COURT:  He doesn't --

22  Q.   Let me ask you this:  In terms of your willingness to

23  either relocate somewhere besides Maine, if there's more

24  therapeutic opportunities, or if we're talking about the camp

25  at Butner, would you be willing to go to the camp at Butner?

United States v. Shields - Discharge Hearing Day 3

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

1   A.   Absolutely.

2   Q.   And in terms of your willingness to stay at the camp, if

3   you were, for example, assigned to the camp, would you walk

4   away from it before you were told you could?

5   A.   No.  I have --

6   Q.   Okay, go ahead.

7   A.   That's all right, go ahead.

8   Q.   Have you been assigned to halfway houses in the past?

9   A.   Yes, sir, in state custody and in federal custody.

10  Q.   Have you ever walked away from a halfway house placement?

11  A.   No, sir.  I have no -- no escapes in my record at all.

12  Q.   Now, do you think you could benefit from being at the camp

13  at Butner during some part of Phase 4?

14       MR. GRADY:  Objection, your Honor.  Competency.

15  A.   I think the lesser restricted environment would be --

16  would be -- like a stepdown would be helpful, yes.

17  Q.   What is your understanding of what you're supposed to

18  learn how to do in the last part of Phase 4?  And if you

19  remember what I asked yesterday regarding work and community

20  integration, what, in your view, would be the benefit of being

21  in that halfway house to work on those components?

22  A.   Oh, it would be a great benefit.  I mean, if I lived in a

23  halfway house where I could work on reintegrating slowly into

24  the community instead of all at once, it would give me the

25  opportunity to find a job, to be able to work that job, to

United States v. Shields - Discharge Hearing Day 3

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

1   secure housing, to secure a bank account, to secure treatment

2   specialists, numerous things that would be far greater than I

3   can do from there that I can't do from here.

4   Q.   Do you hold a job within the four walls of the institution

5   now?

6   A.   Yes, I do.

7   Q.   Okay, what is it you're able to do there?

8   A.   My current job that I have here at the institution that

9   I've had ever since I've been here is, I'm the unit orderly for

10  the unit that we live in, the treatment unit.

11  Q.   And what does unit orderly do?

12  A.   My responsibility as the unit orderly is the cleanliness

13  of the unit, of making sure there's plenty of supplies, that

14  the maintenance is up to keep, the unit is clean and it's ready

15  for weekly inspection.

16  Q.   Are there jobs available at the camp that are still within

17  the institution, different jobs that you could get?

18  A.   Yeah.  There are jobs at the camp that are just like jobs

19  that they have here.  There are jobs at the camp that only camp

20  individuals can do because they have to come into the FCI

21  institution to clean the front lobby and hallways and visit

22  rooms and areas where the secure inmates are not allowed to go

23  to.

24  Q.   Would you describe where you were in terms of your last

25  halfway house experience and in terms of what privileges and

United States v. Shields - Discharge Hearing Day 3

Page 15

1    conditions were imposed on you in that halfway house placement

2    and whether or not you complied with them.

3          THE COURT:  This is what we heard about at trial?

4          MR. SWOMLEY:  He didn't testify about any -- well, he

5    didn't testify, but I'm asking him what he understood were his

6    restrictions when he went to Maine and when he got pulled back,

7    but basically what level of freedom he got then, his last level

8    of freedom, your Honor.

9    Q.   If you could answer that question, Mr. Shields.  Do you

10   need me to repose it?

11   A.   Yeah, when I was at the halfway house in Portland, Maine,

12   I was allowed to enter the community on a daily basis.  I had

13   to fill out an itinerary sheet to go places and do things.  I

14   went to AA meetings every night.  I went to work every day.  I

15   would go to work at 5:00 o'clock every morning and return in

16   the afternoon.  And if I was working the evening shift as well,

17   I would go back and I would return by 11:00 o'clock at night.

18   I was able to go shopping for clothing items or I could go to

19   for grocery items.  I was allowed to go out to dinner.  I was

20   allowed to go to my -- I went to my AA meetings, and I was

21   allowed to have my sponsor come and take me and go on social

22   events within the AA community.  I was able to have a bank

23   account.  I was instructed to set up a bank account.  I was

24   monitored.  I wasn't aware of it until the court hearing that

25   we had a couple of years ago, but every time I left the

United States v. Shields - Discharge Hearing Day 3

1   facility I was under surveillance.  I complied with all the

2   rules and regulations there.  I was never written up.  I wasn't

3   removed from the halfway house for any disciplinary reasons by

4   anything that I did.  The only reason that I was removed from

5   the halfway house was for the Adam Walsh process.

6   Q.   Okay, how long were you in the halfway house before you

7   were removed?

8   A.   I was -- I was scheduled to be there for a period of

9   15 days, and I believe I was there for like 54, 55 days.

10  Q.   And what job was it that you had gotten when you were

11  working while there?

12  A.   I left FCI Butner on 9/11/2006 and arrived at the halfway

13  house on 9/12, and as it was stated in court two years ago, I

14  got a job the first day that I got there, and I was a waiter at

15  the Holiday Inn.  I was not only a dining room waiter but I was

16  a banquet waiter, and was offered a position in the management

17  program once I graduated from the halfway house and had moved

18  to the sober house that I had set up with my case manager to

19  live in.

20  Q.   What kind of work would you like to do going forward in

21  the future?

22  A.   You know --

23  Q.   Or, rather, what are you qualified to do?

24  A.   Restaurant management, hotel/restaurant management.

25  Q.   Okay.

United States v. Shields - Discharge Hearing Day 3

Page 17

1       MR. SWOMLEY:  I think that's it.  Thank you.  Thank

2   you, Mr. Shields.

3       THE COURT:  Mr. Grady is going to ask you a few

4   questions.

5       MR. SHIELDS:  You're welcome.  Okay.

6   CROSS-EXAMINATION BY MR. GRADY:

7   Q.   Mr. Shields, can you hear me?

8   A.   Yes, sir.

9   Q.   Dr. Hernandez has been helpful to you?

10  A.   Yes, sir.

11  Q.   You would be incapable to have made the progress you did

12  without his help, correct?

13  A.   I wouldn't -- I wouldn't say that I would have been

14  incapable of it, but he has made a tremendous impact in my

15  life, yes, sir.

16  Q.   His treatment has helped you, his expertise?

17  A.   Oh, absolutely.

18  Q.   Do you now think that you know better than him what your

19  treatment should be?

20  A.   I don't pretend to know better than him, no.

21  Q.   Okay.  Mr. Shields, I'm just going to run through a few

22  things very quickly.  You pled guilty to three sexual offenses

23  in Maine in 1990, correct?

24  A.   Correct, sir.

25       THE COURT:  Well, we don't need to go back through

Page 18

1  that.  I very much remember what the record is.

2      MR. GRADY:  Sure.

3  Q.  You were incarcerated until 1992, and you were put on

4  probation then, correct?

5  A.  That's correct.

6  Q.  And among the conditions of your probation were to stay

7  away from children under the age of sixteen, correct?

8  A.  I believe so, yes.

9  Q.  And to undergo sex offender treatment, correct?

10 A.  That's correct.

11 Q.  And you underwent sex offender treatment for about three

12 years at that time, from about 1992 to 1995?

13 A.  To 1996.

14 Q.  Okay.

15 A.  And as I stated earlier, it really wasn't a treatment

16 program, but, yes, that's what it was.

17 Q.  Okay.  During this probation, you engaged in oral sex with

18 four boys age thirteen, fifteen, and two boys age sixteen,

19 correct?

20 A.  Yes, sir.

21 Q.  That's both while you were on probation and while you were

22 in treatment, correct?

23 A.  Correct.

24 Q.  And you successfully kept this both from your treatment

25 providers and Probation authorities, correct?

1  A.   Correct.

2  Q.   And there were approximately -- there were well over 400

3  occasions where you sexually abused these children during that

4  time, correct?

5  A.   You're correct, yes.  I don't have my papers in front of

6  me, but I believe that's correct.

7  Q.   You understand that when you went on probation, you made a

8  promise to the court, correct?

9  A.   Yes, sir.

10  Q.   And in the past, you've not kept that promise, correct?

11  A.   In the past, that would be correct.

12  Q.   And you've successfully concealed sexual offending both

13  from treatment providers in the past and from Probation?

14  A.   Again, in the past, that would be correct.

15  Q.   Now, you disclosed a number of offenses in sex offender

16  treatment to Dr. Hernandez of which this Court was unaware,

17  correct?

18  A.   Yes.

19  Q.   And you were interviewed by two doctors in this case,

20  Dr. Plaud selected by the Court and Dr. Rypma selected by your

21  own attorneys, correct?

22  A.   Correct.

23  Q.   And you withheld this information from them, correct?

24  A.   Yes, you could say that.

25  Q.   I could say that, or you did it?

1    A.   I would say "yes," and if I may extend on that, the reason

2    that I have learned in treatment over the period of time that

3    I've been in treatment, I have learned what I would have years

4    ago not considered to be a sexual offense nowadays, and now

5    today I look at that and view that as that was a sexual crime.

6    Before I never used to --

7    Q.   Go ahead.

8    A.   I'm sorry?

9    Q.   Go ahead.

10   A.   I was just saying, and before I never viewed those

11   incidences as sexual crimes.

12   Q.   Okay, you didn't view paying a thirteen-year-old --

13   A.   -- understanding of that.

14   Q.   You didn't view paying a thirteen-year-old or

15   fourteen-year-old or sixteen-year-old for oral sex as a crime?

16   A.   Well, the way my thinking was back then, to be honest with

17   you, I used to think that if I was paying for it -- I was a

18   teenage prostitute, and I got paid for it, and I used to

19   frequent places that were -- where teenage prostitutes worked.

20   And my way of thinking back then was that, no, this wasn't a

21   sex crime; I was paying for a service.

22   Q.   You had served well in excess of a year in prison for

23   sexually assaulting children under the legal age, correct, at

24   this point?

25   A.   I didn't hear you.

Page 21

1  Q.    Sure.  As of 1990, you had served well in excess of a year

2  in prison for sexually assaulting children under the age of

3  sixteen, correct?

4  A.    Correct.

5  Q.    But you still think, or it's your testimony today that at

6  the time you thought it wasn't a crime to have oral sex with

7  thirteen- and fourteen-year-old boys?

8  A.    That's not my view today, no.

9  Q.    But your testimony is that back then, that was your view,

10  it wasn't a crime?

11  A.    Prior -- prior to this -- prior to the treatment that I've

12  had here under Dr. Hernandez, you're correct, I didn't think

13  that way.

14  Q.    Now, you've actually --

15  A.    I have a different --

16  Q.    Go ahead.

17  A.    I have a different opinion about all of that today.

18  Q.    You had a second period of probation from 1999 until 2002,

19  correct?

20  A.    Correct.

21  Q.    And during this time you underwent sex offender treatment

22  a second time, correct?

23  A.    You're right, correct.

24  Q.    And this was cognitive behavioral treatment, was it not?

25  A.    Minimal, yes.

United States v. Shields – Discharge Hearing Day 3

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

Page 22

1    Q.   Well, I'm just going to --

2    A.   Again, it was a group of twenty to twenty-five people,

3    but, yeah.

4    Q.   Okay, I'm just directing -- I'm going to read it for you

5    because I can't show you the document, the Court's prior

6    opinion, 597 Federal Supplement, Second Series, Page 228:

7    "This, unlike his first treatment experience, this program

8    appears to have been of the cognitive behavioral model, a model

9    which today is considered the leading approach in the field."

10        Do you agree with that?

11   A.   Correct.

12   Q.   There were conditions of your probation imposed here as

13   well, correct?

14   A.   Yes, sir.

15   Q.   Refrain from all criminal conduct was one of them?

16   A.   Yes.

17   Q.   You were required to undergo sex offender treatment?

18   A.   Yes.

19   Q.   And as we've discussed, you underwent cognitive behavioral

20   sex offender treatment at this time?

21   A.   You're right, yes.

22   Q.   And, by the way, you were ultimately caught in September

23   of 2002 with child pornography after this treatment, correct?

24   A.   Yes, sir.

25   Q.   Now, this sex offender treatment lasted from approximately

United States v. Shields – Discharge Hearing Day 3

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

1   late 1998, early 1999 through 2001, correct?

2   A.   Yes, sir.

3   Q.   And during this same period, during 1999, you were paying

4   a seventeen-year-old boy to perform oral sex on you two times a

5   week, correct?

6   A.   Yes, sir.

7   Q.   So while you were in treatment, you were engaged in this

8   behavior, correct?

9   A.   Correct.

10   Q.   And you successfully hid this from your treatment

11   providers then, correct?

12   A.   Correct.

13   Q.   And you weren't violated for probation for this, so it

14   seems clear, you'd agree, that you successfully hid this from

15   your probation officer as well?

16   A.   Correct.

17   Q.   You've been under the supervision of Probation in the

18   past, and you've successfully hidden hundreds of sex offenses,

19   correct?

20   A.   Yes.

21   Q.   And you've successfully hidden hundreds of sex offenses

22   from treatment providers in the past, correct?

23   A.   Yes, sir.

24        MR. GRADY:  Nothing further.

25

United States v. Shields - Discharge Hearing Day 3

1   REDIRECT EXAMINATION BY MR. SWOMLEY:

2   Q.   Would you please describe, Mr. Shields, exactly what the

3   cognitive behavioral treatment that you received from '98 to

4   2001 actually looked like, and if you can differentiate it from

5   what you've been receiving.

6   A.   Wow, there's a big difference.  What we did in 1998 to

7   2001, 2000, was that I would meet once a month with a group of

8   twenty-five other sex offenders, and we would -- we would be

9   given a topic of discussion, and that topic of discussion would

10  have different scenarios.  And we would have to go home and do

11  a homework assignment on that, bring it back the next week and

12  read it out loud in group.  And then the other twenty-four

13  people in the group would give you feedback on how they felt

14  you responded to the question, and if you didn't pass, you had

15  to go back and do it again and bring it back the next week.

16  Q.   And -- was that it?

17  A.   And that is far different -- yeah, and that is far

18  different from what we do here at FCI Butner.

19  Q.   Okay.  Well, describe if you benefited from the difference

20  in the therapy.

21  A.   Oh, I most definitely have benefited from this therapy

22  more than I have any other therapy in my life.  Today I, you

23  know, I think differently, I act differently.  I have a clearer

24  mind.  I don't -- I don't view things the same way.  I have

25  compassion for people.  I have empathy.  There are major

1  differences that Dr. Plaud told you that he had even recognized

2  in the two years that he has seen me.

3  Q.   Mr. Grady asked you a little bit about what your views on

4  child prostitution are, and before I ask you any more questions

5  about what your views -- I'm going to actually ask you what

6  your views were then, and I don't know whether there was any

7  conflation to now, but what I want to ask you is, first of all,

8  can you describe your experience with child prostitution such

9  that you might be able to articulate both sides of what it is

10  to be involved in child prostitution.  Were you a child

11  prostitute?

12  A.   Yes, sir.

13  Q.   Okay.  And were you involved in hundreds of acts of child

14  prostitution as a child prostitute?

15  A.   Was I the victim of hundreds?

16  Q.   Well, let me ask you, how many times had you been

17  prostituted as a child and from what ages?

18  A.   I was sexually -- I've been sexually abused -- I was

19  sexually abused from the age of seven years old all the way

20  through -- and was in prostitution all the way through my

21  twenties.

22  Q.   So is it fair to infer that you have been sexually abused

23  thousands of times?

24  A.   Absolutely.

25  Q.   And did that in any way color your understanding of what

United States v. Shields - Discharge Hearing Day 3

1   it meant to, for example, believe that it's okay to have sex

2   with a child prostitute?

3   A.   Yes, it did.  Back then it did, yes.

4   Q.   Would you please both explain your own understanding now

5   as you sit here today of your history of victimization and try

6   and put in context some of the questions that Mr. Grady has

7   asked of you.

8   A.   With my own victimization?

9   Q.   Yes.

10          MR. GRADY:  Objection, your Honor.

11          THE COURT:  You brought it up.

12  Q.   Start at the beginning, Mr. Shields.

13          THE COURT:  No, not at the beginning but answer your

14  question.  What was your question?

15  Q.   My question was, if you can, explain how your own history

16  of victimization sexually may have contributed to the way you

17  viewed child prostitutes that Mr. Grady saw fit to ask you

18  questions about, and please differentiate between your thinking

19  now and your thinking then.

20  A.   Well, my thinking then was that, you know, I was -- I was

21  providing a service for money.  Whether I was being forced to

22  do it or whether I was doing it on my own, I was providing a

23  service of sex to men and was being paid for it and --

24  Q.   Can I stop you for a second, Mr. Shields.

25  A.   Yes.

United States v. Shields - Discharge Hearing Day 3

1  Q.   Did you have great choices in terms of your methods of

2  survival at that point in time?  Did you have lucrative,

3  high-paying jobs --

4       THE COURT:  You ask three questions within a breath,

5  so just one by one.

6       MR. SWOMLEY:  One by one.

7  Q.   What were the economic opportunities that you had

8  available to you at the time that you chose to perform sex for

9  older men for money?

10  A.   That was my way of surviving.

11  Q.   And where were you living at the time?

12  A.   I was on the street.

13  Q.   And so was your choice between providing an old man a blow

14  job and not eating or eating basically?

15  A.   Yes.  If I wanted -- if I wanted to eat, I provided men

16  with sex.

17  Q.   And how is it that those experiences colored your view of

18  what all of that meant?  And I'm now still asking about your

19  thoughts in the past versus present.

20  A.   My thoughts in the past were that I was providing a

21  service and that it was okay, that there was no harm being

22  done, that it was -- it was for money.  You know, I was doing

23  something; I was getting something.

24  Q.   Okay.  And did anybody teach you that that was right or

25  wrong back then?

Page 28

1   A.   No.  I was taught that that's what I do.

2   Q.   And is that your perspective now?

3   A.   Absolutely not.

4   Q.   And what is it that you have learned that permits you to

5   have that conclusion today?

6   A.   Well, any -- you know, even when I was thirteen years old,

7   I didn't have the capacity really to -- to -- to make a

8   judgment consent to have the sex.  Even though I was consenting

9   to have it, I wasn't mentally developed to -- to make those

10  decisions on my own.  No kid should be exposed to any kind of

11  behavior like that.  I don't think that anybody has the

12  emotional capacity to understand what it is that they're fully

13  getting themselves into.

14  Q.   Where did you learn that, Mr. Shields?

15  A.   Here in treatment.

16  Q.   Do you feel like you've internalized that lesson?

17  A.   Most definitely.

18  Q.   Do you recognize that it is wrong to have even consensual

19  or paid for, or whatever you want to call it, sex with someone

20  who is underaged?

21  A.   Absolutely.  It's not -- it's very inappropriate.  It's

22  very damaging, it's very hurtful, and it causes a lot of harm,

23  not only to the person that you're having sex with but to many

24  other people beyond that.

25       MR. SWOMLEY:  Thank you.  No further questions.

United States v. Shields - Discharge Hearing Day 3

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

1        MR. GRADY:  Just one.

2   RECROSS-EXAMINATION BY MR. GRADY:

3   Q.   Mr. Shields, your history of sexual victimization does not

4   make it okay for you to victimize others, correct?

5   A.   No.  I don't think that way today, no.  I used to think

6   that, but, no, I don't think that way today.  Just because I

7   was sexually abused doesn't give me the right to turn around

8   and sexually abuse anybody else, absolutely not.

9   Q.   The fact, yes or no, that you were sexually abused does

10  not make it okay for you to sexually victimize others?  Yes or

11  no.

12       THE COURT:  You can't answer that, "yes" or "no"?

13  A.   You're absolutely right, it does not give you that right,

14  no.

15       MR. GRADY:  Nothing further.

16       THE COURT:  Thank you.

17       MR. SWOMLEY:  Thank you, Mr. Shields.

18       (Witness excused.)

19       THE COURT:  Do you rest?

20       MR. SWOMLEY:  I rest.

21       THE COURT:  Do you rest?  Before you do that, do you

22  have a proffer or do you want to keep the record open for the

23  camp situation?

24       MR. GRADY:  I think, your Honor, to respond to your

25  order, we would, we would have to keep it open until

United States v. Shields - Discharge Hearing Day 3

Page 30

1   December 20 when we respond to the order about why he's not in

2   the camp.

3          THE COURT:  All right.

4          MR. SWOMLEY:  Do you want a summation kind of thing?

5          THE COURT:  Yes, actually, because I've been worrying

6   about this case.  Let me just start with a few basic legal

7   questions.  I should know this, but yesterday we were all

8   talking about a standard of least restrictive confinement.

9   Where does that come from?  We couldn't find it in the statute,

10  and maybe we were looking in the wrong place.  Is that out of

11  case law, or is it out of a statute?  Where is it?

12         MR. GRADY:  There are a few Supreme Court opinions

13  that address the issue, your Honor.

14         THE COURT:  So it's out of the case law?

15         MR. GRADY:  It's not in the statute.  From what I

16  understand Attorney Swomley to be arguing, he's basing it on a

17  few Supreme Court decisions:  Youngberg v. Romeo, 457 U.S.

18  307.  Bell v. Wolfish which would be another, 441 U.S. 520,

19  that addressed pretrial detainees, those individuals detained

20  but not committed a crime.  Youngberg v. Romeo involved, I

21  believe, civilly committed mentally retarded individuals and

22  what the due process clause required.

23         THE COURT:  Do you agree that that's the standard?

24         MR. GRADY:  I think that I would hope to have an

25  opportunity to brief it before I was held to what the

Page 31

1    government's going to view the standard to be.

2            THE COURT:  You'll do that by the 20th?

3            MR. GRADY:  Yes.

4            THE COURT:  Okay, because, as I said yesterday, in the

5    criminal context, a court has very little leeway, but in other

6    contexts, it has greater leeway.  And I think I need to

7    understand what both positions are in terms of that, and it's

8    not in the statute.

9            The second question I have is, whose burden is it?  It

10   says the standard is preponderance of the evidence.  Is the

11   consensus that the burden is on Mr. Shields to prove that he

12   can be released without sexually reoffending?

13           MR. SWOMLEY:  I don't agree with that actually.

14           THE COURT:  I'm asking.

15           MR. SWOMLEY:  I would submit that the burden is always

16   on the government if they're depriving --

17           THE COURT:  But where is it?  It's not in the statute

18   actually.  It says preponderance of the evidence, so that's the

19   standard.

20           MR. SWOMLEY:  We will brief it.

21           THE COURT:  All right, thank you.  So that's the

22   second legal question.  The third question is, legal question,

23   which I don't know the answer to and quick research didn't

24   disclose, suppose after he's done with Phase 4, let's say two

25   to six months, somewhere in that vicinity, has supervised

United States v. Shields - Discharge Hearing Day 3

1  release run in Maine?  How long was supervised release?  Does

2  anyone remember?

3       MR. GRADY:  It was three years, and I don't speak

4  formally on behalf of the Probation Department here, though I

5  understand the position to be that it is not running during the

6  time that he is civilly committed, but I don't wish to formally

7  speak.  I don't represent the Probation Department here, and

8  they would be the ones that --

9       THE COURT:  Well, I'm not sure whether it would be

10  here or whether it would be in Maine or whether it would be in

11  North Carolina, but here's my nightmare, okay, is that he's

12  successfully completed Phase 4.  He has a wonderful

13  relationship with Dr. Hernandez.  He's got actually more

14  treatment -- he's almost got Cadillac treatment at this point.

15  I mean, who gets this kind of treatment?  It's better than most

16  people with any mental illness.

17       MR. SWOMLEY:  That will change as more people go

18  there.

19       THE COURT:  Maybe, but right now it's the Cadillac,

20  and I think he's doing well under it.  Maybe that's an outdated

21  term, the Cadillac.  The Lexus treatment.  But, in any event,

22  let's say he finishes Phase 4, and then I want to release him

23  subject to conditions of release, you know, somewhat akin to

24  what Dr. Hernandez or Dr. Plaud, or whoever it is -- was it

25  Plaud this time? -- yes -- how do I do that?  Let's assume that

Page 33

1  you don't have Phase 5 in place, what do I do if supervised

2  release has run?  Can I -- this is something, I'm looking at

3  both of you, perhaps you can consult with a criminal defense

4  attorney -- can we agree to a modification of supervised

5  release so in case it has run, it can be extended?  Is it

6  something that Butner would supervise him in the community?  It

7  sounds like he's happy to do that and would like to continue

8  with Dr. Hernandez.  Do I put him out in a halfway house in

9  North Carolina and have Butner supervise him?  I actually don't

10 know what I'm supposed to do.  I know what I'm supposed to do

11 in a criminal case.

12       MS. PIEMONTE-STACY:  So, your Honor, in these cases,

13 the part that's tricky is that as long as he remains committed

14 to the Attorney General and he remains a committee, then BOP

15 would have jurisdiction to -- and let me just talk in

16 hypotheticals -- either, say they had a Phase 5 developed,

17 continue to supervise him in a stepped-down environment, be it

18 the camp or somewhere else or someplace like a halfway house.

19 Once he's not an Adam Walsh committee anymore, they really

20 don't have jurisdiction over him.

21       THE COURT:  See, I don't know.  I'm the first one

22 probably.  I don't know what to do.  I was trying to think

23 through.  I was in my mind incorrectly assuming that Probation

24 would be the one to supervise him.  As I thought about it, I

25 believed what you just told me, that supervised release either

Page 34

1    might have run, or at least there's a legal question in my mind

2    that you're going to have to think about.

3            MS. PIEMONTE-STACY:  And I will say, too, we've spoken

4    to -- you know, we've had different probation officers from

5    different states coming; and Connecticut, Maine, Massachusetts,

6    of course, I think they're all reviewing this, and I don't

7    think there's a unified position within Probation as to whether

8    or not --

9            THE COURT:  Well, this is what I don't want to happen,

10   you know, it's sort of almost -- he needs to jump through this

11   Phase 4 hoop.  I'm not going to wait another six months till

12   you all figure out what we do.  I want to have it all in place

13   by the time we have our next hearing.  I understand there's the

14   camp question now as to whether he does Phase 4 in a camp or

15   not, but I don't even know if the camp would qualify or it's

16   too restrictive for a release to the community.  I mean, I

17   don't understand it well enough when all is said and done, and

18   the next time around, I don't want to wait another six months

19   and have you say, "Oh, we don't know yet."  I mean, I'm going

20   to -- I want him to be on -- I mean, obviously, if he

21   flourishes the way Dr. Hernandez, and even your own expert, and

22   basically everyone's saying he's doing so well, if he's

23   continuing on this trajectory, this carries more than just, you

24   know, "Gee, I let him out subject to supervised release and

25   these seven conditions."  Who's going to monitor it?  Who's

Page 35

1  going to do it?

2         MS. PIEMONTE-STACY:  That's right, and so at least for

3  right now we'll leave it as it is.  I think we need to seek a

4  legal opinion.

5         MR. SWOMLEY:  Could I give you an analogy?

6         THE COURT:  Yes.

7         MR. SWOMLEY:  And it really has depended, and I don't

8  think it will because of the federal method of sentencing,

9  which is supervised release is supervision once you're

10 released.  So in theory he is now not released.  So I don't

11 know whether it's tolled or not from when he was on the

12 beginning of the supervised release, and actually the halfway

13 house didn't really count as supervised release.  That counted

14 as incarceration.  That's the only reason three days shy of his

15 total release date he was pulled back.

16        THE COURT:  That's exactly right.

17        MR. SWOMLEY:  So he may not have had any supervised

18 release that counts, and my view is that probably he has those

19 three years.  But I would agree with you, and, frankly, this

20 isn't an important question for you to understand because my

21 perspective is, the safest thing therefore for you to do is to

22 start the stepdown process now while you have him as a civil

23 committee.  And you can do that through the end of Phase 4, and

24 it's both least restrictive and it's a stepdown, and it's the

25 integration.

United States v. Shields - Discharge Hearing Day 3

1        THE COURT:  I understand, and you all will brief that,

2   but let me just say, regardless --

3        MR. SWOMLEY:  You have power for conditional release,

4   if I'm not mistaken, as well.

5        THE COURT:  I will not be conditionally releasing him.

6   If the least restrictive standard does apply, I will want an

7   explanation as to why the camp isn't appropriate, since

8   Dr. Hernandez seems to feel it's appropriate for Phase 4.

9        MS. PIEMONTE-STACY:  His testimony was Phase 5.

10  That's where we're conflating some of the issues.  He said,

11  could it happen?  Yes.  His clinical opinion was that he stay

12  inside until the end of Phase 4, which was six months-ish.

13       THE COURT:  I thought he was advocating for something.

14       MR. SWOMLEY:  His position was far more nuanced than

15  that, I have to say.

16       MS. PIEMONTE-STACY:  The question I posed to him was

17  if he were to be conditionally released for Phase 5.  So he was

18  answering very specifically Phase 5.

19       THE COURT:  But when I think of conditions of release,

20  I'm not thinking of the camp.  I'm thinking more along the

21  lines of what we heard was happening on supervised release,

22  right?

23       MS. PIEMONTE-STACY:  That's right, no, and that's

24  fair --

25       THE COURT:  Not a camp.

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

1        MS. PIEMONTE-STACY:  Right, right.  And so the camp

2   piece, and I think both of them said yesterday he needs to stay

3   in for Phase 4, and we will look at other options for Phase 5.

4        THE COURT:  I would first want to know what the

5   standard is.  Typically I don't interfere, but if it is a least

6   restrictive standard, I have more responsibility and authority

7   than I would in a criminal context.  So I need to at least know

8   what your view is as to the standard, and if it is a least

9   restrictive, why the camp isn't appropriate for Phase 4, or

10  some piece of Phase 4.  I mean, it may be that he needs to put

11  this plan in place, et cetera.  I'd like to know who else is in

12  the camp, whether he could have these group meetings, whether

13  he'd have access to all these treatment providers.  I'd like to

14  know why camp doesn't work.

15       MS. PIEMONTE-STACY:  I mean, and just so the Court

16  knows, the camp is general population, and so I suspect,

17  without knowing fully, that that is one of the security

18  reasons.  You're going to take a sex offender and plop him in

19  the middle of a general population.

20       THE COURT:  Maybe.  There may be a perfectly good

21  institutional reason.  Often there is.  I just need to think

22  about it because it was raised --

23       MS. PIEMONTE-STACY:  And typically it's like a

24  trailer, for lack of a better word.  It's "outside the fence"

25  is the term you'll hear.  So where you have Mr. Shields right

Page 38

1    now, he's in a separate unit, he's segregated, and he's inside

2    the fence, inside the confines of the FCI, the camp gets you

3    outside the fence where there's more freedom, freedom of

4    movement.

5            THE COURT:  Sure.

6            MS. PIEMONTE-STACY:  I know Dr. Cunic was a little

7    vague on that.

8            THE COURT:  I just want the position.  But more

9    importantly than that is, I fully anticipate, if I am not

10   reversed on something that just wipes out this case, that

11   within two to six months he will be released, subject to all

12   these multiple conditions of release, and I want to know how

13   it's going to work.  I like the idea of staying in North

14   Carolina, actually, because he has such a good treatment

15   relationship with Dr. Hernandez.  I actually think that is

16   maybe one of the safest ways to go.  He wants to stay there.

17   That sounds good, but how am I going to do it?  Should we

18   transfer probation?  Let's talk about the technicalities.  We

19   need to go to the judge in Maine.  We need to ask.  And let me

20   tell you because I do, I sign on the dotted line:  You transfer

21   jurisdiction from Maine to North Carolina.  You have to get

22   North Carolina to agree to take the case, and they may not want

23   to be the ones who take all the sex offender cases.  So we at

24   least have to put that in place.  And let's assume they don't

25   want it.  I need to be in touch with the judge in Maine to

United States v. Shields - Discharge Hearing Day 3

4c97532b-b0ef2-4ed6-aab6-05ff5c179b66

Page 39

1   decide whether or not -- he ultimately will make the decision

2   about whether supervised release has been tolled or not tolled,

3   and, if so, whether we can modify it to extend it to provide

4   for at least three years of this, you know, some sort of

5   whatever you all proposed, but some sort of intense supervision

6   with the kind of treatment that Hernandez says is appropriate.

7   And ideally, if Phase 5 happens, where does it happen?  I bet

8   you that's one of the "political" with a small P issues the

9   Bureau of Prisons is trying to deal with.  You know, does it

10  all happen in Butner?  Does it happen in Fort Devens?  Suddenly

11  Massachusetts and North Carolina get everybody?  I'm assuming

12  that's one of the issues they're grappling with, right?

13          MS. PIEMONTE-STACY:  Your Honor, I can say, because

14  it's a conditional release of discharge, absolutely it's a

15  political issue.  So I think you would see the highest level of

16  politicians in North Carolina being concerned that suddenly

17  there are a hundred and something sex offenders released.

18          THE COURT:  Sure, but my view is, that's actually not

19  my hunt.  I'd like to release him either to Maine where he's

20  got a history and a background, in terms of he was doing well

21  in Portland, or in North Carolina.  He really doesn't have

22  relationships here in Massachusetts that we've seen in the

23  history of this case.  I don't know what it means with respect

24  to some of these other guys.  I don't know where they would be,

25  but, I mean, this is the first case where we've hit all these

Page 40

1  little -- I don't know what to do.  And I don't want it to come

2  up so that then I'm holding him an extra six months while I

3  write another encyclopedic decision.

4        MR. SWOMLEY:  Politics with a small P plays out, if

5  you note, on the state side in Framingham which has a lot of

6  sex offender treatment programs.  The city council there tries

7  to do everything they can to get them out of town, and it's

8  because they congregate there, and they don't --

9        THE COURT:  Oh, sure, it's more diffuse if you -- you

10  know, why should they just take --

11        MR. SWOMLEY:  North Carolina is just going to love the

12  Adam Walsh Act when it gets into full swing, and that's going

13  to be a problem.

14        THE COURT:  But, anyway, all I'm dealing with is his

15  constitutional rights and the rights of the public under the

16  Adam Walsh Act.  That's all I'm dealing with.  But if I don't

17  have a Phase 5, then I'll release him subject to criminal

18  conditions.  And let me ask you this:  Legally, let's assume

19  for a minute the supervised release is only three to five

20  years, let's say -- I don't remember what it --

21        MR. GRADY:  At most, three.  It was three years, and

22  if it hasn't run, it will be at most three years.

23        THE COURT:  Okay, so now my issue is, do I have

24  statutory authority under the Adam Walsh Act to direct the

25  Probation Department to provide extended supervision for a

Page 41

1    civil committee?

2         MR. GRADY:  If he is conditionally released, the

3    statute provides that he could be released if, quote, "He will

4    not be sexually dangerous to others if released under a

5    prescribed regimen of medical, psychiatric, or psychological

6    care or treatment."

7         THE COURT:  Yes, but that's different.  That's a

8    different --

9         MR. GRADY:  That is different than conditions of

10   release.

11        THE COURT:  So can I tell Probation, and then if he

12   violates it, I revoke him?  I mean, I think there are lots of

13   issues here.  Suppose he violates under Adam Walsh, is it a

14   revocation like I have every day in my crack cases?  Or do I

15   essentially just yank him from -- do I have the authority to

16   yank him, whether it's in Maine or North Carolina?  I was

17   trying to think.  I was actually stewing about all of this last

18   night because I don't know the answers, and I thought maybe you

19   all could take your time to brief this and figure out what

20   we're going to do, a game plan for the next time so I'm not

21   hitting it cold.

22        Now, this may all be up-sided if he doesn't do well or

23   if the case is completely reversed on appeal, but assume for a

24   minute we're staying the course, we should do that.  And the

25   question for you is, do you want me to rule on the motion for

Page 42

1   review, or do you want me to hold it open?  You were going to

2   talk to your client about that, and maybe you'd let me know

3   when you file your next submission?

4              MR. SWOMLEY:  Yes.

5              THE COURT:  You know, whether this is the review.

6              MR. SWOMLEY:  Yes.  I'm sorry, we're in open court

7   here.  Do you have a question that's --

8              MR. SHIELDS:  Yes.

9              MR. SWOMLEY:  All right.

10             MR. SHIELDS:  Yeah, I do.  I just wanted to say

11  something.  At the end of Phase 4, if Judge Saris was to award

12  a release back to my supervised release, which is three years,

13  it's my understanding that the probation officer has the

14  ability and the right to place me under public law, which would

15  place me in the halfway house for up to six months.

16             MR. SWOMLEY:  I don't know anything about that.

17             MR. SHIELDS:  So I wouldn't be releasing immediately

18  to a free reign of street custody.  I would still be in the

19  halfway house under the rules and regulations of the BOP's

20  halfway house just under a community release, and I would still

21  check in with my probation officer and still be under all of

22  those rules like I was when I was there before.

23             THE COURT:  No, it might be a little different now.  A

24  judge has to impose that condition.  Probation can't.  But if

25  everyone agrees, that would be a likely outcome.  Do we know

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

1  who the sentencing judge was?  Do you remember who your judge

2  was?

3        MR. SWOMLEY:  Judge Woodcock.

4        THE COURT:  Woodcock?  Well, he's still there, and I

5  know him quite well.  I can try and facilitate some of this.

6  There's no reason I can't pick up a phone, I think, if everyone

7  is in agreement.  Who was your criminal offense attorney?  Do

8  you remember?

9        MR. SHIELDS:  Yes.  My criminal defense offense

10  attorney was John Baldacci, Joe Baldacci.

11        THE COURT:  It might be worth placing a call there.

12  Do you know who the prosecutor was up there?

13        MR. GRADY:  That I don't know off the top of my head.

14        THE COURT:  You may want to check --

15        MR. SHIELDS:  Gail Malone.

16        THE COURT:  Gail Malone.  So there you have it.

17        MR. SHIELDS:  Gail Malone was an AUSA.

18        THE COURT:  I would just start putting this all in

19  place, maybe a joint motion to treat supervised release as

20  starting when he comes out, subject to all these conditions so

21  it's all in place with Probation, so I don't have to deal with

22  Probation saying, "I don't want to do it."  You know, I think

23  they were willing to do it when we saw the guy come down last

24  time.

25        MR. TENNEN:  -- taking the position that it will start

United States v. Shields - Discharge Hearing Day 3

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

Page 44

1   when he gets out, that it hasn't run.

2            MS. PIEMONTE-STACY:  That was pre-commitment.

3   Post-commitment may be legally nuanced.  So it may be likened

4   to like an ICE-type detainee.  So I think there's a --

5            MR. TENNEN:  We e-mailed about that.

6            THE COURT:  I don't know.  What I don't want to do is,

7   when he's ready, I want him out of here, either in Phase 5 as

8   Butner proposes it or something I craft with Judge Woodcock or

9   potentially in North Carolina.  I don't even know -- I should

10  know this:  Where's Butner?  What city is it in, do you know?

11           MR. SHIELDS:  Bangor, Maine.

12           THE COURT:  No, where's Butner?  What district in --

13           MR. SHIELDS:  Oh, I'm sorry.  Butner, where is Butner?

14           THE COURT:  Yes.

15           MR. SHIELDS:  It's in Butner, North Carolina.

16           THE COURT:  But what district is it?  Do you know?

17  There are different districts in North Carolina, right?

18           MR. SHIELDS:  Yes, Judge, it's the Eastern District of

19  North Carolina.

20           THE COURT:  Eastern District.  So I could always pick

21  up a phone to the Chief Judge there.  But, ideally speaking,

22  I'll have a joint proposal so that we would have something to

23  actually discuss.  But I think unfortunately you'll have to

24  work through the criminal defense attorney if we wanted to come

25  under that auspices, and the question is, can I transfer?  What

Page 45

1    do I do if he violates?  Does that just go criminal, or do I

2    revoke him under Adam Walsh?

3           MR. SWOMLEY:  Is it possible, to simplify matters, to

4    appoint me as the criminal attorney, if that's what Mr. Shields

5    would want, and that way then I can act as attorney?

6           THE COURT:  I don't think I can unless you're admitted

7    in Maine.

8           MR. SWOMLEY:  Well, I could go in pro hac vice

9    certainly, I would venture.

10           THE COURT:  Why don't you just see.

11           MR. SWOMLEY:  All right.

12           THE COURT:  Do I have a problem with it?  No.  Does

13    Judge Woodcock?  I don't know.  I don't know whether they --

14    I'm assuming that there would be no problem, but what do I

15    know?  Anyway, but you may have to be appointed under the

16    Criminal Justice Act in Maine.

17           MR. SWOMLEY:  Okay.

18           THE COURT:  I don't know how they do it if you're not

19    on the list.  That's my concern.  We'll find out, we'll find

20    out.  Okay.  Do I mind?  No.  I could do it.  But I think we

21    have something in our plan that allows for extraordinary

22    circumstances for someone off the -- you're on our list anyway,

23    right?

24           So good.  He's doing just fine moving through Phase 4.

25    I am hoping -- today's the 7th -- that I'll get all of this by

United States v. Shields - Discharge Hearing Day 3

4c97532b-0ef2-4ed6-aab6-05ff5c179b66

Page 46

1   the 21st, but the truth is, I'm out of here for a week in

2   there.  So if you all need more time and want to go till

3   January 2, that's fine.  What's your preference?

4           MR. GRADY:  The additional time, knowing the

5   government.

6           MR. SWOMLEY:  He's Jewish.  He's going to do it.

7           THE COURT:  Well, then he shouldn't be here today.

8           MR. TENNEN:  That's right.  We light the candles at

9   night, so --

10          THE COURT:  All right.  Okay, so why don't I say the

11  first Tuesday after New Year's, whatever that is.  Do we have a

12  date for that?

13          THE CLERK:  That would be the 4th.

14          THE COURT:  All right, January 4 I'll get all these

15  submissions, legal questions being, who bears the burden of

16  proof?  Is the least restrictive setting provided for in our

17  statute?  What do we do about supervised release?  Has it been

18  tolled?  And, of course, substantively people can take their

19  positions on the camp and Phase 4.  I don't look for anything

20  more than 20 pages.  I don't think it's necessary.  I really

21  understand these issues, I mean, other than as I've just

22  stated.

23          As I said, my instinct is to finish Phase 4 because

24  he's doing so well as it is and he's had prior failures.  So I

25  will get your submissions, I will rule.  And the last thing,

United States v. Shields - Discharge Hearing Day 3

1    let me not forget, is, do you want me to rule?  Or do you want

2    me to just set another hearing in four months to see where he

3    is?

4              MR. SWOMLEY:  I thought you were going to let us have

5    until the submission date.

6              THE COURT:  Yes, yes.

7              MR. SWOMLEY:  Okay.

8              THE COURT:  That's one thing, just don't forget that.

9    Okay, good-bye.

10             MR. SWOMLEY:  Thank you.

11             THE COURT:  Thank you very much.

12             THE CLERK:  Court is in recess.

13             (Adjourned, 12:14 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

United States v. Shields - Discharge Hearing Day 3

Page 48

1                    C E R T I F I C A T E

2


3

UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )
5

6

7          I, Lee A. Marzilli, Official Court Reporter, do hereby

8  certify that the foregoing transcript, Pages 3-1 through 3-47

9  inclusive, was recorded by me stenographically at the time and

10 place aforesaid in Civil Action No. 07-12056-PBS, United States

11 of America v. Jeffrey Shields, and thereafter by me reduced to

12 typewriting and is a true and accurate record of the

13 proceedings.

14     In witness whereof I have hereunto set my hand this 21st

15 day of December, 2010.

16

17

18

19

20                    /s/ Lee A. Marzilli

21                    _____
                      LEE A. MARZILLI, RPR, CRR
22                    OFFICIAL COURT REPORTER

23

24

25