UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CIVIL NO. 07-12056-PBS |
| | ) | |
| JEFFREY SHIELDS, | ) | |
| Respondent. | ) | |

**MEMORANDUM AND ORDER**

January 27, 2011

Saris, U.S.D.J.

Jeffery Shields ("Shields") is civilly committed to the Bureau of Prisons as a "sexually dangerous person" pursuant to the Adam Walsh Act, 18 U.S.C. § 4247-4248. See United States v. Shields, 597 F.Supp.2d 224 (D. Mass. 2009). On June 10, 2010, Shields moved for a hearing on whether he could be safely released into the community. See 18 U.S.C. § 4247(h). Over the course of a three day hearing which concluded on December 7, 2010, the Court heard the testimony of (1) Dr. Joseph Plaud, Ph.D., the Court's designated examiner; (2) Andres Hernandez, Psy, D., the Clinical Coordinator of BOP's commitment and Treatment Program; and (3) Tanya Cunic, Psy. D., a BOP forensic psychologist.

Following the hearing, Shields asked this Court to refrain from deciding whether he remained sexually dangerous until he completes Phase IV of his treatment. At the same time, he

petitioned the Court to order the BOP to transfer him from the Federal Correctional Institution in Butner, North Carolina ("FCI Butner") to the Federal Prison Camp within the Butner complex ("Camp"), where he can complete his treatment within a less restrictive setting. Because the BOP bases its decision to house Mr. Shields within FCI Butner on a reasoned professional judgment, the Court **DENIES** Shields' request.

## Discussion

Mr. Shields is one of the few civil detainees enrolled in the BOP's Commitment and Treatment Program ("CTP") at FCI Butner. Currently, CTP involves a four phase treatment protocol. (See Johns Aff. ¶ 5.) The first phase, Phase I, orients CTP inmates to the policies and procedures of the program and evaluates their treatment needs. Phase II teaches skills including, but not limited to, conflict resolution and social skills, management of negative emotions, management of criminal thinking patterns, management of deviant sexual behavior, understanding of victim impact and moral reasoning. Phase III focuses on skills including, but not limited to, management of healthy sexuality, relapse prevention and lifestyle balance, advanced self-regulatory skills, advanced relationship and intimacy skills, and victim empathy. Phase IV, entitled "Community Reintegration Preparation and Planning, includes but is not limited to, advanced relapse prevention, effective life planning, employment

readiness, and self-governance skills. (See Johns Aff. ¶ 5.) Finally, treatment providers have conceptualized but have not yet implemented a Phase V, which is a "step-down or transitional phase" that helps participants successfully transition into the community. (Tr. 12/6/10, 18:1-6.)

Mr. Shields is currently involved in Phase IV of the program, and the BOP has decided to continue to house him within FCI Butner as opposed to moving him into the Butner Camp, though housing Mr. Shields within the Butner camp will arguably provide an effective stepped-down transition into Mr. Shields' future life outside of an institution.  Mr. Shields argues that because he is civilly detained, the Court should closely scrutinize the conditions of his confinement and order that he be transferred to the Camp.

The statutory language guiding the BOP's determination of where to house an individual committed under the Adam Walsh Act provides minimal guidance.  18 U.S.C. § 4248(d) states that the "Attorney General shall place the person for treatment in a suitable facility." Id.  The statute goes on to specify that a "suitable facility" is a "facility that is suitable to provide care or treatment given the nature of the offense and the characteristics of the defendant." 18 U.S.C. § 4247(a)(2).  The BOP's treatment within FCI Butner has provided Mr. Shields with high quality treatment and care surpassing the minimum statutory requirements.

Nonetheless, the BOP's decisions regarding Mr. Shields treatment are subject to constitutional scrutiny as well. See Youngberg v. Romeo, 457 U.S. 305, 315 (1982) ("The mere fact that Romeo has been [civilly] committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment."). People civilly committed by the government are protected by constitutional considerations not necessarily applicable to those serving criminal sentences. As the Supreme Court explained in Youngberg, "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Id. at 321-22. As opposed to punishment, the purposes of civil confinement are treatment and incapacitation, and "due process requires that the conditions and duration of confinement under [the Adam Walsh Act] bear some reasonable relation to [these purposes]." See Sealing v. Young, 531 U.S. 250, 265 (2001); see also, Allison v. Snyder, 332 F.3d 1076, 1079 (7th Cir. 2003)("[Civil] detainees may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not be punished.").

This inquiry requires the weighing of a number of factors: society's need to protect itself, Mr. Shield's constitutionally protected liberty interests, and the statute's stated goals of rehabilitating sexually dangerous people to a point where they

can reenter society.  Although this difficult determination is ultimately the Court's, in scrutinizing the conditions of civil confinement, due deference must be given to the expertise of the professionals that treat and supervise civil detainees.  As the Supreme Court has explained, "[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised." <u>Youngberg</u>, 457 U.S. at 321.  In other words, in order to override the government's decision to house Mr. Shield within FCI Butner as opposed to the Camp, the Court must find that this determination was not based on a reasoned professional judgment grounded in the purposes of Shields' confinement.  It is not enough for Mr. Shields to show that there are alternative treatment options, or even that there are alternative treatment options that would more quickly bring him to a point where he is no longer sexually dangerous.  In determining the conditions owed civil detainees, "It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." <u>Id.</u>

The government has established that its decision to house Mr. Shields within the correctional facility at FCI Butner is based on a professional judgment that appropriately takes into consideration the need to protect society along with the effectiveness of Mr. Shields treatment.  Dr. Hernandez, Mr. Shields treatment provider, consistently and credibly expressed that Mr. Shields could most effectively complete Phase IV of his

treatment plan within the correctional facility.  He told the Court that "I can offer what I need to offer to him in a more effective and expedient way where he's at [in the correctional facility.]"  (Tr. 12/6/10, 32:20-21.)  Dr. Hernandez later reiterated:

> [I]t's not my convenience.  It's first and foremost my confidence in the fact that there are certain skills that I am in fact more confident in teaching him while he is in total confinement, relapse prevention being one of those critical skills; that I would want to have him master those skills before putting him in a situation where he could re-offend.  And therefore my confidence in knowing that he's not going to not only escape from the camp but effectively apply those relapse prevention skills is increased.

The government has also submitted an affidavit from Tracy W. Johns ("Johns"), the warden at FCI Butner and the Federal Prison Camp. (See Johns Aff.)  Johns notes that Phase IV of the sex offender treatment provided within FCI Butner provides "Community Reintegration, Preparation and Planning, includ[ing] but not limited to advanced relapse prevention, effective life planning, employment readiness, and self-governance skills." (Id. ¶ 5.)  This treatment will prepare Mr. Shields for release to a less restrictive setting, but in the mean time, Johns deems it important to ensure that Shields is adequately secured in order to eliminate the risk that he will re-offend during treatment.  As opposed to the medium security setting provided by FCI-Butner, the prison camp "does not have adequate resources to securely

house [sexually dangerous civil detainees] during Phase IV." (Id. ¶ 9.)

Shields argues that because the BOP has yet to establish a Phase V that would allow him to transition into the community while receiving treatment from the Butner staff, the next best treatment approach would involve providing Phase IV treatment within a less restrictive transitional setting, and, therefore, the Court should order that Shields be transferred to the Camp. The Court is unpersuaded by this argument. For one, as explained above, the Constitution does not require the Court to scrutinize the details of Mr. Shields treatment in order to determine what would be the best possible treatment plan; the Court is free to trust the reasoned judgment of professionals that Phase IV treatment will be more effectively administered within FCI-Butner. Moreover, this argument fails to account for the fact that the Court must weigh not only the therapeutic effectiveness of Shields' treatment, but also society's interests in protecting itself. Notwithstanding the importance of a transitional reentry into the community, the Court does not believe that this transition should occur before Mr. Shields has completed his treatment in advanced relapse prevention.

Finally, though it is indeed discouraging that the BOP has yet to establish a Phase V, the Court is confident that it will have the authority to order a Phase V-like transitional treatment program administered by the Department of Probation as supervised

release or the BOP pursuant to 18 U.S.C. § 4248(e)(2)(A), which allows the Court to "order that a[n Adam Walsh Act detainee] be conditionally discharged under a prescribed regimen of medical, psychiatric, or psychological care or treatment that has been prepared for him, that has been certified to the court as appropriate by the Director of the facility in which he is committed, and that has been found by the court to be appropriate." Id.

### Order

At petitioner's request, the Court refrains from acting on Shield's petition until he has finished Phase IV of his treatment plan within the correctional facility FCI-Butner.

/s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge