Page 1

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,    )
                             )
             Petitioner      )
                             )
        -VS-                 ) CA No. 07-12056-PBS
                             ) Pages 1 - 12
JEFFREY SHIELDS,             )
                             )
             Respondent      )




                    STATUS CONFERENCE

           BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE




                      United States District Court
                      1 Courthouse Way, Courtroom 19
                      Boston, Massachusetts
                      April 26, 2011, 10:15 a.m.




                    LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
               United States District Court
               1 Courthouse Way, Room 7200
                    Boston, MA  02210
                      (617)345-6787
```

6fe0fa99-184a-4add-8ed7-4579a3b816c0

1    A P P E A R A N C E S:

2        EVE A. PIEMONTE-STACEY, ESQ., Assistant United States
     Attorney, Office of the United States Attorney, 1 Courthouse
3    Way, Boston, Massachusetts, 02210, for the Petitioner.

4        JOHN G. SWOMLEY, ESQ. Swomley & Associates,
     227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
5    for the Respondent.

6    ALSO PRESENT:  Phil Doreau, Automation Support Specialist.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2        THE CLERK: This Court calls civil No. 07-12056,
3   United States v. Jeffrey Shields. Will counsel please identify
4   themselves for the record.
5        MS. PIEMONTE-STACY: Good morning, your Honor. Eve
6   Piemonte-Stacey for the United States.
7        MR. SWOMLEY: John Swomley for Jeffrey Shields.
8        THE COURT: Thank you. Let me start off by
9   apologizing. Whenever we try and do these video conferencing,
10  I end up feeling frustrated. For some reason our technology is
11  not speaking to Butner's technology, and for some reason they
12  didn't show up this morning when we tried to do a test run. So
13  I don't know what to do with that other than I understand
14  you've set up a hearing date for whatever at 9:30 in the
15  morning, and we will bring him up. I understand that's a
16  hassle, and the last time he got lost in somewhere or other,
17  Brooklyn maybe?
18       MR. SWOMLEY: That was on the way down, I think, yes.
19       THE COURT: But I think I can't trust the technology
20  at this point for something as important as a hearing. But let
21  me ask you this. Without prejudging it, I will want him to
22  finish Phase 4.
23       MR. SWOMLEY: He will have finished that, and I
24  believe, my understanding is that they're conditioning his
25  discharge around June of this year.

1         THE COURT:  Well, so then let me just ask you this:
2    Do I need to see him?
3         MS. PIEMONTE-STACY:  You may not, your Honor, but out
4    of an abundance -- so where we're at procedurally is, he's
5    completing Phase 4 of the treatment.  It's expected he's going
6    to finish as of June, and Dr. Hernandez is preparing or has
7    prepared a discharge report.  That being said, I have to wait
8    for the clinical.  There's that clinical piece, the forensic
9    piece of Butner that says he's okay to be conditionally --
10        THE COURT:  Then what do I do?
11        MS. PIEMONTE-STACY:  If -- and this is what we're
12   trying to work through, right, because it's the first, so I
13   think one of two things that can happen.  I think, assuming for
14   a minute everyone agrees he can be conditionally released, I
15   don't know whether this Court will allow the petition for
16   discharge or whether the director of the facility under the
17   statute files that certificate that the statute contemplates
18   saying he's deemed no longer sexually dangerous and can be
19   released under these conditions to the community.
20        THE COURT:  So let him sign it.  Okay, let him sign
21   it.  But here's the issue:  Does it come back to me or the
22   sentencing judge in Maine for the conditions of supervised
23   release?
24        MS. PIEMONTE-STACY:  I think jurisdiction is with you,
25   but that ultimately we'll probably need you to get Maine

1  involved in terms of the supervision.
2          THE COURT:  So I'd like him to -- all right, go ahead.
3          MR. SWOMLEY:  Here's the way I see it or where I think
4  Mr. Shields is at this point.  The question was whether he had
5  three years of supervised release or whether he had just your
6  conditions of release, and the government has taken the
7  position that the three years have been running since he
8  wrapped his sentence; and we're prepared to join them in that
9  and have you be the boss, you be the person that is directing
10 conditions of release, as opposed to Probation and just sending
11 him off to a probation officer in Maine.
12         THE COURT:  I think we've looked at that issue.  I'm
13 not sure supervised release has been running.
14         MR. SWOMLEY:  Well, that's a question --
15         THE COURT:  Excuse me. Hold on a second.  We've
16 actually started looking at that.
17         Do you remember?
18         (Discussion between Judge Saris and the law clerks.)
19         (Discussion off the record between attorneys.)
20         THE COURT:  We've looked at it in a slightly different
21 context.
22         MS. PIEMONTE-STACY:  Okay.
23         THE COURT:  We looked at it in detail, this case
24 coming out of Washington, which is, what happens if you're
25 being held in jail for, let's say, six or seven months, and

1  then there's a decision not to go for sexual dangerousness?  I
2  don't even know if that's been appealed or not.  Has it, do you
3  know?
4         MS. PIEMONTE-STACEY:  I don't know, your Honor.  I
5  don't --
6         THE COURT:  That was a very difficult interstitial
7  issue which wasn't crystal clear, like so much of this.  I
8  don't know, but at least my instinct is, the supervised release
9  is not running if he's in a civil commitment, but I don't know.
10         MS. PIEMONTE-STACY:  There's some case law out
11  there --
12         MR. SWOMLEY:  The government has taken the position,
13  at least in this case, that it has been running, right?
14         MS. PIEMONTE-STACY:  Pre-civil commitment, it is not.
15  It is hold.  Post-civil commitment, there's a body of case law
16  out there that says post-civil commitment it does run, the
17  conditions of release do run.  I don't have those cases with me
18  today.  I thought I had briefed it, but I'd be happy to submit
19  something.
20         THE COURT:  My basic view -- so maybe this does make
21  sense -- my basic sense is that he should go back to his home
22  area in Maine.
23         MS. PIEMONTE-STACY:  And he is going to do that, I
24  believe.
25         MR. SWOMLEY:  The question, however, is whether or not

6fe0fa99-184a-4add-8ed7-4579a3b816c0

1  his default position is a probation officer in Maine or you
2  imposing conditions upon him and keeping him on those
3  conditions as opposed to Probation conditions.
4           THE COURT:  Okay, so we've got him on for a date in
5  June.
6           MS. PIEMONTE-STACY:  Yes.
7           THE COURT:  We'll bring him up here.  But I don't want
8  him to be in custody one day longer than he needs to be on a
9  discharge, so if he wants to be discharged from there and have
10 him self-report to here --
11          MR. SWOMLEY:  That would be great.
12          THE COURT:  -- or to Maine.  I prefer -- do we know
13 who the sentencing judge is?
14          MR. SWOMLEY:  I do not.
15          THE COURT:  Could you just give me like a little
16 status report on who the sentencing judge is.  I'll make a
17 call.  How does that sound?  And we'll figure out how many days
18 would be left on supervised release, if any.  I can't believe
19 any would be.  I don't know, though.
20          MR. SWOMLEY:  I think it's till middle of next year.
21          MS. PIEMONTE-STACY:  Yes.
22          THE COURT:  All right, so then I would just send it up
23 to him, let him -- do I keep conditions forever?
24          MS. PIEMONTE-STACY:  Well, so that's the thing.  I
25 think it would be revisited.  And I don't know if your Honor

1  recalls the report that Dr. Hernandez initially prepared and
2  said, when he finishes Phase 4, he can be released with all
3  these conditions; but it should be reevaluated in a year, and
4  if everyone agrees, that will be the government's --
5              MR. SWOMLEY:  He was proposing evaluating every six
6  months with a timeline of discontinuing it in about 18 months
7  is what we were looking at as our timeline and making that as a
8  proposal.  I mean, these are just ideas at this point, but --
9              THE COURT:  All right, so, listen, to keep this hot on
10 everyone's boiler, we have a June date.
11             MR. SWOMLEY:  Thank you.
12             THE COURT:  I have no desire to keep him -- he's done
13 well, and, ideally speaking, to the extent we have such things,
14 he would be the poster child for how this program works, so
15 that people aren't thinking it's like the stateside when you
16 never see the light of day, that this is actually a good
17 program and it works.  And I hope it does, who knows, but --
18             MR. SWOMLEY:  I think he's a very good poster child,
19 quite honestly.
20             THE COURT:  So if it does, I don't have any need for
21 him to just stop here.  He could stop in Maine.  But what's
22 clear is, if he goes directly to Maine, I need to talk to that
23 judge first, and the judge needs to coordinate with Probation.
24 Or he could come here, and then we could provide Second Chance
25 Act moneys to then jump on a bus up to Portland or something.

1   MS. PIEMONTE-STACY: Because at the end of the day,
2  your Honor, where this was the committing court, I do think the
3  jurisdiction is here for that next step. Under the statute, I
4  think this Court has the jurisdiction.
5   THE COURT: And I'm happy to do that, but I've got the
6  additional problem which is the probation. It's his home up in
7  Maine, and he'll probably do the best there, and it will run
8  concurrently with the rest of supervised release.
9   MR. SWOMLEY: He can certainly travel here during the
10 time periods that you would have for review. I mean, that
11 would not be a problem.
12  THE COURT: Okay. Well, whatever, you'll certify him.
13 If he wants to be released down there, that's fine with me as
14 long as the theory is that he report up here ASAP. I don't
15 know if he has a dime to his name. I think we could probably
16 work with Probation to get Second Chance Act moneys to get him
17 a bus ticket up here or a plane, whatever we do these days.
18 And then he'd come here. We'd come up with a set of conditions
19 of release. I should talk to the judge in Maine. I will
20 perhaps at least cede jurisdiction for the first period of time
21 up there, and then after that, we'll have to talk. I don't
22 know.
23  MS. PIEMONTE-STACY: And I can't say. The warden
24 hasn't said he'll certify them, so I'm just making these
25 assumption, assuming everything's agreeing.

1           THE COURT:  Sure.

2           MS. PIEMONTE-STACEY:  But that's why we have this date
3  because --

4           THE COURT:  Ironically, we may finish this up before
5  the First Circuit issues its opinion.  You've heard nothing?

6           MS. PIEMONTE-STACY:  Nothing, not a word.

7           THE COURT:  Fascinating.  Okay, so in some ways I hope
8  I don't see you in June, right?  I mean, theoretically anyway
9  we could just -- I think I'm going to have to see him no matter
10 what.

11          MS. PIEMONTE-STACY:  I think you do, your Honor, I do.

12          THE COURT:  Yes, so we're going to habe him here just
13 in case --

14          MR. SWOMLEY:  Okay.

15          THE COURT:  -- just in case, but I have no --

16          MR. SWOMLEY:  And the habe won't hold him if they
17 discharge him, though, or will it?  Will it prevent them from
18 releasing him?

19          MS. PIEMONTE-STACY:  I think he has to stay in
20 custody.  In other words, he's been civilly committed, and
21 until this Court acts, I don't think that he can be released.
22 But, again, I'm just working through all this too, it's new to
23 everybody, but my understanding is that --

24          THE COURT:  We're going to issue a habe because if for
25 some reason something bad happens, I won't be able -- it takes

1  that long to get him here.  We will cancel the habe if we can,
2  if in fact he needs to come here.  What I don't want him to do
3  is that slow-boat trip up the coast, so just put him on a
4  plane, okay?  And then we'll be here.  And then, ideally
5  speaking, will you coordinate with Probation so that they can
6  coordinate with Maine and get me the number of the judge up
7  there?
8         MS. PIEMONTE-STACY:  What I think is happening right
9  now, your Honor -- and, again, this is all in process -- is, I
10 believe a social worker at Butner is working.  The way that
11 they do with other types of releases is working with the social
12 worker in Maine in order to make these arrangements, where is
13 he going to live --
14        THE COURT:  He liked that lady.
15        MS. PIEMONTE-STACY:  There's been -- Dr. Hernandez has
16 spoken to a treatment provider.
17        THE COURT:  There was a halfway house where he was
18 doing unbelievably well.  It was one of the big notches on his
19 side of the ledger that this woman thought he was doing -- he
20 was a waiter and he was making preparations.
21        MS. PIEMONTE-STACY:  Right, Rene Moore at the Pharos
22 House.
23        THE COURT:  Very good.  So, I mean, maybe she'd
24 take -- very good.  When you get another twenty years on you,
25 the brain cells start going, so -- but, in any event, that

6fe0fa99-184a-4add-8ed7-4579a3b816c0

1  would be a good place.  He seemed happy there.  She liked him.
2          MR. SWOMLEY:  Yes.
3          MS. PIEMONTE-STACY:  So all of that's happening as we
4  speak.
5          THE COURT:  Good.  All right, we've got a plan.  And
6  I'm sorry about the technology, and we're going to try and --
7  did we hear what the issue was down there?
8          MR. DOREAU:  They haven't been able to call through to
9  us, but I can keep testing and trying to call to them.
10         THE COURT:  Well, I think right now we're done, and
11 you'll call Mr. Shields and explain what's going on?
12         MR. SWOMLEY:  I will be able to have him call me, and
13 I will try and do exactly that.
14         THE COURT:  I don't know how it works.
15         MR. SWOMLEY:  Yes.
16         THE COURT:  All right, good.  All right, thank you.
17         MR. SWOMLEY:  Thank you.
18         MS. PIEMONTE-STACY:  Thank you, your Honor.
19         (Adjourned, 10:25 a.m.)
20
21
22
23
24
25

1       C E R T I F I C A T E

2

3

UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7       I, Lee A. Marzilli, Official Court Reporter, do hereby

8   certify that the foregoing transcript, Pages 1 through 12

9   inclusive, was recorded by me stenographically at the time and

10  place aforesaid in Civil Action No. 07-12056-PBS, United States

11  of America v. Jeffrey Shields, and thereafter by me reduced to

12  typewriting and is a true and accurate record of the

13  proceedings.

14      In witness whereof I have hereunto set my hand this

15  7th day of May, 2011.

16

17

18

19

20

            /s/ Lee A. Marzilli
21      _____

        LEE A. MARZILLI, RPR, CRR
22      OFFICIAL COURT REPORTER

23

24

25