IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
               Petitioner      )
                               )
           -VS-                ) CA No. 07-12056-PBS
                               ) Pages 1 - 30
JEFFREY SHIELDS,               )
                               )
               Respondent      )



DISCHARGE HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
June 9, 2011, 10:15 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

```
 1   A P P E A R A N C E S:

 2        EVE A. PIEMONTE-STACEY, ESQ. and MARK J. GRADY, ESQ.,
     Assistant United States Attorneys, Office of the United States
 3   Attorney, 1 Courthouse Way, Boston, Massachusetts, 02210,
     for the Petitioner.
 4
          JOHN G. SWOMLEY, ESQ. and ERIC TENNEN, ESQ.,
 5   Swomley & Associates, 227 Lewis Wharf, Boston, Massachusetts,
     02110-3927, for the Respondent.
 6
     ALSO PRESENT:  Jonathan Hurtig, United States Probation Office.
 7                  Richard Ferris (By phone), Pharos House.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          THE CLERK:  Court calls Civil Action 07-12056, the

3  United States v. Shields.  Could counsel please identify

4  themselves for the record.

5          MS. PIEMONTE-STACY:  Good morning, your Honor.  Eve

6  Piemonte-Stacey and Mark Grady for the United States.

7          MR. SWOMLEY:  John Swomley and Eric Tennen for

8  Mr. Shields.

9          MS. PIEMONTE-STACY:  And, your Honor, Mr. Jonathan

10  Hurtig is with us at counsel table.

11          THE COURT:  Thank you so much for coming.  We were

12  supposed to have someone on the phone from Pharos House, is

13  that right?  Can you hear me?

14          MR. FERRIS:  Yes.

15          THE COURT:  Who is this?

16          MR. FERRIS:  Richard Ferris, Director of Pharos House.

17          THE COURT:  And I'm sorry I don't know this:  What

18  city is that in?

19          MR. FERRIS:  Portland, Maine.

20          THE COURT:  Portland, okay.  And I think you had

21  Mr. Shields before, isn't that right?

22          MR. FERRIS:  Yes.

23          THE COURT:  For a brief, what is it, five months or --

24  for months?

25          MR. FERRIS:  I don't recall, but, yes.

1        THE COURT:  Many years ago.

2        MR. FERRIS:  Yes.

3        THE COURT:  All right, thank you.

4        So as I understand it, we've hit a bump in the road a

5   little bit.  I was expecting to be signing something today, and

6   do I have a draft order somewhere?

7        MS. PIEMONTE-STACY:  Your Honor, the government does

8   have a draft order in its possession but hasn't submitted it

9   based on the latest developments.

10        THE COURT:  Well, let me ask you this.  As I

11   understand your submission -- I finally, by the way, got in the

12   mail yesterday the mailed sealed documents.

13        MS. PIEMONTE-STACY:  Unbelievable.

14        THE COURT:  It was dated May 24, and we received them,

15   I think it was yesterday or the day before.  So would you

16   please -- they still are screening for anthrax in the Marshals

17   Service, so, whatever, it takes me an extra week to get

18   anything.  Would you just let us know it's coming on sealed

19   materials.

20        MS. PIEMONTE-STACY:  Okay.

21        THE COURT:  But, in any event, as I understand it,

22   Mr. Shields has completed Phase 4.  There is a treatment plan.

23   The plan had been to certify him by today, and the bump in the

24   road is the concern about whether or not he should be released

25   for a temporary placement at Coolidge House.  Is that the

1    issue?

2          MS. PIEMONTE-STACY:  Yes, your Honor.  Based on

3    Mr. Shields's temporary placement at Coolidge House,

4    Dr. Hernandez's and I believe Dr. Cunic's opinions are that it

5    would be better for him to remain in BOP custody until he could

6    be permanently released to Pharos House.  Because of that, the

7    warden would not sign a certificate of discharge.

8          THE COURT:  I have the authority to discharge him

9    anyway, is that correct?

10         MS. PIEMONTE-STACY:  You do, your Honor, under --

11   well, 4247(h) was the motion under which Mr. Shields filed a

12   petition for discharge, and 4248(e) would allow this Court to

13   do so.

14         THE COURT:  Let me ask Pharos House.  This is a fairly

15   important case.  In fact, it's the first case like this in the

16   United States of America, to my knowledge.  In fact, I've

17   confirmed that.  I believe that this is the first case.  I

18   think it's in everybody's -- everybody wants him to be released

19   to Pharos House, which is his community, Maine, rather than

20   Massachusetts.  Is there any way of getting him a bed up there?

21         MR. FERRIS:  We are actually at overcapacity at the

22   moment, and all our referrals do come through the Community

23   Corrections Office in Philadelphia, and we consider them as the

24   referrals come into the agency.  We consider them according to

25   placement, you know, or bed space availability.

1          THE COURT:  Well, can I ask -- I'm just trying to

2     understand -- are you the only place in all of Maine that's a

3     halfway house or community confinement center?

4          MR. FERRIS:  For federal, yes.

5          THE COURT:  You're the only community corrections

6     center?

7          MR. FERRIS:  Yes, it is.

8          THE COURT:  And if the Bureau of Prisons ordered you

9     to take somebody, would you take them above other people?

10         MR. FERRIS:  We only access federal anyway.  We're all

11    federal.

12         THE COURT:  I'm trying to figure out, is it a

13    first-come-first-serve, or is it done on any other kind of

14    priority level?

15         MR. FERRIS:  No.  It's first-come-first-serve on the

16    referrals from the Community Corrections Office.  The Community

17    Corrections Office has total control over referrals to the

18    facility.

19         THE COURT:  So I'm not as familiar as you are with the

20    bureaucracy.  Is that center BOP?

21         MR. FERRIS:  Yes.

22         THE COURT:  Okay.  So BOP, does it ever put people in

23    different orders; in other words, if there's somebody a high

24    priority?  So, in other words, he in some sense should have the

25    highest priority of all because he was actually released from

1    BOP years ago.

2           MR. FERRIS:  Well, they send them, and it's all on a

3    space-available basis.

4           THE COURT:  But could he have the next bed?  I'm not

5    asking you to bump anyone.  If BOP told you to give him the

6    next bed, when would that be?

7           MR. FERRIS:  Well, it's a little hard to predict but

8    probably the end of August?

9           THE COURT:  For the next bed opening if we --

10          MR. FERRIS:  Probably the end of August, depending on,

11   we often don't know when somebody's going to go on home

12   confinement or not.  We don't know if people are going to be

13   program failures while they're living here or not, and beds can

14   open up unexpectedly from program failure, home confinements.

15          THE COURT:  Is "program failure" a euphemism for

16   revocation?

17          MR. FERRIS:  Basically, yes.  They can go back to

18   federal prison if they fail --

19          THE COURT:  Okay, that's fine.  So if BOP said it or I

20   ordered it, could he be the next bed available?

21          MR. FERRIS:  Well, that would be up to the Community

22   Corrections Office.

23          THE COURT:  Right, right, or me.

24          MR. FERRIS:  The BOP, right, because --

25          THE COURT:  Or me.

1        MR. FERRIS:  -- private contract.

2        THE COURT:  But let's just suppose I said "the next

3    bed available," can you give me an average of how long that

4    would take?

5        MR. FERRIS:  Right now it is, it's like three months

6    out, approximately three months out.

7        THE COURT:  Unless somebody gets revoked or sick or

8    whatever it is, right?

9        MR. FERRIS:  Yes.  Right now I'm operating at actually

10   20 percent over our capacity.

11       THE COURT:  All right, thank you.  So my first option

12   is order that he get the next bed, as I understand it; but were

13   I to do that, it could be anywhere up to between next week and

14   three months is what it sounds like.  So that's option one.

15       MR. FERRIS:  Basically, yes.  What I --

16       THE COURT:  Option two, release him to Coolidge House,

17   which is what gives -- is Dr. Hernandez here?

18       MS. PIEMONTE-STACY:  Yes, your Honor, both Dr. --

19       THE COURT:  There you are.  Both of you, thank you for

20   coming.  You've been very helpful.  And I understand that it's

21   extremely important because as I congratulated Mr. Shields last

22   week, I congratulate you all, and I understand how important it

23   is to do this correctly.

24       So another option that I have, is this right,

25   Mr. Hurtig, when do we have a bed at Coolidge House?

1          MR. HURTIG:  This afternoon, your Honor.

2          THE COURT:  I also got a call from the medical center.

3  Ms. Molloy can probably say it better than I do.  They wanted a

4  little bit of leeway in order to contact the victims of the

5  offenses from a long time ago?  Since the underlying -- what do

6  you call it? -- the triggering offense here was a child

7  pornography offense, I'm not sure they understand that whatever

8  victims there were were from 30 years ago.  I don't know that

9  they know that.  But we got the call, and I didn't know what

10 you all felt your obligations would be with respect to people

11 from the '70s and '80s -- am I right? -- whether that's a state

12 obligation or a federal obligation.  Have you thought about

13 that issue?

14         MR. GRADY:  Your Honor, this is something that we had,

15 in the context of the proceeding itself, looked at as an

16 office; and the decision was that if there were a federal

17 victim, that the Federal Victim Rights Notification Act would

18 apply, and that it was not the case that it would apply with

19 respect to victims of predecessor offenses that were not

20 federal.  So in this case there is no federal victim per se.

21 Obviously, all of the children depicted in the pictures would

22 be victims, but to the extent that those individuals are

23 unknown, the only victims that we're aware of that we have

24 identities for, to my knowledge, are from offenses in the mid

25 and early '80s and then a twelve-year-old in 1992.

1          THE COURT:  Okay, so the bottom line is, you don't

2     feel like you need victim notification here because they're

3     primarily state victims from a very long time ago and he's been

4     released in the interim, kind of thing?

5          MR. GRADY:  As the statute would apply to the U.S.

6     Attorney's office.  I can honestly say I have not looked at as

7     to how the statute would apply to BOP's report --

8          THE COURT:  Well, you might want to just let Maine

9     Probation know.  I mean, they probably are more familiar with

10    what's required under Maine law for whatever appropriate --

11          All right, so as I understand it -- thank you,

12    Mr. Hurtig -- that we could release him to Coolidge House, and

13    so I have been thinking about this since I heard of the

14    problem.  The concern would be, you know, you start him in one

15    place for three months and then it's staccato; you know, you

16    sort of, like, have to readjust him and then move him to

17    another place.  Is that right?

18          MS. PIEMONTE-STACY:  Yes, your Honor, and

19    Dr. Hernandez can testify if this Court, you know, so desires,

20    but it was the lack of constancy in his release plan for the

21    immediate time.

22          THE COURT:  So the immediate question that comes to

23    mind is, why couldn't I just release him to Coolidge House

24    under -- I mean, I've got the chief probation officer here.

25    Mr. Hurtig is one of the best in the country.  Why don't I just

1    release him here to stay here as an option?  In other words, it

2    goes against my sense of justice to hold him for another three

3    months because of the overcrowding issue.  In fact, I've heard,

4    by the way, in my new position that this overcrowding is

5    happening across the country, so in fact BOP is releasing a lot

6    more people to home confinement, not people in Mr. Shields's

7    position but other people, using the home confinement to free

8    up beds for people like Mr. Shields.  So I'm hearing that

9    that's really been a cost-saving initiative and one

10   necessitated by the overcrowding in the federal prisons in

11   general.  I mean, it's a national problem.  They are now

12   37 percent overcapacity, and they are double and triple

13   bunking.  So I imagine that the, you know, the animal coming

14   through the snake kind of thing is, you know, it's going to hit

15   the confinement centers as well.  But why don't I just release

16   him to Coolidge House?

17           MS. PIEMONTE-STACY:  You could, your Honor, and that

18   was --

19           THE COURT:  Would that meet your Phase 4 concerns?

20           MS. PIEMONTE-STACY:  So the way the discharge report

21   is written -- he's completed Phase 4, so the way the discharge

22   report is written was that he be released to a structured

23   living environment.  Coolidge House is a structured living

24   environment, so you could do that.  It's just that it's

25   Dr. Hernandez's and Dr. Cunic's opinion that it increases his

1    risk if he's put in one place temporarily and someplace else --

2         THE COURT:  Yes, but why don't I -- I'm now turning to

3    you because I know he's from Maine, and everyone would want to

4    go back to their home, and that's better probably, but why

5    don't I put him back in Coolidge House at least for the year

6    and then -- as I read, when I finally got a copy of the release

7    plan, the theory was that in six months to a year he was

8    supposed to go out into the community anyway; and at that point

9    we could, if he's doing well -- I've got these great probation

10   officers -- if they think he's doing well, we could then

11   transfer him up to Maine.

12        MR. SWOMLEY:  Could I give you a -- what I'm hearing

13   sounds like the hybrid of that but a little bit different

14   figures?

15        THE COURT:  Okay.

16        MR. SWOMLEY:  And that is, what you haven't heard and

17   what I don't know -- obviously I haven't heard from

18   Dr. Hernandez testifying-wise as to his reasons for changing

19   his opinion, but in terms of his ability --

20        THE COURT:  I don't think he's changed it.  He just --

21        MR. SWOMLEY:  I guess what I'm saying, in terms of

22   stability and all that, the concerns, I mean, I would think

23   that there are concerns about the alternative that was

24   proposed, not that you're proposing but that was proposed to

25   send him back to Butner.  I would argue that --

1          THE COURT:  I'm not doing that.

2          MR. SWOMLEY:  Okay.  Then I'm not even going to argue.

3          THE COURT:  Don't argue.  I've got two choices here

4    basically.

5          MR. SWOMLEY:  What I would propose instead is that he

6    be discharged to Coolidge House.  The reality, and I think

7    Dr. Hernandez is right about this, that it is more restrictive

8    even than was initially envisioned at Pharos House; but what I

9    would suggest is, if the question that Dr. Hernandez is opining

10   that concerns him is the multiple transitions, then let's

11   discharge him to Coolidge House.  And I would actually ask you,

12   if stability is not an issue, if he is doing well, that we be

13   permitted to come back here the moment that there is a bed

14   available at Pharos House because it is a preferable facility.

15         THE COURT:  Well, can you all live with that on the

16   government's side?  In other words, Mr. Hurtig, we release him

17   to Coolidge, assume it's long-term.  He should go out and look

18   for a job, he should get embedded in AA programs and all the

19   kinds of things that you all want; and then, when it's time for

20   him to be released, if he's doing well, we would let him go

21   back to Maine.  If not, maybe he'll like Massachusetts.

22         Mr. Hurtig, does that make sense to you?

23         MR. HURTIG:  Your Honor, it does make sense.  My only

24   concern with it is Mr. Shields being put in a community that's

25   not his home community, which from my understanding, and I've

1    had no direct conversation with Mr. Shields, is that ultimately

2    the goal is to get him to Maine, and I wouldn't want to impede

3    that in any way.  One thing that may be of benefit to the Court

4    for the Court to know is that the treatment provider that's

5    used in Maine, a Mr. Stephen Thomas, has a good, close working

6    professional relationship with Dr. Cusack, the treatment

7    provider we use here in Massachusetts, and the two of them --

8            THE COURT:  Who's here, right?

9            MR. HURTIG:  No.

10           THE COURT:  Who is he?

11           MS. PIEMONTE-STACY:  Dr. Cunic.  It's real close.

12           THE COURT:  Oh, all right.  I'm sorry.  All right.

13           MR. HURTIG:  The two of them have worked very closely

14   in the past with similar situations such as these and

15   transferring people that have been in sex offender treatment

16   back and forth to one another, and it's something that they're

17   capable to do and willing to do and something that they've done

18   very effectively in the past.  So if Mr. Shields were to begin

19   his placement in the community at Coolidge House, and if and

20   when a bed became available at Pharos House and he was

21   transitioned there, the two treatment providers primarily

22   involved in the case do have a history of working together and

23   would be able to facilitate as smooth a transition as possible.

24           THE COURT:  And could we consult with Dr. Hernandez

25   and Dr. Cunic?

1          Does that work for you, Dr. Hernandez?  I'm looking

2    over the heads of everybody because you know more than anybody

3    sitting in this room.  The two of you do, the two of you do.

4    And so what if we sent him to Coolidge, he gets a job here, he

5    gets settled here, we see how he does, we find out when a bed

6    from Pharos becomes available, and if you feel it's premature

7    and it would be disruptive, we keep him here?

8          DR. HERNANDEZ:  My relationship with Mr. Shields --

9          THE COURT:  Why don't you come on up.  You flew up for

10   this hearing?

11         DR. HERNANDEZ:  Yes, ma'am.

12         THE COURT:  You both did?

13         DR. HERNANDEZ:  Yes.

14         THE COURT:  Thank you.  This is an important case for

15   you right now, huh?

16         DR. HERNANDEZ:  It is.

17         THE COURT:  In fact, it was showcased.  I mean, I

18   think everybody in the country, not to put pressure on you

19   both, but knows about this case, not necessarily the name but

20   the fact that this is happening.  So I know we need it all to

21   go smoothly if possible.

22         DR. HERNANDEZ:  And that's our interest too.  We have

23   invested a lot of resources.  I have invested professional

24   resources, so I'm very interested in this case going well.

25         I do realize that my relationship with Mr. Shields

1   will end and that I will not continue in an advisory

2   relationship with him, as the Bureau of Prisons basically in my

3   role will sever that relationship once we turn over care to

4   U.S. Probation and contractors in the community.

5          The issue is the transitional nature of the immediate

6   release plan.  The transitional plan -- that is, three or four

7   months where he is expected to reintegrate into the community,

8   develop a relationship with his probation officer, develop a

9   relationship with his community therapist, establish a support

10  network through AA, friendships, and establish employment --

11  all of those interests are impeded by the transitional nature

12  of the current release plan.  Should it be a permanent release

13  plan, then we could evaluate that release plan on its own

14  merits without necessarily establishing a goal for him to

15  return home.

16         In my conversations with Mr. Shields, he is prepared

17  to reintegrate or integrate into this community if permitted by

18  the Court.  So, from my perspective, I think it is more of an

19  interest of the probation officer to have him return to Maine,

20  and I certainly understand that.  However, his ties to the

21  community in Maine are not all that great.  It is more --

22         THE COURT:  Does he have family there still?

23         DR. HERNANDEZ:  He has his father from whom he has

24  been estranged for nearly 40 years, and he has recently begun

25  to establish telephone contact with him, so no material support

1   whatsoever and no family support other than his father, who

2   would provide some degree of emotional support.

3          THE COURT:  Would you -- this is a little different

4   than the way I left it with Judge Woodcock, whom, as I

5   mentioned, was the sentencing judge whom I called several weeks

6   ago, but would it, at least from the federal government's and

7   BOP's point of view, be satisfactory to essentially have a

8   permanent release plan to the Coolidge House, and then with

9   eventual release into the community according to your plan?

10  And then, Doctor, when it was time for him to get out, if

11  everyone thought he was still doing terrifically -- and you

12  gave us some warning flags to look for -- but if he was doing

13  very well, then we could consider transitioning him back to

14  Maine if he wanted to, and, if he didn't, have him stay here.

15  Does that make some sense?

16         DR. HERNANDEZ:  I think that would be reasonable.

17         THE COURT:  I'm now trying to think, because this is

18  the first in the country, how to -- he's still on supervised

19  release for the nine months out of Maine.  Have you talk to

20  Maine Probation?  Is anyone here from Maine Probation?  I

21  didn't ask anyone to come.

22         MR. HURTIG:  No, your Honor.  I've been in regular

23  communication with them, and the transfer of supervision in a

24  criminal case from one district to another is a routine event.

25         THE COURT:  So we would simply request it.

1          MR. HURTIG:  Yeah, we wouldn't even have to.  We would

2     just assume supervision of the case; and if they wanted to

3     maintain jurisdiction over it, they could.  If not, that could

4     be transferred as well, depending on what you and Judge Woodcock

5     would prefer.

6          THE COURT:  Okay, so you're happy as long as it's a

7     permanent placement.  And, of course, permanent doesn't really

8     mean permanent.  It means -- you know, it could be -- how long

9     are you recommending I keep supervision?  It's until I cut it

10    off?  Is that it?

11         DR. HERNANDEZ:  Yes, indeterminate.

12         THE COURT:  So this is an indeterminate situation, so,

13    I mean, we're all going to grow old together.

14         DR. HERNANDEZ:  Yes.

15         THE COURT:  You're not going -- so my hope is that at

16    some point, if he chooses to go back to Maine, he will be well

17    enough to be able to do that; and if he integrates here into

18    this community in a successful way, he would stay.  Does that

19    sound right?

20         Do you want to be in Butner?  Do you want to be in

21    North Carolina?  I mean, that's, I guess, a third possibility.

22    Do you want to be down there at all?  If you don't feel a

23    particular -- because you have a program too, right, he could

24    be released to?

25         DR. HERNANDEZ:  Well, there is a halfway house in

1  Fayetteville -- this information came up -- but no referral has

2  been made; and in our conversations with U.S. Probation and the

3  U.S. Attorney's office, it seems like that has not been

4  considered.

5          THE COURT:  Okay, so that's not one of the things

6  anyone wants to be on the plate.  So my two options:  I accept

7  the release plan.  I think no one's really objecting to that.

8  I mean, that seems very well thought out.  And I think I've got

9  the best people in the country here supervising it, and the

10 issue has only been whether or not it's too disjointed to go

11 from one placement to another placement.  And so as long as I

12 send him to Coolidge House, then I give you the right to come

13 back in a year to decide if he prefers to go back to Maine.

14 Does that seem okay to you?

15         MR. SWOMLEY:  It does, your Honor.

16         THE COURT:  In the meantime, if Pharos House could let

17 us know when a bed becomes available, we can make a decision at

18 that point whether it is worth it.

19         MR. SWOMLEY:  That's the only thing I was asking was

20 if a bed becomes available and it appears to be not a

21 disjointed or --

22         THE COURT:  Like, if it's in one week or two weeks,

23 who cares?  We'd move him right up there, right?  If he's

24 deeply ensconced in three months, it makes no sense.  Isn't

25 that what you're saying?

1          MR. SWOMLEY:  And Dr. Hernandez is right in terms of

2     the connections to Maine.  His father could come down here by

3     Amtrak.  He could be permitted, I don't know, at some point to

4     visit him.  That's the only issue, and, frankly, that's not

5     enough to make him not want to get out.

6          THE COURT:  Is everybody happy at this point with this

7     solution?

8          MR. SWOMLEY:  Yes.

9          THE COURT:  Hearing no objection, I will -- do you

10    have an order for me to sign?

11         MS. PIEMONTE-STACY:  Your Honor, I do have a

12    proposed --

13         THE COURT:  I don't actually have the certification

14    from the warden yet, do I?

15         MS. PIEMONTE-STACY:  Well, that's the problem.  He

16    won't certify based on Dr. Hernandez's objection to the --

17         THE COURT:  Yes, but he no longer has one, so when do

18    I get it?

19         MS. PIEMONTE-STACY:  You can do it without one, which

20    is allowing the petition for discharge under 42 --

21         THE COURT:  I'm happy to do that, but I would love

22    this because this could be the poster child case for how these

23    things should work.  I would like everyone to be -- when can I

24    get a certificate from the warden?

25         MS. PIEMONTE-STACY:  Aside from -- I can't speak for

1  the warden, your Honor, but I think what would have to happen

2  is, Dr. Hernandez has to have a communication with the warden,

3  because this is how it all started, saying, "I'm okay with this

4  new plan."

5           THE COURT:  Can you do that, like, leaving right

6  today?

7           DR. HERNANDEZ:  Yes, I can call, and he would expect

8  both I and Dr. Cunic to be in support of this plan.

9           THE COURT:  Dr. Cunic, are you in support of this?

10          DR. CUNIC:  Yes, your Honor.

11          THE COURT:  Perfect.  So why don't you make that call.

12  Why don't we get the certificate out today or tomorrow, and

13  then I will sign everything.  And do you want to just have a

14  quick hearing, not to expect these folks to be here, to bring

15  him back in tomorrow, and then we will release him?

16          MS. PIEMONTE-STACY:  Your Honor, I would like the

17  hearing just in case the warden says "no" or something.

18          THE COURT:  In case the warden says "no," then I

19  will -- I just think this is so significant a case.  The

20  Congress will be watching, you know, all the probation offices

21  in the country.  It's important to do this correctly.

22          MS. PIEMONTE-STACY:  I understand.

23          MR. SWOMLEY:  Could I be the one that says, can we see

24  if we can do this today while he's here and get a fax up from

25  the warden?

510fdd54-3249-4ac7-8eb7-95f6acb478cf

1          THE COURT:  I'm happy to hold him and see if we can do

2    that.  Is that doable?

3          MR. SWOMLEY:  Tomorrow is going to be a little

4    tougher.

5          THE COURT:  What's tomorrow, other than Friday?

6          DR. HERNANDEZ:  Your Honor, I can call right now.

7          THE COURT:  Well, why don't you do that.  I'm here all

8    day today.

9          MR. SWOMLEY:  I have a District Court in the state

10   matter in Brockton.  That's the only thing I have in the

11   morning.

12         THE COURT:  What time?

13         MR. SWOMLEY:  Nine in the morning.

14         THE COURT:  All right.  Well, we could always do it at

15   2:00 or something like that, but let's try and do it right now.

16   I can't?  Oh, I have something at 12:30 that takes me out of

17   the office, so we could do it maybe at noon or something like

18   that if we have to.  But rather than holding everyone here for

19   a day, let's try and get that.  Even if I get the oral say-so

20   that it's okay with the fax to follow, I'm fine with it.  So do

21   you want to just take a, oh, I don't know, half-an-hour break

22   and see what we can figure out?

23         MR. SWOMLEY:  Thank you.

24         THE COURT:  And then we'll all come back in in fifteen

25   minutes.  I will take your word for it, with the fax to follow,

1   that he will sign the certificate, and if not, we'll come back

2   here tomorrow.  So right now we're going to come back -- what

3   time can we --

4            (Discussion off the record between the Court and

5   Clerk.)

6            THE COURT:  Oh, good.  Do you want to come back --

7   it's twenty minutes to 11:00 -- do you want 11:15?  And you'll

8   have an order for me?  Have you seen the order?  You're all

9   happy with it?  You're going to hand me an order, and I'm going

10  to sign it.  And then he'll be brought, just so the marshals

11  will know, he'll be brought back downstairs to be released.

12  Are there any detainers on him?

13           THE MARSHAL:  We haven't received the release

14  paperwork from BOP.  When I came up here this morning, it

15  hadn't come over the fax yet.  So it might be there now.

16  There's a release package to be signed and --

17           THE COURT:  Sure.

18           MR. SWOMLEY:  Mr. Shields tells me that when he was

19  sent from Devens, they sent him as if he were not coming back.

20           THE COURT:  Yes, all right, and that makes sense.

21  Let's just try and do it today while the iron is hot because,

22  as I understand it, the objections are no longer there.

23           MS. PIEMONTE-STACY:  And, I'm sorry, but I have

24  contrary information from legal at Devens, which was that I had

25  requested release from Devens so he could pick up his personal

1   things and have enough medication for 30 to 60 days, so --

2        MR. SWOMLEY:  They have the medication.  The

3   medication is here, but neither his property nor his moneys

4   from Butner has even arrived at Devens yet.

5        THE COURT:  So what happens then?  Will it go right to

6   Coolidge House?

7        MR. SWOMLEY:  Somebody is going to have to get it from

8   Devens.  I don't know the details of that.  Oh, it comes to me.

9   He signed it over to me, so I probably will have to pick it up.

10       THE COURT:  All right, see you at 11:15, and hopefully

11  we'll --

12       MR. SWOMLEY:  We still have the guy from Pharos House

13  on the phone?  Can you ask him or order him that the first bed

14  available, can he notify you and notify me?

15       THE COURT:  Yes.  Can you do that?

16       MR. FERRIS:  At Pharos House, through the CCM's office

17  the referral would go.

18       THE COURT:  I'm just not hearing you well.

19       MR. FERRIS:  Through the BOP office the referral could

20  be made.

21       THE COURT:  Yes, but I'm ordering you to let us know

22  when the first bed becomes available, and Mr. Hurtig can maybe

23  call up there and just coordinate, and then we can coordinate

24  through BOP in terms of timing.  This may not be necessary,

25  just so that we at least have the option.

1          MR. HURTIG:  Your Honor, I'll maintain communication

2     with the Community Corrections manager.

3          THE COURT:  Thank you so much.  Can you hear him?

4     He's going to maintain, but I also want to make sure that if

5     something comes up like tomorrow, that might be the better

6     solution overall, I mean; but if not, if it's not going to be

7     for months and he's deeply involved here and wants to stay

8     here, it may become a moot point, so --

9          MR. FERRIS:  And BOP is in basically daily contact

10    with us anyway.

11         THE COURT:  Okay, perfect.  Thank you, thank you.  And

12    what's your phone number?

13         THE CLERK:  I have it.

14         THE COURT:  All right, we have it.  Okay, perfect.

15    Thank you.

16         MR. FERRIS:  You're welcome.

17         THE COURT:  We'll be back at 11:15.  You don't need to

18    come back, sir, from Pharos House.

19         MR. FERRIS:  Thank you.

20         (A recess was taken, 10:42 a.m.)

21         (Resumed, 11:56 a.m.)

22         THE COURT:  You got it?  All right.  The government,

23    Ms. Stacy?

24         MS. PIEMONTE-STACY:  Yes, your Honor, we've been able

25    to speak with legal counsel who spoke with the warden at

1    Butner, and at this time the warden is able to sign a

2    certificate, again, based on the understanding that it's a

3    possible permanent placement at Coolidge House, and so the

4    certificate will hopefully be forthcoming this afternoon.

5              THE COURT:  All right, I'm going to sign it now.

6              Anything you want to say at this point?

7              MR. SWOMLEY:  Thank you.

8              THE COURT:  All right, thank you.  Well, actually I

9    should probably say a few things because in some ways this is a

10   historic moment, and let me just start off by thanking the team

11   at Butner.  I have some experience with the situation in

12   Massachusetts where once somebody properly is certified under

13   these programs, you almost never get someone to say, "Our

14   treatment plan has moved along to the point where we think this

15   person can be released."  It's a rare bird if it happens, and I

16   really appreciate the almost Cadillac treatment you have given

17   Mr. Shields.  I think he's had -- there are two people in the

18   program, so I understand it's a question of numbers, but you

19   both have invested so much time and effort into it.  I want to

20   thank you for doing that.  And I know how important it is for

21   you to have this succeed because you've flown up here to have

22   this happen.

23             I can assure everyone here that you have the top

24   people in our Probation Office here, and so that he will get

25   good supervision to make sure that the plan is in place and to

1  make sure that the public is protected.  So I want to thank the

2  U.S. Attorney's office for all the efforts.

3          And Mr. Swomley I know knows more about these cases,

4  both on state and federal.  Ironically, the case is still

5  pending in front of the First Circuit, so I honestly don't know

6  legally how long this is going to last, but I wanted to thank

7  you for all the efforts you've put into this case.  From the

8  very beginning till the end, you fought hard in this case.

9          MR. SWOMLEY:  Thank you, your Honor.  And just so you

10  know, I don't leave the case when he goes out the door.  I

11  actually stay involved as long as he would want me to.

12          THE COURT:  Good.  And last and probably most

13  importantly, Mr. Shields, I remember reading your background

14  and being caught by two things.  One is how horrible the

15  background was, but then how much that one psychiatrist at

16  Butner and you finally bonded so that you were able to start

17  working through your problems, and I have your relapse

18  prevention and good life plan together with graphics and how

19  far you have come.

20          I do this with some trepidation because two prior sex

21  offender treatment plans didn't work, so I understand that you

22  still have a lot of work to go, and I am hopeful -- I was

23  thinking about it upstairs -- on your part that this works

24  because you've spent almost half your life in jail, right?

25          MR. SHIELDS:  Yes.

1      THE COURT:  And I'm just hoping that you don't spend

2  the second half of your life in jail.  And also, from the

3  public's point of view, of course, I'd horrified myself if

4  anything happened to a child because you couldn't work this

5  through.  So, please, if you find yourself slipping, the answer

6  is to communicate with your lawyer, with Probation.  The team

7  at Butner I'm sure would take a phone call.  Isn't that right?

8      FROM THE FLOOR:  Yes.

9      THE COURT:  It's critically important, not just for

10  you but for everyone following you, for people to understand

11  that treatment does work because other than that, the

12  temptation of the public, I think, is to throw away the key.

13  So I don't want to put the whole population of people like

14  yourself on your back, but to some extent it's true, and so I

15  for all of us wish you best the luck.

16      I don't know how this works from now on after I sign

17  it, which I'm about to do.  Should we set up a yearly status

18  conference?  How should we do this?

19      MS. PIEMONTE-STACY:  Yes, your Honor, I would suggest

20  a status conference.  And we've confirmed with Devens that he

21  can be released from here.  He does not have to return to

22  Devens.

23      THE COURT:  So I think you have to go back downstairs,

24  is that right?  You've got the release papers now?

25      THE MARSHAL:  I called downstairs, and Supervisor Neil

1  was going to check on it.

2         THE COURT:  It's the 9th today, isn't it, so I get the

3  right date?

4         THE CLERK:  Yes, it's the 9th.

5         THE COURT:  So I'll see you in a year, the 8th of

6  June.

7         THE CLERK:  2012, 9:00?

8         THE COURT:  I don't know.  Do it in the afternoon

9  because we never know when we're on trial.

10        THE CLERK:  All right, 2:30.

11        THE COURT:  I want to thank you very much for coming

12 up from Butner and for all the support that you both have

13 given, and I truly hope I don't see you between now and next

14 June.

15        Is there anything you would like to say?

16        MR. SHIELDS:  Yes.  Just thank you very much.  I have

17 said it time and time again to my treatment team:  Without

18 them, none of this would be possible.  So I know that I had to

19 do the work, but they're the ones that got me through all of

20 this, so thank you very much.

21        THE COURT:  All right.

22        Anything else, Mr. Hurtig, government?  All right,

23 I've signed it.  I will see you in a year.  And then if a bed

24 comes available at Pharos House, and if you want it, we will

25 first communicate deeply with the team to see whether you think

Page 30

1   it would be disruptive and interfere with your predictions as

2   to safety.  And I sincerely hope, other than our annual

3   checkups, shall we say, that I don't see you again.

4          MR. SHIELDS:  The next time you see me will be June 8,

5   2012.

6          THE COURT:  Okay.  And last but not least, are you

7   going to communicate with Probation in Maine so they're not

8   expecting him up there?

9          MR. HURTIG:  Yes, your Honor.  I've already spoken

10  with them today.

11         THE COURT:  So they know what's going on?

12         MR. HURTIG:  Yes.

13         THE COURT:  Perfect.  Thank you.  Thank you to

14  everybody.  All right, we stand in recess.

15         THE CLERK:  All rise.

16         (Adjourned, 12:03 p.m.)

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7            I, Lee A. Marzilli, Official Court Reporter, do hereby

8   certify that the foregoing transcript, Pages 1 through 30

9   inclusive, was recorded by me stenographically at the time and

10  place aforesaid in Civil Action No. 07-12056-PBS, United States

11  of America v. Jeffrey Shields, and thereafter by me reduced to

12  typewriting and is a true and accurate record of the

13  proceedings.

14       In witness whereof I have hereunto set my hand this

15  29th day of June, 2011.

16

17

18

19

20

                    /s/ Lee A. Marzilli
21          _____

                    LEE A. MARZILLI, RPR, CRR
22                  OFFICIAL COURT REPORTER

23

24

25