```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   UNITED STATES OF AMERICA,    )
                                  )
 4              Petitioner        )
                                  )
 5           -VS-                 ) CA No. 07-12056-PBS
                                  ) Pages 1 - 28
 6   JEFFREY SHIELDS,             )
                                  )
 7              Respondent        )


 8


 9


10                        MOTION HEARING


11            BEFORE THE HONORABLE PATTI B. SARIS
          CHIEF JUDGE OF THE UNITED STATES DISTRICT COURT

12


13


14


15                              United States District Court
                                1 Courthouse Way, Courtroom 19
16                              Boston, Massachusetts
                                March 25, 2013, 11:20 a.m.
17


18


19


20


21


22
                            LEE A. MARZILLI
23                       OFFICIAL COURT REPORTER
                        United States District Court
24                      1 Courthouse Way, Room 3205
                            Boston, MA  02210
25                          (617)345-6787
```

1    A P P E A R A N C E S:

2         JENNIFER SERAFYN, ESQ., Assistant United States Attorney,
     Office of the United States Attorney, 1 Courthouse Way, Boston,
3    Massachusetts, 02210, for the Petitioner.

4         JOHN G. SWOMLEY, ESQ., (By Telephone) Swomley & Associates,
     227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
5    for the Respondent.

6    ALSO PRESENT:  Jeffrey R. Smith, United States Probation.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE CLERK:  Court calls Civil Action 07-12056, United

3     States v. Jeffrey Shields.  Could counsel and Probation please

4     identify themselves.

5          MS. SERAFYN:  Good morning, your Honor.  Jennifer

6     Serafyn for the United States, and with the Court's permission,

7     with me is Ryan Deck, one of our law student interns.

8          THE COURT:  All right.

9          MR. SMITH:  Good morning, your Honor.  Jeff Smith from

10    Probation.

11         MR. SWOMLEY:  Good morning, your Honor.  John Swomley

12    for Jeffrey Shields.

13         THE COURT:  All right, thank you, Mr. Swomley, and I'm

14    very sorry about -- is it your mom who died?

15         MR. SWOMLEY:  Yes, it was.  Thank you.  Thank you,

16    your Honor.

17         THE COURT:  Are you sure you want to go forward with

18    this because I could continue this?

19         MR. SWOMLEY:  I do, just because it seems like there's

20    so many movable parts it took to get this put in place.  If we

21    can't resolve everything or if for some reason I can't quite

22    hear everything, I may ask for a further hearing, but I think

23    let's just try and do it, if that's all right with you, your

24    Honor.

25         THE COURT:  All right.  And, Mr. Shields, can you see

1   me and hear me?

2          MR. SHIELDS:  Yes.

3          THE COURT:  All right, and who's with you?

4          MR. SHIELDS:  Dr. Hernandez and Dr. Malterer.

5          THE COURT:  All right, can you both see and hear?

6          DR. HERNANDEZ:  Yes, we can see your Honor.

7          THE COURT:  All right, if at some point you can't see

8   what you need to see or hear what you need to hear, let me know

9   for everyone, all right?

10          All right, now, let me start with the government.

11          MR. SWOMLEY:  Your Honor, this is John Swomley

12  speaking.  The person that is hardest to hear is Ms. Serafyn,

13  so if --

14          THE COURT:  Ms. Serafyn, why don't you stay seated and

15  put the mic right next to your mouth.

16          THE CLERK:  Yes, it moves.

17          THE COURT:  It moves.  All right, so just say your

18  name again and see if that helps.

19          MS. SERAFYN:  Jennifer Serafyn.

20          MR. SWOMLEY:  Thank you.

21          THE COURT:  Does that help?

22          MR. SWOMLEY:  A little bit, yes, your Honor.

23          THE COURT:  Well --

24          MR. SMITH:  Do you want to use this one?  Is this

25  better?

1          THE COURT:  In fact, Mr. Swomley, can I say, although

2    this is a rare event, I'm actually having a little trouble

3    hearing you.  So maybe we all speak loudly and see if we can

4    get through this.

5          So, Ms. Serafyn, what's the government's position and

6    motion?

7          MS. SERAFYN:  Your Honor, the government submitted to

8    the Court a Discharge Report that was signed by Drs. Hernandez

9    and Malterer dated March 13, 2013.  According to the Discharge

10   Report and to both doctors, they believe Mr. Shields is no

11   longer sexually dangerous if released under the prescribed

12   regimen, and there is a list of 21 conditions in this Discharge

13   Report.  The government, actually in consultation with

14   Probation, has two proposed changes to those conditions.

15         THE COURT:  Wait a minute.  I've got the government.

16   Dr. Hernandez is the government, and you're the government, so

17   do you two agree on this?

18         MS. SERAFYN:  Not entirely, your Honor, because the

19   government also includes Probation, so in this case I think

20   Probation and BOP actually disagree about two of the

21   conditions.

22         THE COURT:  So there is a disagreement here, but let

23   me just start here with basics.  So the government agrees that

24   he should be discharged.  It's to Maine, is that right?

25         MS. SERAFYN:  That is correct, your Honor.

```
1              THE COURT:  And you agree with that, right,
2    Dr. Hernandez and Dr. --  what's your name again?
3              DR. MALTERER:  Malterer.
4              THE COURT:  Malterer, okay, thank you.  You both agree
5    as well that he should be discharged?
6              DR. HERNANDEZ:  Yes, your Honor.
7              DR. MALTERER:  Yes, your Honor.
8              THE COURT:  And is the theory that whatever the
9    conditions are, he should go under his own steam back to Maine,
10   is that it, that he doesn't need --
11             DR. HERNANDEZ:  I'm sorry, I couldn't hear you.
12             THE COURT:  All right, I think the proposal -- I hope
13   I'm not breaking someone's ears -- I think the proposal is to
14   have him live in Maine.
15             DR. HERNANDEZ:  Yes, we are recommending release to
16   Maine.  The two conditions that we disagree with Probation, in
17   our view, they are overly restrictive, given the risk of
18   dangerousness that Mr. Shields presents at this point.  I
19   understand the condition.  It is a condition that we have
20   previously made, but at this time we don't feel that it matches
21   the level of risk.
22             THE COURT:  So --
23             MS. SERAFYN:  Your Honor, if I could actually just
24   back up.  It's the government's belief, based on this Discharge
25   Report, that Mr. Shields can be released to Maine, but
```

1    specifically to the Pharos House, and there is not a bed

2    available at the Pharos House now.

3        MR. SWOMLEY:  I'm going to need to interrupt.  I'm

4    having a hard time hearing now Ms. Serafyn again.

5        THE COURT:  What she's saying is that the agreement --

6    can you hear me?

7        MR. SWOMLEY:  Yes.  I hear you loud and clear, Judge.

8        THE COURT:  Okay, that the agreement contemplates him

9    being released to the Pharos House, but there's no bed there

10   right now.

11       MR. SWOMLEY:  Right.

12       MS. SERAFYN:  And I believe Mr. Swomley knows this

13   because I talked to Mr. Tennen about this, but there is not a

14   bed going to be available at Pharos House until July 24.  That

15   could change, but it's the government's recommendation that

16   Mr. Shields stay at Butner until a bed is available at Pharos

17   House.

18       THE COURT:  Do we know when that's likely to be?

19       MS. SERAFYN:  The latest information we have as of

20   Friday is July 24.

21       THE COURT:  Well, that's a lot of continued

22   incarceration if -- or not incarceration -- commitment if he's

23   ready to be released.  So what are our other choices here?

24       MS. SERAFYN:  It seems that the only other choice,

25   your Honor, is independent living, which Dr. Hernandez,

1    Dr. Malterer, the government, and Probation do not believe is

2    appropriate.

3           THE COURT:  Well, how about going to Coolidge House

4    till there's a bed available at Pharos House?  What is your

5    suggestion if there's no bed available, Dr. Hernandez?

6           DR. HERNANDEZ:  Your Honor, I do feel that the

7    Coolidge House as a temporary place would not be a suitable

8    option for Mr. Shields.  One of the things that we are pursuing

9    is stability in his life.  I do regret that there are no beds

10   available until July 24, and that's a regrettable thing.  We

11   did explore other options.  In fact, our social worker did

12   explore many other options, none of which panned out.  So in

13   the absence of other options and other viable options, I am

14   recommending that Mr. Shields be kept, be housed at the FCI

15   Butner commitment and treatment program until such time there

16   is a bed available at Pharos House.

17          THE COURT:  Well, let me ask this:  Suppose I agree

18   with that and then the bed becomes available in July, can we

19   hold it, like, tell them that they can't fill it till he gets

20   on that plane and gets back there?

21          MR. SMITH:  Your Honor, my understanding is, they

22   can't hold the bed until the referrals are made, which would

23   come after your Honor makes an order.  So there's still a

24   chance that it could come sooner.  It's going to depend on

25   people getting terminated from the program, but once the

1    referral has been made, the bed is held for him until we can

2    get him there.

3            THE COURT:  Well, how does he get from North Carolina

4    to Maine?  Does he get on a plane?

5            MR. SMITH:  Yeah, he'd be discharged and --

6            THE COURT:  Where's the money going to come from to

7    fly him from North Carolina to Maine?

8            MR. SMITH:  The Bureau in its previous cases -- I'm

9    sure it would be the same -- they would process his itinerary

10   and either put him on a plane or a bus or some combination.

11           THE COURT:  So will Pharos hold the bed for him if

12   it's a bus?

13           MR. SMITH:  Yes.

14           THE COURT:  Okay.  So does that make the most sense?

15   That's the only option I have.

16           MR. SWOMLEY:  Judge, could I weigh in?

17           THE COURT:  Yes.

18           MR. SWOMLEY:  I would disagree -- I mean, well,

19   starting with the understanding that Probation has more

20   restrictive conditions than Dr. Hernandez believes are

21   necessary is one thing, and there are two conditions that I

22   think we can talk about in a moment, but the question of

23   whether he should stay incarcerated for four months even though

24   he is not sexually dangerous, one, I think is problematic from

25   a legal perspective.  I would suggest that that's not even an

1    option, if in fact we are agreeing that he's not sexually

2    dangerous.

3           THE COURT:  He's not sexually dangerous subject to

4    conditions, and I'm not willing to release him without a

5    structured environment to go into.  So at this point, unless

6    you have another option, I don't have another option.

7           MR. SWOMLEY:  The options I think -- I mean, if you

8    want to consider the options as they relate to sexual

9    dangerousness and as they relate to his ability to be safe in

10   the community, I don't think that anybody is going to be able

11   to argue that even the Coolidge House would make him sexually

12   dangerous if he were put there.  And so whether they would not

13   like to have him there because, yes, optimally it would be more

14   continuity to have him go to the place where he's going to

15   stay, certainly Mr. Shields would like to have his liberty

16   earlier; and if indeed Coolidge House is not going to make him

17   sexually dangerous, he ought to be able to go there if there's

18   a bed available.  And I know that his release was contemplated

19   for quite some time, and it's problematic to me as his lawyer

20   that there couldn't have been reservations made at Pharos House

21   months ago when they knew he was scheduled to be released, and

22   we had to wait until this moment and then four months from this

23   moment to actually reserve a bed isn't fair, frankly.  And it

24   is essentially, because we couldn't put things together faster

25   or in a more reasonable time frame, they are going to keep him

1    for four more months.  I mean, if he's not dangerous, he should
2    be in the least restrictive setting possible.  And one of the
3    things that is a holdover from the last time he was out was, he
4    has still got a security deposit and a reservation and can go
5    to the Ambassador House, which is where he was when he was
6    taken back into custody.  And with conditions, I don't know --
7    I mean, ultimately I would imagine they would be transitioning
8    him to that level of care eventually anyway.  The question then
9    becomes, if that is available now and if there can be
10   restrictions put in place, is Dr. Hernandez going to say he
11   would be sexually dangerous if he went there or might become
12   sexually dangerous if he went there?  I haven't heard that.
13   And I would hope that this whole hearing is going to be
14   evidence-based; that is, the reason why he can't go to
15   something else besides Pharos House is because the evidence
16   shows he will be doing something that he's not supposed to.
17   And, you know, honestly I don't know whether anybody can say
18   that.
19             THE COURT:  Yes?
20             MR. SMITH:  Your Honor, I can just weigh in that the
21   evidence --
22             THE COURT:  Why don't you introduce yourself so they
23   know who's talking.
24             MR. SMITH:  I'm sorry.  It's Jeff Smith again from
25   Probation.  I would just say that the evidence is that the

1    prior release plan that followed him going to Coolidge House

2    and then going to the Pharos House was not successful.  We

3    would all agree that it wasn't a successful transition.  He had

4    problems at the Coolidge House because he was a target there.

5    We had to abruptly change him up to Maine, and the plan didn't

6    work.  So to suggest that that plan is appropriate now after

7    we've had violations I think is not correct.

8         THE COURT:  All right, while I've got you on the --

9         MR. SWOMLEY:  John Swomley.  If I could respond, your

10   Honor, respectfully, the reality is, yes, he violated

11   conditions.  He did not commit any new crimes.  He did not

12   sexually reoffend.  He didn't do anything that was over the

13   line in terms of a sexual crime, and that I think should

14   suggest that while, yes, he did violate conditions, he didn't

15   go into sexual dangerousness, I mean, even at the time.  And I

16   do see a difference between what Probation wants and what his

17   treatment team wants, and, again, that was a friction that

18   happened, that was an occurrence last time.  And I actually,

19   while I'm not trying to be an enabler -- and I know Ms. Serafyn

20   has suggested that his defense attorneys could be viewed as

21   such by proposing conditions -- I am trying to be the voice of

22   reason in terms of what conditions really matter and what

23   conditions actually, in my view, increase his risk because they

24   so box him in to the point where he has, I mean, isolation and,

25   you know, not able to earn a living.  And that gets into the

1    secondary, the only two objections we have to the other

2    conditions, but I won't go there if we're still talking about

3    where he goes.

4             THE COURT:  All right, the next two things, could

5    Probation please discuss the two modifications you want, and

6    then I'll ask Dr. Hernandez and Mr. Swomley about them.

7             MR. SMITH:  Your Honor, I think, in regards to No. 10,

8    I think, and the government can correct me if I'm wrong here,

9    but it was mainly in regards to the wording in the conditions

10   proposed by the BOP.  It suggested random searches, which the

11   searches are done on a reasonable suspicion, so I think that

12   was just a wording for No. 10 that was changed.

13            THE COURT:  Well, I don't understand what you just

14   said, so slow down.  So Dr. Hernandez wants --

15            MR. SMITH:  Random searches, and it's my understanding

16   that in the District of Maine where he'll be supervised, the

17   policy is that searches are done on reasonable suspicion, so

18   they're not random.  And, again, the government can clarify

19   that if I'm misrepresenting that.

20            THE COURT:  Well, why wouldn't that be more supportive

21   of Mr. Shields rather than less supportive?

22            MR. SMITH:  I think it just goes against our policy,

23   your Honor, so that --

24            THE COURT:  No, but a reasonable suspicion requires

25   more of a showing than random.

```
 1            MR. SMITH:  Correct.  I'm not sure.  Maybe the --
 2            THE COURT:  I don't understand why anyone is objecting
 3      to that.
 4            MR. SWOMLEY:  I'm not objecting to reasonable
 5      suspicion.
 6            THE COURT:  I mean, that makes sense.  And then
 7      No. 17, though, curfew, why do you need a curfew?
 8            MR. SMITH:  I think in our discussions last week, your
 9      Honor felt that Mr. Shields should demonstrate, you know, some
10      compliance, and then we could relax some of the conditions.
11      But his prior release involved him going through GPS, which he
12      finished, and I think it was at the point that some of those
13      restrictions were pulled back that he began to exhibit some of
14      this behavior that ultimately led to his --
15            THE COURT:  So how long?  You have it as an open-ended
16      thing.  I don't want it to be an open-ended.  So just tell me,
17      how long does it make sense for?
18            MR. SMITH:  I think six months, your Honor.
19            THE COURT:  All right.  So is there a problem with six
20      months on the GPS?
21            MR. SWOMLEY:  From Mr. Shields's perspective, as I
22      understand it, your Honor, and as I advocate for him, I would
23      point out, he was never out of place when he violated.  There's
24      really no place he's not supposed to go.  And he didn't go
25      someplace where -- you know, he didn't go to a school with
```

1   children.  There's never been an out-of-place violation.  So

2   that, honestly, all GPS is going to do is help them figure out

3   whether he goes to someplace he's not supposed to.  That has

4   not been an issue for him.  And GPS is -- I mean, I have

5   represented -- I do represent a lot of people on GPS.  It is an

6   unbelievable burden to someone who's trying to succeed on the

7   outside.

8           THE COURT:  Why?  He can wear it under his pants.

9           MR. SWOMLEY:  Well, getting a job, first of all, is

10  almost impossible and will be almost impossible for him, even

11  with the most hopeful set of circumstances, and I think that

12  Probation in Maine knows that better than anyone else.  He got

13  jobs, and as soon as he got them, they were taken away from

14  him.  And certainly anything that requires him to not be able

15  to go where he needs to go when he gets a job is going to be a

16  problem.  I think it is an isolating thing, and it's

17  certainly -- it's not that at any particular hour he has done

18  something that has demonstrated his lack of trustworthiness.

19  His lack of trustworthiness was demonstrated unrelated to being

20  out of place.

21          THE COURT:  All right, is there anything you want to

22  say, Mr. Hernandez, Mr. Shields?

23          DR. HERNANDEZ:  I do largely concur with the

24  respondent's counsel.  GPS in this particular case would not

25  have predicted the violation of the conditions of conditional

1   release.  We don't feel for that reason that it is a warranted

2   condition, and we believe it's unnecessary.  For that reason,

3   we have not recommended it and view that condition as overly

4   restrictive at this time.

5          THE COURT:  So hearing Dr. Hernandez, do you feel

6   strongly about it?

7          MR. SMITH:  Well, your Honor, I would just say

8   again --

9          DR. HERNANDEZ:  Yes, your Honor.

10          THE COURT:  No, no, I'm sorry.  I'm talking to

11   Probation now.

12          MR. SMITH:  I would just say, your Honor, that, again,

13   once the GPS was removed and he had more freedom is when he

14   began to go down this road.  So I know that GPS may not prevent

15   that, but if he were to engage in the same conduct again, which

16   was several relationships with random people in the community,

17   at least maybe being on GPS might allow some intervention for

18   the officer to say, you know, "How come you were in this area

19   of the city?"

20          THE COURT:  No, but can I ask about that.  In a way,

21   you want to encourage him to have healthy adult relationships,

22   right, rather than children?

23          MR. SMITH:  We do, your Honor, but I think he was

24   having a random -- I think we wouldn't want him to be involved

25   in random encounters via Craig's List, which I think was the

1    issue last time.

2         THE COURT:  Can I ask why?  Would that be some

3    violation of another condition?  In other words --

4         MR. SMITH:  I think it would just be, and

5    Dr. Hernandez may be able to weigh in, your Honor, but I think

6    it would be high risk.  I mean, he's meeting someone via the

7    Internet where he wasn't authorized to be on the Internet, and

8    it's mainly for sexual purposes, not for like a relationship or

9    a dating-type situation.

10         THE COURT:  Well, what do you think, Dr. Hernandez?

11    Is he allowed, I mean, to -- obviously it's his constitutional

12    right to have an adult consensual relationship, but, in your

13    view, would it be a problem if he were to meet someone off of

14    Craig's List?

15         DR. HERNANDEZ:  It would be problematic, and it would

16    be problematic for him to pursue any kind of impersonal

17    relationship that is not based on trust and intimacy.  Anything

18    that is inconsistent with his relapse prevention and good life

19    plan would be certainly viewed negatively by us.  Does he have

20    the right to pursue a relationship with a consenting adult in

21    which there is consenting sex?  Absolutely, but that would not

22    be necessarily consistent with his commitment to the process of

23    change.

24         THE COURT:  So I'm just trying to get this.  So if in

25    fact the concern here is and it is in fact true -- I remember

1    reading somewhere that he had a series of relationships off of

2    Craig's List -- why wouldn't a curfew be related to that?

3            DR. HERNANDEZ:  His activity online was nothing that

4    GPS could have prevented.  Mr. Shields had an unauthorized

5    computer, and he accessed the Internet, specifically, Craig's

6    List, to pursue sexual liaisons with other men.  GPS would not

7    have prevented that conduct.  You know, obviously the

8    conditions of search would have prevented that, and it did.

9    That computer was found during a search of his home.  So for

10   that reason, the search condition makes more sense than GPS.

11   If Mr. Shields had been unaccounted in the community, that his

12   whereabouts were unaccounted, that he had lost time, then it

13   would make sense to include GPS as a management condition, but

14   in this case it simply doesn't.

15           THE COURT:  How many people did he have relationships

16   with off of Craig's List?  There were quite a few, right?

17           MR. SMITH:  I believe it was eight to ten, your Honor.

18           THE COURT:  So I'm just thinking, why wouldn't this

19   curfew, at least in the beginning, assist in monitoring to make

20   sure that that's so?

21           DR. HERNANDEZ:  Your Honor, we have recommended a

22   curfew.  That is not a point of contention.

23           THE COURT:  Oh.

24           DR. HERNANDEZ:  It is the GPS that we have not

25   included.  The recommendation is for him to go to a halfway

1    house, first and foremost submit to all the rules of the

2    halfway house, and, secondly, as a guideline, to pursue a

3    curfew as imposed by Probation.  We have given some parameters

4    for that.  So we don't disagree with the curfew.  The only

5    point of contention is the GPS.

6            THE COURT:  Oh, so --

7            MR. SMITH:  But, your Honor, my point is, if all of

8    those encounters are in his residence, I agree that GPS

9    wouldn't have been of much value; but if he was traveling for

10   those encounters to a hotel or in some random area, it would

11   have allowed, you know, some questions at least at a minimum

12   from the officer to come in as to, "Why were you at this area

13   outside of your residence at 11:00 o'clock at night?"  So I

14   disagree with Dr. Hernandez's representation that it wouldn't

15   have changed it.  I think it could have.

16           THE COURT:  All right, so is everyone done?

17           Mr. Shields, do you want to say anything?

18           MR. SHIELDS:  Yes, Judge.  As Dr. Hernandez stated,

19   there was never a question of my whereabouts.  I was never

20   unaccountable for where I'm supposed to be.  And all of my

21   encounters did take place in my residence, not outside of my

22   residence.  And I'm not opposed to a curfew.  I think the

23   suggested curfew was 10:00 o'clock at night to 6:00 o'clock in

24   the morning.  I am fine with that.  I have no problems with

25   that at all, but I do want to make that I was never on a plane

1    and that -- so GPS, I have to agree with Dr. Hernandez.

2            THE COURT:  All right, anything else?

3            MS. SERAFYN:  Your Honor, I just wanted to add, on

4    Page 8 of the Discharge Report, Drs. Hernandez and Malterer

5    write, "We strongly recommend that Mr. Shields abstain from

6    forming any romantic or sexually intimate relationship with

7    anyone for the first six months following his release from

8    custody."

9            Now, I understand that that's a strong recommendation

10   and not an official condition, but I think in this instance,

11   GPS monitoring --

12           THE COURT:  Yes, but I don't -- I actually think it

13   would be healthy to have a trusting, good relationship.  It's

14   the Craig's List part that's not good, right?  You want an

15   adult, trusting relationship so he's not lonely.

16           MS. SERAFYN:  Well, absolutely, your Honor, but I

17   think --

18           THE COURT:  I'm not making that a condition that he

19   can't have an adult, trusting, consensual relationship.

20           MS. SERAFYN:  And I don't think anyone is asking you

21   to do that, but I think his past conduct in the ten months when

22   he was out shows that he was incapable of forming such a

23   relationship; and in the instance that he did with this

24   individual who's referenced in the Discharge Report, it was a

25   completely unhealthy relationship.

```
 1            THE COURT:  Well, we have a stay-away order from that
 2     man, right?
 3            MS. SERAFYN:  Well, it's written in one of the
 4     conditions that he stay away from him, absolutely.
 5            THE COURT:  Yes, yes, yes.
 6            MS. SERAFYN:  So it just appears that he hasn't been
 7     able to do that.  So to insure that he can do that, it seems
 8     like GPS monitoring could actually help Probation intercede if
 9     he starts to go down that path again.
10            THE COURT:  All right, this is what I'm going to do
11     because I must say that I was extreme -- I understand that
12     recovery is two steps forward and one step back and it's never
13     a straight trajectory.  That having been said, I was very
14     disappointed the first time around that Mr. Shields basically
15     was starting to slide back into bad conduct.  And so I am going
16     to adopt No. 10, but I want to know.  In other words, if
17     there's going to be a probable cause or reasonable suspicion
18     search from Probation, if possible in advance I would like you
19     to request permission from me.
20            MR. SMITH:  Okay.
21            THE COURT:  And if you can't because, you know, you
22     think it's an urgent situation, tell me about it afterwards so
23     I'll just have a sense of what's going on, and it won't quite
24     be such a surprise to me as it was last time how quickly the
25     relationship disintegrated.
```

1           And the second thing is, I will impose GPS monitoring

2    for six months, but it has got to be consistent with any job he

3    has.  I want him to work.  I don't want Probation to be, you

4    know, trying to in any way interfere with a meaningful, good

5    job opportunity as long as there's not access to children.  And

6    so I'll do it for six months on a GPS, and then if in fact he's

7    behaving and there's no problem, I don't have a problem, it

8    will come off.  And then you will move to modify to continue it

9    if it went further than that.  It will be at the government's

10   expense.  Mr. Shields has nothing.  And it's got to be

11   consistent.  So if for some reason, for example, he got an

12   overnight job in, what would it be, in a hotel or a late-night

13   job in a restaurant up in Maine, you know, you'd make the

14   curfew consistent with that.

15           MR. SMITH:  Okay.

16           THE COURT:  Okay?

17           MR. SMITH:  Yes, your Honor.

18           THE COURT:  And I'm hoping again, Mr. Shields, not to

19   see you again.  I was so disappointed, I can't tell you, what

20   happened.  But I also understand that Dr. Hernandez and

21   Dr. Malterer have supported your leaving again, and I'm hoping

22   again that this is just a bad misstep and that I won't see you

23   again.  And this will be monitored by me even though it's in

24   the Maine Probation, so you're going to work with them to make

25   sure.  There's no one from Maine here?

1          MR. SMITH:  Correct, your Honor.

2          THE COURT:  And I'll release him to the -- what's it

3    called?

4          MR. SMITH:  Pharos House.

5          THE COURT:  Pharos House.

6          MR. SHIELDS:  Your Honor?

7          THE COURT:  Yes.

8          MR. SHIELDS:  Your Honor, could I ask you a question

9    about -- it was my understanding on Friday when the GPS

10   question came about that I would have to pay for this?

11         THE COURT:  I just countered that.  You have no money.

12   I want you to get economically back on your feet again.  That's

13   essential.  I need you to work.  I need you to get economically

14   back on your feet.  I get it that you shouldn't be with people

15   on Craig's List and prostitutes and the sort of bad influences

16   of that man you were involved with; but I also think, I

17   think -- is this right for the doctors there? -- that sort of

18   at the end of this rainbow, we don't want him to be too lonely

19   or economically needy, and I know you're sick in addition.

20         MR. SHIELDS:  Yes.

21         THE COURT:  I think he just needs to get back into as

22   normal a lifestyle as someone can get given this background.

23   Is there a way -- what kind of job could he get right away?

24   Can people start looking for him?  Are there jobs where he can

25   just not be so poverty-stricken and alone?

```
 1          MR. SWOMLEY:  Your Honor, this is John Swomley again.
 2   He had a couple of jobs that I think could have worked out that
 3   were with economically viable companies that Probation in
 4   Maine, because it was at a hotel, they thought there might be
 5   some -- I mean, it was a front desk position, and he could
 6   have -- I mean, that was an economically viable job that
 7   Probation told him he couldn't have after he got it.
 8          THE COURT:  Well, it might be someplace where lots of
 9   kids stay at the hotel.
10          THE COURT:  Well, I think it was fear-based as opposed
11   to, again, reality-based.  And honestly, if there can be some
12   more flexibility, he could handle that kind of a job.  He
13   wasn't allowed to.  But at this point in time, I mean, what
14   really happened was that he would get jobs, and ultimately
15   either Probation would say he couldn't have them, or when he
16   got them, the employer didn't want him after a while because
17   patrons complained that he was a sex offender.
18          THE COURT:  I get that, and I think this is profoundly
19   difficult, but he shouldn't have opportunities to have
20   unsupervised contact with children.
21          MR. SWOMLEY:  No, no, no, nobody's suggesting that,
22   your Honor, and I understand that.
23          THE COURT:  I mean, the hotel, I don't know.  I mean,
24   I don't know if this is a place where lots of kids come in the
25   summertime.  I don't know.  I can't be at that level of micro-
```

1    management.  I don't know why he can't get a job in a factory

2    or maybe in a restaurant that primarily deals with older people

3    as they come in at night, that kind of thing.  There are plenty

4    of places like that in Portland; you know, like, sophisticated

5    restaurants where there aren't little children; not, you know,

6    tourist attractions where there might be lots of kids.  So I'm

7    not going to micromanage that, but I do think Probation

8    understands it's important for his recovery to get a job.

9         MR. SMITH:  We do, your Honor.

10        THE COURT:  And if at some point he gets a job and you

11   think he can pay for the GPS, come back to me, but right now we

12   need to get him stable.  We need to get him a life and

13   hopefully friends in the community and that sort of thing.

14        MR. SWOMLEY:  Your Honor, can I read between the lines

15   in the way you've ruled thus far that you have now ruled on the

16   question of Pharos House or --

17        THE COURT:  Yes, it's Pharos how.  I don't have

18   another option right now, and here I am.  And I'm ordering his

19   discharge, which is a good thing, subject to conditions as I've

20   outlined them to Pharos House.  If it comes open earlier, I'm

21   happy.  If you find another alternative, I'm happy.  But I am

22   persuaded by Probation that Coolidge House was a disaster.  He

23   was reminding me, and I'd forgotten it, what a disaster it was.

24        MR. SWOMLEY:  It was a disaster not by anything that

25   Mr. Shields himself did.  It was a disaster because of another

1    inmate.

2         THE COURT:  I agree with that, but it was horrible.

3    And I remember the crisis meeting.  And it just makes sense for

4    him to go back to his home in Maine.  Pharos House has been

5    relatively successful for him, and he knows it, and they know

6    him, and he's been a success there.  I remember that woman came

7    down and testified for him.  It's just a better environment,

8    so --

9         MR. SWOMLEY:  And can I understand that if I or

10   Probation is able to come up with something that is comparable

11   in the interim in Maine, you would be willing to revisit that?

12        THE COURT:  Sure, I'll take a motion if there's

13   something comparable and everyone agrees on it, or even if they

14   don't, if I'm persuaded.  But right now I want to get this on

15   the record so that I can get the bed.  I don't want to wait.

16        MR. SWOMLEY:  Your Honor, thank you.

17        THE COURT:  I mean, I want the bed.  I don't have

18   another option right now.  So hopefully it's not going to

19   weight till July.  Is he in some sort of release at Butner so

20   it isn't quite as restrained at this point?  Are there like

21   little camps or boot camps or that sort of thing?  Aren't there

22   locations --

23        DR. HERNANDEZ:  Are you saying, is he being released?

24        THE COURT:  Is there something less restrictive at

25   Butner?  Don't you have little release communities right

1    outside the door, like community release?

2              DR. HERNANDEZ:  We do, your Honor.  Mr. Shields would

3    not be eligible for that.  I believe the treatment program is,

4    of all places, in the BOP.  Whether they have a fence or not is

5    probably the best for him.

6              THE COURT:  All right.  Well, I'm sure I'm going to --

7    I think I have a few more coming along the way.  Dr. Hernandez,

8    thank you for your help as always.  Dr. Malterer as well, thank

9    you.

10             I am hoping, Mr. Shields, that it will be successful

11   this time, and I'm hoping that Probation in Maine will work

12   closely with him to get him a job, if you could pass that

13   along.

14             MR. SMITH:  I will, your Honor.

15             THE COURT:  I don't know if they can be looking now.

16   Do they have employers up there, maybe like a factory or

17   something where there aren't kids, you know, in Maine, right?

18             MR. SMITH:  Your Honor, I'll ask them to look into

19   that.  It sounds like Attorney Swomley is going to maybe look

20   into it as well.

21             THE COURT:  Yes, so that's important.  Okay, thank you

22   very much to everyone.  And are you going to give me an order

23   of release, Ms. Serafyn, so I can sign something?

24             MS. SERAFYN:  Yes, your Honor.

25             THE COURT:  With all the conditions on it?

1          MS. SERAFYN:  Yes, your Honor.

2          THE COURT:  Get it to me ASAP, and then I'll sign it,

3    and we can immediately make the referral to Pharos.  You know,

4    like, I'll sign it today or tomorrow just to get it going.

5    Then if you want to move to modify, Mr. Swomley, do it, but I

6    just want to be in the pecking order for the priority for the

7    bed.

8          MR. SWOMLEY:  Thank you.

9          THE COURT:  And I'm very sorry again about your

10   mother, and I appreciate your being willing to go forward today

11   so we can get this judgment lodged.

12         MR. SWOMLEY:  Thank you, your Honor.

13         THE COURT:  All right, thank you.

14         MS. SERAFYN:  Thank you, your Honor.

15         THE CLERK:  All rise.

16         (Adjourned, 11:56 a.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                 )

5

6

7           I, Lee A. Marzilli, Official Court Reporter, do hereby

8   certify that the foregoing transcript, Pages 1 through 28

9   inclusive, was recorded by me stenographically at the time and

10  place aforesaid in Civil Action No. 07-12056-PBS, United States

11  of America v. Jeffrey Shields, and thereafter by me reduced to

12  typewriting and is a true and accurate record of the

13  proceedings.

14          Dated this 12th day of April, 2013.

15

16

17

18

19

                /s/ Lee A. Marzilli
20          _____
            LEE A. MARZILLI, RPR, CRR
21          OFFICIAL COURT REPORTER

22

23

24

25